Erwin Chemerinsky (*pro hac vice* forthcoming*)*
echemerinsky@law.berkeley.edu
Claudia Polsky (CA Bar No. 185505)
cpolsky@law.berkeley.edu
U.C. BERKELEY SCHOOL OF LAW
Law Building
Berkeley, CA 94720-7200
Telephone: 510.642.6483

Elizabeth J. Cabraser (CA Bar No. 83151)
ecabraser@lchb.com
Richard M. Heimann (CA Bar No. 63607)
rheimann@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000

Anthony P. Schoenberg (CA Bar No. 203714)
tschoenberg@fbm.com
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, CA 94104
Telephone: 415. 954.4400

*Attorneys for Plaintiffs and the Proposed Class*
[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEETA THAKUR, KEN ALEX, NELL GREEN NYLEN, ROBERT HIRST, CHRISTINE PHILLIOU, and JEDDA FOREMAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF GOVERNMENT EFFICIENCY ("DOGE"); AMY GLEASON, in her official capacity as Acting Administrator of the Department of Government Efficiency; NATIONAL SCIENCE FOUNDATION;<br><br>[*caption cont'd next page*] | Case No. 3:25-cv-4737____<br><br><br>**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

BRIAN STONE, in his official capacity as
Acting Director of the National Science
Foundation;
NATIONAL ENDOWMENT FOR THE
HUMANITIES;
MICHAEL MCDONALD, in his official
capacity as Acting Chairman of the National
Endowment for the Humanities;
UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY;
LEE ZELDIN, in his official capacity as
Administrator of the U.S. Environmental
Protection Agency;
UNITED STATES DEPARTMENT OF
AGRICULTURE;
BROOKE ROLLINS, in her official capacity as
Secretary of the U.S. Department of Agriculture;
AMERICORPS (a.k.a. the CORPORATION
FOR NATIONAL AND COMMUNITY
SERVICE);
JENNIFER BASTRESS TAHMASEBI, in her
official capacity as Interim Agency Head of
AmeriCorps;
UNITED STATES DEPARTMENT OF
DEFENSE;
PETE HEGSETH, in his official capacity as
Secretary of the U.S. Department of Defense;
UNITED STATES DEPARTMENT OF
EDUCATION;
LINDA MCMAHON, in her official capacity as
Secretary of the U.S. Department of Education;
UNITED STATES DEPARTMENT OF
ENERGY;
CHRIS WRIGHT, in his official capacity as
Secretary of Energy;
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of the U.S. Department of
Health and Human Services;
UNITED STATES CENTERS FOR DISEASE
CONTROL;
MATTHEW BUZZELLI, in his official capacity
as Acting Director of the Centers for Disease
Control;
UNITED STATES FOOD AND DRUG
ADMINISTRATION;
MARTIN A. MAKARY, in his official capacity
as Commissioner of the Food and Drug
Administration;
UNITED STATES NATIONAL INSTITUTES
OF HEALTH;
JAYANTA BHATTACHARYA, in his official
capacity as Director of the National Institutes of

3244440.7

1   Health;
    INSTITUTE OF MUSEUM AND LIBRARY
2   SERVICES;
    KEITH SONDERLING, in his official capacity
3   as Acting Director of the Institute of Museum
    and Library Services;
4   UNITED STATES DEPARTMENT OF THE
    INTERIOR;
5   DOUG BURGUM, in his official capacity as
    Secretary of the Interior;
6   UNITED STATES DEPARTMENT OF STATE;
    MARCO RUBIO, in his official capacity as
7   Secretary of the U.S. Department of State;
    DEPARTMENT OF TRANSPORTATION;
8   SEAN DUFFY, in his official capacity as
    Secretary for the U.S. Department of
9   Transportation,

10  Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................ 1

JURISDICTION AND VENUE ................................................................................. 6

THE PARTIES ............................................................................................................ 7

    A.    Plaintiffs ............................................................................................... 7

    B.    Defendants ........................................................................................... 7

CLASS ALLEGATIONS ......................................................................................... 11

FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS ........................... 14

I.    Throughout Decades of Federal Funding, the UC System Has Made Leading Contributions to Research that Benefit the Public .......................................... 14

II.    Congress's Power of the Purse Makes Illegal the Mass Termination of Grants at the President's Direction ............................................................. 18

III.    President Trump Issues a Flurry of Executive Orders and Creates DOGE, Unlawfully Directing Agencies to Terminate Grants ..................................... 20

IV.    Agencies that Terminated Lead Plaintiffs' Grants Have Acted According to a Common Unlawful Pattern ...................................................... 24

    A.    Environmental Protection Agency ..................................................... 25

        1.    Congress Established the EPA to Protect the Environment, Including Through Research .................................. 25

        2.    In Response to Trump Administration Directives, the EPA Improperly Changed Priorities and Canceled Existing Grants ................. 30

        3.    EPA Plaintiffs and Other Grant Recipients Are Harmed by EPA's Illegal Grant Terminations .......................................... 35

            a.    Plaintiff Neeta Thakur's Grant Termination and Resulting Harm ........................................................ 35

            b.    Plaintiff Ken Alex's Grant Termination and Resulting Harm ...... 39

            c.    Plaintiff Nell Green Nylen's Grant Terminations and Resulting Harm ........................................................ 41

    B.    National Endowment for the Humanities ............................................ 47

        1.    Congress Established NEH to Fund Projects to Support Humanities Research, Training, and Education .......................... 47

        2.    In Response to Trump Administration Directives, NEH Improperly Changed Priorities and Canceled Existing Grants .................................. 52

        3.    NEH Plaintiffs And Other Grant Recipients Are Harmed by NEH's Illegal Grant Terminations .......................................... 57

            a.    Plaintiff Robert Hirst's Grant Termination and Resulting Harm ........................................................ 57

            b.    Plaintiff Christine Philliou's Grant Termination and Resulting Harm ........................................................ 61

    C.    National Science Foundation .............................................................. 63

**TABLE OF CONTENTS**
(continued)

Page

      1.     Congress Established the National Science Foundation to Promote Scientific Research on a Broad Scale to Advance the United States' National Interests ................................................................................ 64

      2.     In Response to Trump Administration Directives, NSF Improperly Changed Priorities and Canceled Existing Grants .................................. 68

      3.     NSF Plaintiff and Other Grant Recipients Are Harmed by NSF's Illegal Grant Terminations ...................................................................... 72

          a.     Plaintiff Jedda Foreman's Grant Terminations and Resulting Harm ........................................................................................ 73

  D.     Allegations Against Additional Federal Agency Defendants .......................... 78

      1.     Department of Agriculture ................................................................. 78

      2.     AmeriCorps ....................................................................................... 80

      3.     Department of Defense ...................................................................... 81

      4.     Department of Education .................................................................... 82

      5.     Department of Energy ....................................................................... 83

      6.     Department of Health and Human Services, including the Centers for Disease Control, the Food and Drug Administration, and the National Institutes of Health ............................................................. 85

      7.     Institute of Museum and Library Services ........................................ 87

      8.     Department of the Interior, including National Park Service .................. 88

      9.     Department of State, including USAID .................................... 89

      10.    Department of Transportation ........................................................... 90

V.     The Trump Administration Is Threatening Additional, Illegal Funding Cuts to the UC System ............................................................................................................... 91

VI.    Unless Enjoined, Grant Terminations Will Cause Irreparable Harm to Plaintiffs, the Class, and the Nation ..................................................................................... 91

CLAIMS FOR RELIEF .............................................................................................. 92

COUNT I – Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions; Violation of Separation of Powers .................................................................... 92

COUNT II – Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions; Violation of First Amendment (Content and Viewpoint Discrimination) ..................... 93

COUNT III – Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions; Violation of Fifth Amendment (Due Process / Void for Vagueness) .............................. 95

COUNT IV – Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C): Contrary to Law; Illegal Departure from Impoundment Control Act, Statutes, and Regulations ................................................................................................... 96

COUNT V – Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A): Arbitrary and Capricious Failure to Engage in Reasoned Decision-making ................................. 97

PRAYER FOR RELIEF .............................................................................................. 99

Plaintiffs, individually and on behalf of all others similarly situated, allege for their

Complaint against the below-named Defendants as follows:

**INTRODUCTION**

1.      This class action for declaratory and injunctive relief is brought by and on

behalf of University of California researchers whose previously approved grants from the federal

agencies here named as Defendants have been or are threatened to be unlawfully terminated or

suspended. These terminations and suspensions occurred pursuant to Executive Orders or other

directives of Defendant President Donald J. Trump, issued from January 20, 2025 to present, that

were implemented through Defendant Department of Government Efficiency ("DOGE") and then

operationalized by myriad administrative agencies.

2.      Plaintiffs challenge these terminations and seek a declaration that they are

unconstitutional and otherwise unlawful because they violate the bedrock constitutional principle

of separation of powers; the First Amendment guarantee of free speech; the Fifth Amendment

guarantee of due process; the Impoundment Control Act of 1974; statutes requiring agencies to

fulfill congressionally defined missions; and the Administrative Procedure Act ("APA"). These

terminations bypassed Congress, ignored or contradicted the purposes for which Congress created

the granting agencies and appropriated funds, and dispensed with the regular procedures and due

process afforded grantees under the APA, in implementing the Trump Administration's political

"cost-cutting" agenda and ideological purity campaign.

3.      Plaintiffs seek, for themselves and the UC researchers class, an injunction

that restores their lost funding, enjoins further unlawful grant terminations or suspensions, and

provides the grant extensions necessary to enable them to effectively complete the work for

which these grants were approved. Plaintiffs and the Class are suffering, or will imminently

suffer, concrete harm to their research, their careers, and their professional standing.

4.      As used in this Complaint, "UC researchers" includes UC faculty, staff,

academic appointees, and employees, across the ten-campus University of California system, who

are or will imminently be suffering loss of research funding, research cessation or interruption, or

loss or reduction of employment, by the termination or suspension of previously approved grants since January 20, 2025.

5.    Grants to UC researchers each year from federal agencies as diverse as the National Science Foundation, National Institutes of Health, Department of Transportation, and Food and Drug Administration, ranging from thousands to millions of dollars, fund the production of new knowledge and fuel the development and deployment of discoveries useful to society.

6.    Federal grants have been key to the innovation that has consistently earned the UC system pride of place among research institutions, including first place in the National Academy of Inventors' list of universities worldwide with the most utility patents[1] and the UC Berkeley campus's rank of #1 public research in institution in the world for nine of the past ten years.[2]

7.    Before President Trump took office, federal agency grant making proceeded under the authority of Congress, which created agencies through its constitutionally assigned exclusive legislative power, and appropriated taxpayer funds for specific public purposes that the agencies were tasked to execute. For decades, agencies carried out these statutory directives and observed due process in making, renewing, and (only seldom) terminating grants. They each adhered to their own grant regulations, duly promulgated through notice and comment rulemaking under the APA, and followed APA procedures when modifying such regulations.

8.    As a corollary, on the rare occasions when agencies terminated grants, they did so pursuant to predictable, regularized processes; based terminations on proper review and evaluation of grantees' activities to assure compliance with the terms and purpose of the awarded grants; and terminated grants only for reasons stated in applicable regulations.

[1] Univ. of Cal., Office of the President, *Federal Investment in UC Research 2025* (2025), https://ucop.edu/communications/_files/federal-investment-in-uc-research-2025.pdf.
[2] Public Affairs, *Times Higher Ed Ranks UC Berkeley No. 1 Public University in U.S.*, UC Berkeley News (Oct. 9, 2024), https://news.berkeley.edu/2024/10/09/times-higher-ed-ranks-uc-berkeley-no-1-public-university-in-u-s/#:~:text=Berkeley%20has%20held%20the%20ranking,industry%20engagement%20and%20international%20outlook.

9.      All of this changed abruptly on January 20, 2025, when Defendant Trump attempted to seize direct control of federal agencies by bypassing Congress and upending the statutory and regulatory system under which federal agencies have historically and legally operated.

10.      On and after January 20, 2025, Defendants Trump and DOGE, through a flurry of Executive Orders and other directives, commanded the federal agencies named as Defendants in this Complaint ("Federal Agency Defendants") to terminate thousands of previously awarded research grants.

11.      Abrupt, wholesale, and unilateral termination of these grants has violated the Constitution's core principle of separation of powers and its guarantees of freedom of speech and due process; flouted the Impoundment Control Act limits on the Executive's ability to withhold or redirect congressionally appropriated money; ignored statutory requirements that agencies fulfill their substantive missions and fund congressionally specified activities; contravened agency-specific grant-making regulations that cannot by law be revised on an abrupt, unexplained, chaotic basis; and violated the APA through this arbitrary, capricious, and *ultra vires* conduct.

12.      The "Wall of Receipts" on the DOGE website boasts that federal agencies have terminated over 15,000 grants pursuant to DOGE's directions to date, reflecting terminations on a mass scale.[3]

13.      Agencies' proffered grounds for such terminations—if grounds were stated at all—were spurious. In some cases, agency correspondence to grantees asserted that grant termination would reduce public costs and promote government efficiency, although no evidence was provided to support this claim. In other cases, agency communications made it clear that grants were being terminated to further Defendant Trump's political objectives, which included

---

[3] Department of Government Efficiency, *Wall of Receipts*, DOGE.gov, https://doge.gov/savings (last visited May 30, 2025). While of questionable accuracy, the data displayed on the DOGE website demonstrate the Trump/DOGE objective: massive cuts to already appropriated and approved grants, without regard to merit.

the elimination of research on climate, environmental justice, "gender ideology," and "DEI" (diversity, equity and inclusion), although the latter terms were not defined.

14. The agencies that terminated grants did so on a categorical, *en masse* basis, without individual review or regard to a project's merit or a grantee's progress, and without any semblance of due process. The terminated and threatened grants that are the subject of this action were not terminated because they violated the terms of their grant applications or grant approvals, or strayed from the subject matter or purpose for which they were funded. Such deficiencies could have been addressed in the normal and ordered course of grant-making and review. To the contrary: these grant terminations were and are occurring, as their timing and reflection of the 2025 Executive Orders demonstrates, not because the research for which funding was approved had departed from its originally approved purpose, but because that purpose now offends the political agenda and ideological requirements of the Trump Administration.

15. Plaintiffs do not seek an Order immunizing all grants from termination or review, or changing agency grantmaking procedures as they existed prior to January 20, 2025. They do seek a return to the *status quo ante* of ordered grant processes, aligned with congressionally authorized purposes, and affording due process to grant recipients. This return to procedures that prevailed prior to January 20, 2025, and conformed to the norms of due process and the APA, by federal agencies that defer not to unilateral Executive dictates but to congressional authority, is the essential relief Plaintiffs seek.

16. Examining similar unlawful executive branch conduct by Defendants Trump and DOGE in the attempted reorganization (and gutting) of entire agencies, and the mass termination of hundreds of thousands of federal employees, the United States District Court (Illston, J.) stated in its May 22, 2025 Order Granting Preliminary Injunction in *American Federation of Government Employees*, *AFL-CIO v. Trump,* Case No. 25-cv-03698-51 (Dkt. 124):

> Presidents may set policy priorities for the executive branch, and agency heads may implement them. This much is undisputed. But Congress creates federal agencies, funds them, and gives them duties that—by statute—they must carry out. Agencies may not conduct large-scale reorganizations and reductions in force in blatant disregard of Congress' mandates, and a President may not initiate large-scale executive branch reorganization without partnering with

Congress. For this reason, nine Presidents over the last one hundred years have sought and obtained authority from Congress to reorganize the executive branch. Other Presidents—including President George W. Bush, President Obama, and President Trump in his first term—asked Congress for agency reorganization authority but did not receive it.

17.    In denying Defendants' request for a stay of the preliminary injunction in that case, the Ninth Circuit reaffirmed the bedrock principles that administrative agencies are creatures of Congress, not the President, and that "Congress has plenary control over the salary, duties, and even existence of federal offices." *Am. Fed'n of Gov't Emps. v. Trump*, —F.4th— (May 30, 2025) (citing *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477,500 (2010)).

18.    Here, Defendants have engaged in the same unprecedented and unlawful overreach described and enjoined above, in the context of mass terminations of research grants. Their playbook involves a trifecta of illegal moves. First, Defendant Trump issued facially unconstitutional Executive Orders and directives that usurped congressional authority and unlawfully discriminated against disfavored speech. Second, acting on presidential instruction, Defendant DOGE commanded agencies to adopt Trump's policies as their own by terminating scores of already awarded grants, notwithstanding that DOGE (whose own status as a governmental entity remains unclear) lacks legal authority to supervise administrative agencies. Third and finally, Federal Agency Defendants terminated grants on the stated basis that they were inconsistent with *agency priorities*, or otherwise in tension with Executive Orders and directives, when in fact the grants' inconsistency was with *executive preferences*. In so doing, agencies violated their statutory mandates, the APA, the constitutional Due Process guarantee, and their own regulations.

19.    Plaintiff UC researchers have suffered concrete financial, professional, and other harms from Federal Agency Defendants' unilateral termination of grants for projects to which they have already dedicated time and effort; for research upon which they have staked careers and reputations; and for work with research teams through which they endeavored to train

a next generation. Without judicial relief, these researchers will suffer irreparable injury to their research and their careers.

20.    As profoundly, these terminations have impaired and will impair the public-serving research mission of the UC system and the concern for public welfare that undergirds it.

21.    All of the Defendants' conduct, and the Plaintiffs' and Class members' resulting harm, proceeds directly from Defendant Trump's determination to erase the constitutional boundaries that separate the branches of government and assign defined powers to each. Specifically, the mass termination of federal agency grants that is the subject of this action proceeds from Defendant Trump's efforts to arrogate the law-making powers of Congress to himself.

22.    Plaintiffs and the Proposed Class will continue to suffer harm on an ongoing basis and will experience increasing and irreparable harm absent the declaratory and injunctive relief here sought.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the United States Constitution, federal statutes, and the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*., and 5 U.S.C. §§ 702, 704. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705-06.

24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are officers and agencies of the United States served in their official capacities, no real property is at issue in this case, and the Plaintiffs and many members of the Proposed Class are citizens of California and are residents of this District, where many of the federal grant terminations that are the subject of this suit, and the resulting harms to Plaintiffs and the Class, have occurred and will continue to occur unless enjoined.

**THE PARTIES**

A.    **Plaintiffs**

25.    Individual Plaintiff and Class Representative Neeta Thakur is a citizen of the United States and the State of California, and a member of the faculty at the University of California, San Francisco ("UCSF"), who engages in research. She resides in the Northern District of California.

26.    Individual Plaintiff and Class Representative Ken Alex is a citizen of the United States and the State of California, and has an academic appointment as a researcher at the University of California, Berkeley ("UC Berkeley"). He resides in the Northern District of California.

27.    Individual Plaintiff and Class Representative Robert Hirst is a citizen of the United States and the State of California, and has an academic appointment as a researcher at the Bancroft Library at UC Berkeley. He resides in the Northern District of California.

28.    Individual Plaintiff and Class Representative Christine Philliou is a citizen of the United States and the State of California, and a member of the faculty at UC Berkeley who engages in research. She resides in the Northern District of California.

29.    Individual Plaintiff Nell Green Nylen is a citizen of the United States and the State of California, and has an academic appointment as a researcher at UC Berkeley. She resides in the Northern District of California.

30.    Individual Plaintiff and Class Representative Jedda Foreman is a citizen of the United States and the State of California, and has an academic appointment as a researcher at UC Berkeley. She resides in the Northern District of California.

B.    **Defendants**

31.    Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

32.    Defendant Department of Government Efficiency ("DOGE") is a federal agency headquartered in Washington, D.C. DOGE is a federal agency within the meaning of the

APA, 5 U.S.C. §551(1). Upon information and belief, DOGE is now headed by Defendant Trump and every member of his cabinet.

33.    Defendant Amy Gleason is the Acting Administrator of DOGE and is sued in her official capacity.

34.    The following federal departments and agencies, including their identified leaders, are sometimes referred to collectively herein as the "Federal Agency Defendants."

35.    Defendant National Science Foundation ("NSF") is a federal agency headquartered in Alexandria, Virginia. NSF is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

36.    Defendant Brian Stone is Acting Director of NSF and is sued in his official capacity.

37.    Defendant National Endowment for the Humanities ("NEH") is a federal agency headquartered in Washington, D.C. NEH is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

38.    Defendant Michael McDonald is Acting Chairman of NEH and is sued in his official capacity.

39.    Defendant United States Environmental Protection Agency ("EPA") is a federal agency headquartered in Washington, D.C. EPA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

40.    Defendant Lee Zeldin is the Administrator for the EPA and is sued in his official capacity.

41.    Defendant United States Department of Agriculture ("USDA") is a federal agency headquartered in Washington, D.C. USDA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

42.    Defendant Brooke Rollins is Secretary of USDA and is sued in her official capacity.

1          43.    Defendant AmeriCorps, also known as the Corporation for National and

2    Community Service, is a federal agency headquartered in Washington, D.C. AmeriCorps is a

3    federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

4          44.    Defendant Jennifer Bastress Tahmasebi is Interim Agency Head of

5    AmeriCorps and is sued in her official capacity.

6          45.    Defendant United States Department of Defense ("Defense") is a federal

7    agency headquartered in Washington, D.C. Defense is a federal agency within the meaning of the

8    APA, 5 U.S.C. § 551(1).

9          46.    Defendant Pete Hegseth is Secretary of Defense and is sued in his official

10   capacity.

11         47.    Defendant United States Department of Education ("Education") is a

12   federal agency headquartered in Washington, D.C. Education is a federal agency within the

13   meaning of the APA, 5 U.S.C. § 551(1).

14         48.    Defendant Linda McMahon is Secretary of Education and is sued in her

15   official capacity.

16         49.    Defendant United States Department of Energy ("DOE") is federal agency

17   headquartered in Washington, D.C. DOE is a federal agency within the meaning of the APA, 5

18   U.S.C. § 551(1).

19         50.    Defendant Chris Wright is Secretary of DOE and is sued in his official

20   capacity.

21         51.    Defendant United States Department of Health and Human Services

22   ("HHS") is a federal agency headquartered in Washington, D.C. HHS is a federal agency within

23   the meaning of the APA, 5 U.S.C. § 551(1).

24         52.    Defendant Robert F. Kennedy, Jr. is Secretary of HHS and is sued in his

25   official capacity.

26         53.    Defendant United States Centers for Disease Control ("CDC"), housed

27   within HHS, is federal agency headquartered in Atlanta, Georgia. CDC is a federal agency within

28   the meaning of the APA, 5 U.S.C. § 551(1).

1          54.     Defendant Matthew Buzzelli is Acting Director of CDC and is sued in his

2 official capacity.

3          55.     Defendant United States Food and Drug Administration ("FDA"), housed

4 within HHS, is a federal agency headquartered in Silver Spring, Maryland. FDA is a federal

5 agency within the meaning of the APA, 5 U.S.C. § 551(1).

6          56.     Defendant Martin Makary is Commissioner of the FDA and is sued in his

7 official capacity.

8          57.     Defendant United States Institutes of Health ("NIH"), housed within HHS,

9 is federal agency headquartered in Bethesda, Maryland. NIH is a federal agency within the

10 meaning of the APA, 5 U.S.C. § 551(1).

11         58.     Defendant Jayanta Bhattacharya is Director of NIH and is sued in his

12 official capacity.

13         59.     Defendant Institute of Museum and Library Services ("IMLS") is a federal

14 agency headquartered in Washington, D.C. ILMS is a federal agency within the meaning of the

15 APA, 5 U.S.C. § 551(1).

16         60.     Defendant Keith Sonderling is Acting Director of IMLS and is sued in his

17 official capacity.

18         61.     Defendant United States Department of the Interior ("Interior or DOI") is a

19 federal agency headquartered in Washington, D.C. Interior is a federal agency within the meaning

20 of the APA, 5 U.S.C. § 551(1).

21         62.     Defendant Doug Burgum is Secretary of the Interior and is sued in his

22 official capacity.

23         63.     Defendant United States Department of State ("State") is a federal agency

24 headquartered in Washington, D.C. State is a federal agency within the meaning of the APA, 5

25 U.S.C. § 551(1).

26         64.     Defendant Marco Rubio is Secretary of State and is sued in his official

27 capacity.

28

65.     Defendant Department of Transportation ("DOT") is a federal agency

headquartered in Washington, D.C. DOT is a federal agency within the meaning of the APA, 5

U.S.C. § 551(1).

66.     Defendant Sean Duffy is Secretary of DOT and is sued in his official

capacity.

