Erwin Chemerinsky (*pro hac vice* forthcoming*)*
echemerinsky@law.berkeley.edu
Claudia Polsky (CA Bar No. 185505)
cpolsky@law.berkeley.edu
U.C. BERKELEY SCHOOL OF LAW
Law Building
Berkeley, CA 94720-7200
Telephone: 510.642.6483

Elizabeth J. Cabraser (CA Bar No. 83151)
ecabraser@lchb.com
Richard M. Heimann (CA Bar No. 63607)
rheimann@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000

Anthony P. Schoenberg (CA Bar No. 203714)
tschoenberg@fbm.com
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, CA 94104
Telephone: 415. 954.4400

*Attorneys for Plaintiffs and the Proposed Class*
[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| NEETA THAKUR, KEN ALEX, NELL GREEN NYLEN, ROBERT HIRST, CHRISTINE PHILLIOU, and JEDDA FOREMAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF GOVERNMENT EFFICIENCY ("DOGE"); AMY GLEASON, in her official capacity as Acting Administrator of the Department of Government Efficiency; NATIONAL SCIENCE FOUNDATION;<br><br>[*caption cont'd next page*] | Case No. 3:25-cv-04737-RL<br><br><br>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>The Honorable Rita F. Lin |

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737-

1

BRIAN STONE, in his official capacity as
2 Acting Director of the National Science
Foundation;
3 NATIONAL ENDOWMENT FOR THE
HUMANITIES;
4 MICHAEL MCDONALD, in his official
capacity as Acting Chairman of the National
5 Endowment for the Humanities;
UNITED STATES ENVIRONMENTAL
6 PROTECTION AGENCY;
LEE ZELDIN, in his official capacity as
7 Administrator of the U.S. Environmental
Protection Agency;
8 UNITED STATES DEPARTMENT OF
AGRICULTURE;
9 BROOKE ROLLINS, in her official capacity as
Secretary of the U.S. Department of Agriculture;
10 AMERICORPS (a.k.a. the CORPORATION
FOR NATIONAL AND COMMUNITY
11 SERVICE);
JENNIFER BASTRESS TAHMASEBI, in her
12 official capacity as Interim Agency Head of
AmeriCorps;
13 UNITED STATES DEPARTMENT OF
DEFENSE;
14 PETE HEGSETH, in his official capacity as
Secretary of the U.S. Department of Defense;
15 UNITED STATES DEPARTMENT OF
EDUCATION;
16 LINDA MCMAHON, in her official capacity as
Secretary of the U.S. Department of Education;
17 UNITED STATES DEPARTMENT OF
ENERGY;
18 CHRIS WRIGHT, in his official capacity as
Secretary of Energy;
19 UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
20 ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of the U.S. Department of
21 Health and Human Services;
UNITED STATES CENTERS FOR DISEASE
22 CONTROL;
MATTHEW BUZZELLI, in his official capacity
23 as Acting Director of the Centers for Disease
Control;
24 UNITED STATES FOOD AND DRUG
ADMINISTRATION;
25 MARTIN A. MAKARY, in his official capacity
as Commissioner of the Food and Drug
26 Administration;
UNITED STATES NATIONAL INSTITUTES
27 OF HEALTH;
JAYANTA BHATTACHARYA, in his official
28 capacity as Director of the National Institutes of

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

2

1    Health;
     INSTITUTE OF MUSEUM AND LIBRARY
2    SERVICES;
     KEITH SONDERLING, in his official capacity
3    as Acting Director of the Institute of Museum
     and Library Services;
4    UNITED STATES DEPARTMENT OF THE
     INTERIOR;
5    DOUG BURGUM, in his official capacity as
     Secretary of the Interior;
6    UNITED STATES DEPARTMENT OF STATE;
     MARCO RUBIO, in his official capacity as
7    Secretary of the U.S. Department of State;
     DEPARTMENT OF TRANSPORTATION;
8    SEAN DUFFY, in his official capacity as
     Secretary for the U.S. Department of
9    Transportation,

10       Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MEMORANDUM IN SUPPORT OF          3
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

1

# **TABLE OF CONTENTS**

INTRODUCTION...................................................................................................................1

BACKGROUND....................................................................................................................4

I.      Background on Federal Agency Grantmaking........................................................4

        A.      Environmental Protection Agency ..............................................................4

        B.      National Endowment for the Humanities.....................................................6

        C.      National Science Foundation ......................................................................8

        D.      Other Agency Defendants ..........................................................................9

II.     Federal Funds Awarded to the UC System ..........................................................10

III.    The Trump Administration Has Directed Federal Agencies to Terminate Grants...............12

IV.     Grant Terminations Will Cause Irreparable Harm If Not Enjoined.....................15

        A.      Environmental Protection Agency ............................................................15

                1.      Plaintiff Neeta Thakur's Grant Terminations..............................19

                2.      Plaintiff Ken Alex's Grant Termination......................................20

                3.      Plaintiff Nell Green Nylen's Grant Terminations .......................21

        B.      National Endowment for the Humanities...................................................22

                1.      Plaintiff Robert H. Hirst's Grant Termination ............................26

                2.      Plaintiff Christine Philliou's Grant Termination.........................27

        C.      National Science Foundation ....................................................................28

                1.      Plaintiff Jedda Foreman's Grant Terminations ...........................31

        D.      Remaining Federal Agency Defendants....................................................33

ARGUMENT .......................................................................................................................33

I.      This Court Should Enjoin Defendant's Unlawful Termination of Grants. ..........33

        A.      This Court Has Jurisdiction to Hear These Claims. ..................................33

                1.      Plaintiffs Have Article III Standing. ..........................................33

                2.      Plaintiffs Should Not be Channeled to Agency Adjudication.....................34

        B.      Plaintiffs Are Likely to Succeed on the Merits of Their Claims that the Grant Terminations are Unlawful. ..........................................................35

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF      i
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

1             1.       Defendants' Grant Terminations Violate Constitutional Separation of Powers........................................................................................................35

2.       Defendants' Grant Terminations Violate the First Amendment. .................38

3.       Defendants' Grant Terminations Violate the Fifth Amendment..................39

4.       Defendants' Grant Terminations Are Contrary to Law Under the APA Because They Violate the Impoundment Control Act and Other Statutes and Regulations. ..................................................................41

5.       Defendants' Grant Terminations Are Arbitrary and Capricious Under the APA. ..........................................................................................43

C.     The Harms Caused by Defendants' Unlawful Conduct Will Become Irreparable Absent This Court's Intervention. .........................................................47

D.     The Balance of Equities Weigh in Plaintiffs' Favor, and a Temporary Restraining Order Is in the Public Interest. ..............................................................49

CONCLUSION ......................................................................................................................49

PLAINTIFFS' MEMORANDUM IN SUPPORT OF     ii
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## FEDERAL CASES

*In re Aiken Cnty.*,
  725 F.3d 255 (D.C. Cir. 2013) ............................................................................36, 38

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ....................................................................................................35

*Am. Ass'n of Colls. for Teacher Educ. v. McMahon*,
  No. 1:25-cv-00702-JRR, 2025 WL 833917 (D. Md. Mar. 17, 2025) .......................47

*Am. Assoc. of Univ. Professors v. Rubio*,
  No. CV 25-10685-WGY, 2025 WL 1235084 (D. Mass. Apr. 29, 2025)...................44

*Am. Fed'n of Gov't Employees v. OPM*,
  No. 25-cv-01780 (N.D. Cal. Feb. 28, 2025)..................................................................3

*Am. Fed'n of Gov't Employees v. Trump*,
  No. 25-3293 (9th Cir. May 30, 2025) ...........................................................................3

*Am. Fed'n of Gov't Employees v. Trump*,
  No. 25-cv-03698 (N.D. Cal. May 9, 2025) ...................................................................3

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
  No. 25-CV-03698-SI, 2025 WL 1358477 (N.D. Cal. May 9, 2025) .........................34

*American Trucking Ass'ns v. City of Los Angeles*,
  577 F.Supp.2d 1110 (C.D. Cal. 2008).........................................................................48

*American Trucking Ass'ns v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009).....................................................................................48

*Axon Enter., Inc. v. Fed. Trade Comm'n*,
  598 U.S. 175 (2023) ..............................................................................................34, 35

*Bennett v. Spear*,
  520 U.S. 154 (1997) ..............................................................................................43, 44

*Bowsher v. Synar*,
  478 U.S. 714 (1986) ....................................................................................................36

*Brown & Williamson Tobacco Corp. v. FDA*,
  153 F.3d 155 (4th Cir. 1998), *aff'd, FDA v. Brown & Williamson Tobacco
  Corp.*, 529 U.S. 120 (2000)........................................................................................43

PLAINTIFFS' MEMORANDUM IN SUPPORT OF     iii
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .................................................................37

*City & Cnty. of S.F. v. Trump*,
897 F.3d 1225 (9th Cir. 2018).................................................................35

*City & Cnty of S. F. v. USCIS*,
408 F. Supp. 3d 1057 (N.D. Cal. 2019) ..................................................47

*Clarke v. Off. of Fed. Housing Enter. Oversight*,
355 F. Supp. 2d 56 (D.D.C. 2004) ..........................................................49

*Clinton v. City of New York*,
524 U.S. 417 (1998) .................................................................................36

*Cnty. of Santa Clara v. Trump*,
250 F.Supp.3d 497 (N.D. Cal. 2017) .......................................................48

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .....................................................................................44

*Department of Commerce v. New York*,
588 U.S. 752 (2019) ..........................................................................35, 46

*Drs. for Am. v. Off. of Pers. Mgmt.*,
766 F. Supp. 3d 39 (D.D.C. 2025) ..........................................................45

*E. Bay Sanctuary Covenant v. Trump*,
994 F.3d 962 (9th Cir. 2020)....................................................................48

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
36 F.4th 850 (9th Cir. 2022).....................................................................44

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .................................................................................45

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) .................................................................................40

*Fed. Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) ..................................................................37

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ..........................................................................34, 35

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) .................................................................................40

*Health Ins. Ass'n of Am., Inc. v. Shalala*,
23 F.3d 412 (D.C. Cir. 1994) ...................................................................42

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF          iv
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

*J.I. Case Co. v. Borak*,
     377 U.S. 426 (1964) ...................................................................................................35

*Kalispel Tribe of Indians v. U.S. Dep't of the Interior*,
     999 F.3d 683 (9th Cir. 2021)......................................................................................44

*Kaweah Delta Health Care Dist. v. Becerra*,
     123 F.4th 939 (9th Cir. 2024)..............................................................................41, 43

*Kisor v. Wilkie*,
     588 U.S. 558 (2019) ...................................................................................................35

*Lands Council v. McNair*,
     537 F.3d 981 (9th Cir. 2008)......................................................................................48

*Larson v. Domestic & Foreign Com. Corp.*,
     337 U.S. 682 (1949) ...................................................................................................37

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
     752 F.3d 755 (9th Cir. 2014)......................................................................................48

*Leedom v. Kyne*,
     358 U.S.184 (1958) ....................................................................................................37

*Loper Bright Enters. v. Raimondo*,
     603 U.S. 369 (2024) .............................................................................................35, 36

*Lujan v. Defs. of Wildlife*,
     504 U.S. 555 (1992) ...................................................................................................36

*Martin Audubon Soc'y v. Fed. Aviation Admin.*,
     121 F.4th 902 (D.C. Dir. 2024) .................................................................................38

*Massachusetts v. Mellon*,
     262 U.S. 447 (1923) ...................................................................................................36

*Melendres v. Arpaio*,
     695 F.3d 990 (9th Cir. 2012)................................................................................48, 49

*Michigan v. EPA*,
     576 U.S. 743 (2015) ...................................................................................................45

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
     463 U.S. 29 (1983) .........................................................................................44, 45, 46

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
     No. 25-1189 (4th Cir. Mar. 14, 2025) .......................................................................15

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
     No. 25-cv-0333-ABA (D. Md. Feb. 21, 2025)...........................................................15

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF      v
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) .................................................................................................38, 39

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*,
595 U.S. 109 (2022) ........................................................................................................36

*Nat'l Treasury Emps. Union v. U.S. Dept. of Treasury*,
838 F. Supp. 631 (D.D.C. 1993) ....................................................................................49

*Nat'l Treasury Emps. Union v. Vought*,
No. 25-cv-381-ABJ (D.D.C. Feb. 14, 2025) ....................................................................3

*New York v. Trump*,
133 F.4th 51 (1st Cir. 2025) ...........................................................................................44

*New York v. Trump*,
No. 25-cv-00039 (D.R.I. Jan. 31, 2025)......................................................................3, 15

*New York v. Trump*,
No. 25-1236 (1st Cir. Mar. 26, 2025).................................................................................3

*Nw. Env't Advocates v. U.S. EPA*,
537 F.3d 1006 (9th Cir. 2008).........................................................................................41

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,
465 F.3d 977 (9th Cir. 2006)...........................................................................................44

*Oregon v. Ashcroft*,
368 F.3d 1118 (9th Cir. 2004), *aff'd sub nom. Gonzales v. Oregon*, 546 U.S.
243 (2006) .......................................................................................................................44

*Packard Elevator v. ICC*,
782 F. 2d 112 (8th Cir. 1986)..........................................................................................47

*Pangea Legal Servs. v. U.S. Dept. of Homeland Security*,
512 F. Supp. 3d 966 (N.D. Cal. 2021) ...........................................................................48

*Papachristou v. City of Jacksonville*,
405 U.S. 156 (1972) ........................................................................................................40

*Patchak v. Zinke*,
583 U.S. 244 (2018) ........................................................................................................36

*PFLAG, Inc. v. Trump*,
No. 8:25-cv-00337-BAH (D. Md. Mar. 4, 2025)...........................................................15

*Plaut v. Spendthrift Farm, Inc.*,
514 U.S. 211 (1995) ........................................................................................................36

PLAINTIFFS' MEMORANDUM IN SUPPORT OF    vi
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

*Regan v. Taxation with Representation of Wash.*,
  461 U.S. 540 (1983) ............................................................................................................38

*Rhode Island Latino Arts v. Nat'l Endowment for the Arts*,
  No.25-cv-79-WES, 2025 WL 1009026 (D.R.I. Apr. 3, 2025)....................................................39

*Rhode Island v. Trump*,
  No. 25-cv-128-JJM-LDA, 2025 WL 1303868 (D.R.I. May 6, 2025)....................................3, 44

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013)................................................................................................48

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) ............................................................................................................38

*Sierra Club v. Trump*,
  963 F.3d 874 (9th Cir. 2020), *judgment vacated on other grounds*, *sub nom.*
  *Biden v. Sierra Club*, 142 S. Ct. 46 (2021) ................................................................................37

*Tennessee v. Dep't of Educ.*,
  104 F.4th 577 (6th Cir. 2024)................................................................................................47

*Thunder Basin Coal Company v. Reich*,
  510 U.S. 200 (1994) ......................................................................................................34, 35

*Townley v. Miller*,
  722 F.3d 1128 (9th Cir. 2013)................................................................................................34

*U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*,
  665 F.3d 1339 (D.C. Cir. 2012) ..............................................................................................4

*United States v. McIntosh*,
  833 F.3d 1163 (9th Cir. 2016)................................................................................................37

*Washington v. Trump*,
  847 F.3d 1151 (9th Cir. 2017)................................................................................................48

*Washington v. Trump*,
  No. 2:25-cv-244-LK (W.D. Wash. Feb. 28, 2025) ....................................................................15

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
  586 U.S. 9 (2018) ................................................................................................................35

*Widakuswara v. Lake*,
  No. 1:25-CV-1015-RCL, 2025 WL 1166400 (D.D.C. Apr. 22, 2025) ................................38, 49

*Widakuswara v. Lake*,
  No. 25-5144 (D.C. Cir. May 28, 2025) ....................................................................................3

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF    vii
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

*Widakuswara v. Lake*,
   No. 25-cv-1015-RCL (D.D.C. Apr. 22, 2025) ............................................................3

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ..............................................................................................33, 47

*Wolford v. Lopez*,
   116 F.4th 959 (9th Cir. 2024)...........................................................................49

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ....................................................................................36, 37

*Ziglar v. Abbasi*,
   582 U.S. 120 (2017) ............................................................................................35

**FEDERAL STATUTES**

2 U.S.C.
   § 682(1) ............................................................................................................41
   § 683(a) ............................................................................................................42
   § 684(b) ............................................................................................................41

5 U.S.C.
   § 704 .................................................................................................................43
   § 706(2)(A) ...............................................................................................41, 44
   § 706(2)(A), (C) .......................................................................................41, 43

7 U.S.C. § 3157 ...............................................................................................10, 33

20 U.S.C.
   § 951(7) ..............................................................................................................6
   § 951(9) ...........................................................................................................6, 7
   § 956 ..................................................................................................................7
   § 956(c) .........................................................................................................7, 26
   § 956(c)(4) ..........................................................................................................7
   § 956(c)(10) ........................................................................................................7
   § 957(b) ..............................................................................................................7
   § 957(f) ...............................................................................................................7
   § 9108 .........................................................................................................10, 33
   § 9162 .........................................................................................................10, 33
   § 9165 .........................................................................................................10, 33
   § 9175 .........................................................................................................10, 33
   § 9511 .........................................................................................................10, 33
   § 9512 .........................................................................................................10, 33

28 U.S.C. § 1331 ...................................................................................................34

PLAINTIFFS' MEMORANDUM IN SUPPORT OF   viii
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

