1  Erwin Chemerinsky (*pro hac vice* forthcoming)
   echemerinsky@law.berkeley.edu
2  Claudia Polsky (CA Bar No. 185505)
   cpolsky@law.berkeley.edu
3  U.C. BERKELEY SCHOOL OF LAW
   Law Building
4  Berkeley, CA 94720-7200
   Telephone: 510.642.6483
5
   Elizabeth J. Cabraser (CA Bar No. 83151)
6  ecabraser@lchb.com
   Richard M. Heimann (CA Bar No. 63607)
7  rheimann@lchb.com
   LIEFF CABRASER HEIMANN &
8  BERNSTEIN, LLP
   275 Battery Street, 29th Floor
9  San Francisco, CA 94111
   Telephone: 415.956.1000
10
   Anthony P. Schoenberg (CA Bar No. 203714)
11 tschoenberg@fbm.com
   FARELLA BRAUN + MARTEL LLP
12 One Bush Street, Suite 900
   San Francisco, CA 94104
13 Telephone: 415. 954.4400

14 *Attorneys for Plaintiffs and the Proposed Class*
   [Additional counsel listed on signature page]
15

16                    **UNITED STATES DISTRICT COURT**

17                    **NORTHERN DISTRICT OF CALIFORNIA**

18

| | |
|---|---|
| NEETA THAKUR, KEN ALEX, NELL GREEN NYLEN, ROBERT HIRST, CHRISTINE PHILLIOU, and JEDDA FOREMAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF GOVERNMENT EFFICIENCY ("DOGE"); AMY GLEASON, in her official capacity as Acting Administrator of the Department of Government Efficiency; NATIONAL SCIENCE FOUNDATION;<br><br>[*caption cont'd next page*] | Case No.  3:25-cv-04737-RL<br><br>**DECLARATION OF KEN ALEX**<br><br>The Honorable Rita F. Lin |

| | |
|---|---|
| 1 | |
| 2 | BRIAN STONE, in his official capacity as Acting Director of the National Science Foundation; |
| 3 | NATIONAL ENDOWMENT FOR THE HUMANITIES; |
| 4 | MICHAEL MCDONALD, in his official capacity as Acting Chairman of the National Endowment for the Humanities; |
| 5 | |
| 6 | UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; |
| 7 | LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency; |
| 8 | UNITED STATES DEPARTMENT OF AGRICULTURE; |
| 9 | BROOKE ROLLINS, in her official capacity as Secretary of the U.S. Department of Agriculture; |
| 10 | AMERICORPS (a.k.a. the CORPORATION FOR NATIONAL AND COMMUNITY SERVICE); |
| 11 | |
| 12 | JENNIFER BASTRESS TAHMASEBI, in her official capacity as Interim Agency Head of AmeriCorps; |
| 13 | UNITED STATES DEPARTMENT OF DEFENSE; |
| 14 | PETE HEGSETH, in his official capacity as Secretary of the U.S. Department of Defense; |
| 15 | UNITED STATES DEPARTMENT OF EDUCATION; |
| 16 | LINDA MCMAHON, in her official capacity as Secretary of the U.S. Department of Education; |
| 17 | UNITED STATES DEPARTMENT OF ENERGY; |
| 18 | CHRIS WRIGHT, in his official capacity as Secretary of Energy; |
| 19 | UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; |
| 20 | ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health and Human Services; |
| 21 | |
| 22 | UNITED STATES CENTERS FOR DISEASE CONTROL; |
| 23 | MATTHEW BUZZELLI, in his official capacity as Acting Director of the Centers for Disease Control; |
| 24 | UNITED STATES FOOD AND DRUG ADMINISTRATION; |
| 25 | MARTIN A. MAKARY, in his official capacity as Commissioner of the Food and Drug Administration; |
| 26 | |
| 27 | UNITED STATES NATIONAL INSTITUTES OF HEALTH; |
| 28 | JAYANTA BHATTACHARYA, in his official capacity as Director of the National Institutes of |

