1  Erwin Chemerinsky (*pro hac vice* forthcoming)
   echemerinsky@law.berkeley.edu
2  Claudia Polsky (CA Bar No. 185505)
   cpolsky@law.berkeley.edu
3  U.C. BERKELEY SCHOOL OF LAW
   Law Building
4  Berkeley, CA 94720-7200
   Telephone: 510.642.6483
5
   Elizabeth J. Cabraser (CA Bar No. 83151)
6  ecabraser@lchb.com
   Richard M. Heimann (CA Bar No. 63607)
7  rheimann@lchb.com
   LIEFF CABRASER HEIMANN &
8  BERNSTEIN, LLP
   275 Battery Street, 29th Floor
9  San Francisco, CA 94111
   Telephone: 415.956.1000
10
   Anthony P. Schoenberg (CA Bar No. 203714)
11 tschoenberg@fbm.com
   FARELLA BRAUN + MARTEL LLP
12 One Bush Street, Suite 900
   San Francisco, CA 94104
13 Telephone: 415. 954.4400

14 *Attorneys for Plaintiffs and the Proposed Class*
   [Additional counsel listed on signature page]
15

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEETA THAKUR, KEN ALEX, NELL GREEN NYLEN, ROBERT HIRST, CHRISTINE PHILLIOU, and JEDDA FOREMAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF GOVERNMENT EFFICIENCY ("DOGE"); AMY GLEASON, in her official capacity as Acting Administrator of the Department of Government Efficiency; NATIONAL SCIENCE FOUNDATION;<br><br>[*caption cont'd next page*] | Case No. 3:25-cv-04737-RL<br><br>**DECLARATION OF NEETA THAKUR**<br><br>The Honorable Rita F. Lin |

BRIAN STONE, in his official capacity as Acting Director of the National Science Foundation;
NATIONAL ENDOWMENT FOR THE HUMANITIES;
MICHAEL MCDONALD, in his official capacity as Acting Chairman of the National Endowment for the Humanities;
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency;
UNITED STATES DEPARTMENT OF AGRICULTURE;
BROOKE ROLLINS, in her official capacity as Secretary of the U.S. Department of Agriculture;
AMERICORPS (a.k.a. the CORPORATION FOR NATIONAL AND COMMUNITY SERVICE);
JENNIFER BASTRESS TAHMASEBI, in her official capacity as Interim Agency Head of AmeriCorps;
UNITED STATES DEPARTMENT OF DEFENSE;
PETE HEGSETH, in his official capacity as Secretary of the U.S. Department of Defense;
UNITED STATES DEPARTMENT OF EDUCATION;
LINDA MCMAHON, in her official capacity as Secretary of the U.S. Department of Education;
UNITED STATES DEPARTMENT OF ENERGY;
CHRIS WRIGHT, in his official capacity as Secretary of Energy;
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;
ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health and Human Services;
UNITED STATES CENTERS FOR DISEASE CONTROL;
MATTHEW BUZZELLI, in his official capacity as Acting Director of the Centers for Disease Control;
UNITED STATES FOOD AND DRUG ADMINISTRATION;
MARTIN A. MAKARY, in his official capacity as Commissioner of the Food and Drug Administration;
UNITED STATES NATIONAL INSTITUTES OF HEALTH;
JAYANTA BHATTACHARYA, in his official capacity as Director of the National Institutes of

DECLARATION OF NEETA THAKUR
Case No.: 3:25-cv-04737-RL

| | |
|---|---|
| 1 | Health; |
| 2 | INSTITUTE OF MUSEUM AND LIBRARY SERVICES; |
| 3 | KEITH SONDERLING, in his official capacity as Acting Director of the Institute of Museum and Library Services; |
| 4 | UNITED STATES DEPARTMENT OF THE INTERIOR; |
| 5 | DOUG BURGUM, in his official capacity as Secretary of the Interior; |
| 6 | UNITED STATES DEPARTMENT OF STATE; |
| 7 | MARCO RUBIO, in his official capacity as Secretary of the U.S. Department of State; |
| 8 | DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, in his official capacity as Secretary for the U.S. Department of |
| 9 | Transportation, |
| 10 | Defendants. |

DECLARATION OF NEETA THAKUR
Case No.: 3:25-cv-04737-RL

# DECLARATION OF NEETA THAKUR

I, Neeta Thakur, declare as follows:

1. I have personal knowledge of the facts contained in this declaration and, if called as a witness, could and would testify competently to those facts.

