1 | Erwin Chemerinsky (*pro hac vice* forthcoming)
echemerinsky@law.berkeley.edu
2 | Claudia Polsky (CA Bar No. 185505)
cpolsky@law.berkeley.edu
3 | U.C. BERKELEY SCHOOL OF LAW
Law Building
4 | Berkeley, CA 94720-7200
Telephone: 510.642.6483

Elizabeth J. Cabraser (CA Bar No. 83151)
ecabraser@lchb.com
Richard M. Heimann (CA Bar No. 63607)
rheimann@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000

Anthony P. Schoenberg (CA Bar No. 203714)
tschoenberg@fbm.com
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, CA 94104
Telephone: 415. 954.4400

*Attorneys for Plaintiffs and the Proposed Class*
[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NEETA THAKUR, KEN ALEX, NELL GREEN NYLEN, ROBERT HIRST, CHRISTINE PHILLIOU, and JEDDA FOREMAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF GOVERNMENT EFFICIENCY ("DOGE"); AMY GLEASON, in her official capacity as Acting Administrator of the Department of Government Efficiency; NATIONAL SCIENCE FOUNDATION;<br><br>[*caption cont'd next page*] | Case No. 3:25-cv-04737-RL<br><br>**DECLARATION OF NELL GREEN NYLEN**<br><br>The Honorable Rita F. Lin |

DECLARATION OF NELL GREEN NYLEN
Case No.: 3:25-cv-04737-RL

| | |
|---|---|
| 1 | |
| 2 | BRIAN STONE, in his official capacity as Acting Director of the National Science Foundation; |
| 3 | NATIONAL ENDOWMENT FOR THE HUMANITIES; |
| 4 | MICHAEL MCDONALD, in his official capacity as Acting Chairman of the National Endowment for the Humanities; |
| 5 | |
| 6 | UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; |
| 7 | LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency; |
| 8 | UNITED STATES DEPARTMENT OF AGRICULTURE; |
| 9 | BROOKE ROLLINS, in her official capacity as Secretary of the U.S. Department of Agriculture; |
| 10 | AMERICORPS (a.k.a. the CORPORATION FOR NATIONAL AND COMMUNITY SERVICE); |
| 11 | |
| 12 | JENNIFER BASTRESS TAHMASEBI, in her official capacity as Interim Agency Head of AmeriCorps; |
| 13 | UNITED STATES DEPARTMENT OF DEFENSE; |
| 14 | PETE HEGSETH, in his official capacity as Secretary of the U.S. Department of Defense; |
| 15 | UNITED STATES DEPARTMENT OF EDUCATION; |
| 16 | LINDA MCMAHON, in her official capacity as Secretary of the U.S. Department of Education; |
| 17 | UNITED STATES DEPARTMENT OF ENERGY; |
| 18 | CHRIS WRIGHT, in his official capacity as Secretary of Energy; |
| 19 | UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; |
| 20 | ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health and Human Services; |
| 21 | |
| 22 | UNITED STATES CENTERS FOR DISEASE CONTROL; |
| 23 | MATTHEW BUZZELLI, in his official capacity as Acting Director of the Centers for Disease Control; |
| 24 | UNITED STATES FOOD AND DRUG ADMINISTRATION; |
| 25 | MARTIN A. MAKARY, in his official capacity as Commissioner of the Food and Drug Administration; |
| 26 | |
| 27 | UNITED STATES NATIONAL INSTITUTES OF HEALTH; |
| 28 | JAYANTA BHATTACHARYA, in his official capacity as Director of the National Institutes of |

