BRETT A. SHUMATE
Assistant Attorney General
Civil Division
ERIC J. HAMILTON
Deputy Assistant Attorney General
JOSEPH E. BORSON
Assistant Branch Director
JASON ALTABET (Md. Bar No. 2211280012)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-0727
Email: Jason.k.altabet2@usdoj.gov

*Attorneys for United States*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| NEETA THAKUR, *et al.,* | Case No. 25-cv-4737-RFL |
| Plaintiffs, | DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.,* | Hearing Date: June 20, 2025 Time: 10:00 AM Judge: Hon. Rita F. Lin |
| Defendants. | Place: San Francisco Courthouse Courtroom 15 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**INTRODUCTION**..................................................................................................... 1

**STATEMENT OF ISSUES TO BE DECIDED** .............................................. 3

**BACKGROUND** ...................................................................................................... 4

I.      THIS COURT LACKS JURISDICTION. ............................................................ 13

         A.      This Court Lacks Jurisdiction to Review Grant-Termination Claims ...................... 13

         B.      Plaintiffs, Who Are Not Parties to Any Terminated Contract, Lack Standing ......... 17

                 i.      Asserting the Rights of Nonparties ................................................. 18

                 ii.      Attenuated Connection Between Terminations and Alleged Harm ...................... 22

                 iii.     Speculative Future Harm ................................................................. 25

II.     PLAINTIFFS' APA AND ULTRA VIRES CLAIMS ARE UNLIKELY TO SUCCEED. ....................... 25

         A.      Plaintiffs' APA Claims are Foreclosed ........................................................ 25

                 i.      Final Agency Action ........................................................................ 26

                   ii.      Committed to Agency Discretion by Law .................................... 27

                   iii.     Statutory and Regulatory Authority .............................................. 29

                   iv.     Arbitrary and Capricious Review ................................................. 31

          B.      Plaintiffs' Ultra Vires Claims are Not Cognizable ........................................ 33

III.    PLAINTIFFS' VARIOUS CONSTITUTIONAL CLAIMS LACK MERIT. ............................ 35

         A.      Plaintiffs' Due Process Claim Fails ............................................................. 35

                 i.      Procedural Due Process ................................................................... 36

                   ii.      Void for Vagueness ......................................................................... 37

**B.** **Plaintiffs' First Amendment Claim Fails**......................................................... 39

**C.** **Plaintiffs' Separation-of-Powers Challenge Fails**....................................... 41

**IV.** **THE REMAINING PRELIMINARY INJUNCTION FACTORS FORECLOSE RELIEF** ......................... 43

**A.** **Plaintiffs Have Not Shown Irreparable Injury** ............................................. 43

**B.** **The Balance of the Equities Weighs in the Federal Government's Favor**................ 45

**V.** **ANY INJUNCTIVE RELIEF SHOULD BE NARROWLY TAILORED.**................................................. 45

**VI.** **ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL, BE ACCOMPANIED BY A BOND, AND NO DECLARATIONS SHOULD BE REQUIRED.**...................................................... 46

**CONCLUSION** ............................................................................................................................. 47

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Freedom Forge Corp.*,
    204 F.3d 475 (3d Cir. 2000) ............................................................. 44

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* ("AID"),
    570 U.S. 205 (2013) .................................................................. 39, 40

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
    357 F.3d 62 (D.C. Cir. 2004) .......................................................... 15

*Allen v. Wright*,
    468 U.S. 737 (1984) ..................................................................... 42

*Am. Cargo Transp., Inc. v. United States*,
    625 F.3d 1176 (9th Cir. 2010)........................................................ 47

*Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*,
    No. 25-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025) .................... 25

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
    750 F.2d 1470 (9th Cir. 1985) ........................................................ 43

*Am. Sch. of Magnetic Healing v. McAnnulty*,
    187 U.S. 94 (1902) ...................................................................... 34

*Armstrong v. Exceptional Child Ctr. Inc.*,
    575 U.S. 320 (2015) ..................................................................... 34

*Bd. of Govs. of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
    502 U.S. 32 (1991) ...................................................................... 34

*Bd. of Regents of State Colls. v. Roth*,
    408 U.S. 564 (1972) ..................................................................... 36

*Bennett v. Spear*,
    520 U.S. 154 (1997) ..................................................................... 26

*Boaz Hous. Auth. v. United States*,
    994 F.3d 1359 (Fed. Cir. 2021) ....................................................... 14

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ................................................................ 44, 45

*Caplin & Drysdale, Chartered v. United States*,
   491 U.S. 617 (1989) ........................................................................................ 21

*Carey v. Population Services Int'l*,
   431 U.S. 678 (1977) ........................................................................................ 22

*Child Trends, Inc. v. Dep't Education*,
   No. 25-cv-1154-BAH, 2025 WL 1651148 (D. Md. June 11, 2025) ................ 17

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ........................................................................................ 31

*City of New Haven v. United States*,
   809 F.2d 900 (D.C. Cir. 1987) ....................................................................... 29

*City of New York v. Dep't of Def.*,
   913 F.3d 423 (4th Cir. 2019) .......................................................................... 24

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ......................................................................... 18, 23, 25

*Cleveland. Bd. of Educ v. Loudermill*,
   470 U.S. 532 (1985) ........................................................................................ 37

*Clinton v. Jones*,
   520 U.S. 681 (1997) ........................................................................................ 43

*Cnty. of Santa Clara v. Astra USA, Inc.*,
   588 F.3d 1237 (9th Cir. 2009) ........................................................................ 19

*Cobell v. Kempthorne*,
   455 F.3d 301 (D.C. Cir. 2006) ....................................................................... 26

*Consol. Edison Co. of N.Y. v. U.S. Dep't of Energy*,
   247 F.3d 1378 (Fed. Cir. 2001) ................................................................. 15-16

*Ctr. for Auto Safety v. Dole*,
   846 F.2d 1532 (D.C. Cir. 1988) ..................................................................... 27

*Dabney v. Reagan*,
   542 F. Supp. 756 (S.D.N.Y. 1982) ................................................................. 29

*Dalton v. Spector*,
   511 U.S. 462 (1994) .......................................................................... 26-27, 35, 42

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019) ................................................................................ 33

*Dep't of Education v. California,*
    145 S. Ct. 966 (2025) ....................................................................... *passim*

*Domino's Pizza, Inc. v. McDonald,*
    546 U.S. 470 (2006) ................................................................................ 19

*E. V. v. Robinson,*
    906 F.3d 1082 (9th Cir. 2018) ................................................... 33, 34, 35

*Easyriders Freedom F.I.G.H.T. v. Hannigan,*
    92 F.3d 1486 (9th Cir. 1996) ........................................................... 44, 46

*Edwards v. Aurora Loan Servs., LLC,*
    791 F. Supp. 2d 144 (D.D.C. 2011) ....................................................... 19

*EPA v. Brown,*
    431 U.S. 99 (1977) .................................................................................. 27

*Faculty Senate of Fla. Int'l Univ. v. Winn,*
    477 F. Supp. 2d 1198 (S.D. Fla. 2007) .................................................. 44

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ................................................................................ 32

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012) ........................................................................... 37-38

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) .......................................................................... 31, 32

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) ...................................................................... 18, 21, 24

*Fleck & Assocs., Inc. v. City of Phoenix,*
    471 F.3d 1100 (9th Cir. 2006) ............................................................... 21

*Forsyth Cnty. v. Army Corp. of Eng'rs,*
    633 F.3d 1032 (11th Cir. 2011) ............................................................. 28

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ................................................................................ 27

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ................................................................................................. 43

*G.L. Christian & Assocs. v. United States*,
    160 Ct. Cl. 1 (1963) ................................................................................................. 37

*GECCMC 2005-C1 Plummer St. Off. Ltd. P'ship v. JPMorgan Chase Bank, NA*,
    671 F.3d 1027 (9th Cir. 2012) ................................................................................. 20

*Gen. Land Off. v. Biden*,
    722 F. Supp. 3d 710 (S.D. Tex. 2024) ................................................................... 29

*Gizzo v. Ben-Habib*,
    44 F. Supp. 3d 374 (S.D.N.Y. 2014) ...................................................................... 36

*Goldberg v. Kelly*,
    397 U.S. 254 (1970) ................................................................................................. 36

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ................................................................................................. 38

*Great-West Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002) ................................................................................................. 16

*Griffith v. FLRA*,
    842 F.2d 487 (D.C. Cir. 1988) ................................................................................ 34

*Haaland v. Brackeen*,
    599 U.S. 255 (2023) ................................................................................................. 23

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ................................................................................................. 27

*Heckler v. Turner*,
    468 U.S. 1305 (1984) ............................................................................................... 45

*Hein v. Freedom From Religion Found., Inc.*,
    551 U.S. 587 (2007) ................................................................................................. 25

*Hewitt v. Helms*,
    459 U.S. 460 (1983)................................................................................................. 37

*Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, NA*,
    747 F.3d 44 (2d Cir. 2014) ...................................................................................... 19

*Holley v. United States*,
    124 F.3d 1462 (Fed. Cir. 1997) ................................................................. 16

*Kidwell v. Dep't of Army*,
    56 F.3d 279 (D.C. Cir. 1995) ..................................................................... 14

*Klamath Water Users Protective Ass'n v. Patterson*,
    204 F.3d 1206 (9th Cir. 1999), *opinion amended on denial of reh'g*,
    203 F.3d 1175 (9th Cir. 2000) .............................................................. 19, 20

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ..................................................................... 19, 21, 22

*Larson v. Domestic & Foreign Com. Corp.*,
    337 U.S. 682 (1949) ..................................................................... 33, 34, 35

*Leathers v. Medlock*,
    499 U.S. 439 (1991) ................................................................................. 40

*Lewis v. Casey*,
    518 U.S. 343 (1996) ................................................................................. 46

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ................................................................................. 28

*Louisiana v. Biden*,
    64 F.4th 674 (5th Cir. 2023) ..................................................................... 26

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555–61 (1992) .................................................................. 18, 24, 25

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ................................................................................. 26

*Maher v. United States*,
    314 F.3d 600 (Fed. Cir. 2002) ................................................................... 19

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137–66 (1803) ............................................................. 43

*Maryland v. King*,
    567 U.S. 1301 (2012) ............................................................................... 45

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ................................................................................. 14

FED. DEFS.' OPP'N TO PLS.' MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 25-CV-4737

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982) ................................................................. 15

*Milk Train, Inc. v. Veneman*,
   310 F.3d 747 (D.C. Cir. 2002) ................................................................. 28

*Mills v. United States*,
   742 F.3d 400 (9th Cir. 2014) ................................................................. 21

*Mississippi v. Johnson*,
   71 U.S. (4 Wall.) 475 (1866) ................................................................. 42-43

*Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*,
   498 U.S. 211 (1991) ................................................................. 32

*Morrisey v. Brewer*,
   408 U.S. 471 (1972) ................................................................. 37

*Morrison v. Olson*,
   487 U.S. 654 (1988) ................................................................. 43

*Munaf v. Geren*,
   553 U.S. 674 (2008) ................................................................. 13

*Murthy v. Missouri*,
   603 U.S. 43 (2024) ................................................................. 18, 21, 23, 46

*Nat'l Endowment of the Arts v. Finley*,
   524 U.S. 569 (1998) ................................................................. 38, 39, 41

*Nat'l Urb. League v. Trump*,
   No. 25-cv-471, --- F. Supp. 3d --- , 2025 ................................................................. 36

*New Vision Photography Program, Inc. v. District of Columbia*,
   54 F. Supp. 3d 12 (D.D.C. 2014) ................................................................. 36-37

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................. 13, 45

*Northrop Grumman Corp. v. United States*,
   46 Fed. Cl. 622 (2000) ................................................................. 31, 37

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ................................................................. 26

*Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*,
    325 F.R.D. 671 (W.D. Wash. 2016) ................................................. 22

*Nyunt v. Chairman, Broadcasting Board of Governors*,
    589 F.3d 445 (D.C. Cir. 2009) ...................................................... 34

*Orff v. United States*,
    358 F.3d 1137 (9th Cir. 2004) ...................................................... 20

*Palantir USG, Inc. v. United States*,
    129 Fed. Cl. 218 (Fed. Cl. 2016) .................................................. 32

*Perry Cap. LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) ................................................. 14-15

*Perry v. Sindermann*,
    408 U.S. 593 (1972) ..................................................................... 36

*Pioneers Mem'l Healthcare Dist. v. Imperial Valley Healthcare Dist.*,
    745 F. Supp. 3d 1088 (S.D. Cal. 2024) ......................................... 23

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*,
    313 F. Supp. 3d 62 (D.D.C. 2018) ................................................. 28

*Powers v. Ohio*,
    499 U.S. 400 (1991) ..................................................................... 22

*Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of Hous. & Urb. Dev.*,
    175 F.3d 132 (2d Cir. 1999) ..................................................... 16-17

*Printz v. United States*,
    521 U.S. 898 (1997) ..................................................................... 43

*Pub. Citizen v. Stockman*,
    528 F. Supp. 824 (D.D.C. 1981) ................................................... 29

*Pub. Citizen, Inc. v. Trump*,
    297 F. Supp. 3d 6 (D.D.C. 2018) .................................................. 42

*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*,
    421 F.3d 1 (1st Cir. 2005) ............................................................ 36

*Rosenberger v. Rector & Visitors of University of Virginia*,
    515 U.S. 819 (1995) ..................................................................... 40

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    102 F.3d 12 (1st Cir. 1996) ........................................................................................ 43

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ........................................................................................... 39, 40

*Sampson v. Murray*,
    415 U.S. 61 (1974) .................................................................................................... 44

*Sardarian v. Fed. Emergency Mgmt. Agency*,
    No. 3:19-CV-00910 (OAW), 2022 WL 4080325 (D. Conn. Apr. 1, 2022) ................................ 20, 21

*Savantage Fin. Servs., Inc. v. United States*,
    595 F.3d 1282 (Fed. Cir. 2010) ................................................................................. 32

*Schroer v. Billington*,
    525 F. Supp. 2d 58 (D.D.C. 2007) ............................................................................. 34

*Sessions v. Dimaya*,
    584 U.S. 148 (2018) ................................................................................................. 37

*Sharp v. Weinberger*,
    798 F.2d 1521 (D.C. Cir. 1986) ................................................................................ 17

*Simon v. E. Ky. Welfare Rts. Org.*,
    426 U.S. 26 (1976)............................................................................................. 23, 25

*Spectrum Leasing Corp. v. United States*,
    764 F.2d 891 (D.C. Cir. 1985) .................................................................................. 15

