1  Erwin Chemerinsky (admitted *pro hac vice*)
     echemerinsky@law.berkeley.edu
2  Claudia Polsky (CA Bar No. 185505)
     cpolsky@law.berkeley.edu
3  U.C. BERKELEY SCHOOL OF LAW
   Law Building
4  Berkeley, CA 94720-7200
   Telephone: 510.642.6483
5
   Elizabeth J. Cabraser (CA Bar No.  83151)
6    ecabraser@lchb.com
   Richard M. Heimann (CA Bar No. 63607)
7    rheimann@lchb.com
   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
8  275 Battery Street, 29th Floor
   San Francisco, CA  94111
9  Telephone:  415.956.1000

10  Anthony P. Schoenberg (State Bar No. 203714)
      tschoenberg@fbm.com
11  Linda S. Gilleran (CA Bar No. 307107)
      lgilleran@fbm.com
12  Kyle A. McLorg (CA Bar No. 332136)
      kmclorg@fbm.com
13  Katherine T. Balkoski (CA Bar No. 353366)
      kbalkoski@fbm.com
14  Farella Braun + Martel LLP
    One Bush Street, Suite 900
15  San Francisco, California 94104
    Telephone: (415) 954-4400
16  Facsimile: (415) 954-4480

17  *Attorneys for Plaintiffs and the Proposed Class*
    [Additional counsel listed on signature page]
18

19              **UNITED STATES DISTRICT COURT**

20            **NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 21  NEETA THAKUR, KEN ALEX, NELL GREEN NYLEN, ROBERT HIRST, | Case No. 3:25-cv-04737-RL |
| 22  CHRISTINE PHILLIOU, and JEDDA FOREMAN, on behalf of themselves and all | **REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY** |
| 23  others similarly situated, | **INJUNCTION** |
| 24              Plaintiff, | Judge:    The Honorable Rita F. Lin |
| 25         vs. | Hearing Date:       June 20, 2025 |
| 26  DONALD J. TRUMP, in his official capacity as President of the United States; | Time:               10:00 A.M.  Courtroom:        15 |
| 27  DEPARTMENT OF GOVERNMENT EFFICIENCY ("DOGE"); | |
| 28  AMY GLEASON, in her official capacity as | |

1 | Acting Administrator of the Department of
Government Efficiency;
2 | NATIONAL SCIENCE FOUNDATION;

3 | [*caption cont'd next page*]

4 | BRIAN STONE, in his official capacity as
Acting Director of the National Science
5 | Foundation;
NATIONAL ENDOWMENT FOR THE
6 | HUMANITIES;
MICHAEL MCDONALD, in his official
7 | capacity as Acting Chairman of the National
Endowment for the Humanities;
8 | UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY;
9 | LEE ZELDIN, in his official capacity as
Administrator of the U.S. Environmental
10 | Protection Agency;
UNITED STATES DEPARTMENT OF
11 | AGRICULTURE;
BROOKE ROLLINS, in her official capacity
12 | as Secretary of the U.S. Department of
Agriculture;
13 | AMERICORPS (a.k.a. the CORPORATION
FOR NATIONAL AND COMMUNITY
14 | SERVICE);
JENNIFER BASTRESS TAHMASEBI, in her
15 | official capacity as Interim Agency Head of
AmeriCorps;
16 | UNITED STATES DEPARTMENT OF
DEFENSE;
17 | PETE HEGSETH, in his official capacity as
Secretary of the U.S. Department of Defense;
18 | UNITED STATES DEPARTMENT OF
EDUCATION;
19 | LINDA MCMAHON, in her official capacity
as Secretary of the U.S. Department of
20 | Education;
UNITED STATES DEPARTMENT OF
21 | ENERGY;
CHRIS WRIGHT, in his official capacity as
22 | Secretary of Energy;
UNITED STATES DEPARTMENT OF
23 | HEALTH AND HUMAN SERVICES;
ROBERT F. KENNEDY, JR., in his official
24 | capacity as Secretary of the U.S. Department
of Health and Human Services;
25 | UNITED STATES CENTERS FOR DISEASE
CONTROL;
26 | MATTHEW BUZZELLI, in his official
capacity as Acting Director of the Centers for
27 | Disease Control;
UNITED STATES FOOD AND DRUG
28 | ADMINISTRATION;

1  | MARTIN A. MAKARY, in his official
   | capacity as Commissioner of the Food and
2  | Drug Administration;
   | UNITED STATES NATIONAL
3  | INSTITUTES OF HEALTH;
   | JAYANTA BHATTACHARYA, in his
4  | official capacity as Director of the National
   | Institutes of Health;
5  | INSTITUTE OF MUSEUM AND LIBRARY
   | SERVICES;
6  | KEITH SONDERLING, in his official
   | capacity as Acting Director of the Institute of
7  | Museum and Library Services;
   | UNITED STATES DEPARTMENT OF THE
8  | INTERIOR;
   | DOUG BURGUM, in his official capacity as
9  | Secretary of the Interior;
   | UNITED STATES DEPARTMENT OF
10 | STATE;
   | MARCO RUBIO, in his official capacity as
11 | Secretary of the U.S. Department of State;
   | DEPARTMENT OF TRANSPORTATION;
12 | SEAN DUFFY, in his official capacity as
   | Secretary for the U.S. Department of
13 | Transportation,

14 |                  Defendants.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION –
Case No. 3:25-cv-04737-RL

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................................1

ARGUMENT ...............................................................................................................................2

I.      THE COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIMS. ..............................2

        A.      The Tucker Act Does Not Deprive the Court of Jurisdiction. ...................................2

        B.      Plaintiffs Have Standing to Assert Their Claims. .....................................................5

                1.      Plaintiffs Have Demonstrated an Injury in Fact. ...........................................5

                2.      There Is a Causal Connection Between Defendants' Decision to
                        Terminate the Grants and Plaintiffs' Injuries. .................................................8

                3.      Plaintiffs' Injuries Will Be Redressed by a Favorable Decision....................9

                4.      Defendants' Conduct Threatens Plaintiffs with Future Harm.......................10

                5.      In the Alternative, Plaintiffs Have Third Party Standing. ............................10

II.     PLAINTIFFS CONSTITUTIONAL CLAIMS ARE LIKELY TO SUCCEED. .................11

        A.      Plaintiffs' Separation of Powers and Take Care Clause Claims Are
                Meritorious. ...........................................................................................................11

        B.      Plaintiffs' First Amendment Claims Are Meritorious...............................................12

        C.      Plaintiffs' Procedural Due Process Claims Are Meritorious. ..................................14

        D.      Plaintiffs' Void for Vagueness Claims Are Meritorious...........................................16

III.    PLAINTIFFS' APA CLAIMS ARE LIKELY TO SUCCEED. ..........................................17

        A.      Plaintiffs' Claims Challenge Final Agency Actions. ...............................................17

        B.      The Challenged Actions Are Not "Committed to Agency Discretion." ..................19

IV.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT
        DEFENDANTS VIOLATED STATUTORY AND REGULATORY
        AUTHORITY..........................................................................................................................20

        A.      The Grant Terminations Violate the Impoundment Control Act. ............................20

        B.      The Grant Terminations Violate the Agencies' Enabling Statutes. .........................21

        C.      The Grant Terminations Violate the Agencies' Own Regulations............................22

        D.      Defendants' Actions Were Arbitrary and Capricious. .............................................24

V.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR *ULTRA VIRES* CLAIMS. ........25

VI.     THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION ARE MET. .................26

    A.      Plaintiffs Have Shown Irreparable Injury. ...............................................................26

    B.      The Balance of Equities and Public Interest Fall Firmly in Favor of Issuing an Injunction..........................................................................................................28

    C.      The Scope of the Requested Injunction Is Appropriate. ..........................................29

VII.    DEFENDANTS' REQUEST FOR A STAY SHOULD BE DENIED, ANY BOND SHOULD BE NOMINAL, AND DECLARATIONS SHOULD BE REQUIRED.............30

CONCLUSION ..........................................................................................................................30

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

### FEDERAL CASES

4
5
*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013) ...........................................................................................................12, 13

6
*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
   766 F. Supp. 3d 74 (D.D.C. Feb. 13, 2025) ...............................................................................18

7
8
*Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*,
   No. CV 25-00400 (AHA), 2025 WL 752378 (D.D.C. Mar. 10, 2025)......................................27

9
10
*In re Aiken Cnty.*,
   725 F.3d 255 (D.C. Cir. 2013) ...................................................................................................12

11
*Am. Ass'n of Univ. Professors & Am. Fed'n of Tchrs. v. Dep't of Just.*,
   No. 25-cv-2429 (MKV), 2025 WL 1684817 (S.D.N.Y. June 16, 2025) ......................................7

12
13
*Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off of Pers. Mgmt.*,
   No. C 25-01780 WHA, 2025 WL 820782 (N.D. Cal. Mar. 14, 2025)........................................25

14
15
*Am. Pub. Health Ass'n v. Nat'l Inst. of Health*,
   No. cv 25-10787-WGY, 2025 WL 1548611 (D. Mass. May 30, 2025) ....................................24

16
*Ass'n of Am. Univs. v. Dept. of Energy*,
   No. 25-cv-10912-ADB, 2025 WL 1414135 (D. Mass. May 15, 2025) .....................................28

17
18
*Bennett v. Spear*,
   520 U.S. 154 (1997) ...................................................................................................................17

19
20
*Cent. Delta Water Agency v. United States*,
   306 F.3d 938 (9th Cir. 2002).......................................................................................................10

21
*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ...................................................................................................27

22
23
*City & Cnty. of S.F. v. Trump*,
   897 F.3d 1225 (9th Cir. 2018).........................................................................................11, 19, 22

24
25
*City of Arlington v. FCC*,
   569 U.S. 290 (2013) ...................................................................................................................22

26
*City of New Haven, Conn. v. United States*,
   809 F.2d 900 (D.C. Cir. 1987) ...................................................................................................21

27
28
*City of Providence v. Barr*,
   954 F.3d 23 (1st Cir. 2020) ........................................................................................................22

*Climate United Fund v. Citibank, N.A.*,
    No. 25-cv-698 (TSC), 2025 WL 1131412 (D.D.C. Apr. 16, 2025) ...........................................23

*Clinton v. City of N.Y.*,
    524 U.S. 417 (1998) (Kennedy, J., concurring) ........................................................................11

*Cobell v. Kempthorne*,
    455 F.3d 301 (D.C. Cir. 2006) ..................................................................................................18

*Cmty. Legal Servs. in East Palo Alto v. U.S. Dep't of Health and Human Servs.*,
    No. 25-cv-02847-AMO, 2025 WL 1168898 (N.D. Cal. Apr. 21, 2025), *aff'd*
    137 F.4th 932 (9th Cir. 2025).........................................................................................4, 5, 19, 29

*Cnty. of Santa Clara v. Trump*,
    275 F. Supp. 3d 1196 (N.D. Cal. 2017) *aff'd in part, vacated in part, remanded*
    *sub nom. City & Cnty. of S.F.*, 897 F.3d 1225 ..........................................................................15

*Craig v. Boren*,
    429 U.S. 190 (1976) ....................................................................................................................11

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ........................................................................................................19, 20, 24

*Dep't of Educ. v. Cal.*,
    145 S. Ct. 966 (2025) ...........................................................................................................3, 4, 29

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ..................................................................................................................24, 25

*Doe #1 v. Trump*,
    957 F.3d 1050 (9th Cir. 2020)....................................................................................................29

*Drs. for Am. v. Off. of Pers. Mgmt.*,
    766 F. Supp. 3d 39 (D.D.C. 2025) .............................................................................................18

*E.V. v. Robinson*,
    906 F.3d 1082 (9th Cir. 2018)....................................................................................................25

*Edwards v. Aurora Loan Servs., LLC*,
    791 F. Supp. 2d 144 (D.D.C. 2011) .............................................................................................8

