1   Erwin Chemerinsky (*pro hac vice*)
    echemerinsky@law.berkeley.edu
2   Claudia Polsky (CA Bar No. 185505)
    cpolsky@law.berkeley.edu
3   U.C. BERKELEY SCHOOL OF LAW
    Law Building
4   Berkeley, CA 94720-7200
    Telephone: 510.642.6483
5
    Elizabeth J. Cabraser (CA Bar No. 83151)
6   ecabraser@lchb.com
    Richard M. Heimann (CA Bar No. 63607)
7   rheimann@lchb.com
    LIEFF CABRASER HEIMANN &
8   BERNSTEIN, LLP
    275 Battery Street, 29th Floor
9   San Francisco, CA 94111
    Telephone: 415.956.1000
10
    Anthony P. Schoenberg (CA Bar No. 203714)
11  tschoenberg@fbm.com
    FARELLA BRAUN + MARTEL LLP
12  One Bush Street, Suite 900
    San Francisco, CA 94104
13  Telephone: 415. 954.4400

14  *Attorneys for Plaintiffs and the Proposed Class*
    [Additional counsel listed on signature page]
15

16              **UNITED STATES DISTRICT COURT**

17             **NORTHERN DISTRICT OF CALIFORNIA**

18

19  NEETA THAKUR, KEN ALEX, NELL          Case No. 3:25-cv-4737
    GREEN NYLEN, ROBERT HIRST,
20  CHRISTINE PHILLIOU, and JEDDA
    FOREMAN, on behalf of themselves and all
21  others similarly situated,             **PLAINTIFFS' REPLY IN
                                           SUPPORT OF MOTION FOR
22              Plaintiffs,                CLASS CERTIFICATION**

23              v.
                                          Date:  June 20, 2025
24  DONALD J. TRUMP, in his official capacity as   Time:  10:00 a.m.
    President of the United States;       Judge:  Hon. Rita F. Lin
25  DEPARTMENT OF GOVERNMENT
    EFFICIENCY ("DOGE");
26  AMY GLEASON, in her official capacity as
    Acting Administrator of the Department of
27  Government Efficiency;
    NATIONAL SCIENCE FOUNDATION;
28  BRIAN STONE, in his official capacity as
    Acting Director of the National Science

Foundation;
NATIONAL ENDOWMENT FOR THE
HUMANITIES;
MICHAEL MCDONALD, in his official
capacity as Acting Chairman of the National
Endowment for the Humanities;
UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY;
LEE ZELDIN, in his official capacity as
Administrator of the U.S. Environmental
Protection Agency;
UNITED STATES DEPARTMENT OF
AGRICULTURE;
BROOKE ROLLINS, in her official capacity as
Secretary of the U.S. Department of Agriculture;
AMERICORPS (a.k.a. the CORPORATION
FOR NATIONAL AND COMMUNITY
SERVICE);
JENNIFER BASTRESS TAHMASEBI, in her
official capacity as Interim Agency Head of
AmeriCorps;
UNITED STATES DEPARTMENT OF
DEFENSE;
PETE HEGSETH, in his official capacity as
Secretary of the U.S. Department of Defense;
UNITED STATES DEPARTMENT OF
EDUCATION;
LINDA MCMAHON, in her official capacity as
Secretary of the U.S. Department of Education;
UNITED STATES DEPARTMENT OF
ENERGY;
CHRIS WRIGHT, in his official capacity as
Secretary of Energy;
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of the U.S. Department of
Health and Human Services;
UNITED STATES CENTERS FOR DISEASE
CONTROL;
MATTHEW BUZZELLI, in his official capacity
as Acting Director of the Centers for Disease
Control;
UNITED STATES FOOD AND DRUG
ADMINISTRATION;
MARTIN A. MAKARY, in his official capacity
as Commissioner of the Food and Drug
Administration;
UNITED STATES NATIONAL INSTITUTES
OF HEALTH;
JAYANTA BHATTACHARYA, in his official
capacity as Director of the National Institutes of
Health;
INSTITUTE OF MUSEUM AND LIBRARY
SERVICES;

1  KEITH SONDERLING, in his official capacity
   as Acting Director of the Institute of Museum
2  and Library Services;
   UNITED STATES DEPARTMENT OF THE
3  INTERIOR;
   DOUG BURGUM, in his official capacity as
4  Secretary of the Interior;
   UNITED STATES DEPARTMENT OF STATE;
5  MARCO RUBIO, in his official capacity as
   Secretary of the U.S. Department of State;
6  DEPARTMENT OF TRANSPORTATION;
   SEAN DUFFY, in his official capacity as
7  Secretary for the U.S. Department of
   Transportation,
8
   Defendants.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. ARGUMENT ..................................................................................................... 2

    A. Provisional Rule 23(b)(2) Class Certification Is Proper and Protects Those Harmed by Defendants' Course of Conduct ............................................. 3

    B. Plaintiffs' Proposed Class Definition Meets Rule 23(b)(2) Standards; Is of Appropriate Scope; and, as Revised, Provides Additional Specificity ............... 4

    C. Plaintiffs Meet All Applicable Commonality and Typicality Requirements ......... 6

        1. Plaintiffs Meet the Commonality Requirement ......................................... 6

        2. Defendants' Litany of "Commonality Roadblocks" Fails to Demonstrate a Lack of Commonality ............................................... 7

        3. Plaintiffs Meet the Typicality Requirement ............................................... 9

    D. Plaintiffs and Class Members Have Standing to Bring This Action .................... 10

        1. Plaintiffs Have Article III Standing ......................................................... 10

        2. The Juridical Link Doctrine Renders Standing Appropriate as to All Defendants .......................................................................................... 13

III. CONCLUSION ................................................................................................ 15

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A.A.R.P v. Trump*,
   145 S.Ct. 1364 (2025) ................................................................................................ 4

