2025 WL 1697463

2025 WL 1697463
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

GREEN & HEALTHY HOME
INITIATIVES, INC., et al., Plaintiffs,
v.
ENVIRONMENTAL PROTECTION
AGENCY, et al., Defendants

Case No. 25-cv-1096-ABA
|
06/17/2025

Adam B. Abelson, United States District Judge

## MEMORANDUM OPINION

**\*1** In August 2022, Congress created an "[e]nvironmental and climate justice block grants" program and funded it with appropriations for fiscal years 2022 through 2026. 42 U.S.C. § 7438(a). The statute is specific, and mandatory. Congress mandated that the Environmental Protection Agency "shall use" the appropriated funds to fund "eligible entit[ies]" (such as local governments and nonprofit organizations) to conduct certain "[e]ligible activities" such as pollution remediation and investments in low-emission technologies. *Id.* § 7438(b)(2). Congress further required that such programs "benefit disadvantaged communities, as defined by the [EPA]." *Id.* § 7438(b)(1).

In compliance with that statutory mandate, EPA selected ten Regional Grantmakers and delegated to them authority to select programs to receive sub-grants. The Regional Grantmakers included the three plaintiffs that have brought this case: Green and Healthy Homes Initiative, Inc. ("GHHI"), the Minneapolis Foundation, and Philanthropy Northwest. They geared up and began complying with their obligations as Regional Grantmakers. Then, in February 2025, EPA announced that "environmental justice" is no longer an agency "priority." Based solely on that change in policy priority, EPA terminated *all* § 7438 grants, and retracted the Regional Grantmakers' authority to fund statutorily designated activities.

Plaintiffs brought this case challenging the termination of their grants. They contend EPA has violated the Administrative Procedures Act by (a) failing to "supply a valid statement of reasons for taking these actions" or "engage in reasoned decisionmaking," ECF No. 1 ¶ 83, (b) exceeding its statutory authority, ECF No. 1 ¶ 95, (c) violating the First and Fifth Amendments of the U.S. Constitution, *id.* ¶¶ 100-103, 109-110, and (d) violating regulations limiting the circumstances in which a federal agency may terminate a grant award, *id.* ¶¶ 120-22. Defendants dispute those claims and further contend that this Court lacks subject matter jurisdiction over Plaintiffs' claims.

Changes in administration often entail changes in policy priorities, and policy changes can mean budgets are redirected. EPA has some leeway, consistent with its statutory mandate, to decide how to administer the environmental and climate justice block grants program Congress created and funded through § 7438 of the Clean Air Act. But that statute, and the Administrative Procedures Act, and the Constitution, impose certain limit and procedural requirements. For example, "the President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *In re Aiken County*, 725 F.3d 255, 260 (D.C. Cir. 2013). And an agency action must be both "reasonable and reasonably explained," *Ohio v. EPA*, 603 U.S. 279, 292 (2024); if it is not, it is "unlawful" and "shall be...set aside," 5 U.S.C. § 706. For the following reasons, EPA has violated the Administrative Procedures Act, and Plaintiffs are entitled to an order setting aside the grant terminations.

**Table of Contents**

I. BACKGROUND............................................................
A. Congress's Mandate to EPA..................................................4
B. The Thriving Communities Grantmaking Program.........................................5
C. EPA's Termination of Plaintiffs' Grants..............................................9
D. EPA's Process for Terminating These Grants...................................13
E. This Case.........................................................18

II. LEGAL STANDARD..............................................................2

III. JURISDICTIONAL MATTERS...............................................24
A. Subject Matter Jurisdiction..........................................24

B. Reviewability....................................................32

IV. DISCUSSION....................................................33
A. The Basis for EPA's Decision to Terminate These Grants..............................33 B. Agency Action in Excess of Statutory Authority..............................................37
C. Arbitrary and Capricious Agency Action.........................................................41

V. RELIEF....................................................46

VI. CONCLUSION....................................................48

## I. BACKGROUND

**A. Congress's Mandate to EPA**

 *2 In August 2022, Congress amended the Clean Air Act by enacting the "Environmental and climate justice block grants" statute as part of the Inflation Reduction Act of 2022. 42 U.S.C. § 7438. Congress appropriated $2.8 billion to "award grants for the activities described in [§ 7438(b)]," and another $200 million for "technical assistance to eligible entities related to grants awarded under this section." 42 U.S.C. § 7438(a). Congress then set forth the following statutory mandate: "The Administrator [EPA] shall use amounts made available under subsection (a)(1) to award grants for periods of up to 3 years to eligible entities to carry out activities described in paragraph (2) that benefit disadvantaged communities, as defined by the Administrator." Id. § 7438(b)(1). Congress defined "eligible entities" to include "community-based nonprofit organization[s]" as well as partnerships among such organizations, or between such organizations and "an Indian tribe, a local government, or an institution of higher education." Id. § 7438(c).

Congress directed EPA to use the funds for specified programs:

> (A) community-led air and other pollution monitoring, prevention, and remediation, and investments in low- and zero-emission and resilient technologies and related infrastructure and workforce development that help reduce greenhouse gas [1] emissions and other air pollutants;

> (B) mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events; (C) climate resiliency and adaptation;

> (D) reducing indoor toxics and indoor air pollution; or

> (E) facilitating engagement of disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes.

*Id.* § 7438(b)(2).

**B. The Thriving Communities Grantmaking Program**

Pursuant to its authority under § 7438, EPA announced the Environmental Justice Thriving Communities Grantmaking Program in February 2023. ECF No. 2-3. It issued a "solicitation" to "request applications for the design and management of a new Environmental Justice (EJ) competitive pass-through program where EPA will competitively select multiple pass-through entities to provide grant funds via subawards to community-based nonprofit organizations and other eligible subrecipient groups representing underserved and disadvantaged communities." *Id.* at 3. [2] EPA explained that it was electing to use a "passthrough model" to "remove[ ] the requirement" that potential grantees "apply[ ] through the federal grants process," which can be "very time-consuming" and "a significant barrier to entry," especially for smaller organizations. *Id.* at 6. EPA considered a passthrough model to be "a more effective approach to providing smaller funding amounts to communities for the initial development of their environmental justice projects." *Id.* EPA explained that Grantmakers would "collaborate with EPA to design and build their own processes to receive and evaluate competitive community project applications from communities for EJ Thriving Communities Subgrants." *Id.* at 7.

 *3 Accordingly, the first step in implementing its obligations under § 7438 was for EPA to select Regional Grantmakers for each of EPA's ten regions, as well as a "national" grantmaker to "fill gaps and potential needs that other Grantmakers may not have the ability to cover." *See* ECF No. 2-3 at 17-18. The solicitation explained that the authority for the grants was § 7438, and that EPA was required to direct the grant funding to "projects to benefit disadvantaged communities." *Id.* at 5. The solicitation noted that EPA was "in the process of defining the term disadvantaged communities,' " *id.* at 4 n.2, but explained that EPA understood Congress's mandate to require "new and innovative strategies and

approaches," "especially...for underserved and disadvantaged communities that have [been], and continue to be, plagued by environmental pollution and health, and environmental justice, challenges." *Id.* at 5. EPA further explained,

> These communities are often exposed to unhealthy land uses, poor air and water quality, dilapidated housing that leads to lead exposure, and other environmental threats that drive health disparities. Many of these communities are also surrounded by social inequities such as job insecurity, underemployment, linguistic isolation, underperforming schools, noise pollution, crowded homes, face high energy burden or fossil fuel dependence, and lack access to healthy foods and transportation. In addition, they often lack adequate resources and experience to navigate complex Federal grant application and award making processes and have been limited in their ability to have meaningful access to, and participation in, governmental decision-making processes that affect them, including those relating to environmental health and justice. The combination of environmental risks and social inequities creates a cumulative, disproportionate impact that hinders optimal environmental health and justice particularly for these communities.

*Id.* at 6.

In December 2023, EPA announced its selections, and designated Plaintiffs as Regional Grantmakers: **GHHI** for EPA Region 3 (Delaware, Maryland, Pennsylvania, Virginia, West Virginia, and Washington, D.C., and seven federally recognized tribes), ECF No. 2-2 ¶¶ 6–7; **Minneapolis Foundation** for EPA Region 5 (Indiana, Illinois, Michigan, Minnesota, Ohio, and Wisconsin, and 37 federally recognized tribes), ECF No. 2-14 ¶ 8; and **Philanthropy Northwest** for EPA Region 10 (Alaska, Idaho, Oregon, and Washington, and 271 tribal nations), ECF No. 2-24 ¶¶ 9–10.

In mid-2024, EPA awarded each organization a three-year, $8 million "initial grant." *See* ECF No. 2-1 at 12. EPA designated these initial grants to support expanded staffing, regionwide outreach to community-based organizations, and the development and administration of a grant application process in each region, as well as to provide technical assistance and initial oversight to subgrant applicants and subgrantees. *Id.* at 12-13.

