UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEETA THAKUR, et al., | Case No. 25-cv-04737-RFL |
| Plaintiffs, | |
| v. | **ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION** |
| DONALD J. TRUMP, et al., | |
| Defendants. | Re: Dkt. Nos. 7, 18 |

**INTRODUCTION**

The University of California is a leading public research institution that has long been on the cutting edge of innovation across numerous fields. UC researchers rely on over $4 billion in federal grants. Many of those grants fund multi-year projects that are awarded after highly competitive selection processes, often involving peer review and expert selection panels.

Upon taking office in January 2025, President Trump issued a series of executive orders blacklisting research on "diversity," "equity," "inclusion," and other forbidden topics, and directed the termination of previously issued research grants in those areas. The executive orders also more broadly directed agencies to engage in a widescale termination of previously issued grants. In response, federal agencies began abruptly terminating grants *en masse* through form termination letters that state simply that the grants no longer meet "agency priorities." Over $324 million in grants to the University of California have already been terminated. Agency Defendants have admitted that grants were flagged for termination for researching blacklisted topics, based on keyword searches or titles. Although Agency Defendants assert that the termination decisions were individualized, the form letters do not convey any reasoned

explanation specific to the cancelled grants.  The letters do not say why the agency changed its mind, or how the grant related to a forbidden topic or otherwise fell outside agency priorities.

Plaintiffs are six UC researchers who had multi-year grants supporting their research suddenly terminated without explanation.  Dr. Neeta Thakur of UCSF, for example, studies how genes in different racial and ethnic groups affect lung disease, and received a federal grant to research ways to mitigate the health risks of wildfire smoke in communities of color and low-income communities.  Her three-year project was cancelled without warning, and with no explanation of why it constituted forbidden DEI work.  Plaintiffs ask the Court to vacate the grant terminations and preliminarily enjoin Defendants from giving effect to those terminations. They seek this relief on behalf of themselves and a proposed class of similarly situated UC researchers who likewise had their grants terminated via form letters without a reasoned explanation and for researching forbidden topics.

Plaintiffs are likely to succeed on their claims that the termination of grants for research involving blacklisted topics like "diversity" and "equity" violates the First Amendment and runs contrary to Congress's specific directives to support research concerning—and foster greater involvement in the sciences of—underrepresented groups.  Although a new presidential administration is entitled to develop programs with its chosen priorities, the Executive may not set out to suppress ideas it deems dangerous by trying to drive them out of the marketplace of ideas, and may not do so by canceling grants on the basis that they serve the very purposes for which Congress appropriated the funds.

Plaintiffs are also likely to succeed on their claims that the *en masse* terminations via form letter were arbitrary and capricious.  The law requires administrative agencies to provide reasoned explanations for their decisions, particularly when changing a longstanding practice and abruptly upending years of planning and work.  The form termination letters here appear to be in blatant violation of that requirement.

Plaintiffs have also shown irreparable harm.  The undisputed evidence is that the termination of their funding will likely result in layoffs, educational interruptions, impair

ongoing research projects, harm Plaintiffs' careers and reputations, and suppress protected speech.

These claims present issues that are classically suited for classwide adjudication. The numerous grant terminations for researching forbidden topics raise common legal issues of viewpoint discrimination and statutory authorization. Likewise, the record shows that the mass terminations were carried out in a concerted fashion through form letters with the same common flaws. Accordingly, two overlapping classes of UC researchers will be certified, consisting generally of (a) those whose grants were terminated for researching blacklisted DEI topics, and (b) those whose grants were terminated by form letter without any grant-specific explanation. The precise class definitions are discussed below. Additionally, the Court grants preliminary injunctive relief on a classwide basis as to both classes, for the reasons explained in the remainder of the order.

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................. 1

**TABLE OF CONTENTS** ................................................................................ 4

**I.    BACKGROUND**...................................................................................... 6

   A.    Federal Agencies ................................................................................ 6

   B.    The Challenged Executive Orders .................................................... 8

   C.    Named Plaintiffs .............................................................................. 11

   D.    Termination of Grants Funding Plaintiffs' Research....................... 13

   E.    Plaintiffs' Claims ............................................................................ 16

**II.    PRELIMINARY INJUNCTIVE RELIEF** ........................................ 17

   A.    Likelihood of Success on the Merits................................................ 17

      1.    Agency Defendants' Implementation of Equity Termination Orders........................... 17

         a.    First Amendment Claim............................................................ 17

         b.    APA Claim Based on Agency Action Contrary to Law .......... 21

            i.    NSF ................................................................................ 22

            ii.    NEH .............................................................................. 24

      2.    Agency Defendants' Implementation of Grant Termination Orders ........................... 25

         a.    APA Arbitrary and Capricious Claim...................................... 25

            i.    No Reasoned Explanation.............................................. 27

            ii.    No Consideration of Important Factors ........................ 29

            iii.    Final Agency Action .................................................... 31

            iv.    Not Unreviewable ........................................................ 33

      3.    Jurisdictional Issues ...................................................................... 35

|  |  | a. | Tucker Act | 36 |
|  |  | b. | Article III Standing | 41 |
|  | B. | Irreparable Harm |  | 47 |
|  | C. | Balance of the Harms and Public Interest |  | 48 |

**III. PROVISIONAL CLASS CERTIFICATION ........................................................ 49**

|  | A. | The Provisionally Certified Classes | 51 |
|  | B. | Joinder | 53 |
|  | C. | The Equity Termination Class | 54 |
|  | D. | The Form Termination Class | 57 |
|  | E. | Claims Against Other Agency Defendants | 59 |
|  | F. | Class Counsel | 60 |

**IV. SCOPE OF INJUNCTION ................................................................................... 60**

**V. REQUEST FOR BOND AND FOR A STAY ...................................................... 61**

**VI. CONCLUSION .................................................................................................... 62**

I.        BACKGROUND

A.        Federal Agencies

Plaintiffs bring this action against sixteen federal agencies that are alleged to be following the same playbook in terminating grants that were previously issued, without providing any reasoned explanation.  The named Plaintiffs allege specifically that the National Endowment for the Humanities, the National Science Foundation, and the Environmental Protection Agency (together, the "Agency Defendants") abruptly terminated multi-year grants that had previously been awarded to fund their research.  Plaintiffs contend, among other things, that these terminations lacked any reasoned explanation and contravened the agencies' congressionally mandated statutory purposes.

The Environmental Protection Agency ("EPA") was given a "broad mandate" to "develop competence in areas of environmental protection that have not previously been given enough attention."[1]  The EPA funds research through a variety of programs, including the Science to Achieve Results (STAR) program, which "leverages the scientific and engineering expertise of academic and non-profit institutions to conduct high priority environmental and public health research."[2]  STAR is a "competitive, peer-reviewed extramural grant program," and grants are designed to further the EPA's overall mission: to "protect human health and the environment."[3]  Of the approximately 2,500 proposals for STAR research grants every year, it awards only around 150 research grants and 125 graduate fellowships.[4]

The National Endowment for the Humanities ("NEH") is an independent federal agency tasked with helping to create and sustain a "climate encouraging freedom of thought, imagination, and inquiry."  20 U.S.C. § 951(7).  In setting forth the "[f]unctions" of the NEH,

---

[1] Reorganization Plan No. 3 of 1970, https://www.epa.gov/archive/epa/aboutepa/reorganization-plan-no-3-1970.html (dated July 9, 1970).  This Order refers to websites that are cited in the Complaint (Dkt. No. 1, "Compl.").  Unless otherwise indicated, all websites were last visited June 22, 2025.

[2] https://www.epa.gov/research-grants/about-epas-research-grants.

[3] *Id.*; https://www.epa.gov/aboutepa/our-mission-and-what-we-do.

[4] https://www.epa.gov/research-grants/learn-about-research-grants.

Congress authorized the NEH's Chair to issue grants in ten areas. *Id.* § 956(c). One of those areas is to "initiate and support programs and research . . . that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community." *Id.* § 956(c)(4). In selecting recipients of funding, NEH's Chair "shall give particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented." *Id.* § 956(c). To receive an award, applicants must undergo a rigorous peer-reviewed process. Panels of experts in the relevant disciplines evaluate the project, NEH staff reviews the evaluations and makes recommendations for funding, and presidentially appointed scholars and community members on the National Council on Humanities make a final set of recommendations to the Chair.[5] Out of approximately 5,700 yearly applications, the NEH selects about 900 projects to receive grants.[6]

The National Science Foundation ("NSF") is an independent agency tasked with "provid[ing] Federal support" including through grants "for basic scientific and engineering research, and to be a primary contributor to mathematics, science, and engineering education at academic institutions in the United States." 42 U.S.C. § 1862k(a)(6)(A). Congress directed that the NSF "shall use" four "core strategies" to achieve its goals, the first of which is to "[d]evelop intellectual capital, both people and ideas, with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering." *Id.* § 1862k(b)(1). Congress mandated that the NSF Director "shall . . . support programs designed to broaden participation of underrepresented populations in STEM fields," including specifically awarding "grants . . . to increase the participation of" women, minorities, and persons with disabilities in STEM. *Id.* § 1862s-5(c), (d)(1). Prior to receiving funding, NSF grant applicants must undergo a review process to assess the project's "intellectual merit and broader impacts." *Id.* § 1862s(b).

---

[5] https://www.neh.gov/grants/application-process.

[6] *Id.*

Historically, the EPA, NEH, NSF, and the other Agency Defendants have maintained a close partnership with, and are a significant source of funding for, the UC System.  For example, in fiscal year 2024, the UC System received $525 million dollars in grant money from the NSF.[7]  Overall, the UC System received $4.069 billion in federal research awards in 2024.[8]

### B.    The Challenged Executive Orders

Since January 20, 2025, the Administration has issued at least eight executive orders that instruct federal agencies to terminate, review, or revise federal grants.  Executive Order Nos. 14151, 14173, 14168, 14154, 14217, 14238, 14158, and 14222, together, will be referred to in this order as the "Grant Termination Orders."  In many cases, the executive orders appear to instruct the agencies to terminate grants based on the viewpoint that the funded project "promotes."  Executive Order No. 14151, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing," states that agencies shall "to the maximum extent allowed by law" terminate "*all* . . . 'equity-related' grants or contracts" within 60 days.  90 Fed. Reg. 8339, 8339 (Jan. 20, 2025) (emphasis added).  Executive Order No. 14173, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," instructs the Office of Management and Budget ("OMB") and the Attorney General to "[t]erminate *all* 'diversity,' 'equity,' . . . and like . . . programs[] or activities."  90 Fed. Reg. 8633, 1634 (Jan. 21, 2025) (emphasis added). Executive Order Nos. 14151 and 14173 will be referred to in this order as the "Equity Termination Orders."  Executive Order No. 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," directs that "federal funds shall not be used to promote gender ideology."  90 Fed. Reg. 8615, 8616 (Jan. 20, 2025).  That executive order is referred to in this order as the "Gender Ideology Termination Order."

Other executive orders appear aimed at reducing federal government spending more

---

[7] https://ucop.edu/communications/_files/federal-investment-in-uc-research-2025.pdf.

[8] *Id.*

broadly, including through the wholesale "eliminat[ion]" of federal entities deemed "unnecessary." For example, Executive Order No. 14217 instructs OMB to review grant requests from certain government entities determined to be "unnecessary," including the "United States Institute of Peace" and "the Presidio Trust." 90 Fed. Reg. 10577, 10577 (Feb. 19, 2025). Executive Order Nos. 14158 and 14222 established the Department of Government Efficiency ("DOGE") and require all federal agencies to work with it to review existing grants and "terminate or modify" them to reduce federal spending. *See* 90 Fed. Reg. 8441, 8441 (Jan. 20, 2025); 90 Fed. Reg. 11095, 11095–96 (Feb. 26, 2025).

In the wake of the executive orders, federal agencies promptly announced their plans to begin immediate compliance with the Administration's directives, and federal grants have quickly been terminated on a massive scale. For example, in a March 10, 2025 press release, the EPA announced that, "with the assistance of" DOGE, it was cancelling more than 400 grants "across nine unnecessary programs."[9] The announced terminations constituted the EPA's "fourth round" of grant terminations.[10] The press release concluded by stating that the "EPA continues to work diligently to implement President Trump's executive orders."[11] EPA declarant Daniel Coogan, the Deputy Assistant Administrator who was the point person in communicating the decision to initiate grant terminations, described that terminations occurred "based on [the] Administration," via a process that "began by looking at grant titles and project descriptions." (Dkt. No. 43-2 ¶¶ 5, 8.)

Similarly, the NEH issued a press release on April 24, 2025, entitled "An Update on NEH Funding Priorities and the Agency's Recent Implementation of Trump Administration Executive Orders."[12] The press release stated that the agency had taken steps to "return to being

---

[9] https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-cancels-400-grants-4th-round-cuts-doge-saving-americans.

[10] *Id.*

[11] *Id.*

[12] https://www.neh.gov/news/update-neh-funding-priorities-and-agencys-recent-implementation-trump-administration-executive.

a responsible steward of taxpayer funds" and that future grants would only go to "projects that do not promote extreme ideologies based upon race or gender, and that help to instill an understanding of the founding principles and ideals that make America an exceptional country."[13]  In a Q&A on its website, the NEH stated that:

> In collaboration with the Administration, NEH has cancelled awards that are at variance with agency priorities, including but not limited to those on diversity, equity, and inclusion (or DEI) and environmental justice, as well as awards that may not inspire public confidence in the use of taxpayer funds.[14]

NEH Acting Chairman Michael McDonald states the agency "focused first on identifying open grants that focused on or promoted (in whole or in part) 'environmental justice,' 'diversity, equity, and inclusion,' or 'diversity, equity, inclusion, and accessibility,' and 'gender ideology.'" (Dkt. No. 46 ¶ 20.)  NEH staff used spreadsheets with "'High, Medium, Low, or No Connection' [to the Equity Termination Orders]" labels to identify projects for termination.  (*Id.* ¶ 9.)  The NEH has terminated "a number of, but not all, open NEH grants . . . in consultation with DOGE."  (*Id.* ¶ 18.)  Termination was based on whether the grant "promoted" the viewpoints identified in the Equity Termination Orders, as well as efficiency factors.  (*Id.* ¶¶ 20-21.)

