1    Erwin Chemerinsky (*pro hac vice*)
     echemerinsky@law.berkeley.edu
2    Claudia Polsky (CA Bar No. 185505)
     cpolsky@law.berkeley.edu
3    U.C. BERKELEY SCHOOL OF LAW
     Law Building
4    Berkeley, CA 94720-7200
     Telephone: 510.642.6483
5
     Elizabeth J. Cabraser (CA Bar No. 83151)
6    ecabraser@lchb.com
     Richard M. Heimann (CA Bar No. 63607)
7    rheimann@lchb.com
     LIEFF CABRASER HEIMANN &
8    BERNSTEIN, LLP
     275 Battery Street, 29th Floor
9    San Francisco, CA 94111
     Telephone: 415.956.1000
10
     Anthony P. Schoenberg (CA Bar No. 203714)
11   tschoenberg@fbm.com
     Linda S. Gilleran (CA Bar No. 307107)
12   lgilleran@fbm.com
     FARELLA BRAUN + MARTEL LLP
13   One Bush Street, Suite 900
     San Francisco, CA 94104
14   Telephone: 415. 954.4400

15   *Attorneys for Plaintiffs and the Proposed Class*
     [Additional counsel listed on signature page]
16

17                    **UNITED STATES DISTRICT COURT**

18                   **NORTHERN DISTRICT OF CALIFORNIA**

19

20   NEETA THAKUR, KEN ALEX, NELL              Case No. 3:25-cv-4737
     GREEN NYLEN, ROBERT HIRST,
21   CHRISTINE PHILLIOU, JEDDA FOREMAN,
     ELI BERMAN, and SUSAN HANDY, on behalf
22   of themselves and all others similarly situated,   **AMENDED CLASS ACTION
                                                        COMPLAINT FOR
23             Plaintiffs,                              DECLARATORY AND
                                                        INJUNCTIVE RELIEF**
24        v.

25   DONALD J. TRUMP, in his official capacity as
     President of the United States;
26   DEPARTMENT OF GOVERNMENT
     EFFICIENCY ("DOGE");
27   AMY GLEASON, in her official capacity as
     Acting Administrator of the Department of
28   Government Efficiency;
     NATIONAL SCIENCE FOUNDATION;

1    BRIAN STONE, in his official capacity as
     Acting Director of the National Science
2    Foundation;
     NATIONAL ENDOWMENT FOR THE
3    HUMANITIES;
     MICHAEL MCDONALD, in his official
4    capacity as Acting Chairman of the National
     Endowment for the Humanities;
5    UNITED STATES ENVIRONMENTAL
     PROTECTION AGENCY;
6    LEE ZELDIN, in his official capacity as
     Administrator of the U.S. Environmental
7    Protection Agency;
     UNITED STATES DEPARTMENT OF
8    AGRICULTURE;
     BROOKE ROLLINS, in her official capacity as
9    Secretary of the U.S. Department of Agriculture;
     AMERICORPS (a.k.a. the CORPORATION
10   FOR NATIONAL AND COMMUNITY
     SERVICE);
11   JENNIFER BASTRESS TAHMASEBI, in her
     official capacity as Interim Agency Head of
12   AmeriCorps;
     UNITED STATES DEPARTMENT OF
13   DEFENSE;
     PETE HEGSETH, in his official capacity as
14   Secretary of the U.S. Department of Defense;
     UNITED STATES DEPARTMENT OF
15   EDUCATION;
     LINDA MCMAHON, in her official capacity as
16   Secretary of the U.S. Department of Education;
     UNITED STATES DEPARTMENT OF
17   ENERGY;
     CHRIS WRIGHT, in his official capacity as
18   Secretary of Energy;
     UNITED STATES DEPARTMENT OF
19   HEALTH AND HUMAN SERVICES;
     ROBERT F. KENNEDY, JR., in his official
20   capacity as Secretary of the U.S. Department of
     Health and Human Services;
21   UNITED STATES CENTERS FOR DISEASE
     CONTROL;
22   MATTHEW BUZZELLI, in his official capacity
     as Acting Director of the Centers for Disease
23   Control;
     UNITED STATES FOOD AND DRUG
24   ADMINISTRATION;
     MARTIN A. MAKARY, in his official capacity
25   as Commissioner of the Food and Drug
     Administration;
26   UNITED STATES NATIONAL INSTITUTES
     OF HEALTH;
27   JAYANTA BHATTACHARYA, in his official
     capacity as Director of the National Institutes of
28   Health;

AMENDED CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    INSTITUTE OF MUSEUM AND LIBRARY
     SERVICES;
2    KEITH SONDERLING, in his official capacity
     as Acting Director of the Institute of Museum
3    and Library Services;
     UNITED STATES DEPARTMENT OF THE
4    INTERIOR;
     DOUG BURGUM, in his official capacity as
5    Secretary of the Interior;
     UNITED STATES DEPARTMENT OF STATE;
6    MARCO RUBIO, in his official capacity as
     Secretary of the U.S. Department of State;
7    DEPARTMENT OF TRANSPORTATION;
     SEAN DUFFY, in his official capacity as
8    Secretary for the U.S. Department of
     Transportation,
9
     Defendants.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2
**Page**

3    INTRODUCTION ................................................................................................. 1

4    JURISDICTION AND VENUE ............................................................................ 6

     THE PARTIES ...................................................................................................... 7

5         A.    Plaintiffs ................................................................................................ 7

6         B.    Defendants ............................................................................................. 8

7    CLASS ALLEGATIONS ................................................................................... 11

     FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS ...................... 15

8    I.    Throughout Decades of Federal Funding, the UC System Has Made Leading
9          Contributions to Research that Benefit the Public ............................................ 15

10   II.   Congress's Power of the Purse Makes Illegal the Mass Termination of Grants at
           the President's Direction .................................................................................. 18

11   III.  President Trump Issues a Flurry of Executive Orders and Creates DOGE,
           Unlawfully Directing Agencies to Terminate Grants ...................................... 21

12   IV.   Agencies that Terminated Lead Plaintiffs' Grants Have Acted According to a
13         Common Unlawful Pattern ............................................................................... 25

           A.    Environmental Protection Agency .......................................................... 26

14              1.    Congress Established the EPA to Protect the Environment,
                      Including Through Research ........................................................ 26

15              2.    In Response to Trump Administration Directives, the EPA
16                    Improperly Changed Priorities and Canceled Existing Grants ................ 30

17              3.    EPA Plaintiffs and Other Grant Recipients Are Harmed by EPA's
                      Illegal Grant Terminations ......................................................... 35

18                    a.    Plaintiff Neeta Thakur's Grant Termination and Resulting
                            Harm ................................................................................ 36

19                    b.    Plaintiff Ken Alex's Grant Termination and Resulting Harm ...... 39

20                    c.    Plaintiff Nell Green Nylen's Grant Terminations and
                            Resulting Harm ................................................................ 42

21         B.    National Endowment for the Humanities .............................................. 47

22              1.    Congress Established NEH to Fund Projects to Support Humanities
                      Research, Training, and Education ............................................... 47

23              2.    In Response to Trump Administration Directives, NEH Improperly
                      Changed Priorities and Canceled Existing Grants ................................. 52

24              3.    NEH Plaintiffs And Other Grant Recipients Are Harmed by NEH's
25                    Illegal Grant Terminations ......................................................... 57

                      a.    Plaintiff Robert Hirst's Grant Termination and Resulting
26                          Harm ................................................................................ 57

27                    b.    Plaintiff Christine Philliou's Grant Termination and
                            Resulting Harm ................................................................ 61

28         C.    National Science Foundation .............................................................. 64

**TABLE OF CONTENTS**
(continued)

Page

1. Congress Established the National Science Foundation to Promote Scientific Research on a Broad Scale to Advance the United States' National Interests ............................................................................ 64

2. In Response to Trump Administration Directives, NSF Improperly Changed Priorities and Canceled Existing Grants ................................... 68

3. NSF Plaintiff and Other Grant Recipients Are Harmed by NSF's Illegal Grant Terminations ...................................................................... 73

   a. Plaintiff Jedda Foreman's Grant Terminations and Resulting Harm ............................................................................................ 73

D. Department of Defense ..................................................................................... 78

1. Congress Established DOD to Create a Comprehensive Program Dedicated to Ensuring the Future Security of the United States, Including Through Research ......................................................................... 78

2. In Response to Trump Administration Directives, DOD Improperly Changed Priorities and Canceled Existing Grants ................................... 84

3. DOD Plaintiff and Other Grant Recipients Are Harmed by DOD's Illegal Grant Terminations ...................................................................... 85

   a. Plaintiff Eli Berman's Grant Termination and Resulting Harm ............................................................................................ 85

E. Department of Transportation ........................................................................... 90

1. Congress Established DOT to Promote the Safety, Quality, and Efficiency of the Nation's Transportation Services, Including Through Research .................................................................................... 90

2. In Response to Trump Administration Directives, DOT Improperly Changed Priorities and Canceled Existing Grants ................................... 96

3. DOT Plaintiff and Other Grant Recipients Are Harmed by DOT's Illegal Grant Terminations .................................................................... 100

   b. Plaintiff Susan Handy's Grant Terminations and Resulting Harm .......................................................................................... 100

F. Allegations Against Additional Federal Agency Defendants ............................ 106

1. Department of Agriculture ...................................................................... 106

2. AmeriCorps ............................................................................................ 108

3. Department of Education ........................................................................ 109

4. Department of Energy ............................................................................ 110

5. Department of Health and Human Services, including the Centers for Disease Control, the Food and Drug Administration, and the National Institutes of Health ................................................................... 111

6. Institute of Museum and Library Services .............................................. 113

7. Department of the Interior, including National Park Service ................. 114

8. Department of State, including USAID .................................................. 115

**TABLE OF CONTENTS**
(continued)

Page

V.  The Trump Administration Is Threatening Additional, Illegal Funding Cuts to the
UC System ................................................................................................................. 116

VI.  Unless Enjoined, Grant Terminations Will Cause Irreparable Harm to Plaintiffs,
the Class, and the Nation.......................................................................................... 116

CLAIMS FOR RELIEF ...................................................................................................... 117

COUNT I – Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;
Violation of Separation of Powers .................................................................. 117

COUNT II – Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;
Violation of First Amendment (Content and Viewpoint Discrimination) ...................... 118

COUNT III – Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;
Violation of Fifth Amendment (Due Process / Void for Vagueness) ............................ 119

COUNT IV – Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C):
Contrary to Law; Illegal Departure from Impoundment Control Act, Statutes, and
Regulations............................................................................................................ 120

COUNT V – Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A): Arbitrary
and Capricious Failure to Engage in Reasoned Decision-making.................................. 121

PRAYER FOR RELIEF........................................................................................................ 123

Plaintiffs, individually and on behalf of all others similarly situated, allege for their Complaint against the below-named Defendants as follows:

**INTRODUCTION**

1.    This class action for declaratory and injunctive relief is brought by and on behalf of University of California researchers whose previously approved grants from the federal agencies here named as Defendants have been or are threatened to be unlawfully terminated or suspended. These terminations and suspensions occurred pursuant to Executive Orders or other directives of Defendant President Donald J. Trump, issued from January 20, 2025 to present, that were implemented through Defendant Department of Government Efficiency ("DOGE") and then operationalized by myriad administrative agencies.

2.    Plaintiffs challenge these terminations and seek a declaration that they are unconstitutional and otherwise unlawful because they violate the bedrock constitutional principle of separation of powers; the First Amendment guarantee of free speech; the Fifth Amendment guarantee of due process; the Impoundment Control Act of 1974; statutes requiring agencies to fulfill congressionally defined missions; and the Administrative Procedure Act ("APA"). These terminations bypassed Congress, ignored or contradicted the purposes for which Congress created the granting agencies and appropriated funds, and dispensed with the regular procedures and due process afforded grantees under the APA, in implementing the Trump Administration's political "cost-cutting" agenda and ideological purity campaign.

3.    Plaintiffs seek, for themselves and the UC researchers class, an injunction that restores their lost funding, enjoins further unlawful grant terminations or suspensions, and provides the grant extensions necessary to enable them to effectively complete the work for which these grants were approved. Plaintiffs and the Class are suffering, or will imminently suffer, concrete harm to their research, their careers, and their professional standing.

4.    As used in this Complaint, "UC researchers" includes UC faculty, staff, academic appointees, and employees, across the ten-campus University of California system, who are or will imminently be suffering loss of research funding, research cessation or interruption, or

1  loss or reduction of employment, by the termination or suspension of previously approved grants

2  since January 20, 2025.

3       5.    Grants to UC researchers each year from federal agencies as diverse as the

4  National Science Foundation, National Institutes of Health, Department of Transportation, and

5  Food and Drug Administration, ranging from thousands to millions of dollars, fund the

6  production of new knowledge and fuel the development and deployment of discoveries useful to

7  society.

8       6.    Federal grants have been key to the innovation that has consistently earned

9  the UC system pride of place among research institutions, including first place in the National

10  Academy of Inventors' list of universities worldwide with the most utility patents[1] and the UC

11  Berkeley campus's rank of #1 public research in institution in the world for nine of the past ten

12  years.[2]

13       7.    Before President Trump took office, federal agency grant making

14  proceeded under the authority of Congress, which created agencies through its constitutionally

15  assigned exclusive legislative power, and appropriated taxpayer funds for specific public

16  purposes that the agencies were tasked to execute. For decades, agencies carried out these

17  statutory directives and observed due process in making, renewing, and (only seldom) terminating

18  grants. They each adhered to their own grant regulations, duly promulgated through notice and

19  comment rulemaking under the APA, and followed APA procedures when modifying such

20  regulations.

21       8.    As a corollary, on the rare occasions when agencies terminated grants, they

22  did so pursuant to predictable, regularized processes; based terminations on proper review and

23  evaluation of grantees' activities to assure compliance with the terms and purpose of the awarded

24  grants; and terminated grants only for reasons stated in applicable regulations.

25

26  [1] Univ. of Cal., Office of the President, *Federal Investment in UC Research 2025* (2025), https://ucop.edu/communications/_files/federal-investment-in-uc-research-2025.pdf.

27  [2] Public Affairs, *Times Higher Ed Ranks UC Berkeley No. 1 Public University in U.S.*, UC Berkeley News (Oct. 9, 2024), https://news.berkeley.edu/2024/10/09/times-higher-ed-ranks-uc-berkeley-no-1-public-university-in-u-

28  s/#:~:text=Berkeley%20has%20held%20the%20ranking,industry%20engagement%20and%20international%20outlook.

9.      All of this changed abruptly on January 20, 2025, when Defendant Trump attempted to seize direct control of federal agencies by bypassing Congress and upending the statutory and regulatory system under which federal agencies have historically and legally operated.

10.      On and after January 20, 2025, Defendants Trump and DOGE, through a flurry of Executive Orders and other directives, commanded the federal agencies named as Defendants in this Complaint ("Federal Agency Defendants") to terminate thousands of previously awarded research grants.

11.      Abrupt, wholesale, and unilateral termination of these grants has violated the Constitution's core principle of separation of powers and its guarantees of freedom of speech and due process; flouted the Impoundment Control Act limits on the Executive's ability to withhold or redirect congressionally appropriated money; ignored statutory requirements that agencies fulfill their substantive missions and fund congressionally specified activities; contravened agency-specific grant-making regulations that cannot by law be revised on an abrupt, unexplained, chaotic basis; and violated the APA through this arbitrary, capricious, and *ultra vires* conduct.

12.      The "Wall of Receipts" on the DOGE website boasts that federal agencies have terminated over 15,000 grants pursuant to DOGE's directions to date, reflecting terminations on a mass scale.[3]

13.      Agencies' proffered grounds for such terminations—if grounds were stated at all—were spurious. In some cases, agency correspondence to grantees asserted that grant termination would reduce public costs and promote government efficiency, although no evidence was provided to support this claim. In other cases, agency communications made it clear that grants were being terminated to further Defendant Trump's political objectives, which included

---

[3] Department of Government Efficiency, *Wall of Receipts*, DOGE.gov, https://doge.gov/savings (last visited May 30, 2025). While of questionable accuracy, the data displayed on the DOGE website demonstrate the Trump/DOGE objective: massive cuts to already appropriated and approved grants, without regard to merit.

- 3 -      AMENDED CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    the elimination of research on climate, environmental justice, "gender ideology," and "DEI"

2    (diversity, equity and inclusion), although the latter terms were not defined.

3          14.    The agencies that terminated grants did so on a categorical, *en masse* basis,

4    without individual review or regard to a project's merit or a grantee's progress, and without any

5    semblance of due process. The terminated and threatened grants that are the subject of this action

6    were not terminated because they violated the terms of their grant applications or grant approvals,

7    or strayed from the subject matter or purpose for which they were funded. Such deficiencies

8    could have been addressed in the normal and ordered course of grant-making and review. To the

9    contrary: these grant terminations were and are occurring, as their timing and reflection of the

10   2025 Executive Orders demonstrates, not because the research for which funding was approved

11   had departed from its originally approved purpose, but because that purpose now offends the

12   political agenda and ideological requirements of the Trump Administration.

13         15.    Plaintiffs do not seek an Order immunizing all grants from termination or

14   review, or changing agency grantmaking procedures as they existed prior to January 20, 2025.

15   They do seek a return to the *status quo ante* of ordered grant processes, aligned with

16   congressionally authorized purposes, and affording due process to grant recipients. This return to

17   procedures that prevailed prior to January 20, 2025, and conformed to the norms of due process

18   and the APA, by federal agencies that defer not to unilateral Executive dictates but to

19   congressional authority, is the essential relief Plaintiffs seek.

20         16.    Examining similar unlawful executive branch conduct by Defendants

21   Trump and DOGE in the attempted reorganization (and gutting) of entire agencies, and the mass

22   termination of hundreds of thousands of federal employees, the United States District Court

23   (Illston, J.) stated in its May 22, 2025 Order Granting Preliminary Injunction in *American*

24   *Federation of Government Employees*, *AFL-CIO v. Trump,* Case No. 25-cv-03698-51 (Dkt. 124):

> Presidents may set policy priorities for the executive branch, and
> agency heads may implement them. This much is undisputed. But
> Congress creates federal agencies, funds them, and gives them duties
> that—by statute—they must carry out. Agencies may not conduct
> large-scale reorganizations and reductions in force in blatant
> disregard of Congress' mandates, and a President may not initiate
> large-scale executive branch reorganization without partnering with

Congress. For this reason, nine Presidents over the last one hundred years have sought and obtained authority from Congress to reorganize the executive branch. Other Presidents—including President George W. Bush, President Obama, and President Trump in his first term—asked Congress for agency reorganization authority but did not receive it.

17.    In denying Defendants' request for a stay of the preliminary injunction in that case, the Ninth Circuit reaffirmed the bedrock principles that administrative agencies are creatures of Congress, not the President, and that "Congress has plenary control over the salary, duties, and even existence of federal offices." *Am. Fed'n of Gov't Emps. v. Trump*, —F.4th— (May 30, 2025) (citing *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477,500 (2010)).

18.    Here, Defendants have engaged in the same unprecedented and unlawful overreach described and enjoined above, in the context of mass terminations of research grants. Their playbook involves a trifecta of illegal moves. First, Defendant Trump issued facially unconstitutional Executive Orders and directives that usurped congressional authority and unlawfully discriminated against disfavored speech. Second, acting on presidential instruction, Defendant DOGE commanded agencies to adopt Trump's policies as their own by terminating scores of already awarded grants, notwithstanding that DOGE (whose own status as a governmental entity remains unclear) lacks legal authority to supervise administrative agencies. Third and finally, Federal Agency Defendants terminated grants on the stated basis that they were inconsistent with *agency priorities*, or otherwise in tension with Executive Orders and directives, when in fact the grants' inconsistency was with *executive preferences*. In so doing, agencies violated their statutory mandates, the APA, the constitutional Due Process guarantee, and their own regulations.

19.    Plaintiff UC researchers have suffered concrete financial, professional, and other harms from Federal Agency Defendants' unilateral termination of grants for projects to which they have already dedicated time and effort; for research upon which they have staked careers and reputations; and for work with research teams through which they endeavored to train

a next generation. Without judicial relief, these researchers will suffer irreparable injury to their research and their careers.

20.    As profoundly, these terminations have impaired and will impair the public-serving research mission of the UC system and the concern for public welfare that undergirds it.

21.    All of the Defendants' conduct, and the Plaintiffs' and Class members' resulting harm, proceeds directly from Defendant Trump's determination to erase the constitutional boundaries that separate the branches of government and assign defined powers to each. Specifically, the mass termination of federal agency grants that is the subject of this action proceeds from Defendant Trump's efforts to arrogate the law-making powers of Congress to himself.

22.    Plaintiffs and the Proposed Class will continue to suffer harm on an ongoing basis and will experience increasing and irreparable harm absent the declaratory and injunctive relief here sought.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the United States Constitution, federal statutes, and the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, and 5 U.S.C. §§ 702, 704. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705-06.

24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are officers and agencies of the United States served in their official capacities, no real property is at issue in this case, and the Plaintiffs and many members of the Proposed Class are citizens of California and are residents of this District, where many of the federal grant terminations that are the subject of this suit, and the resulting harms to Plaintiffs and the Class, have occurred and will continue to occur unless enjoined.

# THE PARTIES

A.    **Plaintiffs**

25.    Individual Plaintiff and Class Representative Neeta Thakur is a citizen of the United States and the State of California, and a member of the faculty at the University of California, San Francisco ("UCSF"), who engages in research. She resides in the Northern District of California.

26.    Individual Plaintiff and Class Representative Ken Alex is a citizen of the United States and the State of California, and has an academic appointment as a researcher at the University of California, Berkeley ("UC Berkeley"). He resides in the Northern District of California.

27.    Individual Plaintiff and Class Representative Robert Hirst is a citizen of the United States and the State of California, and has an academic appointment as a researcher at the Bancroft Library at UC Berkeley. He resides in the Northern District of California.

28.    Individual Plaintiff and Class Representative Christine Philliou is a citizen of the United States and the State of California, and a member of the faculty at UC Berkeley who engages in research. She resides in the Northern District of California.

29.    Individual Plaintiff Nell Green Nylen is a citizen of the United States and the State of California, and has an academic appointment as a researcher at UC Berkeley. She resides in the Northern District of California.

30.    Individual Plaintiff and Class Representative Jedda Foreman is a citizen of the United States and the State of California, and has an academic appointment as a researcher at UC Berkeley. She resides in the Northern District of California.

31.    Individual Plaintiff and Class Representative Eli Berman is a citizen of the United States and the State of California, and has an academic appointment as a researcher at the University of California, San Diego. He resides in San Diego County.

32.    Individual Plaintiff and Class Representative Susan Handy is a citizen of the United States and the State of California, and a member of the faculty at the University of California, Davis. She resides in Yolo County.

1

**B.**    **Defendants**

2        33.    Defendant Donald J. Trump is the President of the United States and is

3   sued in his official capacity.

4        34.    Defendant Department of Government Efficiency ("DOGE") is a federal

5   agency headquartered in Washington, D.C. DOGE is a federal agency within the meaning of the

6   APA, 5 U.S.C. §551(1). Upon information and belief, DOGE is now headed by Defendant Trump

7   and every member of his cabinet.

8        35.    Defendant Amy Gleason is the Acting Administrator of DOGE and is sued

9   in her official capacity.

10        36.    The following federal departments and agencies, including their identified

11   leaders, are sometimes referred to collectively herein as the "Federal Agency Defendants."

12        37.    Defendant National Science Foundation ("NSF") is a federal agency

13   headquartered in Alexandria, Virginia. NSF is a federal agency within the meaning of the APA, 5

14   U.S.C. § 551(1).

15        38.    Defendant Brian Stone is Acting Director of NSF and is sued in his official

16   capacity.

17        39.    Defendant National Endowment for the Humanities ("NEH") is a federal

18   agency headquartered in Washington, D.C. NEH is a federal agency within the meaning of the

19   APA, 5 U.S.C. § 551(1).

20        40.    Defendant Michael McDonald is Acting Chairman of NEH and is sued in

21   his official capacity.

22        41.    Defendant United States Environmental Protection Agency ("EPA") is a

23   federal agency headquartered in Washington, D.C. EPA is a federal agency within the meaning of

24   the APA, 5 U.S.C. § 551(1).

25        42.    Defendant Lee Zeldin is the Administrator for the EPA and is sued in his

26   official capacity.

27

28

1      43.     Defendant United States Department of Agriculture ("USDA") is a federal

2  agency headquartered in Washington, D.C. USDA is a federal agency within the meaning of the

3  APA, 5 U.S.C. § 551(1).

4      44.     Defendant Brooke Rollins is Secretary of USDA and is sued in her official

5  capacity.

6      45.     Defendant AmeriCorps, also known as the Corporation for National and

7  Community Service, is a federal agency headquartered in Washington, D.C. AmeriCorps is a

8  federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

9      46.     Defendant Jennifer Bastress Tahmasebi is Interim Agency Head of

10  AmeriCorps and is sued in her official capacity.

11      47.     Defendant United States Department of Defense ("Defense") is a federal

12  agency headquartered in Washington, D.C. Defense is a federal agency within the meaning of the

13  APA, 5 U.S.C. § 551(1).

14      48.     Defendant Pete Hegseth is Secretary of Defense and is sued in his official

15  capacity.

16      49.     Defendant United States Department of Education ("Education") is a

17  federal agency headquartered in Washington, D.C. Education is a federal agency within the

18  meaning of the APA, 5 U.S.C. § 551(1).

19      50.     Defendant Linda McMahon is Secretary of Education and is sued in her

20  official capacity.

21      51.     Defendant United States Department of Energy ("DOE") is federal agency

22  headquartered in Washington, D.C. DOE is a federal agency within the meaning of the APA, 5

23  U.S.C. § 551(1).

24      52.     Defendant Chris Wright is Secretary of DOE and is sued in his official

25  capacity.

26      53.     Defendant United States Department of Health and Human Services

27  ("HHS") is a federal agency headquartered in Washington, D.C. HHS is a federal agency within

28  the meaning of the APA, 5 U.S.C. § 551(1).

1        54.     Defendant Robert F. Kennedy, Jr. is Secretary of HHS and is sued in his

2   official capacity.

3        55.     Defendant United States Centers for Disease Control ("CDC"), housed

4   within HHS, is federal agency headquartered in Atlanta, Georgia. CDC is a federal agency within

5   the meaning of the APA, 5 U.S.C. § 551(1).

6        56.     Defendant Matthew Buzzelli is Acting Director of CDC and is sued in his

7   official capacity.

8        57.     Defendant United States Food and Drug Administration ("FDA"), housed

9   within HHS, is a federal agency headquartered in Silver Spring, Maryland. FDA is a federal

10  agency within the meaning of the APA, 5 U.S.C. § 551(1).

11       58.     Defendant Martin Makary is Commissioner of the FDA and is sued in his

12  official capacity.

13       59.     Defendant United States Institutes of Health ("NIH"), housed within HHS,

14  is federal agency headquartered in Bethesda, Maryland. NIH is a federal agency within the

15  meaning of the APA, 5 U.S.C. § 551(1).

16       60.     Defendant Jayanta Bhattacharya is Director of NIH and is sued in his

17  official capacity.

18       61.     Defendant Institute of Museum and Library Services ("IMLS") is a federal

19  agency headquartered in Washington, D.C. ILMS is a federal agency within the meaning of the

20  APA, 5 U.S.C. § 551(1).

21       62.     Defendant Keith Sonderling is Acting Director of IMLS and is sued in his

22  official capacity.

23       63.     Defendant United States Department of the Interior ("Interior or DOI") is a

24  federal agency headquartered in Washington, D.C. Interior is a federal agency within the meaning

25  of the APA, 5 U.S.C. § 551(1).

26       64.     Defendant Doug Burgum is Secretary of the Interior and is sued in his

27  official capacity.

28

AMENDED CLASS ACTION COMPLAINT FOR
                                                                                DECLARATORY AND INJUNCTIVE RELIEF

65.    Defendant United States Department of State ("State") is a federal agency headquartered in Washington, D.C. State is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

66.    Defendant Marco Rubio is Secretary of State and is sued in his official capacity.

67.    Defendant Department of Transportation ("DOT") is a federal agency headquartered in Washington, D.C. DOT is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

68.    Defendant Sean Duffy is Secretary of DOT and is sued in his official capacity.

## CLASS ALLEGATIONS

69.    Neeta Thakur, Ken Alex, Nell Green Nylen, Robert Hirst, Christine Philliou, Jedda Foreman, Eli Berman, and Susan Handy ("Plaintiffs" or "Class Representatives") bring this action as a class action for declaratory and injunctive relief pursuant to Federal Rule of Civil Procedure 23(a)(1)-(4) and 23(b)(2). They bring this suit on behalf of themselves and all similarly situated University of California researchers whose federally funded grants have been or will be imminently terminated or suspended by Defendants absent (a) a declaratory judgment that such Executive Orders and directives are illegal; and (b) injunctive relief enjoining further terminations and restoring the terminated grants to enable class members to complete their interrupted work. These Class Representatives seek certification of two classes, as defined by the Court in her Order Granting Motion for Preliminary Injunction and Provisional Class Certification (ECF 54), modified to include the additional Federal Agency Defendants that terminated Plaintiff Berman's and Plaintiff Handy's grants:

> The Equity Termination Class:
>
> All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants by the EPA, NEH, NSF, DOD, or DOT (or their sub-agencies) that are terminated pursuant to Executive Orders 14151 or 14173, from and after January 20,

1    2025.

2    Excluded from the class are Defendants, the judicial officer(s)
     assigned to this case, and their respective employees, staffs, and
3    family members.

4    <u>The Form Termination Class</u>

5    All University of California researchers, including faculty, staff,
     academic appointees, and employees across the University of
6    California system who are named as principal researchers,
     investigators, or project leaders on the grant applications for
7    previously awarded research grants by the EPA, NEH, NSF, DOD,
     or DOT (or their sub-agencies) that are terminated by means of a
8    form termination notice that does not provide a grant-specific
     explanation for the termination that states the reason for the change
9    to the original award decision and considers the reliance interests
     at stake, from and after January 20, 2025.
10
     Excluded from the class are Defendants, the judicial officer(s)
11   assigned to this case, and their respective employees, staffs, and
     family members
12

13        70.    This action meets all of the Rule 23(a) prerequisites for maintaining a class

14   action. The Plaintiff Class is so numerous that individual joinder of all its members is

15   impracticable, satisfying Rule 23(a)(1). The ten-campus UC System has more than 265,000

16   faculty and staff,[4] hundreds to thousands of whom conduct billions of dollars of federally funded

17   research annually. In 2024, for example, UC Berkeley researchers alone received nearly $1

18   billion in new research grants. Of this amount, 51% (approximately $420 million), came from

19   federal grants. On this single campus, as of May 15, 2025, there were more than 2,000 open

20   federal research grants (*i.e.,* ones whose termination date has not arrived). Many of these have

21   now been terminated, suspended, or face imminent termination by the unlawful actions of

22   Defendants. Plaintiffs do not yet know the exact number of the UC researchers whose work has

23   been terminated or imminently threatened by the Defendants' conduct at issue in this suit, but are

24   informed and believe that hundreds or thousands of researchers' grants and work, and their

25   research staff's jobs, have been and will be impacted by such conduct. For example, the National

26   Science Foundation (NSF) published a list of terminated grants that includes nearly 80 grants

27

28   [4] Univ. of California, *About Us*, https://www.universityofcalifornia.edu/about-
     us#:~:text=The%20University%20of%20California%20opened,and%20working%20around%20t
     he%20world. (last visited May 28, 2025).

