Erwin Chemerinsky (*pro hac vice*)
echemerinsky@law.berkeley.edu
Claudia Polsky (CA Bar No. 185505)
cpolsky@law.berkeley.edu
U.C. BERKELEY SCHOOL OF LAW
Law Building
Berkeley, CA 94720-7200
Telephone: 510.642.6483

Elizabeth J. Cabraser (CA Bar No. 83151)
ecabraser@lchb.com
Richard M. Heimann (CA Bar No. 63607)
rheimann@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000

Anthony P. Schoenberg (CA Bar No. 203714)
tschoenberg@fbm.com
Linda S. Gilleran (CA Bar No. 307107)
lgilleran@fbm.com
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, CA 94104
Telephone: 415. 954.4400

*Attorneys for Plaintiffs and the Certified Classes*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEETA THAKUR, et al., | Case No. 3:25-cv-4737 |
| Plaintiffs, | |
| v. | **DECLARATION OF ELI BERMAN** |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

### DECLARATION OF ELI BERMAN

I, Eli Berman, declare as follows:

1.      I have personal knowledge of the facts contained in this declaration and, if called as a witness, could and would testify competently to those facts.

2.      I am a Professor of Economics at the University of California, San Diego ("UCSD").  I hold a dual appointment as a Professor in UCSD's School of Global Policy and Strategy.

3.      I serve as the Research Director for International Securities Studies at the UC Institute on Global Conflict and Cooperation, a research network comprised of scholars from across the University of California and the Los Alamos and Lawrence Livermore National Laboratories, who produce and use research to help build a more peaceful, prosperous world.

4.      I am a founder of the UCSD Policy Design and Evaluation Laboratories, located at the School of Global Policy and Strategy, which combines advanced social science methodology with the power of information technology to design policies and programs that alleviate poverty; promote health, welfare, and security; and enhance accountability.

5.      I am a Research Associate with the National Bureau of Economic Research, a private, nonprofit organization that facilitates cutting-edge research on and analysis of major economic issues.

6.      I am the President and a founding Board Member of the Economics of National Security Association, a professional organization dedicated to promoting excellence in national security economics research. The Association provides a forum for new ideas and empirical results of economic research applied to national security, defense resource management, and public policy relating to national security and defense.

7.      I earned a Ph.D. in Economics from Harvard University in 1993. I obtained my B.A. in Computer Science and Economics from Hebrew University, Jerusalem in 1987, where I also earned an M.A. in Economics in 1989.

8.      My research focuses on economic development in fragile environments, with a focus on conflict. My other research interests include the economics of religion, labor economics,

technological change, and economic demography. I am known particularly for my work applying

rational choice analysis to the behavior of radical religious groups.

9.      I have published several books on national security economics including *Proxy Wars* (with David Lake, 2019), *Small Wars, Big Data: The Information Revolution in Modern Conflict* (with Jacob N. Shapiro and Joseph H. Felter, 2018) and *Radical, Religious and Violent: The New Economics of Terrorism* (2009).  I have also authored or co-authored dozens of articles, papers, and reviews on national security economics and other topics in economics.

10.      Over the past three decades, I have been the recipient of grant funding for my work from a variety of governmental and private sources.  I have received federal grant funding from the National Science Foundation, the Department of Homeland Security, the Office of Naval Research, USAID, the U.S. Institute of Peace, and the Department of Defense.          `

11.      A true and correct copy of my curriculum vitae is attached as **Exhibit A**.

### DOD Minerva Research Initiative and Past Grants

12.      The Department of Defense Minerva Research Initiative ("MRI") "brings together universities and other research institutions around the world and supports. . . projects addressing specific interest areas determined by the Department of Defense." (https://grants.gov/search-results-detail/351388). Minerva "emphasizes questions of strategic importance to U.S. national security policy," including violent extremism, drug cartels, and similar threats to our nation's security.

13.      Since its inception in 2008 by Secretary of Defense Robert Gates, MRI has filled a gap in the knowledge base of the National Security community by developing models of terrorism, insurgency, cybersecurity, information operations, deterrence and other relevant topics, validated using freshly collected data and modern methods. That research has been praised by combatant commanders for its relevance to their increasingly complex challenges in understanding the Social Science (political science, economics, psychology) of modern conflict. For example, MRI project findings have influenced policy decisions in Afghanistan, improving force protection, reducing civilian casualties, and making development projects more effective.

