BRETT A. SHUMATE
Assistant Attorney General
Civil Division
ERIC J. HAMILTON
Deputy Assistant Attorney General
JOSEPH E. BORSON
Assistant Branch Director
JASON ALTABET (Md. Bar No. 2211280012)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-0727
Email: Jason.k.altabet2@usdoj.gov
KATHRYN BARRAGAN (D.C. Bar No. 90026294)
Tel.: (202) 598-7696
Email: kathryn.e.barragan@usdoj.gov

*Attorneys for United States*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| NEETA THAKUR, *et al.,* | Case No. 25-cv-4737-RFL |
| Plaintiffs, | DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ADDITIONAL PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.,* | Hearing Date: August 26, 2025 |
| Defendants. | Time: 10:00 AM |
| | Judge: Hon. Rita F. Lin |
| | Place: San Francisco Courthouse |
| | Courtroom 15 |

# TABLE OF CONTENTS

**INTRODUCTION** ........................................................................................................1

**STATEMENT OF THE ISSUES TO BE DECIDED** ...............................................2

**BACKGROUND** .........................................................................................................3

    *Factual Background* .............................................................................................3

    *Procedural Background* ........................................................................................4

**ARGUMENT** ..............................................................................................................6

**I.**    **This Court Should Reject Plaintiffs' Motion for the Reasons Previously Provided** ...............6

**II.**   **Plaintiffs Have Not Met Their Burden for Provisional Class Certification** .........................10

    **A.**    **Plaintiffs Have Failed To Establish Numerosity** ...............................11

    **B.**    **Plaintiffs Have Additionally Failed to Establish Commonality and Typicality for DoT** ...............12

**III.**  **Even Under the Court's Prior Reasoning, DoD and DoT Should Not be Enjoined** ...............13

    **A.**    **The Form Termination Class Should Not Apply Here** ...............13

        *The Agencies' Decisions Were Committed to Agency Discretion by Law* ...............13

        *DoT's Terminations Were Not Arbitrary and Capricious* ...............17

        *DoD's Terminations Were Not Arbitrary and Capricious* ...............20

    **B.**    **DoT and DoD Terminations Are Also Outside the Equity Termination Class** ...............21

        *Plaintiffs Have Not Shown the Agencies' Actions Were Contrary to Law Under the APA* ...............21

        *DoT Relied on Independent Policy Priorities* ...............23

        *DoD Has Several Terminations Independent of the DEI-Related Executive Orders* ...............23

**IV.**  **Injunctive Relief Should Be Stayed Pending Appeal and Be Accompanied by a Bond** ...............23

**CONCLUSION** ...............24

1

## <u>TABLE OF AUTHORITIES</u>

2

**<u>Cases</u>**

3

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,* ("*USAID*"),
4
   570 U.S. 205 (2013) ........................................................................................................ 9

5
*Am. Med. Ass'n v. Reno,*
   57 F.3d 1129 (D.C. Cir. 1995) .................................................................................... 20

6

7
*Betts v. Reliable Collection Agency, Ltd.,*
   659 F.2d 1000 (9th Cir. 1981) .................................................................................... 11

8
*Califano v. Yamasaki,*
9
   442 U.S. 682 (1979) .................................................................................................... 10

10
*City of New Haven v. United States,*
   809 F.2d 900 (D.C. Cir. 1987) .................................................................................... 21
11

12
*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ...................................................................................................... 8

13
*Cody v. Cox,*
14
   509 F.3d 606 (D.C. Cir. 2007) .................................................................................... 15

15
*Columbus Reg'l Hosp. v. United States,*
   990 F.3d 1330 (Fed. Cir. 2021) .................................................................................... 7
16

17
*Ctr. for Auto Safety v. Dole,*
   846 F.2d 1532 (D.C. Cir. 1988) .................................................................................. 17
18

19
*Dabney v. Reagan,*
   542 F. Supp. 756 (S.D.N.Y. 1982) ............................................................................ 21

20
*Dep't of Com. v. New York,*
21
   588 U.S. 752 (2019) ...................................................................................................... 8

22
*Dep't of Educ. v. California,*
   145 S. Ct. 966 (2025) ........................................................................................ 7, 10, 24
23

24
*Faculty Senate of Fla. Int'l Univ. v. Winn,*
   477 F. Supp. 2d 1198 (S.D. Fla. 2007) ...................................................................... 10
25

26
*FCC v. Prometheus Radio Project,*
   592 U.S. 414 (2021) ............................................................................................ 8, 17, 18

27

28

*FDA v. R. J. Reynolds Vapor Co.*,
    145 S. Ct. 1984 (2025) ................................................................................................ 7

*Gen. Land Off. v. Biden*,
    722 F. Supp. 3d 710 (S.D. Tex. 2024) ...................................................................... 21

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) .................................................................................. 12

*Heckler v. Chaney*,
    470 U.S. 821 (1985) .................................................................................................. 14

*Islamic Am. Relief Agency v. Gonzales*,
    477 F.3d 728 (D.C. Cir. 2007) .................................................................................. 20

*Klamath Water Users Protective Ass'n v. Patterson*,
    204 F.3d 1206 (9th Cir. 1999) .................................................................................... 8

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) .................................................................................................... 8

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ............................................................................................ 14, 16

*Louisiana v. Biden*,
    64 F.4th 674 (5th Cir. 2023) ...................................................................................... 8

*Megapulse v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ................................................................................ 6, 7

*Milk Train, Inc. v. Veneman*,
    310 F.3d 747 (D.C. Cir. 2002) ...................................................................... 14, 15, 17

*Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*,
    498 U.S. 211 (1991) .................................................................................................... 9

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ...................................................................................................... 8

*Ness Inv. Corp. v. U.S. Dep't of Agr., Forest Serv.*,
    512 F.2d 706 (9th Cir. 1975) .................................................................................... 17

*Pub. Citizen v. Stockman*,
    528 F. Supp. 824 (D.D.C. 1981) .............................................................................. 21

*Rannis v. Recchia,*
   380 F. App'x. 646 (9th Cir. 2010) ................................................................. 11

*Refuerzo v. Sw. Airlines Co.,*
   No. 22-cv-00868-JSC, 2024 WL 4177936 (N.D. Cal. Sept. 12, 2024) ............................ 11

*Ries v. Ariz. Beverages USA LLC,*
   287 F.R.D. 523 (N.D. Cal. 2012).................................................................. 11

*Rust v. Sullivan,*
   500 U.S. 173 (1991)............................................................................. 9

*Rutledge v. Elec. Hose & Rubber Co.,*
   511 F.2d 668 (9th Cir. 1975) .................................................................. 10

*Sampson v. Murray,*
   415 U.S. 61 (1974)............................................................................. 10

*Savantage Fin. Servs., Inc. v. United States,*
   595 F.3d 1282 (Fed. Cir. 2010).................................................................. 8

*Simon v. E. Ky. Welfare Rts. Org.,*
   426 U.S. 26 (1976)............................................................................. 8

*Small v. Allianz Life Ins. Co. of N. Am.,*
   122 F.4th 1182 (9th Cir. 2024) ), *cert. denied,* No. 24-1225, 2025 WL 1787755
   (U.S. June 30, 2025) .......................................................................... 10

*Smiley v. Citibank (S. Dakota),*
   517 U.S. 735 (1996)............................................................................ 19

*Sueoka v. United States,*
   101 F. App'x 649 (9th Cir. 2004) .............................................................. 11

*Tennessee v. Becerra,*
   131 F.4th 350 (6th Cir. 2025) .................................................................. 9

