1  Erwin Chemerinsky (*pro hac vice*)
   echemerinsky@law.berkeley.edu
2  Claudia Polsky (CA Bar No. 185505)
   cpolsky@law.berkeley.edu
3  U.C. BERKELEY SCHOOL OF LAW
   Law Building
4  Berkeley, CA 94720-7200
   Telephone: 510.642.6483
5
   Elizabeth J. Cabraser (CA Bar No. 83151)
6  ecabraser@lchb.com
   Richard M. Heimann (CA Bar No. 63607)
7  rheimann@lchb.com
   LIEFF CABRASER HEIMANN &
8  BERNSTEIN, LLP
   275 Battery Street, 29th Floor
9  San Francisco, CA 94111
   Telephone: 415.956.1000
10
   Anthony P. Schoenberg (CA Bar No. 203714)
11 tschoenberg@fbm.com
   FARELLA BRAUN + MARTEL LLP
12 One Bush Street, Suite 900
   San Francisco, CA 94104
13 Telephone: 415. 954.4400

14 *Attorneys for Plaintiffs and the Proposed Class*
   [Additional counsel omitted]
15

16              **UNITED STATES DISTRICT COURT**

17             **NORTHERN DISTRICT OF CALIFORNIA**

18 NEETA THAKUR, KEN ALEX, NELL          Case No. 3:25-cv-4737-RL
   GREEN NYLEN, ROBERT HIRST,
19 CHRISTINE PHILLIOU, and JEDDA
   FOREMAN, on behalf of themselves and all
20 others similarly situated,              **DECLARATION OF PROFESSOR
                                           KAREN MCKINNON**
21              Plaintiffs,
                                           The Honorable Rita F. Lin
22        v.

23 DONALD J. TRUMP, in his official capacity as
   President of the United States;
24 DEPARTMENT OF GOVERNMENT
   EFFICIENCY ("DOGE");
25 AMY GLEASON, in her official capacity as
   Acting Administrator of the Department of
26 Government Efficiency;
   NATIONAL SCIENCE FOUNDATION;
27 BRIAN STONE, in his official capacity as
   Acting Director of the National Science
28 Foundation;

1  NATIONAL ENDOWMENT FOR THE
   HUMANITIES;
2  MICHAEL MCDONALD, in his official
   capacity as Acting Chairman of the National
3  Endowment for the Humanities;
   UNITED STATES ENVIRONMENTAL
4  PROTECTION AGENCY;
   LEE ZELDIN, in his official capacity as
5  Administrator of the U.S. Environmental
   Protection Agency;
6  UNITED STATES DEPARTMENT OF
   AGRICULTURE;
7  BROOKE ROLLINS, in her official capacity as
   Secretary of the U.S. Department of Agriculture;
8  AMERICORPS (a.k.a. the CORPORATION
   FOR NATIONAL AND COMMUNITY
9  SERVICE);
   JENNIFER BASTRESS TAHMASEBI, in her
10 official capacity as Interim Agency Head of
   AmeriCorps;
11 UNITED STATES DEPARTMENT OF
   DEFENSE;
12 PETE HEGSETH, in his official capacity as
   Secretary of the U.S. Department of Defense;
13 UNITED STATES DEPARTMENT OF
   EDUCATION;
14 LINDA MCMAHON, in her official capacity as
   Secretary of the U.S. Department of Education;
15 UNITED STATES DEPARTMENT OF
   ENERGY;
16 CHRIS WRIGHT, in his official capacity as
   Secretary of Energy;
17 UNITED STATES DEPARTMENT OF
   HEALTH AND HUMAN SERVICES;
18 ROBERT F. KENNEDY, JR., in his official
   capacity as Secretary of the U.S. Department of
19 Health and Human Services;
   UNITED STATES CENTERS FOR DISEASE
20 CONTROL;
   MATTHEW BUZZELLI, in his official capacity
21 as Acting Director of the Centers for Disease
   Control;
22 UNITED STATES FOOD AND DRUG
   ADMINISTRATION;
23 MARTIN A. MAKARY, in his official capacity
   as Commissioner of the Food and Drug
24 Administration;
   UNITED STATES NATIONAL INSTITUTES
25 OF HEALTH;
   JAYANTA BHATTACHARYA, in his official
26 capacity as Director of the National Institutes of
   Health;
27 INSTITUTE OF MUSEUM AND LIBRARY
   SERVICES;
28 KEITH SONDERLING, in his official capacity

