UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEETA THAKUR, et al., | Case No.  25-cv-04737-RFL |
| Plaintiffs, | |
| v. | **ORDER RE NATIONAL SCIENCE FOUNDATION'S SUSPENSION OF GRANTS** |
| DONALD J. TRUMP, et al., | Re: Dkt. Nos. 78, 79 |
| Defendants. | |

## I.    INTRODUCTION

Over the last several months, in response to a series of executive orders, federal agencies began to "terminate" federal research funding, *en masse*, through form letters that simply state that the grants no longer meet "agency priorities."  Research projects at the University of California ("UC"), which is a leading public research institution, lost over $324 million in grant funding as a result of these *en masse* funding cuts.  Plaintiffs, UC researchers whose federal funding was terminated, filed suit on behalf of a putative class of UC researchers challenging the abrupt and unexplained funding cuts.  As is relevant to this Order, the Court found that Plaintiffs were likely to succeed on the merits of their Administrative Procedure Act claims, certified a Form Termination Class, and granted a preliminary injunction.  Under the injunction the National Science Foundation ("NSF") and other Agency Defendants could not give effect to any grant termination as to a member of the Form Termination Class, where termination was via a form notice that lacked a grant-specific explanation and consideration of the reliance interests at stake.

On July 30, 2025, NSF engaged in another round of *en masse*, form letter funding cuts,

1

this time directed at researchers at the University of California, Los Angeles ("UCLA").  The first letter, dated July 30, 2025, stated that certain separately listed awards were being "suspended" because "the awards no longer effectuate program goals or agency priorities."  The July 30 letter and a subsequent August 1, 2025 letter also stated that the action was in response to alleged racism, antisemitism, and policies around transgender athletes at UCLA.  NSF described the decision as a "final agency decision [] not subject to appeal" and UCLA was instructed to "immediately discontinue drawing down funds."  Plaintiffs have filed declarations from two impacted researchers.  The declarations describe how projects are already losing talented graduate students, staff will soon be laid off, and years of federally funded work will go to waste.

NSF's actions violate the Preliminary Injunction.  Though there may be situations where a "termination" and "suspension" are not the same thing, there is no principled difference between a "termination" and the immediate, indefinite, and "final" "suspension" of funding in this context.  The suspensions have the same effect, and are based on the same type of deficient explanations, as the original terminations.  NSF communicated the suspensions by means of a form letter that failed to provide the requisite grant-specific reason for halting funding, and that failed to adequately consider grant-specific interests, including the reliance interests of the researchers.  Therefore, pursuant to the Preliminary Injunction (Dkt. No. 55), NSF's suspension of the grants at issue here is **VACATED**.  For avoidance of doubt, the Court also clarifies that grant "termination," as the term is used in the Preliminary Injunction, encompasses circumstances where grant funding is cut off on a long-term or indefinite basis, like the suspensions carried out by NSF on July 30.

## II.     BACKGROUND

On June 23, 2025, the Court provisionally certified a "Form Termination Class" and issued preliminary injunctive relief to that class based on their APA claims that the Agency Defendants' grant terminations were arbitrary and capricious.  *Thakur v. Trump*, No. 25-cv-04737-RFL, 2025 WL 1734471, at \*26 (N.D. Cal. June 23, 2025) ("*Thakur I*" or "Preliminary Injunction Order").  The certified Form Termination Class consisted of:

> All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants by the EPA, NSF, or NEH (or their sub-agencies) that are terminated by means of a form termination notice that does not provide a grant-specific explanation for the termination that states the reason for the change to the original award decision and considers the reliance interests at stake, from and after January 20, 2025.
>
> Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.

*Id.* The Agency Defendants, including the NSF, were enjoined from "giving effect to any grant termination that results in the termination of funding as to a member of the Form Termination Class, where the termination was communicated by means of a form termination notice that does not provide a grant-specific explanation for the termination that states the reason for the change to the original award decision and considers the reliance interests at stake." (Dkt. No. 55 ("Preliminary Injunction") at 2.)[1] Defendants have appealed the Preliminary Injunction Order.

