1  Erwin Chemerinsky (*pro hac vice*)
   echemerinsky@law.berkeley.edu
2  Claudia Polsky (CA Bar No. 185505)
   cpolsky@law.berkeley.edu
3  U.C. BERKELEY SCHOOL OF LAW
   Law Building
4  Berkeley, CA 94720-7200
   Telephone: 510.642.6483
5
   Elizabeth J. Cabraser (CA Bar No. 83151)
6  ecabraser@lchb.com
   Richard M. Heimann (CA Bar No. 63607)
7  rheimann@lchb.com
   LIEFF CABRASER HEIMANN &
8  BERNSTEIN, LLP
   275 Battery Street, 29th Floor
9  San Francisco, CA 94111
   Telephone: 415.956.1000
10
   Anthony P. Schoenberg (CA Bar No. 203714)
11 tschoenberg@fbm.com
   Linda S. Gilleran (CA Bar No. 307107)
12 lgilleran@fbm.com
   FARELLA BRAUN + MARTEL LLP
13 One Bush Street, Suite 900
   San Francisco, CA 94104
14 Telephone: 415.954.4400

15 *Attorneys for Plaintiffs and the Proposed Classes*
   [Additional counsel listed on signature page]

16

17                     **UNITED STATES DISTRICT COURT**

18                     **NORTHERN DISTRICT OF CALIFORNIA**

19

20 NEETA THAKUR, *et al.*,                    Case No. 3:25-cv-4737

21              Plaintiffs,

22       v.                                   **MOTION FOR PRELIMINARY
                                              INJUNCTION AND PROVISIONAL
23 DONALD J. TRUMP, *et al.*,                 CLASS CERTIFICATION AS TO
                                              DEPARTMENT OF HEALTH AND
24              Defendants.                   HUMAN SERVICES/NATIONAL
                                              INSTITUTES OF HEALTH
25

26

27

28

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

I.     Department of Health and Human Services and the National Institutes of Health........... 2

II.    The Trump Administration Directed Federal Agencies to Terminate Grants.................. 4

     A.    HHS-NIH Grant Terminations ................................................................... 4

          1.    Dr. Marcus Horwitz's NIH Grant Termination........................... 5

          2.    Dr. Alexander van der Bliek's NIH Grant Termination ............... 7

          3.    Dr. Rhonda Voskuhl's NIH Grant Termination.......................... 8

ARGUMENT .................................................................................................................. 9

I.     Drs. Horwitz, Van Der Bliek, and Voskuhl Have Standing................................. 9

II.    The Court Should Provisionally Certify Form Termination and Equity Termination Classes for UC Researchers Whose Grants were Terminated by HHS, in addition to DOD and DOT. ........................................................................................... 10

     A.    The Class Definitions. .......................................................................... 10

     B.    The Proposed Classes Satisfy The Requirements of Class Certification............ 10

          1.    Individual Joinder is Impracticable. ......................................... 11

          2.    There Are Common Questions of Law and Fact and the Proposed Classes Satisfy Rule 23(b)(2)....................................... 12

          3.    Plaintiffs' Claims Are Typical of Those of the Proposed Classes. ........... 13

          4.    Plaintiffs and Class Counsel Will Adequately Represent the Proposed Classes. ...................................................................... 14

III.   The Court Should Issue a Preliminary Injunction as to HHS for All the Reasons in the Court's Prior Order. ................................................................................. 15

     A.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims that HHS Grant Terminations are Unlawful. ......................................................... 15

          1.    Defendants' Grant Terminations Violate the First Amendment. .............. 16

          2.    HHS's Grant Terminations Are Contrary to Law Under the APA. ......... 17

          3.    Defendants' Grant Terminations Are Arbitrary and Capricious Under the APA. ..................................................................... 19

     B.    The Harms Caused by HHS's Unlawful Conduct Will Become Irreparable Absent The Court's Intervention. ........................................................... 21

     C.    The Balance of Equities Weigh in Plaintiffs' Favor, and An Expanded Preliminary Injunction Is in the Public Interest. ....................................... 22

CONCLUSION............................................................................................................... 22

1

## TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

4

*Armstrong v. Davis,*
5 275 F.3d 849 (9th Cir. 2001), *overruled on other grounds by Johnson v.*
*California*, 543 U.S. 499 (2005) .......................................................................... 12

6
*Arnold v. United Artists Theatre Cir.*,
7 158 F.R.D. 439 (N.D. Cal. 1994) ......................................................................... 11

8 *Baltimore Gas & Electric Co. v. Natural Res. Def. Council, Inc.*,
462 U.S. 87 (1983) ................................................................................................ 20
9

*Bame v. Dillard*,
10 No. 05-1833, 2008 WL 2168393 (D.D.C. May 22, 2008) ................................... 10

11
*Barbara v. Trump*,
12 No. 2025 DNH 079P, 2025 WL 1904338 (D.N.H. July 10, 2025) ....................... 11

13 *Brown & Williamson Tobacco Corp. v. FDA*,
153 F.3d 155 (4th Cir. 1998), *aff'd*, *FDA v. Brown & Williamson Tobacco*
14 *Corp.*, 529 U.S. 120 (2000) ................................................................................. 19

15 *Buttino v. F.B.I*,
16 1992 WL 13013803 ( N.D. Cal. 1992) .................................................................. 12

17 *City & Cnty of S.F. v. USCIS*,
408 F. Supp. 3d 1057 (N.D. Cal. 2019) ............................................................... 21
18

19 *Clarke v. Off. of Fed. Housing Enter. Oversight*,
355 F. Supp. 2d 56 (D.D.C. 2004) ....................................................................... 22

20 *Coreas v. Bounds*,
21 No. TDC-20-0780, 2020 WL 5593338 (D. Md. Sept. 18, 2020) .......................... 14

22 *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .................................................................................................. 19
23

*Diamond Alternative Energy, LLC v. Env't Prot. Agency*,
24 145 S. Ct. 2121 (2025) ............................................................................................ 9

25 *Does 1-10 v. University of Washington*,
326 F.R.D. 669 (W.D. Wash. 2018) ..................................................................... 12
26

27 *Drs. for Am. v. Off. of Pers. Mgmt.*,
766 F. Supp. 3d 39 (D.D.C. 2025) ....................................................................... 20

28

- ii -

# TABLE OF AUTHORITIES
**(continued)**

Page

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .................................................................................... 19

*Foon v. Centene Mgmt. Co.*,
    No. 2:19-cv-01420 AC, 2023 WL 1447922 (E.D. Cal. Feb. 1, 2023) ................................... 11

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ........................................................................ 14

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ......................................................................... 13

*Hansberry v. Lee*,
    311 U.S. 32 (1940) ................................................................................... 14

*Health Ins. Ass'n of Am., Inc. v. Shalala*,
    23 F.3d 412 (D.C. Cir. 1994) ......................................................................... 19

*Kalispel Tribe of Indians v. U.S. Dep't of the Interior*,
    999 F.3d 683 (9th Cir. 2021) ......................................................................... 19

*Kaweah Delta Health Care Dist. v. Becerra*,
    123 F.4th 939 (9th Cir. 2024) .................................................................... 17, 19

*Kim v. Allison*,
    87 F.4th 994 (9th Cir. 2023) ......................................................................... 14

*Lyon v. U.S. Immigr. & Customs Enf't*,
    308 F.R.D. 203 (N.D. Cal. 2015) ................................................................. 11, 14

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ......................................................................... 12

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ......................................................................... 22

*Meyer v. Portfolio Recovery Assocs., LLC*,
    707 F.3d 1035 ( 9th Cir. 2012) ....................................................................... 11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................... 19

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) .................................................................................. 16

*Nat'l Treasury Emps. Union v. U.S. Dept. of Treasury*,
    838 F. Supp. 631 (D.D.C. 1993) ...................................................................... 22

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*Nw. Env't Advocates v. U.S. EPA,*
  537 F.3d 1006 (9th Cir. 2008) .............................................................................. 17

