BRETT A. SHUMATE
Assistant Attorney General
Civil Division
ERIC J. HAMILTON
Deputy Assistant Attorney General
JOSEPH E. BORSON
Assistant Branch Director
JASON ALTABET (Md. Bar No. 2211280012)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-0727
Email: Jason.k.altabet2@usdoj.gov
KATHRYN BARRAGAN (D.C. Bar No. 90026294)
Tel.: (202) 598-7696
Email: kathryn.e.barragan@usdoj.gov

*Attorneys for United States*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| NEETA THAKUR, *et al.,* | Case No. 25-cv-4737-RFL |
| Plaintiffs, | DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ADDITIONAL PRELIMINARY INJUNCTION AS TO NIH; MEMORANDUM OF POINTS AND AUTHORITIES |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.,* | Hearing Date: September 18, 2025 |
| Defendants. | Time: 2:30 PM |
| | Judge: Hon. Rita F. Lin |
| | Place: Zoom |

1

## <u>TABLE OF CONTENTS</u>

2  INTRODUCTION...........................................................................................................1

3  STATEMENT OF THE ISSUES TO BE DECIDED ...............................................3

4  BACKGROUND ........................................................................................................3

5  *Regulatory Background* ............................................................................................3

6  *Factual Background* .................................................................................................4

7  *Procedural Background* ...........................................................................................5

8  ARGUMENT ..............................................................................................................7

9  I.     This Court Should Reject Plaintiffs' Motion for the Reasons Previously Provided................7

10  II.    Plaintiffs Have Not Met Their Burden for Provisional Class Certification
       Particularly for Any Grants Not Part of the July 31 NIH Suspension Action ......................11

11
12         A.     Typicality, Adequacy, And Commonality Limit the Class Definition to
                  NIH, not all of HHS ....................................................................................12

13         B.     Typicality, Adequacy, and the Good Cause Finding for Modifying the
                  Scheduling Order Limit the Class Definition to Just Grants Affected by
14                the Suspension Letter ..................................................................................13

15         C.     The NIH UCLA Suspension Action is Not Common or Typical with the
                  Termination Actions at DoD and DoT ........................................................14

16
17  III.   Even Under the Court's Prior Reasoning, NIH Should Not be Enjoined ............................16

         A.     The Form Termination Class Should Not Apply Here...............................17
18
19         *NIH's Suspension was Committed to Agency Discretion by Law*.................17

           *NIH's Suspension was not Arbitrary and Capricious*...............................19
20
21         B.     NIH's Suspension is Also Outside the Equity Termination Class .............20

22         *Plaintiffs Have Not Shown NIH's Actions Were Contrary to Law Under the APA*...................20

23         *NIH's Letter Did Not Rely on DEIA-Related Executive Orders or Grant Content* ....................21

24  IV.    Injunctive Relief Should Be Stayed Pending Appeal and Be Accompanied by a
           Bond .............................................................................................................22

25  CONCLUSION ........................................................................................................23

26

27

28  FED. DEFS.' OPP'N TO PLS.' MOT. FOR ADDITIONAL PRELIMINARY INJUNCTION AS TO NIH
    CASE NO. 25-CV-4737

1

## <u>TABLE OF AUTHORITIES</u>

2

**<u>Cases</u>**

3

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, ("*USAID*"),

4
  570 U.S. 205 (2013) ................................................................................................ 10

5

*Am. Med. Ass'n v. Reno*,
  57 F.3d 1129 (D.C. Cir. 1995) ............................................................................... 20

6

7

*Betts v. Reliable Collection Agency, Ltd.*,
  659 F.2d 1000 (9th Cir. 1981) ............................................................................... 11

8

*Bob Jones Univ. v. United States*,

9
  461 U.S. 574, 604 (1983) .................................................................................. 16, 22

10

*Califano v. Yamasaki*,

11
  442 U.S. 682 (1979) .......................................................................................... 10, 12

12

*City of New Haven v. United States*,
  809 F.2d 900 (D.C. Cir. 1987) ............................................................................... 21

13

14

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .................................................................................................. 8

15

*Columbus Reg'l Hosp. v. United States*,

16
  990 F.3d 1330 (Fed. Cir. 2021) ................................................................................ 8

17

*Dabney v. Reagan*,
  542 F. Supp. 756 (S.D.N.Y. 1982) ......................................................................... 20

18

19

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) .................................................................................................. 9

20

*Dep't of Educ. v. California*,

21
  145 S. Ct. 966 (2025) ................................................................................... 8, 10, 23

22

*Faculty Senate of Fla. Int'l Univ. v. Winn*,

23
  477 F. Supp. 2d 1198 (S.D. Fla. 2007) .................................................................. 10

24

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ..................................................................................... 9, 19, 20

25

26

*FDA v. R. J. Reynolds Vapor Co.*,
  145 S. Ct. 1984 (2025) .............................................................................................. 8

27

28

*Glob. Health Council v. Trump,*
    No. 25-5097, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025).................................................. 12

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) ...................................................................................... 11

*Heckler v. Chaney,*
    470 U.S. 821 (1985)...................................................................................................... 17

*Klamath Water Users Protective Ass'n v. Patterson,*
    204 F.3d 1206 (9th Cir. 1999) ........................................................................................ 8

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004)........................................................................................... 8, 22, 23

*Lincoln v. Vigil,*
    508 U.S. 182 (1993)........................................................................................ 17, 18, 19

*Louisiana v. Biden,*
    64 F.4th 674 (5th Cir. 2023) ............................................................................................ 9

*Megapulse v. Lewis,*
    672 F.2d 959 (D.C. Cir. 1982) ........................................................................................ 7

*Milk Train, Inc. v. Veneman,*
    310 F.3d 747 (D.C. Cir. 2002) ...................................................................................... 17

*Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.,*
    498 U.S. 211 (1991)......................................................................................................... 9

*Murthy v. Missouri,*
    603 U.S. 43 (2024).......................................................................................................... 8

*NIH v. Am. Pub. Health Ass'n,*
    No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025)................................................... 7

*Rust v. Sullivan,*
    500 U.S. 173 (1991).................................................................................................. 9, 10

*Rutledge v. Elec. Hose & Rubber Co.,*
    511 F.2d 668 (9th Cir. 1975) ........................................................................................ 11

*Sampson v. Murray,*
    415 U.S. 61 (1974)........................................................................................................ 10

*Savantage Fin. Servs., Inc. v. United States*,
   595 F.3d 1282 (Fed. Cir. 2010) ................................................................ 9

*Simon v. E. Ky. Welfare Rts. Org.*,
   426 U.S. 26 (1976) .................................................................................. 8

*Small v. Allianz Life Ins. Co. of N. Am.*,
   122 F.4th 1182 (9th Cir. 2024) ), *cert. denied,* No. 24-1225, 2025 WL 1787755
   (U.S. June 30, 2025) ............................................................................... 11

*Smiley v. Citibank (S. Dakota)*,
   517 U.S. 735 (1996) ................................................................................ 20

*Sueoka v. United States*,
   101 F. App'x 649 (9th Cir. 2004) ............................................................ 11

*Tennessee v. Becerra*,
   131 F.4th 350 (6th Cir. 2025) .................................................................. 9

*Trump v. Boyle*,
   No. 25A11, 2025 WL 2056889 (U.S. July 23, 2025) ...................... 10, 11

