Erwin Chemerinsky (*pro hac vice*)
echemerinsky@law.berkeley.edu
Claudia Polsky (CA Bar No. 185505)
cpolsky@law.berkeley.edu
U.C. BERKELEY SCHOOL OF LAW
Law Building
Berkeley, CA 94720-7200
Telephone: 510.642.6483

Elizabeth J. Cabraser (CA Bar No. 83151)
ecabraser@lchb.com
Richard M. Heimann (CA Bar No. 63607)
rheimann@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000

Anthony P. Schoenberg (CA Bar No. 203714)
tschoenberg@fbm.com
Donald E. Sobelman (CA Bar No. 184028)
dsobelman@fbm.com
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, CA 94104
Telephone: 415.954.4400

*Attorneys for Plaintiffs and the Proposed Classes*
[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEETA THAKUR, *et al.*, | Case No. 3:25-cv-4737 |
| Plaintiffs, | |
| v. | **REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION AS TO DEPARTMENT OF HEALTH AND HUMAN SERVICES/NATIONAL INSTITUTES OF HEALTH** |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |

46686\20616197.1

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................2

I.    THE COURT SHOULD PROVISIONALLY CERTIFY A DOD/DOT/NIH-HHS
      CLASS, AND MAY UTILIZE SUBCLASSES TO THE EXTENT IT DEEMS
      APPROPRIATE .......................................................................................................2

      A.    The Court May Limit the Class to NIH as a Sub-Agency of HHS ...........................2

      B.    The DOD/DOT/NIH-HHS Class Should Not Exclude Researchers with
            NIH Grants Terminated Before or After the July 31 Letter ......................................3

      C.    The Proposed Classes Meet Commonality and Typicality Requirements .................4

            1.    The Court Should Certify a DOD/DOT/NIH-HHS Form
                  Termination Class ........................................................................................5

            2.    The Court Should Certify a DOD/DOT/NIH-HHS Equity
                  Termination Class ........................................................................................6

      D.    Alternatively, the Certification of Subclasses Is Appropriate ...................................7

II.   THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION AS TO
      NIH/HHS .................................................................................................................8

      A.    The Preliminary Injunction is Warranted Under This Court's and the Ninth
            Circuit's Previous Rulings. .........................................................................................8

      B.    Plaintiffs Are Likely To Succeed On Their APA Claims. .........................................9

            1.    NIH's Grant Terminations Are Contrary to Law Under the APA. ...............9

            2.    NIH's Grant Terminations Are Arbitrary and Capricious Under the
                  APA. ..............................................................................................................9

                  a.    No Reasoned Explanation .................................................................10

                  b.    No Consideration of Reliance Interests ............................................11

            3.    NIH's Actions Are Reviewable and Not Committed to Agency
                  Discretion. ...................................................................................................12

      C.    Plaintiffs Are Likely To Succeed On Their First Amendment Claim ......................12

      D.    The Balance of Equities and Public Interest Favor Plaintiffs. ................................14

III.  THE COURT SHOULD DENY DEFENDANTS' REQUEST FOR A STAY, AND
      NO ADDITIONAL BOND IS NECESSARY. ........................................................15

CONCLUSION .................................................................................................................15

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*303 Creative LLC v. Elenis,*
   600 U.S. 570 (2023) ....................................................................................................13,14

5

6

*Almanzar v. Home Depot U.S.A., Inc.,*
   2023 WL 4373979 (E.D. Cal. July 6, 2023) ...................................................................7

7

*Am. Public Health Ass'n v. NIH,*
   No. 25-10787-WGY, 2025 WL 1822487 (D. Mass. July 2, 2025)....................................8,13,15

8

9

*Am. Timber & Trading Co. v. First Nat'l Bank of Oreg.,*
   690 F.2d 781 (9th Cir. 1992)..........................................................................................7

10

11

*Betances v. Fischer,*
   2024 WL 3848485 (S.D.N.Y. Aug. 16, 2024) ...............................................................8

12

13

*Bob Jones University v. United States,*
   461 U.S. 574 (1983) .......................................................................................................14

14

*Doe #1 v. Trump,*
   No. 25-807, 2025 WL 553485 (9th Cir. Feb. 19, 2025)................................................15

15

16

*Elrod v. Burns,*
   427 U.S. 347 (1976) .......................................................................................................15

17

*NIH v. Am. Pub. Health Ass'n,*
   No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025) .................................................15

18

19

*Nw. Env't. Def. Ctr. v. Bonneville Power Admin.,*
   477 F.3d 668 (9th Cir. 2007)..........................................................................................11

20

21

*Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco,*
   688 F.2d 615 (9th Cir. 1982)..........................................................................................7

22

*Parsons v. Ryan,*
   754 F.3d 657 (9th Cir. 2014)..........................................................................................2

23

24

*Rodriguez v. Hayes,*
   591 F.3d 1105 (9th Cir. 2019)........................................................................................2

25

*Sidibe v. Sutter Health,*
   333 F.R.D. 463 (N.D. Cal 2019) ...................................................................................2

26

27

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College,*
   600 U.S. 181 (2023) .......................................................................................................14

28

*Thakur v. Trump*,
    No. 25-4249, 2025 WL 2414835 (9th Cir. Aug. 21, 2025)................................................. *passim*

*Thakur v. Trump*,
    No. 25-CV-04737, 2025 WL 1734471 (N.D. Cal. Jun. 23, 2025) (Dkt. 55:
    Order for Prelim. Inj.) ...................................................................................................8

