UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEETA THAKUR, et al., | Case No. 25-cv-04737-RFL |
| Plaintiffs, | |
| v. | **ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION AS TO ADDITIONAL AGENCY DEFENDANTS, AS MODIFIED** |
| DONALD J. TRUMP, et al., | |
| Defendants. | Re: Dkt. No. 76, 117 |

## I.    INTRODUCTION

Plaintiffs are individual researchers across the University of California. The university itself has not joined this lawsuit. In June, this Court entered a classwide preliminary injunction prohibiting three federal agencies from terminating research grants, *en masse*, through unreasoned form letters with little or no explanation, and from cutting off funds to stop research involving forbidden topics such as diversity, equity, and inclusion. After the government asked the Ninth Circuit to stay that order, the Ninth Circuit denied that request and entered a 26-page order rejecting the government's reasoning. The Supreme Court has directed that trial courts give deference to higher courts' interim rulings. Accordingly, although the Ninth Circuit's ruling is "not conclusive as to the merits," it must "inform" this Court's determination of how to "exercise its equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025).

Plaintiffs now seek the same preliminary injunction as to three more federal agencies who have likewise engaged in *en masse* funding cuts via similar form letters. The reasoning

adopted by the Ninth Circuit applies equally to the three additional agencies. The government nonetheless contends that a later emergency stay from the Supreme Court in another case requires all grant termination challenges to be heard as contract disputes in the Court of Federal Claims ("CFC"). (Dkt. No. 122 at 2[1] (citing *NIH v. American Pub. Health Ass'n* ("*APHA*"), 145 S.Ct. 2658 (2025)).) The government argues that *APHA* bars the district court from hearing this entire case, even if there is no other court that can hear Plaintiffs' claims.

This Court declines to adopt the government's radical extension of the Supreme Court's emergency stay order. *APHA* did not consider, and thus did not address, the argument made by Plaintiffs here: that they are not parties to the grant agreements and could not obtain *any* relief in the Court of Federal Claims, which can only provide remedies to the contracting parties. Nor did *APHA* consider First Amendment claims, which are well-established to be beyond the Court of Federal Claims' jurisdiction over contract disputes. As government counsel admitted at oral argument, the government's position is that it could flagrantly violate the rights of researchers— even by terminating the federal funding of all Black researchers, or every researcher with an Asian last name—and the researchers would have nowhere to sue to undo those wrongs, unless their universities decided to sue in the Court of Federal Claims. Nothing in the Supreme Court's *APHA* order adopts that extreme view. To the contrary, Justice Barrett emphasized that the Supreme Court did *not* adopt an approach that "leaves the plaintiffs without any prospect of relief" because the Court of Federal Claims "has the authority to fully adjudicate the claims over which it has jurisdiction." *APHA*, 145 S.Ct. at 2662 n. 1 (Barrett, J., concurring in part).

The district courts are the only forum where the UC researchers could defend their constitutional and statutory rights, and the Ninth Circuit has already determined that they may bring their claims here. This Court will not shut its doors to them. For the reasons detailed below, Plaintiffs' motions for a preliminary injunction and provisional class certification are **GRANTED**, as modified.

---

[1] Citations to page numbers refer to ECF pagination.

## II.    BACKGROUND

### A.    Procedural History

Over the last several months, in response to a series of executive orders, federal agencies began to terminate federal research funding, *en masse*, through form letters that simply state that the grants no longer meet "agency priorities."  Researchers at the University of California ("UC"), a leading public research institution, lost over $324 million in grant funding as a result of these *en masse* funding cuts.  Plaintiffs are UC researchers whose federal funding was terminated, and have filed suit on behalf of themselves and a putative class of UC researchers challenging the abrupt and unexplained funding cuts.

The Court already found that Plaintiffs were likely to succeed on the merits of several of their Administrative Procedure Act ("APA") and First Amendment claims, certified a Form Termination Class and an Equity Termination Class, and granted a preliminary injunction as to grants by the EPA, NEH, and NSF.  *Thakur v. Trump*, No. 25-cv-04737-RFL, 2025 WL 1734471 (N.D. Cal. June 23, 2025) ("PI Order").[2]  With regard to the other Agency Defendants named in the lawsuit, no class was certified because no named Plaintiff had experienced a grant termination by those agencies.  *Id.* at *30.  The Preliminary Injunction Order is currently on appeal.  (Dkt. No. 64.)[3]

Defendants EPA and NEH sought to stay the preliminary injunction while the appeal was pending, but the request was denied.  *Thakur v. Trump*, 148 F.4th 1096, 1101 (9th Cir. 2025).  With respect to the First Amendment claim, the Ninth Circuit found that "the current record suggests that the government aimed at the suppression of speech that views DEI, DEIA, and environmental justice favorably."  *Id.* at 1109.  As a result, the "government ha[d] failed to make a strong showing that the district court abused its discretion when it concluded that" Plaintiffs

---

[2] Capitalized terms that are not defined herein were defined in the PI Order.

[3] On August 12, 2025, NSF's immediate and indefinite suspension of grants funding researchers at University of California, Los Angeles ("UCLA") was found to be in violation the Preliminary Injunction, and NSF was ordered to restore funding.  *Thakur v. Trump*, No. 25-cv-04737-RFL, 2025 WL 2325390, at *5 (N.D. Cal. Aug. 12, 2025) ("NSF Order").

were "likely to succeed on the merits of [their] First Amendment claim." *Id*. at 1108. With respect to the APA arbitrary and capricious claim, the Ninth Circuit found that "the [termination] letters left the recipients guessing as to the agencies' rationale, and there is no evidence that the agencies considered reliance interests before terminating the grants." *Id.* at 1107. The Ninth Circuit held that the government failed to "ma[k]e a strong showing" that it was likely to succeed on the merits of its challenges to Plaintiffs' arbitrary and capricious claim. *Id.*

Plaintiffs have now filed a Second Amended Complaint adding five additional named Plaintiffs whose research funding has been summarily terminated by Defendants Department of Defense ("DoD"), Department of Transportation ("DoT"), and Department of Health and Human Services ("HHS"), through its sub-agency National Institutes of Health ("NIH"). (Dkt. No. 112.) They allege that critical years-long research has ground to a halt, including a Tuberculosis Vaccination Project and analysis of patterns of combat in the Israel/Gaza conflict. The unrebutted evidence is that staff and graduate student layoffs have occurred or are imminent, and that much of Plaintiffs' research will be lost if funding is not restored.

Plaintiffs now bring Motions for Preliminary Injunction and Provisional Class Certification as to DoD, DoT, and HHS-NIH. (Dkt. Nos. 76, 117.) They seek to certify Second Form Termination and Equity Termination Classes identical to the previously certified classes, except that they would encompass the UC researchers whose grants were terminated by DoT, DoD, and HHS-NIH. (*Id.*) They also seek a preliminary injunction on behalf of the additional classes. (*Id.*)

### B.    Department of Defense Grants

Since at least 1958, DoD has contracted with educational and research institutions to carry out its research mission of promoting national security.[4] One way DoD funds research activities is through the Minerva Research Institute ("MRI"). The MRI's mission is to "brings

---

[4] Department of Defense Reorganization Act of 1958, Pub. L. No. 85-599 § 9, 72 Stat. 514, 520 (1958).

together universities and other research institutions around the world" and "emphasize[] questions of strategic importance to U.S. national security policy."[5]

Dr. Eli Berman focuses his research on economic development in fragile environments, and research projects under his direction have received millions of dollars of MRI research funding since 2009. (Dkt. No. 69 ¶¶ 8, 16–17.) On August 28, 2023, Berman's team received DoD grant funding for a project titled "Integrated Deterrence: Episodic Analysis," to develop a game theoretic model for analyzing patterns of combat in the Israel/Gaza conflict. (*Id.* ¶¶ 19, 23.) The three-year research project was intended to "continue and expand" on Berman's earlier MRI-funded projects. (*Id.* ¶¶ 17–18, 22.) However, on March 3, 2025, which was nearly two years into the grant, DoD summarily terminated funding to the project via three short documents that provided the following rationale for the terminations:

> In line with recent Presidential executive orders, OUSD R&E has determined that your grant award no longer effectuates [MRI's] program goals or DoD priorities. As such, we are letting you know that you will soon be hearing from the grants officer responsible for your award about terminating it.