### CLASS ALLEGATIONS

67.     Neeta Thakur, Ken Alex, Nell Green Nylen, Robert Hirst, Christine

Philliou, and Jedda Foreman ("Plaintiffs" or "Class Representatives") bring this action as a class

action for declaratory and injunctive relief pursuant to Federal Rule of Civil Procedure 23(a)(1)-

(4) and 23(b)(2). They bring this suit on behalf of themselves and all similarly situated University

of California researchers whose federally funded grants have been or will be imminently

terminated or suspended by Defendants absent (a) a declaratory judgment that such Executive

Orders and directives are illegal; and (b) injunctive relief enjoining further terminations and

restoring the terminated grants to enable class members to complete their interrupted work. These

Class Representatives seek certification of a class (the "Plaintiff Class"), sometimes referred to

collectively in this Complaint for convenience as "UC researchers." and defined as and consisting

of:

> All University of California researchers, including faculty, staff,
> academic appointees, and employees across the University of
> California system ("UC researchers") whose research grants have
> been or will be terminated, denied, suspended, or reduced by any of
> the Defendants pursuant to Executive Orders 14151, 14154, 14158,
> 14168, 14173, 14217, 14238, and/or 14222, and/or other directives
> of the Trump Administration or DOGE, from and after January 20,
> 2025.

68.     This action meets all of the Rule 23(a) prerequisites for maintaining a class

action. The Plaintiff Class is so numerous that individual joinder of all its members is

impracticable, satisfying Rule 23(a)(1). The ten-campus UC System has more than 265,000

faculty and staff,[4] hundreds to thousands of whom conduct billions of dollars of federally funded

---

[4] Univ. of California, *About Us*, https://www.universityofcalifornia.edu/about-
us#:~:text=The%20University%20of%20California%20opened,and%20working%20around%20t
he%20world. (last visited May 28, 2025).

research annually. In 2024, for example, UC Berkeley researchers alone received nearly $1 billion in new research grants. Of this amount, 51% (approximately $420 million), came from federal grants. On this single campus, as of May 15, 2025, there were more than 2,000 open federal research grants (*i.e.,* ones whose termination date has not arrived). Many of these have now been terminated, suspended, or face imminent termination by the unlawful actions of Defendants. Plaintiffs do not yet know the exact number of the UC researchers whose work has been terminated or imminently threatened by the Defendants' conduct at issue in this suit, but are informed and believe that hundreds or thousands of researchers' grants and work, and their research staff's jobs, have been and will be impacted by such conduct. For example, the National Science Foundation (NSF) published a list of terminated grants that includes nearly 80 grants terminated across the UC System by *NSF alone*; a quick review of the terminated grants suggests terminations occurred because the grant titles contain now-suspect DEI-related words such as "equity."[5] A preliminary list of over 30 terminated grants across several federal agencies at UC Berkeley shows the same pattern. Further, databases compiled by news media and nonprofits have also identified over 100 National Institutes of Health (NIH) grants made to UCSF, UC Los Angeles, and UC San Diego researchers that have since been terminated.[6]

69.    The claims of the Plaintiff Class members share important and indeed pivotal common questions of law and fact, including but not limited to whether the Defendants' actions pursuant to the Executive Orders and directives described in this Complaint are unconstitutional and unlawful exercises of executive power, because they usurp Congress's spending authority and also violate the Impoundment Control Act of 1974; whether Defendants' actions are further unconstitutional because they violate Plaintiff Class members' First Amendment right to free speech and Fifth Amendment right to due process; whether they are further unlawful because they violate statutes through which Congress has created the defendant

---

[5] NSF, *Is there a publicly available list of the awards NSF has terminated?*, https://www.nsf.gov/updates-on-priorities#termination-list (last updated May 23, 2025).

[6] Irena Hwang et al., *The Gutting of America's Medical Research: Here is Every Canceled or Delayed N.I.H. Grant*, N.Y. Times (June 4, 2025), https://www.nytimes.com/interactive/2025/06/04/health/trump-cuts-nih-grants-research.html?smid=nytcore-ios-share&referringSource=articleShare.

agencies and determined their purposes, functions, and goals, and additional statutes through

which Congress gives agencies substantive instruction, usurping Congress's legislative authority;

and whether Defendants' actions are arbitrary and capricious, an abuse of discretion, or otherwise

contrary to law, in violation of the APA.

70.     Because the claims of the Plaintiff Class members share common issues of

law and fact, they will not require individualized determinations of the circumstances of any

plaintiff, and satisfy Rule 23(a)(2) for purposes of the requested declaratory and injunctive relief.

71.     The claims of the Class Representatives are typical of the claims of the

members of the Plaintiff Class, because they arise out of the Defendants' common conduct,

satisfying Rule 23(a)(3). Like other members of the class, the Class Representatives have been

concretely harmed, economically, professionally, and reputationally, by Defendants' arbitrary,

capricious, and unlawful actions in categorically terminating or delaying their research grants

under color of Defendant Trump's Executive Orders and/or at the direction of DOGE. The timing

and sheer volume of these terminations (DOGE boasts of over 15,0000 such terminations of

grants nationwide in the space of less than 100 days) shows that these determinations were

without due process or due regard for the individual merits, scientific importance, or public

benefit of the projects affected. Class Representatives and the Plaintiff Class have been similarly

and further harmed by Defendants' failure to adequately explain their actions and decisions. Each

of these actions, independently and collectively, have caused harm to the Class Representatives

and the Plaintiff Class members.

72.     The Class Representatives will fairly and adequately protect the interests of

the Plaintiff Class, satisfying Rule 23(a)(4). They will defend the rights of all proposed class

members fairly and adequately, and have no interest that is now or may be potentially

antagonistic to the interests of the Plaintiff Class. The attorneys representing the Plaintiff Class

Representatives include constitutional, civil rights, environmental, and administrative law experts

and litigators with decades of experience in their respective fields, and class action attorneys with

similar experience and scores of court appointments as class counsel in federal litigation. These

attorneys may and should be appointed as class counsel in this action.

73.     The members of the Plaintiff Class are readily ascertainable through Defendants' own grant records, and the grant-related communications they have issued to Class members pursuant to Executive Orders and/or at the direction of the Trump Administration and/or DOGE.

74.     Through federal research grant cancellations, suspensions, and delays imposed categorically, pursuant to Executive Orders or other Trump Administration directives, in violation of the APA, and in violation of other statutes and the Constitution as alleged in this Complaint, Defendants have acted, have threatened to act, and will continue to act on grounds generally applicable to the Plaintiff Class, thereby making final equitable and declaratory relief appropriate to the Class as a whole. The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(2).

75.     Numerous individual lawsuits alleging similar conduct and claims would disserve the interests of judicial economy, as well as the interests of litigants and the public in the just, speedy, and inexpensive determination of these claims.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

**I.     Throughout Decades of Federal Funding, the UC System Has Made Leading Contributions to Research that Benefit the Public**

76.     The University of California (the "UC System") is the world's leading public research institution. Comprised of ten campuses, three affiliate national laboratories, and dozens of institutes, centers, and research laboratories across California, the UC System has made—and continues to make—outsize contributions to research that have changed the world, and enhanced human knowledge, while contributing to the national security and global prominence of the United States, and the health and welfare of all Americans.

1    77.    Without the UC System's research, for example, the world would not have

2    the internet,[7] plug-in hybrid cars,[8] or the world's largest 3-D map of the universe.[9]

3    78.    In the medical realm, UC System research has led to development of MRI

4    machines,[10] cochlear implants that restore hearing,[11] a universal viral vaccine,[12] a brain implant

5    that prevents Parkinson's symptoms,[13] and the use of CRISPR gene-editing to cure sickle cell

6    disease.[14] In the past 30 years, decades of UC cancer research has saved nearly 4 million lives.[15]

7    79.    The UC System has produced 70 Nobel Prize winners, 101 MacArthur

8    "Genius" grant award winners, 66 National Medal of Science winners, and 42 Pulitzer Prize

---

[7] Pranay Bhattacharyya, *UCLA: Birthplace of the Internet*, US Tech News (April 28, 2021), https://uctechnews.ucop.edu/ucla-birthplace-of-the-internet/#:~:text=ARPANET%3A%20 The%20Beginning,first%20two%20letters%20were%20sent.

[8] USPath Center, *4 Unexpected Discoveries from UC*, UCPath Jobs, https://ucpathjobs.org/lifestyle/4-unexpected-discoveries-uc/ (last visited May 27, 2025).

[9] Michael Levi, *First Results from DESI Make the Most Precise Measurement of Our Expanding Universe*, Berkeley Lab News Center (April 4, 2024), https://newscenter.lbl.gov/2024/04/04/desi-first-results-make-most-precise-measurement-of-expanding-universe/.

[10] Kara Manke, *Jerome R. Singer, pioneer of magnetic resonance imaging, dies at 97,* US Berkeley News (August 6, 2019), https://news.berkeley.edu/2019/08/06/jerome-r-singer-pioneer-of-magnetic-resonance-imaging-dies-at-97/#:~:text=Jerome%20R.-,Singer%2C%20pioneer%20of%20magnetic%20resonance %20imaging%2C%20dies%20at%2097,and%20blood%20volume%20in%20mice.

[11] Pete Farley, *Neuroscientist Wins Prize for Cochlear Implant Contributions*, University of California (January 8, 2015), https://www.universityofcalifornia.edu/news/neuroscientist-wins-prize-cochlear-implant-contributions.

[12] Jules Bernstein, *Vaccine Breakthrough Means No More Chasing Strains*, University of California, Riverside (April 15, 2024), https://news.ucr.edu/articles/2024/04/15/vaccine-breakthrough-means-no-more-chasing-strains.

[13] Robin Marks, *New Parkinson's Treatment Helps Former Pro Keep Skateboarding*, U. of Cal. San Francisco (Apr. 19, 2024), https://www.ucsf.edu/news/2024/04/427391/new-parkinsons-treatment-helps-former-pro-keep-skateboarding.

[14] Robert Sanders, *FDA Approves First Test of CRISPR to Correct Genetic Defect Causing Sickle Cell Disease*, University of California (Apr. 1, 2021),https://www.universityofcalifornia.edu/news/fda-approves-first-test-crispr-correct-genetic-defect-causing-sickle-cell-disease.

[15] Julia Busiek, *What Cuts to NIH Funding Mean for Cancer Patients and Their Families*, University of California (Feb. 26, 2025), https://www.universityofcalifornia.edu/news/what-cuts-nih-funding-mean-cancer-patients-and-their-families.

- 15 -

winners.[16] Since 2013, the UC System has topped the National Academy of Inventors' list of universities worldwide with the most utility patents.[17]

80.     Through continual development of new technologies, UC research stimulates the economy by creating jobs, companies, industries, and scientific advancements that continue to change the world. Entire industries have grown out of UC research, including biotechnology, computing, semiconductors, telecommunications, and agriculture.[18]

81.     UC research prowess has continued at breakneck speed. The UC System averages four new inventions *per day*. In 2023, 78 startups were launched using UC intellectual property or technology.[19] UC research quite literally shapes the future: 8.2% of all U.S. academic research is conducted by UC researchers.[20]

82.     Such achievements would not be possible without federal funding. For years, the UC System has partnered with the federal government to deliver groundbreaking innovations that have made the American public healthier, safer, smarter, and better able to compete in a global market.

83.     Federal funding is the single most important source of UC research funding, historically accounting for more than half of the UC System's total research awards.[21] In fiscal year 2024, the UC System received $4.069 *billion* in federal research awards. This covered 10,256 distinct awards.[22]

84.     The UC System receives more National Institutes of Health ("NIH") and National Science Foundation ("NSF") funding than any other institution.[23] And these are far from the only agencies to offer significant support to UC research.

---

[16] Univ. of Cal., *The University of California at a Glance*, Univ. of Cal. (Feb. 25, 2025), https://ucop.edu/institutional-research-academic-planning/_files/uc-facts-at-a-glance.pdf.
[17] Univ. of Cal., *Federal Investment in UC Research,* Univ. of Cal. (Apr. 2025), https://ucop.edu/communications/_files/federal-investment-in-uc-research-2025.pdf.
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*

85.    In fiscal year 2024, the UC System received approximately the following amounts by agency:[24]

- $2.54 billion – NIH
- $525 million – NSF
- $326 million – Defense
- $160 million – Energy
- $122 million – other HHS
- $104 million – NASA
- $86 million – USDA
- $68 million – Commerce
- $39 million – Interior
- $27 million – Education
- $20 million – State
- $47 million – other agencies

86.    These stable federal funding sources, and the research talent they attract and empower, have enabled the UC System to make its outsize contributions to human progress for decades. Because the very nature of research requires years of ongoing work, the UC system has operated research programs across presidential administrations for generations.

87.    The innovations described above are the result of a successful partnership between the UC System and the federal government, and indeed would be impossible if federal grant funding were terminated.

88.    This research, of course, is carried out by faculty members and other research personnel in the UC system. These individuals' careers—their hiring, their tenure, their advancement—all depend on research that is often supported by federal grants.

---

[24] *Id.*

- 17 -

1

2

**II.    Congress's Power of the Purse Makes Illegal the Mass Termination of Grants at the President's Direction**

3    89.    The partnership between the UC System and the federal government is a

4    product of Congress's powers, and by design insulated from political winds in the executive

5    branch. Congress has repeatedly emphasized the importance of federally funded research as

6    critical to the strength and security of the nation, and has used its powers to set research priorities

7    and appropriate funds to federal agencies to carry out those priorities.

8    90.    Congress has the constitutional power to appropriate funds for such

9    research and to create agencies necessary to implement federal policies. Article I vests Congress

10    with the legislative power to create departments, agencies, and offices within the executive

11    branch, to define their duties, and to fund their activities. U.S. Const. art. I, §1 ("All legislative

12    Powers herein granted shall be vested in a Congress of the United States.").

13    91.    Congress's legislative power includes "the establishment of offices... [and]

14    the determination of their functions." *Myers v. United States*, 272 U.S. 52, 129 (1926); U.S.

15    Const. art I, § 8, cl. 18. "Administrative agencies are creatures of statute," and do not exist or

16    have purpose without Congress's direction. *See Nat'l Fed'n of Indep. Bus v. Dep't of Lab.,*

17    *OSHA*, 595 U.S. 109, 117 (2022). Congress thus establishes executive agencies and crafts the

18    statutes that govern each agency's administration. *See, e.g.*, 10 U.S.C. §§ 111, 113 (Defense); 16

19    U.S.C. § 551 (Agriculture); 42 U.S.C. §§ 202, 203 (HHS); 42 U.S.C. §§ 218, 282 (NIH); 42

20    U.S.C. § 7131 (Energy).

21    92.    Congress also holds the power of the federal purse. Indeed, Congress's

22    powers to set the policies of the nation are at their apex when it comes to spending money, as the

23    Constitution "exclusively grants the power of the purse to Congress, not the President." *City &*

24    *Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). Congress makes its

25    priorities clear by appropriating funds to agencies to carry out specified activities.

26    93.    The Constitution requires the President, meanwhile, to "take Care that the

27    Laws be faithfully executed." U.S. Const., art. II, § 3. The "Take Care Clause" assures that

28    "Congress makes the laws and the President faithfully executes them." *Utility Air Reg. Grp. v.*

*Envtl. Prot. Agency*, 573 U.S. 302, 327 (2014) (cleaned up). This includes ensuring the appropriation of funds per Congress's direction.

94.    The executive branch has *no* constitutional authority to refuse to carry out laws enacted by Congress, and it has no constitutional authority to block, amend, subvert, or delay spending appropriated monies based on the President's own policy preferences. For nearly two hundred years, it has been established that the Executive violates the Take Care Clause when it ignores, refuses to execute, or purports to override statutes. *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838).

95.    A President's Executive Order cannot override Congress's express direction. The President "is without authority to set aside congressional legislation by executive order." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999). Rather, the "President's power, if any, to issue [an] order must stem from either an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

96.    The President has no power to order the rescission of funds. If the President wants funds rescinded, he may *ask* Congress to do so pursuant to the Impoundment Control Act ("ICA"), 2 U.S.C. § 681 *et seq.* Under the ICA, the President can "transmit to both Houses of Congress a special message specifying," among other criteria, the amount of budget authority he proposes be rescinded, the reasons why it should be rescinded, and the effect of the proposed rescission on the "objects, purposes, and programs for which the budget authority is provided." *Id.* § 683(a). Unless Congress passes a rescission bill that covers the President's request within 45 days, however, the funds shall be made available. *Id.* § 683(b).

97.    Even under the ICA—which clearly states it cannot interfere with the Constitutional separation of powers, § 681(1)—the President is constrained. His requests for rescission cannot "supersed[e] any provision of law which *requires* the obligation of budget authority or the making of outlays." 2 U.S.C. § 681 (emphasis added). Nor can the President request reductions of *already obligated* funds, including grants. *See id.* § 683; Congressional Budget Office, *CBO Explains How It Estimates Savings From Rescissions* (May 26, 2023),

1  https://www.cbo.gov/publication/59209 (explaining a rescission will not impact funds that are

2  obligated).

3      98.    In short, once Congress has allocated money for grants or directed agencies

4  to use funding to carry out research, the President cannot unilaterally refuse to spend or to redirect

5  such funds. Nor can agency leaders, substituting the President's directives for Congress's,

6  terminate without lawful cause grants that were awarded pursuant to congressional directives.

7  Such refusal to spend money appropriated by Congress violates both the separation of powers and

8  the Impoundment Control Act.

9  **III.    President Trump Issues a Flurry of Executive Orders and Creates DOGE,**
   **Unlawfully Directing Agencies to Terminate Grants**

10

11     99.    Beginning on Inauguration Day (January 20, 2025), Defendant Trump

12  issued a number of broad directives through Executive Orders (EOs). These included demands on

13  federal agencies to take action to comply with the President's agenda.

14     100.    In particular, Defendant Trump and his administration explicitly and

15  implicitly called on federal agencies to "terminate" previously awarded grant funds. In so doing,

16  the Administration did not comply with Congress's prior spending decisions and direction.

17     101.    For example, Executive Order No. 14151, dated January 20, 2025 and

18  titled "Ending Radical and Wasteful Government DEI Programs and Preferencing," instructs the

19  Attorney General and others to "coordinate the termination of all discriminatory programs,

20  including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates,

21  policies, programs, preferences, and activities in the Federal Government, under whatever name

22  they appear." Additionally, it directs each federal agency head to "terminate, to the maximum

23  extent allowed by law… all 'equity-related' grants or contracts" within 60 days.[25]

24     102.    EO No. 14173, titled "Ending Illegal Discrimination and Restoring Merit-

25  Based Opportunity," addresses purported "immoral race- and sex-based preferences under the

26

27  [25] Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025),

28  https://www.federalregister.gov/documents/2025/01/29/2025-01953/ending-radical-and-wasteful-government-dei-programs-and-preferencing.

guise of so-called [DEI] or [DEIA]." The order requires the Director of OMB to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing  equity,' and like mandates, requirements, programs, or activities, as appropriate."[26]

103.    On January 20, 2025, Defendant Trump also issued EO No. 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," directing that "federal funds shall not be used to promote gender ideology," instructing federal agencies to revise grant conditions accordingly, and defining "gender ideology" as a "false claim" that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity," and that "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex."

104.    On January 20, 2025, Defendant Trump further issued EO No. 14154, "Unleashing American Energy," which directed federal agencies to "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58)." The EO called out specific grant programs, and more generally, directed the agencies to "review their processes, policies, and programs for issuing grants."[27]

105.    On February 19, 2025, Defendant Trump issued EO No. 14217, "Commencing the Reduction of the Federal Bureaucracy." The EO deemed several government entities "unnecessary," and directed that any non-statutory components or functions be "eliminated." The Order also stated that any "grant requests" by these entities should be denied.[28]

---

[26] Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633, (Jan. 21, 2025), https://www.federalregister.gov/documents/2025/01/31/2025-02097/ending-illegal-discrimination-and-restoring-merit-based-opportunity.

[27] Exec. Order No. 14154, *Unleashing American Energy*, 90 Fed. Reg. 8353 (Jan. 29, 2025), https://www.federalregister.gov/documents/2025/01/29/2025-01956/unleashing-american-energy.

[28] Exec. Order No. 14217, *Commencing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 10577 (Feb. 25, 2025), https://www.federalregister.gov/documents/2025/02/25/2025-

106.    On March 14, 2025, Defendant Trump issued EO No. 14238, "Continuing the Reduction of the Federal Bureaucracy." This order listed additional entities determined by Defendant Trump to be "unnecessary," and again directed that grant requests be rejected.[29]

107.    Moreover, to force agencies into complying with his personal agenda, Defendant Trump signed EO No. 14158 on January 20, 2025, "Establishing and Implementing the President's 'Department of Governmental Efficiency,'" commonly known as "DOGE." The EO required the head of each federal agency to establish a team of at least four DOGE employees within their agency.[30]

108.    According to the Order, DOGE would be "dedicated to advancing the President's 18-month DOGE agenda." *Id.* Although the "DOGE agenda" has never been publicly disclosed, DOGE's targets for ostensible "efficiency" improvements have, in practice, born considerable resemblance to the Executive agenda manifest in Defendant Trump's EOs.

109.    On February 26, 2025, Defendant Trump doubled down. He issued EO No. 14222, "Implementing the President's 'Department of Governmental Efficiency' Cost Efficiency Initiative."[31] Notwithstanding that the Constitution allocates spending power to Congress alone, the Order purported to begin the Executive's "transformation in Federal spending on contracts, grants, and loans." This Order required federal agencies to review all existing grants with an eye toward termination:

> Each Agency Head, in consultation with the agency's DOGE Team Lead, shall review all existing covered contracts and grants and, where appropriate and consistent with applicable law, terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate spending

03133/commencing-the-reduction-of-the-federal-bureaucracy.

[29] Exec. Order No. 14238, *Continuing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 13043 (Mar. 20, 2025), https://www.federalregister.gov/documents/2025/03/20/2025-04868/continuing-the-reduction-of-the-federal-bureaucracy.

[30] Exec. Order No. 14158, *Establishing and Implementing the President's "Department of Government Efficiency"*, 90 Fed. Reg. 8441 (Jan. 29, 2025), https://www.federalregister.gov/documents/2025/01/29/2025-02005/establishing-and-implementing-the-presidents-department-of-government-efficiency.

[31] Exec. Order No. 14222, *Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*, 90 Fed. Reg. 11095 (Mar. 3, 2025), https://www.federalregister.gov/documents/2025/03/03/2025-03527/implementing-the-presidents-department-of-government-efficiency-cost-efficiency-initiative.

1
2
3
4

to promote efficiency and advance the policies of my Administration. This process shall commence immediately and shall prioritize the review of funds disbursed under covered contracts and grants to educational institutions and foreign entities for waste, fraud, and abuse. Each Agency Head shall complete this review within 30 days of the date of this order.

5     110.    According to DOGE's self-described "Wall of Receipts," as of June 3,

6     2025, federal agencies had terminated over 15,000 grants, totaling roughly $44 billion in

7     "savings." [32]

8     111.    Despite multiple successful legal challenges to President Trump's EOs and

9     related directives,[33] Defendants have unlawfully terminated grants and continue to terminate

10    grants previously awarded to Plaintiffs and the Class.

11    112.    Indeed, according to data posted by DOGE, the federal government has

12    already terminated over **$324 million**[34] in grants made to the UC system. The harm to UC

13    researchers cannot be overstated.

14    113.    This lawsuit arises because, in unilaterally terminating Plaintiffs' federal

15    grants without lawful cause, Defendants are flouting constitutional limits on the Executive's

16    authority; violating the First Amendment's prohibition on viewpoint discrimination; denying due

17
18

---

19    [32] Department of Government Efficiency, *Savings*, DOGE.gov, https://doge.gov/savings (last visited June 3, 2025).

20    [33] *See, e.g.*, *Nat'l Assn. of Diversity Officers in Higher Education v. Trump*, No. 25-cv-0333-ABA

21    (D. Md. Feb. 21, 2025) ECF No. 45 (preliminarily enjoining provisions requiring agencies to terminate equity-related grants); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir. Mar. 14, 2025), ECF No. 29 (staying preliminary injunction pending appeal);

22    *Washington v. Trump*, No. 2:25-cv-244-LK (W.D. Wash. Feb. 28, 2025) ECF No. 50 (on February 28, 2025, preliminary enjoining sections that condition, withhold, or end federal funding

23    in Plaintiffs states Colorado, Minnesota, Oregon, and Washington); *PFLAG, Inc. v. Donald J. Trump*, No. 8:25-cv-00337-BAH (D. Md. Mar. 4, 2025) ECF No. 116 (on March 4, 2025,

24    preliminarily enjoining the same nationwide); *New York v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I Jan. 31, 2025), ECF No. 50 (preliminarily enjoining federal agency defendants from "pausing,

25    freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds to the States under awarded grants, executed contracts, or other

26    executed financial obligations," based on both the OMB directive and Executive Orders, including the DEI and Gender Ideology Executive Orders).