42 U.S.C.
§ 241 ................................................................................................................10, 33
§ 1862k(a)(6)(A) ..........................................................................................................8
§ 1862k(a)(6)(B) ..........................................................................................................9
§ 1862k(b)(1) ..........................................................................................................9, 42
§ 1862o-5(b) .................................................................................................................9
§ 1862s-5(b)(3), (4) ....................................................................................................42
§ 1862s-5(c) ................................................................................................................42
§ 1862s-5(d)(1) ...........................................................................................................42
§ 1862s(b) .....................................................................................................................9
§ 1885(b) ....................................................................................................................42
§ 12653 ...............................................................................................................10, 33

49 U.S.C. § 330 ....................................................................................................10, 33

Administrative Procedure Act ................................................................................ passim

America COMPETES Act of 2007 ...................................................................................9

Clean Air Act ....................................................................................................................5

Clean Water Act ................................................................................................................5

Impoundment Control Act of 1974 (ICA) ............................................................2, 41, 42

National Science Foundation Authorization Act of 1998 .................................................9

Resource Conservation and Recovery Act .......................................................................5

Safe Drinking Water Act ...................................................................................................5

Toxic Substances Control Act ...........................................................................................5

Pub. L. 81-507 (National Science Foundation Act of 1950, codified at 42 U.S.C. §
1861 et seq.) ....................................................................................................8, 9, 37, 42

Pub. L. 89-209, 79 Stat. 845 (National Foundation on the Arts and Humanities Act
of 1965, codified at 20 U.S.C. §§ 951-60) ....................................................................6

Pub. L. 117-169 (Inflation Reduction Act of 2022) ..............................................5, 13, 17

Pub. L. 117-58 (Infrastructure Investment and Jobs Act) ...............................................13

## FEDERAL RULES AND REGULATIONS

2 CFR § 200.340 .......................................................................................................18, 23

32 CFR § 21.410 .......................................................................................................10, 33

Fed. R. Civ. P. 65(b)(1) ...................................................................................................33

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF          ix
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

Fed. R. Civ. P. 65(c) ................................................................................................................33

**CONSTITUTIONAL AUTHORITIES**

U.S. Const. Amendment I ....................................................................................................38, 39

U.S. Const. Amendment V ...........................................................................................................39

U.S. Const. Article 1, § 1 ............................................................................................................35

U.S. Const. Article I, § 8, cl. 1 .....................................................................................................4

U.S. Const. Article I, § 8, cl. 18 ...................................................................................................4

U.S. Const. Article I, § 9, cl. 7 .....................................................................................................4

U.S. Const. Article II, § 3..................................................................................................35, 37

**EXECUTIVE ORDERS**

*Building the National Garden of American Heroes*, EO 13987 ......................................................27

*Commencing the Reduction of the Federal Bureaucracy*,
    90 Fed. Reg. 10577 (Feb. 19, 2025)................................................................................13, 23

*Continuing the Reduction of the Federal Bureaucracy*,
    90 Fed. Reg. 13043 (Mar. 20, 2025) ........................................................................14, 23, 24

*Defending Women from Gender Ideology Extremism and Restoring Biological
    Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) .....................................13

*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*,
    90 Fed. Reg. 8633, 8634 (Jan. 21, 2025) .................................................................................13

*Ending Radical and Wasteful Government DEI Programs and Preferencing*,
    90 Fed. Reg. 8339 (Jan. 20, 2025) ...........................................................................................12

*Establishing and Implementing the President's "Department of Governmental
    Efficiency,"* 90 Fed. Reg. 8441 (Jan. 29, 2025) ......................................................................14

*Implementing the President's "Department of Governmental Efficiency" Cost
    Efficiency Initiative*, 90 Fed. Reg. 11095 (Feb. 26, 2025) .......................................................14

*Unleashing American Energy*, 90 Fed. Reg. 8353 (Jan. 29, 2025)..................................................13

**OTHER AUTHORITIES**

http://documentcloud.org/documents/25919517-epa-court-filing-april-23-
    2025/?mode=document ............................................................................................................17

https://doge.gov/savings...............................................................................................................15

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF          x
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

https://grant-watch.us/nsf-data.html ................................................................................31

https://news.berkeley.edu/2019/08/06/jerome-r-singer-pioneer-of-magnetic-
    resonance-imaging-dies-at-97/#:~:text=Jerome%20R.-,Singer%2C%20pione
    er%20of%20magnetic%20resonance
    %20imaging%2C%20dies%20at%2097,and%20blood%20volume%20in%20mi
    ce ...............................................................................................................................10

https://news.ucr.edu/articles/2024/04/15/vaccine-breakthrough-means-no-more-
    chasing-strains ........................................................................................................10

https://newscenter.lbl.gov/2024/04/04/desi-first-results-make-most-precise-
    measurement-of-expanding-universe/ ....................................................................10

https://ucop.edu/communications/_files/federal-investment-in-uc-research-2025.pdf.............11, 12

https://ucop.edu/institutional-research-academic-planning/_files/uc-facts-at-a-
    glance.pdf ................................................................................................................11

https://ucpathjobs.org/lifestyle/4-unexpected-discoveries-uc/ ........................................10

https://uctechnews.ucop.edu/ucla-birthplace-of-the-internet/#:~:text=
    ARPANET%3A%20The%20
    Beginning,first%20two%20letters%20were%20sent ...............................................10

https://www.epa.gov/aboutepa/our-mission-and-what-we-do .....................................5, 6

https://www.epa.gov/archive/epa/aboutepa/reorganization-plan-no-3-1970.html........................4, 5

https://www.epa.gov/grants/epa-grants-overview-applicants-and-recipients ...................................5

https://www.epa.gov/inflation-reduction-act/inflation-reduction-act-environmental-
    and-climate-justice-program .....................................................................................5

https://www.epa.gov/laws-regulations/laws-and-executive-orders.....................................................5

https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-announces-epas-
    powering-great-american-comeback ......................................................................18

https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-cancels-20-grants-
    2nd-round-cuts-doge-saving-americans ..................................................................15

https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-cancels-400-
    grants-4th-round-cuts-doge-saving-americans........................................................16

https://www.epa.gov/newsreleases/icymi-administrator-zeldins-powering-great-
    american-comeback-unveiled-epa............................................................................17

https://www.epa.gov/newsreleases/search?f%5B0%5D=year%3A2025-03&page=3 ...................16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' MEMORANDUM IN SUPPORT OF          xi
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

https://www.epa.gov/research-grants/about-epas-research-grants ....................................................6

https://www.epa.gov/system/files/documents/2023-08/fy2024-27necis.pdf ..................................16

https://www.epa.gov/system/files/documents/2025-03/necimemo-20250312.pdf ........................16

https://www.epw.senate.gov/public/_cache/files/b/c/bc3eafbf-38ea-4197-b655-
8466b9901dce/00C154E2DBAFFDF3EF5063DA374406502B1835873497F8D
E2F439A1710460D09.3.7.25-letter-to-epa-re-50k-attachments-002-.pdf ...............................15

https://www.federalregister.gov/documents/2021/01/22/2021-01643/building-the-
national-garden-of-american-heroes .......................................................................................27

https://www.federalregister.gov/documents/2023/01/12/2023-00500/public-
comment-on-epas-national-enforcement-and-compliance-initiatives-for-fiscal-
years-2024-2027 .....................................................................................................................16

https://www.federalregister.gov/documents/2025/02/25/2025-03133/commencing-
the-reduction-of-the-federal-bureaucracy ..........................................................................23, 24

https://www.federalregister.gov/documents/2025/03/20/2025-04868/continuing-
the-reduction-of-the-federal-bureaucracy ................................................................................24

https://www.neh.gov/ ....................................................................................................................27

https://www.neh.gov/executive-orders...........................................................................................22

https://www.neh.gov/general-terms-and-conditions-awards-organizations-grants-
and-cooperative-agreements-issued-january-2022#_Toc92721724 ..........................................24

https://www.neh.gov/general-terms-and-conditions-grants-after-oct-2024...................................24

https://www.neh.gov/grants/application-process .........................................................................7, 8

https://www.neh.gov/news/update-neh-funding-priorities-and-agencys-recent-
implementation-trump-administration-executive....................................................................24

https://www.neh.gov/news/update-neh-funding-priorities-and-agencys-recent-
implementation-trump-administration-executive#:~:text=In%20colla
boration%20with%20the%20
Administration,the%20use%20of%20taxpayer%20funds .........................................................24

https://www.neh.gov/program/national-garden-american-heroes-statues.......................................27

https://www.neh.gov/updates-neh-priorities ..................................................................................24

https://www.npr.org/2025/04/03/nx-s1-5350994/neh-grants-cut-humanities-doge-
trump ......................................................................................................................................22

https://www.nsf.gov/awardsearch/showAward?AWD_ID=221538................................................30

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF          xii
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

https://www.nsf.gov/awardsearch/showAward?AWD_ID=2225567 ...............................................30

https://www.nsf.gov/awardsearch/showAward?AWDID=2243822 ..................................................31

https://www.nsf.gov/awardsearch/showAward?AWD_ID=2310131 ...............................................30

https://www.nsf.gov/updates-on-priorities#statement-of-nsf-priorities-09d .................................29

https://www.nytimes.com/2025/04/01/arts/trump-doge-federal-cuts-
    humanities.html ................................................................................................................22

https://www.nytimes.com/2025/04/21/climate/epa-cuts-forever-chemicals-
    grants.html ........................................................................................................................18

*https://www.nytimes.com/interactive/2025/05/22/upshot/nsf-grants-trump-cuts.html* ...................31

https://www.science.org/content/article/epa-orders-staff-begin-canceling-research-
    grants .................................................................................................................................18

https://www.ucsf.edu/news/2024/04/427391/new-parkinsons-treatment-helps-
    former-pro-keep-skateboarding ........................................................................................11

https://www.universityofcalifornia.edu/news/fda-approves-first-test-crispr-correct-
    genetic-defect-causing-sickle-cell-disease .......................................................................11

https://www.universityofcalifornia.edu/news/neuroscientist-wins-prize-cochlear-
    implant-contributions .......................................................................................................10

https://www.universityofcalifornia.edu/news/what-cuts-nih-funding-mean-cancer-
    patients-and-their-families ...............................................................................................11

https://www.documentcloud.org/documents/25919517-epa-court-filing-april-23-
    2025/?mode=documen .......................................................................................................17

John Drake, *The NSF Is Being Dismantled — With Broad Implications For The
    American Economy,* Forbes (May 9, 2025)......................................................................29

Letter from House of Representatives' Committee on Science, Space and
    Technology to Brian Stone at 1-2 (May 8, 2025) .......................................................30, 31

The Federalist No. 51, at 320 (James Madison) (Clinton Rossiter ed. 1961) ...................................4

The Federalist No. 47, at 325 (J. Cooke ed. 1961).........................................................................36

Smedh Arun Patil, Cloud That, *Proactive Strategies Against ".onmicrosoft.com,
    Phishing Attacks* (Dec. 13, 2023),
    https://www.cloudthat.com/resources/blog/proactive-strategies-against-
    onmicrosoft-com-phishing-attacks ...................................................................................23

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF        xiii
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

1

Understanding and Control of Municipal Solid Waste Landfill Air Emissions
Grants (https://www.epa.gov/research-grants/understanding-and-control-
municipal-solid-waste-landfill-air-emissions-grants) ..................................................................20

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF        xiv
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

1

**INTRODUCTION**

2          Defendants have turned upside down the ordered world of federal agency grant funding.

3    Through a flurry of Executive Orders ("EOs") and other directives, Defendants Donald Trump and

4    the Department of Government Efficiency ("DOGE") unlawfully commanded Federal Agency

5    Defendants[1] to terminate thousands of research grants, categorically and *en masse*. In some

6    instances, terminations were based on noncompliance with the Trump Administration's political

7    viewpoint and objectives. In other instances, terminations were based on the spurious grounds of

8    cost reduction and government efficiency, where no relevant data was supplied.

9          Before President Trump took office, federal agency grant making proceeded under the

10   authority of Congress, which created agencies through its constitutionally assigned exclusive

11   legislative power, and appropriated taxpayer funds for specific public purposes that the agencies

12   were tasked to execute. For decades, agencies carried out these statutory directives and observed

13   due process in making, renewing, and (only seldom) terminating grants. They each adhered to

14   their own grant regulations, duly promulgated through notice and comment rulemaking under the

15   Administrative Procedure Act ("APA"), and followed APA procedures in their administration of

16   grant programs.

17         As a corollary, on the rare occasions when agencies terminated grants, they did so pursuant

18   to predictable, regularized processes; based terminations on proper review and evaluation of

19   grantees' activities to assure compliance with the terms and purpose of the awarded grants; and

20

21   [1] As used herein, "Federal Agency Defendants" refers collectively to Defendant NATIONAL
SCIENCE FOUNDATION; Defendant NATIONAL ENDOWMENT FOR THE HUMANITIES;
22   Defendant UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; Defendant
UNITED STATES DEPARTMENT OF AGRICULTURE; Defendant AMERICORPS (a.k.a. the
23   CORPORATION FOR NATIONAL AND COMMUNITY SERVICE); Defendant UNITED
STATES DEPARTMENT OF DEFENSE; Defendant UNITED STATES DEPARTMENT OF
24   EDUCATION; Defendant UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES; Defendant UNITED STATES CENTERS FOR DISEASE CONTROL; Defendant
25   UNITED STATES FOOD AND DRUG ADMINISTRATION; Defendant UNITED STATES
NATIONAL INSTITUTES OF HEALTH; Defendant INSTITUTE OF MUSEUM AND
26   LIBRARY SERVICES; Defendant UNITED STATES DEPARTMENT OF THE INTERIOR;
Defendant UNITED STATES SECRETARY OF STATE; and Defendant UNITED STATES
27   DEPARTMENT OF TRANSPORTATION.

28

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF          1
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

1   terminated grants only for reasons stated in applicable regulations.

2       All of this changed abruptly on January 20, 2025, when Defendant Trump attempted to

3   seize direct control of federal agencies by bypassing Congress and upending the statutory and

4   regulatory system under which federal agencies have historically and legally operated and

5   awarded research grants.

6       Plaintiffs are University of California ("UC") researchers whose previously approved

7   research grants from the Federal Agency Defendants have been unlawfully terminated or

8   suspended since January 20, 2025 or whose grants are imminently so threatened. They seek, on

9   behalf of themselves and those similarly situated, an immediate temporary restraining order

10  enjoining Defendants from cutting off grantees' access to congressionally appropriated funding

11  that agencies have already awarded; restoring such previously awarded grants; requiring

12  Defendants to provide no-cost extensions to grantees of restored grants for the time necessary to

13  resume and complete interrupted work; enjoining Defendants from undertaking similarly unlawful

14  actions to terminate duly awarded Agency grants in future; and requiring Defendants to return to

15  the lawful orderly and individualized grant administration procedures they employed pursuant to

16  federal regulations prior to January 20, 2025.

17      A TRO is warranted here. First, Plaintiffs and the Proposed Class are likely to succeed on

18  the merits of their claims. Abrupt, wholesale, and unilateral termination of research grants violates

19  the Constitution's core principle of separation of powers, and its guarantees of freedom of speech

20  and due process. It flouts the Impoundment Control Act limits on the Executive's ability to

21  withhold or redirect congressionally appropriated money, and ignores statutory requirements that

22  agencies fulfill their substantive missions and fund congressionally specified activities. And it

23  contravenes agency-specific grant-making regulations that cannot by law be revised on an

24  unexplained, impromptu, and chaotic basis, in violation of the Administrative Procedure Act.

25      Furthermore, absent the Court's intervention, Plaintiffs and the Proposed Class will suffer

26  irreparable harm from Defendants' unlawful actions. The grant terminations will destroy

27  America's scientific infrastructure and result in a lost generation of scientists. They threaten

28  researchers' and educators' ability to keep labs open, conduct research and teaching, and employ

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF     2
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

1   graduate and postdoctoral students, threatening careers and reputations and severely restricting the

2   UC system's ability to fulfill its critical public research mission. Millions of Californians and

3   Americans nationwide who benefit from the UC System's unrivalled contributions to research,

4   education, and the public good, also face injury from Defendants' patently unlawful actions.

5           District courts have granted emergency injunctive relief to halt similar unlawful excesses.

6   *See*, *e.g.*, *Am. Fed'n of Gov't Employees v. Trump*, No. 25-cv-03698 (N.D. Cal. May 9, 2025),

7   ECF No. 85 (J. Illston) (granting TRO barring federal agency defendants including USDA, HHS,

8   EPA, and NSF from cutting programs and staff); *Am. Fed'n of Gov't Employees v. OPM*, No. 25-

9   cv-01780 (N.D. Cal. Feb. 28, 2025), ECF No. 45 (J. Alsup) (granting TRO barring termination of

10  employees at DOD, SBA, and other agencies); *New York v. Trump*, No. 25-cv-00039 (D.R.I. Jan.

11  31, 2025), ECF No. 50 (granting TRO barring federal agency defendants from freezing federal

12  funds obligated to state plaintiffs); *Rhode Island v. Trump*, No. 25-cv-00128 (D.R.I. May 6, 2025),

13  ECF No. 57 (requiring Trump Administration to reverse steps taken to dismantle multiple

14  agencies); (*Nat'l Treasury Emps. Union v. Vought*, No. 25-cv-381-ABJ (D.D.C. Feb. 14, 2025),

15  ECF No. 19 (granting TRO barring termination of CFPB employees and shutdown of entire

16  agency); *Widakuswara v. Lake*, No. 25-cv-1015-RCL (D.D.C. Apr. 22, 2025), ECF No. 99

17  (granting PI enjoining defendants to restore United States Agency for Global Media staff to their

18  status prior to Executive Order ("EO") which purported to dismantle agency, to restore grants to

19  various news networks and outlets, and to restore Voice of America programming).