DECLARATION OF KEN ALEX
Case No.: 3:25-cv-04737-RL

| | |
|---|---|
| 1 | Health; |
| 2 | INSTITUTE OF MUSEUM AND LIBRARY SERVICES; |
| 3 | KEITH SONDERLING, in his official capacity as Acting Director of the Institute of Museum and Library Services; |
| 4 | UNITED STATES DEPARTMENT OF THE INTERIOR; |
| 5 | DOUG BURGUM, in his official capacity as Secretary of the Interior; |
| 6 | UNITED STATES DEPARTMENT OF STATE; |
| 7 | MARCO RUBIO, in his official capacity as Secretary of the U.S. Department of State; |
| 8 | DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, in his official capacity as Secretary for the U.S. Department of Transportation, |
| 9 | |
| 10 | Defendants. |

# DECLARATION OF KEN ALEX

I, Ken Alex, declare as follows:

1. I have personal knowledge of the facts contained in this declaration and, if called as a witness, could and would testify competently to those facts.

2. Since 2019, I have served as Director of Project Climate at the Center for Law, Energy & the Environment (CLEE) at UC Berkeley School of Law. I founded Project Climate as a think tank designed to move promising environmental research into the policy realm quickly, and helping climate interventions scale, given the urgency of mitigating climate change.

3. I received a JD from Harvard Law School in 1983 and a BA in political theory from UC Santa Cruz in 1979.

4. Prior to joining CLEE, I spent eight years as a Senior Policy Advisor to Governor Jerry Brown; as the Director of the Governor's Office of Planning and Research; and as the Chair of the Strategic Growth Council, focusing on climate, environment, and land use issues. Before joining the Governor's Office, I was the Senior Assistant Attorney General heading the environment section of the California Attorney General's Office, and the co-head of the Office's global warming unit. From 2000 to 2006, I led the California Attorney General's energy task force, investigating price and supply issues related to California's energy crisis. My (somewhat dated) CV is attached as Exhibit A.

5. My roles as climate policy expert and gubernatorial advisor on the topic were the subject of a 2020 profile in CalMatters. *See* Julie Cart, *Meet Ken Alex, Gov. Brown's Climate Concierge* (updated June 23, 2020)*,* https://calmatters.org/environment/2018/10 /ken-alex-jerry-brown-climate-change-california/. One important opportunity that Governor Brown gave me before the Paris Agreement on Climate Change in 2015 was to help start an entity called the "Under2 Coalition." This Coalition now has over 200 subnational governments around the world working to promote more aggressive climate action. I see it as an essential complement to the international efforts sponsored by the United Nations, which are at country level; subnational governments are often a force for more aggressive action than is happening at the national level.

6. For the past decade, I have been particularly concerned about methane as a greenhouse gas and a big climate policy issue. Underscoring the connection between academia and policy, much of our understanding of the effects of methane on planetary temperatures is the result of work done by a professor at UC San Diego, Ram Ramanathan, who is one of the world experts on short-lived climate pollutants. He brought to my and the Governor's attention the importance of short-lived but potent climate pollutants. Dr. Ramanathan's research has shown that although methane only remains in the atmosphere for 10 to 15 years—as opposed to carbon dioxide ($CO_2$), which can last 100 years or more— methane is about an 80-times greater greenhouse gas promoter than $CO_2$ over a 20-year period because methane is so effective at trapping heat.

7. In recent work on climate, methane has turned out to be very policy-sensible focus, for a number of reasons. First, If we stop emitting the shorter-lived climate pollutants, not only will we have reduced emissions, but they will be out of the atmosphere in fairly short order, giving us more time to act on $CO_2$. In addition, methane accounts for at least 25 percent of the greenhouse gas forcing function, meaning the amount that it contributes to heating the earth and creating the greenhouse gas effect. Further, methane emissions are somewhat easier to remedy, control, and limit than $CO_2$, because the emissions come from many fewer sources. Methane emissions result mostly from fossil fuel (coal/oil/gas) operations; from certain agricultural operations (mostly cattle and rice production); and from off-gassing from waste sites, such as landfills.

8. The 2021 Conference of the Parties to the United Nations Framework Convention on Climate Change ("COP 26") produced the Global Methane Pledge, which identifies an international goal of cutting methane emissions 30 percent below 2020 emissions levels by 2030. This voluntary agreement has now been signed by over 110 countries to reduce greenhouse gas emissions.