2. I am a pulmonary and critical care specialist at the University of California, San Francisco (UCSF) who examines the role of social and environmental stressors on asthma and COPD in historically marginalized communities. I currently serve as Medical Director of the Zuckerberg San Francisco General Hospital Chest Clinic. I am also an associate professor of medicine and pulmonary and critical care at UCSF.

3. I completed dual degrees in public health and medicine at the University of Arizona, where I earned MPH and MD degrees in 2007. I came to UCSF for a residency in Internal Medicine (2007-10) and stayed to complete a Pulmonary and Critical Care Medicine fellowship (2010-13). From 2013 to 2015, I was a clinical instructor at UCSF and joined faculty in 2015. Since then, I have worked at UCSF as a clinician, professor, and academic researcher.

4. My research focuses on (1) defining obstructive lung disease phenotypes that exist in racially and ethnically diverse communities and how these are shaped by social and environmental stressors; (2) identifying community-specific drivers that place individuals at high risk for poor outcomes; and (3) co-developing place-based and targeted interventions aimed at social and environmental stressors to improve respiratory outcomes in historically marginalized populations. My research is transdisciplinary and employs community-engaged approaches that enable community stakeholders to help shape research questions and propose locally relevant interventions to promote public health.

5. Articles illustrative of my focus on social determinants of pulmonary health include (among many others) an article on *Early life air pollution and asthma risk in minority children* published in the American Journal of Respiratory and Critical Care Medicine 188 (3), 309-318 (2013); and an article on *Associations between historical residential redlining and current age-adjusted rates of emergency department visits due to asthma across eight cities in California,* published in The Lancet Planetary Health 4 (1), e24-e31 (2020).

6. My research, which frequently involves collaboration with other universities and community based organizations, has been supported by state grants, federal grants from the National Institutes of Health (NIH) and Environmental Protection Agency (EPA), foundation grants, and other sources.

7. In recognition of my research leadership, I was this year (2025) selected as the faculty director of Clinical Research Operations for the Clinical Trials Operations Unit at UCSF's Clinical & Translational Science Institute after a competitive search process.

8. A true and correct copy of my curriculum vitae is attached as Exhibit A.

**Grant Application to EPA**

9. In November 2021, I submitted a grant application to EPA in response to its announcement of funding opportunity EPA-G2021-STAR-H1. This opportunity, made available through the agency's Science to Achieve Results (STAR) program, focused on "Cumulative Health Impacts at the Intersection of Climate Change, Environmental Justice, and Vulnerable Populations/Lifestages: Community-Based Research for Solutions."

10. My research team's Grant Application, titled "Partnering for Resilient Opportunities To Eliminate Toxic (PROTECT) Health Effects from Wildfire $PM_{2.5}$ in Environmental Justice Communities," addressed the potential to intervene to prevent adverse health effects to environmental justice (EJ) communities from the fine particulate matter (PM) characteristic of wildfire smoke. Due to their small size (2.5 microns), $PM_{2.5}$ particles can penetrate deeply into human lung tissue and do considerable damage. A true and correct copy of our Grant Application is attached as Exhibit B.

11.     The premise of our grant research was that the increase in wildfire smoke in California has had a widespread and cascading impact on EJ communities, because environmental pollution and the social adversity that magnifies adverse health outcomes are concentrated in communities of color and low-income communities. Our proposal aimed to (1) estimate the health effects of sub-daily exposure to wildfire-specific $PM_{2.5}$ in California, including across social vulnerability factors, with particular focus on effects within EJ communities: (2) understand community recovery from short-term health effects following exposure; (3) understand indoor infiltration of wildfire smoke and the mitigating effect of housing quality and behaviors on health effects; and (4) identify acceptable, community-relevant interventions to mitigate exposure.