DECLARATION OF NELL GREEN NYLEN
Case No.: 3:25-cv-04737-RL

| | |
|---|---|
| 1 | Health; |
| 2 | INSTITUTE OF MUSEUM AND LIBRARY SERVICES; |
| 3 | KEITH SONDERLING, in his official capacity as Acting Director of the Institute of Museum and Library Services; |
| 4 | UNITED STATES DEPARTMENT OF THE INTERIOR; |
| 5 | DOUG BURGUM, in his official capacity as Secretary of the Interior; |
| 6 | UNITED STATES DEPARTMENT OF STATE; |
| 7 | MARCO RUBIO, in his official capacity as Secretary of the U.S. Department of State; |
|   | DEPARTMENT OF TRANSPORTATION; |
| 8 | SEAN DUFFY, in his official capacity as Secretary for the U.S. Department of |
| 9 | Transportation, |
| 10 | Defendants. |

# DECLARATION OF NELL GREEN NYLEN

I, Nell Green Nylen, declare as follows:

1. I have personal knowledge of the facts contained in this declaration and, if called as a witness, could and would testify competently to those facts.

2. In 2013, I joined the Wheeler Water Institute at the Center for Law, Energy & the Environment (CLEE)—a research center at UC Berkeley School of Law—as a Research Fellow. I became a Senior Research Fellow at CLEE in 2016. In my work at CLEE, I provide analysis and recommendations at the intersection of law, policy, and science to inform water governance and management.

3. I received a JD with a Certificate of Specialization in Environmental Law from UC Berkeley School of Law in 2012. I earned a PhD in Geological and Environmental Sciences from Stanford University in 2005 and a BS in Geological and Environmental Sciences from Stanford University in 1996.

4. Prior to joining CLEE, I clerked for Justice Gregory J. Hobbs, Jr., of the Colorado Supreme Court for one year. During law school I served as a Summer Honors Program legal intern for the Environment, Land, and Natural Resources Law Sections of the California Attorney General's Office and as a summer legal intern for the Center for Biological Diversity. Between my PhD program and law school, I worked as a Research and Curatorial Assistant at the California Academy of Sciences and as a Museum Assistant and GIS Specialist at the Peabody Museum of Natural History at Yale University. Before attending graduate school, I worked as a GIS/AutoCAD/Graphics Specialist at Stanford University and as a Geologist for the U.S. Geological Survey. My CV is attached as Exhibit A.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

DECLARATION OF NELL GREEN NYLEN
Case No.: 3:25-cv-04737-RL

1

5.     Much of my work focuses on improving management of water resources across hydrologic extremes—from times of water scarcity to times of abundance. Critically, decisions made in one time and place can affect what water management options are available in other locations and at other times. Enhanced aquifer recharge is an important tool for managing groundwater and surface water in a more integrated way that reflects these temporal and spatial connections. This is an important topic, not just in the American West, where water shortages are an increasing challenge, but also across the nation. In many areas, even where surface water is plentiful, groundwater overuse is increasingly causing aquifer levels to decline, shallow wells to go dry, pumping costs to increase, the land surface to subside, salt water to invade freshwater aquifers, and river and stream flows to diminish. These impacts fall on farmers, small rural communities, suburbs, cities, and the natural environment. A central goal of our water team's research is to help people find ways to avoid or manage problems like these.

6.     One of the ways we do this is to try to improve the information and policy environment for implementing innovative water management solutions. Some of these solutions involve water reuse—putting treated wastewater, stormwater, or another non-traditional water source to valuable uses such as drinking or agricultural irrigation. When done effectively, water reuse can help communities meet critical needs like addressing major water supply challenges or improving water quality in local rivers and streams. However, implementing a water reuse project can be challenging, especially if it involves new techniques that would require regulators to use a non-traditional approach to permitting. I was part of a team, with more than a decade of experience with research and engagement on water innovation, that collaborated with EPA to engage thought leaders from wastewater utilities, regulatory agencies, and environmental organizations to develop *A Framework for Permitting Innovation in the Wastewater Sector* (https://www.law.berkeley.edu/research/clee/research/wheeler/water-innovation/regulatory-relationships-are-a-pathway-to-innovation/synthesis-and-recommendations/) under EPA's National Water Reuse Action Plan, building on my prior work. See *Cultivating Effective Utility-Regulator Relationships Around Innovation: Lessons from Four Case Studies in the U.S. Municipal Wastewater Sector.* (https://journals.plos.org/water/article?id=10.1371/journal.pwat.0000031.)