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ................................................................................................. 18

*Stanley v. Univ. of S. Cal.*,
    13 F.3d 1313 (9th Cir. 1994) .................................................................................... 43

*Sustainability Inst. v. Trump*,
    No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) ..................................... 17, 34, 45

*Tennessee v. Becerra*,
    131 F.4th 350 (6th Cir. 2025) ................................................................................... 33

*Town of Castle Rock v. Gonzalez*,
    545 U.S. 748 (2005) ................................................................................................. 36

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ..................................................................................... 18, 22, 24

*Trump v. Sierra Club,*
    140 S. Ct. 1 (2019) ................................................................................................. 29

*Tucson Airport Auth. v. Gen. Dynamics Corp.,*
    136 F.3d 641 (9th Cir. 1998) ................................................................................ 15

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State,*
    ---F. Supp. 3d---, 2025 .......................................................................................... 17

*U.S. Dep't of Lab. v. Triplett,*
    494 U.S. 715 (1990) ............................................................................................... 21

*United Aeronautical Corp. v. U.S. Air Force,*
    80 F.4th 1017 (9th Cir. 2023) ............................................................................... 15

*United States v. Am. Library Ass'n,*
    539 U.S. 194 (2003) .............................................................................................. 40

*United States v. Hansen,*
    599 U.S. 762 (2023) ............................................................................................... 21

*United States v. Yakima Tribal Ct.,*
    806 F.2d 853 (9th Cir. 1986) ............................................................................... 35

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981) .............................................................................................. 46

*Up State Fed. Credit Union v. Walker,*
    198 F.3d 372 (2d Cir. 1999) ................................................................................ 15

*Webster v. Doe,*
    486 U.S. 592 (1988) .............................................................................................. 28

*West v. Lynch,*
    845 F.3d 1228 (D.C. Cir. 2017) .......................................................................... 25

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................................. 13, 43

*Wis. Pub. Power, Inc. v. FERC,*
    493 F.3d 239 (D.C. Cir. 2007) ............................................................................. 32

*Ysursa v. Pocatello Educ. Ass'n*,
    555 U.S. 353 (2009) ................................................................................................ 40


**Constitutional Provisions**

U.S. Const. art. II, § 3 ............................................................................................... 42

**Statutes**

2 U.S.C. § 683 ........................................................................................................... 29

2 U.S.C. §§ 682 *et seq*. ............................................................................................... 2

5 U.S.C. § 551 ........................................................................................................... 26

5 U.S.C. § 701 ........................................................................................................... 27

5 U.S.C. § 702 ..................................................................................................... 14, 27

5 U.S.C. § 704 ..................................................................................................... 26, 27

5 U.S.C. § 706 ........................................................................................................... 27

20 U.S.C. § 954 ......................................................................................................... 38

20 U.S.C. § 956 ......................................................................................................... 10

28 U.S.C. § 1346 ..................................................................................................... 1, 14

28 U.S.C. § 1491 ..................................................................................................... 1, 14

31 U.S.C. § 503 ........................................................................................................... 6

31 U.S.C. § 6307 ......................................................................................................... 6

42 U.S.C. § 1862s-5 ................................................................................................... 30

42 U.S.C. § 1870 ....................................................................................................... 28

42 U.S.C. § 1873 ................................................................................................... 11, 28

Impoundment Control Act ("ICA"), Pub. L. No. 93-344, tit. X, § 1011, 88 Stat. 297 (1974) ................. 2

**Rules**

Fed. R. Civ. P. 65 ......................................................................................................... 46

**Regulations**

2 C.F.R. 200 ........................................................................................................... 7, 10

2 C.F.R. Part 200 ......................................................................................................... 5

2 C.F.R. Part 200, App. I ............................................................................................. 5

2 C.F.R. § 200.308 ...................................................................................................... 5

2 C.F.R. § 200.309 ...................................................................................................... 6

2 C.F.R. § 200.339 ...................................................................................................... 6

2 C.F.R. § 200.340 .................................................................................................. passim

2 C.F.R. § 200.341 ..................................................................................................... 32

2 C.F.R. § 200.343 ...................................................................................................... 6

2 CFR Part 200.340 .................................................................................................... 11

42 C.F.R. § 52.2 .......................................................................................................... 5

48 C.F.R. § 49.502 ..................................................................................................... 37

48 C.F.R. § 52.249-5 .................................................................................................. 31

89 Fed. Reg. 30,046 (Apr. 22, 2024) ...................................................................... 6, 7

Exec. Order No.14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025) ................................... 5

Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ...................................... 4

Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ...................................... 4

Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025) ...................................... 4

**Other Authorities**

EPA, 2021 EPA General Terms and Conditions, https://www.epa.gov/system/files/documents/2021-09/fy_2022_epa_general_terms_and_conditions_effective_october_1_2021.pdf............................. 8

EPA, 2022 EPA General Terms and Conditions,
    https://www.epa.gov/system/files/documents/2022-09/fy_2022_epa_general_terms_and_
    conditions_effective_october_1_2022_or_later.pdf (Oct. 1, 2022)...................................................... 8

EPA, Cumulative Health Impacts at the Intersection of Climate Change, Environmental Justice, and
    Vulnerable Populations/Lifestages ("2021 Funding Announcement"),
    https://www.epa.gov/system/files/documents/2021-09/shc-climate-change-and-ej-rfa_-final.pdf... 7, 8

EPA, EPA Funding Instruments and Authorities,
    https://www.epa.gov/grants/epa-funding-instruments-and-authorities (last updated May 16, 2025) .. 7

H.R. Rep. No. 93-658, 93d Cong., 1st Sess. 41 (1971)........................................................................ 29

NEH, 2022 NEH General Terms and Conditions,
    https://www.neh.gov/general-terms-and-conditions-awards-organizations-grants-and-cooperative-
    agreements-issued-january-2022 (Jan. 11. 2022) ............................................................ 10

NEH, 2024 NEH General Terms and Conditions,
    https://www.neh.gov/general-terms-and-conditions-grants-after-oct-2024 (Dec. 18, 2024)............. 10

NEH, NEH Update on the 2024 Revisions to 2 C.F.R. 200,
    https://www.neh.gov/grants/manage/2024-Revisions-to-2-CFR-200................................................ 10

NEH, Timeline, https://www.neh.gov/about/history/timeline ................................................................ 10

NSF, 2020 Research Terms and Conditions,
    https://nsf-gov-resources.nsf.gov/files/rtcoverlay-nov20-r.pdf?VersionId=wYsBc0e34TZnYUG
    7TK0PSH0L0oZkog7G (Nov. 12, 2020) ......................................................................................... 11

NSF, 2023 NSF-Specific Requirements,
    https://nsf-gov-resources.nsf.gov/files/nsf-0123-r.pdf?VersionId=TduAHRwo0NmnyThR_Xan
    UmL1butNHo7Z (Jan. 30, 2023)....................................................................................................... 11

NSF Agency Specific Requirements,
    https://www.nsf.gov/awards/managing/rtc.jsp (Jan. 30,2023) ........................................................ 12

NSF Grant General Conditions (GC-1),
     https://www.nsf.gov/awards/managing/general_conditions.jsp (Oct. 1, 2024)................................ 12

# INTRODUCTION

Six researchers at University of California ("UC") affiliated institutions (collectively "Plaintiffs") seek to enforce contracts that are not their own, in a district court divested of jurisdiction by the Tucker Act, via judicial superintendence of grantmaking across the Federal Government. Indeed, they seek to impose such oversight on over a dozen different agencies—even though Plaintiffs cite awards from only three (and wrongly describe those grants as their own). On a variety of threshold and merits grounds, Plaintiffs' case fails. And as Defendants raise in a separately filed response, their motion for class certification should be denied.

First, this case is barred because it is premised "upon any express or implied contract with the United States." 28 U.S.C. § 1346(a)(2) ("[T]he district courts shall not have jurisdiction of any civil action or claim against the United States founded [on such a contract]."). Under the Tucker Act, such actions must be brought in the Court of Federal Claims, as the Supreme Court recently emphasized in *Department of Education v. California*, 145 S. Ct. 966, 968 (2025) (per curiam) (citing 28 U.S.C. § 1491(a)(1)). Plaintiffs do not cite the Tucker Act in their brief, but that bar is dispositive. Each of Plaintiffs' claims is premised on the existence of a contract and each form of requested relief is an effort to enforce those contracts and the continued disbursement of funds to nonparty educational institutions which are entitled to funds, if at all, only pursuant to those contractual agreements. None of that is within the ambit of the district courts. This critical bar defeats Plaintiffs' motion.

Second, Plaintiffs lack standing because they are not parties to any of the contracts they seek to enforce. Indeed, all of Plaintiffs' claims, including those premised on purportedly improper procedures, viewpoint discrimination, or other theories, are entirely aimed at invalidating termination of *other entities'* contracts, thereby enforcing the payment of monies from the United States to which they are not even owed. It is well established that only parties, or select nonparties (intended beneficiaries), may enforce contracts with the United States. Plaintiffs do not meet those well-worn requirements and therefore lack standing for the claims they bring and the relief they request. And Plaintiffs cannot meet the limited circumstances when plaintiffs may assert the rights of others. Even if that were not enough, Plaintiffs' alleged personal harms are too attenuated to support jurisdiction because any asserted harms must flow

from independent choices made by the nonparty educational institutions.

Third, Plaintiffs' Administrative Procedure Act ("APA") claims move far beyond the bounds of what the APA permits, and seek to challenge funding decisions committed to agency discretion by law. Plaintiffs' invocation of the Impoundment Control Act ("ICA"), Pub. L. No. 93-344, tit. X, § 1011, 88 Stat. 297, 332 (1974) (codified as amended at 2 U.S.C. §§ 682 *et seq.*), both misunderstands the Act's reach and is impermissible because only the Legislative Branch is empowered to enforce it. Nor did Defendants act unlawfully or in an arbitrary and capricious manner. The grant awards Plaintiffs cite, from the Environmental Protection Agency ("EPA"), National Endowment for the Humanities ("NEH"), and National Science Foundation ("NSF"), all explicitly preserved the agencies' rights to terminate based on changing priorities, and a preexisting regulation, 2 C.F.R. § 200.340, supports such terminations. At heart, Plaintiffs object to the Executive Branch's discretion to implement policy priorities—but the law has long permitted such choices and preserved the authority to terminate grant awards to effectuate such changes.

Fourth, Plaintiffs' ultra vires claims fail for a variety of reasons. Procedurally, that limited doctrine, preserved for when an Executive Branch actor lacks all authority, is inapplicable in this context, where the question is simply whether the agency properly exercised its contractual discretion. Even if it were permitted, each of Plaintiffs' claims fail on the merits. The First Amendment has long conserved the Federal Government's authority to direct spending of federal funds in conformity with its own viewpoint. That direction only crosses the line into unconstitutional discrimination when the United States demands speech outside the context of the grants—which has not been alleged here. The Due Process Clause claims falter because no protected property interest is at issue with respect to federal contracts in this context and, even if it were, the flexible constraints of procedural due process are met. And the "void for vagueness" doctrine is inapplicable. Plaintiffs' separation of powers claims are ultimately duplicative of their other claims, or otherwise not cognizable.

Lastly, Plaintiffs do not establish the required irreparable harm and public interest in emergency relief. Plaintiffs must allege irreparable harm to themselves and only in rare circumstances can they rely on injury resulting from delayed monetary payments. Their personal harms fall short of the extraordinary burden required to demonstrate irreparable harm and accordingly their motion fails on that shortcoming

alone. Finally, the Supreme Court has recently considered the balance of the equities in the context of terminated grants and held squarely for the Government, as this Court should here.

All told, Plaintiffs seek a novel mechanism to challenge recent Executive Branch decisions on funding priorities with respect to nonparties. But jurisdictional, procedural, and merits bars block the path that Plaintiffs seek to blaze. The Court should accordingly deny their motion.

Lastly, if the Court is inclined to grant Plaintiffs' requested relief, Defendants respectfully request that relief be appropriately narrowed and an appropriate bond be required.

## STATEMENT OF THE ISSUES TO BE DECIDED

1. Is this case, which seeks to enforce the continued payment of contracts with the United States pursuant to the terms of those contracts, outside the jurisdiction of the federal district courts?

2. Do Plaintiffs have standing to enforce contracts between the United States and nonparty educational institutions when Plaintiffs have no rights under those contracts and any asserted harm must flow from independent decisions of those institutions?

3. Are some or all of Plaintiffs' APA claims foreclosed by the lack of final discrete agency action and, if not, are these decisions committed to agency discretion or otherwise lawful and permissible when the relevant contracts provided termination authority for changing agency priorities?

4. Can Plaintiffs bring ultra vires claims that are in substance for breach of contract, when the challenge is ultimately to whether an officer properly exercised authority within a range of reasoned decisionmaking, and a statutory scheme already provides for review?

5. Must Plaintiffs' constitutional challenges, which variously seek to forbid the United States from exercising discretion over its contracting decisions, succeed under the doctrines Plaintiffs cite?

**BACKGROUND**

*President Trump is Inaugurated and Sets Policy Priorities*

On January 20, 2025, President Trump assumed the office of President of the United States. On that day, and in the weeks after, he issued a variety of Executive Orders setting new policy priorities for his administration.

On January 20, the President issued Executive Order No. 14,151, 90 Fed. Reg. 8339, *Ending Radical and Wasteful Government DEI Program and Preferencing* ("EO 14,151"). As relevant here, this Executive Order includes a Termination Provision, which directs that within 60 days of the Order's issuance, each "agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM" shall "terminate, to the maximum extent allowed by law, . . . 'equity-related' grants or contracts[.]" *Id.* § 2(b)(i). Similarly, on January 21, 2025, the President issued Executive Order No. 14,173, 90 Fed. Reg. 8633, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* ("EO 14,173"). This second Executive Order's "purpose" is to ensure that the federal government is "enforcing our civil-rights laws" by "ending illegal preferences and discrimination." *Id.* § 1. The Executive Order also includes a Contract Terms Provision, which instructed the OMB Director to "[e]xcise references to DEI and DEIA principles . . . from Federal acquisition, contracting, grants, and financial assistance procedures[.]" *Id.* § 3(c)(ii). Another Executive Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025), entitled *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* ("EO 14,168"), provides, among other things, that "[a]gencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." *Id.* § 3(e). It also includes a Promoting Gender Ideology Provision, which provides that "Federal funds shall not be used to promote gender ideology" and that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* § 3(g).