*Enstrom v. Regents of the Univ. of Cal.*,
    No. CV 12-5168-JGB (SSX), 2013 WL 11238482 (C.D. Cal. Mar. 18, 2013)....................6, 15

*FCC v. NextWave Pers. Commc'ns Inc.*,
    537 U.S. 293 (2003) ..............................................................................................................20, 21

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ......................................................................................................................6

*FDIC v. Mallen*,
    486 U.S. 230 (1988) .................................................................................................................5

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
    82 F.4th 664 (9th Cir. 2023)...................................................................................................28

*Franklin v. Mass.*,
    505 U.S. 788 (1992) ...............................................................................................................18

*Gen. Land Off. v. Biden*,
    722 F. Supp.3d 710 (S.D. Tex. 2024) ....................................................................................20

*In re Google Referrer Header Priv. Litig.*,
    465 F. Supp. 3d 999 (N.D. Cal. 2020) .....................................................................................6

*Hubbard v. City of San Diego*,
    No. 24-4613, 2025 WL 1572736 (9th Cir. June 4, 2025) ......................................................28

*Idaho Anti-Trafficking Coal. v. Somerton*,
    No. 1:24-cv-00526-REP, 2025 WL 673928 (D. Idaho Mar. 3, 2025) ....................................15

*Khalil v. Trump*,
    No. 25-cv-01963 (MEF)(MAH), 2025 WL 1649197 (D.N.J. June 11, 2025) ..........................27

*Klamath Water Users Prot. Ass'n v. Patterson*,
    204 F.3d 1207 (9th Cir. 1999)..................................................................................................8

*Koala v. Khosla*,
    931 F.3d 887 (9th Cir. 2019)..................................................................................................14

*Krottner v. Starbucks Corp.*,
    628 F.3d 1139 (9th Cir. 2010).................................................................................................10

*Legal Servs. Corp. v. Velazquez*,
    531 U.S. 533 (2001) ...............................................................................................................13

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ...............................................................................................................19

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ..........................................................................................................5, 8, 9

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ..........................................................................................................17, 18

*Maher v. United States*,
    314 F.3d 600 (Fed. Cir. 2002)..................................................................................................8

*Martin Luther King, Jr. Cnty.*,
    No. 2:25-cv-01824-JST, 2025 WL 1582368 (W.D. Wash. June 3, 2025)..........................22, 23

*Maryland v. Corp. for Nat'l & Cmty. Serv.*,
   No. CV DLB-25-1363, 2025 WL 1585051 (D. Md. June 5, 2025) ............................................3

*Mass. v. Nat'l Institutes of Health*,
   No. 25-cv-10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025)...................................................28

*Masvidal v. U.S. Dep't of Just.*,
   716 F. Supp. 2d 1207 (S.D. Fla. 2010)........................................................................................5

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982) ...................................................................................................2

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012)....................................................................................................27

*Metro. Transp. Auth. v. Duffy*,
   No. 25-cv-1413 (LJL), 2025 WL 1513369 (S.D.N.Y. May 28, 2025) ...............................23, 24

*Michigan v. EPA*,
   576 U.S. 743 (2015) .................................................................................................................24

*Milk Train Inc. v. Veneman*,
   310 F.3d 747 (D.C. Cir. 2002) .................................................................................................19

*NAACP v. U.S. Dep't of Educ.*,
   No. 25-CV-1120 (DLF), 2025 WL 1196212 (D.D.C. Apr. 24, 2025) ......................................16

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
   767 F. Supp. 3d 243 (D. Md. 2025) ..........................................................................................16

*NEA v. Finley*,
   524 U.S. 569 (1998) ......................................................................................................14, 16, 17

*NEA v. U.S. Dep't of Educ.*,
   No. 25-cv-091-LM, 2025 WL 1188160 (D.N.H. Apr. 24, 2025) ..............................................16

*New York v. McMahon*,
   No. cv 25-10601-MJJ, 2025 WL 1463009 (D. Mass. May 22, 2025) ......................................28

*New York v. Trump*,
   133 F.4th 51 (1st Cir. 2025) .....................................................................................................18

*New York v. Trump*,
   764 F. Supp. 3d 46 (D.R.I. 2025).............................................................................................12

*New York v. Trump*,
   No. 25-cv-39-JJM-PAS, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ..........................21, 22, 28, 29

*Newsom v. Trump*,
   No. 25-cv-04870-CRB, 2025 WL 1663345 (N.D. Cal. June 12, 2025).....................................30

*Nken v. Holder*,
   556 U.S. 418 (2009) ...............................................................................................30

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ...................................................................................17, 18, 19

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
   465 F.3d 977 (9th Cir. 2006).................................................................................17

*Orff v. United States*,
   358 F.3d 1137 (9th Cir. 2004).................................................................................8

*Pacito v. Trump*,
   No. 2:25-cv-255-JNW, 2025 WL 893530 (W.D. Wash. Mar. 24, 2025)....................3

*Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R.*,
   906 F.2d 25 (1st Cir. 1990) .....................................................................................6

*Rent-a-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
   944 F.2d 597 (9th Cir. 1991)..................................................................................27

*Rhode Island v. Trump*,
   No. 1:25-cv-128-JJM-LDA, 2025 WL 1303868 (D.R.I. May 6, 2025)....................12

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
   102 F.3d 12 (1st Cir. 1996) (cited at Opp'n )........................................................27

*S.F. A.I.D.S. Found. v. Trump*,
   No. 25-cv-01824-JST, 2025 WL 1621636 (N.D. Cal. June 9, 2025) .......................4, 13, 16, 29

*Safari Club Int'l v. Jewell*,
   842 F.3d 1280 (D.C. Cir. 2016) .............................................................................17

*Santa Cruz Lesbian and Gay Community Center v. Trump*,
   508 F. Supp. 3d 521 (N.D. Cal. 2020) ........................................................13, 14, 16

*Sardarian v. Fed. Emergency Mgmt. Agency*,
   No. 3:19-cv-00910 (OAW), 2022 WL 4080325 (D. Conn. Apr. 1, 2022)..............7, 8

*Singleton v. Wulff*,
   428 U.S. 106 (1976) ...............................................................................................11

*Tennessee v. Becerra*,
   131 F.4th 350 (6th Cir. 2025)................................................................................25

*United Aeronautical Corp. v. U.S. Air Force*,
   80 F.4th 1017 (9th Cir. 2023)..................................................................................2

*United States v. Briggs*,
   514 F.2d 794 (5th Cir. 1975)....................................................................................5

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
   587 F.3d 464 (1st Cir. 2009) ................................................................................27

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) .............................................................................................27

*Washington v. Trump*,
   768 F. Supp. 3d 1239 (W.D. Wash. 2025) ............................................................11

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
   No. 1:25-cv-00097-MSM-PAS, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) .............4, 27, 28, 29

## FEDERAL STATUTES

2 U.S.C.
   § 182.650............................................................................................................15

5 U.S.C.
   § 551(4) .............................................................................................................18
   § 701(a)(2)..........................................................................................................19
   § 706(2)(A)..........................................................................................................20

20 U.S.C.
   § 954(d)(1)...........................................................................................................16

31 U.S.C.
   § 6303 .................................................................................................................3
   § 6304 .................................................................................................................3

42 U.S.C.
   § 1873(e)(2), (4) ..................................................................................................20

Administrative Procedure Act ........................................................................... *passim*

Impoundment Control Act ...............................................................................12, 20, 21

National Foundation on the Arts and Humanities Act ...................................................16

Tucker Act.................................................................................................2, 3, 4, 5, 15, 26

## FEDERAL RULES AND REGULATIONS

2 C.F.R.
   § 1.105(b) ............................................................................................................23
   § 200.340............................................................................................22, 23, 24, 25
   § 200.340(a)(4).....................................................................................................12, 23

89 Fed. Reg. 30,046, 30,089 (Apr. 22, 2024)................................................................23, 24

Federal Rule of Civil Procedure 65(c) ............................................................................30

**CONSTITUTIONAL AUTHORITIES**

U.S. Const. Article I ..................................................................................................11

U.S. Const. Article III ..............................................................................1, 2, 5, 6, 8, 9, 10

**EXECUTIVE ORDERS**

EO 14151 ....................................................................................................................1

EO 14168 .................................................................................................................1, 14

EO 14173 ....................................................................................................................1

**OTHER AUTHORITIES**

*Definitions of Categories of Personnel*, Nat'l Sci. Found.,
   https://www.nsf.gov/policies/pappg/24-1/ch-2-exhibit-3 ...........................................6

*EPA Grants Community Library of FAQ*, https://www.epa.gov/grants/epa-grants-
   community-library-frequently-asked-questions-faq.....................................................6

*EPA Implementation Plan for Policy on Multiple Principal Investigators for
   Federally Funded Research Projects* (Feb. 26, 2008),
   https://www.epa.gov/sites/default/files/2015-
   05/documents/multiple_pi_implementation_plan_final.pdf (also available at
   https://www.epa.gov/research-grants/research-grants-guidance-and-policies-
   resources) .............................................................................................................6

https://grant-watch.us/ ...............................................................................................10

https://www.nytimes.com/2025/06/16/us/politics/trump-nih-grants-cut.html ..................1

*Massachusetts v. Robert F. Kennedy, Jr.*,
   No. 1:25-cv-10814-WGY (D. Mass.)........................................................................1

Preliminary Injunction Order, *Ass'n of Am. Univs. v. Dep't of Energy*,
   No. 1:25-cv-10912-ADB (D. Mass. May 15, 2025) ...................................................7

*Public Humanities Projects F.A.Qs.*, Nat'l Endow. Hums.,
   https://www.neh.gov/sites/default/files/inline-
   files/Public%20Humanities%20Projects%20FAQs.pdf .............................................6

*Weekly Terminated NIH Grants Report* (June 10, 2025), https://grant-
   watch.us/docs/2025-06-10_weekly_report_confirmed_term.pdf ...............................10

**INTRODUCTION**[1]

This case raises the profoundly important issue of whether a president can by executive fiat cut off funds appropriated by Congress, acting without legal authority and in violation of the Constitution, the U.S. Code, and federal regulations. With facts this damning, it is unsurprising that Defendants' counter is wholly procedural.

Defendants assert that grant termination cases are non-justiciable under Article III, and further, that Plaintiffs in the UC system who have suffered concrete financial and other professional harms lack standing. In so doing, they propose that the President, his appointees, and the agencies they run are entirely above the law. The Court cannot and should not accept these extreme positions, which carry enormous implications not only for present and future of scientific and other academic research, but also for the constitutional order on which free inquiry depends. This Court should join the swelling chorus of courts around the country that have repeatedly rejected identical defense arguments.

Notably, Defendants do not deny that they committed the wrongful acts alleged in Plaintiffs' Complaint, nor do they deny their impacts. Defendants do not contest that grant termination has harmed the livelihood of the faculty, staff, and student employees engaged in research, and compromises the future of this country's scientific and academic progress. Defendants' failure to dispute those facts is telling, and dispositive.

Defendants' grant termination regime violates the Constitution, federal statutes, and federal grant regulations. It must be called out as the power grab it is. As Judge Young stated from the bench in *Massachusetts v. Robert F. Kennedy, Jr.*,[2] in striking as "void and illegal" federal grant terminations made pursuant to three executive orders: "This represents racial discrimination and discrimination against America's L.G.B.T.Q. community. That's what this is."[3] The Court should

---

[1] This Reply supports Plaintiffs original motion, styled as one for a Temporary Restraining Order, following the Court's request to treat the motion as one for a Preliminary Injunction. Mot. for TRO (June 5, 2025), ECF No. 7 ("TRO Mot.").

[2] No. 1:25-cv-10814-WGY (D. Mass.).

[3] *See* https://www.nytimes.com/2025/06/16/us/politics/trump-nih-grants-cut.html. The three Executive Orders at issue in both *Massachusetts* and this case are EO 14151 (the DEI Order), EO 14168 (the Gender Order), and EO 14173 (the Discrimination Order).