*Angelica S. v .U.S. Dept. of Health and Human Services, et al.*,
   2025 WL 1635369 (D.D.C. 2025) (23)(b)(2) .......................................................... 4

*Briseno v. ConAgra Foods, Inc.*,
   844 F.3d 1121 (9th Cir. 2017) ................................................................................. 6

*Cancel v. City of Chicago*,
   254 F.R.D. 501 (N.D. Ill. 2008) .............................................................................. 8

*Cole v. City of Memphis*,
   839 F.3d 530 (6th Cir. 2016) ........................................................................... 5, 6, 10

*Craig v. Boren*,
   429 U.S. 190 (1976) ................................................................................................ 13

*Enstrom v. Regents of the Univ. of California*,
   2013 WL 11238482 (C.D. Cal. Mar. 18, 2013) ...................................................... 12

*Evon v. Law Offices of Sidney Mitchell*,
   688 F.3d 1015 (9th Cir. 2012) ................................................................................. 7

*FDIC v. Mallen*,
   486 U.S. 230 (1988) ................................................................................................ 12

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ................................................................................. 10

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ................................................................................... 10

*La Mar v. H & B Novelty & Loan Co.*,
   489 F.2d 461 (9th Cir.) ............................................................................................ 14

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................... 11, 13

*Masvidal v. U.S. Dep't of Just.*,
   716 F. Supp. 2d 1207 (S.D. Fla. 2010) ................................................................... 11

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith*,
   Inc., 672 F.3d 482 (7th Cir. 2012) .......................................................................... 6

- ii -

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Payton v. Cty. of Kane,*
    308 F.3d 673 (7th Cir. 2002)........................................................ 10, 11, 14

4

5

*Prantil v. Arkema France S.A.,*
    2022 WL 1570022 (S.D. Tex) ....................................................................... 3

6

*Scholl v. Munchin,*
    489 F.Supp.3d 1008 (N.D. Cal. 2020) ................................................... 6, 10

7

8

*Singleton v. Wulff,*
    428 U.S. 106 (1976) ..................................................................................... 13

9

*Sykes v. Harris,*
    780 F.3d 70 (2d Cir. 2015).............................................................................. 3

10

11

*Torres v. Mercer Canyons Inc.,*
    835 F.3d 1125 (9th Cir. 2016)........................................................... 5, 9, 10

12

13

*U.S. v. Briggs,*
    514 F.2d 794 (5th Cir. 1975)........................................................................ 12

14

*United Farmworkers v. Noem,*
    2025 WL 1235525 (E.D. Cal. 2025) ................................................... 4, 5, 10

15

16

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) .............................................................................. 2, 6, 7

17

**Statutes**

18

31 U.S.C. § 6303 ............................................................................................ 4

19

20

31 U.S.C. § 6304 ............................................................................................ 4

21

**Court Rules**

22

Rule 23 ............................................................................................... 3, 14, 15

23

Rule 23(a)(2) .................................................................................................. 6

24

Rule 23(a)(3) .................................................................................................. 9

25

Rule 23(b)(2) ......................................................................................... *passim*

26

Rule 23(b)(3) .................................................................................................. 5

27

Rule 23(c)(1)(B) ............................................................................................. 4

28

- iii -

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3 Rule 23(c)(1)(C) .................................................................................................. 4, 5

4 Rule 23(c)(5) ......................................................................................................... 5

5 **Treatises**

6 2 Newberg and Rubenstein on Class Actions (6th ed. 2022) ...................................... 3, 5

7 **Other Authorities**

8 *Definitions of Categories of Personnel*, Nat'l Sci. Found. ........................................ 12

9
*EPA Implementation Plan for Policy on Multiple Principal Investigators for
10     Federally Funded Research Projects*, Enviro Prt'n Ag. (Feb. 26, 2008) .............. 12

11 *Public Humanities Projects F.A.Qs.*, Nat'l Endow. Hums. ........................................ 12

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- iv -

1

## I.      **INTRODUCTION**

2

3       This is a class action lawsuit on behalf of University of California researchers whose

4   federal grants were cut off in violation of the Constitution and federal laws. The researchers, who

5   prepared and were named in the grant applications and who oversee the funded research projects

6   day-to-day, were immediately harmed when Defendants, acting uniformly and in concert,

7   terminated the researchers' grants without warning or cause. Defendants' common conduct,

8   which applied "generally to the class," is exactly that which Rule 23(b)(2) is designed to address.

9   *See* Fed. R. Civ. P. 23(b)(2). Defendants' opposition fails to muster any meritorious objection to

10  the grant of Rule 23(b)(2) provisional certification here. Defendants do not challenge Rule

11  23(a)(1) numerosity, Rule 23(a)(4) adequacy, or the Rule 23(g)(1) application for appointment of

12  class counsel. They focus only on the interrelated factors of Rule 23(a)(2) commonality and Rule

13  23(a)(3) typicality, attacking the class definition and Plaintiffs' standing.

14      In so doing, Defendants ignore the very premise of this case: that the Federal Agency

15  Defendants, operating at the direction of Defendants Trump and DOGE, uniformly and

16  unlawfully terminated grants to UC researchers, usurping Congress's legislative power and

17  denying Plaintiffs the fair procedures they were promised before January 20, 2025. Defendants

18  effectively concede this basic premise and confirm that *all* agencies follow a uniform course of

19  conduct when making grants, and that the same regulations "generally govern" *all* federal grants.

20  Dkt. 36 at 2. They also admit that, as of January 20, 2025, *all* agencies began terminating grants

21  at Defendant Trump's order. Dkt. 36 at 2. These admissions go a long way.

22      So do all the facts that Defendants omit entirely. Missing from their description of what

23  happened at the Agencies after January 20, 2025 is any mention of Congress. That is because

24  Congress was completely bypassed. Instead of allowing agencies to disburse congressionally

25  allocated funds for congressionally approved purposes, Defendant DOGE interposed itself

26  between the legislature and federal agencies, invaded those agencies with its own personnel,

27  infected those agencies' grant operations, and thereby effectuated massive grant terminations

28  pursuant to Executive Order ("EO") dictates. Congress did not approve the changes; its policies

were supplanted by new, EO-compliant policies.