EPA then awarded each organization a "subsequent grant" in the amount of $52 million. *Id.* at 13. EPA directed Plaintiffs to use $48 million from those grants to award subgrants; the balance was permitted to cover Plaintiffs' administrative costs. *Id.*; *see also* 42 U.S.C. § 7438(c) ("The Administrator shall reserve 7 percent of the amounts made available under subsection (a) for administrative costs to carry out this section.").

Each Thriving Communities grant is governed by a Cooperative Agreement: ECF No. 2-5 (GHHI, May 3, 2024); ECF No. 2-15 (Minneapolis Foundation, June 24, 2024); ECF No. 2-25 (Philanthropy Northwest, June 14, 2024). Those agreements incorporate General Terms and Conditions issued by EPA. *See, e.g.*, ECF No. 2-5 at 6. Those EPA General Terms and Conditions, the relevant version of which became effective October 1, 2023, permit EPA to terminate grants as follows:

> Consistent with 2 CFR 200.340, EPA may unilaterally terminate this award in whole or in part:
>
> **\*4** (a) If a recipient fails to comply with the terms and conditions of the award including statutory or regulatory requirements; or
>
> (b) If the award no longer effectuates the program goals or agency priorities. Situations in which EPA may terminate an award under this provision include when:
>
> i. EPA obtains evidence that was not considered in making the award that reveals that specific award objective(s) are ineffective at achieving program goals and EPA determines that it is in the government's interest to terminate the award;
>
> ii. EPA obtains evidence that was not considered in making the award that causes EPA to significantly question the feasibility of the intended objective(s) of the award and

EPA determines that it is in the government's interest to terminate the award;

iii. EPA determines that the objectives of the award are no longer consistent with funding priorities for achieving program goals.

ECF No. 2-13 at 3–4.

Those general terms and conditions track the referenced C.F.R. provision, which is an Office of Management and Budget (OMB) regulation that provides that a federal award "may be terminated in part or its entirety" including, "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a). [3]

**C. EPA's Termination of Plaintiffs' Grants**
Upon being selected as Regional Grantmakers for the Thriving Communities program, Plaintiffs proceeded to conduct extensive work to administer the program, including hiring staff, developing partnerships, standing up systems and policies, conducting extensive assessments and strategic planning on how to best effectuate Congress's mandate and EPA's guidance, and preparing to select sub-grantees, disburse funds, and oversee implementation. And by the time EPA terminated Plaintiffs' initial grants in February 2025, each Plaintiff had conducted a first round of selections of sub-grantees. ECF No. 2-2 ¶ 20; ECF No. 2-14 ¶ 30-33; ECF No. 2-24 ¶ 39.

*5 That all came to a halt when EPA issued the terminations at issue, on February 21 and 22, 2025. EPA sent each organization an Assistance Amendment to the Cooperative Agreement governing the organization's initial grant, and a memorandum from each organization's "EPA Award Official." The Assistance Amendments did not contain any explanation for the terminations. Instead, they stated in pertinent part as follows:

> This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements. Administrative terms and conditions are added.
>
> Per 2 CFR 200.340 and the Termination General Terms and Conditions of this agreement, EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions.
>
> ...
>
> Based on your Application dated 04/16/2024 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00.

ECF No. 2-10 at 2 (GHHI); *see also* ECF No. 2-18 at 4 (Minneapolis Foundation); ECF No. 2-28 at 4 (Philanthropy Northwest). The Assistance Amendment invoked 2 CFR 200.340 as the authority for the termination, *e.g.*, ECF No. 2-10 at 5, and noted the following regarding disputes over the terminations:

> If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

ECF No. 2-10 at 2; ECF No. 2-18 at 4; ECF No. 2-28 at 4. To the extent EPA has explained the basis for the terminations, that explanation appears in the Termination Memoranda issued to each Plaintiff. The three letters, also sent February 21 and 22, are materially identical, and state in pertinent part as follows:

> The purpose of this communication is to notify you that the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5N-95341301 awarded to Green & Healthy Homes Initiative, Inc. In accordance with 2 CFR 200.340(a)(2) (effective August

13, 2020 – September 30, 2024) and the Termination term and condition contained in the EPA General Terms and Conditions effective August 13, 2020 – September 30, 2024, EPA Assistance Agreement 5N-95341301 is terminated in its entirety effective immediately on the grounds that the award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities.

It is a priority of the EPA to eliminate discrimination in all programs throughout the United States. The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives, "environmental justice" initiatives, and conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In addition to complying with the civil rights laws, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.

**\*6** The grant specified above provides funding for programs that promote or take part in DEI initiatives or environmental justice initiatives or other initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Agency priorities.

*E.g.*, ECF No. 2-9 at 2 (GHHI); *see also* ECF No. 2-18 at 2 (Minneapolis Foundation); ECF No. 2-28 at 2 (Philanthropy Northwest).

Those February 20 and 21, 2025, letters terminated each Plaintiff's initial $8 million Thriving Communities grants and suspended their access to subsequent grant funds. *See, e.g.*, ECF No. 2-11 at 2, 4 (as of March 21, 2025, GHHI's grants listed as "[s]uspended"). Since then, EPA has also terminated the subsequent grants. ECF Nos. 28 & 32. The May 2025 letters terminating the subsequent grants contain even less explanation than the February 2025 letters terminating the initial grants. The May letters state as follows:

The purpose of this communication is to notify you that the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5N-95341401 awarded to Green & Healthy Homes Initiative Inc. This EPA Assistance Agreement is terminated effective immediately on the grounds that the remaining portion of the Federal award will not accomplish the EPA funding priorities for achieving program goals. The objectives of the award are no longer consistent with EPA funding priorities.

The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In addition to complying with the law, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.

ECF No. 28-3 (GHHI); *see also* ECF No. 28-1 at 2 (Minneapolis Foundation); ECF No. 32-1 at 2 (Philanthropy Northwest).

At the hearing on Plaintiffs' preliminary injunction motion, Plaintiffs represented, on information and belief, that EPA had terminated *all* of the Regional Grantmakers' initial grants. In other words, EPA has, at least for now, effectively shuttered a program that Congress created, that Congress mandated EPA to administer, and that Congress funded through specific appropriations.

**D. EPA's Process for Terminating These Grants**
Under the Administrative Procedures Act, the process EPA employed in deciding on the agency action at issue is central to the analysis. As discussed above, any such process must be both "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. at 292. If it is not, the law considers it to be "arbitrary" or "capricious," *id.* at 293, and thus "unlawful" and required to be "set aside," 5 U.S.C. § 706. To the extent the administrative record in this case (filed at ECF Nos. 36, 40-2, and 40-3) reflects any deliberative process by EPA in deciding to terminate these grants, it is the following.

On January 21, 2025, the director of EPA's Office of Grants and Debarment emailed another employee requesting that

she "identify all OEJECR grant awards" including "award amount, amount obligated, and amount expended." ECF No. 40-3 at 3. "EOJECR" refers to the Office of Environmental Justice and External Civil Rights. The employee reported back later that day that that "Action Task" was "done." *Id.* at 2.

**\*7** On February 11, 2025, another EPA employee, Kathryn Loving, [4] sent an email to two other EPA employees, sharing a link to a document entitled "contract details." ECF No. 36-1 at 154. She wrote, "Hi Travis, as we discussed today, here's a list of contracts and grants that we want to push forward to cancellation, and keep the momentum going! We removed the ones we thought were yellow flags, so we think these are pretty uncontroversial, but we added a column 'AO reviewed', for your team to add any greenlight or flags. Thanks! Kathryn." *Id.* That version of the "contract details" spreadsheet is not in the record, and there is no evidence in the record of the substance of the "discuss[ion]" that Ms. Loving referred to, or what process was entailed by the referenced "AO review[ ]." The next day she wrote, "In addition, we added a new tab 'Feb 12 contracts to cancel' with a new tranche of contracts we found today." *Id.*

The spreadsheets these individuals were circulating contained various columns, such "Date Cancellation Process Started," grant identification or account numbers, recipient names, and grant amounts. *See, e.g.*, *id.* at 149. Another column identified whether notice-and-comment rulemaking would be required to cancel the grants (which is not at issue here; Plaintiffs do not contend that notice-and-comment rulemaking was required). *Id.* The only column pertinent to this case is a column entitled "Rationale." Depending on the contract, the entire extent of any "Rationale" reflected on these spreadsheets is a few words at most: (1) "Environmental justice work" (later revised to read "Program not in line with administration priorities: 66.615 - Environmental Justice Subawards"), (2) "DEI EO issues," or (3) "Wasteful." *See, e.g.*, *id.* at 149–53. ("66.615" is EPA's "assistance listing code" for the Thriving Communities program. *See* ECF No. 36-1 at 7.)

On February 13, EPA employee Travis Voyles wrote,

> Thank you so much! This is really helpful. Paige and I had a good discussion with the Administrator last night reviewing the examples and process. One aspect he raised that we just want to ensure we are covering when taking the action to cancel that we are doing it reflective of any terms/conditions/notification requirements in the contract or grant. Is that something y'all feel you are able to capture in your review or we can engage OMS [Office of Mission Support] to quickly get us that details. Otherwise he liked the process and agrees that we'll be able to quickly move through reviewing these once that element is addressed.