The NSF published a "Statement of [NSF] Priorities" on April 18, 2025, explaining that "[r]esearch projects with more narrow impact limited to subgroups of people based on protected class or characteristics do not effectuate NSF priorities."  (Dkt. No. 48-2 at 5.)[15]  On the same date, an internal staff memorandum indicated that the NSF was implementing "administration priorities."  (*Id.* at 6.)  NSF declarant Brian Stone, who is currently performing the role of NSF Director, states that the NSF identified grants for termination using "keyword searches and analytics."  (Dkt. No. 43-3 ¶ 6.)  The NSF has posted a public running list of terminated

---

[13] *Id.*

[14] https://www.neh.gov/updates-neh-priorities.

[15] All citations to page numbers refer to ECF pagination.

contracts, which as of June 5, 2025, included nearly 1,700.[16]  A review of the titles of the terminated contracts shows that they share common key words, including "equity" or "equitable" (appearing in 238 titles); "diversity" or "diverse" (103 titles); "community" (111 titles); "gender" (58 titles); "underrepresented" (50 titles); "inclusion" (45 titles); and "justice" (46 titles).  *Id.* Responding to the NSF's grant cancellation, the House Committee on Science, Space, and Technology stated in an open letter that "[t]he cancelation of [certain NSF] awards suggests [] that NSF is willing to apply political censorship of awards" in "clear violation of the statutory mission of the agency."[17]

Large-scale grant termination is not confined to the EPA, NEH, and NSF.  As of June 22, 2025, the "Wall of Receipts" on the DOGE website announced that federal agencies had terminated over 11,000 grants, suggesting a coordinated effort to terminate contracts *en masse* in order to comply with the executive orders.[18]  Plaintiffs allege that the Food and Drug Administration ("FDA"), Department of Agriculture, AmeriCorps, Department of Defense, the Department of Education, Department of Energy, Centers for Disease Control, Department of Health and Human Services, National Institutes of Health, the Institute of Museum and Library Services, Department of the Interior, the Department of State, and Department of Transportation (together, the "Other Agency Defendants") have also engaged in mass grant terminations and stated that they were carrying out the directives of DOGE and the President in describing their actions.

### C.    Named Plaintiffs

Named Plaintiffs are six UC System researchers.  Between 2021 and 2023, Plaintiffs submitted grant applications to the EPA, NSF, and NEH.  The grants were awarded, allowing

---

[16] https://www.nsf.gov/updates-on-priorities#termination-list (date of last export, June 5, 2025).

[17] Letter from House of Representatives' Committee on Science, Space and Technology to Brian Stone, dated May 8, 2025, available at https://democrats-science.house.gov/imo/media/doc/2025-05-08%20Letter%20to%20Acting%20Director%20Stone.pdf.

[18] https://doge.gov/savings.

Plaintiffs to launch or continue multi-year projects such as research into community level interventions to mitigate exposure to wildfire smoke (Dkt. No. 10), landfill methane emission studies (Dkt. No. 9), and stewarding an "accessible resource for the life and writings of Mark Twain." (Dkt. No. 13.) As principal researchers, Plaintiffs are responsible for overseeing the grant-funded project, and must notify the funding agency, and receive approval, if they plan to transfer schools or need to reduce the time devoted to the project.[19]

The grants are part of longstanding project funding that Plaintiffs attest that they and their teams rely on. For example, Thakur has received federal funding for her research into asthma in minority populations for more than a decade. (Dkt. No. 10-2 at 24–39.) Her EPA grant application at issue is titled "Partnering for Resilient Opportunities To Eliminate Toxic (PROTECT) Health Effects from Wildfire PM2.5 in Environmental Justice Communities" and was ultimately funded to run from December 2022 to November 2024. (Dkt. No. 10 ¶¶ 10, 15.) The NEH has provided uninterrupted funding to the editorial work of the Mark Twain Project since 1967, and Plaintiff Dr. Robert Hirst has served as the Project's general editor since 1980. (Dkt. No. 13 ¶¶ 2, 21.) Hirst's most recent grant application was approved, and would have provided funding through 2027. (*Id.* ¶¶ 27, 29.) Similarly, the Lawrence Hall of Science relies heavily on federal funding for its research, educational programs, and to provide K-12 science curriculum materials to seven million students in classrooms across the country. (Dkt. No. 14 ¶ 6; Dkt. No. 14-1.) In 2023, several multi-year projects at the Lawrence Hall of Science proposed by Plaintiff Jeda Foreman and her collaborators received funding from the NSF. (Dkt. No. 12 ¶¶ 10–52.) One project, titled "Working Toward Racial Equity: Building Capacity to Institutionalize Equity in Outdoor and Environmental Science Education" aims to position science education institutions to facilitate conversations about racial equity. (*Id.* ¶¶ 24, 28.) A goal of another project, "Supporting Rightful Presence in Museum Spaces: Youth as

---

[19] *See*, *e.g.*, https://www.neh.gov/sites/default/files/inline-files/Public%20Humanities%20Projects%20FAQs.pdf, at 4; https://www.epa.gov/grants/epa-grants-community-library-frequently-asked-questions-faq

Participatory Designers of Indigenous Mixed Reality Science Exhibits," includes "address[ing] the ongoing marginalization of Indigenous communities in informal science learning spaces." (*Id.* ¶¶ 36, 38.)  Each Plaintiff states that no alternate funding is readily available to support their projects.

### D.     Termination of Grants Funding Plaintiffs' Research

Starting in April 2025, the UC System began receiving form letters notifying them that the grants funding Plaintiffs' research had been terminated.  Plaintiffs have submitted declarations appending the termination letters, which Defendants have not contested are form letters sent to implement mass grant terminations.  (*See*, *e.g.*, Dkt. No. 31 at 10; Dkt. No. 46 ¶¶ 18–19; Dkt. No. 43-3 ¶ 6.)  For example, Plaintiffs submit four identical EPA grant termination letters received between April 28, 2025 and May 12, 2025.  (Dkt. No. 9-8 at 2–3; Dkt. No.10-8 at 2–3; Dkt. No. 11-7 at 2–3; Dkt. No. 11-13 at 2–3.)  Each termination letter is titled "Termination of EPA Assistance Agreement [No. X] under 2 CFR 200.340," and states that:

> The purpose of this communication is to notify you that the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. [X] awarded to [X]. This EPA Assistance Agreement is terminated in its entirety effective immediately on the grounds that the award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities.
>
> The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In addition to complying with the law, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.
>
> The grant specified above provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities.

(*See*, *e.g.*, Dkt. No. 9-8 at 2.)

13

Two other plaintiffs submit NEH grant termination letters dated April 2, 2025, which

both stated:

> Your grant no longer effectuates the agency's needs and priorities
> and conditions of the Grant Agreement and is subject to termination
> due to several reasonable causes, as outlined in *2 CFR §200.340*.
> NEH has reasonable cause to terminate your grant in light of the fact
> that the NEH is repurposing its funding allocations in a new
> direction in furtherance of the President's agenda. The President's
> February 19, 2025 executive order mandates that the NEH eliminate
> all non-statutorily required activities and functions. *See
> Commencing the Reduction of the Federal Bureaucracy,* E.O. 14217
> (Feb. 19, 2025). Your grant's immediate termination is necessary to
> safeguard the interests of the federal government, including its fiscal
> priorities. The termination of your grant represents an urgent priority
> for the administration, and due to exceptional circumstances,
> adherence to the traditional notification process is not possible.
> Therefore, the NEH hereby terminates your grant in its entirety
> effective April 1, 2025.

(Dkt. No. 8-5 at 2; Dkt. No. 13-6 at 2.)

Foreman submits form termination emails from the NSF cancelling funding for her three

projects at issue. The emails stated:

> The U.S. National Science Foundation (NSF) has undertaken a
> review of its award portfolio. Each award was carefully and
> individually reviewed, and the agency has determined that
> termination of certain awards is necessary because they are not in
> alignment with current NSF priorities. Effective immediately, the
> following are terminated:
> **NSF Award Id [X]**
> NSF is issuing this termination to protect the interests of the
> government pursuant to NSF Grant General Conditions (GC-1) term
> and condition entitled 'Termination and Enforcement,' on the basis
> that they no longer effectuate the program goals or agency priorities.
> This is the final agency decision and not subject to appeal.

(Dkt. No. 12-8 at 2; Dkt. No. 12-9 at 3.) None of the submitted termination letters discuss any

specific policy interest motivating the termination, nor does any letter mention any specific

offending features of the terminated grant.

The formulaic termination letters received in quick succession and without prior warning,

the large volume of terminated grants, and the sweeping executive orders, support an inference

that Defendants undertook blanket *en masse* terminations pursuant to the executive orders. On

the current record before the Court, it appears that terminations occurred without individualized

consideration of the extent to which the projects continued to serve stated agency priorities, or the reliance interests of those whose careers and livelihoods were upended by the abrupt termination of previously issued grants. For example, some projects appear to have been terminated merely because they had "disfavored words in the project titles," such as references to biodiversity, in the rush to effectuate the Equity Termination Orders and the General Ideology Termination Order. (Dkt. No. 7-1 at 48; Dkt. No. 43-3 ¶ 6; Dkt. No. 43-2 ¶ 8; Dkt. No. 46 ¶ 9.) According to Plaintiffs' review of DOGE's self-reported data, the federal government has terminated over $324 million in grants to the UC System since the executive orders went into effect. (Compl. ¶ 112.)

The abrupt termination of grants—while projects were mid-stream—has already caused significant delays to Plaintiffs' research, will likely result in the layoff of staff and graduate students on whom Plaintiffs rely for help, and may lead to the complete loss of many projects. For example, Plaintiff Ken Alex, who spearheads studies seeking to mitigate hazardous air pollutants emitted from landfills, explains that he is "unable to proceed with [] basic work," and that "graduate students with particular expertise and experience will leave for other project and employment, and replacing that expertise with be difficult or impossible," such that the project will likely be unable to be completed as originally planned. (Dkt. No. 9 ¶ 27.) Thakur explains that her study of the health effects of wildfire smoke on racially and ethnically diverse communities has ground to a halt, she has had to let go a student intern, and that her post-doctoral fellow is not being paid. (Dkt. No. 10 ¶ 25.) Plaintiff Dr. Green Nylen states that the "job of every member of [the] team . . . is currently threatened by these grant terminations." (Dkt. No. 11 ¶ 41.) And the harm is not confined to Plaintiffs and their teams. For example, Thakur has been "unable to complete the health analyses . . . as well as identify promising health-protecting strategies to help protect communities across California during wildfire smoke events." (Dkt. No. 10 ¶ 25.) Alex, Thakur, Green Nylen, and other Plaintiffs allege that without the federal funding, many of their high-impact and time-sensitive research projects will never be completed or published, and in some instances, that research already performed will be wasted

because of the abrupt termination of funds.

Plaintiffs are bracing for more form termination letters to arrive.  In a letter to researchers on April 29, 2025, the Director of the Lawrence Hall of Science at U.C. Berkeley explained that it had lost approximately $4.5 million in federal funding and was expecting to receive additional termination letters as the "NSF continues its review of current grants."  (Dkt. No. 14-1 at 3.)  Plaintiffs allege that the head of the DOJ's "antisemitism taskforce" announced that the DOJ is "going to go after [the UC system] where it hurt them financially."  (Compl. ¶ 430.)  Furthermore, declarations submitted by the Agencies do not refute the allegations that their *en masse* grant termination efforts are ongoing.  For example, the NSF declarant simply states that the "NSF began terminating awards beginning April 18th and conducted several rounds of terminations on a rolling basis."  (Dkt. No. 43-3 ¶ 6.)

### E.    Plaintiffs' Claims

Plaintiffs' Complaint asserts three constitutional claims and two Administrative Procedure Act ("APA") claims.  First, Plaintiffs allege that "Defendants' decisions to unilaterally cancel duly awarded grants and withhold funding that Congress has appropriated" violates separation of powers under Article I, § 1 and Article II, § 3 of the Constitution.  (Compl. ¶ 437.)  Second, Plaintiffs allege that "Defendants' mass termination of grants to disadvantage or promote particular political and ideological viewpoints constitutes" discrimination in violation of the First Amendment.  (*Id.* ¶ 444.)  Third, Plaintiffs invoke the due process clause and the void for vagueness doctrine of the Fifth Amendment, arguing that their funding is being terminated without fair notice.  (*Id.* ¶¶ 449, 451.)  Finally, in their fourth and fifth causes of action under the APA, Plaintiffs allege that the terminations were contrary to law—specifically the Impoundment Control Act and the agencies' enabling statutes and regulations—and arbitrary and capricious.  (*Id.* ¶¶ 454–465.)  The Complaint seeks solely declaratory and injunctive relief, and does not seek damages.  (*Id.* at p. 104 ("Prayer for Relief").)  Plaintiffs seek provisional certification of a class of UC System researchers whose funding was terminated because of Defendants allegedly unlawful actions (Dkt. No. 18), and classwide preliminary injunctive relief.  (Dkt. No. 7.)