- 12 -

terminated across the UC System by *NSF alone*; a quick review of the terminated grants suggests terminations occurred because the grant titles contain now-suspect DEI-related words such as "equity."[5] A preliminary list of over 30 terminated grants across several federal agencies at UC Berkeley shows the same pattern. Further, databases compiled by news media and nonprofits have also identified over 100 National Institutes of Health (NIH) grants made to UCSF, UC Los Angeles, and UC San Diego researchers that have since been terminated.[6]

71.    The claims of the Plaintiff Class members share important and indeed pivotal common questions of law and fact, including but not limited to whether the Defendants' actions pursuant to the Executive Orders and directives described in this Complaint are unconstitutional and unlawful exercises of executive power, because they usurp Congress's spending authority and also violate the Impoundment Control Act of 1974; whether Defendants' actions are further unconstitutional because they violate Plaintiff Class members' First Amendment right to free speech and Fifth Amendment right to due process; whether they are further unlawful because they violate statutes through which Congress has created the defendant agencies and determined their purposes, functions, and goals, and additional statutes through which Congress gives agencies substantive instruction, usurping Congress's legislative authority; and whether Defendants' actions are arbitrary and capricious, an abuse of discretion, or otherwise contrary to law,  in violation of the APA.

72.    Because the claims of the Plaintiff Class members share common issues of law and fact, they will not require individualized determinations of the circumstances of any plaintiff, and satisfy Rule 23(a)(2) for purposes of the requested declaratory and injunctive relief.

73.    The claims of the Class Representatives are typical of the claims of the members of the Plaintiff Class, because they arise out of the Defendants' common conduct, satisfying Rule 23(a)(3). Like other members of the class, the Class Representatives have been

---

[5] NSF, *Is there a publicly available list of the awards NSF has terminated?*, https://www.nsf.gov/updates-on-priorities#termination-list (last updated May 23, 2025).

[6] Irena Hwang et al., *The Gutting of America's Medical Research: Here is Every Canceled or Delayed N.I.H. Grant*, N.Y. Times (June 4, 2025), https://www.nytimes.com/interactive/2025/06/04/health/trump-cuts-nih-grants-research.html?smid=nytcore-ios-share&referringSource=articleShare.

1    concretely harmed, economically, professionally, and reputationally, by Defendants' arbitrary,

2    capricious, and unlawful actions in categorically terminating or delaying their research grants

3    under color of Defendant Trump's Executive Orders and/or at the direction of DOGE. The timing

4    and sheer volume of these terminations (DOGE boasts of over 15,0000 such terminations of

5    grants nationwide in the space of less than 100 days) shows that these determinations were

6    without due process or due regard for the individual merits, scientific importance, or public

7    benefit of the projects affected. Class Representatives and the Plaintiff Class have been similarly

8    and further harmed by Defendants' failure to adequately explain their actions and decisions. Each

9    of these actions, independently and collectively, have caused harm to the Class Representatives

10   and the Plaintiff Class members.

11            74.    The Class Representatives will fairly and adequately protect the interests of

12   the Plaintiff Class, satisfying Rule 23(a)(4). They will defend the rights of all proposed class

13   members fairly and adequately, and have no interest that is now or may be potentially

14   antagonistic to the interests of the Plaintiff Class. The attorneys representing the Plaintiff Class

15   Representatives include constitutional, civil rights, environmental, and administrative law experts

16   and litigators with decades of experience in their respective fields, and class action attorneys with

17   similar experience and scores of court appointments as class counsel in federal litigation. These

18   attorneys may and should be appointed as class counsel in this action.

19            75.    The members of the Plaintiff Class are readily ascertainable through

20   Defendants' own grant records, and the grant-related communications they have issued to Class

21   members pursuant to Executive Orders and/or at the direction of the Trump Administration and/or

22   DOGE.

23            76.    Through federal research grant cancellations, suspensions, and delays

24   imposed categorically, pursuant to Executive Orders or other Trump Administration directives, in

25   violation of the APA, and in violation of other statutes and the Constitution as alleged in this

26   Complaint, Defendants have acted, have threatened to act, and will continue to act on grounds

27   generally applicable to the Plaintiff Class, thereby making final equitable and declaratory relief

28

1   appropriate to the Class as a whole. The Plaintiff Class may therefore be properly certified under

2   Federal Rule of Civil Procedure 23(b)(2).

3          77.    Numerous individual lawsuits alleging similar conduct and claims would

4   disserve the interests of judicial economy, as well as the interests of litigants and the public in the

5   just, speedy, and inexpensive determination of these claims.

6          **FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS**

7   **I.    Throughout Decades of Federal Funding, the UC System Has Made Leading
          Contributions to Research that Benefit the Public**

8

9          78.    The University of California (the "UC System") is the world's leading

10  public research institution. Comprised of ten campuses, three affiliate national laboratories, and

11  dozens of institutes, centers, and research laboratories across California, the UC System has

12  made—and continues to make—outsize contributions to research that have changed the world,

13  and enhanced human knowledge, while contributing to the national security and global

14  prominence of the United States, and the health and welfare of all Americans.

15         79.    Without the UC System's research, for example, the world would not have

16  the internet,[7] plug-in hybrid cars,[8] or the world's largest 3-D map of the universe.[9]

17

18

19

20

21

22

23

---

24  [7] Pranay Bhattacharyya, *UCLA: Birthplace of the Internet*, US Tech News (April 28, 2021),
    https://uctechnews.ucop.edu/ucla-birthplace-of-the-internet/#:~:text=ARPANET%3A%20

25  The%20Beginning,first%20two%20letters%20were%20sent.
    [8] USPath Center, *4 Unexpected Discoveries from UC*, UCPath Jobs,

26  https://ucpathjobs.org/lifestyle/4-unexpected-discoveries-uc/ (last visited May 27, 2025).
    [9] Michael Levi, *First Results from DESI Make the Most Precise Measurement of Our*

27  *Expanding Universe*, Berkeley Lab News Center (April 4, 2024),
    https://newscenter.lbl.gov/2024/04/04/desi-first-results-make-most-precise-measurement-of-

28  expanding-universe/.

80.     In the medical realm, UC System research has led to development of MRI machines,[10] cochlear implants that restore hearing,[11] a universal viral vaccine,[12] a brain implant that prevents Parkinson's symptoms,[13] and the use of CRISPR gene-editing to cure sickle cell disease.[14] In the past 30 years, decades of UC cancer research has saved nearly 4 million lives.[15]

81.     The UC System has produced 70 Nobel Prize winners, 101 MacArthur "Genius" grant award winners, 66 National Medal of Science winners, and 42 Pulitzer Prize winners.[16] Since 2013, the UC System has topped the National Academy of Inventors' list of universities worldwide with the most utility patents.[17]

82.     Through continual development of new technologies, UC research stimulates the economy by creating jobs, companies, industries, and scientific advancements that continue to change the world. Entire industries have grown out of UC research, including biotechnology, computing, semiconductors, telecommunications, and agriculture.[18]

---

[10] Kara Manke, *Jerome R. Singer, pioneer of magnetic resonance imaging, dies at 97,* US Berkeley News (August 6, 2019), https://news.berkeley.edu/2019/08/06/jerome-r-singer-pioneer-of-magnetic-resonance-imaging-dies-at-97/#:~:text=Jerome%20R.-,Singer%2C%20pioneer%20of%20magnetic%20resonance%20imaging%2C%20dies%20at%2097,and%20blood%20volume%20in%20mice.
[11] Pete Farley, *Neuroscientist Wins Prize for Cochlear Implant Contributions*, University of California (January 8, 2015), https://www.universityofcalifornia.edu/news/neuroscientist-wins-prize-cochlear-implant-contributions.
[12] Jules Bernstein, *Vaccine Breakthrough Means No More Chasing Strains*, University of California, Riverside (April 15, 2024), https://news.ucr.edu/articles/2024/04/15/vaccine-breakthrough-means-no-more-chasing-strains.
[13] Robin Marks, *New Parkinson's Treatment Helps Former Pro Keep Skateboarding*, U. of Cal. San Francisco (Apr. 19, 2024), https://www.ucsf.edu/news/2024/04/427391/new-parkinsons-treatment-helps-former-pro-keep-skateboarding.
[14] Robert Sanders, *FDA Approves First Test of CRISPR to Correct Genetic Defect Causing Sickle Cell Disease*, University of California (Apr. 1, 2021), https://www.universityofcalifornia.edu/news/fda-approves-first-test-crispr-correct-genetic-defect-causing-sickle-cell-disease.
[15] Julia Busiek, *What Cuts to NIH Funding Mean for Cancer Patients and Their Families*, University of California (Feb. 26, 2025), https://www.universityofcalifornia.edu/news/what-cuts-nih-funding-mean-cancer-patients-and-their-families.
[16] Univ. of Cal., *The University of California at a Glance*, Univ. of Cal. (Feb. 25, 2025), https://ucop.edu/institutional-research-academic-planning/_files/uc-facts-at-a-glance.pdf.
[17] Univ. of Cal., *Federal Investment in UC Research,* Univ. of Cal. (Apr. 2025), https://ucop.edu/communications/_files/federal-investment-in-uc-research-2025.pdf.
[18] *Id.*

83.     UC research prowess has continued at breakneck speed. The UC System averages four new inventions *per day*. In 2023, 78 startups were launched using UC intellectual property or technology.[19] UC research quite literally shapes the future: 8.2% of all U.S. academic research is conducted by UC researchers.[20]

84.     Such achievements would not be possible without federal funding. For years, the UC System has partnered with the federal government to deliver groundbreaking innovations that have made the American public healthier, safer, smarter, and better able to compete in a global market.

85.     Federal funding is the single most important source of UC research funding, historically accounting for more than half of the UC System's total research awards.[21] In fiscal year 2024, the UC System received $4.069 *billion* in federal research awards. This covered 10,256 distinct awards.[22]

86.     The UC System receives more National Institutes of Health ("NIH") and National Science Foundation ("NSF") funding than any other institution.[23] And these are far from the only agencies to offer significant support to UC research.

87.     In fiscal year 2024, the UC System received approximately the following amounts by agency:[24]

- $2.54 billion – NIH
- $525 million – NSF
- $326 million – Defense
- $160 million – Energy
- $122 million – other HHS
- $104 million – NASA
- $86 million – USDA

---

[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*

1
- $68 million – Commerce

2
- $39 million – Interior

3
- $27 million – Education

4
- $20 million – State

5
- $47 million – other agencies

6      88.    These stable federal funding sources, and the research talent they attract

7 and empower, have enabled the UC System to make its outsize contributions to human progress

8 for decades. Because the very nature of research requires years of ongoing work, the UC system

9 has operated research programs across presidential administrations for generations.

10      89.    The innovations described above are the result of a successful partnership

11 between the UC System and the federal government, and indeed would be impossible if federal

12 grant funding were terminated.

13      90.    This research, of course, is carried out by faculty members and other

14 research personnel in the UC system. These individuals' careers—their hiring, their tenure, their

15 advancement—all depend on research that is often supported by federal grants.

16 **II.    Congress's Power of the Purse Makes Illegal the Mass Termination of Grants at the President's Direction**

17

18      91.    The partnership between the UC System and the federal government is a

19 product of Congress's powers, and by design insulated from political winds in the executive

20 branch. Congress has repeatedly emphasized the importance of federally funded research as

21 critical to the strength and security of the nation, and has used its powers to set research priorities

22 and appropriate funds to federal agencies to carry out those priorities.

23      92.    Congress has the constitutional power to appropriate funds for such

24 research and to create agencies necessary to implement federal policies. Article I vests Congress

25 with the legislative power to create departments, agencies, and offices within the executive

26 branch, to define their duties, and to fund their activities. U.S. Const. art. I, §1 ("All legislative

27 Powers herein granted shall be vested in a Congress of the United States.").

28

3279084.1

AMENDED CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

93.     Congress's legislative power includes "the establishment of offices… [and] the determination of their functions." *Myers v. United States*, 272 U.S. 52, 129 (1926); U.S. Const. art I, § 8, cl. 18. "Administrative agencies are creatures of statute," and do not exist or have purpose without Congress's direction. *See Nat'l Fed'n of Indep. Bus v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022). Congress thus establishes executive agencies and crafts the statutes that govern each agency's administration. *See, e.g.*, 10 U.S.C. §§ 111, 113 (Defense); 16 U.S.C. § 551 (Agriculture); 42 U.S.C. §§ 202, 203 (HHS); 42 U.S.C. §§ 218, 282 (NIH); 42 U.S.C. § 7131 (Energy).

94.     Congress also holds the power of the federal purse. Indeed, Congress's powers to set the policies of the nation are at their apex when it comes to spending money, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). Congress makes its priorities clear by appropriating funds to agencies to carry out specified activities.

95.     The Constitution requires the President, meanwhile, to "take Care that the Laws be faithfully executed." U.S. Const., art. II, § 3. The "Take Care Clause" assures that "Congress makes the laws and the President faithfully executes them." *Utility Air Reg. Grp. v. Envtl. Prot. Agency*, 573 U.S. 302, 327 (2014) (cleaned up). This includes ensuring the appropriation of funds per Congress's direction.

96.     The executive branch has *no* constitutional authority to refuse to carry out laws enacted by Congress, and it has no constitutional authority to block, amend, subvert, or delay spending appropriated monies based on the President's own policy preferences. For nearly two hundred years, it has been established that the Executive violates the Take Care Clause when it ignores, refuses to execute, or purports to override statutes. *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838).

97.     A President's Executive Order cannot override Congress's express direction. The President "is without authority to set aside congressional legislation by executive order." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999). Rather, the "President's power, if any, to issue [an] order must stem from either an act of

1    Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579,

2    585 (1952).

3          98.    The President has no power to order the rescission of funds. If the

4    President wants funds rescinded, he may *ask* Congress to do so pursuant to the Impoundment

5    Control Act ("ICA"), 2 U.S.C. § 681 *et seq.* Under the ICA, the President can "transmit to both

6    Houses of Congress a special message specifying," among other criteria, the amount of budget

7    authority he proposes be rescinded, the reasons why it should be rescinded, and the effect of the

8    proposed rescission on the "objects, purposes, and programs for which the budget authority is

9    provided." *Id.* § 683(a). Unless Congress passes a rescission bill that covers the President's

10    request within 45 days, however, the funds shall be made available. *Id.* § 683(b).

11          99.    Even under the ICA—which clearly states it cannot interfere with the

12    Constitutional separation of powers, § 681(1)—the President is constrained. His requests for

13    rescission cannot "supersed[e] any provision of law which *requires* the obligation of budget

14    authority or the making of outlays." 2 U.S.C. § 681 (emphasis added). Nor can the President

15    request reductions of *already obligated* funds, including grants. *See id.* § 683; Congressional

16    Budget Office, *CBO Explains How It Estimates Savings From Rescissions* (May 26, 2023),

17    https://www.cbo.gov/publication/59209 (explaining a rescission will not impact funds that are

18    obligated).

19          100.    In short, once Congress has allocated money for grants or directed agencies

20    to use funding to carry out research, the President cannot unilaterally refuse to spend or to redirect

21    such funds. Nor can agency leaders, substituting the President's directives for Congress's,

22    terminate without lawful cause grants that were awarded pursuant to congressional directives.

23    Such refusal to spend money appropriated by Congress violates both the separation of powers and

24    the Impoundment Control Act.

25

26

27

28

III.    **President Trump Issues a Flurry of Executive Orders and Creates DOGE, Unlawfully Directing Agencies to Terminate Grants**

101.    Beginning on Inauguration Day (January 20, 2025), Defendant Trump issued a number of broad directives through Executive Orders (EOs). These included demands on federal agencies to take action to comply with the President's agenda.

102.    In particular, Defendant Trump and his administration explicitly and implicitly called on federal agencies to "terminate" previously awarded grant funds. In so doing, the Administration did not comply with Congress's prior spending decisions and direction.

103.    For example, Executive Order No. 14151, dated January 20, 2025 and titled "Ending Radical and Wasteful Government DEI Programs and Preferencing," instructs the Attorney General and others to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." Additionally, it directs each federal agency head to "terminate, to the maximum extent allowed by law… all 'equity-related' grants or contracts" within 60 days.[25]

104.    EO No. 14173, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," addresses purported "immoral race- and sex-based preferences under the guise of so-called [DEI] or [DEIA]." The order requires the Director of OMB to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing  equity,' and like mandates, requirements, programs, or activities, as appropriate."[26]

---

[25] Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025), https://www.federalregister.gov/documents/2025/01/29/2025-01953/ending-radical-and-wasteful-government-dei-programs-and-preferencing.
[26] Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633, (Jan. 21, 2025), https://www.federalregister.gov/documents/2025/01/31/2025-02097/ending-illegal-discrimination-and-restoring-merit-based-opportunity.

105.    On January 20, 2025, Defendant Trump also issued EO No. 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," directing that "federal funds shall not be used to promote gender ideology," instructing federal agencies to revise grant conditions accordingly, and defining "gender ideology" as a "false claim" that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity," and that "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex."

106.    On January 20, 2025, Defendant Trump further issued EO No. 14154, "Unleashing American Energy," which directed federal agencies to "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58)." The EO called out specific grant programs, and more generally, directed the agencies to "review their processes, policies, and programs for issuing grants."[27]

107.    On February 19, 2025, Defendant Trump issued EO No. 14217, "Commencing the Reduction of the Federal Bureaucracy." The EO deemed several government entities "unnecessary," and directed that any non-statutory components or functions be "eliminated." The Order also stated that any "grant requests" by these entities should be denied.[28]

108.    On March 14, 2025, Defendant Trump issued EO No. 14238, "Continuing the Reduction of the Federal Bureaucracy." This order listed additional entities determined by Defendant Trump to be "unnecessary," and again directed that grant requests be rejected.[29]

109.    Moreover, to force agencies into complying with his personal agenda, Defendant Trump signed EO No. 14158 on January 20, 2025, "Establishing and Implementing the President's 'Department of Governmental Efficiency,'" commonly known as "DOGE." The

---

[27] Exec. Order No. 14154, *Unleashing American Energy*, 90 Fed. Reg. 8353 (Jan. 29, 2025), https://www.federalregister.gov/documents/2025/01/29/2025-01956/unleashing-american-energy.

[28] Exec. Order No. 14217, *Commencing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 10577 (Feb. 25, 2025), https://www.federalregister.gov/documents/2025/02/25/2025-03133/commencing-the-reduction-of-the-federal-bureaucracy.

[29] Exec. Order No. 14238, *Continuing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 13043 (Mar. 20, 2025), https://www.federalregister.gov/documents/2025/03/20/2025-04868/continuing-the-reduction-of-the-federal-bureaucracy.

EO required the head of each federal agency to establish a team of at least four DOGE employees within their agency.[30]

110.    According to the Order, DOGE would be "dedicated to advancing the President's 18-month DOGE agenda." *Id.* Although the "DOGE agenda" has never been publicly disclosed, DOGE's targets for ostensible "efficiency" improvements have, in practice, born considerable resemblance to the Executive agenda manifest in Defendant Trump's EOs.

111.    On February 26, 2025, Defendant Trump doubled down. He issued EO No. 14222, "Implementing the President's 'Department of Governmental Efficiency' Cost Efficiency Initiative."[31] Notwithstanding that the Constitution allocates spending power to Congress alone, the Order purported to begin the Executive's "transformation in Federal spending on contracts, grants, and loans." This Order required federal agencies to review all existing grants with an eye toward termination:

> Each Agency Head, in consultation with the agency's DOGE Team Lead, shall review all existing covered contracts and grants and, where appropriate and consistent with applicable law, terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of my Administration. This process shall commence immediately and shall prioritize the review of funds disbursed under covered contracts and grants to educational institutions and foreign entities for waste, fraud, and abuse. Each Agency Head shall complete this review within 30 days of the date of this order.

112.    According to DOGE's self-described "Wall of Receipts," as of June 3, 2025, federal agencies had terminated over 15,000 grants, totaling roughly $44 billion in "savings." [32]

---

[30] Exec. Order No. 14158, *Establishing and Implementing the President's "Department of Government Efficiency"*, 90 Fed. Reg. 8441 (Jan. 29, 2025), https://www.federalregister.gov/documents/2025/01/29/2025-02005/establishing-and-implementing-the-presidents-department-of-government-efficiency.

[31] Exec. Order No. 14222, *Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*, 90 Fed. Reg. 11095 (Mar. 3, 2025), https://www.federalregister.gov/documents/2025/03/03/2025-03527/implementing-the-presidents-department-of-government-efficiency-cost-efficiency-initiative.

[32] Department of Government Efficiency, *Savings*, DOGE.gov, https://doge.gov/savings (last visited June 3, 2025).

113. Despite multiple successful legal challenges to President Trump's EOs and related directives,[33] Defendants have unlawfully terminated grants and continue to terminate grants previously awarded to Plaintiffs and the Class.

114. Indeed, according to data posted by DOGE, the federal government has already terminated over **$324 million**[34] in grants made to the UC system. The harm to UC researchers cannot be overstated.

115. This lawsuit arises because, in unilaterally terminating Plaintiffs' federal grants without lawful cause, Defendants are flouting constitutional limits on the Executive's authority; violating the First Amendment's prohibition on viewpoint discrimination; denying due process of law under the Fifth Amendment; ignoring agency-specific statutory directives; and violating the APA.

116. That these grant terminations violate the separation of powers became even clearer on May 28, 2025. Until then, DOGE was headed by Elon Musk. Now, according to the White House Press Secretary, DOGE will be led by "each and every member of the President's cabinet and the President himself, who is wholeheartedly committed to cutting waste, fraud and abuse from our government."[35] There is no longer any illusion that DOGE is more than a proxy

---

[33] *See, e.g.*, *Nat'l Assn. of Diversity Officers in Higher Education v. Trump*, No. 25-cv-0333-ABA (D. Md. Feb. 21, 2025) ECF No. 45 (preliminarily enjoining provisions requiring agencies to terminate equity-related grants); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir. Mar. 14, 2025), ECF No. 29 (staying preliminary injunction pending appeal); *Washington v. Trump*, No. 2:25-cv-244-LK (W.D. Wash. Feb. 28, 2025) ECF No. 50 (on February 28, 2025, preliminary enjoining sections that condition, withhold, or end federal funding in Plaintiffs states Colorado, Minnesota, Oregon, and Washington); *PFLAG, Inc. v. Donald J. Trump*, No. 8:25-cv-00337-BAH (D. Md. Mar. 4, 2025) ECF No. 116 (on March 4, 2025, preliminarily enjoining the same nationwide); *New York v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I Jan. 31, 2025), ECF No. 50 (preliminarily enjoining federal agency defendants from "pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations," based on both the OMB directive and Executive Orders, including the DEI and Gender Ideology Executive Orders).

[34] This number was produced by searching DOGE data posted at https://api.doge.gov/docs, which is accessible through DOGE's "Wall of Receipts" at https://doge.gov/savings. The $324 million was determined by looking at "Savings" under the "Grants" category, for entries in which the UC system was listed as a recipient.

[35] Diana Stancy, *White House Discloses Who Will Lead DOGE Efforts After Musk's Departure*, Fox News (May 29, 2025), https://www.foxnews.com/politics/white-house-discloses-who-will-lead-doge-efforts-after-musks-departure.

1    for Defendant Trump and his priorities. The White House reiterated that each Cabinet secretary

2    would work with DOGE employees at their agencies so that the "mission of DOGE will

3    continue."[36] The DOGE Trojan Horse has been welcomed inside the gates of the Federal Agency

4    Defendants, and the harms to Plaintiffs and the Class thus will continue and very likely increase.

5         117.    In adopting, implementing, and enforcing Defendant Trump's "priorities"

6    to illegally terminate grants, Defendants have caused and will continue to cause significant

7    concrete harm to Plaintiffs and the Class, as well as the UC System and the broader public that

8    benefits from UC research, discovery, and inventions.

9    **IV.    Agencies that Terminated Lead Plaintiffs' Grants Have Acted According to a Common Unlawful Pattern**

10

11        118.    On information and belief, all Federal Agency Defendants similarly and

12   abruptly failed to continue grants pursuant to Congress's directives, instead substituting

13   Defendant Trump's agenda. In place of reasoned decision-making, the federal agencies took

14   direction not only from the flurry of Executive Orders described herein, but in most instances also

15   took direction directly from DOGE staffers, who have no authority to direct or redirect allocation

16   of federal funds. Indeed, in other cases, the United States, per its Department of Justice counsel,

17   has on the record taken the position that Elon Musk—who helmed DOGE until days ago—did not

18   occupy an "office," lacked a title conferring formal authority, and was thus beyond judicial

19   review or legal consequence.[37]

20        119.    In terminating scores of already awarded federal grants, the Federal

21   Agency Defendants acted recklessly in disregarding the law, failing to consider reliance interests,

22   and failing to consider the harm resulting from immediately stopping ongoing research studies.

23   These included terminations of grants that would require halting human drug trials midstream

24   forcing researchers to breach basic principles of medical ethics.

25

26

---

27   [36] *Id.*

28   [37] *New Mexico v. Musk*, 2025 WL 1502747, at *13 (D.D.C. May 27, 2025) ("Essentially, Defendants argue, so long as the Executive acts without Congressional authority, the court cannot review its conduct.").

120.    Moreover, the Federal Agency Defendants conducted no proper review of grants, instead mass-terminating with form letters those grants they deemed (with no explanation) to no longer "effectuate" agency priorities, notwithstanding that agencies cannot substitute the President's agenda for their congressionally imposed statutory mandates.

121.    This Complaint examines the errant grant practices at the six Agencies that terminated Named Plaintiffs' grants—EPA, NEH, NSF, DOD, and DOT—and then describes how this same pattern played out within each Federal Agency Defendant, to the categorical and common detriment of the Class of UC researchers. There are UC researchers with grants from each and all of these agencies, including grants that have been or are very likely to be arbitrarily terminated.

A.    **Environmental Protection Agency**

122.    The Environmental Protection Agency ("EPA") is an independent federal agency established to address environmental pollution and protect the environment.

1.    **Congress Established the EPA to Protect the Environment, Including Through Research**

123.    Throughout the 1960s, the American public grew increasingly concerned with air pollution, water pollution, and environmental degradation generally. This concern was manifest most markedly in the multi-site celebration of the first Earth Day on April 22, 1970, which drew an estimated 20 million Americans.[38] In response to such pressure, President Nixon the same year presented Congress with a comprehensive message on the environment and established a council to consider how to organize a federal response to environmental concerns.[39]

124.    On July 9, 1970, President Nixon sent Congress "Reorganization Plan No. 3 of 1970," which proposed consolidating several existing federal agency duties into one Environmental Protection Agency.[40] In his transmittal to Congress, President Nixon wrote that "it

---

[38] Earth Day Network, *The History of Earth Day*, https://www.earthday.org/history/ (last visited May 29, 2025).

[39] *See* U.S. Envtl. Prot. Agency, *The Origins of EPA* (May 31, 2024), https://www.epa.gov/history/origins-epa.

[40] U.S. Envtl. Prot. Agency, *The Reorganization Plan No. 3 of 1970* (Sept. 6, 2016), https://www.epa.gov/archive/epa/aboutepa/reorganization-plan-no-3-1970.html.

has become increasingly clear that we need to know more about the total environment—land, water, and air. It also has become increasingly clear that only by reorganizing our Federal efforts can we develop that knowledge, and effectively ensure the protection, development and enhancement of the total environment itself."

125.    Under the Reorganization Plan, EPA was given a "broad mandate" to "develop competence in areas of environmental protection that have not previously been given enough attention." EPA would have the "capacity to do research on important pollutants irrespective of the media in which they appear, and on the impact of these pollutants on the total environment. Both by itself and together with other agencies, EPA would monitor the condition of the environment—biological as well as physical."[41]

126.    Although President Nixon (a Republican) disfavored the creation of new agencies, he broke his own rule "because arresting environmental deterioration is of great importance to the quality of life in our country and the world." He thus "believe[d] that in this case a strong, independent agency is needed."[42]

127.    The principal roles and functions of the new EPA would include:

- The establishment and enforcement of environmental protection standards consistent with national environmental goals.

- The conduct of research on the adverse effects of pollution and on methods and equipment for controlling it, the gathering of information on pollution, and the use of this information in strengthening environmental protection programs and recommending policy changes.

- Assisting others, through grants, technical assistance and other means in arresting pollution of the environment.

- Assisting the Council on Environmental Quality in developing and recommending to the President new policies for the protection of the environment.[43]

128.    After conducting hearings, Congress approved the proposal and EPA was created. Its first Administrator was sworn in on December 4, 1970.[44]

---

[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] U.S. Envtl. Prot. Agency, *The Origins of EPA* (May 31, 2024),

129.    EPA does not derive its regulatory authority from a single statute. Rather, a "number of laws serve as EPA's foundation for protecting the environment and public health." As Congress passes new environmental laws, EPA is most typically the agency tasked with writing regulations necessary to implement them.[45] Examples of key laws reflecting Congress's mandates to EPA include the Clean Air Act; the Clean Water Act; the Safe Drinking Water Act; the Federal Fungicide, Insecticide, and Rodenticide Act; the Toxic Substances Control Act; the Resource Conservation and Recovery Act; the Comprehensive Environmental Response, Compensation, and Liability Act (Superfund); and many more. As a recent example, when Congress enacted the Inflation Reduction Act of 2022, it gave EPA a new mandate to administer an environmental and climate justice block grant program.[46]

130.    These laws all direct EPA to carry out its core mission: "to protect human health and the environment."[47]

131.    Pursuant to this mission, EPA works to ensure that:

- Americans have clean air, land, and water;

- National efforts to reduce environmental risks are based on the best available scientific information;

- Federal laws protecting human health and the environment are administered and enforced fairly, effectively, and as Congress intended;

- Environmental stewardship is integral to U.S. policies concerning natural resources, human health, economic growth, energy, transportation, agriculture, industry, and international trade, and these factors are similarly considered in establishing environmental policy;

- All parts of society—communities, individuals, and businesses, as well as state, local, and Tribal governments—have access to accurate information sufficient to effectively participate in managing human health and

---

https://www.epa.gov/history/origins-epa.

[45] U.S. Envtl. Prot. Agency, *Laws and Executive Orders*,(Jan.29, 2025), https://www.epa.gov/laws-regulations/laws-and-executive-orders.

[46] Marianne Lavelle & Peter Aldhous, *Trump's EPA Funding Cuts Target Disadvantaged Communities*, Inside Climate News (May 1, 2025), https://insideclimatenews.org/news/01052025/trump-epa-funding-cuts-target-disadvantaged-communities/#:~:text=The%20EPA's%20declaration%20said%20it,environmental%20justice%20is%20being%20terminated.