14.     MRI-funded research has enabled a significant improvement in scholarly understanding of subnational conflicts, as reflected in a manyfold increase in publications on these topics in the very best peer-reviewed journals in Political Science and Economics. Over a dozen scholars trained as PhD students and postdoctoral fellows on MRI-funded teams now hold tenured research positions at leading universities.

15.     MRI employs a highly competitive process for the award of its grant funding. It solicits proposals in pre-defined topic areas and selects among them using peer and expert review.

16.     I served as co-Principal Investigator of the MRI project "Terrorism, Governance, and Development," led by Professor Jacob Shapiro of Princeton University, directing a subcontract of $3,064,551 to IGCC, from March 2009 through August 2015. That project addressed the general question of how economic and political development are enabled when a government must also necessarily counter terrorism and insurgency.  The project oversaw over a dozen scholarly empirical research projects including original data collection in Afghanistan, Iraq, the Philippines, Colombia, Northern Ireland and the Palestinian Territories, among other sites.  It resulted in over a dozen scholarly publications in leading journals. Results are summarized in a well-received book *Small Wars, Big Data* (Princeton University Press), which I co-authored with Professor Shapiro and Professor Joseph Felter of Stanford University.

17.     I served as Principal Investigator on a grant from the DOD's MRI for research on "Deterrence with Proxies," for the period 2014 – 2021.  This research investigated how a powerful country can meet its security objectives by guiding the actions of proxy forces, while limiting the vulnerability of its own forces –as the U.S. has done over the last five decades. I was the Principal Investigator for this grant, which resulted in multiple scholarly publications and an academic press book, trained postdoctoral fellows and PhD. students, with a budget of $3,745,988.

18.     I received a second grant from MRI, as the co-Principal Investigator with Stephen Biddle, for a one-year grant entitled "Empirical Analysis for Meeting Great Power Challenges" in 2020. This grant funded research to evaluate the roles of technological advantage vs. force strength in the success of naval battles, using data from the 16th Century through the present.

DECLARATION OF ELI BERMAN
Case No. 3:25-CV-4737

**DOD's 2023 Minerva Research Grant Application and Award**

19.    I, together with my colleagues, submitted an application for funding to the Minerva Research Initiative entitled "Integrated Deterrence: Episodic Analysis" on February 16, 2023, in response to an annual request for proposals. I was the Principal Investigator for the research, and the work was proposed to be done in collaboration with Professor Estaban Klor at Hebrew University, who was designated the co-Principal Investigator. Our work plan included hiring postdoctoral fellows, and both graduate and undergraduate research assistants. A true and correct copy of the funding application is attached as **Exhibit B**.

20.    "Integrated Deterrence" is a national security concept that was the centerpiece of the 2022 National Defense Strategy. Integrated deterrence "involves using every tool at the Department [of Defense]'s disposal, in close collaboration with our counterparts across the U.S. Government, and with Allies and partners, to ensure that potential foes understand the folly of aggression." Those tools include not only coercive measures but also economic, diplomatic, and intelligence instruments.

21.    Our proposal relied on data on the Israel/Gaza conflict discovered and collected as part of the "Deterrence with Proxies" project. We proposed coding textual data on incidents into digital form, validating with social media and official sources, and developing a game theoretic model to analyze the actions of combatants.

22.    This proposed research would continue and expand my earlier Minerva project research funded during the Trump I and Biden administrations, noted above.

23.    We received notice of the Grant Award (No. FA 9550-23-1-0437) on August 28, 2023 for funding over three years.  The total award was $1,032,529. A true and correct copy of the Notice and Grant Agreement is attached as **Exhibit C**.

24.    Progress between 2023 and 2025 was rapid. With the help of a PhD student (later postdoctoral fellow) with superb skills in statistical analysis, we solved a number of technical problems that had stymied previous researchers. The fine-grained nature of our data allowed unprecedented opportunities to test game-theoretic models of deterrence, specifically addressing whether episodes of attack and counter-attack tended to escalate or de-escalate, and whether de-

escalation led to zero attacks or to some violent equilibrium. Our understanding of the Gaza / Israel conflict in the period before October 7, 2023 vastly improved. More importantly, we had a modeling tool to apply to other international conflicts stuck in violent equilibria.

25.     By late 2024, we were already circulating results and disseminating this research to policy and academic audiences, including within the U.S. Department of Defense, U.N. Peacekeeping Operations, and Israel's Institute on National Security Studies, as well as at invited academic seminars and conferences in the U.S, Canada, Europe, Israel and Taiwan.