*Trump v. Boyle,*
   No. 25A11, 2025 WL 2056889 (U.S. July 23, 2025) .............................................. 10

*Trump v. Sierra Club,*
   140 S. Ct. 1 (2019)............................................................................ 21

*Tucson Airport Authority v. General Dynamic.,*
   136 F.3d 641 (9th Cir. 1998) ................................................................... 7

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) .................................................................................... 12

## Statutes

2 U.S.C. § 683 ............................................................................................... 21

5 U.S.C. § 701 .......................................................................................... 13, 14

5 U.S.C. § 702 ............................................................................................... 14

5 U.S.C. § 706 ............................................................................................... 14

10 U.S.C. § 4001 ........................................................................................... 15

31 U.S.C. § 503 .......................................................................................... 3, 22

31 U.S.C. § 6301 *et seq.* ............................................................................... 15

31 U.S.C. § 6307 ....................................................................................... 3, 22

49 U.S.C. § 330 ............................................................................................. 15

49 U.S.C. § 5505 ........................................................................................... 16

49 U.S.C. § 6503 ........................................................................................... 22

50 U.S.C. § 1902 ........................................................................................... 15

Infrastructure Investment and Jobs Act,
  Pub L. No. 117-85, 135 Stat. 429 (2021) ..................................................... 22

## Rules

Fed. R. Civ. P. 23 .......................................................................................... 11

Fed. R. Civ. P. 65 .......................................................................................... 24

## Regulations

2 C.F.R. Part 200 ....................................................................................... 3, 16

2 C.F.R. Part 1201 .......................................................................................... 3

2 C.F.R. § 200.309 .......................................................................................... 3

2 C.F.R. § 200.339 .......................................................................................... 3

2 C.F.R. § 200.340 ................................................................................................ 3, 16

2 C.F.R. § 200.341 .................................................................................................. 16, 17

2 C.F.R. § 200.343 ...................................................................................................... 3

Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ........................................... 2, 4, 22

Exec. Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025) ........................................... 5, 20

Exec. Order No. 14,173, 90 Fed. Reg. 8633 ( Jan. 21, 2025) .......................................... 2, 4, 22

**Other Authorities**

H.R. Rep. No. 658, 93-658, 93d Cong., 1st Sess. (1971), *reprinted in* 1974 U.S.C. Cong. & Admin.
   News 3462 ...................................................................................................... 21

**INTRODUCTION**

Two months ago, this Court preliminarily enjoined three federal agencies, requiring them to restore certain grants where University of California ("UC") affiliated researchers were listed on the grant application in certain positions and setting prospective relief for eligible future terminations. The Court provisionally certified two classes—the Form Termination Class and Equity Termination Class—with criteria for when a termination qualifies under either. The Court did not extend relief to agencies where a named plaintiff was not named on a grant and the Court rejected relief based on separate executive priorities irrelevant to those grants. Ultimately, the Court enjoined three agencies on the basis of the content and form of their termination letters and for terminations pursuant to two DEI-related Executive Orders.

On an agreed schedule, Plaintiffs have now amended their complaint to add two additional named plaintiffs named on grant applications with the Department of Defense ("DoD") and Department of Transportation ("DoT"). After receiving expedited discovery for those agencies, they now move for a preliminary injunction to those two agencies and seek the same class-wide relief.

The Court should deny Plaintiffs' motion. Defendants reiterate and preserve the arguments made in their initial briefing that the Court should not have issued a preliminary injunction and should similarly refrain from doing so here. Assuming the Court maintains its reasoning, Defendants raise several application-specific reasons the Court should not issue an injunction.

First, various class action issues bar class-wide relief here. For one, Plaintiffs have not established sufficient numerosity for a second preliminary injunction as to the identified classes, or at the very least for the Equity Termination Class. Plaintiffs have also failed to identify the typicality and commonality required for DoT.

Second, as to the Form Termination Class, the statutory schemes setting out grant funding at both new agencies commit funding and termination decisions to the agencies' discretion by law. Therefore, the Administrative Procedure Act ("APA") exception for judicial review of such decisions applies. Since the Form Termination Class is premised on Plaintiffs' APA arbitrary and capricious claim, it cannot be applied to these two agencies. If the Court reaches the merits of the notices, the termination letters sent

by DoT are sufficiently detailed to prevent creation of a Form Termination Class for that agency. And DoD should receive additional deference given the military and foreign affairs nature of the grants cited.

Third, as to the Equity Termination Class, if APA review applies, the statutes governing DoD and DoT do not freeze DEI-related grantmaking. Assuming the Court maintains a First Amendment basis for the class criteria, it should still be applied sparingly. Some DoD terminations were not pursuant to the DEI-related Executive Orders identified by the Court, although Defendants agree that the expedited discovery shows at least one was pursuant to those Executive Orders. And the evidence shows that the DoT terminations were based on DoT policy priorities rather than any Executive Order.

In sum, assuming the Court maintains its original reasoning, it should still deny Plaintiffs' motion or limit the resulting preliminary injunction.

## STATEMENT OF THE ISSUES TO BE DECIDED

1. Should the Court issue a preliminary injunction despite the renewed jurisdictional, merits and class certification arguments made by Defendants in opposition to the original motion for an injunction?

2. Have Plaintiffs successfully established the requirements of provisional class certification given a weak showing of numerosity and problems with commonality and typicality for DoT?

Assuming the Court concludes provisional certification is proper and maintains the reasoning underlying its preliminary injunction:

3. For the Form Termination Class, which is premised on APA review, are terminations at DoD and DoT committed to agency discretion by law such that APA review is barred? If APA review is allowed, are DoT's detailed termination letters sufficient to exclude the terminations from the Form Termination Class? Should DoD receive special deference given the military and foreign affairs issues involved?

4. If APA review applies, do the statutes governing DoD and DoT require funding to remain frozen? Regardless, should the Court expand the Equity Termination Class to cover DoD terminations not based on Executive Orders 14,151 or 14,173? Should the Court expand the

Equity Termination Class to DoT terminations that are based on agency policy priorities and a variety of reasons and where the Executive Orders were not cited as a basis?

## BACKGROUND

*Factual Background*

This Court is familiar with the general factual and procedural background of this matter, which is little changed from when the Court issued its preliminary injunction. Preliminary Injunction, ECF No. 55. In short, when President Trump assumed the office of President of the United States, the agencies of the Executive Branch adopted new policy priorities in conformity with the President's objectives. And federal agencies with grantmaking authority have, over the last several months, reviewed existing grants using changed policy priorities. One of the resulting actions, grant terminations, are at issue in this case.

By way of background, agencies are broadly empowered, through terms and conditions of federal grants and regulation, to reorient grant portfolios in response to changing priorities. As a default matter, Office of Management and Budget ("OMB") regulations generally govern a variety of terms for federal grants and contracts. *See generally* 2 C.F.R. Part 200 (titled "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards"). For example, the regulations reference and generally provide terms for the termination of awarded federal grants. *See, e.g., id.* § 200.309 ("If termination occurs, the period of performance will be amended to end upon the effective date of termination."); *id.* § 200.339(c) (noting suspension or termination is a remedy for noncompliance); *id.* § 200.343 (discussing the effects of suspension or termination).

Section 200.340, simply titled "[t]ermination" provides the key substantive and procedural guidelines for terms governing termination of awarded grants. Crucially, the Federal Government has preserved the authority to terminate "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, <u>if an award no longer effectuates the program goals or agency priorities</u>." *Id.* § 200.340 (emphasis added). This termination authority has been promulgated consistent with Congressional directives—delegating to OMB the power to manage various aspects of federal grants and contracts, including termination. *See* 31 U.S.C. § 503; *id.* § 6307; *see also* 2 C.F.R. Part 1201 (DoT regulations). Awardees are accordingly informed in their terms and conditions that awards may be

terminated based on changes in agency priorities.