DECLARATION OF KAREN MCKINNON
Case No. 3:25-CV-4737-RL

1  as Acting Director of the Institute of Museum
   and Library Services;
2  UNITED STATES DEPARTMENT OF THE
   INTERIOR;
3  DOUG BURGUM, in his official capacity as
   Secretary of the Interior;
4  UNITED STATES DEPARTMENT OF STATE;
   MARCO RUBIO, in his official capacity as
5  Secretary of the U.S. Department of State;
   DEPARTMENT OF TRANSPORTATION;
6  SEAN DUFFY, in his official capacity as
   Secretary for the U.S. Department of
7  Transportation,

8  Defendants.

9

10              **DECLARATION OF PROFESSOR KAREN MCKINNON**

11       I, Karen McKinnon, declare as follows:

12       1.      I have personal knowledge of the facts contained in this declaration and, if called

13  as a witness, could and would testify competently to those facts.

14       2.      I am an Associate Professor in the Department of Atmospheric and Oceanic

15  Sciences, the Department of Statistics and Data Science, and the Institute of the Environment and

16  Sustainability at the University of California Los Angeles.

17       3.      Before joining UCLA in November of 2018, I worked as an Applied Scientist at

18  Descartes Labs, and an Advanced Study Program post-doctoral fellow at the National Center for

19  Atmospheric Research. I received my PhD in 2015 from Harvard University.

20       4.      My work focuses on large-scale climate variability and change, with a particular

21  emphasis on connections to high-impact weather events. My work has resulted in several

22  publications[1] and has been covered by news outlets including the New York Times, Fox News,

23  and the Washington Post.

24              **NSF Grant Application & Award**

25       5.      In March 2024, I was awarded the National Science Foundation CAREER award

26  for my research on heat extremes.

27  ─────────────────────

28  [1] *See, e.g.*, McKinnon, Karen A and Simpson, Isla R and Williams, A Park "The pace of change
    of summertime temperature extremes," Proceedings of the National Academy of Sciences, v.121,
    2024, available at: https://doi.org/10.1073/pnas.2406143121.

6.     Per NSF, "[t]he Faculty Early Career Development (CAREER) Program is a Foundation-wide activity that offers the National Science Foundation's most prestigious awards in support of early-career faculty who have the potential to serve as academic role models in research and education and to lead advances in the mission of their department or organization."[2]

7.     An abstract of my CAREER grant, # 238237, is available on the NSF's website.[3] It states:

> Heat waves of unprecedented intensity and duration are expected in a warming world, and the record-breaking heat waves of recent years confirm this expectation. The increasing frequency of such events is alarming and naturally leads to concerns that the severity of heat waves is outpacing the rise in mean temperature. But the extent to which the hottest days are warming faster than the average temperature increase is hard to quantify, and certainly heat waves would become more severe even if the hottest days warmed at the same rate as all the other days. One challenge is that heat extremes are rare by definition, thus there is limited sample size to make statistically robust conclusions. The sample size issue is particularly challenging as the extent to which the hottest days warm faster is likely to vary from one region to another. A further challenge is that we do not have a satisfactory understanding of the physical mechanisms that might lead to stronger warming trends for hot days than for average days.
>
> Work under this award addresses both the extent to which temperature increases are greater for the hottest days and the physical mechanisms that might be responsible. The analysis of temperature trends compares trends for the 50th and 95th percentiles of the temperature distribution on a regional basis and uses various statistical methods to overcome sample size limitations and account for natural variability. The analysis also considers output from the simulations available from the Climate Model Intercomparison Project (CMIP) and the Large Ensembles created with the Community Earth System Model (CESM). Work addressing physical mechanisms focuses on the extent to which drying of the soil contributes to temperature extremes, in particular that drying accompanies heat waves and drying limits the extent to which the surface can cool through evaporation and transpiration, thus leading to greater warming. The dependence of temperature extremes on soil moisture and evapotranspiration is explored by applying a surface energy budget equation to observations and model output, and through idealized experiments with CESM.
>
> The educational component of this CAREER proposal seeks to build a bridge between climate and data science to foster more effective collaboration between the two fields. One activity is the development of an educational module for a freshman class in