On August 4, 2025, the parties advised that NSF had indefinitely "suspended" many grants to UCLA. (Dkt. No. 78 at 2; Dkt. No. 79 at 2.) The suspensions were communicated to UCLA by means of two letters. The first letter, dated July 30, 2025, states in full:

> The U.S. National Science Foundation (NSF) has undertaken a review of its award portfolio. The agency has determined that suspension of certain awards is necessary because they are not in alignment with current NSF priorities and/or programmatic goals. NSF understands that [UCLA] continues to engage in race discrimination including in its admissions process, and in other areas of student life, as well as failing to promote a research environment free of antisemitism and bias. We have considered reliance interests and they are outweighed by the NSF's policy concerns.
>
> Effective immediately, the attached awards are suspended until further notice.
>
> NSF is issuing this suspension to protect the interests of the government pursuant to NSF Grant General Conditions (GC-1) term and condition entitled 'Termination and Enforcement,' on the basis that the awards no longer effectuate program goals or agency

---

[1] All citations to page numbers refer to ECF pagination.

> priorities. This is the final agency decision and not subject to appeal.
>
> Costs incurred as a result of this suspension may be reimbursed, provided such costs would otherwise be allowable under the terms of the award and the governing cost principles. In accordance with your award terms and conditions, you have 30 days from the suspension date to furnish an itemized accounting of allowable costs incurred prior to the suspension date.

(Dkt. No. 79-1 at 2.)

A second letter, dated August 1, 2025, states that it "supplements" the prior communication. It indicates that the suspensions were pursuant to 2 CFR § 200.339(c), which authorizes agencies to "suspend or terminate" grants when agency determines (i) that the recipient failed to comply with federal law or the terms of the grant, *and* (ii) that the less drastic remedy of "imposing specific conditions" will not remedy the noncompliance. *Id.* § 200.339. The letter identifies the following "examples of non-compliance" as the basis for the suspension:

- UCLA engages in racism, in the form of illegal race-based preferences in admissions practices;

- UCLA fails to promote a research environment free of antisemitism and bias;

- UCLA discriminates against and endangers women by allowing men in women's sports and private women-only spaces.

(Dkt. No. 79-2 at 2–3.) The letter states that NSF "has considered UCLA's reliance interests in continued availability of funding under the attached list of grants, and they are outweighed by the concerns identified above." (*Id.* at 3.) UCLA was instructed to "immediately discontinue drawing down funds" and submit a "written corrective action plan" to "enable NSF to evaluate whether the proposed actions are sufficient to resolve the findings and, if applicable, determine any necessary financial adjustments or enforcement measures." (*Id.*)

Plaintiffs have submitted declarations describing some of the projects that lost funding, including multi-year research into global heat extremes, a project to address environmental challenges in the Southwestern United States, and another to enhance veteran participation and leadership in STEM fields. (Dkt. No. 88-2 ¶¶ 5, 9; Dkt. No. 88-3 ¶¶ 13, 22.) When funding was halted, one of the projects quickly lost two post-doctoral fellows (Dkt. No. 88-2 ¶ 12), and staff

layoffs may soon occur for others (Dkt. No. 88-3 ¶ 27).  The declarants explain that if funding is

not restored, much of the research may be lost, reflecting a waste of hundreds of thousands of

dollars of already-spent federal funding.  (*See*, *e.g.*, *Id.* ¶¶ 23, 27.)

### III.    ANALYSIS

#### A.    NSF's Suspensions Are Terminations by Another Name

NSF argues that its actions are not within the scope of the Preliminary Injunction because

it suspended, rather than terminated, the grants at issue.  (Dkt. No. 79 at 5.)  The distinguishing

feature of a suspension, according to NSF, is that it "*can* be lifted once the grantee takes certain

corrective actions."  (*Id.* (emphasis added).)  At oral argument, counsel for NSF also argued that

the regulations define suspension and termination differently, and that the background

mechanism used by agencies to suspend versus terminate grants can differ.