4

5

*R.I.L-R v. Johnson,*
  80 F. Supp. 3d 164 (D.D.C. 2015) ........................................................................ 10

6

*Rannis v. Recchia,*
  380 Fed. Appx. 646 (9th Cir. 2010) ...................................................................... 11

7

8

*Regan v. Taxation with Representation of Wash.,*
  461 U.S. 540 (1983) ............................................................................................... 16

9

*Rhode Island Latino Arts v. Nat'l Endowment for the Arts,*
  No.25-cv-79-WES, 2025 WL 1009026 (D.R.I. Apr. 3, 2025) ............................... 16

10

11

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
  515 U.S. 819 (1995) ............................................................................................... 16

12

13

*Scholl v. Mnuchin,*
  489 F. Supp. 3d 1008 (N.D. Cal. 2020) ................................................................ 15

14

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ................................................................................................. 9

15

16

*Tennessee v. Dep't of Educ.,*
  104 F.4th 577 (6th Cir. 2024) .............................................................................. 22

17

18

*Thakur v. Trump,*
  __ F.Supp.3d ___, 2025 WL 1734471 (N.D. Cal. 2025) ......................................... 1

19

*Thakur v. Trump,*
  No. 25-4249, 2025 WL 2414835 (9th Cir. Aug. 21, 2025) ............................ *passim*

20

21

*Trump v. CASA, Inc.,*
  145 S. Ct. 2540 (2025) ........................................................................................... 11

22

23

*Widakuswara v. Lake,*
  No. 1:25-cv-1015, 2025 WL 1166400 (D.D.C. Apr. 22, 2025) .............................. 22

24

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ............................................................................................. 15, 21

25

26

*Wolford v. Lopez,*
  116 F.4th 959 (9th Cir. 2024) .............................................................................. 22

27

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

**Statutes**

4

5 U.S.C. § 706(2) ........................................................................................... 17, 19

5

42 U.S.C. § 241 .......................................................................................... 2, 3, 17

6

42 U.S.C. § 282(m) .............................................................................. 3, 4, 17, 18

7

42 U.S.C. § 284(b)(1) ............................................................................................ 3

8

**Court Rules**

9

Fed. R. Civ. P. 23(a)(1) ...................................................................................... 11

10

Fed. R. Civ. P. 23(a)(2) ...................................................................................... 12

11

Fed R. Civ. P. 23(a)(3) ....................................................................................... 13

12

Fed. R. Civ. P. 23(a)(4) ...................................................................................... 14

13

Fed. R. Civ. P. 23(b)(2) ...................................................................................... 13

14

**Other Authorities**

15

Health & Human Servs., *HHS Grants Terminated* (May 23, 2025),
    https://taggs.hhs.gov/Content/Data/HHS_Grants_Terminated.pdf.......................... 4

16

17

Library of Congress, *The National Institutes of Health (NIH): Background and
    Congressional Issues (2025)*, https://www.congress.gov/crs-product/R41705 ....................... 3

18

1 *Newberg on Class Actions* § 3:12 (5th ed. 2021) ...................................................... 11

19

20

NIH, *NIH-Wide Strategic Plan, Fiscal Years 2021-2025* (2020),
    https://www.nih.gov/sites/default/files/2025-01/strategic-plan-fy2021-2025.pdf............. 3, 18

21

*NIH-Wide Strategic Plan*, https://www.nih.gov/about-nih/nih-wide-strategic-plan.................... 18

22

Opening Statement of Dr. J. Bhattacharya, S. Comm. on Health, Educ., Lab. &
    Pensions (March 5, 2025), https://bit.ly/Bhattacharya-Statement ............................................. 2

23

24

UCLA Research & Creative Activities, *2025 Federal Administration Transition*,
    https://ora.research.ucla.edu/2025-administration-transition/..................................................... 1

25

26

27

28

- v -

1

## **INTRODUCTION**

2       Four weeks ago, the federal government carried out its largest grant termination action

3   against UC researchers to date, and terminated 800 research grants awarded to researchers at the

4   University of California, Los Angeles ("UCLA").[1] The lion's share of these terminations—almost

5   500 grants—were issued by the Department of Health and Human Services ("HHS") through the

6   National Institutes of Health ("NIH").[2] Defendants did not even attempt to make their assessment

7   appear individualized: HHS sent a single form termination letter to the Chancellor of UCLA with

8   a list of all the NIH grants the agency was terminating immediately. Cabraser Decl., Ex. A.

9   Although styled as "suspensions," as this Court has already observed, the so-called "suspensions

10  have the same effect, and are based on the same type of deficient explanations, as the original

11  terminations." NSF Show Cause Order, Dkt. 96 at 2. Plaintiffs bring this motion to add HHS to

12  the pending preliminary injunction and provisional class certification motion (Dkt. 76) and

13  propose Drs. Marcus Horwitz, Alexander van der Bliek, and Rhonda Voskuhl as class

14  representatives for the DOD/DOT/HHS/NIH Form Termination and Equity Termination Classes.

15      The issues presented in this motion for a preliminary injunction and for class certification

16  are identical to those already decided by this Court with regard to NSF, NEH, and EPA. Dkt. 54

17  ("Order"); *Thakur v. Trump*, __ F.Supp.3d ___, 2025 WL 1734471 (N.D. Cal. 2025). The Ninth

18  Circuit denied the government's motion to stay the preliminary injunction and indeed agreed with

19  this Court on every issue. *Thakur v. Trump*, No. 25-4249, 2025 WL 2414835 (9th Cir. Aug. 21,

20  2025). This motion simply seeks to apply what this Court has already decided to an additional

21  especially important federal agency—the NIH—that has terminated grants to a large number of

22  University of California researchers in a manner that this Court has deemed to violate the First

23  Amendment and the Administrative Procedure Act.

24

25

26

27  _____

[1] UCLA Research & Creative Activities, *2025 Federal Administration Transition*,
28  https://ora.research.ucla.edu/2025-administration-transition/.
[2] *Id.*

1

**BACKGROUND**

2

I.    **Department of Health and Human Services and the National Institutes of Health**

3        The Department of Health and Human Services ("HHS") is the federal agency responsible

4   for protecting public health and well-being in the United States. One of the sub-agencies of HHS

5   is the National Institutes of Health ("NIH"), whose purpose is to conduct and support biomedical

6   and public health research. NIH is widely acknowledged as a "crown jewel" of America's

7   scientific institutions.[3] It is made up of 27 institutes and centers (known as "ICs") that each focus

8   on a different disease or body system. Second Amended Compl. ¶ 491 ("SAC").With over $36

9   billion invested in more than 60,000 research grants in 2024 alone, NIH is the largest public

10   funder of medical research in the world. SAC ¶¶ 489, 491.

11        NIH carries out its public health mission through both "intramural" research

12   (conducted in-house at NIH) and "extramural" research (conducted at outside institutions with

13   NIH financial support). NIH's extramural research activities stem from statutory directives.

14   Congress has specifically enacted laws requiring NIH and its constituent institutes and centers to

15   conduct research and award grants, and has supplied funding for those activities through regular

16   appropriations. The Public Health Service Act (PHSA), as codified at 42 U.S.C. §241, contains

17   Congress's overarching mandate for NIH to conduct research and award grants. Subsection (a) of

18   the statute states:

19        The Secretary [of Health and Human Services] shall conduct in the [Public
         Health] Service, and encourage, cooperate with, and render assistance to other
20       appropriate public authorities, scientific institutions, and scientists in the conduct
         of, and promote the coordination of, research, investigations, experiments,
21       demonstrations, and studies relating to the causes, diagnosis, treatment, control,
         and prevention of physical and mental diseases and impairments of man,
22       including water purification, sewage treatment, and pollution of lakes and
         streams.
23
     And subsection (a)(3) states:
24
         [The Secretary] may make grants-in-aid to universities, hospitals, laboratories,
25       and other public or private institutions, and to individuals for such research
         projects as are recommended by the advisory council to the entity of the
26       Department [of Health and Human Services] supporting such projects and make,
         upon recommendation of the advisory council to the appropriate entity of the
27

28   ---
     [3]   Opening Statement of Dr. J. Bhattacharya, S. Comm. on Health, Educ., Lab. & Pensions
     (March 5, 2025), https://bit.ly/Bhattacharya-Statement.