*Trump v. Sierra Club*,
   140 S. Ct. 1 (2019) ............................................................................ 20, 21

*Tucson Airport Authority v. General Dynamic.*,
   136 F.3d 641 (9th Cir. 1998) ............................................................... 7, 8

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................................ 11

*Wolin v. Jaguar Land Rover N. Am., LLC*,
   617 F.3d 1168 (9th Cir. 2010) ........................................................... 12, 13

*Yates v. NewRez LLC*,
   686 F. Supp. 3d 397 (D. Md. 2023) ........................................................ 12

**Statutes**

2 U.S.C. § 683 ................................................................................................ 20

5 U.S.C. § 701 ................................................................................................ 17

5 U.S.C. § 702 ................................................................................................ 17

5 U.S.C. § 706 ................................................................................................ 17

31 U.S.C. § 503 ..................................................................................................................... 4

31 U.S.C. § 6307 ................................................................................................................... 4

42 U.S.C. § 241 ............................................................................................................... 17, 18

42 U.S.C. § 282 ............................................................................................................... 18, 21

42 U.S.C. § 284 ............................................................................................................... 17, 18

Full-Year Continuing Appropriations and Extensions Act, 2025,
　 Pub L. No. 119-4, 139 Stat. 11 (2025) ............................................................................. 18

Further Consolidated Appropriations Act, 2024,
　 Pub. L. No. 118-47, Div. D, Tit. II, 138 Stat. 656 (2024) ............................................... 18

**Rules**

Fed. R. Civ. P. 23 ................................................................................................................. 11

Fed. R. Civ. P. 65 ................................................................................................................. 23

**Regulations**

2 C.F.R. Part 200 .............................................................................................................. 3, 4

2 C.F.R. § 200.309 ................................................................................................................. 4

2 C.F.R. § 200.339 ................................................................................................................. 4

2 C.F.R. § 200.340 ........................................................................................................ 4, 5, 18

2 C.F.R. § 200.343 ................................................................................................................. 4

45 C.F.R. § 75.371 ....................................................................................................... 4, 18, 19

Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ........................................ 6, 15

Exec. Order No. 14,173, 90 Fed. Reg. 8633 ( Jan. 21, 2025) ........................................ 6, 15

**Other Authorities**

H.R. Rep. No. 658, 93-658, 93d Cong., 1st Sess. (1971), *reprinted in* 1974 U.S.C. Cong. & Admin.
　 News 3462 ........................................................................................................................ 21

1

HHS Agencies & Offices,
    https://www.hhs.gov/about/agencies/hhs-agencies-and-offices/index.html (last visited Sep. 10, 2025)
    .................................................................................................................................. 1

2

3

4

The Department of Justice's July 29 press release,
    https://www.justice.gov/opa/pr/justice-department-finds-university-california-los-angeles-violation-
    federal-civil-rights (last visited Sep. 9, 2025) ........................................................................ 4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Several months ago, this Court preliminarily enjoined three federal agencies, requiring them to restore certain terminated grants where University of California ("UC") affiliated researchers were listed on the grant application in certain positions and issuing prospective relief for certain future terminations. The Court provisionally certified two classes—the Form Termination Class and Equity Termination Class—with criteria for when a termination qualifies under either. The Court did not extend relief to agencies where a named plaintiff was not named on a grant, and the Court rejected relief based on separate executive priorities irrelevant to the named plaintiffs' grants. Ultimately, the Court enjoined three agencies based on the content and form of their termination letters and for terminations pursuant to two DEI-related Executive Orders. Then, on an agreed schedule, Plaintiffs amended their complaint to add two additional named plaintiffs named on grant applications with the Department of Defense ("DoD") and Department of Transportation ("DoT").

However, on the evening of August 21, 2025, Plaintiffs filed a letter brief raising to the Court, for the first time, that Plaintiffs planned to further amend their complaint to add named plaintiffs for the National Institutes of Health ("NIH"). ECF No. 102. The letter came nearly three weeks after NIH suspended grants to the University of California - Los Angeles ("UCLA") based on findings regarding that grantee's conduct. The Court treated Plaintiffs' letter brief as a motion to modify the Court's scheduling order and granted their request to further amend their complaint. The Court permitted that amendment because "these are three new plaintiffs who are alleging injuries that occurred after the deadline for amended pleadings had passed, [so] it does not seem to me that [Plaintiffs] could have anticipated what the form letter would have looked like in advance." Trans. (Aug. 26, 2025) 20:13-20:17. Plaintiffs have since moved to expand their proposed preliminary injunction for DoD and DoT to cover not just NIH, but the entire Department of Health and Human Services ("HHS").[1]

---

[1] This includes over a dozen operating divisions and sub-agencies with grantmaking functions for which Plaintiffs have made no showing and have never mentioned. *See* HHS Agencies & Offices, https://www.hhs.gov/about/agencies/hhs-agencies-and-offices/index.html (last visited Sep. 10, 2025) (identifying various HHS components such as the Administration for Children and Families (ACF), Administration for Community Living (ACL), Advanced Research Projects Agency for Health (ARPHA-H), Administration for Strategic Preparedness and Response (ASPR), Assistant Secretary for Health (ASH), Indian Health Service (IHS), Substance Abuse and Mental Health Services Administration

The Court should reject Plaintiffs' motion or limit it to NIH in line with its ruling authorizing amendment of the complaint. To start, Defendants reiterate and preserve the arguments made in their initial briefing that the Court should not have issued a preliminary injunction and should similarly refrain from doing so here—including their arguments set forth in supplemental briefing. *See* ECF Nos. 25, 122. But even if the Court maintains its previous reasoning, Defendants raise application-specific reasons the Court should not issue an injunction.

First, Plaintiffs do not satisfy multiple class action requirements. The NIH suspension action does not satisfy commonality, and the named plaintiffs are not typical. Even if this Court grants a provisional class, the Court should at the very least limit the class in two ways. It should reject Plaintiffs' attempt to subject all of HHS to an injunction based on only named NIH plaintiffs. Moreover, the NIH portion of the class should be limited to only those researchers listed on grants that were part of the suspension action that Plaintiffs selected as the basis for modifying the scheduling order—the July 31 letter from NIH. Finally, Defendants renew their objection that a suspension is not a termination and therefore cannot fall within the Form Termination Class.

Nor are Plaintiffs likely to succeed on the merits. As to the Form Termination Class, the statutory scheme setting out grant funding for NIH commits funding, suspension, and termination decisions to the agency's discretion by law. Administrative Procedure Act ("APA") review is thus not available. If the Court reaches the merits, the suspension letter sent by NIH is sufficiently detailed.

Finally, as to the Equity Termination Class, if APA review applies, the statutory scheme governing NIH does not bar suspension of ongoing grants. Assuming the Court maintains a First Amendment basis for the class criteria, it should still be applied sparingly. Here, Plaintiffs have not shown that the NIH suspension was premised on the DEIA content of any grant.

In sum, even assuming the Court maintains its original reasoning, it should still deny Plaintiffs' motion or limit the resulting preliminary injunction to only cover grants suspended in the July 31 action by NIH.

---

(SAMHSA), and Agency for Toxic Substances and Disease Registry (ATSDR)).

### STATEMENT OF THE ISSUES TO BE DECIDED

1. Should the Court issue a preliminary injunction despite the renewed jurisdictional, merits, and class certification arguments made by Defendants, including based on the recent Supreme Court decision barring district court litigation involving research-related grant terminations?