*TikTok Inc. v. Garland*,
    604 U.S. 56 (2025) .........................................................................................................13

*Trout Unlimited v. Pirzadeh*,
    1 F.4th 738 (9th Cir. 2021)............................................................................................12

**Statutes and Regulations**

2 C.F.R. §§ 200.340, 200.341, 200.343, and 200.345...........................................................12

42 U.S.C. § 2000d(1)(1)........................................................................................................14

**Court Rules**

Fed. R. Civ. P. 23 ..........................................................................................................1,2,7,8

**Other Authorities**

*'McCarthy Era' Move*, Guardian (Sept. 12, 2025),
    https://www.theguardian.com/us-news/2025/sep/12/uc-berkeley-trump-
    administration-antisemitism ...........................................................................................4

Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs
    and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025),
    https://www.federalregister.gov/documents/2025/01/29/2025-01953/ending-
    radical-andwasteful-government-dei-programs-and-preferencing................................6

Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based
    Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025),
    https://www.federalregister.gov/documents/2025/01/31/2025-02097/ending-
    illegaldiscrimination-and-restoring-merit-based-opportunity .....................................6

NIH, NIH-Wide Strategic Plan, Fiscal Years 2021-2025 at 3 (2020),
    https://www.nih.gov/sites/default/files/2025-01/strategic-plan-fy2021-2025.pdf ......................9

# INTRODUCTION

On July 31, 2025, NIH issued a single form letter to UCLA with a list of almost 500 grants that the government decided to terminate immediately. Just like the form termination letters sent by NSF, NEH, and EPA (as well as DOD and DOT), the letter failed to provide any reasoned bases for terminating the individual grants, did not meaningfully consider the reliance interests at stake, and was aimed at suppressing disfavored viewpoints. The issues presented in Plaintiffs' motion for a preliminary injunction and for class certification are therefore identical to those already decided by this Court and the Ninth Circuit.

Defendants' opposition is mostly a reprise of arguments that this Court and the Ninth Circuit have already considered and explicitly rejected in prior decisions. To the extent Defendants purport to make new arguments with respect to HHS, those also fail.

On class certification, NIH terminated grants in ways substantially similar to DOD and DOT, as well as the Agency Defendants covered by the existing NSF/NEH/EPA Classes. The rationale animating the Court's earlier Order provisionally certifying those two classes compels the same result here. To the extent the NIH terminations present slightly different facts, those differences at most justify a subclass pursuant to Fed. R. Civ. P. 23(c)(5) and 23(d).

Defendants' arguments regarding the proposed preliminary injunction fare no better. NIH failed to explain how or why the agency's  priorities supposedly changed or how the individual grants violated those purported new priorities, and it gave no individualized consideration to the researchers' reliance interests. The termination was therefore arbitrary and capricious for all the same reasons this Court already articulated with respect to the NSF, NEH, and EPA terminations. Plaintiffs' First Amendment claim applies with equal force to NIH, because it terminated grants based on the viewpoints in the grant projects, pursuant to the Equity and DEI Executive Orders. NIH's July 31 letter also made clear that its basis for the terminations were those same viewpoint motivated ends: the Trump administration's distaste for the pursuit of diversity and equity on UCLA's campus and, explicitly, in UCLA's research environment. Plaintiffs therefore request that the Court provisionally certify the HHS Equity and Form Termination classes under Rule 23(b)(2), and issue a preliminary injunction as to NIH/HHS identical to the Court's prior order.

## ARGUMENT

### I. THE COURT SHOULD PROVISIONALLY CERTIFY A DOD/DOT/NIH-HHS CLASS, AND MAY UTILIZE SUBCLASSES TO THE EXTENT IT DEEMS APPROPRIATE

NIH engaged in a common course of conduct towards UC researchers, resulting in the termination of nearly 500 grants through a form letter. While this conduct may harm different researchers in different ways, it is exactly the type of common conduct Rule 23(b)(2) is intended to address. *See, e.g.*, *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014) (explaining Rule 23(b)(2) requirements are satisfied when "members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole"); *Rodriguez v. Hayes*, 591 F.3d 1105, 1123 (9th Cir. 2019); *Sidibe v. Sutter Health*, 333 F.R.D. 463, 499 (N.D. Cal 2019). Without provisional class certification and a preliminary injunction, hundreds of researchers would need to bring individual suits, and nothing would stop NIH from behaving in the same manner again.

The question here is not whether a class should be certified, but what form that certification should take. NIH's conduct is sufficiently similar to that of the Department of Transportation and Department of Defense (and the other Agency Defendants, for that matter) to warrant including UC researchers with NIH grants in both the Form Termination and Equity Termination classes, as explained below. However, if the Court finds any merit in Defendants' arguments distinguishing NIH's actions from that of other agencies, the remedy is to create subclasses under Fed. R. Civ. P. 23(c)(5) and 23(d), not to deny certification entirely.

### A. The Court May Limit the Class to NIH as a Sub-Agency of HHS

Plaintiffs do not object to Defendants' request to limit the class definitions to grants terminated by NIH (as well as DOD and DOT), and to exclude other distinct sub-agencies of HHS, such as FDA, at this time. However, HHS itself must remain a defendant, as it is likely that HHS coordinated with or directed NIH to mass terminate grants. To the extent HHS and NIH are distinct entities, it is likely both played a role in the grant terminations at issue. Discovery concerning communications and decision-making about grant terminations must include both NIH and HHS.