(Dkt. No. 69-4 at 2 (February 28, 2025 email from Air Force Office of Scientific Research ("AFOSR") Program Officer).)

> The Government intends to terminate this award under the authority of 2 CFR 200.340(a)(4). The Government hereby directs that you cease activities under this Federal assistance award and plan to take all reasonable steps to minimize the incurrence of costs allocable to the work while the termination is coordinated.

(Dkt. No. 69-5 at 2 (February 28, 2025 letter from AFOSR Chief of Contracts).)

> The subject grant award no longer effectuates the program goals or agency priorities as found in 2 CFR 200.340(a)(4) as incorporated into the DoD Research and Development General Terms and Conditions for grants by reference. . . As a result, the period of performance is reduced from 36 months to 18 months . . .

(Dkt. No. 69-6 at 2 (Grant/Cooperation Agreement Modification signed March 3, 2025).) No

---

[5] https://grants.gov/search-results-detail/351388. Unless otherwise noted, all websites were last visited September 18, 2025.

further explanation was provided as to why Berman's research project did not satisfy DoD's "goals" or "priorities," and no analysis was provided as to the reliance interests of Berman and his team, the waste resulting from terminating funding mid-stream, or the impact to the public from the loss of the research. The declaration from DoD in the record in this case states that DoD "grants were terminated in several rounds" (Dkt No. 77-3 ¶ 6), and an internal spreadsheet indicates that the termination was pursuant to "Executive Order 15169, Reevaluating and Realigning United States Foreign Aid, 20 January 2025," but does not explain why Berman's study constitutes "foreign aid." (Dkt. No. 87-1.) Nothing else in the record indicates why Berman's funding, in particular, was terminated.

Plaintiffs have identified three public statements made by DoD around the time when the wave of grant terminations occurred that included Berman's funding. In a press release on March 4, 2025, a DoD spokesperson was quoted as stating that DoD was working "hand in hand with the DOGE team" to terminate "$80 million in wasteful spending" and the "DOGE team is just getting started."[6] The March 4 press release identified "Secretary [of Defense] Pete Hegseth's focus on lethality, meritocracy, accountability, standards and readiness," as well as DEI-related speech, as the basis for the terminations.[7] On March 7, 2025, DOD announced in a press release that it was "scrapping its social science research portfolio as part of a broader effort to ensure fiscal responsibility and prioritize mission-critical activities."[8] The March 7 press release attributed the terminations to "President Trump's Executive Orders and Secretary Hegseth's priorities in his January 25, 2025, 'Message to the Force' and January 29, 2025, Memorandum, 'Restoring America's Fighting Force.'"[9] The Message to the Force addresses

---

[6] https://www.war.gov/News/News-Stories/Article/Article/%204096431/initial-doge-findings-reveal-80-million-in-wasteful-spending-atdod/.

[7] *Id.*

[8] https://www.war.gov/News/Releases/Release/article/4113076/pentagon-culls-social-science-research-prioritizes-fiscal-responsibility-and-te/.

[9] *Id.*

DoD's plan to "focus on lethality, meritocracy, accountability, standards, and readiness,"[10] while the Memorandum states that DEI policies "are incompatible with the values of DoD."[11] Finally, on March 20, 2025, Hegseth issued another memorandum, directing the immediate termination of over $360 million in grants "in areas of Diversity, Equity, and Inclusion and related social programs, climate change, social science, Covid-19 pandemic response, and other areas [] that are not aligned with DoD priorities."[12]

As a result of the abrupt termination, Berman was forced to significantly slow his research and instead focus on writing grant applications to try to replace the lost funding. (Dkt. No. 69 ¶ 33.) Berman lost income, and his team has had to release graduate and undergraduate research assistants from employment and could not take on a postdoctoral fellow. (*Id.*)

C.     **Department of Transportation Grants**

DoT is a federal agency established to protect and enhance the safety, adequacy, and efficiency of the nation's transportation system and services. 49 U.S.C. § 101(a). The DoT's enabling statute requires "the development of transportation policies and programs that contribute to providing fast, safe, efficient, and convenient transportation at the lowest cost consistent with those and other national objectives, including the efficient use and conservation of the resources of the United States." *Id.* In 2021, Congress passed the Infrastructure Investment and Jobs Act ("IIJA"). 23 U.S.C § 101. The IIJA requires DoT to award grants to proposals that address certain enumerated research priorities including, "promoting safety" and "preserving the environment." 49 U.S.C. § 6503(c)(1). Congress requires that the Secretary of Transportation's grant selection for "University Transportation Centers ['UTC'] programs" be

---

[10] https://www.war.gov/News/Releases/Release/Article/4040940/secretary-hegseths-message-to-the-force/.

[11] https://media.defense.gov/2025/Jan/29/2003634987/-1/-1/1/RESTORING-AMERICAS-FIGHTING-FORCE.PDF.

[12] https://media.defense.gov/2025/Mar/20/2003673531/-1/-1/0/continuingelimination-of-wasteful-spending-at-the-department-of-defense.pdf. It is not clear from the memorandum if the $360 million in terminations includes the $80 million in previously terminated grants.

based in part on the recipient's "demonstrated commitment" to developing the transportation workforce through "outreach activities to attract new entrants into the transportation field, including women and underrepresented populations." 49 U.S.C. § 5505(b)(4)(B)(v)(II).

Dr. Susan Handy is a the Director of the National Center for Sustainable Transportation ("NCST"), a UTC program, and researches the "relationship[] between transportation and land use, particularly the impact of land use on travel behavior, and [] strategies for reducing automobile dependence." (Dkt. No. 70 ¶¶ 3, 5, 9, 11.) NCST has been a recipient of DoT funding since its founding in 2013, and in 2023 began receiving an annual award of $4 million year. (*Id.* ¶¶ 11, 16–17.) In 2023, Handy, as a principal investigator, received five years of DoT grant funding for NCST's research related to "electrification, alternative fuels, air quality, and environmental justice." (*Id.* ¶¶ 19, 21.) Handy also received DoT funding for research through a separate subaward. (*Id.* ¶¶ 28–29.) On May 2, 2025, Handy's grant funding was terminated. DoT provided form letters with the following rationale for the termination:

This letter provides notice that the U.S. Department of Transportation (DOT), Office of the Secretary is terminating your federal grants, 69A3552344814 and 69A3552348319, the National Center for Sustainable Transportation, effective immediately. The Office of the Secretary is doing so in accordance with the terms of the grant agreement and relevant regulations.

At the time your grant was issued, the grant agreement and applicable regulations authorized termination by "the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 CFR § 200.340(a)(2). DOT's priorities presently include:

- promoting traditional forms of energy and natural resources to the greatest extent possible,
- ensuring that taxpayer dollars are used efficiently in ways that maximally benefit the American people and improve their quality of life, and
- ceasing to promote divisive diversity, equity, and inclusion initiatives that discriminate on the basis of race, national origin, or another protected characteristic.

Having individually reviewed your grant in light of DOT's priorities, the Office of the Secretary has determined that your grant is inconsistent with the priorities listed above. Specifically, your Consortium named on the application, the National Center for Sustainable Transportation, submitted an application in response to the FY22 University Transportation Center Notice of Funding Opportunity that serves as the grant's Statement of Work (SOW) and is incorporated into the grant agreement. The NCST addresses "accelerating reductions in greenhouse gas emissions while simultaneously enhancing transportation equity." NCST's objectives "to prioritize disadvantaged communities," "reduce impacts associated with infrastructure…for disadvantaged populations," and "support a Transportation Equity and Environmental Justice Advisory Group" are inconsistent with the DOT's priority to cease promoting DEI initiatives that discriminate on the basis of race, national origin, or another protected characteristic. C2SMARTER's promise to "investigate MBUF long-term equity impacts," "adopt a quantitative equity screening component," and "build interactive workshops on transportation equity" is similarly inconsistent with this priority. Its EV work ("equity of access to electric vehicles and charging infrastructure") promotes discriminatory considerations and "green new deal" principles, inconsistent with DOT's priorities. The SOW's cited work is inconsistent with DOT's priorities. Because your grant "no longer effectuates … agency priorities," 2 CFR § 200.340(a)(2), the Office of the Secretary is terminating your grant.