27    [34] This number was produced by searching DOGE data posted at https://api.doge.gov/docs, which is accessible through DOGE's "Wall of Receipts" at https://doge.gov/savings. The $324 million

28    was determined by looking at "Savings" under the "Grants" category, for entries in which the UC system was listed as a recipient.

process of law under the Fifth Amendment; ignoring agency-specific statutory directives; and violating the APA.

114.    That these grant terminations violate the separation of powers became even clearer on May 28, 2025. Until then, DOGE was headed by Elon Musk. Now, according to the White House Press Secretary, DOGE will be led by "each and every member of the President's cabinet and the President himself, who is wholeheartedly committed to cutting waste, fraud and abuse from our government."[35] There is no longer any illusion that DOGE is more than a proxy for Defendant Trump and his priorities. The White House reiterated that each Cabinet secretary would work with DOGE employees at their agencies so that the "mission of DOGE will continue."[36] The DOGE Trojan Horse has been welcomed inside the gates of the Federal Agency Defendants, and the harms to Plaintiffs and the Class thus will continue and very likely increase.

115.    In adopting, implementing, and enforcing Defendant Trump's "priorities" to illegally terminate grants, Defendants have caused and will continue to cause significant concrete harm to Plaintiffs and the Class, as well as the UC System and the broader public that benefits from UC research, discovery, and inventions.

## IV. Agencies that Terminated Lead Plaintiffs' Grants Have Acted According to a Common Unlawful Pattern

116.    On information and belief, all Federal Agency Defendants similarly and abruptly failed to continue grants pursuant to Congress's directives, instead substituting Defendant Trump's agenda. In place of reasoned decision-making, the federal agencies took direction not only from the flurry of Executive Orders described herein, but in most instances also took direction directly from DOGE staffers, who have no authority to direct or redirect allocation of federal funds. Indeed, in other cases, the United States, per its Department of Justice counsel, has on the record taken the position that Elon Musk—who helmed DOGE until days ago—did not

---

[35] Diana Stancy, *White House Discloses Who Will Lead DOGE Efforts After Musk's Departure*, Fox News (May 29, 2025), https://www.foxnews.com/politics/white-house-discloses-who-will-lead-doge-efforts-after-musks-departure.

[36] *Id.*

occupy an "office," lacked a title conferring formal authority, and was thus beyond judicial review or legal consequence.[37]

117.    In terminating scores of already awarded federal grants, the Federal Agency Defendants acted recklessly in disregarding the law, failing to consider reliance interests, and failing to consider the harm resulting from immediately stopping ongoing research studies. These included terminations of grants that would require halting human drug trials midstream forcing researchers to breach basic principles of medical ethics.

118.    Moreover, the Federal Agency Defendants conducted no proper review of grants, instead mass-terminating with form letters those grants they deemed (with no explanation) to no longer "effectuate" agency priorities, notwithstanding that agencies cannot substitute the President's agenda for their congressionally imposed statutory mandates.

119.    This Complaint examines the errant grant practices at the three Agencies that terminated Named Plaintiffs' grants—EPA, NEH, and NSF—and then describes how this same pattern played out within each Federal Agency Defendant, to the categorical and common detriment of the Class of UC researchers. There are UC researchers with grants from each and all of these agencies, including grants that have been or are very likely to be arbitrarily terminated.

A.    **Environmental Protection Agency**

120.    The Environmental Protection Agency ("EPA") is an independent federal agency established to address environmental pollution and protect the environment.

1.    **Congress Established the EPA to Protect the Environment, Including Through Research**

121.    Throughout the 1960s, the American public grew increasingly concerned with air pollution, water pollution, and environmental degradation generally. This concern was manifest most markedly in the multi-site celebration of the first Earth Day on April 22, 1970, which drew an estimated 20 million Americans.[38] In response to such pressure, President Nixon

---

[37] *New Mexico v. Musk*, 2025 WL 1502747, at *13 (D.D.C. May 27, 2025) ("Essentially, Defendants argue, so long as the Executive acts without Congressional authority, the court cannot review its conduct.").

[38] Earth Day Network, *The History of Earth Day*, https://www.earthday.org/history/ (last visited May 29, 2025).

the same year presented Congress with a comprehensive message on the environment and

established a council to consider how to organize a federal response to environmental concerns.[39]

122.    On July 9, 1970, President Nixon sent Congress "Reorganization Plan No.

3 of 1970," which proposed consolidating several existing federal agency duties into one

Environmental Protection Agency.[40] In his transmittal to Congress, President Nixon wrote that "it

has become increasingly clear that we need to know more about the total environment—land,

water, and air. It also has become increasingly clear that only by reorganizing our Federal efforts

can we develop that knowledge, and effectively ensure the protection, development and

enhancement of the total environment itself."

123.    Under the Reorganization Plan, EPA was given a "broad mandate" to

"develop competence in areas of environmental protection that have not previously been given

enough attention." EPA would have the "capacity to do research on important pollutants

irrespective of the media in which they appear, and on the impact of these pollutants on the total

environment. Both by itself and together with other agencies, EPA would monitor the condition

of the environment—biological as well as physical."[41]

124.    Although President Nixon (a Republican) disfavored the creation of new

agencies, he broke his own rule "because arresting environmental deterioration is of great

importance to the quality of life in our country and the world." He thus "believe[d] that in this

case a strong, independent agency is needed."[42]

125.    The principal roles and functions of the new EPA would include:

- The establishment and enforcement of environmental protection standards consistent with national environmental goals.

- The conduct of research on the adverse effects of pollution and on methods and equipment for controlling it, the gathering of information on pollution, and the use of this information in strengthening environmental protection

---

[39] *See* U.S. Envtl. Prot. Agency, *The Origins of EPA* (May 31, 2024), https://www.epa.gov/history/origins-epa.

[40] U.S. Envtl. Prot. Agency, *The Reorganization Plan No. 3 of 1970* (Sept. 6, 2016), https://www.epa.gov/archive/epa/aboutepa/reorganization-plan-no-3-1970.html.

[41] *Id.*

[42] *Id.*

programs and recommending policy changes.

- Assisting others, through grants, technical assistance and other means in arresting pollution of the environment.

- Assisting the Council on Environmental Quality in developing and recommending to the President new policies for the protection of the environment.[43]

126.    After conducting hearings, Congress approved the proposal and EPA was created. Its first Administrator was sworn in on December 4, 1970.[44]

127.    EPA does not derive its regulatory authority from a single statute. Rather, a "number of laws serve as EPA's foundation for protecting the environment and public health." As Congress passes new environmental laws, EPA is most typically the agency tasked with writing regulations necessary to implement them.[45] Examples of key laws reflecting Congress's mandates to EPA include the Clean Air Act; the Clean Water Act; the Safe Drinking Water Act; the Federal Fungicide, Insecticide, and Rodenticide Act; the Toxic Substances Control Act; the Resource Conservation and Recovery Act; the Comprehensive Environmental Response, Compensation, and Liability Act (Superfund); and many more. As a recent example, when Congress enacted the Inflation Reduction Act of 2022, it gave EPA a new mandate to administer an environmental and climate justice block grant program.[46]

128.    These laws all direct EPA to carry out its core mission: "to protect human health and the environment."[47]

129.    Pursuant to this mission, EPA works to ensure that:

---

[43] *Id.*

[44] U.S. Envtl. Prot. Agency, *The Origins of EPA* (May 31, 2024), https://www.epa.gov/history/origins-epa.

[45] U.S. Envtl. Prot. Agency, *Laws and Executive Orders*,(Jan.29, 2025), https://www.epa.gov/laws-regulations/laws-and-executive-orders.

[46] Marianne Lavelle & Peter Aldhous, *Trump's EPA Funding Cuts Target Disadvantaged Communities*, Inside Climate News (May 1, 2025), https://insideclimatenews.org/news/01052025/trump-epa-funding-cuts-target-disadvantaged-communities/#:~:text=The%20EPA's%20declaration%20said%20it,environmental%20justice%20is%20being%20terminated.

[47] U.S. Envtl. Prot. Agency, *Our Mission and What We Do* (Apr. 21, 2025), https://www.epa.gov/aboutepa/our-mission-and-what-we-do.

- Americans have clean air, land, and water;

- National efforts to reduce environmental risks are based on the best available scientific information;

- Federal laws protecting human health and the environment are administered and enforced fairly, effectively, and as Congress intended;

- Environmental stewardship is integral to U.S. policies concerning natural resources, human health, economic growth, energy, transportation, agriculture, industry, and international trade, and these factors are similarly considered in establishing environmental policy;

- All parts of society—communities, individuals, and businesses, as well as state, local, and Tribal governments—have access to accurate information sufficient to effectively participate in managing human health and environmental risks;

- Contaminated lands and toxic sites are cleaned up by potentially responsible parties and revitalized; and

- Chemicals in the marketplace are reviewed for safety.[48]

130.    To accomplish its mission, EPA implements Congress's environmental laws by writing and enforcing regulations.[49]

131.    EPA also carries out its mission by making grants. Indeed, "EPA's mission to protect human health and the environment is accomplished, in large part, by the awarding of funds to other organizations to conduct environmental program or projects."[50] EPA awards more than $4 billion in grants (called "assistance agreements") every year.

132.    According to EPA, its authority to make grants comes from three sources. First is the U.S. Constitution, which gives Congress the power of the purse in the Spending Clause. Second are statutes, in which Congress directs funds to be allocated to specific programs. Finally, the EPA derives grant-making power from regulations.[51]

---

[48] *Id.*

[49] *Id*

[50] U.S. Envtl. Prot. Agency, *EPA Grants Overview for Applicants and Recipients*, https://www.epa.gov/grants/epa-grants-overview-applicants-and-recipients (last visited May 29, 2025).

[51] U.S. Envtl. Prot. Agency, *EPA Funding Instruments and Authorities*, https://www.epa.gov/grants/epa-funding-instruments-and-authorities (last visited May 29, 2025).

133.    EPA makes many types of grants. One especially important type is research grants, which are often obtained by university researchers.

134.    EPA funds research through its Science to Achieve Results (STAR) program; its People, Prosperity, and the Planet (P3) Program; and its Small Business Innovation Research (SBIR) program. According to the agency, these "help to engage top research scientists, non-profit organizations, students, and small businesses that results in a strong scientific foundation to support the Agency's mission of protecting human health and the environment."[52]

135.    The STAR program is the "primary competitive, peer-reviewed extramural grant program that has awarded over 4,100 grants nationwide since 1995." The program "leverages the scientific and engineering expertise of academic and non-profit institutions to conduct high priority environmental and public health research," focusing on the effects of "air pollution, water quality and quantity, hazardous waste, toxic substances, pesticides, cumulative impacts, and more."[53]

136.    STAR research is funded through Requests for Applications (RFAs) that are derived from the EPA Office of Research and Development's Strategic Plan. These grants "concentrate on areas of special significance to the EPA mission."[54]

137.    EPA grants are highly competitive. Of the approximately 2,500 proposals for STAR research grants every year, it awards only around 150 research grants and 125 graduate fellowships.[55]

138.    EPA research grants have funded critical projects, including research to advance clean drinking water technologies, address knowledge gaps in antimicrobial resistance, and reduce exposure to wildfire smoke.[56]

---

[52] U.S. Envtl. Prot. Agency, *About EPA's Research Grants*, https://www.epa.gov/research-grants/about-epas-research-grants (last visited May 29, 2025).
[53] *Id.*
[54] U.S. Envtl. Prot. Agency, *Learn About Research Grants*, https://www.epa.gov/research-grants/learn-about-research-grants (last visited May 29, 2025).
[55] *Id.*
[56] *See, e.g.*, U.S. Envtl. Prot. Agency, *Research Grants in the News* (Sept. 23, 2024), https://www.epa.gov/research-grants/research-grants-news.

1

2

**2.**    **In Response to Trump Administration Directives, the EPA Improperly Changed Priorities and Canceled Existing Grants**

3        139.    On his first day in office, President Trump signed Executive Order 14151,

4    "Ending Radical and Wasteful Government DEI Programs and Preferencing" (Jan. 20, 2025). The

5    Order instructs the Director of the Office of Management and Budget (OMB), assisted by the

6    Attorney General and others, to "coordinate the termination of all discriminatory programs,

7    including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates,

8    policies, programs, preferences, and activities in the Federal Government, under whatever name

9    they appear." The Order repeatedly mentions "environmental justice" as a target.[57]

10        140.    In particular, Executive Order 14151 directs each federal agency to

11    "terminate, to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice'

12    offices and positions… [and all] 'equity-related' grants or contracts" within 60 days.

13        141.    The President also signed Executive Orders related to energy, including

14    "Declaring a National Energy Emergency" and "Unleashing American Energy."

15        142.    Shortly after President Trump took office, the EPA began working closely

16    with DOGE.

17        143.    By March 7, 2025, the Democratic Staff of the Senate Committee on

18    Environment and Public Works reported that the EPA had issued guidance to senior staff

19    indicating that "all [funding] actions greater than $50,000 now require approval from an EPA

20    DOGE Team member."[58]

21        144.    A huge part of this DOGE-EPA collaboration included mass-canceling

22    grants. The EPA made no secret of DOGE's hand in EPA affairs, but rather, touted the DOGE

23    partnership in press releases.

24

25        [57] Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025),

26    https://www.federalregister.gov/documents/2025/01/29/2025-01953/ending-radical-and-wasteful-government-dei-programs-and-preferencing.

27        [58] Senate Envtl. & Pub. Works Comm., *Letter to EPA Administrator Lee Zeldin Regarding $50,000 Funding Approval Requirement* (Mar. 7, 2025),

28    https://www.epw.senate.gov/public/_cache/files/b/c/bc3eafbf-38ea-4197-b655-8466b9901dce/00C154E2DBAFFDF3EF5063DA374406502B1835873497F8DE2F439A1710460D09.3.7.25-letter-to-epa-re-50k-attachments-002-.pdf.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

145.    For example, on February 25, 2025, an EPA press release announced a "second round of EPA-DOGE partnered cancellations." EPA stated that these cancellations "represent more than $60 million saved as the EPA puts a stop to wasteful DEI and environmental justice programs."[59]

146.    In a March 10, 2025 press release, EPA announced a fourth round of EPA-DOGE grant terminations, this time stating it was cancelling more than 400 grants "across nine unnecessary programs." This press release concluded, as have others, by stating: "EPA continues to work diligently to implement President Trump's Executive Orders."[60]

147.    The EPA has aligned itself closely with the Trump Administration. For example, on March 12, 2025 alone, the EPA issued 10 press releases in which it referred to itself as the "Trump EPA."[61]

148.    Also on March 12, EPA Acting Assistant Administrator Jeffrey Hall issued an internal memo regarding "Implementing National Enforcement and Compliance Initiatives Consistently with Executive Orders and Agency Priorities" (the "March 12 Administrator Memo").[62]

149.    Among EPA's functions is to establish, every four years, National Enforcement and Compliance Initiatives ("NECIs") that are published in the Federal Register.

[59] U.S. Envtl. Prot. Agency, *EPA Administrator Lee Zeldin Cancels 20 Grants in 2nd Round of Cuts with DOGE, Saving Americans More than $60M* (Feb. 25, 2025), https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-cancels-20-grants-2nd-round-cuts-doge-saving-americans.

[60] U.S. Envtl. Prot. Agency, *EPA Administrator Lee Zeldin Cancels 400+ Grants in 4th Round of Cuts with DOGE, Saving Americans More than $1.7B* (March 10, 2025), https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-cancels-400-grants-4th-round-cuts-doge-saving-americans.

[61] U.S. Envtl. Prot. Agency, *Search News Release*, https://www.epa.gov/newsreleases/search?f%5B0%5D=year%3A2025-03&page=3 (last visited May 27, 2025).

[62] U.S. Envtl. Prot. Agency, *Implementing National Enforcement and Compliance Initiatives Consistently with Executive Orders and Agency Priorities* (Mar. 12, 2025), https://www.epa.gov/system/files/documents/2025-03/necimemo-20250312.pdf.

1    These are "national initiatives, developed in a non-partisan way across administrations" after

2    soliciting public input.[63] NECIs allow the EPA to focus its resources on widespread problems.[64]

3        150.    NECIs for fiscal year 2023-2027 were set on August 17, 2023. The six

4    NECIs—half of which were modified or continued from prior years—are: (1) mitigating climate

5    change; (2) addressing exposure to PFAS; (3) protecting communities from coal ash

6    contamination; (4) reducing air toxics in overburdened communities; (5) increasing compliance

7    with drinking water standards; and (6) chemical accident risk reduction.[65]

8        151.    While the March 12 Memo did not (yet) purport to eliminate the NECIs, it

9    did state, ominously, that notwithstanding the robust and legally required public process used to

10   produce them, "the focus of specific NECIs shall be adjusted to conform to the President's

11   Executive Orders and the Administrator's Initiative."[66]

12       152.    The "Administrator's Initiative" refers to EPA Administrator Lee Zeldin's

13   "Powering the Great American Comeback" initiative, which he announced on February 4, 2025.

14   The initiative has five major pillars: (1) Clean Air, Land, and Water for Every American;

15   (2) Restore American Energy Dominance; (3) Permitting Reform, Cooperative Federalism, and

16   Cross-Agency Partnership; (4) Make the United States the Artificial Intelligence Capital of the

17   World; and (5) Protecting and Bringing Back American Auto Jobs.[67]

18       153.    More generally, the March 12 Memo made clear that the EPA would

19   conform to President Trump's wishes, regardless of the agency's congressional mandates.

20       154.    In a court filing on April 23, 2025, an EPA Deputy Assistant Administrator

21   (Dan Coogan) revealed that EPA leadership had conducted a review of grants to determine

---

23   [63] U.S. Envtl. Prot. Agency, *FY 2024–2027 National Enforcement and Compliance Initiatives*
     (Aug. 17, 2023), https://www.epa.gov/system/files/documents/2023-08/fy2024-27necis.pdf.
24   [64] *Id.*
     [65] *Id.*
25   [66] U.S. Envtl. Prot. Agency, *Implementing National Enforcement and Compliance Initiatives
     Consistently with Executive Orders and Agency Priorities* (Mar. 12, 2025),
26   https://www.epa.gov/system/files/documents/2025-03/necimemo-20250312.pdf.
27   [67] U.S. Envtl. Prot. Agency, *ICYMI: Administrator Zeldin's "Powering the Great American
     Comeback" Unveiled at the EPA* (Feb. 4, 2025).
28    https://www.epa.gov/newsreleases/icymi-administrator-zeldins-powering-great-american-
     comeback-unveiled-epa.

"which should be terminated based on alignment with Administration priorities." He stated that "EPA began this process for the Administration in January 2025."[68]

155.    Although the EPA asserted that this was an "individualized, grant-by-grant review," it provided no substantiation that this occurred, and there is no reason to believe that it did. Instead, Mr. Coogan revealed that EPA was slated to terminate entire grant programs and spheres of activity that Congress had mandated in the Inflation Reduction Act. These included: (a) the Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program; (b) Surveys, Studies, Investigations, Training and Special Purpose Activities Relating to Environmental Justice; (c) the Environmental Justice Government-to-Government Program; (d) the Environmental Justice Small Grant Program; (e) Financial Assistance for Community Support Activities To Address Environmental Justice Issues; (f) the Environmental Justice Thriving Communities Grantmaking Program; (g) the Environmental and Climate Justice Block Grant Program; and (h) Reducing Embodied Greenhouse Gas Emissions for Construction Materials and Products.[69]

156.    Despite a district court's issuance of a preliminary injunction on April 15, 2025 preventing the EPA from indefinitely freezing grants previously awarded under Biden-era legislation,[70] Mr. Coogan stated that the EPA would maintain its grant terminations. He revealed that EPA had sent notices of termination to 377 grantees, and would send termination letters to an additional 404 grantees within two weeks.[71]

157.    On information and belief, EPA turned its attention to universities and other research grants on or around April 15, 2025. According to reports, Mr. Coogan on that date

---

[68] U.S. Envtl. Prot. Agency, *EPA Court Filing* (Apr. 23, 2025), https://www.documentcloud.org/documents/25919517-epa-court-filing-april-23-2025/?mode=document at ¶ 3.

[69] *Id*. at ¶ 6.

[70] National Council of Nonprofits, *Statement in Response to Preliminary Injunction Issued in Woonasquatucket River Watershed Council et al v. Department of Agriculture et al* (Apr. 15, 2025), https://www.councilofnonprofits.org/pressreleases/statement-response-preliminary-injunction-issued-woonasquatucket-river-watershed.

[71] *Id.* at ¶ 5.

1  sent an email directing staff to cancel existing grants awarded to universities and research

2  institutes.[72]

3      158.    Grant termination documents make plain that the agency is not conducting

4  any proper review of grants, but rather, baselessly terminating grants to promote the President's

5  agenda. Grants terminated because they supposedly do not "effectuate agency priorities" (which

6  mirror the President's priorities) include those intended to, for example, provide clean drinking

7  water in rural communities or provide air purifiers for children with asthma.[73]

8      159.    Instead of providing researchers with reasoned explanations of termination

9  decisions, the EPA is sending form termination letters. The letters are not personalized or even

10  signed.

11      160.    One such letter, received by Plaintiff Thakur on April 28, 2025, reads as

12  follows:

> **Subject:**  Termination of EPA Assistance Agreement [Grant No.]
> under 2 CFR 200.340
> **From:**    EPA Award Official
> **To:**      [Grant Recipient]
>
> This EPA Assistance Agreement is terminated in its entirety effective immediately on the grounds that the award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities.
>
> The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In addition to complying with the law, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.
>
> The grant specified above provides funding for programs that

---

[72] *See* Erik Stokstad, *EPA Orders Staff to Begin Canceling Research Grants*, Science (Apr. 21, 2025), https://www.science.org/content/article/epa-orders-staff-begin-canceling-research-grants; and Hiriko Tabuchi, *E.P.A. Set to Cancel Grants Aimed at Protecting Children from Toxic Chemicals*, The New York Times (Apr. 21, 2025), https://www.nytimes.com/2025/04/21/climate/epa-cuts-forever-chemicals-grants.html.

[73] Hayley Smith, *California Nonprofits Suffer After EPA Cancels Hundreds of Environmental Grants*, Los Angeles Times (May 8, 2025), https://www.latimes.com/environment/story/2025-05-08/california-nonprofits-suffer-after-epa-cancels-hundreds-of-environmental-grants.

promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities.

161.    This pro-forma explanation citing vague "Agency priorities" does not constitute reasoned decision-making nor explain why the terminated grants no longer effectuate such priorities.

### 3.    EPA Plaintiffs and Other Grant Recipients Are Harmed by EPA's Illegal Grant Terminations

162.    Plaintiffs and Class members have long relied on EPA grants to fund meritorious projects aimed at protecting human health and the environment. The termination of previously approved grants has caused and continues to cause Plaintiffs and Class members serious harm.

### a.    Plaintiff Neeta Thakur's Grant Termination and Resulting Harm

163.    Dr. Neeta Thakur is a pulmonary and critical care specialist at the University of California, San Francisco (UCSF) who examines the role of social and environmental stressors on asthma and COPD in historically marginalized communities. She currently serves as Medical Director of the Zuckerberg San Francisco General Hospital Chest Clinic and is an associate professor of medicine and pulmonary and critical care clinician at UCSF.

164.    Dr. Thakur's research focuses on (1) defining obstructive lung disease phenotypes that exist in racially and ethnically diverse communities and how these are shaped by social and environmental stressors; (2) identifying community-specific drivers that place individuals at high risk for poor outcomes; and (3) co-developing place-based and targeted interventions aimed at social and environmental stressors to improve respiratory outcomes in historically marginalized populations. In recognition of her research leadership, she was this year

1  (2025) made faculty director of Clinical Research Operations for the Clinical Trials Operations

2  Unit at UCSF's Clinical & Translational Science Institute.

3          165.    Dr. Thakur's research has been supported by state grants, federal grants

4  from the National Institutes of Health (NIH), foundation grants, and other sources.

5                          Grant Application to EPA

6          166.    In November 2021, Dr. Thakur submitted a grant application to EPA in

7  response to its announcement of funding opportunity EPA-G2021-STAR-H1. This opportunity,

8  made available through the agency's Science to Achieve Results (STAR) program, focused on

9  "Cumulative Health Impacts at the Intersection of Climate Change, Environmental Justice, and

10 Vulnerable Populations/Lifestages: Community-Based Research for Solutions."

11         167.    The grant application, titled "Partnering for Resilient Opportunities To

12 Eliminate Toxic (PROTECT) Health Effects from Wildfire PM2.5 in Environmental Justice

13 Communities," addressed the potential to prevent adverse health effects to environmental justice

14 communities from the fine particulate matter (PM2.5) from wildfire smoke.