20          Confirming the propriety and urgency of injunctive relief in such cases, appellate courts

21  have declined to stay emergency injunctive relief. *See*, *e.g.*, *Am. Fed'n of Gov't Employees v.*

22  *Trump*, No. 25-3293 (9th Cir. May 30, 2025), ECF No. 10 (declining to stay TRO issued in case

23  number 25-cv-03698); *New York v*. Trump, No. 25-1236 (1st Cir. Mar. 26, 2025) (denying stay of

24  preliminary injunction issued in case no. 25-cv-00039); *Widakuswara v. Lake*, No. 25-5144, (D.C.

25  Cir. May 28, 2025) (en banc) (dissolving administrative stay and allowing district court's PI

26  issued in case number 25-cv-1015 to remain in effect pending appeal).

27          Accordingly, as set forth in the accompanying proposed order, Plaintiffs request a TRO to

28  preserve this Court's ability to decide a preliminary injunction with the benefit of full briefing.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF          3
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

**BACKGROUND**

## I.    Background on Federal Agency Grantmaking

Article I of the Constitution grants Congress the power of the purse. *See* U.S. Const. art. I, § 8, cl. 1; § 8, cl. 18 (power to legislate); § 9, cl. 7 (power to appropriate funds). The Appropriations Clause grants "Congress's 'exclusive power' over the federal purse." *U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (citation omitted). The "power over the purse was one of the most important authorities allocated to Congress in the Constitution's 'necessary partition of power among the several departments.'" *Id.* at 1346-47 (quoting The Federalist No. 51, at 320 (James Madison) (Clinton Rossiter ed. 1961)).

Pursuant to this bedrock constitutional principle, prior to January 20, 2025 (Inauguration Day), federal agency grantmaking proceeded under the authority of Congress, which appropriated taxpayer funds for specific public purposes and objectives. Agencies carried out these statutory directives and observed due process in the making, renewing and termination of grants, adhering to the requirements of the Administrative Procedure Act (APA).

Prior to Inauguration Day, federal agencies awarded grants using money appropriated and allocated to them by Congress, to promote these agencies' missions (consistent with those articulated by Congress) in a manner compliant with statutory mandates, pursuant to regular administrative processes, on the basis of individualized review and evaluation, and subject to termination only for reasons stated in applicable regulations.

### A.    Environmental Protection Agency

On July 9, 1970, President Nixon sent to Congress "Reorganization Plan No. 3 of 1970," which proposed consolidating several existing federal agency duties into one Environmental Protection Agency.[2] In his transmittal, President Nixon wrote that "it has become increasingly clear that we need to know more about the total environment—land, water, and air. It also has become increasingly clear that only by reorganizing our Federal efforts can we develop that knowledge, and effectively ensure the protection, development and enhancement of the total

---

[2]  https://www.epa.gov/archive/epa/aboutepa/reorganization-plan-no-3-1970.html.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

4

1 environment itself."

2    Under the Reorganization Plan, EPA was thus given a "broad mandate" to "develop

3 competence in areas of environmental protection that have not previously been given enough

4 attention." The EPA would have the "capacity to do research on important pollutants irrespective

5 of the media in which they appear, and on the impact of these pollutants on the total environment.

6 Both by itself and together with other agencies, the EPA would monitor the condition of the

7 environment—biological as well as physical."[3]

8    Numerous laws empower EPA to protect the environment and public health.[4] Examples

9 include the Clean Air Act, Clean Water Act, Safe Drinking Water Act, Resource Conservation and

10 Recovery Act, Toxic Substances Control Act, and many more.[5] When Congress passes new

11 environmental laws, it tasks EPA with their implementation.[6] As a recent example, the EPA

12 received a new mandate in the Inflation Reduction Act of 2022, which specified creation of an

13 EPA-administered environmental and climate justice block grant program.[7]

14    These laws all direct EPA to carry out its core mission: "to protect[] human health and the

15 environment."[8] The EPA also carries out its mission in part by making grants. Indeed, "EPA's

16 mission to protect human health and the environment is accomplished, in large part, by the

17 awarding of funds to other organizations to conduct environmental program or projects."[9] The

18 EPA awards more than $4 billion in grants (called "assistance agreements") every year.

19    The EPA funds research through its Science to Achieve Results (STAR) program, the

20 People, Prosperity, and the Planet (P3) Program, and the Small Business Innovation Research

21 (SBIR) program. According to the EPA, these "help to engage top research scientists, non-profit

22 organizations, students, and small businesses that results in a strong scientific foundation to

23

24 ———————————————

[3] *Id.*

25 [4] https://www.epa.gov/laws-regulations/laws-and-executive-orders.

[5] *Id*.

26 [6] *Id*.

[7] https://www.epa.gov/inflation-reduction-act/inflation-reduction-act-environmental-and-climate-

27 justice-program.

[8] https://www.epa.gov/aboutepa/our-mission-and-what-we-do.

28 [9] https://www.epa.gov/grants/epa-grants-overview-applicants-and-recipients.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

support the Agency's mission of protecting human health and the environment."[10]

EPA describes the STAR program as the "primary competitive, peer-reviewed extramural grant program that has awarded over 4,100 grants nationwide since 1995." In the agency's own words, the program "leverages the scientific and engineering expertise of academic and non-profit institutions to conduct high priority environmental and public health research," bolstering the agency's capacity to address air pollution, water quality and quantity, hazardous waste, toxic substances, pesticides, cumulative impacts of environmental degradation, and other environmental concerns. [11] STAR research is funded through Requests for Applications that derive from the EPA Office of Research and Development's Strategic Plan. STAR grants are directed to areas of special significance to the EPA mission.[12] UC researchers with STAR grants are among those whose funding has been unlawfully terminated by Defendants' actions.

## B.    National Endowment for the Humanities

The National Endowment for the Humanities ("NEH") is an independent federal agency established to support the advancement of the humanities across the United States. Congress created NEH in 1965, as part of the National Foundation on the Arts and Humanities Act of 1965 ("NAFHA"). Pub. L. 89-209, 79 Stat. 845 (1965) (codified at 20 U.S.C. §§ 951-60). The legislation was the result of years of advocacy to ensure that arts and humanities were not left behind as the nation focused on scientific progress. As stated in the enabling statute,  "[a] high civilization must not limit its efforts to science and technology alone but must give full value and support to the other great branches of man's scholarly and cultural activity." Pub. L. 89-209, § 2(2) (1965). Congress further explained that it was necessary and appropriate for the federal government to create and sustain a "climate encouraging freedom of thought, imagination, and inquiry." 20 U.S.C. § 951(7).

Congress created NEH, along with its sister agency the National Endowment for the Arts, so Americans could understand "the diversity of excellence that comprises our cultural heritage."

---

[10]  https://www.epa.gov/research-grants/about-epas-research-grants.
[11]  *Id.*
[12]  https://www.epa.gov/aboutepa/our-mission-and-what-we-do.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF    6
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

*Id.* § 951(9). Accordingly, Congress established NEH to provide funding for individuals involved in research, publication of scholarly works, and promotion of the humanities. *See id.* § 956. Under the statute, the Chair of the NEH is "authorized to enter into arrangements, including contracts, grants, loans, and other forms of assistance" to effectuate these goals. *Id.* § 956(c).

Congress's directives for NEH specifically require it support diverse and underrepresented viewpoints. For example, one statutory function of NEH is to authorize grants to "initiate and support programs and research which have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community." *Id.* § 956(c)(4). Likewise, in selecting recipients of funding, NEH's Chair "shall give particular regard to scholars, and educational and cultural institutions, which have traditionally been underrepresented." *Id.* § 956(c)(10).

Indeed, under the statute, the NEH Chair determines makes grant awards "with the advice of the National Council on the Humanities." *Id.* § 956(c). The Council comprises twenty-six members appointed by the President, who, in selecting Council members, is statutorily required to "give due regard to equitable representation of women, minorities, and individuals with disabilities who are involved in the humanities." *Id.* § 957(b).  The NEH's Chair may not approve or disapprove any grant application "until the Chairperson has received the recommendation of the Council." *Id.* at § 957(f).

NEH funding recipients are selected after a rigorous review process. Every year, NEH recruits over 1,000 experts from every state and organizes them into 200 review panels. These review panels will evaluate approximately 5,700 grant applications. The panels are selected for their expertise in disciplines relevant to the grant programs.[13] The panels are announced in the Federal Register, and panelists' names are listed in NEH's annual reports.

After a grant application is submitted, it will be assigned to a specific peer-review panel based on academic discipline, institutional type, project area, or project type. The evaluators on the panel read all assigned applications and assign them a rating based on "NEH's published review

---

[13]  *See* https://www.neh.gov/grants/application-process.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

7

criteria and program guidelines."[14] These criteria "emphasize humanities significance, the applicant's abilities and qualifications, the proposal's clarity of expression, and the project's feasibility, design, cost, and work plan."[15] After each evaluator assesses the application, the panel meets to discuss the applications. Next, NEH staff reviews the panels' work and recommends the most meritorious applications to the National Council (described above). The Council meets three times a year to discuss the applications and finalize recommendations to the Chairperson.[16] The Chairperson makes the final funding decisions, taking into account the advice provided throughout the review process.[17]

Each year, NEH typically makes about 900 grants, ranging from approximately $1,000 to $750,000. Across all grant programs, only about sixteen percent of applications receive funding.[18]

### C.    National Science Foundation

In 1950, Congress established the National Science Foundation (NSF) as an independent agency designed "[t]o promote the progress of science; to advance the national health, prosperity, and welfare; to secure the national defense; and for other purposes." Pub. L. 81-507 (1950) (National Science Foundation Act of 1950, codified at 42 U.S.C. § 1861 et seq.). The Act was prompted by the growing awareness during World War II that science was crucial to the United States' military victory and its ongoing national interest and security. Accordingly, the Act established the NSF as an agency charged with providing government support to basic scientific research.

The NSF's it tasked by statute to " provide Federal support for basic scientific and engineering research, and to be a primary contributor to mathematics, science, and engineering education at academic institutions in the United States." 42 U.S.C. § 1862k(a)(6)(A). The Act authorizes and directs the NSF to "initiate and support basic scientific research in the mathematical, physical, medical, biological, engineering, and other sciences," as well as "specific

---

14 https://www.neh.gov/grants/application-process.
15 *Id.*
16 *Id.*
17 *Id.*
18 *Id.*

PLAINTIFFS' MEMORANDUM IN SUPPORT OF         8
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

scientific research activities in connection with matters relating to the national defense." Pub. L. 81-507, § 3(a)(2) (1950). The Act also directs the NSF to provide "grants, loans, and other forms of assistance" to support scientific research" and award "scholarships and graduate fellowships in the mathematical, physical, medical, biological, engineering, and other sciences." *Id.* § 3(a)(2) & (4).

The Act has been amended since 1950, including through the National Science Foundation Authorization Act of 1998 (the "1998 Amendment"). The 1998 Amendment reaffirmed the NSF's statutory commitment to making the United States a leader in STEM fields, and it set as long-term goals for the NSF to provide leadership to: (a) enable the United States to maintain a position of world leadership in all aspects of science, mathematics, engineering, and technology; (b) promote the discovery, integration, dissemination, and application of new knowledge in service to society; and (c) achieve excellence in United States science, mathematics, engineering, and technology education at all levels. 42 U.S.C. § 1862k(a)(6)(B). The 1998 Amendment sets forth several "core strategies" for achieving the above goals, including the following: "Develop intellectual capital, both people and ideas, with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering." 42 U.S.C. § 1862k(b)(1).

The Act was again amended in 2007 as part of the America COMPETES Act, which sought to bolster U.C. competitiveness in scientific research and innovation. It instructed the NSF to "give priority" in granting awards to research activities "that can be expected to make contributions in physical or natural science, technology, engineering, social sciences, or mathematics, or that enhance competitiveness, innovation, or safety and security in the United States." 42 U.S.C. § 1862o-5(b).

The NSF awards research grants through a merit review process that is regarded as the gold standard of scientific review. Expert panels of independent scientists, engineers, and educators, all vetted to avoid conflicts of interest, serve as reviewers of NSF grants, reviewing them for both "intellectual merit" and "broader [societal] impacts." 42 U.S.C. § 1862s(b).

**D.    Other Agency Defendants**

Other Federal Agency Defendants include the Department of Agriculture (USDA);

PLAINTIFFS' MEMORANDUM IN SUPPORT OF          9
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

AmeriCorps; the Department of Defense (DOD); the Department of Education (Education); the Department of Energy (DOE); the Department of Health and Human Service (HHS), including the Centers for Disease Control (CDC), the Food and Drug Administration (FDA), and the National Institute of Health (NIH); the Institute of Museum and Library Services (IMLS); the Department of the Interior, including the National Park Service; the Department of State, including U.S.A.I.D.; and the Department of Transportation (DOT). These agencies also award grants, consistent with their respective enabling acts and governing regulations. *See, e.g.* 7 U.S.C. § 3157 (USDA); 42 U.S.C. § 12653 (AmeriCorps); 32 CFR § 21.410 (DOD); 20 U.S.C. §§ 9511, 9512 (Education); 42 U.S.C. § 241 (HHS); 20 U.S.C. §§ 9108, 9162, 9165, 9175 (IMLS); 49 U.S.C. § 330 (DOT).

## II.    Federal Funds Awarded to the UC System

The University of California (the "UC System") is the world's leading public research institution. Comprising ten campuses, three affiliate national laboratories, and dozens of institutes, centers, and research laboratories across California, the UC System has made—and continues to make—outstanding contributions to research that has changed the world, and enhanced human knowledge, while contributing to the national security and global prominence of the United States, and the health and welfare of all Americans. Without the UC System's research, the world would not have the internet,[19] MRI machines,[20] plug-in hybrid cars,[21] cochlear implants,[22] or the world's largest 3-D map of the universe,[23] a universal viral vaccine,[24] a brain implant that prevents

---

[19]  https://uctechnews.ucop.edu/ucla-birthplace-of-the-internet/#:~:text=ARPANET%3A%20
The%20Beginning,first%20two%20letters%20were%20sent.

[20]  https://news.berkeley.edu/2019/08/06/jerome-r-singer-pioneer-of-magnetic-resonance-imaging-dies-at-97/#:~:text=Jerome%20R.-,Singer%2C%20pioneer%20of%20magnetic%20resonance
%20imaging%2C%20dies%20at%2097,and%20blood%20volume%20in%20mice.

[21]  https://ucpathjobs.org/lifestyle/4-unexpected-discoveries-uc/.

[22]  https://www.universityofcalifornia.edu/news/neuroscientist-wins-prize-cochlear-implant-contributions.

[23]  https://newscenter.lbl.gov/2024/04/04/desi-first-results-make-most-precise-measurement-of-expanding-universe/.

[24]  https://news.ucr.edu/articles/2024/04/15/vaccine-breakthrough-means-no-more-chasing-strains.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

Parkinson's symptoms,[25] and the use of CRISPR gene-editing to cure sickle cell disease.[26] Decades of UC cancer research have saved nearly four million lives in the past thirty years.[27] The UC System has produced seventy Nobel Prize winners, 101 MacArthur "Genius" grant award winners, sixty-six National Medal of Science winners, and forty-two Pulitzer Prize winners.[28] Since 2013, the UC System has topped the National Academy of Inventors' list of universities worldwide with the most utility patents.[29]

Through continual development of new technologies, UC research stimulates the economy by creating jobs, companies, industries, and scientific advancements that continue to change the world. Entire industries have grown out of UC research, including biotechnology, computing, semiconductors, telecommunications, and agriculture.[30] UC research prowess has continued at breakneck speed. The UC System averages four new inventions *per day*. In 2023, seventy-eight startups were launched using UC intellectual property or technology.[31] UC research quite literally shapes the future—8.2% of all U.S. academic research is conducted by UC researchers.[32]

Such achievements would not be possible without federal funding. For years, the UC system has partnered with the federal government to deliver groundbreaking innovations that have made the American public healthier, safer, smarter, and better able to compete in a global market. Federal funding is the single most important source of UC research funding, historically accounting for more than half of the UC system's total research awards.[33] In fiscal year 2024, the UC system received $4.069 *billion* in federal research awards. This covered 10,256 distinct

---

[25] https://www.ucsf.edu/news/2024/04/427391/new-parkinsons-treatment-helps-former-pro-keep-skateboarding.
[26] https://www.universityofcalifornia.edu/news/fda-approves-first-test-crispr-correct-genetic-defect-causing-sickle-cell-disease.
[27] https://www.universityofcalifornia.edu/news/what-cuts-nih-funding-mean-cancer-patients-and-their-families.
[28] https://ucop.edu/institutional-research-academic-planning/_files/uc-facts-at-a-glance.pdf.
[29] https://ucop.edu/communications/_files/federal-investment-in-uc-research-2025.pdf.
[30] *Id*.
[31] *Id*.
[32] *Id*.
[33] *Id*.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

11

1  awards.[34]

2      The UC System receives more National Institutes of Health ("NIH") and National Science

3  Foundation ("NSF") funding than any other institution.[35] And these are far from the only agencies

4  to offer significant support to UC research. In fiscal year 2024, illustrative grants to the UCs were:

5
6
7
8
9
10
11
12

- $2.54 billion – NIH
- $525 million – NSF
- $326 million – Defense
- $160 million – Energy
- $122 million – HHS (other)
- $104 million – NASA
- $86 million – USDA
- $68 million – Commerce
- $39 million – Interior
- $27 million – Education
- $20 million – State
- $47 million – other agencies[36]

13      These stable federal funding sources, and the research talent they attract and empower,

14  have enabled the UC system to make its outsize contributions to human progress for decades.