9. Further, although China did not sign onto the Global Methane Agreement, it entered into a separate agreement with the United States that signaled both countries' commitment to reducing methane emissions, and stated that they would share research and information on methane control strategies. (*See International Atomic Energy Agency, U.S.-China Joint Glasgow Declaration on Enhancing Climate Action in the 2020s* (last updated Feb. 21, 2022), https://www.iea.org/policies/14944-us-china-joint-glasgow-declaration-on-enhancing-climate-action-in-the-2020s.)

10. Last year, working with the State of California, I initiated the Subnational Methane Action Coalition, a group of about 25 jurisdictions (and growing) around the world focused on reducing methane emissions more quickly (*see* https://www.smacmethane.org/).

**EPA Grant Application**

11. In 2022, EPA's Office of Research and Development sought applications proposing research on air emissions from municipal solid waste (MWS) landfills. MSW landfills are a significant source of methane emissions. The grant solicitation was part of EPA's Science to Achieve Results (STAR) program, and conducted in collaboration with the Air, Climate, and Energy (ACE) research program.

12. EPA's request for applications solicited proposals that addressed these Agency-identified research priorities:

- How can cost effective stationary, mobile, aerial, and remote sensing technologies be combined to more easily and accurately quantify landfill methane emissions, hazardous air pollutants (HAPs), and other air pollutant emissions from municipal solid waste (MSW) landfills?

- How can cost effective stationary, mobile, aerial, and remote sensing measurements be used to increase ease of use and evaluate mitigation strategies and technologies to identify best landfill management practices?

13. In response to the solicitation, a UC Berkeley professional engineer with specialized expertise in landfill design and analysis enlisted me as a co-Principal Investigator as part of a multi-disciplinary science and public policy team. Our team developed a detailed proposal for applying cutting edge technologies, including satellites and AI, to improve the detection of methane and HAP releases from landfills through improved scientific monitoring methods, and to improve the quality of policy responses by pinpointing sources of high methane emissions that could be targeted for control measures. Implementation of control methods for methane—a climate-forcing pollutant—would have the additional important effect of reducing local emissions of the HAPs that are co-pollutants at emissions hot spots, benefitting the health of fenceline residents.

14. We submitted our Grant Proposal to EPA on December 21, 2022. It described a three-year project that would (a) develop and demonstrate (via multiple integrated sensors operating at different scales) a method for monitoring landfill methane emissions more accurately and economically than previously; (b) explore how continuous air monitoring of MSWs can help assess the efficacy of methane-reduction interventions; and (c) promote creation of robust offset protocols that would financially incentivize methane reductions, while also (d) reducing both methane and hazardous air pollutant (HAP) emissions in communities near landfills.

15. The Grant Application proposed a cumulative budget of $999,999 (later rounded up to $1,000,000), which included personnel and equipment to: deploy autonomous flux chambers to take point measurements of methane and other gases in landfill soil; deploy robots and drones to measure these gases at various special scales and temporal intervals; train AI models to estimate methane concentrations in areas without direct measurements; speciate and quantify landfill gases in the lab; integrate satellite and aircraft observations with data collected at and near ground level to identify areas with high methane emissions from point sources; design methane mitigation strategies; and incentivize the adoption of mitigation through carbon offset or other climate change mitigation funding programs. The last listed item is a high leverage policy intervention, because to date, projects to reduce landfill gas emissions have generated more credits in the U.S. voluntary carbon offset market than any other type of projects.

16. A true and correct copy of our Grant Application responsive to solicitation EPA-G2023-STAR-B1, project title *Next-Generation Landfill Monitoring: A Multi-Scale Approach to Measuring Emissions for Evaluating and Financing Interventions*, is attached as Exhibit B.

**Award of Grant Funding**

17. On October 19, 2023, EPA notified UC Berkeley that it was awarding the grant.

18. A true and correct copy of our research team's Notice of Award and Grant Agreement are attached hereto as Exhibits C and D respectively.

19. On December 16, 2024, EPA notified UC Berkeley that it was awarding the second and final installment of grant funding.

20. A true and correct copy of our 2024 Assistance Amendment is attached as Exhibit E.

21. A printout of EPA's web page *Understanding and Control of Municipal Solid Waste Landfill Air Emissions Grants* (https://www.epa.gov/research-grants/understanding-and-control-municipal-solid-waste-landfill-air-emissions-grants) from May 12, 2025, publicizing our grant as one among five awarded, is attached as Exhibit F.