12.     Our grant proposal, on which I was Principal Investigator, encompassed nine investigators spanning three institutions: UCSF, UC Berkeley, and California's Office of Environmental Health Hazard Assessment. Our team's expertise spanned exposure and building science, environmental engineering, atmospheric modeling, epidemiology, implementation science, and community-based participatory research.

13.     Our proposal also contemplated work with community-based organizations and local government partners in the intended study areas of Fresno, Richmond, and San Francisco, and remuneration to community participants for same.

14.     The Grant Application requested funding commensurate with our cumulative 3-year budget of $1,330,536 to support our multi-campus, multi-agency, multi-nonprofit research collaboration.

**EPA's Grant Award**

15.     On November 22, 2022, an EPA Senior Grants Management Specialist, Jennifer Brooks, transmitted to me a Notice of EPA Award and the Grant Agreement. The Agreement indicated that our team was authorized to proceed for Project Period 12/01/2022-11/30/2025, and that EPA would make an initial grant of $690,000 (i.e., approximately half of project costs).

16.     A true and correct copy of the 2022 Notice and Grant Agreement are attached as Exhibits C and D respectively.

17. On June 21, 2023, an EPA Senior Grants Management Specialist, Jennifer Brooks, transmitted to me a second Notice of EPA Award and an Assistance Amendment. The Amendment likewise indicated that our team was authorized to proceed for Project Period 12/01/2022-11/30/2025. It stated that EPA was awarding $640,536, bringing our total federal funding award to $1,330, 536.

18. A true and correct copy of the 2023 Notice and Grant Agreement are attached as Exhibit E and F respectively.

19. To date, we have subcontracted $297,487 to UC Berkeley and $40,000 to our nonprofit partner Central California Asthma Collaborative.

**EPA's Grant Termination**

20. On April 28, 2025, EPA sent to the UC Regents a document styled as an "Assistance Amendment." A true and correct copy of the Assistance Amendment is attached as Exhibit G.

21. The Amendment instructed our research team to "stop work; terminate the [grant] agreement; reduce performance period duration; [and] curtail scope of work," while waiving certain reporting requirements. *Id.* at 1. It stated that "(EPA) hereby awards $0.00" towards any unfunded, as-yet-unincurred costs of the previously awarded $1,330,536. *Ibid.*

22. The Assistance Amendment stated: "The Agency is asserting its right under 2 C.F.R. 200.340 and the Termination General Term [stet] and Condition of this agreement to unilaterally terminate this award." *Id.* at 4.

23. The Amendment was accompanied by memorandum from EPA to the Director of Contracts and Awards at UCSF titled "Termination of EPA Assistance Agreement RD 84048101 under 2 CFR 200.340." A true and correct copy of this memo is attached as Exhibit H.

24. The memo stated that EPA terminated our grant for the following reasons:

> [T]he award no longer effectuates the program goals or agency priorities. The objectives of the award are no long consistent with EPA funding priorities.

> The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In additional to complying with the law, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.
>
> The grant specified above provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities.

*Id.* at 1.

**Harm from EPA's Grant Termination**

25. I and my project team have suffered immediate harm as a result of the cancellation of the grant. Specifically:

a) I have been unable to complete the health analyses with our UC Berkeley colleagues as well as identify promising health-protecting strategies to help protect communities across California during wildfire smoke events. Instead, I have had to spend significant time seeking alternate funding sources. This includes unexpected grant writing, and reaching out to other funding sources, including philanthropy groups. In addition, to support staff and avoid layoff of two individuals, I needed to use my own discretionary funds to support team members.

b) As my own time was also financially supported by this grant, I also needed to find new funding sources to fill this unexpected funding gap.