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

DECLARATION OF NELL GREEN NYLEN        2
Case No.: 3:25-cv-04737-RL

7. Recently, EPA unilaterally terminated two large grants I was working on that were meant to fund collaborative work with other researchers on issues at the core of my technical and legal expertise.

**EPA Enhanced Aquifer Recharge Grant Application**

8. In 2021, EPA's Office of Research and Development sought applications proposing research to develop cost-benefit tools to support enhanced aquifer recharge. The grant solicitation was part of EPA's Science to Achieve Results (STAR) program. A true and correct copy of solicitation EPA-G2022-STAR-C1 is attached as Exhibit B.

9. EPA's request for applications solicited research proposals that would "identify the key economic, technological, institutional, and legal factors that affect the ability to implement" enhanced aquifer recharge projects; identify best practices and tools for implementing enhanced aquifer recharge projects to achieve different purposes; and, ultimately, "improve life-cycle cost-benefits analysis to support cost-effective enhanced aquifer recharge." *Id* at 7, 8.

10. I was part of a UC Berkeley team that collaborated with a broader multi-disciplinary team of researchers from UC Davis, UC Santa Cruz, and UC Law San Francisco to develop a proposal in response to the solicitation.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

DECLARATION OF NELL GREEN NYLEN
Case No.: 3:25-cv-04737-RL

3

11. We submitted our proposal to EPA on January 13, 2022. It described a three-year project that would build on our team's prior work on enhanced aquifer recharge with review and synthesis of existing literature, legal research, case studies, and targeted engagement. Our project outputs were to include (a) developing guidance on screening and evaluating potential recharge sites and methods, determining what conditions and processes are necessary to effectively operate and maintain a recharge project, and ensuring that recharge projects maintain or improve aquifer water quality; (b) developing guidance on identifying and effectively navigating the applicable legal, policy, and organizational contexts for recharge; (c) developing recommendations for legal and policy changes that could facilitate more extensive, effective, and affordable implementation of enhanced aquifer recharge; (d) developing a generalized framework and tool for cost-benefit analysis of enhanced aquifer recharge projects that accounts for costs and benefits across the project lifecycle; and (e) creating a capstone "Lifecycle Map" report on enhanced aquifer recharge that reflects the interconnections among all research components. Essentially, our outputs would provide one-stop shopping for people interested in planning, evaluating, and implementing enhanced aquifer recharge projects.

12. The Grant Application proposed a cumulative budget of $2,000,000 (later adjusted to $1,999,998).

13. A true and correct copy of our grant application responsive to solicitation EPA-G2022-STAR-C1, project title *A Knowledge-to-Implementation Framework for Enhanced Aquifer Recharge*, is attached as Exhibit C.

**Award of Enhanced Aquifer Recharge Grant Funding**

14. On July 20, 2022, EPA notified UC Berkeley that it was awarding the grant. A true and correct copy of the Enhanced Aquifer Recharge Grant Agreement is attached as Exhibit D.

15. The grant's original end date was August 31, 2025. *Id.* at 1.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

DECLARATION OF NELL GREEN NYLEN
Case No.: 3:25-cv-04737-RL                4

16. A PDF of EPA's web page, *Life-Cycle Analysis to Support Cost-Effective Enhanced Aquifer Recharge Grant* (https://www.epa.gov/research-grants/life-cycle-analysis-support-cost-effective-enhanced-aquifer-recharge-grant) (saved on May 21, 2025), publicizing our grant as one of two awarded, is attached as Exhibit E.

17. On April 10, 2025, we requested a no-cost extension of the grant to better integrate results across the project pillars within the Lifecycle Map report and to allow more time for expert and stakeholder review and feedback to maximize the report's utility for decision makers who are considering whether and how to implement enhanced aquifer recharge. We received verbal approval for the no-cost extension and were awaiting formal written approval.