Those Executive Orders focus on the topics that the Federal Government funds. Relatedly, the President has also identified cost-cutting as a key priority of his administration. He accordingly directed that "[e]ach Agency Head, in consultation with the agency's DOGE Team Lead, shall review all existing covered contracts and grants and, where appropriate and consistent with applicable law, terminate or

modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of my Administration." *Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*, Executive Order 14,222 ("EO 14,222") § 3(b), 90 Fed. Reg. 11,095 (Feb. 26, 2025).

All the orders make clear that they must be "implemented consistent with applicable law." *See* EO 14,151 § 4(b); EO 14,173 § 8(b); EO 14,168 § 8(b); EO 14,222 §§ 3(b), 5(b).[1]

*The Grant Award and Termination Process*

The President having set new policy priorities, agencies with grantmaking authority began reviewing existing grants and considering next steps. The Federal Government, through various agencies, provides funding to institutions of higher learning, using contracts and grants that are subject to specified terms and conditions. As a default matter, Office of Management and Budget ("OMB") regulations generally govern a variety of terms for federal grants and contracts. *See generally* 2 C.F.R. Part 200 (titled "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards"). Usually, an agency will start with a notice of funding opportunity with eligibility information and details of what the agency wishes to fund. *See* 2 C.F.R. Part 200, App. I. In this context, many agencies award grants to grantee institutions, which include the designation of a principal investigator to lead the scientific and technical direction of research projects funded under the grant. *See* 2 C.F.R. Part 200, App. I (b)(2)(C); *see, e.g.*, 42 C.F.R. § 52.2 (discussing the role of principal investigators for grant awards at the National Institute for Health ("NIH")). Principal investigators and project managers are not themselves parties to the grant agreements, as illustrated by the grant agreements Plaintiffs rely on here.

Subpart D of the OMB regulatory scheme is titled "Post Federal Award Requirements." It includes a variety of details for governing awarded grants. For example, 2 C.F.R. § 200.308 governs "[r]evision of budget and program plans" including details for "requesting approval for budget revisions," "review [of] the request for budget or program plan revision" by the relevant federal agency or pass-through entity, details of revision types, and other important guidelines. The regulations also reference and generally

---

[1] Plaintiffs ultimately reference seven Executive Orders and include copies of them in their filings. All can be found at ECF No. 17 and its attachments.

provide terms for the termination of awarded federal grants. *See, e.g.*, *id.* § 200.309 ("If termination occurs, the period of performance will be amended to end upon the effective date of termination."); *id.* § 200.339(c) (noting suspension or termination is a remedy for noncompliance); *id.* § 200.343 (discussing the effects of suspension or termination).

Section 200.340, simply titled "[t]ermination" provides the key substantive and procedural guidelines for termination of awarded grants. Crucially, the Federal Government has preserved the authority to terminate "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, <u>if an award no longer effectuates the program goals or agency priorities</u>." *Id.* § 200.340 (emphasis added). This termination authority has been promulgated consistent with Congressional directives—delegating to OMB the power to manage various aspects of federal grants and contracts, including termination. *See* 31 U.S.C. § 503; *see also id.* § 6307. Awardees are accordingly informed that awards may be terminated based on changes in agency priorities.

Nor is this affirmative termination authority a new requirement. In fact, in 2024, OMB considered removing this preexisting authority for termination and declined to do so. *Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30,046, 30,089 (Apr. 22, 2024). And Plaintiffs do not challenge the lawfulness of this regulation in their suit; they merely cite it when quoting the authority agencies provided for terminations. *See generally* Compl., ECF No. 1.

*Named Plaintiffs' Allegations Regarding Grants from EPA, NEH, and NSF*

Six Plaintiffs are named as putative class representatives in this lawsuit. They each allege one or more grant terminations for grants from EPA, NEH, and NSF. *See* Compl. ¶ 119 ("This Complaint examines the errant grant practices at the three Agencies that terminated Named Plaintiffs' grants—EPA, NEH, and NSF."). Relevant to the present suit are several commonalties across the grants and terminations—summarized here and detailed below.

First, and most notably, no Plaintiff has alleged termination of an award or other contract between themselves and the Federal Government. That bears particular emphasis. Each grant award identified by Plaintiffs was between a federal agency and a nonparty educational institution. Plaintiffs may have been involved in the process by which the nonparty entities applied for the grants, and some were designated

as principal investigators or project managers, but none are parties to any contract. While Plaintiffs refer to themselves as "California researchers whose federally funded grants have been or will be imminently terminated or suspended," they in fact have not alleged any terminated awards between themselves and the federal government. *See id.* ¶ 67.

Second, each award contained an explicit term or condition stating that it was subject to termination for no longer effectuating program goals, agency priorities, funding objectives, or related discretionary rationale. Finally, each grant cited by Plaintiffs was terminated by a communication citing that term or condition.

### *EPA*

Three Plaintiffs, Thakur, Alex, and Nylen, allege grant terminations by EPA.

To start, EPA awards substantial numbers of grants every year to various entities, including universities. *Id.* ¶ 131. And EPA awards such grants pursuant to statutory authorization by Congress and in conformity with regulations. *Id.* ¶ 132. Recipients are informed that "[t]he Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards to Non-Federal Entities (2 C.F.R. 200), commonly known as the Uniform Grant Guidance (UGG), provides a government-wide framework for grants management that reduces administrative burden for non-Federal entities receiving Federal awards while reducing the risk of waste, fraud and abuse." EPA, EPA Funding Instruments and Authorities.[2]

EPA grants typically begin with a funding opportunity announcement. *See, e.g.*, Compl. ¶ 166. Consider by way of example a 2021 funding announcement under the Science to Achieve Results ("STAR") Program. EPA, Cumulative Health Impacts at the Intersection of Climate Change, Environmental Justice, and Vulnerable Populations/Lifestages ("2021 Funding Announcement").[3] Interested parties are informed of the details of the award, the total anticipated funding amount, and the number of anticipated awards, among other details. 2021 Funding Announcement at 1-33. Eligibility may

---

[2] https://www.epa.gov/grants/epa-funding-instruments-and-authorities (last updated May 16, 2025).

[3] https://www.epa.gov/system/files/documents/2021-09/shc-climate-change-and-ej-rfa_-final.pdf (last visited Jun. 7, 2025).

be limited, including to only "[p]ublic and private nonprofit institutions/organizations, public and private institutions of higher education, and hospitals located in the U.S. and its territories or possessions; state and local governments; Federally Recognized Indian Tribal Governments; and U.S. territories or possessions[.]" *Id.* at 3; *see, e.g.*, ECF No. 11-8 at 19 (limiting eligibility to "public and private nonprofit institutions and public and private universities and colleges located in the United States and its territories or possessions").

Critically, announcements may explicitly cite administration priorities to justify the notice and to set the topics to be researched. 2021 Funding Announcement at 5. The example announcement cites Executive Orders related to racial equity, public health, and climate change. *Id.* As to selection, applicants are informed of the criteria to be used. *Id.* at 58-65. This includes not just a peer review component, but also programmatic factors like "program balance, whether the applicant is a new awardee or not, and available funds." *Id.* at 65. Finally, for disputes and terminations, applicants are directed to the regulations governing termination previously described, as well as EPA-specific dispute procedures. *Id.* at 66.

If an award is granted, awardees are directed to the EPA's general terms and conditions, which are available online. EPA, 2022 EPA General Terms and Conditions.[4] Those terms and conditions include, on the very first page, the following: "Consistent with 2 C.F.R. § 200.340, EPA may unilaterally terminate this award in whole or in part: . . . . if the award no longer effectuates the program goals or agency priorities." *Id.* at 1.

Turning to the grants cited in Plaintiffs' papers. Thakur, Alex, and Nylen each cite applications and awards made to UC-affiliated institutions. For example, the application Thakur cites was submitted by "The Regents of the University of California San Francisco" with a "UCSF Contracts and Grants Officer" listed as the point of contact. Thakur Application, ECF No. 10-2 at 1. The applicant type is "Public/State Controlled Institution of Higher Education." *Id.* at 2. The subsequent grant agreement similarly lists the recipient as "The Regents of the University of CA – SF" and the payee is listed as "The Regents of the

---

[4] https://www.epa.gov/system/files/documents/2022-09/fy_2022_epa_general_terms_and_conditions_effective_october_1_2022_or_later.pdf (Oct. 1, 2022). The 2021 version has the same termination provision. https://www.epa.gov/system/files/documents/2021-09/fy_2022_epa_general_terms_and_conditions_effective_october_1_2021.pdf

University of CA - San Francisco." Thakur Agreement, ECF No. 10-4 at 1. The grant agreement provides a link to the EPA terms and conditions discussed above, and the agreement itself makes clear: "[t]here is no guarantee of funding beyond the first year[ funding] . . . is contingent upon the availability of appropriated funds, EPA funding priorities, and satisfactory progress in carrying out the activities described in the scope of work." *Id.* at 5-6. Thakur is listed in the agreement, but is designated by the recipient as "project manager" and is not a payee, nor the Government's counterpart. *Id.* at 1.

The other Plaintiffs, Alex and Nylen, each cite applications and/or grant agreements between EPA and similar institutions as well as grant agreements with the same terms and conditions for termination. Alex Agreement, ECF No. 9-4 at 1 (recipient and payee listed as "The Regents of the University of CA – Berkeley"); *id.* at 5 (general terms and conditions and warning of funds contingent on EPA priorities); First Nylen Application, ECF No. 11-3 at 1 (applicant listed as "Regents of the University of California"); First Nylen Agreement, ECF No. 11-4 (recipient listed as "The Regents of the University of CA – Berkeley" with "Director" listed as payee); *id.* at 5 (general terms and conditions); Second Nylen Application, ECF No. 11-9 at 1 (applicant listed as "Iowa State University of Science and Technology"); Second Nylen Agreement ECF No. 11-10 at 1 (recipient listed as "Iowa State University" with payee "Fiscal and Operational Officer"); *id.* at 5 (general terms and conditions).

Earlier this year, all the grants cited by Plaintiffs were terminated. All terminations were directed to the institutional parties to those contracts, *i.e.* The Regents of the University of California and Iowa State University. The communications informed them that termination was pursuant to the general terms and conditions of the awards, citing to 2 C.F.R. § 200.340, because the award no longer effectuated the program goals or agency priorities, and the award was no longer consistent with EPA funding priorities. ECF Nos. 10-7, 10-8 (directed to "Shelby Mayoral, Director, Contracts and Awards" at "The Regents of the University of California San Francisco"); ECF Nos. 9-7, 9-8 (directed to "Peter Gudlewski, Contracts and Grants Officer" at "The Regents of the University of California"); ECF Nos. 11-6, 11-7 (directed to "Peter Gudlewski, Contracts and Grants Officer" at "The Regents of the University of California"); ECF Nos. 11-12, 11-13 (directed to "Sara Fonseca Ricke, Pre-Award Administrator" at "Iowa State University of Science and Technology"). In those same documents, the recipients were given 30 days to dispute the

termination, and some UC-affiliated recipient institutions plan to submit a dispute. *See, e.g.*, Thakur Decl. ¶¶ 26-28, ECF No. 10.

*NEH*

Two Plaintiffs, Philliou and Hirst, cite grants from NEH.

NEH, through its chairperson, "with the advice of the National Council on the Humanities[], is authorized to enter into arrangements, including contracts, grants, loans, and other forms of assistance." 20 U.S.C. § 956(c). Accordingly, NEH considers grant applications and, using its limited funds and considering a range of actors, makes hundreds of grants a year. Compl. ¶ 241. Indeed, NEH is no stranger to reorganization and reprioritization. For example, in 1995 NEH restructured twice, first merging two of six program divisions, then later consolidating the five into three; turning "thirty-one programs into nine;" creating "an Office of Enterprise"; and reducing staffing by 38 percent. NEH, Timeline.[5]

NEH maintains general terms and conditions for its grants, including a specific statement that termination or suspension is permitted when "an award no longer effectuates the agency's needs and priorities" or "other reasonable cause." NEH, 2024 NEH General Terms and Condition at XIII(a).[6] NEH also refers its grantees to the 2 C.F.R. Part 200 regulations as guiding the terms and conditions of grants. *See, e.g.*, NEH, NEH Update on the 2024 Revisions to 2 C.F.R. 200.[7]

Turning to Plaintiffs' grant awards, each is between a nonparty educational institution, the Regents of the University of California, and the Federal Government. Philliou Award at 1, ECF No. 8-3; Hirst Award at 1-2, ECF No. 13-3. Terminations were directed to the Federal Government's counterparty. Philliou Termination at 1, ECF No. 8-5; Hirst Termination at 1, ECF No. 13-6. The grants identified were appealed by Regents of the University of California. Philliou Appeal at 1, ECF No. 8-6; Hirst Appeal at

---

[5] https://www.neh.gov/about/history/timeline (last visited Jun. 9, 2025).

[6] https://www.neh.gov/general-terms-and-conditions-grants-after-oct-2024 (Dec. 18, 2024). The earlier general terms and conditions include the same authority: https://www.neh.gov/general-terms-and-conditions-awards-organizations-grants-and-cooperative-agreements-issued-january-2022 (Jan. 11. 2022).

[7] https://www.neh.gov/grants/manage/2024-Revisions-to-2-CFR-200 (Jun. 25, 2024).

1, ECF No. 13-7. And while Hirst does not provide the full terms and conditions of the cited award, the award Philliou cites states, "NEH may terminate agreements in whole or in part to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities as noted in 2 CFR Part 200.340." Philliou Appeal at 15.

### NSF

Only one Plaintiff, Foreman, cites terminations by NSF.

To start, NSF, like NEH and EPA, provides research grants to various entities, including universities. Compl. ¶ 308. Like EPA and NEH, NSF must choose between many applicants for a limited number of grants—Plaintiffs allege that "NSF receives over 50,000 such proposals each year, and funds about 10,000 of them." *Id.* ¶ 314. By law, NSF is directed to use "its discretion" to spend federal money to "best realize" its mission of promoting scientific research. 42 U.S.C. § 1873(e).

NSF awards are subject to terms and conditions specified in the award notice. Prior to October 1, 2024, grants awarded to institutions of higher education (including the Regents of the University of California) were subject to the Research Terms and Conditions ("RTCs") and NSF Agency Specific Requirements. NSF, 2023 NSF-Specific Requirements ¶ 41(b)(2)[8]; NSF, 2020 Research Terms and Conditions at 18.[9] NSF ended use of the RTCs for new awards on October 1, 2024. Since that date, NSF Grant General Conditions (GC-1) are applicable to all new NSF grants and pre-existing grants subject to funding amendments. For purpose of this issue, both terms are identical in providing NSF the authority to terminate awards that no longer effectuate program goals or agency priorities.