1  be similarly forthright here in naming and condemning Defendants' abuse of power; finding the

2  Plaintiffs likely to succeed on the merits of their claims; issuing a preliminary injunction; and

3  requiring no or a nominal bond.

**ARGUMENT**

4

5  **I.    THE COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIMS.**

6        **A.    The Tucker Act Does Not Deprive the Court of Jurisdiction.**

7        This case belongs in federal district court. Defendants' present Opposition is just the latest

8  in the government's unsuccessful attempts to assert that the Tucker Act deprives Article III Courts

9  jurisdiction to hear constitutional, *ultra vires*, and Administrative Procedure Act ("APA") claims

10  challenging the termination of grants by speciously mischaracterizing Plaintiffs' claims as

11  contractual. But Plaintiffs allege no breach of any contractual provision nor do they seek contract

12  (or any other) damages. Instead, they seek declaratory and injunctive relief finding that

13  Defendants' actions are unconstitutional and violative of federal statutes and regulations. Under

14  Ninth Circuit law, as well as the persuasive authority of many other courts across the country, this

15  court should reject Defendant's theory and find that it has jurisdiction to hear Plaintiffs' claims.

16        "[T]he mere fact that a court may . . . rule on a contract issue does not . . . automatically

17  transform an action . . . into one on the contract and deprive the court of jurisdiction it might

18  otherwise have" pursuant to the Tucker Act. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C.

19  Cir. 1982). The Tucker Act's jurisdictional hook applies only when a claim is "at its essence" a

20  contract claim. *Id*. at 967. To determine the essence of an action, courts look at (1) the source of

21  the rights on which the plaintiff bases its claims and (2) the type of relief sought. *See United*

22  *Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023). "If rights and remedies

23  are *statutorily* or *constitutionally* based, then district courts have jurisdiction; if rights and

24  remedies are *contractually* based then only the Court of Federal Claims does, even if the plaintiff

25  formally seeks injunctive relief." *Id*. (emphasis in original).

26        Defendants argue that "the source of the rights Plaintiffs assert are the grant agreements

27  themselves," based only on the assertion that the claims "allege[] terminations of contracts."

28  Opp'n at 15:12-17 (June 12, 2025), ECF 35 ("Opp'n"). This oversimplifies Plaintiffs' action, and

it conflates a "source of rights" with an "allegation." Though Plaintiffs' Complaint "alleges" that the grants were terminated, those grants and their provisions are not the source of rights undergirding their claims. The Complaint's charging paragraphs make explicit that the sources of rights are the Constitution, the APA, the statutes passed by Congress to distribute appropriated funds, and federal regulations, rather than any specific grant agreement. *See* Compl. at ¶¶ 433-465 (June 4, 2025), ECF No. 1 ("Compl."). Even assuming it were true that the claims themselves "allege[] terminations of contracts" (*see* Opp'n at 15), it is irrelevant to the Tucker Act analysis where, as here, the claims are founded upon a violation of constitutional and statutory rights, rather than breach of a contractual provision. In another case involving federal grants, a district court recently explained that "[t]he grant terms are simply not relevant to this case at all," because the case "challenge[s] whether the agency action here was unlawful, irrespective of any breach." *Maryland v. Corp. for Nat'l & Cmty. Serv.*, No. CV DLB-25-1363, 2025 WL 1585051, at *23 (D. Md. June 5, 2025) (citation omitted). That is the case here.

More fundamentally, the grants are not "contracts" under the terms of the Tucker Act. The Act requires that the grants "give the contracting parties a substantive right to recover damages in the event of a breach," which Defendants do not show here. *Pacito v. Trump*, No. 2:25-cv-255-JNW, 2025 WL 893530, at *4 (W.D. Wash. Mar. 24, 2025). Contracts under Tucker must also provide "a 'direct' and 'tangible' benefit on the United States." *Id.* at *4 (citation omitted). But as defined, grants merely "*carry out a public purpose*" (31 U.S.C. Section 6304, emphasis added), whereas contracts permit the government to "acquire . . . property or services *for the direct benefit or use of the United States Government*" (31 U.S.C. Section 6303 (emphasis added)).

Defendants then claim that "[t]he relief prong of the test weighs sharply against jurisdiction," without explaining how the Complaint's Prayer, which seeks only injunctive and declaratory relief while making no claim for monetary damages, could support a finding that the claims seek contract-related damages. Opp'n at 16:3-4. The Opposition relies on *Department of Education v. California*, a March 2025 emergency (*i.e.* "shadow") docket Supreme Court decision that granted a stay while opining that the district court "likely" lacked jurisdiction over an APA claim alone. 145 S. Ct. 966 (2025). As it has been repeated in other recent cases, "[t]he

1    Government overreads the three-page stay order." *Woonasquatucket River Watershed Council v.*

2    *U.S. Dep't of Agric.*, No. 1:25-cv-00097-MSM-PAS, 2025 WL 1116157, at *14-15 (D.R.I. Apr.

3    15, 2025) (rejecting defendants' reliance on *California*). First, the Supreme Court did not address

4    whether constitutional claims, like Plaintiffs', might be subject to the Tucker Act. *See generally*

5    *California*, 145 S. Ct. 966. And even while granting the stay, the Court still reaffirmed the general

6    rule that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside

7    an agency's action may result in the disbursement of funds." *Id.* at 968.

8         The Opposition fails to address the numerous courts, including courts in the Ninth Circuit

9    and Northern District of California, that have found *California* inapplicable and non-precedential

10   when faced with the same argument and circumstances. *See*, *e.g.*, *Cmty. Legal Servs. in East Palo*

11   *Alto v. U.S. Dep't of Health and Human Servs.*, No. 25-cv-02847-AMO, 2025 WL 1168898, at *3

12   (N.D. Cal. Apr. 21, 2025), *aff'd* 137 F.4th 932, 939 (9th Cir. 2025) ("Department of Education has

13   no application where, as here, the claims sound in statute, rather than contract"); *S.F. A.I.D.S.*

14   *Found. v. Trump*, No. 25-cv-01824-JST, 2025 WL 1621636 at *11-12 (N.D. Cal. June 9, 2025)

15   (granting TRO and retaining jurisdiction over Tucker Act argument where claims arose under the

16   First and Fifth Amendments, the Spending Clause, and the Separation of Powers; "[t]hese are not

17   breach of contract claims just because they 'requir[e] some reference to or incorporation of a

18   contract.'" (citation omitted)).[4] Despite the centrality of *California* to Defendants' arguments, the

19   Opposition acknowledges the Supreme Court issued only a stay, and found jurisdiction "likely

20   precluded" without actually divesting the district court of its jurisdiction. *See* Opp'n at 16:10-11.

21        Finally, the Opposition has an internal contradiction. On the one hand, according to

22   Defendants, Plaintiffs are required to litigate their "breach of contract" claims in the Court of

23   Federal Claims, while on the other hand, they are "**Not Parties to Any Terminated Contract**".

24   *See* Opp'n at 17:27 (emphasis in original). This contradiction dooms Defendants' Tucker Act

25   theory. *California* has no application where "Plaintiffs have no contract with the government"

26

27   ―――――――――――――
     [4]  *See also Woonasquatucket*, *supra* at *14 ("Since the Court finds that the proper source of the

28   Nonprofits' rights is federal statute and regulations and because the relief sought is injunctive in
     nature, the Court determines that the 'essence' of the action is not contractual in nature.").

1  because those plaintiffs "have no right to sue under the Tucker Act, and the Court of Federal

2  Claims has no jurisdiction to hear their suit." *Cmty. Legal Servs.*, 137 F.4th at 938.

3  ### B.        Plaintiffs Have Standing to Assert Their Claims.

4       Plaintiffs, who are the principal researchers named on the grants at issue and whose

5  livelihoods and professional reputations depend on their ability to carry out their work, were

6  immediately harmed when Defendants unlawfully terminated the grants. Plaintiffs seek not an

7  enforcement of a contract, but a return to procedures that comply with the Constitution and APA.

8  Plaintiffs are not seeking to enforce the rights of others but to remedy their own concrete harm.

9  Instead of engaging with these facts, Defendants present a misleading discussion of third party

10 standing without ever explaining *why* Plaintiffs lack Article III standing under the straightforward

11 inquiry Defendants agree applies. To show standing, Plaintiffs must demonstrate (1) an "injury in

12 fact;" (2) a "causal connection between the injury and the conduct complained of;" and (3) that it

13 is likely that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*,

14 504 U.S. 555, 560-61 (1992) (quotations omitted). Plaintiffs easily meet this standard.

15 ### 1.        Plaintiffs Have Demonstrated an Injury in Fact.

16      Plaintiffs suffered an injury in fact, which requires both a "cognizable interest" and that

17 "the party seeking review be himself among the injured." *Lujan*, 504 U.S. at 563 (citation

18 omitted). Plaintiffs have a clear, legally protected interest in the restoration of the grants because

19 the grants' termination impedes Plaintiffs' ability to work and advance in their profession. "The

20 Supreme Court has made clear that a plaintiff can have a constitutionally protected interest in his

21 professional practice." *Masvidal v. U.S. Dep't of Just.,* 716 F. Supp. 2d 1207, 1212 (S.D. Fla.

22 2010) (citing *FDIC v. Mallen*, 486 U.S. 230, 240 (1988)); *see also United States v. Briggs*, 514

23 F.2d 794, 797 (5th Cir. 1975) (recognizing a "legally cognizable interest[]" in "good names and

24 reputations and impairment of [] ability to obtain employment").

25      Contrary to Defendants' arguments, this is true regardless of whether Plaintiffs were

26 parties to the grant agreements.[5] As one district court has concluded, "just because 'funding

27

28 _____

[5] This action does not seek enforcement of a contract (as Defendants argue). But even if it did,

awards are made to the University' does not necessarily mean that Plaintiff, as Principal

Investigator, does not have a property interest in the award." *See Enstrom v. Regents of the Univ.*

*of Cal.*, No. CV 12-5168-JGB (SSX), 2013 WL 11238482, at *11 (C.D. Cal. Mar. 18, 2013)

(citation omitted). This makes sense: Plaintiffs are part-and-parcel with their grants. They prepared

the projects that the grants will fund, worked with the universities to submit the grants, are named

in the grant applications, and are responsible for "proper conduct of the research, including the

appropriate use of funds."[6] *See* Philliou Decl. at ¶ 13, Ex. B (ECF No. 8) ("Philliou Decl."); Alex

Decl. at ¶¶ 13-16, Ex. B (ECF No. 9) ("Alex Decl."); Thakur Decl. at ¶¶ 9-10, Ex. B (ECF No. 10)

("Thakur Decl."); Green Nylen Decl. at ¶¶ 8-11, Ex. B, ¶¶ 25-27, Ex. I (ECF No. 11) ("Green

Nylen Decl."); Foreman Decl. at ¶ 8, Ex. A, ¶ 24, Ex. C, ¶ 36, Ex. E (ECF No. 12) ("Foreman

Decl."); Hirst Decl. at ¶ 24, Ex. B (ECF No. 13) ("Hirst Decl.") (all describing Plaintiffs'

development of grant projects and applications). When funding grants, Defendants approve the

principal researchers (*i.e.*, Plaintiffs), communicate directly with them, and require notification if

the researcher plans to leave the university.[7] Plaintiffs have a clear interest in the grant funding.

---

Article III standing is not exclusionary, and "breach of a contractual right is [simply one type of] concrete injury." *In re Google Referrer Header Priv. Litig.*, 465 F. Supp. 3d 999, 1011 (N.D. Cal. 2020). The fact that one group of plaintiffs may have standing would not prevent another group from also having standing, because the same government action can harm multiple plaintiffs in different ways. Nor is every plaintiff with standing required to participate in a lawsuit. *See, e.g., FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393-94 (2024) ("organizations may have standing 'to sue on their own behalf for injuries they have sustained'" independent of individual plaintiffs so long as they "satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." (citation omitted)); *Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R.*, 906 F.2d 25, 35 (1st Cir. 1990) (rejecting argument that individual cable operators must participate in suit alongside the cable operator association).