Perhaps recognizing that Defendants' common course of conduct renders Rule 23(b)(2) certification appropriate, Defendants spend much time arguing that Plaintiffs lack standing. For this argument, Defendants lean hard on a formalistic property concept, which they perceive as the sole protectable interest that could be at stake. The research grants, they say, do not "belong" to the researchers, but to the Universities, because it is the Universities that process and transmit paperwork to grantmaking agencies, and as a matter of accounting mechanics, the Universities that receive and then disburse the federal funds to grant-funded researchers. These administrative facts, however, have no bearing on whether Plaintiff researchers have standing. Plaintiffs are the ones who designed and applied for the grants; who were named in the grant applications because of their substantive (and often, unique) competence to perform the work at issue; who were approved to do the research; and who were actually doing it when the grants were abruptly terminated. They are the ones *most* concretely and directly injured by the Defendants' actions, irrespective of whether the University would *also* have standing to litigate these grant terminations. Moreover, the Court may assess standing as to the class as a whole.

The revised proposed class definition, set forth in section II.B., *infra*, has been amended to clarify that the class comprises those who were directly impacted by Defendants' action. A return to the status quo ante will undo or mitigate the otherwise irreparable harm to their professional work, careers, and reputations. This is exactly the kind of class Rule 23(b)(2) seeks to protect.

## II.    ARGUMENT

Rule 23(b)(2) was designed to address unlawful or unconstitutional actions directed toward a definable (though often unidentifiable or shifting) class of persons. It requires simply that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Its hallmark is the appropriateness of a common injunctive or declaratory remedy designed to protect the class as a whole by correcting defendants' violative conduct and/or preventing its future recurrence. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

1

2

3

4

> The rule-makers who re-drafted Rule 23 in 1966 designed Rule 23(b)(2) specifically for cases stemming from the civil rights movement. These cases, like the iconic *Brown v. Board of Education*, tended to seek broad declaratory or injunctive relief for a numerous and often unascertainable or amorphous class of persons. More than a half century after the drafting of this version of Rule 23(b)(2), many of the cases falling under this subsection continue to concern civil or constitutional rights.

5

6

2 Newberg and Rubenstein on Class Actions, § 4:26 (6th ed. 2022) (citing Rules Advisory Committee Notes, 39 F.R.D. 69, 102 (1966)).

7

8

9

10

11

12

13

Rule 23(b)(2)'s "act" requirement focuses on the defendants' policy or conduct toward the class, not the specifics of the resulting harm to class members, or even whether all have been injured in the same way. 2 Newberg, *supra* at § 4:28. "The critical predicate of an injunctive class is common behavior by the defendant toward the class, not common effect on the class." *Prantil v. Arkema France S.A*., 2022 WL 1570022, at *41 (S.D. Tex. May 18, 2022). Here, each Defendant acted in the same way towards the class by illegally terminating previously approved research grants under new Executive Order-dictated criteria.

14

15

**A.**    **Provisional Rule 23(b)(2) Class Certification Is Proper and Protects Those Harmed by Defendants' Course of Conduct**

16

17

18

19

20

21

22

23

24

25

26

Defendants' common course of conduct, from and after January 20, 2025, unites the class. Defendants' grant termination actions are generally applicable to class members, and common answers to common questions of law *and* fact will decide the most important issues in this case. All Plaintiff class members have claims against Defendants Trump and DOGE, regardless of the particular Agency Defendant with which they had a direct relationship; all Agency Defendants acted at the behest of Trump and DOGE, bypassing Congress and abandoning their pre-2025 procedures to, instead, effectuate swift and sweeping grant cuts. As described further in section II.D.2 below, class certification is appropriate against *all* Federal Agency Defendants, even those with whom the Class Representatives had no contact, because of the common directives the Agencies followed, and their uniform course of conduct in so doing.[1] That is what the Complaint

27

28

---

[1] Rule 23(b)(2) certification fits a wide variety of circumstances involving multiple defendants, including those with whom plaintiffs may have no direct relationship. For example, in *Sykes v. Mel. S. Harris & Assocs. LLC*, Rule 23(b)(2) certification was upheld against multiple defendants who engaged in a debt collection scheme where several defendants had little or no direct contact or communication with the plaintiff debtors. 780 F.3d 70 at 75-76, 97-98 (2d Cir. 2015).

- 3 -

1  alleges and what the evidence supports. *See* Compl. §§ III, IV.A.2, IV.B.2, IV.C.2, IV.D. The key

2  fact question—"Did Defendants terminate grant funding to researchers pursuant to Executive

3  directives?"—has a common answer. The key legal question—"Was this action lawful?"—

4  likewise has a common answer as to each of the claims asserted.

5         Provisional class certification is appropriate in the Rule 23(b)(2) injunctive relief context,[2]

6  has been utilized recently by courts across the country in cases seeking relief from unlawful

7  exercises of executive power,[3] and will provide the preliminary relief in which the UC researchers

8  class has a common interest, subject to appropriate revisitation as the case proceeds. The

9  requirements for provisional Rule 23(b)(2) class certification are met.

10     **B.**    **Plaintiffs' Proposed Class Definition Meets Rule 23(b)(2) Standards; Is of Appropriate Scope; and, as Revised, Provides Additional Specificity**

11

12        Much of Defendants' opposition centers around the class definition, which they assert is

13 too broad or too vague, or which betrays a lack of standing. Plaintiffs have amended their

14 proposed definition to tie it expressly and unequivocally to the UC researchers who are directly

15 impacted by Defendants' actions, giving rise to the same claims and suffering the same types of

16 harm. Plaintiffs propose the following revised class definition:[4]

17     All University of California researchers, including faculty, staff, academic
18     appointees, and employees across the University of California system ("UC researchers") who are named as principal researchers, investigators, or project

---

19 [2] *See, e.g.*, *A.A.R.P v. Trump*, 145 S.Ct. 1364, 1369-70 (2025) (because "courts may issue
20 temporary relief to a putative class, we need not decide whether a class should be certified as to the [] due process claims in order to temporarily enjoin the Government from [conducting the
21 challenged action] while the question of [the merits] is adjudicated") (citation omitted).