*Id.* at 154. There is no memorandum or other record of the "discussion with the Administrator" this email refers to.

Ms. Loving responded,

> I have added a column "T&C" that indicates no notice and comment period required for the contracts and grants we already sent you. As you can imagine, the DOGE team has lawyers that are pretty experienced with grant and contract cancellation at this point, so that's what that is based on!
>
> I will also add that the careers in EPA OMS are already supporting us on this – they are the ones who will be executing the cancellation on your greenlight, not us. They see no issues with cancelling the Feb 11 list of contracts, and we're sharing the Feb 12 list with them now. They seem very knowledgeable about this topic, so I think you should trust them on how to cancel properly!

*Id.* Despite the reference to "support[ ]" from the Office of Mission Support, there is no memorandum or other record of analysis or deliberation by individuals in that office.

**\*8** Later in the day on February 13 (at 6:11 p.m.) she added the following:

> Keeping up the cadence today, we have added to the queue a list of 71 grants that were all signed before July 1, 2024, worth $119M (ceiling; savings will be lower once we subtract obligations). The new tab is called "Feb 13 grants to cancel".
>
> It was great to put 5 of the "gold bars" on this list, that are signed before July 1! (The majority of those were signed after July 1.) We have marked those 5 rows in blue, because

gold is too hard to read. Total award value for those 5 is $36.9M, of which $27.8M has not yet been obligated. We are calling them "gold bars" because they were awards to grant makers who plan to give subawards. *4 of the 5 are part of the Thriving communities grantmaking program that Lee cancelled part of earlier today*.

*Id*. The work continued later that night, apparently reflecting the speed at which the EPA employees were being directed to operate. At 10:18 p.m., Mr. Voyles emailed the group, "below is the test batch run that just got approved to cancel. We will go back into the spreadsheet and mark these as 'Approved to Cancel.' " *Id.* at 153.

Over the next week, these employees added some other grants to their cancellation tracking sheet. On Thursday, February 20, Mr. Voyles wrote,

> Below are the next set of approved to cancel grants. $42,261,933 total in remaining funds it looks like, but OMS can confirm.
>
> *One flag I have is the first few large ones are the EJ*
>
> *Thriving Communities Technical Assistance Centers*

(TCTACs)— https://www.epa.gov/environmentaljustice/environmental-justice-thriving-communities-technical-assistance-centers.

There were 18 in total established, so a number of them are missed here. Not sure why they didn't all get captured (they may not have all gone out yet), but *I would want to apply a broad approach and cancel them all in the vein the entire program is inconsistent with Adminstration [sic] priorities and I personally do not see the need for these because at the state-level, EPA and the TCTAC grantees refused to engage with the state in any kind of coordination*. This should result in a larger $$ amount

*Id.* at 149 (emphases added).

At 10:37 a.m., he then recirculated the spreadsheet, this time listing the GHHI, Philanthropy Northwest, and Minneapolis Foundation grants. The entire extent of any "rationale" this team had identified for terminating Plaintiffs' grants is this: "Program not in line with administration priorities: 66.615 - Environmental Justice subawards." *Id.* at 148–49. Unlike for other grant cancellations being discussed in this email chain, EPA did not identify "DEI EO issues" or "Wasteful" in the "Rationale" column for the GHHI, Philanthropy Northwest, and Minneapolis Foundation cancellations.

At 11:12 a.m., Ms. Loving forwarded the list to another employee to "submit[ ] the cancellation requests." *Id.* at 148. At 12:25 p.m., an EPA employee, Daniel Coogan, emailed another EPA employee, Melissa Wise, stating, "Melissa, can we please begin working with the GMOs [Grants Management Officers] to terminate the following 22 grants. I received direction from political leadership that we are to cancel these." ECF No. 40-2 at 4.

**\*9** To effectuate the terminations, EPA employees used a template form letter. ECF No 36-1 at 172. [5] The template contains all of the language that appeared in the termination memoranda that Plaintiffs received; the only changeable fields in the template are the grant recipient's name, the grant number, and the contact information for the pertinent EPA official. *Id.* at 172–73.

The next day or the following day (February 21 or 22), EPA populated the missing fields from the template letter, and sent the first termination notices to Plaintiffs (ECF No. 2-10 at 2; ECF No. 2-18 at 4; ECF No. 2-28 at 4), along with the termination memoranda (ECF No. 2-9 at 2; ECF No. 2-18 at 2; ECF No. 2-28 at 2).

**E. This Case**

Plaintiffs filed this case on April 2, 2025, challenging these grant terminations. The complaint asserts five causes of action.

Count 1 alleges that the terminations were arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Plaintiffs articulated their contention in Count 1 as follows:

> EPA identified three vague and baseless grounds for its actions: (1) because the grant awards are purportedly inconsistent with EPA's newly-adopted "Agency priority" to withdraw financial support from "organizations that promote or take part in … 'DEI' [or] 'environmental justice' initiatives";
>
> (2) because the organizations' grant-funded programs are purportedly not be "free from fraud, abuse, waste, or duplication"; or (3) because the organizations' programs allegedly "otherwise fail to serve the best interests of the United States." EPA's stated reasons for termination of the

grants are so varied and ambiguous that the statement is meaningless. The Agency gave no legitimate reason for its actions.

EPA provided no rationale for its actions beyond this vague and unsubstantiated statement. The Agency did not identify any evidence, find any facts, or supply any reasoning that would support any of its three stated reasons for terminating the grants. With respect to EPA's newly adopted "Agency priority" to withhold financial support from "organizations that promote or take part in...'DEI' [or] 'environmental justice' initiatives," EPA has not identified any offending "initiatives" that it believes the Plaintiff Organizations have "promote[d]," or in which it believes the organizations have "take[n] part." EPA has not pointed to any evidence on which a finding of "promoting or taking part in" disfavored "initiatives" could be based. EPA has not identified the "constitutional and statutory law of the United States" that it claims forms the basis for its newly declared "Agency priority." The Agency has not even defined the terms "DEI" or "environmental justice."

Meanwhile, EPA's invocations of "fraud, waste, abuse or duplication" and "the best interests of the United States" are pure boilerplate. The Agency does not supply even a hint of anything that it might be referencing.

**\*10** Simply put, EPA's actions here, in addition to being unlawful and unconstitutional, are a paradigm of arbitrary and capricious Agency action constituting an improper abuse of discretion as those terms are used in the APA.

ECF No. 1 ¶¶ 84-87.

Count 2 alleges that the terminations were "in excess of [EPA's] statutory...authority" in violation of the APA, 5 U.S.C. § 706(2)(C). Plaintiffs articulated why:

> EPA and Administrator Zeldin had no statutory authority to terminate the grants or suspend access to grant funding on this basis. In the Clean Air Act, Congress did not confer any discretion on the Agency to determine that its own "priorities" no longer match those of Congress and on that basis to decline to fund environmental protection activities that benefit disadvantaged communities. To the contrary, the Clean Air Act unambiguously provides that the EPA and Administrator Zeldin "shall use" appropriated amounts to fund "environmental justice" initiatives. The Agency and its Administrator, in declaring it an "Agency priority" not to fund such initiatives, have acted in defiance of that congressional direction.

ECF No. 1 ¶ 95.

Counts 3 and 4 allege that the terminations violate Plaintiffs' rights under the First and Fifth Amendments of the U.S. Constitution. Count 3 asserts a direct claim, seeking a declaratory judgment that the terminations violate the First and Fifth Amendments. *Id.* ¶¶ 99-105. Count 4 alleges that, if the terminations are unconstitutional, EPA violated APA § 706(2)(B), which applies to agency actions that are "contrary to constitutional right." 5 U.S.C. § 706(2)(B). Plaintiffs articulate their First Amendment claim as follows:

> In terminating the Thriving Communities initial grants that it had previously awarded to the Plaintiff Organizations, EPA declared it an "Agency priority" to ensure "that the Agency's grants do not support...organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives [or] 'environmental justice' initiatives." In so stating, EPA has acknowledged engaging in viewpoint discrimination.
>
> The First Amendment prohibits EPA and Administrator Zeldin from terminating grants or suspending grant funding based on their perception that the Plaintiff Organizations "promote" or "take part in" viewpoints with regard to "environmental justice" that the government now disfavors. Moreover, the First Amendment protects the Plaintiff Organizations' advocacy for and on behalf of disadvantaged communities.

ECF No. 1 ¶¶ 100-101. Plaintiffs articulate their Fifth Amendment claim as follows:

> The Fifth Amendment prohibits "depriv[ations] of life, liberty, or property without due process of law.
>
> In terminating the Plaintiff Organizations' initial grant award and suspending their access to subsequent

grant funds without any legitimate reason, EPA and Administrator Zeldin have violated Plaintiffs' due process rights.

*Id.* ¶¶ 102-103.