## II.    PRELIMINARY INJUNCTIVE RELIEF

"[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).  In order to obtain a preliminary injunction, Plaintiffs must establish that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest.  *Id.* at 20.  When the nonmoving party is the government, the final two factors merge.  *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

### A.    Likelihood of Success on the Merits

On the existing record, Plaintiffs are likely to succeed on their claims that grant terminations pursuant to the Equity Termination Orders violate the First Amendment and, in the case of NSF and NEH, were contrary to congressionally mandated directives to both agencies under the APA.  Plaintiffs are also likely to succeed on their APA claims that Agency Defendants' implementation of the Grant Termination Orders was arbitrary and capricious. Defendants raise threshold jurisdictional barriers to these claims, which the Court finds Plaintiffs are likely to overcome.  However, because the jurisdictional challenges require an understanding of the nature of Plaintiffs' substantive claims, this Order discusses the merits of Plaintiffs' claims before explaining why the jurisdictional challenges are misplaced.

#### 1.    Agency Defendants' Implementation of Equity Termination Orders

##### a.    First Amendment Claim

Plaintiffs have shown a likely First Amendment violation on the basis that Agency Defendants terminated grants because the research touched on forbidden topics such as "equity" and "diversity."  The First Amendment bars the government from using federal funding to penalize private speech that promotes prohibited viewpoints.  "The government may not 'leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints' that might 'aim at the suppression of dangerous ideas.'"  *Koala v.*

*Khosla*, 931 F.3d 887, 898 (9th Cir. 2019) (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998)) (cleaned up).  As such, "the government can violate the First Amendment by withholding benefits for a censorious purpose."  *Id.*

Grant terminations pursuant to the Equity Termination Orders constitute precisely such an impermissible penalty.  Executive Order No. 14151 requires agencies to terminate, "to the maximum extent allowed by law" "*all* . . . 'equity-related' grants or contracts."  90 Fed. Reg. at 8339 (emphasis added).  The "purpose" of the Order is to "end[] today" "diversity, equity, and inclusion" programs, which the Order describes as "immoral" and "shameful."  Executive Order No. 14173 requires termination of "*all* 'diversity,' 'equity,' . . . and like . . . programs[] or activities."  90 Fed. Reg. at 8633 (emphasis added).  The "purpose" of the Order is likewise to "combat" and "end" "diversity, equity, and inclusion" programs, which are described as "dangerous, demeaning, and immoral."  *Id.*  In carrying out *en masse* grant terminations as directed, Defendants are not merely selectively funding future speech to advance a chosen government message, but instead are deliberately penalizing certain "dangerous ideas," by scuttling swaths of preexisting and ongoing federal research.  That "is precisely the kind of 'invidious viewpoint discrimination' that the Supreme Court has suggested would present First Amendment concerns even in the context of federal subsidies."  *San Francisco A.I.D.S. Found. v. Trump*, No. 25-cv-01824-JST, 2025 WL 1621636, at *18 (N.D. Cal. June 9, 2025) (citing *Finley*, 524 U.S. at 587).

Defendants primarily argue that the terminations are lawful because there are no restrictions of "speech on the recipients' own time and dime."  (Dkt. No. 35 at 54–55.)  Even assuming this is the case, it does not end the inquiry.  "[G]overnmental actions seeking to suppress a speaker's particular views are presumptively unconstitutional."  *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024) (citing *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)).  As the Supreme Court explained in *Finley*, a federal agency's decision "to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints," even in the context of a highly selective and discretionary

grant-making process, could result in the unlawful "suppression of dangerous ideas" in violation of the First Amendment. 524 U.S. at 587. That is exactly what Plaintiffs allege.

The government may, of course, create programs intended to advance a certain message, and selectively fund certain speech to the exclusion of other speech in order to advance its chosen message. *Rust v. Sullivan*, 500 U.S. 173 (1991), and *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,* 570 U.S. 205 (2013) ("*AID*"), on which Defendants rely, provide an instructive contrast. In *Rust*, Congress established program clinics to advise patients on family planning, and did not allow abortion to be included in the family planning topics. 500 U.S. at 193. The Court found that permissible because Congress was entitled to "ensure that the limits of the federal program [were] observed." *Id.* at 193. Similarly, in *AID*, Congress funded a program to fight HIV and AIDS by, among other things, promoting behaviors that reduced sexual transmission. 570 U.S. at 209. Congress was within its rights to require speakers not to use its funds to advocate for legalizing prostitution or sex trafficking, though it acted impermissibly by requiring grantees to certify that they opposed those practices even outside the limits of the funded program. *Id.* at 217–18. Both those cases reflect that "viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker" or "in which the government 'used private speakers to transmit specific information pertaining to its own program.'" *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001).

That, however, is not what Defendants appear to have done. Defendants terminated pre-existing grants *en masse* across the federal government for touching on prohibited topics. Those terminations, which occurred across different agencies, do not appear tied to any particular government program advancing a government message.[20] There is no basis to conclude that the UC System, or its researchers, were "transmit[ting] specific information pertaining to" a

---

[20] Indeed, the terminations, in some instances, appear to undercut the programmatic message that Congress directed the agency to advance. *See, e.g.*, 20 U.S.C. § 956(c)(4) (NEH grants should support programs that "reach, or reflect . . . the culture of, a minority, inner city, rural, or tribal community"); 42 U.S.C. § 1885(b) (directing NSF to give "substantial support . . . for increased participation in science and engineering by women, minorities, and persons with disabilities").

government program when they were conducting the research at issue.  *Id.* at 541.  Instead of seeking to define the limits of a government program advancing a government message when awarding new funding or creating new programs, the implementation of the Equity Termination Orders appears to be a concerted effort to penalize existing grants across the board for promoting forbidden views, as reflected in the stated aim to "combat" and "end" the "dangerous, demeaning, and immoral . . . DEI" speech.  90 Fed. Reg. at 8633.  This is quintessential viewpoint discrimination and that likely violates the First Amendment.  *See*, *e.g.*, *San Francisco A.I.D.S. Found.*, 2025 WL 1621636, at *18.

Named Plaintiffs have shown a likelihood that they were subject to viewpoint discrimination by Defendants based on the Equity Termination Orders.  For example, while Foreman was not told the reason why her NSF grant funding was terminated, one of her grant proposal titles includes the words "racial" and "equity," and the subject-matter of her projects can be characterized as "equity-related."  (Dkt. No. 12 ¶¶ 24, 28, 36, 38.)  Furthermore, on the same day that Foreman's funding was terminated, the NSF issued a public memorandum of priorities stating that "research projects with more narrow impact to subgroups of people based on protected class or characteristics do not effectuate NSF priorities."  (Dkt. No. 12-8 at 2; Dkt. No. 48-2 at 5.)  Like Foreman, Thakur's and Plaintiff Dr. Christine Philliou's project funding was also terminated via form letters that lacked any explanation for the terminations.  However, the record shows that the grants were likely terminated because of the researchers' protected speech in their grant applications.  Thakur's EPA grant proposal title includes the term "Environmental Justice."  (Dkt. No. 10 ¶ 10.)  Philliou's NEH grant proposal aimed to "shed light on the possibilities of inclusion and belonging of non-Muslims in a Muslim state."  (Dkt. No. 8-2 at 24.)  Defendant have not provided any evidence of why the named Plaintiffs' funding was terminated, and therefore do not rebut this reasonable presumption.

Plaintiffs allege that Agency Defendants implemented the Equity Termination Orders by identifying grant proposals reflecting "dangerous ideas," based on keywords in their titles, and then terminating the identified projects.  (Compl. ¶ 68.)  The record supports Plaintiffs'

understanding.  NSF Acting Director Brian Stone states that the NSF identified grants for termination using "keyword searches and analytics."  (Dkt. No. 43-3 ¶ 6.)  EPA declarant Daniel Coogan states that the EPA's review "began by looking at grant titles and project descriptions." (Dkt. No. 43-2 ¶ 8.)  NEH Acting Chair Michael McDonald states that open grants were flagged as involving "diversity, equity, or inclusion," among other terms, and that staff used spreadsheets with "High, Medium, Low, or No Connection" to the Equity Termination Orders labels to identify projects for termination.  (Dkt. No. 46 ¶ 9.)  Furthermore, each Agency Defendant has acknowledged via declaration or through public statements that it was implementing the Administration's executive orders in carrying out the grant terminations.  (*Id.* ¶¶ 6–7; Dkt. No. 43-4 at 2; Compl. ¶ 261.)[21]  Plaintiffs have shown a substantial likelihood that their funding was terminated based on the viewpoint expressed in their grant proposals.

### b.    APA Claim Based on Agency Action Contrary to Law

Plaintiffs are also likely to succeed in showing that their NEH and NSF grant terminations were contrary to law, and thus in violation of the APA.  When an executive agency administers a federal statute, the agency's power to act is "authoritatively prescribed by Congress."  *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013).  Therefore, "an agency literally has no power to act . . . unless and until Congress confers power upon it."  *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  Therefore, Courts must "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(A)&(C).  "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as

---

[21] Deputy Assistant Administrator Coogan submitted a declaration stating that the EPA review of grants occurred "distinct from" and "independent from" any executive order.  (Dkt. No. 43-2 ¶ 6.)  That statement, however, is contradicted by the EPA's contemporaneous public announcements.  *See, e.g.*, EPA Administrator Lee Zeldin Cancels 400+ Grants in 4th Round of Cuts with DOGE, Saving Americans More than $1.7B, dated Mar. 10, 2025 (stating that the "EPA continues to work diligently to implement President Trump's executive orders"), available at https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-cancels-400-grants-4th-round-cuts-doge-saving-americans.

the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024); 5 U.S.C. § 706 (courts must "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning . . . of the terms of an agency action").

As detailed below, Plaintiffs have shown that the NEH and NSF likely acted contrary to their enabling statutes when terminating Plaintiffs' funding[22] pursuant to the Equity Termination Orders, because those terminations were based on Plaintiffs' pursuit of the very goals that Congress had mandated.

### i.    NSF

Congress directed that the NSF "shall use" four "core strategies" to achieve its goals, the first of which is to "[d]evelop intellectual capital, both people and ideas, with particular emphasis on *groups* and regions that *traditionally have not participated fully* in science, mathematics, and engineering."  42 U.S.C. § 1862k(b)(1) (emphasis added).  Congress directed that the NSF "shall continue to support programs designed to broaden participation of underrepresented populations in STEM fields," and specifically "shall award grants . . . to increase the participation of underrepresented populations in STEM fields, including individuals identified in section 1885a or section 1885b of this title."  *Id.* § 1862s-5(c), (d)(1).  Those subsections refer to increasing participation of "women," "minorities," and "persons with disabilities" in STEM.  *Id.* §§ 1885a, 1885b.  Those directives reflected Congress's findings that "underrepresented populations are the largest untapped STEM talent pools in the United States," and that "the United States should encourage full participation of individuals from underrepresented populations in STEM fields." *Id.* § 1862s-5(b)(3), (4); *see also id.* § 1885(b) (declaring the "policy of the United States" and "in the national interest" to "increase[] participation in science and engineering by women, minorities, and persons with disabilities").

In light of these directives, it is logical that Foreman and her team received NSF funding.

---

[22] Plaintiffs are challenging final agency actions which are not unreviewable.  *See infra* Sections II.A.2.a.iii & iv.

Her projects aim, for example, to "bring[] broader representation to the STEM field, with greater diversity of lived experiences and perspectives," (Dkt. No. 12-1 at 4), and "expand[] understanding of Indigenous scientific and cultural knowledge amongst non-Indigenous people." (Dkt. No. 12-5 at 4.)  These projects are directly aligned with the first core strategy that the NSF is congressionally mandated to use, as well as Congress's directive that the NSF shall award grants for this purpose, and Foreman's prior application approval indicates that she and her team met the NSF's rigorous standards to qualify for federal funding.

As described *supra* in Section II.A.1.a, Foreman's funding was terminated because her projects no longer "effectuate[d] the program goals or [NSF] priorities" (*see*, *e.g.*, Dkt. No. 12-8 at 2), on the same day that the NSF publicly announced that it would not fund "[r]esearch projects with more narrow impact limited to subgroups of people based on protected class or characteristics" because they "do not effectuate NSF priorities."  (Dkt. No. 48-2 at 5.)  In a FAQ, the NSF has explained that "[a]wards that are not aligned with NSF's priorities have been terminated, including but not limited to those on diversity, equity, and inclusion. . ."  (Dkt. No. 43-4 at 2.)

A decision to terminate a grant *because* it was directed at broadening representation of an underrepresented group in STEM is directly contrary to Congress's mandates.  Certainly, the NSF's enabling statute did not require it to fund Foreman's research specifically, or any other specific research project aimed at broadening representation in STEM.  But when Congress required that the NSF "shall award grants" to increase participation of "women, minorities, and people with disabilities" in STEM, the EPA was barred from terminating such grants *on the basis* that they had a "more narrow impact to subgroups of people based on protected class or characteristics."  *See Green & Healthy Home Initiatives, Inc. v. EPA.*, No. 25-cv-01096, 2025 WL 1697463, *18 (D. Md. June 17, 2025) (finding that agency "exceeded its statutory authority" when it terminated grants "precisely *because* they [were] 'environmental justice' programs," notwithstanding Congress's directive to use those funds to carry out "environmental and climate justice activities" and "benefit disadvantaged  communities") (emphasis in original).  The NSF

does not have the authority to "decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013). Plaintiffs are likely to succeed on this claim.

### ii. NEH

In creating the NEH, Congress identified its "[f]unctions" to include issuing grants in ten areas. 20 U.S.C. § 956(c). One of those areas is to "initiate and support programs and research . . . that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community." *Id.* § 956(c)(4). In selecting recipients of funding, the NEH's Chair "shall give particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented." *Id.* § 956(c). In other words, the NEH has a statutory obligation to fund research reflecting diverse cultures and to fund researchers from diverse backgrounds.