[47] U.S. Envtl. Prot. Agency, *Our Mission and What We Do* (Apr. 21, 2025), https://www.epa.gov/aboutepa/our-mission-and-what-we-do.

environmental risks;

- Contaminated lands and toxic sites are cleaned up by potentially responsible parties and revitalized; and

- Chemicals in the marketplace are reviewed for safety.[48]

132.    To accomplish its mission, EPA implements Congress's environmental laws by writing and enforcing regulations.[49]

133.    EPA also carries out its mission by making grants. Indeed, "EPA's mission to protect human health and the environment is accomplished, in large part, by the awarding of funds to other organizations to conduct environmental program or projects."[50] EPA awards more than $4 billion in grants (called "assistance agreements") every year.

134.    According to EPA, its authority to make grants comes from three sources. First is the U.S. Constitution, which gives Congress the power of the purse in the Spending Clause. Second are statutes, in which Congress directs funds to be allocated to specific programs. Finally, the EPA derives grant-making power from regulations.[51]

135.    EPA makes many types of grants. One especially important type is research grants, which are often obtained by university researchers.

136.    EPA funds research through its Science to Achieve Results (STAR) program; its People, Prosperity, and the Planet (P3) Program; and its Small Business Innovation Research (SBIR) program. According to the agency, these "help to engage top research scientists, non-profit organizations, students, and small businesses that results in a strong scientific foundation to support the Agency's mission of protecting human health and the environment."[52]

---

[48] *Id.*

[49] *Id*

[50] U.S. Envtl. Prot. Agency, *EPA Grants Overview for Applicants and Recipients*, https://www.epa.gov/grants/epa-grants-overview-applicants-and-recipients (last visited May 29, 2025).

[51] U.S. Envtl. Prot. Agency, *EPA Funding Instruments and Authorities*, https://www.epa.gov/grants/epa-funding-instruments-and-authorities (last visited May 29, 2025).

[52] U.S. Envtl. Prot. Agency, *About EPA's Research Grants*, https://www.epa.gov/research-grants/about-epas-research-grants (last visited May 29, 2025).

137.    The STAR program is the "primary competitive, peer-reviewed extramural grant program that has awarded over 4,100 grants nationwide since 1995." The program "leverages the scientific and engineering expertise of academic and non-profit institutions to conduct high priority environmental and public health research," focusing on the effects of "air pollution, water quality and quantity, hazardous waste, toxic substances, pesticides, cumulative impacts, and more." [53]

138.    STAR research is funded through Requests for Applications (RFAs) that are derived from the EPA Office of Research and Development's Strategic Plan. These grants "concentrate on areas of special significance to the EPA mission."[54]

139.    EPA grants are highly competitive. Of the approximately 2,500 proposals for STAR research grants every year, it awards only around 150 research grants and 125 graduate fellowships.[55]

140.    EPA research grants have funded critical projects, including research to advance clean drinking water technologies, address knowledge gaps in antimicrobial resistance, and reduce exposure to wildfire smoke.[56]

**2.    In Response to Trump Administration Directives, the EPA Improperly Changed Priorities and Canceled Existing Grants**

141.    On his first day in office, President Trump signed Executive Order 14151, "Ending Radical and Wasteful Government DEI Programs and Preferencing" (Jan. 20, 2025). The Order instructs the Director of the Office of Management and Budget (OMB), assisted by the Attorney General and others, to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates,

---

[53] *Id.*

[54] U.S. Envtl. Prot. Agency, *Learn About Research Grants*, https://www.epa.gov/research-grants/learn-about-research-grants (last visited May 29, 2025).

[55] *Id.*

[56] *See, e.g.*, U.S. Envtl. Prot. Agency, *Research Grants in the News* (Sept. 23, 2024), https://www.epa.gov/research-grants/research-grants-news.

1    policies, programs, preferences, and activities in the Federal Government, under whatever name
2    they appear." The Order repeatedly mentions "environmental justice" as a target.[57]

3           142.    In particular, Executive Order 14151 directs each federal agency to
4    "terminate, to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice'
5    offices and positions… [and all] 'equity-related' grants or contracts" within 60 days.

6           143.    The President also signed Executive Orders related to energy, including
7    "Declaring a National Energy Emergency" and "Unleashing American Energy."

8           144.    Shortly after President Trump took office, the EPA began working closely
9    with DOGE.

10           145.    By March 7, 2025, the Democratic Staff of the Senate Committee on
11    Environment and Public Works reported that the EPA had issued guidance to senior staff
12    indicating that "all [funding] actions greater than $50,000 now require approval from an EPA
13    DOGE Team member."[58]

14           146.    A huge part of this DOGE-EPA collaboration included mass-canceling
15    grants. The EPA made no secret of DOGE's hand in EPA affairs, but rather, touted the DOGE
16    partnership in press releases.

17           147.    For example, on February 25, 2025, an EPA press release announced a
18    "second round of EPA-DOGE partnered cancellations." EPA stated that these cancellations
19    "represent more than $60 million saved as the EPA puts a stop to wasteful DEI and
20    environmental justice programs."[59]

21

22    [57] Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and*
23    *Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025),
      https://www.federalregister.gov/documents/2025/01/29/2025-01953/ending-radical-and-wasteful-
24    government-dei-programs-and-preferencing.
      [58] Senate Envtl. & Pub. Works Comm., *Letter to EPA Administrator Lee Zeldin Regarding*
25    *$50,000 Funding Approval Requirement* (Mar. 7, 2025),
      https://www.epw.senate.gov/public/_cache/files/b/c/bc3eafbf-38ea-4197-b655-
26    8466b9901dce/00C154E2DBAFFDF3EF5063DA374406502B1835873497F8DE2F439A171046
      0D09.3.7.25-letter-to-epa-re-50k-attachments-002-.pdf.
27    [59] U.S. Envtl. Prot. Agency, *EPA Administrator Lee Zeldin Cancels 20 Grants in 2nd Round of*
      *Cuts with DOGE, Saving Americans More than $60M* (Feb. 25, 2025),
28    https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-cancels-20-grants-2nd-round-
      cuts-doge-saving-americans.

148.    In a March 10, 2025 press release, EPA announced a fourth round of EPA-DOGE grant terminations, this time stating it was cancelling more than 400 grants "across nine unnecessary programs." This press release concluded, as have others, by stating: "EPA continues to work diligently to implement President Trump's Executive Orders."[60]

149.    The EPA has aligned itself closely with the Trump Administration. For example, on March 12, 2025 alone, the EPA issued 10 press releases in which it referred to itself as the "Trump EPA."[61]

150.    Also on March 12, EPA Acting Assistant Administrator Jeffrey Hall issued an internal memo regarding "Implementing National Enforcement and Compliance Initiatives Consistently with Executive Orders and Agency Priorities" (the "March 12 Administrator Memo").[62]

151.    Among EPA's functions is to establish, every four years, National Enforcement and Compliance Initiatives ("NECIs") that are published in the Federal Register. These are "national initiatives, developed in a non-partisan way across administrations" after soliciting public input.[63] NECIs allow the EPA to focus its resources on widespread problems.[64]

152.    NECIs for fiscal year 2023-2027 were set on August 17, 2023. The six NECIs—half of which were modified or continued from prior years—are: (1) mitigating climate change; (2) addressing exposure to PFAS; (3) protecting communities from coal ash contamination; (4) reducing air toxics in overburdened communities; (5) increasing compliance with drinking water standards; and (6) chemical accident risk reduction.[65]

---

[60] U.S. Envtl. Prot. Agency, *EPA Administrator Lee Zeldin Cancels 400+ Grants in 4th Round of Cuts with DOGE, Saving Americans More than $1.7B* (March 10, 2025), https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-cancels-400-grants-4th-round-cuts-doge-saving-americans.

[61] U.S. Envtl. Prot. Agency, *Search News Release*, https://www.epa.gov/newsreleases/search?f%5B0%5D=year%3A2025-03&page=3 (last visited May 27, 2025).

[62] U.S. Envtl. Prot. Agency, *Implementing National Enforcement and Compliance Initiatives Consistently with Executive Orders and Agency Priorities* (Mar. 12, 2025), https://www.epa.gov/system/files/documents/2025-03/necimemo-20250312.pdf.

[63] U.S. Envtl. Prot. Agency, *FY 2024–2027 National Enforcement and Compliance Initiatives* (Aug. 17, 2023), https://www.epa.gov/system/files/documents/2023-08/fy2024-27necis.pdf.

[64] *Id.*

[65] *Id.*

153.    While the March 12 Memo did not (yet) purport to eliminate the NECIs, it did state, ominously, that notwithstanding the robust and legally required public process used to produce them, "the focus of specific NECIs shall be adjusted to conform to the President's Executive Orders and the Administrator's Initiative."[66]

154.    The "Administrator's Initiative" refers to EPA Administrator Lee Zeldin's "Powering the Great American Comeback" initiative, which he announced on February 4, 2025. The initiative has five major pillars: (1) Clean Air, Land, and Water for Every American; (2) Restore American Energy Dominance; (3) Permitting Reform, Cooperative Federalism, and Cross-Agency Partnership; (4) Make the United States the Artificial Intelligence Capital of the World; and (5) Protecting and Bringing Back American Auto Jobs.[67]

155.    More generally, the March 12 Memo made clear that the EPA would conform to President Trump's wishes, regardless of the agency's congressional mandates.

156.    In a court filing on April 23, 2025, an EPA Deputy Assistant Administrator (Dan Coogan) revealed that EPA leadership had conducted a review of grants to determine "which should be terminated based on alignment with Administration priorities." He stated that "EPA began this process for the Administration in January 2025."[68]

157.    Although the EPA asserted that this was an "individualized, grant-by-grant review," it provided no substantiation that this occurred, and there is no reason to believe that it did. Instead, Mr. Coogan revealed that EPA was slated to terminate entire grant programs and spheres of activity that Congress had mandated in the Inflation Reduction Act. These included: (a) the Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program; (b) Surveys, Studies, Investigations, Training and Special Purpose Activities Relating to

---

[66] U.S. Envtl. Prot. Agency, *Implementing National Enforcement and Compliance Initiatives Consistently with Executive Orders and Agency Priorities* (Mar. 12, 2025), https://www.epa.gov/system/files/documents/2025-03/necimemo-20250312.pdf.

[67] U.S. Envtl. Prot. Agency, *ICYMI: Administrator Zeldin's "Powering the Great American Comeback" Unveiled at the EPA* (Feb. 4, 2025). https://www.epa.gov/newsreleases/icymi-administrator-zeldins-powering-great-american-comeback-unveiled-epa.

[68] U.S. Envtl. Prot. Agency, *EPA Court Filing* (Apr. 23, 2025), https://www.documentcloud.org/documents/25919517-epa-court-filing-april-23-2025/?mode=document at ¶ 3.

Environmental Justice; (c) the Environmental Justice Government-to-Government Program; (d) the Environmental Justice Small Grant Program; (e) Financial Assistance for Community Support Activities To Address Environmental Justice Issues; (f) the Environmental Justice Thriving Communities Grantmaking Program; (g) the Environmental and Climate Justice Block Grant Program; and (h) Reducing Embodied Greenhouse Gas Emissions for Construction Materials and Products.[69]

158.    Despite a district court's issuance of a preliminary injunction on April 15, 2025 preventing the EPA from indefinitely freezing grants previously awarded under Biden-era legislation,[70] Mr. Coogan stated that the EPA would maintain its grant terminations. He revealed that EPA had sent notices of termination to 377 grantees, and would send termination letters to an additional 404 grantees within two weeks.[71]

159.    On information and belief, EPA turned its attention to universities and other research grants on or around April 15, 2025. According to reports, Mr. Coogan on that date sent an email directing staff to cancel existing grants awarded to universities and research institutes.[72]

160.    Grant termination documents make plain that the agency is not conducting any proper review of grants, but rather, baselessly terminating grants to promote the President's agenda. Grants terminated because they supposedly do not "effectuate agency priorities" (which mirror the President's priorities) include those intended to, for example, provide clean drinking water in rural communities or provide air purifiers for children with asthma.[73]

---

[69] *Id*. at ¶ 6.

[70] National Council of Nonprofits, *Statement in Response to Preliminary Injunction Issued in Woonasquatucket River Watershed Council et al v. Department of Agriculture et al* (Apr. 15, 2025), https://www.councilofnonprofits.org/pressreleases/statement-response-preliminary-injunction-issued-woonasquatucket-river-watershed.

[71] *Id.* at ¶ 5.

[72] *See* Erik Stokstad, *EPA Orders Staff to Begin Canceling Research Grants*, Science (Apr. 21, 2025), https://www.science.org/content/article/epa-orders-staff-begin-canceling-research-grants; and Hiriko Tabuchi, *E.P.A. Set to Cancel Grants Aimed at Protecting Children from Toxic Chemicals,* The New York Times (Apr. 21, 2025), https://www.nytimes.com/2025/04/21/climate/epa-cuts-forever-chemicals-grants.html.

[73] Hayley Smith, *California Nonprofits Suffer After EPA Cancels Hundreds of Environmental Grants,* Los Angeles Times (May 8, 2025*)*, https://www.latimes.com/environment/story/2025-05-08/california-nonprofits-suffer-after-epa-cancels-hundreds-of-environmental-grants.

161.    Instead of providing researchers with reasoned explanations of termination decisions, the EPA is sending form termination letters. The letters are not personalized or even signed.

162.    One such letter, received by Plaintiff Thakur on April 28, 2025, reads as follows:

> **Subject:**  Termination of EPA Assistance Agreement [Grant No.] under 2 CFR 200.340
> **From:**    EPA Award Official
> **To:**      [Grant Recipient]
>
> This EPA Assistance Agreement is terminated in its entirety effective immediately on the grounds that the award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities.
>
> The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In addition to complying with the law, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.
>
> The grant specified above provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities.

163.    This pro-forma explanation citing vague "Agency priorities" does not constitute reasoned decision-making nor explain why the terminated grants no longer effectuate such priorities.

### 3.    EPA Plaintiffs and Other Grant Recipients Are Harmed by EPA's Illegal Grant Terminations

164.    Plaintiffs and Class members have long relied on EPA grants to fund meritorious projects aimed at protecting human health and the environment. The termination of

1    previously approved grants has caused and continues to cause Plaintiffs and Class members

2    serious harm.

3                                    a.    **Plaintiff Neeta Thakur's Grant Termination and Resulting**
                                          **Harm**

4

5                    165.    Dr. Neeta Thakur is a pulmonary and critical care specialist at the

6    University of California, San Francisco (UCSF) who examines the role of social and

7    environmental stressors on asthma and COPD in historically marginalized communities. She

8    currently serves as Medical Director of the Zuckerberg San Francisco General Hospital Chest

9    Clinic and is an associate professor of medicine and pulmonary and critical care clinician at

10   UCSF.

11                   166.    Dr. Thakur's research focuses on (1) defining obstructive lung disease

12   phenotypes that exist in racially and ethnically diverse communities and how these are shaped by

13   social and environmental stressors; (2) identifying community-specific drivers that place

14   individuals at high risk for poor outcomes; and (3) co-developing place-based and targeted

15   interventions aimed at social and environmental stressors to improve respiratory outcomes in

16   historically marginalized populations. In recognition of her research leadership, she was this year

17   (2025) made faculty director of Clinical Research Operations for the Clinical Trials Operations

18   Unit at UCSF's Clinical & Translational Science Institute.

19                   167.    Dr. Thakur's research has been supported by state grants, federal grants

20   from the National Institutes of Health (NIH), foundation grants, and other sources.

21                   Grant Application to EPA

22                   168.    In November 2021, Dr. Thakur submitted a grant application to EPA in

23   response to its announcement of funding opportunity EPA-G2021-STAR-H1. This opportunity,

24   made available through the agency's Science to Achieve Results (STAR) program, focused on

25   "Cumulative Health Impacts at the Intersection of Climate Change, Environmental Justice, and

26   Vulnerable Populations/Lifestages: Community-Based Research for Solutions."

27                   169.    The grant application, titled "Partnering for Resilient Opportunities To

28   Eliminate Toxic (PROTECT) Health Effects from Wildfire PM2.5 in Environmental Justice

Communities," addressed the potential to prevent adverse health effects to environmental justice communities from the fine particulate matter (PM2.5) from wildfire smoke.

170. The proposal aimed to (1) estimate the health effects of sub-daily exposure to wildfire-specific PM2.5 in California, with particular focus on effects within environmental justice communities; (2) understand community recovery from short-term health effects following exposure; (3) understand indoor infiltration of wildfire smoke and the mitigating effect of housing quality and behaviors on health effects; and (4) identify acceptable, community-relevant interventions to mitigate exposure. Dr. Thakur was the Principal Investigator on the grant proposal, which included nine investigators across three institutions: UCSF, UC Berkeley, and California's Office of Environmental Health Hazard Assessment.

171. The grant Application requested funding commensurate with the cumulative 3-year budget of $1,330,536 to support this multi-campus, multi-agency, multi-nonprofit research collaboration.

EPA's Grant Award

172. On November 22, 2022, an EPA Senior Grants Management Specialist, Jennifer Brooks, sent Dr. Thakur a Notice of EPA's award and the Grant Agreement. The Agreement authorized the proposal for Project Period 12/01/2022-11/30/2025; committed an initial grant of $690,000 (approximately half of project costs); and explained that EPA was "funding this agreement incrementally."

173. On June 21, 2023, Brooks sent Dr. Thakur a second Notice of EPA Award and an Assistance Amendment. The Amendment likewise indicated that the team was authorized to proceed for Project Period 12/01/2022-11/30/2025. It stated that EPA was awarding $640,536, bringing the total federal funding award to $1,330, 536.

EPA's Grant Termination

174. On April 28, 2025, EPA sent to the UC Regents an "Assistance Amendment" that instructed Thakur's team to "stop work; terminate the [grant] agreement; reduce performance period duration; [and] curtail scope of work." It stated that "(EPA) hereby

1  awards $0.00" towards any unfunded, as-yet-unincurred costs of the previously awarded

2  $1,330,536.

3        175.    The Assistance Amendment stated: "The Agency is asserting its right

4  under 2 C.F.R. 200.340 and the Termination General Term and Condition [sic] of this agreement

5  to unilaterally terminate this award." The Amendment was accompanied by a memorandum from

6  EPA to the Director of Contracts and Awards at UCSF titled "Termination of EPA Assistance

7  Agreement RD 84048101 under 2 CFR 200.340."

8        176.    The memo stated that EPA terminated Dr. Thakur's grant because "the

9  award no longer effectuates the program goals or agency priorities." It further asserted that the

10  grant "provides funding for programs that promote initiatives that conflict with the Agency's

11  policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are

12  not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests

13  of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities."

14        177.    This explanation does not explain why the grant would contradict agency

15  priorities when EPA Director Zeldin has announced new priorities under his "Powering the Great

16  American Comeback" initiative that align fully with the purpose of Dr. Thakur's grant. The first

17  stated EPA priority is "Clean Air, Land, and Water for Every American."[74] Dr. Thakur's grant

18  effectuates that purpose.

19        178.    As a result of this unilateral, unlawful grant termination, Dr. Thakur has

20  been unable to complete health analyses with UC Berkeley grantee-colleagues, or to identify

21  promising strategies to protect community health across California during wildfire smoke events.

22        179.    Instead, Dr. Thakur has had to spend significant time seeking alternate

23  funding sources. This includes unexpected grant writing, and reaching out to other funding

24  sources, including philanthropy groups. In addition, to support staff and avoid layoff of two

25  individuals, she has had to use her own discretionary funds to support team members.

26

27

28

[74] U.S. Envtl. Prot. Agency, *EPA Administrator Lee Zeldin Announces EPA's "Powering the Great American Comeback" Initiative* (Feb. 4, 2025), https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-announces-epas-powering-great-american-comeback.

180.    The UCSF and UC Berkeley researchers on this grant have also been unable to complete the proposed analyses of the health impacts of wildfire smoke events across California. This is after considerable work by UC Berkeley researchers to develop a map unprecedented in its detail, showing hourly levels of wildfire smoke by location. As a consequence of termination, at least three research publications will go unpublished that have the potential for high impact for public health and for science more generally.

181.    The premature termination of this grant has also compromised the trust-building necessary for community-engaged participatory action research. It has taken years of effort for Dr. Thakur to develop relationships with the community based organizations and community-engaged individuals who assisted Dr. Thakur in obtaining this grant (by writing letters in support), with the expectation that her project would deliver tangible benefits to their low income communities in the form of improved respiratory health. EPA's termination of this grant will make it more difficult for her and her collaborators to partner with organizations such as the Central California Asthma Collaborative in Fresno and the environmental justice nonprofit Brightline in San Francisco, as well as a specific community-trusted scientist in Richmond.

182.    Additionally, were Dr. Thakur and her team to eventually find replacement funding for this project (a difficult proposition given the sums at stake), they would no longer be adequate to cover personnel, equipment and outreach expenses.

183.    These personal and financial harms are ongoing.

184.    These harms are in addition to the loss of value to the public from Dr. Thakur's research team's inability to complete work on studying health risks from the fine particulate matter associated with wildfire, and inability to design health-protective interventions for three of California's most health-vulnerable communities.

           **b.**    **Plaintiff Ken Alex's Grant Termination and Resulting Harm**

185.    Since 2019, Ken Alex has served as Director of Project Climate at the Center for Law, Energy & the Environment (CLEE) at UC Berkeley School of Law. He founded Project Climate, a think tank designed to move promising environmental research into the policy realm quickly.

186.    Prior to joining CLEE, Alex worked for many years for Governor Jerry Brown on climate-related policy and, before that, for the California Attorney General's Office. His roles as climate policy expert and gubernatorial advisor on the topic were the subject of a 2020 profile in CalMatters.[75]

EPA Grant Application

187.    In 2022, EPA's Office of Research and Development sought applications proposing research on air emissions from municipal solid waste (MSW) landfills, which are a significant source of methane emissions—one of Alex's areas of expertise. The grant solicitation was part of EPA's Science to Achieve Results (STAR) program, and was conducted in collaboration with the Air, Climate, and Energy (ACE) research program.

188.    EPA's request for applications solicited proposals that addressed EPA-identified research priorities, including "cost effective stationary, mobile, aerial, and remote sensing" technologies and measurements that could accurately quantify methane emissions from landfills and evaluate strategies to mitigate them. EPA also sought proposals that encompassed landfill emissions of "hazardous air pollutants (HAPs), and other air pollutant emissions from municipal solid waste (MSW) landfills."[76]

189.    In collaboration with a UC Berkeley engineer with specialized expertise in landfill design and other researchers, Alex developed a detailed proposal for applying cutting edge technologies, including satellites and AI, to improve the detection of methane and HAP releases from landfills and to improve the quality of policy responses. The Grant Application was submitted to EPA on December 21, 2022. It proposed a cumulative budget of $999,999 (later rounded to $1,000,000).

Award of Grant Funding

190.    On October 19, 2023, EPA notified UC Berkeley that it was awarding the grant, and provided the first of two installments of grant funding.

---

[75] *See* Julie Cart, *Meet Ken Alex, Gov. Brown's Climate Concierge* (updated June 23, 2020), https://calmatters.org/environment/2018/10 /ken-alex-jerry-brown-climate-change-california/.
[76] *See* EPA Solicitation for PA-G2023-STAR-B1, *Understanding and Control of Municipal Solid Waste Landfill Air Emissions*, https://cfpub.epa.gov/ncer_abstracts/index.cfm/fuseaction/display.rfatext/rfa_id/701.

1          191.    On December 16, 2024, EPA notified UC Berkeley that it was awarding

2   the second and final installment of grant funding, bringing the total funding awarded to

3   $1,000,000.

4          192.    The EPA's web page, *Understanding and Control of Municipal Solid*

5   *Waste Landfill Air Emissions Grants* (https://www.epa.gov/research-grants/understanding-and-

6   control-municipal-solid-waste-landfill-air-emissions-grants) (accessed May 12, 2025) continues

7   to publicize the grant as one among five awarded.

8                    EPA's Grant Termination

9          193.    On April 29, 2025, EPA sent to the UC Regents an "Assistance

10  Amendment" that instructed Alex's research team to "stop work; terminate the [grant] agreement;

11  reduce performance period duration; [and] curtail scope of work." It stated that "(EPA) hereby

12  awards $0.00" towards any unfunded, as-yet-unincurred costs of the previously awarded

13  $1,000,000.

14         194.    The Assistance Amendment stated: "The Agency is asserting its right

15  under 2 C.F.R. 200.340 and the Termination General Term and Condition of this agreement to

16  unilaterally terminate this award." The Amendment was accompanied by a memorandum from

17  EPA titled "Termination of EPA Assistance Agreement RD 84062301 under 2 CFR 200.340."

18         195.    The memo stated that EPA terminated Alex's grant because "the award no

19  longer effectuates the program goals or agency priorities." The memo further asserted that the

20  grant "provides funding for programs that promote initiatives that conflict with the Agency's

21  policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are

22  not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests

23  of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities."

24         196.    The memo did not explain why Alex's grant no longer effectuates EPA

25  priorities, which currently include "Clean Air, Land, and Water for Every American."

26                    Harm from EPA's Grant Termination

27         197.    Alex and his project team have suffered immediate harm as a result of the

28  unlawful unilateral cancellation of the grant. Specifically, the team has been unable to continue

1    and complete the novel work related to evaluating HAPs and their relationship to methane

2    emissions from landfills. Furthermore, some of his researchers and graduate students have already

3    lost hours and compensation, and one or more will likely be let go.

4         198.    Even if Alex and his team were eventually to find replacement funding for

5    this project (a difficult proposition given the sum at stake), the delay and uncertainty would

6    preclude full recovery of the project.

7              c.    **Plaintiff Nell Green Nylen's Grant Terminations and Resulting**
                    **Harm**

8

9         199.    Dr. Nell Green Nylen joined the Wheeler Water Institute at the Center for

10   Law, Energy & the Environment (CLEE) at UC Berkeley School of Law as a Research Fellow in

11   2013. Since 2016, she has been a Senior Research Fellow at CLEE, providing analysis and

12   recommendations at the intersection of law, policy, and science to inform water governance and

13   management.

14        200.    Much of Dr. Green Nylen's work at CLEE has focused on improving

15   management of water resources across hydrologic extremes—from times of water scarcity to

16   times of abundance. This includes research on enhanced aquifer recharge ("EAR"), a tool for

17   capturing water to increase groundwater supply. Another area of her focus has been improving

18   the information and policy environment for implementing innovative water management

19   solutions, including water reuse.

20        201.    EPA unilaterally terminated two large grants Dr. Green Nylen was working

21   on that were meant to fund collaborative work with other researchers on issues at the core of her

22   technical and legal expertise.

23             EPA Enhanced Aquifer Recharge Grant Application and Funding

24        202.    In 2021, EPA's Office of Research and Development sought applications

25   proposing research to develop cost-benefit tools to support EAR. The grant solicitation was part

26   of EPA's Science to Achieve Results (STAR) program and solicited research proposals that

27   would "identify the key economic, technological, institutional, and legal factors that affect the

28   ability to implement" EAR projects; identify best practices and tools for implementing EAR

1    projects to achieve different purposes; and, ultimately, "improve life-cycle cost-benefits analysis

2    to support cost-effective enhanced aquifer recharge."

3          203.    Dr. Green Nylen was part of a UC Berkeley team that collaborated with a

4    broader multi-disciplinary team of researchers from UC Davis, UC Santa Cruz, and UC Law San

5    Francisco to develop a proposal that they submitted to EPA on January 13, 2022.

6          204.    The proposal—titled "A Knowledge-to-Implementation Framework for

7    Enhanced Aquifer Recharge"—described a three-year project with outputs including: (a)

8    developing guidance on evaluating EAR sites, determining what conditions are necessary to

9    effectively maintain an EAR project, and ensuring that EAR projects maintain aquifer water

10   quality; (b) developing guidance on navigating the legal, policy, and organizational contexts for

11   EAR; (c) developing recommendations for legal and policy changes that could facilitate EAR; (d)

12   developing a generalized framework for cost-benefit analysis of EAR projects; and (e) creating a

13   capstone "Lifecycle Map" report on EAR. In other words, the outputs would provide one-stop

14   shopping for people interested in planning, evaluating, and implementing EAR projects. The

15   Grant Application proposed a cumulative budget of $2,000,000 (later adjusted to $1,999,998).

16         205.    On July 20, 2022, EPA notified UC Berkeley that it was awarding the

17   grant. The award was publicized on EPA's web page, *Life-Cycle Analysis to Support Cost-

18   Effective Enhanced Aquifer Recharge Grant* (https://www.epa.gov/research-grants/life-cycle-

19   analysis-support-cost-effective-enhanced-aquifer-recharge-grant). The grant's original end date

20   was August 31, 2025. On April 10, 2025, Dr. Green Nylen's team requested a no-cost extension

21   of the grant for which they received verbal approval and were awaiting formal written approval.

22                    EPA's Termination of the Enhanced Aquifer Recharge Grant

23         206.    On May 7, 2025, EPA sent the UC Regents a document styled as an

24   "Assistance Amendment" that instructed Dr. Green Nylen's team to "stop work; terminate the

25   [grant] agreement; reduce performance period duration; [and] curtail scope of work." It also

26   stated that "(EPA) hereby awards $0.00" towards any as-yet-unincurred costs. Through the

27   Assistance Amendment, EPA was purportedly "asserting its right under 2 CFR 200.340 and the

28   Termination General Term and Condition of this agreement to unilaterally terminate this award."

207.    The Amendment was accompanied by a memorandum from EPA to the Contracts and Grants Officer for the Regents of the University of California titled "Termination of EPA Assistance Agreement RD- 84046301-1 under 2 CFR 200.340." The memo stated that EPA terminated Dr. Green Nylen's grant because, according to the memo, "the award no longer effectuates the program goals or agency priorities." The memo further asserted that the grant "provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities."

208.    The memo did not explain why EPA had concluded that Dr. Green Nylen's award is "no longer consistent with EPA funding priorities," which are defined partly by governing statutes, and federal statutes specifically identify EAR research as an EPA funding priority and mandate. *See* 33 U.S.C § 1276. It also did not explain why the project was inconsistent with the EPA's priority pillars, which include ensuring that "[e]very American [has] access to clean air, land, and water" and prioritizing permitting reform.[77] The core purpose of the team's research is promoting access to clean water.

EPA Water Reuse Grant Application and Funding

209.    In 2021, EPA's Office of Research and Development sought applications proposing research designed to "accelerate water innovation, information availability, and engagement to advance clean and safe water reuse goals, promote better understanding of the Nation's water and wastewater treatment and infrastructure, and enhance the availability and efficient use of water resources through water reuse."

210.    In response to the solicitation, the Director of the Wheeler Water Institute at CLEE and Dr. Green Nylen collaborated with a multi-disciplinary team of researchers from Iowa State University and the University of Rhode Island to develop a research proposal aimed at accelerating readiness for water reuse in small water systems across the nation.

---

[77] *See Administrator Lee Zeldin Announces EPA's "Powering the Great American Comeback" Initiative*, EPA (Feb. 4, 2025), https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-announces-epas-powering-great-american-comeback.