26.     The policy relevance of these results is manyfold. The game-theoretic model provides an analytical tool simple enough for an undergraduate with some training in economics, political science, or mathematics to use. It has broad applicability to very many conflicts stuck in a mutual deterrence equilibrium that is not entirely peaceful. For instance, in the South China Sea, the U.S. and allies are in constant unfriendly contact with Chinese forces in international waters and airspace contested by China. In cyberspace, the U.S. and multiple western countries face unrelenting attacks from China, Russia, Iran and North Korea, for which the only feasible response would be deterring counterattacks. Disinformation campaigns and election interference have the same logic and reportedly the same perpetrators. The Russia – Ukraine war has similar characteristics: in addition to a conventional war over territory, Russia's attacks on civilian populations and infrastructure are apparently limited by the fear of similar Ukrainian counterattacks –again, a mutual deterrence equilibrium.

27.     Our model and results beg two other fascinating questions, which often come up in presentation: Can the same methods be applied to understand the many other conflicts described above? Can the integration of benign (in addition to coercive) instruments shift those conflicts to a less destructive equilibrium, or even to settlement? The project was on the verge of taking on those policy-relevant research questions in early 2025.

**The Minerva Research Grant Termination**

28.     On February 28, 2025, I was one of more than two dozen recipients of a mass email from the program officer for the Air Force Office of Scientific Research, which stated:

- 5 -

> In line with recent Presidential executive orders, [the Office of the Undersecretary of Defense for Research & Engineering] has determined that your grant award no longer effectuates Minerva program goals or DoD priorities. As such, we are letting you know that you will soon be hearing from the grants officer responsible for your award about terminating it.

A true and correct copy of the email is attached as **Exhibit D**.

29.    The campus subsequently received a brief notice from the Department of Defense Department of the Air Force that stated: "The Government intends to terminate this Award under the authority of 2 CFR 200.340(a)(4)." No explanation of any kind for the termination was provided. A true and correct copy of the notice is attached as **Exhibit E**.

30.    On March 3, 2025, the Air Force issued a Grant/Cooperative Agreement Modification regarding the Grant. Again, it provided no explanation for the termination beyond form language:

> The subject grant award no longer effectuates the program goals or agency priorities as found in 2 CFR 200.340(a)(4) as incorporated into the DoD Research and Development General Terms and Conditions for grants by reference.

31.    As a result of the Modification, the DOD eliminated the third year of funding on the grant ($248,991). A true and correct copy of the Modification is attached as **Exhibit F**.

32.    UCSD submitted an appeal of the award termination on May 28, 2025. The campus has, as yet, received no response to the appeal.

**Harm from DOD Grant Termination**

33.    I and my project team have suffered immediate harm as a result of the cancellation of the grant. Specifically:

a)    I have been forced to significantly slow both research progress and dissemination. Rather than taking on pressing research questions – investigating benign instruments of power, and applying the model to other festering conflicts, much of my own time and that of my co-PI are taken up writing grant applications to replace the lost funding.

b)    The researchers on this grant have been unable to employ a postdoctoral fellow, and have released from employment graduate and undergraduate research assistants. This not only has slowed our empirical and theoretical progress, it has also ceased our training of these young scholars.

c)    Loss of grant funding similarly threatens our ability to retain support staff at our Institute on Global Conflict and Cooperation, who are essential to

continuity of research and are budgeted in this grant as a direct cost.
Loss of grant funding threatens the overall research and teaching operations of the University of California, which relies on Indirect Cost charges (currently 59% of total cost on new grants at UC San Diego) to cover activities such as building use, equipment depreciation, operation and maintenance of UC facilities, student services, departmental administration, or administrative support offices.

    d)    These personal and financial harms are ongoing. Twenty-two percent of my annual compensation was lost this calendar year due to grant termination.

    e)    These harms are in addition to the loss of value to the public from my research – specifically the national security community, as I have lost both time to travel (as I pursue new grant funding) and the resources to pay for travel to professional and policy conferences and meetings. (Those tend to be in Washington D.C. and New York, far from San Diego.)

### Role of Class Representative

34.    I am ready to assume the responsibilities of serving as a class representative. I understand that I must stay informed regarding developments in the lawsuit, communicate regularly with my attorneys, and act in the best interests of the class. I have no conflicts that would prevent me from assuming this responsibility.

35.    I have been in communication with other UC researchers, who would be members of the class, who have suffered the same general type of harm as I describe above, from the abrupt termination of their previously approached research grants. This harm is widespread and I believe it will only increase in scope and impact if classwide relief is not granted.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed _____, 2025.
    07/14/25 | 6:11 PM PDT



_____
Eli Berman