*Procedural Background*

On June 5, 2025, Plaintiffs filed this suit naming 16 grantmaking agencies as defendants, moved for a temporary restraining order, and sought to certify a class. Compl., ECF No. 1; Pls.' Mem. in Supp. of Mot. for TRO, ("Pls.' PI Mem."), ECF No. 7-1; Pls.' Mot. for Class Certification, ECF No. 18. Plaintiffs brought claims under ultra vires review alleging that Defendants have violated the Take Care Clause and Appropriations Clause, the First Amendment's bar on viewpoint discrimination, and the Fifth Amendment's Due Process Clause. Compl. ¶¶ 433-52. Plaintiffs also sought APA review for alleged violations of the Impoundment Control Act, agencies' governing statutes, unspecified regulations, and the bar on arbitrary and capricious final agency action. *Id.* ¶¶ 453-65.

In their emergency motion, Plaintiffs sought the restoration of terminated grant funding, bars on future terminations, and a judicial order reinstating pre-January 20, 2025 grant termination procedures. Pls.' PI Mem. at 2. The Court subsequently set briefing on both motions with a hearing on June 20. ECF No. 28.

After a hearing, the Court granted preliminary injunctive relief but limited both the scope and reach. The preliminary injunction is limited to only those agencies where named plaintiffs were listed "as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants," Preliminary Injunction ¶¶ 1, 3—namely the Environmental Protection Agency ("EPA"), National Science Foundation ("NSF"), and National Endowment for the Humanities ("NEH"). As to those three agencies, the Court certified two classes. The Equity Termination Class, based on Plaintiffs' First Amendment claim, and part of their APA contrary to law claim, covers "grants terminated by Agency Defendants pursuant to Executive Orders 14151 or 14173." *Id.* ¶ 4a. The Form Termination Class, based on Plaintiffs' arbitrary and capricious claim under the APA, covers "grant terminations . . . communicated by means of a form termination notice that does not provide a grant-specific explanation for the termination that states the reason for the change to the original award decision and considers the reliance interests at stake." *Id.* ¶ 2a. The Court also explained the basis for its injunction and provisional class certification. Order Granting Motion for Preliminary Injunction and

Class Certification ("Mem. Op."), ECF No. 54.

After the Court issued its preliminary injunction, the parties conferred on a schedule for further proceedings. Joint Case Management Statement, ECF No. 58. The parties agreed that Plaintiffs would amend their complaint to add additional named plaintiffs and then move to expand the scope of the Court's preliminary injunction. *Id.* at 2. Plaintiffs subsequently amended their complaint to include two additional plaintiffs. Am. Compl., ECF No. 68. Those plaintiffs are named on terminated grants with DoD and DoT. *Id.* ¶ 395 (Eli Berman, DoD); ¶¶ 467, 474 (Handy, DoT). Berman was listed as an investigator on a grant to study the Israel/Gaza conflict using a game theoretical model. *Id.* ¶ 397. Handy was listed as an investigator on two grants for the National Center for Sustainable Transportation related to "electrification, alternative fuels, air quality, and environmental justice," *id.* ¶ 466, and as an investigator on a subaward to a University of California school for a grant involving the Pacific Southwest Region University Transportation Center, *id.* ¶¶ 473-74.

The Court additionally ordered that Defendants provide expedited discovery for those additional defendants. Minute Order, ECF No. 60. Defendants provided that discovery. For DoD, declarant Day attests that he included every "non-privileged document" that he was able to collect through the method he details in his declaration, including spreadsheets, internal communications, policy memoranda, and other documents. Day Decl. ¶¶ 5-9, ECF No. 77-3; DoD Production, ECF No. 77-4. He attests that the dozens of pages of documents, and several spreadsheets, are sufficient to show the categories that the Court set out for expedited discovery.[1] Day Decl. ¶¶ 5-9. Indeed, DoD's production includes specific records listing grants and the Executive Orders under which they were terminated. Ex. A (excerpt with Berman's grant and applicable Executive Order); DEFSDOD_00023 (listing UC grants in an email with applicable Executive Orders), ECF No. 77-4 at 10. DoD agrees that at least one UC grant was

---

[1] For example, Day collected a spreadsheet, produced by Defendants to Plaintiffs, listing terminations with a column for the "Applicable Executive Order" for terminations. Ex. A (excerpt of the spreadsheet provided to Plaintiffs showing just the Berman termination), ECF No. 87-1. For Plaintiff Berman's single cited grant, No. FA 9550-23-1-0437, Berman Decl. ¶ 23, ECF No. 69, the column states "(b) Executive Order 14169, Reevaluating and Realigning United States Foreign Aid, 20 January 2025." Ex. A. That Executive Order is not cited by Plaintiffs in their amended complaint as a basis for their claims. *See generally* Am. Compl.

terminated pursuant to one of the DEI-related Executive Orders. DEFSDOD_00023 (listing a University of California San Diego grant terminated pursuant to the "Ending Radical and Wasteful Government DEI Programs" Executive Order and implementing memorandum).

For DoT, Declarant Young, who recommended grants for termination, explained that he personally reviewed all grants in the University Transportation Center program without using "any search terms" and reviewed "UTC's public-facing website and publications, [while] other individuals within the Office of the Secretary of Transportation reviewed statements of work." Young Decl. ¶ 3, ECF No. 77-1. Moreover, he enclosed certain priorities and policies of DoT that terminations were based on. *Id.* ¶¶ 4-5. And he explained that "to [his] knowledge, there are no readily available non-privileged documents, other than provided, which could substitute for the information in th[e] declaration." *Id.* ¶ 8.

Plaintiffs now move for an additional preliminary injunction for DoD and DoT. Mot. for Preliminary Injunction & Provisional Class Certification as to Additional Agency Defendants ("2nd PI Mot."), ECF No. 76. Defendants oppose.

## ARGUMENT

Plaintiffs seek a new preliminary injunction to DoD and DoT. Defendants maintain their original objections to a preliminary injunction including that Plaintiffs' alleged irreparable harm and the balance of the equities do not support emergency injunctive relief. However, presuming the Court maintains the reasoning underling its first preliminary injunction, the Court should still deny Plaintiffs' second motion, or grant it only in limited part as detailed below.

### I.    This Court Should Reject Plaintiffs' Motion for the Reasons Previously Provided

As an initial matter, Defendants briefly renew, preserve, and expand on the arguments that the Court previously considered.

First, this Court lacks jurisdiction over each claim—and particularly the APA claims—because Congress has specifically divested federal courts of jurisdiction over matters like this one. Under the test laid out in *Megapulse v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982), and regularly applied by the Ninth Circuit, *Tucson Airport Authority v. General Dynamic.*, 136 F.3d 641, 647 (9th Cir. 1998), Plaintiffs

may not bypass the Court of Federal Claims through clever pleading. If "a particular action" is "at its essence a contract action" it is not within the jurisdiction of the district courts—a test that requires looking at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968 (citation omitted). Plaintiffs' claims are ultimately based on grant agreements themselves, and a claim-by-claim analysis shows each would fail without the terms of the grant agreements. That is particularly true for the APA arbitrary and capricious claim. As *Megapulse* explained, "[i]t is hard to conceive of a claim falling no matter how squarely within the Tucker Act which could not be urged to involve as well agency error subject to review under the APA." 672 F.2d at 967 n.34 (citation omitted). And the APA arbitrary and capricious claim here is materially identical to a claim that a contracting party failed to properly terminate a contract. As to relief, that the order is ultimately one to "enforce [the Government's] contractual obligation to pay money" means the relief prong of the *Megapulse* test divests the court of jurisdiction. *See Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam) (citation omitted). In sum, the Ninth Circuit takes a strong view of preclusion, even holding "that the Tucker Act prevents constitutional claims that are dependent on rights under a government contract," *Tucson Airport Auth.*, 136 F.3d at 648, and such reasoning applies here.