---

[2] https://www.nsf.gov/funding/opportunities/career-faculty-early-career-development-program.
[3] https://www.nsf.gov/awardsearch/showAward?AWD_ID=2338237&HistoricalAwards=false.

environmental science intended to teach statistical thinking through hands-on data analysis. The module uses Jupyter notebooks to give students access to observational data for their own hometowns, and guides them through the calculation of means and extremes and their variation over time. Another activity is a workshop for 30-40 graduate students working at the interface between data science and climate science, to be held at the National Center for Atmospheric Research (NCAR). The workshop is mostly devoted to a 'science hackathon' in which teams of students with a mix of disciplinary backgrounds will work together to solve specific problems related to climate extremes. The award provides support for 20 attendees at the workshop who are chosen through an open competitive process.

8.      Notably, the abstract confirms that "[t]his award reflects NSF's statutory mission and has been deemed worthy of support through evaluation using the Foundation's intellectual merit and broader impacts review criteria."

9.      The grant was for five years (September 2024 – August 2029) for an amount of $944,511.00. I am the Principal Investigator on the grant.

**Indefinite Suspension of Grant Funding**

10.      On July 30, 2025, Lisa Scott-Morring, Acting Division Director, Division of Grants and Agreements at NSF, sent a letter to Dr. Julio Frenk, Chancellor of UCLA, notifying the Chancellor that certain NSF awards were being indefinitely suspended, effective immediately, because UCLA allegedly "continues to engage in race discrimination including in its admissions process, and in other areas of student life, as well as failing to promote a research environment free of antisemitism and bias."

11.      I received a "Stop Work Notice" on July 31, 2025, from UCLA's Office of Contract & Grant Administration informing me that my grant was among those indefinitely suspended by NSF and directing me to "immediately stop incurring costs/expenditures" related to the grant.

**Harm Suffered from NSF Grant Suspension**

12.      At the time the grant was suspended, approximately $900,000 of the original award of $944,511 had yet to be expended. The indefinite suspension has resulted and will continue to result in immediate harm. Specifically:

a.      The grant was providing a full salary to a post-doctorate researcher at

UCLA working to better understand the impact of aerosols on summertime heat extremes. As a result of the indefinite suspension, this post-doctorate has lost his funding and has had to move on to other projects with other funding sources.

        b.      The grant was also providing funding for a graduate student working on interactions between land and atmosphere as it relates to heat extremes. Her work can continue only by diverting funds from other sources, which comes at significant opportunity cost.

        c.      Additional grant funds were to be used to further grow the research team and increase the team's capacity and productivity. Specifically, I had extended an informal offer to another post-doctorate, who was in the process of obtaining a visa to join our team. As a result of NSF's indefinite suspension, her onboarding efforts were aborted and she has committed to a different project for at least the next year.

        d.      All of these disruptions have resulted in a significant loss of momentum and loss of productivity, which is having and will continue to have a dampening effect on the research and my own career.

        e.      In addition, the grant was supposed to fund my salary for August 2025.

13.      In many ways, there is no meaningful difference between a termination and an indefinite suspension. Both result in significant disruption and lost opportunities, among other things.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed this 10 day of August, 2025.

*Karen McKinnon*

_____

Karen McKinnon

- 4 -