Though suspensions and terminations may be different in some contexts, for purposes of

the Preliminary Injunction, NSF's indefinite suspensions differ from a termination in name only.

Just like with its prior terminations, NSF describes the suspensions as "final agency decision[s]

not subject to appeal," because the "awards no longer effectuate program goals or agency

priorities."  *Compare* (Dkt. No. 79-1 at 2) *with Thakur I*, 2025 WL 1734471, at *7.  There is no

listed end date for the suspensions, nor is there any path for researchers to restore funding for

their project.  If any curative action is actually feasible, it would need to be undertaken by

UCLA, and would still be subject to NSF's evaluation of "whether the proposed actions are

sufficient to resolve the findings and, if applicable, determine any necessary financial

adjustments or enforcement measures."  (Dkt. No. 79-2 at 3.)  In other words, researchers have

no guarantee that funding will ever be restored and no way to take action to increase the

likelihood of restoration.  Furthermore, the harm experienced by the researchers subject to

suspension is identical to the harm caused by termination:  research grinds to an immediate halt

and may eventually be wasted, staff and graduate students lose jobs and valuable experience, and

critical work goes unpublished.

"In deciding whether an injunction has been violated it is proper to observe the objects

for which the relief was granted and to find a breach of the decree in a violation of the spirit of the injunction, even though its strict letter may not have been disregarded." *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 949 (9th Cir. 2014) (quoting *John B. Stetson Co. v. Stephen L. Stetson Co.*, 128 F.2d 981, 983 (2d Cir. 1942)).  In this case, NSF's indefinite, *en masse* funding cuts via form letters, without providing any avenue for the researchers to restore their funding, amount to a termination under the meaning of the Preliminary Injunction.  NSF may have re-labeled its action a "suspension," but it is a distinction without a difference in this case.  After all, a terminated grant can be reinstated, just as a suspension can be "lifted."  And a suspension, if it is of indefinite length, is functionally identical to a termination from the researcher's perspective.  NSF's logic, as articulated by counsel at oral argument on this matter, would nullify the Preliminary Injunction.  NSF claims that it could simply turn around the day after the Preliminary Injunction issued, and halt funding on every grant that had been ordered reinstated, so long as that action was labeled as a "suspension" rather than a "termination."  This is not a reasonable interpretation of the scope of the Preliminary Injunction.

NSF argues that the Preliminary Injunction is unclear because "suspension" is not explicitly incorporated into the Form Termination Class definition.  (Dkt. No. 79 at 5.)  The Preliminary Injunction is not unclear.  It is not necessary for the order to describe every possible label an Agency could use to describe a research grant funding cut.  Rather, "[b]y construing [its] obligations narrowly to include only refraining from acts specifically enumerated in the injunction, and not acts likely to nullify the injunction, the [NSF] assumed the risk that [its] attempts at technical compliance would prove wanting." *Inst. of Cetacean Rsch.*, 774 F.3d at 954–55.  Grant "termination," as the term is used in the Preliminary Injunction, encompasses circumstances where grant funding is cut off on a long-term or indefinite basis, like the suspensions carried out by NSF on July 30.

**B.     NSF's Form Suspension Letters Do Not Provide Grant-Specific Consideration as Required by the Preliminary Injunction**

NSF has been enjoined from giving effect to terminations where a form letter failed to provide a "grant-specific explanation for the termination that states the reason for the change to the original award decision and considers the reliance interests at stake." (Preliminary Injunction at 2.)  As the Preliminary Injunction Order explained:

> The record reflects that the challenged grant terminations were likely performed *en masse*, without individualized analysis, and without providing grantees with reasoned explanation for the terminations.  The standardized termination letters make only conclusory statements that the "award no longer effectuates the program goals or agency priorities," "promote initiatives that conflict with the Agency's" policy goals, or must be terminated for "several reasonable causes," in order to "safeguard the interests of the federal government, including its fiscal priorities." (Dkt. No. 7-1 at 35.)  They provide no indication that Defendants have "considered the relevant factors" and do not "articulate[ ] a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).  "[B]aldly asserting that" longstanding funding is being terminated to "comply with [an agency's] statutory mandate" does not constitute a "reasoned explanation" under the APA.  *Nw. Env't. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 689 (9th Cir. 2007).