Department, grants-in-aid to public or nonprofit universities, hospitals, laboratories, and other institutions for the general support of their research.

42 U.S.C. §§241(a), (a)(3).

Other sections of the PHSA provide more specific directives to each of NIH's constituent institutes and centers, detailing the ICs' general purposes and establishing initiatives and programs within each of them. *See, e.g.*, 42 U.S.C. §284(b)(1) (providing that the NIH Secretary, acting through the Director of each NIH research institute, "shall encourage and support research, investigations, experiments, demonstrations, and studies in the health sciences" with respect to the human disease or disorder or other aspects of human health for which the national research institutes were established). Some of these statutory provisions are directly at odds with the "policy priorities" Defendants HHS, Kennedy, NIH, and Bhattacharya now invoke to terminate plaintiffs' NIH grants.

In addition to the above statutory directives, Congress also established a public process to identify the research priorities of NIH and its institutes and centers. For example, NIH and each of its institutes and centers must develop and promulgate a strategic plan that publicly articulates their research priorities. 42 U.S.C. § 282(m)(1); *id.* at (m)(3). NIH's strategic plan must be submitted to Congress. *Id.* at (m)(1). In 2020, the NIH published its Strategic Plan for 2021-2025 and stated that NIH would prioritize "improving minority health and reducing health disparities; enhancing women's health; addressing public health challenges across the lifespan; promoting collaborative science; and leveraging data science for biomedical discovery."[4] The Plan also stated that NIH "supports a comprehensive spectrum of immunology and infectious disease research focused on developing improved or novel vaccines, including the rapid development of new vaccines to mitigate emerging infectious disease outbreaks, such as COVID-19, Ebola virus disease (EVD), and influenza (flu)."[5] Consistent with NIH's promulgated priorities, UC researchers applied for and received NIH grants after a highly competitive two-tier system of peer review conducted over several months.[6]

---

[4] NIH, *NIH-Wide Strategic Plan, Fiscal Years 2021-2025* at 3 (2020), https://www.nih.gov/sites/default/files/2025-01/strategic-plan-fy2021-2025.pdf.
[5] *Id.* at 8.
[6] Library of Congress, *The National Institutes of Health (NIH): Background and Congressional*

1  **II.        The Trump Administration Directed Federal Agencies to Terminate Grants.**

2           Beginning on Inauguration Day, the Trump Administration explicitly and implicitly

3  directed federal agencies to "terminate" previously awarded grant funds through a series of EOs

4  to that effect. HHS and NIH quickly caved to President Trump's and DOGE's directives to

5  eliminate grants relating to disfavored topics. Senior officials at HHS issued directives to review

6  funding "that promote[s] or take[s] part in diversity, equity, and inclusion ('DEI') initiatives or

7  any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or

8  another protected characteristic," claiming that such grants "violate Federal civil rights law."

9  HHS consequently developed a policy that required the termination of grants related to specific

10  categories of research that were disfavored as a matter of Administration policy. These categories

11  originally focused on "DEI-related" projects, but evolved to include other disfavored categories,

12  including projects related to gender identity, vaccine hesitancy, China, and COVID-19.

13           **A.        HHS-NIH Grant Terminations**

14           As early as February, HHS and NIH began issuing form termination letters to UC

15  researchers. *See* Cabraser Decl., Ex. B, DEFSNIH_00001-00002. These form letters stated that

16  grants were being terminated because they "no longer effectuate[d] agency priorities" and stated

17  that the agency would no longer prioritize "amorphous equity objectives" or "so-called diversity,

18  equity, and inclusion ('DEI') studies [that] are often used to support unlawful discrimination on

19  the basis of race and other protected characteristics." *Id.* HHS and NIH continued to issue form

20  termination letters on an ongoing basis. By May, HHS's database of grant terminations reflected

21  that it had terminated 104 grants to UC recipients.[7] Then, on June 23, HHS and NIH were ordered

22  in *National Institutes of Health v. American Public Health Association*, No. 25-cv-10787 (D.

23  Mass. June 23, 2025) and *Massachusetts v. Kennedy*, No. 25-cv-10814 (D. Mass. June 23, 2025)

24  to restore NIH grants. HHS and NIH subsequently began restore certain NIH grants listed in those

25  actions.

26  _____

27  *Issues (2025)*, https://www.congress.gov/crs-product/R41705 ("All NIH grant[s]…undergo
review through a two-tiered system of peer review…The peer review system is pursuant to statute
… [and] typically takes between 8 to 20 months" to complete).

28  [7] U.S. Dep't of Health & Human Servs., *HHS Grants Terminated* (May 23, 2025),
https://taggs.hhs.gov/Content/Data/HHS_Grants_Terminated.pdf.

Following the Massachusetts district court's decisions, HHS and NIH took a new approach. On July 31, HHS issued a single form termination letter—styled as a "suspension"—to UCLA, terminating hundreds of grants to its researchers, including to Drs. Horwitz, van der Bliek, and Voskuhl. Cabraser Decl., Ex. A. Whereas the prior letters stated that the individual grants "no longer effectuate agency priorities," the new letter accuses UCLA of "noncompliance." *Id.* Specifically, the NIH-UCLA letter alleges that UCLA has failed to comply with federal rules and regulations in three ways:

1. UCLA engages in racism, in the form of illegal affirmative action;
2. UCLA fails to promote a research environment free of antisemitism and bias;
3. UCLA discriminates against and endangers women by allowing men in women's sports and private women-only spaces.

*Id.* In other words, HHS terminated grants of UC researchers at UCLA because it disfavors the UC institution's DEI efforts with respect to race, religion, and gender identity.

## 1.    <u>Dr. Marcus Horwitz's NIH Grant Terminations</u>

Dr. Marcus A. Horwitz is a Distinguished Professor of Medicine and Microbiology, Immunology, and Molecular Genetics at UCLA. Horwitz Decl. ¶ 2. He researches the immunobiology of various diseases, including tuberculosis, and develops treatment regimens, vaccines, and antibiotics to combat them. Horwitz Decl. ¶ 5. He currently serves as a fellow in the Infectious Diseases Society of America and is a member of the American Society for Clinical Investigation. Horwitz Decl. ¶ 4. Dr. Horwitz's research focuses on (1) the immunobiology of the disease components of Legionnaires' disease, leprosy, tuberculosis, and tularemia; (2) developing vaccines against those diseases; and (3) developing an ultra-short drug treatment regimen for treating tuberculosis. Horwitz Decl. ¶ 5. In recognition of his accomplishments, he was awarded the Oswald Avery (formerly Squibb) award by the Infectious Diseases Society of America and was elected to a Fellowship in the American Association for the Advancement of Science. Horwitz Decl. ¶ 4.

On July 31, HHS terminated three of Dr. Horwitz's NIH grants via the mass termination letter sent to UCLA. The first grant was for a research projected titled "Optimization and Advanced Proof-of-Concept Studies of a Listeria-vectored Multi-Antigenic Vaccine against

1    Tuberculosis." Horwitz Decl. ¶ 7. The grant project addressed the potential to develop a safer and

2    more effective vaccine and booster vaccine against tuberculosis. The purpose of the project was

3    to optimize and conduct advanced proof-of-concept studies in small animals and non-human

4    primates of a second generation vaccine against tuberculosis. *Id.* For the TB Vaccine project, NIH

5    authorized funding for five years of work for a total award of $5,424,173. Horwitz Decl. ¶ 8.