2. Have Plaintiffs successfully established the requirements of provisional class certification given the uniqueness of the NIH suspension action?

3. Even if the NIH suspension action qualifies, should the Court limit the class definition to only the NIH suspension action—instead of HHS generally (and its over a dozen grantmaking components), or prior NIH terminations—given that Plaintiffs' basis for modifying the scheduling order was the July 31 NIH suspension action?

Assuming the Court concludes provisional certification is proper and maintains the reasoning underlying its preliminary injunction:

4. For the Form Termination Class, which is premised on APA review, were NIH's actions committed to agency discretion by law such that APA review is barred? If APA review is allowed, was NIH's suspension letter sufficient to exclude the action from the Form Termination Class?

5. If APA review applies, does the statutory scheme governing NIH require grant funding to remain frozen in place regardless of developments? And should the Court expand the Equity Termination Class to cover the NIH suspension action where the letter explains that NIH acted based on UCLA's conduct, not the content of any individual grant, nor any DEIA-related Executive Order?

### BACKGROUND

The background of this matter is little changed from when the Court issued its preliminary injunction. Preliminary Injunction, ECF No. 55.

*Regulatory Background*

Agencies are broadly empowered, through terms and conditions of federal grants and associated

regulations and guidance, to reorient grant portfolios in response to changing priorities. As a default matter, Office of Management and Budget ("OMB") regulations generally govern a variety of terms for federal grants and contracts. *See generally* 2 C.F.R. Part 200 (titled "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards"). For example, the regulations reference and generally provide terms for the suspension or termination of awarded federal grants. *See, e.g.*, *id.* § 200.309 ("If termination occurs, the period of performance will be amended to end upon the effective date of termination."); *id.* § 200.339(c) (noting suspension or termination is a remedy for noncompliance); *id.* § 200.343 (discussing the effects of suspension or termination).

Section 200.340 preserves agencies' ability to, "pursuant to the terms and conditions of the Federal award," terminate existing grants "including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *Id.* § 200.340(a)(4). This authority has been promulgated consistent with Congressional directives delegating to OMB the power to manage various aspects of federal grants and contracts. *See* 31 U.S.C. § 503; *id.* § 6307. Awardees are accordingly informed in their terms and conditions that funding may be cut off based on changes in agency priorities.

HHS regulations further detail remedies for noncompliance with "Federal statutes, regulations, or the terms and conditions of a Federal award." 45 C.F.R. § 75.371. They also explain how a suspension operates. If a component of HHS, like NIH, determined that a grantee is not in compliance with statutes, regulations, or terms and conditions, it may take a variety of corrective actions. *Id.* As relevant here, the regulations authorize NIH to "[w]holly or partly suspend (suspension of award activities) or terminate the Federal award." *Id.* § 75.371(c).

*Factual Background*

In a letter dated July 31, 2025, NIH informed UCLA that it would be suspending various grants to the university after findings by the Department of Justice that UCLA violated federal civil rights law.[2] Ex. A ("NIH Suspension Letter"), ECF No. 118-1. The suspension letter made detailed factual findings specific to UCLA, and informed the institution that NIH was willing to work with UCLA to resolve these

---

[2] The Department of Justice's July 29 press release is located at https://www.justice.gov/opa/pr/justice-department-finds-university-california-los-angeles-violation-federal-civil-rights (last visited Sep. 9, 2025).

concerns and facilitate corrective action. The letter identified several "specific examples of noncompliance": (1) "illegal race-based preferences in admissions practices;" (2) "fail[ure] to promote a research environment free of antisemitism and bias;" and (3) "discriminat[ion] against and endanger[ing] women by allowing men in women's sports and private women-only spaces." *Id.* NIH dedicated a paragraph to each identified example of noncompliance with cited sources. *Id.* at 1-3. For example, NIH cited "UCLA's own Task Force to Combat Antisemitism and Anti-Israeli Bias" which, NIH explained, "revealed that Jewish students, faculty, and staff were subjected to threats, assaults, swastika graffiti, and hostile slogans during the 2024 pro-Palestinian encampment." *Id.* at 2. As to reliance interests, NIH stated that it "has considered UCLA's reliance interests in continued availability of funding under the attached list of grants, and they are outweighed by the concerns identified." *Id.* at 3.

NIH stated its "willing[ness] to work with UCLA to identify corrective actions to bring UCLA into compliance." *Id.* To that end, it requested a "written corrective action plan." *Id.* NIH closed by explaining "that under 2 CFR § 200.340, NIH may move to terminate an award for reasons including if the recipient has failed to comply with the terms and conditions of an award." *Id.* The letter did not cite any Executive Order.

Plaintiffs additionally claim that NIH issued "form termination letters to UC researchers" but has not identified any named plaintiffs who received such a letter, nor provided any allegations related to a specific researcher's termination. *See* Mot. For Preliminary Injunction and Provisional Class Cert. as to HHS/NIH ("3rd PI Mot.") at 4-5, ECF No. 117.

### *Procedural Background*

On June 5, 2025, Plaintiffs filed this suit naming 16 grantmaking agencies as defendants, moved for a temporary restraining order, and sought to certify a class. Compl., ECF No. 1; Pls.' Mem. in Supp. of Mot. for TRO, ("Pls.' PI Mem."), ECF No. 7-1; Pls.' Mot. for Class Certification, ECF No. 18. In their emergency motion, Plaintiffs sought the restoration of terminated grant funding, a bar on future terminations, and a judicial order reinstating pre-January 20, 2025 grant termination procedures. Pls.' PI Mem. at 2. The Court subsequently set briefing on both motions with a hearing on June 20. ECF No. 28.

After a hearing, the Court granted preliminary injunctive relief but limited both the scope and

reach. The preliminary injunction is limited to only those agencies where named plaintiffs were listed "as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants," Preliminary Injunction ¶¶ 1, 3, namely the Environmental Protection Agency ("EPA"), National Science Foundation ("NSF"), and National Endowment for the Humanities ("NEH").

As to those three agencies, the Court certified two classes. The Equity Termination Class, based on Plaintiffs' First Amendment claim, and part of their APA contrary to law claim, covers "grants terminated by Agency Defendants pursuant to Executive Orders 14151 or 14173." *Id.* ¶ 4a. The Form Termination Class, based on Plaintiffs' arbitrary and capricious claim under the APA, covers "grant terminations . . . communicated by means of a form termination notice that does not provide a grant-specific explanation for the termination that states the reason for the change to the original award decision and considers the reliance interests at stake." *Id.* ¶ 2a. The Court also explained the basis for its injunction and provisional class certification. Order Granting Motion for Preliminary Injunction and Class Certification ("Mem. Op."), ECF No. 54.

After the Court issued its preliminary injunction, the parties conferred on a schedule for further proceedings. Joint Case Management Statement, ECF No. 58. The parties agreed that Plaintiffs would amend their complaint to add additional named plaintiffs and then move to expand the scope of the Court's preliminary injunction. *Id.* at 2. Plaintiffs subsequently amended their complaint to include two additional plaintiffs. Am. Compl., ECF No. 68. Plaintiffs then moved for an additional preliminary injunction for DoD and DoT. Mot. for Preliminary Injunction & Provisional Class Certification as to Additional Agency Defendants ("2nd PI Mot."), ECF No. 76. That motion is fully briefed.