46686\20616197.1

**B.    The DOD/DOT/NIH-HHS Class Should Not Exclude Researchers with NIH
Grants Terminated Before or After the July 31 Letter**

Plaintiffs propose a class period from and after January 20, 2025—the same date as the other proposed and provisionally certified classes—because the proposed NIH class representatives suffered the same injuries caused by the same course of conduct from Defendants, which began in or around January 20, 2025, and, which, absent injunctive relief, is continuing. The specific date that a class representative suffered the relevant injury does not define the class, so long as the requirements of class certification are met and the class representative is adequate. *See e.g.*, Dkt. 112, Second Amended Complaint ("SAC") ¶ 304 (Plaintiff Philliou's NEH grant terminated April 1, 2025); SAC ¶ 217 (Plaintiff Green Nylen's EPA grant terminated May 12, 2025); SAC ¶¶ 353-354 (Plaintiff Foreman's NSF grants terminated April 18 and 25, 2025); SAC ¶ 406 (Plaintiff Berman's DOD grant terminated February 28, 2025); SAC ¶ 473 (Plaintiff Handy's DOT grant terminated May 2, 2025).

Defendants take the position that class treatment should be limited only to NIH grants affected by the July 31 suspension action, excluding grants terminated before that date as well as any prospective relief. Dkt. 126 ("Opp'n") at 13-14. With respect to pre-July 31 NIH terminations, Defendants renew the failed argument made in their Response to Plaintiffs' Request for Supplemental NIH Briefing (Dkt. 103) and maintain that Plaintiffs already had an opportunity and thus should be barred from including NIH terminations "previously known to them" in the HHS-NIH class definition. Opp'n at 14; *cf.* Dkt. 103 at 3 (arguing "Plaintiffs had both the incentive and opportunity to add a named NIH plaintiff and declined to do so"). This is incorrect.

As Plaintiffs explained at the August 26 hearing, Plaintiffs could not add an NIH plaintiff during the time permitted to amend the complaint because Defendants were simultaneously reinstating NIH grants, and only took additional NIH termination action once Plaintiffs' deadline for amending the complaint had expired. Defendants also misquote the Court's good cause ruling in support of their argument, stating that the Court limited Plaintiffs' amendment as to NIH to those "alleg[ed] injuries that occurred after the deadline for amended pleadings had passed." Opp'n at 14 (quoting the Court). Not so. Rather, as part of its good cause holding, the Court found

1  that the "*three new plaintiffs* [] are alleging injuries that occurred after the deadline for amended

2  pleadings had passed"—meaning that the allegations of the new representative plaintiffs were not

3  untimely. *See* Hrg. Trans. (Aug. 26, 2025) at 20.

4      With respect to prospective relief, Defendants offer no arguments for why prospective

5  relief for HHS-NIH Plaintiffs should be denied, when such relief has been granted and is in effect

6  under the Court's preliminary injunction as to NEH, NSF, and EPA. If anything, the new NIH

7  grant terminations against UCLA demonstrate the need for prospective relief because, as

8  Defendants themselves state, "non-enjoined agencies c[an] take additional actions on grants." Dkt.

9  103 at 3. The Head of DOJ's "antisemitism task force" publicly stated Defendants' intent to target

10  the UC system with "massive lawsuits." SAC ¶ 644. Such action now appears to be imminent

11  against UC Berkeley.[1] As explained at length in Plaintiffs' First PI Motion, prospective relief

12  should be granted for the HHS-NIH class.

13      **C.    The Proposed Classes Meet Commonality and Typicality Requirements**

14      What happened to UCLA researchers with NIH grants—what Defendants describe as a

15  "single suspension letter" incident, Opp'n at 14—is not nearly as distinct from what has happened

16  to UC researchers who received grants from other Defendant Agencies as Defendants make it out

17  to be. NIH identified a viewpoint it disliked and attempted to silence that viewpoint by mass

18  terminating grants via a form letter that (a) was directed to the university, (b) listed 500 grants to

19  terminate *en masse*, and (c) failed to meaningfully consider the researchers' reliance interests. This

20  is precisely what happened to researchers whose grants were terminated by other Defendant

21  Agencies. *See, e.g.*, Dkt. 12, Exs. H & I (NSF letters listing several grants to terminate).

22      The Court should provisionally certify the DOD/DOT/NIH-HHS class. To the extent the

23  Court is concerned about minor differences in fact pattern for the NIH terminations, such issues

24  can be easily addressed through subclasses as explained below. The Court should not allow the

25  government to evade the Preliminary Injunction by slightly modifying its conduct to accomplish

26

27  ---

[1] *See, e.g.*, Sam Levin, *UC Berkeley Shares 160 Names With Trump Administration in 'McCarthy Era' Move*, Guardian (Sept. 12, 2025), https://www.theguardian.com/us-news/2025/sep/12/uc-

28  berkeley-trump-administration-antisemitism.

the same results that the Court has enjoined.

> **1.    The Court Should Certify a DOD/DOT/NIH-HHS Form Termination Class**

As this Court found when concluding that NSF violated the Preliminary Injunction through its action at UCLA, NIH's conduct fits squarely within the Form Termination class definition and does not preclude commonality and typicality with DOD and DOT. *See* Dkt. 96 at 10-11 ("NSF Order"). The Form Termination Class encompasses UC researchers whose grants are "terminated by means of a form termination notice that does not provide a grant-specific explanation for the termination that states the reasons for the change … and considers the reliance interests at stake, from and after January 20, 2025."