(Dkt. No. 70-6 at 2.)  The letter does not explain why reducing emissions or infrastructure impacts in "disadvantaged communities" constitutes a "DEI initiative[] that discriminate[s] on the basis of race, national origin, or another protected characteristic."

      With respect to the subaward, DoT sent a termination letter with materially identical language with the exception of the below text:

> Having individually reviewed your grant in light of DOT's priorities, the Office of the Secretary has determined that your grant is inconsistent with the priorities listed above.  Specifically, your Consortium named on the application, the Pacific Southwest Region University Transportation Center (PSRUTC), submitted an application in response to the FY22 University Transportation Center Notice of Funding Opportunity that serves as the grant's Statement of Work (SOW) and is incorporated into the grant agreement.  The PSRUTC promotes equitable access and furthers research themes regarding "uneven transportation access across PSR's enormously diverse region, particularly among transportation-disadvantaged travelers and communities."  PSRUTC's research priorities that "deepen commitments to diversifying the transportation workforce; draw a more diverse pool of students; and focuses on Equity" are inconsistent with DOT's priority to cease promoting DEI initiatives that discriminate on the basis of race, national origin, or another protected characteristic.  Furthermore, PSRUTC's EV statement ("perspective on equity in the transition to electric vehicles") and environmental justice themes ("addressing EJ problems in the goods movement system") promote discriminatory consideration and "green new deal" principles that are inconsistent with DOT's priorities.  The SOW's cited work is inconsistent with DOT's priorities.  Because your grant "no longer effectuates … agency priorities," 2 CFR § 200.340(a)(2), the Office of the Secretary is terminating your grant.

(Dkt. No. 70-8 at 3.)  The letter does not explain why researching "uneven transportation access" among "transportation-disadvantaged travelers and communities" or "diversifying the transportation workforce" constitutes a "DEI initiative[] that discriminate[s] on the basis of race, national origin, or another protected characteristic."  DoT also issued public statements that it was "advancing President Donald Trump's agenda to rescind woke policies" and ensure that all DoT "policies align with the Administration's priorities."[13]  Transportation Secretary Sean Duffy signed a "'Woke Rescission' Memorandum," committing DoT to "identify and eliminate" programs that promote, among other things "environmental justice, and other partisan objectives."[14]  In a press release, Duffy identified NCST and other UTC program funding as

---

[13] https://www.transportation.gov/briefing-room/us-transportation-secretary-sean-duffy-takes-action-rescind-woke-dei-policies-and.

[14] *Id.*

"woke university grants . . . used to advance a radical DEI and green agenda."[15]

In addition to income loss, Handy states that she and many "other researchers funded by these grants at the time of cancellation have been forced to significantly slow both research progress and dissemination." (Dkt. No. 70 ¶ 34.) "As of the terminations of the grants, 79 research projects [that] were in progress [] may not be completed." (*Id.*) Researchers have had to "lay off or find new sources of funding for more than 40 graduate and undergraduate research assistants" and have lost nearly "5 full time staff positions." (*Id.*) Finally, Handy asserts that the "terminations put an end to research that is critical to ensuring the environmental and financial sustainability of the nation's transportation system and enhancing its ability to serve the needs of the U.S. population." (*Id.* ¶ 36.)

### D.    Department of Health and Human Services Grants

The mission of HHS is to "enhance the health and well-being of all Americans, by providing for effective health and human services and by fostering sound, sustained advances in the sciences underlying medicine, public health, and social services."[16] One of the sub-agencies of HHS is NIH, whose purpose is to conduct and support biomedical and public health research.[17] NIH funds external research pursuant to its congressional authorization. *See* 42 U.S.C. §§ 241(a)(3), 282, 284. NIH must fund research "relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments," including by offering "grants-in-aid to universities . . . other public and private institutions, and to individuals." 42 U.S.C. § 241(a)(3). As the record in this case reflects, NIH grants generally provide several years of continuous funding for selected research projects, after a highly competitive selection process. Once granted, NIH funding has historically been stable and predictable. Testimony in another case suggested that "NIH terminated fewer than six grants

---

[15] https://www.transportation.gov/briefing-room/us-transportation-secretary-sean-p-duffy-defunds-woke-university-grants.

[16] https://www.hhs.gov/about/index.html.

[17] https://www.nih.gov/.

midstream" between 2012 and 2025. *APHA*, 145 S.Ct. at 2667 (Jackson, J., concurring in part).

Drs. Rhonda Voskuhl and Alexander van der Bliek both study neurodegenerative diseases. Voskuhl has received continuous NIH funding since 1997, across 40 grants, and has never before had an NIH grant terminated. (Dkt. No. 113 ¶ 7.) Van der Bliek has also had "multiple cycles of four- or five-year NIH grants" and had never before experienced a grant funding disruption. (Dkt. No. 114 ¶ 7.) On April 29, 2020, NIH funded a five-year research project, led by van der Bliek, titled "Control of Calcium Flux and Mitochondrial Fission by the Charcot Marie Tooth Disease Protein Mfn2." (*Id.* ¶ 9.) On May 8, 2023, NIH funded an eight-year research project, led by Voskuhl, titled "Neurodegeneration Underlying Distinct Disabilities in Multiple Sclerosis Using a Cell-Specific, Region-Specific, and Sex-Specific Approach." (Dkt. No. 113 ¶¶ 9, 14.)

Dr. Marcus Horwitz leads research "focused on intracellular parasitism, especially the immunobiology of the etiologic agents of Legionnaires' disease, leprosy, tuberculosis ['TB'], and tularemia," and has developed several vaccines. (Dkt. No. 115 ¶ 5.) Horwitz has been a "co-investigator or principal investigator on . . . 34 research grants from the [NIH] since 1985" and has never before had his funding suspended or terminated. (*Id.* ¶¶ 5–6.) On November 29, 2017, NIH funded Horwitz's "TB Vaccine Project," and subsequently extended funding through November 30, 2025. (*Id.* ¶¶ 7–9.) On February 27, 2024, NIH funded Horwitz's "Latent TB Treatment Project," and subsequently extended funding through January 2027. (*Id.* ¶¶ 12–14.)

On July 31, 2025, HHS and NIH notified UCLA, via a form letter, of its *en masse*, immediate, and indefinite suspension of grants, including the NIH grants funding Voskuhl, van der Bliek, and Horwitz's research projects. (Dkt. No. 113 ¶ 21; Dkt. No. 114 ¶ 15; Dkt. No. 115 ¶¶ 10, 15; *see also*, *e.g.*, Dkt. No. 113-6 at 3–11.) The July 31 letter stated that the suspensions were for the purpose of "address[ing] concerns reported and observed in UCLA programs and ensure compliance with applicable Federal statutes and regulations and the terms and conditions of these Federal awards." (Dkt. No. 113-6 at 3.) The "[n]oncompliance" was based on the following alleged conduct:

- UCLA engages in racism, in the form of illegal affirmative action;
- UCLA fails to promote a research environment free of antisemitism and bias;
- UCLA discriminates against and endangers women by allowing men in women's sports and private women-only spaces.

(*Id.*)  NIH stated that it had "considered UCLA's reliance interests in continued availability of funding under the attached list of grants and they are outweighed by the concerns identified above."  (*Id.* at 5.)  No explanation was provided of how the reliance interests were considered or why they were outweighed as to any particular grant.  UCLA was instructed to "cease all activities on the awards and immediately discontinue drawing down funds."  (*Id.*)

The record reflects that over the past seven months HHS and NIH have terminated or frozen thousands of research grants, including many grants to UC recipients, in addition to the UCLA grants.[18]  For example, in this case NIH provided an exemplar termination letter that it sent to UC researchers on February 28, 2025, which states that the award at issue "no longer effectuates agency priorities."  (Dkt. No. 118-2 at 2; *see also* Dkt. No. 118 ¶ 3.)  In the letter, NIH asserts that "[r]esearch programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, . . . provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness."  (*Id.* at 2–3.)  The exemplar letter also states that "diversity, equity, and inclusion ('DEI') studies are often used to support unlawful discrimination."  (Dkt. No. 118-2 at 3.)  The exemplar letter does not explain why the particular project was found to be inconsistent with NIH priorities or constitutes forbidden DEI research, nor does it contain any discussion of reliance interests or waste of resources.