15         168.    The proposal aimed to (1) estimate the health effects of sub-daily exposure

16 to wildfire-specific PM2.5 in California, with particular focus on effects within environmental

17 justice communities; (2) understand community recovery from short-term health effects following

18 exposure; (3) understand indoor infiltration of wildfire smoke and the mitigating effect of housing

19 quality and behaviors on health effects; and (4) identify acceptable, community-relevant

20 interventions to mitigate exposure. Dr. Thakur was the Principal Investigator on the grant

21 proposal, which included nine investigators across three institutions: UCSF, UC Berkeley, and

22 California's Office of Environmental Health Hazard Assessment.

23         169.    The grant Application requested funding commensurate with the

24 cumulative 3-year budget of $1,330,536 to support this multi-campus, multi-agency, multi-

25 nonprofit research collaboration.

26         EPA's Grant Award

27         170.    On November 22, 2022, an EPA Senior Grants Management Specialist,

28 Jennifer Brooks, sent Dr. Thakur a Notice of EPA's award and the Grant Agreement. The

Agreement authorized the proposal for Project Period 12/01/2022-11/30/2025; committed an initial grant of $690,000 (approximately half of project costs); and explained that EPA was "funding this agreement incrementally."

171. On June 21, 2023, Brooks sent Dr. Thakur a second Notice of EPA Award and an Assistance Amendment. The Amendment likewise indicated that the team was authorized to proceed for Project Period 12/01/2022-11/30/2025. It stated that EPA was awarding $640,536, bringing the total federal funding award to $1,330, 536.

<u>EPA's Grant Termination</u>

172. On April 28, 2025, EPA sent to the UC Regents an "Assistance Amendment" that instructed Thakur's team to "stop work; terminate the [grant] agreement; reduce performance period duration; [and] curtail scope of work." It stated that "(EPA) hereby awards $0.00" towards any unfunded, as-yet-unincurred costs of the previously awarded $1,330,536.

173. The Assistance Amendment stated: "The Agency is asserting its right under 2 C.F.R. 200.340 and the Termination General Term and Condition [sic] of this agreement to unilaterally terminate this award." The Amendment was accompanied by a memorandum from EPA to the Director of Contracts and Awards at UCSF titled "Termination of EPA Assistance Agreement RD 84048101 under 2 CFR 200.340."

174. The memo stated that EPA terminated Dr. Thakur's grant because "the award no longer effectuates the program goals or agency priorities." It further asserted that the grant "provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities."

175. This explanation does not explain why the grant would contradict agency priorities when EPA Director Zeldin has announced new priorities under his "Powering the Great American Comeback" initiative that align fully with the purpose of Dr. Thakur's grant. The first

stated EPA priority is "Clean Air, Land, and Water for Every American."[74] Dr. Thakur's grant effectuates that purpose.

176.    As a result of this unilateral, unlawful grant termination, Dr. Thakur has been unable to complete health analyses with UC Berkeley grantee-colleagues, or to identify promising strategies to protect community health across California during wildfire smoke events.

177.    Instead, Dr. Thakur has had to spend significant time seeking alternate funding sources. This includes unexpected grant writing, and reaching out to other funding sources, including philanthropy groups. In addition, to support staff and avoid layoff of two individuals, she has had to use her own discretionary funds to support team members.

178.    The UCSF and UC Berkeley researchers on this grant have also been unable to complete the proposed analyses of the health impacts of wildfire smoke events across California. This is after considerable work by UC Berkeley researchers to develop a map unprecedented in its detail, showing hourly levels of wildfire smoke by location. As a consequence of termination, at least three research publications will go unpublished that have the potential for high impact for public health and for science more generally.

179.    The premature termination of this grant has also compromised the trust-building necessary for community-engaged participatory action research. It has taken years of effort for Dr. Thakur to develop relationships with the community based organizations and community-engaged individuals who assisted Dr. Thakur in obtaining this grant (by writing letters in support), with the expectation that her project would deliver tangible benefits to their low income communities in the form of improved respiratory health. EPA's termination of this grant will make it more difficult for her and her collaborators to partner with organizations such as the Central California Asthma Collaborative in Fresno and the environmental justice nonprofit Brightline in San Francisco, as well as a specific community-trusted scientist in Richmond.

---

[74] U.S. Envtl. Prot. Agency, *EPA Administrator Lee Zeldin Announces EPA's "Powering the Great American Comeback" Initiative* (Feb. 4, 2025), https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-announces-epas-powering-great-american-comeback.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

180.    Additionally, were Dr. Thakur and her team to eventually find replacement funding for this project (a difficult proposition given the sums at stake), they would no longer be adequate to cover personnel, equipment and outreach expenses.

181.    These personal and financial harms are ongoing.

182.    These harms are in addition to the loss of value to the public from Dr. Thakur's research team's inability to complete work on studying health risks from the fine particulate matter associated with wildfire, and inability to design health-protective interventions for three of California's most health-vulnerable communities.

**b.    Plaintiff Ken Alex's Grant Termination and Resulting Harm**

183.    Since 2019, Ken Alex has served as Director of Project Climate at the Center for Law, Energy & the Environment (CLEE) at UC Berkeley School of Law. He founded Project Climate, a think tank designed to move promising environmental research into the policy realm quickly.

184.    Prior to joining CLEE, Alex worked for many years for Governor Jerry Brown on climate-related policy and, before that, for the California Attorney General's Office. His roles as climate policy expert and gubernatorial advisor on the topic were the subject of a 2020 profile in CalMatters.[75]

EPA Grant Application

185.    In 2022, EPA's Office of Research and Development sought applications proposing research on air emissions from municipal solid waste (MSW) landfills, which are a significant source of methane emissions—one of Alex's areas of expertise. The grant solicitation was part of EPA's Science to Achieve Results (STAR) program, and was conducted in collaboration with the Air, Climate, and Energy (ACE) research program.

186.    EPA's request for applications solicited proposals that addressed EPA-identified research priorities, including "cost effective stationary, mobile, aerial, and remote sensing" technologies and measurements that could accurately quantify methane emissions from

---

[75] *See* Julie Cart, *Meet Ken Alex, Gov. Brown's Climate Concierge* (updated June 23, 2020), https://calmatters.org/environment/2018/10 /ken-alex-jerry-brown-climate-change-california/.

landfills and evaluate strategies to mitigate them. EPA also sought proposals that encompassed landfill emissions of "hazardous air pollutants (HAPs), and other air pollutant emissions from municipal solid waste (MSW) landfills."[76]

187.     In collaboration with a UC Berkeley engineer with specialized expertise in landfill design and other researchers, Alex developed a detailed proposal for applying cutting edge technologies, including satellites and AI, to improve the detection of methane and HAP releases from landfills and to improve the quality of policy responses. The Grant Application was submitted to EPA on December 21, 2022. It proposed a cumulative budget of $999,999 (later rounded to $1,000,000).

Award of Grant Funding

188.     On October 19, 2023, EPA notified UC Berkeley that it was awarding the grant, and provided the first of two installments of grant funding.

189.     On December 16, 2024, EPA notified UC Berkeley that it was awarding the second and final installment of grant funding, bringing the total funding awarded to $1,000,000.

190.     The EPA's web page, *Understanding and Control of Municipal Solid Waste Landfill Air Emissions Grants* (https://www.epa.gov/research-grants/understanding-and-control-municipal-solid-waste-landfill-air-emissions-grants) (accessed May 12, 2025) continues to publicize the grant as one among five awarded.

EPA's Grant Termination

191.     On April 29, 2025, EPA sent to the UC Regents an "Assistance Amendment" that instructed Alex's research team to "stop work; terminate the [grant] agreement; reduce performance period duration; [and] curtail scope of work." It stated that "(EPA) hereby awards $0.00" towards any unfunded, as-yet-unincurred costs of the previously awarded $1,000,000.

---

[76] *See* EPA Solicitation for PA-G2023-STAR-B1, *Understanding and Control of Municipal Solid Waste Landfill Air Emissions*, https://cfpub.epa.gov/ncer_abstracts/index.cfm/fuseaction/display.rfatext/rfa_id/701.

192.    The Assistance Amendment stated: "The Agency is asserting its right under 2 C.F.R. 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award." The Amendment was accompanied by a memorandum from EPA titled "Termination of EPA Assistance Agreement RD 84062301 under 2 CFR 200.340."

193.    The memo stated that EPA terminated Alex's grant because "the award no longer effectuates the program goals or agency priorities." The memo further asserted that the grant "provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities."

194.    The memo did not explain why Alex's grant no longer effectuates EPA priorities, which currently include "Clean Air, Land, and Water for Every American."

Harm from EPA's Grant Termination

195.    Alex and his project team have suffered immediate harm as a result of the unlawful unilateral cancellation of the grant. Specifically, the team has been unable to continue and complete the novel work related to evaluating HAPs and their relationship to methane emissions from landfills. Furthermore, some of his researchers and graduate students have already lost hours and compensation, and one or more will likely be let go.

196.    Even if Alex and his team were eventually to find replacement funding for this project (a difficult proposition given the sum at stake), the delay and uncertainty would preclude full recovery of the project.

c.    **Plaintiff Nell Green Nylen's Grant Terminations and Resulting Harm**

197.    Dr. Nell Green Nylen joined the Wheeler Water Institute at the Center for Law, Energy & the Environment (CLEE) at UC Berkeley School of Law as a Research Fellow in 2013. Since 2016, she has been a Senior Research Fellow at CLEE, providing analysis and recommendations at the intersection of law, policy, and science to inform water governance and management.

198.    Much of Dr. Green Nylen's work at CLEE has focused on improving management of water resources across hydrologic extremes—from times of water scarcity to times of abundance. This includes research on enhanced aquifer recharge ("EAR"), a tool for capturing water to increase groundwater supply. Another area of her focus has been improving the information and policy environment for implementing innovative water management solutions, including water reuse.

199.    EPA unilaterally terminated two large grants Dr. Green Nylen was working on that were meant to fund collaborative work with other researchers on issues at the core of her technical and legal expertise.

### EPA Enhanced Aquifer Recharge Grant Application and Funding

200.    In 2021, EPA's Office of Research and Development sought applications proposing research to develop cost-benefit tools to support EAR. The grant solicitation was part of EPA's Science to Achieve Results (STAR) program and solicited research proposals that would "identify the key economic, technological, institutional, and legal factors that affect the ability to implement" EAR projects; identify best practices and tools for implementing EAR projects to achieve different purposes; and, ultimately, "improve life-cycle cost-benefits analysis to support cost-effective enhanced aquifer recharge."

201.    Dr. Green Nylen was part of a UC Berkeley team that collaborated with a broader multi-disciplinary team of researchers from UC Davis, UC Santa Cruz, and UC Law San Francisco to develop a proposal that they submitted to EPA on January 13, 2022.

202.    The proposal—titled "A Knowledge-to-Implementation Framework for Enhanced Aquifer Recharge"—described a three-year project with outputs including: (a) developing guidance on evaluating EAR sites, determining what conditions are necessary to effectively maintain an EAR project, and ensuring that EAR projects maintain aquifer water quality; (b) developing guidance on navigating the legal, policy, and organizational contexts for EAR; (c) developing recommendations for legal and policy changes that could facilitate EAR; (d) developing a generalized framework for cost-benefit analysis of EAR projects; and (e) creating a capstone "Lifecycle Map" report on EAR. In other words, the outputs would provide one-stop

1    shopping for people interested in planning, evaluating, and implementing EAR projects. The

2    Grant Application proposed a cumulative budget of $2,000,000 (later adjusted to $1,999,998).

3           203.    On July 20, 2022, EPA notified UC Berkeley that it was awarding the

4    grant. The award was publicized on EPA's web page, *Life-Cycle Analysis to Support Cost-*

5    *Effective Enhanced Aquifer Recharge Grant* (https://www.epa.gov/research-grants/life-cycle-

6    analysis-support-cost-effective-enhanced-aquifer-recharge-grant). The grant's original end date

7    was August 31, 2025. On April 10, 2025, Dr. Green Nylen's team requested a no-cost extension

8    of the grant for which they received verbal approval and were awaiting formal written approval.

9                    EPA's Termination of the Enhanced Aquifer Recharge Grant

10           204.    On May 7, 2025, EPA sent the UC Regents a document styled as an

11    "Assistance Amendment" that instructed Dr. Green Nylen's team to "stop work; terminate the

12    [grant] agreement; reduce performance period duration; [and] curtail scope of work." It also

13    stated that "(EPA) hereby awards $0.00" towards any as-yet-unincurred costs. Through the

14    Assistance Amendment, EPA was purportedly "asserting its right under 2 CFR 200.340 and the

15    Termination General Term and Condition of this agreement to unilaterally terminate this award."

16           205.    The Amendment was accompanied by a memorandum from EPA to the

17    Contracts and Grants Officer for the Regents of the University of California titled "Termination

18    of EPA Assistance Agreement RD- 84046301-1 under 2 CFR 200.340." The memo stated that

19    EPA terminated Dr. Green Nylen's grant because, according to the memo, "the award no longer

20    effectuates the program goals or agency priorities." The memo further asserted that the grant

21    "provides funding for programs that promote initiatives that conflict with the Agency's policy of

22    prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free

23    from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the

24    United States. The grant is inconsistent with, and no longer effectuates, Agency priorities."

25           206.    The memo did not explain why EPA had concluded that Dr. Green Nylen's

26    award is "no longer consistent with EPA funding priorities," which are defined partly by

27    governing statutes, and federal statutes specifically identify EAR research as an EPA funding

28    priority and mandate. *See* 33 U.S.C § 1276. It also did not explain why the project was

inconsistent with the EPA's priority pillars, which include ensuring that "[e]very American [has] access to clean air, land, and water" and prioritizing permitting reform.[77] The core purpose of the team's research is promoting access to clean water.

<u>EPA Water Reuse Grant Application and Funding</u>

207.    In 2021, EPA's Office of Research and Development sought applications proposing research designed to "accelerate water innovation, information availability, and engagement to advance clean and safe water reuse goals, promote better understanding of the Nation's water and wastewater treatment and infrastructure, and enhance the availability and efficient use of water resources through water reuse."

208.    In response to the solicitation, the Director of the Wheeler Water Institute at CLEE and Dr. Green Nylen collaborated with a multi-disciplinary team of researchers from Iowa State University and the University of Rhode Island to develop a research proposal aimed at accelerating readiness for water reuse in small water systems across the nation.

209.    The lead Principal Investigator at Iowa State University submitted the grant proposal—titled "Accelerating Technical and Community Readiness for Water Reuse in Small Systems"—to EPA on September 29, 2021. It described a four-year project that would (a) develop methods to inventory sources of water for beneficial reuse across the nation; (b) produce guidance on water source / treatment technology / end-use combinations that may be appropriate for small communities; (c) support cost-benefit analysis of different water reuse options in small communities; (d) survey small communities to assess public attitudes towards different water reuse options; (e) produce guidance on opportunities for fostering institutional innovation to overcome barriers to water reuse in small communities; and (f) construct implementation roadmaps centered around windows of opportunity for water reuse for several case-study communities.

210.    The Grant Application proposed a total budget of $4,057,500, combining a request for $3,246,000 of federal funds with a commitment from the research team to provide an

---

[77] *See Administrator Lee Zeldin Announces EPA's "Powering the Great American Comeback" Initiative*, EPA (Feb. 4, 2025), https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-announces-epas-powering-great-american-comeback.

$811,500 cost share from other sources. The budget included (a) personnel and personnel travel costs; (b) participant support costs; (c) laboratory supplies and laboratory user fees; (d) support for consultants; (e) tuition remission for graduate students; and (f) indirect costs. This included a subaward of $559,941 to UC Berkeley.

211.    On August 8, 2022, EPA notified Iowa State University that it was awarding the grant, and Iowa State University notified the subrecipients, including UC Berkeley. The award was publicized on EPA's web page, *National Priorities: Water Innovation, Science and Engagement to Advance Water Reuse Grants* (https://www.epa.gov/research-grants/national-priorities-water-innovation-science-and-engagement-advance-water-reuse-1).

#### EPA's Termination of the Water Reuse Grant

212.    On May 12, 2025, EPA sent to Iowa State University a document styled as an "Assistance Amendment" that instructed Dr. Green Nylen's team to "stop work; terminate the [grant] agreement; reduce performance period duration; [and] curtail scope of work." It also stated that "(EPA) hereby awards $0.00" towards any as-yet-unincurred costs. Through the Assistance Amendment, the EPA was purportedly "asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award."

213.    The Amendment was accompanied by a memorandum from EPA to the Pre-Award Administrator at Iowa State University titled "Termination of EPA Assistance Agreement CR- 84046101 under 2 CFR 200.340." The memo stated that EPA terminated Dr. Green Nylen's grant because, according to the memo, "the award no longer effectuates the program goals or agency priorities." The memo further asserted that the grant "provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities." The reasons provided for termination of the EPA Water Reuse Grant and the EPA Enhanced Aquifer Recharge Grant were identical.

214.    As with the EPA Enhanced Aquifer Recharge Grant, the termination memo for the EPA Water Reuse Grant did not explain how EPA concluded that the award is "no longer consistent with EPA funding priorities," even though EPA states that addressing the wastewater challenges of small, rural communities remains one of its ongoing priorities.[78]

<u>Harm from the Grant Terminations</u>

215.    Dr. Green Nylen, and the larger project teams for both grant projects, have suffered immediate harm as a result of the cancellation of these grants.

216.    For the Enhanced Aquifer Recharge Grant, the harms include: an inability to proceed with the basic work of refining the team's analysis and distilling that information for the capstone Lifecycle Map report and the team's inability to work together to complete the capstone report and the accompanying cost-benefit analysis decision support tool.

217.    For the Water Reuse Grant, the harms include an inability to proceed with the basic work of the project. For example, the team has been unable to continue their interview-based research. Further, if the funding is not reinstated, the work that has already gone into the project will go to waste.

218.    For both grants, even if replacement funding is secured, the delay will preclude full recovery of the project. The current teams are unlikely to be able to stay together over a prolonged period. Further, time spent searching for replacement funding has considerable opportunity and financial costs (as well as societal costs), as that time would otherwise be allocated to work on other water-related research projects that confer public benefit.

219.    In addition, at CLEE, the jobs of every member of the water team are currently threatened by these grant terminations. CLEE is a self-funded entity at UC Berkeley that does not receive general salary support from the University. Without grant and contract funding, the team members will not get paid their full salary and could lose their jobs. Absent the reinstatement of these grants, members of the team could likely be let go in the coming months.

---

[78] *See EPA Announces $49 Million in Technical Assistance to Help Rural, Small, and Tribal Communities Address Wastewater Challenges* (Apr. 29, 2025), https://www.epa.gov/newsreleases/epa-announces-49-million-technical-assistance-help-rural-small-and-tribal-0.

B.     **National Endowment for the Humanities**

220.     The National Endowment for the Humanities ("NEH") is an independent federal agency established to support the advancement of the humanities across the United States.

1.     **Congress Established NEH to Fund Projects to Support Humanities Research, Training, and Education**

221.     Congress created NEH in 1965, as part of the National Foundation on the Arts and Humanities Act of 1965 ("NFAHA"). Pub. L 89-209, 79 Stat. 845 (Sept. 29, 1965) (codified at 20 U.S.C. §§ 951-60).

222.     The legislation was the result of years of advocacy to ensure that arts and humanities were not left behind as the nation focused on scientific progress. As laid out in the enabling statute, a "high civilization must not limit its efforts to science and technology alone but must give full value and support to the other great branches of man's scholarly and cultural activity." P.L. 89-209, sec. 2(2). Congress further explained that it was necessary and appropriate for the federal government to create and sustain a "climate encouraging freedom of thought, imagination, and inquiry." *Id.* at (4).

223.     In the sixty years since NFAHA's passage, Congress has repeatedly reaffirmed its commitment to these goals. Last updated in 1990, the enabling statute makes clear that the "humanities belong to all people of the United States," 20 U.S.C. § 951(1), and that "[d]emocracy demands wisdom and vision in its citizens. It must therefore foster and support a form of education, and access to the arts and the humanities, designed to make people of all backgrounds and wherever located masters of their technology and not its unthinking servants." *Id.* at § 951(4).

224.     In other words, congressional intent was to ensure that what is now sometimes short-handed as "DEI," and branded by Defendants as illegal and undesirable, was Congress's actual mandate, unchanged for 60 years, until upended on Inauguration Day.

225.     Congress determined it is "necessary and appropriate for the Federal Government to complement, assist, and add to programs for the advancement of the humanities and the arts by local, State, regional, and private agencies and their organizations." 20 U.S.C.

§ 951(5). Congress created NEH and its sister agency the National Endowment for the Arts ("NEA") so Americans could understand "the diversity of excellence that comprises our cultural heritage." *Id.* at 951(9).

226.    Accordingly, Congress established NEH to provide funding for individuals involved in research, publication of scholarly works, and promotion of the humanities. *See* 20 U.S.C. § 956. Under the statute, the Chairperson of the NEH is "authorized to enter into arrangements, including contracts, grants, loans, and other forms of assistance" to effectuate these goals. *Id.*

227.    Congress's directives for NEH specifically require it to support diverse and underrepresented viewpoints.

228.    For example, one statutory function of NEH is to authorize grants to "initiate and support programs and research which have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community." 20 U.S.C. § 956(c)(4).

229.    Likewise, in selecting recipients of funding, NEH's Chairperson "shall give particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented." 20 U.S.C. § 956(c).

230.    Congress's commitment to funding humanities initiatives that mirror the breadth and diversity of American culture is clear in the structure of the grant-making process. Under the statute, the Chairperson of the NEH determines funding "with the advice of the National Council on the Humanities." 20 U.S.C. § 956(c).

231.    The Council is comprised of twenty-six members appointed by the President, "selected from among private citizens of the United States who are recognized for their broad knowledge of, expertise in, or commitment to the humanities," and who will "provide a comprehensive representation of the view of scholars and professional practitioners in the humanities and of the public throughout the United States." 20 U.S.C. § 957(b). In making appointments, the "President shall give due regard to equitable representation of women, minorities, and individuals with disabilities who are involved in the humanities." *Id.*

232. NEH's Chairperson "shall not approve or disapprove any such application [for funding] until the Chairperson has received the recommendation of the Council." *Id.* at § 957(f).

233. NEH's other statutory functions include providing funding to:

a. develop and encourage the pursuit of a national policy for the promotion of progress and scholarship in the humanities;

b. initiate and support research and programs to strengthen the research and teaching potential of the United States in the humanities by making arrangements with individuals or groups to support such activities;

c. initiate and support training and workshops in the humanities by making arrangements with institutions or individuals;

d. foster international programs and exchanges;

e. foster the interchange of information in the humanities;

f. foster, with groups, education in, and public understanding and appreciation of the humanities;

g. support the publication of scholarly works in the humanities;

h. ensure that the benefit of its programs will also be available to our citizens where such programs would otherwise be unavailable due to geographic or economic reasons; and

i. foster programs and projects that provide access to, and preserve materials important to research, education, and public understanding of, the humanities. 20 U.S.C. § 956.

234. For sixty years, NEH has carried out its duty to fund research, training, and education that advance the humanities. Since 1965, NEH has awarded over $6 billion to support "museums, historic sites, universities, teachers, libraries, documentary filmmakers, public TV and radio stations, research institutions, scholars, and local humanities programming."[79] Indeed, NEH

---

[79] Nat'l Endowment for the Humanities, https://www.neh.gov/, (last visited May 27, 2025).

is the largest federal funder of the humanities, and (at least until recently) offered 47 grant programs that support humanities work around the country.[80]

235.    Since its inception, NEH funding has contributed to over 70,000 projects in all 50 states and jurisdictions; over 9,000 books (including 20 Pulitzer Prize winners); and over 500 film and radio programs (including six Oscar nominees, 30 Peabody award winners, and 27 Emmy award winners).[81] NEH funding has also supported collecting the papers of twelve United States presidents and of several other notable American figures including Mark Twain, Thomas Edison, Martin Luther King Jr., and Ernest Hemingway.[82]

236.    NEH has long had a strong relationship with the UC system. In 1974, for example, NEH supported UC Berkeley as it launched what would become the National Writing Project, which trains teachers to help youth nationwide learn how to do research, form arguments, and write publicly on topics they care about.[83] And in 2011, NEH and China's Ministry of Culture hosted a "Bi-national Conversation on Bridging Cultures" at UC Berkeley, bringing together artists, writers, historians, and political theorists of both countries.[84]

237.    As designed by statute, NEH funding supports a broad array of projects, including preserving endangered languages, digitizing early newspapers, depicting the history of the civil rights struggle through film, and detailing what life was like for early American colonists.[85]

238.    Prior to January 20, 2025, NEH funding recipients were selected after a rigorous review process. Every year, NEH recruits over 1,000 experts from every state and organizes them into 200 review panels that evaluate roughly 5,700 grant applications. The panels

---

[80] Nat'l Endowment for the Humanities, *Grants,* https://www.neh.gov/grants (last visited May 27, 2025).