15  **III.    The Trump Administration Has Directed Federal Agencies to Terminate Grants.**

16      Beginning on January 20, 2025, the Trump Administration explicitly and implicitly

17  directed federal agencies to "terminate" previously awarded grant funds through a series of EOs to

18  that effect.

19      An EO titled "*Ending Radical and Wasteful Government DEI Programs and Preferencing*"

20  ("First DEI EO") instructs the Attorney General and others to "coordinate the termination of all

21  discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility'

22  (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government,

23  under whatever name they appear." [37] Additionally, the DEI EO directs each federal agency head

24  to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts"

---

25

26  [34] *Id.*

[35] *Id.*

27  [36] *Id.*

[37] *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339

28  (Jan. 20, 2025), attached to Decl. of Tony Schoenberg in Supp. of this Mot. ("Schoenberg Decl.")
¶ 2, Ex. A.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF        12
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

1    within sixty days.

2         An EO titled "*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*"

3    ("Second DEI EO") addresses purported "immoral race- and sex-based preferences under the guise

4    of so-called [DEI] or [DEIA]." [38] The order requires the Director of OMB to "[e]xcise references

5    to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition,

6    contracting, grants, and financial assistance procedures" and to "[t]erminate all 'diversity,'

7    'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,'

8    'advancing  equity,' and like mandates, requirements, programs, or activities, as appropriate."[39]

9         An EO titled "*Defending Women from Gender Ideology Extremism and Restoring*

10   *Biological Truth to the Federal Government*" ("Gender EO") directed that "[f]ederal funds shall

11   not be used to promote gender ideology," instructing federal agencies to revise grant conditions

12   accordingly, and defining "gender ideology" as a "false claim" that "replaces the biological

13   category of sex with an ever-shifting concept of self-assessed gender identity," and that "includes

14   the idea that there is a vast spectrum of genders that are disconnected from one's sex." [40]

15        An EO titled "*Unleashing American Energy*" ("Energy EO") directed federal agencies to

16   "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of

17   2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58)."

18   The Energy EO called out specific grant programs, and more generally, directed the agencies to

19   "review their processes, policies, and programs for issuing grants." [41]

20        An EO titled "*Commencing the Reduction of the Federal Bureaucracy*" ("Bureaucracy

21   EO") deemed several government entities "unnecessary," and directed that any non-statutory

22   components or functions be "eliminated."[42] The Order also stated that any "grant requests" by

23

---

24   [38] *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633,
     8634 (Jan. 21, 2025), attached to Schoenberg Decl. ¶ 3, Ex. B.

25   [39] *Id.*

     [40] *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the*
26   *Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025), attached to Schoenberg Decl. ¶ 4, Ex. C.

27   [41] *Unleashing American Energy*, 90 Fed. Reg. 8353 (Jan. 29, 2025), attached to Schoenberg Decl.
     ¶ 5, Ex. D.

28   [42] *Commencing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 10577 (Feb. 19, 2025),
     attached to Schoenberg Decl. ¶ 6, Ex. E.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF        13
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

1  these entities should be denied.

2      An EO titled "*Continuing the Reduction of the Federal Bureaucracy*" ("Second

3  Bureaucracy EO") listed additional entities determined by President Trump to be "unnecessary,"

4  and again directed that grant requests be rejected.[43]

5      An EO titled "*Establishing and Implementing the President's 'Department of*

6  *Governmental Efficiency'*" ("First DOGE EO") required the head of each federal agency to

7  establish a team of at least four DOGE employees within their agency.[44] As per the EO, DOGE

8  would be "dedicated to advancing the President's 18-month DOGE agenda."[45] Although the

9  "DOGE agenda" has never been publicly disclosed, DOGE's targets for ostensible "efficiency"

10  improvements have, in practice, born considerable resemblance to the Executive agenda manifest

11  in Defendant Trump's EOs.

12      An EO titled "*Implementing the President's 'Department of Governmental Efficiency'*

13  *Cost Efficiency Initiative*" ("Second DOGE EO") purports to begin the Executive's

14  "transformation in Federal spending on contracts, grants, and loans."[46] This EO required federal

15  agencies to review all existing grants with an eye toward termination:

16          Each Agency Head, in consultation with the agency's DOGE Team Lead,
           shall review all existing covered contracts and grants and, where appropriate
17          and consistent with applicable law, terminate or modify (including through
           renegotiation) such covered contracts and grants to reduce overall Federal
18          spending or reallocate spending to promote efficiency and advance the
           policies of my Administration. This process shall commence immediately
19          and shall prioritize the review of funds disbursed under covered contracts
           and grants to educational institutions and foreign entities for waste, fraud,
20          and abuse. Each Agency Head shall complete this review within 30 days of
           the date of this order.
21

22  According to DOGE's self-described "Wall of Receipts," as of May 31, 2025, federal agencies

---

23

24

25  [43] *Continuing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 13043 (Mar. 20, 2025), attached to Schoenberg Decl. ¶ 7, Ex. F.

26  [44] *Establishing and Implementing the President's "Department of Governmental Efficiency,"* 90 Fed. Reg. 8441 (Jan. 29, 2025), attached to Schoenberg Decl. ¶ 8, Ex. G.

27  [45] *Id.*

28  [46] *Implementing the President's "Department of Governmental Efficiency" Cost Efficiency Initiative*, 90 Fed. Reg. 11095 (Feb. 26, 2025), attached to Schoenberg Decl. ¶ 9, Ex. H.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF       14
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

1    had terminated over 15,000 grants, totaling roughly $40 billion in "savings." [47]

2        Despite multiple successful legal challenges to President Trump's EOs and related

3    directives,[48] Defendants have unlawfully terminated grants and continue to terminate grants

4    previously awarded to Plaintiffs and the Proposed Class.

5    **IV.    Grant Terminations Will Cause Irreparable Harm If Not Enjoined.**

6        **A.    Environmental Protection Agency**

7        Shortly after President Trump took office, the EPA began working closely with DOGE. By

8    March 7, the Democratic Staff of the Senate Committee on Environment and Public Works

9    reported that the EPA had issued guidance to senior staff indicating that "all [funding] actions

10   greater than $50,000 now require approval from an EPA DOGE Team member."[49]

11       A huge part of this DOGE-EPA collaboration included mass-canceling grants. The EPA

12   touted its relationship with DOGE in several press releases. For example, on February 25, an EPA

13   press release issued a "second round of EPA-DOGE partnered cancellations." The EPA stated that

14   these cancellations "represent more than $60 million saved as the EPA puts a stop to wasteful DEI

15   and environmental justice programs."[50]

16

17   _____

18   [47] https://doge.gov/savings.
     [48] *See, e.g.*, *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-cv-0333-ABA (D.
19   Md. Feb. 21, 2025), ECF No. 45 (preliminarily enjoining provisions requiring agencies to
     terminate equity-related grants); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No.
20   25-1189 (4th Cir. Mar. 14, 2025), ECF No. 29 (staying preliminary injunction pending appeal);
     *Washington v. Trump*, No. 2:25-cv-244-LK (W.D. Wash. Feb. 28, 2025), ECF No. 50 (on
21   February 28, 2025, preliminary enjoining sections that condition, withhold, or end federal funding
     in Plaintiffs states Colorado, Minnesota, Oregon, and Washington); *PFLAG, Inc. v. Trump*, No.
22   8:25-cv-00337-BAH (D. Md. Mar. 4, 2025), ECF No. 116 (on March 4, 2025, preliminarily
     enjoining the same nationwide); *New York v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I Jan. 31,
23   2025), ECF No. 50 (preliminarily enjoining federal agency defendants from pausing, freezing,
     blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of
24   appropriated federal funds to the States under awarded grants, executed contracts, or other
     executed financial obligations, based on both the OMB directive and EOs, including the DEI and
25   Gender Ideology EOs).
     [49] https://www.epw.senate.gov/public/_cache/files/b/c/bc3eafbf-38ea-4197-b655-
26   8466b9901dce/00C154E2DBAFFDF3EF5063DA374406502B1835873497F8DE2F439A1710460
27   D09.3.7.25-letter-to-epa-re-50k-attachments-002-.pdf.
     [50] https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-cancels-20-grants-2nd-round-
28   cuts-doge-saving-americans.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF          15
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

In a March 10 press release, EPA announced a fourth round of EPA-DOGE terminations, this time stating it was cancelling more than 400 grants "across nine unnecessary programs." The press release concluded, as do the others, by stating: "EPA continues to work diligently to implement President Trump's executive orders."[51]

The EPA has aligned itself closely with the Trump Administration. For example, on March 12, 2025 alone, the EPA issued ten press releases in which it referred to itself as the "Trump EPA."[52] Also on March 12, EPA Acting Assistant Administrator Jeffrey Hall issued an internal memo regarding "Implementing National Enforcement and Compliance Initiatives Consistently with Executive Orders and Agency Priorities." (the "March 12 Memo").[53]

National Enforcement and Compliance Initiatives ("NECIs") are selected by the EPA every four years after soliciting public comment by publishing in the Federal Register.[54] These are "national initiatives, developed in a non-partisan way across administrations" that allow the EPA to focus resources on widespread problems.[55] NECIs for fiscal year 2023-2027 were set on August 17, 2023. The six NECIs—half of which were modified or continued from prior years—are: (1) mitigating climate change; (2) addressing exposure to PFAS; (3) protecting communities from coal ash contamination; (4) reducing air toxics in overburdened communities; (5) increasing compliance with drinking water standards; and (6) chemical accident risk reduction.[56] The March 12 Memo did not purport to eliminate the NECIs (yet), but states that "the focus of specific NECIs shall be adjusted to conform to the President's Executive Orders and the Administrator's Initiative."[57]

The "Administrator's Initiative" refers to EPA Administrator Lee Zeldin's "Powering the Great American Comeback" initiative, which he announced on February 4, 2025. The initiative

---

[51] https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-cancels-400-grants-4th-round-cuts-doge-saving-americans.

[52] https://www.epa.gov/newsreleases/search?f%5B0%5D=year%3A2025-03&page=3.

[53] https://www.epa.gov/system/files/documents/2025-03/necimemo-20250312.pdf.

[54] https://www.federalregister.gov/documents/2023/01/12/2023-00500/public-comment-on-epas-national-enforcement-and-compliance-initiatives-for-fiscal-years-2024-2027.

[55] https://www.epa.gov/system/files/documents/2023-08/fy2024-27necis.pdf.

[56] *Id.*

[57] https://www.epa.gov/system/files/documents/2025-03/necimemo-20250312.pdf.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

16

have five major pillars: (1) Clean Air, Land, and Water for Every American; (2) Restore American Energy Dominance; (3) Permitting Reform, Cooperative Federalism, and Cross-Agency Partnership; (4) Make the United States the Artificial Intelligence Capital of the World; and (5) Protecting and Bringing Back American Auto Jobs.[58] The March 12 Memo made clear that the EPA would conform to President Trump's wishes, regardless of its congressional mandates.

In a court filing on April 23, EPA administrator Dan Coogan revealed that EPA leadership conducted a review of grants to determine "which should be terminated based on alignment with Administration priorities." He stated that "EPA began this process for the Administration in January 2025."[59] Although the EPA claimed this was an "individualized, grant-by-grant review," no details are provided. Instead, Mr. Coogan revealed that entire grant programs created by Congress under the Inflation Reduction Act were slated to be terminated. These programs are: Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program; Surveys, Studies, Investigations, Training and Special Purpose Activities Relating to Environmental Justice; Environmental Justice Government-to-Government(EJG2G) Program; Environmental Justice Small Grant Program; Financial Assistance for Community Support Activities to Address Environmental Justice Issues; Environmental Justice Thriving Communities Grantmaking Program (EJTCGM); Environmental and Climate Justice Block Grant Program; and Reducing Embodied Greenhouse Gas Emissions for Construction Materials and Products.[60]

Despite the issuance of a preliminary injunction on April 15, Mr. Coogan stated the EPA would continue forward with its termination decisions. He revealed that EPA had sent notices of termination to 377 grantees, and would send termination letters to an additional 404 grantees within two weeks.[61] On information and belief, EPA turned its attention to universities and

---

[58] https://www.epa.gov/newsreleases/icymi-administrator-zeldins-powering-great-american-comeback-unveiled-epa.

[59] https://www.documentcloud.org/documents/25919517-epa-court-filing-april-23-2025/?mode=document at ¶ 3.

[60] https://www.documentcloud.org/documentcloud.org/documents/25919517-epa-court-filing-april-23-2025/?mode=document at ¶ 6.

[61] https://www.documentcloud.org/documents/25919517-epa-court-filing-april-23-2025/?mode=document at ¶ 5.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF       17
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

research grants on or around April 15. According to reports, on that date Mr. Coogan sent an email

directing staff to cancel existing grants awarded to universities and research institutes.[62]

Instead of providing researchers with reasoned explanations of termination decisions, the

EPA is sending form termination letters. These letters are not personalized or even signed. One

such letter, received by Plaintiff Thakur on April 28, 2025, reads as follows:

> **Subject:** Termination of EPA Assistance Agreement [Grant No.] under 2 CFR 200.340
> **From:** EPA Award Official
> **To:** [Grant Recipient]
>
> . . . . . This EPA Assistance Agreement is terminated in its entirety effective immediately on the grounds that the award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities.
>
> The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In addition to complying with the law, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.
>
> The grant specified above provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities.

Decl. of Neeta Thakur in Supp. of this Mot. ("Thakur Decl.") ¶¶ 20-24, Ex. H.

This letter does not explain why the grant would contradict agency priorities when EPA

Director Zeldin has announced new priorities under his "*Powering the Great American

Comeback*" initiative. The first priority is "Clean Air, Land, and Water for Every American."[63]

Plaintiffs and Class members have long relied on EPA grants to fund meritorious projects

aimed at protecting human health and the environment. The termination of previously approved

---

[62] *See* https://www.science.org/content/article/epa-orders-staff-begin-canceling-research-grants and https://www.nytimes.com/2025/04/21/climate/epa-cuts-forever-chemicals-grants.html.
[63] https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-announces-epas-powering-great-american-comeback.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

18

1  grants has caused and continues to cause serious harm to Plaintiffs and Class members.

2  **1.     Plaintiff Neeta Thakur's Grant Terminations**

3  Dr. Neeta Thakur is a pulmonary and critical care specialist at the University of California,

4  San Francisco (UCSF) who examines the role of social and environmental stressors on asthma and

5  COPD in historically marginalized communities. *Id.* ¶ 2, Ex. A. She currently serves as Medical

6  Director of the Zuckerberg San Francisco General Hospital Chest Clinic and is an associate

7  professor of medicine and pulmonary and critical care at UCSF. *Id.* Dr. Thakur's research has

8  been supported by state grants, federal grants from the National Institutes of Health (NIH),

9  foundation grants, and other sources. *Id.* ¶ 6.

10  In November 2021, Dr. Thakur submitted a grant application to EPA in response to its

11  announcement of funding opportunity EPA-G2021-STAR-H1. *Id.* ¶¶ 9-14, Ex. B. The grant

12  application, titled "*Partnering for Resilient Opportunities To Eliminate Toxic (PROTECT) Health*

13  *Effects from Wildfire PM2.5 in Environmental Justice Communities*," addressed the potential to

14  prevent adverse health effects to environmental justice communities from the fine particulate

15  matter (PM) from wildfire smoke. *Id.* ¶ 10, Ex. B. On November 22, 2022 and June 21, 2023, an

16  EPA Senior Grants Management Specialist, Jennifer Brooks, sent Dr. Thakur two Notice of EPA

17  Awards, awarding total funding of $1,330, 536. *Id.* ¶¶ 15-19, Exs. C-F.

18  On April 28, 2025, EPA sent to the UC Regents an "Assistance Amendment" that

19  instructed Thakur's team to "stop work; terminate the [grant] agreement; reduce performance

20  period duration; [and] curtail scope of work." *Id.* ¶¶ 20-22, Ex. G. It stated that "'(EPA) hereby

21  awards $0.00' towards any unfunded, as-yet-unincurred costs of the previously awarded

22  $1,330,536." *Id.* ¶ 21.