**EPA's Grant Termination**

22. On April 29, 2025, EPA sent to the UC Regents a document styled as an "Assistance Amendment." A true and correct copy of the Assistance Amendment is attached as Exhibit G.

23. The Amendment instructed our research team to "stop work; terminate the [grant] agreement; reduce performance period duration; [and] curtail scope of work," while waiving certain reporting requirements. *Id*. at 1. It stated that "(EPA) hereby awards $0.00" towards any unfunded, as-yet-unincurred costs of the previously awarded $1,000,000. *Ibid.*

24. The Assistance Amendment stated: "The Agency is asserting its right under 2 C.F.R. 200.340 and the Termination General Term [stet] and Condition [stet] of this agreement to unilaterally terminate this award." *Id*. at 4.

25. The Amendment was accompanied by memorandum from EPA titled "Termination of EPA Assistance Agreement RD 84062301 under 2 CFR 200.340." A true and correct copy of this memo is attached as Exhibit H.

26. The memo stated that EPA terminated our grant for the following reasons:

> [T]he award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities.
>
> The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In additional to complying with the law, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.
>
> The grant specified above provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities.

*Id.* at 1.

### Harm from EPA's Grant Termination

27. I and my project team have suffered immediate harm as a result of the cancellation of the grant. Specifically:

   a) I have been unable to proceed with the basic work to evaluate policy options, with a particular focus on how we can use the detailed methane and HAPs emissions findings to improve landfill regulations, impact decision-making at landfill sites, promote subnational action at landfills, and improve emissions offset protocols. Because California and the United States are leaders in this field, halting the policy work also impacts what is possible internationally.

b)  Our research team has been unable to continue and complete novel work related to evaluating HAPs and their relationship to methane emissions from landfills, evaluation of atmospheric and weather impacts on emissions, and the relationship of satellite emissions data to terrestrial data, which is important as we build a satellite-based system for monitoring, reporting, and verification. Most painfully, to my understanding and belief, some of researchers and graduate students will lose hours and compensation, and there is some concern that one or more may need to be let go.

c)  Additionally, even if we were eventually to find replacement funding for this project (a difficult proposition given the sum at stake), the delay and uncertainty would preclude full recovery of the project.  First, we have multiple partners, including those evaluating HAPs and those evaluating variables related to interpretation of atmospheric variables, who will have scheduling and project conflicts making it quite likely that the project as originally conceived cannot be completed.  Second, graduate students with particular expertise and experience will leave for other project and employment, and replacing that expertise will be difficult or impossible.  Third, the timing of reduction of methane emissions is critical, as reflected in the Global Methane Pledge reduction goal for 2030.  Landfill emissions are a key element of meeting the reduction goals, and the work of this grant in refining our understanding of emissions, tying terrestrial and satellite data, establishing meaningful and robust offset criteria, and accelerating regulatory reform for landfill emissions will be delayed if not put off indefinitely. Finally, our ability to work with jurisdictions around the world will be impacted by the delay in data, results, analysis, and offset protocol determination, all of which is relevant to policy and implementation of landfill emissions mitigation action.

d)  These harms are ongoing.

e) In addition, my inability to complete work on the design of policy instruments to reduce landfill emissions of methane and HAPs, which are respectively key contributors to climate change and environmental health impairment, will result in the loss of value to the public.

## Appeal of Grant Termination

28. The EPA memo regarding grant termination provided that UC Berkeley could submit a "Dispute" to a named Disputes Decision Official at EPA within 30 days from the date EPA transmitted the termination notice.

29. Our Lead PI (Dimitrios Zekkos) has indicated to our Sponsored Projects Office (SPO) that our team would like to appeal this denial and has provided relevant information to SPO. SPO has responded that outside counsel will use that information to draft an appeal letter.

30. The Award of Grant Funding remains unavailable to our project pending the outcome of the appeal.

## Role of Class Representative

31. I am ready to assume the responsibilities of serving as a class representative. I understand that I must stay informed regarding developments in the lawsuit, communicate regularly with my attorneys, and act in the best interests of the class. I have no conflicts that would prevent me from assuming this responsibility.

32. I have been in communication with other UC researchers, who would be members of the class, who have suffered the same general type of harm as I describe above, from the abrupt termination of their previously approved research grants. This harm is widespread and I believe it will only increase in scope and impact if classwide relief is not granted.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed this 28 day of May, 2025.



Ken Alex