c) The abrupt loss of funding has additionally impacted the overall training environment for my research team, which has had to endure a funding gap for a post-doctoral fellow, the letting go of a student intern with our team, and uncertainty over whether we can accept new trainees on our team.

d) The UCSF and UC Berkeley researchers on this grant have been unable to complete the proposed analyses of the health impacts of wildfire smoke events across the state of California. This is after considerable work by UCB researchers to develop an unprecedented, highly temporally spatially resolute map of wildfire smoke at the hourly level. As a consequence, at least three research publications will go unpublished that have the potential for high impact both for science and public health.

e) The now-terminated grant also supported new collaborations as well as early career investigators at UC Berkeley. The loss of this funding has impacted the pay plan for a recently hired graduate student at UC Berkeley, support for a post-doctoral fellow, and productivity for an early career investigator.

f) Lastly, the unrealized objectives of this transdisciplinary grant have important public health impacts that include:

- Generation of a temporally and geographically resolute map of wildfire smoke PM2.5 for the time period 2017 to 2022. This unprecedented modeling approach of using ground-level measures over an extended time period was to be used to provide more accurate estimates of exposure during future wildfire smoke events.

- Improved understanding of the health impacts of wildfire smoke, and specifically, how long after an event we expect health harms and for what health conditions. This has direct clinical and public health relevance.

- Identification of relevant thresholds for public health guidance during wildfire events. To our team's knowledge, all studies to date on the health effects of wildfire smoke use daily exposure averages. However, this is not how individuals experience adverse air quality: there are time periods where smoke exposure may be very high, and this is not reflected in the daily mean exposure. With our team's hourly exposure measurements, we are uniquely able to identify relevant thresholds for public health guidance during wildfire events.

g) Grant termination has compromised the trust-building necessary for community-engaged participatory action research.  It has taken years for effort for me to develop relationships with the community based organizations and community-engaged individuals who wrote letters in support of our grant application. They did so notwithstanding their scare time and resources, with the expectation that our project would deliver tangible benefits to their low income communities in the form of improved respiratory health. Through this EPA grant we were able to build partnerships with fifteen community based organizations and the work with these groups was abruptly stopped due to this termination. This is after significant efforts by these partners to co-design a survey, and also after my team had made a commitment to better understand how health impacts were being experienced in their communities and barriers to health protective resources during wildfire smoke events. The EPA's termination of this grant will make it more difficult for me to partner with organizations such as the Central California Asthma Collaborative in Fresno and Brightline in San Francisco, and with a community-trusted scientist in Richmond (Dr. Omoniyi Omotoso).

h) Additionally, even if we were eventually to find replacement funding for this project (a difficult proposition given the sums at stake), they would no longer be adequate to cover our expenses. This includes costs of staff, finding and training post-doctoral fellows to carry out proposed analyses, and re-establishing partnerships.

i) These personal and financial harms are ongoing.

j) These harms are in addition to the loss of value to the public from my research team's inability to complete work on studying health risks from the fine particulate matter associated with wildfire, and inability to design health-protective interventions for three of California's most health-vulnerable communities.

**Appeal of Grant Termination**

26. The EPA memo regarding grant termination provided that UCSF could submit a "Dispute" to a named Disputes Decision Official at EPA within 30 days from the date EPA transmitted the termination notice.

27. UCSF is currently preparing such a Dispute.

28. The Award of Grant Funding will remain unavailable to our project pending the outcome of the appeal.

**Role of Class Representative**

29. I am ready to assume the responsibilities of serving as a class representative. I understand that I must stay informed regarding developments in the lawsuit, communicate regularly with my attorneys, and act in the best interests of the class. I have no conflicts that would prevent me from assuming this responsibility.

30. I have been in communication with other UC researchers, who would be members of the class, who have suffered the same general type of harm as I describe above, from the abrupt termination of their previously approved research grants. This harm is widespread and I believe it will only increase in scope and impact if classwide relief is not granted.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed this 28 day of May, 2025.



Neeta Thakur