**EPA's Termination of the Enhanced Aquifer Recharge Grant**

18. On May 7, 2025, EPA sent the UC Regents a document styled as an "Assistance Amendment." A true and correct copy of the Assistance Amendment is attached as Exhibit F.

19. The Amendment instructed our research team to "stop work; terminate the [grant] agreement; reduce performance period duration; [and] curtail scope of work," while waiving certain reporting requirements. *Id*. at 1. It stated that "(EPA) hereby awards $0.00" towards any as-yet-unincurred costs of the previously awarded $1,999,998 of federal funds. *Ibid.*

20. The Assistance Amendment stated: "The Agency is asserting its right under 2 CFR 200.340 and the Termination General Term [stet] and Condition [stet] of this agreement to unilaterally terminate this award." *Id*. at 4.

21. The Amendment was accompanied by a memorandum from EPA to the Contracts and Grants Officer for the Regents of the University of California titled "Termination of EPA Assistance Agreement RD- 84046301-1 under 2 CFR 200.340." A true and correct copy of this memo is attached as Exhibit G.

22. The memo stated that EPA terminated our grant for the following reasons:

> [T]he award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

DECLARATION OF NELL GREEN NYLEN         5
Case No.: 3:25-cv-04737-RL

> The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In additional to complying with the law, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.
>
> The grant specified above provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities.

*Id.* at 1.

23. The memo did not explain why EPA has concluded that our award is "no longer consistent with EPA funding priorities" or why EPA believes it "provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States."

24. Despite the memo's (very generic) claims otherwise, we believe our enhanced aquifer recharge research is entirely consistent with EPA's priorities. Those priorities are defined partly by governing statutes, and federal statutes specifically identify EAR research as an EPA funding priority and mandate. See 33 U.S.C § 1276. Our research is also consistent with the priority pillars EPA Administrator Lee Zeldin has identified. See *EPA Administrator Lee Zeldin Announces EPA's "Powering the Great American Comeback" Initiative* (https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-announces-epas-powering-great-american-comeback) (accessed May 27, 2025). Those pillars include ensuring that "[e]very American . . . [has] access to clean air, land, and water" and prioritizing permitting reform. *Id.* The core purpose of our research is promoting access to clean water, and a key component of our grant project is identifying better ways to review and approve enhanced aquifer recharge projects to help communities meet their water needs. Due to the nature of enhanced aquifer recharge, most applications will be in rural, agricultural areas, serving core constituencies that depend directly on long-term, reliable water supply to support economic development, and for their livelihoods.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

DECLARATION OF NELL GREEN NYLEN
Case No.: 3:25-cv-04737-RL

6

### EPA Water Reuse Grant Application

25. In 2021, EPA's Office of Research and Development sought applications proposing research designed to "accelerate water innovation, information availability, and engagement to advance clean and safe water reuse goals, promote better understanding of the Nation's water and wastewater treatment and infrastructure, and enhance the availability and efficient use of water resources through water reuse." A true and correct copy of solicitation EPA-G2021-ORD-E1 is attached as Exhibit H.

26. In response to the solicitation, the Director of the Wheeler Water Institute at CLEE and I collaborated with a multi-disciplinary team of researchers from Iowa State University and the University of Rhode Island to develop a research proposal aimed at facilitating the convergence of technical, informational, social, and institutional innovation to accelerate technical and community readiness for water reuse in small water systems across the nation.

27. The lead Principal Investigator at Iowa State University submitted our grant proposal to EPA on September 29, 2021. It described a four-year project with six central objectives. Objective 1 focused on developing geospatial analytical methods to quantify and inventory potential sources of water for beneficial reuse across the nation. Objective 2 involved identifying, validating, and producing guidance on water source / treatment technology / end-use combinations that may be appropriate for small communities, which often have more limited resources and capacities than larger communities. Objective 3 focused on developing cost curves to support cost-benefit analysis of water reuse options in small communities. Objective 4 focused on surveying small communities to assess public attitudes towards and willingness to pay for different water reuse options. Objective 5 included several strands of research aimed at identifying and producing guidance on opportunities for fostering institutional innovation to overcome barriers to water reuse in small communities. Finally, Objective 6 focused on constructing community implementation roadmaps centered around identifying windows of opportunity for water reuse for several case-study communities.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