Turning to the grants cited by Foreman, none are between any Plaintiffs and the Federal Government. Indeed, each proposal lists "Regents of the University of California" as the organization to which the award is made. ECF Nos. 12-1 at 1, 12-3 at 1, 12-5 at 1. Each award lists the recipient as the "Regents of the University of California." ECF Nos. 12-2 at 1, 12-4 at 1, 12-6 at 1, 12-7 at 1. And each

---

[8] https://nsf-gov-resources.nsf.gov/files/nsf-0123-r.pdf?VersionId=TduAHRwo0NmnyThR_XanUmL1butNHo7Z (Jan. 30, 2023).

[9] https://nsf-gov-resources.nsf.gov/files/rtcoverlay-nov20-r.pdf?VersionId=wYsBc0e34TZnYUG7TK0PSH0L0oZkog7G (Nov. 12, 2020).

award states that it is subject to "Research Terms and Conditions (RTCs) dated 11/12/2020, and NSF Agency Specific Requirements, dated 01/30/2023, available at https://www.nsf.gov/awards/managing/rtc.jsp." ECF Nos. 12-2 at 4, 12-4 at 4, 12-6 at 4; *see also* ECF No. 12-7 at 4 (supplemental grant subject to "NSF Grant General Conditions (GC-1), dated 10/01/2024, available at https://www.nsf.gov/awards/managing/general_conditions.jsp," featuring the same relevant terms and conditions). As discussed, those conditions explicitly include the termination authority for no longer effectuating program goals or agency priorities.

This year, the cited grants were all terminated. The emails were directed to "Angela R. Ford," "Executive Director" at "University of California-Berkeley." First Foreman Termination at 2, ECF No. 12-8; Second Foreman Termination at 2, ECF No. 12-9. Ms. Ford was informed that "the agency has determined that termination of certain awards is necessary because they are not in alignment with current NSF priorities" and "on the basis that they no longer effectuate the program goals or agency priorities." First Foreman Termination at 2; *accord* Second Foreman Termination at 3. The emails further state that "[t]his is the final agency decision and not subject to appeal." First Foreman Termination at 2; Second Foreman Termination at 3.

*This Suit*

On June 5, 2025, Plaintiffs filed this suit, moved for a temporary restraining order, and sought to certify a class. Compl.; Pls.' Mem. in Supp. of Mot. for TRO, ("Pls.' PI Mem."), ECF No. 7-1; Pls.' Mot. for Class Certification, ECF No. 18.

Plaintiffs' complaint brings several claims for relief. First, ultra vires review alleging that Defendants have violated the Take Care Clause and Appropriations Clause of the Constitution and thereby the separation of powers. Compl. ¶¶ 433-39, Count I. Second, ultra vires review alleging a violation of the First Amendment's bar on viewpoint discrimination. *Id.* ¶¶ 440-45, Count II. Third, ultra vires review alleging a violation of both procedural due process and the "void for vagueness" doctrine. *Id.* ¶¶ 446-52, Count III. Fourth, APA review alleging violations of the ICA, agencies' governing statutes, and unspecified regulations. *Id.* ¶¶ 453-59, Count IV. Fifth, APA review of arbitrary and capricious decisionmaking. *Id.* ¶¶ 460-65, Count V. For relief, Plaintiffs ask to void "Termination Notices that

terminated grants previously awarded to Plaintiffs and members of the UC Researchers Class"; "declare" that "Defendants' decisions and implementation of the mass termination of grants to Plaintiffs and the UC Researchers Class" was without authority; and to order by preliminary or permanent injunction the restoration of grant funding, bar future terminations, and a "return to the lawful and orderly grant procedures they employed prior to January 20, 2025." *Id.*, Prayer for Relief A-C. That final request appears to be a reference to Plaintiffs' procedural due process claim. *See* Compl. Count III.

In their emergency motion, Plaintiffs' seek, similar to their request for relief, the restoration of terminated grant funding, bars on future terminations, and a judicial order reinstating pre-January 20, 2025 grant termination procedures. Pls.' PI Mem. at 2. The Court subsequently set briefing on both motions with a hearing set for June 20. ECF No. 28. Defendants understand Plaintiffs' motion for a temporary restraining order to be converted to one for a preliminary injunction based on the language of the Court's prior order setting out possible briefing schedules. ECF No. 20.

## ARGUMENT

A "preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). A district court should enter a preliminary injunction only "upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the moving party must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer an irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the proposed injunction is in the public interest. *Id.* at 20. Finally, when "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs cannot satisfy these requirements.

## I.   THIS COURT LACKS JURISDICTION.

### A.    This Court Lacks Jurisdiction to Review Grant-Termination Claims

This Court lacks jurisdiction over this matter because Congress has specifically divested federal courts of jurisdiction over matters like this one. In challenging the government's grant terminations, Plaintiffs seek an order to enforce the government's contractual obligation to pay. Specifically, Plaintiffs

ask for the restoration of funding under existing awards and a bar on future terminations. Pls.' PI Mem. at 2; Compl., Request for Relief A-C. So all of Plaintiffs' relief is premised on contracts between the United States and nonparty educational entities. And each of Plaintiffs' claims is founded on maintaining parts of the contract, disabling the termination provisions, and requiring the continued disbursement of funds. In short, Plaintiffs ask for specific performance of contractual agreements.

That triggers jurisdiction in the Court of Federal Claims under the Tucker Act, which provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The Tucker Act precludes relief under the APA or otherwise because the APA's waiver of sovereign immunity is limited to claims "seeking relief other than money damages," 5 U.S.C. § 702, and the APA does not apply "'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought,'" *California*, 145 S. Ct. at 968 (quoting 5 U.S.C. § 702). This exception "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). Moreover, Congress has by statute explicitly forbidden district court jurisdiction for such claims. 28 U.S.C. § 1346(a)(2) ("[T]he district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States [unless it is for less than $10,000].") In sum, by statute and by the United States' sovereign immunity, if this action is founded upon a contract with the United States, this Court must dismiss for lack of jurisdiction.[10]

Plaintiffs raise self-styled constitutional, statutory, and regulatory, claims. But that is of no moment. Courts must look to the claims' "substance, not merely [their] form." *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995). Thus, regardless of how a claim is styled, a district court lacks jurisdiction if a case "is in 'its essence' contractual." *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C.

---

[10] The grant awards here are simply "contracts to set the terms of and receive commitments from recipients," *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021). The bar on district court jurisdiction therefore applies and a "suit in the Claims Court for damages relating to [the] alleged breach" is the only recourse. *Id.* Notably, this is not some unknown pathway. Class actions related to recent government actions have been filed in the Court of Federal Claims seeking payment of funds. *See, e.g.*, *Jane Doe, et. al., v. United States*, 1:25-cv-947-EHM (Ct. Fed. Cl.) (bringing breach of contract claims on behalf of a class of fellowship recipients).

Cir. 2017) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)); *see also Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004); *Holley v. United States*, 124 F.3d 1462, 1466 (Fed. Cir. 1997) ("The presence of a constitutional issue does not erase the jurisdiction of the Court of Federal Claims based on a properly brought claim under the Tucker Act, or bar the court from considering the constitutional issue in the course of determining whether the [challenged action] was wrongful.").

Determining whether "a particular action" is "at its essence a contract action" not within the jurisdiction of the district courts, requires looking at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968 (citation omitted); *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (applying *Megapulse*). Both prongs point toward a lack of district court jurisdiction.

First, the source of the rights Plaintiffs assert are the grant agreements themselves. Specifically, Plaintiffs challenge the termination of grants under a variety of theories, but all ultimately stem from contracts without which no claims would exist. The First Amendment claim alleges improper terminations of contracts; the due process claim alleges terminations of contracts on grounds too vague, or without sufficient process, to support them; the separation of powers and APA claims assert that the terminations of the contracts were without authority or were not sufficiently reasoned.

"Because the United States's obligation is in the first instance dependent on the contract, these claims are contractually-based" and "the district court lacks jurisdiction under the Tucker Act." *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 647 (9th Cir. 1998) (concluding that district court lacked jurisdiction under the Tucker Act over constitutional claim because it was contractually based). In other words, "it is likely that no cause of action would exist at all," in the absence of the contracts. *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 377 (2d Cir. 1999) (citation omitted). That Plaintiffs' claims could not "exist[] prior to and apart from rights created under the [agreements]" weighs sharply against district court jurisdiction. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985)*; see also Consol. Edison Co. of N.Y. v. U.S. Dep't of Energy*, 247 F.3d 1378, 1385-86 (Fed. Cir.

2001) (directing court to transfer case asserting constitutional, including due process, claims to the Court of Federal Claims in a case sounding in contract).

The relief prong of the test weighs sharply against jurisdiction. Indeed, the Supreme Court recently explained that the type of relief sought here is in the heartland of the Tucker Act's bar. There, several plaintiffs brought a similar APA challenge to termination of federal grants related to DEI—with the caveat that those plaintiffs were asserting their own rights under their own contracts. *California*, 145 S. Ct. at 968. The Court concluded that the lower court likely lacked jurisdiction because the remedy sought was ultimately an order to "enforce [the Government's] contractual obligation to pay money." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). The contracts at issue in *California* were government grants awards. *Id.* So the Court identified the contractual grant award, considered the remedy sought, and concluded jurisdiction was likely precluded.

Moreover, the Court saw no difference between jurisdiction over Plaintiffs' pre-termination claims and post-termination claims. A request to enjoin any future termination still seeks contractual money. *Id.* In fact, plaintiffs in *California* also sought "an injunction against further unlawful terminations" along with their request for reinstatement of already terminated grants. Opp'n to Application at 25, *Dep't of Educ. v. California*, No. 24A910 (U.S. Mar. 28, 2025). Tellingly, the Supreme Court stayed the injunction in full.

Plaintiffs' relief can fare no better than the *California* plaintiffs' request. In their Proposed Order, Plaintiffs explicitly identify their remedy as enforcement of the government's purported obligations under contract: "TRO Defendants[] are hereby enjoined and/or stayed from taking any actions to implement or enforce Defendant Trump and Defendant DOGE's directives to terminate grants previously awarded to Plaintiffs and the Proposed Class." Proposed Order, ECF No. 7-2; *accord* Compl., Request for Relief. So the claims are founded, by definition, on contracts with the United States, and the relief sought is to preserve certain contractual terms and enforce specific performance. The Tucker Act "specifically bar[s] . . . any 'injunctive, mandatory or declaratory relief against government officials when the result would be the equivalent of obtaining of money damages'" and Plaintiffs' claims are accordingly outside this Court's jurisdiction. *See Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of Hous. & Urb. Dev.*, 175 F.3d 132,

143 (2d Cir. 1999).

After *California*, the Fourth Circuit recently stayed a district court injunction effectively identical to the one sought here. *Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025). Plaintiffs there brought APA and ultra vires constitutional claims against Federal defendants and by virtue of those purported legal infirmities sought to reverse or prevent grant terminations. *Id.* Looking to *California*, and the law it applied, the Fourth Circuit easily concluded that those defendants were likely to succeed in showing that the district court lacked jurisdiction. "While the appropriation statutes authorize the agencies to award grants, it is the operative grant agreements which entitle any particular Plaintiff to receive federal funds." *Id.* The same is true here. Likewise, the Circuit concluded that constitutional claims did not change this calculus, as they were still subsumed by the contracts and foreclosed by Congress's statutory scheme. *See id.*; *accord Child Trends, Inc. v. Dep't Education*, No. 25-cv-1154-BAH, 2025 WL 1651148, at *7 (D. Md. June 11, 2025) (rejecting motion for preliminary injunction where "Plaintiffs br[ought] claims under the APA, as well as nonstatutory claims seeking equitable relief" because of Tucker Act preclusion).

At bottom, in seeking an injunction to maintain payments pursuant to the schedule in a contract with the United States, Plaintiffs "want[] the Government to keep paying up." *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, ---F. Supp. 3d---, 2025 WL 763738, at *5-6 (D.D.C. Mar. 11, 2025), *appeal dismissed*, No. 25-5066, 2025 WL 1350103 (D.C. Cir. May 2, 2025). Because the claims here are "founded upon a contract" they "must be heard in Claims Court." *Id.* at *7 (quoting *Sharp v. Weinberger*, 798 F.2d 1521, 1524 (D.C. Cir. 1986) (Scalia, J.) ("We know of no case in which a court has asserted jurisdiction . . . to issue an injunction compelling the United States to fulfill its contractual obligations.")). That is true regardless of whether Defendants are ordered to reinstate the agreements cited by Plaintiffs, or are prevented from exercising contractual discretion for other grants. Either way, granting Plaintiffs' request would amount to an order to "enforce [the Government's] contractual obligation to pay money." *California*, 145 S. Ct. at 968 (citation omitted), and cannot move forward. This Court lacks jurisdiction over this challenge in full.

**B.     Plaintiffs, Who Are Not Parties to Any Terminated Contract, Lack Standing**

To establish Article III standing, a plaintiff must show: (i) an "injury in fact," that is, a violation of a legally protected interest that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (ii) a causal connection between the injury and the defendant's conduct such that the injury is "fairly . . . traceable to the challenged action"; and (iii) that it is "likely, as opposed to merely speculative that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). Each plaintiff "bears the burden of establishing these elements," and therefore "must clearly . . . allege facts demonstrating each." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted). The alleged injury in fact cannot be "speculative—meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). If the injury has not materialized, it must be "*certainly impending,*" and "[a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted).

Critically, "standing is not dispensed in gross," and "'plaintiffs must demonstrate standing for each claim they press' against each defendant, 'and for each form of relief.'" *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (citation omitted). That bears particular emphasis in this context—for every claim, and every form of relief, against every defendant, Plaintiffs must demonstrate standing.

In their motion, Plaintiffs' sole argument for standing is that "Plaintiffs have suffered, or may imminently suffer, grant terminations that have impacted their careers and livelihoods." Pls.' PI Mem. at 34. But this theory fails for a variety of reasons. First, because the contracts Plaintiffs seek to enforce are not their own, they lack standing for their requested remedies. Second, Plaintiffs fail causation and redressability because their alleged injury, career and livelihood damage, is attenuated by a chain insufficient to support federal district court jurisdiction. Finally, Plaintiffs fail to adequately allege standing for all grant terminations that they speculate may occur in the future.