[6] *EPA Implementation Plan for Policy on Multiple Principal Investigators for Federally Funded Research Projects* (Feb. 26, 2008), https://www.epa.gov/sites/default/files/2015-05/documents/multiple_pi_implementation_plan_final.pdf (also available at https://www.epa.gov/research-grants/research-grants-guidance-and-policies-resources) (EPA definition of principal investigator); *accord Definitions of Categories of Personnel*, Nat'l Sci. Found., https://www.nsf.gov/policies/pappg/24-1/ch-2-exhibit-3 (NSF definition of principal investigator); *Public Humanities Projects F.A.Qs.*, Nat'l Endow. Hums., https://www.neh.gov/sites/default/files/inline-files/Public%20Humanities%20Projects%20FAQs.pdf ("The project director is the person directly in charge of the conduct of the funded project.").

[7] *See id.*; *see also EPA Grants Community Library of FAQ*, https://www.epa.gov/grants/epa-

Plaintiffs have also demonstrated concrete and actual harm resulting from the "invasion" of their interest in the grants. *See*, e.g., Philliou Decl. at ¶¶ 29-32 (explaining she cannot "continue [her] work"); Alex Decl. at ¶ 27 (explaining he has been "unable to proceed with [] basic work"); Thakur Decl. at ¶ 25 (explaining she has been "unable to complete" her work, which includes "identify[ing] promising health-protecting strategies"); Green Nylen Decl. at ¶ 41 (explaining she has been "unable to proceed with [] basic work" on two grants, and that the "job of every member of [the] team… is currently threatened by these grant terminations); Foreman Decl. at ¶¶ 62-70 (explaining terminations "have compromised our ability to carry out our public service mission"); Hirst Decl. at ¶ 39 (describing inability to "retain [] highly trained and experienced staff" and "cutbacks in [] work plans"). Defendants do not attempt to explain why these particularized harms would not constitute an injury in fact.[8]

Plaintiffs need not show they are parties or third party beneficiaries of the grant contracts. As described in Section I.A., this is not a contract case. *See* Preliminary Injunction Order at 16 n.1, *Ass'n of Am. Univ. v. Dep't of Energy*, No. 1:25-cv-10912-ADB (D. Mass. May 15, 2025), ECF No. 62 (rejecting Government's "contention that this is an action seeking to compel the government to specifically perform a contract."). But even if third party beneficiary status were required, the cases Defendants cite are all markedly different than the situation here.[9] In those

grants-community-library-frequently-asked-questions-faq ("What is the definition of 'key personnel'? How can we get pre-approval of a change if the employee gives 2 weeks notice (or less) before leaving?").

[8] Plaintiffs will be prepared to address the Southern District of New York decision, attached to Defendants' Statement of Recent Decision, at the hearing. *See Am. Ass'n of Univ. Professors & Am. Fed'n of Tchrs. v. Dep't of Just.*, No. 25-cv-2429 (MKV), 2025 WL 1684917 (S.D.N.Y. June 16, 2025) ("*AAUP*"); ECF No. 39. The facts in this case are far different. Here, Plaintiffs' "core business" is the research work that Defendants have terminated, not labor unionization, and unlike the *AAUP* plaintiffs, they have suffered concrete and actual injury to that "core business" pursuit. *Id.* at *12. The injury alleged by the *AAUP* Plaintiffs was "a 'setback' to the AAUP's interest in academic freedom" (*id.* at *12); Plaintiffs injury here is the devastating and irreplaceably lost work that Plaintiffs have undertaken personally in reliance on the grants. Thus, Plaintiffs are not simply "inserting themselves into a quarrel between the Executive Branch and non-party Columbia, which, Plaintiffs' own submissions make clear, Columbia wishes to resolve cooperatively." *Id.* at *11. They bring suit to protect their own critical interests, and thus have standing.

[9] Defendants make much of *Sardarian v. Fed. Emergency Mgmt. Agency*, No. 3:19-cv-00910

cases, members of the broader public who expected downstream benefits from government contracts asserted third party beneficiary status—a far cry from researchers who prepared and are named in the grant awards and execute the work that the grants fund. *See, e.g.*, *Klamath Water Users Prot. Ass'n v. Patterson*, 204 F.3d 1207, 1211-12 (9th Cir. 1999) (government contract "to protect the irrigation" of land did not create obligation to "every domestic, municipal, or irrigation water user"); *Orff v. United States*, 358 F.3d 1137, 1145 (9th Cir. 2004) (generalized references to "water users" in Federal water allocation contract did not empower all water users to sue); *Edwards v. Aurora Loan Servs., LLC*, 791 F. Supp. 2d 144, 150-51 (D.D.C. 2011) (not enough that government entered contract "as a means of assisting distressed homeowners"); *Maher v. United States*, 314 F.3d 600, 604 (Fed. Cir. 2002) (no standing where plaintiffs argued government breach caused company to become insolvent, which caused company to terminate plaintiffs). Defendants entered into the grant agreements *on the condition* that Plaintiffs, named in the grant applications, would carry out the research projects. The Court thus could find that Plaintiffs have third party beneficiary status as the intended beneficiaries of the grant agreements.

Plaintiffs have adequately alleged an injury in fact. Unlike the attenuated harm in Defendants' cited cases, Plaintiffs are the direct "object of the [government] action…at issue," thereby establishing standing. *Lujan*, 504 U.S. at 560-61.

### 2. There Is a Causal Connection Between Defendants' Decision to Terminate the Grants and Plaintiffs' Injuries.

Under the second element of Article III standing, there can be no question that there is a "causal connection" between Defendants' termination of the grants and Plaintiffs' harm. There are no other links in the causation chain: Defendants terminated the funding for Plaintiffs' research, and Plaintiffs' livelihoods began to suffer. Plaintiffs' injury is directly "traceable to the challenged

---

(OAW), 2022 WL 4080325 (D. Conn. Apr. 1, 2022), in which an "American expatriate" erroneously referred to a FEMA grant awarded to a town in which he had a house as "*his* grant." *Id.* at *2. The circumstances are entirely different than those here, where research grants were awarded for projects developed by specific researchers. Moreover, the pro se plaintiff in *Sardarian* sought a "monetary judgment against the federal government" (*id.* at *3), and seemed to be disputing the *amount* of funding awarded. *Id.* at *2 ("[P]laintiff asserts…Defendants misled him about *his* grant award limit.").

1    action of the defendant." *Lujan*, 504 U.S. at 560 (citation omitted).

2        In a convoluted discussion, Defendants claim there is no causal connection between their

3    decision to terminate the grants and Plaintiffs' injuries because the "choices" of the universities

4    "interrupt any link between the challenged actions and the alleged harms." Opp'n at 24:24-27. For

5    Plaintiffs "to suffer a tangible harm, [their] employer must choose not to provide [their]

6    funding."[10] *Id.* This makes no sense. The universities made no choices, only Defendants did.

7    Defendants knew their conduct would directly and specifically harm *Plaintiffs*, because Plaintiffs

8    were named in the grant applications that Defendants unilaterally terminated. Philliou Decl. Ex. E

9    at 2 (NEH letter terminating "Grant Application No. RZ29265023"); *id.* Ex. C at 2 (NEH award

10   letter for same grant, noting the award was sent directly to UC researcher); Thakur Decl. Ex. G

11   (EPA letter terminating grant, copying UC researcher); Foreman Decl. Ex. H at 2 (NSF letter

12   terminating Grant 2314075); *id.* Ex. B at 3-4 (NSF letter awarding same grant, listing three UC

13   researchers). There is a clear causal connection between Defendants' conduct and Plaintiffs' harm.

14               **3.    Plaintiffs' Injuries Will Be Redressed by a Favorable Decision.**

15       Plaintiffs meet the final element of Article III standing: their injuries will be redressed by a

16   favorable decision from this Court. This is straightforward. Plaintiffs' injuries resulted from

17   Defendants' decision to terminate the grants, so a court order enjoining Defendants from

18   unlawfully terminating the grants would solve Plaintiffs' problem. A favorable decision would

19   allow Plaintiffs to resume their professional activities.

20       In opposition, Defendants once again argue that Plaintiffs' injury "results from the

21   independent action of" the universities, so the Court cannot redress it. Opp'n at 23:12-15.

22   Defendants claim that redressability depends on "guesswork" as to how the universities would

23   "exercise their judgment." *Id.* It is unclear what judgment the universities could exercise. The

24   terminated grants are for Plaintiffs' projects, to be conducted by Plaintiffs *as named in the grant*

25

---

26   [10]  Defendants misquote Plaintiff Philliou's declaration, implying the UC System is considering
     providing replacement funds. Opp'n at 24:16-18 (citing Philliou Decl. at ¶ 30). The declaration
27   does not mention the UC System, and instead explains why replacement funding is not a viable
     alternative, because *even if* Philliou *herself* could find replacement funding, there would still be
28   resulting harm.

*applications*. If the grants were restored, the universities would not have discretion to use the grant in some other fashion, and there is no reason to believe that the University of California would not want the funding to resume. A favorable decision would thus redress Plaintiffs' injuries.

### 4.    Defendants' Conduct Threatens Plaintiffs with Future Harm.

In addition to the restoration of their illegally terminated grants, Plaintiffs seek to prevent Defendants from continuing to engage in the same pattern of illegal terminations with respect to any other grants of UC researchers. Plaintiffs' allegations of future harm are not speculative. The Federal government has publicly indicated its intent to terminate more grants in the same illegal manner. Compl. ¶¶ 258, 415. Defendants have announced plans "to go after [the UC system] where it hurts them financially" in more ways, and have taken such action against other academic institutions. Compl. ¶ 430. Further, as the weekly reports from Grant Watch[11] indicate, grant terminations are ongoing and proceeding apace. *See Weekly Terminated NIH Grants Report* (June 10, 2025)[12] (indicating sixteen NIH grants were terminated last week). It is well-established that "threatened injury constitutes 'injury in fact.'" *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1142 (9th Cir. 2010) (citing *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002)). Plaintiffs have sufficiently alleged that they face "a credible threat of [future] harm" from Defendants. *Krottner*, 628 F.3d at 1143.

### 5.    In the Alternative, Plaintiffs Have Third Party Standing.

In sum, Plaintiffs have demonstrated Article III standing. If the Court disagrees, however, there is a strong basis to conclude Plaintiffs have third party standing given their "close relationship" with the university named on the grant award. Defendants argue no such close relationship exists because the "mere status of being an employee or researcher at an institution" is insufficient. Opp'n at 21:25-26. But—with regard to the awarded grants—Plaintiffs are hardly "mere employees." Plaintiffs play the essential role in the grant funding process, and are part-and-

---

[11]  Grant Watch is a newly launched database tracking the terminations of research grants from the National Institutes of Health (NIH) and the National Science Foundation (NSF). https://grant-watch.us/.

[12]  https://grant-watch.us/docs/2025-06-10_weekly_report_confirmed_term.pdf.

parcel of the grant awards. Without Plaintiffs, the universities would not have these grants. Further, third party standing is appropriate because the University is hindered from protecting its own interests given the high likelihood of retaliation by the Federal government. *See* Compl. ¶ 430 (describing Defendant Trump's threats against the UC system); *Washington v. Trump*, 768 F. Supp. 3d 1239, 1258 (W.D. Wash. 2025) (finding third party standing where non-party faced "fear of retaliation from the federal government"). Quite importantly, the Supreme Court repeatedly has made clear that third party standing exists when there is a substantial identity of interest between the plaintiffs and the injured third party. *Singleton v. Wulff*, 428 U.S. 106, 117-18 (1976); *Craig v. Boren*, 429 U.S. 190, 195 (1976). That is the case here.