[3] Other recent Rule 23(b)(2) class actions against various federal agencies, arising from the flurry
22 of Executive Orders and the efforts of various agencies to carry them out, including DOGE, U.S. Dept. of Health and Human Services, Homeland Security, and the U.S. Border Patrol, have been
23 granted provisional class certification, concurrent with injunctive relief. *See, e.g.*, *United Farmworkers v. Noem*, 2025 WL 1235525 at *38, 43 (E.D. Cal. Apr. 29, 2025); *Angelica S. v.*
24 *U.S. Dept. of Health and Human Servs., et al.*, 2025 WL 1635369, at *9 (D.D.C. 2025) (Rule 23(b)(2) class certified of "unaccompanied children [] whose sponsor's family reunification
25 application has been denied, closed, withdrawn, delayed, or cannot be completed because the sponsor is missing documents newly required on or after March 7, 2025").

26 [4] Defendants also argue the class definition is improper because Plaintiffs reference a declaration from a non-plaintiff citing a terminated FDA agreement. After meet and confer, Plaintiffs were
27 able to confirm that Pimentel's award was a services contract, not a grant. While Defendants also improperly terminated such contracts, the provisional class certification Plaintiffs request is
28 limited to researchers with terminated grants, subject to potential amendment before final judgment under Rule 23(c)(1)(C).

               - 4 -           PLAINTIFFS' CLASS CERTIFICATION REPLY BRIEF
                                             Case No. 3:25-CV-4737

leaders on the grant applications for previously awarded research grants that have since been or will be terminated, denied, suspended, or reduced by any of the Defendants pursuant to Executive Orders 14151, 14154, 14158, 14168, 14173, 14217, 14238, and/or 14222, and/or other directives of the Trump administration or DOGE, from and after January 20, 2025.

Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.[5]

As provided in Rule 23(c)(1)(C), class certification orders may be amended until the final judgment, and courts may exercise their discretion to amend and recast class definitions as well.[6] *See United Farmworkers*, 2025 WL 1235525, at *28 (certifying court-revised provisional declaratory and injunctive relief classes related to detentions and arrests by the U.S. Border Patrol); *Ruiz Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1139 (9th Cir. 2016).[7]

While the proposed class definition enables the parties and the Court to identify the class members so as to effectuate the proper scope of relief, it should be noted that Defendants' "vagueness" arguments are unsupportable as a matter of law. There is no "identifiability" or "ascertainability" requirement for the certification of Rule 23(b)(2) classes. *See, e.g.*, *Cole v. City of Memphis*, 839 F.3d 530, 541-42 (6th Cir. 2016) (surveying cases rejecting the importation of a Rule 23(b)(3) ascertainability requirement into 23(b)(2) cases because the two subsections "create two remarkably different litigation devices").[8] For a Rule 23(b)(2) class, it is not the

---

[5] The previously proposed class definition was: "All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system ('UC researchers') whose research grants have been or will be terminated, denied, suspended, or reduced by any of the Defendants pursuant to Executive Orders 14151, 14154, 14158, 14168, 14173, 14217, 14238, and/or 14222, and/or other directives of the Trump administration or DOGE, from and after January 20, 2025."

[6] The court may also, in its discretion, as the discovery progresses, designate agency-specific subclasses, each represented by a named Plaintiff, under Rule 23(c)(5).

[7] In *United Farmworkers*, the DOJ, representing the Homeland Security and U.S. Border Patrol defendants, argued that plaintiffs were seeking an impermissible "fail-safe" class: one comprised only of those proven to have been harmed, thus improperly conflating class coverage and merits issues. 2025 WL 1235525, at *26-28. Here, the opposite argument is made by DOJ: the class is impermissible because it includes those without injury or standing. In the context of Rule 23(b)(2), getting the definition "just right" does not require nearly the degree of precision as in a 23(b)(3) class, because the focus of the suit is on the Defendants' actions. 2 Newberg, *supra* at § 4.28.

[8] *See also Cole*, 839 F.3d at 541 ("[A]scertainability is a requirement tied almost exclusively to the practical need to notify absent class members and to allow those members a chance to opt-out and avoid the potential collateral estoppel effects of a final judgment….Since notice is not required for a (b)(2) class, the practical efficiencies that come with knowing the precise membership of the class are nonexistent."); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123-25 (9th Cir. 2017) (rejecting ascertainability requirement, holding that class proponents are

1   identifiability or homogeneity of the class, but the defendants' actions against it, that matter.[9]

2        The Court should order provisional certification of the above-defined class.

3        **C.    Plaintiffs Meet All Applicable Commonality and Typicality Requirements**

4        Contrary to Defendants' arguments, Plaintiffs have satisfied commonality and typicality.

5   Defendants do not challenge adequacy or numerosity.

6             **1.    Plaintiffs Meet the Commonality Requirement**

7        The parties agree that *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), controls the

8   Rule 23(a)(2) commonality analysis in Rule 23(b)(2) class actions. What matters in *Dukes* is not

9   the number of common questions—even a single one will do—but their significance. *Dukes* asks:

10  Will the determination of one or more questions, as to which there is a single answer, advance the

11  litigation toward resolution? 564 U.S. at 350. Put another way, commonality requires at least one

12  "common contention," which "must be of such a nature that it is capable of classwide resolution –

13  which means that determination of its truth or falsity will resolve an issue that is central to the