Count 5 alleges that EPA's terminations also are unlawful and should be set aside as "not in accordance with law" or "without observance of procedure required by law," 5 U.S.C. § 706(2)(A) & (D), because they violate OMB regulations "limiting the circumstances under which a federal agency may terminate a grant award." ECF No. 1 ¶ 116 (citing 2 C.F.R. §§ 200.340, .341). Plaintiffs specifically allege that the terminations violate OMB regulations for two reasons: (1) EPA "failed to provide a meaningful statement of its 'reasons for termination,' " ECF No. 1 ¶ 117, and (2) although the terms and conditions that accompanied the EPA grants authorized EPA to "unilaterally terminate this award in whole or in part...[i]f the award no longer effectuates the program goals or agency priorities," the "[s]ituations" that EPA identified as "included" in that authority did not include changes in "agency priorities." *Id.* ¶¶ 117-22; *see also* ECF No. 2-13 at 3-4 (referenced terms and conditions).

**\*11** As relief, Plaintiffs requested in their complaint that the Court (A) "postpone the effective date of the EPA's termination of Plaintiffs' Thriving Communities initial grant awards, pending final judicial review"; (B) "hold unlawful and set aside" those terminations and suspensions as "arbitrary and capricious, in excess of statutory authority, contrary to constitutional right, not in accordance with law, and without observance of procedure required by law"; (C) issue a declaratory judgment that the terminations and suspensions are unlawful; and (D) order that EPA "reinstate Plaintiffs' Thriving Communities initial grant awards." ECF No. 1 at 33.

Plaintiffs accompanied their complaint with a motion for a preliminary injunction requiring that EPA "reinstate Plaintiffs' Thriving Communities 'initial grants' and restore Plaintiffs' access to the funds awarded in their Thriving Communities 'subsequent grants,' thereby returning the parties to the status quo prior to Defendants' termination and suspension of those grants," and enjoining EPA from "terminating, suspending, or freezing access to funds under any of the Plaintiffs' Thriving Communities grants." ECF No. 2-31 (Plaintiffs' proposed preliminary injunction). The Court held a preliminary injunction hearing on April 29, 2025, and took the motion under advisement. During the hearing on the motion for a preliminary injunction, the Court ordered that Defendants file the administrative record by May 13, 2025, ECF No. 29, which the Defendants did, ECF No. 36-1. Plaintiffs filed a motion for summary judgment, ECF No. 41, and Defendants filed a motion to dismiss for lack of jurisdiction, motion to transfer the case to the Court of Federal Claims, or in the alternative, a motion for summary judgment, ECF No. 44. Both parties filed response briefs. ECF Nos. 46, 48. The Court held a summary judgment hearing on May 30, 2025. ECF No. 50.

As explained in greater detail below, Defendants oppose Plaintiffs' motions (and move to dismiss and/or transfer this case) on a number of grounds. They argue this Court lacks subject matter jurisdiction over Plaintiffs' claims and that the Court of Federal Claims has exclusive jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491. ECF No. 44-1 at 13-25. On the merits, Defendants contend that EPA can lawfully decline to fund the "Environmental and climate justice block grants" program mandated by 42 U.S.C. § 7438, or at minimum suspend the program and reorient the funding pursuant to the current administration's "funding priorities." They argue the grant terminations are "committed to agency discretion by law" and therefore unreviewable under 5 U.S.C. § 701(a)(2), and in any event were not arbitrary and capricious. ECF No. 44-1 at 32-33. They argue Plaintiffs have not stated a cognizable First Amendment claim because "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." ECF No. 22 at 22 (quoting *Rust v. Sullivan*, 500 U.S. 173, 193 (1991)). And they argue that if EPA's reasoning or explanation for the terminations was deficient, at most the Court should "remand the matter back to EPA to provide a more detailed explanation for each grant termination on an expedited schedule." *Id.* at 27.

**II. LEGAL STANDARD**

"Because claims brought under the APA are adjudicated without a trial or discovery, on the basis of an existing administrative record, such claims are properly decided on summary judgment." *Audubon Naturalist Society of the Central Atlantic States, Inc. v. U.S. Dep't of Transportation*, 524 F. Supp. 2d 642, 660 (D. Md. 2007) (citing *Citizens for the Scenic Severn River Bridge, Inc. v. Skinner*, 802 F. Supp. 1325, 1332 (D. Md. 1991), *aff'd*, 1992 WL 180138 (4th Cir. July 29, 1992). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). In determining whether the moving party has made that showing, the Court must consider the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Where, as here, there are cross-motions for summary judgment, the Court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Bollech v. Charles Cnty.*, 69 F. App'x 178, 180 (4th Cir. 2003) (citation omitted).

## III. JURISDICTIONAL MATTERS

### A. Subject Matter Jurisdiction

**\*12** Before turning to the merits of Plaintiffs' claims, this Court must "first determin[e] that it has jurisdiction over the category of claim in suit." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007). "The United States is immune from suit unless it unequivocally consents." *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 322 (2020). The parties agree that the United States has waived immunity for claims such as Plaintiffs', but they disagree on which authority provides that waiver. Plaintiffs contend that the Government has waived its sovereign immunity pursuant to the Administrative Procedures Act because Plaintiffs allege that they have been "aggrieved by agency action" and they "seek[ ] relief other than money damages." 5 U.S.C. § 702. EPA disagrees, arguing that Plaintiffs are in fact seeking money damages pursuant to a contract, so the Tucker Act, 28 U.S.C. § 1491, under which the Court of Federal Claims would have exclusive jurisdiction, applies. *See* 28 U.S.C. § 1491(a)(1) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States."); *Portsmouth Redevelopment & Hous. Auth. v. Pierce*, 706 F.2d 471, 473 (4th Cir. 1983) (explaining that when such a claim exceeds $10,000, the Court of Federal Claims' jurisdiction is exclusive). Courts across the country have been wrestling with this issue in grant-termination cases.

The parties agree that the controlling question for whether this Court has subject matter jurisdiction turns on whether this action is " 'at its essence' a contract action," which in turn depends on (1) "the source of the rights upon which the plaintiff bases its claims," and (2) "the type of relief sought." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). In performing this analysis, this Court "must look beyond the form of the pleadings to the substance of the claim." *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1124 (Fed. Cir. 2007). Plaintiffs contend that the source of the rights upon which they base their claims are the Constitution, statutes, and regulations—not the terms of the grants themselves. ECF No. 48 at 13-15. They assert that the type of relief they seek is equitable and designed to clarify EPA's obligations on a prospective basis—not an award of money damages. *Id.* at 16-17. EPA asserts that the source of Plaintiffs' claims is the language and provisions in the grant agreements, and that because Plaintiffs seek reinstatement of the grants, they should be deemed to be seeking money damages. ECF No. 44-1 at 16-21.

As for the first question, the source of the allegedly violated rights, EPA contends that because Plaintiffs refer to the terms of the grants in their complaint and attached the grants thereto, those terms are the source of the rights Plaintiffs allege have been violated. But the fact that Plaintiffs' complaint refers to contractual terms is not determinative; "[c]ontract issues may arise in various types of cases where the action itself is not founded on a contract." *Megapulse*, 672 F.2d at 968; *see also Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*, 554 F.3d 1290, 1300 (10th Cir. 2009) ("When the source of rights asserted is constitutional, statutory, or regulatory in nature, the fact that resolution of the claim requires some reference to contract does not magically 'transform [the] action...into one on the contract and deprive the court of jurisdiction it might otherwise have.' ") (quoting *Megapulse*, 672 F.2d at 968); *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1083-84 (10th Cir. 2006) ("[L]itigants may bring statutory and constitutional claims in federal district court even when the claims depend on the existence and terms of a contract with the government.") (citation omitted).

Here, after careful review of the complaint, this Court concludes that, under these facts, Plaintiffs are not alleging violations of the terms of the grants, but instead are asserting constitutional, statutory, and regulatory violations, including that EPA acted arbitrarily and capriciously when terminating and suspending the grants without adequate reasoning (Count 1), acted in excess of the authority provided by the Clean Air Act (Count 2), violated the First and Fifth Amendments by terminating the grants without due process based on viewpoints EPA no longer wishes to support (Counts 3 & 4), and failed to adhere to agency regulations that limit when an agency can terminate a grant award (Count 5). ECF No. 1 ¶¶ 79-124. These do not appear to be artfully drafted pleadings cloaking contract claims as something

Case 3:25-cv-04737-RFL    Document 44-1    Filed 06/19/25    Page 11 of 20
**GREEN & HEALTHY HOME INITIATIVES, INC., et al., Plaintiffs,..., Slip Copy (2025)**
2025 WL 1697463

else. The "essence" of the action alleges constitutional, statutory, and regulatory violations, not breaches of contract, even though the case involves grants that are arguably contracts under these particular facts. *Megapulse,* 672 F.2d at 968. As the D.C. Circuit put it in *Crowley Government Services, Inc. v. General Services Administration*, "the sources of Crowley's claimed right are the statutes identified in Crowley's complaint." 38 F.4th. 1099, 1108 (D.C. Cir. 2022). So too here: although Plaintiffs' grant agreements gave them certain contractual rights, those are not the rights that Plaintiffs have brought this case to enforce. Rather, their claim is that EPA has violated the APA, the Constitution, and OMB regulations; *those* are the sources of rights that are pertinent to this case.