Despite this obligation, the record reflects that pursuant to the Equity Termination, NEH leadership has determined that it will no longer fund projects that further the interests of "diversity." The NEH states in its online Q&A that "[i]n collaboration with the Administration, NEH has cancelled awards that are at variance with agency priorities, including but not limited to those on diversity, equity, and inclusion . . ."[23] The FAQ goes on to state, "NEH-supported projects should not preference some groups at the expense of others."[24] The acting Chairman of the NEH has submitted a declaration stating that the NEH reviewed grants for termination pursuant to the Equity Termination Orders, using a system that indicated whether a grant had "'High, Medium, Low, or No Connection' in terms of the [Equity Termination Orders]." (Dkt. No. 46 ¶ 9.) As with the NSF, though the NEH's statute might not have required it fund any specific project, the NEH was not free to terminate grants *because* they advance "diversity" or "give particular regard to [those] that have traditionally been underrepresented," as mandated by

---

[23] https://www.neh.gov/updates-neh-priorities.

[24] *Id.*

Congress.  As such, the record shows a substantial likelihood that NEH has exceeded its statutory authority by terminating grants on the basis that they advanced Congress's stated objectives.

Having found that the termination of Plaintiffs' grants pursuant to the Equity Termination Orders likely violated the NEH and NSF enabling statutes, the Court declines to reach the issue of whether those terminations also violated the EPA's enabling statute at this stage.  The record as to the EPA is less developed and would benefit from further fact development, including, for example, whether the grants at issue were funded from appropriations specifically earmarked for a particular purpose.  Also, because Plaintiffs have already shown the termination of grants pursuant to the Equity Termination Orders likely violated both the First Amendment and APA, the Court does not need to reach Plaintiffs' other claims under the Constitution and the APA challenging such terminations, for purposes of assessing preliminary injunctive relief.

### 2.    Agency Defendants' Implementation of Grant Termination Orders

#### a.    APA Arbitrary and Capricious Claim

Plaintiffs are also likely to succeed in showing that the mass grant terminations carried out via form letters were conducted in a manner that was arbitrary and capricious.  Under the APA, an agency action must be set aside and held unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An agency decision is unlawfully arbitrary and capricious:

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Conversely, agency action is lawful if the agency "has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).  The court may not

"infer an agency's reasoning from mere silence." *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008) (citation omitted).

The change-in-position doctrine provides a framework for analyzing whether an agency acts in an arbitrary and capricious way by changing its position. "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that [they are] changing position, and consider serious reliance interests." *FDA v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 917 (2025) (cleaned up). When an agency effectively rescinds its existing, "longstanding" position, it must consider any "serious reliance interests" it may have engendered, "determine whether they [are] significant, and weigh [them] against competing policy concerns." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30, 33 (2020) (cleaned up). The agency must also consider alternatives to its change in position that are "within the ambit of existing [policy]." *Id.* at 30 (alteration in original) (quoting *State Farm*, 463 U.S. at 42). What the agency must not do is depart from its prior position *sub silentio*. *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009).

In reviewing a final agency action under the APA, courts may only consider the facts that the agency reviewed during its decision-making process. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). A court may not "uphold regulations on the basis of post-hoc rationalizations offered by the agency." *Bunker Hill Co. v. EPA*, 572 F.2d 1286, 1292 (9th Cir. 1977). While courts may consider affidavits not contained in the agency record, such post-hoc materials must only (1) provide background information or evidence of whether all relevant factors were examined by an agency or (2) be merely explanatory of the original record and contain no new rationalizations. *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1159 (9th Cir. 1980); *Bunker Hill Co.*, 572 F.2d at 1292.

Plaintiffs argue that the termination of grants was arbitrary and capricious because the "mass termination" notices "do not provide a reasoned explanation" for the termination and reflect a change in position without "adequate explanation." (Dkt. No. 7-1 at 62–63.) They also

26

argue that Defendants failed to consider important aspects of the problems that the terminations would cause, including "the reliance interests of the grantees," the waste created when projects are left incomplete, and the harm to the broader public. (*Id.* at 62–63.) Plaintiffs have shown a likelihood of success on their arbitrary and capricious claim.

### i.    No Reasoned Explanation

The record reflects that the challenged grant terminations were likely performed *en masse*, without individualized analysis, and without providing grantees with reasoned explanation for the terminations. The standardized termination letters make only conclusory statements that the "award no longer effectuates the program goals or agency priorities," "promote initiatives that conflict with the Agency's" policy goals, or must be terminated for "several reasonable causes," in order to "safeguard the interests of the federal government, including its fiscal priorities." (*Id.* at 35, 40.) They provide no indication that Defendants have "considered the relevant factors" and do not "articulate[] a rational connection between the facts found and the choice made." *Baltimore Gas*, 462 U.S. at 105. "[B]aldly asserting that" longstanding funding is being terminated to "comply with [an agency's] statutory mandate" does not constitute a "reasoned explanation" under the APA. *Nw. Env't. Def. Ctr. v. Bonneville Power Admin.,* 477 F.3d 668, 689 (9th Cir. 2007). Based on the form termination letters, received without any prior warnings, it is impossible to determine which item in the disjunctive list of "priorities" and "reasonable causes" resulted in the termination of the grant, much less why the specific project was found to be incompatible with the Agency's priorities.

Agency Defendants do not contest that the termination letters represent the sum-total of their "reasoned explanation," and none of the evidence Defendants have produced supplements the reasoning in the form letters. Instead, Defendants argue that their reference to "agency priorities" satisfies their legal obligation. (Dkt. No. 18 at 47–48.) That empty statement, though, does not explain *why* the agency changed its view of how the grant serves statutory priorities. It conveys the bare fact of the change, not the reasons for the change. "[C]onclusory statements will not do; an agency's statement must be one of *reasoning.*'" *Amerijet Int'l, Inc. v. Pistole*,

753 F.3d 1343, 1350 (D.C. Cir. 2014) (emphasis in original); *see also* 2 CFR §200.341(a) ("written notice of termination [of federal funding] should include the reasons for termination"). Agency Defendants' simultaneous rollout of a mass grant-termination policy, effectuated through form termination letters, means that grant recipients and reviewing courts are improperly "compelled to guess at the theory underlying the agency's action." *SEC v. Chenery Corp.*, 332 U.S. 194, 196–197 (1947).

This guesswork is made even more difficult by the inconsistencies in the existing record. For example, the NEH form termination letters state that termination is pursuant to Executive Order No. 14217, but the NEH now states that was a "mistake[]." (Dkt. No. 46 ¶ 19.) Instead, the NEH declarant suggests that Executive Orders Nos. 14151, 14168, and 14222 guided the NEH's review and termination of grants. (*Id.* ¶¶ 6–7, 19.) Similarly, the EPA has repeatedly issued public statements confirming that it is terminating contracts pursuant to executive orders and in coordination with DOGE, yet the EPA declarant now states that grant terminations occurred "distinct from" and "independent from" any executive order. (Dkt. No. 43-2 ¶ 5–6.) Plaintiffs and the Court should not be left to guess at Agency Defendants' true reasons for terminating Plaintiffs' funding. *See Bonneville Power,* 477 F.3d at 689.

Agency Defendants' characterization of their grant termination process as "individualized review" is belied by the rest of the record. As discussed *supra* in Sections II.A.1.a & I, Agency Defendants appear to have flagged grants for termination based on keyword searches or other cursory review, and terminated grants that appear to have no connection to the Equity Termination Orders they were purporting to implement. The pace of the review and the resulting large waves of terminations via form letters further suggests a likelihood that no APA-compliant individualized review occurred. These are precisely the kinds of concerns that the APA's bar on arbitrary-and-capricious agency decisionmaking was meant to address. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (explaining that the APA requires a reviewing court to ensure that "the agency . . . has reasonably considered the relevant issues and reasonably explained the decision"). Simply put, the "the record reflects a lack of the individualized

reasoning and analysis required" by the APA.  *See California v. Dep't of Educ.*, No. 25-cv-10548, 2025 WL 760825, at *3 (D. Mass. Mar. 10, 2025) (finding likelihood of success on the merits of an arbitrary and capricious claim where agency sent form letters terminating grants), *stayed granted on other grounds by* 145 S. Ct. 966 (2025).[25]

Furthermore, the termination of previously awarded grants is a *per se* change in agency position, requiring a reasoned explanation of the change.  *See White Lion*, 145 S. Ct. at 917.  As reflected in the record, Agency Defendants engaged in a comprehensive review process prior to approving each of the grants that funded Plaintiffs' projects, and the grant award reflects the agency's determination that the project being funded aligned with the statutory mandate and policies of the agency.  While an agency may change its "view of what is in the public interest," it must do so in accordance with the law and "must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored."  *Bonneville Power*, 477 F.3d at 687 (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)).  And "if an agency glosses over or swerves from prior precedents without discussion," they likely "cross the line from the tolerably terse to the intolerably mute."  *Id.* at 687–88 (quoting same); *see also Pacito v. Trump*, No. 25-cv-00255, 2025 WL 893530, at *11 (W.D. Wash. Mar. 24, 2025) (holding that a "[f]unding [t]ermination [w]as arbitrary and capricious because it constitute[d] a shift in agency policy without any reasoned explanation").  Nothing in the letters or any other source in the record provides the reasoned explanation that the APA requires.

### ii.    No Consideration of Important Factors

Plaintiffs have reliance interests in the research they were conducting based on the multi-year funding grants, and Defendants have not introduced any evidence that they considered those

---

[25] 2 C.F.R. § 200.340, to the extent it applies, does not alter the requirement under the APA that Defendants must provide a reasoned decision for their termination.  *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 851 (D. Md. 2025) (citing *Prometheus*, 592 U.S. at 423).

interests prior to terminating the grants.  Agency Defendants' apparent failure to "properly consider[] the reliance interests of grant recipients and program participants or [show] that [they] accounted for all relevant impacts of cutting off funding to programs already in place" suggest that the agencies likely acted in an arbitrary and capricious manner.  *See California v. Dep't of Educ.*, 132 F.4th 92, 99 (1st Cir. 2025), *stay granted on other grounds by* 145 S. Ct. 966 (2025). Agency Defendants terminated grants for active programs, some of which have been receiving federal funding for decades.  The terminated grants were being used to pay Plaintiffs' and their staff's salaries, and to fund graduate student programs, field research, and community outreach. These facts indicate significant reliance interests that cannot simply be ignored.  *Id.* at 99.

Defendants have had the opportunity to introduce evidence showing that they considered Plaintiffs' reliance interests prior to terminating their grants, but have not done so.  Instead, they argue that Plaintiffs cannot, as a matter of law, have reliance interests because Agency Defendants have discretion to unilaterally terminate the grants.  The Supreme Court rejected an almost identical argument in *DHS v. Regents of University of California*.  591 U.S. 1, 30 (2020). In *DHS*, the government argued that DACA recipients had no "legitimate reliance" interests because "the DACA Memorandum stated that the program 'conferred no substantive rights' and provided benefits only in two-year increments."  *Id.* at 30 (quoting the government's reply brief). The Court found that while such disclaimers might go to "strength of [the] reliance interests," the agency was still obligated under the APA to undertake the consideration.  *Id.* at 31.  Here as well, the Agency Defendants have an obligation to consider Plaintiffs' reliance interests prior to terminating the grants.  *See Woonasquatucket River Watershed Council v. Dep't of Agric.*, No. 25-cv-00097, 2025 WL 1116157, at *18–19 (D.R.I. Apr. 15, 2025) (finding likelihood of success on an arbitrary and capricious claim where government terminated grants while "ignor[ing] significant reliance interests").

Similarly, Defendants have not introduced any evidence indicating that they considered other important factors, including the waste that would result from projects halted before completion, or the loss to the public of critical research that will go unpublished.  *See California*,

132 F.4th at 99 ("[I]t does not appear that the Department properly considered the reliance interests of grant recipients and program participants or that it accounted for all relevant impacts of cutting off funding to programs already in place.").  Thakur states that due to the termination of her grant, she has been unable to publish "at least three research publications" and could not continue her work identifying strategies to help protect communities across California during wildfire smoke events.  (Dkt. No. 10 ¶ 25.)  Instead, she "had to spend significant time seeking alternate funding sources."  (*Id.*)  Similarly, Foreman describes several projects—some of which were already in the prototype phase—that she was forced to terminate or put on pause due to the lack of funding.  (Dkt. No. 12 ¶ 70.)  As a consequence, Foreman states that her research group's ability to "carry out [their] public service mission" to improve STEM education has been compromised.  (*Id.* ¶ 62.)  Defendants do not appear to have addressed or considered these factors in their termination decisions.

### iii.    Final Agency Action

"[F]inal agency action" is a requirement for APA review.  5 U.S.C. § 704.  Agency actions will be deemed final where the challenged action (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) is an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (first quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); and then quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).  The form grant termination letters represent final agency actions consistent with *Bennett*.  The EPA and NSF letters state that termination is effective "immediately," while the NEH letters dated April 2, 2025 state that termination was effective April 1, 2025. (Dkt. No. 7-1 at 35, 40.)  As a direct consequence of the termination letters, Plaintiffs' projects immediately stopped receiving grant funding.  Therefore, the grant terminations are final agency actions subject to APA challenge.

Defendants do not contest that the individual grant terminations are final agency actions.  Instead, they argue that Plaintiffs' challenge is to an "on-going program or policy," which

amounts to an improper "broad programmatic attack." (Dkt. No. 35 at 41–42.) "Under the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes harm." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 891 (1990). However, the APA does not "bar[] a plaintiff from challenging a number of discrete final agency actions all at once." *New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025).