211.    The lead Principal Investigator at Iowa State University submitted the grant proposal—titled "Accelerating Technical and Community Readiness for Water Reuse in Small Systems"—to EPA on September 29, 2021. It described a four-year project that would (a) develop methods to inventory sources of water for beneficial reuse across the nation; (b) produce guidance on water source / treatment technology / end-use combinations that may be appropriate for small communities; (c) support cost-benefit analysis of different water reuse options in small communities; (d) survey small communities to assess public attitudes towards different water reuse options; (e) produce guidance on opportunities for fostering institutional innovation to overcome barriers to water reuse in small communities; and (f) construct implementation roadmaps centered around windows of opportunity for water reuse for several case-study communities.

212.    The Grant Application proposed a total budget of $4,057,500, combining a request for $3,246,000 of federal funds with a commitment from the research team to provide an $811,500 cost share from other sources. The budget included (a) personnel and personnel travel costs; (b) participant support costs; (c) laboratory supplies and laboratory user fees; (d) support for consultants; (e) tuition remission for graduate students; and (f) indirect costs. This included a subaward of $559,941 to UC Berkeley.

213.    On August 8, 2022, EPA notified Iowa State University that it was awarding the grant, and Iowa State University notified the subrecipients, including UC Berkeley. The award was publicized on EPA's web page, *National Priorities: Water Innovation, Science and Engagement to Advance Water Reuse Grants* (https://www.epa.gov/research-grants/national-priorities-water-innovation-science-and-engagement-advance-water-reuse-1).

EPA's Termination of the Water Reuse Grant

214.    On May 12, 2025, EPA sent to Iowa State University a document styled as an "Assistance Amendment" that instructed Dr. Green Nylen's team to "stop work; terminate the [grant] agreement; reduce performance period duration; [and] curtail scope of work." It also stated that "(EPA) hereby awards $0.00" towards any as-yet-unincurred costs. Through the Assistance Amendment, the EPA was purportedly "asserting its right under 2 CFR 200.340 and

1    the Termination General Term and Condition of this agreement to unilaterally terminate this

2    award."

3            215.    The Amendment was accompanied by a memorandum from EPA to the

4    Pre-Award Administrator at Iowa State University titled "Termination of EPA Assistance

5    Agreement CR- 84046101 under 2 CFR 200.340." The memo stated that EPA terminated Dr.

6    Green Nylen's grant because, according to the memo, "the award no longer effectuates the

7    program goals or agency priorities." The memo further asserted that the grant "provides funding

8    for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit,

9    fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse,

10    waste, or duplication; or that otherwise fail to serve the best interests of the United States. The

11    grant is inconsistent with, and no longer effectuates, Agency priorities." The reasons provided for

12    termination of the EPA Water Reuse Grant and the EPA Enhanced Aquifer Recharge Grant were

13    identical.

14            216.    As with the EPA Enhanced Aquifer Recharge Grant, the termination memo

15    for the EPA Water Reuse Grant did not explain how EPA concluded that the award is "no longer

16    consistent with EPA funding priorities," even though EPA states that addressing the wastewater

17    challenges of small, rural communities remains one of its ongoing priorities.[78]

18            Harm from the Grant Terminations

19            217.    Dr. Green Nylen, and the larger project teams for both grant projects, have

20    suffered immediate harm as a result of the cancellation of these grants.

21            218.    For the Enhanced Aquifer Recharge Grant, the harms include: an inability

22    to proceed with the basic work of refining the team's analysis and distilling that information for

23    the capstone Lifecycle Map report and the team's inability to work together to complete the

24    capstone report and the accompanying cost-benefit analysis decision support tool.

25

26

---

27    [78] *See EPA Announces $49 Million in Technical Assistance to Help Rural, Small, and Tribal
      Communities Address Wastewater Challenges* (Apr. 29, 2025),

28    https://www.epa.gov/newsreleases/epa-announces-49-million-technical-assistance-help-rural-
      small-and-tribal-0.

219.    For the Water Reuse Grant, the harms include an inability to proceed with the basic work of the project. For example, the team has been unable to continue their interview-based research. Further, if the funding is not reinstated, the work that has already gone into the project will go to waste.

220.    For both grants, even if replacement funding is secured, the delay will preclude full recovery of the project. The current teams are unlikely to be able to stay together over a prolonged period. Further, time spent searching for replacement funding has considerable opportunity and financial costs (as well as societal costs), as that time would otherwise be allocated to work on other water-related research projects that confer public benefit.

221.    In addition, at CLEE, the jobs of every member of the water team are currently threatened by these grant terminations. CLEE is a self-funded entity at UC Berkeley that does not receive general salary support from the University. Without grant and contract funding, the team members will not get paid their full salary and could lose their jobs. Absent the reinstatement of these grants, members of the team could likely be let go in the coming months.

### B.    National Endowment for the Humanities

222.    The National Endowment for the Humanities ("NEH") is an independent federal agency established to support the advancement of the humanities across the United States.

#### 1.    Congress Established NEH to Fund Projects to Support Humanities Research, Training, and Education

223.    Congress created NEH in 1965, as part of the National Foundation on the Arts and Humanities Act of 1965 ("NFAHA"). Pub. L 89-209, 79 Stat. 845 (Sept. 29, 1965) (codified at 20 U.S.C. §§ 951-60).

224.    The legislation was the result of years of advocacy to ensure that arts and humanities were not left behind as the nation focused on scientific progress. As laid out in the enabling statute, a "high civilization must not limit its efforts to science and technology alone but must give full value and support to the other great branches of man's scholarly and cultural activity." P.L. 89-209, sec. 2(2). Congress further explained that it was necessary and appropriate

1    for the federal government to create and sustain a "climate encouraging freedom of thought,

2    imagination, and inquiry." *Id.* at (4).

3            225.    In the sixty years since NFAHA's passage, Congress has repeatedly

4    reaffirmed its commitment to these goals. Last updated in 1990, the enabling statute makes clear

5    that the "humanities belong to all people of the United States," 20 U.S.C. § 951(1), and that

6    "[d]emocracy demands wisdom and vision in its citizens. It must therefore foster and support a

7    form of education, and access to the arts and the humanities, designed to make people of all

8    backgrounds and wherever located masters of their technology and not its unthinking servants."

9    *Id.* at § 951(4).

10           226.    In other words, congressional intent was to ensure that what is now

11   sometimes short-handed as "DEI," and branded by Defendants as illegal and undesirable, was

12   Congress's actual mandate, unchanged for 60 years, until upended on Inauguration Day.

13           227.    Congress determined it is "necessary and appropriate for the Federal

14   Government to complement, assist, and add to programs for the advancement of the humanities

15   and the arts by local, State, regional, and private agencies and their organizations." 20 U.S.C.

16   § 951(5). Congress created NEH and its sister agency the National Endowment for the Arts

17   ("NEA") so Americans could understand "the diversity of excellence that comprises our cultural

18   heritage." *Id.* at 951(9).

19           228.    Accordingly, Congress established NEH to provide funding for individuals

20   involved in research, publication of scholarly works, and promotion of the humanities. *See* 20

21   U.S.C. § 956. Under the statute, the Chairperson of the NEH is "authorized to enter into

22   arrangements, including contracts, grants, loans, and other forms of assistance" to effectuate these

23   goals. *Id.*

24           229.    Congress's directives for NEH specifically require it to support diverse and

25   underrepresented viewpoints.

26           230.    For example, one statutory function of NEH is to authorize grants to

27   "initiate and support programs and research which have substantial scholarly and cultural

28

significance and that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community." 20 U.S.C. § 956(c)(4).

231.    Likewise, in selecting recipients of funding, NEH's Chairperson "shall give particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented." 20 U.S.C. § 956(c).

232.    Congress's commitment to funding humanities initiatives that mirror the breadth and diversity of American culture is clear in the structure of the grant-making process. Under the statute, the Chairperson of the NEH determines funding "with the advice of the National Council on the Humanities." 20 U.S.C. § 956(c).

233.    The Council is comprised of twenty-six members appointed by the President, "selected from among private citizens of the United States who are recognized for their broad knowledge of, expertise in, or commitment to the humanities," and who will "provide a comprehensive representation of the view of scholars and professional practitioners in the humanities and of the public throughout the United States." 20 U.S.C. § 957(b). In making appointments, the "President shall give due regard to equitable representation of women, minorities, and individuals with disabilities who are involved in the humanities." *Id.*

234.    NEH's Chairperson "shall not approve or disapprove any such application [for funding] until the Chairperson has received the recommendation of the Council." *Id.* at § 957(f).

235.    NEH's other statutory functions include providing funding to:

a.    develop and encourage the pursuit of a national policy for the promotion of progress and scholarship in the humanities;

b.    initiate and support research and programs to strengthen the research and teaching potential of the United States in the humanities by making arrangements with individuals or groups to support such activities;

c.    initiate and support training and workshops in the humanities by making arrangements with institutions or individuals;

d.    foster international programs and exchanges;

1                 e.      foster the interchange of information in the humanities;

2                 f.      foster, with groups, education in, and public understanding and

3 appreciation of the humanities;

4                   g.     support the publication of scholarly works in the humanities;

5                 h.     ensure that the benefit of its programs will also be available to our

6 citizens where such programs would otherwise be unavailable due to geographic or economic

7 reasons; and

8                   i.      foster programs and projects that provide access to, and preserve

9 materials important to research, education, and public understanding of, the humanities.

10 20 U.S.C. § 956.

11        236.    For sixty years, NEH has carried out its duty to fund research, training, and

12 education that advance the humanities. Since 1965, NEH has awarded over $6 billion to support

13 "museums, historic sites, universities, teachers, libraries, documentary filmmakers, public TV and

14 radio stations, research institutions, scholars, and local humanities programming."[79] Indeed, NEH

15 is the largest federal funder of the humanities, and (at least until recently) offered 47 grant

16 programs that support humanities work around the country.[80]

17        237.    Since its inception, NEH funding has contributed to over 70,000 projects in

18 all 50 states and jurisdictions; over 9,000 books (including 20 Pulitzer Prize winners); and over

19 500 film and radio programs (including six Oscar nominees, 30 Peabody award winners, and 27

20 Emmy award winners).[81] NEH funding has also supported collecting the papers of twelve United

21 States presidents and of several other notable American figures including Mark Twain, Thomas

22 Edison, Martin Luther King Jr., and Ernest Hemingway.[82]

23        238.    NEH has long had a strong relationship with the UC system. In 1974, for

24 example, NEH supported UC Berkeley as it launched what would become the National Writing

---

[79] Nat'l Endowment for the Humanities, https://www.neh.gov/, (last visited May 27, 2025).
[80] Nat'l Endowment for the Humanities, *Grants,* https://www.neh.gov/grants (last visited May 27, 2025).
[81] Nat'l Endowment for the Humanities, NEH Funding by the Numbers (description of data on homepage), https://www.neh.gov/ (last visited May 27, 2025).
[82] *Id.*

Project, which trains teachers to help youth nationwide learn how to do research, form arguments, and write publicly on topics they care about.[83] And in 2011, NEH and China's Ministry of Culture hosted a "Bi-national Conversation on Bridging Cultures" at UC Berkeley, bringing together artists, writers, historians, and political theorists of both countries.[84]

239.    As designed by statute, NEH funding supports a broad array of projects, including preserving endangered languages, digitizing early newspapers, depicting the history of the civil rights struggle through film, and detailing what life was like for early American colonists.[85]

240.    Prior to January 20, 2025, NEH funding recipients were selected after a rigorous review process. Every year, NEH recruits over 1,000 experts from every state and organizes them into 200 review panels that evaluate roughly 5,700 grant applications. The panels are selected for their expertise in disciplines relevant to the grant programs.[86] The panels are announced in the Federal Register, and panelists' names are listed in NEH's annual reports.

241.    This exacting review proceeded as follows: After a grant application was submitted, it was assigned to a specific peer-review panel based on academic discipline, institutional type, project area, or project type. The evaluators on the panel read all assigned applications and assigned them a rating based on "NEH's published review criteria and program guidelines." These criteria "emphasize humanities significance, the applicant's abilities and qualifications, the proposal's clarity of expression, and the project's feasibility, design, cost, and work plan."[87] After each evaluator assessed the application, the panel would meet to discuss the applications.

242.    Next, NEH staff reviewed the panels' work and recommended the most meritorious applications to the National Council (described above). The Council meets three

---

[83] Nat'l Writing Project, https://www.nwp.org/ (last visited May 29, 2025).
[84] Nat'l Endowment for the Humanities, *NEH Timeline,* https://www.neh.gov/about/history/timeline (last visited May 27, 2025).
[85] *See, e.g.*, Nat'l Endowment for the Humanities, *NEH Essentials*, https://www.neh.gov/essentials (last visited May 27, 2025).
[86] Nat'l Endowment for the Humanities, *NEH's Application Review Process*, https://www.neh.gov/grants/application-process (last visited June 2, 2025).
[87] *Id.*

times a year to discuss the applications and finalize recommendations to the Chairperson.[88] The Chairperson made the final funding decisions, taking into account the advice provided throughout the review process.[89]

243.    Each year, NEH typically makes about 900 grants, ranging from approximately $1,000 to $750,000 each. Across all grant programs, only about sixteen percent of applications receive funding.[90] The projects selected for funding by NEH thus represent the best of the best.

244.    Congress has repeatedly affirmed its support for NEH's mission, appropriating funds for grant-making every fiscal year.

245.    In the 2024 Appropriations Act, for example, Congress appropriated $207,000,000 to NEH, with $192,000,000 specifically designated for grants, loans, contracts, and other assistance to further the purposes set forth under 20 U.S.C. § 956(c), and $15,000,000 designated to carry out NEH's "matching grants" program. Pub. L. 118-42, 138 Stat. 25, 281-82 (Mar. 9, 2024).

246.    On March 15, 2025, notwithstanding the Executive Orders or DOGE's mandates, Congress enacted a Continuing Appropriations and Extensions Act, which re-appropriated all of the funds appropriated to NEH under the 2024 Act. Pub. L. 119-4, §§ 1101-08, 139 Stat. 9, 10-12 (Mar. 15, 2025). NEH thus received another roughly $200 million to spend on grants. NEH announced $22.6 million in grants for 219 humanities projects across the country on January 14, 2025.[91]

**2.    In Response to Trump Administration Directives, NEH Improperly Changed Priorities and Canceled Existing Grants**

247.    Around the very same time Congress was re-appropriating grant-making funds to NEH, as noted above, the agency came under fire from the Trump Administration.

[88] *Id*.
[89] *Id*
[90] *Id*
[91] Nat'l Endowment for the Humanities, *NEH Announces $22.6 Million for 219 Humanities Projects Nationwide*, https://www.neh.gov/news/neh-announces-grant-awards-jan-2025 (last visited May 27, 2025)..

1      248.    On March 13, 2025, NEH Chair Shelly Low was directed by the White

2  House to resign. Shortly thereafter, DOGE agents began visiting NEH. DOGE actors

3  recommended dramatically cutting NEH staff and cancelling grants made under the Biden

4  administration that had not been fully paid out.[92] According to reports, Acting NEH Chair

5  Michael McDonald told staff that DOGE wanted to claw back $175 million in undispersed grant

6  money.[93]

7      249.    On March 20, 2025, NEH posted a webpage titled "NEH Implementation

8  of Recent Executive Orders." The page stated that NEH was updating the Funding Restrictions

9  section of its Notices of Funding Opportunities ("NOFOs") in order "to comply with several

10 recent Executive Orders, including 'Ending Radical and Wasteful Government DEI Programs and

11 Preferencing,' 'Defending Women from Gender Ideology Extremism and Restoring Biological

12 Truth to the Federal Government,' and 'Ending Radical Indoctrination in K-12 Schooling.'"[94]

13     250.    The page provided "Frequently Asked Questions," including, for example,

14 Q: "Does the addition of the new guidance on gender ideology … mean that NEH will not fund

15 projects on … the suffragist movement?" A: "No, not necessarily. The restrictions only apply to

16 the categories mentioned in the relevant Executive Orders. We encourage you to read the relevant

17 Executive Orders and consider whether your project's topic – joining with its goals, methodology,

18 activities, and intended audience – seems allowable."

19     251.    The page only discussed the implication of the Executive Orders on grant

20 applications, not terminations of existing grants.

21     252.    Nonetheless, on or around April 2, 2025, recipients of NEH grant funding

22 began receiving emails informing them that their grants had been terminated. Peculiarly, these

23 emails did not come from an NEH server or government email address, but rather, from

24

---

25 [92] Jennifer Schuessler, *DOGE Demands Deep Cuts at Humanities Endowment*, N.Y. Times (Apr.
26 1, 2025), https://www.nytimes.com/2025/04/01/arts/trump-doge-federal-cuts-humanities.html.
   [93] Elizabeth Blair, *Cultural groups across U.S. told that federal humanities grants are terminated*,
27 NPR (Apr. 3, 2025), https://www.npr.org/2025/04/03/nx-s1-5350994/neh-grants-cut-humanities-
   doge-trump.
28 [94] Nat'l Endowment for the Humanities, *Implementation of Recent Executive Orders* (Mar. 20,
   2025), https://www.neh.gov/executive-orders.

1    "Grant_Notifications@nehemail.onmicrosoft.com."[95] The terminations were not made through

2    NEH's grants management system.

3            253.    The emails attached a form termination letter. On information and belief,

4    the termination letters sent to all grantees on April 2 and thereafter were nearly identical and

5    lacked any individualized analysis or discussion of any terminated grant.

6            254.    The termination letters received by Plaintiffs and Class members contained

7    the following "explanation" for the terminations:

8            Your grant no longer effectuates the agency's needs and priorities
             and conditions of the Grant Agreement and is subject to termination
9            due to several reasonable causes, as outlined in *2CFR§200.340*. NEH
             has reasonable cause to terminate your grant in light of the fact that
10           the NEH is repurposing its funding allocations in a new direction in
             furtherance of the President's agenda. The President's February 19,
11           2025 executive order mandates that the NEH eliminate all non-
             statutorily required activities and functions. *See Commencing the*
12           *Reduction of the Federal Bureaucracy*, E.O. 14217 (Feb. 19, 2025).
             Your grant's immediate termination is necessary to safeguard the
13           interests of the federal government, including its fiscal priorities. The
             termination of your grant represents an urgent priority for the
14           administration, and due to exceptional circumstances, adherence to
             the traditional notification process is not possible. Therefore, the
15           NEH hereby terminates your grant in its entirety effective April 1,
             2025.
16
             255.    Although the termination letter to NEH grantees states that Executive
17
     Order 14217 "mandates that the NEH eliminate all non-statutorily required activities and
18
     functions," that Order in fact makes no mention of NEH (despite mentioning other agencies).[96]
19
             256.    The termination letters make no effort to explain how or why the relevant
20
     grant fails to "effectuate[] the agency's needs and priorities" or otherwise warrant termination.
21
     Nor did they address NEH's prior assessment—through its comprehensive panel and Council
22

23   _____

24   [95] Adding yet another layer of irregularity, the "onmicrosoft.com" domain is notoriously used by
     cybercriminals and other malicious actors to carry out phishing attacks. *See, e.g.*, Smedh Arun
     Patil, Cloud That, *Proactive Strategies Against ".onmicrosoft.com" Phishing Attacks* (Dec. 13,
25   2023), https://www.cloudthat.com/resources/blog/proactive-strategies-against-onmicrosoft-com-
     phishing-attacks
26   [96] *See* Exec. Order No. 14217, *Commencing the Reduction of the Federal Bureaucracy*, 90 Fed.
     Reg. 10577 (Feb. 25, 2025), https://www.federalregister.gov/documents/2025/02/25/2025-
27   03133/commencing-the-reduction-of-the-federal-bureaucracy. President Trump also issued Exec.
     Order 14238, *Continuing the Reduction of the Federal Bureaucracy*, on March 14, 2025,
28   https://www.federalregister.gov/documents/2025/03/20/2025-04868/continuing-the-reduction-of-
     the-federal-bureaucracy. This Order also made no mention of NEH.

1    review process—that these projects *do* effectuate agency priorities and are aligned with the

2    statutory mandate and goals of NEH.

3            257.    The termination letters likewise fail to explain what "exceptional

4    circumstances" preclude adherence to ordinary notification procedures.

5            258.    Additionally, the termination letters included no reference to any method

6    for appeal or to seek reconsideration, even though NEH's General Terms and Conditions require

7    that grantees have a right to appeal a termination.[97]

8            259.    On April 24, 2025—three weeks *after* NEH began terminating existing

9    grants—the agency issued a press release titled: "An Update on NEH Funding Priorities and the

10   Agency's Recent Implementation of Trump Administration Executive Orders."[98]

11           260.    The press release stated that NEH had, in recent weeks, "taken several

12   internal operational steps to improve efficiency, eliminate offices that are not essential to

13   fulfilling its statutory requirements, and to return to being a responsible steward of taxpayer

14   funds."[99] It further stated that NEH had also taken steps to "ensure that all future awards will,

15   among other things, be merit-based, awarded to projects that do not promote extreme ideologies

16   based upon race or gender, and that help to instill an understanding of the founding principles and

17   ideals that make America an exceptional country."

18           261.    As part of the press release, NEH issued a new "Statement on NEH

19   Priorities" and "Frequently Asked Questions."[100]

20   _____

21   [97] *See* Nat'l Endowment for the Humanities, *General Terms and Conditions for Awards to Organizations (for grants and cooperative agreements issued between January 1, 2022, and September 30, 2024* (Mar. 15, 2025), https://www.neh.gov/general-terms-and-conditions-awards-

22   organizations-grants-and-cooperative-agreements-issued-january-2022#_Toc92721724, section 13 (terms for grants issued January 1, 2022 to September 30, 2024) and Nat'l Endowment for the

23   Humanities, *General Terms and Conditions for Awards to Organizations (for grants and cooperative agreements issued October 1, 2024, or later)* (Mar. 13, 2025),

24   https://www.neh.gov/general-terms-and-conditions-grants-after-oct-2024, section XIII (terms for grants issued October 1, 2024 or later).

25   [98] Nat'l Endowment for the Humanities, *An Update on NEH Funding Priorities and the Agency's Recent Implementation of Trump Administration Executive Orders*,

26   https://www.neh.gov/news/update-neh-funding-priorities-and-agencys-recent-implementation-trump-administration-executive (last visited May 27, 2025).

27   [99] *Id.*

28   [100] Nat'l Endowment for the Humanities, *Updates on NEH Priorities* (Apr. 24, 2025), https://www.neh.gov/updates-neh-priorities.

262.    The "Statement on NEH Priorities" reads as follows:

Founded in 1965, the National Endowment for the Humanities (NEH) is a grant-making agency of the U.S. government dedicated to supporting exemplary humanities research and programming in service of the American people. It does so by investing in the most meritorious proposals for the advancement and dissemination of humanities learning.

As set forth in NEH's enabling legislation, the humanities include the study of modern and classical languages, linguistics, literature, history, jurisprudence, philosophy, archaeology, comparative religion, ethics, the history of the arts, and those aspects of the social sciences which have humanistic content and use humanistic methods, as well as other areas.

To bring the wisdom of the humanities to all Americans, NEH supports research projects that advance humanistic learning, preservation projects that ensure access to significant humanities resources, education projects that strengthen teaching in the humanities, and public programing that conveys the best of the humanities to all Americans.

Moving forward, NEH is especially interested in projects on the nation's semiquincentennial and U.S. history more generally. In addition, the agency will be more finely attuned to its statutory responsibility that "funding should contribute to public support and confidence in the use of taxpayer funds."

As per longstanding agency policy, NEH-supported projects must not promote a particular political, religious, or ideological point of view and must not engage in political or social advocacy. NEH-supported projects should not preference some groups at the expense of others and should ultimately support public purposes.

The principles of intellectual significance, merit, competition, and equal opportunity lie at the heart of NEH's mission.

263.    Two of the posted "Frequently Asked Questions" addressed the terminated grants:

Q:    Why is NEH cancelling awards?

A:    All federal grantmaking agencies, including NEH, must ensure that taxpayer dollars are spent effectively and are consistent with each agency's mission. This requires that NEH regularly evaluate its funding priorities within the policy framework established by Congress, the Administration, and the head of NEH. Awards and programming must align with these priorities.

Q:    What types of awards are being cancelled?

A:    In collaboration with the Administration, NEH has cancelled

awards that are at variance with agency priorities, including but not limited to those on diversity, equity, and inclusion (or DEI) and environmental justice, as well as awards that may not inspire public confidence in the use of taxpayer funds.

264.    This post-hoc explanation does not constitute reasoned decision-making, nor could it provide appropriate notice to grant recipients that their grants would be terminated, or constitute sufficient rationale therefor.

265.    NEH's new "priorities" also directly contradict its statutory mandate to make grants that "reflect the diversity and richness of our American cultural heritage" and "give particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented." 20 U.S.C. § 956(c).

266.    As it explains in its new statements, NEH has dramatically narrowed its definition of agency "priorities" based on Defendant Trump's Executive Orders or otherwise in "collaboration with the Administration."

267.    In so doing, NEH improperly ignores the statutory priorities Congress set out in 20 U.S.C. § 956, which Congress reaffirmed by allocating additional grant-making funds to NEH in March 2025.

**3.    NEH Plaintiffs And Other Grant Recipients Are Harmed by NEH's Illegal Grant Terminations**

268.    Plaintiffs and Class members have long relied on NEH grants to fund meritorious projects in the humanities. The termination of nearly all previously awarded grants has caused and continues to cause Plaintiffs and class members serious harm.

**a.    Plaintiff Robert Hirst's Grant Termination and Resulting Harm**

269.    Plaintiff Robert Hirst is the curator of the Mark Twain Papers and general editor of the Mark Twain Project at the Bancroft Library at the University of California, Berkeley. He has served in this role since 1980.

270.    The Mark Twain Papers contain the voluminous private papers of Samuel Langhorne Clemens, known to all Americans by his pen name, "Mark Twain." He has long been considered one of the most important writers of the 19th Century. His papers were bequeathed to

the University of California in 1962; hundreds of original documents have since been added to that core collection. The collection makes it possible to read, in a single location, virtually every surviving document in Mark Twain's hand.

271.    The Mark Twain Project, a major editorial and publishing program of the Bancroft Library, is housed within the Mark Twain Papers archive. The aim of this Project is to create, maintain, correct, and update a permanent, globally accessible resource for the life and writings of Mark Twain. The Project hosts over 200 in-person and online visits to the Papers each year. In addition, the editors routinely go out to speak about the collection and the edition to students and to a variety of other interested groups. In order to maintain this collection and conduct ongoing research, the Mark Twain Papers and Project employ five full-time editors.

272.    Since 2001, the Mark Twain Project has focused much of its effort on the Mark Twain Project Online (the "Online Project"), which is intended to make available all of the Project's edited texts. Its original online website platform has become obsolete and work is underway to migrate the website and database to a modern, technologically supportable platform.

273.    In his recently published biography of Mark Twain, writer Ron Chernow—a Pulitzer Prize-winning biographer—wrote: "Perhaps no other American author can boast such a richly documented record. . . . With its learned editions and digitized website, the Mark Twain Papers ranks as one of the foremost scholarly achievements of our era."

274.    NEH has awarded more than $11,000,000 to support the editorial work of the Mark Twain Project, without interruption, since 1967, and has also made a generous challenge grant for the renovation of the Online Project.

275.    On the occasion of the NEH's 50th birthday in 2015, the agency honored the Mark Twain Papers and Project as one among fifty nationwide across five decades that "'have shaped what we think and what we know about ourselves and our culture' since 1965."[101]

Application (RQ-300297) for Grant Funding

---

[101] Sharon Goetz, *Mark Twain Papers and Project Honored by NEH*, UC Berkeley Library UPDATE (Oct. 9, 2015), https://update.lib.berkeley.edu/2015/10/09/mark-twain-papers-and-project-honored-by-neh/.

276.    On November 29, 2023, the Mark Twain Project, through the Regents of the University of California, submitted to the NEH an Application for Federal Domestic Assistance—application RQ-300297, titled "Mark Twain Project." Dr. Hirst's Grant Application sought to draw the Mark Twain Project nearer to its goal of making all of Twain's works available to the public for free through the Online Project.

277.    The Grant Application proposed a cumulative budget of $900,000, including $450,000 in NEH funds. This budget would fund roughly half the salaries for three editors and a digital publications manager for three years. The other half of the staff salaries would need to be paid by private funds raised by Dr. Hirst.

Award of Grant (RQ-300297) Funding

278.    On August 28, 2024, UC Berkeley received a letter from the chair of the NEH, approving the Mark Twain Project's application RQ-300297 to receive an offer for funding ("Offer Letter").

279.    The Offer Letter provided UC Berkeley up to $450,000 in federal matching funds if Dr. Hirst raised an equal amount of eligible non-federal, third-party gifts, and certified their availability, and if NEH had available to it sufficient funds allocated for matching purposes. The Offer Letter provided: "If you wish to accept this offer of support, your response to the above condition(s) and the Gift Certification Form must be submitted via eGMS Reach, NEH's online electronic grant management system no later than June 30, 2027."

280.    On October 31, 2024, the university's Sponsored Projects Office ("SPO") accepted the NEH offer and sent in the required certification, signed by Dr. Hirst.

Termination of Grant (RQ-300297) Funding

281.    On April 2, 2025, UC Berkeley received an email from the address "Grant_Notifications@nehemail.onmicrosoft.com," purporting to be from Michael McDonald, Acting Chairman for the National Endowment for the Humanities (the "Termination Email"). This is not an e-mail domain that NEH has ever used to communicate with Dr. Hirst or the university regarding the Mark Twain Project.

282. Attached to the Termination Email was a letter from Michael McDonald, Acting Chairman for the National Endowment for the Humanities, cancelling the Mark Twain Project's grant, Award No. RQ-300297-25, in its entirety effective April 1, 2025 (the "Termination Letter").

283. The Termination Letter reads in relevant part:

> Your grant no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement and is subject to termination due to several reasonable causes, as outlined in *2CFR200.340*. NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda. The President's February 19, 2024 executive order mandates that the NEH eliminate all non-statutorily required activities and functions. *See Commencing the Reduction of the Federal Bureaucracy*, E.O. 14217 (Feb. 19, 2025). Your grant's immediate termination is necessary to safeguard the interests of the federal government, including its fiscal priorities. The termination of your grant represents an urgent priority for the administration, and due to exceptional circumstances, adherence to the traditional notification process is not possible. Therefore, the NEH hereby terminates your grant in its entirety effective April 1, 2025.

284. Dr. Hirst then searched for the Mark Twain Project's grant on eGMS Reach, NEH's online electronic grant management system. He could find no record of the grant or his many communications about it on eGMS Reach: It had apparently been deleted entirely from the system. Agency erasure of grant records was unprecedented in Dr. Hirst's multi-decade relationship with NEH.

285. Dr. Hirst spoke with his longtime NEH program officer, Jason Boffetti, who told him that DOGE had required NEH to lay off most of its staff if the agency wanted to continue to operate.

Harm Suffered from Termination of Grant (RQ-300297)

286. Dr. Hirst, the Mark Twain Papers and Project, and project staff, have suffered immediate harm as a result of the cancellation of their NEH grant, which will continue into the future.