It does not matter whether these plaintiffs could bring a claim in the Court of Federal Claims. Plaintiffs "conflate[] two distinct concepts . . . the presence or absence of an adequate remedy within the meaning of § 704, and the requirement that a cause of action not be 'impliedly forbidden' under § 702." *Id.* at 646. When Congress creates a " cause of action enabling [some parties] (and not [others]) to seek judicial review . . . [a]llowing [the others] to sue under the APA would … frustrat[e] that scheme." *FDA v. R. J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1995 n.8 (2025). And under Federal Circuit law, these are indeed contracts enforceable in the Court of Federal Claims. *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021) ("[W]e have followed our predecessor court in treating federal grant agreements as contracts when the standard conditions for a contract are satisfied.").

Second, Plaintiffs lack standing because they are not parties to the contracts they seek to enforce. It is well established that each party generally "must assert his own legal rights" and may not invoke the rights of "third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). Yet Plaintiffs' claims and relief

are entirely premised on requiring the Federal Government to continue paying nonparties. And Plaintiffs are not third-party beneficiaries, *see Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999*)*, nor can they assert third-party standing, *see Kowalski*, 543 U.S. at 129-30. That Plaintiffs require the Court to assume "how independent decisionmakers will exercise their judgment" defeats redressability, *see Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (citation omitted), and causation is lacking because a Court order merely encourages third parties to eventually remedy Plaintiffs' alleged harms, *see Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-43 (1976). Finally, enjoining future alleged terminations is too speculative to support standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (explaining that any allegation of "threatened injury must be *certainly impending*" (citation omitted)).

Third, Plaintiffs' APA claims are foreclosed for lack of final agency action. While each individual termination may eventually represent a final agency action (directed at nonparties) a plaintiff may not "in a single swipe at the duly elected executive" seek judicial superintendence over the entire grantmaking structure of the Executive Branch. *See Louisiana v. Biden*, 64 F.4th 674, 684 (5th Cir. 2023). Plaintiffs' attempt to categorically enjoin alleged future terminations is thus barred.

Fourth, on the merits of the APA arbitrary and capricious claim, such review is deferential because it "represents a substantial intrusion into the workings of another branch of Government." *See Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) (quotation marks omitted); *see also Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) ("[D]etermining an agency's minimum needs is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess." (quotations omitted)). The terminations were "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). In their notices, the agencies explained that the grants were ending based on termination authorities available when the nonparty educational institutions received the grant awards. So agencies, pursuant to terms previously laid out, effectuated a long-held authority to determine whether grant awards are in conformity with current priorities. And it is exceedingly unlikely that anyone has a reliance interest in continued discretionary funding—particularly when the agency communications themselves recognize funding may not continue in future years

1   despite initial funding. *See Tennessee v. Becerra*, 131 F.4th 350, 370 (6th Cir. 2025) ("Tennessee likely

2   has no legally cognizable reliance interest in the receipt of a discretionary funding award on the

3   conditions that it prefers." (emphasis removed)). So no reliance interests should have weighed in favor

4   of preliminary injunctive relief. The APA does not require Defendants to simply maintain grants that no

5   longer effectuate their priorities and forego a regulatorily permitted termination pathway. *See, e.g.*,

6   *Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230 (1991) ("An agency

7   enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of

8   procedures, and priorities[.]" (citations omitted)).

9       Perhaps most importantly, the First Amendment claim directly contradicts longstanding

10  precedent on when viewpoint discrimination is impermissible in government grantmaking. In short,

11  Government spending is not subject to traditional First Amendment scrutiny. "The Government can,

12  without violating the Constitution, selectively fund a program to encourage certain activities it believes

13  to be in the public interest." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). That is not considered

14  impermissible viewpoint discrimination. Indeed, "[i]n so doing, the Government has not discriminated

15  on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Id.* So

16  "[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to

17  decline the funds. This remains true when the objection is that a condition <u>may affect the recipient's</u>

18  <u>exercise of its First Amendment rights</u>." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*

19  ("*USAID*"), 570 U.S. 205, 214 (2013) (emphasis added). Under the *USAID* distinction, so long as the

20  Government has regulated speech within the contours of the program, rather than imposing an external

21  pledge, there is no First Amendment violation. That is, it cannot "leverage funding to regulate speech

22  *outside* the contours of the programs itself." *Id.* at 214-15 (emphasis added). Terminations tied to the

23  topics of the grants are therefore entirely permissible. At the very least, a person merely listed as a

24  researcher on a grant application has no personal First Amendment right to bar the Government from

25  cancelling someone else's grant. Any First Amendment right, if it were to exist, would belong to the

26  grantee itself, who is not a party in this matter.

27      Finally, irreparable harm and the balance of the equities counsel against issuing an additional

28

injunction. "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" before the court. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And "mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough." *See Sampson v. Murray*, 415 U.S. 61, 90 (1974); *see also Faculty Senate of Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1208 (S.D. Fla. 2007) ("There is no irreparable harm here because the plaintiffs can fund the desired travel themselves and then, if they prevail in this suit, obtain reimbursement. In other words, the harm is financial."). Plaintiffs' alleged harms are necessarily financial and insufficient for irreparable harm. As for the balance of the equities, the Supreme Court in *California* squarely explained that it favors the Federal Government in this context. The public interest is harmed when the United States is forced to pay out funds that it may not be able to recover. *California*, 145 S. Ct. at 969. And the grantees have the choice of whether "to keep the programs operating," and if they choose not to, "then any ensuing irreparable harm would be of their own making." *Id.* The Court recently clarified that such reasoning is binding on the lower courts. *Trump v. Boyle*, No. 25A11, 2025 WL 2056889 (U.S. July 23, 2025) ("Although our interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases.").

## II. Plaintiffs Have Not Met Their Burden for Provisional Class Certification

Having reraised and preserved their earlier arguments, Defendants move now to application of provisional class certification to DoD and DoT. Critically, "plaintiffs must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23 by a preponderance of the evidence." *Small v. Allianz Life Ins. Co. of N. Am.*, 122 F.4th 1182, 1197 (9th Cir. 2024) (internal quotation marks omitted), *cert. denied,* No. 24-1225, 2025 WL 1787755 (U.S. June 30, 2025). This is "a rigorous analysis." *Id.* (quotation omitted). And the failure to meet "any one of Rule 23's requirements destroys the alleged class action." *Rutledge v. Elec. Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir. 1975).

Plaintiffs ask the Court to "certify two new provisional classes." 2nd PI Mot. at 9. Each class must meet the requirements of Rule 23. Fed. R. Civ. P. 23(a) (defining the requirements as to "the

1  class"). And even if the Court were to consider these subclasses, the Ninth Circuit is clear: "each

2  subclass must independently meet the requirements of Rule 23 for the maintenance of a class action."

3  *Betts v. Reliable Collection Agency, Ltd*., 659 F.2d 1000, 1005 (9th Cir. 1981); *accord Sueoka v. United*

4  *States*, 101 F. App'x 649, 652 (9th Cir. 2004) (unpublished).