*Thakur I*, 2025 WL 1734471, at *14 (alterations in *Thakur I*).

NSF's July 30 and August 1 letters suffer from the same infirmities as the letters considered in the Preliminary Injunction Order.  The July 30 letter includes a nearly identical conclusory determination that the listed "awards no longer effectuate program goals or agency priorities." (Dkt. No. 79-1 at 2.)  Based on NSF's letters, there is no way to know "why the specific project was found to be incompatible with [NSF's] priorities." *Thakur I*, 2025 WL 1734471, at *14.  The July 30 and August 1 letters also indicate that the suspensions are in response to "race discrimination," "antisemitism," and "bias" at UCLA. (Dkt. No. 79-1 at 2; Dkt. No. 79-2 at 2.)  The July 30 letter appears to imply that this is the basis for the determination that the individual awards no longer effectuate NSF's goals or priorities. (Dkt. No. 79-1 at 2.)  But, the letters do not explain how the alleged conduct by UCLA as an institution relates to whether the "awards . . . effectuate [NSF's] program goals or agency priorities."  This

7

leaves "Plaintiffs and the Court . . . to guess at Agency Defendants' true reasons for terminating" the funding. *Thakur I*, 2025 WL 1734471, at *14. The form letters fail to provide a "grant-specific explanation" for why the award has been terminated, as required by the Preliminary Injunction.

Additionally, the letters do not provide any grant-specific explanation of NSF's consideration of the researchers' reliance interests, in violation of the Preliminary Injunction. NSF points to boilerplate language in the letters stating that it has considered UCLA's "reliance interests" in continued availability of funding. (Dkt. No. 79 at 8.) As already explained in the Preliminary Injunction Order, "baldly asserting" reliance interests have been considered does not constitute a reasoned explanation under the APA. *Thakur I*, 2025 WL 1734471, at *14–15 (quoting *Nw. Env't. Def. Ctr.,* 477 F.3d at 689); *see also DHS v. Regents of University of California*, 591 U.S. 1, 31 (2020) (agency was obligated under the APA to consider reliance interests). Moreover, this blanket statement regarding UCLA's interests does not reflect any grant-specific consideration of the harms to the researchers from interrupting ongoing multi-year research, wasting resources by halting funding midstream, or forcing staffing changes. These are the factors already identified in the Preliminary Injunction Order as requiring consideration. *Thakur I*, 2025 WL 1734471, at *15. Indeed, although Plaintiffs have shown via declaration that those harms are present and are in no way theoretical, NSF acknowledged at the hearing that it had not conducted any individualized grant-by-grant analysis into researcher's reliance interests as required by the Preliminary Injunction.[2]

NSF's funding cuts violate the provisions of the Preliminary Injunction providing relief to the Form Termination Class. This order thus does not reach the parties' arguments regarding the Equity Termination Class.

---

[2] Counsel explained at oral argument that, at most, NSF reviewed the topics of the research it intended to suspend and identified some grants of critical importance to the public interest, which it chose not to suspend. This consideration did not account for the individualized reliance interests of the researchers.