6         The second grant HHS terminated was for a project titled "Efficacy and Safety of AI-

7    enabled PRS Regimen VI (Clofazimine, Bedaquiline and Pyrazinamide) as Ultra-Short Course

8    Therapy of LTBI in Non-Human Primates in a Setting Mimicking HIV co-infection." Horwitz

9    Decl. ¶ 12. The project's goal was to examine a short-term three-drug treatment regimen for latent

10   tuberculosis infection ("LBTI"), leveraging artificial intelligence platforms to determine whether

11   the treatment prevents reactivation of tuberculosis. *Id.* This study was intended to pave the way

12   towards a much shorter regimen that would eventually eliminate latent tuberculosis and

13   tuberculosis itself. *Id.* For the Latent TB Treatment project, NIH authorized funding to Dr.

14   Horwitz for three years of work from March 2024 through January 2027, for a total award of

15   $2,798,273. Horwitz Decl. ¶ 13.

16        The third grant HHS terminated was for a project titled "Identification by High

17   Throughput Screening of Inhibitors of the Mycobacterium tuberculosis ESX-1 and ESX-5 Type

18   VII Secretion Systems – critical virulence determinants and novel drug targets." Horwitz Decl. ¶

19   17. The goal of the T7SS Drug project was to identify promising lead compounds with the highest

20   therapeutic ratio and study them to potentially develop a new class of antibiotics to treat

21   tuberculosis. *Id.* On July 17, 2025, NIH issued a Notice of Award, authorizing grant funding for

22   the T7SS Project. *Id.* The Notice of Award authorized funding for two years of work on the

23   project, from July 2025 through June 2027, for a total award of $433,125. Horwitz Decl. ¶ 18.

24        On August 1, 2025, Dr. Horwitz received "Stop Work Notices" from UCLA

25   administrators instructing him to stop work on his three NIH-funded projects as a result of the

26   grant termination letter HHS sent to UCLA. Horwitz Decl. ¶¶ 10, 15, 19.

27

28

- 6 -    PL'S MOTION FOR PRELIM. INJUNCTION & CLASS
CERTIFICATION AS TO HHS/NIH
CASE NO. 3:25-CV-4737

1

2.      **Dr. Alexander van der Bliek's NIH Grant Termination**

2

Dr. Alexander van der Bliek is a Professor of Biological Chemistry at UCLA who

3

examines the role of mitochondria in neurodegenerative diseases. Van der Bliek Decl. ¶¶ 2, 5. For

4

the past two decades he has also served as a regular member and temporary member of multiple

5

NIH study sections, which decides which grant applications get funded. Van der Bliek Decl. ¶

6

4.Dr. van der Bliek's research focuses on the role that mitochondria serves in neurodegenerative

7

diseases such as Alzheimer's and peripheral neuropathies. Van der Bliek Decl. ¶ 5. Having

8

discovered the molecular basis of mitochondrial fission, which is essential for both cell survival

9

and cell death, Dr. van der Bliek's research on mitochondrial dynamics is recognized for its

10

relevance to neurodegenerative diseases and conditions with high energy demands, including

11

cancer and diabetes. *Id.* In recognition of his research, Dr. van der Bliek has been honored with a

12

fellowship with EMBO (an international membership organization promoting excellence in the

13

life sciences) and HFSPO (the Human Frontiers of Science Organization), and a five-year role as

14

Research Scholar at the American Cancer Society. Van der Bliek Decl. ¶ 4.

15

On July 31, HHS terminated Dr. van der Bliek's NIH grant via the mass termination letter

16

sent to UCLA. Dr. van der Bliek's grant was for a project titled "Control of Calcium Flux and

17

Mitochondrial Fission by the Charcot Marie Tooth Disease Protein Mfn2." Van der Bliek Decl. ¶

18

9. The project aimed to research the underlying causes of Charcot-Marie-Tooth (CMT) disease.

19

Van der Bliek Decl. ¶ 10. CMT is an inherited condition that damages the nerves controlling

20

movement and sensation. *Id.* In the study, Dr. van der Bliek sought to study how mutations in a

21

protein called Mfn2 affect the way mitochondria, the cell's "power plants," divide. Van der Bliek

22

Decl. ¶ 10. Because the process is closely tied to nerve cell health, Dr. van der Bliek's research

23

may help explain what causes CMT and point toward new ways to treat it. *Id.* When NIH

24

awarded the grant to Dr. van der Bliek, it authorized grant funding for five years of work, from

25

January 2021 through December 2025, for a total award of $2,243,240. Van der Bliek Decl. ¶ 11.

26

On August 1, 2025, Dr. van der Bliek received a "Stop Work Notice" from UCLA

27

administrators instructing him to stop work on the CMT project as a result of the grant

28

termination letter HHS sent to UCLA. Van der Bliek Decl. ¶ 15.

1

### 3.   Dr. Rhonda Voskuhl's NIH Grant Termination

2   Dr. Rhonda Voskuhl is a Professor of Neurology at the UCLA School of Medicine, who

3   examines how sex hormones and sex chromosomes cause sex differences in the onset and

4   severity of neurodegenerative diseases. Voskuhl Decl. ¶¶ 2, 5. She currently holds the Jack. H.

5   Skirball Chair and serves as the Director of the UCLA Multiple Sclerosis Program. Voskuhl Decl.

6   ¶ 2. Dr. Voskuhl is also a Faculty Neurologist for the UCLA Comprehensive Menopause Care

7   Program. *Id.*

8   Dr. Voskuhl's research focuses on (1) determining how sex hormones and sex

9   chromosomes cause sex differences in the onset and severity of neurodegenerative diseases and

10   (2) investigating the role of brain aging on neurodegeneration, identifying a sex hormone by age

11   interaction whereby being estrogen deficient and midlife combine to induce cognitive decline,

12   dorsal hippocampal atrophy, glial activation, and synaptic loss. Voskuhl Decl. ¶ 5. The goal of

13   Dr. Voskuhl's research is to use a brain region-specific, cell-specific, and sex-specific approach

14   to identify neuroprotective treatment targets, then design clinical trials to repair

15   neurodegeneration which are optimally tailored for sex and age. *Id.* In recognition of her research,

16   Dr. Voskuhl was most recently awarded the 2024 John Dystel Prize in Multiple Sclerosis from

17   the American Academy of Neurology and the National MS Society, the most prestigious award in

18   the field of MS. Voskuhl Decl. ¶ 4. In addition to numerous national and international awards, Dr.

19   Voskuhl was also awarded the Rachel Horne Prize for Women's Research in Multiple Sclerosis,

20   2023, from the European and American Committees for Treatment and Research in MS. *Id.*

21   On July 31, HHS terminated Dr. Voskuhl's NIH grant via a mass termination letter sent to

22   UCLA. Dr. van der Bliek's grant was for a project titled "Neurodegeneration Underlying Distinct

23   Disabilities in Multiple Sclerosis Using a Cell-Specific, Region-Specific, and Sex-Specific

24   Approach." Voskuhl Decl. ¶ 9. The research project aimed to (1) extend the cell-specific and

25   region-specific transcriptomics in astrocytes and oligodendrocytes to microglia and neurons, with

26   cell to cell interactions revealed in mice double-labelled to show gene expression changes in two

27   distinct cell types in the same region in the same mouse, and (2) determine if there are effects of

28   sex and/or age on the most differentially expressed cell-specific and region-specific pathways.

- 8 -

1    Voskuhl Decl. ¶ 10. If successful, the project would discover neurodegenerative targets optimized

2    for each disability in MS models in females and males during young adulthood and aging. *Id.*

3    When NIH awarded the grant to Dr. Voskuhl, it authorized grant funding for eight years of work,

4    from April 2023 through March 2031, for a total award of $7,307,976. Voskuhl Decl. ¶ 12.

5         On August 1, 2025, Dr. Voskuhl received a "Stop Work Notice" from UCLA

6    administrators instructing her to stop work on the MS research project as a result of the grant

7    termination letter HHS sent to UCLA. Voskuhl Decl. ¶ 21.

8                                    **ARGUMENT**

9    I.    **Drs. Horwitz, Van Der Bliek, and Voskuhl Have Standing.**

10        To establish standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly

11   traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

12   favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). This Court has

13   already held that the original Plaintiffs have Article III standing. *See* Dkt. 54 ("Order") at 47

14   (citing *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 145 S. Ct. 2121 (2025)). The

15   same is true for Drs. Horwitz, van der Bliek, and Voskuhl, who are the principal investigators for

16   their respective grants. Horwitz Decl. ¶¶ 7, 12, 17; van der Bliek Decl. ¶ 11; Voskuhl Decl. ¶ 12.