The Court subsequently permitted Plaintiffs to modify the scheduling order. Plaintiffs filed an additional amended complaint with three named plaintiffs listed on NIH grants that were suspended through the NIH Suspension Letter. 2nd Am. Compl., ECF No. 112. Plaintiffs then filed a motion to include HHS as a whole and the sub-agency NIH as part of the injunction. 3rd PI Mot. at 10. Moreover, both parties have filed supplemental briefing on the effect of recent decisions on the issues here— particularly the Tucker Act preclusion arguments. ECF Nos. 121, 122. Finally, the Parties filed a stipulation and proposed order, which the Court has adopted, for further proceedings—including the

1  production of an administrative record by "NIH." ECF Nos. 123, 125.

2                                    **ARGUMENT**

3          Plaintiffs seek to enjoin all of HHS based on the July 31 NIH suspension action. Defendants

4  maintain their original objections to a preliminary injunction in its entirety, including that Plaintiffs'

5  alleged irreparable harm and the balance of the equities do not support emergency injunctive relief—

6  especially after the Supreme Court's recent ruling. *NIH v. Am. Pub. Health Ass'n*, No. 25A103, 2025 WL

7  2415669, at *1 (U.S. Aug. 21, 2025).

8          Even if the Court maintains the reasoning underlying its first preliminary injunction, the Court

9  should still deny Plaintiffs' third motion, or limit it only to NIH grants affected by the July 31 suspension

10  action, as detailed below.

11  **I.      This Court Should Reject Plaintiffs' Motion for the Reasons Previously Provided**

12          As an initial matter, Defendants renew, preserve, and expand on the arguments that the Court

13  previously considered.

14          First, this Court lacks jurisdiction over each claim—and particularly the APA claims—because

15  Congress has specifically divested federal courts of jurisdiction over matters like this one. Were there any

16  doubt, the Supreme Court's recent *NIH* decision forecloses any lingering arguments against this approach

17  for the reasons provided in Defendants' supplemental brief. ECF No. 122.

18          Under the test laid out in *Megapulse v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982), and regularly

19  applied by the Ninth Circuit, *Tucson Airport Authority v. General Dynamic.*, 136 F.3d 641, 647 (9th Cir.

20  1998), Plaintiffs may not bypass the Court of Federal Claims through clever pleading. If "a particular

21  action" is "at its essence a contract action" it is not within the jurisdiction of the district courts—a test that

22  requires looking at both "the source of the rights upon which the plaintiff bases its claims" and "the type

23  of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968 (citation omitted). Plaintiffs' claims are

24  ultimately based on grant agreements themselves, and a claim-by-claim analysis shows each would fail

25  without the terms of the grant agreements. As *Megapulse* explained, "[i]t is hard to conceive of a claim

26  falling no matter how squarely within the Tucker Act which could not be urged to involve as well agency

27  error subject to review under the APA." 672 F.2d at 967 n.34 (citation omitted). And the APA arbitrary

28

and capricious claim here is materially identical to a claim that a contracting party failed to properly terminate a contract. As to relief, that the order is ultimately one to "enforce [the Government's] contractual obligation to pay money" means the relief prong of the *Megapulse* test divests the court of jurisdiction. The Supreme Court has recently emphasized as much. *See Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam) (citation omitted). In sum, the Ninth Circuit takes a strong view of preclusion, even holding "that the Tucker Act prevents constitutional claims that are dependent on rights under a government contract," *Tucson Airport Auth.*, 136 F.3d at 648, and such reasoning applies here.

It does not matter whether these specific plaintiffs could bring a claim in the Court of Federal Claims. Plaintiffs "conflate[] two distinct concepts . . . the presence or absence of an adequate remedy within the meaning of § 704, and the requirement that a cause of action not be 'impliedly forbidden' under § 702." *Id.* at 646. When Congress creates a "cause of action enabling [some parties] (and not [others]) to seek judicial review . . . [a]llowing [the others] to sue under the APA would … frustrat[e] that scheme." *FDA v. R. J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1995 n.8 (2025). And under Federal Circuit law, these are indeed contracts enforceable in the Court of Federal Claims. *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021) ("[W]e have followed our predecessor court in treating federal grant agreements as contracts when the standard conditions for a contract are satisfied.").

Second, Plaintiffs lack standing because they are not parties to the contracts they seek to enforce. It is well established that each party generally "must assert his own legal rights" and may not invoke the rights of "third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). Yet Plaintiffs' claims and relief are entirely premised on requiring the Federal Government to continue paying contractual obligations to nonparties. Plaintiffs would lose on the merits because they lack third-party beneficiary status, *see Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999*)*, nor can they assert third-party standing, *see Kowalski*, 543 U.S. at 129-30. The fact that Plaintiffs require the Court to assume "how independent decisionmakers will exercise their judgment" defeats redressability, *see Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (citation omitted), and causation is lacking because a Court order merely encourages third parties to eventually remedy Plaintiffs' alleged harms, *see Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-43 (1976). Finally, enjoining future alleged terminations is too

speculative to support standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (explaining that any allegation of "threatened injury must be *certainly impending*" (citation omitted)).

Third, Plaintiffs' APA claims are foreclosed for lack of final agency action. While each individual termination may eventually represent a final agency action (directed at nonparties) a plaintiff may not "in a single swipe at the duly elected executive" seek judicial superintendence over the entire grantmaking structure of the Executive Branch. *See Louisiana v. Biden*, 64 F.4th 674, 684 (5th Cir. 2023). Plaintiffs' attempt to categorically enjoin alleged future terminations is thus barred.

Fourth, on the merits of the APA arbitrary and capricious claim, such review is deferential because it "represents a substantial intrusion into the workings of another branch of Government." *See Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) (quotation marks omitted); *see also Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) ("[D]etermining an agency's minimum needs is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess." (quotations omitted)). The suspension was "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). And it is exceedingly unlikely that anyone has a reliance interest in continued discretionary funding—particularly when the agency communications themselves recognize funding may not continue in future years despite initial funding. *See Tennessee v. Becerra*, 131 F.4th 350, 370 (6th Cir. 2025) ("Tennessee likely has no legally cognizable reliance interest in the receipt of a discretionary funding award on the conditions that it prefers." (emphasis removed)). Reliance interests therefore do not weigh in favor of preliminary injunctive relief. The APA does not require Defendants to simply maintain grants that no longer effectuate their priorities and forego a regulatorily permitted termination pathway. *See, e.g.*, *Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230 (1991) ("An agency enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures, and priorities[.]" (citations omitted)).

Fifth, Plaintiffs' First Amendment argument directly contradicts longstanding precedent on when viewpoint discrimination is impermissible in government grantmaking. In short, Government spending is not subject to traditional First Amendment scrutiny. "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public

interest." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). That is not considered impermissible viewpoint discrimination. Indeed, "[i]n so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Id.* So "[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition <u>may affect the recipient's exercise of its First Amendment rights</u>." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* ("*USAID*"), 570 U.S. 205, 214 (2013) (emphasis added). At the very least, a person merely listed as a researcher on a grant application has no personal First Amendment right to bar the Government from affecting someone else's grant. Any First Amendment right, if it were to exist, would belong to the grantee itself, who is not a party in this matter.