Here, NIH issued a form letter that terminated nearly 500 grants without any grant-specific explanation or consideration of reliance interests. It does not matter that the letter called the terminations "suspensions." NSF Order at 5 ("[I]ndefinite suspensions differ from a termination in name only."). And simply stating that "NIH has considered UCLA's reliance interests in continued availability of funding," *see* Dkt. 118-1 at 4 (July 31, 2025 letter), does not "constitute a reasoned explanation under the APA" or "reflect any grant-specific consideration of the harms to the researchers." NSF Order at 8. Claiming the suspensions "are in response to 'race discrimination,' 'antisemitism,' and 'bias' at UCLA" likewise does not cure NIH's deficiencies. *See* NSF Order at 7.

Plaintiffs have satisfied commonality and typicality. The common question has already been identified by the Court: "whether the indefinite, unreasoned halting of funding was arbitrary and capricious under the APA." NSF Order at 10. The Court likewise concluded that the fact the form letter used a different template does not preclude commonality with researchers who received a different form letter. *Id.*; *see also id.* at 11 ("Courts routinely permit plaintiffs who received one version of a form letter to represent those who received other versions of the form letters that were deficient for the same reasons.").[2] Defendants make no meaningful argument

---

[2] As described below in Section II.B.2, UC researchers with NIH grants previously received form termination letters nearly identical to those sent by other Defendant Agencies, citing changes in

46686\20616197.1

against including NIH researchers in the Form Termination Class. *See* Opp'n at 16.

A Form Termination subclass is therefore not necessary. However, if the Court decides to create a subclass related to NIH's conduct at UCLA, the subclass should not be limited to the July 31, 2025 action or to the UCLA campus. It should encompass all similar situations in which the government uses a form letter to mass terminate grants and harm researchers by targeting specific campuses. The government should not be able to use essentially the same form letter to mass terminate grants at other UC campuses. *See* SAC ¶ 644 (Trump Administration indicating intent to "go after" the UC system).

### 2.  The Court Should Certify a DOD/DOT/NIH-HHS Equity Termination Class

The Equity Termination class includes UC researchers whose grants were "terminated pursuant to Executive Orders 14151 or 14173, from and after January 20, 2025." Executive Order 14151 concerns "DEI programs" and "preferencing."[3]  Executive Order 14173 concerns "ending illegal discrimination."[4] As Plaintiffs explained—and Defendants do not seriously contest—the NIH-UCLA letter evidences the same viewpoint discrimination expressed in these Executive Orders. *See* Dkt. 117 at 13-14. Nearly 500 NIH grants were terminated as punishment for UCLA's purported viewpoints on DEI-related issues. *See* Dkt. 118-1 at 2 (citing as reasons for termination "illegal affirmative action," "bias," and "discriminat[ion]"). That the targeted viewpoint was the campus's, rather than the individual grant's, does not significantly alter the common question: whether the government violated the First Amendment by terminating

_____

"agency priorities" as the reason for termination. *See* Dkt. 48-6 at Ex. F (NIH Exemplar Termination Letter). Plaintiffs have explained why they did not add NIH class representatives earlier. *See supra*.

[3] Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025), https://www.federalregister.gov/documents/2025/01/29/2025-01953/ending-radical-andwasteful-government-dei-programs-and-preferencing.

[4] Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633, (Jan. 21, 2025), https://www.federalregister.gov/documents/2025/01/31/2025-02097/ending-illegaldiscrimination-and-restoring-merit-based-opportunity.

46686\20616197.1

1    research grants. Other common questions—such as who directed such action and why—are

2    likewise common. The proposed class representatives are typical of all affected NIH researchers.

3        **D.        Alternatively, the Certification of Subclasses Is Appropriate**

4            Should the Court conclude that the NIH-HHS action against UCLA does not fall within the

5    current Equity Termination class definition, Plaintiffs propose a subclass of UC researchers

6    whose grants appear to have been terminated because of the viewpoints expressed by the *UC*

7    *campus* at which the researcher is employed. Again, such a subclass should not be limited to the

8    July 31 action or the UCLA campus, but should encompass any other similar action by NIH.

9    Repetition of the action taken against UCLA at other UC campuses may be imminent and would

10   directly harm UC researchers through massive grant terminations.[5] That the government has

11   altered its strategy to evade litigation—using a new form letter, with viewpoint discrimination

12   against an entire campus—should not defeat class certification.

13           Rule 23 provides for the amendment of class certification orders as an action unfolds and

14   for the designation of "subclasses that are each treated as a class under this rule." Fed. R. Civ. P.

15   23(c)(5). Subclasses are utilized for two purposes: (1) to cure intraclass conflicts; and (2) to "assist

16   a court in managing complex litigation in a variety of circumstances in which subclasses would

17   promote efficiency." § 7:29. Subclasses—Overview of Types, 3 Newberg and Rubenstein on

18   Class Actions (6th ed. 2022). Here, there are no intraclass conflicts, and the Court may utilize its

19   discretion to deploy Rule 23(c)(5) in conjunction with Rule 23(d), "which grants a court

20   significant leeway in managing a class suit" and authorizes such "permissive subclassing." *Id.*

21   Ordinarily, each subclass must meet all Rule 23(a) and 23(b)(2) requirements. *See Officers for*

22   *Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 630 (9th Cir.