When Voskuhl, van der Bliek, and Horwitz's funding was suspended, their research was immediately halted or substantially slowed.  (Dkt. No. 113 ¶ 24; Dkt. No. 114 ¶¶ 20–21; Dkt. No. 115 ¶¶ 11, 16, 20.)  They are unable to purchase supplies and will have to let staff go.  (*Id.*)

---

[18] https://taggs.hhs.gov/Content/Data/HHS_Grants_Terminated.pdf.

Some projects will soon lose test animals, and Plaintiffs assert that they will have to let graduate students go, and will be unable to hire students for future terms. (*Id.*)

## III.    PRELIMINARY INJUNTIVE RELIEF

"[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). In order to obtain a preliminary injunction, Plaintiffs must establish that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Id.* at 20. When the nonmoving party is the government, the final two factors merge. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

### A.    Likelihood of Success on the Merits

#### 1.    District Court Jurisdiction

"The APA confers a general cause of action upon persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984) (quoting 5 U.S.C. § 702). But the APA's waiver of sovereign immunity "does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam) (quoting 5 U.S.C. § 702). As relevant here, the Tucker Act commits to the exclusive jurisdiction of the CFC all actions "founded . . . upon any express or implied contract with the United States" exceeding $10,000. 28 U.S.C. § 1491(a)(1). The determinative jurisdictional question with respect to the Tucker Act is whether the "action is a 'disguised' breach-of-contract claim." *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). In making this determination, the Court "looks to (1) the source of the rights upon which the plaintiff bases its claims and (2) the type of relief sought (or appropriate)." *Id.* (quotation omitted).

As the prior PI Order already held, Plaintiffs' claims are not disguised breach-of-contract

claims, and therefore are not required to be brought in the CFC under the Tucker Act. "Plaintiffs do not have the right to sue under the Tucker Act because they are not parties to a government contract." PI Order, 2025 WL 1734471, at *19. In fact, if Plaintiffs sued in the CFC, that court would be required to dismiss the case for lack of jurisdiction under Federal Circuit case law, which governs litigation in the CFC, because Plaintiffs are not parties to the contract at issue. *Id.* In addition, Plaintiffs "cannot obtain injunctive relief" as to their "First Amendment claim alleging viewpoint discrimination" in the CFC, which can only award contract damages. *Id.* at *21. Because the CFC cannot hear the claims at issue on the merits or award the relief sought, the Tucker Act does not apply, and Plaintiffs may sue in district court.

The Ninth Circuit reached the same conclusion in denying the government's motion to stay the PI Order. "The government first argues that the Tucker Act precludes district court jurisdiction over the Form Termination Class's APA claim. We disagree."[19] *Thakur*, 148 F.4th at 1103. "[The requested] relief is not based on any conditions or obligations under the grant agreements. Indeed, the record does not reflect that Plaintiffs are even parties to the grant agreements." *Id.* at 1104.

Defendants ask the Court to reconsider its prior determinations and the Ninth Circuit's instruction, which apply equally to the claims at issue here, in light of the Supreme Court's subsequent order in *APHA*. In that case, the district court consolidated claims brought by individual researchers, unions, and states suing on behalf of public universities, concerning the summary termination of certain NIH grants. After a bench trial, the district court entered a partial final judgment in plaintiffs' favor on their APA claim under 5 U.S.C. § 706(2)(A), finding that NIH's "policy of mass grant terminations [] was 'breathtakingly arbitrary and capricious.'" 145 S.Ct. at 2669 (Jackson, J., concurring in part) (quoting appellate record). The Supreme

---

[19] At oral argument before the Ninth Circuit, counsel for Defendants conceded that, for purposes of the stay request, Defendants were not pursuing the argument that the Tucker Act barred the district court from hearing Plaintiffs' First Amendment claim. Therefore, the Ninth Circuit did not consider the argument in its stay opinion.

Court stayed the portions of the district court's order that vacated the grant terminations. The Court found that the Tucker Act required the claim at issue to be brought in the CFC instead, and that the district court lacked "jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *Id.* at 2659 (quoting *California*, 604 U.S. at 651).

APHA did not consider or address the key issue here: that non-parties to the contracts cannot bring claims in the CFC, and thus are not within the Tucker Act. Although some of the *APHA* plaintiffs were individual researchers, they did not make that argument to the Supreme Court in their briefing. As the government notes, the *APHA* plaintiffs did argue that their grant agreements did not constitute contracts under the Tucker Act, and thus that "*no* court [will] have jurisdiction to hear Plaintiffs' claims." Opp'n Stay Mot., No. 25A103, 2025 WL 2244206, at *28–29 (emphasis in original). However, the Supreme Court appears to have rejected that argument by treating the "research-related grants" as contracts under the Tucker Act. *APHA*, 145 S.Ct. at 2659. Accordingly, the Supreme Court did not address whether non-parties who are barred from obtaining relief in the CFC would nonetheless be required to bring a futile suit there under the Tucker Act. Indeed, Justice Barrett's concurrence appears to assume that the plaintiffs *could* sue in the CFC, and emphasizes that the plaintiffs were not left "without any prospect of relief" because the CFC "has the authority to fully adjudicate the claims over which it has jurisdiction." *Id.* at 2662 n. 1 (Barrett, J., concurring in part). "An appellate court is not presumed to have decided issues not presented[,] argued before it, or . . . addressed in its opinion." *Rivera v. Nat'l R.R. Passenger Corp.*, No. 99-cv-04003-SI, 2004 WL 603587, at *5 (N.D. Cal. Mar. 22, 2004) (citing *United States v. Kellington,* 217 F.3d 1084, 1095 (9th Cir. 2000)).

Absent contrary Supreme Court authority, this Court must continue to follow the guidance of the Ninth Circuit that where "no contract exists between plaintiffs and the Government" and "plaintiffs seek to enforce compliance with statutes and regulations," the "matter [is] beyond the scope of the Tucker Act's exclusive jurisdiction." *Cmty. Legal Servs. in*

*E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, 137 F.4th 932, 938 (9th Cir. 2025); *see also Thakur*, 148 F.4th at 1104 (Tucker Act does not bar Plaintiffs' APA claim).  "The result requested by the Government would mean that no court has jurisdiction to hear plaintiffs' claims. Not only is this result contrary to common sense, but it also conflicts with the strong presumption favoring judicial review of administrative action that is embodied in the APA." *Cmty. Legal Servs.*, 137 F.4th at 939 (citation and quotation marks omitted).

Defendants argue that "it would not be logical to allow indirect recipients of grant funding to bring APA claims challenging the government's grant terminations while barring direct recipients."  (Dkt. No. 122 at 8.)  But, as Justice Barrett explained in *APHA*, it is unsurprising that such "[t]wo-track litigation results from the jurisdictional scheme governing actions against the United States." 145 S.Ct. at 2662 (Barrett, J., concurring in part) (quotation omitted).  Grantees whose contract claims may be heard in the CFC must sue there, while non-parties who cannot have their claims heard in the CFC must sue instead in district court.  *See id.* (indicating that "plaintiffs' challenges to the grant terminations belong in the CFC, and their APA challenges to the guidance belong in district court").  "Each forum has the authority to fully adjudicate the claims over which it has jurisdiction."  *Id.* at 2662 n. 1.

Defendants suggest that the APA and Tucker Act should instead be interpreted to provide Plaintiffs no remedy at all, if they cannot sue in the CFC.  (Dkt. No. 122 at 8–9.)  Defendants note that Congress sometimes intends to deprive certain plaintiffs of any remedy.  (*Id.*)  But unlike the statutory schemes upon which Defendants rely,[20] the Tucker Act and APA do not appear to have that purpose.  The Tucker Act's purpose is to route certain claims to the exclusive jurisdiction of the CFC, not to create a categorical bar to relief for certain plaintiffs.  *See Cmty. Legal Servs. in E. Palo Alto*, 137 F.4th at 938–39 (explaining that "[t]he Tucker Act provides the

---

[20] *See, e.g.*, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 346–48 (1984) (holding that "the statutory scheme [] makes [] clear Congress' intention to limit the classes entitled to participate in the development of market orders."); *Filebark v. DoT*, 555 F.3d 1009, 1014 (D.C. Cir. 2009) (finding that "[i]n exempting the FAA from the CSRA, Congress made its intent perfectly clear," that "Congress intended to provide [certain] employees with no judicial review").