[81] Nat'l Endowment for the Humanities, NEH Funding by the Numbers (description of data on homepage), https://www.neh.gov/ (last visited May 27, 2025).

[82] *Id.*

[83] Nat'l Writing Project, https://www.nwp.org/ (last visited May 29, 2025).

[84] Nat'l Endowment for the Humanities, *NEH Timeline,* https://www.neh.gov/about/history/timeline (last visited May 27, 2025).

[85] *See, e.g.,* Nat'l Endowment for the Humanities, *NEH Essentials,* https://www.neh.gov/essentials (last visited May 27, 2025).

are selected for their expertise in disciplines relevant to the grant programs.[86] The panels are announced in the Federal Register, and panelists' names are listed in NEH's annual reports.

239.    This exacting review proceeded as follows: After a grant application was submitted, it was assigned to a specific peer-review panel based on academic discipline, institutional type, project area, or project type. The evaluators on the panel read all assigned applications and assigned them a rating based on "NEH's published review criteria and program guidelines." These criteria "emphasize humanities significance, the applicant's abilities and qualifications, the proposal's clarity of expression, and the project's feasibility, design, cost, and work plan."[87] After each evaluator assessed the application, the panel would meet to discuss the applications.

240.    Next, NEH staff reviewed the panels' work and recommended the most meritorious applications to the National Council (described above). The Council meets three times a year to discuss the applications and finalize recommendations to the Chairperson.[88] The Chairperson made the final funding decisions, taking into account the advice provided throughout the review process.[89]

241.    Each year, NEH typically makes about 900 grants, ranging from approximately $1,000 to $750,000 each. Across all grant programs, only about sixteen percent of applications receive funding.[90] The projects selected for funding by NEH thus represent the best of the best.

242.    Congress has repeatedly affirmed its support for NEH's mission, appropriating funds for grant-making every fiscal year.

243.    In the 2024 Appropriations Act, for example, Congress appropriated $207,000,000 to NEH, with $192,000,000 specifically designated for grants, loans, contracts, and other assistance to further the purposes set forth under 20 U.S.C. § 956(c), and $15,000,000

---

[86] Nat'l Endowment for the Humanities, *NEH's Application Review Process*, https://www.neh.gov/grants/application-process (last visited June 2, 2025).
[87] *Id.*
[88] *Id.*
[89] *Id*
[90] *Id*

1    designated to carry out NEH's "matching grants" program. Pub. L. 118-42, 138 Stat. 25, 281-82

2    (Mar. 9, 2024).

3         244.    On March 15, 2025, notwithstanding the Executive Orders or DOGE's

4    mandates, Congress enacted a Continuing Appropriations and Extensions Act, which re-

5    appropriated all of the funds appropriated to NEH under the 2024 Act. Pub. L. 119-4, §§ 1101-08,

6    139 Stat. 9, 10-12 (Mar. 15, 2025). NEH thus received another roughly $200 million to spend on

7    grants. NEH announced $22.6 million in grants for 219 humanities projects across the country on

8    January 14, 2025.[91]

9         **2.    In Response to Trump Administration Directives, NEH Improperly
10            Changed Priorities and Canceled Existing Grants**

11        245.    Around the very same time Congress was re-appropriating grant-making

12    funds to NEH, as noted above, the agency came under fire from the Trump Administration.

13        246.    On March 13, 2025, NEH Chair Shelly Low was directed by the White

14    House to resign. Shortly thereafter, DOGE agents began visiting NEH. DOGE actors

15    recommended dramatically cutting NEH staff and cancelling grants made under the Biden

16    administration that had not been fully paid out.[92] According to reports, Acting NEH Chair

17    Michael McDonald told staff that DOGE wanted to claw back $175 million in undispersed grant

18    money.[93]

19        247.    On March 20, 2025, NEH posted a webpage titled "NEH Implementation

20    of Recent Executive Orders." The page stated that NEH was updating the Funding Restrictions

21    section of its Notices of Funding Opportunities ("NOFOs") in order "to comply with several

22    recent Executive Orders, including 'Ending Radical and Wasteful Government DEI Programs and

23

24    ───────────────

25    [91] Nat'l Endowment for the Humanities, *NEH Announces $22.6 Million for 219 Humanities Projects Nationwide*, https://www.neh.gov/news/neh-announces-grant-awards-jan-2025 (last visited May 27, 2025)..

26    [92] Jennifer Schuessler, *DOGE Demands Deep Cuts at Humanities Endowment*, N.Y. Times (Apr.

27    1, 2025), https://www.nytimes.com/2025/04/01/arts/trump-doge-federal-cuts-humanities.html.

28    [93] Elizabeth Blair, *Cultural groups across U.S. told that federal humanities grants are terminated*, NPR (Apr. 3, 2025), https://www.npr.org/2025/04/03/nx-s1-5350994/neh-grants-cut-humanities-doge-trump.

Preferencing,' 'Defending Women from Gender Ideology Extremism and Restoring Biological

Truth to the Federal Government,' and 'Ending Radical Indoctrination in K-12 Schooling.'" [94]

248.    The page provided "Frequently Asked Questions," including, for example,

Q: "Does the addition of the new guidance on gender ideology … mean that NEH will not fund

projects on … the suffragist movement?" A: "No, not necessarily. The restrictions only apply to

the categories mentioned in the relevant Executive Orders. We encourage you to read the relevant

Executive Orders and consider whether your project's topic – joining with its goals, methodology,

activities, and intended audience – seems allowable."

249.    The page only discussed the implication of the Executive Orders on grant

applications, not terminations of existing grants.

250.    Nonetheless, on or around April 2, 2025, recipients of NEH grant funding

began receiving emails informing them that their grants had been terminated. Peculiarly, these

emails did not come from an NEH server or government email address, but rather, from

"Grant_Notifications@nehemail.onmicrosoft.com." [95] The terminations were not made through

NEH's grants management system.

251.    The emails attached a form termination letter. On information and belief,

the termination letters sent to all grantees on April 2 and thereafter were nearly identical and

lacked any individualized analysis or discussion of any terminated grant.

252.    The termination letters received by Plaintiffs and Class members contained

the following "explanation" for the terminations:

> Your grant no longer effectuates the agency's needs and priorities
> and conditions of the Grant Agreement and is subject to termination
> due to several reasonable causes, as outlined in *2CFR§200.340*. NEH
> has reasonable cause to terminate your grant in light of the fact that
> the NEH is repurposing its funding allocations in a new direction in
> furtherance of the President's agenda. The President's February 19,
> 2025 executive order mandates that the NEH eliminate all non-

---

[94] Nat'l Endowment for the Humanities, *Implementation of Recent Executive Orders* (Mar. 20, 2025), https://www.neh.gov/executive-orders.

[95] Adding yet another layer of irregularity, the "onmicrosoft.com" domain is notoriously used by cybercriminals and other malicious actors to carry out phishing attacks. *See, e.g.*, Smedh Arun Patil, Cloud That, *Proactive Strategies Against ".onmicrosoft.com" Phishing Attacks* (Dec. 13, 2023), https://www.cloudthat.com/resources/blog/proactive-strategies-against-onmicrosoft-com-phishing-attacks

statutorily required activities and functions. *See Commencing the Reduction of the Federal Bureaucracy*, E.O. 14217 (Feb. 19, 2025). Your grant's immediate termination is necessary to safeguard the interests of the federal government, including its fiscal priorities. The termination of your grant represents an urgent priority for the administration, and due to exceptional circumstances, adherence to the traditional notification process is not possible. Therefore, the NEH hereby terminates your grant in its entirety effective April 1, 2025.

253.     Although the termination letter to NEH grantees states that Executive Order 14217 "mandates that the NEH eliminate all non-statutorily required activities and functions," that Order in fact makes no mention of NEH (despite mentioning other agencies).[96]

254.     The termination letters make no effort to explain how or why the relevant grant fails to "effectuate[] the agency's needs and priorities" or otherwise warrant termination. Nor did they address NEH's prior assessment—through its comprehensive panel and Council review process—that these projects *do* effectuate agency priorities and are aligned with the statutory mandate and goals of NEH.

255.     The termination letters likewise fail to explain what "exceptional circumstances" preclude adherence to ordinary notification procedures.

256.     Additionally, the termination letters included no reference to any method for appeal or to seek reconsideration, even though NEH's General Terms and Conditions require that grantees have a right to appeal a termination.[97]

---

[96] *See* Exec. Order No. 14217, *Commencing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 10577 (Feb. 25, 2025), https://www.federalregister.gov/documents/2025/02/25/2025-03133/commencing-the-reduction-of-the-federal-bureaucracy. President Trump also issued Exec. Order 14238, *Continuing the Reduction of the Federal Bureaucracy*, on March 14, 2025, https://www.federalregister.gov/documents/2025/03/20/2025-04868/continuing-the-reduction-of-the-federal-bureaucracy. This Order also made no mention of NEH.

[97] *See* Nat'l Endowment for the Humanities, *General Terms and Conditions for Awards to Organizations (for grants and cooperative agreements issued between January 1, 2022, and September 30, 2024* (Mar. 15, 2025), https://www.neh.gov/general-terms-and-conditions-awards-organizations-grants-and-cooperative-agreements-issued-january-2022#_Toc92721724, section 13 (terms for grants issued January 1, 2022 to September 30, 2024) and Nat'l Endowment for the Humanities, *General Terms and Conditions for Awards to Organizations (for grants and cooperative agreements issued October 1, 2024, or later)* (Mar. 13, 2025), https://www.neh.gov/general-terms-and-conditions-grants-after-oct-2024, section XIII (terms for grants issued October 1, 2024 or later).

257.    On April 24, 2025—three weeks *after* NEH began terminating existing grants—the agency issued a press release titled: "An Update on NEH Funding Priorities and the Agency's Recent Implementation of Trump Administration Executive Orders."[98]

258.    The press release stated that NEH had, in recent weeks, "taken several internal operational steps to improve efficiency, eliminate offices that are not essential to fulfilling its statutory requirements, and to return to being a responsible steward of taxpayer funds."[99] It further stated that NEH had also taken steps to "ensure that all future awards will, among other things, be merit-based, awarded to projects that do not promote extreme ideologies based upon race or gender, and that help to instill an understanding of the founding principles and ideals that make America an exceptional country."

259.    As part of the press release, NEH issued a new "Statement on NEH Priorities" and "Frequently Asked Questions."[100]

260.    The "Statement on NEH Priorities" reads as follows:

> Founded in 1965, the National Endowment for the Humanities (NEH) is a grant-making agency of the U.S. government dedicated to supporting exemplary humanities research and programming in service of the American people. It does so by investing in the most meritorious proposals for the advancement and dissemination of humanities learning.
>
> As set forth in NEH's enabling legislation, the humanities include the study of modern and classical languages, linguistics, literature, history, jurisprudence, philosophy, archaeology, comparative religion, ethics, the history of the arts, and those aspects of the social sciences which have humanistic content and use humanistic methods, as well as other areas.
>
> To bring the wisdom of the humanities to all Americans, NEH supports research projects that advance humanistic learning, preservation projects that ensure access to significant humanities resources, education projects that strengthen teaching in the humanities, and public programing that conveys the best of the humanities to all Americans.

---

[98] Nat'l Endowment for the Humanities, *An Update on NEH Funding Priorities and the Agency's Recent Implementation of Trump Administration Executive Orders*, https://www.neh.gov/news/update-neh-funding-priorities-and-agencys-recent-implementation-trump-administration-executive (last visited May 27, 2025).

[99] *Id.*

[100] Nat'l Endowment for the Humanities, *Updates on NEH Priorities* (Apr. 24, 2025), https://www.neh.gov/updates-neh-priorities.

Moving forward, NEH is especially interested in projects on the nation's semiquincentennial and U.S. history more generally. In addition, the agency will be more finely attuned to its statutory responsibility that "funding should contribute to public support and confidence in the use of taxpayer funds."

As per longstanding agency policy, NEH-supported projects must not promote a particular political, religious, or ideological point of view and must not engage in political or social advocacy. NEH-supported projects should not preference some groups at the expense of others and should ultimately support public purposes.

The principles of intellectual significance, merit, competition, and equal opportunity lie at the heart of NEH's mission.

261.    Two of the posted "Frequently Asked Questions" addressed the terminated grants:

Q:    Why is NEH cancelling awards?

A:    All federal grantmaking agencies, including NEH, must ensure that taxpayer dollars are spent effectively and are consistent with each agency's mission. This requires that NEH regularly evaluate its funding priorities within the policy framework established by Congress, the Administration, and the head of NEH. Awards and programming must align with these priorities.

Q:    What types of awards are being cancelled?

A:    In collaboration with the Administration, NEH has cancelled awards that are at variance with agency priorities, including but not limited to those on diversity, equity, and inclusion (or DEI) and environmental justice, as well as awards that may not inspire public confidence in the use of taxpayer funds.

262.    This post-hoc explanation does not constitute reasoned decision-making, nor could it provide appropriate notice to grant recipients that their grants would be terminated, or constitute sufficient rationale therefor.

263.    NEH's new "priorities" also directly contradict its statutory mandate to make grants that "reflect the diversity and richness of our American cultural heritage" and "give particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented." 20 U.S.C. § 956(c).

264.    As it explains in its new statements, NEH has dramatically narrowed its definition of agency "priorities" based on Defendant Trump's Executive Orders or otherwise in "collaboration with the Administration."

265.    In so doing, NEH improperly ignores the statutory priorities Congress set out in 20 U.S.C. § 956, which Congress reaffirmed by allocating additional grant-making funds to NEH in March 2025.

### 3.    NEH Plaintiffs And Other Grant Recipients Are Harmed by NEH's Illegal Grant Terminations

266.    Plaintiffs and Class members have long relied on NEH grants to fund meritorious projects in the humanities. The termination of nearly all previously awarded grants has caused and continues to cause Plaintiffs and class members serious harm.

#### a.    Plaintiff Robert Hirst's Grant Termination and Resulting Harm

267.    Plaintiff Robert Hirst is the curator of the Mark Twain Papers and general editor of the Mark Twain Project at the Bancroft Library at the University of California, Berkeley. He has served in this role since 1980.

268.    The Mark Twain Papers contain the voluminous private papers of Samuel Langhorne Clemens, known to all Americans by his pen name, "Mark Twain." He has long been considered one of the most important writers of the 19th Century. His papers were bequeathed to the University of California in 1962; hundreds of original documents have since been added to that core collection. The collection makes it possible to read, in a single location, virtually every surviving document in Mark Twain's hand.

269.    The Mark Twain Project, a major editorial and publishing program of the Bancroft Library, is housed within the Mark Twain Papers archive. The aim of this Project is to create, maintain, correct, and update a permanent, globally accessible resource for the life and writings of Mark Twain. The Project hosts over 200 in-person and online visits to the Papers each year. In addition, the editors routinely go out to speak about the collection and the edition to students and to a variety of other interested groups. In order to maintain this collection and conduct ongoing research, the Mark Twain Papers and Project employ five full-time editors.

270.    Since 2001, the Mark Twain Project has focused much of its effort on the Mark Twain Project Online (the "Online Project"), which is intended to make available all of the Project's edited texts. Its original online website platform has become obsolete and work is underway to migrate the website and database to a modern, technologically supportable platform.

271.    In his recently published biography of Mark Twain, writer Ron Chernow—a Pulitzer Prize-winning biographer—wrote: "Perhaps no other American author can boast such a richly documented record. . . . With its learned editions and digitized website, the Mark Twain Papers ranks as one of the foremost scholarly achievements of our era."

272.    NEH has awarded more than $11,000,000 to support the editorial work of the Mark Twain Project, without interruption, since 1967, and has also made a generous challenge grant for the renovation of the Online Project.

273.    On the occasion of the NEH's 50th birthday in 2015, the agency honored the Mark Twain Papers and Project as one among fifty nationwide across five decades that "'have shaped what we think and what we know about ourselves and our culture' since 1965."[101]

### Application (RQ-300297) for Grant Funding

274.    On November 29, 2023, the Mark Twain Project, through the Regents of the University of California, submitted to the NEH an Application for Federal Domestic Assistance—application RQ-300297, titled "Mark Twain Project." Dr. Hirst's Grant Application sought to draw the Mark Twain Project nearer to its goal of making all of Twain's works available to the public for free through the Online Project.

275.    The Grant Application proposed a cumulative budget of $900,000, including $450,000 in NEH funds. This budget would fund roughly half the salaries for three editors and a digital publications manager for three years. The other half of the staff salaries would need to be paid by private funds raised by Dr. Hirst.

---

[101] Sharon Goetz, *Mark Twain Papers and Project Honored by NEH*, UC Berkeley Library UPDATE (Oct. 9, 2015), https://update.lib.berkeley.edu/2015/10/09/mark-twain-papers-and-project-honored-by-neh/.

Award of Grant (RQ-300297) Funding

276.    On August 28, 2024, UC Berkeley received a letter from the chair of the NEH, approving the Mark Twain Project's application RQ-300297 to receive an offer for funding ("Offer Letter").

277.    The Offer Letter provided UC Berkeley up to $450,000 in federal matching funds if Dr. Hirst raised an equal amount of eligible non-federal, third-party gifts, and certified their availability, and if NEH had available to it sufficient funds allocated for matching purposes. The Offer Letter provided: "If you wish to accept this offer of support, your response to the above condition(s) and the Gift Certification Form must be submitted via eGMS Reach, NEH's online electronic grant management system no later than June 30, 2027."

278.    On October 31, 2024, the university's Sponsored Projects Office ("SPO") accepted the NEH offer and sent in the required certification, signed by Dr. Hirst.

Termination of Grant (RQ-300297) Funding

279.    On April 2, 2025, UC Berkeley received an email from the address "Grant_Notifications@nehemail.onmicrosoft.com," purporting to be from Michael McDonald, Acting Chairman for the National Endowment for the Humanities (the "Termination Email"). This is not an e-mail domain that NEH has ever used to communicate with Dr. Hirst or the university regarding the Mark Twain Project.

280.    Attached to the Termination Email was a letter from Michael McDonald, Acting Chairman for the National Endowment for the Humanities, cancelling the Mark Twain Project's grant, Award No. RQ-300297-25, in its entirety effective April 1, 2025 (the "Termination Letter").

281.    The Termination Letter reads in relevant part:

> Your grant no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement and is subject to termination due to several reasonable causes, as outlined in *2CFR200.340*. NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda. The President's February 19, 2024 executive order mandates that the NEH eliminate all non-statutorily required activities and functions. *See Commencing the Reduction of the Federal Bureaucracy*, E.O. 14217 (Feb. 19, 2025).

Your grant's immediate termination is necessary to safeguard the interests of the federal government, including its fiscal priorities. The termination of your grant represents an urgent priority for the administration, and due to exceptional circumstances, adherence to the traditional notification process is not possible. Therefore, the NEH hereby terminates your grant in its entirety effective April 1, 2025.

282.    Dr. Hirst then searched for the Mark Twain Project's grant on eGMS Reach, NEH's online electronic grant management system. He could find no record of the grant or his many communications about it on eGMS Reach: It had apparently been deleted entirely from the system. Agency erasure of grant records was unprecedented in Dr. Hirst's multi-decade relationship with NEH.

283.    Dr. Hirst spoke with his longtime NEH program officer, Jason Boffetti, who told him that DOGE had required NEH to lay off most of its staff if the agency wanted to continue to operate.

Harm Suffered from Termination of Grant (RQ-300297)

284.    Dr. Hirst, the Mark Twain Papers and Project, and project staff, have suffered immediate harm as a result of the cancellation of their NEH grant, which will continue into the future.

285.    In lieu of conducting his editorial work, Dr. Hirst will have to refocus his time on fundraising to replace the cancelled grant funding ($450,000).

286.    The financial uncertainty created by this grant cancellation significantly threatens his ability to retain the highly trained and experienced staff working on the Mark Twain Project. These individuals are among the world's experts on Mark Twain, and their knowledge of the collection is irreplaceable.

287.    The cancellation threatens the migration of the collection to new platforms as the existing ones have become obsolete. Because the online platform allows scholars and students from all over the world to access these original documents, any interruption or delay in this work is very harmful to the Project and to the many who regularly access or will want to access these materials in the future.

288.    In addition, Dr. Hirst and his staff will have less ability to go out to schools and universities to share the incomparable work of Mark Twain.

289.    The termination of Plaintiff Hirst's grant is especially ironic given then NEH continues to promote the collection of Mark Twain's papers as a significant achievement on its website's homepage.[102] Moreover, Mark Twain is included in the list of individuals in Executive Order 13987, "Building the National Garden of American Heroes," which seeks to create a statue garden of such heroes, and which NEH now says it will provide grant funding to support.[103]

### b.    Plaintiff Christine Philliou's Grant Termination and Resulting Harm

290.    Dr. Christine Philliou is a Professor of History at the University of California, Berkeley. Previously, she was a professor at Columbia University and Yale University.

291.    She is the author of two books: *Turkey: A Past Against History* (University of California Press, 2021), and *Biography of an Empire: Governing Ottomans in an Age of Revolution* (University of California Press, 2010), as well as dozens of articles and book chapters. Her work has received numerous recognitions, including a Fulbright-Hays Research Fellowship, a Brookings Institution Research Award, and the Lenfest Distinguished Faculty Award, and has led to offers of fellowships from Stanford University and the American Council of Learned Societies.

292.    In addition to her research and teaching, Dr. Philliou founded the Program in Modern Greek and Hellenic Studies at the Institute for European Studies; the Turkish Ottoman and Post-Ottoman Studies Initiative at the Center for Middle Eastern Studies; and the Istan-Polis collaborative research project. All are designed to broaden and deepen appreciation for the history of Turkey, Greece, and the Ottoman Empire.

---

[102] Nat'l Endowment for the Humanities, NEH Funding by the Numbers (description of data on homepage), https://www.neh.gov/ (last visited May 27, 2025).

[103] Nat'l Endowment for the Humanities, *National Garden of American Heroes: Statues*, https://www.neh.gov/program/national-garden-american-heroes-statues (last visited May 27, 2025); Exec. Order No. 13978, *Building the National Garden of American Heroes*, 86 Fed. Reg. 6809 (Jan. 22, 2021), https://www.federalregister.gov/documents/2021/01/22/2021-01643/building-the-national-garden-of-american-heroes.

1          <u>Application for Grant Funding (RZ-292650-23)</u>

2          293.    On November 29, 2022, through the Regents of the University of

3   California, Dr. Philliou submitted to the NEH an Application for Federal Domestic Assistance

4   titled "Visualizing Local Christian Communities in Muslim Cosmopolitan Istanbul in the 19th

5   and 20th Centuries."

6          294.    The purpose of the grant was to help fund the Istan-Polis Project, an effort

7   to reconstruct and analyze the history of Istanbul's Orthodox Christian communities in the final

8   Ottoman century. The grant would also fund development of a public-facing website to display

9   the results of data projects and to feed further research and collaboration. The focus on the

10  experience of Istanbul's Christian minority in the final stage of the Ottoman Empire was intended

11  to provide new tools for scholars seeking to clarify how the tensions between cosmopolitanism

12  and nationalism were historically manifested in cities globally. Such work has obvious relevance

13  to pressing questions of nationalism versus broader inclusion of minority groups today.

14          <u>Award of Grant Funding (RZ-292650-23)</u>

15          295.    On September 22, 2023, the University of California, Berkeley and Dr.

16  Philliou received a letter from Shelly Lowe, the chair of the NEH, approving Project Application

17  RZ-292650-23 for funding (the "Offer Letter") for an award of $246,347.00 over three years.

18          296.    In response to the award of the grant, Dr. Philliou's team planned for and

19  then began executing the steps laid out in the grant application. This included team members'

20  travel to Berkeley for a winter meeting in January 2024, to Europe in June 2024 for a related

21  seminar, and to Istanbul in June-July 2024 for an *in situ* seminar. The team hired and contracted

22  with project managers to coordinate transcription and other work on the census register project,

23  and spent funds on the project's website infrastructure. This included contracting with

24  independent contractors, purchasing airline tickets, reimbursing expenses for international and

25  domestic travel, hiring student workers, and paying vendors for lodging and catering.