23  The UCSF and UC Berkeley researchers on this grant have been unable to produce

24  research outputs, deliver community benefits, and pursue professional advancement following the

25  termination. *Id.* ¶ 25. EPA's termination of this grant will make it more difficult for Dr. Thakur to

26  partner with organizations that serve impacted communities. *Id.* These harms are in addition to the

27  loss of value to the public from the research team's inability to complete work on studying health

28  risks from the fine particulate matter associated with wildfire, and inability to design health-

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF        19
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

protective interventions for three of California's most health-vulnerable communities. *Id.*

## 2.    Plaintiff Ken Alex's Grant Termination

Since 2019, Ken Alex has served as Director of Project Climate at the Center for Law, Energy & the Environment (CLEE) at UC Berkeley School of Law. Decl. of Ken Alex in Supp. of this Mot. ("Alex Decl.") ¶ 2, Ex. A. He founded Project Climate, a think tank designed to move promising environmental research into the policy realm quickly. *Id.*

In collaboration with a UC Berkeley engineer with specialized expertise in landfill design and others, Alex developed a detailed proposal for applying cutting edge technologies, including satellites and AI, to improve the detection of methane and HAP releases from landfills and to improve the quality of policy responses. *Id.* ¶ 13. The Grant Proposal was submitted to EPA on December 21, 2022. *Id.* ¶¶ 14, 16, Ex. B. The Grant Application proposed a cumulative budget of $999,999 (later rounded to $1,000,000). *Id.* ¶ 15, Ex. B. On October 19, 2023, EPA notified UC Berkeley that it was awarding the grant. *Id.* ¶¶ 17-21, Exs. C-D.

On April 29, 2025, EPA sent to the UC Regents an "Assistance Amendment" that instructed Alex's research team to "stop work; terminate the [grant] agreement; reduce performance period duration; [and] curtail scope of work." *Id.* ¶¶ 22-23, Ex. G. It stated that "'(EPA) hereby awards $0.00' towards any unfunded, as-yet-unincurred costs of the previously awarded $1,000,000." *Id.* ¶ 23. The EPA's web page Understanding and Control of Municipal Solid Waste Landfill Air Emissions Grants (https://www.epa.gov/research-grants/understanding-and-control-municipal-solid-waste-landfill-air-emissions-grants) continues to publicize the grant as one among five awarded. *Id.* ¶ 21, Ex. F.

Alex and his project team have suffered immediate harm as a result of the cancellation of the grant. *Id.* ¶ 27. Specifically, the team has been unable to continue and complete the novel work related to evaluating HAPs and their relationship to methane emissions from landfills. *Id.* Furthermore, some of researchers and graduate students have already lost hours and compensation, and one or more will likely be let go. *Id.* Even if the team were eventually to find replacement funding for this project (a difficult proposition given the sum at stake), the delay and uncertainty would preclude full recovery of the project. *Id.*

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF    20
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

### 3.    Plaintiff Nell Green Nylen's Grant Terminations

Dr. Nell Green Nylen is a Research Fellow at UC Berkeley School of Law's Wheeler Water Institute at the Center for Law, Energy & the Environment (CLEE). Decl. of Nell Green Nylen in Supp. of this Mot. ("Green Nylen Decl.") ¶ 2, Ex. A.

Dr. Nylen and her collaborators submitted a proposal to the EPA on January 13, 2022 titled "*A Knowledge-to-Implementation Framework for Enhanced Aquifer Recharge*" with a proposed a cumulative budget of $2,000,000 (later adjusted to $1,999,998). *Id.* ¶¶ 8-13, Exs. B-C. On July 20, 2022, EPA notified UC Berkeley that it was awarding the grant. On April 10, 2025, the team requested a no-cost extension of the grant to better integrate results and to allow more time for expert and stakeholder review. *Id.* ¶¶ 14-17, Exs. D-E. The team received verbal approval for the no-cost extension and were awaiting formal written approval. *Id.* ¶ 17. On May 7, 2025, EPA sent the UC Regents a document styled as an "Assistance Amendment," which instructed the research team to "stop work; terminate the [grant] agreement; reduce performance period duration; [and] curtail scope of work," while waiving certain reporting requirements. *Id.* ¶¶ 18-20, Ex. F. It stated that "'(EPA) hereby awards $0.00' towards any as-yet-unincurred costs of the previously awarded $1,999,998 of federal funds." *Id.* ¶ 19.

Dr. Nylen and her collaborators submitted another proposal titled "*Accelerating Technical and Community Readiness for Water Reuse in Small Systems*" to the EPA on September 29, 2021. *Id.* ¶¶ 25-29, Exs. H-I. The Grant Application proposed a total budget of $4,057,500, combining a request for $3,246,000 of federal funds under the grant with a commitment from the research team to provide a $811,500 cost share from other sources. *Id.* ¶ 28. On August 8, 2022, EPA notified the team it was awarding the grant. *Id.* ¶¶ 30-32, Exs. J-K. On May 12, 2025, EPA informed the team it was terminating the grant. *Id.* ¶ 33, Ex. L. The notice instructed the research team to "stop work; terminate the [grant] agreement; reduce performance period duration; [and] curtail scope of work," and stated that "'(EPA) hereby awards $0.00' towards any as-yet-unincurred costs of the previously awarded $3,246,000 of federal funds." *Id.* ¶ 34.

Dr. Nylen and her collaborators have suffered immediate harm as a result of the cancellation of these grants. *Id.* ¶ 41. They have been unable to complete the research outputs they

PLAINTIFFS' MEMORANDUM IN SUPPORT OF       21
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

1    dedicated significant time and resources to. *Id.* Even if they are eventually able to find

2    replacement funding, the delay and uncertainty in the interim would preclude full recovery of the

3    project. *Id.* Time spent searching for replacement funding has considerable opportunity and

4    financial costs. *Id.* The job of every member of the water team at CLEE is currently threatened by

5    these grant terminations. *Id.* CLEE is a self-funded entity within UC Berkeley that does not

6    receive general salary support from the University. *Id.* Without funding from grants, team

7    members cannot be paid and may lose their jobs. *Id.*

8    **B.    National Endowment for the Humanities**

9    On March 13, 2025, NEH Chair Shelly Low was directed by the White House to resign.

10    Shortly thereafter, agents from DOGE began visiting NEH. DOGE actors recommended

11    dramatically cutting NEH staff and cancelling grants made under the Biden administration that

12    had not been fully paid out.[64] According to reports, Acting NEH Chair Michael McDonald told

13    staff that DOGE wanted to claw back $175 million in undispersed grant money.[65]  On March 20,

14    2025, NEH posted a webpage titled "*NEH Implementation of Recent Executive Orders*." The page

15    stated NEH was updating the Funding Restrictions section of its Notices of Funding Opportunities

16    ("NOFOs") "to comply with several recent Executive Orders, including 'Ending Radical and

17    Wasteful Government DEI Programs and Preferencing,' 'Defending Women from Gender

18    Ideology Extremism and Restoring Biological Truth to the Federal Government,' and 'Ending

19    Radical Indoctrination in K-12 Schooling.'" [66]

20    The page provided "Frequently Asked Questions," including, for example, Q: "Does the

21    addition of the new guidance on gender ideology … mean that NEH will not fund projects on …

22    the suffragist movement?" A: "No, not necessarily. The restrictions only apply to the categories

23    mentioned in the relevant Executive Orders. We encourage you to read the relevant Executive

24    Orders and consider whether your project's topic—jointing with its goals, methodology, activities,

25    and intended audience—seems allowable." The page only discussed the implication of the

26

27    _____

[64]  https://www.nytimes.com/2025/04/01/arts/trump-doge-federal-cuts-humanities.html.

28    [65]  https://www.npr.org/2025/04/03/nx-s1-5350994/neh-grants-cut-humanities-doge-trump.
[66]  https://www.neh.gov/executive-orders.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF          22
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

Executive Orders on grant applications, not terminations of existing grants.

On or around April 2, 2025, recipients of grant funding began receiving emails informing them that their grants had been terminated. These emails did not come from an NEH server or government email address, but from "Grant_Notifications@nehemail.onmicrosoft.com."[67] The terminations were not made through NEH's grants management system. The emails attached a form termination letter. On information and belief, the termination letters sent to all grantees on April 2 and thereafter were nearly identical and lacked any individualized analysis or discussion of each terminated grant. The termination letters received by Plaintiffs and Class members contained the following explanation for the terminations:

> Your grant no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement and is subject to termination due to several reasonable causes, as outlined in *2CFR§200.340*. NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda. The President's February 19, 2025 executive order mandates that the NEH eliminate all non-statutorily required activities and functions. *See Commencing the Reduction of the Federal Bureaucracy*, E.O. 14217 (Feb. 19, 2025). Your grant's immediate termination is necessary to safeguard the interests of the federal government, including its fiscal priorities. The termination of your grant represents an urgent priority for the administration, and due to exceptional circumstances, adherence to the traditional notification process is not possible. Therefore, the NEH hereby terminates your grant in its entirety effective April 1, 2025.

Decl. of Robert H. Hirst in Supp. of this Mot. ("Hirst Decl.") ¶¶ 33-38, Exs. E-F; Decl. of Christine Philliou in Supp. of this Mot. ("Philliou Decl.") ¶¶ 26-28, Exs. D-E.

Although the termination letter to NEH grantees states that EO 14217 "mandates that the NEH eliminate all non-statutorily required activities and functions," that Order makes no mention of NEH (despite mentioning other agencies).[68] The termination letters included no reference to any

---

[67] Adding yet another layer of irregularity, the "onmicrosoft.com" domain is notoriously used by cybercriminals and other malicious actors to carry out phishing attacks. *See, e.g.*, Smedh Arun Patil, Cloud That, *Proactive Strategies Against ".onmicrosoft.com" Phishing Attacks* (Dec. 13, 2023), https://www.cloudthat.com/resources/blog/proactive-strategies-against-onmicrosoft-com-phishing-attacks.

[68] https://www.federalregister.gov/documents/2025/02/25/2025-03133/commencing-the-reduction-of-the-federal-bureaucracy. President Trump also issued EO 14238, "*Continuing the*

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF     23
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

1  method for appeal or to seek reconsideration, even though NEH's General Terms and Conditions

2  require that grantees have a right to appeal a termination.[69]

3       The termination letters make no effort to explain how or why the relevant grant fails to

4  "effectuate[] the agency's needs and priorities" or otherwise warrant termination. Nor did they

5  address NEH's prior assessment—through its comprehensive panel and Council review process—

6  that these projects *do* effectuate agency priorities and are aligned with the statutory mandate and

7  goals of NEH.

8       On April 24, 2025—three weeks after NEH began terminating existing grants—the agency

9  issued a press release title "*An Update on NEH Funding Priorities and the Agency's Recent*

10  *Implementation of Trump Administration Executive Orders*."[70] The press release stated NEH had,

11  in recent weeks, "taken several internal operational steps to improve efficiency, eliminate offices

12  that are not essential to fulfilling its statutory requirements, and to return to being a responsible

13  steward of taxpayer funds."[71] The press release stated NEH had also taken steps to "ensure that all

14  future awards will, among other things, be merit-based, awarded to projects that do not promote

15  extreme ideologies based upon race or gender, and that help to instill an understanding of the

16  founding principles and ideals that make American an exceptional country."

17       As part of the press release, NEH issued a new "Statement on NEH Priorities" and

18  "Frequently Asked Questions."[72]

19       The "Statement on NEH Priorities" reads as follows:

20

21  *Reduction of the Federal Bureaucracy*," on March 14, 2025. This Order also made no mention of
   NEH. https://www.federalregister.gov/documents/2025/03/20/2025-04868/continuing-the-

22  reduction-of-the-federal-bureaucracy.

23  [69] *See* https://www.neh.gov/general-terms-and-conditions-awards-organizations-grants-and-
   cooperative-agreements-issued-january-2022#_Toc92721724, Section 13 (terms for grants issued

24  January 1, 2022 to September 30, 2024); https://www.neh.gov/general-terms-and-conditions-
   grants-after-oct-2024, Section XIII (terms for grants issued October 1, 2024 or later).

25  [70] https://www.neh.gov/news/update-neh-funding-priorities-and-agencys-recent-implementation-
   trump-administration-executive.

26  [71] https://www.neh.gov/news/update-neh-funding-priorities-and-agencys-recent-implementation-
   trump-administration-executive#:~:text=In%20collaboration%20with%20the%20

27  Administration,the%20use%20of%20taxpayer%20funds.

28  [72] https://www.neh.gov/updates-neh-priorities.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF          24
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

Founded in 1965, the National Endowment for the Humanities (NEH) is a grant-making agency of the U.S. government dedicated to supporting exemplary humanities research and programming in service of the American people. It does so by investing in the most meritorious proposals for the advancement and dissemination of humanities learning.

As set forth in NEH's enabling legislation, the humanities include the study of modern and classical languages, linguistics, literature, history, jurisprudence, philosophy, archaeology, comparative religion, ethics, the history of the arts, and those aspects of the social sciences which have humanistic content and use humanistic methods, as well as other areas.

To bring the wisdom of the humanities to all Americans, NEH supports research projects that advance humanistic learning, preservation projects that ensure access to significant humanities resources, education projects that strengthen teaching in the humanities, and public programing that conveys the best of the humanities to all Americans.

Moving forward, NEH is especially interested in projects on the nation's semiquincentennial and U.S. history more generally. In addition, the agency will be more finely attuned to its statutory responsibility that "funding should contribute to public support and confidence in the use of taxpayer funds."

As per longstanding agency policy, NEH-supported projects must not promote a particular political, religious, or ideological point of view and must not engage in political or social advocacy. NEH-supported projects should not preference some groups at the expense of others and should ultimately support public purposes.

The principles of intellectual significance, merit, competition, and equal opportunity lie at the heart of NEH's mission.

Two of the posted "Frequently Asked Questions" addressed the terminated grants:

Q:    Why is NEH cancelling awards?

A:    All federal grantmaking agencies, including NEH, must ensure that taxpayer dollars are spent effectively and are consistent with each agency's mission. This requires that NEH regularly evaluate its funding priorities within the policy framework established by Congress, the Administration, and the head of NEH. Awards and programming must align with these priorities.

Q:    What types of awards are being cancelled?

A:    In collaboration with the Administration, NEH has cancelled awards that are at variance with agency priorities, including but not limited to those on diversity, equity, and inclusion (or DEI) and environmental justice, as well as awards that may not inspire public confidence in the use of taxpayer funds.

NEH's new "priorities" also directly contradict its statutory mandate to make grants that

"reflect the diversity and richness of our American cultural heritage" and "give particular regard to

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

25

scholars, and educational and cultural institutions, that have traditionally been underrepresented." 20 U.S.C. § 956(c). As it explains in its new statements, NEH has dramatically narrowed its definition of agency "priorities" based on President Trump's EOs or otherwise in "collaboration with the Administration."

Plaintiffs and the Class have long relied on NEH grants to fund meritorious projects in the humanities. The termination of nearly all previously approved grants has caused and continues to cause serious harm to Plaintiffs and all those similarly situated.

### 1.    Plaintiff Robert H. Hirst's Grant Termination

Plaintiff Robert H. Hirst is the curator of the Mark Twain Papers and general editor of the Mark Twain Project at the Bancroft Library at the University of California, Berkeley. Hirst Decl. ¶ 2, Ex. A. He has served in this role since 1980. *Id.* The Mark Twain Project, a major editorial and publishing program of the Bancroft Library, is housed within the Mark Twain Papers archive. *Id.* ¶ 11. The aim of this Project is to create, maintain, correct, and update a permanent, globally accessible resource for the life and writings of Mark Twain. *Id.* The National Endowment for the Humanities ("NEH") has awarded more than $11,000,000 to support the editorial work of the Mark Twain Project, without interruption, since 1967, and has also made a generous challenge grant for the renovation of the Online Project. *Id.* ¶ 21.

On November 29, 2023, the Mark Twain Project, through the Regents of the University of California, submitted to the NEH an Application for Federal Domestic Assistance—application RQ-300297. *Id.* ¶ 22, Ex. B. On August 28, 2024, the University of California, Berkeley received a letter from the chair of the NEH, approving the Mark Twain Projection application RQ-300297. *Id.* ¶ 28, Ex. C. The Offer Letter provided the University of California, Berkeley, up to $450,000 in federal matching funds if Hirst raised an equal amount of eligible non-federal, third-party gifts, and certify their availability, and NEH had available to it sufficient funds allocated for matching purposes. *Id.* ¶ 29, Ex. C. On October 31, 2024, the university's Sponsored Projects Office ("SPO") accepted the NEH offer and sent in the required certification, signed by Hirst. *Id.* ¶ 32, Ex. D.

On April 2, 2025, the University of California, Berkeley, received an email from the

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

26

1 address "Grant_Notifications@nehemail.onmicrosoft.com," purporting to be Michael McDonald,

2 Acting Chairman for the National Endowment for the Humanities (the "Termination Email"),

3 terminating the award. *Id*. ¶ 33, Ex. E.

4       Hirst, the Mark Twain Papers and Project, and its staff, have suffered immediate harm as a

5 result of the cancellation of the grant, which will continue into the future. *Id*. ¶ 39. In lieu of

6 conducting his editorial work, Hirst will have had to refocus his time on fundraising to replace the

7 cancelled grant funding ($450,000). *Id*. The financial uncertainty created by this grant cancellation

8 significantly threatens his ability to retain the highly trained and experienced staff working on the

9 Mark Twain Project. *Id*. These individuals are among the world's experts on Mark Twain and their

10 knowledge of the collection is irreplaceable. *Id*. The cancellation threatens the migration of the

11 collection to new platforms as the existing ones have become obsolete. *Id*. Because the online

12 platform allows scholars and students from all over the world to access these original documents,

13 any interruption or delay in this work is very harmful to the Project and to the many who regularly

14 access or will want to access these materials in the future. *Id*. In addition, Hirst and his staff will

15 have less ability to go out to schools and universities to share the incomparable work of Mark

16 Twain. *Id*.

17       The termination of Plaintiff Hirst's grant is especially ironic given then NEH continues to

18 promote the collection of Mark Twain's papers as a significant achievement on its website's

19 homepage.[73] Moreover, Mark Twain is included in the list of individuals in EO 13987, "*Building*

20 *the National Garden of American Heroes*," that NEH now says it will provide funding to

21 support.[74]

22                    **2.       Plaintiff Christine Philliou's Grant Termination**

23       Christine Philliou is a Professor of History at the University of California, Berkeley, and

24 before that at Columbia University and Yale University. Philliou Decl. ¶ 2, Ex. A. Ms. Philliou

25

26 ───────────────
[73]  https://www.neh.gov/ ("NEH Funding by the Numbers" box).