DECLARATION OF NELL GREEN NYLEN   7
Case No.: 3:25-cv-04737-RL

28. The Grant Application proposed a total budget of $4,057,500, combining a request for $3,246,000 of federal funds under the grant with a commitment from our research team to provide a $811,500 cost share from other sources. The budget included (a) personnel and personnel travel costs; (b) participant support costs; (c) laboratory supplies and laboratory user fees to support validation of water source / treatment technology / end-use combinations; (d) support for engineering and other expert consultants; (e) tuition remission for graduate students to cover their time on the project; and (f) indirect costs. This included a subaward of $559,941 to support our UC Berkeley team's work under the grant, which would be focused on Objective 5 (institutional innovation) and Objective 6 (community implementation roadmaps).

29. A true and correct copy of our grant application responsive to solicitation EPA-G2021-ORD-E1, project title *Accelerating Technical and Community Readiness for Water Reuse in Small Systems*, is attached as Exhibit I.

**Award of Water Reuse Grant Funding**

30. On August 8, 2022, EPA notified Iowa State University that it was awarding the grant, and Iowa State University notified the subrecipients, including UC Berkeley.

31. A true and correct copy of the grant agreement is attached as Exhibit J.

32. A PDF of EPA's web page, *National Priorities: Water Innovation, Science and Engagement to Advance Water Reuse Grants* (https://www.epa.gov/research-grants/national-priorities-water-innovation-science-and-engagement-advance-water-reuse-1) (saved on May 21, 2025), publicizing our grant as one of two awarded, is attached as Exhibit K.

**EPA's Termination of the Water Reuse Grant**

33. On May 12, 2025, EPA sent Iowa State University a document styled as an "Assistance Amendment." A true and correct copy of the Assistance Amendment is attached as Exhibit L.

34. The Amendment instructed our research team to "stop work; terminate the [grant] agreement; reduce performance period duration; [and] curtail scope of work," while waiving certain reporting requirements. *Id*. at 1. It stated that "(EPA) hereby awards $0.00" towards any as-yet-unincurred costs of the previously awarded $3,246,000 of federal funds. *Ibid.*

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

DECLARATION OF NELL GREEN NYLEN
Case No.: 3:25-cv-04737-RL
8

35. The Assistance Amendment stated: "The Agency is asserting its right under 2 CFR 200.340 and the Termination General Term [stet] and Condition [stet] of this agreement to unilaterally terminate this award." *Id*. at 4.

36. The Amendment was accompanied by a memorandum from EPA to the Pre-Award Administrator at Iowa State University titled "Termination of EPA Assistance Agreement CR-84046101 under 2 CFR 200.340." A true and correct copy of this memo is attached as Exhibit M.

37. The memo stated that EPA terminated our grant for the following reasons:

> [T]he award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities.
>
> The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In additional to complying with the law, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.
>
> The grant specified above provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities.

*Id.* at 1.

38. The text describing the reasons for termination in the Assistance Amendment and the termination memorandum for the EPA Water Reuse Grant was identical to the text describing the reasons for termination in the parallel documents for the EPA Enhanced Aquifer Recharge Grant.

39. As with the EPA Enhanced Aquifer Recharge Grant, the termination memo for the EPA Water Reuse Grant did not explain why EPA has concluded that our award is "no longer consistent with EPA funding priorities" or why EPA believes it "provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States."

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

DECLARATION OF NELL GREEN NYLEN
Case No.: 3:25-cv-04737-RL

9

40. Again, despite the termination memo's generic and unsupported assertions, we believe our water reuse research is entirely consistent with EPA's priorities. It is clear that addressing the wastewater challenges of small, rural communities remains one of EPA's ongoing priorities. A PDF of EPA's April 29, 2025, news release webpage, *EPA Announces $49 Million in Technical Assistance to Help Rural, Small, and Tribal Communities Address Wastewater Challenges* (https://www.epa.gov/newsreleases/epa-announces-49-million-technical-assistance-help-rural-small-and-tribal-0) (saved on May 21, 2025), is attached as Exhibit N. Our research squarely addressed these issues.