### i.    <u>Asserting the Rights of Nonparties</u>

*First*, and most importantly, Plaintiffs lack standing to enforce the rights of nonparties to recover funding on grants and contracts. Article III does not empower federal courts to "exercise general legal oversight of the Legislative and Executive Branches[.]" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-424 (2021). It is well established that each party generally "must assert his own legal rights" and may not

invoke the rights of "third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). Yet Plaintiffs' claims and relief are entirely premised on requiring the Federal Government to continue paying nonparties.

To start, Plaintiffs have no individualized standing to obtain a remedy enforcing payment of these contracts—to which they are nonparties. "In order to establish standing to enforce" payment of a government contract, or any other terms, a plaintiff must show that they are party to the contract or an intended third-party beneficiary. *Edwards v. Aurora Loan Servs., LLC*, 791 F. Supp. 2d 144, 150 (D.D.C. 2011); *see also Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, NA*, 747 F.3d 44, 49 (2d Cir. 2014) (holding that plaintiff lacked prudential standing because it could not "enforce the terms of" an agreement "as to which it is neither a party nor a third-party beneficiary"); *Maher v. United States*, 314 F.3d 600, 605 (Fed. Cir. 2002) ("The remaining shareholders [who were nonparties to the contract] did not have standing to sue and were not intended third-party beneficiaries."); *cf. Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479–80 (2006) ("[W]e hold that a plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'")

Plaintiffs are not in privity with the government and lack rights under these contracts—they are neither parties nor intended third-party beneficiaries. They are instead researchers with either faculty positions or academic appointments at UC-affiliated institutions. "Before a third party can recover under a contract, it must show that the contract was made for its direct benefit—that it is an intended beneficiary of the contract." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999) (discussing the federal common law of contract that governs when the United States is a party), *opinion amended on denial of reh'g*, 203 F.3d 1175 (9th Cir. 2000). Plaintiffs do not argue that they are intended beneficiaries, nor could they. "[T]he third party must show that the contract reflects the express or implied intention of the parties to the contract to benefit the third party." *Id.* at 1211. Courts apply a "'clear intent' hurdle [which] is not satisfied by a contract's recitation of interested constituencies, vague, hortatory pronouncements, statements of purpose, explicit reference to a third party, or even a showing that the contract operates to the third parties' benefit and was entered into with them in mind." *Cnty. of Santa Clara v. Astra USA, Inc.*, 588 F.3d 1237, 1244 (9th Cir. 2009) *rev'd on other grounds*, 563 U.S. 110 (2011) (cleaned up). Indeed, a contract may "operate[] to the [researchers'] benefit by" providing funds that the

institutions use to fund projects "entered into with the [researchers] in mind." *See Klamath Water Users Protective Ass'n*, 204 F.3d at 1212. None of that is sufficient to make Plaintiffs intended third-party beneficiaries. *Id.*

Indeed, the Ninth Circuit has emphasized time and again just how rare it is for a third party to be an intended beneficiary under a Government contract. The Court has said, for example, the individuals "[who] were explicitly referred to in and benefitted by the contract and were clearly 'in [the] mind' of the contracting parties" are still not intended beneficiaries. *GECCMC 2005-C1 Plummer St. Off. Ltd. P'ship v. JPMorgan Chase Bank, NA*, 671 F.3d 1027, 1034 (9th Cir. 2012) (quoting *Orff v. United States*, 358 F.3d 1137, 1145-50 (9th Cir. 2004), *aff'd,* 545 U.S. 596 (2005)). The rarity of success flows inexorably from the "heightened standard required of third-party beneficiaries to government contracts." *Id.*

Each of Plaintiffs' claims, and each form of relief, is premised on nonparty rights. For example, their First Amendment claim is based on alleged disfavoring of the speech in the grant applications submitted by nonparties and grant agreements signed by nonparties. Their due process claims relate to the procedure and notice given to the recipients of the grants—after all, Plaintiffs have no due process rights in the procedure for terminating another's contracts. Plaintiffs' separation of powers claims and APA claims are all premised on the theory that the United States improperly terminated the contracts with the nonparty universities and, the terminations being unlawful, require continued disbursements of funds under the individual contracts. So each form of relief seeks to enforce or preserve these nonparties' contracts and payment to those nonparties. Plaintiffs accordingly do not assert their own rights, and lack individual standing.

In sum, Plaintiffs do not have "a legally protected interest" as project managers or principal investigators working for a nonparty who has received a Federal award. *See Sardarian v. Fed. Emergency Mgmt. Agency*, No. 3:19-CV-00910 (OAW), 2022 WL 4080325, at *1–2 (D. Conn. Apr. 1, 2022). In *Sardarian*, the plaintiff filed suit against FEMA and local and state agencies, alleging that "*his* grant" under FEMA's Hazard Mitigation Program "was unjustifiably terminated," and FEMA "misled him about *his* grant award limit," and his home "[was] under threat of constant flooding." *Id.* at *2. The court dismissed the suit for lack of standing, holding that the plaintiff did not have a "legally protected interest"

under *Lujan,* because FEMA awarded "the grant in question" to the State of Connecticut and to the Town of Westport, and plaintiff was not the recipient of the Federal grant "for purposes of establishing jurisdiction." *Id.*

Like the *Sardarian* plaintiff, Plaintiffs are not parties to the grant that was terminated. And because they are not "recipient[s] of a [Federal] award," *see id.* at *2, and do not have any direct legal relationship with the agencies, they do not have a "legally protected interest." *Id.*

Lacking rights for themselves, Plaintiffs' only path is to argue that they have third-party standing to enforce the rights of others—the recipients. But "litigants typically lack standing to assert the constitutional rights of third parties," *United States v. Hansen*, 599 U.S. 762, 769 (2023); *see, e.g.*, *All. for Hippocratic Med.*, 602 U.S. at 393 n.5 ("[T]he third-party standing doctrine does not allow doctors to shoehorn themselves into Article III standing simply by showing that their patients have suffered injuries or may suffer future injuries."); *Murthy*, 603 U.S. at 76. So third-party standing is "disfavored." *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1105 n.3 (9th Cir. 2006); *see also Mills v. United States*, 742 F.3d 400, 407 (9th Cir. 2014) ("Courts 'typically decline to hear cases asserting rights properly belonging to third parties rather than the plaintiff.'" (citation omitted)). "This is generally so even when the very same allegedly illegal act that affects the litigant also affects a third party." *U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720 (1990).

The exception permitting third party suits applies only when a plaintiff shows that: (1) it has "a 'close' relationship with the person who possesses the right" and (2) there is "a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski*, 543 U.S. at 130 (citation omitted). Plaintiffs, despite carrying the burden, do not even attempt to make this showing.

Even if they had tried, they would have failed. Start with relationship. Some, but not all, Plaintiffs cite grant awards between UC-affiliated institutions which they work for and the United States. *But see* Second Nylen Application at 1 (applicant listed as "Iowa State University of Science and Technology"). Nonetheless, the mere status of being an employee or researcher at an institution is far from the kinds of relationships generally recognized as being sufficient. *See, e.g.*, *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989) (holding that law firm with attorney-client relationship had standing to

challenge drug forfeiture statute that affected existing client); *Carey v. Population Services Int'l*, 431 U.S. 678 (1977) (permitting direct distributors of contraceptives to raise the rights of purchasers to challenge restrictions on sales). If Plaintiffs have a sufficiently close relationship, then any employee of any organization, no matter how large the organization or how disconnected the employee, could sue to enforce the rights of that organization anytime that employee so chose. That is precisely the kind of boundless Article III superintendence that standing doctrine is meant to prevent. And it would run roughshod over the specific, limited instances when one may sue asserting a third party's rights.

Plaintiffs also fail at the hindrance prong. Plaintiffs must show that the recipients are "sufficiently hindered to warrant third-party standing." *Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 325 F.R.D. 671, 690 (W.D. Wash. 2016). Yet, Plaintiffs have not alleged that the actual parties to the contracts face "daunting" barriers or have "little incentive" to litigate their own claims. *Powers v. Ohio*, 499 U.S. 400, 414-15 (1991). As such, Plaintiffs need not—and cannot—litigate the contracting parties' claims for them.

In sum, Plaintiffs cannot assert the rights of the nonparty educational institutions. This is true even though Plaintiffs claim their own harm flowing from the harm to the nonparties. *See, e.g.*, *Kowalski*, 543 U.S. at 129 n.2, 134 (holding lack of third-party standing for attorneys invoking nonparties' Sixth Amendment rights when challenging a statute limiting their ability to obtain clients, despite an undisputed pocketbook injury to the attorneys). Even assuming Plaintiffs suffer downstream financial or other harm from a termination directed at the nonparties, Plaintiffs lack third-party standing to invoke the rights of the nonparty funding recipients and seek the relief of payment to those entities. Plaintiffs thus lack standing as to every claim and for every form of relief.

Finally, to the extent Plaintiffs try to reframe their harm as some kind of assertion that they have an individual injury-in-fact when their employers lose funding due to Federal Government action, or upon a breach of a contract, that is simply not cognizable. An injury must be "a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 417. The only relevant traditional harm would be that of a third-party intended beneficiary suing on a contract, which Plaintiffs decidedly are not for the foregoing reasons.

FED. DEFS.' OPP'N TO PLS.' MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 25-CV-4737

22

1

ii.     *Attenuated Connection Between Terminations and Alleged Harm*

2   *Second*, even if the Court concludes that Plaintiffs may invoke third-party standing, or otherwise

3   considers Plaintiffs' Article III individual standing with respect to the three *Lujan* factors, it should

4   conclude that redressability and causation are wanting, because it depends on the actions of third-parties,

5   *i.e.* the actual parties to the contract, or that the injury is too speculative. *See Pioneers Mem'l Healthcare*

6   *Dist. v. Imperial Valley Healthcare Dist.*, 745 F. Supp. 3d 1088, 1098 (S.D. Cal. 2024) ("[B]ecause Article

7   III standing is a 'jurisdictional prerequisite to the consideration of any federal claim,' any arguments about

8   third-party standing are moot here if Petitioner cannot satisfy Article III." (citation omitted)). The

9   hypothetical future conduct by nonparties to this suit, including nonparties who Plaintiffs speculate will

10  take various actions against Plaintiffs as a downstream result of the contract terminations, is insufficient

11  to support standing to seek injunctive relief.

12  A "federal court cannot redress 'injury that results from the independent action of some third party

13  not before the court.'" *See Murthy*, 603 U.S. at 57 (citation omitted). Courts are "'reluctant to endorse

14  standing theories that require guesswork as to how independent decisionmakers will exercise their

15  judgment,'" *id.* (quoting *Clapper*, 568 U.S. at 413), and have rejected theories of redressability that depend

16  on such guesswork, *id.* at 73; *Haaland v. Brackeen*, 599 U.S. 255, 293-94 (2023). And the Court has

17  forbidden standing based merely on speculation of how a Governmental action may encourage a harm to

18  Plaintiffs. *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-43 (1976) (holding that causation was not

19  met where plaintiffs asserted that the challenged federal regulations "encouraged" the actions of private

20  entities that resulted in the injury complained of). For similar reasons, standing is wanting when an

21  attenuated chain of reasoning is needed to support Plaintiffs' claims. *See Clapper*, 568 U.S. at 409.

22  Here, Plaintiffs lack standing to seek relief against Defendants predicated on harms that

23  independent nonparties would purportedly inflict on Plaintiffs. Since every contract Plaintiffs cite is

24  between the United States and a nonparty educational entity, Plaintiffs' standing theory necessarily relies

25  on those institutions to make choices which would "impact[] their careers and livelihoods." Pls.' PI Mem.

26  at 34. Presumably, the injury Plaintiffs invoke is that of monetary harm and direct interference with their

27  ability to perform their jobs. After all, any more free-floating injury definitions would not be cognizable

28

as they would not be "harm[s] traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 417. If Plaintiffs' oblique sentence is meant to assert such an unmoored injury, Defendants challenge that definition as impermissible.

Assuming that Plaintiffs meant to invoke sufficiently tangible harm, they lack standing. In order for their livelihoods to be sufficiently affected, they must establish that the loss of funding on the identified contracts disrupts their careers and inflicts direct monetary harm. But under any lens—attenuated chain, causation, or redressability—that harm complained of is too far removed from the Government action challenged. Consider, for example, Philliou. She is a professor and researcher who runs a "Program in Modern Greek and Hellenic Studies" among other things. Philliou Decl. ¶ 6, ECF No. 8. As part of her work she created a group seeking to study Istanbul. *Id.* ¶ 11. The Regents of the University of California subsequently chose to submit a grant application seeking funds "to develop an expansive and scholarly, public-facing website, in order to build new structures of knowledge and raise public awareness about Istanbul and its constituent Orthodox Christian communities in the 19th and 20th centuries." Philliou Application at 1, ECF No. 8-2. The application listed Philliou as project director, alongside a graduate student and a finance director, for purposes of calculating award amounts. *Id.* at 5. The award was subsequently terminated. Philliou Decl. ¶ 29. Philliou, like other Plaintiffs speculates that the recipient of the grant, the Regents of the University of California, or others, may not provide or solicit sufficient "replacement fund[s]." *See id.* ¶ 30.

That theory cannot suffice. "It is not enough for plaintiffs to simply identify a governmental action that ultimately affected them through the independent responses and choices of third parties." *City of New York v. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (Wilkinson, J.) (citation omitted). And ultimately, it is the choice of the nonparties to this case, the grant recipients, to determine what to do. If, for example, the grantee or a donor chooses to continue funding the project, then no harm flows to Plaintiffs from the termination. Thus, the choices of nonparties who have "broad and legitimate discretion," interrupt any link between the challenged actions and the alleged harms. *See Lujan*, 504 U.S. at 562. For Philliou to suffer a tangible harm, her employer must choose not to provide her funding, nor successfully solicit from others. This is an impermissible "attenuated link[]." *See All. for Hippocratic Med.*, 602 U.S. at 383.

At base, Plaintiffs assert harm flowing from the cancellation of nonparty contracts. Standing doctrine does not permit the kind of attenuated chain Plaintiffs seek to build. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. 25-10276-GAO, 2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025) (holding that unions lack standing to challenge an incentive program for resignations because the harm from loss of membership dues in the event of resignations was insufficiently "certain" and related harms from "upstream effects" flowing from employees' choice to resign was not cognizable). When this kind of "conjecture is necessary, redressability is lacking." *West v. Lynch*, 845 F.3d 1228, 1237 (D.C. Cir. 2017) (citing *Simon*, 426 U.S. at 43-44). Plaintiffs lack standing under Article III to bring claims dependent on the attenuation that terminations of nonparties' grants will flow down and eventually harm them.