## II.    PLAINTIFFS CONSTITUTIONAL CLAIMS ARE LIKELY TO SUCCEED.

### A.    Plaintiffs' Separation of Powers and Take Care Clause Claims Are Meritorious.

Under the Constitution, Congress has the spending power. U.S. Const. art. I. The President can veto spending bills. But once a spending bill is adopted into law, that President does not get an unreviewable veto by refusing to spend money appropriated by Congress, nor does the executive branch have the power to unilaterally enact, amend, or repeal parts of duly enacted statutes, including spending statutes. *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, [an agency] may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals . . . [without] violat[ing] the constitutional principle of the Separation of Powers."). When the executive branch exercises power that belongs to Congress, the Separation of Powers is violated. *See Clinton v. City of N.Y.*, 524 U.S. 417, 451 (1998) (Kennedy, J., concurring) (where the "decision to spend [is] determined by the Executive alone, without adequate control by … Congress, liberty is threatened"). The Motion establishes that this is precisely what Defendants seek to do. *See* Mot. at 35-38.

The Opposition does not respond to Plaintiffs arguments or authority here. *See* Opp'n at 41-42. Instead, Defendants take the remarkable position—*without any authoritative support*—that neither the Spending Clause, Appropriations Clause, or even Congress's appropriation statutes, require agencies to continue to fund the terminated grant agreements. *Id*. The implication of

1   Defendants' position is dire: that the President and his agencies can override Congress's

2   constitutional spending power by simply invoking a subdivision of a non-binding Federal

3   regulation. *See id*. at 42 (arguing that agencies can override congressionally mandated grant

4   programs based on 2 C.F.R. § 200.340(a)(4)). That is not how the Constitution works. Rather, if

5   the President and his appointees "want[] to spend less than the full amount appropriated by

6   Congress," they "must propose the rescission of funds [under the ICA], and Congress then may

7   decide whether to approve a rescission bill"; the Executive Branch "does not have unilateral

8   authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

9       Finally, Defendants assert this Court lacks jurisdiction to hear claims against "the President

10  or any other Defendant" for violation of the Take Care clause. *Id.* at 42:18-20. This position

11  amounts to an incorrect and dangerous assertion that the President's conduct is beyond the scope

12  of judicial review. *See*, *e.g.*, *New York v. Trump*, 764 F. Supp. 3d 46, 51 (D.R.I. 2025) (granting

13  TRO based on Take Care claim); *Rhode Island v. Trump*, No. 1:25-cv-128-JJM-LDA, 2025 WL

14  1303868, at *14-15 (D.R.I. May 6, 2025) (evaluating, and finding likelihood of success, on

15  plaintiffs' claims that President Trump and agency defendants violated Take Care and Separation

16  of Powers clauses). The Court can, and absolutely should, hear and find Plaintiffs likely to

17  succeed on these constitutional claims, which Defendants do not challenge on a factual basis.

18              **B.     Plaintiffs' First Amendment Claims Are Meritorious.**

19      Defendants do not dispute that they have terminated Plaintiffs' grants based on viewpoints

20  they disfavor; they admit to having done exactly that. *See* Opp'n at 39-41 ("the government []

21  does not violate the First Amendment by not funding awards that are out of alignment with" its

22  "policy priorities" *Id.* at 40:24-26). Instead, they argue, incorrectly and contradictorily,[13] that these

23  viewpoint-based terminations are not subject to judicial scrutiny for First Amendment violations.

24  *Id.* at 39. Defendants' primary authority holds the opposite: the government's power to "define the

25  limits of [a] Government spending program" does not extend to "conditions that seek to leverage

26

27  ─────────────────────
    [13]  *Compare* Opposition at 39:7-9 ("Government spending is not subject to traditional First

28  Amendment scrutiny") *with* 39:15-16 ("While government funding is not free from the First
    Amendment in all respects…").

funding to regulate speech outside the contours of the program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* ("*AID*"), 570 U.S. 205, 214-15 (2013). In other words, although the government may use conditions to "define the federal program," it may not "reach outside" the program to influence speech. *Id.* at 217. This includes where a funding statute has "no programmatic message . . . to allow the Government to [regulate speech as] deemed necessary for its legitimate objectives . . ." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548 (2001). Nor can the government "recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise." *Id.* at 547. Thus, Defendants are mistaken in claiming they are "permitted" to terminate grants and free from First Amendment scrutiny as long as doing so "align[s with] the government's sponsorship of activities within its policy priorities" (Opp'n at 40:13-15). Executive agencies cannot override Congress's "policy priorities" espoused in the funding programs' enabling statutes based on a new President's desires.

To be clear, Defendants grant terminations do not "advanc[e] any legitimate objectives embedded within the programs they burden—as appropriated and determined by Congress—but" rather suppress "disfavored speech." *S.F. A.I.D.S. Found.*, 2025 WL 1621636 at *17-18 (holding that provisions of the Gender Order, EO 14168, likely violate the First Amendment). They are revoking funding to stifle specific categories of activity or expression that the current administration disfavors, regardless of the scope of the grant in question or the statute enabling appropriations for the grant, including grants authorized under statutes that explicitly call for the consideration of those currently-disfavored categories. *See id.*

Defendants are also incorrect to conclude that their terminations, and the executive orders and agency directives that led to them, "do not seek to regulate a grantee's speech 'outside the contours of'" their policy initiatives. Opp'n at 40:15-17. The facial intent and blatant effect of Defendants' actions is to halt current, and chill future, expression that the administration disfavors, in violation of the First Amendment. Judge Labson Freeman rejected this same argument in *Santa Cruz Lesbian and Gay Community Center v. Trump*, 508 F. Supp. 3d 521, 542-43 (N.D. Cal. 2020). In *Santa Cruz*, Defendant Trump issued an executive order directing agency heads to review grant programs to see which could be conditioned on certification that the funds would not

be used to promote concepts that the executive order considered "divisive." *Id*. at 542. The government argued there, as it does here, that "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest," but the court disagreed. *Id*. at 542-43 (citation omitted). The court held that the executive order "authorize[d], as a condition of federal funding, a speech restriction that by its nature 'cannot be confined to the scope of the Government program." *Id*. at 543 (citation omitted).

Further, "the government can violate the First Amendment by withholding benefits for a censorious purpose…" *Koala v. Khosla*, 931 F.3d 887, 898 (9th Cir. 2019) ("The *Speiser-Perry-Regan-Finley* line of cases reflects the Supreme Court's continued cautionary admonition that the First Amendment will not tolerate the administration of subsidy programs with a censorious purpose." (citations omitted)). Once again, Defendants do not bother to dispute that it terminated these grants for a censorious purpose—it specifically aims to suppress Plaintiffs' research into, and expression regarding diversity and equity (*see* Compl. at ¶¶ 139-140; 326; 367; TRO Mot. at 12-13), gender ideology (Compl. at ¶¶ 247; 367); climate science (TRO Mot. at 13), and vaccine information (Compl. at ¶¶ 326; 394). To take just one example, the express purpose of his Gender Order (EO 14168) is to root out the "extrem[e]," "false claims" of gender identity that contradict the current administration's view that there is only one "biological reality of sex." *See* EO No. 14168 §§ 1, 2(f).[14] The government here is not merely selectively funding some programs but not others—it is rendering ineligible for federal funding *all* activities, speech, and conduct that is even related to the ideas it disapproves of, precisely the "invidious viewpoint discrimination" that the Supreme Court has suggested would present First Amendment concerns, even in the context of federal subsidies. *See NEA v. Finley*, 524 U.S. 569, 587 (1998).

### C.    Plaintiffs' Procedural Due Process Claims Are Meritorious.

Defendants' primary argument against Plaintiffs' procedural due process claims is that Plaintiffs lack a protected property interest in the grant agreements, which it claims are "routine

---

[14]  *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025). Schoenberg Decl. Ex. C (June 5, 2025), ECF No. 17.

1  government contracts" that Defendants can terminate at will. Opp'n at 36-37. This is incorrect.

2          First, as discussed *supra*, "grants" and "contracts" are not the same as a matter of statutory

3  law: 2 U.S.C. Section 182.650 makes clear that a grant is "*a thing of value*" "*transferred*" "*to the*

4  *recipient*" "*rather than to acquire property or services*"—*i.e.*, property in which the recipient has

5  an interest. The *County of Santa Clara v. Trump* case illustrates this: two counties sued alleging

6  that Defendant Trump's executive order seeking to terminate grants to "sanctuary jurisdictions"

7  violated their Fifth Amendment Procedural Due Process rights. 275 F. Supp. 3d 1196, 1201, 1218

8  (N.D. Cal. 2017) *aff'd in part, vacated in part, remanded sub nom. City & Cnty. of S.F.*, 897 F.3d

9  1225. Judge Orrick found that the plaintiff-counties "ha[d] a legitimate property interest in federal

10 funds that Congress has already appropriated and that the Counties have accepted." *Id*. at 1218.

11 The same is true here—"Congress has already appropriated" the grant funds, and Plaintiffs "have

12 accepted" and relied on those grants to embark on years of crucial work now hanging in the

13 balance. *Id*; *see also Idaho Anti-Trafficking Coal. v. Somerton*, No. 1:24-cv-00526-REP, 2025 WL

14 673928, at *9-10 (D. Idaho Mar. 3, 2025) ("Plaintiff's overarching legal theory is sound (an

15 agency's regulations can give rise to a property interest)" in grant funding).[15]

16         Next, Defendants argue that Plaintiffs are not entitled to due process "because the grants

17 are to nonparties." Opp'n at 36:12. However, "just because 'funding awards are made to the

18 University' does not necessarily mean that Plaintiff[s], as Principal Investigator[s], do[] not have a

19 property interest in the award." *Enstrom*, 2013 WL 11238482, at *11 (citation omitted). Again,

20 Defendants make too much of their distinction between the UC recipients and the Plaintiffs, whose

21 names are identified on the grants to do the funded work. Defendants are wrong that the property

22 right does not rest with those whose lives' work are threatened by the government's conduct.

23         Otherwise, Defendants make no real effort to dispute that they have failed to provide

24 Plaintiffs with proper process protections. Opp'n at 37:16-17. They claim that "the Tucker Act

25 provides a judicial mechanism sufficient to satisfy due process," which, as discussed above, is not

26 _____

27 [15]  The *Somerton* court denied the plaintiff's due process claim on distinguishable facts from those
    at issue here. *Somerton* was based on grant offers that were withdrawn before the grant agreement

28 was executed, which was necessary to "show a property interest tethered to positive state law."
    *Somerton*, 2025 WL 673928 at *10. Here, Plaintiffs had and relied on their grants.

true under Defendants' own view of the facts: if Plaintiffs are not contracting parties they have no claim in the Court of Federal Claims. *See supra* at § I(A). And in arguing that "post-termination procedures are robust and well satisfy due process," Defendants entirely fail to acknowledge the immediate and irreparable harms that flow from work-halting terminations. Opp'n at 37:21-21.

### D.    Plaintiffs' Void for Vagueness Claims Are Meritorious.

Defendants argue that the void for vagueness doctrine is inapplicable here. Opp'n at 37-38. This is simply baseless: numerous courts have entertained vagueness challenges to precisely the same type of executive orders, agency directives, and grant terminations at issue in this case. *See*, *e.g.*, *S.F. A.I.D.S. Found.*, 2025 WL 1621636, at *20 (rejecting same argument); *Santa Cruz*, 508 F. Supp. 3d at 545; *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 277-78 (D. Md. 2025) (evaluating provisions in Executive Order under void for vagueness); *NEA v. U.S. Dep't of Educ.*, No. 25-cv-091-LM, 2025 WL 1188160, at *18 (D.N.H. Apr. 24, 2025). Defendants also baldly assert that "[n]o vagueness concern arises in this context," (Opp'n at 38:8-10), without responding to the Motion's thorough discussion of vagueness concerns (TRO Mot. at 39-41); *NEA*, 2025 WL 1188160, at *18 (collecting cases) ("The Letter does not make clear…what the Department believes constitutes a DEI program" and "does not even define what a 'DEI program' is."); *NAACP v. U.S. Dep't of Educ.*, No. 25-CV-1120 (DLF), 2025 WL 1196212, at *6 (D.D.C. Apr. 24, 2025). Where a law or policy "regulates conduct based on 'wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings,' it is likely to be void for vagueness." *NEA*, 2025 WL 1188160, at *18 (citation omitted).