14  validity of each one of the claims in one stroke." *Id.* Plaintiffs need not show that every question

15  in the case, or even a preponderance of them, is capable of class-wide resolution. So long as there

16  is "even a single [common] question," the commonality request can be satisfied. *Id.* at 359.[10]

17       The Ninth Circuit's *Dukes*-informed test of commonality is straightforward and likewise

18  supports certification. It holds that, "[w]here the circumstance of each particular class member

19  vary but retain a common core of factual or legal issues with the rest of the class, commonality

20  exists." *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1029 (9th Cir. 2012) (citing

---

21  not required to demonstrate an administratively feasible way to determine who is in the class in
22  order for it to be certified); *Scholl v. Mnuchin*, 489 F.Supp.3d 1008, 1047 (N.D. Cal. 2020)
    (provisionally certifying 23(b)(2) class of incarcerated taxpayers and granting preliminary
23  injunction).
    [9] Should the Court consider it appropriate, the Class members can be identified and notified, *see*
24  Fed. R. Civ. P. 23(c)(2)(A); unlike in *Briseno* or *Cole*, the Defendants know exactly who the class
    members are—they are named in the grant applications.
25  [10] *See also McReynolds v. Merrill Lynch, Pierce, Fenner & Smith,* Inc., 672 F.3d 482, 490-92 (7th
    Cir. 2012) (Title VII race discrimination case, in which the Seventh Circuit applied *Dukes* to
26  reverse the district court's denial of a 23(b)(2) injunctive relief class based on the identification of
    a single common question: whether a company policy that left to stockbrokers the choice of
27  forming self-selected teams had a categorical disparate impact on black stockbrokers. The court
    held that this question was susceptible to class-wide determination for injunctive relief, justifying
28  certification, though many other issues, including impact on particular brokers, and resulting
    damages, varied by individual.).

*Dukes*, 564 U.S. at 350). Such a common core was absent in *Dukes* because, according to the Court, the employment-related decisions at issue were local and subjective; there was no proof that defendant operated under a "general policy" or that direction came from the top. Instead, the *only* corporate policy was one "of allowing discretion by local supervisors over employment matters." *Dukes*, 564 U.S. at 353, 355.

This case presents a very different scenario. Contrary to Defendants' assertions, each agency did not follow its own (congressionally-directed) policies or make its own grant-specific decisions. Defendants claim that, despite the blitz of Executive Orders that began on January 20, 2025, and the creation of DOGE, nothing changed at the agency level. But Plaintiffs allege, and the evidence will show, that these events transformed the "no general policy, no central authority" world of *Dukes* to one in which the "policy of allowing discretion by local supervisors" disappeared. 564 U.S. at 355 (cleaned up). Instead of a *Dukes*-like regime of discretionary local control by various Agencies, the general policies of the President, set forth in Executive Orders, and implemented by a new central authority (DOGE), supervened. The Agencies no longer had independent discretion, and indeed there is no evidence that any of the Agency Defendants resisted or ignored Trump's EOs or the incursions of DOGE.[11]

This situation raises a cluster of key, common questions of fact and of law, all of which relate to Defendants' actions and their legality. They include, among others: What did the Federal Agency Defendants do in response to the Trump EOs and DOGE directives at issue? As to each Claim for Relief, were Defendants' actions lawful? Each of these questions has a common answer that will "apply generally to the class." Fed. R. Civ. P. 23(b)(2).

### 2. Defendants' Litany of "Commonality Roadblocks" Fails to Demonstrate a Lack of Commonality

Defendants stray from these common questions and instead focus myopically on the minutiae of each grant termination. All of Defendants' purported "roadblocks," Dkt. 36 at 10-12,

---

[11] The unique and unprecedented convergence of the Trump Administration, the Trump-invented DOGE, and the Agency Defendants is evidenced most dramatically by President Trump's announcement, pursuant to the departure of Elon Musk, that every single cabinet member (including several Defendants: Lee Zeldin, Brooke Rollins, Pete Hegseth, Linda McMahon, Chris Wright, Robert F. Kennedy Jr., Doug Burgum, Marco Rubio, and Sean Duffy) are now collectively running DOGE. Compl. ¶ 114.

ignore that the acts of Defendants here proceeded directly from a nucleus of Executive Orders and directives aimed at eliminating grants that offended the policies of the Trump Administration.

The First Amendment claim, for example, applies classwide because the evidence addressed in the Complaint, TRO submissions, and Preliminary Injunction Reply brief shows that Defendants selected grants for termination based on newly offensive words or subjects. And, the terminations themselves have further chilled speech. Whether the class prevails will depend on classwide proof that the Executive Orders were executed by Defendants using methods to detect, and target for termination, grants with newly offensive words and disfavored ideas.[12]

In arguing that the due process claims cannot receive class treatment, Defendants again raise the issue of standing by focusing on class members' property interests. But courts are "obliged to reject [defendants'] invitation to delve into the merits of [plaintiffs'] claims when analyzing standing." *Cancel v. City of Chicago*, 254 F.R.D. 501, 506 (N.D. Ill. 2008). When considering Rule 23(b)(2) certification, courts "must look at the case as a whole, rather than picking apart its various components to separate the claims for which the plaintiff will be entitled to relief from those for which he will not." *Id.* (citation omitted). Defendants' other issues with the Fifth Amendment claim depend on investigation of common documents, directives, and processes.

As to the APA claims, Defendants argue that agency-specific inquiries are required to determine whether the Agencies departed from statutory and regulatory standards, given different agency procedures. But Defendants themselves acknowledge that "[a]s a default matter, Office of Management and Budget [] regulations generally govern a variety of terms for federal grants and contracts." Dkt. 36 at 2 (citing 2 C.F.R. Part 200). Defendants explain the "usual[]" approach agencies take to grantmaking. *Id.* Moreover, the premise of the Complaint is that, in terminating grants, the Agencies did not act independently, but instead followed the Executive Order directives of Trump and DOGE. The same goes for the arbitrary and capricious claim—what

---

[12] The grant-by-grant analysis conducted on terminated NSF and NIH grants by Grant Watch (a database tracking terminations, available at https://grant-watch.us/) demonstrates that grants were selected for termination based on newly offensive words or subjects. Of course, if, as fact discovery progresses, the Court has concerns about the applicability of any claims to all class members, subclasses can be designated.