**\*13** As for the second question, the type of relief sought, the parties have only cited one precedential case on point: *Bowen v. Massachusetts*, 487 U.S. 879 (1988). *Bowen* involved a refusal by the Secretary of Health and Human Services "to reimburse a State for a category of expenditures under its Medicaid program." *Id.* at 882. The Supreme Court in *Bowen* concluded that the district court, rather than the Court of Federal Claims, had jurisdiction to hear the case. *Id.* at 883. The *Bowen* Court held that the plaintiff was not seeking money damages even though the relief sought involved the payment of money; instead, the plaintiff sought to enjoin the agency from reducing the size of its federal grant. *Id.* at 893-94; *see id.* at 893 ("The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.' "). The Court reasoned that money damages "are given to the plaintiff to substitute for a suffered loss, whereas specific remedies are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Id.* at 895 (internal quotation marks omitted); *Am.'s Cmty. Bankers v. F.D.I.C.*, 200 F.3d 822, 829 (D.C. Cir. 2000) ("Where a plaintiff seeks an award of funds to which it claims entitlement under a statute, the plaintiff seeks specific relief, not damages."). "The crux of this inquiry...boils down to whether the plaintiff effectively seeks to attain monetary damages in the suit," which means jurisdiction lies in the Court of Federal Claims, or "declaratory or injunctive relief," which means jurisdiction lies in a district court. *Crowley*, 38 F.4th at 1107.

EPA argues that because the relief sought by Plaintiffs necessarily involves monetary *relief*, the relief should be classified as monetary *damages*. But this argument is incompatible with *Bowen*. 487 U.S. at 896 (rejecting the argument that all forms of monetary relief are also monetary damages). EPA, for the first time in one of its recent notices of supplemental authority, attempts to distinguish *Bowen*, arguing that *Bowen* is inapplicable because it involved a dispute between a state and the federal government and the relationship was not contractual. ECF No. 49 at 4 (citing *Suburban Mortg. Assocs., Inc.*, 480 F.3d at 1127). In distinguishing *Bowen*, the Federal Circuit in *Suburban Mortgage* noted that *Bowen* involved an ongoing relationship in which the plaintiff sought declaratory and injunctive relief, unlike in *Suburban Mortgage*, which dealt with a simple breach of an insurance contract. *Suburban Mortg. Assocs., Inc.*, 480 F.3d at 1127. The present case is more like *Bowen* than *Suburban Mortgage* in that regard and this Court concludes that *Bowen* controls. Plaintiffs do not seek money as a substitute for a loss, *Bowen,* 487 U.S. at 895, or "specific sums already calculated, past due, and designed to compensate for completed labors," *Maine Cmty. Health Options*, 590 U.S. at 327 (distinguishing *Bowen*). Instead, Plaintiffs seek equitable and declaratory relief regarding EPA's obligations and Plaintiffs' rights on a prospective basis. Plaintiffs do not seek money damages.

Various other courts have agreed, in similar circumstances. *See, e.g.*, *Maryland v. Corp. for Nat'l & Cmty. Serv.*, No. CV DLB-25-1363, 2025 WL 1585051, at \*1, \*23, \*25 (D. Md. June 5, 2025) (holding that under *Bowen* and *Megapulse*, the Tucker Act did not apply to a claim that AmeriCorps grants could not be terminated in the absence of notice-and-comment rulemaking, because "[t]he grant terms are simply not relevant to this case at all";"[t]he source of the rights for the States' notice-and-comment claims is a federal statute"; and the "requested relief is equitable, not monetary"); *Climate United Fund v. Citibank, N.A.*, -- F. Supp. 3d ---, No. 25-CV-698 (TSC), 2025 WL 1131412, at \*9-12 (D.D.C. Apr. 16, 2025) (holding that Tucker Act did not apply to claims that EPA violated the APA and Constitution by terminating certain grants); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, -- F. Supp. 3d ---, No. 1:25-CV-00097-MSM-PAS, 2025 WL 1116157, at \*14 (D.R.I. Apr. 15, 2025) (holding that Tucker Act did not apply to claims that agencies violated the APA in freezing certain grants and contracts under two statutes) [6] ; *Chicago Women in Trades v. Trump*, -- F. Supp. 3d ---, No. 25 C 2005, 2025 WL 1114466, at \*8-10 (N.D. Ill. Apr. 14, 2025) (holding that Tucker Act did not apply to claims that Department of Labor had violated "the First and Fifth Amendments, the Spending Clause, and the separation of powers" by terminating certain grants and contracts); *Maine v. United States Dep't of Agric.*, -- F. Supp. 3d ---, No. 1:25-CV-00131-JAW, 2025 WL 1088946,

at *19 (D. Me. Apr. 11, 2025) (holding that Tucker Act did not apply to claims challenging agencies' "compliance with the APA"); *Pacito v. Trump*, No. 2:25-CV-255-JNW, 2025 WL 1077401, slip op. at *3 (W.D. Wash. Apr. 9, 2025)(holding that Tucker Act did not apply to claims challenging termination of funding for United States Refugee Assistance Program because "Plaintiffs here assert rights derived from statutory mandates, not contractual promises, and seek equitable enforcement of statutory obligations, not contractual remedies") [7] ; *Normandy Apartments,* 554 F.3d at 1296-1300 (holding that Tucker Act did not apply where plaintiff sought injunctive relief against HUD's "attempts to terminate Housing Assistance Payments").

**\*14** Courts in other cases have reached different conclusions, holding that certain grant-termination claims belong in the Court of Federal Claims. EPA relies on the Supreme Court's recent order granting a stay of a TRO "enjoining the Government from terminating various education-related grants." *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025). In that order, the Supreme Court recognized that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* (quoting *Bowen,* 487 U.S. at 910). But it concluded that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' *along the lines of what the District Court ordered here*." *Id.* (emphasis added) (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).

Here, Plaintiffs do not seek to "enforce a contractual obligation to pay money," but rather seek a declaratory judgment that EPA has violated the Administrative Procedures Act and the Constitution, and relief including an order that EPA reinstate the terminated grants based on EPA's statutory and constitutional obligations. *Bowen* remains controlling, and no one contends it has been overruled. *See Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (A "stay order is not a ruling on the merits.") (Kavanaugh, J., concurring). This Court will "follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023).

EPA also relies on Judge Griggsby's recent opinions in *Solutions in Hometown Connections v. Noem*, which involved a decision by the Secretary of Homeland Security "to freeze, and later terminate, certain grants" issued by the United States Citizenship and Immigration Services to, among other things, "assist lawful permanent residents with learning English, studying for the citizenship test and applying to be naturalized citizens." No. 25-CV-0885-LKG, 2025 WL 1530318, slip op. at *1 (D. Md. May 29, 2025); *see also* 2025 WL 1103253, slip op. at *1 (D. Md. Apr. 14, 2025). In that case, Judge Griggsby concluded that the relief sought was actually money damages because the plaintiffs had sought in their initial complaint and were seeking in their amended complaint "reimbursement for expenses already incurred under their Grants." *Solutions*, 2025 WL 1530318, slip op. at *7; *see also id.* slip op. at *13 (concluding that "Plaintiffs primarily seek reimbursement for work already performed under their Grant Agreements"). Such relief would be akin to the specific past-due sums discussed in *Maine Community Health Options,* 590 U.S. at 327. Plaintiffs here do not seek reimbursement of funds already expended, or money damages "to substitute for a suffered loss." *Bowen*, 487 U.S. at 895. Indeed, at the May 30 hearing, Plaintiffs' counsel specifically stated that she could "unequivocally say that none of the Plaintiffs is at this point asking for reimbursement of any of these [previously incurred] costs and that such reimbursement is not part of this case." Instead, Plaintiffs seek "the very thing to which [they] allege they were] entitled." *Id.* The EPA also points to *United States Conference of Cath. Bishops v. U.S. Dep't of State,* -- F. Supp. 3d. --, No. 1:25-CV-00465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025). But there, the court understood the thrust of the plaintiff's claim as seeking "an award of money due." *Id.*, 2025 WL 763738 at *5.

The Fourth Circuit has recently stayed a preliminary injunction in *Sustainability Institute v. Trump,* No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025), a case that is similar in a number of respects to this case. [8] ECF No. 52; s*ee* 2025 WL 1587100 at *1 (describing the factual scenario as "the cancellation of grants that were funded generally by an authorizing statute but awarded specifically to each grantee by an operative grant agreement"). In *Sustainability Institute*, the Fourth Circuit motions panel concluded that the government was likely to succeed in showing that the Tucker Act (rather than the APA) provided jurisdiction over the plaintiffs' claims based in part on the Supreme Court's stay order in *California*. *Id.* at *1-2. The Fourth Circuit distinguished *Bowen* on the ground that *Bowen*'s holding does not applies to cases seeking "to enforce a contractual obligation to pay money." *Id.* at *2 (quoting *California*, 145 S. Ct. at 968).