Defendants further argue that if the final agency action is the individual grant termination itself, then prospective relief cannot be issued as to grant terminations that have not yet occurred. To adopt that view would defy the purpose—and logic—of class certification under Rule 23(b)(2). As explained in Section III, Rule 23(b)(2) requires "the party opposing the class [to have] acted or refused to act on grounds that apply generally to the class," such that injunctive or declaratory relief is appropriate to address the injuries of the class as a whole. Fed. R. Civ. P. 23(b)(2). Here, the record shows that Agency Defendants are acting on a classwide basis in terminating grants in massive waves with form letters that contain no reasoned grant-specific explanation for why the agency changed its mind, or how it has considered the required factors. Prospective injunctive relief for the Form Termination Class, as discussed below, is limited to terminations that are entered via form letters pursuant to that classwide practice. That is classic and routine Rule 23(b)(2) relief. *See, e.g.*, *Ramirez v. Immigr. and Customs Enf't*, 338 F. Supp. 3d 1, 12 (D.D.C. 2018) (certifying a 23(b)(2) class, defined as "[a]ll former unaccompanied alien children who are detained or *will be* detained by ICE after being transferred by transferred [] because they have turned 18 years of age and as to whom ICE did not consider placement in the least restrictive setting available. . . (emphasis added)); *New York*, 133 F.4th at 68 (where grant terminations were made pursuant to an overall categorical practice, agency was enjoined from terminating funding in that same unlawful manner).

Moreover, even if Plaintiffs were required to identify a final agency action beyond the individual grant terminations, they have done so. The record shows that, in response to the Grant Termination Orders, Agency Defendants likely each adopted a categorical policy of executing grant terminations via form letters that referenced only an unexplained change in agency

priorities.  Shortly after the executive orders issued, the agencies began sending termination letters with the same type of language within weeks of each other.  In the face of that lockstep action, a court is "not required to exhibit a naiveté from which ordinary citizens are free," and may infer that the EPA, NEH, and NSF likely adopted a categorical policy to carry out the terminations via unreasoned form letter.  *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-00239, 2025 WL 597959, at *7 (D.D.C. Feb. 25, 2025) (rejecting the contention that "countless federal agencies . . . suddenly began exercising their own discretion to suspend funding across the board at the exact same time" because it requires "unfathomable" "coincidental assumptions" and "contradicts the record").  That policy does not appear to be a tentative or non-final one.  Rather, it was used to execute mass terminations and continued to be used through multiple waves of terminations.  That policy, too, is a final agency action that is appropriately enjoined on a prospective basis.

### iv.    Not Unreviewable

Defendants argue that the terminations are part of the "narrow[]" class of agency actions that are unreviewable in federal court under Section 701(a)(2) of the APA.  *Dep't of Com.*, 588 U.S. at 772 (citation omitted); 5 U.S.C. § 701(a)(2) (exempting from judicial review agency action "committed to agency discretion by law").  In assessing whether this exception to judicial review applies, courts begin "with the strong presumption that Congress intends judicial review of administrative action."  *Bowen v. Michigan Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986).  Therefore, to overcome the presumption, an agency must ultimately make "a showing of clear and convincing evidence of a contrary legislative intent [to] restrict access to judicial review."  *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975) (cleaned up).

Such a showing requires not only that the agency be given some discretion but that such discretion be so unbounded that "there is truly no law to apply."  *Cmty. Legal Servs. in E. Palo Alto v. Dep't of Health & Hum. Servs.*, 137 F.4th 932, 942 (9th Cir. 2025) (quoting *Jajati v. Customs & Border Prot.*, 102 F.4th 1011, 1014 (9th Cir. 2024)).  In *Lincoln v. Vigil*, for example, the Supreme Court found that standard met when the Indian Health Service stopped

funding a program where Congress made a "single lump-sum appropriation" and left the decision about how to "expend . . . money[ ] . . . for the benefit, care, and assistance of the Indians" up to the agency's unbounded discretion.  508 U.S. 182, 185 (1993).

Defendants have not met their burden to show such unbounded discretion here.  In arguing that the "NSF is given 'discretion' to 'utilize appropriations' however will 'best realize' four congressional objectives," (Dkt. No. 35 at 43), Defendants cite to the NSF's enabling statute authorizing it to "enter into contracts . . . for the carrying on . . . of such scientific or engineering activities as the Foundation deems necessary to carry out the purposes of this chapter," 42 U.S.C. § 1870(c).  The purposes of the chapter, however, require that the NSF "shall use" four "core strategies" including to "[d]evelop intellectual capital, [through] both people and ideas, with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering."  *Id.* § 1862k(b)(1).  That is hardly a lump-sum appropriation lacking any "meaningful standard against which to judge the agency's exercise of discretion."  *San Francisco Unified Sch. Dist. v. AmeriCorps*, No. 25-cv-02425-EMC, 2025 WL 1180729, at *4 (N.D. Cal. Apr. 23, 2025) (quoting *Weyerhauser Co. v. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)) (considering AmeriCorps' statutory objectives).  And, of course, Defendants' reference to the NSF's mandate is insufficient to establish that the other Agency Defendants' grant termination decisions are unreviewable.

In addition, Defendants acknowledge that applicable regulations cabin their discretion as to when they can terminate existing grants.  (*See* Dkt. No. 35 at 45 ("Defendants properly and explicitly invoked [2 C.F.R. § 200.340] to terminate Plaintiffs' grants").)  Section 200.340 does not reflect standardless discretion.  Rather, it permits an agency to terminate a grant in certain circumstances, including "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  § 200.340(a)(4).  Defendants also recognize that under Section 200.341 they are required to provide "written notice" containing the "reasons for termination."  (Dkt. No. 35 at 47 (quoting § 200.341(a).)  These regulatory limits on the agencies' discretion also create

34

"meaningful standard[s] by which to judge the [agency]'s action." *California*, 132 F.4th at 97 (citing *Dep't of Com.*, 588 U.S. at 772). Therefore, Defendants are not likely to meet their burden of showing that Congress intended these decisions to be nonreviewable under APA Section 701(a)(2).

Having found that Plaintiffs have shown a likelihood of success on their arbitrary and capricious claim as to the *en masse* grant terminations by form letter, the Court declines to reach Plaintiffs' separation of powers, Fifth Amendment, and APA contrary to law claims concerning those terminations for purposes of resolving this motion for preliminary relief.

### 3.    Jurisdictional Issues

Defendants raise two difficult-to-reconcile jurisdictional challenges. First, Defendants argue that Plaintiffs' claims must be brought instead in the Court of Federal Claims, which would be powerless to order injunctive relief and thus to stop the alleged irreparable harm to Plaintiffs' careers and livelihoods. The central premise of Defendants' argument is that Plaintiffs' lawsuit is a disguised breach of contract claim for money damages, over which the Court of Federal Claims has exclusive jurisdiction under the Tucker Act. Yet, at the same time, Defendants' second jurisdictional challenge asserts that Plaintiffs lack standing because they are *not* parties to the grant agreements and therefore cannot claim a contract-based injury.

Both of these arguments falter for the same reason: Plaintiffs' claims are not based on breach of any contract. As non-parties to any grant agreement, their claims cannot be heard in the Court of Federal Claims because they do not have a contract with the federal government, as required by binding precedent in that jurisdiction. And Plaintiffs have standing to bring their claims seeking injunctive relief on the grounds that the Agency Defendants terminated the grants to punish their protected speech and without the reasoned explanation required, regardless of the fact that Plaintiffs might lack contractual rights to assert a breach of the grant agreements. Plaintiffs suffered direct, classic injury-in-fact from likely illegal grant terminations that upended their research and threatened the funds from which they are paid. Plaintiffs have suffered cognizable injuries, and their claims belong in district court, where the relief sought is available,

and not in the Court of Federal Claims, which cannot grant that relief and will dismiss the claims as outside that court's jurisdiction.

### a.    Tucker Act

The Tucker Act commits to the exclusive jurisdiction of the Court of Federal Claims all actions "founded . . . upon any express or implied contract with the United States" exceeding $10,000.  28 U.S.C. § 1491(a)(1).  "Generally speaking, the Tucker Act does not permit the Court of Federal Claims to grant equitable or declaratory relief."  *United Aeronautical Corp. v. United States Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (cleaned up).  "Due to this limited remedial authority, a contract-based action falls within the scope of the Tucker Act only if the plaintiff seeks *money damages* for the breach of a government contract."  *Id.* (emphasis in original).

It is undisputed that none of the Plaintiffs is a party to any contract at issue in this case. Defendants nonetheless contend that Plaintiffs' suit is *impliedly* a claim seeking money damages for breach of a government contract.  But "the mere fact that a court may rule on a contract issue does not . . . automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have."  *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).  Instead, the Tucker Act applies only when the lawsuit is "at its essence" a contract claim for money damages.  *Id.*  "We interpret the Tucker Act to 'impliedly forbid' an APA action seeking injunctive and declaratory relief only if that action is a 'disguised' breach-of-contract claim."  *United Aeronautical*, 80 F.4th at 1026 (quoting *Megapulse*, 672 F.2d at 968).

Plaintiffs' claims are not disguised breach of contract claims for money damages under the Tucker Act.  As an initial matter, Plaintiffs do not have the right to sue under the Tucker Act because they are not parties to a government contract.  If Plaintiffs' claims were sent to the Court of Federal Claims, binding precedent in that jurisdiction would require the suit to be dismissed for lack of jurisdiction and sent back to the district court.  To "maintain a cause of action pursuant to the Tucker Act [in the Court of Federal Claims] that is based on a contract, the contract must be between the plaintiff and the government."  *Cienega Gardens v. United States*,

194 F.3d 1231, 1239 (Fed. Cir. 1998) (quotation omitted). Because Plaintiffs lack any such agreement, they cannot sue in the Court of Federal Claims. *Katz v. Cisneros*, 16 F.3d 1204 (Fed. Cir. 1994), confirms this point. There, the Department of Housing and Urban Development ("HUD") contracted with a local public housing agency to maintain low-income housing, which in turn contracted with the plaintiff to renovate and rent out the units. The plaintiff sought declaratory relief when HUD changed its funding formula for the local public housing agency, because it would affect the payments by the local housing agency to the plaintiff. The Federal Circuit held that the Court of Claims lacked jurisdiction under the Tucker Act because there was no contract between the plaintiff and HUD. "A grant of benefits and subsequent oversight by HUD is insufficient to establish a contractual obligation between [the plaintiff] and the government." *Id.* at 1210. "This is true even if the local agency is acting merely as a conduit for the federal funds." *Id.* (quotation omitted). Accordingly, in the absence of a contract between the plaintiff and the federal government, the Federal Circuit held that the Court of Claims lacked jurisdiction, because the Tucker Act "does not cover this situation," and did not "impliedly forbid[] relief under the APA." *Id.*[26]

It is nonsensical to send Plaintiffs on a pointless round trip to the Court of Federal Claims. That "would mean that no court has jurisdiction to hear plaintiffs' claims," a result that is not only "contrary to common sense" but also "conflicts with the strong presumption in favor of judicial review of administrative action" under the APA. *Cmty. Legal Servs. in E. Palo Alto*, 137 F.4th at 939 (quotation omitted) (declining to apply Tucker Act to subcontractor's claims

---

[26] At oral argument, Defendants cited *Columbus Regional Hospital v. United States*, 990 F.3d 1330 (Fed. Cir. 2021), for the proposition that the Court of Federal Claims may have 12(b)(1) subject matter jurisdiction over a breach of contract claim, even if the claim cannot ultimately survive dismissal under 12(b)(6). There, though, the Federal Circuit allowed Tucker Act jurisdiction based on the plaintiff's "allegations of an express contract" with FEMA, noting that "FEMA and [the plaintiff] exchanged signed documents specifying the scope and funding for [the plaintiff's] recovery projects." *Id.* at 1343. Nothing in *Columbus Regional* overrules the holding of *Katz* that, where no contract between a plaintiff and the federal government exists, the claim must be dismissed for lack of jurisdiction in the Court of Federal Claims and returned to district court.

regarding grant termination because subcontractor could not sue in the Court of Federal Claims as a nonparty to the contract); *see also Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006) (categorically "reject[ing] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims"); *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1109 (D.C. Cir. 2022) ("Because a plaintiff could not bring this type of tort action in [the Court of Federal Claims] in the first place, that Court would not have exclusive jurisdiction of them.").

Moreover, Plaintiffs' APA and constitutional claims do not satisfy any of the traditional criteria for disguised breach of contract claims under the Tucker Act.  The Ninth Circuit uses "a two-part test derived from the D.C. Circuit's *Megapulse* decision, which looks to (1) the source of the rights upon which the plaintiff bases its claims and (2) the type of relief sought." *United Aeronautical*, 80 F.4th at 1026 (quotation omitted).  "If rights and remedies are *statutorily* or *constitutionally* based, then districts courts have jurisdiction; if rights and remedies are *contractually* based then only the Court of Federal Claims does, even if the plaintiff formally seeks injunctive relief." *Id.* (emphases in original).  Neither the source of the rights nor the remedies sought here are based on contracts.

With respect to the source of rights, Defendants repeatedly observe that "Plaintiffs . . . lack rights under these contracts—they are neither parties nor intended third-party beneficiaries." (Dkt. No. 35 at 34.)  "[N]o Plaintiff has alleged termination of an award or other contract between themselves and the Federal Government."  (*Id.* at 21.)  As such, Plaintiffs do not rely on the terms of the agreements to support their claims in either their motion for emergency relief or their Complaint.  Indeed, as Plaintiffs' counsel stated at oral argument, Plaintiffs could assert identical APA and First Amendment claims even if no written agreement controlled their funding.  *See Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646 (9th Cir. 1998) (claims barred by the Tucker Act because they were "based solely on the Modification Center Contract's provision" requiring the government to assume liability).  Thus, Plaintiffs' claim that the terminations carried out in an arbitrary and capricious manner does not rest on a contention

that Defendants breached the terms of any contracts.

Nor do Plaintiffs' claims that the terminations pursuant to the Equity Termination Order were viewpoint discrimination in violation of the First Amendment rely on the terms of any contract. District courts routinely adjudicate viewpoint discrimination cases, regardless of whether the discrimination occurred through the act of terminating a contract. *Cf. Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) (holding that the City of Philadelphia's refusal to renew a contract with an adoption agency unless it agreed to certify same-sex couples violated the Free Exercise Clause, and adjudicating the constitutional claim in federal courts). Under First Amendment doctrine, the right to free speech is the source of the claim, which "exist[s] prior to and apart from rights created under the contract." *See Crowley*, 38 F.4th at 1107 (quotation omitted).