287. In lieu of conducting his editorial work, Dr. Hirst will have to refocus his time on fundraising to replace the cancelled grant funding ($450,000).

288.    The financial uncertainty created by this grant cancellation significantly threatens his ability to retain the highly trained and experienced staff working on the Mark Twain Project. These individuals are among the world's experts on Mark Twain, and their knowledge of the collection is irreplaceable.

289.    The cancellation threatens the migration of the collection to new platforms as the existing ones have become obsolete. Because the online platform allows scholars and students from all over the world to access these original documents, any interruption or delay in this work is very harmful to the Project and to the many who regularly access or will want to access these materials in the future.

290.    In addition, Dr. Hirst and his staff will have less ability to go out to schools and universities to share the incomparable work of Mark Twain.

291.    The termination of Plaintiff Hirst's grant is especially ironic given then NEH continues to promote the collection of Mark Twain's papers as a significant achievement on its website's homepage.[102] Moreover, Mark Twain is included in the list of individuals in Executive Order 13987, "Building the National Garden of American Heroes," which seeks to create a statue garden of such heroes, and which NEH now says it will provide grant funding to support.[103]

        **b.**      <u>**Plaintiff Christine Philliou's Grant Termination and Resulting Harm**</u>

292.    Dr. Christine Philliou is a Professor of History at the University of California, Berkeley. Previously, she was a professor at Columbia University and Yale University.

293.    She is the author of two books: *Turkey: A Past Against History* (University of California Press, 2021), and *Biography of an Empire: Governing Ottomans in an Age of*

---

[102] Nat'l Endowment for the Humanities, NEH Funding by the Numbers (description of data on homepage), https://www.neh.gov/ (last visited May 27, 2025).

[103] Nat'l Endowment for the Humanities, *National Garden of American Heroes: Statues*, https://www.neh.gov/program/national-garden-american-heroes-statues (last visited May 27, 2025); Exec. Order No. 13978, *Building the National Garden of American Heroes*, 86 Fed. Reg. 6809 (Jan. 22, 2021), https://www.federalregister.gov/documents/2021/01/22/2021-01643/building-the-national-garden-of-american-heroes.

            - 61 -            

1    *Revolution* (University of California Press, 2010), as well as dozens of articles and book chapters.

2    Her work has received numerous recognitions, including a Fulbright-Hays Research Fellowship, a

3    Brookings Institution Research Award, and the Lenfest Distinguished Faculty Award, and has led

4    to offers of fellowships from Stanford University and the American Council of Learned Societies.

5        294.    In addition to her research and teaching, Dr. Philliou founded the Program

6    in Modern Greek and Hellenic Studies at the Institute for European Studies; the Turkish Ottoman

7    and Post-Ottoman Studies Initiative at the Center for Middle Eastern Studies; and the Istan-Polis

8    collaborative research project. All are designed to broaden and deepen appreciation for the history

9    of Turkey, Greece, and the Ottoman Empire.

10                    Application for Grant Funding (RZ-292650-23)

11        295.    On November 29, 2022, through the Regents of the University of

12    California, Dr. Philliou submitted to the NEH an Application for Federal Domestic Assistance

13    titled "Visualizing Local Christian Communities in Muslim Cosmopolitan Istanbul in the 19th

14    and 20th Centuries."

15        296.    The purpose of the grant was to help fund the Istan-Polis Project, an effort

16    to reconstruct and analyze the history of Istanbul's Orthodox Christian communities in the final

17    Ottoman century. The grant would also fund development of a public-facing website to display

18    the results of data projects and to feed further research and collaboration. The focus on the

19    experience of Istanbul's Christian minority in the final stage of the Ottoman Empire was intended

20    to provide new tools for scholars seeking to clarify how the tensions between cosmopolitanism

21    and nationalism were historically manifested in cities globally. Such work has obvious relevance

22    to pressing questions of nationalism versus broader inclusion of minority groups today.

23                    Award of Grant Funding (RZ-292650-23)

24        297.    On September 22, 2023, the University of California, Berkeley and Dr.

25    Philliou received a letter from Shelly Lowe, the chair of the NEH, approving Project Application

26    RZ-292650-23 for funding (the "Offer Letter") for an award of $246,347.00 over three years.

27        298.    In response to the award of the grant, Dr. Philliou's team planned for and

28    then began executing the steps laid out in the grant application. This included team members'

travel to Berkeley for a winter meeting in January 2024, to Europe in June 2024 for a related seminar, and to Istanbul in June-July 2024 for an *in situ* seminar. The team hired and contracted with project managers to coordinate transcription and other work on the census register project, and spent funds on the project's website infrastructure. This included contracting with independent contractors, purchasing airline tickets, reimbursing expenses for international and domestic travel, hiring student workers, and paying vendors for lodging and catering.

299.    Overall, in Year 1 the team focused on the Old City of Istanbul. The resulting website has become a treasure to people with Greek heritage and other heritages tracing their lineage to Istanbul around the world, and received special recognition from the Archbishop of North and South America, Elpidophoros. The team's Year 1 *in situ* seminar was also life-changing for the undergraduate and graduate students who accompanied the research team.

300.    Years 2 and 3 of the grant were to focus on the Frankish Quarter and other neighborhoods up and down the Bosporus. They would have produced similarly dramatic, perspective-changing results.

Termination of Grant Funding (RZ-292650-23)

301.    On April 2, 2025, UC Berkeley received an email from the address "Grant_Notifications@nehemail.onmicrosoft.com," sent on behalf of Michael McDonald, Acting Chairman for the NEH (the "Termination Email"). Attached to the Termination Email was a letter cancelling grant RZ-292650-23, effective the prior day, April 1.

302.    The Termination Letter states that the grant "no longer effectuates the agency's needs and priorities . . . in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda. The President's February 19, 2025 executive order mandates that the NEH eliminate all non-statutorily required activities and functions. See Commencing the Reduction of the Federal Bureaucracy, E.O. 14217 (Feb. 19, 2025)." It further stated that "adherence to the traditional notification process is not possible" because of "exceptional circumstances."

Harm Suffered from Termination of Grant Funding

303.    The Istan-Polis Project, its staff, and Dr. Philliou have suffered direct and immediate harm as a result of the cancellation of the grant. Work on the website has been disrupted. A seminar in Istanbul for this summer very likely will not proceed. Staff who were depending on funds provided by the grant may be without a livelihood. Researchers may not even be paid for work they have already performed. In addition, the team incurred $46,750 in project expenses that remain unreimbursed. Further, the end of the grant will likely mean an end to the project as a whole and the closing of a remarkable window on history that had just opened.

C.    **National Science Foundation**

304.    The National Science Foundation ("NSF") is an independent federal agency intended to promote the progress of science in the United States.

1.    **Congress Established the National Science Foundation to Promote Scientific Research on a Broad Scale to Advance the United States' National Interests**

305.    NSF was created after World War II when it became clear that federally funded scientific research was key to the nation's national security interests. Describing it as an Act "[t]o promote the progress of science; to advance the national health, prosperity, and welfare; to secure the national defense; and for other purposes," Congress established NSF in 1950 through the enactment of the National Science Foundation Act of 1950 (the "Act"). Public Law 81-507 (codified at 42 U.S.C. § 1861 et seq.).

306.    The NSF's core function is making grants to fund innovative scientific research. The NSF awards grants through an apolitical merit review process, under which panels of disinterested scientific experts vet grant applications and make award decisions. The NSF's merit review process is often referred to as the "gold standard" of scientific review, and NSF-funded research has contributed to some of the most important scientific advances of the past 70 years.

307.    The Act arose out of the growing awareness during World War II that science was crucial to the Unites States' national interest and security, as science was key to the Allied successes in the war. Indeed, during World War II, federal government support of

scientific research accelerated dramatically, and a growing consensus emerged in favor of

continuing government support of basic scientific research after the end of the war.

308.    The NSF's statutorily defined mission "is to provide Federal support for

basic scientific and engineering research, and to be a primary contributor to mathematics, science,

and engineering education at academic institutions in the United States." 42 U.S.C.

§ 1862k(a)(6)(A).

309.    The Act establishes a series of core "functions" for the NSF. Chief among

them, the Act authorizes and directs the NSF to "initiate and support basic scientific research in

the mathematical, physical, medical, biological, engineering, and other sciences," as well as

"specific scientific research activities in connection with matters relating to the national defense."

310.    The Act also directs the NSF to provide "grants, loans, and other forms of

assistance" to support scientific research" and award "scholarships and graduate fellowships in

the mathematical, physical, medical, biological, engineering, and other sciences."

311.    The Act has been amended at various times since 1950. Since at least 1980,

Congress has recognized that for the United States to maintain its competitive edge, it would need

to encourage and prepare people from groups traditionally underrepresented in STEM to acquire

skills and pursue careers in science and engineering fields. Congress consequently declared that

"the highest quality science over the long-term requires substantial support, from currently

available research and education funds, for increased participation in science and technology by

women and minorities." Pub. L. 96-516, § 32. Congress later *expanded* this declaration to include

increasing participation for people with disabilities. 42 U.S.C. § 1885(b). The importance of

STEM to the interests of the United States prompted Congress, in 1980, to prescribe a national

policy to promote "full use of the human resources of the Nation" in STEM fields:

> The Congress declares it is the policy of the United States to
> encourage men and women, equally, of all ethnic, racial, and
> economic backgrounds to acquire skills in science and mathematics,
> to have equal opportunity in education, training, and employment in
> scientific and technical fields, and thereby to promote scientific
> literacy and the full use of the human resources of the Nation in
> science and technology.

1   Pub. L. 96-516 § 32. In other words, Congress has consistently acted to consciously *expand*

2   STEM access rather than to narrow it, by affirmative outreach to groups not traditionally invited

3   or encouraged to contribute to STEM initiatives.

4       312.   One such act was the National Science Foundation Authorization Act of

5   1998 (the "1998 Amendment"). The 1998 Amendment to the Act reaffirmed the NSF's statutory

6   commitment to making the United States a leader in STEM fields, and it set as long-term goals

7   for the NSF to provide leadership to:

8       a.   enable the United States to maintain a position of world leadership

9   in all aspects of science, mathematics, engineering, and technology;

10      b.   promote the discovery, integration, dissemination, and application

11  of new knowledge in service to society; and

12      c.   achieve excellence in United States science, mathematics,

13  engineering, and technology education at all levels. 42 U.S.C. § 1862k(a)(6)(B).

14      313.   Pursuant to these congressional directives, much of the NSF-funded

15  research at universities has, for decades, supported the participation in STEM fields by women,

16  minorities, and people with disabilities.

17      314.   Notably, the 1998 Amendment sets forth several "core strategies" for

18  achieving the above goals, which include a focus on ensuring diversity in entrants to STEM

19  fields: "Develop intellectual capital, both people and ideas, with particular emphasis on groups

20  and regions that traditionally have not participated fully in science, mathematics, and

21  engineering." 42 U.S.C. § 1862k(b)(1).

22      315.   The Act was again amended in 2007 as part of the "America COMPETES

23  Act," which sought to bolster the competitiveness of the United States in scientific research and

24  innovation. It instructed the NSF to "give priority" in granting awards to research activities "that

25  can be expected to make contributions in physical or natural science, technology, engineering,

26  social sciences, or mathematics, or that enhance competitiveness, innovation, or safety and

27  security in the United States." 42 U.S.C. § 1862o-5(b).

28

316.     The NSF seeks to fulfill its mission chiefly by issuing competitive, limited-term grants in response to specific proposals from researchers and research organizations. The NSF receives over 50,000 such proposals each year, and funds about 10,000 of them.

317.     The NSF employs a merit review process in which reviews of grant applications are carried out by panels of independent scientists, engineers, and educators who are experts in the relevant scientific field, and they are vetted to avoid conflicts of interest. Reviewers judge grant applications for both "intellectual merit" and "broader societal impact."

318.     NSF grants are highly competitive and prestigious, and its pre-January 20, 2025 merit review process is often credited for the profound success of the NSF throughout its history. Indeed, it is no exaggeration to say that the world as we know it today would not exist without the NSF. NSF grants have contributed to an extraordinary number of scientific and technological innovations and achievements over the past 75 years, including:

|     |     |
| --- | --- |
| a. | The Internet |
| b. | Semiconductors (i.e., computer chips) |
| c. | Supercomputers |
| d. | Artificial intelligence |
| e. | 3-D printing |
| f. | American Sign Language |
| g. | Captcha |
| h. | Deep ocean exploration and drilling |
| i. | Detecting gravitational waves |
| j. | DNA amplification (central to biotech) |
| k. | Doppler radar |
| l. | Duolingo |
| m. | Fusion energy |
| n. | Geographic Information Systems (GIS) |
| o. | Kidney matching |
| p. | LASIK eye surgery |
| q. | MRI |
| r. | Seeing black holes |

319.     To date, at least 268 Nobel laureates have been supported by NSF grants. In 2024 alone, NSF grant recipients received Nobel prizes in physiology or medicine, physics, chemistry, and economics.

320.     The NSF has also funded numerous national observatories, has had responsibility for U.S. research operations in the Antarctic, and has been heavily involved in

1    United States deep sea exploration. The NSF also managed laboratories from the Defense

2    Department's Advanced Research Projects Agency (DARPA), which lead to the creation of the

3    Internet.

4        321.    The enormous impact of the NSF grant-making process is summarized

5    neatly in this statement from Forbes: "For 75 years, the National Science Foundation has been the

6    quiet backbone of American scientific progress. It funds a substantial share of all federally

7    supported basic research outside the biomedical sphere, supporting discoveries in climate science,

8    artificial intelligence, cybersecurity and quantum materials among many, many others. Its grants

9    train graduate students, launch early-career faculty and sustain the open, reproducible research

10   that fuels U.S. competitiveness."[104]

11       **2.    In Response to Trump Administration Directives, NSF Improperly**
          **Changed Priorities and Canceled Existing Grants**
12

13       322.    The foregoing paragraphs describe the NSF as it existed and functioned

14   through the decades, from its original founding until January 20, 2025.

15       323.    The NSF is now facing an existential threat: the Trump Administration has

16   negated the NSF's core grant-making function by unilaterally, arbitrarily and illegally terminating

17   billions of dollars in lawfully awarded scientific grants that the Administration views (often

18   mistakenly) as having some connection to diversity, equity and inclusion (most broadly defined),

19   as well as other subjects the Trump Administration dislikes, such as climate change, vaccines,

20   HIV/AIDS, and COVID-19.

21       324.    At Defendants Trump and DOGE's direction, NSF has taken aim at the

22   pillars sustaining the United States' STEM preeminence. These actions violate the law and

23   jeopardize America's longstanding global leadership in STEM. NSF has announced that it will no

24   longer abide by Congress's longstanding mandates.

25       325.    Since the Trump Administration took office in January 2025, the NSF has

26   terminated more than a billion dollars in scientific grants that had previously been approved and

27

28   [104] John Drake, *The NSF Is Being Dismantled — With Broad Implications For The American
     Economy,* Forbes (May 9, 2025), https://www.forbes.com/sites/johndrake/2025/05/09/the-
     national-science-foundation-is-being-dismantled-what-the-economy-needs-is-more-investment.

- 68 -

awarded through the merit review process and which the NSF was legally obligated to provide. The pace of the terminations has escalated rapidly since mid-April, as the Trump Administration has taken a wrecking ball to the NSF. During that brief time period, more than 1,400 grants have been terminated. NSF terminated over 430 grants *in one week*.[105] The grant terminations were generally not preceded by warnings, and thus came as a complete shock to the researchers whose livelihoods and life's work depended on them.

326.    The grant terminations have typically been conveyed in short, standardized missives containing boilerplate statements. For example, Plaintiff Jedda Foreman and other UC researchers all received the following termination letter:

> The U.S. National Science Foundation (NSF) has undertaken a review of its award portfolio. Each award was carefully and individually reviewed, and the agency has determined that termination of certain awards is necessary because they are not in alignment with current NSF priorities. Effective immediately, the following are terminated: [list of NSF Award IDs]. NSF is issuing this termination to protect the interests of the government pursuant to NSF Grant General Conditions (GC-1) term and condition entitled 'Termination and Enforcement,' on the basis that they no longer effectuate the program goals or agency priorities. This is the final agency decision and not subject to appeal.

327.    In an apparent attempt to justify its new war on science, the NSF published a "Statement of NSF Priorities" on April 18, 2025, explaining that NSF's activities "must aim to create opportunities for all Americans everywhere" and "[r]esearch projects with more narrow impact limited to subgroups of people based on protected class or characteristics do not effectuate NSF priorities."[106] Pursuant to this Directive, NSF began issuing termination notices *en masse* to research projects, including many grants to UC researchers, designed to implement Congress's express goals of increasing STEM participation, studying misinformation, and addressing environmental justice.

---

[105] Erin Socha, *New Database Tracks Canceled N.S.F. Research Grants*, U. Daily Kansan (April 25, 2025), https://www.kansan.com/news/new-database-tracks-canceled-n-s-f-research-grants/article_0a3d2a6c-97e5-43c3-96c0-db02dc609210.html.

[106] U.S. Nat'l Sci. Found., *Statement on NSF Priorities* (April 18, 2025), https://www.nsf.gov/updates-on-priorities#statement-of-nsf-priorities-09d.

328.    NSF also issued an accompanying set of FAQ's, which indicated that awards not aligned with NSF priorities include, but are "not limited to those on diversity, equity, and inclusion (DEI) and misinformation/disinformation."

329.    The grant cancellations are one prong in what can only be described as an effort to radically shrink and marginalize the NSF. In mid-April it was announced that the NSF was freezing any new grants, and in early May, the NSF announced that its 37 research divisions were being abolished. Then, on April 24, 2025, the Director of NSF, Sethuraman Panchanathan, resigned 16 months early. Massive layoffs are now anticipated. Meanwhile, President Trump proposed cutting the NSF's budget for the 2026 fiscal year by 55%. As recently stated in *Forbes*, "This is not reform. It is a dismantling."[107]

330.    It appears that DOGE is behind the unlawful grant terminations at NSF. *See, e.g.,* Katrina Miller & Carl Zimmer, *National Science Foundation Terminates Hundreds of Active Research Awards*, New York Times (April 22, 2025) ("Last Wednesday, the magazine Science reported that all new research grants by the agency had been frozen, as ordered by the Department of Government Efficiency, or DOGE."); Dan Garisto, *Trump Team Freezes New NSF Awards – And Could Soon Axe Hundreds of Grants*, Nature (Apr. 17, 2025) ("All new research grants have been frozen at the US National Science Foundation (NSF) — an action apparently ordered by the Department of Government Efficiency (DOGE) . . . DOGE is also reviewing a list of active research grants, assessed in February by the NSF, for terms associated with diversity, equity and inclusion (DEI). It is considering terminating more than 200 of them, NSF staff members have told Nature.").

331.    Indeed, on May 13, 2025, Alondra Nelson, the Harold F. Linder Professor at Princeton University's Institute for Advanced Study, resigned her prestigious position on the National Science Foundation's board of directors. Explaining her decision to Time Magazine, she said: "Last week, as the Board held its 494th meeting, I listened to NSF staff say that DOGE had by fiat the authority to give thumbs up or down to grant applications which had been

---

[107] John Drake, *The NSF Is Being Dismantled — With Broad Implications For The American Economy,* Forbes (May 9, 2025), https://www.forbes.com/sites/johndrake/2025/05/09/the-national-science-foundation-is-being-dismantled-what-the-economy-needs-is-more-investment.

1    systematically vetted by layers of subject matter experts. Our closed-to-the-public deliberations

2    were observed by Zachary Terrell from the DOGE team. Through his Zoom screen, Terrell

3    showed more interest in his water bottle and his cuticles than in the discussion."[108]

4            332.    These grant terminations are a disaster for the future of science in the

5    United States. The gravity of the situation and illegality of the grant terminations were

6    summarized in a letter from the House of Representatives' Committee on Science, Space, and

7    Technology sent to the acting director of the NSF, Brian Stone, on May 8, 2025. The letter

8    characterizes the Trump Administration's actions against the NSF as "chaos and destruction," and

9    states that "[DOGE's] accusation that these terminated awards lack merit is a lie, as most, if not

10   all these awards, carry a statement from the agency declaring that the award "reflects NSF's

11   statutory mission and has been deemed worthy of support through evaluation using the

12   Foundation's intellectual merit and broader impacts review criteria.'"[109]

13           333.    The House Committee Letter goes on to state: "The cancelation of these

14   awards suggests instead that NSF is willing to apply political censorship of awards under

15   direction from President Trump and the DOGE teenagers, which is a clear violation of the

16   statutory mission of the agency." *Id*. It then provides a few examples of recently terminated grants

17   to illustrate the folly, harmfulness, and in some instances absurdity of the Trump Administration's

18   grant cancellations. The list of cancelled grants includes those for:

19           a.    A rural after-school program that gives middle school students an

20   opportunity to use mathematics and design thinking to address agricultural issues, such as

21   designing water catchment systems for drought conditions.[110]

22

23

---

[108] Alonda Nelson, *Why I'm Resigning From Positions at the National Science Foundation and Library of Congress,* Time Magazine, May 13, 2025; https://time.com/7285045/resigning-national-science-foundation-library-congress/.

[109] Letter from House of Representatives' Committee on Science, Space and Technology to Brian Stone (May 8, 2025), https://democrats-science.house.gov/imo/media/doc/2025-05-08%20Letter%20to%20Acting%20Director%20Stone.pdf.

[110] Nat'l Sci. Found., *Award Abstract #2215382 – Engaging Rural, Latinx Youth in an After School Program That Integrates Design Thinking, Making and Math*, https://www.nsf.gov/awardsearch/showAward?AWD_ID=2215382, (last visited May 27, 2025).

b.      Research on developing a tool that uses machine learning to detect deepfakes, which are used for all manner of disinformation, be it political content planted by foreign adversaries or the creation of child sexual abuse material.[111]

c.      A grant to study improved mental health interventions for engineering students, who – across demographics – are statistically less likely than students in other disciplines to seek mental health treatment. This research was aimed at improving outcomes for engineering students in mental health distress and with mental health disabilities.[112]

d.      An industry-focused workforce development program that trains the next generation of quantum technicians, including through accessible experiential learning and certification opportunities for entry-level professionals.[113]

e.      A National Research Traineeship award, supporting 25 graduate students, to develop new interdisciplinary studies applying AI to better understand "legal system processes, impacts, and institutions" as well as to develop "tools and methods for leveraging newly available data from the criminal legal system, and ethical and social implications of big data and AI in the context of criminal justice."[114]

334.    The House Committee Letter condemns these grant terminations as "an abdication of NSF's mission and a betrayal of the scientific community, including the thousands of graduate students and early career researchers whose careers will be derailed. It also states that the terminations are of questionable legality. The grant terminations are in direct defiance of a court-ordered preliminary injunction enjoining NSF from impeding the disbursement of

---

[111] Andrea E Hickerson,, *Award Abstract #2310131 – Collaborative Research: SaTC: TTP: Small: DeFake: Deploying a Tool for Robust Deepfake Detection, Nat'l Sci. Found.,* https://www.nsf.gov/awardsearch/showAward?AWD_ID=2310131 (last visited May 27, 2025).
[112] Nat'l Sci. Found., *Award Abstract # 2225567 – Research: Identifying intervention targets to increase mental health help seeking in undergraduate engineers,* https://www.nsf.gov/awardsearch/showAward?AWD_ID=2225567 (last visited May 27, 2025).
[113] Nat'l Sci. Found., *Award Abstract # 2243822 - NRT-HDR: Computational Research for Equity in the Legal System" (CRELS),* https://www.nsf.gov/awardsearch/showAward?AWD-ID=2243822 (last visited May 29, 2025).
[114] *Id.*

appropriated federal funds under awarded grants or other executed financial obligations directed or implied by Executive Order 14151… or any other materially similar policy."[115]

### 3.  NSF Plaintiff and Other Grant Recipients Are Harmed by NSF's Illegal Grant Terminations

335.    Plaintiff Foreman and Class members have long relied on NSF grants to fund meritorious projects aimed at advancing scientific knowledge. The termination of previously approved grants has caused and continues to cause Plaintiff and Class members serious harm.

### a.  Plaintiff Jedda Foreman's Grant Terminations and Resulting Harm

336.    Jedda Foreman is the Director, Center for Environmental Learning, at the Lawrence Hall of Science at the University of California, Berkeley.

First Application for Grant Funding (2314075):

337.    On January 11, 2023, with her collaborators at the Lawrence Hall of Science, Foreman submitted (through the Regents of the University of California) a grant proposal to NSF's National Science Foundation Program NSF 22-626, Advancing Informal STEM Learning (AISL). The AISL program invests in research and practice on how people learn STEM outside of formal education. It seeks proposals that further the well-being of individuals and communities who have historically been and continue to be excluded, under-served, or underrepresented.

338.    Foreman's proposal, titled "Understanding the Impact of Outdoor Science and Environmental Learning Experiences Through Community-Driven Outcomes," was for a four-year Integrating Research and Practice project that would produce a set of science and environmental literacy measures for underrepresented communities.

First Award of Grant Funding (2314075)

339.    On August 22, 2023, the NSF accepted Foreman's proposal and awarded her a grant (Award Number 2314075). The Award Notice stated that the NSF was obligated in the

---

[115] *New York v. Trump*, No. 25-cv-39-JJM-PAS, (D.R.I. Jan. 31, 2025), https://ag.ny.gov/sites/default/files/court-filings/state-of-new-york-et-al-v-trump-tro-2025.pdf (last visited May 27, 2025).

amount of $1,583,195, and that the total intended award was $2,149,437. The Award Notice provided: "Contingent on the availability of funds and scientific progress of the project, NSF expects to continue support at approximately the following level: Fiscal Year: 2026, Increment Amount: $566,242." The Award Notice was made as per the provisions of NSF Solicitation: "NSF 22-626 Advancing Informal STEM Learning," and provided that the period of performance was from January 1, 2024 through December 31, 2027.

340.    The award covered salaries and wages for three senior personnel: principal investigator Melissa Collins, Ph.D., co-principal investigator Valeria Romero, M.A., and Foreman. The award also covered salaries and wages for several other professional researchers and project coordinators at the Lawrence Hall of Science, UC Berkeley's public science center. The award further provided for support from an undergraduate research assistant.

Second Application for Grant Funding (2315277)

341.    On January 17, 2023, together with her collaborators at the Lawrence Hall of Science, Foreman submitted (through the Regents of the University of California) a proposal to the National Science Foundation Program NSF 22-634, Racial Equity in STEM Education (RESTEM), which aims to support groundbreaking projects that contribute to advancing racial equity in STEM education and workforce development.

342.    Foreman's proposal, titled "Working Toward Racial Equity: Building Capacity to Institutionalize Equity in Outdoor and Environmental Science Education," was designed to support a team of leaders from five organizations to facilitate and guide organization-wide discussions related to racial equity. The project was to develop a Tool Kit with three components—(1) a Facilitator's Reflection Guide, (2) a Foundations of Racial Equity Guide, and (3) Organization Systems Change Tools—that would produce a replicable model for broadening participation.

Second Award of Grant Funding (2315277)

343.    On September 13, 2023, the NSF accepted Foreman's proposal and awarded her a grant (Award Number 2315277). The Award Notice stated that the NSF was obligated in the amount of $1,701,416, and that the total intended award was $4,723,028. The

1    Award Notice provided: "Contingent on the availability of funds and scientific progress of the

2    project, NSF expects to continue support at approximately the following level: Fiscal Year: 2025,

3    Increment Amount: $947,005, Fiscal Year: 2026, Increment Amount: $1,133,391, Fiscal Year:

4    2027, Increment Amount: $941,216." The award was made as per the provisions of NSF

5    Solicitation: NSF 22-634 Racial Equity in STEM Education and provided that the period of

6    performance was from January 1, 2024 through December 31, 2028.

7                    Third Application for Grant Funding (2241805)

8                    344.    On August 12, 2022, Foreman and her collaborators submitted a proposal

9    (through the Regents of the University of California) to the National Science Foundation Program

10   NSF 22-585, Innovative Technology Experiences for Students and Teachers (ITEST). This

11   applied research and development program aims to advance the equitable integration of

12   technology in the learning and teaching of science, technology, engineering, or mathematics from

13   pre-kindergarten through high school.

14                   345.    Foreman's proposal, titled "Supporting Rightful Presence in Museum

15   Spaces: Youth as Participatory Designers of Indigenous Mixed Reality Science Exhibits," aimed

16   to address the ongoing marginalization of Indigenous communities in informal science learning

17   spaces by developing and studying a model that strengthens Indigenous youths' disposition

18   towards, and capacity for STEM pathways.

19                   346.    The project built on a partnership between the Lawrence Hall of Science

20   and mak-'amham, an Indigenous Ohlone cultural organization. The project would engage

21   Indigenous youth directly and investigate the impact of the participatory design model on their

22   STEM learning, science identity, and interest in STEM careers. The project findings would be

23   disseminated in informal science and technology learning communities to support the youth

24   participatory design model in informal science education contexts.

25                   Third Award of Grant Funding (2241805)

26                   347.    On February 19, 2023, the NSF accepted Foreman's proposal and awarded

27   a grant (Award Number 2241805). The Award Notice stated that the NSF was obligated in the

28   amount of $1,292,298. The award was made in accordance with the provisions of NSF

Solicitation: "NSF 22-585, Innovative Technology Experiences for Students and Teachers," and provided that the period of performance was from June 1, 2023 through May 31, 2026.

348.    The award covered salaries and wages for five senior personnel: Principal Investigator Ari Krakowski, Ph.D.; co-Principal Investigator Kimiko Ryokai, Ph.D.; co-Principal Investigator Sarah Olsen, Ph.D.; co-Principal Investigator Vincent Medina; and Foreman. The award also covered salaries and wages for several other professional researchers and project coordinators at the Lawrence Hall of Science. The award also provided $162,712 to support the work of graduate students.

<u>Supplemental Award to Celebrate NSF's 75th Anniversary (2241805)</u>

349.    Together with her collaborators, Foreman submitted (through the Regents of the University of California) to the NSF a proposal for a supplement to award number 2241805 to celebrate NSF's 75th anniversary on May 10, 2025. On January 15, 2025, the NSF accepted Foreman's proposal and awarded a grant supplement (Award Number 2241805). The Supplemental Award Notice stated that the NSF was obligated by an additional amount of $98,981, bringing the total funds awarded to $1,391,279. The Supplemental Award Notice also extended the end of the award period from May 31, 2026 to November 30, 2026.

<u>Termination of Grant Funding (2315277, 2314075, and 2241805)</u>

350.    On April 18, 2025, the University of California, Berkeley received an email (the "April 18 Termination Email") from the address "grants005@nsf.gov," purporting to be from Jamie H. French, Division Director, Office of Budget Finance and Award Management, Division of Grants and Agreements. The April 18 Termination Email stated that the NSF "ha[d] determined that termination of certain awards is necessary because they are not in alignment with current NSF priorities." It purported to terminate awards 2315277 and 2314075. It further stated that "the basis" of the termination is that the awards "no longer effectuate the program goals or agency priorities. This is the final agency decision and not subject to appeal."