5        Plaintiffs have failed to establish, by a preponderance of the evidence, numerosity, commonality,

6  and typicality for each class. So provisional certification is inappropriate.

7                    **A.  Plaintiffs Have Failed to Establish Numerosity**

8        By rule, Plaintiffs must show that "the class is so numerous that joinder of all members is

9  impracticable." Fed. R. Civ. P. 23(a)(1). As the Court noted in its opinion, "courts find the numerosity

10  requirement satisfied when a class includes at least 40 members." *Rannis v. Recchia*, 380 F. App'x. 646,

11  651 (9th Cir. 2010) (unpublished); Mem. Op. at 54 (quoting and citing the same). After all, 40 members

12  would generally make joinder an impracticable mechanism for continuing litigation. On the other hand,

13  even in the (b)(2) context, "[w]hile there is no fixed number that satisfies the numerosity requirement, as

14  a general matter, . . . one less than twenty-one does not." *Refuerzo v. Sw. Airlines Co.*, No. 22-cv-00868-

15  JSC, 2024 WL 4177936, at *4 (N.D. Cal. Sept. 12, 2024) (considering numerosity in a (b)(2) class

16  action) (quoting *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 536 (N.D. Cal. 2012)); *see also Ries*,

17  287 F.R.D. at 536 (stating the same in the (b)(2) class action context).

18        Plaintiffs have failed to establish numerosity. They can identify an estimated 19 grant

19  terminations that would be covered *across* their two class definitions. 2nd PI Mot. at 11. But they have

20  failed to identify any particular number for the Equity Termination Class, as is their burden, and the

21  evidence does not suggest twenty-one or more class members. *See id.* Moreover, even if the Court

22  concludes that each of the 19 identified terminations fall within the Form Termination Class, that is still

23  insufficiently large to satisfy numerosity. While Plaintiffs cite potential future terminations, *see id.*, they

24  have not shown it is more likely than not such terminations would be form terminations within the

25  Court's definition, or pursuant to the Executive Orders identified for the Equity Termination Class.

26  Thus, at this time, class treatment is inappropriate.

27        And Defendants are not at fault for this lack of proof. No one contests that there were only a few

28

FED. DEFS.' OPP'N TO PLS.' MOT. FOR ADDITIONAL PRELIMINARY INJUNCTION
CASE NO. 25-CV-4737

1   relevant terminations at DoT. And DoD collected and provided substantial spreadsheets of terminated

2   and non-terminated grants and internal communications regarding the same. *See* Ex. A;

3   DEFSDOD_00023; DEFSDOD_00057, ECF No. 77-5. The DoD declarant attests that he provided

4   "every non-privileged document" that he was able to collect through the method he details in his

5   declaration, including spreadsheets, internal communications, policy memoranda, and other documents.

6   Day Decl. ¶¶ 5-9, At least at this time, numerosity has not been satisfied as to both classes—and at the

7   very least—as to the Equity Termination Class.

8           **B.   Plaintiffs Have Additionally Failed to Establish Commonality and Typicality for**

9                  **DoT**

10          The commonality and typicality requirements of Rule 23(a) are interrelated and, in some

11  instances, merge. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 n. 5 (2011). Commonality requires

12  that "claims must depend upon a common contention . . . of such a nature that it is capable of classwide

13  resolution." *Id.* at 350. Typicality focuses on how the named plaintiffs' claims relate to those of the

14  potential class members. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). In sum,

15  "[b]oth [requirements] serve as guideposts for determining whether under the particular circumstances

16  maintenance of a class action is economical and whether the named plaintiff's claim and the class claims

17  are so interrelated that the interests of the class members will be fairly and adequately protected in their

18  absence." *Dukes*, 564 U.S. at 349 n.5. These principles fail for DoT.

19          First, commonality and typicality fail for the Form Termination Class because the DoT

20  termination letters are more detailed than the termination letters that the Court reviewed for EPA, NSF,

21  NEH, and DoD, as even Plaintiffs acknowledge. 2nd PI Mot. at 20. Defendants agree that the DoD

22  letters are sufficiently similar to satisfy the commonality and typicality analysis as compared to the

23  terminations at EPA, NEH, and NSF. All four stated the legal basis for termination without a detailed

24  explanation regarding the change from the original decision and a statement of consideration of reliance

25  interests. But the limited number of DoT letters, containing substantial detail, are sufficiently unique to

26  bar class-wide treatment as to the Form Termination Class.

27          Second, the evidence of how terminations were performed at DoT also counsel against

28

FED. DEFS.' OPP'N TO PLS.' MOT. FOR ADDITIONAL PRELIMINARY INJUNCTION
CASE NO. 25-CV-4737

commonality and typicality. DoT's terminations were accomplished through personal review by the declarant without "any search terms." Young Decl. ¶ 3. Part of that review included websites and publications—a process not suggested as part of the EPA, NEH, NSF, or DoD actions. *Id.* This factual difference suggests class treatment of the few DoT terminations is inappropriate for the Equity Termination Class and the DoT-specific policy priorities discussed, *id.* ¶¶ 3-5, also differ from DoD terminations and those the Court found more directly based on Executive Orders. *See* DEFSDOD_23; Ex. A; *see also* Mem. Op. at 14 (concluding that the evidence for EPA, NEH, and NSF—before the Court at the time—"support[s] an inference that Defendants undertook blanket *en masse* terminations pursuant to the executive orders"); *id.* at 28 (finding "Agency Defendants appear to have flagged grants for termination based on keyword searches or other cursory review, and terminated grants that appear to have no connection to the Equity Termination Orders they were purporting to implement").

In sum, the unique situation with DoT's terminations counsels against a finding of commonality and typicality with the DoD terminations under both proposed classes, as well as with the terminations at EPA, NEH, and NSF.

**III.    Even Under the Court's Prior Reasoning, DoD and DoT Should Not be Enjoined**

Even accepting the Court's earlier reasoning, and class treatment, DoD and DoT should not be enjoined, or only to a limited extent for DoD as to the Equity Termination Class.

**A.  The Form Termination Class Should Not Apply Here**

As to the Form Termination Class, the APA's committed to agency discretion by law exception bars APA review for both agencies. Moreover, DoT's termination notices are sufficient to satisfy arbitrary and capricious review. Finally, the Court should apply a more lenient standard for DoD, given the deference afforded to DoD decisionmaking in this context.

*The Agencies' Decisions Were Committed to Agency Discretion by Law*

Withdrawal of funding is quintessential agency action "committed to agency discretion by law," for which the APA does not provide an avenue for review. 5 U.S.C. § 701(a)(2). While the APA establishes a waiver of sovereign immunity and a cause of action for injunctive relief for parties adversely affected by either final agency action or an agency's failure to act, 5 U.S.C. §§ 702, 706(1)-

1   (2), the waiver of sovereign immunity is limited. It does not apply in circumstances where "agency

2   action is committed to agency discretion by law[,]" *id.* § 701(a)(2). Review under the APA therefore is

3   unavailable "if the statute is drawn so that a court would have no meaningful standard against which to

4   judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

5       The Supreme Court has long recognized that an agency's determination of how to allocate

6   appropriated funds among competing priorities and recipients—precisely what Plaintiffs challenge

7   here—is classic discretionary agency action. *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). In *Lincoln*,

8   the Court explained that there is no waiver of sovereign immunity where agency action requires "a

9   complicated balancing of a number of factors which are peculiarly within [the agency's] expertise,"

10  including whether "resources are best spent on one program or another; whether it is likely to succeed in

11  fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and,

12  indeed, whether the agency has enough resources to fund a program at all." *Id.* (citations and internal

13  quotation marks omitted). An "agency is far better equipped than the courts to deal with the many

14  variables involved in the proper ordering of its priorities." *Id.* (citation omitted). The APA "gives the

15  courts no leave to intrude" via arbitrary-and-capricious review. *Id.*

16      The Court previously rejected application of this exception, in large part, because of the agency

17  statutes at issue. Mem. Op. at 34-35. The statutes for DoD and DoT are distinct, however, and leave the

18  agencies with "the decision about how the moneys" for their program "could best be distributed." *See*

19  *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions "clearly require[] a

20  complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.*

21  at 752 (citations omitted). As a result, the grant funding decisions are committed to the agencies'

22  discretion.