####    C.    This Order Does Not Disturb the Original Standing and Class Certification Findings

As explained above, the Preliminary Injunction already prohibited the *en masse*, form letter funding cuts that NSF carried out, and the researchers who experienced the recent funding cuts are already part of the Form Termination Class.  Therefore, there is no need to revisit the prior standing and class certification findings in this case.  *Thakur I*, 2025 WL 1734471, at *21– 24, 26–30.  However, for completeness, the Court briefly addresses NSF's arguments that (i) class members whose funds the NSF suspended lack standing and (ii) that Rule 23 requirements are not met for the affected individuals.  Neither argument has merit, for the reasons already articulated in the Preliminary Injunction Order.

####    1.    The Class Members Have Standing

NSF argues that standing is lacking because its funding cuts targeted UCLA, and not individual researchers, but this challenge has already been considered and rejected.  As the Preliminary Injunction Order explained, whether or not Plaintiffs are the "object" of a government action, they may demonstrate standing by showing that the action "may be likely" to cause predictable "downstream or upstream economic injuries" to them.  *Id.* at *23 (citing *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 145 S. Ct. 2121, 2136–37 (2025)). Therefore, "even if the grant terminations were . . . directed solely at the University to the exclusion of Plaintiffs, Plaintiffs [] still have standing."  *Id*.  That is the case because "Plaintiffs' unrebutted declarations show that the grant terminations will 'likely' have a 'predictable effect' on the continued funding of their projects."  *Id*.  As already discussed above, record in this case demonstrates that standing is not lacking.[3]

---

[3] To the extent NSF argues that the named Plaintiffs, whose funding was terminated, lack "standing" to represent class members who were subject to suspensions, this is a typicality and adequacy inquiry, not an issue of standing.  *See Melendres v. Arpaio*, 784 F.3d 1254, 1261–63 (9th Cir. 2015).

### 2.    The Requirements of Rule 23 Are Met With Regard to the Researchers Whose Grants Were Suspended

Nothing about the NSF's recent suspensions alters the original Rule 23 analysis in the Preliminary Injunction Order.  The original order found a central common question as to whether "*en masse* unreasoned termination of grants, as executed through form letters without any reasoned explanation, are arbitrary and capricious in violation of the APA."  *Thakur I*, 2025 WL 1734471, at \*29.  The order explained that "Plaintiffs ha[d] sufficiently shown that it is likely th[e] termination decisions were made pursuant to a common playbook of terminating grants in groups without considering the required individualized factors."  *Id.*  This reasoning applies with equal force to researchers whose grants are indefinitely suspended, *en masse*, by means of substantially similar form letters that fail to address grant-specific reasons for the termination or important grant-specific reliance interests.  The suspensions—which NSF itself labeled a "final agency action"—give rise to the same common question:  whether the indefinite, unreasoned halting of funding was arbitrary and capricious under the APA.  Furthermore, as discussed above, the language in the July 30 letter overlaps significantly with the representative NSF form termination letter.  Even if NSF's defense may invoke ostensibly unique reasons for suspending UCLA's funding, that does not "eliminate the significant common *question*" already identified.  *See Stockwell v. City & Cnty. of San Francisco*, 749 F.3d 1107, 1114–16 (9th Cir. 2014) (observing that such defense arguments cannot defeat commonality so long as there is a central common question presented in the "elements of the class members'[] case-in-chief").

Nor are the typicality or adequacy inquiries affected.  The Preliminary Injunction Order found that the named Plaintiffs and their claims were typical because they were "subjected to the *en masse* termination, and [had] provided representative form termination letters."  *Thakur I*, 2025 WL 1734471, at \*30.  The named Plaintiffs were adequate because "their interests are aligned with those of absent class members, having had their funding terminated in the same way via unreasoned letters."  *Id.*  As discussed above, the exact same reasoning extends to researchers whose grants were indefinitely suspended by means of substantially similar unreasoned form letters.  *See Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9th Cir. 1998) (typicality requires

only that named plaintiffs' claims be "reasonably co-extensive" with the class, "not substantially

identical"), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

Courts routinely permit plaintiffs who received one version of a form letter to represent those

who received other versions of the form letters that were deficient for the same reasons.[4]  Nor

has NSF identified any potential conflict of interest that would render named Plaintiffs

inadequate or prevent them from vigorously pursuing the entire class's claims.  *See Ellis v.

Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (setting forth adequacy standard).

### D.     The Court Has Jurisdiction To Enforce, and if Necessary, to Clarify The Preliminary Injunction

NSF raises a question as to the Court's jurisdiction to enter this order while the

Preliminary Injunction Order is on appeal.  The Court, of course, retains jurisdiction to enforce

the Preliminary Injunction during the pending appeal.  As detailed above, NSF's *en masse*

funding cuts were in violation of the Preliminary Injunction as issued, and the affected

individuals were part of the Form Termination Class prior to the issuance of this Order.

Moreover, a district court has jurisdiction to clarify the meaning of its orders even while an

appeal is pending.  *See*, *e.g.*, *Pub. Serv. Co. of Colo. v. Batt*, 67 F.3d 234, 238 (9th Cir. 1995);

*see also* Order, *Al Otro Lado v. Wolf*, No. 20-56287 (9th Cir. Jan. 14, 2021), ECF No. 30 at 4–5

(finding that it was "unlikely" that the Ninth Circuit had jurisdiction over the interlocutory

appeal of a "clarification order").

Even if this Order *had* modified the Preliminary Injunction Order (which it does not),

such a modification would be appropriate for the reasons articulated above, and would be

permissibly within this Court's jurisdiction.  Federal Rule of Civil Procedure 62(d) allows

---

[4] *See*, *e.g.*, *McCoy v. Nationstar Mortg., LLC*, No. 15-cv-2366, 2018 WL 11434580, at *8 (S.D. Cal. Feb. 20, 2018) ("Although class members may have received different letters, each class member will have been the subject of a collection effort in some form, and in that respect, Plaintiff's claims are typical of the claims of the proposed class."); *see also Copeland v. MCI Commc'ns Servs., Inc*., No. 07-cv-4865, 2008 WL 11334494, at *10–11 (C.D. Cal. Oct. 23, 2008) (class representatives who were fired could represent individuals who resigned with respect to defendant's failure to pay final wages when due).

district courts to issue further orders modifying injunctions, even during an appeal, in order to preserve the status quo.  *See Nat. Res. Def. Council, Inc. v. Sw. Marine, Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001).[5]  The court's exercise of jurisdiction is permissible, so long as it does "not materially alter the status of the case on appeal."  *Mayweathers v. Newland*, 258 F.3d 930, 935 (9th Cir. 2001) (quotation omitted).  For example, in *Southwest Marine*, the district court issued an injunction requiring the defendant to conduct water testing "at the surface" and to take steps to capture storm water runoff from piers in "a reasonably expeditious manner."  *Sw. Marine*, 242 F.3d at 1166.  While the injunction was on appeal, the district court modified the order to provide further explanation of the meaning of the phrases "at the surface" and "reasonably expeditious."  *Id.* at 1167.  The Ninth Circuit found that the modifications made by the district court "did not materially alter the status of the consolidated appeal," and that such alterations were proper pursuant to Rule 62(d).  *Id.*  The same reasoning would apply here.

## IV.    CONCLUSION

Pursuant to the Preliminary Injunction (Dkt. No. 55), the suspension of the grants at issue here is **VACATED**.  NSF shall **RESTORE** the affected members of the Form Termination Class to the status quo and **REINSTATE** the suspended grants.  The parties shall file a joint status report by **August 19, 2025,** confirming all steps to comply with the Preliminary Injunction have been completed by NSF or, in the event that has not occurred, an explanation of why it was not feasible and a description of the steps that have been taken thus far.

**IT IS SO ORDERED.**

Dated: August 12, 2025

_____
RITA F. LIN
United States District Judge

---

[5] The *Southwest Marine* court, and other courts cited in this Order, refer to Rule 62(c).  Rule 62 was reorganized in 2018, and the pertinent subsection is now 62(d).