17   The wrongful termination of their grants has caused great harm to their careers and livelihood and

18   can be redressed through the same injunctive and declaratory relief as the other Plaintiffs.

19   Horwitz Decl. ¶¶ 11, 16, 20; van der Bliek Decl. ¶¶ 18-22; Voskuhl Decl. ¶ 24. In short, Drs.

20   Horwitz, van der Bliek, and Voskuhl "assert[] invasions of traditionally cognizable interests

21   sufficient to confer standing" which "can be redressed by a reversal of the allegedly illegal grant

22   terminations." Order at 42. In denying Defendants' partial stay motion, the Ninth Circuit

23   recognized the standing of the representative UC researchers plaintiffs to redress researchers'

24   own harms. *Thakur*, 2025 WL 2414835 at *4.

25

26

27

28

1

**II.    The Court Should Provisionally Certify Form Termination and Equity Termination Classes for UC Researchers Whose Grants were Terminated by HHS, in addition to DOD and DOT.**

2

3

**A.    The Class Definitions.**

4

The Court has provisionally certified two Classes: the Equity Termination Class and the

5

Form Termination Class. Order at 51–52. In this Motion, Plaintiffs propose modifying the

6

provisional classes proposed in Plaintiffs' pending motion as to additional agency defendants

7

(Dkt. 76) so as to encompass HHS and its sub-agency, NIH:

8

> **DOD/DOT/HHS Equity Termination Class.** All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants by the DOD, DOT, or HHS and its sub-agency NIH that are terminated pursuant to Executive Orders 14151 or 14173, from and after January 20, 2025.

9

10

11

12

> Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.

13

14

> **DOD/DOT/HHS Form Termination Class.** All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants by the DOD, DOT, and HHS and its sub-agency NIH that are terminated by means of a form termination notice that does not provide a grant-specific explanation for the termination that states the reason for the change to the original award decision and considers the reliance interests at stake, from and after January 20, 2025.Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.

15

16

17

18

19

20

21

**B.    The Proposed Classes Satisfy The Requirements of Class Certification.**

22

In granting provisional certification, the Court must determine that the requirements of

23

Rule 23 have been met, although "its analysis is tempered, [] by the understanding that 'such

24

certifications may be altered or amended before the decision on the merits.'" *R.I.L-R v. Johnson*,

25

80 F. Supp. 3d 164, 179–80 (D.D.C. 2015) (quoting *Bame v. Dillard*, No. 05-1833, 2008 WL

26

2168393, at *5 (D.D.C. May 22, 2008)). This Court already determined that Plaintiffs have

27

satisfied the requirements for provisional class certification as to NSF, NEH, and EPA. It should

28

- 10 -

also do so here, where Plaintiffs are proposing identical classes with respect to HHS. Plaintiffs'

proposed HHS/NIH classes satisfy all Rule 23(a) factors as well as the requirements of Rule

23(b)(2). *See Lyon v. U.S. Immigr. & Customs Enf't*, 308 F.R.D. 203, 210-11 (N.D. Cal. 2015).

As recently noted in *Barbara v. Trump*, "[c]ourts routinely grant provisional class certification for

purposes of entering injunctive relief." No. 2025 DNH 079P, 2025 WL 1904338, at *3 (D.N.H.

July 10, 2025) (collecting grants of provisional class certification, including *Meyer v. Portfolio

Recovery Assocs., LLC*, 707 F.3d 1035, 1041-43 ( 9th Cir. 2012)).[8]

### 1.    <u>Individual Joinder is Impracticable.</u>

Plaintiffs typically must demonstrate that "the class is so numerous that joinder of all

members is impracticable." Fed. R. Civ. P. 23(a)(1). Although numbers alone are not controlling,

"a class of 40 or more members raises a presumption of impracticability of joinder based on

numbers alone." 1 *Newberg on Class Actions* § 3:12 (5th ed. 2021); *see also Rannis v. Recchia*,

380 Fed. Appx. 646, 651-652 (9th Cir. 2010). "Plaintiffs 'need not state the exact number of

potential members nor identify all the members of the class so long as the putative class is not

amorphous.'" *Foon v. Centene Mgmt. Co*., No. 2:19-cv-01420 AC, 2023 WL 1447922, at *4

(E.D. Cal. Feb. 1, 2023) (quoting *Arnold v. United Artists Theatre Cir.*, 158 F.R.D. 439, 449

(N.D. Cal. 1994)). As the Second Amended Complaint alleges, and the NIH-UCLA letter

confirms, HHS has terminated close to 500 NIH grants to UC researchers at UCLA. *See* SAC ¶

543; Cabraser Decl., Ex. A at 5-13. The proposed classes easily satisfies the numerosity

requirement.

While the proposed classes are demonstrably numerous to meet any application of

23(a)(1), as the July 31 letter halting approximately 500 NIH grants illustrates, other

impracticability factors, unique to the purposes of Rule 23(b)(2) class certification, underscore the

appropriateness and necessity of class treatment. The Rule 23(b)(2) class offers a necessary haven

---

[8] Quoting *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2567 (2025) (Kavanaugh, J. concurring), the *Barbara* court noted that "plaintiffs who challenge the legality of a new federal statute or executive action and request preliminary injunctive relief may sometimes seek to proceed by class action under [R]ule 23(b)(2) and ask a court to award preliminary classwide relief that may, for example, be statewide, regionwide, or even nationwide." *Barbara*, 2025 WL 1904338, at *3. The court did just that, holding that it could "later modify or amend the order granting class certification." *Id*

in cases such as this, for those who fear retaliation. "Moreover, in determining numerosity, the court also considers whether 'individual claimants would have difficulty filing individual lawsuits out of fear of retaliation, exposure, and/ or prejudice, such that it is unlikely that individual class members would institute separate suits.'" *Does 1-10 v. University of Washington*, 326 F.R.D. 669, 679 (W.D. Wash. 2018), quoting *Buttino v. F.B.I*, 1992 WL 13013803, at *2 ( N.D. Cal. 1992) (finding numerosity where an unknown number of gay FBI employees worked under anti-gay policies and were unlikely to come forward individually).

> **2.    There Are Common Questions of Law and Fact and the Proposed Classes Satisfy Rule 23(a)(2) and Rule 23(b)(2).**

Plaintiffs must demonstrate "the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted). As this Court previously noted, commonality is satisfied where, like here, plaintiffs challenge "a system-wide practice or policy that affects all of the putative class members." Order at 54 (quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *overruled on other grounds by Johnson v. California*, 543 U.S. 499 (2005)).

By amending their complaint to allege unlawful HHS grant terminations alongside unlawful grant terminations by EPA, NEH, NSF, DOD, and DOT, Plaintiffs have asked the same "common questions" that the Court already recognized were sufficient to establish Rule 23(a)(2) commonality. For example: whether Agency Defendants followed Trump and DOGE directives in terminating grants to both classes; whether grant terminations violated the First Amendment rights of both sets of class members; and whether the Agency Defendants' terminations to the Form Termination Class were arbitrary and capricious in violation of the APA. *See* Order at 54, 55, 58; SAC ¶¶ 529-546 (alleging that HHS terminated grants at the behest of President Trump and DOGE), ¶¶ 654-659 (alleging that Defendants, including HHS, violated the First Amendment in terminating grants), ¶ 677 (alleging that Defendants violated the APA by distributing generic form letters to class members).