Finally, irreparable harm and the balance of the equities counsel against issuing an additional injunction. "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" before the court. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And "mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough." *See Sampson v. Murray*, 415 U.S. 61, 90 (1974); *see also Faculty Senate of Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1208 (S.D. Fla. 2007) ("There is no irreparable harm here because the plaintiffs can fund the desired travel themselves and then, if they prevail in this suit, obtain reimbursement. In other words, the harm is financial."). Plaintiffs' alleged harms are necessarily financial and insufficient for irreparable harm. Indeed, they are reparable in the Court of Federal Claims.

As for the balance of the equities, the Supreme Court in *California* squarely explained that it favors the Federal Government in this context. The public interest is harmed when the United States is forced to pay out funds that it may not be able to recover. *California*, 145 S. Ct. at 969. And grantees can choose whether "to keep the programs operating," and if they choose not to, "then any ensuing irreparable harm would be of their own making." *Id.* The Court recently clarified that such reasoning is binding on the lower courts. *Trump v. Boyle*, No. 25A11, 2025 WL 2056889 (U.S. July 23, 2025) ("Although our interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases."). And the *NIH* case entirely forecloses Plaintiffs' contrary arguments, as Defendants

explained in their supplemental brief. ECF No. 122.

## II.    Plaintiffs Have Not Met Their Burden for Provisional Class Certification Particularly for Any Grants Not Part of the July 31 NIH Suspension Action

Plaintiffs do not satisfy the requirements for provisional class certification as to NIH. Critically, "plaintiffs must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23 by a preponderance of the evidence." *Small v. Allianz Life Ins. Co. of N. Am.*, 122 F.4th 1182, 1197 (9th Cir. 2024) (internal quotation marks omitted), *cert. denied,* No. 24-1225, 2025 WL 1787755 (U.S. June 30, 2025). This is "a rigorous analysis." *Id.* (quotation omitted). And the failure to meet "any one of Rule 23's requirements destroys the alleged class action." *Rutledge v. Elec. Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir. 1975).

Plaintiffs ask the Court to certify two new provisional classes. 3rd PI Mot. at 10. Each class must meet the requirements of Rule 23. Fed. R. Civ. P. 23(a) (defining the requirements as to "the class"). And even if the Court were to consider these as subclasses, the Ninth Circuit is clear: "each subclass must independently meet the requirements of Rule 23 for the maintenance of a class action." *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981); *accord Sueoka v. United States*, 101 F. App'x 649, 652 (9th Cir. 2004) (unpublished).

Rule 23(a)'s commonality and typicality requirements are interrelated and, in some instances, merge. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 n.5 (2011). Commonality requires that "claims must depend upon a common contention . . . of such a nature that it is capable of classwide resolution." *Id.* at 350. Typicality focuses on how the named plaintiffs' claims relate to those of the potential class members. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). In sum, "[b]oth [requirements] serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Dukes*, 564 U.S. at 349 n.5.

Commonality bars a class definition when "differences in the factual background of each claim will affect the outcome of the legal issue." *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979). Meanwhile,

"the test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation omitted). Adequacy requires named plaintiffs to "fairly and adequately protect the interests of the class without a conflict of interest with the absent class members." Mem. Op. at 56 (quoting *Yates v. NewRez LLC*, 686 F. Supp. 3d 397, 405 (D. Md. 2023)) (cleaned up).

These principles bar, at the very least, inclusion of the entirety of HHS (as opposed to just NIH) in the class definition, as well as NIH terminations (as opposed to suspensions based on the July 31 letter). Moreover, the UCLA suspension action is so distinct from the terminations by other agencies that the Court should also find that Plaintiffs have not shown commonality and typicality.

### A. Typicality, Adequacy, And Commonality Limit the Class Definition to NIH, not all of HHS

First, for the reasons this Court previously laid out, only NIH should be part of any class definition here.

As the Court recognized in its original order, a class cannot be certified using broad strokes disconnected from the situation of any named plaintiff. Mem. Op. at 51-53, 59-60. The Court thus rejected "adequacy and typicality of the named plaintiffs" as to "absent class members whose grants were terminated" based on Executive Orders other than those named plaintiffs had established were responsible for their grant terminations. *Id.* at 52-53. The Court then conformed the class definition to the situation of named plaintiffs.

Similarly, the Court only included the three agencies where named plaintiffs were listed on grants in the class definition. *See id.* 59-60. This Court found that "Plaintiffs have not shown that any 'mandatory' rule required the Other Agency Defendants to adopt a policy of issuing unreasoned form termination letters." *Id.* at 59. "With respect to the First Amendment and APA contrary to law claims, Plaintiffs have not shown that the Other Agency Defendants were required to apply a common rule across the board to UC System grants with respect to the Equity Termination Orders." *Id.* at 60.

Here, Plaintiffs seek to include all of HHS in the class definition—a sprawling, labyrinthian agency with over a dozen siloed, grantmaking components—but have provided only named plaintiffs listed on NIH grants. Even then Plaintiffs have only identified named plaintiffs on grants suspended in one discrete NIH suspension action. *See* 3rd PI Mot. at 5-9. That is not sufficient under both typicality and adequacy to include the over a dozen other components of HHS with entirely separate factual situations and different courses of conduct. *See Wolin*, 617 F.3d at 1175.

The lack of support for typicality and adequacy is illustrated by the situation with FDA, one HHS component. FDA was originally included in Plaintiffs' class definition but, upon factual discovery, was dropped because the named plaintiff's award was a services contract. *See* Pls.' Reply in Supp. 1st Preliminary Injunction at 4 n.4, ECF No. 41. Those developments are exactly why having a relevant named plaintiff is necessary to properly adjudicate an agency's amenability to class treatment. Fact-specific treatment of a particular grantmaking component, and a particular named plaintiff, helps to narrow the scope of litigation and determine whether a particular component is properly subject to an injunction.

That is not the only issue with including all of HHS. Plaintiffs have also entirely failed to show commonality across terminations at other HHS sub-agencies and the NIH suspension action. Indeed, Plaintiffs provide no factual material about terminations at other HHS sub-agencies at all. That glaring lack of detail bars Plaintiffs' omnibus inclusion of HHS in their proposed class definition.

All told, the Court should at the very least conclude that Plaintiffs have failed to meet their burden to show that all of HHS should be added to the proposed class definitions.

### B.    Typicality, Adequacy, and the Good Cause Finding for Modifying the Scheduling Order Limit the Class Definition to Just Grants Affected by the Suspension Letter

Next, Plaintiffs also fail typicality and adequacy as to earlier NIH terminations compared to the July 31 suspension. Each of the three named NIH plaintiffs were listed on grants affected by the NIH suspension letter. 3rd PI Mot. at 5-9. None alleges that they had a grant previously terminated. *Id.* And Plaintiffs do not provide the details of any individual grant termination by NIH prior to the NIH suspension letter. Indeed, Plaintiffs' entire class certification argument revolves around the "single NIH-UCLA" action. *Id.* at 11-15.

As a result, Plaintiffs have not satisfied the typicality and adequacy for pre-July 31 NIH terminations. No named plaintiff alleges a pre-July 31 action was taken for a grant listing them in a relevant position. And Plaintiffs do not provide any specific factual information detailing how a pre-July 31 termination meets typicality, or how named plaintiffs satisfy adequacy for such a termination. It is Plaintiffs' burden to satisfy class certification. That they have failed to provide sufficient factual material in support defeats a broader application to NIH terminations.