23   1982).[6] In this case, each does. The Court already required one or more class representatives for

24

25   _____

     [5] *See* Levin, *supra.*

26   [6] *But see Almanzar v. Home Depot U.S.A., Inc.*, 2023 WL 4373979, *6 n.4 (E.D. Cal. July 6,

27   2023) (citing *Am. Timber & Trading Co. v. First Nat'l Bank of Oreg.*, 690 F.2d 781, 787 n.5 (9th
     Cir. 1992)) (permissive subclassing under Rule 23(d) does not require separate satisfaction of

28   Rule 23(a) requirements).

each agency, ensuring adequacy of representation under Rule 23(a)(4). Subclasses of researchers within the Equity and Form Termination classes whose grants were terminated in actions directed against their UC campus, and even agency-specific or incident specific subclasses would meet Rule 23(a)(1) impracticability of individual joinders; Rule 23(a)(2) commonality; and Rule 23(a)(3) typicality of claims requirements, as well Rule 23(b)(2). As the accompanying Declaration of Claudia Polsky demonstrates, investigation into UC DOT grants reveals more than sufficient numerosity for that agency. As to an NIH subclass, the same is true. Five hundred grants were halted. Agency-specific or even incident-specific subclasses, while not necessary in a Rule 23(b)(2) class context, could simplify case management in terms of organizing the conduct of summary adjudication and trial, and Plaintiffs have no objections to such structuring as a case management measure. *Betances v. Fischer*, 2024 WL 3848485, at *7 (S.D.N.Y. Aug. 16, 2024).

## II.    THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION AS TO NIH/HHS.

### A.    The Preliminary Injunction is Warranted Under This Court's and the Ninth Circuit's Previous Rulings.

The Opposition initially purports to "renew, preserve, and expand on the arguments that the Court previously considered." *See* Opp'n at 7. But rather than raise any new arguments, or "expand" on those the Court previously considered, as they contend, Defendants simply rehash, in abbreviated form, the exact same arguments that both this Court and the Ninth Circuit have already considered and explicitly rejected. In particular, the Opposition argues that: (1) this Court lacks jurisdiction over the APA claims under the Tucker Act; (2) Plaintiffs lack standing; (3) the terminations were not final agency actions; (4) APA review should be deferential; (5) the terminations do not violate the First Amendment; and (6) the balance of equities weighs in favor of the government. *Id.* at 7-10. All of these issues have been decided in Plaintiffs' favor by both of the Courts that considered them. *See Thakur v. Trump*, No. 25-CV-04737, 2025 WL 1734471 (N.D. Cal. Jun. 23, 2025) (Dkt. 55: Order for Prelim. Inj.); NSF Order (Order vacating NSF grant suspensions); *Thakur v. Trump*, No. 25-4249, 2025 WL 2414835 (9th Cir. Aug. 21, 2025) (Order denying Defendants' request for stay pending appeal). The only new issue raised (in passing) relates to the impact of the Supreme Court's ruling in *NIH* concerning the Tucker Act, which the

1    Parties have separately briefed. Plaintiffs therefore incorporate their briefing and arguments

2    already submitted on these issues, and refer the Court to its Orders—as well as the Ninth Circuit's

3    Order—rejecting Defendants' same arguments.[7]

4          **B.**      **Plaintiffs Are Likely To Succeed On Their APA Claims.**

5              **1.**      **NIH's Grant Terminations Are Contrary to Law Under the APA.**

6          This Court has already found that Defendants' actions were contrary to law under the APA

7    "because . . . terminations were based on Plaintiffs' pursuit of the very goals that Congress had

8    mandated." See Dkt. 54 at 22 ("Order Granting PI"). The government does not meaningfully

9    address Plaintiffs' argument that NIH's grant terminations are similarly violative.

10         NIH's congressionally approved research priorities required NIH to prioritize "improving

11   minority health and reducing health disparities" and "enhancing women's health."[8] *See* Dkt. 117 at

12   24 (Mot.for Prelim. Inj. and Class Certification as to HHS/NIH ("Mot.")). NIH terminated grants

13   because they "include[d] amorphous equity objectives" which NIH characterized as "antithetical

14   to the scientific inquiry [sic]." *See* Dkt. 118 (Cabraser Decl. ISO Mot.) at Ex. B 118-2 (NIH Letter

15   terminating grant). NIH's grant suspension letter to UCLA indicates that hundreds of NIH grants

16   were suspended because of UCLA's "'holistic review' admission process," which considers race

17   and ethnicity among other factors, and UCLA's policy of allowing transgender students to use

18   facilities aligned with their gender. Dkt. 113-6 , Ex. F at 3-4 (July 31, 2025 NIH Suspension Letter

19   to UCLA). NIH's termination of grants *because* those grants advance "equity" or because a

20   grantee institution's policies advance "equity" is contrary to law under the APA. The government

21   does not even attempt to argue otherwise. Opp'n at 27-28.

22             **2.**      **NIH's Grant Terminations Are Arbitrary and Capricious Under the APA.**

23

24         The NIH grant terminations at issue here suffer from the same flaws as the other Agency

---

25   [7] Plaintiffs note that the Court's rulings to date have been limited to Plaintiffs' APA and First

26   Amendment claims. The Court has not yet issued any determination regarding Plaintiffs' other claims, including that the grant terminations violated the separation of powers, the Impoundment

27   Control Act, and Plaintiffs' due process rights.

28   [8] NIH, NIH-Wide Strategic Plan, Fiscal Years 2021-2025 at 3 (2020), https://www.nih.gov/sites/default/files/2025-01/strategic-plan-fy2021-2025.pdf.