Court of Federal Claims with [exclusive] jurisdiction" to hear certain claims, but "categorically" cannot deprive the district court of jurisdiction where "no jurisdiction lies in the Court of Federal Claims") (quotation omitted).  Likewise, the APA carries a strong presumption in favor of judicial review (*id.* at 939), because "Congress rarely allows claims about agency action to escape effective judicial review."  *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 186 (2023); *see also Bowen v. Massachusetts*, 487 U.S. 879, 904 (1988) (purpose of Section 704 of the APA is to "remove obstacles to judicial review of agency action").  There is no reason to conclude that Congress intended for plaintiffs with potentially meritorious statutory and constitutional claims to be deprived of any forum in which to vindicate those alleged wrongs.

Alternatively, Defendants argue that Plaintiffs can make out "a non-frivolous allegation of breach of contract" as intended third-party beneficiaries, so the CFC does have jurisdiction over Plaintiffs' claims.  (Dkt. No. 122 at 10.)  However, in the context of government contracts, even individuals who "were explicitly referred to in and benefitted by the contract and were clearly in the mind of the contracting parties" are not intended beneficiaries absent the "express or implied intention of the parties to the contract to benefit the third party."  *GECCMC 2005-C1 Plummer St. Off. Ltd. P'ship v. JPMorgan Chase Bank, NA*, 671 F.3d 1027, 1034 (9th Cir. 2012) (cleaned up).  As described *supra* in Section II, the grant agreements fund research for the benefit of the general public, in line with the agencies' statutory purposes, and not in order to generate work for, or financially support, individual researchers.  As such, it is doubtful that Plaintiffs could make out a non-frivolous claim to intended beneficiary status.  This Court has already declined to send Plaintiffs on "a pointless round trip" to the CFC, and once again declines to do so here.  *See* PI Order, 2025 WL 1734471, at *19.

Moreover, *APHA* only involved an APA arbitrary and capricious claim, and thus does not bear on Plaintiffs' First Amendment claim or their claim that the agencies acted contrary to law.  As this Court has already held, Plaintiffs' First Amendment claim must be heard in district court, not the CFC, under well-established principles.  PI Order, 2025 WL 1734471, at *19–20.  At oral argument on these Motions, government counsel was unable to identify a single case in which a

district court was required to dismiss a First Amendment claim because it had to be brought in the CFC as a disguised contract claim.  Plaintiffs' First Amendment claim is "about speech and whether the federal government is improperly infringing on the[ir] free speech rights. . . .  The resolution of these claims might result in money changing hands, but what is fundamentally at issue is a bedrock constitutional principle rather than the interpretation of contract terms."  *President & Fellows of Harvard Coll. v. United States Dep't of Health & Hum. Servs.*, No. 25-cv-10910, 2025 WL 2528380, at *14 (D. Mass. Sept. 3, 2025).  For this reason, "[t]he Federal Circuit has expressly held the [CFC] lacks jurisdiction over claims arising under the First Amendment . . . as they are not money-mandating."  *Stephens v. United States*, 165 Fed. Cl. 341, 348 (2023) (citing *Cooper v. United States*, 771 F. App'x 997, 1000–01 (Fed. Cir. 2019)).  Nothing in *APHA* disturbs this analysis.  Likewise, nothing in *APHA* addresses the application of the Tucker Act to claims that an agency acted outside its statutory authority.

Plaintiffs' claims are not barred by the Tucker Act, as they cannot be heard in the CFC.

### 2.    APA Claims

#### a.    Arbitrary and Capricious Claim

Plaintiffs have shown a likelihood of success on the merits of their APA arbitrary and capricious claim against DoD, DoT, and HHS-NIH, largely for the same reasons described in the PI Order.  2025 WL 1734471, at *13–24.

With respect to DoD, the standardized termination letters state, with only slight variations, that the "grant award no longer effectuates [] program goals or DoD priorities."  (Dkt. No. 69-4 at 2.)  That language again reflects "that the challenged grant terminations were likely performed *en masse*, without individualized analysis, and without providing grantees with reasoned explanation for the terminations."  2025 WL 1734471, at *14.  In fact, "Defendants agree that DoD's letters are materially similar to the letters the Court found wanting in its opinion."  (Dkt. No. 86 at 27.)  However, they argue that Plaintiffs claims should fail under the "more lenient standard" of arbitrary and capricious review that should be applied to certain "military and foreign affairs matters."  (*Id.* at 21, 27 (citing *Islamic Am. Relief Agency v.*

*Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007).)  But Defendants do not explain how the decision to terminate existing funding to public-facing research projects using unreasoned form letters involves "sensitive issues of national security and foreign policy" that would counsel for additional deference here.  *Cf. Gonzales*, 477 F.3d at 730, 734 (finding that the blocking of assets to a designated terrorist organization involved sensitive issues of national security and foreign policy).

Furthermore, as the Ninth Circuit explained:

> 2 C.F.R. § 200.340(a) provides uniform administrative requirements for the termination of federal grants, including those an agency terminates because they "no longer effectuat[e] . . . agency priorities." § 200.340(a)(4).  Sections 200.340, 200.341, 200.343, and 200.345 outline the requirements for termination, the notification requirements when grants are terminated, and the effects of suspension and termination of grants. These regulations provide a meaningful standard by which courts may review the agencies' exercise of discretion.

*Thakur*, 148 F.4th at 1105–06 (alterations in original).  While Defendants take issue with the weight the Ninth Circuit assigns to these regulations and how they are interpreted (Dkt. No. 86 at 23–24), they do not dispute that the guidance is applicable to DoD and the other Agency Defendants (*id.* at 10–11).  Therefore, as the Ninth Circuit instructs, these regulations provide a basis for arbitrary and capricious review of grant termination decisions.

With respect to DoT, Defendants argue that Plaintiffs are not likely to succeed on their arbitrary and capricious claim because the two-page form letters terminating Plaintiffs' grants include a brief discussion of supposedly grant-specific reasons for the termination.  (Dkt. No. 86 at 25–26.)  For example, one letter cites "NCST's objectives to prioritize disadvantaged communities" and "support a Transportation Equity and Environmental Justice Advisory Group" as "inconsistent with DoT's priorities to cease promoting DEI initiatives that discriminate on the basis of race, national origin, or other protected characteristics."  (Dkt. No. 70-6 at 2 (internal quotations omitted).)  Another letter states that "research priorities that deepen commitments to diversifying the transportation workforce" are inconsistent with the same DoT priority.  (Dkt. No. 70-8 at 3.)  However, DoT offers no explanation as to why the research at issue—some of

which involved, for example, reducing emissions in disadvantaged communities—constituted a "DEI initiative that discriminates on the basis of race, national origin, or other protected characteristics." Furthermore, one of the letters appears to reference research activities of an entirely different UTC grantee (C2SMARTER) as the basis for termination, raising serious questions regarding the extent to which individualized consideration occurred. (Dkt. No. 70 ¶ 25; Dkt. No. 70-6 at 2.)

Moreover, DoT acknowledges that it "did not explicitly consider reliance interests." (Dkt. No. 86 at 26.) And nothing in the record suggests that DoT considered other important factors, such as waste of taxpayer money resulting from mid-stream funding cuts, or the public's loss of important research. Based on these facts, Plaintiffs have a likelihood of success on the merits of their arbitrary and capricious claim against DoT. *See Thakur*, 148 F.4th at 1106 (finding that Plaintiffs likely to succeed on the merits where "government conceded at oral argument that there is no record evidence that either agency considered the researchers' reliance interests . . . [or] the hundreds of millions of dollars taxpayers have invested in the grant projects that would be lost if the grants are terminated").[21]

For similar reasons, Plaintiffs are likely to succeed on the merits of their claim that HHS and NIH's immediate and indefinite grant suspensions were arbitrary and capricious. Defendants argue that the form letter triggering *en masse* suspension of hundreds of NIH grants funding research at UCLA was not arbitrary and capricious because the agency "made specific factual findings as to UCLA" and stated that it had "considered UCLA's reliance interests." (Dkt. No. 126 at 26–27.) The Court has already considered, and rejected, these arguments when they were raised by NSF regarding materially similar form letters to UCLA. *See* NSF Order, 2025 WL 2325390, at *4–5.