26          297.    Overall, in Year 1 the team focused on the Old City of Istanbul. The

27  resulting website has become a treasure to people with Greek heritage and other heritages tracing

28  their lineage to Istanbul around the world, and received special recognition from the Archbishop

of North and South America, Elpidophoros. The team's Year 1 *in situ* seminar was also life-changing for the undergraduate and graduate students who accompanied the research team.

298.    Years 2 and 3 of the grant were to focus on the Frankish Quarter and other neighborhoods up and down the Bosporus. They would have produced similarly dramatic, perspective-changing results.

### Termination of Grant Funding (RZ-292650-23)

299.    On April 2, 2025, UC Berkeley received an email from the address "Grant_Notifications@nehemail.onmicrosoft.com," sent on behalf of Michael McDonald, Acting Chairman for the NEH (the "Termination Email"). Attached to the Termination Email was a letter cancelling grant RZ-292650-23, effective the prior day, April 1.

300.    The Termination Letter states that the grant "no longer effectuates the agency's needs and priorities . . . in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda. The President's February 19, 2025 executive order mandates that the NEH eliminate all non-statutorily required activities and functions. See Commencing the Reduction of the Federal Bureaucracy, E.O. 14217 (Feb. 19, 2025)." It further stated that "adherence to the traditional notification process is not possible" because of "exceptional circumstances."

### Harm Suffered from Termination of Grant Funding

301.    The Istan-Polis Project, its staff, and Dr. Philliou have suffered direct and immediate harm as a result of the cancellation of the grant. Work on the website has been disrupted. A seminar in Istanbul for this summer very likely will not proceed. Staff who were depending on funds provided by the grant may be without a livelihood. Researchers may not even be paid for work they have already performed. In addition, the team incurred $46,750 in project expenses that remain unreimbursed. Further, the end of the grant will likely mean an end to the project as a whole and the closing of a remarkable window on history that had just opened.

**C.    National Science Foundation**

302.    The National Science Foundation ("NSF") is an independent federal agency intended to promote the progress of science in the United States.

1

    **1.**    **Congress Established the National Science Foundation to Promote Scientific Research on a Broad Scale to Advance the United States' National Interests**

2

3      303.    NSF was created after World War II when it became clear that federally

4   funded scientific research was key to the nation's national security interests. Describing it as an

5   Act "[t]o promote the progress of science; to advance the national health, prosperity, and welfare;

6   to secure the national defense; and for other purposes," Congress established NSF in 1950

7   through the enactment of the National Science Foundation Act of 1950 (the "Act"). Public Law

8   81-507 (codified at 42 U.S.C. § 1861 et seq.).

9      304.    The NSF's core function is making grants to fund innovative scientific

10  research. The NSF awards grants through an apolitical merit review process, under which panels

11  of disinterested scientific experts vet grant applications and make award decisions. The NSF's

12  merit review process is often referred to as the "gold standard" of scientific review, and NSF-

13  funded research has contributed to some of the most important scientific advances of the past 70

14  years.

15     305.    The Act arose out of the growing awareness during World War II that

16  science was crucial to the Unites States' national interest and security, as science was key to the

17  Allied successes in the war. Indeed, during World War II, federal government support of

18  scientific research accelerated dramatically, and a growing consensus emerged in favor of

19  continuing government support of basic scientific research after the end of the war.

20     306.    The NSF's statutorily defined mission "is to provide Federal support for

21  basic scientific and engineering research, and to be a primary contributor to mathematics, science,

22  and engineering education at academic institutions in the United States." 42 U.S.C.

23  § 1862k(a)(6)(A).

24     307.    The Act establishes a series of core "functions" for the NSF. Chief among

25  them, the Act authorizes and directs the NSF to "initiate and support basic scientific research in

26  the mathematical, physical, medical, biological, engineering, and other sciences," as well as

27  "specific scientific research activities in connection with matters relating to the national defense."

28

308.    The Act also directs the NSF to provide "grants, loans, and other forms of assistance" to support scientific research" and award "scholarships and graduate fellowships in the mathematical, physical, medical, biological, engineering, and other sciences."

309.    The Act has been amended at various times since 1950. Since at least 1980, Congress has recognized that for the United States to maintain its competitive edge, it would need to encourage and prepare people from groups traditionally underrepresented in STEM to acquire skills and pursue careers in science and engineering fields. Congress consequently declared that "the highest quality science over the long-term requires substantial support, from currently available research and education funds, for increased participation in science and technology by women and minorities." Pub. L. 96-516, § 32. Congress later *expanded* this declaration to include increasing participation for people with disabilities. 42 U.S.C. § 1885(b). The importance of STEM to the interests of the United States prompted Congress, in 1980, to prescribe a national policy to promote "full use of the human resources of the Nation" in STEM fields:

> The Congress declares it is the policy of the United States to encourage men and women, equally, of all ethnic, racial, and economic backgrounds to acquire skills in science and mathematics, to have equal opportunity in education, training, and employment in scientific and technical fields, and thereby to promote scientific literacy and the full use of the human resources of the Nation in science and technology.

Pub. L. 96-516 § 32. In other words, Congress has consistently acted to consciously *expand* STEM access rather than to narrow it, by affirmative outreach to groups not traditionally invited or encouraged to contribute to STEM initiatives.

310.    One such act was the National Science Foundation Authorization Act of 1998 (the "1998 Amendment"). The 1998 Amendment to the Act reaffirmed the NSF's statutory commitment to making the United States a leader in STEM fields, and it set as long-term goals for the NSF to provide leadership to:

    a.    enable the United States to maintain a position of world leadership in all aspects of science, mathematics, engineering, and technology;

1    b.    promote the discovery, integration, dissemination, and application

2  of new knowledge in service to society; and

3    c.    achieve excellence in United States science, mathematics,

4  engineering, and technology education at all levels. 42 U.S.C. § 1862k(a)(6)(B).

5    311.    Pursuant to these congressional directives, much of the NSF-funded

6  research at universities has, for decades, supported the participation in STEM fields by women,

7  minorities, and people with disabilities.

8    312.    Notably, the 1998 Amendment sets forth several "core strategies" for

9  achieving the above goals, which include a focus on ensuring diversity in entrants to STEM

10  fields: "Develop intellectual capital, both people and ideas, with particular emphasis on groups

11  and regions that traditionally have not participated fully in science, mathematics, and

12  engineering." 42 U.S.C. § 1862k(b)(1).

13    313.    The Act was again amended in 2007 as part of the "America COMPETES

14  Act," which sought to bolster the competitiveness of the United States in scientific research and

15  innovation. It instructed the NSF to "give priority" in granting awards to research activities "that

16  can be expected to make contributions in physical or natural science, technology, engineering,

17  social sciences, or mathematics, or that enhance competitiveness, innovation, or safety and

18  security in the United States." 42 U.S.C. § 1862o-5(b).

19    314.    The NSF seeks to fulfill its mission chiefly by issuing competitive, limited-

20  term grants in response to specific proposals from researchers and research organizations. The

21  NSF receives over 50,000 such proposals each year, and funds about 10,000 of them.

22    315.    The NSF employs a merit review process in which reviews of grant

23  applications are carried out by panels of independent scientists, engineers, and educators who are

24  experts in the relevant scientific field, and they are vetted to avoid conflicts of interest. Reviewers

25  judge grant applications for both "intellectual merit" and "broader societal impact."

26    316.    NSF grants are highly competitive and prestigious, and its pre-January 20,

27  2025 merit review process is often credited for the profound success of the NSF throughout its

28  history. Indeed, it is no exaggeration to say that the world as we know it today would not exist

without the NSF. NSF grants have contributed to an extraordinary number of scientific and

technological innovations and achievements over the past 75 years, including:

    a.    The Internet
    b.    Semiconductors (i.e., computer chips)
    c.    Supercomputers
    d.    Artificial intelligence
    e.    3-D printing
    f.    American Sign Language
    g.    Captcha
    h.    Deep ocean exploration and drilling
    i.    Detecting gravitational waves
    j.    DNA amplification (central to biotech)
    k.    Doppler radar
    l.    Duolingo
    m.    Fusion energy
    n.    Geographic Information Systems (GIS)
    o.    Kidney matching
    p.    LASIK eye surgery
    q.    MRI
    r.    Seeing black holes

317.    To date, at least 268 Nobel laureates have been supported by NSF grants.

In 2024 alone, NSF grant recipients received Nobel prizes in physiology or medicine, physics,

chemistry, and economics.

318.    The NSF has also funded numerous national observatories, has had

responsibility for U.S. research operations in the Antarctic, and has been heavily involved in

United States deep sea exploration. The NSF also managed laboratories from the Defense

Department's Advanced Research Projects Agency (DARPA), which lead to the creation of the

Internet.

319.    The enormous impact of the NSF grant-making process is summarized

neatly in this statement from Forbes: "For 75 years, the National Science Foundation has been the

quiet backbone of American scientific progress. It funds a substantial share of all federally

supported basic research outside the biomedical sphere, supporting discoveries in climate science,

artificial intelligence, cybersecurity and quantum materials among many, many others. Its grants

- 67 -

train graduate students, launch early-career faculty and sustain the open, reproducible research that fuels U.S. competitiveness."[104]

**2.**     **In Response to Trump Administration Directives, NSF Improperly Changed Priorities and Canceled Existing Grants**

320.    The foregoing paragraphs describe the NSF as it existed and functioned through the decades, from its original founding until January 20, 2025.

321.    The NSF is now facing an existential threat: the Trump Administration has negated the NSF's core grant-making function by unilaterally, arbitrarily and illegally terminating billions of dollars in lawfully awarded scientific grants that the Administration views (often mistakenly) as having some connection to diversity, equity and inclusion (most broadly defined), as well as other subjects the Trump Administration dislikes, such as climate change, vaccines, HIV/AIDS, and COVID-19.

322.    At Defendants Trump and DOGE's direction, NSF has taken aim at the pillars sustaining the United States' STEM preeminence. These actions violate the law and jeopardize America's longstanding global leadership in STEM. NSF has announced that it will no longer abide by Congress's longstanding mandates.

323.    Since the Trump Administration took office in January 2025, the NSF has terminated more than a billion dollars in scientific grants that had previously been approved and awarded through the merit review process and which the NSF was legally obligated to provide. The pace of the terminations has escalated rapidly since mid-April, as the Trump Administration has taken a wrecking ball to the NSF. During that brief time period, more than 1,400 grants have been terminated. NSF terminated over 430 grants *in one week*.[105] The grant terminations were generally not preceded by warnings, and thus came as a complete shock to the researchers whose livelihoods and life's work depended on them.

---

[104] John Drake, *The NSF Is Being Dismantled — With Broad Implications For The American Economy,* Forbes (May 9, 2025), https://www.forbes.com/sites/johndrake/2025/05/09/the-national-science-foundation-is-being-dismantled-what-the-economy-needs-is-more-investment.
[105] Erin Socha, *New Database Tracks Canceled N.S.F. Research Grants*, U. Daily Kansan (April 25, 2025), https://www.kansan.com/news/new-database-tracks-canceled-n-s-f-research-grants/article_0a3d2a6c-97e5-43c3-96c0-db02dc609210.html.

1

2

3

324.    The grant terminations have typically been conveyed in short, standardized missives containing boilerplate statements. For example, Plaintiff Jedda Foreman and other UC researchers all received the following termination letter:

4

5

6

7

8

9

10

> The U.S. National Science Foundation (NSF) has undertaken a review of its award portfolio. Each award was carefully and individually reviewed, and the agency has determined that termination of certain awards is necessary because they are not in alignment with current NSF priorities. Effective immediately, the following are terminated: [list of NSF Award IDs]. NSF is issuing this termination to protect the interests of the government pursuant to NSF Grant General Conditions (GC-1) term and condition entitled 'Termination and Enforcement,' on the basis that they no longer effectuate the program goals or agency priorities. This is the final agency decision and not subject to appeal.

11

12

13

14

15

16

17

18

325.    In an apparent attempt to justify its new war on science, the NSF published a "Statement of NSF Priorities" on April 18, 2025, explaining that NSF's activities "must aim to create opportunities for all Americans everywhere" and "[r]esearch projects with more narrow impact limited to subgroups of people based on protected class or characteristics do not effectuate NSF priorities."[106] Pursuant to this Directive, NSF began issuing termination notices *en masse* to research projects, including many grants to UC researchers, designed to implement Congress's express goals of increasing STEM participation, studying misinformation, and addressing environmental justice.

19

20

21

326.    NSF also issued an accompanying set of FAQ's, which indicated that awards not aligned with NSF priorities include, but are "not limited to those on diversity, equity, and inclusion (DEI) and misinformation/disinformation."

22

23

24

25

26

327.    The grant cancellations are one prong in what can only be described as an effort to radically shrink and marginalize the NSF. In mid-April it was announced that the NSF was freezing any new grants, and in early May, the NSF announced that its 37 research divisions were being abolished. Then, on April 24, 2025, the Director of NSF, Sethuraman Panchanathan, resigned 16 months early. Massive layoffs are now anticipated. Meanwhile, President Trump

27

28

---

[106] U.S. Nat'l Sci. Found., *Statement on NSF Priorities* (April 18, 2025), https://www.nsf.gov/updates-on-priorities#statement-of-nsf-priorities-09d.

proposed cutting the NSF's budget for the 2026 fiscal year by 55%. As recently stated in *Forbes*, "This is not reform. It is a dismantling."[107]

328.    It appears that DOGE is behind the unlawful grant terminations at NSF. *See, e.g.,* Katrina Miller & Carl Zimmer, *National Science Foundation Terminates Hundreds of Active Research Awards*, New York Times (April 22, 2025) ("Last Wednesday, the magazine Science reported that all new research grants by the agency had been frozen, as ordered by the Department of Government Efficiency, or DOGE."); Dan Garisto, *Trump Team Freezes New NSF Awards – And Could Soon Axe Hundreds of Grants*, Nature (Apr. 17, 2025) ("All new research grants have been frozen at the US National Science Foundation (NSF) — an action apparently ordered by the Department of Government Efficiency (DOGE) . . . DOGE is also reviewing a list of active research grants, assessed in February by the NSF, for terms associated with diversity, equity and inclusion (DEI). It is considering terminating more than 200 of them, NSF staff members have told Nature.").

329.    Indeed, on May 13, 2025, Alondra Nelson, the Harold F. Linder Professor at Princeton University's Institute for Advanced Study, resigned her prestigious position on the National Science Foundation's board of directors. Explaining her decision to Time Magazine, she said: "Last week, as the Board held its 494th meeting, I listened to NSF staff say that DOGE had by fiat the authority to give thumbs up or down to grant applications which had been systematically vetted by layers of subject matter experts. Our closed-to-the-public deliberations were observed by Zachary Terrell from the DOGE team. Through his Zoom screen, Terrell showed more interest in his water bottle and his cuticles than in the discussion."[108]

330.    These grant terminations are a disaster for the future of science in the United States. The gravity of the situation and illegality of the grant terminations were summarized in a letter from the House of Representatives' Committee on Science, Space, and

---

[107] John Drake, *The NSF Is Being Dismantled — With Broad Implications For The American Economy,* Forbes (May 9, 2025), https://www.forbes.com/sites/johndrake/2025/05/09/the-national-science-foundation-is-being-dismantled-what-the-economy-needs-is-more-investment.
[108] Alonda Nelson, *Why I'm Resigning From Positions at the National Science Foundation and Library of Congress,* Time Magazine, May 13, 2025; https://time.com/7285045/resigning-national-science-foundation-library-congress/.

1    Technology sent to the acting director of the NSF, Brian Stone, on May 8, 2025. The letter

2    characterizes the Trump Administration's actions against the NSF as "chaos and destruction," and

3    states that "[DOGE's] accusation that these terminated awards lack merit is a lie, as most, if not

4    all these awards, carry a statement from the agency declaring that the award "reflects NSF's

5    statutory mission and has been deemed worthy of support through evaluation using the

6    Foundation's intellectual merit and broader impacts review criteria.'"[109]

7            331.    The House Committee Letter goes on to state: "The cancelation of these

8    awards suggests instead that NSF is willing to apply political censorship of awards under

9    direction from President Trump and the DOGE teenagers, which is a clear violation of the

10   statutory mission of the agency." *Id*. It then provides a few examples of recently terminated grants

11   to illustrate the folly, harmfulness, and in some instances absurdity of the Trump Administration's

12   grant cancellations. The list of cancelled grants includes those for:

13           a.      A rural after-school program that gives middle school students an

14   opportunity to use mathematics and design thinking to address agricultural issues, such as

15   designing water catchment systems for drought conditions.[110]

16           b.      Research on developing a tool that uses machine learning to detect

17   deepfakes, which are used for all manner of disinformation, be it political content planted by

18   foreign adversaries or the creation of child sexual abuse material.[111]

19           c.      A grant to study improved mental health interventions for

20   engineering students, who – across demographics – are statistically less likely than students in

21   other disciplines to seek mental health treatment. This research was aimed at improving outcomes

22   for engineering students in mental health distress and with mental health disabilities.[112]

23   _____

24   [109] Letter from House of Representatives' Committee on Science, Space and Technology to Brian
     Stone (May 8, 2025), https://democrats-science.house.gov/imo/media/doc/2025-05-
     08%20Letter%20to%20Acting%20Director%20Stone.pdf.

25   [110] Nat'l Sci. Found., *Award Abstract #2215382 – Engaging Rural, Latinx Youth in an After
     School Program That Integrates Design Thinking, Making and Math*,

26   https://www.nsf.gov/awardsearch/showAward?AWD_ID=2215382, (last visited May 27, 2025).

27   [111] Andrea E Hickerson,, *Award Abstract #2310131 – Collaborative Research: SaTC: TTP:
     Small: DeFake: Deploying a Tool for Robust Deepfake Detection, Nat'l Sci. Found.*,
     https://www.nsf.gov/awardsearch/showAward?AWD_ID=2310131 (last visited May 27, 2025).

28   [112] Nat'l Sci. Found., *Award Abstract # 2225567 – Research: Identifying intervention targets to*

d.      An industry-focused workforce development program that trains the next generation of quantum technicians, including through accessible experiential learning and certification opportunities for entry-level professionals.[113]

e.      A National Research Traineeship award, supporting 25 graduate students, to develop new interdisciplinary studies applying AI to better understand "legal system processes, impacts, and institutions" as well as to develop "tools and methods for leveraging newly available data from the criminal legal system, and ethical and social implications of big data and AI in the context of criminal justice."[114]

332.    The House Committee Letter condemns these grant terminations as "an abdication of NSF's mission and a betrayal of the scientific community, including the thousands of graduate students and early career researchers whose careers will be derailed. It also states that the terminations are of questionable legality. The grant terminations are in direct defiance of a court-ordered preliminary injunction enjoining NSF from impeding the disbursement of appropriated federal funds under awarded grants or other executed financial obligations directed or implied by Executive Order 14151… or any other materially similar policy."[115]

### 3.      NSF Plaintiff and Other Grant Recipients Are Harmed by NSF's Illegal Grant Terminations

333.    Plaintiff Foreman and Class members have long relied on NSF grants to fund meritorious projects aimed at advancing scientific knowledge. The termination of previously approved grants has caused and continues to cause Plaintiff and Class members serious harm.

---

*increase mental health help seeking in undergraduate engineers*, https://www.nsf.gov/awardsearch/showAward?AWD_ID=2225567 (last visited May 27, 2025).
[113] Nat'l Sci. Found., *Award Abstract # 2243822 - NRT-HDR: Computational Research for Equity in the Legal System" (CRELS)*, https://www.nsf.gov/awardsearch/showAward?AWD-ID=2243822 (last visited May 29, 2025).
[114] *Id.*
[115] *New York v. Trump*, No. 25-cv-39-JJM-PAS, (D.R.I. Jan. 31, 2025), https://ag.ny.gov/sites/default/files/court-filings/state-of-new-york-et-al-v-trump-tro-2025.pdf (last visited May 27, 2025).

a. **Plaintiff Jedda Foreman's Grant Terminations and Resulting Harm**

334. Jedda Foreman is the Director, Center for Environmental Learning, at the Lawrence Hall of Science at the University of California, Berkeley.

First Application for Grant Funding (2314075):

335. On January 11, 2023, with her collaborators at the Lawrence Hall of Science, Foreman submitted (through the Regents of the University of California) a grant proposal to NSF's National Science Foundation Program NSF 22-626, Advancing Informal STEM Learning (AISL). The AISL program invests in research and practice on how people learn STEM outside of formal education. It seeks proposals that further the well-being of individuals and communities who have historically been and continue to be excluded, under-served, or underrepresented.

336. Foreman's proposal, titled "Understanding the Impact of Outdoor Science and Environmental Learning Experiences Through Community-Driven Outcomes," was for a four-year Integrating Research and Practice project that would produce a set of science and environmental literacy measures for underrepresented communities.

First Award of Grant Funding (2314075)

337. On August 22, 2023, the NSF accepted Foreman's proposal and awarded her a grant (Award Number 2314075). The Award Notice stated that the NSF was obligated in the amount of $1,583,195, and that the total intended award was $2,149,437. The Award Notice provided: "Contingent on the availability of funds and scientific progress of the project, NSF expects to continue support at approximately the following level: Fiscal Year: 2026, Increment Amount: $566,242." The Award Notice was made as per the provisions of NSF Solicitation: "NSF 22-626 Advancing Informal STEM Learning," and provided that the period of performance was from January 1, 2024 through December 31, 2027.

338. The award covered salaries and wages for three senior personnel: principal investigator Melissa Collins, Ph.D., co-principal investigator Valeria Romero, M.A., and Foreman. The award also covered salaries and wages for several other professional researchers

and project coordinators at the Lawrence Hall of Science, UC Berkeley's public science center. The award further provided for support from an undergraduate research assistant.

### Second Application for Grant Funding (2315277)

339.    On January 17, 2023, together with her collaborators at the Lawrence Hall of Science, Foreman submitted (through the Regents of the University of California) a proposal to the National Science Foundation Program NSF 22-634, Racial Equity in STEM Education (RESTEM), which aims to support groundbreaking projects that contribute to advancing racial equity in STEM education and workforce development.

340.    Foreman's proposal, titled "Working Toward Racial Equity: Building Capacity to Institutionalize Equity in Outdoor and Environmental Science Education," was designed to support a team of leaders from five organizations to facilitate and guide organization-wide discussions related to racial equity. The project was to develop a Tool Kit with three components—(1) a Facilitator's Reflection Guide, (2) a Foundations of Racial Equity Guide, and (3) Organization Systems Change Tools—that would produce a replicable model for broadening participation.

### Second Award of Grant Funding (2315277)

341.    On September 13, 2023, the NSF accepted Foreman's proposal and awarded her a grant (Award Number 2315277). The Award Notice stated that the NSF was obligated in the amount of $1,701,416, and that the total intended award was $4,723,028. The Award Notice provided: "Contingent on the availability of funds and scientific progress of the project, NSF expects to continue support at approximately the following level: Fiscal Year: 2025, Increment Amount: $947,005, Fiscal Year: 2026, Increment Amount: $1,133,391, Fiscal Year: 2027, Increment Amount: $941,216." The award was made as per the provisions of NSF Solicitation: NSF 22-634 Racial Equity in STEM Education and provided that the period of performance was from January 1, 2024 through December 31, 2028.

### Third Application for Grant Funding (2241805)

342.    On August 12, 2022, Foreman and her collaborators submitted a proposal (through the Regents of the University of California) to the National Science Foundation Program

NSF 22-585, Innovative Technology Experiences for Students and Teachers (ITEST). This applied research and development program aims to advance the equitable integration of technology in the learning and teaching of science, technology, engineering, or mathematics from pre-kindergarten through high school.

343.    Foreman's proposal, titled "Supporting Rightful Presence in Museum Spaces: Youth as Participatory Designers of Indigenous Mixed Reality Science Exhibits," aimed to address the ongoing marginalization of Indigenous communities in informal science learning spaces by developing and studying a model that strengthens Indigenous youths' disposition towards, and capacity for STEM pathways.

344.    The project built on a partnership between the Lawrence Hall of Science and mak-'amham, an Indigenous Ohlone cultural organization. The project would engage Indigenous youth directly and investigate the impact of the participatory design model on their STEM learning, science identity, and interest in STEM careers. The project findings would be disseminated in informal science and technology learning communities to support the youth participatory design model in informal science education contexts.

Third Award of Grant Funding (2241805)

345.    On February 19, 2023, the NSF accepted Foreman's proposal and awarded a grant (Award Number 2241805). The Award Notice stated that the NSF was obligated in the amount of $1,292,298. The award was made in accordance with the provisions of NSF Solicitation: "NSF 22-585, Innovative Technology Experiences for Students and Teachers," and provided that the period of performance was from June 1, 2023 through May 31, 2026.