27 [74]  https://www.neh.gov/program/national-garden-american-heroes-statues;
https://www.federalregister.gov/documents/2021/01/22/2021-01643/building-the-national-garden-

28 of-american-heroes.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF      27
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

submitted to the National Endowment for the Humanities (NEH) an Application for Federal Domestic Assistance titled "*Visualizing Local Christian Communities in Muslim Cosmopolitan Istanbul in the 19th and 20th Centuries.*" *Id.* ¶ 13, Ex. B. The purpose of the grant was to help fund the Istan-Polis Project, a project to reconstruct and analyze the history of Istanbul's Orthodox Christian communities in the final Ottoman century. *Id.* ¶ 14. The grant would also fund development of a public-facing website to display the results of the data projects and to feed further research and collaboration. *Id.* ¶ 15. The focus on the experience of this minority was intended to provide new tools for scholars seeking to clarify how the tensions between cosmopolitanism and nationalism were manifested in cities globally. *Id.* ¶ 16.

The application (RZ-292650-23) was approved for funding for an award of $246,347.00 over three years. *Id.* ¶¶ 18-19, Ex. C. On April 2, 2025, the University of California, Berkeley, received an email from the address "Grant_Notifications@nehemail.onmicrosoft.com," sent on behalf of Michael McDonald, Acting Chairman for the NEH (the "Termination Email") terminating the grant. *Id.* ¶ 26-28, Exs. D-E.

The Istan-Polis Project, its staff, and Philliou have suffered direct and immediate harm as a result of the cancellation of the grant. *Id.* ¶ 29. Work on the website has been disrupted. *Id.* ¶ 32. A seminar in Istanbul for this summer very likely will not proceed. *Id.* ¶ 30. Staff who were depending on funds provided by the grant may be without a livelihood. *Id.* ¶ 31. Researchers may not even be paid for work they have already performed. *Id.* In addition, the team incurred $46,750 in project expenses that remain unreimbursed. *Id.* ¶ 20. Also, the end of the grant will likely mean an end to the project as a whole. *Id.* ¶ 34.

### C.    National Science Foundation

Since the Trump Administration took office in January 2025, the NSF has terminated more than a billion dollars in scientific grants that had previously been approved and awarded through the merit review process and which the NSF was legally obligated to provide. The pace of the terminations has escalated rapidly since mid-April, as the Trump Administration has taken a wrecking ball to the NSF. During that brief time period, more than 1,400 grants have been terminated. The grant terminations were generally not preceded by warnings, and thus came as a

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF    28
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

complete shock to the researchers whose livelihoods and life's work depended on them. The grant terminations have typically been conveyed in short, standardized missives containing the following boilerplate statements:

- "[T]he agency has determined that termination of certain awards is necessary because they are not in alignment with current NSF priorities."

- "NSF is issuing this termination to protect the interests of the government pursuant to NSF Grant General Conditions (GC-1) term and condition entitled 'Termination and Enforcement,' on the basis that they [sic] no longer effectuate the program goals or agency priorities."

Decl. of Jedda Foreman in Supp. of this Mot. ("Foreman Decl.") ¶¶ 53-57, Exs. H & I. These form terminations end by stating: "This is the final agency decision and not subject to appeal." *Id.*

In an apparent attempt to justify its new war on science, the NSF published a "Statement of NSF Priorities" on April 18, 2025, explaining that NSF's activities "must aim to create opportunities for all Americans everywhere" and "[r]esearch projects with more narrow impact limited to subgroups of people based on protected class or characteristics do not effectuate NSF priorities."[75]

NSF also issued an accompanying set of FAQ's, which indicated that awards not aligned with NSF priorities include, but are "not limited to those on diversity, equity, and inclusion (DEI), environmental justice, and misinformation/disinformation."

The grant cancellations are one prong in what can only be described as an effort to radically shrink and marginalize the NSF. In mid-April, it was announced that the NSF was freezing any new grants, and in early May, the NSF announced that its thirty-seven research divisions were being abolished. Then, on April 24, 2025, the Director of NSF, Sethuraman Panchanathan, resigned sixteen months early. Massive layoffs are now anticipated. Meanwhile, President Trump proposed cutting the NSF's budget for the 2026 fiscal year by 55%. As recently stated in Forbes, "This is not reform. It is a dismantling." John Drake, *The NSF Is Being Dismantled — With Broad Implications For The American Economy,* Forbes, May 9, 2025.

These grant terminations are a disaster for the future of science in the United States. The

---

[75] https://www.nsf.gov/updates-on-priorities#statement-of-nsf-priorities-09d.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF          29
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

gravity of the situation and illegality of the grant terminations were summarized in a letter from the House of Representatives' Committee on Science, Space, and Technology sent to the acting director of the NSF, Brian Stone, on May 8, 2025. The letter characterizes the Trump Administration's actions against the NSF as "chaos and destruction," and states that "[DOGE's] accusation that these terminated awards lack merit is a lie, as most, if not all these awards, carry a statement from the agency declaring that" the award "reflects NSF's statutory mission and has been deemed worthy of support through evaluation using the Foundation's intellectual merit and broader impacts review criteria."  Letter from House of Representatives' Committee on Science, Space and Technology to Brian Stone at 1-2 (May 8, 2025).

The House Committee Letter goes on to state: "The cancelation of these awards suggests instead that NSF is willing to apply political censorship of awards under direction from President Trump and the DOGE teenagers, which is a clear violation of the statutory mission of the agency." *Ibid*. It then provides a few examples of recently terminated grants to illustrate the folly, harmfulness, and in some instances absurdity of the Trump Administration's grant cancellations. The list of cancelled grants includes those for:

- A rural after-school program that gives middle school students an opportunity to use mathematics and design thinking to address agricultural issues, such as designing water catchment systems for drought conditions.[76]

- Research on developing a tool that uses machine learning to detect deepfakes, which are used for all manner of disinformation, be it political content planted by foreign adversaries or the creation of child sexual abuse material.[77]

- A grant to study improved mental health interventions for engineering students, who – across demographics – are statistically less likely than students in other disciplines to seek mental health treatment. This research was aimed at improving outcomes for engineering students in mental health distress and with mental health disabilities.[78]

---

[76] Award Abstract # 2215382 – *Engaging Rural, Latinx Youth in an After School Program That Integrates Design Thinking, Making and Math*, https://www.nsf.gov/awardsearch/showAward?AWD_ID=2215382.
[77] Award Abstract # 2310131 – *Collaborative Research: SaTC: TTP: Small: DeFake: Deploying a Tool for Robust Deepfake Detection*, https://www.nsf.gov/awardsearch/showAward?AWD_ID=2310131.
[78] Award Abstract # 2225567 – *Research: Identifying intervention targets to increase mental health help seeking in undergraduate engineers*, https://www.nsf.gov/awardsearch/showAward?AWD_ID=2225567.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF        30
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

- An industry-focused workforce development program that trains the next generation of quantum technicians, including through accessible experiential learning and certification opportunities for entry-level professionals.[79]

- A National Research Traineeship award, supporting 25 graduate students, to develop new interdisciplinary studies applying AI to better understand "legal system processes, impacts, and institutions" as well as to develop "tools and methods for leveraging newly available data from the criminal legal system, and ethical and social implications of big data and AI in the context of criminal justice."[80]

The House Committee Letter condemns these grant terminations as "an abdication of NSF's mission and a betrayal of the scientific community, including the thousands of graduate students and early career researchers whose careers will be derailed." Letter from House of Representatives' Committee on Science, Space and Technology to Brian Stone at 3 (May 8, 2025).

A crowdsourced public database of terminated NSF grants indicates that over 1600 active NSF grants have been terminated since January 20, 2025.[81] The total value of these awards is over $1.5 billion. *Id.* A review of the terminated awards suggests that many were flagged for termination because of disfavored words in the project titles, *e.g.*, "Effects of Leaf ***Diversity*** on Aquatic Insect Colonizer ***Diversity***" (2230887);"Revealing the Vast ***Diversity*** Within the Legume-Rhizobia Mutualism" (2345627), "The ***Evolution*** of Evolvability in Microbial Populations." (1914916); and "Ecological Turnover at the Dawn of the Great Ordovician Bio***diversification*** Event - Quantifying the Cambro-Ordovician ***Transition*** Through the Lens of Exceptional Preservation" (2047192) (emphasis added throughout).

### 1. Plaintiff Jedda Foreman's Grant Terminations

Jedda Foreman is the Director of the Center for Environmental Learning at the Lawrence

---

[79] Award Abstract # 2243822 - *NRT-HDR: Computational Research for Equity in the Legal System" (CRELS)*, https://www.nsf.gov/awardsearch/showAward?AWDID=2243822.

[80] Award Abstract # 2243822 – *NRT-HDR: Computational Research for Equity in the Legal System (CRELS)*, https://www.nsf.gov/awardsearch/showAward?AWD_ID=2243822&HistoricalAwards=false.

[81] The database objectively verifies submissions by listing NSF-issued grant serial numbers unique to each grant and website hyperlinks to federal databases describing each grant. *See* https://grant-watch.us/nsf-data.html. See also https://www.nytimes.com/interactive/2025/05/22/upshot/nsf-grants-trump-cuts.html (confirming that more than 1,600 active NSF grants worth roughly $1.5 billion have been terminated this year).

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF    31
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

Hall of Science at the University of California, Berkeley. Foreman Decl.¶ 2. Ms. Foreman was the lead Principal or co Principal Investigator for three NSF grants terminated in April 2025:

- "*Understanding the Impact of Outdoor Science and Environmental Learning Experiences Through Community-Driven Outcomes*," (Award Number 2314075), total intended award amount $2,149,437. *Id*. ¶¶ 16-23, Ex. B.

- "*Working Toward Racial Equity: Building Capacity to Institutionalize Equity in Outdoor and Environmental Science Education*," (Award Number 2315277), total intended award amount: $4,723,028. *Id*. ¶¶ 24-35, Exs. C-D.

- "*Supporting Rightful Presence in Museum Spaces: Youth as Participatory Designers of Indigenous Mixed Reality Science Exhibits*," (Award Number 2241805), total intended award amount, of $1,292,298. *Id*. ¶¶ 36-48, Exs. E-F.

  - Supplemental Award to celebrate NSF's 75th anniversary on May 10, 2025, additional award amount of $98,981, bringing the total funds awarded to $1,391,279. *Id*. ¶¶ 49-52, Ex. G.

All three awards were terminated with boilerplate termination notices in April 2025. *Id*. ¶¶ 53-61, Exs. H-J. As to "*Supporting Rightful Presence in Museum Spaces: Youth as Participatory Designers of Indigenous Mixed Reality Science Exhibits*" (Award 2241805), $490,834.22 or 35% of the award remained unpaid at the time of termination. *Id*. ¶ 63. In addition, when this award was terminated, the supplemental funding for a celebration of the NSF's 75th anniversary on May 10, 2025 was terminated as well. *Id.* Because promises had already been made to community members, the Hall still went forward with the event and incurred the remaining costs. *Id.* As to "*Working Toward Racial Equity: Building Capacity to Institutionalize Equity in Outdoor and Environmental Science Education*" (Award 2315277), approximately $3,769,075.24 or 80% of the award remained unpaid at the time of termination. *Id*. ¶ 64. As to "*Understanding the Impact of Outdoor Science and Environmental Learning Experiences Through Community-Driven Outcomes*" (Award 2314075), approximately $1,500,251.79 or 75% of the award remained unpaid at the time of termination. *Id*. ¶ 65.

The financial implications of these abrupt terminations are enormous, representing millions of dollars of lost funding to the Lawrence Hall. *Id*. ¶ 66. These mid-project terminations will negatively impact the ability of Ms. Foreman and her collaborators to advance their work and careers. *Id*. ¶ 68. The terminations have a significant impact on the Lawrence Hall's ability to operate and serve the public, and it will likely need to reduce time for and/or lay off both academic

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

32

1  personnel and staff if it is not able to find alternative resources quickly. *Id.* ¶¶ 67-70. While the

2  financial implications are debilitating, the human cost of the termination of these awards is also

3  profound. *Id.* Taken together, the grant-funded projects are important to the thousands of young

4  people, educators, and community partners that they are designed to engage, serve, and/or impact.

5  *Id.* ¶ 69. The abrupt termination of these grants means these public benefits will go unrealized. *Id.*

6          **D.      Remaining Federal Agency Defendants**

7          The remaining Federal Agency Defendants have terminated grants already awarded to the

8  Proposed Class in similar, categorical, and lockstep fashion. *See, e.g.*, Compl. (June 4, 2025), ECF

9  No. 1 at ¶¶ 360-65 (USDA), 366-72 (AmeriCorps), 373-79 (DOD), 380-84 (Education), 385-92

10  (DOE), 393-407 (HHS), 408-13 (IMLS), 414-18 (DOI), 419-22 (DOS), 423-29 (DOT).

11          The remaining Federal Agency Defendants have terminated these grants despite facing

12  limitations and restrictions on agency action, similar to those faced by the EPA, NEH, and NSF,

13  their respective enabling acts and governing regulations. *See, e.g.* 7 U.S.C. § 3157 (USDA); 42

14  U.S.C. § 12653 (AmeriCorps); 32 C.F.R. § 21.410 (DOD); 20 U.S.C. §§ 9511, 9512 (Education);

15  42 U.S.C. § 241 (HHS); 20 U.S.C. §§ 9108, 9162, 9165, 9175 (IMLS); 49 U.S.C. § 330 (DOT).

16          Proposed Class members whose grant awards have been terminated by the remaining

17  Federal Agency Defendants have suffered the same concrete harm and will suffer the same

18  irreparable harm as the named-Plaintiff class-representatives.

19                                   **ARGUMENT**

20          A temporary restraining order is warranted where the moving party establishes that (1) it is

21  likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief;

22  (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest.

23  Fed. R. Civ. P. 65(c); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); Fed. R. Civ. P.

24  65(b)(1). All of these factors strongly favor Plaintiffs.

25  **I.      This Court Should Enjoin Defendant's Unlawful Termination of Grants.**

26          **A.      This Court Has Jurisdiction to Hear These Claims.**

27                  **1.      Plaintiffs Have Article III Standing.**

28          While all Plaintiffs have standing, this Court can proceed upon finding that even a

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF     33
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

single plaintiff does. *See Townley v. Miller*, 722 F.3d 1128, 1135 (9th Cir. 2013). Plaintiffs have suffered, or may imminently suffer, grant terminations that have impacted their careers and livelihoods. Alex Decl. ¶ 27; Foreman Decl. ¶¶ 62-70; Green Nylen Decl. ¶ 41; Hirst Decl. ¶ 39; Philliou Decl. ¶¶ 20, 29-34; Thakur Decl. ¶ 25.

### 2.    Plaintiffs Should Not be Channeled to Agency Adjudication.

This Court has subject matter jurisdiction to hear these federal claims pursuant to 28 U.S.C. Section 1331. Defendants may argue, as the Administration has elsewhere, that this Court lacks jurisdiction over Plaintiffs' claims, on the theory that Congress impliedly intended to "channel" claims into an administrative adjudicatory scheme *before* being heard in federal court, under the doctrine established by *Thunder Basin Coal Company v. Reich*, 510 U.S. 200, 207-13 (1994). The *Thunder Basin* doctrine asks whether a plaintiff's claims are "are of the type Congress intended to be reviewed" within a system of agency adjudication created by a statute, even though the statute does not expressly preclude federal jurisdiction. *Id*. at 212. Here, however, the doctrine is inapplicable to Plaintiffs' claims, which all arise under the Constitution or the APA.

Plaintiffs are suing Defendants for enacting a government-wide policy and program that violates the Constitution and the APA. The Court must "presume that Congress does not intend to limit jurisdiction if 'a finding of preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin*, 510 U.S. at 212-213).

Plaintiffs' claims raise constitutional and statutory challenges to agencies' failures to carry out statutory duties and refusal to expend appropriations. Such claims are not run of the mill challenges to adverse individual agency actions. "[A]gency adjudications are generally ill suited to address structural constitutional challenges." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 195 (2023) (citation omitted). Claims challenging whether an agency had power to act— "issues related to the appropriate distribution of authority to and within the executive branch"— are well suited for judicial, rather than agency review. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, No. 25-CV-03698-SI, 2025 WL 1358477, at *15 (N.D. Cal. May 9, 2025) (J. Illston)

PLAINTIFFS' MEMORANDUM IN SUPPORT OF    34
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

1   (rejecting government's channeling argument).