## Harm from the Grant Terminations

41. I, and the larger project teams for both grant projects, have suffered immediate harm as a result of the cancellation of these grants.  Specifically:

For the Enhanced Aquifer Recharge Grant:

a) I have been unable to proceed with the basic work of refining our team's analysis of the legal and policy context for enhanced aquifer recharge and distilling that information into useful content for our capstone Lifecycle Map report.

b) Our research team has been unable to continue to work together to complete the capstone report and the accompanying cost-benefit analysis decision support tool, or to seek and incorporate feedback from key experts and stakeholders on preliminary versions of the report and tool.

c) I, and the rest of the project team, care deeply about putting our expertise to work to make a positive difference in how people manage water.  We have dedicated our careers to it. The prospect of not being able to finish this project—of leaving our efforts to create integrated guidance for those interested in planning, evaluating, and implementing recharge projects to wither—is, frankly, crushing (as is thinking about the utter waste of taxpayer money and government resources this and all the other federal grant terminations represent).

d) Even if we are eventually able to find replacement funding so that we can complete this project in some form, the delay and uncertainty in the interim would preclude full recovery of the project. We have assembled an incredible team of experts with complementary experience and expertise. The current team, which includes a postdoc who was entirely supported by this grant, is unlikely to be able to stay together over a prolonged period of delay. Furthermore, time we spend searching for replacement funding has considerable opportunity and financial costs (as well as societal costs), since this is time we would otherwise allocate to work on other water-related research projects that confer public benefit.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

DECLARATION OF NELL GREEN NYLEN      10
Case No.: 3:25-cv-04737-RL

For the Water Reuse Grant:

a) I have been unable to proceed with the basic work of the project. For example, I should be coordinating with a partner organization to identify and interview community members from small, under-resourced communities about the water-related challenges their communities face; the degree of trust they have in their water and wastewater systems/providers; whether and how they think some form of water reuse could play a role in addressing their community's challenges; and their ideas for building trust and accountability where it is currently lacking. We had planned to co-develop a report with our partner organization to share the results of this research—including key takeaways and recommendations for building trust in and accountability for water reuse—in ways that are accessible and useful to communities.

b) I have also been unable to continue assisting my CLEE colleague and a consultant partner who are taking the lead on interview-based research to clarify key intervention points in small communities' water planning and decision-making processes where water reuse can be considered. We had already interviewed a number of local water managers and consultants for small communities around the country, and we had many outstanding interview requests at the time this grant was terminated. Many of those we interviewed wore multiple hats and were stretched thin trying to serve their communities to the best of their abilities, yet they took the time to talk with us because they hoped the perspectives and information they shared could help others. If we are unable to find an alternative source of funding, I fear their contributions and insights will go to waste. We will also have compromised the trust we have been begun to build with these local actors, making it more difficult for us to reengage with them in the future.

c) As for the Enhanced Aquifer Recharge Grant, I am heartbroken by the prospect of not being able to finish this project and by the waste of time, effort, and resources that represents for us, for our partners, for the federal government, and for taxpayers.

d) Also, as for the Enhanced Aquifer Recharge Grant, even if we are eventually able to find replacement funding that would allow us to complete this project, the delay and uncertainty in the interim would preclude full recovery of the project, and the search for replacement funding would itself involve substantial time/money/productivity costs to all involved in such fundraising.