### iii.   *Speculative Future Harm*

*Third*, to the extent that Plaintiffs attempt to allege that they will suffer future harm due to federal funding cuts, those allegations are too speculative to satisfy Article III standing. *See Clapper*, 568 U.S. at 409 (explaining that any allegation of "threatened injury must be *certainly impending*" (citation omitted)). The mere fact that Plaintiffs' employing institutions receive federal funding is not nearly "concrete and particularized" enough to challenge *specific* future funding decisions, and some grants have been terminated pursuant to changes in general funding priorities, does not render the termination of other grants held by those institutions sufficiently imminent to confer Article III standing to challenge those hypothetical future funding decisions. *See Lujan*, 504 U.S. at 560-61; *cf. Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 593 (2007) ("[I]f every federal taxpayer could sue to challenge any Government expenditure, the federal courts would cease to function as courts of law and would be cast in the role of general complaint bureaus.").

## II.   PLAINTIFFS' APA AND ULTRA VIRES CLAIMS ARE UNLIKELY TO SUCCEED.

### A.   Plaintiffs' APA Claims are Foreclosed

Even if this Court concludes that Plaintiffs' claims are not precluded by the Tucker Act, and that Plaintiffs have standing, their APA claims fail at the threshold and on the merits. First, Plaintiffs do not challenge discrete final agency action. Second, the allocation of appropriations is committed to agency

1    discretion by law. Third, the agencies' actions were consistent with all applicable law. Fourth, the agencies

2    did not act arbitrarily or capriciously.

3                    i.    _Final Agency Action_

4        "[F]inal agency action" is a requirement for APA review. 5 U.S.C. § 704. Agency action requires

5    a specific "rule, order, license, sanction, relief, or the equivalent." _Id._ § 551(13). It must be a "discrete"

6    act, and a plaintiff may not bring a "broad programmatic attack." _Norton v. S. Utah Wilderness All._, 542

7    U.S. 55, 64 (2004). Meanwhile, the Supreme Court has laid out a two-part test for finality, including that

8    (1) "the action must mark the 'consummation' of the agency's decisionmaking process," rather than being

9    "of a merely tentative or interlocutory nature[;]" and (2) "the action must be one by which "rights or

10   obligations have been determined," or from which "legal consequences will flow[.]" _Bennett v. Spear_, 520

11   U.S. 154, 177–78 (1997) (citations omitted). The APA expressly excludes "preliminary, procedural, or

12   intermediate agency action[s] or ruling[s]." 5 U.S.C. § 704.

13       Plaintiffs' broader challenge, to any current or future grant terminations across a myriad of

14   agencies, is definitionally a broad programmatic attack not based on the consummation of an agency's

15   decisionmaking process. While each termination may eventually represent a final agency action (directed

16   at nonparties) a plaintiff may not "in a single swipe at the duly elected executive" seek judicial

17   superintendence over the entire grantmaking structure of the Executive Branch. _See Louisiana v. Biden_,

18   64 F.4th 674, 684 (5th Cir. 2023). Indeed, by Congressional ordering, the APA does not permit Plaintiffs

19   to "seek _wholesale_ improvement" of agency management "by court decree"—even in the face of

20   allegations of "rampant" violations of law. _Lujan v. Nat'l Wildlife Fed'n_, 497 U.S. 871, 891 (1990).

21   "Because 'an on-going program or policy is not, in itself, a "final agency action" under the APA,' [a

22   court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." _Cobell

23   v. Kempthorne_, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted). "Consequently, as each case only

24   presents the court with a narrow question to resolve, [the court] can have no occasion to order wholesale

25   reform." _Id._

26       Nor does it matter that the President has set policy directives that may flow to agencies. The

27   Supreme Court has consistently held that "the President is not an 'agency' under that A[PA]." _Dalton v._

28

*Spector*, 511 U.S. 462, 476 (1994). As a result, the APA, making "final *agency* action for which there is no other adequate remedy in a court subject to judicial review," is inapplicable to the President. 5 U.S.C. § 704 (emphasis added). This conclusion flows from "respect for the separation of powers and the unique constitutional position of the President[.]" *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992). Indeed, the Court in *Franklin* directly confronted what would happen if a statute invested the President with the authority to take an administrative action—there to make certain calculations and a final apportionment from the census. *Id.* at 800. The Court concluded that the action was simply not subject to the requirements in the APA including, for example, arbitrary and capricious requirements. *Id.* at 800–01. As a result, it is only the discrete final actions of agencies, not broad programmatic Presidential prerogatives, which are properly subject to APA review.

Accordingly, the Court should reject Plaintiffs' blockbuster APA challenge as being beyond the bounds Congress has set out for such review. Even if it does not wholly toss the claims, it should at least apply the APA only to finally terminated grants. And it certainly should not exercise authority over speculative future terminations, as "[f]or [courts] to review [agency actions] not yet promulgated, the final form of which has only been hinted at, would be wholly novel." *EPA v. Brown*, 431 U.S. 99, 104 (1977).

## ii. Committed to Agency Discretion by Law

Withdrawal of funding is quintessential agency action "committed to agency discretion by law," for which the APA does not provide an avenue for review. 5 U.S.C. § 701(a)(2). While the APA establishes a waiver of sovereign immunity and a cause of action for injunctive relief for parties adversely affected by either final agency action or an agency's failure to act, 5 U.S.C. §§ 702, 706(1)-(2), the waiver of sovereign immunity is limited. It does not apply in circumstances where "agency action is committed to agency discretion by law," *id.* § 701(a)(2). Review under the APA therefore is unavailable "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Although, where the statute does not provide any judicially manageable standard, "regulations promulgated by an administrative agency in carrying out its statutory mandate can provide standards for judicial review." *Ctr. for Auto Safety v. Dole*, 846 F.2d 1532, 1534 (D.C. Cir. 1988).

The Supreme Court has long recognized that an agency's determination of how to allocate appropriated funds among competing priorities and recipients—precisely what Plaintiffs challenge here—is classic discretionary agency action. *See Lincoln* v. *Vigil*, 508 U.S. 182, 193 (1993). In *Lincoln*, the Court explained that there is no waiver of sovereign immunity where agency action requires "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including whether "resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all." *Id.* (citations and internal quotation marks omitted). An "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* The APA "gives the courts no leave to intrude" via arbitrary-and-capricious review. *Id.*

Moreover, Courts have made clear that *Lincoln*'s logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions—like decisions regarding how best to allocate lump-sum appropriations—"clearly require[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752 (quotation omitted); *see also Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018).

Consider, for example, NSF. Congress authorizes the agency to issue grants it "deems necessary to carry out" its mission. 42 U.S.C. § 1870(c). To that end, NSF is given "discretion" to "utilize appropriations" however will "best realize" four congressional objectives. *Id.* § 1873(e). Statutory language that empowers the agency head in such a manner "fairly exudes deference to the" agency head. *See Webster v. Doe*, 486 U.S. 592, 600 (1988) (citation omitted). And statutory language giving an agency "discretion" to act creates no law to apply. *See, e.g., Forsyth Cnty. v. Army Corp. of Eng'rs*, 633 F.3d 1032, 1041 (11th Cir. 2011).

In sum, the agencies here had broad discretion to set funding priorities and determine whether and when to exercise contractual rights to terminate grant agreements. The committed to agency by law bar accordingly applies.

         *iii.*    <u>Statutory and Regulatory Authority</u>

Plaintiffs likewise cannot show a violation of statutory and regulatory authority.

Plaintiffs first cite the Impoundment Control Act ("ICA"). Pls.' PI Mem. at 41. Under that Act, appropriated funds "shall be made available for obligation" unless the President transmits a special message to Congress and Congress rescinds the appropriation. 2 U.S.C. § 683(b). The Act enforces Congress's power over the purse in relation to the Executive. *See Dabney v. Reagan*, 542 F. Supp. 756, 760 (S.D.N.Y. 1982). It provides for enforcement by the Comptroller General (an official in the Legislative Branch), but does not include private enforcement. The statute is thus generally not enforceable through an APA suit. *See Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 734–35 (S.D. Tex. 2024); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981); *cf. Trump v. Sierra Club*, 140 S. Ct. 1 (2019); *id.* at 1 (Breyer, J., concurring in part and dissenting in part) (noting that the majority had stayed a lower court order "rais[ing] novel and important questions about the ability of private parties to enforce Congress' appropriations power").

But even if the ICA is reviewable, the termination of grants is not an impoundment. As the D.C. Circuit has explained, withholding funds within the bounds of a statutory or regulatory program does not qualify as an impoundment or a failure to make funds "available for obligation" under the statute. *See City of New Haven v. United States*, 809 F.2d 900, 907 (D.C. Cir. 1987) (explaining how Congress has previously "acknowledged that 'the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year' and such delays may result from the 'normal and orderly operation of the government'" (quoting H.R. Rep. No. 93-658, 93d Cong., 1st Sess. 41 (1971))). Indeed, the alternative would be startling. If any termination of a contract violated the ICA, the Federal Government would be entirely disabled from ever reordering its funding affairs, or even cutting off funding to entities committing fraud, that have gone bankrupt, or any of the myriad instances where

agencies must redirect funding. That is not what the ICA requires, and accordingly, Defendants have not violated it.

Next, Plaintiffs allege violations of "agencies' enabling statutes and other laws passed by Congress that include grant-making as a directive to the agencies." Pls.' PI Mem. at 42. By way of example, they cite statutes stating, for the NSF, that "the United States should encourage full participation of individuals from underrepresented populations in STEM fields." 42 U.S.C. § 1862s-5(b)(4). That same statute states that the NSF "shall continue to support programs designed to broaden participation of underrepresented populations in STEM fields" and "shall award grants on a competitive, merit-reviewed basis, to eligible entities to increase the participation of underrepresented populations in STEM fields." *Id.* § 1862s-5(c), (d)(1). For the reasons already discussed, such funding decisions are committed to agency discretion. But setting that aside, Plaintiffs have not alleged any violation of that provision, or other provisions. Plaintiffs have not alleged that NSF has failed to support any programs within the ambit of Section 1862s-5(c), nor are terminations a failure to "award" grants to eligible entities. *Id.* § 1862s-5(d)(1). Plaintiffs' reading, that "terminating already-awarded grants which involve underrepresented population" violates the statute is entirely implausible. *See* Pls.' PI Mem. at 42. The various statutory grantmaking schemes set forth considerations for agencies to utilize when making awards—but do not foreclose the use of policy priorities to terminate such awards, as Plaintiffs appear to suggest. NSF's actions do not forestall future grants involving such populations or designed to increase participation of underrepresented populations. Plaintiffs' position would result in a conclusion that NSF cannot terminate any grants that involve underrepresented populations for any reason (including non-compliance). This nonsensical outcome demonstrates the error in Plaintiffs' position.

Finally, Plaintiffs state that "Defendants are violating their own regulations to the extent grants were issued in accordance with regulation." *Id.* at 43. But the grants and scheme explicitly set out 2 C.F.R. 200.340, including the authority to terminate for inconsistency with agency priorities. Defendants properly and explicitly invoked that authority to terminate Plaintiffs' grants. There is thus no regulatory conflict.

The only caveat to this is Plaintiffs' inclusion of a declaration from Samuel Pimentel, an individual not referenced in the complaint and not listed as a named plaintiff. Decl. of Samuel Pimentel, ECF No.

15. Pimentel cites an alleged "grant" termination by the Food and Drug Administration ("FDA") for "the Government's convenience." Ex. H, Notice of Termination at 1, ECF No. 15-8 ("Notice of Termination"). As an initial matter, the agreement was between an educational institution, Columbia, and the Federal Government. Ex. D, Pimentel Application at 2, ECF No. 15-4 ("The Trustees of Columbia University"). Indeed, the University of California Berkley, where Pimentel works, is listed merely as a subcontractor. *Id.* at 1. That also illustrates a larger issue—the cited application and agreement is no grant at all. It is a contract for the completion of a "study" for which the FDA sought a contractor. Ex. E, Award/Contract at 3, ECF No. 15-5 ("Award Contract"); *id.* at 4 ("This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text."); *id.* (specifying deliverables); *id.* at 5-7 (specifying task and subtasks for Columbia University as "contractor").

The Federal Acquisition Regulation ("FAR") govern the contract. And the FAR states that "[t]he Government may terminate performance of work under this contract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest." 48 C.F.R. § 52.249-5(a); Award/Contract at 28. And FDA subsequently terminated the contract for the Government's convenience, as authorized under the applicable FAR. Notice of Termination at 1. So that too was not violative of any regulations, nor does it otherwise justify Plaintiff's attacks on the terminations. *Northrop Grumman Corp. v. United States*, 46 Fed. Cl. 622, 626 (2000) ("The Government's right to terminate a contract for convenience is broad.").

All told, Plaintiffs' scattershot statutory and regulatory objections cannot support their APA claim.

### iv.    Arbitrary and Capricious Review

Even if the Court applied arbitrary and capricious review, the challenged terminations survive. Under the arbitrary and capricious standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). A court must "uphold [even] a decision of

less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (quotation marks omitted). An agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Id.* at 515. Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.* Moreover, the judiciary affords a particularly lenient standard of review to agency action in the contracting context. *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) ("[D]etermining an agency's minimum needs is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess." (quotations omitted)); *cf. Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 260-61 (Fed. Cl. 2016) ("Effective contracting demands broad discretion" so contracting decisions are subject to a "highly deferential rational basis review.").

In conformity with 2 C.F.R. § 200.340, and the individual terms and conditions of the awards cited by Plaintiffs, an agency may generally terminate a federal award "if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). In addition, 2 C.F.R. § 200.341(a) requires an agency to "provide written notice of termination to the recipient or subrecipient," and include in that notice "the reasons for termination, the effective date, and the portion of the Federal award to be terminated." Each of the grants Plaintiffs cite were terminated pursuant to recognized termination authorities and in compliance with the terms permitting such terminations. Given that "reasonableness is a zone, not a pinpoint," *Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 266 (D.C. Cir. 2007) (per curiam), Plaintiffs necessarily lack plausible allegations that the APA required Defendants to simply maintain grants that no longer effectuated their priorities and forego a regulatorily permitted termination pathway. *See, e.g.*, *Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230 (1991) ("An agency enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures, and priorities[.]" (citations omitted)).