As a corollary, Defendants argue that the Supreme Court's *Finley* decision permits vague criteria in the grant funding process. Opp'n at 38. *Finley* does no such thing. The plaintiff there brought a facial challenge to language in a *statute*, the National Foundation on the Arts and Humanities Act, directing the grantor to "tak[e] into consideration general standards of decency and respect for the diverse beliefs and values of the American public" when issuing a grant. *Finley*, 524 U.S. at 572 (quoting 20 U.S.C. § 954(d)(1)). In finding the condition constitutional, the Court noted Congress's "wide latitude to set spending priorities," while making clear that "[t]he terms of the provision are undeniably opaque, and if they appeared in a criminal statute or

regulatory scheme, they could raise substantial vagueness concerns." *Id.* at 588. This critical

distinction makes *Finley* inapposite; the agencies here have no such "latitude" to impose the vague

criteria they rely on, and thus those criteria are void for vagueness.[16]

### III.  PLAINTIFFS' APA CLAIMS ARE LIKELY TO SUCCEED.

#### A.  Plaintiffs' Claims Challenge Final Agency Actions.

As Defendants acknowledge, an agency action is final if it marks the consummation of the

agency's decision-making and carries legal consequences. Opp'n at 26:7-11 (citing *Bennett v.*

*Spear*, 520 U.S. 154, 177-78 (1997). Finality is often evident when the agency's action requires

"immediate compliance," as here. *See Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977,

982 (9th Cir. 2006) (citation omitted); TRO Mot. at 44:8-11 (grantees ordered to "stop work

immediately"). Removing any doubt, many of the termination notices describe the terminations as

a "final agency action" not subject to appeal. *See, e.g.,* Foreman Decl. ¶¶ 53-61, Exs. H & I.[17]

Despite this, Defendants contend that Plaintiffs are not attacking a final agency action, but

rather are proceeding with an impermissible "broad programmatic attack." Opp'n at 26:4-20

(citing *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) and *Lujan v. Nat'l Wildlife*

*Fed'n,* 497 U.S. 871 (1990)). But the APA allows Plaintiffs to challenge the overarching policy

that led to the agencies' actions. Specifically, the types of "agency action" that can be reviewed

under the APA include "rule[s]," which the statute defines broadly to encompass "agency

statement[s] of general or particular applicability and future effect designed to implement,

---

[16]  The Court also stated that it was unlikely "that speakers will be compelled to steer too far clear
of any 'forbidden area' in the context of grants of this nature" and therefore any concerns over
chilled speech due to vagueness were "not constitutionally severe." *Id.* at 588-89. Here, unlike in
*Finley*, it is likely that a speaker *would* feel compelled to steer clear of "forbidden area[s]": for
example, DEI and gender ideology. And as detailed extensively in the Complaint and Motion,
Defendants' orders and directives provide no definition or even an example of what is considered
"DEI," "gender identity," or "COVID-related research." *See* TRO Mot. at 39-41.

[17]  Defendants argue that the Court "should at least apply the APA only to finally terminated
grants [or] speculative future terminations."  Opp'n at 27:11-13. Defendants misunderstand
Plaintiffs' allegations, which seek relief for grants that "have been or will be imminently
terminated or suspended." Compl. ¶ 67. The agencies have made their intention to terminate grants
"abundantly clear"; that meets finality. *See Safari Club Int'l v. Jewell,* 842 F.3d 1280, 1289-90
(D.C. Cir. 2016); *see, e.g.,* Compl. ¶ 388 (DOE announced its intent to terminate projects).

interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. §551(4). As the First Circuit explained in *New York v. Trump*, 133 F.4th 51, 67 (1st Cir. 2025), a case involving categorical funding freezes, even *Lujan* recognized that "[i]f . . . in fact some specific order or regulation[ ] appl[ied] some particular measure across the board to all individual classification terminations and withdrawal revocations, and . . . that order or regulation is final . . . it can of course be challenged under the APA" by a person adversely affected. *New York*, 133 F.4th at 67 (quoting *Lujan*, 497 U.S. at 890 n.2).

Nor are Plaintiffs making "generalized complaints about agency behavior" that seek "wholesale reform." Opp'n at 26:21-25 (citing *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006)).[18] Plaintiffs challenge the grant terminations, which are "circumscribed, discrete agency actions" that affect Plaintiffs and the Proposed Class. *Norton*, 542 U.S. at 62.

Next, relying upon *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), Defendants argue that the President is not an agency and, thus, cannot make a final agency action that is reviewable under the APA. Opp'n at 26-27. If this were true, it "would allow the President and agencies to simply reframe agency action as orders or directives originating from the President to avoid APA review." *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 766 F. Supp. 3d 74, 83 (D.D.C. Feb. 13, 2025). The Court should not allow Defendants to gut the APA in this way.

This case also differs from *Franklin*, where the "final action complained of [was] that of the President." *Franklin*, 505 U.S. at 796. Here, the grant terminations were actions undertaken by agencies to comply with the President's executive orders. *Drs. for Am. v. Off. of Pers. Mgmt.*, 766 F. Supp. 3d 39, 51 (D.D.C. 2025) (finding that "defendants' removals of the webpages and datasets" pursuant to the President's executive order "likely constitute final agency action"); *see, e.g.*, TRO Mot. at 16:1-4 (quoting from an EPA press release that announced the cancellation of more than 400 grants: "EPA continues to work diligently to implement President Trump's

---

[18]  In *Norton*, the Supreme Court explained that courts are not suited to "enter general orders compelling compliance with broad statutory mandates." *Id.* at 66. Similarly, in *Cobell*, the D.C. Circuit reiterated that courts "must allow [the agency] to . . . utilize its expertise in complying with broad statutory mandates." *Cobell*, 455 F.3d at 307. That is not at issue here, where there are discrete agency actions that Plaintiffs challenge.

1   executive orders."). Plaintiffs challenge only final agency actions. *Norton*, 542 U.S. at 62.

2   ### B.    The Challenged Actions Are Not "Committed to Agency Discretion."

3       Defendants argue that the agencies' withdrawal of funding is discretionary, and thus

4   Plaintiffs' claims are not reviewable under the APA, which exempts agency action from judicial

5   review "to the extent that [it] is committed to agency discretion by law." Opp'n at 27:17-22 (citing

6   5 U.S.C. § 701(a)(2)). "This exception has been construed 'narrowly' to apply only in 'those rare

7   circumstances where the relevant statute is drawn so that a court would have no meaningful

8   standard against which to judge the agency's exercise of discretion.'" *Cmty. Legal Servs.*, 137

9   F.4th at 939-40 (citations omitted).[19] This is not one of those "rare circumstances." *Id.*

10      Defendants cite *Lincoln v. Vigil* and *Milk Train, Inc. v. Veneman* to argue that funding

11  decisions are an action within an agency's discretion. Opp'n at 28. In *Lincoln*, petitioners

12  challenged the Indian Health Service's decision to allocate its funding to one program and not

13  another. 508 U.S. 182, 184 (1993). In *Milk Train Inc.*, milk producers challenged the U.S.

14  Department of Agriculture's decision to allocate a portion of its funding to smaller dairy farmers.

15  310 F.3d 747, 750 (D.C. Cir. 2002). Both cases are distinguishable: neither pertains to already-

16  appropriated funds now being withheld, as is the case here. *See City & Cnty. of S.F.*, 897 F.3d at

17  1235 (administration may not withhold properly appropriated funds for its own policy goals).

18      Contrary to Defendants' assertion that the agencies' authorizing statutes provide broad

19  discretion on funding decisions, making the agencies' Grant Terminations unreviewable (Opp'n at

20  28), even broad statutory language can provide "meaningful standard[s] against which to judge the

21  agency's exercise of discretion." *Cmty. Legal Servs.*, 137 F.4th at 939-40 (citation omitted). In

22  *Department of Commerce v. New York*, for example, at issue was the Census Act, which "confers

23  broad authority on the Secretary . . . to take 'a decennial census of population' in 'such form and

24  content as he may determine, including the use of sampling procedures and special surveys.'" 588

25  U.S. 752, 771 (2019) (citation omitted). However, the Supreme Court determined that even this

26  "broad authority" had constraints. *Id.* For example, the Census Act directs the Secretary on how to

27

28     [19]  To the extent this exception applies, if at all, it does not govern Plaintiffs' constitutional claims.

act in certain circumstances, *e.g.*, when it is appropriate to obtain information through direct inquiries. *Id.* at 772-73. Such directives were enough to make "[t]he Secretary's decision . . . amenable to review for compliance with those and other provisions of the Census Act." *Id.* at 773.

The same is true for the authorizing statutes at issue here. *See* Section IV. For example, Defendants point to NSF's statutory language to show that the agency is given discretion on how to use funds. But even NSF is directed to use funds to "'best realize' **four congressional objectives**" (Opp'n at 28:20-21 (emphasis added)), which include "strengthening the research staff of organizations, particularly nonprofit organizations, in the United States" and "encouraging independent scientific or engineering research by individuals." 42 U.S.C. § 1873(e)(2), (4). In other words, similar to the Census Act's directives in *Department of Commerce*, NSF's authorizing statute, with its enumerated congressional objectives, contains meaningful standards against which to judge the agency's mass termination of grants. Thus, the Defendants' actions do not fall into the rare category of unreviewable agency actions.

## IV. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT DEFENDANTS VIOLATED STATUTORY AND REGULATORY AUTHORITY.

### A. The Grant Terminations Violate the Impoundment Control Act.

Defendants first argue that Plaintiffs may not allege violation of the Impoundment Control Act ("ICA"), relying on a single Southern District of Texas decision holding that "an alleged ICA violation has only one proper plaintiff: the Comptroller General." Opp'n at 29 (citing *Gen. Land Off. v. Biden*, 722 F. Supp.3d 710, 734-35 (S.D. Tex. 2024)). The *General Land Office* case rests on the faulty premise that, even where the APA "generally presumes reviewability," the ICA's inclusion of a cause of action that can be brought by the Comptroller General forecloses a suit for violation of the statute by anyone else. *Id*. This holding is contrary to binding Supreme Court precedent holding that the APA "requires federal courts to set aside federal agency action that is 'not in accordance with law,' 5 U.S.C. § 706(2)(A)—which means, of course, *any* law." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (emphasis in original). The District of Rhode Island expressly rejected the *General Land Office* holding, and permitted an APA claim to go forward based on ICA violations, when faced with the same argument Defendants make here.

1   *New York v. Trump*, No. 25-cv-39-JJM-PAS, 2025 WL 715621, at * 9 n.13 (D.R.I. Mar. 6, 2025)

2   (quoting *FCC* and "declin[ing] to adopt such a narrow view of what it may consider when

3   determining whether an agency has acted 'not in accordance with the law' under the APA").

4          Next, without addressing the ICA's applicability to Plaintiffs' claims or Plaintiffs'

5   evidence of ICA violations, Defendants assert that terminating congressionally mandated grant

6   funds "is not an impoundment." Opp'n at 29:17. They misread their sole authority, *City of New*

7   *Haven, Connecticut v. United States*, which held that, in passing the ICA, Congress "required prior

8   congressional approval before a rescission could go into effect." 809 F.2d 900, 908 (D.C. Cir.