1    matters is not the variety of ways an act could be arbitrary and capricious, but the fact of the

2    wholesale departure from the Agencies' pre-Inauguration Day norm. Regular, authorized

3    procedures have been abandoned for the entire class.

4         The point of the requested injunction is to restore the normal—and legal—order that

5    prevailed prior to January 20, 2025. It is a common aim to correct a common action by *all*

6    Defendants that has created chaos and resulted in real and classwide harm.

### 3.    Plaintiffs Meet the Typicality Requirement

8         Plaintiffs likewise meet the Rule 23(a)(3) typicality requirement. Typicality functions to

9    ensure that the interests of the named representatives align with those of the class. *Torres*, 835

10   F.3d at 1141. They do here. It is not difficult to determine that *all UC researchers* want to

11   conduct the research projects they designed and proposed, as per the approved and funded grants

12   for which they applied, and want to be protected going forward from arbitrary and

13   unconstitutional grant administration.

14        To satisfy typicality, a plaintiff's claim is not required to be identical to, but rather

15   "reasonably co-extensive" with, those of the absent class members. *Hanlon v. Chrysler Corp.*,

16   150 F.3d 1011, 1020 (9th Cir. 1998); *United Farmworkers*, 2025 WL 1235525 at *38. The

17   prevailing test of typicality is "whether other members have the same or similar injury, whether

18   the action is based on conduct which is not unique to the named plaintiffs, and whether other

19   class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*,

20   976 F.2d 497, 508 (9th Cir. 1992) (cleaned up); *Torres*, 835 F.3d at 1141; *United Farmworkers*,

21   2025 WL 1235525 at *38. Plaintiffs meet this test. This action is based on what happened not

22   only to them, but to many others, inflicting the same or similar injury, as the supporting

23   Declarations from Plaintiffs and class members alike demonstrate.

24        Defendants focus on the fact that named Plaintiffs' grants came from three, not all, of the

25   Agency Defendants. But all Plaintiffs and Class members have the same claims based on the

26   same conduct by Defendants Trump and DOGE. Moreover, a Rule 23(b)(2) class can be certified

27   against multiple defendants, even those with whom the class representatives have not interacted.

28   *See*, *e.g.*, *Payton v. Cty. of Kane*, 308 F.3d 673, 678 (7th Cir. 2002). Certification is appropriate

even when the class representatives present different facts than those of the class because it is the defendants' actions that matter. For example, the incarcerated taxpayer Rule 23(b)(2) class certified in *Scholl v. Mnuchin*, 489 F.Supp.3d 1008 (N.D. Cal. 2020) (Hamilton, J.), owed their incarcerated status to many different convictions, for many different offenses, with many different sentences. What mattered is that defendants took uniform action against this variegated class: they withheld the CARES Act checks authorized by Congress from those incarcerated based on an IRS decision that unlawfully contradicted the statute by deciding that incarcerated persons were ineligible. Likewise in *Cole*, the Sixth Circuit certified a Rule 23(b)(2) class and enjoined unlawful police sweeps to protect the cross-section of humanity that might, on any given Saturday, be present on the Beale Street sidewalks, even though such sweeps were performed by different officers on different days in different ways against different people. As here, none of this variety in execution defeats the essential commonality of the practice or its categorical violation of the Constitution, nor does it render the class representatives lacking in typicality.

### D.    Plaintiffs and Class Members Have Standing to Bring This Action

Plaintiffs are principal researchers named in the grants at issue whose careers, livelihoods, and professional reputations immediately suffered when Defendants unlawfully terminated the grants. Defendants contend with none of these facts, instead arguing that Plaintiffs are unrelated non-parties seeking to enforce government contracts, and that only signatories to these contracts have any legal rights. That is simply incorrect. Plaintiffs are not seeking to enforce the rights of others but to remedy their own concrete and imminent harms. Plaintiffs do not seek contract enforcement, but Defendants' return to procedures that comply with the Constitution and APA. Plaintiffs suffered concrete professional harms, caused by Defendants' grant terminations, which will be redressed by the restoration of the grants. Under the *Lujan* three-factor test, as well as the "juridical link doctrine," Plaintiffs have standing with respect to all Agency defendants. *See Payton*, 308 F.3d at 678.

### 1.    Plaintiffs Have Article III Standing

To establish standing, Plaintiffs must demonstrate (1) an "injury in fact"; (2) a "causal connection between the injury and the conduct complained of"; and (3) that the injury will likely

be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotations omitted). Injury in fact requires both a "cognizable interest" and that "the party seeking review be himself among the injured." *Id.* at 563 (quotation omitted). Plaintiffs have a clear, legally protected interest in the restoration of the grants because the grants' termination impedes their ability to work and advance in their profession. "[T]he Supreme Court has made clear that a plaintiff can have a constitutionally protected interest in his professional practice." *Masvidal v. U.S. Dep't of Just.,* 716 F. Supp. 2d 1207, 1212 (S.D. Fla. 2010) (citing *FDIC v. Mallen*, 486 U.S. 230, 240 (1988)); *see also U.S. v. Briggs*, 514 F.2d 794, 797 (5th Cir. 1975) (recognizing a "legal cognizable interest[]" in "good names and reputations and impairment of [] ability to obtain employment"). Plaintiffs' Declarations describe the many ways in which grant termination has resulted in lost income and salary support (*see, e.g.*, Dkt. 11 ¶ 41 (Green Nylen Decl.)); reduced their research output and publications (*see, e.g.*, Dkt. 9 ¶ 27 (Alex Decl.)); prevented them from presenting their work (*see, e.g.*, Dkt. 13 ¶ 39(d) (Hirst Decl.)); and interfered with their ability train the next generation of researchers (*see, e.g.*, Dkt. 10 ¶ 25 (Thakur Decl.)).