**\*15** But, applying *Bowen*, and the other decisions cited above that were rendered on the merits (as opposed to in

Case 3:25-cv-04737-RFL    Document 44-1    Filed 06/19/25    Page 13 of 20
GREEN & HEALTHY HOME INITIATIVES, INC., et al., Plaintiffs,..., Slip Copy (2025)
2025 WL 1697463

the context of a motion to stay, *see Merrill*, 142 S. Ct. at 879), this Court concludes that Plaintiffs' claims are subject to the APA's waiver of sovereign immunity. Plaintiffs' claims are not contractual in nature and Plaintiffs do not seek money damages. This Court has jurisdiction under the APA to adjudicate the claims. [9]

**B. Reviewability**
EPA's terminations of Plaintiffs' block grants are reviewable under the APA and does not run afoul of the APA's inapplicability to "agency action[s]" that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). EPA argues that this Court lacks jurisdiction under 5 U.S.C. § 701(a)(2) because EPA's decision to terminate these grants was a "quintessential decision[ ] committed to agency discretion by law." ECF No. 22 at 25. EPA primarily cites *Lincoln v. Vigil*, 508 U.S. 182 (1993), in support of its contention to argue that it has discretion in determining how to allocate resources from a lump-sum appropriation. *Id.* But in *Lincoln*, Congress never expressly appropriated funds for the centers at issue, and there was "no meaningful standard," statutory or otherwise, "against which to judge the agency's exercise of discretion." *Lincoln*, 508 U.S. at 191. In contrast, here, EPA terminated grants that were awarded using statutorily-appropriated funds under the Clean Air Act. "Congress has circumscribed agency discretion to allocate resources by putting restrictions in the operative statute," *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 100 (D.C. Cir. 2021), and thus EPA's actions are reviewable. *See also Climate United Fund*, 2025 WL 1131412, at *13 (holding that EPA's actions there were reviewable because Congress "appropriated money for specific grant programs by a specific deadline and set specific, substantive priorities").

**IV. DISCUSSION**
Having concluded that this Court has subject matter jurisdiction to decide whether EPA violated the APA in terminating the grants at issue, the Court now turns to the merits. Plaintiffs contend that the terminations are arbitrary and capricious (Count 1); exceed EPA's statutory authority (Count 2); violate the First Amendment (Counts 3, 4); and conflict with grant-termination regulations (Count 5).

**A. The basis for EPA's decision to terminate these grants**
Assessing whether EPA's decision to terminate these grants was "reasonable and reasonably explained," *Ohio v. EPA*, 603 U.S. at 292—including whether EPA "reasonably considered the relevant issues," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), and "provide[d] a reasoned explanation for the change" from its prior policy and whether it "consider[ed] serious reliance interests," *Food and Drug Admin. v. Wages & White Lion Investments, LLC*, 145 S. Ct. 898, 917 (2025), as well as whether EPA exceeded its statutory authority under § 7438 of the Clean Air Act, *see* 5 U.S.C. § 706(2)—requires first identifying the *basis* for EPA's agency action. [10]

**\*16** As noted above, the EPA's termination letters articulate the basis for the termination as this: "[T]he award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities." ECF No. 36-1 at 586, 903, 1084. The letters then contain two paragraphs from the template form letter described above. Much of that language is untethered to EPA's termination of *these* grants. For example, they refer to "ensuring" that EPA programs "do not support programs or organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives." *Id.*

As noted above, at the same time EPA was deciding to terminate Plaintiffs' grants, EPA was also deciding to terminate other grants. And as to some of those other grants, EPA's stated "rationale" included a reference to "DEI EO issues" as a "rationale" for a termination. *See, e.g.*, *id.* at 149 (referring to a grant to the Institute For Sustainable Communities). But those references were not the basis for the termination of Plaintiffs' grants. They appear in Plaintiffs' letters only because the only changeable field in the template termination letters were the grant recipient's name, grant number, and the contact information for the pertinent EPA official. *Id.* at 172–73. As reflected in EPA's spreadsheets, the only basis that EPA identified as a reason to terminate *Plaintiffs'* grants was that supporting "Environmental Justice Subawards" was "not in line with administration priorities." *Id.* at 148–49. [11]

To the extent that basis appeared in the termination memoranda that EPA sent to Plaintiffs, it is limited to the bolded portion of the memoranda:

> It is a priority of the EPA to eliminate discrimination in all programs throughout the United States. The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, **this priority includes ensuring that the Agency's grants do not support** programs or organizations that promote or take part in diversity,

Case 3:25-cv-04737-RFL    Document 44-1    Filed 06/19/25    Page 14 of 20
GREEN & HEALTHY HOME INITIATIVES, INC., et al., Plaintiffs,..., Slip Copy (2025)
2025 WL 1697463

equity, and inclusion ("DEI") initiatives, **"environmental justice" initiatives**, and conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In addition to complying with the civil rights laws, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.

 *17  **The grant specified above provides funding for programs that promote** or take part in DEI initiatives or **environmental justice initiatives** or other initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Agency priorities.

*Id.* at 586, 903, 1084.

In other words, the language of the termination memoranda must be understood in the context of the administrative record as a whole. And in that context, the administrative record reflects that (1) the entire articulated basis for terminating Plaintiffs' grants was that supporting any programs under section 7438 of the Clean Air Act is not an "administration priority," *see, e.g., id.* at 148–49 ("Program not in line with administration priorities: 66.615 - Environmental Justice Subawards."), and (2) EPA's entire deliberative process reflected in the administrative record are a few email threads among a few EPA employees between February 11 and February 20, 2025.

Thus, the questions presented by Plaintiffs' claims are whether EPA exceeded its statutory authority when it terminated these grants based on an objection to "environmental justice," whether EPA engaged in a reasoned decision-making process as required by the APA, and whether the terminations violated the First or Fifth Amendments or OMB regulations. As explained below, Plaintiffs have established that the EPA's terminations exceed EPA's statutory authority and are arbitrary and capricious, requiring that the terminations be set aside. The Court need not and does not reach Plaintiffs' other claims. *See Dalton v. Specter*, 511 U.S. 462, 472 (1994) (explaining that courts should generally "avoid deciding constitutional questions presented unless essential to proper disposition of a case") (quoting *Harmon v. Brucker*, 355 U.S. 579, 581 (1958)).

**B. Agency Action in Excess of Statutory Authority**

The APA requires courts to hold unlawful and set aside final agency actions that are "not in accordance with the law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2). Plaintiffs allege, in Count 2 of their complaint, that EPA exceeded the authority Congress delegated to it in § 7438 of the Clean Air Act. Plaintiffs argue that by terminating the grants to Plaintiffs, who had been selected to administer the § 7438 program, "EPA has effectively dismantled the Thriving Communities Grantmaking Program in its entirety, an action in direct contravention of its statutory mandate to use appropriated funds to support environmental protection activities in disadvantaged communities." ECF No. 41-1 at 30. EPA argues that it did not exceed its statutory authority because § 7438 delegates authority to the EPA to define "disadvantaged communities," and the EPA is not constrained to appropriate funds to any *specific* recipient. ECF No. 44-1 at 26.

"Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024); 5 U.S.C. § 706 (courts must "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning...of the terms of an agency action"). *See, e.g., Northwest Environmental Advocates v. U.S. E.P.A.*, 537 F.3d 1006, 1019-1027 (9th Cir. 2008) (holding that the EPA acted in excess of the Clean Water Act in promulgating a regulation that ran counter to the statute's requirements); *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 876-78 (8th Cir. 2013) (same). And courts may not "defer to a merely convenient litigation position or *post hoc* rationalization advanced to defend past agency action against attack." *Kisor v. Wilkie*, 588 U.S. 558, 579 (2019).

 *18  Section 7438 is titled "Environmental and climate justice block grants," and it imposes mandatory duties on EPA. Congress directed that EPA "shall use" the appropriated "[e]nvironmental and climate justice block grants" ($3 billion, over the years 2022 through 2027) to carry out designated "eligible activities," defined as:

> (A) community-led air and other pollution monitoring, prevention, and remediation, and investments in low- and zero-emission and resilient technologies and related infrastructure and workforce development that help reduce greenhouse gas emissions and other air pollutants;

(B) mitigating climate and health risks from urban heat islands, extreme heat, wood heater emissions, and wildfire events;

(C) climate resiliency and adaptation;

(D) reducing indoor toxics and indoor air pollution; or

(E) facilitating engagement of disadvantaged communities in State and Federal advisory groups, workshops, rulemakings, and other public processes.

*Id.* § 7438(b)(2). Congress further directed EPA, in "carry[ing] out" those "[e]nvironmental and climate justice" activities, to ensure that the programs "benefit disadvantaged communities, as defined by [EPA]." *Id.* § 7438(b)(1).

When EPA terminated the grants at issue, it exceeded its statutory authority under § 7438 because it cancelled these grants precisely *because* they are "environmental justice" programs. The termination letter specifically states that the reasons the grants were being terminated was because they "provide[ ] funding for programs that promote or take part in...environmental justice initiatives." ECF No. 2-9 at 2. As discussed above, that is the sole basis for the terminations, as confirmed in the "Rationale" column of the spreadsheet created by the team responsible for terminating the grants. ECF No. 36-1 at 148–49. But "[e]nvironmental and climate justice" is precisely what Congress *required* EPA to support with the § 7438 funds. EPA surely has discretion under § 7438, for example, to define what constitutes a "disadvantaged community." 42 U.S.C. § 7438(b)(1). What it does not have discretion to do is to "decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d at 259. Yet that is precisely what EPA has done here.