Furthermore, although Agency Defendants may refer to the termination provisions of the contracts in *defending* against that claim, that does not provide a basis to apply the Tucker Act. "The Tucker Act does not bar an APA action if the plaintiff's rights and remedies, as alleged, are noncontractual—even if it is inevitable that the government will raise a contract provision as a defense." *United Aeronautical*, 80 F.4th at 1026 (describing the test as "something akin to a well-pleaded complaint rule for Tucker Act-adjacent APA actions").

With respect to the remedies sought, Plaintiffs seek exclusively injunctive and declaratory relief. (Compl. at 104–05.) Although enjoining the allegedly illegal terminations of the grants would result in payment of money, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). As the Supreme Court recently reaffirmed, "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam) (quoting *Bowen*, 487 U.S. at 910). Instead, a suit for money damages is one "seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated," not a "suit seeking to enforce the statutory

mandate itself, which happens to be one for the payment of money." *Bowen*, 487 U.S. at 901 (emphasis in original). Here, Plaintiffs seek the latter, not the former. Indeed, sending Plaintiffs to the Court of Federal Claims would deny them access to the principal remedy they seek: emergency injunctive relief to stop the disruption to their research, prevent them from having to lay off team members, and avoid having to call a halt to time-sensitive projects. Compensation for damages at the conclusion of a lawsuit in the Court of Federal Claims would not redress those harms, even if such a remedy were available to Plaintiffs despite being non-parties to the grant agreements.

The Supreme Court's three-page per curiam order granting an emergency stay in *Department of Education v. California* does not counsel a different result. 145 S.Ct. 966 (2025). There, the plaintiffs were states whose public schools were *parties* to the grant agreements at issue. *See*, *e.g.*, *Feied v. Regents of the Univ. of Cal.*, 188 F. App'x 559, 560 (2006) (explaining Regents is an instrumentality or arm of the state for purposes of Eleventh Amendment immunity). As such, they did not face potential dismissal upon arrival at the Court of Federal Claims, as Plaintiffs do here.

Moreover, the complaint in *California* expressly relied upon the terms of the grant agreements, alleging that "the terms and conditions of the [] grant awards do not authorize termination on these grounds." Complaint, *California*, No. 25-cv-10548, Dkt. No. 1 ¶ 14 (D. Mass. Mar. 6, 2025). The government relied on that fact in its briefing to the Supreme Court. *See*, *e.g.*, Application to Vacate, *California*, No. 24A910, at 14 ("Respondents allege that the government terminated the grants and withheld funds improperly and in violation of the grant instruments' terms and conditions. They would have no claim at all without having alleged a breach of the grant agreements by the government." (citation omitted)). The *California* plaintiffs thus sought to "enforce [the government's] contractual obligation to pay money," not to enforce independent statutory and constitutional obligations. *California*, 145 S.Ct. at 968 (citation omitted). By contrast, Plaintiffs here do not rely on the terms of the contracts in the Complaint or seek to enforce its terms. *See Cmty. Legal Servs. in E. Palo Alto*, 137 F.4th at 939 (declining

to apply Tucker Act to grant termination claim because it "sound[s] in statute, rather than contract").

In addition, the district court in *California* found that the plaintiffs were likely to succeed only on an APA claim for arbitrary and capricious action, and did not reach the likelihood of success as to any constitutional claims. *California*, 2025 WL 760825, at *23. Here, as noted above, Plaintiffs have demonstrated that they are likely to succeed on a First Amendment claim alleging viewpoint discrimination that has nothing to do with the terms of the contracts. Plaintiffs cannot obtain injunctive relief to protect that constitutional right in the Court of Federal Claims. *See, e.g.*, *San Francisco Unified Sch. Dist.*, 2025 WL 1180729, at *8–9; *American Bar Ass'n v. Dep't of Justice*, No. 25-cv-01263, 2025 WL 1388891, at *6 (D.D.C. May 14, 2025) (distinguishing *California* on the basis that there was no constitutional claim at issue in that case). This Court declines to conclude that *California* implicitly overrules the Supreme Court's longstanding case law preserving district court jurisdiction in these circumstances.

### b. Article III Standing

Defendants' argument that Plaintiffs lack Article III standing is likewise misplaced. Article III requires a plaintiff to answer a basic question: "What's it to you?" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (quoting Antonin Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U. L. Rev. 881, 882 (1983)). A "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). In other words, "plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the dispute." *All. for Hippocratic Med.*, 602 U.S. at 379 (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).

In this case, Plaintiffs' "personal stake" in their claims is easy to see. Plaintiffs all have had lengthy research careers of federal grant-supported research. Their current research projects were funded after an exhaustive process that required Plaintiffs to prepare detailed grant applications laying out their planned multi-year research proposals. (*See, e.g.*, Dkt. No. 8 ¶ 13; Dkt. No. 9 ¶¶ 13–15.) Once awarded, the grant could be used only to fund their project as described in their research proposal. (*See, e.g.*, Dkt. No. 12-2 at 2–3.) Plaintiffs explain in their declarations that the research at issue is not only personally significant to them, but also represents their livelihood and their professional reputation.

Plaintiffs attest that Defendants' decision to suddenly terminate the specific grants funding their projects as part of an *en masse,* unreasoned process—without considering important factors including Plaintiffs' reliance interests—has caused them injury. They face unexpected funding shortfalls, will likely have to lay off staff, and will experience career and reputational harm if they cannot complete their projects. They also must spend time seeking alternate funding, a time-consuming process with little chance of success. Finally, Plaintiffs allege that Defendants targeted many of their projects for termination because of Plaintiffs' constitutionally-protected speech in their grant applications. Plaintiffs are asserting invasions of traditionally cognizable interests sufficient to confer standing. *See*, *e.g.*, *Vullo*, 602 U.S. at 193 (cognizable interest in expressed viewpoint); *FDIC v. Mallen*, 486 U.S. 230, 240 (1988) (recognizing interest in "continuing employment relationship"); *Meese v. Keene*, 481 U.S. 465, 474–76, 479 n.14 (1987) ("The risk of [] reputational harm . . . is sufficient to establish appellee's standing[.]"); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262 (1977) (real estate developer had standing to challenge "arbitrary or irrational" rezoning of a property it did not yet own because it had "expended thousands of dollars" and its "plans and studies will be worthless" if rezoning was not granted). These interests are concrete and actual, and the harm to Plaintiffs can be redressed by a reversal of the allegedly illegal grant terminations.

Defendants argue that because Plaintiffs are not parties to or "intended beneficiaries" of

the grant agreements that funded their projects, they cannot have standing. But the traditional Article III standing rules do not change simply because the alleged harm occurred through the termination of a contract with a third party. In *Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-cv-716, 2025 WL 1276857 (D.D.C. May 2, 2025), a law firm challenged an executive order that "prohibit[ed] funding contractors that use Perkins Coie LLP" under the First Amendment. *Id.* at *22. As in this case, the government challenged Perkins's standing on the theory that Perkins was not party to the contractors' agreements with the government. *Id.* at *23. The court found that Perkins "plainly" had established standing, and whether "plaintiff itself is directly a signatory to a federal government contract is immaterial if plaintiff sufficiently pleads injury-in-fact traceable to Section 3 [of the executive order] and redressable by the injunctive relief requested by performing work for clients holding or seeking to hold federal government contract." *Id.*; *see also Nw. Envtl. Def. Ctr.*, 477 F.3d at 679 (environmental groups had standing to challenge an agency's failure to renew a contract for a fish protection program, even though they were not parties to the contract, because "[r]ather than asking us to remedy a violation of private law (e.g., a breach of contract), the petitioners ask us to remedy the violation of a public law" under the APA); *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 422 (1942) (broadcasting network had standing to sue over agency's announced plan to deny licenses to broadcasting stations that conducted certain business with broadcasting networks, even though the broadcasting networks were not parties to the broadcasting stations' licenses). Other courts have reached the same conclusion in lawsuits challenging recent grant terminations.[27]

---

[27] *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 268 (D. Md. 2025), *opinion clarified*, No. 25-cv-0333, 2025 WL 750690 (D. Md. Mar. 10, 2025) (finding standing for members of organization who were professors that had projects halted as the result of the termination of grants made to the school); *Maryland v. Corp. for Nat'l & Cmty. Serv.*, No. 25-cv-1363, 2025 WL 1585051, at *18 n.12 (D. Md. June 5, 2025) (plaintiff states had standing to challenge termination of grants disbursed to entities or citizens other than the states because the plaintiff states were "*among* the injured"); *Am. Ass'n of Univ. Professors v. Dep't of Justice*, No. 25-cv-2429, 2025 WL 1684817, *13 (S.D.N.Y. June 16, 2025) (finding that individual researchers who "used federal grants to Columbia for their academic work" may demonstrate injury in fact based on the "loss of professional opportunities or income," but declining to find

Defendants then suggest that Plaintiffs should be construed as asserting the claims of others rather than their own, and found to lack standing on that basis. At oral argument, Defendants likened Plaintiffs to the attorneys in *Kowalski v. Tesmer*, 543 U.S. 125 (2004), who challenged the state's refusal to fund indigent criminal defense lawyers for guilty pleas on the basis that it violated their future clients' right to counsel. *Id.* at 127. Although the attorneys were financially harmed by the state's policy, they lacked standing because a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* at 129 (citation omitted). The concern was that "if the claim is brought by someone other than one at whom the constitutional protection is aimed," that party may lack the "appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation." *Id.* The Supreme Court found that the attorneys did not satisfy the criteria for third-party standing based on another's rights. *Id.*

But, unlike the attorneys in *Kowalski*, Plaintiffs do assert their own rights. Plaintiffs are exactly the individuals whom the First Amendment and the APA aim to protect. They are the ones who engaged in the protected speech, and their research is the target of the unreasoned arbitrary termination of funding. Indeed, Defendants conceded at oral argument that if a future administration were to terminate grants on the basis that the lead researchers had Asian last names, the lead researchers affected would have standing to sue to vindicate their "legally invaded interest" in not being subject to racial discrimination, even though they were not parties to the grant agreements. Here, as in the hypothetical, named researchers on grant applications assert claims based on their own legally protected interest in not being subject to viewpoint discrimination or unexplained arbitrary agency action. The third party standing doctrine is inapplicable.

---

standing because Columbia, unlike the UC system here, had completely covered the shortfall through its private resources).

The Supreme Court's opinion a few days ago in *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, No. 24-7, 2025 WL 1716141 (U.S. June 20, 2025), confirms this analysis. There, the EPA had approved California regulations requiring automakers to make fewer gasoline-powered vehicles. *Id.* at *7. Even though the regulations imposed requirements only on automakers and not on fuel producers, the Supreme Court held that the fuel producers had standing to challenge the regulations. *Id.* "Importantly, if a plaintiff is 'an object of the action (or forgone action) at issue,' then 'there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" *Id.* at *8 (quoting *Lujan*, 504 U.S. at 561). For example, "[i]f the government bans bookstores from selling certain publishers' books, then those publishers, not just bookstores, might be objects of the regulation," and have standing to sue. *Id.*

However, in *Diamond Alternative Energy*, the Supreme Court did not ultimately reach the question of whether the fuel producers were an object of the regulations because "the fuel producers have readily demonstrated their standing" even if the automakers were the only "object" of the regulations. *Id.* at *9. The Court applied traditional causation and redressability analysis, determining that the regulations raised the "'familiar' circumstance where government regulation of a business 'may be likely' to cause injuries to other linked businesses." *Id.* at *9 (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 384 (2024)). The fuel producers had standing under "commonsense economic principles," because the regulation of automakers "will likely cause downstream or upstream economic injuries to others in the chain, such as producers of gasoline and other liquid fuels." *Id.* at *9 (internal quotation marks omitted). "It may not be certain, but it is at least 'predictable' that invalidating the California regulations would likely result in the fuel producers ultimately selling more gasoline and other liquid fuels." *Id.* at *13.

Both prongs of the Supreme Court's analysis confirm Plaintiffs' standing here. Plaintiffs' research is the "object" of the grant cancellations pursuant to the Equity Termination Orders. Likewise, Plaintiffs' research is the object of the unreasoned, arbitrary conclusion that their research no longer matches agency priorities. Agency Defendants' own declarations

describe their grant termination decisions as being based on a review of the researchers' projects, not a review of the grantee universities.  (Dkt. No. 48-2 ¶ 6; Dkt. No. 48-3 ¶ 20; Dkt. No. 48-1 ¶ 8.)  Just as publishers would have standing to challenge a ban on bookstores selling forbidden books if the publishers' speech is an object of the ban, Plaintiffs have standing to challenge Agency Defendants' termination of the grant agreements with the University because Plaintiffs' research is an object of the termination.

Moreover, even if the grant terminations were implausibly construed to be directed solely at the University to the exclusion of Plaintiffs, Plaintiffs would still have standing for the same reasons as the fuel producers did.  Plaintiffs' unrebutted declarations show that the grant terminations will "likely" have a "predictable effect" on the continued funding of their projects. The grants were expressly made to fund Plaintiffs' projects, and Plaintiffs have attested that no alternate funding is readily available.  It belies "commonsense economic realities," and the record in this case, that grantees would be able to immediately cover millions or billions of dollars in funding shortfalls.  Plaintiffs have standing under *Diamond Alternative Energy*.