351.    On April 25, 2025, the University of California, Berkeley received an email (the "April 25 Termination Email") from the address "grants005@nsf.gov," purporting to be from Jamie H. French, Division Director, Office of Budget Finance and Award Management,

Division of Grants and Agreements. The April 25 Termination Email again stated that "the agency ha[d] determined that termination of certain awards is necessary because they are not in alignment with current NSF priorities." It terminated, among others, award 2241805. This email likewise further stated that "the basis" of the termination is that the awards "no longer effectuate the program goals or agency priorities. This is the final agency decision and not subject to appeal."

<u>Harm Suffered from Terminations of Grant Funding</u>

352.    The Lawrence Hall of Science is UC Berkeley's public science center, with a mission to inspire and engage through science discovery and learning in ways that advance equity and opportunity. Nationwide, the Lawrence Hall reaches over 20% of U.S. students in grades K through 12 with its science curricula. The Lawrence Hall has successfully obtained significant federal funding (20-25% of its budget) to support the research and development to inspire young people, families, communities, and educators in STEM discovery and learning in ways that advance equity. Without federal grant funds, including the terminated grants, the Lawrence Hall's ability to carry out its public service mission is and will be significantly compromised.

353.    As to "Supporting Rightful Presence in Museum Spaces: Youth as Participatory Designers of Indigenous Mixed Reality Science Exhibits" (Award 2241805), $490,834.22 or 35% of the award remained unpaid at the time of termination. In addition, when this award was terminated, the supplemental funding for a celebration of the NSF's 75th anniversary on May 10, 2025 was terminated as well. Because promises had already been made to community members, the Hall still went forward with the event and incurred the remaining costs.

354.    As to "Working Toward Racial Equity: Building Capacity to Institutionalize Equity in Outdoor and Environmental Science Education" (Award 2315277), approximately $3,769,075.24 or 80% of the award remained unpaid at the time of termination.

355.    As to " Understanding the Impact of Outdoor Science and Environmental Learning Experiences Through Community-Driven Outcomes" (Award 2314075), approximately $1,500,251.79 or 75% of the award remained unpaid at the time of termination.

356.    The financial implications of these abrupt terminations are enormous, representing millions of dollars of lost funding to the Lawrence Hall. It will likely need to reduce the time basis of and/or lay off both academic personnel and staff if it is not able to find alternative resources quickly.

357.    While the financial implications are debilitating, the human cost of the termination of these awards is also profound. Taken together, the grant-funded projects are important to the thousands of young people, educators, and partners that they are designed to engage, serve, and/or impact. The abrupt termination of these grants means these public benefits will go unrealized.

### D.    Department of Defense

358.    The Department of Defense ("DOD") is a federal agency within the meaning of the APA that was established to promote national security.

### 1.    Congress Established DOD to Create a Comprehensive Program Dedicated to Ensuring the Future Security of the United States, Including Through Research

359.    Shortly after the end of World War II, President Truman urged Congress to combine the War and Navy Departments under one single Department of National Defense.[116] In his address to Congress, President Truman stated that creating the Department of National Defense was an "essential step … in the development of a comprehensive and continuous program for our future safety and for the peace and security of the world."[117]

360.    After months of deliberations regarding the role of the military in society and the possible threat of granting too much military power to the executive, Congress created the National Military Establishment through the National Security Act of 1947.[118] In 1949, the National Military Establishment was renamed the DOD.

---

[116] Harry S. Truman Library Museum, *Special Message to the Congress Recommending the Establishment of a Department of National Defense*, (Dec. 19, 1945) https://www.trumanlibrary.gov/library/public-papers/218/special-message-congress-recommending-establishment-department-national.

[117] *Id.*

[118] National Security Act of 1947, Pub. L. No. 80-253, 61 Stat. 495.

- 78 -

361.    In passing the National Security Act of 1947, Congress intended to provide a "comprehensive program for the future security of the United States" and to unify the armed forces into "an efficient team of land, naval, and air forces."[119]

362.    Research was a critical component of the Act. The National Security Act established a Research and Development Board, which would advise the Secretary of Defense as to the status of scientific research relative to national security and to assist the Secretary of Defense in assuring adequate funding for research and development on scientific problems relating to national security.

363.    The Department of Defense Reorganization Act of 1958 amended the National Security Act of 1947 and created a Director of Defense Research and Engineering, who would supervise all research activities in DOD. The law further contemplated that DOD would contract with "educational or research institutions" to carry out its research mission.[120]

364.    Since 1961, Congress has annually updated the specific duties and functions of the DOD through the National Defense Authorization Act (NDAA).

365.    For example, the NDAA of Fiscal Year 2024 ("NDAA 2024") authorized the DOD to grant awards and funding for research activities related but not limited to topics such as microelectronics, artificial intelligence, thermal destruction of PFAS, quantum information, treatment of armed forces personnel with post-traumatic stress or traumatic brain injury using designated psychedelic substances, and the effect of the COVID-19 vaccine on service officers.[121]

366.    The NDAA for Fiscal Year 2021 ("NDAA 2021") required the Secretary of Defense, acting under the Secretary of Defense for Research and Engineering, to carry out a program of research and development in social science, management science, and information science.[122] The purpose of program was to:

(1)    To ensure that the Department of Defense has access to innovation and expertise in social science, management science, and

---

[119] *Id.*

[120] Department of Defense Reorganization Act of 1958, Pub. L. No. 85-599, 72 Stat. 514.

[121] National Defense Authorization Act for Fiscal Year 2024, Pub. L. No. 118-31, 137 Stat. 136.

[122] National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388.

1   information science to enable the Department to improve the
2   effectiveness, efficiency, and agility of the Department's
    operational and management activities.

3   (2)   To develop and manage a portfolio of research initiatives in
          fundamental and applied social science, management science, and
4         information science that is stable, consistent, and balanced across
          relevant disciplines.

5
    (3)   To enhance cooperation and collaboration on research and
6         development in the fields of social science, management science,
          and information science between the Department of Defense and
7         appropriate private sector and international entities that are involved
          in research and development in such fields.

8
9   (4)   To accelerate the development of a research community and
          industry to support Department of Defense missions in the fields of
          social science, management science, and information science,
10        including the development of facilities, a workforce, infrastructure,
          and partnerships in support of such missions.

11
12  (5)   To coordinate all research and development within the Department
          of Defense in the fields of social science, management science, and
          information science.

13
14  (6)   To collect, synthesize, and disseminate critical information on
          research and development in the fields of social science,
          management science, and information science.

15
16  (7)   To assess and appropriately share, with other departments and
          agencies of the Federal Government and appropriate entities in the
          private sector—

17
18        (A)   challenges within the Department of Defense that may
                be addressed through the application of advances in
                social science, management science, and information
19              science; and

20        (B)   datasets related to such challenges.

21  (8)   To support the identification of organizational and institutional
          barriers to the implementation of management and organizational
22        enhancements and best practices.

23  (9)   To accelerate efforts—

24        (A)   to transition, and deploy within the Department of
                Defense, technologies and concepts derived from
25              research and development in the fields of social science,
                management science, and information science; and

26
          (B)   to establish policies, procedures, and standards for
27              measuring the success of such efforts.

28  (10)  To integrate knowledge from cross-disciplinary research on—

      (A)     how factors relating to social science, management science, and information science affect the global security environment; and

      (B)     best practices for management in the public and private sectors.

(11)     To apply principles, tools, and methods from social science, management science, and information science—

      (A)     to ensure the Department of Defense is more agile, efficient, and effective in organizational management and in deterring and countering current and emerging threats; and

      (B)     to support the National Defense Strategy.[123]

367.    In addition to the annual NDAAs, Congress has passed legislation instructing the DOD to award grants to institutions of higher education. For example, the David L. Boren National Security Education Act of 1991 ("NSEA") instructed the Secretary of Defense to create the National Security Education Program, which would award grants to institutions of higher education in order enable such institutions to establish, operate, or improve programs in foreign languages, area studies, counter proliferation studies, and other international fields that are critical areas of those disciplines through research.[124]

368.    The National Security Education Program is codified at 50 U.S.C. § 1902. Its goal is to create vital experience in language and cultures critical to U.S. National Security.

369.    Moreover, in 2008, the Secretary of Defense created the Minerva Research Initiative ("MRI") to address challenges such as ethnic strife, failing or failed states, rise of new powers, rise of violent extremism, disease, poverty, climate change, as well other unprecedented social change.[125] MRI was built on the lessons learned after the September 11 terrorist attacks, and was billed by the Pentagon as funding "[s]ocial science for a safer world."[126]

---

[123] *Id.*

[124] David L. Boren National Security Education Act of 1991, Pub. Law. No. 102-183, 105 Stat. 1271 (codified at 50 U.S.C. §1901 et seq.).

[125] The Minerva Initiative, https://web.archive.org/web/20090211034051/http://minerva.dtic.mil/.

[126] Kai Kupferschmidt, *Pentagon Guts National Security Program that Harnessed Social Science*, Science (Mar. 2, 2025), https://www.science.org/content/article/pentagon-guts-national-security-program-harnessed-social-science.

370.    MRI "brings together universities and other research institutions around the world and supports . . . projects addressing specific interest areas determined by the Department of Defense."[127] MRI "emphasizes questions of strategic importance to U.S. national security policy,"[128] including violent extremism, drug cartels, and similar threats to the nation's security.

371.    Since its inception in 2008, MRI has filled a gap in the knowledge base of the National Security community by developing models of terrorism, insurgency, cybersecurity, information operations, deterrence and other relevant topics, validated using freshly collected data and modern methods. That research has been praised by combatant commanders for its relevance to their increasingly complex challenges in understanding the Social Science of modern conflict.

372.    MRI-funded research has enabled a significant improvement in scholarly understanding of subnational conflicts, as reflected in a manyfold increase in publications on these topics in the best peer-reviewed journals in Political Science and Economics.

373.    MRI employs a highly competitive process for the award of its grant funding. It solicits proposals in pre-defined topic areas and selects among them using peer and expert review.

374.    Since its inception, MRI has awarded various grants to UC researchers, including several examples in recent years.

375.    In September 2024, MRI awarded a Peace Scholar Fellowship to a UC Berkeley graduate student researching the intertwined political, economic, and social dynamics of international conflict and conflict management.[129] In August 2023, MRI awarded a Peace Scholar Fellowship to a UC Davis graduate student conducting doctoral research related to broad concerns in conflict management and peacebuilding, including security and stability.[130] In 2022,

---

[127] Grants.Gov, *View Grant Opportunity* (Mar. 15, 2024), https://grants.gov/search-results-detail/351388.

[128] *Id.*

[129] *Department of Defense Selects 2024-2025 Minerva-USIP Peace and Security Fellows*, U.S. Dep't of Def. (Sept. 20, 2024), https://www.defense.gov/News/Releases/Release/Article/3912615/department-of-defense-selects-2024-2025-minerva-usip-peace-and-security-fellows/.

[130] *DOD Selects 2023-2024 Minerva-USIP Peace and Security Dissertation Fellows*, U.S. Dep't of Def. (Aug. 10, 2023), https://www.defense.gov/News/Releases/Release/Article/3490020/dod-selects-2023-2024-minerva-usip-peace-and-security-dissertation-fellows/.

the Minerva Initiative awarded a Peace Scholar Dissertation Fellowship to UC Berkeley and UC San Diego graduate students whose research showed "great potential to advance the peacebuilding and security fields and to positively influence policy and practice."[131]

376.    In May 2023, the DOD announced that it would award $18 million in grants to 11 university-based faculty teams under its Minerva Initiative, including one UC San Diego team, one UC Davis team, and one UC Santa Barbara team.[132]

377.    In February 2022, the DOD announced that it would award $28.7 million in grants to 17 university based faculty teams, including one UC Berkeley team, through the FY2021 Minerva Research Initiative to support research in social and behavioral science.[133] The 17 faculty awardees were selected from approximately 220 applicants using a merit competition. The research proposals were peer-reviewed and selected for scientific merit, relevance, and potential impact in conference between the Office of the Under Secretary of Defense for Research and Engineering and the Office of the Under Secretary of Defense for Policy.

378.    Outside of grants given through MRI, when deciding whether to award a grant, the DOD employs a merit review process in which the technical merits of the proposed research and its potential relationship with the missions of the DOD are evaluated. 32 C.F.R. § 22.315 (describing "[m]erit-based, competitive procedures").

379.    It is clear that Congress understood the importance of conducting research relating to national security when creating the DOD. The annual NDAAs and Acts like the NSEA make clear that Congress intended for funding to be allocated for the study of social issues since such research would further the DOD's mission: national security.

---

[131] *Department of Defense Announces Awards for the 2022-2023 Cohort of the Minerva-United States Institute of Peace and Security Dissertation Fellows*, U.S. Dep't of Def. (Sept. 12, 2022), https://www.defense.gov/News/Releases/Release/Article/3155346/department-of-defense-announces-awards-for-the-2022-2023-cohort-of-the-minerva/.

[132] *DOD Awards $18 Million for Academic Research on the Socio-Political Drivers of Future Conflict,* U.S. Dep't of Def. (May 26, 2023), https://www.defense.gov/News/Releases/Release/Article/3408680/dod-awards-18-million-for-academic-research-on-the-socio-political-drivers-of-f/.

[133] *Department of Defense Awards $28.7M in Grants for the FY2021 Minerva Research Initiative*, U.S. Dep't of Def. (Feb. 24, 2022), https://www.defense.gov/News/Releases/Release/Article/2944623/department-of-defense-awards-287m-in-grants-for-the-fy2021-minerva-research-ini/.

2. **In Response to Trump Administration Directives, DOD Improperly Changed Priorities and Canceled Existing Grants**

380.    DOD quickly caved to President Trump's and DOGE's directives to eliminate grants relating to disfavored topics. On March 4, 2025, Chief Pentagon Spokesman Sean Parnell stated that DOD had been working "hand in hand with the DOGE team."[134]

381.    By March 7, the Department had terminated more than $30 million in grants that funded 91 studies. In a press release, the Department recognized "the value of academic research" but stated it was taking action "in response to President Trump's Executive Orders."[135] The press release stated that the studies affected included research focused on "global migration patterns, climate change impacts, and social trends."[136]

382.    By March 20, Secretary Hegseth had issued a memorandum directing the immediate termination of over $360 million in additional grants in order to "implement the President's orders."[137] The memorandum stated that funding would be cut to research efforts in areas of "Diversity, Equity, and Inclusion and related social programs, climate change, social science, Covid-19 pandemic response, and other areas – that are not aligned with DOD priorities."[138]

383.    This termination essentially gutted MRI, which was partly created to better understand climate change impacts and social trends. Beginning in March 2025, the MRI's website, which included reports on finished and ongoing projects, became unavailable.[139] Many, if not all, of the grants previously awarded through MRI have been terminated.

---

[134] C. Todd Lopez, *Initial DOGE Findings Reveal $80 Million in Wasteful Spending at DOD*, U.S. Dep't of Def. (Mar. 4, 2025), https://www.defense.gov/News/News-Stories/Article/Article/4096431/initial-doge-findings-reveal-80-million-in-wasteful-spending-at-dod/.

[135] *Pentagon Culls Social Science Research, Prioritizes Fiscal Responsibility and Technologies for Future Battlefield*, U.S. Dep't of Def. (Mar. 7, 2025), https://www.defense.gov/News/Releases/Release/Article/4113076/pentagon-culls-social-science-research-prioritizes-fiscal-responsibility-and-te/.

[136] *Id.*

[137] *Continuing Elimination of Wasteful Spending at the Department of Defense*, U.S. Dep't of Def. (Mar. 20, 2025), https://media.defense.gov/2025/Mar/20/2003673531/-1/-1/0/CONTINUING-ELIMINATION-OF-WASTEFUL-SPENDING-AT-THE-DEPARTMENT-OF-DEFENSE.PDF.

[138] *Id.*

[139] Kai Kupferschmidt, *Pentagon abruptly ends all funding for social science research*, Science

384.    By terminating grants at the direction of the President, the DOD has violated its congressional mandates, which require that the DOD fund social science research. Such mandates include, for example, Congress's determination of DOD's funding through legislation such as 50 U.S.C. § 1902 and the annual National Defense Authorization Acts.

### 3.    DOD Plaintiff and Other Grant Recipients Are Harmed by DOD's Illegal Grant Terminations

385.    Plaintiff Berman and Class members have long relied on DOD grants to fund meritorious projects aimed at promoting national security. The termination of previously approved grants has caused and continues to cause Plaintiff and Class members serious harm.

### a.    Plaintiff Eli Berman's Grant Termination and Resulting Harm[140]

386.    Dr. Eli Berman is a Professor of Economics at the University of California, San Diego ("UCSD") who studies economic development in fragile environments, with a focus on conflict. He is known particularly for his work applying rational choice analysis to the behavior of radical religious groups. He holds a dual appointment as a Professor in UCSD's School of Global Policy and Strategy.

387.    He also serves as the Research Director for International Securities Studies at the UC Institute on Global Conflict and Cooperation ("IGCC"), a research network comprised of scholars from across the University of California and the Los Alamos and Lawrence Livermore National Laboratories, who produce and use research to help build a more peaceful, prosperous world.

388.    Dr. Berman has published several books on national security economics including *Proxy Wars: Suppressing Violence through Local Agents* (with David Lake, Cornell University Press, 2019), *Small Wars, Big Data: The Information Revolution in Modern Conflict* (with Jacob N. Shapiro and Joseph H. Felter, Princeton U. Press, 2018), and *Radical, Religious and Violent: The New Economics of Terrorism* (Cambridge: MIT Press, 2009). He has also

---

(Mar. 10, 2025), https://www.science.org/content/article/pentagon-abruptly-ends-all-funding-social-science-research.

[140] Plaintiff Berman submitted a declaration, filed herewith, that further details his background and research, including information about his terminated grant.

1  authored or co-authored dozens of articles, papers, and reviews on national security economics
2  and other topics in economics.

3         389.    Over the past three decades, he has received grant funding from a variety
4  of governmental and private sources. He has received federal grant funding from the National
5  Science Foundation, the Department of Homeland Security, the Office of Naval Research,
6  USAID, the U.S. Institute of Peace, and the Department of Defense.

7                     DOD Minerva Research Initiative and Past Grants

8         390.    Dr. Berman has previously served as a principal researcher on several
9  Minerva Research Initiative projects.

10        391.    For example, Dr. Berman served as co-Principal Investigator of the MRI
11 project "Terrorism, Governance, and Development," led by Professor Jacob Shapiro of Princeton
12 University, directing a subcontract of $3,064,551 to IGCC, from March 2009 through August
13 2015. That project addressed how economic and political development are enabled when a
14 government must also necessarily counter terrorism and insurgency. The research encompassed
15 over a dozen scholarly empirical projects including original data collection in Afghanistan, Iraq,
16 the Philippines, Colombia, Northern Ireland and the Palestinian Territories, among other sites. It
17 resulted in over a dozen scholarly publications in leading journals and a book.

18        392.    Dr. Berman served as Principal Investigator on an MRI project for research
19 on "Deterrence with Proxies," from 2014–2021. This research investigated how a powerful
20 country can meet its security objectives by guiding the actions of proxy forces, while limiting the
21 vulnerability of its own forces—as the U.S. has done over the last five decades. This grant
22 resulted in multiple scholarly publications and an academic press book, trained postdoctoral
23 fellows and PhD students, with a budget of $3,745,988.

24        393.    Dr. Berman received another grant from MRI, as the co-Principal
25 Investigator with Stephen Biddle, for a one-year project entitled "Empirical Analysis for Meeting
26 Great Power Challenges" in 2020. This grant funded research to evaluate the roles of
27 technological advantage versus force strength in the success of naval battles, using data from the
28 16th Century through the present.

394.    Dr. Berman's prior MRI grant funding resulted in successful projects that furthered the DOD's understanding of national security.

DOD's 2023 Minerva Research Grant Application and Award

395.    On February 16, 2023, Dr. Berman, together with his colleagues, submitted an application for funding to MRI titled "Integrated Deterrence: Episodic Analysis" in response to an annual request for proposals. Dr. Berman was the Principal Investigator for the research, and the work was proposed to be done in collaboration with Professor Estaban Klor at Hebrew University, who was designated the co-Principal Investigator. Their work plan included hiring postdoctoral fellows, and both graduate and undergraduate research assistants.

396.    "Integrated Deterrence" is a national security concept that was the centerpiece of the 2022 National Defense Strategy. Integrated deterrence "involves using every tool at the Department [of Defense]'s disposal, in close collaboration with our counterparts across the U.S. Government, and with Allies and partners, to ensure that potential foes understand the folly of aggression."[141] Those tools include not only coercive measures but also economic, diplomatic, and intelligence instruments.

397.    Dr. Berman's proposal relied on data from the Israel/Gaza conflict discovered and collected as part of the "Deterrence with Proxies" project. Dr. Berman's team proposed: (1) coding textual data on incidents into digital form; (2) validating with social media and official sources; and (3) developing a game theoretic model to analyze the actions of combatants.

398.    This proposed research would continue and expand Dr. Berman's earlier Minerva project research funded during the Trump I and Biden administrations.

Award of Grant Funding (No. FA 9550-23-1-0437)

399.    On August 28, 2023, Dr. Berman and his team received notice of a Grant Award that would provide $1,032,529 in funding over three years.

---

[141] *2022 National Defense Strategy*, U.S. Dep't of Def. (Oct. 27, 2022), https://media.defense.gov/2022/Oct/27/2003103845/-1/-1/1/2022-NATIONAL-DEFENSE-STRATEGY-NPR-MDR.pdf.

400.     Progress between 2023 and 2025 was rapid. With the help of a PhD student, Dr. Berman's team solved a number of technical problems that had stymied previous researchers. The fine-grained nature of the team's data allowed unprecedented opportunities to test game-theoretic models of deterrence, specifically addressing whether episodes of attack and counter-attack tended to escalate or de-escalate, and whether de-escalation led to zero attacks or to some violent equilibrium. The team's understanding of the Gaza/Israel conflict in the period before October 7, 2023 vastly improved. More importantly, the team had a modeling tool to apply to other international conflicts stuck in violent equilibria.

401.     By late 2024, Dr. Berman's team was already circulating results and disseminating this research to policy and academic audiences, including within the U.S. Department of Defense, U.N. Peacekeeping Operations, and Israel's Institute on National Security Studies, as well as at invited academic seminars and conferences.

402.     The policy relevance of these results is manyfold. The game-theoretic model provides an analytical tool simple enough for an undergraduate with some training in economics, political science, or mathematics to use. It has broad applicability to numerous conflicts stuck in a mutual deterrence equilibrium that is not entirely peaceful. Disinformation campaigns and election interference have the same logic and reportedly the same perpetrators, so the results are applicable in that context as well. The model and results also beg two other questions: (1) can the same methods be applied to understand other conflicts?; and (2) can the integration of benign (in addition to coercive) instruments shift those conflicts to a less destructive equilibrium, or even to settlement? Dr. Berman was on the verge of answering these questions in early 2025.

Research Grant Termination (No. FA 9550-23-1-0437)

403.     On February 28, 2025, Dr. Berman received an email from the program officer for the Air Force Office of Scientific Research, which stated:

> In line with recent Presidential executive orders, [the Office of the Undersecretary of Defense for Research & Engineering] has determined that your grant award no longer effectuates Minerva program goals or DOD priorities. As such, we are letting you know

that you will soon be hearing from the grants officer responsible for
your award about terminating it.

404.    UCSD subsequently received a brief notice from the DOD Department of
the Air Force that stated: "The Government intends to terminate this Award under the authority of
2 CFR 200.340(a)(4)." No explanation of any kind for the termination was provided.

405.    On March 3, 2025, DOD issued a Grant/Cooperative Agreement
Modification. Again, it provided no explanation for the termination beyond form language:

The subject grant award no longer effectuates the program goals or
agency priorities as found in 2 CFR 200.340(a)(4) as incorporated
into the DOD Research and Development General Terms and
Conditions for grants by reference.

406.    As a result of the modification, the DOD eliminated the third year of
funding on the grant ($248,991).

Harm from Grant Termination

407.    Dr. Berman and his team have suffered immediate harm as a result of the
grant cancellation.

408.    Dr. Berman and his co-PI have been forced to significantly slow research
progress and dissemination because they must now devote much of their time to writing grant
applications.

409.    The researchers on Dr. Berman's grant have been unable to employ a
postdoctoral fellow and have had to release from employment their research assistants. This has
slowed the team's empirical and theoretical progress, and ceased their training of young scholars.

410.    Similarly, the loss of grant funding threatens the team's ability to retain
essential support staff at the IGCC.

411.    The loss of grant funding also threatens the overall research and teaching
operations of the University of California, which relies on Indirect Cost charges (currently 59% of
total cost on new grants at UC San Diego) to cover activities such as building use, equipment
depreciation, operation and maintenance of UC facilities, student services, departmental
administration, or administrative support offices.

412. Dr. Berman lost 22% of his annual compensation this calendar year due to grant termination.

413. These personal and financial harms are ongoing.

414. These harms are in addition to the loss of value to the public from Dr. Berman's research—specifically the national security community, as Dr. Berman has lost both time to travel and the resources to pay for travel to conferences and meetings.

**E.      Department of Transportation**

415. The Department of Transportation ("DOT") is a federal agency within the meaning of the APA established to protect and enhance the safety, adequacy, and efficiency of the nation's transportation system and services.

**1.      Congress Established DOT to Promote the Safety, Quality, and Efficiency of the Nation's Transportation Services, Including Through Research**

416. Before the DOT was created in 1967, various federal programs devoted nearly 100,000 employees and almost $6 billion to transportation across the United States.[142] President Lyndon B. Johnson decried this decentralized system as "not good enough" for the nation, and told Congress that system resulted in inefficient, congested, and unsafe transportation.[143] An improved, coordinated system was essential to the nation's economic health and well-being, including employment, standard of living, accessibility, and the national defense.[144]

417. Congress then passed the Department of Transportation Act ("the Act"), Pub. L. No. 89-670, 80 Stat. 931 (1966), which President Johnson signed into law on October 15, 1966. The Act centralized 31 federal agencies and functions, including the Federal Aviation Agency, the Coast Guard, the Federal Railroad Administration, and many others.[145]

---

[142] President Lyndon B. Johnson, *Special Message to Congress on Transportation* (March 2, 1066), https://www.presidency.ucsb.edu/documents/special-message-the-congress-transportation-0.

[143] *Id.*

[144] *A Brief History of the DOT*, U.S. Dep't of Trans., https://transportation.libguides.com/c.php?g=1154894&p=8441208.

[145] *Id.*

418.    Today, the DOT's operating administrations include the U.S. Department of Transportation Office of the Secretary (OST), National Highway Traffic Safety Administration (NHTSA), Federal Aviation Administration (FAA), Office of Inspector General (OIG), Federal Highway Administration (FHWA), Pipeline and Hazardous Materials Safety Administration (PHMSA), Federal Motor Carrier Safety Administration (FMCSA), Federal Railroad Administration (FRA), Great Lakes St. Lawrence Seaway Development Corporation (GLS), Federal Transit Administration (FTA), and the Maritime Administration (MARAD).[146]

419.    The Act provides "that the national objectives of general welfare, economic growth and stability, and security of the United States require the development of transportation policies and programs that contribute to providing fast, safe, efficient, and convenient transportation at the lowest cost consistent with those and other national objectives, including the efficient use and conservation of the resources of the United States." Pub. L. No. 97-449 (codified at 49 U.S.C. § 101(a)).

420.    The Act also provides that the DOT shall:

- ensure the coordinated and effective administration of the transportation programs of the United States Government;

- make easier the development and improvement of coordinated transportation service to be provided by private enterprise to the greatest extent feasible;

- encourage cooperation of Federal, State, and local governments, carriers, labor, and other interested persons to achieve transportation objectives;

- stimulate technological advances in transportation, through research and development or otherwise;

- provide general leadership in identifying and solving transportation problems; and

- develop and recommend to the President and Congress transportation policies and programs to achieve transportation objectives considering the needs of the public, users, carriers, industry, labor, and national defense.[147]

---

[146] *Id.*

[147] Pub. L. 97-449 (codified at 49 U.S.C. § 101(b)).

421.    One way the DOT effectuates its mission is by providing funding to projects that invest in "transportation infrastructure, safety, and innovation across the country."[148] Congress appropriates these funds and authorizes transportation programs based on national priorities.[149] The DOT provides funding through Competitive Grant Funding Programs, Formula Grant Funding Programs (funding to states, tribes, and transit agencies), Loan Financing Programs, and Public-Private Partnerships (P3s).

422.    The DOT administers competitive grant programs through its operating administrations ("OAs") and the Office of the Secretary of Transportation.[150] Each OA (e.g., Federal Highway Administration, Federal Transit Administration) solicits applications through a Notice of Funding Opportunity and selects projects based on program eligibility, evaluation criteria, and Departmental or program priorities. The Bipartisan Infrastructure Law alone provided billions of dollars for the DOT to distribute through competitive grant programs.[151]

423.    Since the DOT's creation, Congress has continually provided funding and additional duties for the DOT to carry out its mission.[152] The Department's authorities are codified under U.S. Code Titles 23 (highways), 46 (maritime), and 49 (aviation, railroads, and other surface modes).[153]

424.    In subsequent legislation, Congress has consistently affirmed that the DOT shall improve the nation's transportation system for all Americans, and has done so using language that the Trump Administration associates with "DEI" and "environmental justice."

425.    For example, in 1991, Congress passed the Intermodal Surface Transportation Efficiency Act ("ISTEA") to develop a National Intermodal Transportation System. Pub. L. No.  102-240, 105 Stat. 1914 (Dec. 18, 1991). Congress declared that the system

---

[148] *Overview of Funding and Financing at USDOT*, U.S. Dep't of Trans., https://www.transportation.gov/grants/dot-navigator/overview-funding-and-financing-usdot.
[149] *Id.*
[150] *Id.*
[151] *The Bipartisan Infrastructure Law and Innovation,* U.S. Dep't of Trans., https://www.transportation.gov/priorities/innovation/bipartisan-infrastructure-law-and-innovation.
[152] *Strategic Plan for FY 2028-2022*, U.S. Dep't of Trans., (February 2018), https://www.transportation.gov/sites/dot.gov/files/docs/mission/administrations/office-policy/304866/dot-strategic-planfy2018-2022508.pdf.
[153] *Id.*

would include "significant improvements in public transportation necessary to achieve national goals for improved air quality, energy conservation, international competitiveness, and mobility for elderly persons, persons with disabilities, and economically disadvantaged persons in urban and rural areas of the country." Pub L. 102-240 § 2. Parts of the ISTEA directed the Secretary of the DOT ("the Secretary") to implement this system by leading and coordinating the research and development of high-speed rail, wooden bridges, and highway safety conditions. *Id*. Title I, Part A, §§ 1036, 1039. The ISTEA also authorized the Secretary of the DOT to collaborate with non-federal entities and to conduct research into areas such as underground pipes, buses, and construction materials. *Id*. Title VI, Part A §§ 6001, 6005, 6020, 6021.

426.    In 1998, Congress passed the Transportation Equity Act for the 21st Century ("TEA-21") to authorize funds for Federal-aid highways, highway safety programs, transit programs, and other transportation purposes. Pub. L. No. 105–178, 112 Stat. 107 (June 9, 1998).