23      Start with DoD. It would be hard to find a grant funding authority that better encompasses the

24  committed to agency discretion by law exception. The statute simply and clearly authorizes funding

25  discretion: "Authorized means.--The Secretary of Defense or the Secretary of a military department <u>may</u>

26  perform research and development projects-- (1) by contract, cooperative agreement, or grant, in

27  accordance with chapter 63 of title 31." 10 U.S.C. § 4001(b)(1) (emphasis added); *see also* 31 U.S.C. §

28

FED. DEFS.' OPP'N TO PLS.' MOT. FOR ADDITIONAL PRELIMINARY INJUNCTION
CASE NO. 25-CV-4737

6301 *et seq* (providing guidelines for how to manage funding). The use of the word "may" provides discretion as to whether funding for research and development projects shall be undertaken at all. *See Milk Train*, 310 F.3d at 751 ("Insofar as Congress has left to the Secretary's sole judgment the determination of the manner for providing assistance to dairy farmers, we hold that the district court lacked jurisdiction to review Milk Train's challenge.").

The only statutory hook Plaintiffs can point to is a requirement for "awarding grants to institutions of higher education to enable such institutions to establish, operate, or improve <u>programs</u> in foreign languages, area studies, counterproliferation studies, and other international fields that are critical areas of those disciplines." 50 U.S.C. § 1902(a)(1)(C) (emphasis added); *see* 2nd PI Mot. at 18 & n.31. But nothing suggests that the research grant here, for "empirically examin[ing] conflict and deterrence postures using Israeli-Gaza conflicts as a use case," Ex. A, has anything to do with establishing, operating, or improving an institution of higher education's program in a statutorily designated area. On its face, the grant is designed to assist DoD with studying "questions of strategic importance to U.S. national security policy," in support of the "2022 National Defense Strategy." Berman Decl. ¶¶ 12, 20 (citation omitted). And, at its discretion, DoD chose to reorient its priorities. Especially when paired with the added deference for "second-guessing executive branch decisions involving complicated foreign policy matters" under this exception, *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007) (citation modified), the statute commits grant funding and termination decisions for related research to DoD's discretion by law.

DoT has been granted similar discretion. "-The Secretary <u>may</u>—(1) enter into grants and cooperative agreements with Federal agencies, State and local government agencies, other public entities, private organizations, and other persons to conduct research into transportation service and infrastructure assurance and to carry out other research activities of the Department of Transportation." 49 U.S.C. § 330(e)(1) (emphasis added). Once again, Congress has provided broad, discretionary, funding authority.

Nonetheless, it is true that for University Transportation Centers, like the National Center for Sustainable Transportation, Congress provided additional guidance. "The Secretary of Transportation,

acting through the Assistant Secretary for Research and Technology (referred to in this section as the 'Secretary'), shall make grants under this section to eligible nonprofit institutions of higher education to establish and operate university transportation centers." *Id.* § 5505(a)(1). And "the Secretary shall provide grants to 5 consortia that the Secretary determines best meet the criteria described in subsection (b)(4)." *Id.* § 5505(c)(2); *id.* § 5505(b)(4) (referencing nine criteria and seven research priorities); *id.* § 5505(c)(3) (setting the same for regional transportation centers). But the varied criteria (nine of them) and research priorities (seven of them), for which the Secretary is invested with selection discretion, is precisely the "complicated balancing of a number of factors" that takes a funding decision out of APA review. *See Lincoln*, 508 U.S. at 193. Nor does the statute mandate any particular grant on any particular topic be approved and maintained.

The fact that a regulation provides for termination in accordance with agency priorities does not limit this discretion. Most obviously, the regulations are really guidelines for "terms and conditions," 2 C.F.R. § 200.340, eventually placed in individual contracts—emphasizing the requirement for Court of Federal Claims, rather that district court, review. *See supra* Part I. Putting that to the side, "the proper ordering of [agency] priorities" is precisely what the Supreme Court in *Lincoln* emphasized as being squarely committed to agency discretion by law in the funding context. 508 U.S. at 193 (citation omitted). And the mere creation of contractual funding cannot suddenly provide "law to apply" for purposes of defeating this exception. To the extent any such law is generated, it is contractual, an area of law entirely placed within the sphere of the Court of Federal Claims and outside this Court's review. *See supra* Part I. And even if the Court could consider Section 200.340, the agencies terminated pursuant to the terms and conditions based on a change in priorities—nothing further was required.

Finally, 2 C.F.R. § 200.341's statement that written notice shall be sent with the "reasons for termination, the effective date, and the portion of the Federal award to be terminated" does not defeat this exception either. For one, the regulatory restriction cannot bind these agencies for purpose of the committed to agency discretion by law exception. The regulation was promulgated by OMB. *See* 2 C.F.R. Part 200. But the application of regulatory constraints applies only when the regulation is "promulgated by an administrative agency in carrying out its statutory mandate" as a "self-imposed

constraint[]." *See Ctr. for Auto Safety v. Dole*, 846 F.2d 1532, 1534 (D.C. Cir. 1988). That these agencies did not write the relevant regulation suggests it cannot provide law to apply within the meaning of the exception. Next, the regulation is as to the "recipient or subrecipient" and provides no rights to those merely listed on the application. *See* 2 C.F.R. § 200.341. So these Plaintiffs have no ability to raise this issue at all.

Setting all that aside, the notice regulation is not sufficient law to apply to overcome the discretionary decisionmaking in this funding context. As the Ninth Circuit has explained, the Court in this context may review for compliance with regulatory restrictions, but not "when the alleged abuse of discretion consists only of the making of an informed judgment by the agency." *Ness Inv. Corp. v. U.S. Dep't of Agr., Forest Serv.*, 512 F.2d 706, 715 (9th Cir. 1975). Yet, how much detail to include in the reasons for termination is bound up in informed judgment, particularly in this funding context. And even if the Court rejects those objections and concludes Section 200.341 is a sufficient "reference point," review would still be limited to just whether the agencies complied with that one requirement. *See Milk Train*, 310 F.3d at 751-52 (cleaned up) (differentiating between reviewable and unreviewable aspects of the action under review). That is, as the D.C. Circuit applied the exception in *Milk Train*, such a reference point would merely provide review as to the limited question of whether notice containing the three listed elements was met. *See id.* Both DoD and DoT provided the reasons (agency priorities for DoD; extensive discussion of conflict with priorities for DoT); the effective date; and the portion to be terminated. So no violation resulted.

Both agencies' termination decisions are not subject to APA review at all and the Form Termination Class fails as to the agencies. At the very least, the broad statutory discretion means the Court can only provide very limited review tied solely to compliance with Section 200.341. And the agencies complied with the import of Section 200.341 in written notices of termination.