1    The Rule 23(b)(2) requirement is satisfied for the same reasons. Plaintiffs must show that

2  "the party opposing the class has acted or refused to act on grounds that apply generally to the

3  class." Fed. R. Civ. P. 23(b)(2). Plaintiffs have done so. The Second Amended Complaint focuses

4  *entirely* on Defendants' general course of conduct that caused substantially similar class-wide

5  injuries to all class members. *See, e.g.*, SAC ¶¶ 144–224 (EPA), ¶¶ 250–306 (NEH), ¶¶ 325–60

6  (NSF), ¶¶ 383–417 (DOD), ¶¶ 441–87 (DOT), ¶¶ 528-98 (NIH). The proposed DOD/DOT/HHS

7  Equity Termination and Form Termination Classes, then, satisfy Rule 23(b)(2) for identical

8  reasons as the current Classes.

9    **3.    Plaintiffs' Claims Are Typical of Those of the Proposed Classes.**

10    To satisfy typicality, Plaintiffs must show that their claims are "typical of the claims or

11  defenses of the class." Fed R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to

12  assure that the interest of the named representative aligns with the interests of the class." *Hanon*

13  *v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted). This Court has

14  already ruled that the original Plaintiffs met the typicality requirement for both the Equity

15  Termination and Form Termination Classes. Order at 56, 58-59. Drs. Horwitz, van der Bliek, and

16  Voskuhl satisfy the typicality inquiry for claims against HHS/NIH as well.

17    Typicality is easily met here because the grants of the three proposed class representatives

18  and the entire proposed classes were terminated in the exact same way: by a single NIH-UCLA

19  form termination letter. The letter provides no reasoned grant-specific explanation for the

20  termination of the grants. The letter's one-sentence declaration that "the NIH has considered

21  UCLA's reliance interests" rings hollow and is not sufficient to demonstrate that NIH actually

22  took into account the Plaintiffs' reliance interests. Ex. A at 3. As such, Plaintiffs' grants were

23  terminated in a way typical of the other proposed members of the DOD/DOT/HHS Form

24  Termination Class.

25    The same goes for the DOD/DOT/HHS Equity Termination Class. The NIH-UCLA letter

26  evidences viewpoint discrimination by HHS in violation of the First Amendment. Close to 500

27  NIH grants were sacrificed as punishment for UCLA's purported viewpoints on DEI-related

28  issues. The letter categorically accuses UCLA of racism, sexism, and antisemitism for the same

policies condemned in the DEI-related Executive Orders that animated the prior individualized NIH termination letters. "This is precisely the type of conduct other Equity Termination Class members will have been subject to and same injury other members will have suffered." Order at 56.

### 4. Plaintiffs and Class Counsel Will Adequately Represent the Proposed Classes.

Absent class members must be adequately represented for judgment to bind them. *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940). This prerequisite is satisfied if the representative party "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Resolution of the adequacy issue requires the Court to address two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Kim v. Allison*, 87 F.4th 994, 1000 (9th Cir. 2023) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). The Court has already ruled that class counsel and the original Plaintiffs are adequate representatives. *See* Order at 57–60. That same logic applies here.

As their accompanying Declarations demonstrate, Drs. Horwitz, van der Bliek, and Voskuhl are adequate class representatives for the same reasons as the original Plaintiffs. They have no conflicts of interest with absent class members. They are committed to the vigorous prosecution of this action, as evidenced in their Declarations. And their interests are aligned with those of the new DOD/DOT/HHS Form Termination and Equity Termination class members. *See id.* at 57–59. Even if Drs. Horwitz's, van der Bliek's, and Voskuhl's grant terminations are different in some ways from the other class representatives, Plaintiffs need not advance representatives that experienced every single variety of harm suffered by the class. *Lyon*, 308 F.R.D. at 214 (certifying a Rule 23(b)(2) class where "Plaintiffs do not seek individualized relief for each class member, but rather ask for systemic changes consistent with a single overarching constitutional standard that will be applicable to all class members"); *Coreas v. Bounds*, No. TDC-20-0780, 2020 WL 5593338, at *15 (D. Md. Sept. 18, 2020) (rejecting the defendants' argument against certification that "different subsets of putative class members may be entitled to

1    relief where others would not" because "there is available relief that would benefit the entire class

2    or an entire subclass"). *Scholl v. Mnuchin*, 489 F. Supp. 3d 1008, 1046 (N.D. Cal. 2020)

3    ("Plaintiffs assert that Rule 23(b)(2) is met [ ] because defendants implemented a generally

4    applicable policy of denying CARES Act payments to incarcerated persons. . . . The court agrees

5    with plaintiffs that defendants' policy is generally applicable to the class as a whole.").

6        Plaintiffs have demonstrated that all Rule 23(a) requirements, as well as the Rule 23(b)(2)

7    requirement, are satisfied for the new proposed classes. As such, the Court should provisionally

8    certify the DOD/DOT/HHS Equity Termination and Form Termination Classes and appoint Drs.

9    Horwitz, van der Bliek, and Voskuhl as class representatives.

10   **III.    The Court Should Issue a Preliminary Injunction as to HHS for All the Reasons in
         the Court's Prior Order.**

11
12       The Court has already enjoined the EPA, NEH, and NSF from effectuating grant

13   terminations to members of the Form Termination and Equity Termination classes; vacated grant

14   terminations by those agencies; and ordered those agencies to reinstate terminated grants. Order

15   at 61. The Court has also held that suspensions are the same as terminations. NSF Show Cause

16   Order. The Ninth Circuit has issued an opinion, for publication, determining that the original

17   plaintiffs are likely to succeed on their certified claims, and that the balance of equities favors the

18   continuation of the Court's pending injunction. The Court should issue an additional preliminary

19   injunction that extends its decision to HHS (as well as DOD and DOT) for the same reasons.

20       A preliminary injunction is warranted where the moving party establishes that (1) it is

21   likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief;

22   (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public

23   interest. Order at 17; *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). These factors

24   strongly favor Plaintiffs.

25   **A.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims that HHS
         Grant Terminations are Unlawful.**

26       This Court, and the Ninth Circuit, have already determined that Plaintiffs are likely to

27   succeed on the merits of their claims that "grant terminations pursuant to the Equity Termination

28   Orders violate the First Amendment and, in the case of NSF and NEH, were contrary to

1  congressionally mandated directives to both agencies under the APA." Order at 17; *Thakur v.*

2  *Trump*, 2025 WL 2414835 at *7-8. The Court also found that Plaintiffs are "likely to succeed in

3  showing that the mass grant terminations carried out via form letters were conducted in a manner

4  that was arbitrary and capricious." Order at 25. For nearly identical reasons, the Court should rule

5  that Plaintiffs are likely to succeed on their claims against HHS.

6  **1.    Defendants' Grant Terminations Violate the First Amendment.**

7  The First Amendment prohibits the government from "regulating speech when the specific

8  motivating ideology or the opinion or perspective of the speaker is the rationale for the

9  restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829, 833 (1995).

10  "Discrimination against speech because of its message is presumed to be unconstitutional." *Id.* at

11  828. "[E]ven in the provision of subsidies, the Government may not 'ai[m] at the suppression of

12  dangerous ideas.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quoting

13  *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 550 (1983) (alteration in

14  original)). In the grantmaking context, the government may not reject "a whole class of projects"

15  based on "viewpoint alone," or use Federal funding to "impose a disproportionate burden

16  calculated to drive certain ideas or viewpoints from the marketplace." *Rhode Island Latino Arts v.*

17  *Nat'l Endowment for the Arts*, No.25-cv-79-WES, 2025 WL 1009026, at *12 (D.R.I. Apr. 3,

18  2025) (quoting *Finley*, 524 U.S. at 587).

19  However, Defendants' NIH-UCLA letter demonstrates that HHS engaged in viewpoint

20  discrimination when terminating grants at the Executive's behest. HHS terminated "a whole class

21  of projects"—close to 500 NIH grants—based on DEI-related viewpoints HHS attributes to

22  UCLA and imputes to its researchers. The letter categorically accuses UCLA of racism, sexism,

23  and antisemitism for the same policies condemned in the DEI-related Executive Orders that

24  animated the prior individualized NIH termination letters. "This is precisely the type of conduct

25  other Equity Termination Class members will have been subject to and same injury other

26  members will have suffered." Order at 56. The goal of such action could not be clearer: "to drive

27  certain ideas or viewpoints from the marketplace." *Rhode Island Latino Arts,* 2025 WL 1009026,

28  at *12 (quoting *Finley*, 524 U.S. at 587). In short, the record shows that HHS terminated grants *en*

*masse* to promote particular ideological viewpoints. The First Amendment does not tolerate such viewpoint discrimination. Accordingly, Defendants' actions are unconstitutional. As this Court has already concluded, and as the Ninth Circuit has acknowledged, plaintiffs are likely to succeed on their First Amendment claim. *See Thakur v. Trump*, 2025 WL 2414835 at *6-7.