Even if the typicality and adequacy inquiry did not bar pre-July 31 terminations, the Court's underlying good cause ruling should do exactly that. The Court found that Plaintiffs had good cause to amend their complaint to cover NIH because Plaintiffs planned to "alleg[e] injuries that occurred after the deadline for amended pleadings had passed," and "it does not seem . . . they could have anticipated what the form letter would have looked like in advance." Trans. (Aug. 26, 2025) 20:14-20:17.

The Court's ruling did not suggest that Plaintiffs would be able to include terminations using letters previously available to them. Indeed, the Court appeared to contemplate that good cause only applied because a new "form letter" was issued that Plaintiffs would not have been able to anticipate "in advance." *Id.* It was on that basis that the Court permitted amendment, and only on the basis set forth by Plaintiffs in the hearing. *Id.* 22:18-22:20 (holding that the Court would "grant Plaintiffs' motion to file an amended complaint along the lines that we discussed").

Accordingly, the Court should enforce its order permitting limited, specific amendment of the scheduling order. It should thus forbid Plaintiffs from including NIH terminations previously known to them.[3]

## C.  The NIH UCLA Suspension Action is Not Common or Typical with the Termination Actions at DoD and DoT

Moving to the commonality and typicality inquiry for the NIH suspension, the Court should deny Plaintiffs' proposed class (combining DoD, DoT, and HHS/NIH) because the single suspension letter is not common or typical with the terminations at DoD and DoT.

---

[3] The Court's order permitting modification of the scheduling for the limited purpose of adding the NIH suspension action should also bar Plaintiffs' broader appeal to include all of HHS in the class definition as opposed to just NIH.

FED. DEFS.' OPP'N TO PLS.' MOT. FOR ADDITIONAL PRELIMINARY INJUNCTION AS TO NIH
CASE NO. 25-CV-4737

The Court preliminarily certified the Equity Termination Class, which applies to "[a]ll grants terminated by Agency Defendants pursuant to Executive Orders 14151 or 14173." Preliminary Injunction ¶ 4a. As the Court explained in its opinion, Executive Order 14151 directs "to the maximum extent allowed by law" termination of "*all* . . . equity-related grants or contracts." Mem. Op. at 18 (quoting 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025)) (internal quotation marks omitted). And Executive Order 14173, as relevant, directs the termination of "all diversity, equity, . . . and like . . . programs[] or activities." *Id.* (quoting 90 Fed. Reg. 8633, 1634 (Jan. 21, 2025)) (internal quotation marks omitted). The Court found commonality and typicality as to the Equity Termination Class because defendants purportedly used similar grant-specific procedures that involved looking for terms such as "diversity, equity, and inclusion." *Id.* at 54-55.

The Court certified the "Form Termination Class," which covers terminations "communicated by means of a form termination notice that does not provide a grant-specific explanation for the termination that states the reason for the change to the original award decision and considers the reliance interests at stake." Preliminary Injunction ¶ 2b. The Court found commonality and typicality as to the Form Termination Class because the named plaintiffs were subject to "*en masse* unreasoned termination of grants" which raised the common question of whether terminations by "form letters without any reasoned explanation, are arbitrary and capricious in violation of the APA." Mem. Op. at 57-59.

Plaintiffs propose to apply both of those prior holdings to DoD, DoT, and HHS/NIH. 3rd PI Mot. at 10. Applying these definitions and findings here, commonality and typicality fail for both proposed classes on the details of the action.

Start with the Equity Termination Class. The NIH suspension letter cited "concerns reported and observed in UCLA programs" as the basis for suspending grants—not the DEIA-related Executive Orders identified by the Court. NIH Suspension Letter at 1. And the suspension letter explains that the action was based on a finding of discriminatory conduct by UCLA; it does not reference the content of any individual grant. *Id.* at 1-3. Meanwhile, the Court's prior holding was based on a finding that the agencies improperly considered the content underlying a grant. Mem. Op. at 54-55. Plaintiffs argue the same for DoD and DoT—that the viewpoint of individual grants was the impetus for termination. 2nd PI Mot. at 16-18.

Moreover, where part of the agency's justification is barring federal funds for discrimination in education, the First Amendment analysis is notably different compared to the grant-content-funding inquiry litigated prior to the injunction. *See, e.g., Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983) (holding that the government has a "fundamental, overriding interest in eradicating racial discrimination in education"). So the underlying First Amendment analysis differs across the various actions that would be covered by the Equity Termination Class.

All told, Plaintiffs have not met their burden to show that the NIH suspension action fits within the DoD, DoT, and HHS/NIH combined Equity Termination Class. Therefore, the Court should not add NIH to that proposed class definition.

The newly proposed Form Termination Class is similarly flawed. The NIH suspension letter is several pages long with detailed reasoning as to the basis for the suspension and citations to relevant sources. NIH Suspension Letter at 1-3. NIH identified UCLA-specific conduct that, in its view, authorized suspension. *Id.* NIH considered reliance interests. *Id.* at 3. This is substantially more detailed than DoD's letters, and even more than the already detailed DoT letters. As a result, NIH's action is sufficiently distinct as to preclude commonality and typicality with the other agencies in the newly proposed class.

Defendants acknowledge that Court has already ruled that it considers a suspension like the one set out by NIH as effectively acting as a termination. *See* Order RE NSF Suspensions at 10-11, ECF No. 96. Nonetheless, Defendants reiterate their earlier objection to that finding. A suspension differs from a termination because it is a temporary change in the funding of a grant rather than the permanent cessation of the agreement. *See* Opp. Order Show Clause, ECF No. 86. Because the other actions in the proposed class are based on terminations, rather than suspensions, Plaintiffs have not met their burden for commonality and typicality, and their request to create a combined DoD, DoT, and HHS/NIH class should be denied. And Defendants maintain their original objections to a combined DoD and DoT class, including numerosity. Opp. 2nd PI Mot. at 10-13, ECF No. 86.

## III.    Even Under the Court's Prior Reasoning, NIH Should Not be Enjoined

Even accepting the Court's earlier reasoning, and class treatment, NIH should not be enjoined. The Form Termination Class does not apply because the APA does not foreclose the suspension. And the

1  Equity Termination Class criteria is inapplicable to this suspension action premised on UCLA's conduct.

2  **A.  The Form Termination Class Should Not Apply Here**

3  As to the Form Termination Class, the APA's committed to agency discretion by law exception

4  bars APA review. Even if APA review is available, NIH's suspension letter is not arbitrary and capricious.

5  *NIH's Suspension was Committed to Agency Discretion by Law*

6  Withdrawal of funding is quintessential agency action "committed to agency discretion by law,"

7  for which the APA does not provide an avenue for review. 5 U.S.C. § 701(a)(2). While the APA

8  establishes a waiver of sovereign immunity and a cause of action for injunctive relief for parties adversely

9  affected by either final agency action or an agency's failure to act, 5 U.S.C. §§ 702, 706(1)-(2), the waiver

10  of sovereign immunity is limited. It does not apply in circumstances where "agency action is committed

11  to agency discretion by law[,]" *id.* § 701(a)(2). Review under the APA therefore is unavailable "if the

12  statute is drawn so that a court would have no meaningful standard against which to judge the agency's

13  exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

14  The Supreme Court has long recognized that an agency's determination of how to allocate

15  appropriated funds among competing priorities and recipients—precisely what Plaintiffs challenge here—

16  is classic discretionary agency action. *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993).