46686\20616197.1

1  Defendant terminations that the Court previously enjoined: they were carried out via a form letter

2  with a list of grants, without any consideration of the individual researchers' reliance interests, all

3  because of disfavored viewpoints. For the same reasons this Court enjoined the other terminations,

4  the NIH terminations are also likely to be found arbitrary and capricious.

### a.    *No Reasoned Explanation*

6      NIH argues that the terminations were not arbitrary and capricious because NIH's letter

7  listed reasons that applied to UCLA *as an institution*. Opp'n at 19. This is the exact same

8  argument that this Court already rejected when it held that similar NSF terminations of UCLA

9  research grants violated the preliminary injunction. *See* NSF Order at 8 ("The form letters fail to

10  provide a 'grant-specific explanation' for why the award has been terminated, as required by the

11  Preliminary Injunction.").

12      Just like the NSF and other Agency Defendant terminations, the NIH terminations at issue

13  here contained no details whatsoever about the individual grants or why each specific grant was

14  terminated, which NIH concedes. *See* Opp'n at 19 ("NIH's suspension letter made specific factual

15  findings as to UCLA[.]"). Accordingly, as this Court has already held, it is "impossible to

16  determine which item in the disjunctive list of 'priorities' and 'reasonable causes' resulted in the

17  termination of the grant, much less *why the specific project* was found to be incompatible with the

18  Agency's priorities" (Order Granting PI at 27 (emphasis added)), or in noncompliance with federal

19  requirements, policies, and procedures. *See id.* at 14 ("[N]or does any letter mention any specific

20  offending features of the terminated grant."). Furthermore, "the termination of previously awarded

21  grants is a per se change in agency position, requiring a reasoned explanation of the change."

22  Order Granting PI at 29. Just like the other defendants, NIH has made no attempt to provide any

23  reasoned explanation for the change to the original award decisions, as required by the APA. *See*

24  *id.* ("While an agency may change its view of what is in the public interest, it must do so in

25  accordance with the law and must supply a reasoned analysis indicating that prior policies and

26  standards are being deliberately changed, not casually ignored.") (citing *Nw. Env't. Def. Ctr. v.*

27  *Bonneville Power Admin.*, 477 F.3d 668, 687 (9th Cir. 2007) (internal quotation marks omitted)).

28  / / /

1

**b.**    *No Consideration of Reliance Interests*

2        NIH also argues that the terminations were not arbitrary and capricious because NIH

3   considered UCLA's reliance interests, as evidenced by a single sentence in the letter stating that

4   UCLA's "reliance interests . . . are outweighed" by NIH's identified concerns. *See* Opp'n at 20.

5   But NIH is conflating its duties to the specific UCLA research grantees with its duties to UCLA.

6   This, again, is the exact same argument that this Court already rejected when it held that the NSF

7   letter containing an identical reliance statement violated the preliminary injunction. *See* NSF

8   Order at 8 ("[T]he letters do not provide any grant-specific explanation of NSF's consideration of

9   the researchers' reliance interests, in violation of the Preliminary Injunction.").

10       Second, the single sentence does nothing to demonstrate that NIH has given any

11  "individualized consideration" to class members' "significant reliance interests" as required. Order

12  Granting PI at 14-15, 30. As this Court explained previously, "Agency Defendants terminated

13  grants for active programs, some of which have been receiving federal funding for decades. The

14  terminated grants were being used to pay Plaintiffs' and their staff's salaries, and to fund graduate

15  student programs, field research, and community outreach." *Id.* at 30. So too here. "These facts

16  indicate significant reliance interests that cannot simply be ignored," *id.*, and there is no evidence

17  that NIH took any of these factors into consideration before terminating the grants. *See id.* at 14-15

18  ("[I]t appears that terminations occurred without individualized consideration of the extent to

19  which the projects continued to serve stated agency priorities, or the reliance interests of those

20  whose careers and livelihoods were upended[.]").

21       Finally, NIH has "not introduced any evidence indicating that they considered other

22  important factors, including the waste that would result from projects halted before completion, or

23  the loss to the public of critical research that will go unpublished." Order Granting PI at 30. Once

24  again, NIH's "blanket statement regarding UCLA's interests does not reflect any grant-specific

25  consideration of the harms to the researchers from interrupting ongoing multi-year research,

26  wasting resources by halting funding midstream, or forcing staffing changes." NSF Order at 8.

27  ///

28  ///

PL'S REPLY ISO MOTION FOR PRELIM. INJUNCTION & CLASS CERTIFICATION AS TO HHS/NIH

**3. NIH's Actions Are Reviewable and Not Committed to Agency Discretion.**

The government rehashes its argument that grant terminations are "committed to agency discretion by law" under Section 701(a)(2) of the APA and therefore unreviewable. This Court and the Ninth Circuit have repeatedly rejected this position. *See* Order Granting PI at 33-35; *Thakur*, 2025 WL 2414835 at *4 (Ninth Circuit Order).

The government's argument that NIH's statutory scheme is distinguishable from that of other agencies is without merit. Opp'n at 24-26. Both this Court and the Ninth Circuit have held that 2 C.F.R. Sections 200.340, 200.341, 200.343, and 200.345 "provide a meaningful standard by which courts may review the agencies' exercise of discretion." *Thakur*, 2025 WL 2414835 at *4 (Ninth Circuit Order); *see also* Order Granting PI at 34-35. The government cites no statutory provision suggesting NIH's discretion over terminations is unbounded: even if it could, NIH's actions could "nonetheless be reviewed" because "regulations or agency practice provide a meaningful standard by which this court may review [NIH's] exercise of discretion." *See Thakur*, 2025 WL 2414835 at *4 (quoting *Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 751 (9th Cir. 2021)).