The same result is warranted here. NIH's indefinite suspension was likely arbitrary and

---

[21] There is also law for the Court to apply with respect to the arbitrary and capricious claim against DoT. *See infra* Section III.A.2.b.

capricious.  Although the form letters assert that NIH considered "UCLA's reliance interests," the record produced to date by Defendants appears to contain no evidence that the agency actually considered either the University's or the researchers' reliance interests, despite the fact that Plaintiffs have received NIH funding for decades and were several years into their multi-year grants.  There is also no evidence that NIH, as part of its *en masse* suspension of hundreds of grants, considered important issues such as waste of taxpayer funds or loss of research that is of significant interest to the public.  Accordingly, in communicating its decision to abruptly change its position by freezing Plaintiffs' funding, NIH offered Plaintiffs no explanation regarding its consideration of reliance or these other concerns, as applicable to the grants at issue.  For example, Horwitz estimates that the suspension of his TB Vaccination Project before "the final results could be determined" will result in "a cost to taxpayers of over $5.3 million." (Dkt. No. 115 ¶ 11.)  The suspension will also result in the loss of a potentially life-saving vaccine for a disease that impacts billions of people around the world (*id.* ¶ 11), but there is no indication that NIH considered this fact prior to suspending Horwitz's funding.

Defendants argue that the Court cannot reach the issue of whether NIH's actions were arbitrary or capricious because NIH has complete discretion in how it allocates, or attempts to withhold, funding.  (Dkt. No. 126 at 24–26.)  But Defendants' argument disregards the detailed congressional direction governing the NIH's allocation of funds.  For example, NIH is congressionally mandated to prioritize certain training objectives and areas of research, such as establishing the National Institute on Minority Health and Health Disparities ("NIMHD") to "support [] research, training, dissemination of information, and other programs with respect to minority health conditions and other populations with health disparities."  42 U.S.C. § 285t(a); *see also id.* §§ 285t(b), 282(h).  Congress also requires NIH's research funding to be operated transparently through public strategic plans, which must be updated at least every six years.  *Id.* § 282(m)(1).  The current strategic plan includes in its priorities "improving minority health and reducing health disparities," and supporting a "comprehensive spectrum of immunology and infectious disease research focused on developing improved or novel vaccines," including "the

rapid development of new vaccines to mitigate emerging infectious disease outbreaks. . ."[22]
Regulations also govern the highly competitive selection process that is used to allocate funds,
and funding termination.[23]  These statutory and regulatory requirements constitute law for the
Court to apply in assessing whether the terminations were arbitrary and capricious.  Furthermore,
the uniform administrative requirements discussed above likewise constitute law for the Court to
apply in that assessment.  *See* 2 C.F.R. § 200.340–45.  NIH was required to consider certain
factors, and explain its consideration of them, in changing its position regarding Plaintiffs' grant
funding.  Plaintiffs have shown a likelihood that NIH arbitrarily and capriciously failed to do so.

### b.    Contrary to Law Claim

Plaintiffs are also likely to succeed as to their claim that the grant terminations by DoT
are contrary to law.  *See* PI Order, 2025 WL 1734471, at *11–12.  Congress requires that
the Secretary of Transportation's grant selection for UTC programs be based in part on the
recipient's "demonstrated commitment" to developing the transportation workforce through
"outreach activities to attract new entrants into the transportation field, including women and
underrepresented populations."  49 U.S.C. § 5505(b)(4)(B)(v)(II).  Notwithstanding this clear
congressional directive, DoT informed Handy that it was suspending grants funding her UTC
research *because* her projects' commitment to "diversifying the transportation workforce" and
"prioritiz[ing] disadvantaged communities" was "inconsistent with DoT's priorities."  (Dkt. No.
70-6 at 2; Dkt. No. 70-8 at 3.)  In other words, DoT determined that outreach to underrepresented
populations counts dispositively *against* continuing Handy's grant, even though Congress
requires DoT to weigh that very same factor in *favor* of issuing Handy's grant.  Defendants stress
that the "outreach" described in section 5505 is only one of many "criteria," that DoT is
congressionally obligated to consider.  (Dkt. No. 86 at 23.)  But this fact does not suggest that

---

[22] https://www.nih.gov/sites/default/files/2025-01/strategic-plan-fy2021-2025.pdf, (last visited
September 21, 2025).

[23] *See*, *e.g.*, 42 C.F.R. § 52a.6; 45 C.F.R. § 75.371; *see also* 42 U.S.C. § 284a;
https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf, (last visited September 21, 2025).

DoT may choose to reject or terminate grant applications based on a project's commitment to one of the very criteria Congress required DoT to prioritize.  Therefore, Handy is likely to succeed on her claim that DoT's basis for terminating her contract was contrary to DoT's statutory mandate.

The Court declines, at this stage, to reach the issue of whether HHS-NIH or DoD's terminations violate the agencies' respective statutory mandates.  The record as to HHS-NIH and DoD is less developed and would benefit from further fact development, including, for example, "whether the grants at issue were funded from appropriations specifically earmarked for a particular purpose."  *See* PI Order, 2025 WL 1734471, at *12.  Further factual development is also needed regarding HHS-NIH's basis for the termination of funding for Voskuhl, van der Bliek, and Horwitz's research, and the applicable procedural protections.

### 3.    First Amendment Claim

Plaintiffs have also established a likelihood of success on the merits of their First Amendment claim against DoT.  DoT's public statements and termination letters indicate that it terminated grants, including grants funding Handy's research, for the purpose of implementing the Equity Termination Orders, in a way that constitutes viewpoint discrimination.  First, the termination letters state that the reasons for the termination include the grant applicants' objectives to "prioritize disadvantaged communities," "investigate [] long-term equity impacts," increase diversity, and conduct research that "focuses on Equity."  (Dkt. No. 70-6 at 2; Dkt. No. 70-8 at 3.)  These are the very topics that the Equity Termination Orders seek to "eliminate."  *See* Executive Order No. 14151, 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025) (agencies shall "to the maximum extent allowed by law" terminate "all . . . 'equity-related' grants or contracts"); Executive Order No. 14173, 90 Fed. Reg. 8633, 1634 (Jan. 21, 2025) (requiring the termination of "all 'diversity,' 'equity,' . . . and like . . . programs[ ] or activities").

Furthermore, Secretary of Transportation Sean Duffy stated that DoT would "identify and eliminate" programs that promote, among other things "environmental justice, and other partisan

objectives."[24]  And Duffy identified NCST's funding as a "woke university grant . . . used to advance a radical DEI and green agenda."[25]  On this record, Plaintiffs have established a likelihood of success on the merits of their First Amendment claim for the reasons described in the PI Order.  2025 WL 1734471, at *9–10.  The Court is "bound by the bedrock principle that the government cannot 'leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints' or 'aim at the suppression of dangerous ideas' in the provision of subsidies."  *Thakur*, 148 F.4th at 1108 (quoting *National Endowment for the Arts v. Finley* 524 U.S. 569, 587) (citation modified by *Thakur*).  It is highly likely that the termination of Handy's funding was an unconstitutional effort to suppress Handy and her fellow researchers' viewpoints and ideas, and drive those viewpoints from the marketplace of ideas.  Therefore, Handy is likely to success on the merits of her claim that DoT violated the First Amendment by terminating her research funding.  *Id.*

However, on the existing record, named Plaintiffs have not established a likelihood of success on the merits of their First Amendment claim against DoD or HHS-NIH.  Admittedly, the record suggests that DoD engaged in a similar course of viewpoint discrimination as NSF, NEH, EPA, and DoT.  As explained above, DoD issued several public statements describing its efforts to eliminate what it considered to be DEI-related grants.  The parties also agree that DoD terminated at least one grant pursuant to the Equity Termination Orders.  (Dkt. No. 86 at 30 (citing Dkt. No. 77-4 at 10).)  The record produced by DoD in this case also includes a memorandum from the Secretary of the Navy stating that Navy grants were terminated based on "DEI."  (Dkt. No. 77-4 at 2.)  Furthermore, DoD declarant Jason Day confirmed that "topics [were] used to identify terminations" of DoD grants, (Dkt. No. 77-3 ¶ 9), which is consistent with the practice of other agencies.  PI Order, 2025 WL 1734471, at *28.

---

[24] https://www.transportation.gov/briefing-room/us-transportation-secretary-sean-duffy-takes-action-rescind-woke-dei-policies-and.