346.    The award covered salaries and wages for five senior personnel: Principal Investigator Ari Krakowski, Ph.D.; co-Principal Investigator Kimiko Ryokai, Ph.D.; co-Principal Investigator Sarah Olsen, Ph.D.; co-Principal Investigator Vincent Medina; and Foreman. The award also covered salaries and wages for several other professional researchers and project coordinators at the Lawrence Hall of Science. The award also provided $162,712 to support the work of graduate students.

Supplemental Award to Celebrate NSF's 75th Anniversary (2241805)

347.    Together with her collaborators, Foreman submitted (through the Regents of the University of California) to the NSF a proposal for a supplement to award number 2241805 to celebrate NSF's 75th anniversary on May 10, 2025. On January 15, 2025, the NSF accepted Foreman's proposal and awarded a grant supplement (Award Number 2241805). The Supplemental Award Notice stated that the NSF was obligated by an additional amount of $98,981, bringing the total funds awarded to $1,391,279. The Supplemental Award Notice also extended the end of the award period from May 31, 2026 to November 30, 2026.

Termination of Grant Funding (2315277, 2314075, and 2241805)

348.    On April 18, 2025, the University of California, Berkeley received an email (the "April 18 Termination Email") from the address "grants005@nsf.gov," purporting to be from Jamie H. French, Division Director, Office of Budget Finance and Award Management, Division of Grants and Agreements. The April 18 Termination Email stated that the NSF "ha[d] determined that termination of certain awards is necessary because they are not in alignment with current NSF priorities." It purported to terminate awards 2315277 and 2314075. It further stated that "the basis" of the termination is that the awards "no longer effectuate the program goals or agency priorities. This is the final agency decision and not subject to appeal."

349.    On April 25, 2025, the University of California, Berkeley received an email (the "April 25 Termination Email") from the address "grants005@nsf.gov," purporting to be from Jamie H. French, Division Director, Office of Budget Finance and Award Management, Division of Grants and Agreements. The April 25 Termination Email again stated that "the agency ha[d] determined that termination of certain awards is necessary because they are not in alignment with current NSF priorities." It terminated, among others, award 2241805. This email likewise further stated that "the basis" of the termination is that the awards "no longer effectuate the program goals or agency priorities. This is the final agency decision and not subject to appeal."

1          <u>Harm Suffered from Terminations of Grant Funding</u>

2          350.    The Lawrence Hall of Science is UC Berkeley's public science center, with

3    a mission to inspire and engage through science discovery and learning in ways that advance

4    equity and opportunity. Nationwide, the Lawrence Hall reaches over 20% of U.S. students in

5    grades K through 12 with its science curricula. The Lawrence Hall has successfully obtained

6    significant federal funding (20-25% of its budget) to support the research and development to

7    inspire young people, families, communities, and educators in STEM discovery and learning in

8    ways that advance equity. Without federal grant funds, including the terminated grants, the

9    Lawrence Hall's ability to carry out its public service mission is and will be significantly

10   compromised.

11         351.    As to "Supporting Rightful Presence in Museum Spaces: Youth as

12   Participatory Designers of Indigenous Mixed Reality Science Exhibits" (Award 2241805),

13   $490,834.22 or 35% of the award remained unpaid at the time of termination. In addition, when

14   this award was terminated, the supplemental funding for a celebration of the NSF's 75th

15   anniversary on May 10, 2025 was terminated as well. Because promises had already been made to

16   community members, the Hall still went forward with the event and incurred the remaining costs.

17         352.    As to "Working Toward Racial Equity: Building Capacity to

18   Institutionalize Equity in Outdoor and Environmental Science Education" (Award 2315277),

19   approximately $3,769,075.24 or 80% of the award remained unpaid at the time of termination.

20         353.    As to "Understanding the Impact of Outdoor Science and Environmental

21   Learning Experiences Through Community-Driven Outcomes" (Award 2314075), approximately

22   $1,500,251.79 or 75% of the award remained unpaid at the time of termination.

23         354.    The financial implications of these abrupt terminations are enormous,

24   representing millions of dollars of lost funding to the Lawrence Hall. It will likely need to reduce

25   the time basis of and/or lay off both academic personnel and staff if it is not able to find

26   alternative resources quickly.

27         355.    While the financial implications are debilitating, the human cost of the

28   termination of these awards is also profound. Taken together, the grant-funded projects are

1    important to the thousands of young people, educators, and partners that they are designed to

2    engage, serve, and/or impact. The abrupt termination of these grants means these public benefits

3    will go unrealized.

4    **D.    Allegations Against Additional Federal Agency Defendants**

5    356.    While Plaintiffs' grants were unlawfully terminated by EPA, NEH, and

6    NSF, these agencies are acting no differently than other federal agencies choosing to ignore their

7    congressional mandates in favor of political objectives. Indeed, all are acting under the Executive

8    Orders and other unlawful directives from Defendants Trump and DOGE, rather than under the

9    authority of their statutory mandates.

10    357.    The Federal Agency Defendants are acting in similar, categorical, and

11    lockstep fashion. Their uniform and categorically unlawful conduct usurps congressional

12    authority and the rights of Class members in the same unlawful way, and it will only increase,

13    absent the declaratory and injunctive relief requested in this Complaint. The violation of

14    separation of power principles is still more blatant now that Defendant Trump and the members

15    of his Cabinet collectively and directly run DOGE. The following allegations demonstrate that all

16    Federal Agency Defendants have engaged in the same course of conduct and harmed the

17    members of the UC researchers class in the same way as the Named Plaintiffs have been harmed,

18    under the same Executive Orders and DOGE directives.

19    358.    Class members (researchers in the UC system) receive funding from an

20    array of federal agencies, and have suffered the same type of harm (abrupt termination of

21    previously awarded grants under Executive Orders and/or other Trump administration directives)

22    from the universal terminations perpetuated by Defendants.

23    359.    At minimum, the following Federal Agency Defendants have terminated or

24    will imminently terminate grants to Class members:

25    **1.    Department of Agriculture**

26    360.    Early into President Trump's tenure, the Department of Agriculture

27    (USDA) ceded control to DOGE. Secretary of Agriculture Brooke Rollins announced on

28    February 14, 2025 that she "welcome[d]" DOGE's spending cuts, and that DOGE would have

"full access" as Rollins reviewed "thousands of …grants" over the first weeks of her tenure. All of this, according to USDA, would be done "per the President's directives."[116]

361.    By March 13, 2025, USDA announced that Rollins had "worked with [DOGE] to streamline USDA operations by cutting wasteful spending," hyperlinking to a social media post about a terminated university research grant.[117]

362.    USDA also canceled its Partnerships for Climate-Smart Commodities program, which included research grants to universities.[118] USDA stated that recipients could re-apply for funding if their projects were "aligned with the priorities of this Administration."[119]

363.    USDA grants to UC researchers were terminated, causing serious harm. On information and belief, researchers received form termination letters.

364.    By terminating grants at the direction of the President and DOGE, USDA has violated its congressional mandates. Such mandates include, for example, compliance with and effectuation of the legislative purposes implicit in congressional appropriations, and 7 U.S.C. § 3157, which establishes a research grant program to "promote research in food, agriculture, and related areas."

365.    By effectuating mass terminations of grants to UC researchers without proper review or clear explanation, USDA acted unconstitutionally and unlawfully, as set forth in the Claims for Relief asserted below.

---

[116] U.S. Dep't of Agric., *Secretary Rollins Takes Bold Action to Stop Wasteful Spending and Optimize USDA to Better Serve American Agriculture* (Feb. 14, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/02/14/secretary-rollins-takes-bold-action-stop-wasteful-spending-and-optimize-usda-better-serve-american.

[117] U.S. Dep't of Agric., *Secretary Brooke Rollins Takes Bold Action in First 30 Days at USDA* (Mar. 13, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/03/13/secretary-brooke-rollins-takes-bold-action-first-30-days-usda.

[118] *See, e.g.*, Univ. of Idaho, *Secretary Brooke Rollins Takes Bold Action in First 30 Days at USDA* (Apr. 16, 2025), https://www.uidaho.edu/news/news-articles/news-releases/2025/041625-iamp-termination.

[119] U.S. Dep't of Agric., *USDA Cancels Biden Era Climate Slush Fund, Reprioritizes Existing Funding to Farmers* (Apr. 14, 2025), https://content.govdelivery.com/accounts/USDAOC/bulletins/3dbe363.https://content.govdelivery.com/accounts/USDAOC/bulletins/3dbe363.

1                              **2.**    **AmeriCorps**

2          366.    AmeriCorps has also mass terminated grants in response to President

3    Trump's Executive Orders and DOGE directives.

4          367.    AmeriCorps has stated that it is "taking proactive action to ensure

5    alignment with . . . the Trump-Vance Administration priorities." AmeriCorps has also stated that

6    all grants and grant applications "must comply with President Trump's executive orders,"

7    specifically listing the following Executive Orders: "Defending Women From Gender Ideology

8    Extremism and Restoring Biological Truth to the Federal Government," "Unleashing American

9    Energy," "Ending Radical and Wasteful Government DEI Programs and Preferencing," and

10   "Ending Illegal Discrimination and Restoring Merit-Based Opportunity."[120]

11         368.    On April 25, 2025, news outlets reported that DOGE had ordered

12   AmeriCorps to terminate almost $400 million in grants.[121] This constitutes roughly 41% of the

13   agency's total grant funding.

14         369.    That same day, UC researchers received form termination letters that read:

15         Effective immediately, the AmeriCorps award subrecipient(s)
           included in the attached spreadsheet is/are being terminated per 2
16         CFR 200.340(a)(4) because it has been determined that the award no
           longer effectuates agency priorities. You must immediately cease all
17         award activities. This is a final agency action and is not
           administratively appealable.
18

19         370.    UC researchers have suffered serious harm as a result of Defendants'

20   actions.

21         371.    By terminating grants at the direction of the President and DOGE,

22   AmeriCorps has violated its congressional mandates. Such mandates include, for example,

23   compliance with and effectuation of the legislative purposes implicit in congressional

---

24   [120] AmeriCorps, *Grantee and Sponsor Guidance on Compliance,*
25   https://www.americorps.gov/grantees-sponsors/grantee-sponsor-guidance-compliance (last visited
     May 28, 2025).
26   [121] Teri Raji, *DOGE Orders major cut to AmeriCorps funding, imperiling agency's work*, The
     Washington Post (Apr. 25, 2025),
27   https://www.washingtonpost.com/nation/2025/04/25/americorps-grant-cuts-doge/; Sophia Cai &
     Ben Johansen, *DOGE Hits Trump Country*, Politico (Apr. 30, 2025),
28   https://www.politico.com/news/2025/04/30/doge-hits-trump-country-00319654.

1    appropriations, and 42 U.S.C. 12653 (describing activities AmeriCorps must carry out directly or

2    through grants).

3           372.    By effectuating mass terminations of grants to UC researchers without

4    proper review or clear explanation, AmeriCorps acted unconstitutionally and unlawfully, as set

5    forth in the Claims for Relief asserted below.

6                           **3.    Department of Defense**

7           373.    The Department of Defense (DOD) quickly caved to President Trump's

8    and DOGE's directives to eliminate grants. On March 4, Chief Pentagon Spokesman Sean Parnell

9    stated that DOD had been working "hand in hand with the DOGE team."[122]

10          374.    By March 7, the Department had terminated more than $30 million in

11   grants that funded 91 studies. In a press release, the Department recognized "the value of

12   academic research" but stated it was taking action "in response to President Trump's Executive

13   Orders."[123]

14          375.    By March 20, Secretary Hegseth issued a memorandum directing the

15   immediate termination of over $360 million in additional grants in order to "implement the

16   President's orders."[124]

17          376.    By terminating grants at the direction of the President, DOD has violated

18   its congressional mandates. Such mandates include, for example, Congress's determination of

19   DOD's funding through the annual National Defense Authorization Act and the requirement that

20   all DOD grants be based on authorizing legislation. *See* 32 CFR 21.410; 32 CFR Part 22.

21

22   [122] C. Todd Lopez, *Initial DOGE Findings Reveal $80 Million in Wasteful Spending at DOD*,
     U.S. Dep't of Def. (Mar. 4, 2025), https://www.defense.gov/News/News-
23   Stories/Article/Article/4096431/initial-doge-findings-reveal-80-million-in-wasteful-spending-at-
     dod/.
24   [123] U.S. Dep't of Def., *Pentagon Culls Social Science Research, Prioritizes Fiscal Responsibility
     and Technologies for Future Battlefield*, (Mar. 7, 2025),
25   https://www.defense.gov/News/Releases/Release/Article/4113076/pentagon-culls-social-science-
     research-prioritizes-fiscal-responsibility-and-te/.
26   [124] U.S. Dep't of Def., *Continuing Elimination of Wasteful Spending at the Department of
     Defense* (Mar. 20, 2025), https://media.defense.gov/2025/Mar/20/2003673531/-1/-
27   1/0/CONTINUING-ELIMINATION-OF-WASTEFUL-SPENDING-AT-THE-DEPARTMENT-
     OF-DEFENSE.PDF.
28

377.    On information and belief, DOD grant terminations have caused serious harm to UC researchers.

378.    For example, a development economist at UC Santa Barbara received a grant through DOD's Minerva Research Initiative, a social sciences program built to learn from the failures of the September 11, 2001 terrorist attacks.[125] Her grant to study the effects of climate shocks on food security in sub-Saharan Africa—awarded in 2023 for three years with an option of two more—was terminated.[126]

379.    On information and belief, by effectuating mass terminations of grants to UC researchers without proper review or clear explanation, DOD acted unconstitutionally and unlawfully, as set forth in the Claims for Relief asserted below.

### 4.    <u>Department of Education</u>

380.    Department of Education grants were an early DOGE target. On February 10, DOGE announced (on X, Elon Musk's social media platform) that it had terminated 29 "DEI training grants" totaling over $100 million.[127] DOGE also announced the termination of 89 other Department of Education contracts. This included contracts made by the Department's nonpartisan research arm, the Institute of Education Sciences.[128]

381.    When asked for comment on the terminations, a spokesperson for the Department stated: "We kindly point you to the X post from DOGE."[129]

382.    On information and belief, Department of Education grant terminations have caused serious harm to UC researchers.

---

[125] Nick Evans, *Save the Minerva Research Initiative — Again*, Breaking Defense (Apr. 11, 2025), https://breakingdefense.com/2025/04/save-the-minerva-research-initiative-again/..

[126] Smriti Mallapaty, *'Boggles the mind': US defence department slashes research on emerging threats*, Nature (Mar. 21, 2025), https://www.nature.com/articles/d41586-025-00840-7.

[127] DOGE (@DOGE), *Also today, the Department Of Education terminated 89 contracts worth $881mm.* (Feb. 10, 2025), https://x.com/DOGE/status/1889113011282907434.

[128] Rebecca Carballo & Juan Perez Jr., *DOGE announces $881 million in cuts for Education Department Contracts*, Politico (Feb. 10, 2025), https://www.politico.com/news/2025/02/10/education-department-pauses-research-contracts-00203494.

[129] Kalyn Belsha, *Crucial research halted as DOGE abruptly terminates Education Department contracts*, Chalkbeat (Feb. 11, 2025), https://www.chalkbeat.org/2025/02/11/elon-musk-and-doge-cancel-education-department-research-contracts/.

383.    By terminating grants at the direction of the President and DOGE, the Department has violated its congressional mandates. Such mandates include, for example, compliance with and effectuation of the legislative purposes implicit in congressional appropriations, and specific directives such as 20 U.S.C. §§ 9511, 9512 (establishing Institute of Education Sciences).

384.    On information and belief, the Department effectuated mass terminations of grants to UC researchers without proper review or clear explanation, thereby acting unconstitutionally and unlawfully as set forth in the Claims for Relief asserted below.

### 5.    Department of Energy

385.    The Department of Energy (DOE) quickly began department-wide restructuring pursuant to Trump orders. On February 5, 2025, the Secretary of Energy announced that DOE would "take immediate action . . . in accordance with President Trump's executive orders."[130]

386.    DOE began implementing Defendant Trump's orders with help from DOGE. In a press release, DOE announced that it was appointing the then-current head of DOGE at DOE, Carl Coe, as its new Chief of Staff. The press release specified that Coe "has worked closely with Secretary Wright" in order to effectuate "process improvement and cost savings," or what DOE referred to as "DOGE efforts."[131]

387.    Soon thereafter, DOE instituted a 15% cap on indirect costs for university research grants, even while acknowledging that "many grant recipients use indirect cost payments to effectuate research funded by the Department's grant awards." This action was taken to

---

[130] Chris Wright, *Unleashing the Golden Era of American Energy Dominance,* U.S. Dep't of Energy (Feb. 5, 2025), https://www.energy.gov/articles/secretary-wright-acts-unleash-golden-era-american-energy-dominance.
[131] U.S. Dep't of Energy, *DOE Announces New Leadership to Tackle Challenges of Growing Energy Demand* (May 2, 2025), https://www.energy.gov/articles/doe-announces-new-leadership-tackle-challenges-growing-energy-demand.

"deliver[] on President Trump's commitment" to slash research grants.[132] The cap has been temporarily enjoined.[133]

388.    On May 15, 2025, Secretary Wright issued a Secretarial Memorandum titled: "Secretarial Policy on Ensuring Responsibility for Financial Assistance."[134] The memo announced that DOE would be reviewing prior funding awards to ensure they are "consistent with… this Administration's policies and priorities." It also announced an intent to terminate projects.

389.    DOE stated its review would begin by reviewing 179 awards that totaled over $15 billion, and would then extend to other awards.[135]

390.    DOE is one of the largest funders of UC research. UC researchers have been or will be seriously harmed by DOE's imminent grant terminations.

391.    By terminating or imminently terminating grants to UC researchers at the direction of the President and DOGE, DOE has violated its congressional mandates. Such mandates include, for example, compliance with and effectuation of the legislative purposes implicit in congressional appropriations.

392.    By effectuating mass terminations of grants to UC researchers without proper review or clear explanation, DOE acted unconstitutionally and unlawfully as set forth in the Claims for Relief asserted below.

---

[132] U.S. Dep't of Energy, *Department of Energy Overhauls Policy on College and University Research, Saving $405 Million Annually for American Taxpayers* (Apr. 11, 2025), https://www.energy.gov/articles/department-energy-overhauls-policy-college-and-university-research-saving-405-million.

[133] *Id.*

[134] Chris Wright, *Secretarial Policy on Ensuring Responsibility for Financial Assistance*, EXEC-2025-005990, U.S. Dep't of Energy (May 14, 2025), https://www.energy.gov/sites/default/files/2025-05/EXEC-2025-005990%20-%20Secretarial%20Policy%20-PRP%20-%205-14-25%20(FINAL)%20(2).pdf.

[135] U.S. Dep't of Energy, *Secretary Wright Announces New Policy for Increasing Accountability, Identifying Wasteful Spending of Taxpayer Dollars* (May 15, 2025), https://www.energy.gov/articles/secretary-wright-announces-new-policy-increasing-accountability-identifying-wasteful.

1

2

**6.**    **Department of Health and Human Services, including the Centers for Disease Control, the Food and Drug Administration, and the National Institutes of Health**

3      393.    The Department of Health and Human Services (HHS) has been explicit

4   about its adherence to Trump's and DOGE's orders. HHS announced on March 27, 2025 that it

5   would begin "restructuring in accordance with President Trump's Executive Order" creating

6   DOGE.[136]

7      394.    HHS has cancelled hundreds of millions of dollars in research grants,

8   including grants related to COVID-19, to prioritize "projects that will deliver on President

9   Trump's mandate[s]."[137]

10      395.    HHS is taking such action at DOGE's direction, and promoting the idea

11   that it has "saved" $67 billion."[138] The "Defend the Spend" collaboration between DOGE and

12   HHS has frozen thousands of grants.[139]

13      396.    Indeed, DOGE operatives have personally directed top NIH officials to

14   terminate "hundreds" of grants.[140]

15      397.    *Science* reported in late March that DOGE would begin reviewing all new

16   NIH grant funding applications to ensure that HHS-funded research aligned with Trump

17   priorities.[141]

18      398.    By terminating grants to UC researchers at the direction of the President

19   and DOGE, HHS has violated its congressional mandates. Such mandates include, for example,

20

21   [136] Chris Wright, *Unleashing the Golden Era of American Energy Dominance,* U.S. Dep't of Energy (Feb. 5, 2025), https://www.energy.gov/articles/secretary-wright-acts-unleash-golden-era-american-energy-dominance.

22   [137] Brandy Zadrozny, *CDC Pulling Back $11B in COVID Funding Sent to Health Departments*, NBC News (Mar. 25, 2025), https://www.nbcnews.com/health/health-news/cdc-pulling-back-

23   11b-covid-funding-sent-health-departments-rcna198006.
   [138] U.S. Dep't of Health & Human Servs., *Celebrating Big Wins of the Trump Administration*,

24   https://www.hhs.gov/hhs-big-wins-maha/index.html (last visited May 28, 2025).

25   [139] Dan Diamond, et al., *DOGE, Trump Grants, HHS NIH Backlog*, Washington Post (Apr. 17, 2025), https://www.washingtonpost.com/politics/2025/04/17/doge-trump-grants-hhs-nih-

26   backlog/.
   [140] Max Kozlov, *NIH killed grants on orders from Elon Musk's DOGE,* Nature (May 21, 2025),

27    https://www.nature.com/articles/d41586-025-01617-8.
   [141] Sara Readon, *Trump Officials Will Screen NIH Funding Opportunities*, Science Adviser (Mar.

28   26, 2025), https://www.science.org/content/article/trump-officials-will-screen-nih-funding-opportunities.

1   compliance with and effectuation of the legislative purposes implicit in congressional

2   appropriations; spending required by 42 U.S.C. § 241; and directives to HHS subunits.

3          399.    HHS's mass grant terminations have caused serious harm to UC

4   researchers, including those who received grants through HHS's subunits: the Centers for Disease

5   Control (CDC), the Food and Drug Administration (FDA), and the National Institutes of Health

6   (NIH).

7          400.    HHS's own database of grant terminations reveals that it has terminated

8   104 grants to UC recipients.[142] A study published on May 8, 2025 identified UCSF as being

9   particularly hard-hit by HHS grant terminations.[143]

10         401.    As but one example, a UC Berkeley statistician in March received a form

11  notice stating that the FDA was terminating already awarded grant funding for his project "Health

12  and Neurodevelopmental Outcomes in Infants at Risk for Neonatal Opioid Withdrawal

13  Syndromes: Effects of Timing and Duration of Prenatal Opioid Exposure and Postnatal

14  Management with ESC" had been terminated.

15         402.    The premise of the grant research was that non-pharmacological

16  approaches to managing neonatal opioid withdrawal syndrome (NOWS) in infants, such as the

17  use of "Eat, Sleep, Console (ESC)," improve infant outcomes compared to opioid replacement

18  treatment. The project planned to compare differences in outcomes between opioid replacement

19  pharmacotherapy and non-pharmacological management in infants with NOWS.

20         403.    As a result of the grant termination, progress on this critical project has

21  been delayed and left incomplete.

22         404.    Moreover, the UC researcher has had to backfill for lost funding, including

23  by agreeing to teach an online introductory statistics course that will require many hours of

24

25  [142] U.S. Dep't of Health & Human Servs., *HHS Grants Terminated* (May 23, 2025),
    https://taggs.hhs.gov/Content/Data/HHS_Grants_Terminated.pdf.

26  [143] Michael Liu, Kushal T. Kadakia & Vishal R. Patel, *Characterization of Research Grant*
    *Terminations at the National Institutes of Health*, JAMA Network (May 8, 2025),

27  https://jamanetwork.com/journals/jama/fullarticle/2833880?guestAccessKey=3a432109-6c9d-
    4ef2-9d10-

28  bf48d91fe441&utm_source=for_the_media&utm_medium=referral&utm_campaign=ftm_links&
    utm_content=tfl&utm_term=050825.

preparation and instruction. Time he spends on this would otherwise have been committed to research.

405.    Additionally, the researcher has been unable to offer research assistantships to graduate students due to lack of funding, limiting his research productivity. Finally, and consequentially vis-à-vis training a next generation of researchers, the graduate student supported by the grant award has been unable to continue his planned dissertation work involving project data.

406.    The CDC also terminated a grant awarded to a UC Berkeley Biostatistician/Epidemiologist for a project titled "Strengthening California's Public Health Workforce to Improve Decision Making and Health Equity Through Advanced Training and Academic Partnership."

407.    On information and belief, HHS and its subunits have effectuated mass terminations of grants to UC researchers without proper review or clear explanation, thereby acting unconstitutionally and unlawfully as set forth in the Claims for Relief asserted below.