2       In recent years, the Supreme Court has reiterated the APA's "command" of judicial review

3   (*Department of Commerce v. New York*, 588 U.S. 752, 772 (2019)), and construed exceptions to

4   the APA "quite narrowly." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22-23

5   (2018).[82] As the Court recently held in rejecting a different implied doctrine, "[t]he text of the

6   APA means what it says." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 393 (2024). As the

7   Supreme Court has held, the APA was designed to "serve as the fundamental charter of the

8   administrative state," *Kisor v. Wilkie*, 588 U.S. 558, 580 (2019) (plurality opinion) (internal

9   quotation marks omitted). That is the role the APA must play here, and one reason this Court must

10  hear these important claims.

### B.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims that the Grant Terminations are Unlawful.

13      Defendants' termination and suspension of already-awarded grants manifestly violates

14  their constitutional, statutory, and regulatory authorities.

### 1.     Defendants' Grant Terminations Violate Constitutional Separation of Powers.

17      This Court has jurisdiction to enjoin Federal officials from violating the Constitution,

18  including the separation of powers. *Free Enter. Fund*, 561 U.S. at 491 n.2.

19      The Constitution empowers Congress to make laws (U.S. Const. art. 1, § 1), and requires

20  the President to faithfully execute those laws (*id.* art. II, § 3). Congress's powers to set the policies

21  of the nation are at their apex when it comes to spending money, as the Constitution "exclusively

22  grants the power of the purse to Congress, not the President." *City & Cnty. of S.F. v. Trump*, 897

23

---

24  [82] At the same time, it has refused to expand the implied *Thunder Basin* doctrine. *See Axon Enters.*, 598 U.S. at 195-96. While federal courts once readily departed from the text enacted by

25  Congress—fashioning "implie[d]" doctrines as they deemed "necessary to make effective the congressional purpose" expressed in that text (*J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964))—

26  today, that approach is recognized as an "ancien regime." *Ziglar v. Abbasi*, 582 U.S. 120, 131-32 (2017) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001)); *see also Axon Enters.*, 598

27  U.S. at 217 (Gorsuch, J., concurring) ("Respectfully, this Court should be done with the *Thunder Basin* project. I hope it will be soon.").

PLAINTIFFS' MEMORANDUM IN SUPPORT OF     35
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

1  F.3d 1225, 1231, 1238 (9th Cir. 2018).

2      The President and executive branch agencies have no constitutional power to exercise

3  Congress's Article I powers by attempting to unilaterally enact, amend, or repeal duly enacted

4  statutes. *Clinton v. City of New York*, 524 U.S. 417, 438-39 (1998); *see also In re Aiken Cnty.*, 725

5  F.3d 255, 259 (D.C. Cir. 2013) ("the President may not decline to follow a statutory mandate or

6  prohibition simply because of policy objections ... Those basic constitutional principles apply to

7  the President and subordinate executive agencies").[83] Indeed, because "[t]he accumulation of all

8  powers, legislative, executive, and judiciary, in the same hands . . . pose[s] an inherent 'threat to

9  liberty[,]'" each branch of the federal government must stay within its proper domain. *Patchak v.*

10  *Zinke*, 583 U.S. 244, 250 (2018) (plurality opinion) (citation omitted); *Massachusetts v. Mellon*,

11  262 U.S. 447, 488 (1923); *see also Bowsher v. Synar*, 478 U.S. 714, 721-22 (1986) ("there can be

12  no liberty where the legislative and executive powers are united in the same person") (quoting The

13  Federalist No. 47, at 325 (J. Cooke ed. 1961)). Moreover, as the Supreme Court recently

14  reaffirmed, "Administrative agencies are creatures of statute. They accordingly possess only the

15  authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595

16  U.S. 109, 117 (2022).

17      When one of the three branches exceeds the scope of its statutory or constitutional

18  authority, it falls to the federal courts to reestablish the proper division of federal power. *See, e.g.*,

19  *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995) (rebuking Congress's intrusion into

20  judicial sphere); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (preventing judiciary from

21  intruding into executive sphere); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 655

22  (1952) (Jackson, J., concurring) (halting President's encroachment upon legislative sphere); *cf.*

23  *also Loper Bright*, 603 U.S. at 391-92 (refusing to imply into APA any deference to agency

24  decisions interpreting laws, because that would permit other branches to usurp Article III).

25      Federal agency action outside of any constitutional or statutory authority therefore may be

26

27  _____

[83] This constitutional principle likewise extends to rewriting statutory appropriations by refusing

28  to expend funds, here on grants.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF        36
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

struck down as *ultra vires*. *E.g.*, *Sierra Club v. Trump*, 963 F.3d 874, 888-93 (9th Cir. 2020), *judgment vacated on other grounds*, *sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996); *see also Leedom v. Kyne*, 358 U.S.184, 188 (1958); *Larson v. Domestic & Foreign Com. Corp*., 337 U.S. 682, 691 (1949); *cf. United States v. McIntosh*, 833 F.3d 1163, 1174 (9th Cir. 2016) ("both federalism and separation-of-powers constraints in the Constitution serve to protect individual liberty, and a litigant in a proper case can invoke such constraints '[w]hen government acts in excess of its lawful powers.'" (citation omitted)). It is well-established that there is "'extreme' agency error where the agency has 'stepped so plainly beyond the bounds of [its statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court.'" *Fed. Express Corp. v. U.S. Dep't of Com*., 39 F.4th 756, 764 (D.C. Cir. 2022) (citation omitted) (analyzing both "extent of the agency's delegated authority" and whether "agency has acted within that authority") (citation omitted) (quotations omitted); *see also Sierra Club v. Trump*, 963 F.3d at 888-93.

As set forth above, Congress has consistently appropriated specific funds to agencies like NSF to further the goals set out in the NSF Act—i.e., to increase the involvement of communities underrepresented in STEM and grow a diverse STEM workforce—which has, for years, included billions of dollars of grant awards in furtherance of that purpose. This funding was duly authorized and appropriated by Congress, and Defendants may not unilaterally refuse to spend it by improperly terminating grants or by refusing to fund a class of congressionally mandated projects in the future. The Executive's interference with duly authorized agency spending is not authorized by the Constitution or by statute, and therefore the Executive's authority is at "its lowest ebb." *Youngstown*, 343 U.S. at 637.

The Executive has also failed to "take Care that the Laws be faithfully executed" (U.S. Const. art. II, § 3)—*e.g.*, the laws directing NSF to support programs and fund projects designed to increase STEM participation by women, minorities, and people with disabilities. "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown*, 343 U.S. at 587. "[T]he President may

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

37

1  not decline to follow a statutory mandate … simply because of policy objections." *Aiken Cnty.*,

2  725 F.3d at 259. "[B]ecause federal agencies are 'creatures of statute,' and 'the Take Care Clause

3  cannot be used to bypass agencies' limited status as creatures of statute, [they] possess only the

4  authority that Congress has provided them.'" *Widakuswara v. Lake*, No. 1:25-CV-1015-RCL,

5  2025 WL 1166400, at *15 (D.D.C. Apr. 22, 2025) (quoting *Martin Audubon Soc'y v. Fed.*

6  *Aviation Admin.*, 121 F.4th 902, 914 (D.C. Dir. 2024). By rejecting congressionally mandated

7  policy to expand STEM participation by women, minorities, and people with disabilities, and

8  terminating projects because they advance those congressionally mandated goals, Defendants have

9  violated the Take Care Clause.

10       Defendants' decisions to unilaterally cancel duly awarded grants and withhold funding

11  Congress has appropriated precisely to fund such grants violates the separation of powers.

12  Defendants' decisions to delay spending and outright refuse to spend the amounts Congress

13  appropriated violates Congress's power of the purse and the separation of powers. Because

14  Defendants' actions violate the separation of powers and are *ultra vires*, they should be enjoined

15  and declared unconstitutional.

16          **2.**      **Defendants' Grant Terminations Violate the First Amendment.**

17       The First Amendment provides that the Federal government "shall make no law . . .

18  abridging the freedom of speech."  U.S. Const. amend. I.

19       The First Amendment prohibits the government from "regulating speech when the specific

20  motivating ideology or the opinion or perspective of the speaker is the rationale for the

21  restriction."  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829, 833 (1995).

22  "Discrimination against speech because of its message is presumed to be unconstitutional."  *Id.* at

23  828.

24       "[E]ven in the provision of subsidies, the Government may not 'ai[m]at the suppression of

25  dangerous ideas.'"  *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quoting

26  *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 550 (1983) (alteration in

27  original)). In the grant-making context, the government may not reject "a whole class of projects"

28  based on "viewpoint alone," or use Federal funding to "impose a disproportionate burden

PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

1   calculated to drive certain ideas or viewpoints from the marketplace." *Rhode Island Latino Arts v.*

2   *Nat'l Endowment for the Arts*, No.25-cv-79-WES, 2025 WL 1009026, at *12 (D.R.I. Apr. 3, 2025)

3   (quoting *Finley*, 524 U.S. at 587).

4           Defendants' mass termination of grants to promote particular political and ideological

5   viewpoints, is "the product of invidious viewpoint discrimination." *Finley*, 524 U.S. at 587.

6   Defendants terminated the grants based on the recipients' viewpoint and the content their works

7   would cover, in an effort to drive such views out of the marketplace of ideas. This is most evident

8   by the citation in the Termination Notices to EOs purporting to combat "Radical Indoctrination"

9   and "Radical . . . DEI Programs," and to further "Biological Truth."  It is evident from the

10  Termination Notice that Defendants believe Plaintiffs' speech conflicts with the Administration's

11  views, and their grants were terminated at least in part for this reason. The First Amendment does

12  not tolerate such viewpoint discrimination.

13          Accordingly, Defendants' actions are not in accordance with law and contrary to

14  constitutional right or power.

15              **3.      Defendants' Grant Terminations Violate the Fifth Amendment.**

16          The Due Process Clause of the Fifth Amendment to the Constitution requires due process

17  of law before the deprivation of a constitutionally protected interest. Plaintiffs have a

18  constitutionally protected property interest in grant and contract funding that supports their

19  salaries and stipends, as well as their ongoing research. Plaintiffs have relied on this funding, and

20  the protections of federal law governing this funding, in pursuing their research, hiring staff,

21  making commitments to research partners, and in many other ways. Plaintiffs also have

22  constitutionally protected liberty interests in their freedom of speech and expression, including

23  academic freedom, and in pursuing their livelihoods.

24          Defendants' cancellation or imminent cancellation of federal grant and contract funding

25  does not provide Plaintiffs fair notice or a reasonable opportunity to be heard.

26          The Due Process Clause also prohibits government actions that fail to give fair notice of

27  what conduct is forbidden or required. A government enactment is unconstitutionally vague if it

28  fails to provide a reasonable opportunity to know what conduct is prohibited or is so indefinite as

PLAINTIFFS' MEMORANDUM IN SUPPORT OF          39
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

1    to allow arbitrary and discriminatory enforcement. "It is a basic principle of due process that an

2    enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of*

3    *Rockford*, 408 U.S. 104, 108 (1972). A law or policy is unconstitutionally vague if it (1) "fails to

4    give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden" or (2)

5    "encourages arbitrary and discriminatory enforcement." *Papachristou v. City of Jacksonville*, 405

6    U.S. 156, 162, 170 (1972). This doctrine applies to administrative policies and federal agency

7    guidelines. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012) (holding that the FCC's

8    indecency policy invited arbitrary enforcement).

9        Here, the new administration priorities referenced in the termination letters "are not clearly

10    defined," encouraging arbitrary enforcement by Defendants. *See id.* at 253. "[P]recision and

11    guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory

12    way." *Id.* Defendants fail to define any of the research areas or topics that purportedly "no longer

13    effectuate[] agency priorities" in the termination notices, forbidding research using undefined

14    terms  such as "DEI"; "gender identity," and "COVID-related research." The EOs , agency

15    directives, and termination notices "encourage[] arbitrary and discriminatory enforcement." *See*

16    *Papachristou*, 405 U.S. at 170. The terminations also fail to provide "fair notice" of what is

17    prohibited. *See Fox Television Stations*, 567 U.S. at 254. There is no way for Plaintiffs and

18    Members to know why or how their individual projects "fail[] to effectuate[] agency priorities."

19    This lack of notice limits Plaintiffs' ability to meaningfully address Defendants' concerns about

20    their projects in their appeals, or—to the extent necessary—revise their projects to align with any

21    purported agency priorities. Because Defendants' vague statements have not allowed Plaintiffs to

22    "know what is required of them so they may act accordingly," they must be enjoined. *See Fox*

23    *Television Stations*, 567 U.S. at 253.

24        Because of the vagueness in the language of Defendants' Directives and the Agency's

25    chaotic efforts to give effect to those Directives, Plaintiffs are unsure, for example, which areas of

26    study they can pursue, which populations they can focus on as study subjects, what they might

27    argue to appeal grant terminations, and what the demographics of study participants must be. This

28    makes it impossible to determine how to reconfigure future research to stay within the bounds of

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF       40
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

1  the agencies' newest "priorities." Defendants' Directives and efforts to purge certain research thus

2  violate the Due Process Clause because its termination notices and related documents provide

3  inadequate notice of what types of research it purports to prohibit.

4        Defendants' efforts to purge certain disfavored research from federal agencies' grant rolls

5  accordingly violates the Due Process Clause.

6                    **4.    Defendants' Grant Terminations Are Contrary to Law Under the APA
                             Because They Violate the Impoundment Control Act and Other**

7                            **Statutes and Regulations.**

8        The APA directs courts to hold unlawful and set aside agency actions that are not in

9  accordance with law. 5 U.S.C. § 706(2)(A). The APA prohibits agency action that exceeds

10 statutory or constitutional authority or is otherwise contrary to law. 5 U.S.C. §706(2)(A), (C);

11 *Kaweah Delta Health Care Dist. v. Becerra*, 123 F.4th 939, 944 (9th Cir. 2024) ("[U]nder our

12 system of separation of powers, neither good intentions nor pressing policy problems can

13 substitute for an agency's lack of statutory authority to act."); *Nw. Env't Advocates v. U.S. EPA*,

14 537 F.3d 1006, 1025-27 (9th Cir. 2008).

15       First, by refusing to spend money that Congress appropriated, Defendants are violating the

16 Impoundment Control Act of 1974 (ICA), and the appropriations statutes underlying each

17 agency's funding scheme. Under the ICA, a "deferral" includes any "withholding or delaying the

18 obligation or expenditure of" appropriated funds, as well as "any other type of Executive action or

19 inaction which effectively precludes the obligation or expenditure of" appropriated funds. 2 U.S.C.

20 § 682(1). When the Executive wishes to defer funds, it must send a special message to Congress

21 detailing the money to be deferred and the reasons for deferral. There are only three permissible

22 grounds for deferrals, none of which includes effort to ensure funds are spent consistent with the

23 President's new policy priorities. *Id.* § 684(b).

24       Defendants' actions constitute a "deferral" because they reflect a "withholding or delaying

25 [of] the obligation or expenditure of" funds that Congress appropriated for NEH. 2 U.S.C.

26 § 682(1). Defendants did not notify Congress of the deferrals as the ICA requires, nor did

27 Defendants undertake the deferrals for reasons permitted by the ICA.

28       Defendants' actions also constitute an unlawful "rescission" of the funds appropriated for

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF          41
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

1  agency action, including grant-making. Where the President seeks to "rescind" appropriated funds,

2  the ICA requires, among other things, that the President send a special message to Congress

3  specifying the funds he seeks to have rescinded and the reasons for his proposal. 2 U.S.C.

4  § 683(a). The President did not do so.

5      Defendants' termination of grants, including the grants to Plaintiffs, is without statutory

6  authority and violates the Impoundment Control Act, because the individual grant terminations

7  were a primary means by which Defendants carried out their deferral of appropriated funds and

8  their outright refusals to spend appropriated funds.

9      Second, Defendants are violating the agencies' enabling statutes and other laws passed by

10  Congress that include grant-making as a directive to the agencies. The work that Plaintiffs and the

11  Class were awarded grants to do furthers agency missions and specific statutory requirements set

12  by Congress. Withholding the appropriated funds illegally contradicts Congress's directives.

13      For example, the NSF Act of 1950, as amended, requires NSF to pursue programs

14  designed to broaden participation of women, minorities, and people with disabilities in STEM

15  fields. The NSF Act of 1950 directs NSF to pursue congressional goals by applying a core strategy

16  of developing intellectual capital "with particular emphasis on groups … that traditionally have

17  not participated fully in [STEM]." 42 U.S.C. § 1862k(b)(1). Congress required this based on its

18  judgment that "underrepresented populations are the largest untapped STEM talent pools in the

19  United States," and that "the United States should encourage full participation of individuals from

20  underrepresented populations in STEM fields." 42 U.S.C. § 1862s-5(b)(3), (4). Congress has

21  directed NSF to prioritize the participation of "women, minorities, and persons with disabilities"

22  42 U.S.C. § 1885(b). The NSF Director is mandated to "continue to support programs designed to

23  broaden participation of underrepresented populations in STEM fields," 42 U.S.C. § 1862s-5(c),

24  and "shall award grants ... to increase the participation of underrepresented populations in STEM

25  fields, including [women, minorities, and people with disabilities]." 42 U.S.C. § 1862s-5(d)(1).

26      Defendants now disregard these directives by terminating already-awarded grants which

27  involve underrepresented populations. The APA does not allow an agency to flout Congress's

28  clear directives in this way. *See, e.g., Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 416

PLAINTIFFS' MEMORANDUM IN SUPPORT OF      42
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

(D.C. Cir. 1994) (explaining that a court may not accept "the agency's policy judgments ... if they conflict with the policy judgments that undergird the statutory scheme"); *Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155, 176 (4th Cir. 1998), *aff'd*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) (explaining that "federal agencies" cannot "substitute their policy judgments for those of Congress").

Third, Defendants are violating their own regulations to the extent grants were issued in accordance with regulations. Congress authorized the federal agencies, through the head of each agency, to award federally funded grants and disburse federal funds consistent with their authorizing statutes. Defendants' actions seek to override these statues by terminating grants in a manner inconsistent with their authorizing statutes. *See, e.g.,* Decl. of Samuel Pimentel in Supp. of this Mot. ("Pimentel Decl.") ¶ 18, Ex. G (stating, as the sole explanation for grant termination, "the Government's convenience").[84]

Defendants have exceeded their own statutory authority and have therefore violated 5 U.S.C. Section 706(2)(A) and (C). Accordingly, "the only appropriate remedy is vacatur." *Kaweah*, 123 F.4th at 944. Because Defendants' actions violate statutory commands and are otherwise *ultra vires*, they should be enjoined and declared unlawful.

### 5. Defendants' Grant Terminations Are Arbitrary and Capricious Under the APA.

Defendants' actions terminating already-awarded grants constitute final agency action for APA purposes. 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 156, 177-78 (1997) (final agency action marks "consummation of the agency's decisionmaking process" and is one by which "rights or obligations have been determined," or from which "legal consequences will flow") (citation

---

[84] Remarkably, the "termination for convenience of the government" language used in agency documents terminating Dr. Pimentel's FDA grant (*see* Pimentel Decl. ¶ 18, Ex. G.) references a standard for contract terminations in Federal Acquisition Regulation ("FAR") 52.212-4. Federal Acquisition Regulations, which govern federal agencies' procurement of commercial goods such as airplanes, have no logical relationship to and are wholly inapplicable to the making or termination of academic research grants.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF          43
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

1  omitted).[85] These terminations were not "tentative or interlocutory" (*id.*), and have all the

2  hallmarks of a programmatic decision that constitutes final agency action. The Ninth Circuit has

3  instructed that courts look at the "practical effect," and in particular, whether "immediate

4  compliance [with the terms] is expected." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d

5  977, 982 (9th Cir. 2006); *see also Rhode Island v. Trump*, No. 25-cv-128-JJM-LDA, 2025 WL

6  1303868, at *8 (D.R.I. May 6, 2025); *New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025); *Am.*

7  *Assoc. of Univ. Professors v. Rubio*, No. CV 25-10685-WGY, 2025 WL 1235084 (D. Mass. Apr.

8  29, 2025). Here, there can be no question that Defendants ordered and expected immediate

9  compliance with their abrupt, unexpected, and unexplained grant terminations, many of which

10  ordered recipient to "stop work immediately." *See e.g.*, Green Nylen Decl. ¶¶ 19, 34, Exs. F, L;

11  Thakur Decl. ¶ 21, Ex. G, Many of the termination notices additionally describe the terminations

12  as a "final agency action" not subject to appeal. *See, e.g.,* Foreman Decl. ¶¶ 53-61, Exs. H & I.

13       The APA prohibits arbitrary and capricious action. 5 U.S.C. §706(2)(A). *Kalispel Tribe of*

14  *Indians v. U.S. Dep't of the Interior*, 999 F.3d 683, 688 (9th Cir. 2021). It requires federal

15  agencies to engage in "reasoned decisionmaking" (*Dep't of Homeland Sec. v. Regents of the Univ.*

16  *of Cal.*, 591 U.S. 1, 16 (2020)), meaning an agency must "examine the relevant data and articulate

17  a satisfactory explanation for its action including a rational connection between the facts found

18  and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,

19  43 (1983) (citation omitted) (quotations omitted).

20       A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary,

21  capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

22  § 706(2)(A). Government agencies' and officers' actions act in an arbitrary and capricious manner

23

24  _____

25  [85]  Final agency action is the programmatic decision, even where further steps are necessary to
implement the program and comply with the directive. *E.g.*, *Oregon v. Ashcroft*, 368 F.3d 1118,
1148 (9th Cir. 2004), *aff'd sub nom. Gonzales v. Oregon*, 546 U.S. 243 (2006) ("An agency action
26  can be final even if its concrete legal effects are contingent upon a future event."); *Env't Def. Ctr.*
*v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 869 (9th Cir. 2022) ("programmatic review" is
27  final agency action regardless of whether "reviewing and approving individual, site-specific
permits" remains.

28

PLAINTIFFS' MEMORANDUM IN SUPPORT OF       44
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

1   if they fail to engage in "reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015)

2   (citation omitted). Therefore, agency action, particularly action which represents a departure from

3   prior agency policy, is lawful only if it rests "on a consideration of the relevant factors." *Motor*

4   *Vehicle Mfrs. Ass'n*, 463 U.S. at 42-43.

5       Further, an agency action is arbitrary and capricious if the agency has

6           relied on factors which Congress has not intended it to consider, entirely
            failed to consider an important aspect of the problem, offered an
7           explanation for its decision that runs counter to the evidence before the
            agency, or is so implausible that it could not be ascribed to a difference in
8           view or the product of agency expertise.

9   *Id*. An agency action is also arbitrary and capricious if, when departing from a prior policy, an

10  agency does not "display awareness that it *is* changing position" or does not "show that there

11  are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515

12  (2009) (emphasis in original).

13      Defendants' mass termination of grants previously awarded to Plaintiffs and the Class was

14  arbitrary and capricious for many reasons, including but not limited to the following.

15      First, the Termination Notices do not provide a reasoned explanation. Rather, the letters

16  sent across all agencies generally state that the terminated grant no longer "effectuates" or is no

17  longer "in alignment" with Agency priorities. This conclusory statement is not a reasoned

18  explanation for agency action. Alex Decl. ¶¶ 22-26, Ex. H; Foreman Decl. ¶¶ 53-60, Exs. H & I;

19  Green Nylen Decl. ¶¶ 18-24 & 33-40, Exs. G & M; Hirst Decl. ¶¶ 33-38, Ex. F; Philliou Decl.

20  ¶¶ 26-28, Ex. E; Thakur Decl. ¶¶ 20-24, Ex. H. Defendants' wholesale termination of already

21  awarded grants without any coherently articulated rationale must be invalidated on that basis

22  alone. *See, e.g.*, *Drs. for Am. v. Off. of Pers. Mgmt.*, 766 F. Supp. 3d 39, 53 (D.D.C. 2025)

23  ("[Plaintiff's] arbitrary and capricious argument is simple: the agencies' removal decisions were

24  'completely unreasoned' and thus were not the product of reasoned decisionmaking. . . . The Court

25  agrees that [Plaintiff] has demonstrated a likelihood of success on the merits as to this claim.").

26      Second, the terminations ignore the reliance interests of grantees. For example, grantees

27  who had already received some but not all of their awards had already spent significant time

28  working on the projects funded by their grants. Alex Decl. ¶ 27; Foreman Decl. ¶¶ 62-70; Green

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF          45
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

Nylen Decl. ¶ 41; Hirst Decl. ¶ 39; Philliou Decl. ¶¶ 20, 29-34; Thakur Decl. ¶ 25. Similarly, many grantees—as their grants required—took leaves of absence from their jobs, cancelled teaching plans, or otherwise altered their employment status in reliance on the promise of receiving grant money to support them while they completed their projects. Thakur Decl. ¶ 25(b).

Third, the grant terminations conflict with prior agency decisions—to award the grants—without adequate explanation for the change in the agency's position. All class members received their grants after a rigorous and objective application and review process that determined that funded projects were meritorious, socially useful, and satisfied all relevant grant criteria. Alex Decl. ¶¶ 11-21, Exs. B-F; Foreman Decl. ¶¶ 8-52, Exs. A-G; Green Nylen Decl. ¶¶ 8-17, 25-32, Exs. B-E, H-K; Hirst Decl. ¶¶ 20-32, Exs. C-D; Philliou Decl. ¶¶ 11-25, Exs. B-C; Thakur Decl. ¶¶ 9-19, Exs. B-F. Defendants failed to provide any reasoned explanation for the agency's change in position.

Fourth, the mass termination of grants "entirely failed to consider. . . important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. Among other things, Defendants ignored waste and inefficiency caused by the terminations, given the investment that taxpayers have already made in many of the projects. The terminations also ignored the significant consequences the termination will have on the individuals and organizations involved in creating the works, the state(s) and congressional district(s) in which the works are being produced, and critically, the broader public that would benefit from the work accomplished with the grant funding.

Defendants have failed to adequately justify their actions; have not considered or addressed key aspects of the problem, and grantees' substantial reliance interests; have relied on factors that Congress did not authorize them to consider; and have not acknowledged or justified their marked departure from prior agency positions.

In sending standardized termination letters to terminate grants en masse, Defendants failed to "examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [their] decision, 'including a rational connection between the facts found and the choice made,'" *Dep't of Com. v. New York*, 588 U.S. at 773 (quoting *State Farm*, 463 U.5. at 43). The terminations must be set aside under the APA as arbitrary and capricious.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

46

1

2

### C.    The Harms Caused by Defendants' Unlawful Conduct Will Become Irreparable Absent This Court's Intervention.

3      Plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief."

4   *Winter*, 555 U.S. at 20. In addition to sustaining sizeable monetary losses, Plaintiffs have had to

5   abruptly stop work on important research projects with attendant public benefits. Alex Decl. ¶ 27;

6   Foreman Decl. ¶¶ 62-70; Green Nylen Decl. ¶ 41; Hirst Decl. ¶ 39; Philliou Decl. ¶¶ 20, 29-34;

7   Thakur Decl. ¶ 25. Faculty, staff, PhD and undergraduate students have lost or will lose jobs and

8   research opportunities due to canceled projects. *Id.* Undergraduate students have also lost access to

9   training and mentorship programs. *Id.*

10     Budget shortfalls attributable to canceled grants will require the UC System to lay off staff,

11  scale back or even halt critical research. *Id.*; *see also* Decl. of Rena Dorph in Supp. of this Mot.

12  ("Dorph Decl.") ¶¶ 7-8, Ex. A. ("These grant terminations pose a serious ongoing threat to the

13  viability of much of the institution's work, and to our ability to retain our specialized, highly

14  educated and skilled research staff."). These terminations have caused and will continue to cause

15  concrete harm and create uncertainty (in many cases, to the point of operational chaos) for

16  Plaintiffs and the Proposed Class. *Id.*

17     These types of harms have been recognized as warranting preliminary injunctive relief. *See*

18  *City & Cnty of S. F. v. USCIS*, 408 F. Supp. 3d 1057, 1123 (N.D. Cal. 2019) (recognizing

19  "burdens on . . . ongoing operations" for public entities, including administrative costs caused by

20  changes in federal policy, constitute irreparable harm); *Tennessee v. Dep't of Educ.*, 104 F.4th

21  577, 613 (6th Cir. 2024) (same).[86] Even recoverable costs "may constitute irreparable harm . . .

22  where the loss threatens the very existence" of an organization or program. *Packard Elevator v.*

23  *ICC*, 782 F. 2d 112, 115 (8th Cir. 1986); *see Am. Ass'n of Colls. for Teacher Educ. v. McMahon*,

24  No. 1:25-cv-00702-JRR, 2025 WL 833917, at *23 (D. Md. Mar. 17, 2025) (agency action

25  affecting existence of programs and livelihoods of individuals within those programs constituted

26  irreparable harm).

27

28  ---

[86] *See also* list of recent TROs and PIs *supra* at 3.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF    47
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

"[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted); *Rodriguez v. Robbins*, 715 F.3d 1127, 1144-45 (9th Cir. 2013). Where an executive action causes constitutional injuries, injunctive relief is appropriate. *See Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017). These principles apply beyond infringement of individual constitutional rights and extend to structural separation of powers violations. *See Cnty. of Santa Clara v. Trump*, 250 F.Supp.3d 497, 537-38 (N.D. Cal. 2017). As this Court explained:

> [T]his distinction between personal and structural constitutional rights is not recognized in the Ninth Circuit. Although the Government cites to *American Trucking Ass'ns v. City of Los Angeles*, 577 F.Supp.2d 1110, 1127 (C.D. Cal. 2008) for the proposition that "in the case of Supremacy Clause violations," the presumption of irreparable harm "is not necessarily warranted," that case was reversed by the Ninth Circuit. On appeal the court concluded that, even where the constitutional injury is structural, "the constitutional violation alone, coupled with the damages incurred, can suffice to show irreparable harm." *American Trucking [Ass'ns, Inc. v. City of Los Angeles]*, 559 F.3d [1046,] at 1058 [9th Cir. 2009]].

*Id.* at 538; *see also Am. Trucking Ass'ns*, 559 F.3d at 1058-59 (holding that forcing truckers to comply with "unconstitutional . . . agreements" would cause irreparable injury). Plaintiffs identify abundant and serious harm they have faced from Defendants' constitutional violations, and that is sufficient to warrant immediate relief.

Third, Plaintiffs face irreparable injury from the disruption of critical government services including research that serves the public interest on pressing public health and environmental issues. "[E]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) (quoting *Lands Council v. McNair*, 537 F.3d 981, 1004 (9th Cir. 2008) (en banc)).

Finally, damages are not available in APA cases, making monetary harm irreparable. *See Pangea Legal Servs. v. U.S. Dept. of Homeland Security*, 512 F. Supp. 3d 966, 976 (N.D. Cal. 2021) ("Economic injuries are deemed irreparable in APA cases because plaintiffs are unable to recover money damages."); *E. Bay Sanctuary Covenant v. Trump*, 994 F.3d 962, 984 (9th Cir. 2020)).

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

48

1

2

### D.    The Balance of Equities Weigh in Plaintiffs' Favor, and a Temporary Restraining Order Is in the Public Interest.

3      The equities and public interest, which merge when the government is a party, tip sharply

4   in favor of Plaintiffs. *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024). The threatened and

5   actual harm to Plaintiffs far outweighs the federal government's interests in immediately enforcing

6   these grant terminations, and preserving Plaintiffs' constitutional and statutory rights is in the

7   public interest. *See Melendres*, 695 F.3d at 1002 ("[I]t is always in the public interest to prevent

8   the violation of a party's constitutional rights" (citation omitted)); *Nat'l Treasury Emps. Union v.*

9   *U.S. Dept. of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993) ("The preservation of . . . the legality

10  of the process by which government agencies function certainly weighs heavily in the public

11  interest."); *Clarke v. Off. of Fed. Housing Enter. Oversight*, 355 F. Supp. 2d 56, 66 (D.D.C. 2004)

12  ("[T]here is a substantial public interest in ensuring that [the agency] acts within the limits of its

13  authority."); *Widakuswara*, 2025 WL 1166400, at *17 ("[T]here is a substantial public interest 'in

14  having governmental agencies abide by the federal laws that govern their existence and

15  operations.'") (citation omitted).

16     The government will suffer no harm from ceasing to terminate already authorized grants

17  for which Congress has already appropriated funds, nor from returning to the orderly and legally

18  compliant grant administration processes in place prior to Inauguration Day. The government will

19  certainly continue to function (and will indeed function better) if the status quo ante is restored.

20  The balance of equities therefore strongly supports a temporary restraining order to preserve the

21  status quo until this case can be decided on the merits.

22                                       **CONCLUSION**

23     For the foregoing reasons, Plaintiffs respectfully request this Court grant this

24  Motion and enter the accompanying proposed temporary restraining order.

25

26

27

28

PLAINTIFFS' MEMORANDUM IN SUPPORT OF       49
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737

1    Dated: June 5, 2025

2                                          By: _____

3                                          Anthony P. Schoenberg (CA Bar No. 203714)
                                           tschoenberg@fbm.com
                                           John J. Darin (CA Bar No. 323730)
4                                          jdarin@fmb.com
                                           Katherine T. Balkoski (CA Bar No. 353366)
5                                          kbalkoski@fbm.com
                                           FARELLA BRAUN + MARTEL LLP
6                                          One Bush Street, Suite 900
                                           San Francisco, CA 94104
7                                          Telephone: 415. 954.4400

8                                          Erwin Chemerinsky (*pro hac vice* forthcoming*)*
                                           echemerinsky@law.berkeley.edu
9                                          Claudia Polsky (CA Bar No. 185505)
                                           cpolsky@law.berkeley.edu
10                                         U.C. BERKELEY SCHOOL OF LAW
                                           Law Building
11                                         Berkeley, CA 94720-7200
                                           Telephone: 510.642.6483
12
                                           Elizabeth J. Cabraser (CA Bar No.  83151)
13                                         ecabraser@lchb.com
                                           Richard M. Heimann (CA Bar No. 63607)
14                                         rheimann@lchb.com
                                           Kevin R. Budner (CA Bar No. 287271)
15                                         kbudner@lchb.com
                                           Annie M. Wanless
16                                         awanless@lchb.com (CA Bar No. 339635)
                                           LIEFF CABRASER HEIMANN &
17                                         BERNSTEIN, LLP
                                           275 Battery Street, 29th Floor
18                                         San Francisco, CA  94111
                                           Telephone:  415.956.1000
19

20                                         *Attorneys for Plaintiffs and the Proposed Class*

21
     46686\20342671.9
22

23

24

25

26

27

28

PLAINTIFFS' MEMORANDUM IN SUPPORT OF          50
MOTION FOR TEMPORARY RESTRAINING
ORDER – No. 3:25-cv-04737