For both grants:

a) The job of every member of our water team at CLEE is currently threatened by these grant terminations. We are a self-funded entity within UC Berkeley that does not receive general salary support from the University. Instead, we subsist primarily on grants and contracts. Without that funding, we won't get paid, and we could lose our jobs. Absent the reinstatement of these grants or the development of other funding sources to replace them, we may need to lay off members of our team in the coming months.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

DECLARATION OF NELL GREEN NYLEN
Case No.: 3:25-cv-04737-RL
11

    b) This is a worst-case scenario for us—being committed to deliver work and then having the funding suddenly and unexpectedly disappear without cause—because the nature of our funding means it is not possible for us to prepare an effective contingency plan. Recovering from an instantaneous loss of promised funding is far different than our usual mode of operation, in which we spend small amounts of time pursuing grant opportunities while dedicating most of our time and resources to existing funded projects.

    c) Grant terminations represent sunk costs to our institution in other important ways. For example, we depend on our record of performance under past grants and contracts to help us win new ones. Unless we succeed in finding replacement funding that allows us to complete our key products, we will not have that record to show. This threatens not only the specific teams that worked on these specific grants, but (through no fault of our own) the capacity of our entire organization to persist.

    d) These harms are ongoing.

### Appeal of EPA Enhanced Aquifer Recharge Grant Termination

42. The EPA memo regarding termination of the Enhanced Aquifer Recharge Grant provided that UC Berkeley could submit a "Dispute" to a named Disputes Decision Official at EPA within 30 days from the date EPA transmitted the termination notice.

43. The termination memo provides no concrete information about why our grant was terminated and, therefore, provides no information to support the development of a responsive appeal. The memo also provides no commitment to the timely resolution of a dispute, and the 6-month period generally provided for in 2 C.F.R. 1500.17(b) would extend several months past the original end date of this grant.

44. Our Lead PI (Michael Kiparsky) for the Enhanced Aquifer Recharge Grant has indicated to our Sponsored Projects Office (SPO) at UC Berkeley that our team would like to appeal this grant termination and has provided relevant information. My understanding is that the SPO is currently considering whether to appeal.

45. Regardless of the UC Berkeley SPO's next steps, the grant funding would remain unavailable to our project (whether pending the outcome of an appeal or in the absence of one), making it impossible for us to take the logical next steps in the project and make the commitments necessary to retain staff and keep partners engaged.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

DECLARATION OF NELL GREEN NYLEN
Case No.: 3:25-cv-04737-RL

12

## Appeal of EPA Water Reuse Grant Termination

46. The EPA memo regarding termination of the Water Reuse Grant provided that Iowa State University could submit a "Dispute" to a named Disputes Decision Official at EPA within 30 days from the date EPA transmitted the termination notice.

47. Again, the termination memo provides no concrete information about why our grant was terminated (and, therefore, provides no information to support the development of a responsive appeal), and it does not provide a commitment to the timely resolution of a dispute.

48. Our project team, including the Lead PI for the Water Reuse Grant at Iowa State University, has indicated to Iowa State's SPO that we would like to appeal this grant termination and has provided relevant information to their SPO. However, my understanding is that Iowa State University does not currently plan to appeal the termination.

49. If Iowa State University changes course and decides to appeal, the grant funding would remain unavailable to our project pending the outcome of that appeal, with the same consequences as for our Enhance Aquifer Recharge Grant.

## Role of Class Representative

50. I am ready to assume the responsibilities of serving as a class representative. I understand that I must stay informed regarding developments in the lawsuit, communicate regularly with my attorneys, and act in the best interests of the class. I have no conflicts that would prevent me from assuming this responsibility.

51. I have been in communication with other UC researchers, who would be members of the class, who have suffered the same general type of harm as I describe above, from the abrupt termination of their previously approved research grants. This harm is widespread and I believe it will only increase in scope and impact if classwide relief is not granted.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

DECLARATION OF NELL GREEN NYLEN
Case No.: 3:25-cv-04737-RL                13

1   I declare under penalty of perjury under the laws of the State of California and the United
2   States that the foregoing is true and correct.
3   Executed this 28 day of May, 2025.

4   _____
    Nell Green Nylen

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

DECLARATION OF NELL GREEN NYLEN    14
Case No.: 3:25-cv-04737-RL