Moreover, the decisions to terminate were "reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423. In its notices, the agencies explained that the grants were ending based on termination authorities available when the nonparty educational institutions received the grant awards. So

agencies, pursuant to terms previously laid out, effectuated a long-held authority to determine whether grant awards are in conformity with current priorities. That is well within the bounds of reasonable explanation. And it is exceedingly unlikely that anyone has a reliance interest in continued discretionary funding. *Tennessee v. Becerra*, 131 F.4th 350, 370 (6th Cir. 2025) ("Tennessee likely has no legally cognizable reliance interest in the receipt of a discretionary funding award on the conditions that it prefers." (emphasis removed)). So no reliance interests can defeat the agencies' terminations.

In sum, arbitrary and capricious review of agency policy priorities and reasons is deferential because it "represents a substantial intrusion into the workings of another branch of Government." *See Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) (quotation marks omitted). These terminations satisfied its strictures. The Court should accordingly reject Plaintiffs' arbitrary and capricious claim.

## B.    Plaintiffs' Ultra Vires Claims are Not Cognizable

Beyond the APA, Plaintiffs assert a generalized "ultra vires" right to review Defendants' actions. "Suits against the government are barred for lack of subject matter jurisdiction unless the government expressly and unequivocally waives its sovereign immunity." *E. V. v. Robinson*, 906 F.3d 1082, 1090 (9th Cir. 2018) (citation omitted). As discussed, the APA narrowly waives sovereign immunity in certain circumstances. The ultra vires doctrine bypasses this bar only when the claims effectively "are not 'against the government.'" *Id.* (citation omitted).

There are a variety of issues entirely barring these ultra vires claims here. First and foremost, such claims can only be brought against individual officers, not agencies, so no ultra vires claims can succeed against the latter. *Id.* (describing ultra vires as applying to "officers" sued in their official capacity). Second, the Ninth Circuit has specifically recognized that in the context of "breach of contract" ultra vires cannot succeed because "the relief sought in a suit nominally addressed to the officer is relief against the sovereign." *Id.* (quoting and citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 684-87 (1949)). And because the claims are effectively for breach of contract, *see supra* Part I.A., that bar applies here. *Larson*, 337 U.S. at 688 (dismissing due to sovereign immunity because the suit was "in substance, a suit against the Government over which the court, in the absence of consent, has no jurisdiction"). Third, ultra vires relief developed as an equitable remedy to prevent the government from unlawfully acting upon

a person—i.e., to prevent a certain restriction or enforcement action. *See, e.g.*, *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110–11 (1902). While it can be used by a plaintiff facing direct and immediate action by a government actor, this careful equitable tool is not designed for third parties to an allegedly unlawful action to intervene. Finally, it is subject to "implied statutory limitations," such as the Tucker Act. *See Armstrong v. Exceptional Child Ctr. Inc.*, 575 U.S. 320, 324–27 (2015); *see also Sustainability Inst.*, 2025 WL 1587100, at *2 (citing *Armstrong* and holding that "it appears unlikely that Plaintiffs' ultra vires claims, which allege the Government violated the Constitution when it terminated or suspended Plaintiffs' grants, would provide a detour around the Tucker Act"). Because the Tucker Act shows "meaningful and adequate opportunity for judicial review," or "clear and convincing evidence that Congress intended to deny . . . District Court jurisdiction," ultra vires review is foreclosed. *See Bd. of Govs. of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43-44 (1991).

Even if the Court moves to the next step of the analysis, ultra vires still fails. It is well recognized as "a doctrine of last resort," *Schroer v. Billington*, 525 F. Supp. 2d 58, 65 (D.D.C. 2007), and the equivalent of "a Hail Mary pass—and in court as in football, the attempt rarely succeeds," *Nyunt v. Chairman, Broadcasting Board of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). More specifically, ultra vires review outside the APA is only available when the invocation of authority not granted is "so extreme that one may view it as jurisdictional or nearly so." *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988). It is thus an equitable cause of action, fashioned by courts in the most limited of circumstances, to review whether an executive official is entirely outside the bounds of his authority.

In the Ninth Circuit, such an ultra vires claim is only cognizable when the defendant officials act so far outside the bounds of authority that the suit is effectively "not [a] suit[] against the sovereign." *E. V.*, 906 F.3d at 1090 (quoting *Larson*, 337 U.S. at 688-89). For non-constitutional claims, this occurs when the official acts wholly outside the bounds of authority, rather than merely being subject to "[a] claim of error in the exercise of [assigned] power." *Id.* at 1091 (cleaned up). For constitutional claims, the claims must assert that the officers acted pursuant to unconstitutional authority, or in an unconstitutional manner, such that "the conduct against which specific relief is sought is beyond the officer's powers and is, therefore, not the conduct of the sovereign." *See id.* (cleaned up).

To start, Plaintiffs' separation of powers claim is ultimately a claim of lack of statutory or regulatory authority and is impermissible. In *Dalton v. Specter* the Court considered, in the context of an attempt for ultra vires review of Presidential and agency action, whether "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." 511 U.S. 462, 471 (1994). Specifically, the Court sought to determine whether nonstatutory review was applicable when the President and agency actors allegedly "violated the procedural requirements of the [authorizing] Act." *Id.* at 471–72. The Court rejected that contention. "Our cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is ipso facto in violation of the Constitution." *Id.* at 472. "[C]laims simply alleging that the President [or an executive officer] has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review." *Id.* at 473. They are simply statutory claims. Thus, Plaintiffs' separation of powers claim is really a non-constitutional ultra vires claim. And because Plaintiffs' challenge merely alleges that Defendants made the wrong decisions within otherwise lawful statutory grant programs and regulatory termination clauses, ultra vires cannot succeed. *See E. V.*, 906 F.3d at 1097 (explaining officers have "discretionary authority to make incorrect as well as correct decisions" (cleaned up)); *United States v. Yakima Tribal Ct.*, 806 F.2d 853, 860 (9th Cir. 1986) ("[T]here is no per se divestiture of sovereign immunity when statutes or regulations are violated while an agent is pursuing his authorized duties.").

As to the other constitutional claims, the Ninth Circuit generally recognizes that a claim of unconstitutional action, asserted against an officer, defeats sovereign immunity. *E. V.*, 906 F.3d at 1098. Nonetheless, that should not apply here where, in addition to allegations that officers took actions that should be considered "constitutionally void," Plaintiffs also ask for relief as to actions that have not occurred. *See Larson*, 337 U.S. at 702. At the very least, the Court should reject use of the ultra vires vehicle for such speculative relief regarding future actions.

## III.    PLAINTIFFS' VARIOUS CONSTITUTIONAL CLAIMS LACK MERIT.

### A.    Plaintiffs' Due Process Claim Fails

Plaintiffs assert procedural due process and void-for-vagueness challenges under the Fifth Amendment's Due Process Clause. Plaintiff argues that the terminations did not comply with the strictures

of procedural due process and failed to give fair notice to Plaintiffs about what conduct was prohibited. *See* Pls.' PI Mem. at 39-41. These challenges fail at the threshold and on the merits.

### i. *Procedural Due Process*

In order to assert a due process claim, Plaintiffs must identify a liberty or property interest that is protected by the Fifth Amendment in the first place. "The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire'" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005) (citation omitted). Plaintiffs cite "a constitutionally protected property interest in grant and contract funding that supports their salaries and stipends, as well as their ongoing research." Pls.' PI Mem. at 39. But that is insufficient.

Most importantly, Plaintiffs have no entitlement here because the grants are to nonparties. Plaintiffs cannot have an entitlement to payments that are not their own, premised on contracts with nonparties. Plaintiffs therefore have no legitimate claim of entitlement—it is not their agreement with the government. That squarely defeats their due process claim.

If that were not enough, or if the Court permits third-party standing here, it is well established that future grant funding is not a protected property interest even for recipients. The Supreme Court has identified only a narrow set of government benefits—so-called "new property"—that are protected under the Due Process Clause. *See Perry v. Sindermann,* 408 U.S. 593 (1972) (tenured teaching position); *Goldberg v. Kelly,* 397 U.S. 254 (1970) (welfare benefits); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) (collecting cases). But the protections afforded to this narrow set have not been extended to "'ordinary' or 'routine' government contracts." *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014); *Nat'l Urb. League v. Trump*, No. 25-cv-471, --- F. Supp. 3d --- , 2025 WL 1275613, at *18 (D.D.C. May 2, 2025) (denying injunction in a similar funding case); *see also Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 10 (1st Cir. 2005) ("We have held with a regularity bordering on the echolalic that a simple breach of contract does not amount to an unconstitutional deprivation of property."); *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C.

2014) ("The Supreme Court has never held that government contracts for goods and services create property interests protected by due process . . . it is unimaginable that all government agencies would be required to provide a hearing before they take any action that is arguably inconsistent with a contract." (citation omitted)).

Here, Plaintiffs have not shown that they have any constitutionally protected entitlement-like contracts/grants that will be subject to termination. Government contracts and grants generally allow for termination at the agency's direction. *See* 2 C.F.R. § 200.340(a)(4) ("program goals or agency priorities"); 48 C.F.R. § 49.502 ("[t]ermination for the convenience of the Government"). Courts have upheld the government's right to terminate a contract for convenience even absent a termination clause. *See G.L. Christian & Assocs. v. United States*, 160 Ct. Cl. 1 (1963) (reading a termination for convenience clause into the contract by operation of law); *see also Northrop Grumman Corp.*, 46 Fed. Cl. at 626 ("The Government's right to terminate a contract for convenience is broad."). That is the antithesis of a constitutionally protected entitlement.

Finally, even if there were a protected interest, and Plaintiffs could somehow invoke it, "the question remains what process is due." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). Here, the Tucker Act provides a judicial mechanism sufficient to satisfy due process. And the terminations themselves provided notice, some with the opportunity for appeal. Due process standards are "flexible" and "call[] for such procedural protections as the particular situation demands." *Morrisey v. Brewer*, 408 U.S. 471, 481 (1972). The Due Process Clause does not invariably require an opportunity to be heard in advance of a decision. *See Hewitt v. Helms*, 459 U.S. 460, 476 & n.8 (1983). Here, the post-termination procedures are robust and well satisfy due process.

### ii.     <u>Void for Vagueness</u>

Plaintiffs also argue that the standard for terminations was so vague that it violates due process under the "void for vagueness" doctrine. As a preliminary matter, the void-for-vagueness doctrine under the Fifth Amendment is inapplicable. The vagueness doctrine traditionally "guarantees that ordinary people have 'fair notice' of the conduct *a statute* proscribes." *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (plurality op.) (emphasis added). And while courts have applied the doctrine outside of the

statutory context, they have done so with respect to direct regulation of primary conduct. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." (citation omitted)). There is good reason for the doctrine's limited reach. The Due Process Clause prohibits uneven enforcement, of coercive sanctions; not the discretion to affirmatively fund the work of private institutions. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). No vagueness concerns arise in this context. It is especially inapplicable here where Plaintiffs are not the ones being subject to the governmental decision—and instead educational institutions are the grantees.

Even setting aside that Plaintiffs are not the subject of the governmental action, the kind of vagueness challenge Plaintiffs bring has been rejected by the Supreme Court previously. Plaintiffs argue that the terminations are invalid because "new administration priorities referenced in the termination letters are not clearly defined." Pls.' PI Mem. at 40 (cleaned up). But in *National Endowment for the Arts v. Finley*, the Supreme Court rejected application of demanding vagueness standards to government funding decisions. 524 U.S. 569, 572 (1998). There, plaintiffs brought vagueness challenges under the First and Fifth Amendments to a funding provision that required the National Endowment for the Arts to "take[] into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id.* at 572 (quoting 20 U.S.C. § 954(d)(1)). Those terms, like decency and respect, are little different from the kinds of "agency priority" provisions in the relevant regulations, termination letters, and grant conditions. Nonetheless, that "[t]he terms of the provision are undeniably opaque," was of no constitutional concern, even though "if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns," for "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Id.* at 588-89; *see also id.* at 589 (cautioning that "[t]o accept [plaintiffs'] vagueness argument would be to call into question the constitutionality of . . . valuable Government programs and countless others like them" that "award[] scholarships and grants on the basis of subjective criteria such as 'excellence'"). This Court should

similarly reject Plaintiffs' invitation to impose a demanding vagueness standard on the government when it "is acting as patron rather than as sovereign[.]" *Id.*

### B.      Plaintiffs' First Amendment Claim Fails

Plaintiffs argue that Defendants' action violate the First Amendment because they amount to viewpoint discrimination. Plaintiffs' claim fails because these provisions pertain to government's sponsorship of speech—not regulation of it.

Government spending is not subject to traditional First Amendment scrutiny. "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest . . . In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). Thus, "[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* ("*AID*"), 570 U.S. 205, 214 (2013) (collecting cases).

While government funding is not free from the First Amendment in all respects, the relevant First Amendment limitation is the prohibition against an unconstitutional "condition." *Id.* at 213-15. Under this limitation, the government may "specify the activities [it] wants to subsidize[,]" but it cannot "leverage funding to regulate speech *outside* the contours of the programs itself." *Id.* at 214-15 (emphasis added). For example, limitations on the use of federal funds for a specific purpose—such as "promot[ing] or advocat[ing] [for] the legalization or practice of prostitution or sex trafficking"—is constitutionally permissible, *id.* at 217-18 (citation omitted), but outright conditioning federal funds on a pledge to a policy "explicitly opposing prostitution or sex trafficking" is not, *id.* at 221 (citation omitted). The latter amounts to an unconstitutional condition because it regulates speech even on the recipients' "own time and dime." *Id.* at 218-19. That is; a pledge outside the program is different than the topic of the funds to be used. "By demanding that funding recipients adopt—as their own—the Government's view on an issue of public concern, [an offending] condition by its very nature affects 'protected conduct outside the scope of the federally funded program.'" *Id.* at 218 (quoting *Rust*, 500 U.S. at 197). This critical distinction decides

the present case.

To start, as Defendants have noted before, Plaintiffs' claims again fail because they are not the subjects of the governmental action. It is the actual grantees—decidedly not Plaintiffs—who would have to bring a First Amendment challenge. And it is allegedly the nonparty educational institutions' research missions which are being discriminated against.

Putting that hurdle to the side, Plaintiffs do not base their First Amendment claims on speeches, pledges, or other conditions outside of the federally funded activities. To the contrary. Their First Amendment argument is tied directly to the topics of the grants—alleging that the grants themselves cover certain viewpoints and content that the agencies have decided that they no longer wish to promote. *See* Pls.' PI Mem. at 39. As Plaintiffs allege, "Defendants terminated many grants based on the recipients' (presumed) viewpoint as reflected in the subject matter of their research." Compl. ¶ 444. Accepting that allegation as true, however, Plaintiffs fail to establish a violation.

In short, what Plaintiffs allege does not impose an unconstitutional condition on Plaintiffs' speech or amount to viewpoint discrimination; rather, as permitted under *Rust* and *AID*, the terminations align the government's sponsorship of activities with its policy priorities. In so doing, the terminations do not seek to regulate a grantee's speech "outside the contours of" any such policy initiatives—*i.e.*, they do not prohibit entities from engaging in protected speech on their "own time and dime." *AID*, 570 U.S. at 218. The Supreme Court has repeatedly held that the government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it. *See, e.g.*, *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that government "is not required to assist others in funding the expression of particular ideas[]"); *United States v. Am. Library Ass'n*, 539 U.S. 194, 212 (2003) (plurality op.) (holding that a "decision not to subsidize the exercise of a fundamental right does not infringe the right" (quoting *Rust*, 500 U.S. at 193)); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) ( "[The Government] is not required to subsidize First Amendment rights."). Simply put, the government is permitted to have policy priorities, and it does not violate the First Amendment by not funding awards that are out of alignment with those policies.

In support of their challenge, Plaintiffs primarily invoke *Rosenberger v. Rector & Visitors of*

*University of Virginia*, 515 U.S. 819, 828-29 (1995). But *Rosenberger* is inapposite; there, the Supreme Court "found the viewpoint discrimination unconstitutional, not because funding of 'private' speech was involved, but because the government had established a limited public forum[.]" *Finley*, 524 U.S. at 598-99 (Scalia, J., concurring). Here, Plaintiffs make no such showing.

Lastly, Plaintiffs have no meaningful argument that Defendants' actions are vague and therefore impose a "chilling" effect on protected speech because any such argument has been foreclosed by the Supreme Court's decision in *Finley*. As the Court explained in *Finley*, no First Amendment concern exists even though, "as a practical matter, [government-funding recipients] may conform their speech to what they believe to be the decisionmaking criteria in order to acquire funding." *Id.* at 589. At bottom, when the government acts "as patron," it does not infringe on constitutionally protected speech even when it articulates funding standards with "imprecision." *Id.*; *see also id.* at 599 (Scalia, J., concurring) ("Insofar as it bears upon First Amendment concerns, the vagueness doctrine addresses the problems that arise from government *regulation* of expressive conduct . . . not government grant programs." (citation omitted)).

In sum, the Federal Government may choose how it wishes to promote certain policy priorities within the bounds of the First Amendment. As *AID* and the related cases establish—considering the content of a grant is well within the bounds of the Government's discretion.

## C. Plaintiffs' Separation-of-Powers Challenge Fails

Plaintiffs argue that Defendants have violated the separation of powers by acting in excess of statutory authority and violating the Take Care Clause. *See* Pls.' PI Mem. at 35–38. Specifically, Plaintiffs argue that conditioning or cancelling federal grants amounts to interference with Congress's spending power, or failure to take care that the laws are faithfully executed, because it is violative of Congress's appropriations statutes and those governing the agencies. *Id.* As an initial matter, for the reasons previously discussed, the ultra vires vehicle cannot support this claim, previously foreclosed by *Dalton*. *Supra* Part II.B.

Even taking the challenge on its own terms, Plaintiffs do not allege viable constitutional claims merely by invoking the Spending Clause and the Appropriations Clause. Neither of these constitutional provisions—or even the appropriations statutes that Congress passed pursuant to its Article I powers—

requires that the agencies continue to fund the terminated grant agreements. While the conduct under those grant agreements may be reviewable in the Court of Federal Claims, the mere fact that grants are funded through Congressional appropriations does not mean that the routine execution or termination of those grant agreements takes on statutory, let alone constitutional, dimensions. Indeed, Plaintiffs do not point to any appropriations statutes that specifically require funding to any specific grants challenged here. Again, any entitlement to grant funds comes via contractual agreements (in this case, between the government and nonparties to the suit).

Indeed, it is the relief that Plaintiffs seek that threatens the separation of powers and would undermine the Executive Branch. It is axiomatic that the President and his officers may make policy decisions as part of their everyday functioning. *See, e.g.*, *Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 25 (D.D.C. 2018) (instructing that "[t]he Court must, of course, avoid any undue intrusion on the discretion of the Executive Branch to set policy priorities[]") (citing *Allen v. Wright*, 468 U.S. 737, 759–61 (1984)). And government-wide regulations promulgated by OMB recognize that an agency may terminate a grant if it "no longer effectuates the program goals or agency priorities." *See* 2 C.F.R. § 200.340(a)(4). Plaintiffs' arguments to the contrary ignore this regulatory framework.

In addition, Plaintiffs' claim under the Take Care Clause also fails on its own merits. That claim comprises a broad programmatic attack on Presidential authority, attempting to circumvent the limitations of the APA. Plaintiffs cannot prevail on their Take Care Clause claim because the Take Care Clause does not provide a cause of action against the President or any other Defendant, and this Court, in any event, has no jurisdiction to issue declaratory or injunctive relief of that kind. *See Dalton*, 511 U.S. at 473. Even if the Clause could furnish a basis for affirmative relief, Plaintiffs seek to rely on violations of purported duties that are found nowhere in the statutes establishing the Defendant agencies, but rather, are based on Plaintiffs' subjective views about how to best implement and administer those agencies.

Through the Take Care Clause, the Constitution vests the President with broad, discretionary authority to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Inevitably, the laws that the President executes are those enacted by Congress. As the Supreme Court has recognized, the duty of the President when exercising his power to see that the laws are faithfully executed is "purely executive

and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1866); *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66 (1803) ("[T]he President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character[.]").

Nor does the Take Care Clause provide a basis to review the actions of subordinate Executive Branch officials. The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492-93 (2010) ("It is *his* responsibility to take care that the laws be faithfully executed."); 561 U.S. at 495-97; *see also Printz v. United States*, 521 U.S. 898, 922 (1997); *Morrison v. Olson*, 487 U.S. 654, 689-90 (1988); *Clinton v. Jones*, 520 U.S. 681, 712-13 (1997) (Breyer, J., concurring). A subordinate Executive officer cannot violate the President's duty to faithfully execute the laws.

## IV.  THE REMAINING PRELIMINARY INJUNCTION FACTORS FORECLOSE RELIEF

### A.    Plaintiffs Have Not Shown Irreparable Injury

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Here, for the reasons previously described, any harm to the actual Plaintiffs in this suit is impermissibly speculative and attenuated. *See supra* Part I.B; *Winter*, 555 U.S. at 22 (explaining that issuing a preliminary injunction "based only on a possibility of irreparable harm" would be "inconsistent" with treating a preliminary injunction as an "extraordinary remedy"); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) ("[A] preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm."). But even putting that to the side, injunctive relief is still not warranted because Plaintiffs' only relief is for money to be dispersed to the nonparty institutions and to continue having that money disbursed. Where a plaintiff seeks money to be paid, and later payment is possible, there is rarely irreparable harm. *See Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320-21 (9th Cir. 1994). It is only when the harm complained of is like that of "[t]he threat of being driven out of business" that a delay of monetary disbursement "is sufficient to establish irreparable harm." *See Am. Passage Media*

*Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985).

Plaintiffs' allegations are not of this type. As an initial matter, while Plaintiffs sweep widely in their papers—citing programs, institutions, and other individuals—they may only succeed by showing irreparable harm *to themselves*. *See, e.g.*, *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 485-86 (3d Cir. 2000) (partially vacating a preliminary injunction because "[i]nstead of making a case-by-case determination that each plaintiff demonstrated irreparable harm, . . . the court dealt with the plaintiffs as a unit and concluded that because several of them probably risked irreparable harm, that was sufficient to satisfy that prong of the preliminary injunction test"); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" before the court). Moreover, injunctive relief analysis should be limited to only named plaintiffs so long as there is no class certification, and the Court should accordingly look only at their irreparable harm. *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996). So Plaintiffs' various references to unnamed others, and institutions who are not part of this suit or even a member of the alleged class, cannot suffice. *See, e.g.*, Pls.' PI Mem. at 32 (citing irreparable harm to "Lawrence Hall's ability to operate and serve the public[]").

Plaintiffs do not demonstrate the magnitude of harms that justify extraordinary injunctive relief. The kinds of harms alleged by Plaintiffs include that "termination of [a] grant will make it more difficult for Dr. Thakur to partner with organizations that serve impacted communities," *id.* at 19, "delay and uncertainty" of a kind that damages a research project, *id.* at 20, "less ability to go out to schools and universities to share the incomparable work of Mark Twain," *id.* at 27, and similar claims. Plaintiffs allege, in many ways, that they believe their research and certain projects will be hampered upon termination of funding to the nonparties. If these harms come to pass, such harms may be personally painful for Plaintiffs. But these are not the harms that support the extraordinary remedy of injunctive relief. "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough." *See Sampson v. Murray*, 415 U.S. 61, 90 (1974); *see also Faculty Senate of Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1208 (S.D. Fla. 2007) ("There is no irreparable harm here because the plaintiffs can fund the desired travel themselves and then, if they prevail

1  in this suit, obtain reimbursement. In other words, the harm is financial.”). Plaintiffs have accordingly

2  failed to establish irreparable injury.

3      **B.     The Balance of the Equities Weighs in the Federal Government's Favor**

4          Lastly, Plaintiffs cannot establish that the balance of equities and public interest favor granting the

5  extraordinary remedy of a preliminary relief. These final two factors merge in cases where relief is sought

6  from the government. *Nken*, 556 U.S. at 435.

7          The Supreme Court in *California* squarely explained that the balance of the equities favors the

8  Federal Government in this context. The public interest is harmed when the United States is forced to pay

9  out funds that it may not be able to recover. *California*, 145 S. Ct. at 969. And the grantees have the choice

10  of whether “to keep the programs operating,” and if they choose not to, “then any ensuing irreparable

11  harm would be of their own making.” *Id.*; *see also Heckler v. Turner*, 468 U.S. 1305, 1307-08 (1984)

12  (Rehnquist, J., in chambers) (prospect of the government being forced to make $1.3 million in improper

13  payments per month supported a stay of injunction); *cf. Sustainability Inst.*, 2025 WL 1587100, at *2

14  (“[T]he Government has demonstrated irreparable harm because it is being forced to disburse funds from

15  a finite appropriation and will not be able to recoup those funds once expended.”).

16          This is all in addition to the fact that any injunction interfering with the President's priorities is

17  itself a substantial harm in the balance of the equities analysis. For, “[a]ny time [the Government] is

18  enjoined by a court from effectuating [laws], it suffers a form of irreparable injury.” *Maryland v. King*,

19  567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). To the extent the Court finds

20  the balance of various factors close, this equities analysis should tip against an injunction.

21  **V.   ANY INJUNCTIVE RELIEF SHOULD BE NARROWLY TAILORED.**

22          Because “injunctive relief should be no more burdensome to the defendant than necessary to

23  provide complete relief to the plaintiffs,” the Court should be cautious in fashioning any injunction.

24  *Califano*, 442 U.S. at 702. To the extent the Court intends to grant Plaintiffs' request for a preliminary

25  injunction, such relief should be narrowly tailored to apply only to defendant agencies, Plaintiffs, and the

26  provisions that affect them, and to leave intact the Executive's discretion to engage in further consideration

27  of the topic at hand and implement new policies consistent with law.

28  FED. DEFS.' OPP'N TO PLS.' MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 25-CV-4737

First, any injunction should be limited to EPA, NEH, and NSF only. The purpose of a preliminary injunction "to preserve the relative position *of the parties* until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (emphasis added); *see Lewis v. Casey*, 518 U.S. 343, 360 (1996) (providing that an injunction should not provide "a remedy beyond what [is] necessary to provide relief" to the injured parties). Plaintiffs may seek to certify a class, but in this extraordinary relief posture, the Court should be cautious to allow mass judicial superintendence of sixteen agencies' grantmaking based on allegations specific to only three (and based on contracts that are entered into with non-parties). And, if the Court does not certify a class, the relief should be only for named Plaintiffs. *Easyriders Freedom F.I.G.H.T.*, 92 F.3d at 1501.

And the Court should only order relief that flows from the claims it concludes are likely to succeed on the merits, to those Defendants for which the claims and relief are applicable. That result flows inexorably from *Murthy*'s command that "'plaintiffs must demonstrate standing for each claim they press' against each defendant, 'and for each form of relief.'" *Murthy*, 603 U.S. at 61 (citation omitted).

## VI.    ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL, BE ACCOMPANIED BY A BOND, AND NO DECLARATIONS SHOULD BE REQUIRED.

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

Defendants also respectfully request that any injunctive relief accompany a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A bond is appropriate here given that any preliminary relief would potentially mandate that the Executive spend money that may be lost forever once distributed. *California*, 145 S. Ct. at 969.

Finally, Plaintiffs ask that Defendants be made to serve declarations "within two (2) business days, . . . verifying that they have complied with this Order, and detailing what steps they have taken to do so."

1   Proposed Order at 4. The Court should not order such an extraordinary filing. Instead, if the Court orders

2   relief, the presumption of regularity should apply and the Court should presume the Federal Government

3   will comply with any such order. *See Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th

4   Cir. 2010).

5                                          **CONCLUSION**

6          For these reasons, this Court should deny Plaintiffs' Motion for a Preliminary Injunction.

7

8                                          Respectfully submitted,

9

10                                         BRETT A. SHUMATE
                                           Assistant Attorney General
11                                         Civil Division

12                                         ERIC J. HAMILTON
13                                         Deputy Assistant Attorney General

14                                         JOSEPH E. BORSON
15                                         Assistant Branch Director

16

17                                         */s/ Jason Altabet*
                                           JASON ALTABET (Md. Bar No. 2211280012)
18                                         Trial Attorney, U.S. Department of Justice
                                           Civil Division, Federal Programs Branch
19                                         1100 L Street, N.W.
                                           Washington, D.C. 20005
20                                         Tel.: (202) 305-0727
21                                         Email: jason.k.altabet2@usdoj.gov

22

23                                         *Attorneys for United States*

24

25

26

27

28   FED. DEFS.' OPP'N TO PLS.' MOT. FOR PRELIMINARY INJUNCTION
     CASE NO. 25-CV-4737
                                                47

1

**CERTIFICATE OF SERVICE**

2    I hereby certify that on June 12, 2025, I electronically filed this document with the Court by using

3 the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.

4

5                 */s/ Jason Altabet*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28