9   1987). As the court explained, Congress had an "expressed intention to *control* rather than

10  *authorize* presidential deferrals," and "most certainly did not mean to suggest that impoundments

11  designed to negate congressional budgetary *policies* would be 'presumptively valid.'" *Id.*

12  (emphasis in original). "It is precisely this sort of impoundment"—impoundment based on policy,

13  like those at issue in this case—"that Congress was determined to forestall." *Id.*; *see also New*

14  *York*, 2025 WL 715621, at *9-10 (defendants "indefinite withholding or delay of obligated

15  funds . . . without sending a special message to Congress as the ICA requires" was contrary to

16  law).

17              **B.      The Grant Terminations Violate the Agencies' Enabling Statutes.**

18         Defendants argue, without authority, that the agencies are entitled to "use [] policy

19  priorities to terminate" the grant awards as they please, even when doing so would contradict the

20  stated policies in the enabling statutes. Opp'n at 30:15-17 ("The various statutory grantmaking

21  schemes…do not foreclose the use of policy priorities to terminate such awards."). The result

22  would make Federal grantmaking an entirely impossible endeavor. Under Defendants' theory, the

23  agencies would be bound by Congress's intent to distribute money in a particular way right up

24  until the moment it is committed. Then, they would be free to revoke that commitment at any time

25  based on "policy priorities." Few, if any, researchers would be willing to invest the time or effort

26  into research projects based on grants that could be terminated on a whim and without warning.

27         Defendants' position is also contrary to the numerous and longstanding authorities cited in

28  Plaintiffs' Motion holding that the APA forbids an agency from flouting Congress's directives in

appropriating funds. TRO Mot. at 42-43 (collecting cases). Courts have been clear that "[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & Cnty. of S.F.*, 897 F.3d at 1235; *see also New York*, 2025 WL 715621, at *10-11 (funding freeze not tied to compliance with President's policy priorities likely violated APA).[20]

### C.    The Grant Terminations Violate the Agencies' Own Regulations.

Defendants argue that because "the grants and scheme[s] explicitly set out 2 C.F.R. 200.340," the agencies have the "authority to terminate [them] for inconsistency with agency priorities." Opp'n at 30:23-24. But Section 200.340 does not apply to Defendants' grant terminations, which they concede resulted from categorical presidential directives;[21] Section 200.340's plain language only refers to changes in "*agency*" priorities, not "*executive*" priorities.

Defendants also ignore Section 200.340's requirement that terminations be "authorized by law," *entirely omitting* this essential limiting clause of the regulation from their discussion. This clause makes explicit the obvious point that agency regulations cannot override statutes. *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) ("When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'") (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)). Accordingly, in rejecting the same Section 200.340 argument Defendants make here, the Western District of Washington recently explained, "an agency *regulation* cannot create *statutory* authority; only Congress can do that." *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-cv-01824-JST, 2025 WL 1582368, at *15 (W.D. Wash. June 3, 2025) (emphasis in original). "Whatever actions [an agency] chooses to take based on a

---

[20]  Defendants also seem to argue that it is permissible for the agencies to terminate grants that effectuated Congress's intent now because it may issue grants that do so in the future. Opp'n at 30:17-18 ("NSF's actions do not forestall future grants involving such populations or designed to increase participation of underrepresented populations."). This empty suggestion of future potential action has no bearing on the question of whether or not the agencies' current actions and directives violate the APA.

[21]  *See*, *e.g.*, Opp'n at 4-5 (Executive Orders "directed" agencies to terminate equity, DEI, and gender ideology related grants); 26:26-27 (conceding that "the President has set policy directives that may flow to agencies"); 27:9-10 (describing APA claims as an attack on "broad programmatic Presidential prerogatives.").

change in its policy priorities must still be rooted in a congressional delegation of authority, a limitation that the cited regulation itself makes clear." *Id*. (citing 2 C.F.R. § 200.340(a)(4)). Defendants cannot—and indeed, do not—argue that the grant terminations at issue in this case are "rooted in a congressional delegation of authority." *Id*; *see also Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (TSC), 2025 WL 1131412, at *16 (D.D.C. Apr. 16, 2025) (over Defendants' Section 200.340 argument, holding EPA's award termination decisions "must be made lawfully and in accordance with established procedures and relevant rules and regulations.").[22] Defendants' position sets a dangerous precedent: agencies could simply invoke changing priorities to usurp Congress's spending power, raising serious separation of powers, Spending Clause, and Due Process concerns. *See supra*, §§ II.A; II.C; II.D.

Defendants far overstate this subdivision's significance. "Section 200.340 does not create a default ability by the federal government to terminate an award over the recipient's objection, whenever an agency determines its priorities have changed." *Metro. Transp. Auth. v. Duffy*, No. 25-cv-1413 (LJL), 2025 WL 1513369, at *28-29 (S.D.N.Y. May 28, 2025). The most natural reading of that language is an application to projects that no longer effectuate agency priorities in place at the time of the grant—*e.g.*, if new evidence shows that the project is ineffective. As discussed above, Defendants' contrary interpretation—that "agency priorities" include priorities newly identified after the notice of award—would allow agencies to terminate awards at any time simply by changing their minds, entirely "undermin[ing] the security of all federal awards" and conflicting "with the plain meaning of its text." *Id*. It would also render superfluous a whole host of Office of Management and Budget ("OMB") regulations dealing with grant terminations. That is not a realistic construction: there is no reason to think that OMB buried absolute authority to cancel a project, at any time for any reason, in a minor subclause of a nonbinding provision that the OMB itself considers to be "guidance, not regulation." 2 C.F.R. § 1.105(b).

Equally important, Section 200.340(a)(4) can only authorize grant termination if the

---

[22] For the grants fully executed prior to April 2024, when the language Defendants rely on became operative, the current iteration of Section 200.340 does not apply at all. The regulation was amended on April 22, 2024 to add that language for the first time. *See* Guidance for Federal Financial Assistance, 89 Fed. Reg. 30,046, 30,089 (Apr. 22, 2024).

grounds for doing so are "actually included as a term and condition of the federal award." *Duffy*, 2025 WL 1513369, at *28-29; *see also Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024) ("*Provided that the language is included in the terms and condition of the award*…) (emphasis added). Defendants are patently incorrect to claim that "each award contained an explicit term or condition stating that it was subject to termination for no longer effectuating program goals, agency priorities, funding objectives, or related discretionary rationale" (Opp'n at 7:5-7): most of the award letters contain no such explicit provision. But even if they did, general terms and conditions which "refer back to 2 C.F.R. § 200.340" do not create a "unilateral right to terminate" grants on a whim. *See Duffy*, 2025 WL 1513369, at *28.

Finally, even if Section 200.340 did permit the agencies to override Congress's intent and terminate grants, Plaintiffs APA claims still survive: "whether the 'award no longer effectuates the programs goals or agency priorities' can still be challenged under the APA where," as here, "the Plaintiffs allege a failure to provide a reasonable explanation." *Am. Pub. Health Ass'n v. Nat'l Inst. of Health*, No. cv 25-10787-WGY, 2025 WL 1548611, at *11 (D. Mass. May 30, 2025).

### D. Defendants' Actions Were Arbitrary and Capricious.

Under the arbitrary-and-capricious standard, courts will not uphold an agency action if an agency has failed to engage in "reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (citation omitted). Plaintiffs' Motion identified four ways in which Defendants' grant terminations were arbitrary and capricious, none of which Defendants' adequately addressed. TRO Mot. at 45-46. First, the termination notices do not provide a reasoned explanation. *Id.* at 29, 32 (describing boilerplate statements used in certain grant termination notices). Defendants claim to have terminated the awards because they no longer "effectuated" or aligned with the agencies' priorities. Opp'n at 32-33. But the agencies' vague, boilerplate language, devoid of reasoning, is insufficient to justify agency action. *Dep't of Com.*, 588 U.S. at 756 ("The reasoned explanation requirement [] is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public.").

Second, the terminations ignore the reliance interests of grantees. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,* 591 U.S. 1, 30 (2020) (agency must "address whether there

1    was 'legitimate reliance'" on a policy before changing it). Defendants, relying on *Tennessee v.*

2    *Becerra*, brazenly claim that "it is exceedingly unlikely that anyone has a reliance interest in

3    continued discretionary funding." Opp'n at 33:3-4. But, in *Tennessee*, the funding at issue was for

4    one year with an option to continue for additional years. 131 F.4th 350, 369-70 (6th Cir. 2025). In

5    contrast, the funding here was cut midstream. Indeed, grantees who received some, but not all, of

6    their awards had already invested significant time in their projects. TRO Mot. at 15-33; 47-48

7    (detailing Plaintiffs' harm). Many grantees also took leaves of absence, canceled teaching plans, or

8    altered their employment status based on the expectation of grant money. *Id.*

9        Third, the grant terminations conflict with prior agency decisions, in that the agencies

10   previously awarded the grants after a rigorous and objective application and review process.

11   Defendants' opposition fails to address this, and merely points to 2 C.F.R. Section 200.340, which

12   as discussed in Section IV.C, Defendants misunderstand. Section 200.340 is not a hall pass to

13   terminate grants wholesale based on a change in agency priorities.

14       Fourth, the mass termination of grants "entirely failed to consider. . . important aspect[s] of

15   the problem." *DHS,* 591 U.S. at 30 (citation omitted). Plaintiffs' Motion explains that Defendants

16   ignored the obvious waste and inefficiency *caused* by their grant terminations, including the total

17   waste of already-invested taxpayer money in many of the projects, and the wasteful consequences

18   of discontinuing this work. Indeed, the lack of engagement with data underlying or resulting from

19   the research supported by the terminated grants highlights that failure here. *See id.*.

20   **V.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR *ULTRA VIRES* CLAIMS.**

21       Defendants first argue that Plaintiffs cannot maintain *ultra vires* claims against the

22   agencies but only against individual officers. Opp'n at 33. They rely only on *E.V. v. Robinson*, 906

23   F.3d 1082, 1090 (9th Cir. 2018) for this proposition, while failing to respond to the Plaintiffs'

24   authorities permitting *ultra vires* actions against federal agencies that act outside of constitutional

25   and statutory authority, which is precisely what Plaintiffs claim here. *See* TRO Mot. at 36-37

26   (collecting cases); *see also Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off of Pers. Mgmt.*, No. C

27   25-01780 WHA, 2025 WL 820782, at *5 (N.D. Cal. Mar. 14, 2025) (permitting *ultra vires* action

28   against OMB for exceeding authority vested by Congress).

1    Defendants next assert that Plaintiffs are barred from bringing *ultra vires* claims "in the

2    context of 'breach of contract'" (Opp'n at 33-34), rehashing their Tucker Act argument. As

3    established above, Plaintiffs bring no breach of contract claim; the Tucker Act does not apply.

4    They also rehash their standing argument that Plaintiffs are "third parties to an allegedly unlawful

5    action" (*id*. at 34:2-4) which, as also established above, is a mischaracterization.

6    Finally, Defendants urge that *ultra vires* review is unnecessary by framing Plaintiffs'

7    claims as run-of-the-mill administrative or statutory challenges. Opp'n at 34-35. But as

8    Defendants concede, *ultra vires* constitutional claims are cognizable for actions made "pursuant to

9    unconstitutional authority, or in an unconstitutional manner" (*id*. at 34:24-27), precisely what the

10   Complaint asserts Defendants did in this case. Compl. at ¶¶ 433-452; TRO Mot. at 35-41. Those

11   are not, as Defendants contend, "simply statutory claims." Opp'n at 35:11. Nor are Plaintiffs

12   "alleg[ing] that Defendants made the wrong decisions within otherwise lawful statutory grant

13   programs and regulatory termination clauses," (*id.* at 35:12-14)—Plaintiffs challenge Defendants'

14   terminations as directly and flagrantly violative of the statutory framework that they are bound to

15   follow. Compl. at ¶¶ 453-465; TRO Mot. at 41-46.

16   **VI.    THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION ARE MET.**

17       **A.    Plaintiffs Have Shown Irreparable Injury.**

18   The Opposition proffers three unavailing arguments in an effort to rebut Plaintiffs'

19   showing of irreparable harm. First, without any citation to the record, Defendants urge that

20   Plaintiffs' injuries are "speculative [and] attenuated." Opp'n at 43:17-18. To the contrary, the

21   harms alleged in Plaintiffs' Complaint and Motion are concrete, already occurring, and a direct

22   result of Defendants' wrongful conduct. *See* TRO Mot. at 15-33; 47-48 (extensively detailing the

23   harm Plaintiffs have suffered). In response, Defendants have offered *no* competent evidence.

24   Next, Defendants assert that the harms can be remedied later through the mere payment of

25   money. Opp'n at 43. As Plaintiffs' Motion and supporting declarations explain, they cannot wait,

26   and monetary compensation[23] could not remedy the substantial and irreparable *non*-monetary

27

28   _____

[23] The Opposition obtusely blurs the distinction between a plaintiff seeking injunctive relief for

harms they are suffering.[24] These injuries are beyond remediation, including because of disruption to ongoing research and other programs; there is no "possibility [of] adequate compensatory or other corrective relief . . . at a later date." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citation omitted). The loss of time and resources invested in projects like Plaintiffs' constitutes serious cognizable harm. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262 (1977). Because this "loss is so great as to threaten the existence" of Plaintiffs' work, it is "irreparable." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) (citation omitted); *see also Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 752378, at *20 (D.D.C. Mar. 10, 2025).

Meanwhile, Defendants entirely ignore two additional forms of harm alleged by Plaintiffs that are irreparable and warrant injunctive relief. The first is reputational, which Defendants' own authority holds is irreparable and grounds for injunctive relief. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) (cited at Opp'n at 43:20-22; holding injury to reputation "is not easily measured or fully compensable in damages" so "often held to be irreparable"); *Woonasquatucket*, 2025 WL 1116157, at *22 (considering that the plaintiffs' "standing in the communities that they serve has suffered"); *see also Khalil v. Trump*, No. 25-cv-01963 (MEF)(MAH), 2025 WL 1649197, at *3, *5 (D.N.J. June 11, 2025) (same); *accord Rent-a-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).

The second harm that Defendants ignore arises from Plaintiffs' constitutional claims. *See* Opp'n at 43-45. As explained in the Motion, violations of the First and Fifth Amendment, as well as the Take Care and Separation of Power Clauses, "unquestionably constitute[ the] irreparable injury" necessitating immediate injunctive relief. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted); *see* TRO Mot. at 47-48 (collecting cases). Where a First Amendment

---

wrongdoing that causes economic harm and a plaintiff seeking money damages for that economic harm. Nevertheless, the fact that Defendants caused Plaintiffs to suffer economic harm here means that the harm is irreparable, because damages are not available in APA cases. *See* TRO Mot. at 48. Defendants leave this arguments and these authorities unaddressed as well.

[24]  *See* Philliou Decl. at ¶¶ 29-34; Alex Decl. at ¶ 27; Thakur Decl. at ¶ 25; Green Nylen Decl. at ¶ 41; Foreman Decl. at ¶¶ 62-70; Hirst Decl. at ¶ 39; Dorph Decl. at ¶¶ 7-8 & Ex. A at 2-4 (ECF No. 14).

violation is alleged, "[i]rreparable harm is relatively easy to establish" because the plaintiff "need only demonstrate the existence of a colorable First Amendment claim." *Hubbard v. City of San Diego*, No. 24-4613, 2025 WL 1572736, at *7 (9th Cir. June 4, 2025) (quoting *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 694-95 (9th Cir. 2023)). Defendants' silence regarding both of these harms deafening.

Finally, Defendants ask the Court to avert its gaze from the widespread fallout of Defendants' terminations, insisting that it should "look only at [Plaintiffs'] irreparable harm." Opp'n at 44:10-12. Plaintiffs have thoroughly established their direct harm, but even if they had not, the Court is not so constrained; the downstream impacts on non-parties is a critical consideration in a case like this. *See*, *e.g.*, *Mass. v. Nat'l Institutes of Health*, No. 25-cv-10338, 2025 WL 702163, at *28-31 (D. Mass. Mar. 5, 2025) ("It is impossible to accurately measure or compensate humans who lose their lives . . . the value of lost research animals . . . that will be euthanized . . . the value of discovery from scientists who choose to leave, or of the potential students who now never become scientists at all"); *Ass'n of Am. Univs. v. Dept. of Energy*, No. 25-cv-10912-ADB, 2025 WL 1414135, at *18-19 (D. Mass. May 15, 2025) (considering universities' inability to "train the next generation of scientists in their programs" and "need to lay off or otherwise be unable to hire the brilliant minds that make up their world-renowned programs"); *New York*, 2025 WL 715621, at *13 ("It is so obvious that it almost need not be stated . . . when there is no end in sight to the Defendants' funding freeze, the harm is amplified because *those served by the expected but frozen funds* have no idea when the promised monies will flow again") (emphasis added); *New York v. McMahon*, No. cv 25-10601-MJJ, 2025 WL 1463009, at *38 (D. Mass. May 22, 2025) ("Students will feel these effects in the form of lower quality of education, further demonstrating irreparable harm"). Irreparable harm is established in this case.

## B.    The Balance of Equities and Public Interest Fall Firmly in Favor of Issuing an Injunction.

Courts have already soundly rejected the two harms that Defendants claim they will suffer if an injunction issues. First, Defendants suffer no harm from an order to maintain the status quo because it requires them to pay out funds. *See*, *e.g.*, *Woonasquatucket*, 2025 WL 1116157, at *23-

24 ("The Government is not harmed where an order requires them to disburse funds that Congress has appropriated and that Agencies have already awarded."); *New York*, 2025 WL 715621, at \*15-16 (same). Nor will Defendants suffer harm from the injunction sought here on the basis that it would "interfer[e] with the President's priorities." Opp'n at 45:16-17. As Judge Tigar explained in *San Francisco A.I.D.S. Foundation*, where the government seeks to "implement [] priorities in ways that are inconsistent with the Constitution and existing statutes . . Defendants [] do not suffer harm from being unable to enforce those unlawful provisions." 2025 WL 1621636, at \*28; *see also, Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020) (if Defendants' position were correct, then "no act of the executive branch asserted to be inconsistent with a legislative enactment could be the subject of a preliminary injunction. That cannot be so.").

The Defendants' only response to the harms that Plaintiffs will suffer relies on the Supreme Court's shadow docket *California* decision.[25] There, the plaintiffs "represented [] that they have the financial wherewithal to keep their programs running." 145 S. Ct. at 969. Plaintiffs' declarations make clear they do not; research efforts and programs years in the making will be lost forever if the grants are not reinstated without delay. *See supra* at n.24. The equities and public interest are both overwhelmingly in favor of granting Plaintiffs' request for injunctive relief.

## C.    The Scope of the Requested Injunction Is Appropriate.

The Court has authority to issue an injunction of the requested scope. The Opposition insists the Court should narrowly tailor the injunction such that it applies only to the agencies while "leav[ing] intact the Executive's discretion to [] implement new policies consistent with law." Opp'n at 45:24-27. It does not explain why the injunction sought here would prevent the President from acting "consistent with the law"—this is precisely the relief Plaintiffs seek—nor does it cite any authority purporting to prevent this Court from issuing an order to stop the President from violating the Constitution or federal statutes. *See* Section VII.A.

In requesting that the Court limit the injunction to apply only to EPA, NEH, and NSF,

---

[25]  Defendants also rely on *California* to support their claim that they will suffer irreparable injury if the requested injunction issues. The Ninth Circuit rejected the same argument in *Community Legal Services in East Palo Alto*, 137 F.4th at 943.

1    Defendants disregard Plaintiffs well-founded allegations that the grant terminations effectuated by

2 each and every agency in this case were made pursuant to the same illegal and unconstitutional

3 Executive Orders and pursuant to the same arbitrary processes in violation of the APA and the

4 regulations that govern the agencies' conduct. *See* Compl. at ¶¶ 356-429. Defendants concede that

5 this is the case, as discussed more thoroughly Section II(D)(2) of Plaintiffs' Class Certification

6 Reply. The injunctive relief sought would therefore not constitute "mass judicial

7 superintendence," as Defendants contend.[26]

8 **VII.   DEFENDANTS' REQUEST FOR A STAY SHOULD BE DENIED, ANY BOND**
9 **SHOULD BE NOMINAL, AND DECLARATIONS SHOULD BE REQUIRED.**

10    Defendants request for a stay pending appeal should be denied. Opp'n at 46. "The party

11 requesting a stay bears the burden of showing that the circumstances justify an exercise of that

12 discretion[,]" *Nken v. Holder*, 556 U.S. 418, 433-34 (2009), and the Opposition makes no such

13 showing. As to a bond, the Court has "discretion as to the amount required, *if any*" under Federal

14 Rule of Civil Procedure 65(c), and a nominal $100 bond should suffice in this case. *See*, *e.g.*,

15 *Newsom v. Trump*, No. 25-cv-04870-CRB, 2025 WL 1663345, at *21 (N.D. Cal. June 12, 2025).

16 Finally, Defendants request to be relieved from serving declarations verifying compliance,

17 insisting that "the presumption of regularity should apply and the Court should presume the

18 Federal Government will comply with any such order." Opp'n at 46:26-47:3. Needless to say,

19 Defendants have given courts no reason to make such a presumption.

20 **CONCLUSION**

21    Plaintiffs respectfully request that the Court grant their Motion for Preliminary Injunction.

22

23

24

25

26

27

28   [26] Plaintiffs' reply supporting their class certification motion addresses Defendants' arguments
that certain agency Defendants are not represented in the currently named Plaintiffs' grants.

1    Dated: June 17, 2025

2                                          By: _____

3                                          Anthony P. Schoenberg (CA Bar No. 203714)
                                           tschoenberg@fbm.com
4                                          Linda S. Gilleran (CA Bar No. 307107)
                                           lgilleran@fbm.com
5                                          Kyle A. McLorg (CA Bar No. 332136)
                                           kmclorg@fbm.com
6                                          Katherine T. Balkoski (CA Bar No. 353366)
                                           kbalkoski@fbm.com
7                                          FARELLA BRAUN + MARTEL LLP
                                           One Bush Street, Suite 900
8                                          San Francisco, CA 94104
                                           Telephone: 415. 954.4400
9

10                                         Erwin Chemerinsky (Admitted *pro hac vice*)
                                           echemerinsky@law.berkeley.edu
11                                         Claudia Polsky (CA Bar No. 185505)
                                           cpolsky@law.berkeley.edu
12                                         U.C. BERKELEY SCHOOL OF LAW
                                           Law Building
13                                         Berkeley, CA 94720-7200
                                           Telephone: 510.642.6453
14

15                                         Elizabeth J. Cabraser (CA Bar No.  83151)
                                           ecabraser@lchb.com
16                                         Richard M. Heimann (CA Bar No. 63607)
                                           rheimann@lchb.com
17                                         Kevin R. Budner (CA Bar No. 287271)
                                           kbudner@lchb.com
18                                         Annie M. Wanless
                                           awanless@lchb.com (CA Bar No. 339635)
19                                         LIEFF CABRASER HEIMANN &
                                           BERNSTEIN, LLP
20                                         275 Battery Street, 29th Floor
                                           San Francisco, CA  94111
21                                         Telephone:  415.956.1000
22

23                                         *Attorneys for Plaintiffs and the Proposed Class*

24

25

26

27

28

REPLY IN SUPPORT OF PLAINTIFFS' MOTION       31
FOR PRELIMINARY INJUNCTION –
Case No. 3:25-cv-04737-RL