Plaintiffs need not be parties to the grant agreements: "[J]ust because 'funding awards are made to the University' does not necessarily mean that Plaintiff, as Principal Investigator, does not have a property interest in the award." *Enstrom v. Regents of the Univ. of Cal.*, 2013 WL 11238482, at *11 (C.D. Cal. Mar. 18, 2013).[13] This makes sense: Plaintiffs have a professional investment and sweat equity in their grants. They prepared the projects that the grants will fund, worked with the Universities to submit the grants, are named in the grant applications, and are responsible for "proper conduct of the research, including the appropriate use of funds."[14] *See*

---

[13] Plaintiffs will be prepared to address *Am. Assoc. of Univ. Professors & Am. Fed. of Teachers v. Dep't of Just.*, 2025 WL 1684817 (S.D.N.Y. June 16, 2025) ("*AAUP*") at the hearing. *See* Dkt. 39. This case is a far cry from *AAUP*. Here, Plaintiffs' "core business" is research, not labor unionization; unlike the *AAUP* plaintiffs, researchers have suffered concrete and actual injury to their own "core business" pursuit. The *AAUP* plaintiffs were described as "inserting themselves into a quarrel between the Executive Branch and non-party Columbia, which ... Columbia wishes to resolve cooperatively." *Id.* at *11. That is not the case here.

[14] U.S. Envtl. Prot. Agency, *EPA Implementation Plan for Policy on Multiple Principal Investigators for Federally Funded Research Projects* (Feb. 26, 2008), https://www.epa.gov/sites/default/files/2015-05/documents/multiple_pi_implementation_plan_final.pdf (also available at

Dkt. 8 ¶ 13, Ex. B; Dkt. 9 ¶¶ 13-16, Ex. B; Dkt. 10 ¶¶ 9-10, Ex. B; Dkt. 11 ¶¶ 8-11, 25-27, Exs. C & I; Dkt. 12 ¶¶ 8, 24, 36, Exs. A, C & E; Dkt. 13 ¶¶ 22-24, Ex. B (all describing Plaintiffs' development of grant projects and applications). Defendants approve the principal researchers (*i.e.*, Plaintiffs). *See, e.g.*, Dkt. 11-3 at 5-6 (listing and distinguishing "Project Managers" from the purely "Administrative Contacts" provided at campus level). Defendants communicate directly with Plaintiffs. *See, e.g.*, Dkt. 10-5 at 2 (program officer communication with researcher)). And Defendants require notification if a specific funded researcher plans to leave the university. Plaintiffs thus have a clear, legally protected interest in their grant funding independent of any University interest.

Plaintiffs have demonstrated concrete and actual harm resulting from the "invasion" of their interest in the grants. *See, e.g.*, Dkt. 8 ¶¶ 29-32 (Philliou cannot "continue [her] work"); Dkt. 9 ¶ 27 (Alex has been "unable to proceed with [] basic work"); Dkt. 10 ¶ 25 (Thakur has been "unable to complete" her work, which includes "identify[ing] promising health-protecting strategies"); Dkt. 11 ¶ 41 (Green Nylen has been "unable to proceed with [] basic work" on two grants, and that the "job of every member of [the] team… is currently threatened by these grant terminations); Dkt. 12 ¶¶ 62-70 (Foreman stating that terminations "have compromised our ability to carry out our public service mission"); Dkt. 13 ¶ 39 (Hirst describing the inability to "retain [] highly trained and experienced staff" and "cutbacks in work plans"). These particularized harms constitute an injury in fact and do not depend on a signature on a contract.[15]

---

https://www.epa.gov/research-grants/research-grants-guidance-and-policies-resources) (EPA definition of principal investigator); *accord Definitions of Categories of Personnel*, Nat'l Sci. Found.; Nat'l Endow. Hums.,*Public Humanities Projects F.A.Qs* https://www.nsf.gov/policies/pappg/24-1/ch-2-exhibit-3 (NSF definition of principal investigator); https://www.neh.gov/sites/default/files/inline-files/Public%20Humanities%20Projects%20FAQs.pdf ("The project director is the person directly in charge of the conduct of the funded project.").

[15] Nonetheless, as the accompanying injunctive relief reply explains, if this formality matters, Plaintiffs and the class also have third party standing. While UC is the technically contracting party, it does not design, apply for, write-up or do the work the grants fund: the researchers to. Although UC would *also* have standing to litigate grant terminations, standing is non-exclusive, and its participation is not here necessary to vindicate researchers' rights. Indeed, the University's own spokesperson has so confirmed. *See* Tyler Kingkade, *UC Berkeley researchers team up for first-of-its-kind lawsuit over Trump funding cuts*, NBCNews.com (June 5, 2025), https://www.nbcnews.com/news/us-news/trump-funding-cuts-uc-berkelev-researchers-lawsuit-rcna206667 ("'Individual UC Berkelev faculty have every right to pursue litigation on their own behalf,' Dan Mogulof, a UC Berkeley spokesman, wrote in an email.")The UC researchers bear a

There is unquestionably a direct "causal connection" between Defendants' termination of the grants and Plaintiffs' harm. There are no intervening links in the causation chain: Defendants terminated the funding, and Plaintiffs' livelihoods began to suffer. Plaintiffs' injury is directly "traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 560. Defendants claim there is no causal connection between their decision to terminate the grants and Plaintiffs' injuries because the "choices" of the universities "interrupt any link between the challenged actions and the alleged harms." Dkt. 35 at 24. According to Defendants, for Plaintiffs "to suffer a tangible harm, [their] employer must choose not to provide [their] funding." *Id.* But the universities made no choices; the Defendants' action was unilateral. Contrary to Defendants' arguments, Plaintiffs and the class are not unknown, unforeseeable, attenuated causalities of Defendants' acts (although Rule 23(b)(2) classes can encompass such unknown or future members). Defendants knew their actions would directly and specifically harm *Plaintiffs*, because Plaintiffs were named in the grant applications that Defendants unilaterally terminated.

Plaintiffs' injuries will also be redressed by a favorable decision from this Court that would restore the grant funding and allow Plaintiffs to resume their professional activities. Defendants argue that Plaintiffs' injury results from the independent action of the universities and that redressability depends on guesswork as to how UC would exercise its judgment. But there is no judgment UC could exercise. The terminated grants were approved and funded specifically for Plaintiffs' projects, to be conducted by Plaintiffs *as named in the grant applications*. If the grants were restored, UC would have no discretion to award them to someone else.[16]

### 2. The Juridical Link Doctrine Renders Standing Appropriate as to All Defendants

The juridical link doctrine allows plaintiffs to sue similarly situated defendants on behalf of a class, even if the named plaintiffs themselves were not harmed by every defendant. *See*

---

"close relationship" with the universities, and the universities are impeded from asserting their own right given the potential for retaliation, *see* Compl. ¶ 430. *See, e.g.*, *Singleton v. Wulff*, 428 U.S. 106, 117-18 (1976); *Craig v. Boren*, 429 U.S. 190, 195 (1976).

[16] Plaintiffs' revised class definition addresses Defendants' argument that "too many" unnamed class members would not have standing. *See* Dkt. 36 at 15. Defendants' concern that the class would be overwhelmed by "individuals simply speculating that a grant award could be terminated in the future," *id.*, is misplaced. Class members at imminent risk of unlawful grant termination by Defendants' unlawful conduct would be appropriately protected by the Rule 23(b)(2) injunction.

*Payton*, 308 F.3d at 678. Once the requirements of Rule 23 are met, the court can consider "the true plaintiff [to be] the class as a whole" for standing purposes. *See id.* (citing *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461 (9th Cir.)). Essentially, if all defendants "took part in a similar scheme," sustained by a common instrument or rule, "it is appropriate to join as defendants even parties with whom the *named* class representative did not have direct contact." *Id.* at 679 (collecting cases).[17]

Just so here. Although the named Plaintiffs represent only three Agency Defendants, standing exists on behalf of the class as to all other Agency Defendants. The facts here are similar to those in *Payton*, where six named plaintiffs alleged that nineteen counties were charging a bail fee in manner that contravened the law. The plaintiffs, however, were only charged a bail fee by two of the counties. Nevertheless, they alleged that nineteen counties were following a general practice of imposing this fee on an unknown number of individuals. *Payton*, 308 F.3d at 675. To determine if the juridical link existed, the court considered "whether the essence of the suit relates to the state statute or if the named representatives' claims are more particular to each individual county." *Id.* at 680. Although it remanded to the district court to consider the Rule 23 factors, the court concluded that "plaintiffs may be entitled to represent a class suing all 19 defendant counties if . . . they fulfill all the requirements of Rule 23." *Id.* at 681.

As discussed, Defendants have admitted that all Agency Defendants follow generalized grant-making procedures and that the same regulations govern all grants. Dkt. 36 at 2. Moreover, Defendants admit that all Agencies altered their grantmaking in response to Defendant Trump's orders. *Id.* This case is not about the "named representatives' claims…particular to each individual" agency, *Payton*, 308 F.3d at 680, but rather about the general directives and processes the Agencies followed when terminating UC researchers' grants. Because the named Plaintiffs meet the requirements of Rule 23, standing exists as to all Defendants.

---

[17] This doctrine rests on the "long-standing rule that, once a class is properly certified, statutory and Article III standing requirements must be assessed with reference to the class as a whole, not simply with reference to the individual named plaintiffs." *Payton*, 308 F.3d at 680 (citing *Ortiz v. Fibreboard Corp*, 527 U.S. 815 (1999)).

III.    **CONCLUSION**

For these reasons, Plaintiffs respectfully request that the Court grant provisional

certification to the UC Researchers class, and enter the accompanying Proposed Order, which has

been revised only to update the class definition.

Dated: June 17, 2025                    By:    */s/ Elizabeth J. Cabraser*

Erwin Chemerinsky (*pro hac vice*)
echemerinsky@law.berkeley.edu
Claudia Polsky (CA Bar No. 185505)
cpolsky@law.berkeley.edu
U.C. BERKELEY SCHOOL OF LAW
Law Building
Berkeley, CA 94720-7200
Telephone: 510.642.6483

Elizabeth J. Cabraser (CA Bar No. 83151)
ecabraser@lchb.com
Richard M. Heimann (CA Bar No. 63607)
rheimann@lchb.com
Kevin R. Budner (CA Bar No. 287271)
kbudner@lchb.com
Annie M. Wanless (CA Bar No. 339635)
awanless@lchb.com
Nabila M. Abdallah (CA Bar No. 347764)
nabdallah@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000

Anthony P. Schoenberg (CA Bar No. 203714)
tschoenberg@fbm.com
John J. Darin (CA Bar No. 323730)
jdarin@fmb.com
Katherine T. Balkoski (CA Bar No. 353366)
kbalkoski@fbm.com
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, CA 94104
Telephone: 415. 954.4400

*Attorneys for Plaintiffs and the Proposed Class*

1

## <u>CERTIFICATE OF SERVICE</u>

2      I hereby certify under penalty of perjury that on June 17, 2025, I authorized the electronic

3   filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send

4   notification of such filing to registered parties.

5      Executed June 17, 2025, at San Francisco, California.

6

7                                      */s/ ELIZABETH J. CABRASER*
                                       ELIZABETH J. CABRASER

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28