The violation of statutory authority is especially clear here, because the stated basis for terminating these grants is entirely incompatible with the statutory mandate, as confirmed repeatedly in the administrative record. The record contains several emails about terminating the Thriving Communities Grant Program in its entirety because of its connection to environmental justice. Some examples:

• "One flag I have is the first few large ones are the EJ Thriving Communities Technical Assistance Centers (TCTACs)...There were 18 in total established, so a number of them are missed here. Not sure why they didn't all get captured (they may not have all gone out yet), but *I would want to apply a broad approach and cancel them all in the vein the entire program is inconsistent with Administration priorities* and I personally do not see the need for these because at the state-level, EPA and the TCTAC grantees refused to engage with the state in any kind of coordination. This should result in a larger $$ amount. I can flag for OMS separately too that we want the cancellation to extend to *every TCTAC grantee*." ECF No. 36-1 at 149 (emphasis added).

**\*19** • "Sorry – I missed these additional 4 TCTAC ones you had flagged that should have been included. Not sure this gets us up to the 18 total still." *Id.* at 148 (listing the grants for Plaintiffs as being cancelled because the programs are not in line with administration priorities, and Plaintiffs' grants seem to be flagged because they have the words "environmental justice" in the grant name).

• "We will get moving on these, plus *all the TCTACs*!" *Id.*

The above correspondence makes clear that, in terminating the grants at issue in this case, EPA's intention was the removal of a grant program in its entirety that was congressionally mandated under the Clean Air Act.

The incompatibility of EPA's termination of these grants on the sole basis of opposition to "environmental justice," on one hand, and Congress's mandate that EPA spend the appropriated funds on specific "[e]nvironmental and climate justice" priorities (such as pollution monitoring, etc.), on the other hand, only became clearer as this litigation proceeded. At the final hearing, EPA went so far as to contend that it has authority to not spend any of the funds that Congress appropriated in § 7438. Specifically, EPA argued that "the congressional mandate was to award the grants, period, full stop," and that "there was not a mandate that all of the money must be spent." In other words, EPA contends that it has authority to thumb its nose at Congress and refuse to comply with its directives. That constitutes a clear example of an agency acting "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and thereby violating the APA. 5 U.S.C. § 706(C)(2).

This is not to say, of course, that the Clean Air Act requires that EPA specifically fund *Plaintiffs* (or any other particular grantee), as Plaintiffs acknowledge. *See* ECF No. 48 at 24. But the Clean Air Act does require that the grant program exist and that these grants support "environmental justice" in some way, as defined by the EPA. And it does prohibit precisely what EPA did here: expressly terminating grants

*because* they are for programs that Congress mandated EPA to fund. In other words, Congress expressly required EPA to use the appropriated funds for "environmental justice" programs. By terminating Plaintiffs' grants *on the basis* that current EPA leadership no longer wants to support "environmental justice" programs, EPA exceeded its authority under the Clean Air Act, and therefore was "in excess of statutory...authority, or limitations," in violation of the APA. 5 U.S.C. § 706(2).

**C. Arbitrary and Capricious Agency Action**
In addition to authorizing courts to "police the outer statutory boundaries" of Congress's delegations of authority, Loper Bright, 603 U.S. at 374, the APA requires courts to hold unlawful and set aside final agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is "arbitrary and capricious" if it is not both "reasonable and reasonably explained." Ohio v. EPA, 603 U.S. at 292. An agency must "act[ ] within a zone of reasonableness" and "reasonably consider[ ] the relevant issues and reasonably explained the decision." Prometheus Radio, 592 U.S. at 423. "Generally, an agency decision is arbitrary and capricious if 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " Sierra Club v. United States Dep't of the Interior, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc.*

**\*20** *v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). An agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Food and Drug Admin., 145 S. Ct. at 917 (quoting *State Farm*, 463 U.S. at 43).
Determining whether an agency action is "reasonable and reasonably explained" is "measured by what [the agency] did, not by what it might have done." SEC v. Chenery Corp., 318 U.S. 80, 93-94 (1943). As noted above, "judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.' " Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 20 (2020) (quoting Michigan v. EPA, 576 U.S. 743, 758 (2015)). And although "[a]gencies are free to change their existing policies," a change in policy requires an agency to "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." Food and Drug Admin., 145 S. Ct. at 917 (cleaned up).

Plaintiffs argue that the terminations were arbitrary and capricious for several reasons. They argue that the ground(s) that EPA articulated in its termination memoranda were vague, varied, and devoid of support, and otherwise failed to "explain or substantiate any of its possible grounds for termination." ECF No. 41-1 at 25–26. They argue the administrative record "confirms that the termination memorandum was a form document that EPA mass emailed to hundreds of grantees operating under a wide variety of agency programs." ECF No. 41-1 at 26. Plaintiffs also argue that that EPA failed to account for "Plaintiffs' reliance interests." Id. at 29 (citing Regents of the Univ. of Cal., 591 U.S. at 30).

EPA argues, in response, that the federal acquisition regulations permit it to terminate grants "if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4); *see* ECF No. 44-1 at 32-33.[12] That regulation, in turn, is incorporated into the general terms and conditions of the grants at issue here, as noted above. ECF No. 2-13 at 3-4. EPA asserts that, under Section 200.340, it may terminate the grants at issue here pursuant to changes in agency priorities and program goals, and that therefore Plaintiffs' argument that the terminations were arbitrary and capricious are likely to fail. ECF No. 22 at 24; ECF No. 44-1 at 33. Plaintiffs respond that, not only is EPA's declaration of its new "agency priority" itself arbitrary and capricious, but "an agency cannot render its actions non-arbitrary merely by invoking the term 'agency priorities.' " ECF No. 24 at 20 (citing Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor, 358 F.3d 40, 44 (D.C. Cir. 2004) ("The [agency's] statement that there was a 'change in agency priorities,' without explanation, is not informative in the least[.]").

**\*21** EPA's terminations of Plaintiffs' grants, in addition to exceeding statutory authority and limitations as discussed above, also failed to "reasonably consider[ ] the relevant issues" or "explain[ ] the decision," Prometheus Radio, 592 U.S. at 423. The February 2025 termination memoranda supplied no meaningful explanation for the termination of the initial grants. And as discussed above, the sole actual basis for the terminations was that they "provide[ ] funding for programs that promote or take part in ...environmental justice initiatives." ECF No. 36-1 at 586, 903, 1084. But that is a meaningless statement in the context of a statute that mandates expenditure of appropriated funds on environmental justice initiatives. For example, nowhere did

EPA contend that the Regional Grantmakers should hold off issuing sub-grants so that EPA could issue guidance on interpreting the phrase "disadvantaged communities" under § 7348(b)(1). Instead, to the extent EPA provided an explanation for its decision to terminate these grants, it was announcing a disagreement with Congress. Although that could conceivably form a basis for the administration to go to Congress to request that it revoke § 7438, *see* n. 12, *supra*, it does not qualify as a "satisfactory explanation" for terminating these grants. *See Food and Drug* Admin., 145 S. Ct. at 917. Put differently, EPA "relied on factors which Congress has not intended it to consider," *Sierra Club*, 899 F.3d at 293, namely a policy disagreement with its statutory mandate. EPA is correct that OMB regulations allow EPA to terminate grant awards that "no longer effectuate[ ] the program goals or agency priorities," but only "to the extent authorized by law." 2 C.F.R. § 200.340(a)(4). The APA does not permit agencies to act arbitrarily and capriciously. 5 U.S.C. § 706(2)(A).

Furthermore, EPA has not conducted any individualized analysis for why these grants or grantees conflict with the agency's priorities. In fact, all three plaintiffs in this case received nearly identical termination letters with identical reasons for their grants being terminated. *Compare* ECF No. 2-9 at 2-3, *with* ECF No. 2-28 at 2-3; ECF No. 2-18 at 2-3. EPA used form letters and emails to terminate not only the grants at issue in this case, but a swath of other grants too. ECF No. 36-1 at 161, 172-73. The EPA's form email contains only two total changeable fields, the grant number and the grantee name. *Id.* at 161. And the termination letters sent to the Plaintiffs were created from a form letter circulated by the EPA officials, where the only changeable fields were relating to the grant-specific identifying information. *Id.* at 172-73. The reasons laid out for the terminations were pre-written. Although using pre-written language does not, standing alone, render a decision arbitrary and capricious, the administrative record here clearly establishes that EPA's decision to wipe out all programs funded under § 7438 of the Clean Air Act was not tailored to any specific plaintiff or grantee. EPA offered no individualized analysis or discussion about why *these grants* failed to comply with the Clean Air Act or other legal requirements, or any other basis for terminating these grants. In other words, there was no "rational connection between the facts found and the choice made." *State Farm,* 463 U.S. at 43.

The lack of any reasoned decision-making, or reasoned explanation, is compounded by the fact that the terminations reflect a reversal of EPA's prior policies under which these grants at issue were awarded. The APA requires an agency to provide detailed justification for a new policy priority "when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citing *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)). The EPA plainly failed to do so here, and in so doing, has not shown that it took the reliance interests of the Plaintiffs into account when deciding to terminate the grants at issue.

For these reasons, Plaintiffs have shown that the terminations were "arbitrary, capricious, [and] an abuse of discretion," 5 U.S.C. § 706(2)(A), and for those additional reasons the APA requires that they be "set aside," *id.* § 706(2).

## V. RELIEF

Because Defendants have violated the APA, then as a matter of constitutional avoidance, the Court need not reach the remaining counts, including those asserting constitutional claims. *See, e.g.*, *Bonumose, Inc. v. United States Food and Drug Admin.*, 747 F. Supp. 3d 211, 232-33 (D.D.C. 2024) (denying the constitutional claims with the caveat that plaintiffs may raise those arguments on remand and in any subsequent judicial proceeding); *see also Whims v. Harbaugh*, 139 F.3d 897, at *1 (4th Cir. 1998) (per curiam) (construing the *Accardi* doctrine claim as a procedural due process claim).

**\*22** When an agency has violated the APA, "[t]he reviewing court shall...hold unlawful and set aside [the] agency action." 5 U.S.C. § 706(2)(a). Defendants ask this Court to instead not vacate this action but rather remand to matter back to EPA to correct the deficiencies, while keeping the terminations in place. ECF No. 44-1 at 35. Remand without vacatur is a remedy that turns on two factors: "(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 197 (D.C. Cir. 2009 (cleaned up)) (quoting *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1048-49 (D.C. Cir. 2002)). Defendants conceded in the May 30 hearing that remand without vacatur is an unusual and disfavored remedy, and have not explained how EPA would be able to justify the terminations on remand nor how vacatur would cause disruption for the agency. Therefore, the Court will vacate the terminations of Plaintiffs' grants at issue and remand for further agency proceedings.

In addition to the usual remedy of vacatur and remand, Plaintiffs further request that the Court enter a permanent injunction prohibiting Defendants "from terminating the Plaintiffs Organizations' Thriving Communities grants on the ground that the Plaintiff Organizations or their subgrantees promote or take part in 'environmental justice initiatives' or on the ground that the Thriving Communities program is itself an 'environmental justice initiative.' " ECF No. 41-8 at 3. In other words, Plaintiffs request an injunction prohibiting EPA from terminating their grants again on the exact same basis that this Court now holds violated the APA. The Court declines to issue the injunctive relief sought by Plaintiffs. "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course. If a less drastic remedy... [is] sufficient to redress [Plaintiffs'] injury, no recourse to the additional and extraordinary relief of an injunction [is] warranted." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-12 (1982)). Here, vacatur has the effect of prohibiting the EPA from terminating Plaintiffs' grants on the grounds at issue in this case.

**VI. CONCLUSION**

For the foregoing reasons, EPA's terminations of Plaintiffs' grants were "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of 5 U.S.C. § 706(2)(C), and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of 5 U.S.C. § 706(2)(A). Accordingly, the Administrative Procedures Act requires that the terminations be "set aside." *Id.* ¶ 706(2). This means Plaintiffs' motion for summary judgment will be largely granted (and Defendants' motion will be denied), but the Court denies Plaintiffs' request for an injunction because Plaintiffs' requested injunction would essentially duplicate this Court's order setting aside the terminations. A separate order follows.

/s/

Date: June 17, 2025 _____

Adam B. Abelson

United States District Judge

**All Citations**

Slip Copy, 2025 WL 1697463

---

**Footnotes**

1     Congress defined "greenhouse gas" to mean "the air pollutants carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride." 42 U.S.C. § 7438(d).

2     Page numbers herein refer to the ECF pagination in the header of the parties' filings. Those page numbers do not necessarily align with the documents' original page numbers.

3     Plaintiffs argue that the EPA General Terms and Conditions narrowed the permissible grounds for terminating grants to cover only a subset of the grounds authorized by the OMB regulation. OMB authorizes termination of grants where an award "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). The EPA terms and conditions do too: "EPA may unilaterally terminate this award in whole or in part... [i]f the award no longer effectuates the program goals or agency priorities." ECF No. 2-13 at 4. The EPA terms and conditions go on to identify some examples of "[s]ituations in which EPA may terminate an award under this provision," and those examples are specific and focus on whether an award remains "effective" at achieving program goals, or whether the "intended objective(s) of the award" are "feasible" or remain "consistent with funding priorities for achieving program goals." *Id.* Plaintiffs argue that, by including those examples, EPA effectively disclaimed a right to terminate grants based on a change in "agency priorities." ECF No. 2-1 at 37-39. Not so. The EPA terms and conditions are congruent with 2 C.F.R. § 200.340; not only

|   |   |
|---|---|
|   | do the EPA terms and conditions expressly authorize terminating awards that "no longer effectuate[ ]...agency priorities" but the EPA terms and conditions expressly incorporate 2 C.F.R. § 200.340. ECF No. 2-13 at 3–4. |
| 4 | Other than as stated herein, the record does not reflect the titles or responsibilities of the individuals in these email chains. Based on one email chain it appears that at least Ms. Loving is associated with the "Department of Government Efficiency" *See* ECF No. 36-1 at 154. In any event, the Court refers to each of these individuals (including Ms. Loving) as EPA employees because they have "epa.gov" email addresses. |
| 5 | Although the version of the template appearing on that page contains a date of May 9, 2025, EPA explains that the template "exists with EPA's records as a Word (*e.g.*, .doc or .docx) file with a template date field," and when EPA converted the document to PDF to file on the court's CM/ECF system, that "resulted in the template date field updating to the date of conversion"; in fact, "[i]n its Word file version, this document is dated February 21, 2025." ECF No. 36-1 at 3 n.1. |
| 6 | The district court partially stayed the proceedings (but not the preliminary injunction) on May 30, 2025. *Woonasquatucket River Watershed*, 1:25-CV-00097-MSM-PAS, 5/30/25 text order. |
| 7 | The Ninth Circuit partially stayed the preliminary injunction on March 25, 2025. *Pacito v. Trump*, 25-1313 (9th Cir.), Doc. Nos. 28.1 & 113. |
| 8 | Appellees petitioned for rehearing *en banc* on June 10, 2025. Sustainability Institute, No. 25-1575, ECF No. 43. |
| 9 | Plaintiffs also argue that the Court of Federal Claims lacks subject matter jurisdiction over this case because the Thriving Communities grants, and the Cooperative Agreements, are not "contracts" within the meaning of the Tucker Act because they lack consideration. ECF No. 48 at 11-13 (relying on *Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 132 (D.D.C. 2023); *San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 463 (2019); and *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997)). This Court need not reach that question; regardless of whether the grants and associated agreements are "contracts," the Tucker Act does not apply for the reasons explained above. |
| 10 | There is no dispute that the grant terminations at issue here are final agency actions. |
| 11 | Defendants argued at the May 30, 2025 hearing that "waste" was also a consideration in terminating Plaintiffs' grants. Just as "DEI" was identified as a "Rationale" for terminating *other* grants, so was "waste." *See, e.g.*, ECF 36-1 at 586, 903, 1084. But "waste" appears nowhere in the "Rationale" for terminating the grants at issue in this case. That makes sense, because, as discussed below, EPA is *required* to spend the funds that Congress appropriated in § 7438, and to do so on specified types of projects, and to specifically ensure that such projects benefit disadvantaged communities. Insofar as, by deeming these grants "waste," EPA is lodging a post-hoc rationale for these terminations, it fails for two reasons. First, an agency may not rely on post-hoc rationales to defend agency actions challenged under the APA. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) ("It is 'a foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.' "). Second, to the extent the label "waste" is a way of contending that EPA could terminate these grants as a way to save the federal government money, that would be irreconcilable with the plain language of § 7438. Congress mandated that the funds appropriated in § 7438 be spent; the only (lawful) way to avoid expending the funds Congress appropriated in § 7438 would be for Congress to further amend the Clean Air Act. |
| 12 | That regulation in full provides as follows: |
|   | (a) The Federal award may be terminated in part or its entirety as follows: |

**GREEN & HEALTHY HOME INITIATIVES, INC., et al., Plaintiffs,..., Slip Copy (2025)**
Case 3:25-cv-04737-RFL   Document 44-1   Filed 06/19/25   Page 20 of 20

2025 WL 1697463

(1) By the Federal agency or pass-through entity if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award;

(2) By the Federal agency or pass-through entity with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions. These conditions include the effective date and, in the case of partial termination, the portion to be terminated;

(3) By the recipient or subrecipient upon sending the Federal agency or pass-through entity a written notification of the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal agency or pass-through entity determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made, the Federal agency or pass-through entity may terminate the Federal award in its entirety; or

(4) By the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, *to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities*.

(b) The Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award.

2 C.F.R. § 200.340(a)-(b) (emphasis added).

---

**End of Document**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.