Defendants mount one final causation challenge:  They argue that the grantee universities are an intervening actor that breaks the causal chain because the universities could choose to "provide or solicit sufficient replacement funds" to avoid interruption to Plaintiffs' research. (Dkt. No. 35 at 39 (internal quotation marks omitted).)  *Diamond Alternative Energy* forecloses this argument as well.  In that case, consumers could have decided to buy just as many gasoline-powered cars due to changes in the new vehicle market, thereby insulating fuel producers from the effects of the new the regulations.  2025 WL 1716141, at *9–11.  But the fuel producers still had standing, because the commonsense economic reality was that reduced sales were a likely and predictable effect of the challenged agency action.  *Id.*; *see also Bennett v. Spear*, 520 U.S. 154, 169 (1997) (a plaintiff need not show that the defendants' actions are "the very last step in the chain of causation").  Likewise, Agency Defendants' actions here are likely to cause a predictable disruption to Plaintiffs' research.  That is sufficient for causation and redressability. *See*, *e.g.*, *Vullo*, 602 U.S. at 193 (hearing and finding plausible a First Amendment claim brought

by NRA against a government actor even though any harm to the NRA was contingent on the acts of intermediate third parties); *Perkins Coie LLP*, 2025 WL 1276857, at *23 (intermediary third party did not break chain of causation).

The point of Article III's standing requirements is to ensure that Plaintiffs have a personal stake in the litigation, so that they "do not sue the wrong parties and courts do not issue advisory opinions." *Diamond Alternative Energy*, 2025 WL 1716141, at *11. It is hard to imagine who could have a more personal stake in this case than the researchers whose research was allegedly defunded as either dangerous or insufficiently important. As the Supreme Court aptly observed, Agency Defendants "may not target [Plaintiffs] through stringent and allegedly unlawful regulation, and then evade the resulting lawsuits by claiming that the targets of its regulation should be locked out of court as unaffected bystanders." *Id.* at *14. Plaintiffs have standing.

### B.    Irreparable Harm

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original).

As discussed in the analysis on the merits, Plaintiffs have demonstrated that Agency Defendants' implementation of the Equity Termination Orders likely violates the First Amendment. That means Plaintiffs have made a sufficient showing of irreparable harm, as it is "well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (internal citation omitted); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). This is particularly true when the First Amendment is implicated, because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)).

Furthermore, the record contains detailed and unrebutted evidence of the irreparable harm that Plaintiffs are already experiencing, including layoffs of team members, interruption of graduate programs, and the potential complete loss of projects, all of which will harm Plaintiffs'

professional reputations.  Injury to reputation "is not easily measured or fully compensable in damages" so "often held to be irreparable."  *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) (collecting cases).  Furthermore, when Plaintiffs' multi-year projects rely heavily on federal funding, "[a] total loss of federal funding would be catastrophic, and the [Plaintiffs'] need for certainty renders damages inadequate."  *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018).  Plaintiffs have shown a likelihood of irreparable harm.

### C.  Balance of the Harms and Public Interest

Finally, both the balance of equities and the public interest strongly favor the entry of a preliminary injunction.  These two factors merge when the federal government is a party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  As the D.C. Circuit has explained, "[t]here is generally no public interest in the perpetuation of unlawful agency action."  *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  To the contrary, an injunction serves the interests of the general public where it ensures that federal agency actions "comply with the Constitution."  *See Hernandez*, 872 F.3d at 996.  Because Plaintiffs have shown a likelihood of success on the merits of their First Amendment and APA claims, the issuance of an injunction serves the public interest.

The harms that Plaintiffs have suffered—and Plaintiffs and the public will continue to suffer absent preliminary injunctive relief—are significant.  Plaintiffs have shown that the grant terminations have brought their research to a grinding halt, will likely result in layoffs, and may lead to the total loss or paring back of projects that were years in the making.  This harms the public interest as well as Plaintiffs.  For example, Thakur and her team were within months of completing a three-year project aimed to "help protect communities across California during wildfire smoke events."  (Dkt. No. 10 ¶ 25.)  Using highly spatially and temporally detailed maps, the research seeks to identify "where smoke exposure may be very high" even when "daily exposure averages" are not.  (*Id.*)  Without restoration of funding, her research, with immediate "direct clinical and public health relevance," cannot be completed and will go unpublished.  (*Id.*)

The public will not only suffer the loss of Thakur's research, but also the hundreds of thousands of dollars that were already paid out and spent during the first two and a half years of her project. Defendants have made no effort to rebut that showing, nor have they put in any evidence of what harm the government will experience.

Defendants counter only that they are harmed by paying out funds they cannot recover, and because an injunction would interfere with the "President's priorities." As to the first concern, the agencies are not harmed where an order requires them to disburse funds that Congress has appropriated and that agencies have already awarded. Furthermore, the Court's order enjoins unreasoned agency action that was likely arbitrary, in violation of statutory mandates, and prohibited by the First Amendment. An agency is not harmed by an order prohibiting it from violating the law. *See, e.g.*, *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 25-CV-00097, 2025 WL 1116157, at *23 (D.R.I. Apr. 15, 2025). As to the second concern, if courts were to adopt Defendants' argument that an injunction should not issue because the requested relief would pause the President's ability to effectuate his agenda, then "no act of the executive branch asserted to be inconsistent with a legislative enactment could be the subject of a preliminary injunction. That cannot be so." *Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020).

The balance of harms and public interest favor granting a preliminary injunction.

## III.    PROVISIONAL CLASS CERTIFICATION

A "class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). Class certification is governed by the Federal Rules of Civil Procedure, which provide: "One or more members of a class may sue or be sued as representative parties on behalf of all members" under certain circumstances. Fed. R. Civ. P. 23(a). Pursuant to Rule 23, a court must determine whether to certify a class "[a]t an early practicable time after a person sues . . . as a class representative." Fed. R. Civ. P. 23(c)(1)(A).

Plaintiffs seek "provisional class certification" related to their motion for a preliminary injunction.  Courts have discretion to grant provisional class certification when considering a preliminary injunction.  *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012) (finding the district court "did not abuse its discretion by granting provisional class certification" in an order also addressing a request for a preliminary injunction); *see also Al Otro Lado v. Wolf*, 952 F.3d 999, 1005 n.4 (9th Cir. 2020) ("We have approved provisional class certification for purposes of preliminary injunction proceedings.").  In granting provisional certification, the Court must satisfy itself that the requirements of Rule 23 have been met. However, "its analysis is tempered, [] by the understanding that 'such certifications may be altered or amended before the decision on the merits.'"  *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 179–80 (D.D.C. 2015) (quoting *Bame v. Dillard,* No. 05-1833, 2008 WL 2168393, at *5 (D.D.C. May 22, 2008)).

Pursuant to Rule 23(a), a class action is proper if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  When a proposed class satisfies the prerequisites of Rule 23(a), the Court must determine whether the class is maintainable under Rule 23(b).  Here, Plaintiffs are seeking certification under Rule 23(b)(2), which is maintainable if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate responding the class as a whole."  Fed. R. Civ. P. 23(b)(2).

"Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011).  When members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole, that inquiry "does not require an examination of the viability or bases of the class members' claims for relief, does not

require that the issues common to the class satisfy a Rule 23(b)(3)-like predominance test, and does not require a finding that all members of the class have suffered identical injuries." *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014). Rather, as the text of the rule makes clear, this inquiry asks only whether "the party opposing the class has acted or refused to act on grounds that apply generally to the class." *Id.*; Fed. R. Civ. P. 23(b)(2).

### A.    The Provisionally Certified Classes

For the reasons discussed in the sections below, the Court provisionally certifies two overlapping classes—the Equity Termination Class and the Form Termination Class—for purposes of these preliminary injunction proceedings and to address likely irreparable harm.

The Equity Termination Class encompasses Plaintiffs who are likely to succeed on their claims that termination of their funding pursuant to the Equity Termination Orders violates the First Amendment, and is contrary to the NSF's and NEH's congressionally mandated directives under the APA. The Equity Termination Class consists of:

> All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants by the EPA, NEH, or NSF (or their sub-agencies) that are terminated pursuant to Executive Orders 14151 or 14173, from and after January 20, 2025.

> Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.

The Form Termination Class encompasses Plaintiffs with a likelihood of success on their APA claims that the Agency Defendants' implementation of the Grant Termination Orders was arbitrary and capricious. The Form Termination Class consists of:

> All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants by the EPA, NSF, or NEH (or their sub-agencies) that are terminated by means of a form termination notice that does not provide a grant-specific explanation for the termination that states the reason for the change to the

> original award decision and considers the reliance interests at stake, from and after January 20, 2025.
>
> Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.

The certified classes differ from the class proposed by Plaintiffs. Plaintiffs proposed one class to include all researchers whose grants were terminated pursuant to certain listed executive orders "or other directives of the Trump administration or DOGE."[28] However, because the preliminary injunctive relief relates only to Plaintiffs' APA and First Amendment claims, the proposed class is overbroad at the provisional certification stage. For example, if a researcher had a grant terminated pursuant to a listed executive order but received adequate notice and a reasoned determination based on the appropriate factors, that person would not have been harmed by Defendants' alleged failure to engage in reasoned decision-making. Similarly, Plaintiffs do not argue that all the listed executive orders discriminate based on viewpoint. Finally, none of the named Plaintiffs suffered a grant termination based on viewpoint discrimination pursuant to the Gender Ideology Termination Order, and none suffered a termination based on Executive Order No. 14154, titled "Unleashing American Energy." As such, the record is insufficient at this point to establish the adequacy and typicality of the named

---

[28] The class definition that Plaintiffs propose in their reply brief reads in full:

> All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system ("UC researchers") who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants that have since been or will be terminated, denied, suspended, or reduced by any of the Defendants pursuant to Executive Orders 14151, 14154, 14158, 14168, 14173, 14217, 14238, and/or 14222, and/or other directives of the Trump administration or DOGE, from and after January 20, 2025.
>
> Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.

(Dkt. No. 41 at 11–12.)

Plaintiffs to represent absent class members whose grants were terminated on those bases alone, unless the termination occurred through the unreasoned form letter process. Therefore, the Court exercises its discretion in revising the class definition to conform it to the findings in this Order. *See, e.g.*, *Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586, 594 (E.D. Cal. 2008), *adhered to*, 287 F.R.D. 615 (E.D. Cal. 2012) ("[C]ourts retain the discretion to alter an inadequate class definition"); *Dekker v. Vivint Solar, Inc.*, 2022 WL 829382, at *9 (N.D. Cal. 2022) (revising proposed class definition).

As explained below, a preponderance of the evidence demonstrates that the Equity Termination Class and Form Termination Class satisfy the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy, as well as the Rule 23(b) requirements. This provisional class certification determination, like all class certification decisions, "may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). As such, as the record develops, the parties may request to revisit the certification determination and the scope of the certified classes.

## B.    Joinder

As a threshold issue, Defendants argue that the class cannot be certified because the education institution grantees are not part of the class, raising an impermissible risk of "inconsistent adjudications." (Dkt. No. 36 at 12–13.) As detailed above, Plaintiffs have standing to assert their APA and First Amendment claims related to the conduct that has impacted their research projects. They have not brought claims for breach of contract predicated on the grants to which they are not parties, and therefore will not receive "a judgment related to a contract." (*Id.* at 13.) The grantees under the relevant contracts remain free to assert their breach of contract claims in another action, should they choose to do so. Therefore, Defendants do not identify any risk of "inconsistent adjudications."

Furthermore, to the extent Defendants can be understood to argue that the grantees are a "necessary" party under Rule 19 with respect to the asserted APA and constitutional claims, this argument fails as well. *See Disabled Rts. Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861,

880–81 (9th Cir. 2004) (where plaintiffs brought a claim under the ADA, a party to a contract that was related to plaintiffs' claims was not a necessary party).  Again, nothing in the existing record suggests that the existing parties cannot be afforded complete relief.  Moreover, to the extent grantees have a legally protected interest, Defendants identify no reason to doubt that Plaintiffs would be adequate representatives of grantees' interests as to the claims in this action. *Id.*

## C.    The Equity Termination Class

***Numerosity.***  Defendants do not dispute, and the Court finds, that numerosity is satisfied. Although numbers alone are not controlling, in general, "courts find the numerosity requirements satisfied when a class includes at least 40 members."  *Rannis v. Recchia*, 380 Fed. App'x. 646, 651 (9th Cir. 2010).  Plaintiffs allege, and the record supports, that grant terminations will impact hundreds or thousands of researchers across the UC System.  (Compl. ¶ 68.)  Plaintiffs further assert that an initial survey of around 110 terminated grants revealed that many of the grant titles contain DEI-related words such as "equity."  (*Id.*)  These allegations are sufficient to establish numerosity.

***Commonality and Rule 23(b)(2) Maintainability.***  The class also meets the commonality requirement.  To satisfy commonality, the "plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation."  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted).  Courts have found commonality to be satisfied when the plaintiffs are "challeng[ing] a system-wide practice or policy that affects all of the putative class members."  *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *overruled on other grounds by Johnson v. California*, 543 U.S. 499 (2005).

This is exactly what Plaintiffs have done here.  Plaintiffs have shown that each of the Agency Defendants acted under the direction of DOGE and used similar, keyword-based procedures to terminate grants pursuant to the Equity Termination Orders.  Plaintiffs submitted a declaration by the NEH Chairman, who explained that two DOGE representatives "contacted

NEH to discuss and advise [him] on implementing the President's priorities as stated in the Executive Orders, including terminating grants." (Dkt. No. 48-3 ¶ 12.)  The Chairman further stated that he sent DOGE employees his final list of cuts and terminated the grants "in consultation with DOGE." (*Id.* ¶¶ 17, 18, 21.)  Likewise, the Acting Director of the NSF, Brian Stone, testified that both the NSF and DOGE employees worked to identify grants for termination. (Dkt. No. 48-2 ¶ 6.)  The EPA issued several releases touting "EPA-DOGE partnered cancellations" and "more than $60 million saved as the EPA puts a stop to wasteful DEI and environmental justice programs." (*See* Compl. ¶¶ 144–46.)  And Plaintiffs have produced evidence showing that all three agencies likely terminated grants using similar keyword-based procedures. (Dkt. No. 43-3 ¶ 6 (the NSF used keyword searches and analytics); Dkt. No. 48-3 ¶ 20 (the NEH identified grants by looking for those involving "environmental justice" or "diversity, equity, and inclusion"); Dkt. No. 48-1 ¶ 8 (the EPA terminated grants by "looking at grant titles and project descriptions").)

The classwide proceedings, moreover, will generate "common answers to common questions of law." *Mazza*, 666 F.3d at 588 (internal quotation marks omitted).  There is a central common question as to whether the EPA, NEH, and NSF's termination of grants pursuant to the Equity Termination Orders constitutes impermissible viewpoint discrimination under the First Amendment.  The answer to this question can be determined on a classwide basis.  Grant-by-grant review is unnecessary in order to determine whether terminations pursuant to the Equity Termination Orders constitute unconstitutional viewpoint discrimination.  Likewise, there are common answers to the question of whether the termination of grants pursuant to the Equity Termination Orders is contrary to the statutory mandates of the NSF and NEH.  The record indicates that the NEH and NSF likely terminated grants pursuant to the Equity Termination Orders because the research involved diversity or underrepresented groups in STEM, even though Congress had directed the agencies to fund research on those very topics.  The question of whether that exceeded the NEH's and NSF's statutory authorization can be answered on a

common basis across the grants terminated by each agency.[29]

The requirements of Rule 23(b)(2) are met for the same reasons. Plaintiffs have sufficiently shown that Agency Defendants have "acted or refused to act" on grounds that apply to the proposed Equity Termination Class "as a whole" through their mass termination of grants pursuant to the Equity Termination Orders. Fed. R. Civ. P. 23(b)(2).

*Typicality.* Several Plaintiffs meet the typicality requirements with respect to this claim. "The test of typicality is whether other class members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanlon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation marks omitted). The title of one of Foreman's NSF grant proposals includes the words "racial" and "equity," and the subject-matter of her projects can be characterized as "equity-related." (Dkt. No. 12 ¶ 24.) Thakur's EPA grant proposal is titled "Partnering for Resilient Opportunities To Eliminate Toxic (PROTECT) Health Effects from Wildfire PM2.5 in Environmental Justice Communities" (Dkt. No. 10 ¶ 10) and Philliou's NEH grant proposal aimed to "shed light on the possibilities of inclusion and belonging of non-Muslims in a Muslim state." (Dkt. No. 8-2 at 24.) The record supports a reasonable and unrebutted inference that the grants funding these Plaintiffs' research were flagged by a keyword search and terminated pursuant to the Equity Termination Orders. This is precisely the type of conduct other Equity Termination Class members will have been subject to and same injury other members will have suffered.

*Adequacy.* The Court finds that the class representatives and class counsel are adequate. In assessing adequacy, courts look to (1) whether the named plaintiffs "'fairly and adequately protect the interests of the class' without a conflict of interest with the absent class members," *Yates v. NewRez LLC*, 686 F. Supp. 3d 397, 405 (D. Md. 2023), and (2) whether class counsel is

---

[29] Because of potential differences between the NEH, NSF, and EPA in their authorizing statutes, subclasses may be appropriate on the APA claim for agency action contrary to law. That issue is reserved for a later stage of the proceedings.

"qualified, experienced, and generally able to conduct the litigation." 1 Newberg and Rubenstein on Class Actions § 3:72 (6th ed.). Defendants do not dispute that both prongs are satisfied here. The named Plaintiffs' interests are aligned with those of absent class members as all have been subject to termination of their funding pursuant to the Equity Termination Orders. Moreover, as discussed further below, Plaintiffs have retained counsel with extensive experience litigating constitutional claims and complex class actions.

### D. The Form Termination Class

***Numerosity.*** Defendants do not dispute, and the Court finds, that numerosity is satisfied. The record shows that the hundreds of grant terminations were—and likely will continue to be— issued through unreasoned form letters. (*See, e.g.*, Dkt. No. 38; Dkt. No. 43-3 ¶ 6.)

***Commonality and Rule 23(b)(2) Maintainability.*** The commonality requirement is also met for the Form Termination Class. Plaintiffs are challenging Agency Defendants' practice of terminating grants "abruptly, categorically, [and] *en masse*" without providing a grant-specific reason for the termination or giving consideration to the necessary factors. Such a practice is sufficiently supported by the record. As discussed above, Plaintiffs have provided evidence that, upon issuance of the Executive Orders, each of the Agency Defendants undertook a mass termination effort, directed by DOGE, to identify grants for termination in large numbers and then moved forward quickly with executing those terminations via form letter. While the form termination letters differed slightly in wording across agencies, they remained fundamentally similar: The letters emphasized that agency priorities have shifted, reasoned that termination is necessary to effectuate the priorities of the government, and most importantly, declined to provide any grant-specific reasons for termination. The evidence also shows that within an agency, the termination letters were often identical despite the fact that they were sent to different researchers with (sometimes drastically) different research projects. (*See, e.g.*, Dkt. No. 9-8 at 2–3; Dkt. No.10-8 at 2–3; Dkt. No. 11-7 at 2–3; Dkt. No. 11-13 at 2–3; Dkt. No. 8-5 at 2; Dkt. No. 13-6 at 2.)

Accordingly, Plaintiffs and the class share a question susceptible to a common answer:

Whether Agency Defendants' lockstep *en masse* unreasoned termination of grants, as executed through form letters without any reasoned explanation, are arbitrary and capricious in violation of the APA.  The answer to this question is central to the validity of each class member's APA claim, and can be determined on a classwide basis.  *See Parsons v. Ryan*, 754 F.3d 657, 684 (9th Cir. 2014); *Ruiz Torres v. Mercer Canyons Inc*., 835 F.3d 1125, 1140 (9th Cir. 2016).  Although Defendants argue that each plaintiff's arbitrary and capricious claim will require context-specific analysis of whether each termination decision was "reasonable[]" (Dkt. No. 36 at 18), Plaintiffs have sufficiently shown that it is likely those termination decisions were made pursuant to a common playbook of terminating grants in groups without considering the required individualized factors.  Moreover, the form letters themselves present a common issue, with a common answer, as to whether a sufficiently reasoned explanation was provided.

For the same reasons, the requirements of Rule 23(b)(2) are met.  Plaintiffs have sufficiently alleged that Agency Defendants have "acted or refused to act" on grounds that apply to the proposed Form Termination Class "as a whole" through their concerted *en masse* terminations of grants through unreasoned form letters.  Fed. R. Civ. P. 23(b)(2).

**Adequacy and Typicality**.  Named Plaintiffs are typical of the class because they were subjected to the *en masse* termination, and have provided representative form termination letters. *See, e.g.*, Compl. ¶ 160 (Thakur's termination letter stating that "[t]he grant is inconsistent with, and no longer effectuates, Agency priorities"); Compl. ¶ 252 (NEH termination letter received by Plaintiffs stating that the "NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda. . . . Your grant's immediate termination is necessary to safeguard the interests of the federal government, including its fiscal priorities"); Compl. ¶ 324 (NSF termination letter received by Foreman and other UC researchers stating that "[e]ach award was carefully and individually reviewed, and the agency has determined that termination of certain awards is necessary because they are not in alignment with current NSF priorities").  The proposed class representatives are adequate because their interests are aligned with those of

absent class members, having had their funding terminated in the same way via unreasoned letters, and the proposed class counsel is adequate and highly experienced in these areas, for the reasons discussed further below.

### E.     Claims Against Other Agency Defendants

Named Plaintiffs experienced project funding cuts at the hands of the EPA, NEH, and NSF.  However, they seek to represent a class of plaintiffs who would also assert claims against the Other Agency Defendants.  On reply, Plaintiffs argue that, notwithstanding that they have not been injured by the Other Agency Defendants themselves, they may represent absent class members in their claims against those other defendants under the juridical link doctrine.  (Dkt. No. 41 at 20–21.)

The juridical link doctrine can apply where "all defendants are juridically related in a manner that suggests a single resolution of the dispute would be expeditious." *La Mar v. H & B Novelty & Loan Company*, 489 F.2d 461, 466 (9th Cir. 1973).  However, the Ninth Circuit has elaborated that the exception is narrow.  *See Martinez v. Newsom*, 46 F.4th 965, 970–71 (9th Cir. 2022).  In the context of suits against government entities, the exception is limited to circumstances where all defendants are applying a "common" and "mandatory" rule.  *Martinez*, 46 F.4th at 971.  Encouragement is not sufficient.  *Id.*  In *Martinez*, the identified rule left defendants with "discretion to decide how to" follow it, and the court determined that the juridical link doctrine was inapplicable.  *Id.*

Here, Plaintiffs have not established the factual predicate, by a preponderance of the evidence, to support the application of the juridical link doctrine.  With respect to the APA arbitrary and capricious claim, though Plaintiffs have shown the likely adoption of a common policy as urged by DOGE that encouraged mass grant terminations, Plaintiffs have not shown that any "mandatory" rule required the Other Agency Defendants to adopt a policy of issuing unreasoned form termination letters.  With respect to the First Amendment and APA contrary to law claims, Plaintiffs have not shown that the Other Agency Defendants were required to apply a common rule across the board to UC System grants with respect to the Equity Termination

Orders.  For example, the record shows that some agencies have not terminated any UC System grants.  (Dkt. No. 38 at 2–3.)

Plaintiffs cannot meet the high bar of showing that the juridical link doctrine applies.  Therefore, at this stage the certified classes will not include individuals whose project funding was terminated by the Other Agency Defendants.[30]

### F.    Class Counsel

The Court appoints Plaintiffs Neeta Thakur, Ken Alex, Nell Green Nylen, Robert Hirst, Christine Philliou, and Jedda Foreman as class representatives, and Elizabeth J. Cabraser, Richard M. Heimann, and Kevin R. Budner of Lieff Cabraser Heimann & Bernstein, LLP; Anthony P. Schoenberg of Farella, Braun + Martel; and Erwin Chemerinsky and Claudia Polsky of Berkeley Law as class counsel for the above-defined Class, pursuant to Fed. R. Civ. P. 23(a)(4) and 23(g).  The record shows that counsel has sufficient experience, knowledge, resources, and has already invested significant time preparing to bring this case.  Claudia Polsky is a Berkeley Law faculty member with extensive experience litigating cases under APA, and Erwin Chemerinsky is the Dean of Berkeley Law, a prolific constitutional law scholar, and seasoned advocate.  (Dkt. No. 18-1 ¶¶ 7–8.)  Elizabeth J. Cabraser and Richard M. Heimann of Lieff Cabraser Heimann & Bernstein LLP, each have over forty years of experience litigating class action lawsuits, and Cabraser has previously served as court-appointed class counsel in various high-profile cases.  (*Id.* ¶¶ 3–4.)  Lieff Cabraser partner Kevin R. Budner and Anthony P. Schoenberg of Farella Braun + Martel LLP are both former lead counsel with extensive experience in complex civil litigation.  (*Id.* ¶¶ 5–6.)

## IV.   SCOPE OF INJUNCTION

When an agency is in violation of the APA, the court "shall . . . hold unlawful and set

---

[30] At oral argument, Plaintiffs raised the possibility that the Other Agency Defendants could be joined under Federal Rule of Civil Procedure 20(a).  Because this argument was not briefed, the Court declines to consider it at this time, but the decision is without prejudice to renewal of the argument in later proceedings concerning class certification.

aside [the] agency action." 5 U.S.C. § 706(2). Agency Defendants' grant terminations as to the Form Termination Class and the Equity Termination Class are set aside and vacated.

Plaintiffs also request a preliminary injunction. In light of the scope of the provisionally certified classes and the findings of this order, the Court will order preliminary injunctive relief barring the Agency Defendants from giving effect to the vacated terminations and restoring the status quo. In addition, Plaintiffs have shown a significant likelihood of future unlawful terminations to the certified classes pursuant to the same policies at issue. (*See* Section II.A.2.iii.) As described in the Section I, Agency Defendants describe their grant termination processes as ongoing, and the Administration has allegedly declared its intention to "go after" the UC System financially through its grants. Accordingly, the Court will order on a prospective basis that future grant terminations meeting the required criteria are likewise vacated upon issuance, and may not be given effect.

A separate order will issue detailing the scope of the APA vacatur and accompanying preliminary injunctive relief.

## V.    REQUEST FOR BOND AND FOR A STAY

Defendants request that the Court require Plaintiffs to post a bond as security for damages that may result from a wrongfully-granted injunction. In granting relief under Rule 65, "[t]he court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review." *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985). As result of Defendants' actions, the Plaintiffs in many cases are unable to continue their research, pay themselves, their staff, and graduate students, and are laying some of them off. Based on this record, the Court finds that requiring a bond would stifle Plaintiffs' enforcement of their rights under the APA and the First Amendment. Because this litigation is brought to protect the public interest and ensure compliance with federal law, Plaintiffs shall be required to pay a nominal bond of $100.

Defendants' request for a stay pending appeal, or for seven days pending a motion to the

court of appeals for a stay, is also denied.  A stay is not appropriate because Plaintiffs are likely to succeed on the merits of their APA and First Amendment claims.  *See Manrique v. Kolc*, 65 F.4th 1037, 1040 (9th Cir. 2023) (providing that one of the primary factors considered for whether a stay should be issued is whether the applicant for the stay has "made a strong showing that he is likely to succeed on the merits") (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)); *see also Washington v. Trump*, No. 25-807, 2025 WL 553485, at *3 (9th Cir. Feb. 19, 2025) (Forrest, J., concurring).  Moreover, Defendants have not carried their burden of showing that they are likely to face "irreparable injury . . . during the period before the appeal is decided."  *See Doe #1 v. Trump*, 957 F.3d 1050, 1058–59 (9th Cir. 2020).

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is **GRANTED** as modified, and two classes are provisionally certified.  A separate order for APA vacatur and preliminary injunctive relief will issue.

**IT IS SO ORDERED.**

Dated: June 23, 2025

RITA F. LIN
United States District Judge