427.    The TEA-21 reauthorized the Disadvantaged Business Enterprises ("DBE") provision, which was first introduced in DOT legislation beginning in 1983, and has been reauthorized at every opportunity since.[154] The TEA-21's DBE provision required that at least 10 percent of the funding made available by the statute was to be provided to small businesses controlled and owned by "socially and economically disadvantaged individuals." *Id*. Title I, Subtitle A, § 1101(b)(1).

428.    Most recently, in 2021, Congress passed the Infrastructure Investment and Jobs Act ("IIJA"), also known as the Bipartisan Infrastructure Law. Pub L. No. 117-85, 135 Stat. 429 (codified at 23 U.S.C § 101). Much of the IIJA requires the DOT to consider and prioritize projects that target disadvantaged communities and prioritize equitable outcomes.

429.    The IIJA directed the Secretary to establish the Healthy Streets program, which would provide grants to mitigate urban heats islands and improve air quality. Pub L. No.

---

[154]*Disadvantaged Business Enterprise (DBE) Program,* U.S. Dep't of Trans., https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise.

117-85, Title I, Subtitle D, § 11406. In awarding the grants, Congress specified that the Secretary should prioritize projects that target low-income or disadvantaged communities. *Id.* § 11406(f)(1).

430.    The IIJA also directed the Secretary to make grants to organizations constructing safe and connected active transportation facilities. The IIJA also directed that in considering applications, the Secretary should consider the extent to which a proposal addresses "existing disparities in bicyclist and pedestrian fatality rates based on race or income level or provide access to jobs and services for low-income communities and disadvantaged communities." *Id.*

431.    The IIJA also directed the Secretary to establish the Reconnecting Communities Pilot ("RCP") Grant Program to advance "community-centered transportation connection projects, with a priority for projects that benefit low-capacity communities."[155] The primary goal of the RCP is to "reconnect communities harmed by past transportation infrastructure decision."[156] In evaluating grant applications, the Secretary is required to consider a project's "opportunities for inclusive economic development." Pub L. 117-85 Title I, Subtitle E, § 11509 (d)(4)(B)(v).

432.    The IIJA also directed the Secretary to establish the Rural Opportunities to Use Transportation for Economic Success Office ("ROUTES") which was tasked to "improve analysis of projects from rural areas, Indian Tribes, and historically disadvantaged communities in rural areas applying for Department discretionary grants." *Id.* § 25010(b)(1)(A). The IIJA codified the ROUTES initiative, which was established under the first Trump administration in October 2019 with DOT Order 5050.1.[157]

433.    The IIJA also amended the University Transportation Centers ("UTC") Program, which was established in 1987. The UTC program "advances the state-of-the-art in transportation research and technology, and develops the next generation of transportation

---

[155] *Reconnecting Communities Pilot (RCP) Grant Program,* U.S. Dep't of Trans., https://www.transportation.gov/reconnecting.
[156] *Id.*
[157] *Rural Opportunities to Use Transportation for Economic Success (ROUTES)*, U.S. Dep't of Trans., https://www.transportation.gov/rural.

1   professionals."[158] The program requires the Secretary to award grants to proposals that address

2   six research priorities: improving mobility of people and goods; reducing congestion; promoting

3   safety; improving the durability and extending the life of transportation infrastructure; preserving

4   the environment; preserving the existing transportation system; and reducing transportation

5   cybersecurity risks. 49 U.S.C. § 6503(c)(1). And the Secretary is required to select grants based in

6   part on the recipient's "demonstrated commitment" to developing the transportation workforce

7   through "outreach activities to attract new entrants into the transportation field, including women

8   and underrepresented populations." *Id.* § 5505(b)(4)(B)(v)(II).

9        434.    The IIJA also established the Safe Streets and Roads for All (SS4A)

10  program with over $5 billion in funds to distribute to initiatives preventing roadway fatalities and

11  serious injuries.[159] In awarding grants, the IIJA requires the Secretary to consider whether a

12  project ensures "equitable investment in the safety needs of underserved communities in

13  preventing transportation-related fatalities and injuries." Pub L. No. 117-85, Title IV, Subtitle A,

14  § 24112(d)(3)(E).

15       435.    The IIJA also required the Federal Motor Carrier Safety Administration, an

16  administration of the DOT, to establish an advisory board focused on creating opportunities for

17  women in the trucking industry. *Id.* § 23007.

18       436.    The IIJA also reauthorized the DBE program, finding that "while

19  significant progress has occurred due to the establishment of the disadvantaged business

20  enterprise program, discrimination and related barriers continue to pose significant obstacles for

21  minority- and women-owned businesses seeking to do business in Federally assisted"

22  transportation markets. *Id.* Title I, Subtitle A, § 11101(e)(1)(A).

23       437.    These measures demonstrate that Congress directed the DOT to consider

24  so-called "DEI" priorities in its initiatives, including in grant funding.

25

26

27  [158] *University Transportation Centers,* U.S. Dep't of Trans.,
https://www.transportation.gov/content/university-transportation-centers.

28  [159] *Safe Streets and Roads for All (SS4A) Grant Program,* U.S. Dep't of Trans.,
https://www.transportation.gov/grants/SS4A.

  AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**2.**    **In Response to Trump Administration Directives, DOT Improperly Changed Priorities and Canceled Existing Grants**

438.    In January 2025, Sean Duffy was appointed as the Secretary of the DOT.[160] Duffy's first actions were to "advance[] President Donald Trump's agenda to rescind woke policies" and ensure that all DOT "policies align with the Administration's priorities."[161] He made no mention of the priorities set by Congress.

439.    To align with President Trump's executive orders, including E.O. 14148, the Secretary signed the "Woke Rescission" Memorandum, which directed DOT officials to "identify and eliminate all Biden-era programs, policies, activities, rules, and orders that promote climate change activism, Diversity, Equity, and Inclusion (DEI) initiatives, racial equity, gender identity policies, environmental justice, and other partisan objectives."[162]

440.    This alignment with the Trump administration included how the DOT defended its lawsuits.

441.    In October 2023, two DOT contractors had sued the DOT, challenging the constitutionality of the DBE program. *Mid-Am. Milling Co. v. United States Dep't of Transp.*, No. 3:23-CV-00072-GFVT-EBA, 2025 WL 1461818, at *1 (E.D. Ky. May 21, 2025). Any person may qualify as socially and economically disadvantaged, but certain racial groups and women are "rebuttably presumed" to be disadvantaged. *Id.* In September 2024, a district court judge issued a preliminary injunction enjoining the DOT from "mandating the use of race-and gender-based rebuttable presumptions for [DOT] contracts impacted by DBE goals." *Id.* at *2. In May 2025, after the change in administration, the DOT filed a proposed consent order stipulating that the DBE program's use of race- and sex-based presumptions is unconstitutional.[163] However, the

---

[160] *U.S. Transportation Secretary Duffy Takes Action to Rescind "Woke" DEI Policies and Advance President Trump's Economic Agenda*, U.S. Dep't of Trans. (Jan. 29, 2025), https://www.transportation.gov/briefing-room/us-transportation-secretary-sean-duffy-takes-action-rescind-woke-dei-policies-and.

[161] *Id.*

[162] *Id.*

[163] *Mid-Am. Milling Co. v. United States Dep't of Transp.* No. 3:23-CV-00072-GFVT-EBA, Dkt. 82-1, May 28, 2025.

district judge has not yet approved the order as intervenor-defendants continue to litigate the case on behalf of beneficiaries of the program. *Mid-Am. Milling Co,* 2025 WL 1461818, at *1.

442.    Secretary Duffy has been clear that he is targeting polices and grants that do not conform to the Administration's priorities.

443.    On April 24, 2025, the Secretary sent a letter to all DOT grant recipients instructing them to "Follow the Law."[164] The letter told recipients they had "entered into legally enforceable agreements with the United States Government and are obligated to comply fully with all applicable Federal laws and regulations."[165] The letter also provided that:

> "Whether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called "diversity, equity, and inclusion," or "DEI," goals, presumptively violates Federal law. Recipients of DOT financial assistance must ensure that the personnel practices (including hiring, promotions, and terminations) within their organizations are merit-based and do not discriminate based on prohibited categories. Recipients are also precluded from allocating money received under DOT awards—such as through contracts or the provision of other benefits—based on suspect classifications."[166]

444.    The letter told recipients they were required to cooperate with federal authorities, including cooperating and not impeding U.S. Immigration and Customs Enforcement ("ICE").[167] And it provided that "DOT may also terminate funding in response to substantiated breaches of the terms of the agreement, or if DOT determines that continued funding is no longer in the public interest."[168]

445.    In blatant contradiction of its enabling legislation in the IIJA, on April 1, 2025, the Secretary removed the "DEI/Climate Requirements" in the grant application for the SS4A grant program.[169] This action removed the definition of equity and language stating that the

---

[164] *Trump's Transportation Secretary Sean P. Duffy: Follow The Law*, U.S. Dep't of Trans. (Apr. 24, 2025), https://www.transportation.gov/briefing-room/trumps-transportation-secretary-sean-p-duffy-follow-law. The full text of the letter is available at https://www.transportation.gov/sites/dot.gov/files/2025-05/Follow%20the%20Law%20Letter%20to%20Applicants%204.24.25.pdf.

[165] *Id.*

[166] *Id.*

[167] *Id.*

[168] *Id.*

[169] *U.S. Transportation Secretary Sean P. Duffy Announces Funding for Communities to Improve*

- 97 -

AMENDED CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    DOT was seeking projects that address equity and environmental justice from the notice of

2    funding opportunity.[170] The Secretary said that "DEI and environmental justice requirements for

3    the Safe Streets program weren't just unnecessary – they were bogging down the system and

4    preventing money from going out to where it's needed."[171]

5              446.    On May 2, 2025, the Secretary announced that the DOT terminated "seven

6    woke university grants" that were used to "advance a radical DEI and green agenda that were

7    both wasteful and ran counter to the transportation priorities of the American people."[172] The

8    Secretary explained that the "previous administration turned the [DOT] into the Department of

9    Woke" and that Americans "have zero interest in millions of their tax dollars funding research on

10   the intersection of gender non-conforming people and infrastructure inequality or whether road

11   improvement projects are racist."[173] The terminations included grants to UC Davis for

12   "accelerating equitable decarbonization research," to USC for research regarding how "the

13   transportation system creates and perpetuates inequities," and to Johns Hopkins for research on

14   "pollution exposure inequality in New York City."[174]

15             447.    Plaintiff Handy received a letter containing the following form explanation

16   for her grant's termination, which demonstrates that DOT replaced its Congressionally mandated

17   directives for Defendant Trump's:

18             At the time your grant was issued, the grant agreement and applicable
               regulations authorized termination by "the Federal awarding agency
19             or pass-through entity, to the greatest extent authorized by law, if an
               award no longer effectuates the program goals or agency priorities."
20             2 CFR § 200.340(a)(2). DOT's priorities presently include:

21             • promoting traditional forms of energy and natural resources to the
               greatest extent possible,
22
               • ensuring that taxpayer dollars are used efficiently in ways that
23

24   *Road Safety*, U.S. Dep't of Trans. (April 1, 2025), https://www.transportation.gov/briefing-
     room/us-transportation-secretary-sean-p-duffy-announces-funding-communities-improve-road.
25   [170] *Id.*

     [171] *Id.*
26   [172] *U.S. Transportation Secretary Sean P. Duffy Defunds Woke University Grants*, U.S. Dep't of
27   Trans. (May 2, 2025), https://www.transportation.gov/briefing-room/us-transportation-secretary-
     sean-p-duffy-defunds-woke-university-grants.
28   [173] *Id.*
     [174] *Id.*

maximally benefit the American people and improve their quality of life, and

• ceasing to promote divisive diversity, equity, and inclusion initiatives that discriminate on the basis of race, national origin, or another protected characteristic.

Having individually reviewed your grant in light of DOT's priorities, the Office of the Secretary has determined that your grant is inconsistent with the priorities listed above.[175]

448.    On information and belief, all researchers received the same "rationale" for grant termination.

449.    The DOT's present priorities used to rescind research grants contradict Congress's mandate to the DOT in the IIJA and other directives.

450.    Many parts of the IIJA provide funding for clean energy projects, as opposed to "traditional forms of energy," and mandates that the DOT distribute these funds. For example, the IIJA appropriated "$1.1 billion for the Federal Transit Administration's Low or No Emission Vehicle Program and $50 million for the Electric or Low-emitting Ferry Program in FY 2022."[176] The IIJA also included billions of dollars to create additional charging stations for electric vehicles.[177]

451.    "Ceasing to promote divisive diversity, equity, and inclusion, initiatives" also violates the IIJA and other legislation. Specifically, applicants for the UTC program are required to be evaluated on their "demonstrated commitment" to developing the transportation workforce through "outreach activities to attract new entrants into the transportation field, including women and underrepresented populations." 49 U.S.C. § 5505(b)(4)(B)(v)(II).

452.    On July 2, 2025, the Secretary sent a second letter to all DOT grant recipients announcing that the "Trump Administration will not enforce Biden-era DEI and Green New Scam policies or requirements."[178] The Secretary wrote that the DOT will not enforce

---

[175] Handy Decl. Ex. F.

[176] *Fact Sheet: Climate and Resilience in the Bipartisan Infrastructure Law,* U.S. Dep't of Trans., https://www.transportation.gov/bipartisan-infrastructure-law/fact-sheet-climate-and-resilience-bipartisan-infrastructure-law.

[177] *Id.*

[178] *President Trump's Transportation Secretary Sean P. Duffy to Recipients of Federal Funds: We're Tossing All Biden-Era DEI Directives*, U.S. Dep't of Trans. (July 9, 2025),

1    anything related to climate change, greenhouse gas emissions, racial equity, gender identity,

2    diversity, equity, and inclusion goals, environmental justice, or the Justice 40 Initiative. This

3    change was in response to several of President Trump's Executive Orders, including:

- E.O. 14170, Reforming the Federal Hiring Process and Restoring Merit to Government Service;

- E.O. 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing;

- E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;

- E.O. 14149, Restoring Freedom of Speech and Ending Federal Censorship;

- E.O. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity; and

- E.O. 14154, Unleashing American Energy.[179]

13    453.    The Trump DOT's drastic shift in priorities and purging of certain ideas

14    deviates from the DOT's long-tradition of improving the nation's transportation for all Americans

15    and violates Congressional statutes.

### 3. DOT Plaintiff and Other Grant Recipients Are Harmed by DOT's Illegal Grant Terminations

454.    Plaintiff Handy and Class members have long relied on DOT grants to fund

meritorious projects in the transportation space. The termination of previously approved grants

has caused and continues to cause Plaintiff and Class members serious harm.

### b. Plaintiff Susan Handy's Grant Terminations and Resulting Harm[180]

455.    Dr. Susan L. Handy is a Distinguished Professor in the Department of

Environmental Science and Policy at the University of California, Davis who studies the

relationship between transportation and land use, particularly the impact of land use on travel

behavior and on strategies for reducing automobile dependence.

---

https://www.transportation.gov/briefing-room/president-trumps-transportation-secretary-sean-p-duffy-recipients-federal-funds-were.

[179] *Id.*

[180] Plaintiff Handy submitted a declaration, filed herewith, that further details her background and research, including information about her terminated grant.

- 100 -    AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

456.    Dr. Handy has served as the Center Director of the National Center for Sustainable Transportation (NCST) since its founding in 2013. She previously served as the Chair of the Transportation Technology and Policy Graduate Group, the Chair of the Department of Environmental Science and Policy, and the Director of the Sustainable Transportation Center at UC Davis. Her recent work includes projects for the California Air Resources Board and Caltrans.

457.    Dr. Handy is the author of the book Shifting *Gears: Toward a New Way of Thinking About Transportation* (MIT Press, 2023). She has also authored or co-authored dozens of articles, papers, and reviews on transportation and land use.

458.    Dr. Handy also serves as an Associate Editor of *Transportation Research Record* and serves on the Editorial Board of numerous other journals including *Transport Reviews*, *Travel Behavior & Society*; *Transport Policy*; *Journal of Transportation and Land Use*; *Journal of Planning Education and Research*; and *Transportation Research*.

### The National Center for Sustainable Transportation (NCST)

459.    Dr. Handy is the director of the National Center for Sustainable Transportation ("NCST"), which provides national leadership in advancing environmentally sustainable transportation through cutting-edge research, direct policy engagement, and education. The NCST was established in 2013 after being selected in a national competition to serve as one of five national transportation centers as part of the University Transportation Centers (UTC) program administered by the DOT under the Moving Ahead for Progress in the 21st Century Act. In 2016, the NCST successfully re-competed for the opportunity to continue serving as one of the DOT's national UTCs under the Fixing America's Surface Transportation Act

460.    The NCST is a powerful coalition of seven universities across the country. The Institute of Transportation Studies at the University of California, Davis, leads the NCST, with partner centers at California State University, Long Beach; Georgia Institute of Technology; Texas Southern University; the University of California, Riverside; the University of Southern California; and the University of Vermont.

461.    Since its founding, the NCST has been delivering results with timely, practical research that has produced 356 reports and white papers, 163 policy and research briefs—which make complex findings easy to understand for everyday Americans—and over 400 peer-reviewed publications. Over the past decade, the NCST has hosted 416 events, drawing nearly 30,000 participants from government agencies, industry leaders, and the public. Hundreds of students have taken part in NCST programs.

462.    Many of the NCST's studies target transportation challenges in small towns and farming communities, where good roads and access to jobs and services are essential to daily life and economic survival. NCST also supports American industry and supply chains by exploring better ways to move goods.

463.    Moreover, the NCST's activities have had transformational impacts on the nation's transportation systems. Its work has contributed to accelerated adoption of vehicles and fuels that minimize greenhouse gas emissions, new approaches to infrastructure provision and systems operation that lessen environmental impacts, and a shift towards modes other than driving so as to reduce vehicle miles traveled while improving accessibility. These transformations help the United States reduce its greenhouse gas emissions while reducing other environmental harms, enhancing social equity, and supporting economic vitality.

464.    The NCST has received funding from the DOT, the California Department of Transportation, the California Air Resources Board, the California Energy Commission, the South Coast Air Quality Management District, sources in the States of Georgia, Texas, and Vermont, and private industry.

Award of NCST Grant Funding (Nos. 69A3552344814 and 69A3552348319)

465.    In 2022, Dr. Handy and her colleagues at the NCST submitted a grant proposal to the DOT to fund the NCST's research activities in the DOT Priority Area "Preserving the Environment," as set out by the Infrastructure Investment and Jobs Act ("IIJA").

466.    The NCST would support four kinds of research activities, all aimed at matching research to policy: (1) building tools; (2) developing policy; (3) conducting studies; and

(4) undertaking basic research. The application explained that the NCST's research activities would relate to electrification, alternative fuels, air quality, and environmental justice.

467.    Dr. Handy was the Principal Investigator for this grant proposal.

468.    On June 1, 2023, Dr. Handy and her team received from DOT notice of Grant Award Nos. 69A3552344814 and 69A3552348319 awarding a total of $4,000,000 per funding year, for five annual allocations of funding.

469.    This award was made under the IIJA, through which the DOT awarded $90 million in funding per year for the competitively selected UTC programs, including the NCST's $4 million annual award. The NCST's funding was awarded to promote research focused on accelerating equitable decarbonization that benefits both the transportation system and the well-being of people in overburdened and historically disadvantaged communities. The research activities were focused on three critical domains: (1) vehicle technology to accelerate lower greenhouse gas emissions; (2) infrastructure provision; and (3) reshaping travel demand.

Termination of NCST Grant Funding (Nos. 69A3552344814 and 69A3552348319)

470.    On May 2, 2025, Dr. Handy and her team learned of the termination of all of NCST's DOT funding—in effect the termination of the NCST itself—through a DOT press release titled "U.S. Transportation Secretary Sean P. Duffy Defunds Woke University Grants."[181]

471.    Also on May 2, 2025, UC Davis received a Notice of Termination announcing the termination of Award Nos. 69A3552344814 and 69A3552348319 on the grounds that the awards are "inconsistent" with current DOT "priorities," including "DOT's priority to cease promoting DEI initiatives that discriminate on the basis of race, national origin, or another protected characteristic."

472.    The Notice of Termination also apparently references the research activities of a different DOT grantee, C2SMARTER, in purporting to explain the reasons for the termination of NCST's grants.

---

[181] *U.S. Transportation Secretary Sean P. Duffy Defunds Woke University Grants*, U.S. Dep't of Trans. (May 2, 2025), https://www.transportation.gov/briefing-room/us-transportation-secretary-sean-p-duffy-defunds-woke-university-grants.

1

<u>Pacific Southwest Region University Transportation Center (PSR UTC) and Grant Funding</u>

2

3        473.    The Pacific Southwest Region University Transportation Center is a

4  regional UTC funded by the DOT. Established in 2016, the PSR UTC is led by the University of

5  Southern California and includes nine research partner universities, including the University of

6  California, Berkeley, the University of California, Davis, the University of California, Irvine, and

7  the University of California, Los Angeles.

8        474.    Dr. Handy is the Principal Investigator on Subaward No. SCON-00005220

9  funded through PSR UTC's DOT Grant No. 69A3552348309. The subaward was for $245,000

10  for a budget period of June 1, 2023, through May 31, 2024; subsequently amended on July 1,

11  2024, to provide the second annual allocation of funding in the amount of $240,734.55, and to

12  extend the subaward end date to May 31, 2025.

13        <u>Termination of PSR UTC Grant Funding and Subaward</u>

14        475.    The May 2, 2025 DOT press release announcing the termination of

15  NCST's grants also announced the termination of PSR UTC's grants.

16        476.    On May 5, 2025, UC Davis's Sponsored Programs Office received a stop

17  work notification relating to Subaward No. SCON-00005220. Attached to the email was the

18  termination letter the University of Southern California received from DOT, terminating PSR

19  UTC's Grant No. 69A3552348309.

20        477.    The language of this termination letter was similar to the language in the

21  letter terminating NCST's grant funding. The PSR UTC termination letter similarly states that the

22  "grant is inconsistent with the priorities" of DOT, including "DOT's priority to cease promoting

23  DEI initiatives that discriminate on the basis of race, national origin, or another protected

24  characteristic." The letter also labels PSR UTC's electric vehicle statement and "environmental

25  justice themes" as "discriminatory consideration and 'green new deal' principles that are

26  inconsistent with DOT's priorities."

27        <u>Harm Suffered from Grant Terminations</u>

28

478.    Dr. Handy and her collaborators at NCST and PSR UTC have suffered immediate harm as a result of the cancellation of their grants and the defunding of their research centers.

479.    Dr. Handy and the 77 other researchers funded by these grants at the time of cancellation have been forced to significantly slow both research progress and dissemination. As of the terminations of the grants, 79 research projects were in progress that now may not be completed. Rather than taking on pressing research questions, much of Dr. Handy's time and that of her fellow researchers has been taken up writing grant applications to replace lost funding. They have lost both time and funding needed to travel to meetings and conferences to disseminate their research.

480.    The researchers on these grants have had to lay off or find new sources of funding for more than 40 graduate and undergraduate research assistants who were employed on research projects funded by these grants. Researchers have been unable to make employment offers to graduate and undergraduate research assistants or to postdoctoral fellows for the coming year. This not only has slowed Dr. Handy's research progress, it has also ceased her training of these young scholars.

481.    Loss of grant funding similarly threatens Dr. Handy's ability to retain essential support staff. The loss of grant funding resulted in the loss of the equivalent of nearly 5 full time staff positions at UC Davis alone. The reduction in staffing is severely limiting the active dissemination of findings from completed projects to agencies, industry, and the public.

482.    Loss of grant funding threatens the overall research and teaching operations of UC Davis, which relies on federal funding to further its educational and scientific purposes.

483.    These personal and financial harms are ongoing. Nearly 10 percent of Dr. Handy's annual compensation was lost this calendar year due to grant terminations.

484.    These harms are in addition to the loss of value to the public from the research funded by these grants. The grant terminations put an end to research that is critical to

1  ensuring the environmental and financial sustainability of the nation's transportation system and

2  enhancing its ability to serve the needs of the U.S. population.

3        **F.**      **Allegations Against Additional Federal Agency Defendants**

4        485.    While Plaintiffs' grants were unlawfully terminated by EPA, NEH, NSF,

5  DOD, and DOT, these agencies are acting no differently than other federal agencies choosing to

6  ignore their congressional mandates in favor of political objectives. Indeed, all are acting under

7  the Executive Orders and other unlawful directives from Defendants Trump and DOGE, rather

8  than under the authority of their statutory mandates.

9        486.    The Federal Agency Defendants are acting in similar, categorical, and

10  lockstep fashion. Their uniform and categorically unlawful conduct usurps congressional

11  authority and the rights of Class members in the same unlawful way, and it will only increase,

12  absent the declaratory and injunctive relief requested in this Complaint. The violation of

13  separation of power principles is still more blatant now that Defendant Trump and the members

14  of his Cabinet collectively and directly run DOGE. The following allegations demonstrate that all

15  Federal Agency Defendants have engaged in the same course of conduct and harmed the

16  members of the UC researchers class in the same way as the Named Plaintiffs have been harmed,

17  under the same Executive Orders and DOGE directives.

18        487.    Class members (researchers in the UC system) receive funding from an

19  array of federal agencies, and have suffered the same type of harm (abrupt termination of

20  previously awarded grants under Executive Orders and/or other Trump administration directives)

21  from the universal terminations perpetuated by Defendants.

22        488.    At minimum, the following Federal Agency Defendants have terminated or

23  will imminently terminate grants to Class members:

24        **1.**      **Department of Agriculture**

25        489.    Early into President Trump's tenure, the Department of Agriculture

26  (USDA) ceded control to DOGE. Secretary of Agriculture Brooke Rollins announced on

27  February 14, 2025 that she "welcome[d]" DOGE's spending cuts, and that DOGE would have

28

1   "full access" as Rollins reviewed "thousands of …grants" over the first weeks of her tenure. All

2   of this, according to USDA, would be done "per the President's directives."[182]

3          490.    By March 13, 2025, USDA announced that Rollins had "worked with

4   [DOGE] to streamline USDA operations by cutting wasteful spending," hyperlinking to a social

5   media post about a terminated university research grant.[183]

6          491.    USDA also canceled its Partnerships for Climate-Smart Commodities

7   program, which included research grants to universities.[184] USDA stated that recipients could re-

8   apply for funding if their projects were "aligned with the priorities of this Administration."[185]

9          492.    USDA grants to UC researchers were terminated, causing serious harm. On

10  information and belief, researchers received form termination letters.

11         493.    By terminating grants at the direction of the President and DOGE, USDA

12  has violated its congressional mandates. Such mandates include, for example, compliance with

13  and effectuation of the legislative purposes implicit in congressional appropriations, and 7 U.S.C.

14  § 3157, which establishes a research grant program to "promote research in food, agriculture, and

15  related areas."

16         494.    By effectuating mass terminations of grants to UC researchers without

17  proper review or clear explanation, USDA acted unconstitutionally and unlawfully, as set forth in

18  the Claims for Relief asserted below.

19

20

21

22  [182] U.S. Dep't of Agric., *Secretary Rollins Takes Bold Action to Stop Wasteful Spending and Optimize USDA to Better Serve American Agriculture* (Feb. 14, 2025),

23  https://www.usda.gov/about-usda/news/press-releases/2025/02/14/secretary-rollins-takes-bold-action-stop-wasteful-spending-and-optimize-usda-better-serve-american.

24  [183] U.S. Dep't of Agric., *Secretary Brooke Rollins Takes Bold Action in First 30 Days at USDA* (Mar. 13, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/03/13/secretary-

25  brooke-rollins-takes-bold-action-first-30-days-usda.
    [184] *See, e.g.*, Univ. of Idaho, *Secretary Brooke Rollins Takes Bold Action in First 30 Days at*

26  *USDA* (Apr. 16, 2025), https://www.uidaho.edu/news/news-articles/news-releases/2025/041625-iamp-termination.

27  [185] U.S. Dep't of Agric., *USDA Cancels Biden Era Climate Slush Fund, Reprioritizes Existing Funding to Farmers* (Apr. 14, 2025),

28  https://content.govdelivery.com/accounts/USDAOC/bulletins/3dbe363.https://content.govdelivery.com/accounts/USDAOC/bulletins/3dbe363.

1

2.     **AmeriCorps**

2          495.     AmeriCorps has also mass terminated grants in response to President

3     Trump's Executive Orders and DOGE directives.

4          496.     AmeriCorps has stated that it is "taking proactive action to ensure

5     alignment with . . . the Trump-Vance Administration priorities." AmeriCorps has also stated that

6     all grants and grant applications "must comply with President Trump's executive orders,"

7     specifically listing the following Executive Orders: "Defending Women From Gender Ideology

8     Extremism and Restoring Biological Truth to the Federal Government," "Unleashing American

9     Energy," "Ending Radical and Wasteful Government DEI Programs and Preferencing," and

10    "Ending Illegal Discrimination and Restoring Merit-Based Opportunity."[186]

11         497.     On April 25, 2025, news outlets reported that DOGE had ordered

12    AmeriCorps to terminate almost $400 million in grants.[187] This constitutes roughly 41% of the

13    agency's total grant funding.

14         498.     That same day, UC researchers received form termination letters that read:

15         Effective immediately, the AmeriCorps award subrecipient(s)
           included in the attached spreadsheet is/are being terminated per 2
16         CFR 200.340(a)(4) because it has been determined that the award no
           longer effectuates agency priorities. You must immediately cease all
17         award activities. This is a final agency action and is not
           administratively appealable.

18

19         499.     UC researchers have suffered serious harm as a result of Defendants'

20    actions.

21         500.     By terminating grants at the direction of the President and DOGE,

22    AmeriCorps has violated its congressional mandates. Such mandates include, for example,

23    compliance with and effectuation of the legislative purposes implicit in congressional

24    _____

25    [186] AmeriCorps, *Grantee and Sponsor Guidance on Compliance,*
       https://www.americorps.gov/grantees-sponsors/grantee-sponsor-guidance-compliance (last visited
       May 28, 2025).

26    [187] Teri Raji, *DOGE Orders major cut to AmeriCorps funding, imperiling agency's work*, The
       Washington Post (Apr. 25, 2025),

27    https://www.washingtonpost.com/nation/2025/04/25/americorps-grant-cuts-doge/; Sophia Cai &
       Ben Johansen, *DOGE Hits Trump Country*, Politico (Apr. 30, 2025),

28    https://www.politico.com/news/2025/04/30/doge-hits-trump-country-00319654.

1    appropriations, and 42 U.S.C. 12653 (describing activities AmeriCorps must carry out directly or

2    through grants).

3           501.    By effectuating mass terminations of grants to UC researchers without

4    proper review or clear explanation, AmeriCorps acted unconstitutionally and unlawfully, as set

5    forth in the Claims for Relief asserted below.

6           **3.    <u>Department of Education</u>**

7           502.    Department of Education grants were an early DOGE target. On February

8    10, DOGE announced (on X, Elon Musk's social media platform) that it had terminated 29 "DEI

9    training grants" totaling over $100 million.[188] DOGE also announced the termination of 89 other

10   Department of Education contracts. This included contracts made by the Department's

11   nonpartisan research arm, the Institute of Education Sciences.[189]

12          503.    When asked for comment on the terminations, a spokesperson for the

13   Department stated: "We kindly point you to the X post from DOGE."[190]

14          504.    On information and belief, Department of Education grant terminations

15   have caused serious harm to UC researchers.

16          505.    By terminating grants at the direction of the President and DOGE, the

17   Department has violated its congressional mandates. Such mandates include, for example,

18   compliance with and effectuation of the legislative purposes implicit in congressional

19   appropriations, and specific directives such as 20 U.S.C. §§ 9511, 9512 (establishing Institute of

20   Education Sciences).

21

22

23

---

24   [188] DOGE (@DOGE), *Also today, the Department Of Education terminated 89 contracts worth
25   $881mm.* (Feb. 10, 2025), https://x.com/DOGE/status/1889113011282907434.
     [189] Rebecca Carballo & Juan Perez Jr., *DOGE announces $881 million in cuts for Education
26   Department Contracts*, Politico (Feb. 10, 2025),
     https://www.politico.com/news/2025/02/10/education-department-pauses-research-contracts-
27   00203494.
     [190] Kalyn Belsha, *Crucial research halted as DOGE abruptly terminates Education Department
28   contracts*, Chalkbeat (Feb. 11, 2025), https://www.chalkbeat.org/2025/02/11/elon-musk-and-
     doge-cancel-education-department-research-contracts/.

- 109 -    AMENDED CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

506.    On information and belief, the Department effectuated mass terminations of grants to UC researchers without proper review or clear explanation, thereby acting unconstitutionally and unlawfully as set forth in the Claims for Relief asserted below.

### 4.    **Department of Energy**

507.    The Department of Energy (DOE) quickly began department-wide restructuring pursuant to Trump orders. On February 5, 2025, the Secretary of Energy announced that DOE would "take immediate action . . . in accordance with President Trump's executive orders."[191]

508.    DOE began implementing Defendant Trump's orders with help from DOGE. In a press release, DOE announced that it was appointing the then-current head of DOGE at DOE, Carl Coe, as its new Chief of Staff. The press release specified that Coe "has worked closely with Secretary Wright" in order to effectuate "process improvement and cost savings," or what DOE referred to as "DOGE efforts."[192]

509.    Soon thereafter, DOE instituted a 15% cap on indirect costs for university research grants, even while acknowledging that "many grant recipients use indirect cost payments to effectuate research funded by the Department's grant awards." This action was taken to "deliver[] on President Trump's commitment" to slash research grants.[193] The cap has been temporarily enjoined.[194]

510.    On May 15, 2025, Secretary Wright issued a Secretarial Memorandum titled: "Secretarial Policy on Ensuring Responsibility for Financial Assistance."[195] The memo

[191] Chris Wright, *Unleashing the Golden Era of American Energy Dominance,* U.S. Dep't of Energy (Feb. 5, 2025), https://www.energy.gov/articles/secretary-wright-acts-unleash-golden-era-american-energy-dominance.
[192] U.S. Dep't of Energy, *DOE Announces New Leadership to Tackle Challenges of Growing Energy Demand* (May 2, 2025), https://www.energy.gov/articles/doe-announces-new-leadership-tackle-challenges-growing-energy-demand.
[193] U.S. Dep't of Energy, *Department of Energy Overhauls Policy on College and University Research, Saving $405 Million Annually for American Taxpayers* (Apr. 11, 2025), https://www.energy.gov/articles/department-energy-overhauls-policy-college-and-university-research-saving-405-million.
[194] *Id.*
[195] Chris Wright, *Secretarial Policy on Ensuring Responsibility for Financial Assistance*, EXEC-2025-005990, U.S. Dep't of Energy (May 14, 2025), https://www.energy.gov/sites/default/files/2025-05/EXEC-2025-005990%20-

announced that DOE would be reviewing prior funding awards to ensure they are "consistent with… this Administration's policies and priorities." It also announced an intent to terminate projects.

511.    DOE stated its review would begin by reviewing 179 awards that totaled over $15 billion, and would then extend to other awards.[196]

512.    DOE is one of the largest funders of UC research. UC researchers have been or will be seriously harmed by DOE's imminent grant terminations.

513.    By terminating or imminently terminating grants to UC researchers at the direction of the President and DOGE, DOE has violated its congressional mandates. Such mandates include, for example, compliance with and effectuation of the legislative purposes implicit in congressional appropriations.

514.    By effectuating mass terminations of grants to UC researchers without proper review or clear explanation, DOE acted unconstitutionally and unlawfully as set forth in the Claims for Relief asserted below.

### 5.    Department of Health and Human Services, including the Centers for Disease Control, the Food and Drug Administration, and the National Institutes of Health

515.    The Department of Health and Human Services (HHS) has been explicit about its adherence to Trump's and DOGE's orders. HHS announced on March 27, 2025 that it would begin "restructuring in accordance with President Trump's Executive Order" creating DOGE.[197]

---

%20Secretarial%20Policy%20-PRP%20-%205-14-25%20(FINAL)%20(2).pdf.
[196] U.S. Dep't of Energy, *Secretary Wright Announces New Policy for Increasing Accountability, Identifying Wasteful Spending of Taxpayer Dollars* (May 15, 2025), https://www.energy.gov/articles/secretary-wright-announces-new-policy-increasing-accountability-identifying-wasteful.
[197] Chris Wright, *Unleashing the Golden Era of American Energy Dominance,* U.S. Dep't of Energy (Feb. 5, 2025), https://www.energy.gov/articles/secretary-wright-acts-unleash-golden-era-american-energy-dominance.

516. HHS has cancelled hundreds of millions of dollars in research grants, including grants related to COVID-19, to prioritize "projects that will deliver on President Trump's mandate[s]."[198]

517. HHS is taking such action at DOGE's direction, and promoting the idea that it has "saved" $67 billion."[199] The "Defend the Spend" collaboration between DOGE and HHS has frozen thousands of grants.[200]

518. Indeed, DOGE operatives have personally directed top NIH officials to terminate "hundreds" of grants.[201]

519. *Science* reported in late March that DOGE would begin reviewing all new NIH grant funding applications to ensure that HHS-funded research aligned with Trump priorities.[202]

520. By terminating grants to UC researchers at the direction of the President and DOGE, HHS has violated its congressional mandates. Such mandates include, for example, compliance with and effectuation of the legislative purposes implicit in congressional appropriations; spending required by 42 U.S.C. § 241; and directives to HHS subunits.

521. HHS's mass grant terminations have caused serious harm to UC researchers, including those who received grants through HHS's subunits: the Centers for Disease Control (CDC), the Food and Drug Administration (FDA), and the National Institutes of Health (NIH).

---

[198] Brandy Zadrozny, *CDC Pulling Back $11B in COVID Funding Sent to Health Departments*, NBC News (Mar. 25, 2025), https://www.nbcnews.com/health/health-news/cdc-pulling-back-11b-covid-funding-sent-health-departments-us-rcna198006.
[199] U.S. Dep't of Health & Human Servs., *Celebrating Big Wins of the Trump Administration*, https://www.hhs.gov/hhs-big-wins-maha/index.html (last visited May 28, 2025).
[200] Dan Diamond, et al., *DOGE, Trump Grants, HHS NIH Backlog*, Washington Post (Apr. 17, 2025), https://www.washingtonpost.com/politics/2025/04/17/doge-trump-grants-hhs-nih-backlog/.

522.    HHS's own database of grant terminations reveals that it has terminated 104 grants to UC recipients.[203] A study published on May 8, 2025 identified UCSF as being particularly hard-hit by HHS grant terminations.[204]

523.    The CDC also terminated a grant awarded to a UC Berkeley Biostatistician/Epidemiologist for a project titled "Strengthening California's Public Health Workforce to Improve Decision Making and Health Equity Through Advanced Training and Academic Partnership."

524.    On information and belief, HHS and its subunits have effectuated mass terminations of grants to UC researchers without proper review or clear explanation, thereby acting unconstitutionally and unlawfully as set forth in the Claims for Relief asserted below.

**6.    Institute of Museum and Library Services**

525.    Through an Executive Order, Defendant Trump called for the elimination of the Institute of Museum and Library Services (IMLS).[205] IMLS grant activities have been hit particularly hard by Defendants' illegal actions.

526.    On information and belief, IMLS's mass termination of grants likewise occurred at DOGE's direction. On its social media account X, IMLS wrote: "The era of using your taxpayer dollars to fund DEI grants is OVER." The post tagged DOGE and reposted a Fox News post asserting that "Trump's DOGE push slashes millions."[206]

---

[203] U.S. Dep't of Health & Human Servs., *HHS Grants Terminated* (May 23, 2025), https://taggs.hhs.gov/Content/Data/HHS_Grants_Terminated.pdf.

[204] Michael Liu, Kushal T. Kadakia & Vishal R. Patel, *Characterization of Research Grant Terminations at the National Institutes of Health*, JAMA Network (May 8, 2025), https://jamanetwork.com/journals/jama/fullarticle/2833880?guestAccessKey=3a432109-6c9d-4ef2-9d10-bf48d91fe441&utm_source=for_the_media&utm_medium=referral&utm_campaign=ftm_links&utm_content=tfl&utm_term=050825.

[205] Exec. Order No. 14238, *Continuing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 813043 (Mar. 14, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/continuing-the-reduction-of-the-federal-bureaucracy/.

[206] U.S. Inst. of Museum & Library Servs. (@US_IMLS), *The era of using your taxpayer dollars to fund DEI grants is OVER.* (Apr. 3, 2025), https://x.com/US_IMLS/status/1907814174693941660.

527.    In early April 2025, UC researchers who had previously received IMLS grants received a form letter terminating their grants. It read:

> This letter provides notice that the Institute of Museum and Library Services (IMLS) is terminating your federal grant ([Grant Application No.]) effective April 8, 2025, in accordance with the termination clause in your Award Agreement. Upon further review, IMLS has determined that your grant is unfortunately no longer consistent with the agency's priorities and no longer serves the interest of the United States and the IMLS Program. IMLS is repurposing its funding allocations in a new direction in furtherance of the President's agenda. Independently and secondly, the President's March 14, 2025 executive order mandates that the IMLS eliminate all non-statutorily required activities and functions. See Continuing the Reduction of the Federal Bureaucracy, E.O. 14238 (Mar. 14, 2025). Therefore, the IMLS hereby terminates your grant in its entirety effective April 8, 2025. …. Please contact grant-notices@imls.gov with only urgent questions. We wish you well.

528.    UC researchers are concretely harmed by the termination of IMLS grants.

529.    By terminating grants at the direction of the President and DOGE, IMLS has violated its congressional mandates. Such mandates include, for example, compliance with and effectuation of the legislative purposes implicit in congressional appropriations, and the more general direction in 20 U.S.C. §§ 9108, 9162, 9165, 9175 (notably, the last two sections direct IMLS to "develop a diverse workforce" of library and museum professionals).

530.    By effectuating mass terminations of grants to UC researchers without proper review or clear explanation, IMLS acted unconstitutionally and unlawfully as set forth in the Claims for Relief asserted below.

**7.    Department of the Interior, including National Park Service**

531.    The Department of the Interior (DOI) has worked closely with DOGE to implement Defendant Trump's orders. DOI said that it was "committed to supporting President Trump's Executive Order" creating DOGE.[207]

532.    DOI allowed a DOGE staffer to prepare lists of grants for termination, flagging those that addressed "climate" or "D.E.I." As of May 7, 2025, a DOGE staff member

---

[207] U.S. Dep't of the Interior, *SO-3429 – Consolidation, Unification, and Optimization of Administrative Function* (Apr. 17, 2025), https://www.doi.gov/document-library/secretary-order/so-3429-consolidation-unification-and-optimization-administrative.

had earmarked many research grants from the National Park Service (NPS) and other DOI

subagencies for future termination.[208] DOI has carried out or will imminently carry out these

terminations.

533.    By terminating grants at the direction of the President and DOGE, DOI has

violated its congressional mandates. Such mandates include, for example, compliance with and

effectuation of the legislative purposes implicit in congressional appropriations, and other

legislation specifying the functions of individual DOI subunits, such as NPS.[209]

534.    DOI has terminated or will imminently terminate grants to UC researchers,

causing concrete harm.

535.    By effectuating mass terminations of grants to UC researchers without

proper review or clear explanation, DOI acted unconstitutionally and unlawfully as set forth in the

Claims for Relief asserted below.

### 8.    Department of State, including USAID

536.    Early into President Trump's tenure, DOGE set its sights on USAID,

essentially gutting the entire agency.[210]

537.    USAID terminated grants to UC researchers, causing serious harm.

538.    By terminating grants at the direction of the President and DOGE, the State

Department has violated its congressional mandates. Such mandates include, for example,

compliance with and effectuation of the legislative purposes implicit in congressional

appropriations, such as the fiscal year 2024 Department of State and Foreign Operations

Appropriations Act.

---

[208] Lisa Friedman, *Trump Administration is Said to Target Park Services*, The New York Times (May 7, 2025), https://www.nytimes.com/2025/05/07/climate/trump-park-service-grants-cuts.html.
[209] *See, e.g.*, U.S. Nat'l Park Serv., *Grants for Cultural Resources, Consultation, and Repatriation*, https://www.nps.gov/history/grants.htm (last visited May 29, 2025), ("Grant programs fund projects as described or limited by their authorizing legislation.").
[210] Ellen Knickmeyer, *Trump Administration Fires at Least 1,600 USAID Workers*, AP News (Feb. 23, 2025), https://apnews.com/article/usaid-trump-musk-foreign-aid-firings-a3af8ce6ef17878b718c8e2ed3bf98e4.

- 115 -

539.    By effectuating mass terminations of grants to UC researchers without proper review or clear explanation, the State Department acted unconstitutionally and unlawfully as set forth in the Claims for Relief asserted below.

**V.    The Trump Administration Is Threatening Additional, Illegal Funding Cuts to the UC System**

540.    In the days leading up to the filing of this complaint, the head of DOJ's "antisemitism task force," Leo Terrell, announced forthcoming "massive lawsuits" targeting the UC system. According to Terrell, the DOJ is "going to go after [the UC system] where it hurts them financially." If recent actions against other universities are any guide, this will likely include the revocation of additional congressionally allocated grants and funds. These anticipated cuts, while not directly implicated by this lawsuit, borrow from the same playbook and are part of the same executive branch scheme of illegally seizing and weaponizing the power of the purse to harm universities and their faculty, to the great detriment of the American public.

**VI.    Unless Enjoined, Grant Terminations Will Cause Irreparable Harm to Plaintiffs, the Class, and the Nation**

541.    Plaintiffs and the proposed Class have suffered and will continue to suffer the following injuries as a direct result of Defendants' conduct:

a.    Interruption or abandonment of ongoing research projects as a direct result of the loss of previously awarded grants;

b.    Attendant reduction of employment for or layoffs of researchers and their staff;

c.    Career disadvantage, including: loss of opportunities to publish research, inability to attend project-relevant conferences, and reduced ability to obtain related or follow-on grants;

d.    Expenditure of considerable time and effort to find substitute funding;

e.    The need to support project team members with discretionary funds, or to otherwise duct-tape solutions to a massive funding shortfall that first manifests as an immediate cash flow problem within affected campus research units; and

f.    Reputational injury, including loss of trust from the community partners so

integral to ensuring that public university research is responsive and relevant to local needs.

542.    These direct, concrete injuries to Plaintiff researchers themselves have an

inexorable and damaging ripple effect on the research mission of individual researchers and

research teams; on the research mission of the UC system itself; on the citizens of California; and

on all Americans, and indeed people throughout the world, who daily benefit from the fruits of

UC discoveries, innovations, and inventions.

## CLAIMS FOR RELIEF

### COUNT I –
**Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;
Violation of Separation of Powers**

543.    Plaintiffs reallege all paragraphs above as if fully set forth herein.

544.    This Court has jurisdiction to enjoin federal officials from violating the

Constitution, including the separation of powers. *Free Enter. Fund v. Pub. Co. Acct. Oversight

Bd.*, 561 U.S. 477, 491 n.2 (2010).

545.    The Constitution empowers Congress to make laws, U.S. Const. art. 1, § 1,

and requires the President to "take Care that the Laws be faithfully executed," *id.* art. II, § 3. The

"Take Care Clause" assures that, consistent with the structural and functional separation of

powers on which our system of government is based—and on which it depends—"Congress

makes the laws and the President faithfully… executes them." *Utility Air Reg. Grp. v. Envtl. Prto.

Agency*, 573 U.S. 302, 327 (2014) (cleaned up). The faithfulness the Constitution requires of the

Executive is not to the President's views on priorities, but to the laws enacted by Congress as

interpreted and enforced by the Courts. Congress's powers to set the policies of the nation are at

their apex when it comes to spending money, as the Constitution "exclusively grants the power of

the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d

1225, 1231 (9th Cir. 2018).

546.    The executive branch has no constitutional authority to refuse to carry out

laws enacted by Congress, and it has no constitutional authority to block, amend, subvert, or

delay spending appropriations based on the President's own policy preferences. For nearly two

hundred years, it has been established that a president violates the Take Care Clause when he overrides statutes enacted by Congress, or refuses to execute such statutes or their implementing regulations. *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838). The President "is without authority to set aside congressional legislation by executive order." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999).

547.    Defendants' decisions to unilaterally cancel duly awarded grants and withhold funding that Congress has appropriated precisely to fund such grants violates the separation of powers.

548.    Defendants' decisions to delay spending and outright refuse to spend the amounts Congress appropriated violates Congress's power of the purse and the separation of powers.

549.    Because Defendants' actions violate the separation of powers and are *ultra vires*, they should declared unconstitutional and enjoined.

### COUNT II –
**Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;**
**Violation of First Amendment (Content and Viewpoint Discrimination)**

550.    Plaintiffs reallege all paragraphs above as if fully set forth herein.

551.    The First Amendment provides that the federal government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

552.    The First Amendment prohibits the government from "regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). "Discrimination against speech because of its message is presumed to be unconstitutional." *Id.* at 828.

553.    "[E]ven in the provision of subsidies, the Government may not 'ai[m]at the suppression of dangerous ideas.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quoting *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 550 (1983) (alteration in original)). In the grant-making context, the government may not reject "a whole class of projects" based on "viewpoint alone," or use Federal funding to "impose a

1    disproportionate burden calculated to drive certain ideas or viewpoints from the marketplace."

2    *Rhode Island Latino Arts v. Nat'l Endowment for the Arts*, No.25-cv-79-WES, 2025 WL

3    1009026, at *12 (D.R.I. Apr. 3, 2025) (quoting *Finley*, 524 U.S. at 587).

4         554.    Defendants' mass termination of grants to disadvantage or promote

5    particular political and ideological viewpoints is "the product of invidious viewpoint

6    discrimination." *Finley*, 524 U.S. at 587. In an effort to drive views they disfavored out of the

7    marketplace of ideas, Defendants terminated many grants based on the recipients' (presumed)

8    viewpoint as reflected in the subject matter of their research. This is most evident in the

9    Termination Notices' citation to Executive Orders purporting to combat "Radical Indoctrination"

10   and "Radical . . . DEI Programs," and to further "Biological Truth." The Termination Notices

11   make plain that Defendants believe that the content of Plaintiffs' speech conflicts with the

12   Administration's views, and Plaintiffs' grants were terminated at least in part for this reason. The

13   First Amendment does not tolerate such viewpoint discrimination.

14        555.    Accordingly, Defendants' actions are not in accordance with law and are

15   contrary to constitutional right or power.

16                          **COUNT III –**
     **Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;**
17   **Violation of Fifth Amendment (Due Process / Void for Vagueness)**

18        556.    Plaintiffs reallege and incorporate by reference the allegations contained in

19   each of the preceding paragraphs as if fully set forth herein.

20        557.    The Due Process Clause of the Fifth Amendment to the Constitution

21   requires due process of law before the deprivation of a constitutionally protected interest.

22        558.    Plaintiffs have a constitutionally protected property interest in grant

23   funding that supports their salaries and stipends, as well as their ongoing research. Plaintiffs have

24   relied on this funding, and the protections of federal law governing this funding, in pursuing their

25   research, in hiring staff, in making commitments to research partners, and in many other ways.

26   Plaintiffs also have constitutionally protected liberty interests in their freedom of speech and

27   expression, including academic freedom, and in pursuing their livelihoods.

28

559.    Defendants' cancellation or imminent cancellation of federal grant funding does not provide Plaintiffs fair notice or a reasonable opportunity to be heard.

560.    The Due Process Clause also prohibits government actions that fail to give fair notice of what conduct is forbidden or required. A government enactment is unconstitutionally vague if it fails to provide a reasonable opportunity to know what conduct is prohibited or is so indefinite as to allow arbitrary and discriminatory enforcement.

561.    Because of the vagueness in the language of Defendant Trump's Orders and the Federal Agency Defendants' chaotic efforts to give effect to those Orders, Plaintiffs are unsure, for example, which areas of study they can pursue, which populations they can focus on as study subjects, and what the demographics of study participants must be. This makes it impossible to determine how to reconfigure future research to stay within the bounds of the agencies' newest "priorities."

562.    Defendants' efforts to purge certain disfavored research from federal agencies' grant rolls accordingly violates the Due Process Clause.

**COUNT IV –**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C): Contrary to Law; Illegal Departure from Impoundment Control Act, Statutes, and Regulations**

563.    Plaintiffs reallege all paragraphs above as if fully set forth herein.

564.    The APA directs courts to "hold unlawful and set aside agency actions, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law … [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A),(C). Defendants' actions violate these provisions, calling on the Court to hold them unlawful and set them aside for several reasons, including those specified below.

565.    First, by refusing to spend money that Congress appropriated, Defendants are violating the Impoundment Control Act of 1974 (ICA), and the appropriations statutes underlying each agency's funding scheme. Under the ICA, a "deferral" includes any "withholding or delaying the obligation or expenditure of" appropriated funds, as well as "any other type of

1   Executive action or inaction which effectively precludes the obligation or expenditure of"

2   appropriated funds. 2 U.S.C. § 682(1). When the executive branch wishes to defer funds, it must

3   send a special message to Congress detailing the money to be deferred and the reasons for

4   deferral. There are only three permissible grounds for deferrals, *id.* § 684(b), none of which

5   includes effort to ensure funds are spent consistent with the President's new policy priorities.

6          566.    Defendants' actions constitute a "deferral" because they reflect a

7   "withholding or delaying [of] the obligation or expenditure of" funds that Congress appropriated.

8   Defendants did not notify Congress of the deferrals as the ICA requires, nor did Defendants

9   undertake the deferrals for reasons the ICA permits.

10         567.    Defendants' actions also constitute an unlawful "rescission" of the funds

11  appropriated for agency action, including grant-making. Where the President seeks to "rescind"

12  appropriated funds, the ICA requires, among other things, that the President send a special

13  message to Congress specifying the funds he seeks to have rescinded and the reasons for his

14  proposal. 2 U.S.C. § 683(a). The President did not do so.

15         568.    Second, Defendants are violating the agencies' enabling statutes and other

16  laws passed by Congress that include grant-making as a directive to the agencies. The work that

17  Plaintiffs and the Class were awarded grants to perform furthers agency missions and fulfills

18  specific statutory requirements set by Congress. Withholding the appropriated funds contradicts

19  Congress's directives.

20         569.    Third, where grants were issued in accordance with agency-specific rules

21  and terminated for reasons inconsistent with those rules, Defendants are violating their own

22  regulations and agreements.

23                              **COUNT V –**
    **Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A): Arbitrary and Capricious**
24                    **Failure to Engage in Reasoned Decision-making**

25         570.    Plaintiffs reallege all paragraphs above as if fully set forth herein.

26         571.    A reviewing court must "hold unlawful and set aside agency action" that is

27  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

28  § 706(2)(A). Government agencies and officers act in an arbitrary and capricious manner if they

1    fail to engage in "reasoned decision-making." *Michigan v. EPA*, 576 U.S. 743, 750 (2015)

2    (citation omitted). Agency action is therefore lawful only if it rests "on a consideration of the

3    relevant factors." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile*

4    *Ins. Co.*, 463 U.S. 29, 43 (1983). This principle applies *a fortiori* to agency departures from long

5    settled policy. *Id*.

6         572.    Further, agency action is arbitrary and capricious if the agency has "relied

7    on factors which Congress has not intended it to consider, entirely failed to consider an important

8    aspect of the problem, offered an explanation for its decision that runs counter to the evidence

9    before the agency, or is so implausible that it could not be ascribed to a difference in view or the

10   product of agency expertise." *Id*. Agency action is also arbitrary and capricious if, when

11   departing from a prior policy, an agency does not "display awareness that it *is* changing

12   position" or does not "show that there are good reasons for the new policy." *FCC v. Fox*

13   *Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original).

14        573.    Defendants' mass termination of grants previously awarded to Plaintiffs

15   and the Class was arbitrary and capricious for many reasons, including (but not limited to) the

16   following:

17        a.    The Termination Notices do not provide a reasoned explanation for grant

18   cancellations. Rather, the letters sent across all agencies generally state that the grant being

19   cancelled no longer "effectuates" or is no longer "in alignment" with Agency priorities. That

20   generic statement is not a reasoned explanation.

21        b.    The terminations ignore the reliance interests of grantees. For example,

22   grantees who had already received some but not all of their awards had already spent significant

23   time working on the projects funded by their grants. Similarly, many grantees—as their grants

24   required—took leaves of absence from their jobs, cancelled teaching plans, or otherwise altered

25   their employment status in reliance on the promise of receiving grant money to support them

26   while they completed their projects.

27        c.    The grant terminations conflict with prior agency decisions to award the

28   grants without providing adequate explanation for the change in agency position. All class

1    members received their grants after a rigorous and objective application and review process that

2    necessarily established that funded projects were meritorious and satisfied relevant criteria.

3    Defendants have failed to provide any reason the grants fail to satisfy applicable criteria.

4        d.    The mass termination of grants "entirely failed to consider. . . important

5    aspect[s] of the problem." *State Farm*, 463 U.S. at 43. Among other things, Defendants ignored

6    the waste and inefficiency caused by the terminations, given the investment that Federal Agency

7    Defendants—and by extension, taxpayers—have already made in the terminated projects.

8        e.    Defendants likewise failed to consider the significant consequences grant

9    termination will have on the individuals and organizations involved in conducting research, the

10    durability of the institutions in which they work, and on the broader public that will be deprived

11    of benefits meant to accrue from the work accomplished with the grant funding.

12        574.    Defendants have failed to adequately justify their actions; have not

13    considered the substantial reliance interests at stake; have relied on factors that Congress did not

14    authorize them to consider; and have not acknowledged or justified their change from prior

15    agency positions.

16        575.    In sending standardized termination letters to terminate grants *en masse*,

17    Defendants failed to "examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for

18    [their] decision, 'including a rational connection between the facts found and the choice made,'"

19    *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019) (quoting *State Farm*, 463 U.5. at 43).

20    The terminations must be set aside under the APA as arbitrary and capricious.

21    **PRAYER FOR RELIEF**

22        WHEREFORE, Plaintiffs respectfully request that the Court certify a UC Researchers

23    Class pursuant to Fed. R. Civ. P. 23(a)(1)-(4) and 23(b)(2), enter judgment in favor of Plaintiffs

24    and the certified UC Researchers Class, and award Plaintiffs and the Certified UC Researchers

25    Class the following relief:

26        A.    Declare as unlawful and set aside Defendants' Termination Notices that

27    terminated grants previously awarded to Plaintiffs and members of the UC Researchers Class, as

28    violative of the Constitutional separation of powers; the First and Fifth Amendment protections of

free speech and due process; the Impoundment Control Act; agency-specific statutes and regulations, including congressional directives and appropriations acts; and the Administrative Procedure Act;

B.    Declare as *ultra vires* Defendants' decisions and implementation of the mass termination of grants to Plaintiffs and the UC Researchers Class;

C.    Grant preliminary and ultimately final injunctive relief to enjoin Defendants from cutting off agency and grantee access to congressionally appropriated funding, from giving effect to the violative terminations, or undertaking any similar violative action to terminate additional duly awarded agency grants; to restore such previously awarded grants; to require Defendants to provide no-cost extensions to grantees for the time necessary to resume and complete interrupted work; and to return to the lawful and orderly grant procedures they employed prior to January 20, 2025;

D.    Appoint the Named Plaintiffs as Class Representatives, and the undersigned counsel as Class Counsel, upon certification of a UC Researchers Class pursuant to Fed. R. Civ. P. 23(g);

E.    Designate such additional class representatives, class counsel, and sub-classes as the Court may deem appropriate at any time before final judgment, pursuant to Fed. R. Civ. P. 23(c)(1)(C) and 23(c)(5);

F.    Award Plaintiffs and counsel for the Proposed Class reasonable costs and attorneys' fees; and

G.    Issue such other relief as the Court deems just and proper.

Dated: July 18, 2025                    By:    */s/ Claudia Polsky*

Erwin Chemerinsky (*pro hac vice* forthcoming)
echemerinsky@law.berkeley.edu
Claudia Polsky (CA Bar No. 185505)
cpolsky@law.berkeley.edu
U.C. BERKELEY SCHOOL OF LAW
Law Building
Berkeley, CA 94720-7200
Telephone: 510.642.6483

*[con't next page]*

1

Dated: July 18, 2025                    By:      /s/ Elizabeth J. Cabraser

2
3          Elizabeth J. Cabraser (CA Bar No. 83151)
           ecabraser@lchb.com
           Richard M. Heimann (CA Bar No. 63607)
4          rheimann@lchb.com
           Kevin R. Budner (CA Bar No. 287271)
5          kbudner@lchb.com
           Annie M. Wanless
6          awanless@lchb.com (CA Bar No. 339635)
           LIEFF CABRASER HEIMANN &
7          BERNSTEIN, LLP
           275 Battery Street, 29th Floor
8          San Francisco, CA 94111
           Telephone: 415.956.1000

9

10   Dated: July 18, 2025                    By:      /s/ Anthony P. Schoenberg

11         Anthony P. Schoenberg (CA Bar No. 203714)
           tschoenberg@fbm.com
12         Linda S. Gilleran (CA Bar No. 307107)
           lgilleran@fbm.com
13         Kyle A. McLorg (CA Bar No. 332136)
           kmclorg@fbm.com
14         John J. Darin (CA Bar No. 323730)
           jdarin@fmb.com
15         Katherine T. Balkoski (CA Bar No. 353366)
           kbalkoski@fbm.com
16         FARELLA BRAUN + MARTEL LLP
           One Bush Street, Suite 900
17         San Francisco, CA 94104
           Telephone: 415. 954.4400

18
           *Attorneys for Plaintiffs and the Proposed Class*
19

20

21

22

23

24

25

26

27

28

1

## FILER'S ATTESTATION

2      I hereby attest that each Signatory has concurred in the filing of this document, as

3  indicated by their conformed signatures within this e-filed document.

4

5      Dated: July 18, 2025                                    */s/ Elizabeth J. Cabraser*
                                                           Elizabeth J. Cabraser

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28