*DoT's Terminations Were Not Arbitrary and Capricious*

The arbitrary and capricious standard "requires that agency action be reasonable and reasonably explained." *FCC*, 592 U.S. at 423. "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Id.*

FED. DEFS.' OPP'N TO PLS.' MOT. FOR ADDITIONAL PRELIMINARY INJUNCTION
CASE NO. 25-CV-4737

DoT's detailed termination letters satisfy the arbitrary and capricious framework, despite not explicitly citing reliance interests. The letters, covering three grants, begin with a statement of DoT's three priorities:

- promoting traditional forms of energy and natural resources to the greatest extent possible,

- ensuring that taxpayer dollars are used efficiently in ways that maximally benefit the American people and improve their quality of life, and

- ceasing to promote divisive diversity, equity, and inclusion initiatives that discriminate on the basis of race, national origin, or another protected characteristic.

First Termination Letter at 1, ECF No. 77-2 at 2-3; Second Termination Letter at 1, ECF No. 77-2 at 4-5. Both letters identify individual review. First Termination Letter at 1; Second Termination Letter at 1. Both state that review was based, at least in part, on the statement of work and grant agreement of the relevant grants. First Termination Letter at 1; Second Termination Letter at 1.

For the National Center for Sustainable Transportation termination, DoT quoted the following statements as evidence of incompatibility with priorities: "accelerating reductions in greenhouse gas emissions while simultaneously enhancing transportation equity" and "NCST's objectives 'to prioritize disadvantaged communities,' 'reduce impacts associated with infrastructure . . . for disadvantaged populations,' and 'support a Transportation Equity and Environmental Justice Advisory Group.'" First Termination Letter at 1. The quoted statements appear in the same, or similar, form in the grant materials Handy included as exhibits, although only the first appears exactly as quoted. Sustainable Transportation Grant Proposal at i ("[A]ccelerating reductions in greenhouse gas emissions while simultaneously enhancing transportation equity."), ECF No. 70-3; *id.* at 17 (stating "prioritize disadvantaged communities" in the context of K-12 education); *id.* at 3 (discussing support for strategies that "reduce . . . environmental impacts . . . for disadvantaged communities"); *id.* at 26 (discussing "Transportation Equity and Environmental Justice Advisory Group"). DoT explained that all that conflicts with "DOT's priority to cease promoting DEI initiatives that discriminate on the basis of race, national origin, or another protected characteristic." First Termination Letter at 1. The letter then cited

1  the "agency priorities" language permitting termination and provided standard language regarding next

2  steps following termination. *Id.* at 1-2.

3      The letter for the Pacific Southwest Region University Transportation Center was similarly

4  detailed, stating that the grantee "promotes equitable access and furthers research themes regarding

5  'uneven transportation access across PSR's enormously diverse region, particularly among

6  transportation-disadvantaged travelers and communities'" and has "research priorities that 'deepen

7  commitments to diversifying the transportation workforce; draw a more diverse pool of students; and

8  focuses on Equity.'" Second Termination Letter at 1; *see, e.g.*, Pacific Southwest Grant Proposal at 2

9  ("Uneven Transportation access across our enormously diverse region, particularly among

10 transportation-disadvantaged travelers and communities." (emphasis removed)), ECF No. 70-7 at 88-

11 168. DoT concluded that this was "inconsistent with DOT's priority to cease promoting DEI initiatives

12 that discriminate on the basis of race, national origin, or another protected characteristic." Second

13 Termination Letter at 1. DoT also cited additional statements from the Pacific Southwest Region

14 University Transportation Center and concluded they "promote discriminatory consideration and 'green

15 new deal' principles that are inconsistent with DOT's priorities." *Id.*

16     These letters more than suffice under the arbitrary and capricious standard. The agency began by

17 clearly laying out its new policy priorities. First Termination Letter at 1; Second Termination Letter at 1.

18 Next, it identified specific conflicts for particular grants with specific priorities—the DEI initiative

19 priority and anti-green-new-deal priority. First Termination Letter at 1; Second Termination Letter at 1.

20 Finally, it cited the legal basis for termination. First Termination Letter at 1; Second Termination Letter

21 at 1. So these detailed letters clearly explain DoT's termination decision was based on an explained,

22 individualized, review and was accordingly not arbitrary or capricious.

23     While it is true that the agency did not explicitly consider reliance interests, that should not lead

24 this Court to conclude the decision was arbitrary and capricious. An agency need only consider reliance

25 interests to the extent warranted in a given instance. *See Smiley v. Citibank (S. Dakota)*, 517 U.S. 735,

26 742 (1996) (requiring agencies to consider "legitimate reliance"). The termination provision cited by

27 DoT permitted a mid-stream termination and citing the provision is sufficient in this context. *See, e.g.*,

28

*Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1134 (D.C. Cir. 1995) (discussing how the need to explain varies with context). Thus, citing the provision and noting "[a]t the time your grant was issued, the grant agreement and applicable regulations authorized termination" for changes in agency priorities, should suffice. First Termination Letter at 1; Second Termination Letter at 1.

>           *DoD's Terminations Were Not Arbitrary and Capricious*

Defendants agree that DoD's letters are materially similar to the letters the Court found wanting in its opinion. However, the Court should nonetheless conclude that they suffice for arbitrary and capricious review under the more lenient standard for military and foreign affairs matters. Such "review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential." *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007). Indeed, such review is even more deferential than the already "highly deferential standard of review" mandated for arbitrary and capricious consideration. *Id.* at 732.

The only kind of DoD grants cited by Plaintiffs are "Minerva Research Institute" grants. 2nd PI Mot. at 3. As described by Plaintiffs, such grants are "designed to address challenges such as ethnic strife; failing or failed states; the rise of new powers; the rise of violent extremism, disease, poverty, and climate change; and other unprecedented social changes." *Id.* Yet these are precisely the topics for which courts should provide the most deference to Executive Branch priorities. Indeed, the applicable Executive Order listed for the termination of Berman's grant, Reevaluating and Realigning United States Foreign Aid, directs that grant choices be "aligned with the foreign policy of the President of the United States," Reevaluating and Realigning United States Foreign Aid, Exec. Order No. 14169 § 2, 90 F.R. 8619, 8619 (Jan. 20, 2025). Ex. A at 1 (providing the applicable Executive Order). And the grant itself was focused on "empirically examin[ing] conflict and deterrence postures using Israeli-Gaza conflicts as a use case." Ex. A. DoD has substantial discretion when realigning grants for such topics—grants within the heartland of military preparedness, natural security, and foreign policy analysis. As a result, the Court should apply an even more deferential arbitrary and capricious analysis and hold that DoD's termination letter suffices, even without a detailed grant-specific explanation and explicit consideration of reliance interests.

**B.  DoT and DoD Terminations Are Also Outside the Equity Termination Class**

The Equity Termination Class is similarly inapplicable. First, assuming APA review is permitted, Plaintiffs do not argue that the Equity Termination Class criteria is required by APA contrary-to-law review. Second, DoT's terminations were pursuant to independent policy priorities and not the Executive Orders. Finally, some DoD terminations were not pursuant to the DEI-related Executive Orders, although evidence shows at least one was, indicating no common basis for termination.

*Plaintiffs Have Not Shown the Agencies' Actions Were Contrary to Law Under the APA*

Plaintiffs first cite the Impoundment Control Act ("ICA"). Under that Act, appropriated funds "shall be made available for obligation" unless the President transmits a special message to Congress and Congress rescinds the appropriation. 2 U.S.C. § 683(b). The Act enforces Congress's power over the purse in relation to the Executive. *See Dabney v. Reagan*, 542 F. Supp. 756, 760 (S.D.N.Y. 1982). It provides for enforcement by the Comptroller General (an official in the Legislative Branch), but does not include private enforcement. The statute is thus generally not enforceable through an APA suit. *See Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 734–35 (S.D. Tex. 2024); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981); *cf. Trump v. Sierra Club*, 140 S. Ct. 1 (2019); *id.* at 1 (Breyer, J., concurring in part and dissenting in part) (noting that the majority had stayed a lower court order "rais[ing] novel and important questions about the ability of private parties to enforce Congress' appropriations power").

But even if the ICA were enforceable, the termination of grants is not an impoundment. As the D.C. Circuit has explained, withholding funds within the bounds of a statutory or regulatory program does not qualify as an impoundment or a failure to make funds "available for obligation" under the statute. *See City of New Haven v. United States*, 809 F.2d 900, 907 (D.C. Cir. 1987) (explaining how Congress has previously acknowledged that "the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year" and such delays may result from the "normal and orderly operation of the government" (quoting H.R. Rep. No. 658, 93-658, 93d Cong., 1st Sess. 41 (1971), *reprinted in* 1974 U.S.C. Cong. & Admin. News 3462, 3486-87). Indeed, the alternative would be startling. If any termination of a contract violated the ICA, the Federal Government would be entirely disabled from ever reordering its funding affairs, or even cutting off funding to entities committing fraud, that have gone

1    bankrupt, or any of the myriad instances where agencies must redirect funding. That is not what the ICA

2    requires, and accordingly, Defendants have not violated it.

3        Plaintiffs next argue that the governing statutes bar terminations of DoT research funding for

4    grants related to preserving the environment. 2nd PI Mot. at 18. Specifically, for DoT, Plaintiffs cite the

5    topic "Preserving the Environment" located in the Infrastructure Investment and Jobs Act, Pub L. No.

6    117-85, 135 Stat. 429 (2021). 49 U.S.C. § 6503(c)(1)(E). Plaintiffs argue that the inclusion of this topic

7    in statute forbids termination of grants related to that topic. But that is not the case.

8        The statutory scheme merely directs the creation of a "Department of Transportation Strategic

9    Plan" and specifies seven different "primary purposes" including "promoting safety" and "reducing

10   transportation cybersecurity risks." *Id.* § 6503(a), (c)(1). The fact that the grant here falls within one of

11   those seven primary purposes for the Department's strategic plan does not simply bar terminations. This

12   is particularly true where the same scheme notes that the kinds of research "may include-- (A)

13   fundamental research pertaining to the applied physical and natural sciences; (B) applied science and

14   research; (C) technology development research; and (D) social science research." *Id.* § 6503(c)(2). So

15   DoT may orient even within a primary purpose what kinds of research it wishes to emphasize.[2]

16       Additionally, Plaintiffs do not argue in their contrary-to-law section that DoT or DoD statutes

17   forbid termination based on the topics laid out in Executive Orders 14151 or 14173, nor do they cite in

18   that section any statutory language supporting such a hypothetical claim. 2nd PI Mot. at 17-19. Thus, to

19   support the Equity Termination Class, Plaintiffs must succeed on their First Amendment argument,

20   which should be rejected for the reasons explained earlier. *See supra* Part I. If the Court maintains its

21   earlier reasoning, it should still reject application of the class to DoT's termination and at least in part to

22

---

23       [2] Plaintiffs also argue that the appropriations statutes and grantmaking statutes bar any
     terminations of grants. 2nd PI Mot. at 18. But that is simply not the case. Plaintiffs' reading, that
24   terminating already-awarded grants is barred, is implausible. The various statutory grantmaking schemes
     set forth considerations for agencies to utilize when making awards—but do not foreclose the use of
25   policy priorities to terminate such awards. Plaintiffs' position would result in a conclusion that agencies
     cannot terminate any grants for any reason (including non-compliance). This nonsensical outcome
26   demonstrates the error in Plaintiffs' position. And that is especially true given the termination
     regulations promulgated pursuant to statute. *See* 31 U.S.C. § 503*; see also id.* § 6307.

27

28

1    DoD for the reasons explained below.

2        *DoT Relied on Independent Policy Priorities*

3        As to DoT, the termination letters specified the reasons for termination as flowing from DoT

4    policy priorities. First Termination Letter at 1; Second Termination Letter at 1. Specifically, the letters

5    explained a conflict with "DOT's priority to cease promoting DEI initiatives that discriminate on the

6    basis of race, national origin, or another protected characteristic" and the second letter discussed, as to

7    the relevant grantee, "promot[ion of] discriminatory consideration and 'green new deal' principles that

8    are inconsistent with DOT's priorities." First Termination Letter at 1; Second Termination Letter at 1.

9    And several policy statements, other than the DEI-related Executive Orders, were cited by Declarant

10   Young who personally recommended the grants for termination. Young Decl. ¶ 3; *id.* ¶ 5 (listing policy

11   documents); DoT Production, ECF No. 77-2. While the DEI-related Executive Orders discuss DEI-

12   related grant terminations, these additional sources of policy priorities for the agency should prevent

13   application of the Equity Termination Class to these terminations.

14       *DoD Has Several Terminations Independent of the DEI-Related Executive Orders*

15       As to DoD, Defendants agree that at least one grant was terminated pursuant to one of the DEI-

16   related Executive Orders. DEFSDOD_00023. However, DoD's produced records demonstrate that

17   various grants were terminated based on other directives. For example, Berman's grant was identified

18   based on an entirely different applicable Executive Order. Ex. A. So, to the extent that the Court applies

19   the Equity Termination Class to DoD, it should only apply to those terminations pursuant to the DEI-

20   related Executive Orders.

21   **IV.    Injunctive Relief Should Be Stayed Pending Appeal and Be Accompanied by a Bond**

22       To the extent the Court expands injunctive relief, Defendants respectfully request that such relief

23   be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a

24   minimum, administratively stayed for a period of seven days to allow the United States to seek an

25   emergency, expedited stay from the court of appeals if an appeal is authorized.

26       Defendants also respectfully request that any additional injunctive relief accompany a bond

27   under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a

28

FED. DEFS.' OPP'N TO PLS.' MOT. FOR ADDITIONAL PRELIMINARY INJUNCTION
CASE NO. 25-CV-4737

1    temporary restraining order only if the movant gives security in an amount that the court considers

2    proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or

3    restrained." A bond is appropriate here given that any preliminary relief would potentially mandate that

4    the Executive spend money that may be lost forever once distributed. *California*, 145 S. Ct. at 969.

5                                    **CONCLUSION**

6         For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion

7    for a preliminary injunction as to DoD and DoT, or that the Court limit it in the manner described above.

8

9    DATED: August 8, 2025                     Respectfully submitted,

10                                             BRETT A. SHUMATE
                                               Assistant Attorney General
11                                             Civil Division

12                                             ERIC J. HAMILTON
                                               Deputy Assistant Attorney General
13

14                                             JOSEPH E. BORSON
                                               Assistant Branch Director
15

16                                             */s/ Jason Altabet*

17                                             JASON ALTABET (Md. Bar No. 2211280012)
                                               Trial Attorney, U.S. Department of Justice
18                                             Tel.: (202) 305-0727
                                               Email: jason.k.altabet2@usdoj.gov
19

20                                             KATHRYN BARRAGAN (D.C. Bar No. 90026294)
                                               Trial Attorney, U.S. Department of Justice
21                                             Civil Division, Federal Programs Branch
                                               1100 L Street, N.W.
22                                             Washington, D.C. 20005
                                               Tel.: (202) 598-7696
23                                             Email: kathryn.e.barragan@usdoj.gov

24                                             *Attorneys for the United States*

25

26

27

28