## 2.    HHS's Grant Terminations Are Contrary to Law Under the APA.

The APA prohibits agency action that exceeds statutory or constitutional authority or is otherwise contrary to law. 5 U.S.C. § 706(2)(A), (C); *Kaweah Delta Health Care Dist. v. Becerra*, 123 F.4th 939, 944 (9th Cir. 2024) ("[U]nder our system of separation of powers, neither good intentions nor pressing policy problems can substitute for an agency's lack of statutory authority to act."); *Nw. Env't Advocates v. U.S. EPA*, 537 F.3d 1006, 1025-27 (9th Cir. 2008). By refusing to spend money that Congress appropriated, Defendants are violating the Impoundment Control Act of 1974 and the appropriations statutes underlying NIH's funding schemes.

Defendants are also violating NIH's enabling statutes and other laws passed by Congress that include grantmaking as a directive. For example, the PHSA specifically instructs the HHS Secretary "to encourage, cooperate with, and render assistance to other appropriate public authorities, scientific institutions, and scientists in the conduct of, and promote the coordination of, research, investigations, experiments, demonstrations, and studies relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments of man." 42 U.S.C. §241(a).

Defendants are also acting contrary to their enabling statutes by terminating funding of particular research topics, "because those terminations were based on Plaintiffs' pursuit of the very goals that Congress had mandated." Order at 22. Congress has statutorily mandated NIH and the ICs under it to engage in a public process to identify the research priorities of NIH and its institutes and centers. Every six years, the NIH director must "develop and submit to the appropriate committees of Congress and post on the [NIH's website] a coordinated strategy (to be known as the 'National Institutes of Health Strategic Plan') to provide direction to the biomedical research investments made by the National Institutes of Health, to facilitate collaboration across the institutes and centers, to leverage scientific opportunity, and to advance biomedicine." 42

1  U.S.C. § 282(m)(1). Each of NIH's institutes and centers similarly develops and promulgates a

2  strategic plan that publicly articulates its research priorities. Id. § 282(m)(3).

3          Until January 2025, NIH followed this congressional directive and publicized its research

4  priorities. In September 2019, the NIH director began the process of updating the agency's

5  priorities in biomedical and behavioral research areas, research capacity, and research conduct.

6  Between October 2019 and July 2020, NIH gathered feedback from its institutes and centers, their

7  advisory councils, external stakeholders, and the general public. In 2020, the NIH published its

8  Strategic Plan for 2021-2025 and stated that NIH would prioritize "improving minority health and

9  reducing health disparities; enhancing women's health; addressing public health challenges across

10  the lifespan; promoting collaborative science; and leveraging data science for biomedical

11  discovery."[9] Similarly, the plan stated that NIH "supports a comprehensive spectrum of

12  immunology and infectious disease research focused on developing improved or novel vaccines"

13  including "the rapid development of new vaccines to mitigate emerging infectious disease

14  outbreaks, such as COVID-19, Ebola virus disease (EVD), and influenza (flu)."[10] This is still

15  NIH's Strategic Plan *today*; the NIH has yet to promulgate a new Strategic Plan pursuant to

16  statute.[11]

17          The NIH grants awarded to Drs. Horwitz, van der Bliek, and Voskuhl remain consistent

18  with NIH's current strategic plan. Dr. Horwitz received NIH grants to fund the creation of a

19  vaccine and treatments for tuberculosis, an infectious disease. Horwitz Decl. ¶¶ 7, 12, 17. Dr.

20  Vuskuhl received an NIH grant to address sex and age disparities in multiple sclerosis and

21  neurodegenerative diseases. Vuskuhl Decl. ¶¶ 9-13. Dr. van der Bliek received an NIH grant for

22  research on Charcot Marie Tooth disease. Van der Bliek Decl. ¶¶ 9-10. By terminating these

23  grants, HHS acted contrary to Congress's direct mandate and the Strategic Plan NIH promulgated

24  pursuant to statute. The APA does not allow an agency to flout Congress's clear directives in this

---

25  [9] *NIH-Wide Strategic Plan for Fiscal Years 2021–2025*, at 3,
   https://www.nih.gov/sites/default/files/2025-01/strategic-plan-fy2021-2025.pdf.

26  [10] *Id.* at 8.

27  [11] *See NIH-Wide Strategic Plan*, https://www.nih.gov/about-nih/nih-wide-strategic-plan ("The
   strategic plan was launched in July 2021 and is being implemented through September 2025. NIH

28  is currently updating the strategic plan to ensure it is aligned with the current Administration's
   priorities and complies with this Administration's Executive Orders.")

way. *See, e.g.*, *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994) (explaining that a court may not accept "the agency's policy judgments ... if they conflict with the policy judgments that undergird the statutory scheme"); *Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155, 176 (4th Cir. 1998), *aff'd*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) (explaining that "federal agencies" cannot "substitute their policy judgments for those of Congress").

HHS has exceeded its own statutory authority and have therefore violated 5 U.S.C. Section 706(2)(A) and (C). Accordingly, "the only appropriate remedy is vacatur." *Kaweah*, 123 F.4th at 944. HHS's actions violate statutory commands and are otherwise *ultra vires*.

### 3. Defendants' Grant Terminations Are Arbitrary and Capricious Under the APA.

The APA prohibits arbitrary and capricious action. 5 U.S.C. §706(2)(A). *Kalispel Tribe of Indians v. U.S. Dep't of the Interior*, 999 F.3d 683, 688 (9th Cir. 2021). It requires federal agencies to engage in "reasoned decisionmaking" (*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020)), meaning an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted) (quotations omitted). Therefore, agency action, particularly action which represents a departure from prior agency policy, is lawful only if it rests "on a consideration of the relevant factors." *Id.* at 42-43.

Further, an agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Id.* An agency action is also arbitrary and capricious if, when departing from a prior policy, an agency does not "display awareness that it *is* changing position" or does not "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original).

1    HHS's mass termination of grants awarded to Drs. Horwitz, van der Bliek, and Voskuhl

2    and the Class was arbitrary and capricious. Defendants do not provide grant-specific reasoning

3    for the terminations. The NIH-UCLA termination letter "provide[s] no indication that Defendants

4    have 'considered the relevant factors' and do[es] not 'articulate a rational connection between the

5    facts found and the choice made.'" Order at 27 (citing *Baltimore Gas & Electric Co. v. Natural*

6    *Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983)) (cleaned up). In the same way that the

7    individualized termination letters at issue in the prior Order stated the funding "no longer

8    effectuate[] the program goals or agency priorities" and mentioned the disfavored topics, the

9    NIH-UCLA termination letter simply accuses UCLA of "noncompliance" with reference to the

10   federal government's revised stance on DEI matters. Such conclusory statements cannot

11   constitute reasoned explanations for agency action. *See, e.g.*, *Drs. for Am. v. Off. of Pers. Mgmt.*,

12   766 F. Supp. 3d 39, 53 (D.D.C. 2025) ("[Plaintiff's] arbitrary and capricious argument is simple:

13   the agencies' removal decisions were 'completely unreasoned' and thus were not the product of

14   reasoned decisionmaking . . . The Court agrees that [Plaintiff] has demonstrated a likelihood of

15   success on the merits as to this claim.").

16   Equally as important, the NIH-UCLA termination letter shows that the agencies failed to

17   consider the reliance interests of grantees (a fact the other Agency Defendants conceded in a

18   recent argument before the Ninth Circuit *on the same day* that HHS issued the NIH-UCLA letter

19   claiming that reliance interests were considered). *See* Order at 26-28. Instead, Plaintiffs were left

20   stranded, without funding, in the middle of multi-year research projects they were told would be

21   fully funded. Horwitz Decl. ¶¶ 11, 16, 120; van der Bliek Decl. ¶¶ 18-22; Voskuhl Decl. ¶ 24.

22   Grantees who had received some, but not all, of their awards had already spent significant time on

23   their projects. Grantees had been using their federal funds to pay for their salaries and those of

24   their staff and research assistants. Without those funds, they have had to lay off critical staff

25   members and research assistants. Horwitz Decl. ¶¶ 16, 20; van der Bliek Decl. ¶ 19; Voskuhl

26   Decl. ¶ 24. Defendants have failed to introduce any evidence that they considered the

27   consequences of prematurely terminating partially-funded research projects that would have

28   benefited grantees, affiliate institutions, and members of the public alike. *See* Order at 30.

1    Finally, as this Court previously concluded, Defendants' terminations of already-awarded

2    grants constitute final agency action for APA purposes. Order at 31-33. As such, APA review is

3    appropriate.

4    **B.      The Harms Caused by HHS's Unlawful Conduct Will Become Irreparable
              Absent The Court's Intervention.**

5    Plaintiffs must demonstrate that they are "likely to suffer irreparable harm in the absence

6    of preliminary relief." *Winter*, 555 U.S. at 20. They are able to do so here. As with DOD and

7    DOT, HHS is causing the exact same irreparable harm as EPA, NEH, and NSF. *See* Order at 47–

8    48. HHS has caused irreparable harm to the First Amendment rights of Drs. Horwitz, van der

9    Bliek, and Voskuhl. *See id.* at 47 (the violation of First Amendment rights "unquestioningly"

10   causes irreparable injury). The other irreparable harms HHS has caused include sizable monetary

11   losses, layoffs, hiring and training disruptions, interruption of graduate research programs, injury

12   to professional reputation, and potential cancellation of research altogether. Order at 47–48.

13   Lastly, the harms to the public cannot be overstated. UC researchers with NIH grants are at the

14   forefront of medical and public health research. By terminating Dr. Horwitz's grants, for

15   example, NIH has caused the cessation of a long-running tuberculosis vaccine project, causing

16   harm to the public health by preventing or delaying the introduction of a vaccine to battle a now

17   resurgent infectious disease. Horwitz Decl. ¶ 11. In Dr. Vuskuhl's case, terminating her NIH

18   grant hinders medical advancements for multiple sclerosis and neurodegenerative diseases.

19   Vuskuhl Decl. ¶ 24. Similarly, the termination of Dr. van der Bliek's grant harms the public in

20   that it prevents or delays the study and treatment of Charcot Marie Tooth disease, Alzheimer's,

21   and dementia. Van der Bliek Decl. ¶ 22.

22   HHS's grant terminations have caused and will continue to cause concrete harm and

23   create uncertainty (in many cases, to the point of operational chaos) for Drs. Horwitz, van der

24   Bliek, and Voskuhl, and the proposed class members. This Court and others have recognized

25   these types of harms as warranting preliminary injunctive relief. *See* Order at 47–49; *City & Cnty*

26   *of S.F. v. USCIS*, 408 F. Supp. 3d 1057, 1123 (N.D. Cal. 2019) (recognizing "burdens on . . .

27   ongoing operations" for public entities, including administrative costs caused by changes in

28

federal policy, as constituting irreparable harm); *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (same).

### C.    The Balance of Equities Weigh in Plaintiffs' Favor, and An Expanded Preliminary Injunction Is in the Public Interest.

The equities and public interest, which merge when the government is a party, tip sharply in favor of Plaintiffs. *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024). The threatened and actual harm to Plaintiffs far outweighs the federal government's interests in immediately enforcing these grant terminations, and preserving Plaintiffs' constitutional and statutory rights is in the public interest. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights" (citation omitted)); *Nat'l Treasury Emps. Union v. U.S. Dept. of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993) ("The preservation of . . . the legality of the process by which government agencies function certainly weighs heavily in the public interest."); *Clarke v. Off. of Fed. Housing Enter. Oversight*, 355 F. Supp. 2d 56, 66 (D.D.C. 2004) ("[T]here is a substantial public interest in ensuring that [the agency] acts within the limits of its authority."); *Widakuswara v. Lake*, No. 1:25-cv-1015, 2025 WL 1166400, at *17 (D.D.C. Apr. 22, 2025) ("[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'") (citation omitted).

The government will suffer no harm from ceasing to terminate already authorized grants for which Congress has already appropriated funds, nor from returning to the orderly and legally compliant grant administration processes in place prior to Inauguration Day. The government will certainly continue to function (and will indeed function better) if the status quo ante is restored. *See* Order at 49 ("An agency is not harmed by an order prohibiting it from violating the law."). The balance of equities therefore strongly supports a preliminary injunction. *See id.* at 48; *see also Thakur v. Trump*, 2025 WL 2414835 at *8.

### CONCLUSION

For all of these reasons, Plaintiffs respectfully request that the Court grant their Motion to provisionally certify the DOD/DOT/HHS Form Termination and Equity Termination Classes;

1   appoint plaintiffs Marcus Horwitz, Alexander van der Bliek, and Rhonda Voskuhl as additional

2   Class Representatives; appoint the undersigned Counsel to represent these classes; and issue an

3   additional preliminary injunction applicable to HHS/NIH as well as DOD and DOT.

4

5   Dated: August 29, 2025                    By:    /s/ *Elizabeth J. Cabraser*

6                                            Elizabeth J. Cabraser (CA Bar No. 83151)
                                             ecabraser@lchb.com
7                                            Richard M. Heimann (CA Bar No. 63607)
                                             rheimann@lchb.com
8                                            Kevin R. Budner (CA Bar No. 287271)
                                             kbudner@lchb.com
9                                            Annie M. Wanless (CA Bar No. 339635)
                                             awanless@lchb.com
10                                           Nabila M. Abdallah (CA Bar No. 347764)
                                             nabdallah@lchb.com
11                                           LIEFF CABRASER HEIMANN &
                                             BERNSTEIN, LLP
12                                           275 Battery Street, 29th Floor
                                             San Francisco, CA 94111
13                                           Telephone: 415.956.1000

14

15                                           Erwin Chemerinsky (*pro hac vice*)
                                             echemerinsky@law.berkeley.edu
                                             Claudia Polsky (CA Bar No. 185505)
16                                           cpolsky@law.berkeley.edu
                                             U.C. BERKELEY SCHOOL OF LAW
17                                           Law Building
                                             Berkeley, CA 94720-7200
18                                           Telephone: 510.642.6483

19                                           Anthony P. Schoenberg (CA Bar No. 203714)
                                             tschoenberg@fbm.com
20                                           Donald E. Sobelman (CA Bar No. 184028)
                                             dsobelman@fbm.com
21                                           Dylan M. Silva (State Bar No. 306363)
                                             dmsilva@fbm.com
22                                           Linda S. Gilleran (CA Bar No. 307107)
                                             lgilleran@fbm.com
23                                           Kyle A. McLorg (CA Bar No. 332136)
                                             kmclorg@fbm.com
24                                           Katherine T. Balkoski (CA Bar No. 353366)
                                             kbalkoski@fbm.com
25                                           FARELLA BRAUN + MARTEL LLP
                                             One Bush Street, Suite 900
26                                           San Francisco, CA 94104
                                             Telephone: 415. 954.4400
27
                                             *Attorneys for Plaintiffs and the Proposed Classes*
28

1

## <u>CERTIFICATE OF SERVICE</u>

2      I hereby certify under penalty of perjury that August 29, 2025, I authorized the electronic

3 filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send

4 notification of such filing to registered parties.

5      Executed August 29, 2025 at San Francisco, California.

6

7           */s/ ELIZABETH J. CABRASER*
           ELIZABETH J. CABRASER

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28