17  The Court previously rejected application of this exception, in large part, because of the agency

18  statutes at issue. Mem. Op. at 34-35. NIH's statutory scheme, however, leave the agency with "the decision

19  about how the moneys" for their program "could best be distributed." *See Milk Train, Inc. v. Veneman*,

20  310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions "clearly require[] a complicated balancing of a number

21  of factors which are peculiarly within [the agency's] expertise." *Id.* at 752 (citations omitted). As a result,

22  the grant funding decisions are committed to the agencies' discretion.

23  Start with the basics. NIH and its constituent institutes make grants to fund research at universities,

24  hospitals, laboratories, and other research institutions. *See* 42 U.S.C. 241(a)(1), 284(b)(1)-(2). Congress

25  supports that research via lump-sum appropriations. For example, in 2024 Congress appropriated $6.5

26  billion for the National Institute of Allergy and Infectious Diseases to carry out the Public Health Service

27  Act "with respect to allergy and infectious diseases." Further Consolidated Appropriations Act, 2024, Pub.

28

FED. DEFS.' OPP'N TO PLS.' MOT. FOR ADDITIONAL PRELIMINARY INJUNCTION AS TO NIH
CASE NO. 25-CV-4737

L. No. 118-47, Div. D, Tit. II, 138 Stat. 656; *see* Full-Year Continuing Appropriations and Extensions Act, 2025, § 1101(a)(8), Pub L. No. 119-4, 139 Stat. 11 (carrying forward HHS's 2024 appropriation into 2025).

NIH's choices in how to allocate that money are discretionary. The Secretary of HHS, in broad terms, is directed to "encourage, cooperate with, and render assistance to other appropriate public authorities, scientific institutions, and scientists in the conduct of, and promote the coordination of, research, investigations, experiments, demonstrations, and studies relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments of man." 42 U.S.C. §241(a). But that does not direct any particular funding decision. Indeed, by statute, NIH "may" provide support "through grants, contracts, and cooperative agreements." *See* 42 U.S.C. 284(b)(2).

Nothing in the portions of the statute directing the irregular creation of strategic plans cabin this discretion. 42 U.S.C. § 282(m). The scheme does not make such plans binding for all future funding decisions. *See id.* So the fact that prior strategic plans reference certain priorities does not provide law to apply here. *Contra* 3rd PI Mot. at 18-19 (suggesting that strategic plans are *sub silentio* incorporated by reference into the statute and therefore any funding decision potentially conflicting with a plan violates statutory authority).

Lump sum appropriations are precisely what the Supreme Court in *Lincoln* determined was committed to agency discretion by law. *Lincoln*, 508 U.S. at 193. And the other uses of discretionary language set forth precisely the "complicated balancing of a number of factors" that takes a funding decision out of APA review. *See id.* Nor does the statute mandate any particular grant on any particular topic be approved and maintained.

The fact that a regulation provides for *termination* in accordance with agency priorities does not limit this discretion. *See* 2 C.F.R. § 200.340. First, there has been no termination by regulation here, merely a suspension permitted by NIH's own regulation. NIH Suspension Letter at 1-3. Indeed, NIH's regulation specifically permits NIH to "[w]holly or partly suspend (suspension of award activities) or terminate the Federal award" for the reasons identified in its letter. 45 C.F.R. § 75.371(c).

Putting that to the side, "the proper ordering of [agency] priorities" is precisely what the Supreme

Court in *Lincoln* emphasized as being squarely committed to agency discretion by law in the funding context. 508 U.S. at 193 (citation omitted). And the mere creation of contractual obligation of lump-sum funding cannot suddenly provide "law to apply" for purposes of defeating this exception. To the extent any such law is generated, it is contractual, an area of law placed within the sphere of the Court of Federal Claims and outside this Court's review. *See supra* Part I. And even if the Court were to conclude that it could review NIH's compliance with its own regulations, Plaintiffs have not set forth any reason to think NIH has violated 45 C.F.R. § 75.371 and any accompanying procedures.

NIH's suspension action is not subject to APA review at all and the Form Termination Class fails as to NIH. At the very least, the broad statutory discretion means the Court can only provide very limited review tied solely to compliance with regulation—which NIH satisfied.

*NIH's Suspension was not Arbitrary and Capricious*

The arbitrary and capricious standard "requires that agency action be reasonable and reasonably explained." *FCC*, 592 U.S. at 423. "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Id.*

Even if this Court can review the merits of Plaintiffs' claim, NIH's detailed suspension letter satisfies the arbitrary and capricious framework.

First, NIH's suspension letter made specific factual findings as to UCLA and informed the institution that NIH was willing to work with UCLA to resolve these concerns and facilitate corrective action. NIH Suspension Letter at 1-3. The letter identified several "specific examples of noncompliance": (1) "illegal race-based preferences in admissions practices;" (2) "fail[ure] to promote a research environment free of antisemitism and bias;" and (3) "discriminat[ion] against and endanger[ing] women by allowing men in women's sports and private women-only spaces." *Id.* NIH subsequently dedicated a paragraph to each identified example of noncompliance with cited sources. *Id.* For example, NIH cited "UCLA's own Task Force to Combat Antisemitism and Anti-Israeli Bias" which, NIH explained, "revealed that Jewish students, faculty, and staff were subjected to threats, assaults, swastika graffiti, and hostile slogans during the 2024 pro-Palestinian encampment." *Id.* at 2. This detailed statement of

1 reasoning suffices to show that NIH's choice to suspend was "reasonable and reasonably explained." *See*
2 *FCC*, 592 U.S. at 423.

3     Second, the agency explicitly considered reliance interests. NIH Suspension Letter at 3. NIH stated
4 that it "has considered UCLA's reliance interests in continued availability of funding under the attached
5 list of grants, and they are outweighed by the concerns identified." *Id.* Nothing more is required. The
6 grantee was always on notice that funding could be suspended based on the terms and conditions of the
7 grant or violation of federal law. *See Smiley v. Citibank (S. Dakota)*, 517 U.S. 735, 742 (1996) (requiring
8 agencies to consider "legitimate reliance"). NIH informed the grantee, UCLA, that it had considered its
9 reliance interests but found the underlying violations sufficient to overcome those interests. NIH
10 Suspension Letter at 3. As a result, reliance interests do not overcome NIH's substantial findings and
11 explanation. *See, e.g., Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1134 (D.C. Cir. 1995) (discussing how the
12 need to explain varies with context).

13     **B.  NIH's Suspension is Also Outside the Equity Termination Class**

14     The Equity Termination Class is similarly inapplicable. First, assuming APA review is permitted,
15 Plaintiffs do not succeed under APA contrary-to-law review. Second, NIH's suspension letter explains
16 that its actions were aimed at UCLA's noncompliance, not the content of any grant.

17     *Plaintiffs Have Not Shown NIH's Actions Were Contrary to Law Under the APA*

18     Plaintiffs first cite the Impoundment Control Act ("ICA"). Under that Act, appropriated funds
19 "shall be made available for obligation" unless the President transmits a special message to Congress and
20 Congress rescinds the appropriation. 2 U.S.C. § 683(b). The Act enforces Congress's power over the purse
21 in relation to the Executive. *See Dabney v. Reagan*, 542 F. Supp. 756, 760 (S.D.N.Y. 1982). It provides
22 for enforcement by the Comptroller General (an official in the Legislative Branch), but does not include
23 private enforcement. The statute is thus generally not enforceable through an APA suit. *Glob. Health*
24 *Council v. Trump*, No. 25-5097, 2025 WL 2480618, at *1 (D.C. Cir. Aug. 28, 2025); *cf. Trump v. Sierra*
25 *Club*, 140 S. Ct. 1 (2019); *id.* at 1 (Breyer, J., concurring in part and dissenting in part) (noting that the
26 majority had stayed a lower court order "rais[ing] novel and important questions about the ability of
27 private parties to enforce Congress' appropriations power").

28  

FED. DEFS.' OPP'N TO PLS.' MOT. FOR ADDITIONAL PRELIMINARY INJUNCTION AS TO NIH
CASE NO. 25-CV-4737

But even if the ICA were enforceable, the suspension of grants is not an impoundment within the meaning of the Act. As the D.C. Circuit has explained, withholding funds within the bounds of a statutory or regulatory program does not qualify as an impoundment or a failure to make funds "available for obligation" under the statute. *See City of New Haven v. United States*, 809 F.2d 900, 907 (D.C. Cir. 1987) (explaining how Congress has previously acknowledged that "the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year" and such delays may result from the "normal and orderly operation of the government" (quoting H.R. Rep. No. 658, 93-658, 93d Cong., 1st Sess. 41 (1971), *reprinted in* 1974 U.S.C. Cong. & Admin. News 3462, 3486-87). Indeed, the alternative would be startling. If any suspension of a contract violated the ICA, the Federal Government would be entirely disabled from ever reordering its funding affairs, or even cutting off funding to entities committing fraud, that have gone bankrupt, or any of the myriad instances where agencies must redirect funding. That is not what the ICA requires, and accordingly, Defendants have not violated it.

Plaintiffs next argue that the governing NIH statutory scheme bars NIH's action because 42 U.S.C. § 282(m) requires irregular generation of strategic plans for NIH. 3rd PI Mot. at 17-19. But, as discussed previously, nothing in the statutory scheme makes those plans binding for all future funding decisions. So there is nothing contrary to "law" about any purported conflict between NIH's suspension action and the plan. And even setting that aside, Plaintiffs have not shown that it is contrary to the strategic plan generally to suspend grants to a specific grantee based on detailed findings that the grantee has facilitated discrimination or violated federal law. *See* NIH Suspension Letter at 1-3. By Plaintiffs' logic, a grantee found to have stolen every dollar of funding would be immunized from suspension for any grants related to the active strategic plan. That makes little sense and is ultimately not the law.

*NIH's Letter Did Not Rely on DEIA-Related Executive Orders or Grant Content*

Finally, Plaintiffs have not shown that NIH relied on the content of any grant in its UCLA suspension action. Instead, the letter invoked UCLA's actions determining that suspension was warranted based on specific conduct by the grantee. NIH Suspension Letter at 1. NIH accordingly concluded that suspension was required to "ensure compliance with applicable federal statutes and regulations, and the terms and conditions of these Federal awards." *Id.*

In order to fit this action into the Equity Termination Class, Plaintiffs argue the suspension was "based on DEI-related viewpoints HHS attributes to UCLA and imputes to its researchers." 3rd PI Mot. at 16. Plaintiffs provide no basis for this imputation claim and it does not fit the plain text of the relevant letter. NIH's actions are directly tied to specific activities at UCLA. NIH did not reference any viewpoint in any grant, nor is there any indication that the DEIA content of any grant was the basis for these suspensions. Indeed, the whole stated purpose of the suspension is that it was categorical to UCLA generally, regardless of the content of specific grants. NIH Suspension Letter at 1-3. Nor do the grants listed by the NIH named plaintiffs suggest some kind of focus on DEIA content. *See* 3rd PI Mot. at 5-9.

Plaintiffs have not shown that NIH is "deliberately penalizing certain 'dangerous ideas,'" of the kind the Court found convincing in issuing its original injunction. Mem. Op. at 18; *see also id.* at 19 ("Defendants terminated pre-existing grants *en masse* across the federal government for touching on prohibited topics."). And even if all that were not true, NIH has substantial discretion under the First Amendment to ensure that it is not funding discriminatory behavior in educational environments. *See Bob Jones Univ.*, 461 U.S. at 604. Plaintiffs have not demonstrated that this overriding federal interest has been overcome.

Finally, Defendants reiterate that the lack of evidence suggesting that suspensions were based on the content of the grants defeats standing as well. The Court concluded previously that standing was proper because, "Plaintiffs are exactly the individuals whom the First Amendment and the APA aim to protect. They are the ones who engaged in the protected speech, and their research is the target of the unreasoned arbitrary termination of funding." Mem. Op. at 44. That is not the case here for the First Amendment claim. Other than Plaintiffs' imputation argument, for which it provides no basis, Plaintiffs concede that any First Amendment rights would belong to UCLA. 3rd PI Mot. at 16. But Plaintiffs do not explain why Plaintiffs should be able to assert any First Amendment right belonging to UCLA. *See Kowalski*, 543 U.S. at 129. Thus, at the very least in this distinct scenario involving this suspension of grants to UCLA premised on UCLA's conduct, Plaintiffs lack standing to bring their First Amendment claim.

**IV.    Injunctive Relief Should Be Stayed Pending Appeal and Be Accompanied by a Bond**

To the extent the Court expands injunctive relief, Defendants respectfully request that such relief

1  be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a

2  minimum, administratively stayed for a period of seven days to allow the United States to seek an

3  emergency, expedited stay from the court of appeals if an appeal is authorized.

4       Defendants also respectfully request that any additional injunctive relief accompany a bond under

5  Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary

6  restraining order only if the movant gives security in an amount that the court considers proper to pay the

7  costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A bond

8  is appropriate here given that any preliminary relief would potentially mandate that the Executive spend

9  money that may be lost forever once distributed. *California*, 145 S. Ct. at 969.

10                                    **CONCLUSION**

11       For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion

12  for a preliminary injunction as to HHS, or at the very least that the Court limit it to just NIH and

13  to only those UC researchers listed on grants subject to the July 31 suspension action.

14

15  DATED: September 10, 2025                    Respectfully submitted,

16                                              BRETT A. SHUMATE
                                                Assistant Attorney General
17                                              Civil Division

18                                              ERIC J. HAMILTON
19                                              Deputy Assistant Attorney General

20                                              JOSEPH E. BORSON
21                                              Assistant Branch Director

22                                              */s/ Jason Altabet*

23                                              JASON ALTABET (Md. Bar No. 2211280012)
                                                Trial Attorney, U.S. Department of Justice
24                                              Tel.: (202) 305-0727
                                                Email: jason.k.altabet2@usdoj.gov
25
                                                KATHRYN BARRAGAN (D.C. Bar No. 90026294)
26                                              Trial Attorney, U.S. Department of Justice
                                                Civil Division, Federal Programs Branch
27                                              1100 L Street, N.W.
                                                Washington, D.C. 20005
28

Tel.: (202) 598-7696
Email: kathryn.e.barragan@usdoj.gov

*Attorneys for the United States*