**C. Plaintiffs Are Likely To Succeed On Their First Amendment Claim.**

The Opposition focuses too narrowly on NIH/HHS's July 31 letter. As discussed in Section I.B and explained during the hearing on Plaintiffs' Motion to Amend, Plaintiffs' request was triggered by, but not limited to, the UCLA terminations. Plaintiffs amended their Complaint on behalf of *all UC researchers*, and with respect to *all NIH terminations* effected pursuant to President Trump's executive orders, including the DEI and Equity Orders. *See* Mot. at 1 (seeking "to add HHS to the pending preliminary injunction" and new plaintiffs "as class representatives for the DOD/DOT/HHS/NIH Form Termination and Equity Termination Classes").

On information and belief, the complete administrative record will show that NIH followed the same course of conduct as the other agencies subject to the Equity Termination injunction: it identified grants for termination based on DEI and equity topic and word searches. Indeed, the limited record to date shows that NIH did so. *See* Dkt. 118 (Cabraser Decl. ISO Mot.) at Ex. B 118-2 (NIH Letter terminating grant on the basis of "amorphous equity objectives" and "so-called

diversity, equity and inclusion"). The District Court in *American Public Health Association v. National Institutes of Health* also found that NIH terminated grants this way pursuant to President Trump's DEI and Equity Orders. *See generally Am. Public Health Ass'n v. NIH*, No. 25-10787-WGY, 2025 WL 1822487, *8-14 (D. Mass. July 2, 2025) (especially at *14: holding the HHS/NIH directives "are a final agency action on their evolving 'eradication' of DEI, gender identity, and other topics ostensibly under the Executive Orders").

Regardless, Defendants are incorrect to argue that the letter to UCLA does not implicate the Equity Termination Class. Defendants assert in a subheading that "*NIH's Letter Did Not Rely on DEIA-Related Executive Orders*" without support. Opp'n at 21. To the contrary, the letter's first two "examples of noncompliance" apparently precipitating termination are that "UCLA engages *in racism*, in the form of illegal affirmative action" and that "UCLA fails to promote *a research environment* free of antisemitism *and bias*." Dkt. 118-1, Ex A (July 31, 2025 letter) (emphasis added). These bases plainly implicate the DEI and Equity Orders, which this Court held violate the First Amendment when relied on as a basis for grant terminations. Order Granting PI at 20. DHHS/NIH's vague reference to "bias" in "research environment[s]" in particular only amplifies the profound chilling effect on the researchers in the class. These bases confirm that Defendants' terminations are "based on DEI-related viewpoints [which] imputes to [the] researchers" in that research environment. Mot. at 16. Accordingly, Defendants are incorrect to argue that NIH is not "deliberately penalizing certain 'dangerous ideas.'" Opp'n at 22. Plaintiffs have shown that the July 31 letter takes direct aim at DEI and equity principles in Defendants' typical coded synonyms: "racism," "illegal affirmative action," and "bias."

Nor are Defendants correct that they are entitled to "substantial discretion under the First Amendment to ensure that [they] are not funding discriminatory behavior in educational environments." Opp'n at 22. This Court and the Ninth Circuit have already rejected this argument after finding that Defendants likely engaged in viewpoint discrimination. Order Granting PI at 20; *Thakur*, 2025 WL 2414835 at *7. Defendants must meet strict scrutiny, which requires proving a compelling interest and least restrictive means to achieve it. *See TikTok Inc. v. Garland*, 604 U.S. 56, 67, 70 (2025). No such justification exists here. Indeed, in *303 Creative LLC v. Elenis*, the

1  Supreme Court held that a government's claimed interest in combatting discrimination is not

2  sufficient to meet strict scrutiny. 600 U.S. 570, 592, 596 (2023) (public accommodations law

3  violates First Amendment: "no public accommodations law is immune from the demands of the

4  Constitution," and "no government may 'interfer[e]'" with the petitioner's "desired message").

5       Defendants claim that the grant terminations are permissible because they are combatting

6  discrimination at UCLA, relying on *Bob Jones University v. United States*, 461 U.S. 574 (1983).

7  Opp'n at 16, 22. But in *Bob Jones*, there was no dispute that the university was discriminating in

8  violation of federal law. 461 U.S. at 605. Here, there are merely conclusory assertions of

9  discrimination in Defendants' letter. That is surely not sufficient to meet the demanding test of

10 strict scrutiny. Moreover, these assertions—that UCLA was pursuing diversity through holistic

11 admissions and providing services to transgender students—violate no law or Supreme Court

12 decision, and Defendants cite none in the letter. For example, nothing in *Students for Fair*

13 *Admissions, Inc. v. President and Fellows of Harvard College* prevents schools from pursuing

14 diversity as an objective, so long as they do not give a preference based on race. 600 U.S. 181,

15 230-231 (2023). And no civil rights law prohibits schools from providing services to transgender

16 students. As such, this case is completely different from *Bob Jones*, where there was no dispute as

17 to the university's racial discrimination and no question that it violated the law.[9]

18       **D.      <u>The Balance of Equities and Public Interest Favor Plaintiffs.</u>**

19       The government repeats the same rejected argument that Plaintiffs' harms are "necessarily

20 financial." Opp'n at 17. As this Court and the Ninth Circuit have held, grant terminations result in

21 harms to Plaintiffs' careers, reputations, and research, as well as harm to scientific advancement

22 and harm to taxpayers through the loss of research halted midstream. Order Granting PI at 47-48;

23 Thakur, 2025 WL 2414835 at *8 (Ninth Circuit Order). And, crucially, the "loss of First

24 Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

25 _____

26 [9] If Defendants claim that they are terminating grants because UCLA is discriminating in violation
   of the law, there are procedures that it must follow under 42 U.S.C. § 2000d(1)(1). Defendants

27 have not even remotely complied with these procedures—notice, hearing, findings of fact, notice
   to both houses of Congress, terminations limited to programs found to discriminate. That does not

28 meet the requirements of strict scrutiny.

46686\20616197.1

1  injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

2         The government also contends that *NIH v. Am. Pub. Health Ass'n*, No. 25A103, 2025 WL

3  2415669, at *1 (U.S. Aug. 21, 2025), controls this Court's weighing of the equities and that the

4  government will be harmed by paying out funds it cannot recover. Opp'n at 17. As Plaintiffs

5  explained in their recent briefing, that case is distinguishable. Dkt. 121 at 10-11 (Supplemental

6  Brief Re *NIH*). First, as the Ninth Circuit noted, in this case "the Government does not

7  meaningfully contest . . . that there are 'existing mechanisms to recoup funds.'" *Thakur*, 2025 WL

8  2414835, at *8 n.8. And, unlike in *NIH*, Plaintiffs do not have the resources to continue their

9  research if their grants are terminated or remain indefinitely suspended, and there is no indication

10 that there is any source of funds to replace the federal money. Finally, although the University of

11 California and the State of California are highly unlikely to replace federal funds, if ever there

12 were a final court determination that money provided by HHS must be refunded, the University

13 and the State have the resources to satisfy a judgment reflecting such a determination.

14 **III.    THE COURT SHOULD DENY DEFENDANTS' REQUEST FOR A STAY, AND NO ADDITIONAL BOND IS NECESSARY.**

15

16        Defendants' single-sentence, unsupported stay request should be denied because they once

17 again provide no reason for it, and thus "have not carried their burden of showing that they are

18 likely to face 'irreparable injury … during the period before the appeal is decided.'" Opp'n at 22-

19 23; Order Granting PI at 62 (quoting *Doe #1 v. Trump*, No. 25-807, 2025 WL 553485, at *3 (9th

20 Cir. Feb. 19, 2025)). The Court should also deny Defendants' request for a bond, but if granted, it

21 should be nominal, as required in the Court's original Order, "because this litigation is brought to

22 protect the public interest and ensure compliance with federal law." Order Granting PI at 61.

23                                    **CONCLUSION**

24        For all of these reasons, Plaintiffs respectfully request that the Court grant their Motion to

25 provisionally certify the DOD/DOT/NIH-HHS Form Termination and Equity Termination

26 Classes; appoint plaintiffs Marcus Horwitz, Alexander van der Bliek, and Rhonda Voskuhl as

27 additional Class Representatives; appoint the undersigned Counsel to represent these classes; and

28 issue an additional preliminary injunction applicable to NIH/HHS as well as DOD and DOT.

46686\20616197.1

1    Dated: September 15, 2025              By:     /s/ *Donald E. Sobelman*

2                                          Anthony P. Schoenberg (CA Bar No. 203714)
                                           tschoenberg@fbm.com
3                                          Donald E. Sobelman (CA Bar No. 184028)
                                           dsobelman@fbm.com
4                                          Dylan M. Silva (State Bar No. 306363)
                                           dmsilva@fbm.com
5                                          Linda S. Gilleran (CA Bar No. 307107)
                                           lgilleran@fbm.com
6                                          Kyle A. McLorg (CA Bar No. 332136)
                                           kmclorg@fbm.com
7                                          Katherine T. Balkoski (CA Bar No. 353366)
                                           kbalkoski@fbm.com
8                                          FARELLA BRAUN + MARTEL LLP
                                           One Bush Street, Suite 900
9                                          San Francisco, CA 94104
                                           Telephone: 415. 954.4400
10
                                           Elizabeth J. Cabraser (CA Bar No. 83151)
11                                         ecabraser@lchb.com
                                           Richard M. Heimann (CA Bar No. 63607)
12                                         rheimann@lchb.com
                                           Kevin R. Budner (CA Bar No. 287271)
13                                         kbudner@lchb.com
                                           Annie M. Wanless (CA Bar No. 339635)
14                                         awanless@lchb.com
                                           Nabila M. Abdallah (CA Bar No. 347764)
15                                         nabdallah@lchb.com
                                           LIEFF CABRASER HEIMANN &
16                                         BERNSTEIN, LLP
                                           275 Battery Street, 29th Floor
17                                         San Francisco, CA 94111
                                           Telephone: 415.956.1000
18

19                                         Erwin Chemerinsky (*pro hac vice*)
                                           echemerinsky@law.berkeley.edu
20                                         Claudia Polsky (CA Bar No. 185505)
                                           cpolsky@law.berkeley.edu
21                                         U.C. BERKELEY SCHOOL OF LAW
                                           Law Building
22                                         Berkeley, CA 94720-7200
                                           Telephone: 510.642.6483
23
                                           *Attorneys for Plaintiffs and the Proposed Classes*
24

25

26

27

28