[25] https://www.transportation.gov/briefing-room/us-transportation-secretary-sean-p-duffy-defunds-woke-university-grants.

However, while it appears likely that DoD engaged in viewpoint discrimination, the record is insufficient, at this stage, to demonstrate that the grant to Berman—the only named Plaintiff who had a grant terminated by DoD—was likely terminated because he was researching forbidden DEI topics.  The record to date reflects that, during the period when DoD terminated Berman's funding, it terminated grants for a variety of reasons, including to "cut wasteful spending," increase its focus on "lethality" and other priorities, and to eliminate DEI-related speech.  While DoD's apparent determination that Berman's funding should be terminated pursuant to Executive Order 15169 as "foreign aid" makes little sense, the record at this stage is insufficient to raise the inference that Berman's funding was actually terminated due to his research into forbidden DEI topics, and not for one of the several other reasons for which DoD has recently terminated grants.  Therefore, Berman fails to show that he has a likelihood of success on the merits of his First Amendment claim against DoD.

At this early stage, the individual named Plaintiffs likewise have not shown a likelihood of success on the merits of their First Amendment claim against HHS-NIH.  Plaintiffs' legal theory, as reflected in the Second Amended Complaint, is that "Defendants terminated [] grants based on the recipients' (presumed) viewpoint as reflected in the *subject matter of their research* . . . [and] Defendants['] belie[f] that the content of Plaintiffs' speech conflicts with the Administration's views" expressed in the Equity Termination Orders and other executive orders. (Dkt. No. 112 ¶ 658 (emphasis added).)  But the record suggests that Horwitz, Voskuhl, and van der Bliek's grant funding was frozen not because of the subject matter of their research, but because HHS-NIH targeted UCLA, due to certain practices it believed UCLA to be engaged in, including: (i) race-based admissions preferences, (ii) failure to adequately address antisemitism, (iii) UCLA's treatment of transgender athletes.  Furthermore, nothing in the existing record indicates that HHS-NIH froze the UCLA grants pursuant to the Equity Termination Orders. Although Plaintiffs contend that the freezing of those funds violated the First Amendment for other reasons, that is not the First Amendment claim pled in the operative complaint.

Much like DoD, the record suggests that HHS and NIH have likely engaged in viewpoint

discrimination against UC researchers by terminating grants, pursuant to Equity Termination Orders, based on disfavored speech contained in the grant applications. *See supra* Section II.D. However, no named Plaintiff can presently assert a claim based on these facts. Therefore, while the evidence in the record is troubling, on the existing record the Court cannot find that the named Plaintiffs have a likelihood of success on the merits of their claims that the suspensions were intended "to drive [Plaintiffs'] ideas or viewpoints from the marketplace."

For the reasons discussed above, Plaintiffs have shown a likelihood of success on the merits of the APA arbitrary and capricious claim (as to DoD, DoT, and HHS) and, as to DoT, on their APA contrary to law claim and their First Amendment claim. This ruling is without prejudice to Plaintiffs seeking further leave to amend, if supported by good cause, as the record in this case develops.

**B.    Irreparable Harm**

Plaintiffs have also established a high likelihood of irreparable harm for the reasons explained in the PI Order. 2025 WL 1734471, at *24. Berman states that not only has he lost income and been unable to continue work on his research as a result of the DoD funding termination, he has also had to release his graduate and undergraduate research assistants and could not take on a postdoctoral fellow, resulting in a loss of invaluable educational experience to them. (Dkt. No. 69 ¶ 33.) Handy has similarly experienced significant research delays and has lost staff positions and student research assistants due to DoT's funding termination. (Dkt. No. 70 ¶ 34.) Horwitz asserts that his research has halted at a critical stage. Although much of the work is complete, his team is unable to analyze the results to potentially deliver a lifesaving vaccine. He states that:

> despite completing the live-animal component of the final definitive vaccine efficacy study, we cannot uncover the extent to which the vaccine worked. Were that information available and the vaccine shown to be highly protective, as preliminary data suggests, we would have immediately begun plans to take the vaccine into clinical trials. Our inability to do so potentially substantially delays development of a potent TB vaccine for which the primary purpose is to boost the immunity of the ~5 billion people in the world previously vaccinated with BCG and in whom most TB cases in the

world develop.

(Dkt. No. 115 ¶ 11.)  Van der Bliek describes that his postdoctoral fellows will be unable to complete their projects and publish associated papers, with lasting effects on their careers because a "gap in publications resulting from layoffs will make them far less desirable in the job market and potentially make them unemployable."  (Dkt. No. 114 ¶ 21.)  Voskuhl describes that the lab has "genetically engineered mice that took over 3 years to generate," and without funding the mice will soon be lost.  (Dkt. No. 113 ¶ 24.)  Voskuhl also states that she will soon have to let "staff go due to lack of funding," resulting in the loss of a "team of researchers [that] has taken two decades [] to gradually build."  (*Id.*)  All of these harms constitute irreparable injury, as the PI Order already found.  2025 WL 1734471, at *24.

### C.    Balance of Harms and Public Interest

Citing *APHA*, Defendants argue that there is always "irreparable harm to the government and to the public interest" when an injunction requires "the payment of money that the government may never recover" and that this harm must necessarily outweigh the irreparable harm that Plaintiffs have shown.  (Dkt. No. 122 at 11; *see also* Dkt. No. 126 at 17.)  Therefore, they ask the Court to reconsider its balance of equities and public interest analysis in the PI Order, which would otherwise be applicable here.  *See* 2025 WL 1734471, at *24–25.  However, this case presents a very different balance of equities from *APHA*.  In *APHA*, the grantees themselves were parties to the action, and made no commitment that they would repay any drawn-down funds.  145 S.Ct. at 2659 ("The plaintiffs do not state that they will repay grant money if the Government ultimately prevails.").  In this case, there are legal mechanisms for the government to recoup funds if it ultimately prevails on the merits here, by seeking the funds directly from the grantee institutions (Dkt. No. 121 at 10), and nothing in the record indicates that the UC System would be unable to repay funds if ordered to do so.  *See Thakur*, 148 F.4th at 1110 n. 8 (noting that "unlike in [*California*], Plaintiffs here contend—and the Government does not meaningfully contest—that there are 'existing mechanisms to recoup funds'").  Therefore, it is not relevant whether the Plaintiff researchers themselves commit to personally return the funds

in the event that they lose on the merits.

In sum, the balance of harms and public interest favor granting a preliminary injunction for the same reasons already explain the PI Order.

## IV.    PROVISIONAL CLASS CERTIFICATION

Plaintiffs seek "provisional class certification" related to their motion for a preliminary injunction. *See Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012) (affirming the grant of provisional class certification in conjunction with the grant of a preliminary injunction). Under Rule 23(a), a class action is proper if: (i) there are questions of law or fact common to the class; (ii) the claims or defenses of the representative parties are typical of the claims or defenses of the class; (ii) the representative parties will fairly and adequately protect the interests of the class; and (iv) the class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a). When a proposed class satisfies the prerequisites of Rule 23(a), the Court must determine whether the class is maintainable under Rule 23(b). Here, Plaintiffs are seeking certification under Rule 23(b)(2), which is maintainable if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Plaintiffs seek to certify provisional Second Form Termination and Equity Termination Classes along the lines of classes provisionally certified in the PI Order. For the reasons discussed below, a provisional Second Form Termination Class will be certified, comprising:

> All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants by, or on behalf of, DoD, DoT, and NIH[26] (or their sub-agencies) that are terminated by means of a

---

[26] The parties agree that it is appropriate to limit the class definition to grants terminated by NIH, rather than extending the definition to terminations by all HHS sub-agencies. (Dkt. No. 127 at 6; Dkt. No. 126 at 19–20.) However, HHS remains a Defendant in this case, is bound by the concurrently filed injunction, and is still subject to discovery to the same extent as NIH.

form termination notice that does not provide a grant-specific explanation for the termination that states the reason for the change to the original award decision and considers the reliance interests at stake, from and after January 20, 2025.

Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.

A provisional Second Equity Termination Class will also be certified, comprising:

All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants by, or on behalf of, DoT (or its sub-agencies) that are terminated pursuant to Executive Orders 14151 or 14173 from and after January 20, 2025.

Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.

### A.    Commonality and Rule 23(b)(2) Maintainability.

***Second Form Termination Class***.  The class meets the commonality requirement and is maintainable under Rule 23(b)(2).  "Plaintiffs have sufficiently shown that it is likely th[e] termination decisions were made pursuant to a common playbook of terminating grants in groups without considering the required individualized factors."  PI Order, 2025 WL 1734471, at *29. Therefore, "Plaintiffs and the class share a question susceptible to a common answer: Whether Agency Defendants' lockstep *en masse* unreasoned termination of grants, as executed through form letters . . . , are arbitrary and capricious in violation of the APA."  *Id.*  Likewise, Plaintiffs have sufficiently alleged that DoT, DoD, and NIH have "acted or refused to act" on grounds that apply to the proposed Second Form Termination Class "as a whole" through their concerted *en masse* terminations of grants through insufficiently reasoned form letters.  *See id.* (citing Fed. R. Civ. P. 23(b)(2)).

Defendants argue that because DoT and NIH's letters contain slightly more detailed about the reasons for termination than those issued by other Agency Defendants, this difference defeats commonality.  (Dkt. No. 86 at 19–20; Dkt. No. 126 at 23.)  But common questions remain regarding the Agency Defendants' *en mass*e terminations via form letters that fail to

address any individualized reliance interests or other important factors such as wasted resources. Therefore, the fact that the DoT and NIH letters contain some information about the reasons for the termination does not defeat commonality, nor does it make the class unmaintainable under Rule 23(b)(2).

*Second Equity Termination Class*. Defendants argue that DoT's pre-termination grant review was more detailed than simply using search terms, defeating commonality and maintainability. (Dkt. No. 86 at 13, 19–20.) This argument fails. First, as discussed *infra* in Section IV.B, the Second Equity Termination Class will include only individuals impacted by DoT cancellations, so whether or not DoT's grant review process varied materially from the review process of other Agency Defendants has no bearing on the commonality analysis. Furthermore, even if the two Equity Termination Classes are eventually merged, common questions remain regarding whether DoT intentionally targeted viewpoints to drive them from the market, regardless of its grant identification strategy. Furthermore, a common injunction can remedy DoT's discriminatory practices as well as those of the other Agency Defendants, meaning that the class is maintainable under 23(b)(2).

## B.    Typicality and Adequacy[27]

*Second Form Termination Class*. Named Plaintiffs are adequate representatives, and their claims are typical, for the same reasons explained *supra* in Section IV.A. Defendants argue that "Plaintiffs' entire class certification argument [with respect to HHS-NIH] revolves around the 'single NIH-UCLA' action," and therefore Plaintiffs have not satisfied the typicality and adequacy requirements for "pre-July 31 NIH terminations." (Dkt. No. 126 at 21.) But Plaintiffs have shown that the form letters sent to them by HHS-NIH suffer the same basic deficiencies as those sent by other Agency Defendants, and involved the same playbook of freezing funding *en masse* via form letters. Nor is there any meaningful distinction between Named Plaintiffs who

---

[27] Proposed class counsel is adequate for the reasons described in the PI Order. 2025 WL 1734471, at *30.

had their funding abruptly frozen for an indefinite period and class members who had their funding terminated. NSF Order, 2025 WL 2325390, at *5–6. Named Plaintiffs have standing to assert an APA arbitrary and capricious claim against HHS-NIH, and are sufficiently adequate and typical to represent a class of those who were also harmed by the same course of conduct for purposes of certifying a class under Rule 23(b)(2). *Id.*

*Second Equity Termination Class*. Handy's claims are typical of a class of researchers whose grant funding was terminated by DoT pursuant to the Equity Termination Orders, and she is an adequate class representative as to those class members. Defendants argue that Handy's claims are not "typical" because the letters terminating her grant funding contained slightly more detail compared to letters sent by other Agency Defendants. Even if the level of detail in DoT's termination letters were sufficient to make Handy's claim atypical (which it is not), at this stage of the proceedings the Second Equity Termination Class will contain only individuals impacted by DoT cancellation, as explained below. Therefore, any variance between Handy's letters and letters sent by other Agency Defendants is irrelevant to the typicality analysis.

An equity termination class will not be certified as to DoD and HHS-NIH. Plaintiffs argue that they "need not advance representatives that experienced every single variety of harm suffered by the class." (Dkt. No. 76 at 22.) But as the Court previously held, in the absence of a named Plaintiff with standing to bring a claim against an Agency Defendant, the Ninth Circuit requires plaintiffs to show that "all defendants are applying a 'common' and 'mandatory' rule" in order to avail themselves of the juridical link doctrine. PI Order, 2025 WL 1734471, at *30 (quoting *Martinez v. Newsom*, 46 F.4th 965, 970–71 (9th Cir. 2022)); *see also California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018) ("Standing as to one claim does not suffice for all claims arising from the same 'nucleus of operative fact.'") (quotation omitted). At this stage, there is insufficient record evidence to support application of the juridical link doctrine to DoD and HHS-NIH's implementation of the Equity Termination Orders to terminate grant funding, or to support the inference that those Defendants are acting in concert with the other Agency Defendants across the grant terminations at issue. Therefore, while the allegations and record

evidence of DoD and HHS-NIH's conduct is troubling, it cannot support certification at this juncture.

Plaintiffs ask the Court, in the alternative, to certify an Equity Termination sub-class comprised of "UC researchers whose grants appear to have been terminated because of the viewpoints expressed by the *UC campus* at which the researcher is employed" in violation of the First Amendment. (Dkt. No. 127 at 11–12 (emphasis in original).) However, Plaintiffs appear to be proposing a new legal theory for a First Amendment violation that has not been pled in their complaint. *See supra* Section III.A.3. Therefore, without reaching the merits, the Court declines to certify a sub-class on this basis.

### C.    Numerosity

*Second Form Termination Class*. Rule 23(a)(1) requires that a class be certified only where it is "so numerous that joinder of all members is impracticable." The record indicates that NIH's *en masse* termination alone affected hundreds of grants funding UC researchers' projects. *See* PI Order, 2025 WL 1734471, at *27. Therefore, the class is sufficiently numerous to satisfy the requirements of Rule 23(a).

*Second Equity Termination Class*. As discussed above, the class is limited, at this stage, to researchers whose funding was terminated by DoT pursuant to the Equity Termination Orders. At oral argument on the Motions, the parties agreed that over 40 UC researchers would be members of a Second Equity Termination Class if one were provisionally certified. The members identified to date are researchers whose projects were funded by the grants described in Handy's declaration, which were terminated by DoT. (Dkt. No. 127-1 at 6.) Therefore, Defendants no longer dispute, and the Court finds, that the numerosity requirement is satisfied for the Second Equity Termination Class. *See Rannis v. Recchia*, 380 Fed. App'x. 646, 651 (9th Cir. 2010) (explaining that, in general, "courts find the numerosity requirements satisfied when a class includes at least 40 members"); *see also Chinitz v. Intero Real Est. Servs*., 2020 WL 7391299, at *8 (N.D. Cal. July 22, 2020) (stating that the numerosity requirement is relaxed in injunctive relief cases).

## V.    REQUEST FOR BOND AND FOR A STAY

Defendants request that the Court require Plaintiffs to post a bond as security for damages that may result from a wrongfully-granted injunction.  In granting relief under Rule 65, "[t]he court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review." *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985).  As result of Defendants' actions, Plaintiffs in many instances will be unable to continue their research, or to pay themselves, their staff, and graduate students, and are laying some of them off.  Based on this record, the Court finds that requiring a bond would stifle Plaintiffs' enforcement of their rights under the APA and the First Amendment.  Because this litigation is brought to protect the public interest and ensure compliance with federal law, Plaintiffs shall be required to pay a nominal bond of $100.

Defendants' request for a stay pending appeal, or for seven days pending a motion to the court of appeals for a stay, is also denied.  A stay is not appropriate for the reasons stated by the Ninth Circuit when it denied the government's first request for a stay.  *See Thakur*, 148 F.4th at 1101–1110; *see also* PI Order, 2025 WL 1734471, at *31.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification (Dkt. Nos. 76, 117) are **GRANTED** as modified, and two classes are provisionally certified.  A separate order for APA vacatur and preliminary injunctive relief will issue.

**IT IS SO ORDERED.**

Dated: September 22, 2025

_____
RITA F. LIN
United States District Judge