### 7.    Institute of Museum and Library Services

408.    Through an Executive Order, Defendant Trump called for the elimination of the Institute of Museum and Library Services (IMLS).[144] IMLS grant activities have been hit particularly hard by Defendants' illegal actions.

409.    On information and belief, IMLS's mass termination of grants likewise occurred at DOGE's direction. On its social media account X, IMLS wrote: "The era of using your taxpayer dollars to fund DEI grants is OVER." The post tagged DOGE and reposted a Fox News post asserting that "Trump's DOGE push slashes millions."[145]

---

[144] Exec. Order No. 14238, *Continuing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 813043 (Mar. 14, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/continuing-the-reduction-of-the-federal-bureaucracy/.

[145] U.S. Inst. of Museum & Library Servs. (@US_IMLS), *The era of using your taxpayer dollars to fund DEI grants is OVER.* (Apr. 3, 2025), https://x.com/US_IMLS/status/1907814174693941660.

410.    In early April 2025, UC researchers who had previously received IMLS grants received a form letter terminating their grants. It read:

> This letter provides notice that the Institute of Museum and Library Services (IMLS) is terminating your federal grant ([Grant Application No.]) effective April 8, 2025, in accordance with the termination clause in your Award Agreement. Upon further review, IMLS has determined that your grant is unfortunately no longer consistent with the agency's priorities and no longer serves the interest of the United States and the IMLS Program. IMLS is repurposing its funding allocations in a new direction in furtherance of the President's agenda. Independently and secondly, the President's March 14, 2025 executive order mandates that the IMLS eliminate all non-statutorily required activities and functions. See Continuing the Reduction of the Federal Bureaucracy, E.O. 14238 (Mar. 14, 2025). Therefore, the IMLS hereby terminates your grant in its entirety effective April 8, 2025. …. Please contact grant-notices@imls.gov with only urgent questions. We wish you well.

411.    UC researchers are concretely harmed by the termination of IMLS grants.

412.    By terminating grants at the direction of the President and DOGE, IMLS has violated its congressional mandates. Such mandates include, for example, compliance with and effectuation of the legislative purposes implicit in congressional appropriations, and the more general direction in 20 U.S.C. §§ 9108, 9162, 9165, 9175 (notably, the last two sections direct IMLS to "develop a diverse workforce" of library and museum professionals).

413.    By effectuating mass terminations of grants to UC researchers without proper review or clear explanation, IMLS acted unconstitutionally and unlawfully as set forth in the Claims for Relief asserted below.

**8.    Department of the Interior, including National Park Service**

414.    The Department of the Interior (DOI) has worked closely with DOGE to implement Defendant Trump's orders. DOI said that it was "committed to supporting President Trump's Executive Order" creating DOGE.[146]

415.    DOI allowed a DOGE staffer to prepare lists of grants for termination, flagging those that addressed "climate" or "D.E.I." As of May 7, 2025, a DOGE staff member

---

[146] U.S. Dep't of the Interior, *SO-3429 – Consolidation, Unification, and Optimization of Administrative Function* (Apr. 17, 2025), https://www.doi.gov/document-library/secretary-order/so-3429-consolidation-unification-and-optimization-administrative.

1  had earmarked many research grants from the National Park Service (NPS) and other DOI

2  subagencies for future termination.[147] DOI has carried out or will imminently carry out these

3  terminations.

4          416.    By terminating grants at the direction of the President and DOGE, DOI has

5  violated its congressional mandates. Such mandates include, for example, compliance with and

6  effectuation of the legislative purposes implicit in congressional appropriations, and other

7  legislation specifying the functions of individual DOI subunits, such as NPS.[148]

8          417.    DOI has terminated or will imminently terminate grants to UC researchers,

9  causing concrete harm.

10          418.    By effectuating mass terminations of grants to UC researchers without

11  proper review or clear explanation, DOI acted unconstitutionally and unlawfully as set forth in the

12  Claims for Relief asserted below.

13          **9.       Department of State, including USAID**

14          419.    Early into President Trump's tenure, DOGE set its sights on USAID,

15  essentially gutting the entire agency.[149]

16          420.    USAID terminated grants to UC researchers, causing serious harm.

17          421.    By terminating grants at the direction of the President and DOGE, the State

18  Department has violated its congressional mandates. Such mandates include, for example,

19  compliance with and effectuation of the legislative purposes implicit in congressional

20  appropriations, such as the fiscal year 2024 Department of State and Foreign Operations

21  Appropriations Act.

22

23

24  [147] Lisa Friedman, *Trump Administration is Said to Target Park Services*, The New York Times
25  (May 7, 2025), https://www.nytimes.com/2025/05/07/climate/trump-park-service-grants-
    cuts.html.
26  [148] *See, e.g.*, U.S. Nat'l Park Serv., *Grants for Cultural Resources, Consultation, and
    Repatriation*, https://www.nps.gov/history/grants.htm (last visited May 29, 2025), ("Grant
27  programs fund projects as described or limited by their authorizing legislation.").
    [149] Ellen Knickmeyer, *Trump Administration Fires at Least 1,600 USAID Workers*, AP News
28  (Feb. 23, 2025), https://apnews.com/article/usaid-trump-musk-foreign-aid-firings-
    a3af8ce6ef17878b718c8e2ed3bf98e4.

422.    By effectuating mass terminations of grants to UC researchers without proper review or clear explanation, the State Department acted unconstitutionally and unlawfully as set forth in the Claims for Relief asserted below.

**10.    Department of Transportation**

423.    The Department of Transportation (DOT) quickly fell in line with Trump's orders. Secretary of Transportation Sean Duffy told recipients of DOT funding that they must comply with President Trump's orders if they wished to continue receiving it.[150]

424.    In a memorandum to staff in early March 2025, DOT required review of all grant projects announced from fiscal year 2022 through 2025, requiring termination of grants that "are allocating funding to advance climate, equity, and other priorities counter to the Administration's Executive Orders."[151]

425.    DOGE has also directed DOT to slash university research grants. Secretary Duffy has openly discussed DOGE's cost-cutting efforts at DOT,[152] and Elon Musk has broadcast posts on social media about his collaboration with Secretary Duffy to cancel university research grants.[153]

426.    By terminating grants at the direction of the President and DOGE, DOT has violated its congressional mandates. Such mandates include, for example, compliance with and effectuation of the legislative purposes implicit in congressional appropriations, and 49 U.S.C. § 330.

---

[150] U.S. Dep't of Transp., *U.S. Transportation Secretary Sean P. Duffy Defunds Woke University Grants* (May 2, 2025), https://www.transportation.gov/briefing-room/us-transportation-secretary-sean-p-duffy-defunds-woke-university-grants.

[151] Jeff Davis, *USDOT Issues Review Procedures for Competitive Grants*, Eno Transp. Found. (Mar. 14, 2025), https://enotrans.org/article/document-usdot-issues-review-procedures-for-competitive-grants/#:~:text=Summary:%20All%20competitive%20grant%20and,Government%20DE%20Programs%20and%20Preferencing.

[152] YouTube, *Sean Duffy: My Department's Role Is Safety*, Fox News https://youtu.be/rNM-Fb0jI_0?feature=shared (last visited May 28, 2025).

[153] Elon Musk (@elonmusk). *Working with @SecDuffy, the @DOGE is glad to stop funding studies to determine if roads are racist* (May 2, 2025), https://x.com/elonmusk/status/1918412277709193503.

427.    DOT's mass termination of grants has caused concrete harm to UC researchers.

428.    For example, DOT unlawfully terminated $12 million in previously allocated funding to UC Davis for research on equitable decarbonization.[154] This cut also affected researchers at UC Riverside, a university partner of the UC Davis-based sustainable transportation research consortium that originally received the grant.[155]

429.    On information and belief, DOT effectuated mass terminations of grants to UC researchers without proper review or clear explanation, thereby acting unconstitutionally and unlawfully as set forth in the Claims for Relief asserted below.

## V.    **The Trump Administration Is Threatening Additional, Illegal Funding Cuts to the UC System**

430.    In the days leading up to the filing of this complaint, the head of DOJ's "antisemitism task force," Leo Terrell, announced forthcoming "massive lawsuits" targeting the UC system. According to Terrell, the DOJ is "going to go after [the UC system] where it hurts them financially." If recent actions against other universities are any guide, this will likely include the revocation of additional congressionally allocated grants and funds. These anticipated cuts, while not directly implicated by this lawsuit, borrow from the same playbook and are part of the same executive branch scheme of illegally seizing and weaponizing the power of the purse to harm universities and their faculty, to the great detriment of the American public.

## VI.    **Unless Enjoined, Grant Terminations Will Cause Irreparable Harm to Plaintiffs, the Class, and the Nation**

431.    Plaintiffs and the proposed Class have suffered and will continue to suffer the following injuries as a direct result of Defendants' conduct:

---

[154] U.S. Dep't of Transp., *U.S. Transportation Secretary Sean P. Duffy Defunds Woke University Grants* (May 2, 2025), https://www.transportation.gov/briefing-room/us-transportation-secretary-sean-p-duffy-defunds-woke-university-grants.

[155] Sam Chiu, *UC Davis Secures $20 Million Federal Grant Renewal to Lead the National Center for Sustainable Transportation*, UC Davis Inst. of Transp. Studies (Feb, 23, 2023), https://its.ucdavis.edu/blog-post/uc-davis-secures-20-million-federal-grant-renewal-to-lead-the-national-center-for-sustainable-transportation/.

a.      Interruption or abandonment of ongoing research projects as a direct result of the loss of previously awarded grants;

b.      Attendant reduction of employment for or layoffs of researchers and their staff;

c.      Career disadvantage, including: loss of opportunities to publish research, inability to attend project-relevant conferences, and reduced ability to obtain related or follow-on grants;

d.      Expenditure of considerable time and effort to find substitute funding;

e.      The need to support project team members with discretionary funds, or to otherwise duct-tape solutions to a massive funding shortfall that first manifests as an immediate cash flow problem within affected campus research units; and

f.      Reputational injury, including loss of trust from the community partners so integral to ensuring that public university research is responsive and relevant to local needs.

432.    These direct, concrete injuries to Plaintiff researchers themselves have an inexorable and damaging ripple effect on the research mission of individual researchers and research teams; on the research mission of the UC system itself; on the citizens of California; and on all Americans, and indeed people throughout the world, who daily benefit from the fruits of UC discoveries, innovations, and inventions.

## CLAIMS FOR RELIEF

### COUNT I –
**Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;
Violation of Separation of Powers**

433.    Plaintiffs reallege all paragraphs above as if fully set forth herein.

434.    This Court has jurisdiction to enjoin federal officials from violating the Constitution, including the separation of powers. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

435.    The Constitution empowers Congress to make laws, U.S. Const. art. 1, § 1, and requires the President to "take Care that the Laws be faithfully executed," *id.* art. II, § 3. The "Take Care Clause" assures that, consistent with the structural and functional separation of

powers on which our system of government is based—and on which it depends—"Congress makes the laws and the President faithfully… executes them." *Utility Air Reg. Grp. v. Envtl. Prto. Agency*, 573 U.S. 302, 327 (2014) (cleaned up). The faithfulness the Constitution requires of the Executive is not to the President's views on priorities, but to the laws enacted by Congress as interpreted and enforced by the Courts. Congress's powers to set the policies of the nation are at their apex when it comes to spending money, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

436. The executive branch has no constitutional authority to refuse to carry out laws enacted by Congress, and it has no constitutional authority to block, amend, subvert, or delay spending appropriations based on the President's own policy preferences. For nearly two hundred years, it has been established that a president violates the Take Care Clause when he overrides statutes enacted by Congress, or refuses to execute such statutes or their implementing regulations. *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838). The President "is without authority to set aside congressional legislation by executive order." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999).

437. Defendants' decisions to unilaterally cancel duly awarded grants and withhold funding that Congress has appropriated precisely to fund such grants violates the separation of powers.

438. Defendants' decisions to delay spending and outright refuse to spend the amounts Congress appropriated violates Congress's power of the purse and the separation of powers.

439. Because Defendants' actions violate the separation of powers and are *ultra vires*, they should declared unconstitutional and enjoined.

### COUNT II –
**Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;**
**Violation of First Amendment (Content and Viewpoint Discrimination)**

440. Plaintiffs reallege all paragraphs above as if fully set forth herein.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    441.    The First Amendment provides that the federal government "shall make no

2    law . . . abridging the freedom of speech." U.S. Const. amend. I.

3    442.    The First Amendment prohibits the government from "regulating speech

4    when the specific motivating ideology or the opinion or perspective of the speaker is the rationale

5    for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

6    "Discrimination against speech because of its message is presumed to be unconstitutional." *Id.* at

7    828.

8    443.    "[E]ven in the provision of subsidies, the Government may not 'ai[m]at the

9    suppression of dangerous ideas.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587

10    (1998) (quoting *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 550 (1983)

11    (alteration in original)). In the grant-making context, the government may not reject "a whole

12    class of projects" based on "viewpoint alone," or use Federal funding to "impose a

13    disproportionate burden calculated to drive certain ideas or viewpoints from the marketplace."

14    *Rhode Island Latino Arts v. Nat'l Endowment for the Arts*, No.25-cv-79-WES, 2025 WL

15    1009026, at *12 (D.R.I. Apr. 3, 2025) (quoting *Finley*, 524 U.S. at 587).

16    444.    Defendants' mass termination of grants to disadvantage or promote

17    particular political and ideological viewpoints is "the product of invidious viewpoint

18    discrimination." *Finley*, 524 U.S. at 587. In an effort to drive views they disfavored out of the

19    marketplace of ideas, Defendants terminated many grants based on the recipients' (presumed)

20    viewpoint as reflected in the subject matter of their research. This is most evident in the

21    Termination Notices' citation to Executive Orders purporting to combat "Radical Indoctrination"

22    and "Radical . . . DEI Programs," and to further "Biological Truth." The Termination Notices

23    make plain that Defendants believe that the content of Plaintiffs' speech conflicts with the

24    Administration's views, and Plaintiffs' grants were terminated at least in part for this reason. The

25    First Amendment does not tolerate such viewpoint discrimination.

26    445.    Accordingly, Defendants' actions are not in accordance with law and are

27    contrary to constitutional right or power.

28

**COUNT III –**
**Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;**
**Violation of Fifth Amendment (Due Process / Void for Vagueness)**

446.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

447.    The Due Process Clause of the Fifth Amendment to the Constitution requires due process of law before the deprivation of a constitutionally protected interest.

448.    Plaintiffs have a constitutionally protected property interest in grant funding that supports their salaries and stipends, as well as their ongoing research. Plaintiffs have relied on this funding, and the protections of federal law governing this funding, in pursuing their research, in hiring staff, in making commitments to research partners, and in many other ways. Plaintiffs also have constitutionally protected liberty interests in their freedom of speech and expression, including academic freedom, and in pursuing their livelihoods.

449.    Defendants' cancellation or imminent cancellation of federal grant funding does not provide Plaintiffs fair notice or a reasonable opportunity to be heard.

450.    The Due Process Clause also prohibits government actions that fail to give fair notice of what conduct is forbidden or required. A government enactment is unconstitutionally vague if it fails to provide a reasonable opportunity to know what conduct is prohibited or is so indefinite as to allow arbitrary and discriminatory enforcement.

451.    Because of the vagueness in the language of Defendant Trump's Orders and the Federal Agency Defendants' chaotic efforts to give effect to those Orders, Plaintiffs are unsure, for example, which areas of study they can pursue, which populations they can focus on as study subjects, and what the demographics of study participants must be. This makes it impossible to determine how to reconfigure future research to stay within the bounds of the agencies' newest "priorities."

452.    Defendants' efforts to purge certain disfavored research from federal agencies' grant rolls accordingly violates the Due Process Clause.

- 95 -

**COUNT IV –**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C): Contrary to Law;**
**Illegal Departure from Impoundment Control Act, Statutes, and**
**Regulations**

453.     Plaintiffs reallege all paragraphs above as if fully set forth herein.

454.     The APA directs courts to "hold unlawful and set aside agency actions, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law … [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A),(C). Defendants' actions violate these provisions, calling on the Court to hold them unlawful and set them aside for several reasons, including those specified below.

455.     First, by refusing to spend money that Congress appropriated, Defendants are violating the Impoundment Control Act of 1974 (ICA), and the appropriations statutes underlying each agency's funding scheme. Under the ICA, a "deferral" includes any "withholding or delaying the obligation or expenditure of" appropriated funds, as well as "any other type of Executive action or inaction which effectively precludes the obligation or expenditure of" appropriated funds. 2 U.S.C. § 682(1). When the executive branch wishes to defer funds, it must send a special message to Congress detailing the money to be deferred and the reasons for deferral. There are only three permissible grounds for deferrals, *id.* § 684(b), none of which includes effort to ensure funds are spent consistent with the President's new policy priorities.

456.     Defendants' actions constitute a "deferral" because they reflect a "withholding or delaying [of] the obligation or expenditure of" funds that Congress appropriated. Defendants did not notify Congress of the deferrals as the ICA requires, nor did Defendants undertake the deferrals for reasons the ICA permits.

457.     Defendants' actions also constitute an unlawful "rescission" of the funds appropriated for agency action, including grant-making. Where the President seeks to "rescind" appropriated funds, the ICA requires, among other things, that the President send a special message to Congress specifying the funds he seeks to have rescinded and the reasons for his proposal. 2 U.S.C. § 683(a). The President did not do so.

458.     Second, Defendants are violating the agencies' enabling statutes and other laws passed by Congress that include grant-making as a directive to the agencies. The work that Plaintiffs and the Class were awarded grants to perform furthers agency missions and fulfills specific statutory requirements set by Congress. Withholding the appropriated funds contradicts Congress's directives.

459.     Third, where grants were issued in accordance with agency-specific rules and terminated for reasons inconsistent with those rules, Defendants are violating their own regulations and agreements.

**COUNT V –
Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A): Arbitrary and Capricious
Failure to Engage in Reasoned Decision-making**

460.     Plaintiffs reallege all paragraphs above as if fully set forth herein.

461.     A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Government agencies and officers act in an arbitrary and capricious manner if they fail to engage in "reasoned decision-making." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (citation omitted). Agency action is therefore lawful only if it rests "on a consideration of the relevant factors." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). This principle applies *a fortiori* to agency departures from long settled policy. *Id.*

462.     Further, agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*  Agency action is also arbitrary and capricious if, when departing from a prior policy, an agency does not "display awareness that it *is* changing position" or does not "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original).

463.    Defendants' mass termination of grants previously awarded to Plaintiffs and the Class was arbitrary and capricious for many reasons, including (but not limited to) the following:

a.    The Termination Notices do not provide a reasoned explanation for grant cancellations. Rather, the letters sent across all agencies generally state that the grant being cancelled no longer "effectuates" or is no longer "in alignment" with Agency priorities. That generic statement is not a reasoned explanation.

b.    The terminations ignore the reliance interests of grantees. For example, grantees who had already received some but not all of their awards had already spent significant time working on the projects funded by their grants. Similarly, many grantees—as their grants required—took leaves of absence from their jobs, cancelled teaching plans, or otherwise altered their employment status in reliance on the promise of receiving grant money to support them while they completed their projects.

c.    The grant terminations conflict with prior agency decisions to award the grants without providing adequate explanation for the change in agency position. All class members received their grants after a rigorous and objective application and review process that necessarily established that funded projects were meritorious and satisfied relevant criteria. Defendants have failed to provide any reason the grants fail to satisfy applicable criteria.

d.    The mass termination of grants "entirely failed to consider. . . important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. Among other things, Defendants ignored the waste and inefficiency caused by the terminations, given the investment that Federal Agency Defendants—and by extension, taxpayers—have already made in the terminated projects.

e.    Defendants likewise failed to consider the significant consequences grant termination will have on the individuals and organizations involved in conducting research, the durability of the institutions in which they work, and on the broader public that will be deprived of benefits meant to accrue from the work accomplished with the grant funding.

464.    Defendants have failed to adequately justify their actions; have not considered the substantial reliance interests at stake; have relied on factors that Congress did not

1    authorize them to consider; and have not acknowledged or justified their change from prior

2    agency positions.

3            465.    In sending standardized termination letters to terminate grants *en masse*,

4    Defendants failed to "examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for

5    [their] decision, 'including a rational connection between the facts found and the choice made,'"

6    *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019) (quoting *State Farm*, 463 U.5. at 43).

7    The terminations must be set aside under the APA as arbitrary and capricious.

8                            **PRAYER FOR RELIEF**

9            WHEREFORE, Plaintiffs respectfully request that the Court certify a UC Researchers

10   Class pursuant to Fed. R. Civ. P. 23(a)(1)-(4) and 23(b)(2), enter judgment in favor of Plaintiffs

11   and the certified UC Researchers Class, and award Plaintiffs and the Certified UC Researchers

12   Class the following relief:

13           A.    Declare as unlawful and set aside Defendants' Termination Notices that

14   terminated grants previously awarded to Plaintiffs and members of the UC Researchers Class, as

15   violative of the Constitutional separation of powers; the First and Fifth Amendment protections of

16   free speech and due process; the Impoundment Control Act; agency-specific statutes and

17   regulations, including congressional directives and appropriations acts; and the Administrative

18   Procedure Act;

19           B.    Declare as *ultra vires* Defendants' decisions and implementation of the

20   mass termination of grants to Plaintiffs and the UC Researchers Class;

21           C.    Grant preliminary and ultimately final injunctive relief to enjoin

22   Defendants from cutting off agency and grantee access to congressionally appropriated funding,

23   from giving effect to the violative terminations, or undertaking any similar violative action to

24   terminate additional duly awarded agency grants; to restore such previously awarded grants; to

25   require Defendants to provide no-cost extensions to grantees for the time necessary to resume and

26   complete interrupted work; and to return to the lawful and orderly grant procedures they

27   employed prior to January 20, 2025;

28           D.    Appoint the Named Plaintiffs as Class Representatives, and the

1  undersigned counsel, as Class Counsel upon certification of a UC Researchers Class pursuant to

2  Fed. R. Civ. P. 23(g);

3         E.     Designate such additional class representatives, class counsel, and sub-

4  classes as the Court may deem appropriate at any time before final judgment, pursuant to Fed. R.

5  Civ. P. 23(c)(1)(C) and 23(c)(5);

6         F.     Award Plaintiffs and counsel for the Proposed Class reasonable costs and

7  attorneys' fees; and

8         G.     Issue such other relief as the Court deems just and proper.

9

10

11  Dated: June 4, 2025           By:     */s/ Claudia Polsky*

12                      Erwin Chemerinsky (*pro hac vice* forthcoming*)*
     echemerinsky@law.berkeley.edu

13       Claudia Polsky (CA Bar No. 185505)
     cpolsky@law.berkeley.edu

14       U.C. BERKELEY SCHOOL OF LAW
     Law Building

15       Berkeley, CA 94720-7200
     Telephone: 510.642.6483

16  Dated: June 4, 2025           By:     */s/ Elizabeth J. Cabraser*

17       Elizabeth J. Cabraser (CA Bar No. 83151)
     ecabraser@lchb.com

18       Richard M. Heimann (CA Bar No. 63607)
     rheimann@lchb.com

19       Kevin R. Budner (CA Bar No. 287271)
     kbudner@lchb.com

20       Annie M. Wanless
     awanless@lchb.com (CA Bar No. 339635)

21       LIEFF CABRASER HEIMANN &
     BERNSTEIN, LLP

22       275 Battery Street, 29th Floor
     San Francisco, CA 94111

23       Telephone: 415.956.1000

24       [*con't next page*]

25

26

27

28

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

| | | |
|---|---|---|
| 1 | Dated: June 4, 2025 | By: _____/s/ Anthony P. Schoenberg_____ |
| 2 | | Anthony P. Schoenberg (CA Bar No. 203714) |
| | | tschoenberg@fbm.com |
| 3 | | John J. Darin (CA Bar No. 323730) |
| | | jdarin@fmb.com |
| 4 | | Katherine T. Balkoski (CA Bar No. 353366) |
| | | kbalkoski@fbm.com |
| 5 | | FARELLA BRAUN + MARTEL LLP |
| | | One Bush Street, Suite 900 |
| 6 | | San Francisco, CA 94104 |
| | | Telephone: 415. 954.4400 |
| 7 | | |
| | | *Attorneys for Plaintiffs and the Proposed Class* |
| 8 | | |

1

**FILER'S ATTESTATION**

2        I hereby attest that each Signatory has concurred in the filing of this document, as

3    indicated by their conformed signatures within this e-filed document.

4

5        Dated: June 4, 2025                                    */s/ Elizabeth J. Cabraser*
                                                              Elizabeth J. Cabraser

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF