1   Erwin Chemerinsky (*pro hac vice*)
    echemerinsky@law.berkeley.edu
2   Claudia Polsky (CA Bar No. 185505)
    cpolsky@law.berkeley.edu
3   U.C. BERKELEY SCHOOL OF LAW
    Law Building
4   Berkeley, CA 94720-7200
    Telephone: 510.642.6483
5
    Elizabeth J. Cabraser (CA Bar No. 83151)
6   ecabraser@lchb.com
    Richard M. Heimann (CA Bar No. 63607)
7   rheimann@lchb.com
    LIEFF CABRASER HEIMANN &
8   BERNSTEIN, LLP
    275 Battery Street, 29th Floor
9   San Francisco, CA 94111
    Telephone: 415.956.1000
10
    Anthony P. Schoenberg (CA Bar No. 203714)
11  tschoenberg@fbm.com
    Linda S. Gilleran (CA Bar No. 307107)
12  lgilleran@fbm.com
    Kyle A. McLorg (CA Bar No. 332136)
13  kmclorg@fbm.com
    FARELLA BRAUN + MARTEL LLP
14  One Bush Street, Suite 900
    San Francisco, CA 94104
15  Telephone: 415.954.4400

16  *Attorneys for Plaintiffs and the Proposed Classes*
    [Additional counsel listed on signature page]
17

18              **UNITED STATES DISTRICT COURT**

19             **NORTHERN DISTRICT OF CALIFORNIA**

20  NEETA THAKUR, et al.,                    Case No. 3:25-cv-4737-RL

21          Plaintiffs,

22      vs.                                  **PLAINTIFFS' MOTION FOR LEAVE
                                             TO FILE THIRD AMENDED
23  DONALD J. TRUMP, et al.,                 COMPLAINT AND MEMORANDUM
                                             OF POINTS AND AUTHORITIES IN
24          Defendants.                      SUPPORT; PROPOSED THIRD
                                             AMENDED COMPLAINT; REDLINE
25                                           COMPARISON**

26                                           Date:  December 18, 2025
                                             Time:  10:00 AM
27                                           Judge: The Honorable Rita F. Lin

28

MOTION FOR LEAVE TO FILE THIRD AM.
                                             COMPLAINT - Case No. 3:25-cv-04737-RL

**TO ALL DEFENDANTS: PLEASE TAKE NOTICE** that on December 18, 2025 at 10:00 AM in the Courtroom of the Honorable Rita F. Lin, Courtroom 15, United States District Court, Northern District of California, 450 Golden Gate Avenue, 18th Floor, San Francisco, California, Plaintiffs will and hereby do move the Court for an Order granting leave to file their Third Amended Complaint to add allegations against the Department of Energy, pursuant to the Federal Rules of Civil Procedure, Rules 15 and 16.

The Motion is made on the grounds that Plaintiffs have demonstrated good cause under Rule 16(b) and satisfied all requirements under Rule 15(a) for leave to amend in order to add allegations against the Department of Energy ("DOE"), which unlawfully terminated grants to University of California research on or around October 2, 2025. Plaintiffs further seek to add a new count under the Fifth Amendment (Equal Protection) against DOE. Plaintiffs' Proposed Third Amended Complaint also makes minor updates to some statements, *e.g.*, revising citations to case law to reflect recent developments.

Plaintiffs further respectfully request that this Court issue an order that the Proposed Third Amended Complaint, which, pursuant to Local Rule 10-1, is attached hereto as **Attachment 1**, is deemed filed and served as of the date of the granting of this Motion.

This Motion is based on the memorandum of points and authorities in support thereof, the Declarations of Claudia Polsky ("Polsky Decl."), Louise Wells Bedsworth ("Bedsworth Decl."), Plamen Atanassov ("Atanassov Decl."), and Kyle McLorg ("McLorg Decl.") in support of the Motion, and all files and pleadings in this action. Per this Court's standing order, a redline comparing the Proposed Third Amended Complaint to the operative Second Amended Complaint is attached hereto as **Attachment 2**.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiffs seek leave to file a Third Amended Complaint pursuant to Rules 15 and 16 of the Federal Rules of Civil Procedure.[1] In October 2025, the Department of Energy ("DOE") abruptly terminated grants that had been funding work by University of California ("UC") researchers, including grants supporting critical clean energy and climate research projects. Atanassov Decl. ¶¶ 10, 12, 17, 19, 24, 31; Bedsworth Decl. ¶¶ 10, 16-17, 19. These terminations occurred while researchers were actively engaged in their projects, having begun work and made substantial progress toward project objectives. Atanassov Decl. ¶¶ 30, 32; Bedsworth Decl. ¶ 15. The terminations resulted in immediate financial harm to Plaintiffs, including loss of researcher and staff salaries, elimination of funding for graduate student researchers, and the loss of matching grants and cost-share contributions from other funding sources. Atanassov Decl. ¶¶ 14, 22, 36; Bedsworth Decl. ¶ 18.

In addition, the terminations targeted awardees researching clean energy, but only in states where a majority of the citizens voted for the opposition political party, *i.e.*, "Blue States." McLorg Decl. ¶¶ 4-5. Specifically: In announcing the terminations, Russell Vought, Director of the Office of Management and Budget, proclaimed that Defendants were targeting "the Left's climate agenda." *Id.* at Exh. E. He then went out of his way to highlight that "[t]he projects are in the following states," listing sixteen states that voted for the Democratic candidates in the most recent presidential and senatorial elections, including California and Massachusetts. *Id.* Vought made this announcement the day after President Trump stated: "We can do things during the

---

[1] Plaintiffs, of course, could file this as a new lawsuit against DOE. But since the issues here concern the same claims and identical issues as to the other agencies in the existing lawsuit, it is in the Court's interest, as well as the parties, to simply amend the Complaint to include the allegations against DOE. To that end, time is of the essence in restoring these grants, and inclusion of these new allegations in the existing case promotes judicial economy and efficiency. Atanassov Decl. ¶ 36 ("Beyond my personal and professional distress at the instant, unforeseen, and chaotic unraveling of ARCHES and the many partnerships I have worked for years to cultivate, I have been monetarily and materially harmed by DOE's decisions to eliminate project funding.").

shutdown that are irreversible, that are bad for [Democrats] and irreversible by them, like . . .

cutting things that they like, cutting programs that they like." *Id.* at Exh. C.

Plaintiffs could not have made these allegations against DOE or included a count under the Fifth Amendment's equal protection guarantee when they filed their Second Amended Complaint on August 29, 2025 (Dkt. No. 112) because the grant terminations did not occur until October 2025. Atanassov Decl. ¶¶ 12, 19, 31; Bedsworth Decl. ¶¶ 16-17.

Leave to amend is routinely granted. Further, because Plaintiffs filed this Motion within weeks of learning of the grant terminations, and the factual basis for the proposed amendment arose only in October 2025, there will be no prejudice to Defendant.

## II.    ARGUMENT

To determine whether a proposed amendment to a pleading should be granted after the deadline set in the scheduling order has passed, courts engage in a two-step inquiry. *See, e.g., Skillz Platform Inc. v. AviaGames Inc.*, 2023 WL 7308385, at *1 (N.D. Cal. Nov. 6, 2023) (Freeman, J.); *Cooper Drum Cooperating Parties Grp. v. Am. Polymers Corp.*, 2020 WL 5845983, at *1 (C.D. Cal. Aug. 10, 2020). First, the movant must demonstrate that good cause exists to amend the scheduling order. *See* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). Once good cause is shown, the court must consider whether amendment is proper under Rule 15(a). *Cooper Drum*, 2020 WL 5845983, at *1.

### A.    Good Cause Exists to Modify the Case Management Order to Allow Plaintiffs to Amend Their Complaint.

Rule 16(b)'s "good cause standard" considers the "diligence of the party seeking the amendment . . . . [T]he focus of the . . . inquiry is upon the moving party's reasons for seeking modification." *Skillz Platform Inc.*, 2023 WL 7308385, at *1 (citation modified). "Good cause" may be shown where "pretrial schedule cannot reasonably be met despite the diligence of the party seeking the extension." *YYGM S.A. v. Hanger 221 Santa Monica, Inc.*, 2015 WL 12819168, at *1 (C.D. Cal. Feb. 3, 2015) (citation modified).

Plaintiffs have been diligent in investigating and pursuing their case and could not bring their proposed amendment sooner. Polsky Decl. ¶¶ 2, 5-10. Plaintiffs worked for months to gather

information related to DOE's termination of grants to UC researchers, which had been few in number and thus ill-suited to inclusion in a class action lawsuit.. *Id.* at ¶ 2. That all changed with the October 2025 terminations, allowing Plaintiffs to bring forward such facts and theories against DOE. *Id.* at ¶¶ 2, 9. As explained below, once Plaintiffs learned of the October 2025 terminations, they worked as expediently as possible with the proposed plaintiffs and others to collect the necessary facts and prepare the amended Complaint. *Id.* at ¶¶ 2, 5-10. With the opportunity to amend, Plaintiffs also make minor updates to some statements, *e.g.*, revising citations to case law to reflect recent developments, for accuracy.

### B.    Courts Liberally Grant Motions for Leave to Amend Pleadings.

Courts should freely give leave to amend a pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962).  In the Ninth Circuit, the policy favoring amendment "should be applied with 'extreme liberality.'" *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981) (citing *Rosenberg Bros. & Co. v. Arnold*, 283 F.2d 406, 406 (9th Cir. 1960) (per curiam)). "Five factors are taken into account to assess the propriety of a motion for leave to amend: bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint." *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir.2004). The "nonmoving party bears the burden of demonstrating why leave to amend should not be granted." *Genentech, Inc. v. Abbott Lab'ys*, 127 F.R.D. 529, 530–31 (N.D. Cal. 1989) (Patel, J.). Ultimately, the decision to grant leave to amend is committed to the sound discretion of the district court. *Cooper Drum*, 2020 WL 5845983, at *2 (citing *Rich v. Shrader*, 823 F.3d 1205, 1208 (9th Cir. 2016)).

**1.      Plaintiffs Are Not Amending in Bad Faith.**

Plaintiffs do not seek to amend their complaint in bad faith. Plaintiffs seek to add allegations against DOE, which terminated grants to UC researchers in early October 2025, and a new count under the Fifth Amendment (Due Process/Equal Protection) against DOE. Plaintiffs further seek to add facts about the impact of such terminations on two proposed class representatives, Dr. Plamen Atanassov and Dr. Louise Bedsworth. The information was not available to Plaintiffs prior to the filing of their previous complaint in August 2025, given that the grants were not terminated until October 2025. Polsky Decl. ¶¶ 2, 8-9. Plaintiffs also make minor updates to some statements, *e.g.*, revising citations to case law to reflect recent developments, for accuracy.

**2.      Plaintiffs Did Not Unduly Delay in Seeking Leave to Amend Their Complaint.**

There has been no undue delay here, and in any event, delay alone is an insufficient basis to deny leave to amend. *See Abels v. JBC Legal Grp., P.C.*, 229 F.R.D. 152, 156 (N.D. Cal. 2005) (Ware, J.) (finding no undue delay when approximately one month after identifying the true owner of the underlying debt, the plaintiff moved to amend). Plaintiffs filed this Motion as soon as practicable following the October terminations. Specifically, counsel for Plaintiffs, Claudia Polsky, inquired with faculty members at multiple UC campuses to obtain information about grants DOE terminated. Polsky Decl. ¶ 5. Ms. Polsky spoke with more than seven different employees across multiple UC campuses as well as Lawrence Berkeley National Laboratory. *Id.* These efforts were delayed and complicated by several factors. *Id.* at ¶¶ 5, 9. For example, Ms. Polsky sought to obtain information and documents about DOE's termination of an award to the Alliance for Renewable Clean Energy Systems ("ARCHES"). *Id.* at ¶ 4. However, the Executive Director of ARCHES was fired in early November because of cash-flow problems arising from DOE's termination of the ARCHES project. *Id.* at ¶ 5. As a result of her firing, she was locked out of her computer and could not access documents concerning the project. *Id.* Additionally, the Chief Technology Officer for ARCHES was on a boat during this time period with minimal connectivity. *Id.*. In light of these logistical obstacles, Plaintiffs did not unduly delay in bringing

1    this Motion.

2    **3.    Defendants Will Not Be Prejudiced by the Amendment.**

3    Any potential prejudice resulting from amendment "carries the greatest weight" in the

4    court's analysis. *Eminence Cap.*, *LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

5    However, "[t]o deny leave to amend, the prejudice ***must be substantial***." *Abels*, 229 F.R.D. at 156

6    (citation omitted) (emphasis added). Defendants will suffer no prejudice as a result of Plaintiffs

7    filing their Third Amended Complaint. This litigation is still in the early stages. The parties agreed

8    that, if the Court grants this Motion, then DOE would be able to produce an administrative record

9    on January 9, 2026. Dkt. No. 151 (Stipulation for Modification of Scheduling Order (ECF No.

10   125)); *see also* Dkt. No. 152 (granting stipulation, as modified). It will be another two months

11   (March 9, 2026) before Plaintiffs file their motion for summary judgment and class certification.

12   Dkt. No. 152. In other words, Defendants have conceded through stipulation that they have

13   sufficient time to prepare the administrative record and prepare their opposition to Plaintiffs'

14   motion for summary judgment, which opposition is due April 27, 2026. *Id.*

15   **4.    Plaintiffs' Proposed Amendment Is Not Futile.**

16   "[A] proposed amendment is futile only if no set of facts can be proved under the

17   amendment to the pleadings that would constitute a valid and sufficient claim or defense." *McFall*

18   *v. Stacy and Witbeck, Inc.*, 2016 WL 2851589, at *3 (N.D. Cal. May 16, 2016) (Corley, M.J.)

19   (citation modified). Denial of leave to amend for futility is disfavored. *Netbula, LLC v. Distinct*

20   *Corp.*, 212 F.R.D. 534, 539 (N.D. Cal. 2003) (Larson, M. J.). "Ordinarily, courts will defer

21   consideration of challenges to the merits of a proposed amended pleading until after leave to

22   amend is granted and the amended pleading is filed." *Id.*

23   Here, Plaintiffs' amendment is not futile because the additional allegations support

24   Plaintiffs' Constitutional and statutory claims. This Court has already determined that form

25   termination letters violate the Administrative Procedure Act ("APA").  Dkt. Nos. 55, 134.  Here,

26   too, the DOE termination letters fail to meet the requirements of the APA as they do not "provide

27   a grant-specific explanation for the termination that states the reason for the change to the original

28   award decision" nor do they "consider[] the reliance interests at stake." *Id.*; Atanassov Decl. ¶¶ 12,

1  20 (stating identical reasons for termination). As it did with the National Science Foundation,

2  National Endowment for the Humanities, Environmental Protection Agency, Department of

3  Defense, Department of Transportation and National Institutes of Health, this Court can restore

4  grants terminated via form termination letters.

5       Further, the DOE termination letters also suffer from a novel legal infirmity that is

6  premised on the Equal Protection guarantee of the Fifth Amendment because the terminations

7  occurred only in states where a majority of the citizens voted for the opposition political party.

8  McLorg Decl. ¶¶ 4-5.  Again, since this Court can restore grants that were unlawfully terminated,

9  Plaintiffs' proposed amendment is not futile.

10         **5.**     **Plaintiffs' Previous Amendments Are Not Dispositive.**

11       While Plaintiffs have twice previously amended their complaint, leave to amend still can

12  and should be granted. *See Eminence Cap.*, 316 F.3d at 1053 (reversing the lower court's denial of

13  leave to amend despite the plaintiff already having amended three times).

14  **III.**   **<u>CONCLUSION</u>**

15       For the foregoing reasons, the Plaintiffs should be granted leave to file their Third

16  Amended Complaint. Plaintiffs have demonstrated good cause under Rule 16(b) and satisfied all

17  requirements under Rule 15(a) for leave to amend.

18

19

20

21

22

23

24

25

26

27

28

Dated: November 24, 2025

By:    /s/ Linda S. Gilleran

Anthony P. Schoenberg (State Bar No. 203714)
tschoenberg@fbm.com
Donald Sobelman (State Bar No. 184028)
dsobelman@fbm.com
Linda S. Gilleran (State Bar No. 307107)
lgilleran@fbm.com
Dylan M. Silva (State Bar No. 306363)
dmsilva@fbm.com
Kyle A. McLorg (State Bar No. 332136)
kmclorg@fbm.com
Katherine T. Balkoski (State Bar No. 353366)
kbalkoski@fbm.com
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 954-4400

By:    /s/ Claudia Polsky

Erwin Chemerinsky (*pro hac vice*)
echemerinsky@law.berkeley.edu
Claudia Polsky (State Bar No. 185505)
cpolsky@law.berkeley.edu
U.C. BERKELEY SCHOOL OF LAW
Law Building
Berkeley, CA 94720-7200
Telephone: (510) 642-6483

Elizabeth J. Cabraser (State Bar No. 83151)
ecabraser@lchb.com
Richard M. Heimann (State Bar No. 63607)
rheimann@lchb.com
Kevin R. Budner (State Bar No. 287271)
kbudner@lchb.com
Annie M. Wanless (State Bar No. 339635)
awanless@lchb.com
Nabila M. Abdallah (State Bar No. 347764)
nabdallah@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000

*Attorneys for Plaintiffs and the Proposed Class*

8

## FILER'S ATTESTATION

Pursuant to Civil Local Rule 5.1, the undersigned attests that all parties have concurred in the filing of this PLAINTIFFS' MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT.

Dated: November 24, 2025

By:  */s/ Linda S. Gilleran*

Anthony P. Schoenberg (State Bar No. 203714)
tschoenberg@fbm.com
Donald Sobelman (State Bar No. 184028)
dsobelman@fbm.com
Linda S. Gilleran (State Bar No. 307107)
lgilleran@fbm.com
Dylan M. Silva (State Bar No. 306363)
dmsilva@fbm.com
Kyle A. McLorg (State Bar No. 332136)
kmclorg@fbm.com
Katherine T. Balkoski (State Bar No. 353366)
kbalkoski@fbm.com
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 954-4400

Erwin Chemerinsky (*pro hac vice*)
echemerinsky@law.berkeley.edu
Claudia Polsky (State Bar No. 185505)
cpolsky@law.berkeley.edu
U.C. BERKELEY SCHOOL OF LAW
Law Building
Berkeley, CA 94720-7200
Telephone: (510) 642-6483

Elizabeth J. Cabraser (State Bar No.  83151)
ecabraser@lchb.com
Richard M. Heimann (State Bar No. 63607)
rheimann@lchb.com
Kevin R. Budner (State Bar No. 287271)
kbudner@lchb.com
Annie M. Wanless (State Bar No. 339635)
awanless@lchb.com
Nabila M. Abdallah (State Bar No. 347764)
nabdallah@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone: (415) 956-1000

*Attorneys for Plaintiffs and the Proposed Class*

# ATTACHMENT 1

1   Erwin Chemerinsky (*pro hac vice*)
    echemerinsky@law.berkeley.edu
2   Claudia Polsky (CA Bar No. 185505)
    cpolsky@law.berkeley.edu
3   U.C. BERKELEY SCHOOL OF LAW
    Law Building
4   Berkeley, CA 94720-7200
    Telephone: 510.642.6483
5
    Elizabeth J. Cabraser (CA Bar No. 83151)
6   ecabraser@lchb.com
    Richard M. Heimann (CA Bar No. 63607)
7   rheimann@lchb.com
    LIEFF CABRASER HEIMANN &
8   BERNSTEIN, LLP
    275 Battery Street, 29th Floor
9   San Francisco, CA 94111
    Telephone: 415.956.1000
10
    Anthony P. Schoenberg (CA Bar No. 203714)
11  tschoenberg@fbm.com
    Linda S. Gilleran (CA Bar No. 307107)
12  lgilleran@fbm.com
    FARELLA BRAUN + MARTEL LLP
13  One Bush Street, Suite 900
    San Francisco, CA 94104
14  Telephone: 415. 954.4400

15  *Attorneys for Plaintiffs and the Proposed Class*
    [Additional counsel listed on signature page]
16

17              **UNITED STATES DISTRICT COURT**

18              **NORTHERN DISTRICT OF CALIFORNIA**

19

20  NEETA THAKUR, KEN ALEX, NELL          Case No. 3:25-cv-4737
    GREEN NYLEN, ROBERT HIRST,
21  CHRISTINE PHILLIOU, JEDDA FOREMAN,
    ELI BERMAN, SUSAN HANDY, MARCUS
22  HORWITZ, ALEXANDER VAN DER BLIEK,     **[PROPOSED] THIRD AMENDED**
    RHONDA VOSKUHL, PLAMEN               **CLASS ACTION COMPLAINT**
23  ATANASSOV, and LOUISE BEDSWORTH on    **FOR DECLARATORY AND**
    behalf of themselves and all others similarly  **INJUNCTIVE RELIEF**
24  situated,

25              Plaintiffs,

26          v.

27  DONALD J. TRUMP, in his official capacity as
    President of the United States;
28  DEPARTMENT OF GOVERNMENT
    EFFICIENCY ("DOGE");

46686\20709500

1    AMY GLEASON, in her official capacity as
     Acting Administrator of the Department of
2    Government Efficiency;
     NATIONAL SCIENCE FOUNDATION;
3    BRIAN STONE, in his official capacity as
     Acting Director of the National Science
4    Foundation;
     NATIONAL ENDOWMENT FOR THE
5    HUMANITIES;
     MICHAEL MCDONALD, in his official
6    capacity as Acting Chairman of the National
     Endowment for the Humanities;
7    UNITED STATES ENVIRONMENTAL
     PROTECTION AGENCY;
8    LEE ZELDIN, in his official capacity as
     Administrator of the U.S. Environmental
9    Protection Agency;
     UNITED STATES DEPARTMENT OF
10   AGRICULTURE;
     BROOKE ROLLINS, in her official capacity as
11   Secretary of the U.S. Department of Agriculture;
     AMERICORPS (a.k.a. the CORPORATION
12   FOR NATIONAL AND COMMUNITY
     SERVICE);
13   JENNIFER BASTRESS TAHMASEBI, in her
     official capacity as Interim Agency Head of
14   AmeriCorps;
     UNITED STATES DEPARTMENT OF
15   DEFENSE;
     PETE HEGSETH, in his official capacity as
16   Secretary of the U.S. Department of Defense;
     UNITED STATES DEPARTMENT OF
17   EDUCATION;
     LINDA MCMAHON, in her official capacity as
18   Secretary of the U.S. Department of Education;
     UNITED STATES DEPARTMENT OF
19   ENERGY;
     CHRIS WRIGHT, in his official capacity as
20   Secretary of Energy;
     UNITED STATES DEPARTMENT OF
21   HEALTH AND HUMAN SERVICES;
     ROBERT F. KENNEDY, JR., in his official
22   capacity as Secretary of the U.S. Department of
     Health and Human Services;
23   UNITED STATES CENTERS FOR DISEASE
     CONTROL;
24   MATTHEW BUZZELLI, in his official capacity
     as Acting Director of the Centers for Disease
25   Control;
     UNITED STATES FOOD AND DRUG
26   ADMINISTRATION;
     MARTIN A. MAKARY, in his official capacity
27   as Commissioner of the Food and Drug
     Administration;
28   UNITED STATES NATIONAL INSTITUTES

OF HEALTH;
JAYANTA BHATTACHARYA, in his official
capacity as Director of the National Institutes of
Health;
INSTITUTE OF MUSEUM AND LIBRARY
SERVICES;
KEITH SONDERLING, in his official capacity
as Acting Director of the Institute of Museum
and Library Services;
UNITED STATES DEPARTMENT OF THE
INTERIOR;
DOUG BURGUM, in his official capacity as
Secretary of the Interior;
UNITED STATES DEPARTMENT OF STATE;
MARCO RUBIO, in his official capacity as
Secretary of the U.S. Department of State;
DEPARTMENT OF TRANSPORTATION;
SEAN DUFFY, in his official capacity as
Secretary for the U.S. Department of
Transportation,

Defendants.

1

**TABLE OF CONTENTS**

2

Page

3   INTRODUCTION ........................................................................................................... 1

    JURISDICTION AND VENUE ................................................................................... 6
4
    THE PARTIES ................................................................................................................ 7
5
            A.      Plaintiffs ................................................................................................... 7
6
            B.      Defendants ............................................................................................... 8
7   CLASS ALLEGATIONS ........................................................................................... 12

    FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS ........................... 17
8
    I.      Throughout Decades of Federal Funding, the UC System Has Made Leading
9           Contributions to Research that Benefit the Public ......................................... 17

10  II.     Congress's Power of the Purse Makes Illegal the Mass Termination of Grants at
            the President's Direction ............................................................................... 21
11
    III.    President Trump Issues a Flurry of Executive Orders and Creates DOGE,
            Unlawfully Directing Agencies to Terminate Grants .................................... 23
12
    IV.     Agencies that Terminated Lead Plaintiffs' Grants Have Acted According to a
13          Common Unlawful Pattern ........................................................................... 27

14          A.      Environmental Protection Agency ....................................................... 28

15                  1.      Congress Established the EPA to Protect the Environment,
                            Including Through Research ................................................. 29
16
                    2.      In Response to Trump Administration Directives, the EPA
17                          Improperly Changed Priorities and Canceled Existing Grants ................ 33

                    3.      EPA Plaintiffs and Other Grant Recipients Are Harmed by EPA's
18                          Illegal Grant Terminations ................................................... 38

19                          a.      Plaintiff Neeta Thakur's Grant Termination and Resulting
                                    Harm ....................................................................... 39
20
                            b.      Plaintiff Ken Alex's Grant Termination and Resulting Harm ...... 43
21
                            c.      Plaintiff Nell Green Nylen's Grant Terminations and
22                                  Resulting Harm ...................................................... 45

            B.      National Endowment for the Humanities ............................................. 51
23
                    1.      Congress Established NEH to Fund Projects to Support Humanities
24                          Research, Training, and Education ........................................ 51

25                  2.      In Response to Trump Administration Directives, NEH Improperly
                            Changed Priorities and Canceled Existing Grants ................... 56
26
                    3.      NEH Plaintiffs And Other Grant Recipients Are Harmed by NEH's
27                          Illegal Grant Terminations ................................................... 61

                            a.      Plaintiff Robert Hirst's Grant Termination and Resulting
                                    Harm ....................................................................... 62

                            b.      Plaintiff Christine Philliou's Grant Termination and
                                    Resulting Harm ...................................................... 66

            C.      National Science Foundation ............................................................... 69

**TABLE OF CONTENTS**
(continued)

Page

2. Congress Established the National Science Foundation to Promote Scientific Research on a Broad Scale to Advance the United States' National Interests .................................................................. 69

3. In Response to Trump Administration Directives, NSF Improperly Changed Priorities and Canceled Existing Grants ................................... 73

4. NSF Plaintiff and Other Grant Recipients Are Harmed by NSF's Illegal Grant Terminations ..................................................................... 78

    a. Plaintiff Jedda Foreman's Grant Terminations and Resulting Harm .................................................................................... 78

D. Department of Defense .............................................................................. 83

1. Congress Established DOD to Create a Comprehensive Program Dedicated to Ensuring the Future Security of the United States, Including Through Research ...................................................................... 83

2. In Response to Trump Administration Directives, DOD Improperly Changed Priorities and Canceled Existing Grants ................................... 89

3. DOD Plaintiff and Other Grant Recipients Are Harmed by DOD's Illegal Grant Terminations ..................................................................... 91

    a. Plaintiff Eli Berman's Grant Termination and Resulting Harm .................................................................................... 91

E. Department of Transportation .................................................................... 96

1. Congress Established DOT to Promote the Safety, Quality, and Efficiency of the Nation's Transportation Services, Including Through Research ..................................................................................... 96

2. In Response to Trump Administration Directives, DOT Improperly Changed Priorities and Canceled Existing Grants ............................... 102

3. DOT Plaintiff and Other Grant Recipients Are Harmed by DOT's Illegal Grant Terminations ................................................................... 107

    b. Plaintiff Susan Handy's Grant Terminations and Resulting Harm .................................................................................. 107

F. Department of Health and Human Services and National Institutes of Health .................................................................................................... 112

1. Congress Established NIH to Fund Medical Research on a Broad Scale to Advance Human Health and Well-Being in the United States ..................................................................................................... 113

2. In Response to Trump Administration Directives, HHS Through NIH Improperly Changed Priorities and Canceled Existing Grants ....... 125

3. NIH Plaintiffs and Other Grant Recipients Are Harmed by NIH's Illegal Grant Terminations. .................................................................. 130

    a. Plaintiff Marcus A. Horwitz's Grant Termination and Resulting Harm .......................................................................... 131

    NIH TB Vaccine Grant Application and Award.................................... 131

    NIH Latent TB Treatment Grant Application and Award ..................... 132

1

**TABLE OF CONTENTS**
(continued)

2

Page

3    b.    Plaintiff Alexander Van Der Bliek's Grant Termination and
Resulting Harm ........................................................................ 135

4    c.    Plaintiff Rhonda Voskuhl's Grant Termination and
Resulting Harm ........................................................................ 138

5

G.    The Department of Energy ...................................................................... 141

6    1.    Congress created the Department of Energy to promote energy
research, innovation, and conservation; to promote U.S. energy
7    independence; and to develop alternatives to fossil fuels. ..................... 141

8    2.    In Response to Trump Administration Directives, DOE Improperly
Changed Priorities and Canceled Existing Grants ................................. 141

9    3.    DOE Terminates Funding to Awardees Exclusively in "Blue"
States ...................................................................................................... 143

10

4.    DOE Plaintiffs and Other Grant Recipients Are Harmed by DOE's
11    Illegal Grant Terminations ..................................................................... 146

12    a.    Plaintiff Plamen Atanassov's Grant Terminations and
Resulting Harm ........................................................................ 146

13    b.    Plaintiff Louise Bedsworth's Grant Termination and
Resulting Harm ........................................................................ 154

14

H.    Allegations Against Additional Federal Agency Defendants ............................ 157

15    1.    Department of Agriculture ...................................................................... 157

16    2.    AmeriCorps ............................................................................................ 158

3.    Department of Education ........................................................................ 160

17    4.    Institute of Museum and Library Services .............................................. 161

18    5.    Department of the Interior, including National Park Service ................. 162

19    6.    Department of State, including USAID .................................................. 163

V.    The Trump Administration Is Threatening Additional, Illegal Funding Cuts to the
20    UC System ........................................................................................................... 163

21    VI.    Unless Enjoined, Grant Terminations Will Cause Irreparable Harm to Plaintiffs,
the Class, and the Nation ..................................................................................... 164

22    CLAIMS FOR RELIEF .......................................................................................................... 165

23    COUNT I  Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;
Violation of Separation of Powers ....................................................................... 165

24    COUNT II  Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;
Violation of First Amendment (Content and Viewpoint Discrimination) ..................... 166

25    COUNT III Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;
Violation of Fifth Amendment (Due Process / Equal Protection) ................................. 167

26    COUNT IV Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;
Violation of Fifth Amendment (Due Process / Void for Vagueness) ............................. 168

27

28

- iii -

**TABLE OF CONTENTS**
**(continued)**

| | Page |
|---|---|

COUNT V  Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C): Contrary to Law; Illegal Departure from Impoundment Control Act, Statutes, and Regulations........................................................................................... 169

COUNT VI  Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A): Arbitrary and Capricious Failure to Engage in Reasoned Decision-making ................................. 170

PRAYER FOR RELIEF........................................................................................ 172

Plaintiffs, individually and on behalf of all others similarly situated, allege for their Complaint against the below-named Defendants as follows:

## **INTRODUCTION**

1.      This class action for declaratory and injunctive relief is brought by and on behalf of University of California researchers whose previously approved grants from the federal agencies here named as Defendants have been or are threatened to be unlawfully terminated or suspended. These terminations and suspensions occurred pursuant to Executive Orders or other directives of Defendant President Donald J. Trump, issued from January 20, 2025 to present, that were implemented through Defendant Department of Government Efficiency ("DOGE") and then operationalized by myriad administrative agencies.

2.      Plaintiffs challenge these terminations and seek a declaration that they are unconstitutional and otherwise unlawful because they violate the bedrock constitutional principle of separation of powers; the First Amendment guarantee of free speech; the Fifth Amendment guarantee of due process; the Impoundment Control Act of 1974; statutes requiring agencies to fulfill congressionally defined missions; and the Administrative Procedure Act ("APA"). These terminations bypassed Congress, ignored or contradicted the purposes for which Congress created the granting agencies and appropriated funds, and dispensed with the regular procedures and due process afforded grantees under the APA, in implementing the Trump Administration's political "cost-cutting" agenda and ideological purity campaign.

3.      Plaintiffs seek, for themselves and the UC researchers class, an injunction that restores their lost funding, enjoins further unlawful grant terminations or suspensions, and provides the grant extensions necessary to enable them to effectively complete the work for which these grants were approved. Plaintiffs and the Class are suffering, or will imminently suffer, concrete harm to their research, their careers, and their professional standing.

4.      As used in this Complaint, "UC researchers" includes UC faculty, staff, academic appointees, and employees, across the ten-campus University of California system,

who are or will imminently be suffering loss of research funding, research cessation or interruption, or loss or reduction of employment, by the termination or suspension of previously approved grants since January 20, 2025.

5.      Grants to UC researchers each year from federal agencies as diverse as the National Science Foundation, National Institutes of Health, Department of Transportation, and Food and Drug Administration, ranging from thousands to millions of dollars, fund the production of new knowledge and fuel the development and deployment of discoveries useful to society.

6.      Federal grants have been key to the innovation that has consistently earned the UC system pride of place among research institutions, including first place in the National Academy of Inventors' list of universities worldwide with the most utility patents[1] and the UC Berkeley campus's rank of #1 public research in institution in the world for nine of the past ten years.[2]

7.      Before President Trump took office, federal agency grant making proceeded under the authority of Congress, which created agencies through its constitutionally assigned exclusive legislative power, and appropriated taxpayer funds for specific public purposes that the agencies were tasked to execute. For decades, agencies carried out these statutory directives and observed due process in making, renewing, and (only seldom) terminating grants. They each adhered to their own grant regulations, duly promulgated through notice and comment rulemaking under the APA, and followed APA procedures when modifying such regulations.

8.      As a corollary, on the rare occasions when agencies terminated grants, they did so pursuant to predictable, regularized processes; based terminations on proper

---

[1] Univ. of Cal., Office of the President, *Federal Investment in UC Research 2025* (2025), https://ucop.edu/communications/_files/federal-investment-in-uc-research-2025.pdf.

[2] Public Affairs, *Times Higher Ed Ranks UC Berkeley No. 1 Public University in U.S.*, UC Berkeley News (Oct. 9, 2024), https://news.berkeley.edu/2024/10/09/times-higher-ed-ranks-uc-berkeley-no-1-public-university-in-u-s/#:~:text=Berkeley%20has%20held%20the%20ranking,industry%20engagement%20and%20international%20outlook.

46686\20709500

review and evaluation of grantees' activities to assure compliance with the terms and purpose of the awarded grants; and terminated grants only for reasons stated in applicable regulations.

9.      All of this changed abruptly on January 20, 2025, when Defendant Trump attempted to seize direct control of federal agencies by bypassing Congress and upending the statutory and regulatory system under which federal agencies have historically and legally operated.

10.      On and after January 20, 2025, Defendants Trump and DOGE, through a flurry of Executive Orders and other directives, commanded the federal agencies named as Defendants in this Complaint ("Federal Agency Defendants") to terminate thousands of previously awarded research grants.

11.      Abrupt, wholesale, and unilateral termination of these grants has violated the Constitution's core principle of separation of powers and its guarantees of freedom of speech and due process; flouted the Impoundment Control Act limits on the Executive's ability to withhold or redirect congressionally appropriated money; ignored statutory requirements that agencies fulfill their substantive missions and fund congressionally specified activities; contravened agency-specific grant-making regulations that cannot by law be revised on an abrupt, unexplained, chaotic basis; and violated the APA through this arbitrary, capricious, and *ultra vires* conduct.

12.      The "Wall of Receipts" on the DOGE website boasts that federal agencies have terminated over 15,000 grants pursuant to DOGE's directions to date, reflecting terminations on a mass scale.[3]

13.      Agencies' proffered grounds for such terminations—if grounds were stated at all—were spurious. In some cases, agency correspondence to grantees asserted that grant termination would reduce public costs and promote government efficiency, although no evidence was provided to support this claim. In other cases, agency communications made it

---

[3] Department of Government Efficiency, *Wall of Receipts*, DOGE.gov, https://doge.gov/savings (last visited May 30, 2025). While of questionable accuracy, the data displayed on the DOGE website demonstrate the Trump/DOGE objective: massive cuts to already appropriated and approved grants, without regard to merit.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

clear that grants were being terminated to further Defendant Trump's political objectives, which included the elimination of research on climate, environmental justice, "gender ideology," and "DEI" (diversity, equity, and inclusion), although the latter terms were not defined.

14.     The agencies that terminated grants did so on a categorical, *en masse* basis, without individual review or regard to a project's merit or a grantee's progress, and without any semblance of due process. The terminated and threatened grants that are the subject of this action were not terminated because they violated the terms of their grant applications or grant approvals, or strayed from the subject matter or purpose for which they were funded. Such deficiencies could have been addressed in the normal and ordered course of grant-making and review. To the contrary: these grant terminations were and are occurring, as their timing and reflection of the 2025 Executive Orders demonstrates, not because the research for which funding was approved had departed from its originally approved purpose, but because that purpose now offends the political agenda and ideological requirements of the Trump Administration.

15.     Plaintiffs do not seek an Order immunizing all grants from termination or review, or changing agency grantmaking procedures as they existed prior to January 20, 2025. They do seek a return to the *status quo ante* of ordered grant processes, aligned with congressionally authorized purposes, and affording due process to grant recipients. This return to procedures that prevailed prior to January 20, 2025, and conformed to the norms of due process and the APA, by federal agencies that defer not to unilateral Executive dictates but to congressional authority, is the essential relief Plaintiffs seek.

16.     Examining similar unlawful executive branch conduct by Defendants Trump and DOGE in the attempted reorganization (and gutting) of entire agencies, and the mass termination of hundreds of thousands of federal employees, the United States District Court (Illston, J.) stated in its May 22, 2025 Order Granting Preliminary Injunction in *American Federation of Government Employees*, *AFL-CIO v. Trump*. 784 F. Supp. 3d 1316

(May 22, 2025), *vacated and remanded by Am. Fed'n of Gov't Emps. v. Trump*, __ F.4th __, 2025 WL 2716266 (Sept. 19, 2025):

> Presidents may set policy priorities for the executive branch, and agency heads may implement them. This much is undisputed. But Congress creates federal agencies, funds them, and gives them duties that—by statute—they must carry out. Agencies may not conduct large-scale reorganizations and reductions in force in blatant disregard of Congress' mandates, and a President may not initiate large-scale executive branch reorganization without partnering with Congress. For this reason, nine Presidents over the last one hundred years have sought and obtained authority from Congress to reorganize the executive branch. Other Presidents—including President George W. Bush, President Obama, and President Trump in his first term—asked Congress for agency reorganization authority but did not receive it.

17.    In denying Defendants' request for a stay of the preliminary injunction in that case, the Ninth Circuit reaffirmed the bedrock principles that administrative agencies are creatures of Congress, not the President, and that "Congress has plenary control over the salary, duties, and even existence of federal offices." *Am. Fed'n of Gov't Emps. v. Trump*, 139 F.4th 1020, 1033 (May 30, 2025) (citing *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477,500 (2010)).

18.    Here, Defendants have engaged in the same unprecedented and unlawful overreach described and enjoined above, in the context of mass terminations of research grants. Their playbook involves a trifecta of illegal moves. First, Defendant Trump issued facially unconstitutional Executive Orders and directives that usurped congressional authority and unlawfully discriminated against disfavored speech. Second, acting on presidential instruction, Defendant DOGE commanded agencies to adopt Trump's policies as their own by terminating scores of already awarded grants, notwithstanding that DOGE (whose own status as a governmental entity remains unclear) lacks legal authority to supervise administrative agencies. Third and finally, Federal Agency Defendants terminated grants on the stated basis that they were inconsistent with *agency priorities*, or otherwise in tension with Executive Orders and directives, when in fact the grants' inconsistency was with *executive*

*preferences*. In so doing, agencies violated their statutory mandates, the APA, the constitutional Due Process guarantee, and their own regulations.

19.    Plaintiff UC researchers have suffered concrete financial, professional, and other harms from Federal Agency Defendants' unilateral termination of grants for projects to which they have already dedicated time and effort; for research upon which they have staked careers and reputations; and for work with research teams through which they endeavored to train a next generation. Without judicial relief, these researchers will suffer irreparable injury to their research and their careers.

20.    As profoundly, these terminations have impaired and will impair the public-serving research mission of the UC system and the concern for public welfare that undergirds it.

21.    All of the Defendants' conduct, and the Plaintiffs' and Class members' resulting harm, proceeds directly from Defendant Trump's determination to erase the constitutional boundaries that separate the branches of government and assign defined powers to each. Specifically, the mass termination of federal agency grants that is the subject of this action proceeds from Defendant Trump's efforts to arrogate the law-making powers of Congress to himself.

22.    Plaintiffs and the Proposed Class will continue to suffer harm on an ongoing basis and will experience increasing and irreparable harm absent the declaratory and injunctive relief here sought.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the United States Constitution, federal statutes, and the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*., and 5 U.S.C. §§ 702, 704. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705-06.

46686\20709500

24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are officers and agencies of the United States served in their official capacities, no real property is at issue in this case, and many Plaintiffs and members of the Proposed Class are citizens of California and are residents of this District, where many of the federal grant terminations that are the subject of this suit, and the resulting harms to Plaintiffs and the Class, have occurred and will continue to occur unless enjoined.

## THE PARTIES

### A.    Plaintiffs

25.    Individual Plaintiff and Class Representative Neeta Thakur is a citizen of the United States and the State of California, and a member of the faculty at the University of California, San Francisco ("UCSF"), who engages in research. She resides in the Northern District of California.

26.    Individual Plaintiff and Class Representative Ken Alex is a citizen of the United States and the State of California, and has an academic appointment as a researcher at the University of California, Berkeley ("UC Berkeley"). He resides in the Northern District of California.

27.    Individual Plaintiff and Class Representative Robert Hirst is a citizen of the United States and the State of California, and has an academic appointment as a researcher at the Bancroft Library at UC Berkeley. He resides in the Northern District of California.

28.    Individual Plaintiff and Class Representative Christine Philliou is a citizen of the United States and the State of California, and a member of the faculty at UC Berkeley who engages in research. She resides in the Northern District of California.

29.    Individual Plaintiff Nell Green Nylen is a citizen of the United States and the State of California, and has an academic appointment as a researcher at UC Berkeley. She resides in the Northern District of California.

30.    Individual Plaintiff and Class Representative Jedda Foreman is a citizen of the United States and the State of California, and has an academic appointment as a researcher at UC Berkeley. She resides in the Northern District of California.

46686\20709500

31.     Individual Plaintiff and Class Representative Eli Berman is a citizen of the United States and the State of California, and has an academic appointment as a researcher at the University of California, San Diego. He resides in San Diego County.

32.     Individual Plaintiff and Class Representative Susan Handy is a citizen of the United States and the State of California, and a member of the faculty at the University of California, Davis. She resides in Yolo County.

33.     Individual Plaintiff and Class Representative Marcus Horwitz is a citizen of the United States and the State of California, and a member of the faculty at the University of California, Los Angeles ("UCLA"), who engages in research. He resides in the Central District of California.

34.     Individual Plaintiff and Class Representative Alexander van der Bliek is a citizen of the United States and the State of California, and a member of the faculty at UCLA, who engages in research. He resides in the Central District of California.

35.     Individual Plaintiff and Class Representative Rhonda Voskuhl is a citizen of the United States and the State of California, and a member of the faculty at UCLA, who engages in research. She resides in the Central District of California.

36.     Individual Plaintiff and Class Representative Plamen Atanassov is a citizen of the United States, a resident of the State of California, and a member of the faculty at UC Irvine, who engages in research. He resides in the Central District of California.

37.     Individual Plaintiff and Class Representative Louise Bedsworth is a citizen of the United States, a resident of the State of California, and a member of the faculty at UC Berkeley, who engages in research. She resides in the Northern District of California.

**B.     Defendants**

38.     Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

39.     Defendant Department of Government Efficiency ("DOGE") is a federal agency headquartered in Washington, D.C. DOGE is a federal agency within the

46686\20709500

meaning of the APA, 5 U.S.C. §551(1). Upon information and belief, DOGE is now headed by Defendant Trump and every member of his cabinet.

40.     Defendant Amy Gleason is the Acting Administrator of DOGE and is sued in her official capacity.

41.     The following federal departments and agencies, including their identified leaders, are sometimes referred to collectively herein as the "Federal Agency Defendants."

42.     Defendant National Science Foundation ("NSF") is a federal agency headquartered in Alexandria, Virginia. NSF is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

43.     Defendant Brian Stone is Acting Director of NSF and is sued in his official capacity.

44.     Defendant National Endowment for the Humanities ("NEH") is a federal agency headquartered in Washington, D.C. NEH is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

45.     Defendant Michael McDonald is Acting Chairman of NEH and is sued in his official capacity.

46.     Defendant United States Environmental Protection Agency ("EPA") is a federal agency headquartered in Washington, D.C. EPA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

47.     Defendant Lee Zeldin is the Administrator for the EPA and is sued in his official capacity.

48.     Defendant United States Department of Agriculture ("USDA") is a federal agency headquartered in Washington, D.C. USDA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

49.     Defendant Brooke Rollins is Secretary of USDA and is sued in her official capacity.

46686\20709500

50.     Defendant AmeriCorps, also known as the Corporation for National and Community Service, is a federal agency headquartered in Washington, D.C. AmeriCorps is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

51.     Defendant Jennifer Bastress Tahmasebi is Interim Agency Head of AmeriCorps and is sued in her official capacity.

52.     Defendant United States Department of Defense ("Defense") is a federal agency headquartered in Washington, D.C. Defense is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

53.     Defendant Pete Hegseth is Secretary of Defense and is sued in his official capacity.

54.     Defendant United States Department of Education ("Education") is a federal agency headquartered in Washington, D.C. Education is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

55.     Defendant Linda McMahon is Secretary of Education and is sued in her official capacity.

56.     Defendant United States Department of Energy ("DOE") is federal agency headquartered in Washington, D.C. DOE is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

57.     Defendant Chris Wright is Secretary of DOE and is sued in his official capacity.

58.     Defendant United States Department of Health and Human Services ("HHS") is a federal agency headquartered in Washington, D.C. HHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

59.     Defendant Robert F. Kennedy, Jr. is Secretary of HHS and is sued in his official capacity.

60.     Defendant United States Centers for Disease Control ("CDC"), housed within HHS, is federal agency headquartered in Atlanta, Georgia. CDC is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

61.     Defendant Matthew Buzzelli is Acting Director of CDC and is sued in his official capacity.

62.     Defendant United States Food and Drug Administration ("FDA"), housed within HHS, is a federal agency headquartered in Silver Spring, Maryland. FDA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

63.     Defendant Martin Makary is Commissioner of the FDA and is sued in his official capacity.

64.     Defendant United States Institutes of Health ("NIH"), housed within HHS, is federal agency headquartered in Bethesda, Maryland. NIH is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

65.     Defendant Jayanta Bhattacharya is Director of NIH and is sued in his official capacity.

66.     Defendant Institute of Museum and Library Services ("IMLS") is a federal agency headquartered in Washington, D.C. ILMS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

67.     Defendant Keith Sonderling is Acting Director of IMLS and is sued in his official capacity.

68.     Defendant United States Department of the Interior ("Interior or DOI") is a federal agency headquartered in Washington, D.C. Interior is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

69.     Defendant Doug Burgum is Secretary of the Interior and is sued in his official capacity.

70.     Defendant United States Department of State ("State") is a federal agency headquartered in Washington, D.C. State is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

71.     Defendant Marco Rubio is Secretary of State and is sued in his official capacity.

72.     Defendant Department of Transportation ("DOT") is a federal agency headquartered in Washington, D.C. DOT is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

73.     Defendant Sean Duffy is Secretary of DOT and is sued in his official capacity.

## CLASS ALLEGATIONS

74.     Neeta Thakur, Ken Alex, Nell Green Nylen, Robert Hirst, Christine Philliou, Jedda Foreman, Eli Berman, Susan Handy, Marcus Horwitz, Alexander van der Bliek, Rhonda Voskuhl, Plamen Atanassov, and Louise Bedsworth ("Plaintiffs" or "Class Representatives") bring this action as a class action for declaratory and injunctive relief pursuant to Federal Rule of Civil Procedure 23(a)(1)-(4) and 23(b)(2). They bring this suit on behalf of themselves and all similarly situated University of California researchers whose federally funded grants have been or will be imminently terminated or suspended by Defendants absent (a) a declaratory judgment that such Executive Orders and directives are illegal; and (b) injunctive relief enjoining further terminations and restoring the terminated grants to enable class members to complete their interrupted work.

75.     On June 23, 2025, the Court ordered that a preliminary injunction be entered as to two classes. Dkt. 55.

The Form Termination Class consists of:

> All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants by the EPA, NSF, or NEH (or their sub-agencies) that are terminated by means of a form termination notice that does not provide a grant-specific explanation for the termination that states the reason for the change to the original award decision and considers the reliance interests at stake, from and after January 20, 2025.

> Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.

The Equity Termination Class consists of:

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1

2

3

4

> All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants by the EPA, NSF, or NEH (or their sub-agencies) that are terminated pursuant to Executive Orders 14151 or 14173, from and after January 20, 2025.

5

6

> Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.

7

8

      76.    On September 22, 2025, the Court ordered that a second preliminary

9

injunction be entered as to two classes. Dkt. 134.

10

The Second Form Termination Class consists of:

11

12

13

14

15

16

> All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants by, or on behalf of, DoD, DoT, and NIH (or their sub-agencies) that are terminated by means of a form termination notice that does not provide a grant-specific explanation for the termination that states the reason for the change to the original award decision and considers the reliance interests at stake, from and after January 20, 2025.

17

> Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.

18

The Second Equity Termination Class consists of:

19

20

21

22

23

> All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants by, or on behalf of, DoT (or its sub-agencies) that are terminated pursuant to Executive Orders 14151 or 14173 from and after January 20, 2025.

24

> Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.

25

26

      77.    Plaintiffs seek a Third Form Termination Class consistent with the

27

Court's Order Granting Motion for Preliminary Injunction and Provisional Class Certification

28

1    (Dkt. 54) and Order Granting Plaintiffs' Motions for Preliminary Injunction and Provisional

2    Class Certification as to Additional Agency Defendants, As Modified (Dkt. 133):

3        The Third Form Termination Class consists of:

4            All University of California researchers, including faculty, staff,
             academic appointees, and employees across the University of
5            California system who are named as principal researchers,
             investigators, or project leaders on the grant applications for
6            previously awarded research grants by the DOE that are terminated
             by means of a form termination notice that does not provide a
7            grant-specific explanation for the termination that states the reason
             for the change to the original award decision and considers the
8            reliance interests at stake, from and after January 20, 2025.

9            Excluded from the class are Defendants, the judicial officer(s)
             assigned to this case, and their respective employees, staffs, and
10           family members.

11           78.     Plaintiffs further seek a new Equal Protection Termination Class

12   relating to DOE terminations that violate the equal protection guarantee provided in the Due

13   Process Clause of the Fifth Amendment:

14           All University of California researchers, including faculty, staff,
             academic appointees, and employees across the University of
15           California system who are named as principal researchers,
             investigators, or project leaders on the grant applications for
16           previously awarded research grants by the DOE that were included
             in the 314 grants that DOE terminated on or around October 2,
17           2025, which Plaintiffs allege was done in violation of the equal
             protection guarantee of the Fifth Amendment.
18
             Excluded from the class are Defendants, the judicial officer(s)
19           assigned to this case, and their respective employees, staffs, and
             family members.
20

21           79.     This action meets all of the Rule 23(a) prerequisites for maintaining a

22   class action. The Plaintiff Class is so numerous that individual joinder of all its members is

23   impracticable, satisfying Rule 23(a)(1). The ten-campus UC System has more than 265,000

24   faculty and staff,[4] hundreds to thousands of whom conduct billions of dollars of federally

25   funded research annually. In 2024, for example, UC Berkeley researchers alone received

26   nearly $1 billion in new research grants. Of this amount, 51% (approximately $420 million),

27

28   [4] Univ. of California, *About Us*, https://www.universityofcalifornia.edu/about-
     us#:~:text=The%20University%20of%20California%20opened,and%20working%20around%20t
     he%20world. (last visited May 28, 2025).

- 14 -

came from federal grants. On this single campus, as of May 15, 2025, there were more than 2,000 open federal research grants (*i.e.,* ones whose termination date has not arrived). Many of these have now been terminated, suspended, or face imminent termination by the unlawful actions of Defendants. Plaintiffs do not yet know the exact number of the UC researchers whose work has been terminated or imminently threatened by the Defendants' conduct at issue in this suit, but are informed and believe that hundreds or thousands of researchers' grants and work, and their research staff's jobs, have been and will be impacted by such conduct. For example, the National Science Foundation (NSF) published a list of terminated grants that includes nearly 80 grants terminated across the UC System by *NSF alone*; a quick review of the terminated grants suggests terminations occurred because the grant titles contain now-suspect DEI-related words such as "equity."[5] A preliminary list of over 30 terminated grants across several federal agencies at UC Berkeley shows the same pattern. Further, databases compiled by news media and nonprofits have also identified over 100 National Institutes of Health (NIH) grants made to UCSF, UC Los Angeles, and UC San Diego researchers that have since been terminated.[6]

80.    The claims of the Plaintiff Class members share important and indeed pivotal common questions of law and fact, including but not limited to whether the Defendants' actions pursuant to the Executive Orders and directives described in this Complaint are unconstitutional and unlawful exercises of executive power, because they usurp Congress's spending authority and also violate the Impoundment Control Act of 1974; whether Defendants' actions are further unconstitutional because they violate Plaintiff Class members' First Amendment right to free speech and Fifth Amendment right to due process; whether they are further unlawful because they violate statutes through which Congress has created the defendant agencies and determined their purposes, functions, and goals, and

---

[5] NSF, *Is there a publicly available list of the awards NSF has terminated?*, https://www.nsf.gov/updates-on-priorities#termination-list (last updated May 23, 2025).

[6] Irena Hwang et al., *The Gutting of America's Medical Research: Here is Every Canceled or Delayed N.I.H. Grant*, N.Y. Times (June 4, 2025), https://www.nytimes.com/interactive/2025/06/04/health/trump-cuts-nih-grants-research.html?smid=nytcore-ios-share&referringSource=articleShare.

additional statutes through which Congress gives agencies substantive instruction, usurping Congress's legislative authority; and whether Defendants' actions are arbitrary and capricious, an abuse of discretion, or otherwise contrary to law, in violation of the APA.

81.    Because the claims of the Plaintiff Class members share common issues of law and fact, they will not require individualized determinations of the circumstances of any plaintiff, and satisfy Rule 23(a)(2) for purposes of the requested declaratory and injunctive relief.

82.    The claims of the Class Representatives are typical of the claims of the members of the Plaintiff Class, because they arise out of the Defendants' common conduct, satisfying Rule 23(a)(3). Like other members of the class, the Class Representatives have been concretely harmed, economically, professionally, and reputationally, by Defendants' arbitrary, capricious, and unlawful actions in categorically terminating or delaying their research grants under color of Defendant Trump's Executive Orders and/or at the direction of DOGE. The timing and sheer volume of these terminations (DOGE boasts of over 15,0000 such terminations of grants nationwide in the space of less than 100 days) shows that these determinations were without due process or due regard for the individual merits, scientific importance, or public benefit of the projects affected. Class Representatives and the Plaintiff Class have been similarly and further harmed by Defendants' failure to adequately explain their actions and decisions. Each of these actions, independently and collectively, have caused harm to the Class Representatives and the Plaintiff Class members.

83.    The Class Representatives will fairly and adequately protect the interests of the Plaintiff Class, satisfying Rule 23(a)(4). They will defend the rights of all proposed class members fairly and adequately, and have no interest that is now or may be potentially antagonistic to the interests of the Plaintiff Class. The attorneys representing the Plaintiff Class Representatives include constitutional, civil rights, environmental, and administrative law experts and litigators with decades of experience in their respective fields, and class action attorneys with similar experience and scores of court appointments as class

counsel in federal litigation. These attorneys may and should be appointed as class counsel in this action.

84.     The members of the Plaintiff Class are readily ascertainable through Defendants' own grant records, and the grant-related communications they have issued to Class members pursuant to Executive Orders and/or at the direction of the Trump Administration and/or DOGE.

85.     Through federal research grant cancellations, suspensions, and delays imposed categorically, pursuant to Executive Orders or other Trump Administration directives, in violation of the APA, and in violation of other statutes and the Constitution as alleged in this Complaint, Defendants have acted, have threatened to act, and will continue to act on grounds generally applicable to the Plaintiff Class, thereby making final equitable and declaratory relief appropriate to the Class as a whole. The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(2).

86.     Numerous individual lawsuits alleging similar conduct and claims would disserve the interests of judicial economy, as well as the interests of litigants and the public in the just, speedy, and inexpensive determination of these claims.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

I.    **Throughout Decades of Federal Funding, the UC System Has Made Leading Contributions to Research that Benefit the Public**

87.     The University of California (the "UC System") is the world's leading public research institution. Comprised of ten campuses, three affiliate national laboratories, and dozens of institutes, centers, and research laboratories across California, the UC System has made—and continues to make—outsize contributions to research that have changed the world, and enhanced human knowledge, while contributing to the national security and global prominence of the United States, and the health and welfare of all Americans.

88.     Without the UC System's research, for example, the world would not have the internet,[7] plug-in hybrid cars,[8] or the world's largest 3-D map of the universe.[9]

89.     In the medical realm, UC System research has led to development of MRI machines,[10] cochlear implants that restore hearing,[11] a universal viral vaccine,[12] a brain implant that prevents Parkinson's symptoms,[13] and the use of CRISPR gene-editing to cure sickle cell disease.[14] In the past 30 years, decades of UC cancer research has saved nearly 4 million lives.[15]

90.     The UC System has produced 70 Nobel Prize winners, 101 MacArthur "Genius" grant award winners, 66 National Medal of Science winners, and 42 Pulitzer Prize

---

[7] Pranay Bhattacharyya, *UCLA: Birthplace of the Internet*, US Tech News (April 28, 2021), https://uctechnews.ucop.edu/ucla-birthplace-of-the-internet/#:~:text=ARPANET%3A%20The%20Beginning,first%20two%20letters%20were%20sent.

[8] USPath Center, *4 Unexpected Discoveries from UC*, UCPath Jobs, https://ucpathjobs.org/lifestyle/4-unexpected-discoveries-uc/ (last visited May 27, 2025).

[9] Michael Levi, *First Results from DESI Make the Most Precise Measurement of Our Expanding Universe*, Berkeley Lab News Center (April 4, 2024), https://newscenter.lbl.gov/2024/04/04/desi-first-results-make-most-precise-measurement-of-expanding-universe/.

[10] Kara Manke, *Jerome R. Singer, pioneer of magnetic resonance imaging, dies at 97*, US Berkeley News (August 6, 2019), https://news.berkeley.edu/2019/08/06/jerome-r-singer-pioneer-of-magnetic-resonance-imaging-dies-at-97/#:~:text=Jerome%20R.-,Singer%2C%20pioneer%20of%20magnetic%20resonance%20imaging%2C%20dies%20at%2097,and%20blood%20volume%20in%20mice.

[11] Pete Farley, *Neuroscientist Wins Prize for Cochlear Implant Contributions*, University of California (January 8, 2015), https://www.universityofcalifornia.edu/news/neuroscientist-wins-prize-cochlear-implant-contributions.

[12] Jules Bernstein, *Vaccine Breakthrough Means No More Chasing Strains*, University of California, Riverside (April 15, 2024), https://news.ucr.edu/articles/2024/04/15/vaccine-breakthrough-means-no-more-chasing-strains.

[13] Robin Marks, *New Parkinson's Treatment Helps Former Pro Keep Skateboarding*, U. of Cal. San Francisco (Apr. 19, 2024), https://www.ucsf.edu/news/2024/04/427391/new-parkinsons-treatment-helps-former-pro-keep-skateboarding.

[14] Robert Sanders, *FDA Approves First Test of CRISPR to Correct Genetic Defect Causing Sickle Cell Disease*, University of California (Apr. 1, 2021), https://www.universityofcalifornia.edu/news/fda-approves-first-test-crispr-correct-genetic-defect-causing-sickle-cell-disease.

[15] Julia Busiek, *What Cuts to NIH Funding Mean for Cancer Patients and Their Families*, University of California (Feb. 26, 2025), https://www.universityofcalifornia.edu/news/what-cuts-nih-funding-mean-cancer-patients-and-their-families.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

winners.[16] Since 2013, the UC System has topped the National Academy of Inventors' list of universities worldwide with the most utility patents.[17]

91.     Through continual development of new technologies, UC research stimulates the economy by creating jobs, companies, industries, and scientific advancements that continue to change the world. Entire industries have grown out of UC research, including biotechnology, computing, semiconductors, telecommunications, and agriculture.[18]

92.     UC research prowess has continued at breakneck speed. The UC System averages four new inventions *per day*. In 2023, 78 startups were launched using UC intellectual property or technology.[19] UC research quite literally shapes the future: 8.2% of all U.S. academic research is conducted by UC researchers.[20]

93.     Such achievements would not be possible without federal funding. For years, the UC System has partnered with the federal government to deliver groundbreaking innovations that have made the American public healthier, safer, smarter, and better able to compete in a global market.

94.     Federal funding is the single most important source of UC research funding, historically accounting for more than half of the UC System's total research awards.[21] In fiscal year 2024, the UC System received $4.069 *billion* in federal research awards. This covered 10,256 distinct awards.[22]

95.     The UC System receives more National Institutes of Health ("NIH") and National Science Foundation ("NSF") funding than any other institution.[23] And these are far from the only agencies to offer significant support to UC research.

---

[16] Univ. of Cal., *The University of California at a Glance*, Univ. of Cal. (Feb. 25, 2025), https://ucop.edu/institutional-research-academic-planning/_files/uc-facts-at-a-glance.pdf.
[17] Univ. of Cal., *Federal Investment in UC Research,* Univ. of Cal. (Apr. 2025), https://ucop.edu/communications/_files/federal-investment-in-uc-research-2025.pdf.
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*

96.     In fiscal year 2024, the UC System received approximately the following amounts by agency:[24]

- $2.54 billion – NIH
- $525 million – NSF
- $326 million – Defense
- $160 million – Energy
- $122 million – other HHS
- $104 million – NASA
- $86 million – USDA
- $68 million – Commerce
- $39 million – Interior
- $27 million – Education
- $20 million – State
- $47 million – other agencies

97.     These stable federal funding sources, and the research talent they attract and empower, have enabled the UC System to make its outsize contributions to human progress for decades. Because the very nature of research requires years of ongoing work, the UC system has operated research programs across presidential administrations for generations.

98.     The innovations described above are the result of a successful partnership between the UC System and the federal government, and indeed would be impossible if federal grant funding were terminated.

99.     This research, of course, is carried out by faculty members and other research personnel in the UC system. These individuals' careers—their hiring, their tenure, their advancement—all depend on research that is often supported by federal grants.

---

[24] *Id.*

II.    **Congress's Power of the Purse Makes Illegal the Mass Termination of Grants at the President's Direction**

100.    The partnership between the UC System and the federal government is a product of Congress's powers, and by design insulated from political winds in the executive branch. Congress has repeatedly emphasized the importance of federally funded research as critical to the strength and security of the nation, and has used its powers to set research priorities and appropriate funds to federal agencies to carry out those priorities.

101.    Congress has the constitutional power to appropriate funds for such research and to create agencies necessary to implement federal policies. Article I vests Congress with the legislative power to create departments, agencies, and offices within the executive branch, to define their duties, and to fund their activities. U.S. Const. art. I, §1 ("All legislative Powers herein granted shall be vested in a Congress of the United States.").

102.    Congress's legislative power includes "the establishment of offices… [and] the determination of their functions." *Myers v. United States*, 272 U.S. 52, 129 (1926); U.S. Const. art I, § 8, cl. 18. "Administrative agencies are creatures of statute," and do not exist or have purpose without Congress's direction. *See Nat'l Fed'n of Indep. Bus v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022). Congress thus establishes executive agencies and crafts the statutes that govern each agency's administration. *See, e.g.*, 10 U.S.C. §§ 111, 113 (Defense); 16 U.S.C. § 551 (Agriculture); 42 U.S.C. §§ 202, 203 (HHS); 42 U.S.C. §§ 218, 282 (NIH); 42 U.S.C. § 7131 (Energy).

103.    Congress also holds the power of the federal purse. Indeed, Congress's powers to set the policies of the nation are at their apex when it comes to spending money, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). Congress makes its priorities clear by appropriating funds to agencies to carry out specified activities.

104.    The Constitution requires the President, meanwhile, to "take Care that the Laws be faithfully executed." U.S. Const., art. II, § 3. The "Take Care Clause" assures that "Congress makes the laws and the President faithfully executes them." *Utility Air Reg.*

1    *Grp. v. Envtl. Prot. Agency*, 573 U.S. 302, 327 (2014) (cleaned up). This includes ensuring

2    the appropriation of funds per Congress's direction.

3    105.    The executive branch has *no* constitutional authority to refuse to carry

4    out laws enacted by Congress, and it has no constitutional authority to block, amend, subvert,

5    or delay spending appropriated monies based on the President's own policy preferences. For

6    nearly two hundred years, it has been established that the Executive violates the Take Care

7    Clause when it ignores, refuses to execute, or purports to override statutes. *Kendall v. United*

8    *States*, 37 U.S. (12 Pet.) 524, 613 (1838).

9    106.    A President's Executive Order cannot override Congress's express

10   direction. The President "is without authority to set aside congressional legislation by

11   executive order." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir.

12   1999). Rather, the "President's power, if any, to issue [an] order must stem from either an act

13   of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343

14   U.S. 579, 585 (1952).

15   107.    The President has no power to order the rescission of funds. If the

16   President wants funds rescinded, he may *ask* Congress to do so pursuant to the Impoundment

17   Control Act ("ICA"), 2 U.S.C. § 681 *et seq.* Under the ICA, the President can "transmit to

18   both Houses of Congress a special message specifying," among other criteria, the amount of

19   budget authority he proposes be rescinded, the reasons why it should be rescinded, and the

20   effect of the proposed rescission on the "objects, purposes, and programs for which the budget

21   authority is provided." *Id.* § 683(a). Unless Congress passes a rescission bill that covers the

22   President's request within 45 days, however, the funds shall be made available. *Id.* § 683(b).

23   108.    Even under the ICA—which clearly states it cannot interfere with the

24   Constitutional separation of powers, § 681(1)—the President is constrained. His requests for

25   rescission cannot "supersed[e] any provision of law which *requires* the obligation of budget

26   authority or the making of outlays." 2 U.S.C. § 681 (emphasis added). Nor can the President

27   request reductions of *already obligated* funds, including grants. *See id.* § 683; Congressional

28   Budget Office, *CBO Explains How It Estimates Savings From Rescissions* (May 26, 2023),

https://www.cbo.gov/publication/59209 (explaining a rescission will not impact funds that are obligated).

109.    In short, once Congress has allocated money for grants or directed agencies to use funding to carry out research, the President cannot unilaterally refuse to spend or to redirect such funds. Nor can agency leaders, substituting the President's directives for Congress's, terminate without lawful cause grants that were awarded pursuant to congressional directives. Such refusal to spend money appropriated by Congress violates both the separation of powers and the Impoundment Control Act.

## III.    President Trump Issues a Flurry of Executive Orders and Creates DOGE, Unlawfully Directing Agencies to Terminate Grants

110.    Beginning on Inauguration Day (January 20, 2025), Defendant Trump issued a number of broad directives through Executive Orders (EOs). These included demands on federal agencies to take action to comply with the President's agenda.

111.    In particular, Defendant Trump and his administration explicitly and implicitly called on federal agencies to "terminate" previously awarded grant funds. In so doing, the Administration did not comply with Congress's prior spending decisions and direction.

112.    For example, Executive Order No. 14151, dated January 20, 2025 and titled "Ending Radical and Wasteful Government DEI Programs and Preferencing," instructs the Attorney General and others to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." Additionally, it directs each federal agency head to "terminate, to the maximum extent allowed by law… all 'equity-related' grants or contracts" within 60 days.[25]

---

[25] Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025), https://www.federalregister.gov/documents/2025/01/29/2025-01953/ending-radical-and-wasteful-government-dei-programs-and-preferencing.

[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

46686\20709500

113.    EO No. 14173, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," addresses purported "immoral race- and sex-based preferences under the guise of so-called [DEI] or [DEIA]." The order requires the Director of OMB to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing  equity,' and like mandates, requirements, programs, or activities, as appropriate."[26]

114.    On January 20, 2025, Defendant Trump also issued EO No. 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," directing that "federal funds shall not be used to promote gender ideology," instructing federal agencies to revise grant conditions accordingly, and defining "gender ideology" as a "false claim" that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity," and that "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex."

115.    On January 20, 2025, Defendant Trump further issued EO No. 14154, "Unleashing American Energy," which directed federal agencies to "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58)." The EO called out specific grant programs, and more generally, directed the agencies to "review their processes, policies, and programs for issuing grants."[27]

116.    On February 19, 2025, Defendant Trump issued EO No. 14217, "Commencing the Reduction of the Federal Bureaucracy." The EO deemed several government entities "unnecessary," and directed that any non-statutory components or

---

[26] Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633, (Jan. 21, 2025), https://www.federalregister.gov/documents/2025/01/31/2025-02097/ending-illegal-discrimination-and-restoring-merit-based-opportunity.

[27] Exec. Order No. 14154, *Unleashing American Energy*, 90 Fed. Reg. 8353 (Jan. 29, 2025), https://www.federalregister.gov/documents/2025/01/29/2025-01956/unleashing-american-energy.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

functions be "eliminated." The Order also stated that any "grant requests" by these entities should be denied.[28]

117.    On March 14, 2025, Defendant Trump issued EO No. 14238, "Continuing the Reduction of the Federal Bureaucracy." This order listed additional entities determined by Defendant Trump to be "unnecessary," and again directed that grant requests be rejected.[29]

118.    Moreover, to force agencies into complying with his personal agenda, Defendant Trump signed EO No. 14158 on January 20, 2025, "Establishing and Implementing the President's 'Department of Governmental Efficiency,'" commonly known as "DOGE." The EO required the head of each federal agency to establish a team of at least four DOGE employees within their agency.[30]

119.    According to the Order, DOGE would be "dedicated to advancing the President's 18-month DOGE agenda." *Id.* Although the "DOGE agenda" has never been publicly disclosed, DOGE's targets for ostensible "efficiency" improvements have, in practice, born considerable resemblance to the Executive agenda manifest in Defendant Trump's EOs.

120.    On February 26, 2025, Defendant Trump doubled down. He issued EO No. 14222, "Implementing the President's 'Department of Governmental Efficiency' Cost Efficiency Initiative."[31] Notwithstanding that the Constitution allocates spending power to Congress alone, the Order purported to begin the Executive's "transformation in Federal

---

[28] Exec. Order No. 14217, *Commencing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 10577 (Feb. 25, 2025), https://www.federalregister.gov/documents/2025/02/25/2025-03133/commencing-the-reduction-of-the-federal-bureaucracy.

[29] Exec. Order No. 14238, *Continuing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 13043 (Mar. 20, 2025), https://www.federalregister.gov/documents/2025/03/20/2025-04868/continuing-the-reduction-of-the-federal-bureaucracy.

[30] Exec. Order No. 14158, *Establishing and Implementing the President's "Department of Government Efficiency"*, 90 Fed. Reg. 8441 (Jan. 29, 2025), https://www.federalregister.gov/documents/2025/01/29/2025-02005/establishing-and-implementing-the-presidents-department-of-government-efficiency.

[31] Exec. Order No. 14222, *Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*, 90 Fed. Reg. 11095 (Mar. 3, 2025), https://www.federalregister.gov/documents/2025/03/03/2025-03527/implementing-the-presidents-department-of-government-efficiency-cost-efficiency-initiative.

1    spending on contracts, grants, and loans." This Order required federal agencies to review all

2    existing grants with an eye toward termination:

3            Each Agency Head, in consultation with the agency's DOGE Team
        Lead, shall review all existing covered contracts and grants and,
4        where appropriate and consistent with applicable law, terminate or
        modify (including through renegotiation) such covered contracts
5        and grants to reduce overall Federal spending or reallocate spending
        to promote efficiency and advance the policies of my
6        Administration. This process shall commence immediately and shall
        prioritize the review of funds disbursed under covered contracts and
7        grants to educational institutions and foreign entities for waste,
        fraud, and abuse. Each Agency Head shall complete this review
8        within 30 days of the date of this order.

9

10           121.    According to DOGE's self-described "Wall of Receipts," as of June 3,

11   2025, federal agencies had terminated over 15,000 grants, totaling roughly $44 billion in

12   "savings." [32]

13           122.    Despite multiple successful legal challenges to President Trump's EOs

14   and related directives,[33] Defendants have unlawfully terminated grants and continue to

15   terminate grants previously awarded to Plaintiffs and the Class.

16           123.    Indeed, according to data posted by DOGE, the federal government has

17   already terminated over **$324 million**[34] in grants made to the UC system. The harm to UC

18   researchers cannot be overstated.

19   _____

20   [32] Department of Government Efficiency, *Savings*, DOGE.gov, https://doge.gov/savings (last
     visited June 3, 2025).

21   [33] *See, e.g., Nat'l Assn. of Diversity Officers in Higher Education v. Trump*, No. 25-cv-0333-ABA
     (D. Md. Feb. 21, 2025) ECF No. 45 (preliminarily enjoining provisions requiring agencies to
22   terminate equity-related grants); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No.
     25-1189 (4th Cir. Mar. 14, 2025), ECF No. 29 (staying preliminary injunction pending appeal);
     *Washington v. Trump*, No. 2:25-cv-244-LK (W.D. Wash. Feb. 28, 2025) ECF No. 50 (on
23   February 28, 2025, preliminarily enjoining sections that condition, withhold, or end federal funding
     in Plaintiffs states Colorado, Minnesota, Oregon, and Washington); *PFLAG, Inc. v. Donald J.*
24   *Trump*, No. 8:25-cv-00337-BAH (D. Md. Mar. 4, 2025) ECF No. 116 (on March 4, 2025,
     preliminarily enjoining the same nationwide); *New York v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I
25   Jan. 31, 2025), ECF No. 50 (preliminarily enjoining federal agency defendants from "pausing,
     freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of
26   appropriated federal funds to the States under awarded grants, executed contracts, or other
     executed financial obligations," based on both the OMB directive and Executive Orders,
27   including the DEI and Gender Ideology Executive Orders).

28   [34] This number was produced by searching DOGE data posted at https://api.doge.gov/docs, which
     is accessible through DOGE's "Wall of Receipts" at https://doge.gov/savings. The $324 million
     was determined by looking at "Savings" under the "Grants" category, for entries in which the UC

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

124.    This lawsuit arises because, in unilaterally terminating Plaintiffs' federal grants without lawful cause, Defendants are flouting constitutional limits on the Executive's authority; violating the First Amendment's prohibition on viewpoint discrimination; denying due process of law under the Fifth Amendment; ignoring agency-specific statutory directives; and violating the APA.

125.    That these grant terminations violate the separation of powers became even clearer on May 28, 2025. Until then, DOGE was headed by Elon Musk. Now, according to the White House Press Secretary, DOGE will be led by "each and every member of the President's cabinet and the President himself, who is wholeheartedly committed to cutting waste, fraud and abuse from our government."[35] There is no longer any illusion that DOGE is more than a proxy for Defendant Trump and his priorities. The White House reiterated that each Cabinet secretary would work with DOGE employees at their agencies so that the "mission of DOGE will continue."[36] The DOGE Trojan Horse has been welcomed inside the gates of the Federal Agency Defendants, and the harms to Plaintiffs and the Class thus will continue and very likely increase.

126.    In adopting, implementing, and enforcing Defendant Trump's "priorities" to illegally terminate grants, Defendants have caused and will continue to cause significant concrete harm to Plaintiffs and the Class, as well as the UC System and the broader public that benefits from UC research, discovery, and inventions.

IV.    **Agencies that Terminated Lead Plaintiffs' Grants Have Acted According to a Common Unlawful Pattern**

127.    On information and belief, all Federal Agency Defendants similarly and abruptly failed to continue grants pursuant to Congress's directives, instead substituting Defendant Trump's agenda. In place of reasoned decision-making, the federal agencies took direction not only from the flurry of Executive Orders described herein, but in most instances

---

system was listed as a recipient.

[35] Diana Stancy, *White House Discloses Who Will Lead DOGE Efforts After Musk's Departure*, Fox News (May 29, 2025), https://www.foxnews.com/politics/white-house-discloses-who-will-lead-doge-efforts-after-musks-departure.

[36] *Id.*

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

46686\20709500

also took direction directly from DOGE staffers, who have no authority to direct or redirect allocation of federal funds. Indeed, in other cases, the United States, per its Department of Justice counsel, has on the record taken the position that Elon Musk—who helmed DOGE until days ago—did not occupy an "office," lacked a title conferring formal authority, and was thus beyond judicial review or legal consequence.[37]

128.    In terminating scores of already awarded federal grants, the Federal Agency Defendants acted recklessly in disregarding the law, failing to consider reliance interests, and failing to consider the harm resulting from immediately stopping ongoing research studies. These included terminations of grants that would require halting human drug trials midstream forcing researchers to breach basic principles of medical ethics.

129.    Moreover, the Federal Agency Defendants conducted no proper review of grants, instead mass-terminating with form letters those grants they deemed (with no explanation) to no longer "effectuate" agency priorities, notwithstanding that agencies cannot substitute the President's agenda for their congressionally imposed statutory mandates.

130.    This Complaint examines the errant grant practices at the seven Agencies that terminated Named Plaintiffs' grants—EPA, NEH, NSF, DOD, DOT, NIH, and DOE—and then describes how this same pattern played out within each Federal Agency Defendant, to the categorical and common detriment of the Class of UC researchers. There are UC researchers with grants from each and all of these agencies, including grants that have been or are very likely to be arbitrarily terminated.

A.    **Environmental Protection Agency**

131.    The Environmental Protection Agency ("EPA") is an independent federal agency established to address environmental pollution and protect the environment.

---

[37] *New Mexico v. Musk*, 2025 WL 1502747, at *13 (D.D.C. May 27, 2025) ("Essentially, Defendants argue, so long as the Executive acts without Congressional authority, the court cannot review its conduct.").

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

46686\20709500

1.    **Congress Established the EPA to Protect the Environment, Including Through Research**

132.    Throughout the 1960s, the American public grew increasingly concerned with air pollution, water pollution, and environmental degradation generally. This concern was manifest most markedly in the multi-site celebration of the first Earth Day on April 22, 1970, which drew an estimated 20 million Americans.[38] In response to such pressure, President Nixon the same year presented Congress with a comprehensive message on the environment and established a council to consider how to organize a federal response to environmental concerns.[39]

133.    On July 9, 1970, President Nixon sent Congress "Reorganization Plan No. 3 of 1970," which proposed consolidating several existing federal agency duties into one Environmental Protection Agency.[40] In his transmittal to Congress, President Nixon wrote that "it has become increasingly clear that we need to know more about the total environment—land, water, and air. It also has become increasingly clear that only by reorganizing our Federal efforts can we develop that knowledge, and effectively ensure the protection, development and enhancement of the total environment itself."

134.    Under the Reorganization Plan, EPA was given a "broad mandate" to "develop competence in areas of environmental protection that have not previously been given enough attention." EPA would have the "capacity to do research on important pollutants irrespective of the media in which they appear, and on the impact of these pollutants on the total environment. Both by itself and together with other agencies, EPA would monitor the condition of the environment—biological as well as physical."[41]

---

[38] Earth Day Network, *The History of Earth Day*, https://www.earthday.org/history/ (last visited May 29, 2025).
[39] *See* U.S. Envtl. Prot. Agency, *The Origins of EPA* (May 31, 2024), https://www.epa.gov/history/origins-epa.
[40] U.S. Envtl. Prot. Agency, *The Reorganization Plan No. 3 of 1970* (Sept. 6, 2016), https://www.epa.gov/archive/epa/aboutepa/reorganization-plan-no-3-1970.html.
[41] *Id.*

[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

135.     Although President Nixon (a Republican) disfavored the creation of new agencies, he broke his own rule "because arresting environmental deterioration is of great importance to the quality of life in our country and the world." He thus "believe[d] that in this case a strong, independent agency is needed."[42]

136.     The principal roles and functions of the new EPA would include:

- The establishment and enforcement of environmental protection standards consistent with national environmental goals.

- The conduct of research on the adverse effects of pollution and on methods and equipment for controlling it, the gathering of information on pollution, and the use of this information in strengthening environmental protection programs and recommending policy changes.

- Assisting others, through grants, technical assistance and other means in arresting pollution of the environment.

- Assisting the Council on Environmental Quality in developing and recommending to the President new policies for the protection of the environment.[43]

137.     After conducting hearings, Congress approved the proposal and EPA was created. Its first Administrator was sworn in on December 4, 1970.[44]

138.     EPA does not derive its regulatory authority from a single statute. Rather, a "number of laws serve as EPA's foundation for protecting the environment and public health." As Congress passes new environmental laws, EPA is most typically the agency tasked with writing regulations necessary to implement them.[45] Examples of key laws reflecting Congress's mandates to EPA include the Clean Air Act; the Clean Water Act; the Safe Drinking Water Act; the Federal Fungicide, Insecticide, and Rodenticide Act; the Toxic Substances Control Act; the Resource Conservation and Recovery Act; the Comprehensive Environmental Response, Compensation, and Liability Act (Superfund); and many more. As a

---

[42] *Id.*

[43] *Id.*

[44] U.S. Envtl. Prot. Agency, *The Origins of EPA* (May 31, 2024), https://www.epa.gov/history/origins-epa.

[45] U.S. Envtl. Prot. Agency, *Laws and Executive Orders*,(Jan.29, 2025), https://www.epa.gov/laws-regulations/laws-and-executive-orders.

[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

recent example, when Congress enacted the Inflation Reduction Act of 2022, it gave EPA a new mandate to administer an environmental and climate justice block grant program.[46]

139.    These laws all direct EPA to carry out its core mission: "to protect human health and the environment."[47]

140.    Pursuant to this mission, EPA works to ensure that:

- Americans have clean air, land, and water;

- National efforts to reduce environmental risks are based on the best available scientific information;

- Federal laws protecting human health and the environment are administered and enforced fairly, effectively, and as Congress intended;

- Environmental stewardship is integral to U.S. policies concerning natural resources, human health, economic growth, energy, transportation, agriculture, industry, and international trade, and these factors are similarly considered in establishing environmental policy;

- All parts of society—communities, individuals, and businesses, as well as state, local, and Tribal governments—have access to accurate information sufficient to effectively participate in managing human health and environmental risks;

- Contaminated lands and toxic sites are cleaned up by potentially responsible parties and revitalized; and

- Chemicals in the marketplace are reviewed for safety.[48]

141.    To accomplish its mission, EPA implements Congress's environmental laws by writing and enforcing regulations.[49]

142.    EPA also carries out its mission by making grants. Indeed, "EPA's mission to protect human health and the environment is accomplished, in large part, by the

---

[46] Marianne Lavelle & Peter Aldhous, *Trump's EPA Funding Cuts Target Disadvantaged Communities*, Inside Climate News (May 1, 2025), https://insideclimatenews.org/news/01052025/trump-epa-funding-cuts-target-disadvantaged-communities/#:~:text=The%20EPA's%20declaration%20said%20it,environmental%20justice%20is%20being%20terminated.

[47] U.S. Envtl. Prot. Agency, *Our Mission and What We Do* (Apr. 21, 2025), https://www.epa.gov/aboutepa/our-mission-and-what-we-do.

[48] *Id.*

[49] *Id*

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

46686\20709500

awarding of funds to other organizations to conduct environmental program or projects."[50]
EPA awards more than $4 billion in grants (called "assistance agreements") every year.

143.    According to EPA, its authority to make grants comes from three sources. First is the U.S. Constitution, which gives Congress the power of the purse in the Spending Clause. Second are statutes, in which Congress directs funds to be allocated to specific programs. Finally, the EPA derives grant-making power from regulations.[51]

144.    EPA makes many types of grants. One especially important type is research grants, which are often obtained by university researchers.

145.    EPA funds research through its Science to Achieve Results (STAR) program; its People, Prosperity, and the Planet (P3) Program; and its Small Business Innovation Research (SBIR) program. According to the agency, these "help to engage top research scientists, non-profit organizations, students, and small businesses that results in a strong scientific foundation to support the Agency's mission of protecting human health and the environment."[52]

146.    The STAR program is the "primary competitive, peer-reviewed extramural grant program that has awarded over 4,100 grants nationwide since 1995." The program "leverages the scientific and engineering expertise of academic and non-profit institutions to conduct high priority environmental and public health research," focusing on the effects of "air pollution, water quality and quantity, hazardous waste, toxic substances, pesticides, cumulative impacts, and more."[53]

---

[50] U.S. Envtl. Prot. Agency, *EPA Grants Overview for Applicants and Recipients*, https://www.epa.gov/grants/epa-grants-overview-applicants-and-recipients (last visited May 29, 2025).
[51] U.S. Envtl. Prot. Agency, *EPA Funding Instruments and Authorities*, https://www.epa.gov/grants/epa-funding-instruments-and-authorities (last visited May 29, 2025).
[52] U.S. Envtl. Prot. Agency, *About EPA's Research Grants*, https://www.epa.gov/research-grants/about-epas-research-grants (last visited May 29, 2025).
[53] *Id.*

46686\20709500

147.    STAR research is funded through Requests for Applications (RFAs) that are derived from the EPA Office of Research and Development's Strategic Plan. These grants "concentrate on areas of special significance to the EPA mission."[54]

148.    EPA grants are highly competitive. Of the approximately 2,500 proposals for STAR research grants every year, it awards only around 150 research grants and 125 graduate fellowships.[55]

149.    EPA research grants have funded critical projects, including research to advance clean drinking water technologies, address knowledge gaps in antimicrobial resistance, and reduce exposure to wildfire smoke.[56]

## 2.    In Response to Trump Administration Directives, the EPA Improperly Changed Priorities and Canceled Existing Grants

150.    On his first day in office, President Trump signed Executive Order 14151, "Ending Radical and Wasteful Government DEI Programs and Preferencing" (Jan. 20, 2025). The Order instructs the Director of the Office of Management and Budget (OMB), assisted by the Attorney General and others, to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." The Order repeatedly mentions "environmental justice" as a target.[57]

151.    In particular, Executive Order 14151 directs each federal agency to "terminate, to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice' offices and positions… [and all] 'equity-related' grants or contracts" within 60 days.

---

[54] U.S. Envtl. Prot. Agency, *Learn About Research Grants*, https://www.epa.gov/research-grants/learn-about-research-grants (last visited May 29, 2025).
[55] *Id.*
[56] *See, e.g.*, U.S. Envtl. Prot. Agency, *Research Grants in the News* (Sept. 23, 2024), https://www.epa.gov/research-grants/research-grants-news.
[57] Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025), https://www.federalregister.gov/documents/2025/01/29/2025-01953/ending-radical-and-wasteful-government-dei-programs-and-preferencing.

[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

152.    The President also signed Executive Orders related to energy, including "Declaring a National Energy Emergency" and "Unleashing American Energy."

153.    Shortly after President Trump took office, the EPA began working closely with DOGE.

154.    By March 7, 2025, the Democratic Staff of the Senate Committee on Environment and Public Works reported that the EPA had issued guidance to senior staff indicating that "all [funding] actions greater than $50,000 now require approval from an EPA DOGE Team member."[58]

155.    A huge part of this DOGE-EPA collaboration included mass-canceling grants. The EPA made no secret of DOGE's hand in EPA affairs, but rather, touted the DOGE partnership in press releases.

156.    For example, on February 25, 2025, an EPA press release announced a "second round of EPA-DOGE partnered cancellations." EPA stated that these cancellations "represent more than $60 million saved as the EPA puts a stop to wasteful DEI and environmental justice programs."[59]

157.    In a March 10, 2025 press release, EPA announced a fourth round of EPA-DOGE grant terminations, this time stating it was cancelling more than 400 grants "across nine unnecessary programs." This press release concluded, as have others, by stating: "EPA continues to work diligently to implement President Trump's Executive Orders."[60]

---

[58] Senate Envtl. & Pub. Works Comm., *Letter to EPA Administrator Lee Zeldin Regarding $50,000 Funding Approval Requirement* (Mar. 7, 2025), https://www.epw.senate.gov/public/_cache/files/b/c/bc3eafbf-38ea-4197-b655-8466b9901dce/00C154E2DBAFFDF3EF5063DA374406502B1835873497F8DE2F439A1710460D09.3.7.25-letter-to-epa-re-50k-attachments-002-.pdf.

[59] U.S. Envtl. Prot. Agency, *EPA Administrator Lee Zeldin Cancels 20 Grants in 2nd Round of Cuts with DOGE, Saving Americans More than $60M* (Feb. 25, 2025), https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-cancels-20-grants-2nd-round-cuts-doge-saving-americans.

[60] U.S. Envtl. Prot. Agency, *EPA Administrator Lee Zeldin Cancels 400+ Grants in 4th Round of Cuts with DOGE, Saving Americans More than $1.7B* (March 10, 2025), https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-cancels-400-grants-4th-round-cuts-doge-saving-americans.

46686\20709500

158.    The EPA has aligned itself closely with the Trump Administration. For example, on March 12, 2025 alone, the EPA issued 10 press releases in which it referred to itself as the "Trump EPA."[61]

159.    Also on March 12, EPA Acting Assistant Administrator Jeffrey Hall issued an internal memo regarding "Implementing National Enforcement and Compliance Initiatives Consistently with Executive Orders and Agency Priorities" (the "March 12 Administrator Memo").[62]

160.    Among EPA's functions is to establish, every four years, National Enforcement and Compliance Initiatives ("NECIs") that are published in the Federal Register. These are "national initiatives, developed in a non-partisan way across administrations" after soliciting public input.[63] NECIs allow the EPA to focus its resources on widespread problems.[64]

161.    NECIs for fiscal year 2023-2027 were set on August 17, 2023. The six NECIs—half of which were modified or continued from prior years—are: (1) mitigating climate change; (2) addressing exposure to PFAS; (3) protecting communities from coal ash contamination; (4) reducing air toxics in overburdened communities; (5) increasing compliance with drinking water standards; and (6) chemical accident risk reduction.[65]

162.    While the March 12 Memo did not (yet) purport to eliminate the NECIs, it did state, ominously, that notwithstanding the robust and legally required public process used to produce them, "the focus of specific NECIs shall be adjusted to conform to the President's Executive Orders and the Administrator's Initiative."[66]

---

[61] U.S. Envtl. Prot. Agency, *Search News Release,* https://www.epa.gov/newsreleases/search?f%5B0%5D=year%3A2025-03&page=3 (last visited May 27, 2025).

[62] U.S. Envtl. Prot. Agency, *Implementing National Enforcement and Compliance Initiatives Consistently with Executive Orders and Agency Priorities* (Mar. 12, 2025), https://www.epa.gov/system/files/documents/2025-03/necimemo-20250312.pdf.

[63] U.S. Envtl. Prot. Agency, *FY 2024–2027 National Enforcement and Compliance Initiatives* (Aug. 17, 2023), https://www.epa.gov/system/files/documents/2023-08/fy2024-27necis.pdf.

[64] *Id.*

[65] *Id.*

[66] U.S. Envtl. Prot. Agency, *Implementing National Enforcement and Compliance Initiatives Consistently with Executive Orders and Agency Priorities* (Mar. 12, 2025),

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

163.    The "Administrator's Initiative" refers to EPA Administrator Lee Zeldin's "Powering the Great American Comeback" initiative, which he announced on February 4, 2025. The initiative has five major pillars: (1) Clean Air, Land, and Water for Every American; (2) Restore American Energy Dominance; (3) Permitting Reform, Cooperative Federalism, and Cross-Agency Partnership; (4) Make the United States the Artificial Intelligence Capital of the World; and (5) Protecting and Bringing Back American Auto Jobs.[67]

164.    More generally, the March 12 Memo made clear that the EPA would conform to President Trump's wishes, regardless of the agency's congressional mandates.

165.    In a court filing on April 23, 2025, an EPA Deputy Assistant Administrator (Dan Coogan) revealed that EPA leadership had conducted a review of grants to determine "which should be terminated based on alignment with Administration priorities." He stated that "EPA began this process for the Administration in January 2025."[68]

166.    Although the EPA asserted that this was an "individualized, grant-by-grant review," it provided no substantiation that this occurred, and there is no reason to believe that it did. Instead, Mr. Coogan revealed that EPA was slated to terminate entire grant programs and spheres of activity that Congress had mandated in the Inflation Reduction Act. These included: (a) the Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program; (b) Surveys, Studies, Investigations, Training and Special Purpose Activities Relating to Environmental Justice; (c) the Environmental Justice Government-to-Government Program; (d) the Environmental Justice Small Grant Program; (e) Financial Assistance for Community Support Activities To Address Environmental Justice Issues; (f) the Environmental Justice Thriving Communities Grantmaking Program; (g) the

---

https://www.epa.gov/system/files/documents/2025-03/necimemo-20250312.pdf.

[67] U.S. Envtl. Prot. Agency, *ICYMI: Administrator Zeldin's "Powering the Great American Comeback" Unveiled at the EPA* (Feb. 4, 2025). https://www.epa.gov/newsreleases/icymi-administrator-zeldins-powering-great-american-comeback-unveiled-epa.

[68] U.S. Envtl. Prot. Agency, *EPA Court Filing* (Apr. 23, 2025), https://www.documentcloud.org/documents/25919517-epa-court-filing-april-23-2025/?mode=document at ¶ 3.

1  Environmental and Climate Justice Block Grant Program; and (h) Reducing Embodied
2  Greenhouse Gas Emissions for Construction Materials and Products.[69]

3      167.    Despite a district court's issuance of a preliminary injunction on April
4  15, 2025 preventing the EPA from indefinitely freezing grants previously awarded under
5  Biden-era legislation,[70] Mr. Coogan stated that the EPA would maintain its grant terminations.
6  He revealed that EPA had sent notices of termination to 377 grantees, and would send
7  termination letters to an additional 404 grantees within two weeks.[71]

8      168.    On information and belief, EPA turned its attention to universities and
9  other research grants on or around April 15, 2025. According to reports, Mr. Coogan on that
10  date sent an email directing staff to cancel existing grants awarded to universities and research
11  institutes.[72]

12      169.    Grant termination documents make plain that the agency is not
13  conducting any proper review of grants, but rather, baselessly terminating grants to promote
14  the President's agenda. Grants terminated because they supposedly do not "effectuate agency
15  priorities" (which mirror the President's priorities) include those intended to, for example,
16  provide clean drinking water in rural communities or provide air purifiers for children with
17  asthma.[73]

18      170.    Instead of providing researchers with reasoned explanations of
19  termination decisions, the EPA is sending form termination letters. The letters are not
20  personalized or even signed.

---

[69] *Id.* at ¶ 6.

[70] National Council of Nonprofits, *Statement in Response to Preliminary Injunction Issued in Woonasquatucket River Watershed Council et al v. Department of Agriculture et al* (Apr. 15, 2025), https://www.councilofnonprofits.org/pressreleases/statement-response-preliminary-injunction-issued-woonasquatucket-river-watershed.

[71] *Id.* at ¶ 5.

[72] *See* Erik Stokstad, *EPA Orders Staff to Begin Canceling Research Grants*, Science (Apr. 21, 2025), https://www.science.org/content/article/epa-orders-staff-begin-canceling-research-grants; and Hiriko Tabuchi, *E.P.A. Set to Cancel Grants Aimed at Protecting Children from Toxic Chemicals,* The New York Times (Apr. 21, 2025), https://www.nytimes.com/2025/04/21/climate/epa-cuts-forever-chemicals-grants.html.

[73] Hayley Smith, *California Nonprofits Suffer After EPA Cancels Hundreds of Environmental Grants,* Los Angeles Times (May 8, 2025*),* https://www.latimes.com/environment/story/2025-05-08/california-nonprofits-suffer-after-epa-cancels-hundreds-of-environmental-grants.

171.    One such letter, received by Plaintiff Thakur on April 28, 2025, reads as follows:

**Subject:**  Termination of EPA Assistance Agreement [Grant No.] under 2 CFR 200.340

**From:**  EPA Award Official

**To:**  [Grant Recipient]

This EPA Assistance Agreement is terminated in its entirety effective immediately on the grounds that the award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities.

The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In addition to complying with the law, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities.

172.    This pro-forma explanation citing vague "Agency priorities" does not constitute reasoned decision-making nor explain why the terminated grants no longer effectuate such priorities.

**3.    EPA Plaintiffs and Other Grant Recipients Are Harmed by EPA's Illegal Grant Terminations**

173.    Plaintiffs and Class members have long relied on EPA grants to fund meritorious projects aimed at protecting human health and the environment. The termination of previously approved grants has caused and continues to cause Plaintiffs and Class members serious harm.

a.      **Plaintiff Neeta Thakur's Grant Termination and Resulting Harm**

174.    Dr. Neeta Thakur is a pulmonary and critical care specialist at the University of California, San Francisco (UCSF) who examines the role of social and environmental stressors on asthma and COPD in historically marginalized communities. She currently serves as Medical Director of the Zuckerberg San Francisco General Hospital Chest Clinic and is an associate professor of medicine and pulmonary and critical care clinician at UCSF.

175.    Dr. Thakur's research focuses on (1) defining obstructive lung disease phenotypes that exist in racially and ethnically diverse communities and how these are shaped by social and environmental stressors; (2) identifying community-specific drivers that place individuals at high risk for poor outcomes; and (3) co-developing place-based and targeted interventions aimed at social and environmental stressors to improve respiratory outcomes in historically marginalized populations. In recognition of her research leadership, she was this year (2025) made faculty director of Clinical Research Operations for the Clinical Trials Operations Unit at UCSF's Clinical & Translational Science Institute.

176.    Dr. Thakur's research has been supported by state grants, federal grants from the National Institutes of Health (NIH), foundation grants, and other sources.

Grant Application to EPA

177.    In November 2021, Dr. Thakur submitted a grant application to EPA in response to its announcement of funding opportunity EPA-G2021-STAR-H1. This opportunity, made available through the agency's Science to Achieve Results (STAR) program, focused on "Cumulative Health Impacts at the Intersection of Climate Change, Environmental Justice, and Vulnerable Populations/Lifestages: Community-Based Research for Solutions."

178.    The grant application, titled "Partnering for Resilient Opportunities To Eliminate Toxic (PROTECT) Health Effects from Wildfire PM2.5 in Environmental Justice

Communities," addressed the potential to prevent adverse health effects to environmental justice communities from the fine particulate matter (PM2.5) from wildfire smoke.

179.    The proposal aimed to (1) estimate the health effects of sub-daily exposure to wildfire-specific PM2.5 in California, with particular focus on effects within environmental justice communities; (2) understand community recovery from short-term health effects following exposure; (3) understand indoor infiltration of wildfire smoke and the mitigating effect of housing quality and behaviors on health effects; and (4) identify acceptable, community-relevant interventions to mitigate exposure. Dr. Thakur was the Principal Investigator on the grant proposal, which included nine investigators across three institutions: UCSF, UC Berkeley, and California's Office of Environmental Health Hazard Assessment.

180.    The grant Application requested funding commensurate with the cumulative 3-year budget of $1,330,536 to support this multi-campus, multi-agency, multi-nonprofit research collaboration.

EPA's Grant Award

181.    On November 22, 2022, an EPA Senior Grants Management Specialist, Jennifer Brooks, sent Dr. Thakur a Notice of EPA's award and the Grant Agreement. The Agreement authorized the proposal for Project Period 12/01/2022-11/30/2025; committed an initial grant of $690,000 (approximately half of project costs); and explained that EPA was "funding this agreement incrementally."

182.    On June 21, 2023, Brooks sent Dr. Thakur a second Notice of EPA Award and an Assistance Amendment. The Amendment likewise indicated that the team was authorized to proceed for Project Period 12/01/2022-11/30/2025. It stated that EPA was awarding $640,536, bringing the total federal funding award to $1,330, 536.

EPA's Grant Termination

183.    On April 28, 2025, EPA sent to the UC Regents an "Assistance Amendment" that instructed Thakur's team to "stop work; terminate the [grant] agreement; reduce performance period duration; [and] curtail scope of work." It stated that "(EPA)

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

46686\20709500

hereby awards $0.00" towards any unfunded, as-yet-unincurred costs of the previously awarded $1,330,536.

184.    The Assistance Amendment stated: "The Agency is asserting its right under 2 C.F.R. 200.340 and the Termination General Term and Condition [sic] of this agreement to unilaterally terminate this award." The Amendment was accompanied by a memorandum from EPA to the Director of Contracts and Awards at UCSF titled "Termination of EPA Assistance Agreement RD 84048101 under 2 CFR 200.340."

185.    The memo stated that EPA terminated Dr. Thakur's grant because "the award no longer effectuates the program goals or agency priorities." It further asserted that the grant "provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities."

186.    This explanation does not explain why the grant would contradict agency priorities when EPA Director Zeldin has announced new priorities under his "Powering the Great American Comeback" initiative that align fully with the purpose of Dr. Thakur's grant. The first stated EPA priority is "Clean Air, Land, and Water for Every American."[74] Dr. Thakur's grant effectuates that purpose.

187.    As a result of this unilateral, unlawful grant termination, Dr. Thakur has been unable to complete health analyses with UC Berkeley grantee-colleagues, or to identify promising strategies to protect community health across California during wildfire smoke events.

188.    Instead, Dr. Thakur has had to spend significant time seeking alternate funding sources. This includes unexpected grant writing, and reaching out to other funding

---

[74] U.S. Envtl. Prot. Agency, *EPA Administrator Lee Zeldin Announces EPA's "Powering the Great American Comeback" Initiative* (Feb. 4, 2025), https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-announces-epas-powering-the-great-american-comeback.

sources, including philanthropy groups. In addition, to support staff and avoid layoff of two individuals, she has had to use her own discretionary funds to support team members.

189.    The UCSF and UC Berkeley researchers on this grant have also been unable to complete the proposed analyses of the health impacts of wildfire smoke events across California. This is after considerable work by UC Berkeley researchers to develop a map unprecedented in its detail, showing hourly levels of wildfire smoke by location. As a consequence of termination, at least three research publications will go unpublished that have the potential for high impact for public health and for science more generally.

190.    The premature termination of this grant has also compromised the trust-building necessary for community-engaged participatory action research. It has taken years of effort for Dr. Thakur to develop relationships with the community based organizations and community-engaged individuals who assisted Dr. Thakur in obtaining this grant (by writing letters in support), with the expectation that her project would deliver tangible benefits to their low income communities in the form of improved respiratory health. EPA's termination of this grant will make it more difficult for her and her collaborators to partner with organizations such as the Central California Asthma Collaborative in Fresno and the environmental justice nonprofit Brightline in San Francisco, as well as a specific community-trusted scientist in Richmond.

191.    Additionally, were Dr. Thakur and her team to eventually find replacement funding for this project (a difficult proposition given the sums at stake), they would no longer be adequate to cover personnel, equipment and outreach expenses.

192.    These personal and financial harms are ongoing.

193.    These harms are in addition to the loss of value to the public from Dr. Thakur's research team's inability to complete work on studying health risks from the fine particulate matter associated with wildfire, and inability to design health-protective interventions for three of California's most health-vulnerable communities.

46686\20709500

1

                              **b.**       **Plaintiff Ken Alex's Grant Termination and Resulting Harm**

2

        194.     Since 2019, Ken Alex has served as Director of Project Climate at the

3

Center for Law, Energy & the Environment (CLEE) at UC Berkeley School of Law. He

4

founded Project Climate, a think tank designed to move promising environmental research

5

into the policy realm quickly.

6

        195.     Prior to joining CLEE, Alex worked for many years for Governor Jerry

7

Brown on climate-related policy and, before that, for the California Attorney General's

8

Office. His roles as climate policy expert and gubernatorial advisor on the topic were the

9

subject of a 2020 profile in CalMatters.[75]

10

           EPA Grant Application

11

        196.     In 2022, EPA's Office of Research and Development sought

12

applications proposing research on air emissions from municipal solid waste (MSW) landfills,

13

which are a significant source of methane emissions—one of Alex's areas of expertise. The

14

grant solicitation was part of EPA's Science to Achieve Results (STAR) program, and was

15

conducted in collaboration with the Air, Climate, and Energy (ACE) research program.

16

        197.     EPA's request for applications solicited proposals that addressed EPA-

17

identified research priorities, including "cost effective stationary, mobile, aerial, and remote

18

sensing" technologies and measurements that could accurately quantify methane emissions

19

from landfills and evaluate strategies to mitigate them. EPA also sought proposals that

20

encompassed landfill emissions of "hazardous air pollutants (HAPs), and other air pollutant

21

emissions from municipal solid waste (MSW) landfills."[76]

22

        198.     In collaboration with a UC Berkeley engineer with specialized

23

expertise in landfill design and other researchers, Alex developed a detailed proposal for

24

applying cutting edge technologies, including satellites and AI, to improve the detection of

25

methane and HAP releases from landfills and to improve the quality of policy responses. The

26

---

[75] *See* Julie Cart, *Meet Ken Alex, Gov. Brown's Climate Concierge* (updated June 23, 2020),

27

https://calmatters.org/environment/2018/10 /ken-alex-jerry-brown-climate-change-california/.

[76] *See* EPA Solicitation for PA-G2023-STAR-B1, *Understanding and Control of Municipal Solid Waste Landfill Air Emissions*,

28

https://cfpub.epa.gov/ncer_abstracts/index.cfm/fuseaction/display.rfatext/rfa_id/701.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

46686\20709500

1    Grant Application was submitted to EPA on December 21, 2022. It proposed a cumulative

2    budget of $999,999 (later rounded to $1,000,000).

3            Award of Grant Funding

4            199.    On October 19, 2023, EPA notified UC Berkeley that it was awarding

5    the grant, and provided the first of two installments of grant funding.

6            200.    On December 16, 2024, EPA notified UC Berkeley that it was

7    awarding the second and final installment of grant funding, bringing the total funding

8    awarded to $1,000,000.

9            201.    The EPA's web page, *Understanding and Control of Municipal Solid*

10   *Waste Landfill Air Emissions Grants* (https://www.epa.gov/research-grants/understanding-

11   and-control-municipal-solid-waste-landfill-air-emissions-grants) (accessed May 12, 2025)

12   continues to publicize the grant as one among five awarded.

13           EPA's Grant Termination

14           202.    On April 29, 2025, EPA sent to the UC Regents an "Assistance

15   Amendment" that instructed Alex's research team to "stop work; terminate the [grant]

16   agreement; reduce performance period duration; [and] curtail scope of work." It stated that

17   "(EPA) hereby awards $0.00" towards any unfunded, as-yet-unincurred costs of the

18   previously awarded $1,000,000.

19           203.    The Assistance Amendment stated: "The Agency is asserting its right

20   under 2 C.F.R. 200.340 and the Termination General Term and Condition of this agreement to

21   unilaterally terminate this award." The Amendment was accompanied by a memorandum

22   from EPA titled "Termination of EPA Assistance Agreement RD 84062301 under 2 CFR

23   200.340."

24           204.    The memo stated that EPA terminated Alex's grant because "the award

25   no longer effectuates the program goals or agency priorities." The memo further asserted that

26   the grant "provides funding for programs that promote initiatives that conflict with the

27   Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory

28   functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

46686\20709500

1    serve the best interests of the United States. The grant is inconsistent with, and no longer

2    effectuates, Agency priorities."

3        205.    The memo did not explain why Alex's grant no longer effectuates EPA

4    priorities, which currently include "Clean Air, Land, and Water for Every American."

5                    Harm from EPA's Grant Termination

6        206.    Alex and his project team have suffered immediate harm as a result of

7    the unlawful unilateral cancellation of the grant. Specifically, the team has been unable to

8    continue and complete the novel work related to evaluating HAPs and their relationship to

9    methane emissions from landfills. Furthermore, some of his researchers and graduate students

10    have already lost hours and compensation, and one or more will likely be let go.

11        207.    Even if Alex and his team were eventually to find replacement funding

12    for this project (a difficult proposition given the sum at stake), the delay and uncertainty

13    would preclude full recovery of the project.

14        c.    **Plaintiff Nell Green Nylen's Grant Terminations and Resulting Harm**

16        208.    Dr. Nell Green Nylen joined the Wheeler Water Institute at the Center

17    for Law, Energy & the Environment (CLEE) at UC Berkeley School of Law as a Research

18    Fellow in 2013. Since 2016, she has been a Senior Research Fellow at CLEE, providing

19    analysis and recommendations at the intersection of law, policy, and science to inform water

20    governance and management.

21        209.    Much of Dr. Green Nylen's work at CLEE has focused on improving

22    management of water resources across hydrologic extremes—from times of water scarcity to

23    times of abundance. This includes research on enhanced aquifer recharge ("EAR"), a tool for

24    capturing water to increase groundwater supply. Another area of her focus has been

25    improving the information and policy environment for implementing innovative water

26    management solutions, including water reuse.

27

28

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

46686\20709500

210.    EPA unilaterally terminated two large grants Dr. Green Nylen was working on that were meant to fund collaborative work with other researchers on issues at the core of her technical and legal expertise.

<u>EPA Enhanced Aquifer Recharge Grant Application and Funding</u>

211.    In 2021, EPA's Office of Research and Development sought applications proposing research to develop cost-benefit tools to support EAR. The grant solicitation was part of EPA's Science to Achieve Results (STAR) program and solicited research proposals that would "identify the key economic, technological, institutional, and legal factors that affect the ability to implement" EAR projects; identify best practices and tools for implementing EAR projects to achieve different purposes; and, ultimately, "improve life-cycle cost-benefits analysis to support cost-effective enhanced aquifer recharge."

212.    Dr. Green Nylen was part of a UC Berkeley team that collaborated with a broader multi-disciplinary team of researchers from UC Davis, UC Santa Cruz, and UC Law San Francisco to develop a proposal that they submitted to EPA on January 13, 2022.

213.    The proposal—titled "A Knowledge-to-Implementation Framework for Enhanced Aquifer Recharge"—described a three-year project with outputs including: (a) developing guidance on evaluating EAR sites, determining what conditions are necessary to effectively maintain an EAR project, and ensuring that EAR projects maintain aquifer water quality; (b) developing guidance on navigating the legal, policy, and organizational contexts for EAR; (c) developing recommendations for legal and policy changes that could facilitate EAR; (d) developing a generalized framework for cost-benefit analysis of EAR projects; and (e) creating a capstone "Lifecycle Map" report on EAR. In other words, the outputs would provide one-stop shopping for people interested in planning, evaluating, and implementing EAR projects. The Grant Application proposed a cumulative budget of $2,000,000 (later adjusted to $1,999,998).

214.    On July 20, 2022, EPA notified UC Berkeley that it was awarding the grant. The award was publicized on EPA's web page, *Life-Cycle Analysis to Support Cost-Effective Enhanced Aquifer Recharge Grant* (https://www.epa.gov/research-grants/life-cycle-

analysis-support-cost-effective-enhanced-aquifer-recharge-grant). The grant's original end date was August 31, 2025. On April 10, 2025, Dr. Green Nylen's team requested a no-cost extension of the grant for which they received verbal approval and were awaiting formal written approval.

<u>EPA's Termination of the Enhanced Aquifer Recharge Grant</u>

215.    On May 7, 2025, EPA sent the UC Regents a document styled as an "Assistance Amendment" that instructed Dr. Green Nylen's team to "stop work; terminate the [grant] agreement; reduce performance period duration; [and] curtail scope of work." It also stated that "(EPA) hereby awards $0.00" towards any as-yet-unincurred costs. Through the Assistance Amendment, EPA was purportedly "asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award."

216.    The Amendment was accompanied by a memorandum from EPA to the Contracts and Grants Officer for the Regents of the University of California titled "Termination of EPA Assistance Agreement RD- 84046301-1 under 2 CFR 200.340." The memo stated that EPA terminated Dr. Green Nylen's grant because, according to the memo, "the award no longer effectuates the program goals or agency priorities." The memo further asserted that the grant "provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities."

217.    The memo did not explain why EPA had concluded that Dr. Green Nylen's award is "no longer consistent with EPA funding priorities," which are defined partly by governing statutes, and federal statutes specifically identify EAR research as an EPA funding priority and mandate. *See* 33 U.S.C § 1276. It also did not explain why the project was inconsistent with the EPA's priority pillars, which include ensuring that "[e]very

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

American [has] access to clean air, land, and water" and prioritizing permitting reform.[77] The core purpose of the team's research is promoting access to clean water.

EPA Water Reuse Grant Application and Funding

218.    In 2021, EPA's Office of Research and Development sought applications proposing research designed to "accelerate water innovation, information availability, and engagement to advance clean and safe water reuse goals, promote better understanding of the Nation's water and wastewater treatment and infrastructure, and enhance the availability and efficient use of water resources through water reuse."

219.    In response to the solicitation, the Director of the Wheeler Water Institute at CLEE and Dr. Green Nylen collaborated with a multi-disciplinary team of researchers from Iowa State University and the University of Rhode Island to develop a research proposal aimed at accelerating readiness for water reuse in small water systems across the nation.

220.    The lead Principal Investigator at Iowa State University submitted the grant proposal—titled "Accelerating Technical and Community Readiness for Water Reuse in Small Systems"—to EPA on September 29, 2021. It described a four-year project that would (a) develop methods to inventory sources of water for beneficial reuse across the nation; (b) produce guidance on water source / treatment technology / end-use combinations that may be appropriate for small communities; (c) support cost-benefit analysis of different water reuse options in small communities; (d) survey small communities to assess public attitudes towards different water reuse options; (e) produce guidance on opportunities for fostering institutional innovation to overcome barriers to water reuse in small communities; and (f) construct implementation roadmaps centered around windows of opportunity for water reuse for several case-study communities.

221.    The Grant Application proposed a total budget of $4,057,500, combining a request for $3,246,000 of federal funds with a commitment from the research

---

[77] See Administrator Lee Zeldin Announces EPA's "Powering the Great American Comeback" Initiative, EPA (Feb. 4, 2025), https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-announces-epas-powering-great-american-comeback.

46686\20709500

team to provide an $811,500 cost share from other sources. The budget included (a) personnel and personnel travel costs; (b) participant support costs; (c) laboratory supplies and laboratory user fees; (d) support for consultants; (e) tuition remission for graduate students; and (f) indirect costs. This included a subaward of $559,941 to UC Berkeley.

222.    On August 8, 2022, EPA notified Iowa State University that it was awarding the grant, and Iowa State University notified the subrecipients, including UC Berkeley. The award was publicized on EPA's web page, *National Priorities: Water Innovation, Science and Engagement to Advance Water Reuse Grants* (https://www.epa.gov/research-grants/national-priorities-water-innovation-science-and-engagement-advance-water-reuse-1).

### EPA's Termination of the Water Reuse Grant

223.    On May 12, 2025, EPA sent to Iowa State University a document styled as an "Assistance Amendment" that instructed Dr. Green Nylen's team to "stop work; terminate the [grant] agreement; reduce performance period duration; [and] curtail scope of work." It also stated that "(EPA) hereby awards $0.00" towards any as-yet-unincurred costs. Through the Assistance Amendment, the EPA was purportedly "asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award."

224.    The Amendment was accompanied by a memorandum from EPA to the Pre-Award Administrator at Iowa State University titled "Termination of EPA Assistance Agreement CR- 84046101 under 2 CFR 200.340." The memo stated that EPA terminated Dr. Green Nylen's grant because, according to the memo, "the award no longer effectuates the program goals or agency priorities." The memo further asserted that the grant "provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency

1    priorities." The reasons provided for termination of the EPA Water Reuse Grant and the EPA

2    Enhanced Aquifer Recharge Grant were identical.

3            225.    As with the EPA Enhanced Aquifer Recharge Grant, the termination

4    memo for the EPA Water Reuse Grant did not explain how EPA concluded that the award is

5    "no longer consistent with EPA funding priorities," even though EPA states that addressing

6    the wastewater challenges of small, rural communities remains one of its ongoing priorities.[78]

7            Harm from the Grant Terminations

8            226.    Dr. Green Nylen, and the larger project teams for both grant projects,

9    have suffered immediate harm as a result of the cancellation of these grants.

10           227.    For the Enhanced Aquifer Recharge Grant, the harms include: an

11   inability to proceed with the basic work of refining the team's analysis and distilling that

12   information for the capstone Lifecycle Map report and the team's inability to work together to

13   complete the capstone report and the accompanying cost-benefit analysis decision support

14   tool.

15           228.    For the Water Reuse Grant, the harms include an inability to proceed

16   with the basic work of the project. For example, the team has been unable to continue their

17   interview-based research. Further, if the funding is not reinstated, the work that has already

18   gone into the project will go to waste.

19           229.    For both grants, even if replacement funding is secured, the delay will

20   preclude full recovery of the project. The current teams are unlikely to be able to stay together

21   over a prolonged period. Further, time spent searching for replacement funding has

22   considerable opportunity and financial costs (as well as societal costs), as that time would

23   otherwise be allocated to work on other water-related research projects that confer public

24   benefit.

---

[78] *See EPA Announces $49 Million in Technical Assistance to Help Rural, Small, and Tribal Communities Address Wastewater Challenges* (Apr. 29, 2025), https://www.epa.gov/newsreleases/epa-announces-49-million-technical-assistance-help-rural-small-and-tribal-0.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

230.    In addition, at CLEE, the jobs of every member of the water team are currently threatened by these grant terminations. CLEE is a self-funded entity at UC Berkeley that does not receive general salary support from the University. Without grant and contract funding, the team members will not get paid their full salary and could lose their jobs. Absent the reinstatement of these grants, members of the team could likely be let go in the coming months.

**B.    National Endowment for the Humanities**

231.    The National Endowment for the Humanities ("NEH") is an independent federal agency established to support the advancement of the humanities across the United States.

**1.    Congress Established NEH to Fund Projects to Support Humanities Research, Training, and Education**

232.    Congress created NEH in 1965, as part of the National Foundation on the Arts and Humanities Act of 1965 ("NFAHA"). Pub. L 89-209, 79 Stat. 845 (Sept. 29, 1965) (codified at 20 U.S.C. §§ 951-60).

233.    The legislation was the result of years of advocacy to ensure that arts and humanities were not left behind as the nation focused on scientific progress. As laid out in the enabling statute, a "high civilization must not limit its efforts to science and technology alone but must give full value and support to the other great branches of man's scholarly and cultural activity." P.L. 89-209, sec. 2(2). Congress further explained that it was necessary and appropriate for the federal government to create and sustain a "climate encouraging freedom of thought, imagination, and inquiry." *Id.* at (4).

234.    In the sixty years since NFAHA's passage, Congress has repeatedly reaffirmed its commitment to these goals. Last updated in 1990, the enabling statute makes clear that the "humanities belong to all people of the United States," 20 U.S.C. § 951(1), and that "[d]emocracy demands wisdom and vision in its citizens. It must therefore foster and support a form of education, and access to the arts and the humanities, designed to make

46686\20709500

people of all backgrounds and wherever located masters of their technology and not its

unthinking servants." *Id.* at § 951(4).

235.    In other words, congressional intent was to ensure that what is now

sometimes short-handed as "DEI," and branded by Defendants as illegal and undesirable, was

Congress's actual mandate, unchanged for 60 years, until upended on Inauguration Day.

236.    Congress determined it is "necessary and appropriate for the Federal

Government to complement, assist, and add to programs for the advancement of the

humanities and the arts by local, State, regional, and private agencies and their organizations."

20 U.S.C. § 951(5). Congress created NEH and its sister agency the National Endowment for

the Arts ("NEA") so Americans could understand "the diversity of excellence that comprises

our cultural heritage." *Id.* at 951(9).

237.    Accordingly, Congress established NEH to provide funding for

individuals involved in research, publication of scholarly works, and promotion of the

humanities. *See* 20 U.S.C. § 956. Under the statute, the Chairperson of the NEH is

"authorized to enter into arrangements, including contracts, grants, loans, and other forms of

assistance" to effectuate these goals. *Id.*

238.    Congress's directives for NEH specifically require it to support diverse

and underrepresented viewpoints.

239.    For example, one statutory function of NEH is to authorize grants to

"initiate and support programs and research which have substantial scholarly and cultural

significance and that reach, or reflect the diversity and richness of our American cultural

heritage, including the culture of, a minority, inner city, rural, or tribal community." 20 U.S.C.

§ 956(c)(4).

240.    Likewise, in selecting recipients of funding, NEH's Chairperson "shall

give particular regard to scholars, and educational and cultural institutions, that have

traditionally been underrepresented." 20 U.S.C. § 956(c).

241.    Congress's commitment to funding humanities initiatives that mirror

the breadth and diversity of American culture is clear in the structure of the grant-making

46686\20709500

1   process. Under the statute, the Chairperson of the NEH determines funding "with the advice

2   of the National Council on the Humanities." 20 U.S.C. § 956(c).

3   242.    The Council is comprised of twenty-six members appointed by the

4   President, "selected from among private citizens of the United States who are recognized for

5   their broad knowledge of, expertise in, or commitment to the humanities," and who will

6   "provide a comprehensive representation of the view of scholars and professional

7   practitioners in the humanities and of the public throughout the United States." 20 U.S.C.

8   § 957(b). In making appointments, the "President shall give due regard to equitable

9   representation of women, minorities, and individuals with disabilities who are involved in the

10  humanities." *Id.*

11  243.    NEH's Chairperson "shall not approve or disapprove any such

12  application [for funding] until the Chairperson has received the recommendation of the

13  Council." *Id.* at § 957(f).

14  244.    NEH's other statutory functions include providing funding to:

15  a.    develop and encourage the pursuit of a national policy for the

16  promotion of progress and scholarship in the humanities;

17  b.    initiate and support research and programs to strengthen the

18  research and teaching potential of the United States in the humanities by making arrangements

19  with individuals or groups to support such activities;

20  c.    initiate and support training and workshops in the humanities by

21  making arrangements with institutions or individuals;

22  d.    foster international programs and exchanges;

23  e.    foster the interchange of information in the humanities;

24  f.    foster, with groups, education in, and public understanding and

25  appreciation of the humanities;

26  g.    support the publication of scholarly works in the humanities;

27

28

- 53 -

h.    ensure that the benefit of its programs will also be available to our citizens where such programs would otherwise be unavailable due to geographic or economic reasons; and

i.    foster programs and projects that provide access to, and preserve materials important to research, education, and public understanding of, the humanities.

20 U.S.C. § 956.

245.    For sixty years, NEH has carried out its duty to fund research, training, and education that advance the humanities. Since 1965, NEH has awarded over $6 billion to support "museums, historic sites, universities, teachers, libraries, documentary filmmakers, public TV and radio stations, research institutions, scholars, and local humanities programming."[79] Indeed, NEH is the largest federal funder of the humanities, and (at least until recently) offered 47 grant programs that support humanities work around the country.[80]

246.    Since its inception, NEH funding has contributed to over 70,000 projects in all 50 states and jurisdictions; over 9,000 books (including 20 Pulitzer Prize winners); and over 500 film and radio programs (including six Oscar nominees, 30 Peabody award winners, and 27 Emmy award winners).[81] NEH funding has also supported collecting the papers of twelve United States presidents and of several other notable American figures including Mark Twain, Thomas Edison, Martin Luther King Jr., and Ernest Hemingway.[82]

247.    NEH has long had a strong relationship with the UC system. In 1974, for example, NEH supported UC Berkeley as it launched what would become the National Writing Project, which trains teachers to help youth nationwide learn how to do research, form arguments, and write publicly on topics they care about.[83] And in 2011, NEH and China's Ministry of Culture hosted a "Bi-national Conversation on Bridging Cultures" at UC

---

[79] Nat'l Endowment for the Humanities, https://www.neh.gov/, (last visited May 27, 2025).

[80] Nat'l Endowment for the Humanities, *Grants,* https://www.neh.gov/grants (last visited May 27, 2025).

[81] Nat'l Endowment for the Humanities, NEH Funding by the Numbers (description of data on homepage), https://www.neh.gov/ (last visited May 27, 2025).

[82] *Id.*

[83] Nat'l Writing Project, https://www.nwp.org/ (last visited May 29, 2025).

46686\20709500

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

Berkeley, bringing together artists, writers, historians, and political theorists of both countries.[84]

248.    As designed by statute, NEH funding supports a broad array of projects, including preserving endangered languages, digitizing early newspapers, depicting the history of the civil rights struggle through film, and detailing what life was like for early American colonists.[85]

249.    Prior to January 20, 2025, NEH funding recipients were selected after a rigorous review process. Every year, NEH recruits over 1,000 experts from every state and organizes them into 200 review panels that evaluate roughly 5,700 grant applications. The panels are selected for their expertise in disciplines relevant to the grant programs.[86] The panels are announced in the Federal Register, and panelists' names are listed in NEH's annual reports.

250.    This exacting review proceeded as follows: After a grant application was submitted, it was assigned to a specific peer-review panel based on academic discipline, institutional type, project area, or project type. The evaluators on the panel read all assigned applications and assigned them a rating based on "NEH's published review criteria and program guidelines." These criteria "emphasize humanities significance, the applicant's abilities and qualifications, the proposal's clarity of expression, and the project's feasibility, design, cost, and work plan."[87] After each evaluator assessed the application, the panel would meet to discuss the applications.

251.    Next, NEH staff reviewed the panels' work and recommended the most meritorious applications to the National Council (described above). The Council meets three times a year to discuss the applications and finalize recommendations to the Chairperson.[88]

---

[84] Nat'l Endowment for the Humanities, *NEH Timeline,* https://www.neh.gov/about/history/timeline (last visited May 27, 2025).

[85] *See, e.g.,* Nat'l Endowment for the Humanities, *NEH Essentials*, https://www.neh.gov/essentials (last visited May 27, 2025).

[86] Nat'l Endowment for the Humanities, *NEH's Application Review Process*, https://www.neh.gov/grants/application-process (last visited June 2, 2025).

[87] *Id.*

[88] *Id.*

1    The Chairperson made the final funding decisions, taking into account the advice provided

2    throughout the review process.[89]

3         252.    Each year, NEH typically makes about 900 grants, ranging from

4    approximately $1,000 to $750,000 each. Across all grant programs, only about sixteen percent

5    of applications receive funding.[90] The projects selected for funding by NEH thus represent the

6    best of the best.

7         253.    Congress has repeatedly affirmed its support for NEH's mission,

8    appropriating funds for grant-making every fiscal year.

9         254.    In the 2024 Appropriations Act, for example, Congress appropriated

10   $207,000,000 to NEH, with $192,000,000 specifically designated for grants, loans, contracts,

11   and other assistance to further the purposes set forth under 20 U.S.C. § 956(c), and

12   $15,000,000 designated to carry out NEH's "matching grants" program. Pub. L. 118-42, 138

13   Stat. 25, 281-82 (Mar. 9, 2024).

14        255.    On March 15, 2025, notwithstanding the Executive Orders or DOGE's

15   mandates, Congress enacted a Continuing Appropriations and Extensions Act, which re-

16   appropriated all of the funds appropriated to NEH under the 2024 Act. Pub. L. 119-4,

17   §§ 1101-08, 139 Stat. 9, 10-12 (Mar. 15, 2025). NEH thus received another roughly $200

18   million to spend on grants. NEH announced $22.6 million in grants for 219 humanities

19   projects across the country on January 14, 2025.[91]

20        **2.    <u>In Response to Trump Administration Directives, NEH Improperly
      Changed Priorities and Canceled Existing Grants</u>**

22        256.    Around the very same time Congress was re-appropriating grant-

23   making funds to NEH, as noted above, the agency came under fire from the Trump

24   Administration.

25

26   _____

[89] *Id*

27   [90] *Id*

28   [91] Nat'l Endowment for the Humanities, *NEH Announces $22.6 Million for 219 Humanities
     Projects Nationwide*, https://www.neh.gov/news/neh-announces-grant-awards-jan-2025 (last
     visited May 27, 2025)..

46686\20709500

257.    On March 13, 2025, NEH Chair Shelly Low was directed by the White House to resign. Shortly thereafter, DOGE agents began visiting NEH. DOGE actors recommended dramatically cutting NEH staff and cancelling grants made under the Biden administration that had not been fully paid out.[92] According to reports, Acting NEH Chair Michael McDonald told staff that DOGE wanted to claw back $175 million in undispersed grant money.[93]

258.    On March 20, 2025, NEH posted a webpage titled "NEH Implementation of Recent Executive Orders." The page stated that NEH was updating the Funding Restrictions section of its Notices of Funding Opportunities ("NOFOs") in order "to comply with several recent Executive Orders, including 'Ending Radical and Wasteful Government DEI Programs and Preferencing,' 'Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government,' and 'Ending Radical Indoctrination in K-12 Schooling.'" [94]

259.    The page provided "Frequently Asked Questions," including, for example, Q: "Does the addition of the new guidance on gender ideology … mean that NEH will not fund projects on … the suffragist movement?" A: "No, not necessarily. The restrictions only apply to the categories mentioned in the relevant Executive Orders. We encourage you to read the relevant Executive Orders and consider whether your project's topic – joining with its goals, methodology, activities, and intended audience – seems allowable."

260.    The page only discussed the implication of the Executive Orders on grant applications, not terminations of existing grants.

---

[92] Jennifer Schuessler, *DOGE Demands Deep Cuts at Humanities Endowment*, N.Y. Times (Apr. 1, 2025), https://www.nytimes.com/2025/04/01/arts/trump-doge-federal-cuts-humanities.html.

[93] Elizabeth Blair, *Cultural groups across U.S. told that federal humanities grants are terminated*, NPR (Apr. 3, 2025), https://www.npr.org/2025/04/03/nx-s1-5350994/neh-grants-cut-humanities-doge-trump.

[94] Nat'l Endowment for the Humanities, *Implementation of Recent Executive Orders* (Mar. 20, 2025), https://www.neh.gov/executive-orders.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

261.     Nonetheless, on or around April 2, 2025, recipients of NEH grant funding began receiving emails informing them that their grants had been terminated. Peculiarly, these emails did not come from an NEH server or government email address, but rather, from "Grant_Notifications@nehemail.onmicrosoft.com."[95] The terminations were not made through NEH's grants management system.

262.     The emails attached a form termination letter. On information and belief, the termination letters sent to all grantees on April 2 and thereafter were nearly identical and lacked any individualized analysis or discussion of any terminated grant.

263.     The termination letters received by Plaintiffs and Class members contained the following "explanation" for the terminations:

> Your grant no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement and is subject to termination due to several reasonable causes, as outlined in *2CFR§200.340*. NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda. The President's February 19, 2025 executive order mandates that the NEH eliminate all non-statutorily required activities and functions. *See Commencing the Reduction of the Federal Bureaucracy*, E.O. 14217 (Feb. 19, 2025). Your grant's immediate termination is necessary to safeguard the interests of the federal government, including its fiscal priorities. The termination of your grant represents an urgent priority for the administration, and due to exceptional circumstances, adherence to the traditional notification process is not possible. Therefore, the NEH hereby terminates your grant in its entirety effective April 1, 2025.

264.     Although the termination letter to NEH grantees states that Executive Order 14217 "mandates that the NEH eliminate all non-statutorily required activities and functions," that Order in fact makes no mention of NEH (despite mentioning other agencies).[96]

---

[95] Adding yet another layer of irregularity, the "onmicrosoft.com" domain is notoriously used by cybercriminals and other malicious actors to carry out phishing attacks. *See, e.g.*, Smedh Arun Patil, Cloud That, *Proactive Strategies Against ".onmicrosoft.com" Phishing Attacks* (Dec. 13, 2023), https://www.cloudthat.com/resources/blog/proactive-strategies-against-onmicrosoft-com-phishing-attacks

[96] *See* Exec. Order No. 14217, *Commencing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 10577 (Feb. 25, 2025), https://www.federalregister.gov/documents/2025/02/25/2025-03133/commencing-the-reduction-of-the-federal-bureaucracy. President Trump also issued Exec. Order 14238, *Continuing the Reduction of the Federal Bureaucracy*, on March 14, 2025, https://www.federalregister.gov/documents/2025/03/20/2025-04868/continuing-the-reduction-of-

46686\20709500

265.    The termination letters make no effort to explain how or why the relevant grant fails to "effectuate[] the agency's needs and priorities" or otherwise warrant termination. Nor did they address NEH's prior assessment—through its comprehensive panel and Council review process—that these projects *do* effectuate agency priorities and are aligned with the statutory mandate and goals of NEH.

266.    The termination letters likewise fail to explain what "exceptional circumstances" preclude adherence to ordinary notification procedures.

267.    Additionally, the termination letters included no reference to any method for appeal or to seek reconsideration, even though NEH's General Terms and Conditions require that grantees have a right to appeal a termination.[97]

268.    On April 24, 2025—three weeks *after* NEH began terminating existing grants—the agency issued a press release titled: "An Update on NEH Funding Priorities and the Agency's Recent Implementation of Trump Administration Executive Orders."[98]

269.    The press release stated that NEH had, in recent weeks, "taken several internal operational steps to improve efficiency, eliminate offices that are not essential to fulfilling its statutory requirements, and to return to being a responsible steward of taxpayer funds."[99] It further stated that NEH had also taken steps to "ensure that all future awards will, among other things, be merit-based, awarded to projects that do not promote extreme

---

the-federal-bureaucracy. This Order also made no mention of NEH.

[97] *See* Nat'l Endowment for the Humanities, *General Terms and Conditions for Awards to Organizations (for grants and cooperative agreements issued between January 1, 2022, and September 30, 2024* (Mar. 15, 2025), https://www.neh.gov/general-terms-and-conditions-awards-organizations-grants-and-cooperative-agreements-issued-january-2022#_Toc92721724, section 13 (terms for grants issued January 1, 2022 to September 30, 2024) and Nat'l Endowment for the Humanities, *General Terms and Conditions for Awards to Organizations (for grants and cooperative agreements issued October 1, 2024, or later)* (Mar. 13, 2025), https://www.neh.gov/general-terms-and-conditions-grants-after-oct-2024, section XIII (terms for grants issued October 1, 2024 or later).

[98] Nat'l Endowment for the Humanities, *An Update on NEH Funding Priorities and the Agency's Recent Implementation of Trump Administration Executive Orders*, https://www.neh.gov/news/update-neh-funding-priorities-and-agencys-recent-implementation-trump-administration-executive (last visited May 27, 2025).

[99] *Id.*

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

ideologies based upon race or gender, and that help to instill an understanding of the founding

principles and ideals that make America an exceptional country."

270.    As part of the press release, NEH issued a new "Statement on NEH

Priorities" and "Frequently Asked Questions."[100]

271.    The "Statement on NEH Priorities" reads as follows:

> Founded in 1965, the National Endowment for the Humanities (NEH) is a grant-making agency of the U.S. government dedicated to supporting exemplary humanities research and programming in service of the American people. It does so by investing in the most meritorious proposals for the advancement and dissemination of humanities learning.
>
> As set forth in NEH's enabling legislation, the humanities include the study of modern and classical languages, linguistics, literature, history, jurisprudence, philosophy, archaeology, comparative religion, ethics, the history of the arts, and those aspects of the social sciences which have humanistic content and use humanistic methods, as well as other areas.
>
> To bring the wisdom of the humanities to all Americans, NEH supports research projects that advance humanistic learning, preservation projects that ensure access to significant humanities resources, education projects that strengthen teaching in the humanities, and public programing that conveys the best of the humanities to all Americans.
>
> Moving forward, NEH is especially interested in projects on the nation's semiquincentennial and U.S. history more generally. In addition, the agency will be more finely attuned to its statutory responsibility that "funding should contribute to public support and confidence in the use of taxpayer funds."
>
> As per longstanding agency policy, NEH-supported projects must not promote a particular political, religious, or ideological point of view and must not engage in political or social advocacy. NEH-supported projects should not preference some groups at the expense of others and should ultimately support public purposes.
>
> The principles of intellectual significance, merit, competition, and equal opportunity lie at the heart of NEH's mission.

272.    Two of the posted "Frequently Asked Questions" addressed the

terminated grants:

Q:    Why is NEH cancelling awards?

---

[100] Nat'l Endowment for the Humanities, *Updates on NEH Priorities* (Apr. 24, 2025), https://www.neh.gov/updates-neh-priorities.

46686\20709500

A:      All federal grantmaking agencies, including NEH, must ensure that taxpayer dollars are spent effectively and are consistent with each agency's mission. This requires that NEH regularly evaluate its funding priorities within the policy framework established by Congress, the Administration, and the head of NEH. Awards and programming must align with these priorities.

Q:      What types of awards are being cancelled?

A:      In collaboration with the Administration, NEH has cancelled awards that are at variance with agency priorities, including but not limited to those on diversity, equity, and inclusion (or DEI) and environmental justice, as well as awards that may not inspire public confidence in the use of taxpayer funds.

273.    This post-hoc explanation does not constitute reasoned decision-making, nor could it provide appropriate notice to grant recipients that their grants would be terminated, or constitute sufficient rationale therefor.

274.    NEH's new "priorities" also directly contradict its statutory mandate to make grants that "reflect the diversity and richness of our American cultural heritage" and "give particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented." 20 U.S.C. § 956(c).

275.    As it explains in its new statements, NEH has dramatically narrowed its definition of agency "priorities" based on Defendant Trump's Executive Orders or otherwise in "collaboration with the Administration."

276.    In so doing, NEH improperly ignores the statutory priorities Congress set out in 20 U.S.C. § 956, which Congress reaffirmed by allocating additional grant-making funds to NEH in March 2025.

**3.     NEH Plaintiffs And Other Grant Recipients Are Harmed by NEH's Illegal Grant Terminations**

277.    Plaintiffs and Class members have long relied on NEH grants to fund meritorious projects in the humanities. The termination of nearly all previously awarded grants has caused and continues to cause Plaintiffs and class members serious harm.

46686\20709500

a.    **Plaintiff Robert Hirst's Grant Termination and Resulting Harm**

278.    Plaintiff Robert Hirst is the curator of the Mark Twain Papers and general editor of the Mark Twain Project at the Bancroft Library at the University of California, Berkeley. He has served in this role since 1980.

279.    The Mark Twain Papers contain the voluminous private papers of Samuel Langhorne Clemens, known to all Americans by his pen name, "Mark Twain." He has long been considered one of the most important writers of the 19th Century. His papers were bequeathed to the University of California in 1962; hundreds of original documents have since been added to that core collection. The collection makes it possible to read, in a single location, virtually every surviving document in Mark Twain's hand.

280.    The Mark Twain Project, a major editorial and publishing program of the Bancroft Library, is housed within the Mark Twain Papers archive. The aim of this Project is to create, maintain, correct, and update a permanent, globally accessible resource for the life and writings of Mark Twain. The Project hosts over 200 in-person and online visits to the Papers each year. In addition, the editors routinely go out to speak about the collection and the edition to students and to a variety of other interested groups. In order to maintain this collection and conduct ongoing research, the Mark Twain Papers and Project employ five full-time editors.

281.    Since 2001, the Mark Twain Project has focused much of its effort on the Mark Twain Project Online (the "Online Project"), which is intended to make available all of the Project's edited texts. Its original online website platform has become obsolete and work is underway to migrate the website and database to a modern, technologically supportable platform.

282.    In his recently published biography of Mark Twain, writer Ron Chernow—a Pulitzer Prize-winning biographer—wrote: "Perhaps no other American author can boast such a richly documented record. . . . With its learned editions and digitized website, the Mark Twain Papers ranks as one of the foremost scholarly achievements of our era."

283.    NEH has awarded more than $11,000,000 to support the editorial work of the Mark Twain Project, without interruption, since 1967, and has also made a generous challenge grant for the renovation of the Online Project.

284.    On the occasion of the NEH's 50th birthday in 2015, the agency honored the Mark Twain Papers and Project as one among fifty nationwide across five decades that "'have shaped what we think and what we know about ourselves and our culture' since 1965."[101]

### Application (RQ-300297) for Grant Funding

285.    On November 29, 2023, the Mark Twain Project, through the Regents of the University of California, submitted to the NEH an Application for Federal Domestic Assistance—application RQ-300297, titled "Mark Twain Project." Dr. Hirst's Grant Application sought to draw the Mark Twain Project nearer to its goal of making all of Twain's works available to the public for free through the Online Project.

286.    The Grant Application proposed a cumulative budget of $900,000, including $450,000 in NEH funds. This budget would fund roughly half the salaries for three editors and a digital publications manager for three years. The other half of the staff salaries would need to be paid by private funds raised by Dr. Hirst.

### Award of Grant (RQ-300297) Funding

287.    On August 28, 2024, UC Berkeley received a letter from the chair of the NEH, approving the Mark Twain Project's application RQ-300297 to receive an offer for funding ("Offer Letter").

288.    The Offer Letter provided UC Berkeley up to $450,000 in federal matching funds if Dr. Hirst raised an equal amount of eligible non-federal, third-party gifts, and certified their availability, and if NEH had available to it sufficient funds allocated for matching purposes. The Offer Letter provided: "If you wish to accept this offer of support, your response to the above condition(s) and the Gift Certification Form must be submitted via

---

[101] Sharon Goetz, *Mark Twain Papers and Project Honored by NEH*, UC Berkeley Library UPDATE (Oct. 9, 2015), https://update.lib.berkeley.edu/2015/10/09/mark-twain-papers-and-project-honored-by-neh/.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1  eGMS Reach, NEH's online electronic grant management system no later than June 30,

2  2027."

3          289.  On October 31, 2024, the university's Sponsored Projects Office

4  ("SPO") accepted the NEH offer and sent in the required certification, signed by Dr. Hirst.

5  <u>Termination of Grant (RQ-300297) Funding</u>

6          290.  On April 2, 2025, UC Berkeley received an email from the address

7  "Grant_Notifications@nehemail.onmicrosoft.com," purporting to be from Michael

8  McDonald, Acting Chairman for the National Endowment for the Humanities (the

9  "Termination Email"). This is not an e-mail domain that NEH has ever used to communicate

10  with Dr. Hirst or the university regarding the Mark Twain Project.

11          291.  Attached to the Termination Email was a letter from Michael

12  McDonald, Acting Chairman for the National Endowment for the Humanities, cancelling the

13  Mark Twain Project's grant, Award No. RQ-300297-25, in its entirety effective April 1, 2025

14  (the "Termination Letter").

15          292.  The Termination Letter reads in relevant part:

16  > Your grant no longer effectuates the agency's needs and priorities
17  > and conditions of the Grant Agreement and is subject to termination
   > due to several reasonable causes, as outlined in *2CFR200.340*. NEH
18  > has reasonable cause to terminate your grant in light of the fact that
   > the NEH is repurposing its funding allocations in a new direction in
19  > furtherance of the President's agenda. The President's February 19,
   > 2024 executive order mandates that the NEH eliminate all non-
20  > statutorily required activities and functions. *See Commencing the
   > Reduction of the Federal Bureaucracy*, E.O. 14217 (Feb. 19, 2025).
21  > Your grant's immediate termination is necessary to safeguard the
   > interests of the federal government, including its fiscal priorities. The
22  > termination of your grant represents an urgent priority for the
   > administration, and due to exceptional circumstances, adherence to
23  > the traditional notification process is not possible. Therefore, the
   > NEH hereby terminates your grant in its entirety effective April 1,
   > 2025.
24
25          293.  Dr. Hirst then searched for the Mark Twain Project's grant on eGMS

26  Reach, NEH's online electronic grant management system. He could find no record of the

27  grant or his many communications about it on eGMS Reach: It had apparently been deleted

28

entirely from the system. Agency erasure of grant records was unprecedented in Dr. Hirst's multi-decade relationship with NEH.

294.    Dr. Hirst spoke with his longtime NEH program officer, Jason Boffetti, who told him that DOGE had required NEH to lay off most of its staff if the agency wanted to continue to operate.

Harm Suffered from Termination of Grant (RQ-300297)

295.    Dr. Hirst, the Mark Twain Papers and Project, and project staff, have suffered immediate harm as a result of the cancellation of their NEH grant, which will continue into the future.

296.    In lieu of conducting his editorial work, Dr. Hirst will have to refocus his time on fundraising to replace the cancelled grant funding ($450,000).

297.    The financial uncertainty created by this grant cancellation significantly threatens his ability to retain the highly trained and experienced staff working on the Mark Twain Project. These individuals are among the world's experts on Mark Twain, and their knowledge of the collection is irreplaceable.

298.    The cancellation threatens the migration of the collection to new platforms as the existing ones have become obsolete. Because the online platform allows scholars and students from all over the world to access these original documents, any interruption or delay in this work is very harmful to the Project and to the many who regularly access or will want to access these materials in the future.

299.    In addition, Dr. Hirst and his staff will have less ability to go out to schools and universities to share the incomparable work of Mark Twain.

300.    The termination of Plaintiff Hirst's grant is especially ironic given then NEH continues to promote the collection of Mark Twain's papers as a significant achievement on its website's homepage.[102] Moreover, Mark Twain is included in the list of individuals in Executive Order 13987, "Building the National Garden of American Heroes,"

---

[102] Nat'l Endowment for the Humanities, NEH Funding by the Numbers (description of data on homepage), https://www.neh.gov/ (last visited May 27, 2025).

[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

which seeks to create a statue garden of such heroes, and which NEH now says it will provide grant funding to support.[103]

### b.  Plaintiff Christine Philliou's Grant Termination and Resulting Harm

301.    Dr. Christine Philliou is a Professor of History at the University of California, Berkeley. Previously, she was a professor at Columbia University and Yale University.

302.    She is the author of two books: *Turkey: A Past Against History* (University of California Press, 2021), and *Biography of an Empire: Governing Ottomans in an Age of Revolution* (University of California Press, 2010), as well as dozens of articles and book chapters. Her work has received numerous recognitions, including a Fulbright-Hays Research Fellowship, a Brookings Institution Research Award, and the Lenfest Distinguished Faculty Award, and has led to offers of fellowships from Stanford University and the American Council of Learned Societies.

303.    In addition to her research and teaching, Dr. Philliou founded the Program in Modern Greek and Hellenic Studies at the Institute for European Studies; the Turkish Ottoman and Post-Ottoman Studies Initiative at the Center for Middle Eastern Studies; and the Istan-Polis collaborative research project. All are designed to broaden and deepen appreciation for the history of Turkey, Greece, and the Ottoman Empire.

Application for Grant Funding (RZ-292650-23)

304.    On November 29, 2022, through the Regents of the University of California, Dr. Philliou submitted to the NEH an Application for Federal Domestic Assistance titled "Visualizing Local Christian Communities in Muslim Cosmopolitan Istanbul in the 19th and 20th Centuries."

---

[103] Nat'l Endowment for the Humanities, *National Garden of American Heroes: Statues*, https://www.neh.gov/program/national-garden-american-heroes-statues (last visited May 27, 2025); Exec. Order No. 13978, *Building the National Garden of American Heroes*, 86 Fed. Reg. 6809 (Jan. 22, 2021), https://www.federalregister.gov/documents/2021/01/22/2021-01643/building-the-national-garden-of-american-heroes.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

305.    The purpose of the grant was to help fund the Istan-Polis Project, an effort to reconstruct and analyze the history of Istanbul's Orthodox Christian communities in the final Ottoman century. The grant would also fund development of a public-facing website to display the results of data projects and to feed further research and collaboration. The focus on the experience of Istanbul's Christian minority in the final stage of the Ottoman Empire was intended to provide new tools for scholars seeking to clarify how the tensions between cosmopolitanism and nationalism were historically manifested in cities globally. Such work has obvious relevance to pressing questions of nationalism versus broader inclusion of minority groups today.

Award of Grant Funding (RZ-292650-23)

306.    On September 22, 2023, the University of California, Berkeley and Dr. Philliou received a letter from Shelly Lowe, the chair of the NEH, approving Project Application RZ-292650-23 for funding (the "Offer Letter") for an award of $246,347.00 over three years.

307.    In response to the award of the grant, Dr. Philliou's team planned for and then began executing the steps laid out in the grant application. This included team members' travel to Berkeley for a winter meeting in January 2024, to Europe in June 2024 for a related seminar, and to Istanbul in June-July 2024 for an *in situ* seminar. The team hired and contracted with project managers to coordinate transcription and other work on the census register project, and spent funds on the project's website infrastructure. This included contracting with independent contractors, purchasing airline tickets, reimbursing expenses for international and domestic travel, hiring student workers, and paying vendors for lodging and catering.

308.    Overall, in Year 1 the team focused on the Old City of Istanbul. The resulting website has become a treasure to people with Greek heritage and other heritages tracing their lineage to Istanbul around the world, and received special recognition from the Archbishop of North and South America, Elpidophoros. The team's Year 1 *in situ* seminar

1    was also life-changing for the undergraduate and graduate students who accompanied the

2    research team.

3        309.    Years 2 and 3 of the grant were to focus on the Frankish Quarter and

4    other neighborhoods up and down the Bosporus. They would have produced similarly

5    dramatic, perspective-changing results.

6            Termination of Grant Funding (RZ-292650-23)

7        310.    On April 2, 2025, UC Berkeley received an email from the address

8    "Grant_Notifications@nehemail.onmicrosoft.com," sent on behalf of Michael McDonald,

9    Acting Chairman for the NEH (the "Termination Email"). Attached to the Termination Email

10   was a letter cancelling grant RZ-292650-23, effective the prior day, April 1.

11       311.    The Termination Letter states that the grant "no longer effectuates the

12   agency's needs and priorities . . . in light of the fact that the NEH is repurposing its funding

13   allocations in a new direction in furtherance of the President's agenda. The President's

14   February 19, 2025 executive order mandates that the NEH eliminate all non-statutorily

15   required activities and functions. See Commencing the Reduction of the Federal Bureaucracy,

16   E.O. 14217 (Feb. 19, 2025)." It further stated that "adherence to the traditional notification

17   process is not possible" because of "exceptional circumstances."

18           Harm Suffered from Termination of Grant Funding

19       312.    The Istan-Polis Project, its staff, and Dr. Philliou have suffered direct

20   and immediate harm as a result of the cancellation of the grant. Work on the website has been

21   disrupted. A seminar in Istanbul for this summer very likely will not proceed. Staff who were

22   depending on funds provided by the grant may be without a livelihood. Researchers may not

23   even be paid for work they have already performed. In addition, the team incurred $46,750 in

24   project expenses that remain unreimbursed. Further, the end of the grant will likely mean an

25   end to the project as a whole and the closing of a remarkable window on history that had just

26   opened.

27

28

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

46686\20709500

C.    **National Science Foundation**

313.    The National Science Foundation ("NSF") is an independent federal agency intended to promote the progress of science in the United States.

2.    **Congress Established the National Science Foundation to Promote Scientific Research on a Broad Scale to Advance the United States' National Interests**

314.    NSF was created after World War II when it became clear that federally funded scientific research was key to the nation's national security interests. Describing it as an Act "[t]o promote the progress of science; to advance the national health, prosperity, and welfare; to secure the national defense; and for other purposes," Congress established NSF in 1950 through the enactment of the National Science Foundation Act of 1950 (the "Act"). Public Law 81-507 (codified at 42 U.S.C. § 1861 et seq.).

315.    The NSF's core function is making grants to fund innovative scientific research. The NSF awards grants through an apolitical merit review process, under which panels of disinterested scientific experts vet grant applications and make award decisions. The NSF's merit review process is often referred to as the "gold standard" of scientific review, and NSF-funded research has contributed to some of the most important scientific advances of the past 70 years.

316.    The Act arose out of the growing awareness during World War II that science was crucial to the Unites States' national interest and security, as science was key to the Allied successes in the war. Indeed, during World War II, federal government support of scientific research accelerated dramatically, and a growing consensus emerged in favor of continuing government support of basic scientific research after the end of the war.

317.    The NSF's statutorily defined mission "is to provide Federal support for basic scientific and engineering research, and to be a primary contributor to mathematics, science, and engineering education at academic institutions in the United States." 42 U.S.C. § 1862k(a)(6)(A).

318.    The Act establishes a series of core "functions" for the NSF. Chief among them, the Act authorizes and directs the NSF to "initiate and support basic scientific

46686\20709500

research in the mathematical, physical, medical, biological, engineering, and other sciences," as well as "specific scientific research activities in connection with matters relating to the national defense."

319.    The Act also directs the NSF to provide "grants, loans, and other forms of assistance" to support scientific research" and award "scholarships and graduate fellowships in the mathematical, physical, medical, biological, engineering, and other sciences."

320.    The Act has been amended at various times since 1950. Since at least 1980, Congress has recognized that for the United States to maintain its competitive edge, it would need to encourage and prepare people from groups traditionally underrepresented in STEM to acquire skills and pursue careers in science and engineering fields. Congress consequently declared that "the highest quality science over the long-term requires substantial support, from currently available research and education funds, for increased participation in science and technology by women and minorities." Pub. L. 96-516, § 32. Congress later *expanded* this declaration to include increasing participation for people with disabilities. 42 U.S.C. § 1885(b). The importance of STEM to the interests of the United States prompted Congress, in 1980, to prescribe a national policy to promote "full use of the human resources of the Nation" in STEM fields:

> The Congress declares it is the policy of the United States to encourage men and women, equally, of all ethnic, racial, and economic backgrounds to acquire skills in science and mathematics, to have equal opportunity in education, training, and employment in scientific and technical fields, and thereby to promote scientific literacy and the full use of the human resources of the Nation in science and technology.

Pub. L. 96-516 § 32. In other words, Congress has consistently acted to consciously *expand* STEM access rather than to narrow it, by affirmative outreach to groups not traditionally invited or encouraged to contribute to STEM initiatives.

321.    One such act was the National Science Foundation Authorization Act of 1998 (the "1998 Amendment"). The 1998 Amendment to the Act reaffirmed the NSF's

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

statutory commitment to making the United States a leader in STEM fields, and it set as long-term goals for the NSF to provide leadership to:

a.      enable the United States to maintain a position of world leadership in all aspects of science, mathematics, engineering, and technology;

b.      promote the discovery, integration, dissemination, and application of new knowledge in service to society; and

c.      achieve excellence in United States science, mathematics, engineering, and technology education at all levels. 42 U.S.C. § 1862k(a)(6)(B).

322.    Pursuant to these congressional directives, much of the NSF-funded research at universities has, for decades, supported the participation in STEM fields by women, minorities, and people with disabilities.

323.    Notably, the 1998 Amendment sets forth several "core strategies" for achieving the above goals, which include a focus on ensuring diversity in entrants to STEM fields: "Develop intellectual capital, both people and ideas, with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering." 42 U.S.C. § 1862k(b)(1).

324.    The Act was again amended in 2007 as part of the "America COMPETES Act," which sought to bolster the competitiveness of the United States in scientific research and innovation. It instructed the NSF to "give priority" in granting awards to research activities "that can be expected to make contributions in physical or natural science, technology, engineering, social sciences, or mathematics, or that enhance competitiveness, innovation, or safety and security in the United States." 42 U.S.C. § 1862o-5(b).

325.    The NSF seeks to fulfill its mission chiefly by issuing competitive, limited-term grants in response to specific proposals from researchers and research organizations. The NSF receives over 50,000 such proposals each year, and funds about 10,000 of them.

326.    The NSF employs a merit review process in which reviews of grant applications are carried out by panels of independent scientists, engineers, and educators who are experts in the relevant scientific field, and they are vetted to avoid conflicts of interest. Reviewers judge grant applications for both "intellectual merit" and "broader societal impact."

327.    NSF grants are highly competitive and prestigious, and its pre-January 20, 2025 merit review process is often credited for the profound success of the NSF throughout its history. Indeed, it is no exaggeration to say that the world as we know it today would not exist without the NSF. NSF grants have contributed to an extraordinary number of scientific and technological innovations and achievements over the past 75 years, including:

    a.    The Internet
    b.    Semiconductors (i.e., computer chips)
    c.    Supercomputers
    d.    Artificial intelligence
    e.    3-D printing
    f.    American Sign Language
    g.    Captcha
    h.    Deep ocean exploration and drilling
    i.    Detecting gravitational waves
    j.    DNA amplification (central to biotech)
    k.    Doppler radar
    l.    Duolingo
    m.    Fusion energy
    n.    Geographic Information Systems (GIS)
    o.    Kidney matching
    p.    LASIK eye surgery
    q.    MRI
    r.    Seeing black holes

328.    To date, at least 268 Nobel laureates have been supported by NSF grants. In 2024 alone, NSF grant recipients received Nobel prizes in physiology or medicine, physics, chemistry, and economics.

329.    The NSF has also funded numerous national observatories, has had responsibility for U.S. research operations in the Antarctic, and has been heavily involved in United States deep sea exploration. The NSF also managed laboratories from the Defense

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
46686\20709500

Department's Advanced Research Projects Agency (DARPA), which lead to the creation of the Internet.

330.    The enormous impact of the NSF grant-making process is summarized neatly in this statement from Forbes: "For 75 years, the National Science Foundation has been the quiet backbone of American scientific progress. It funds a substantial share of all federally supported basic research outside the biomedical sphere, supporting discoveries in climate science, artificial intelligence, cybersecurity and quantum materials among many, many others. Its grants train graduate students, launch early-career faculty and sustain the open, reproducible research that fuels U.S. competitiveness."[104]

### 3.    In Response to Trump Administration Directives, NSF Improperly Changed Priorities and Canceled Existing Grants

331.    The foregoing paragraphs describe the NSF as it existed and functioned through the decades, from its original founding until January 20, 2025.

332.    The NSF is now facing an existential threat: the Trump Administration has negated the NSF's core grant-making function by unilaterally, arbitrarily and illegally terminating billions of dollars in lawfully awarded scientific grants that the Administration views (often mistakenly) as having some connection to diversity, equity and inclusion (most broadly defined), as well as other subjects the Trump Administration dislikes, such as climate change, vaccines, HIV/AIDS, and COVID-19.

333.    At Defendants Trump and DOGE's direction, NSF has taken aim at the pillars sustaining the United States' STEM preeminence. These actions violate the law and jeopardize America's longstanding global leadership in STEM. NSF has announced that it will no longer abide by Congress's longstanding mandates.

334.    Since the Trump Administration took office in January 2025, the NSF has terminated more than a billion dollars in scientific grants that had previously been approved and awarded through the merit review process and which the NSF was legally

---

[104] John Drake, *The NSF Is Being Dismantled — With Broad Implications For The American Economy,* Forbes (May 9, 2025), https://www.forbes.com/sites/johndrake/2025/05/09/the-national-science-foundation-is-being-dismantled-what-the-economy-needs-is-more-investment.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

obligated to provide. The pace of the terminations has escalated rapidly since mid-April, as the Trump Administration has taken a wrecking ball to the NSF. During that brief time period, more than 1,400 grants have been terminated. NSF terminated over 430 grants *in one week*.[105] The grant terminations were generally not preceded by warnings, and thus came as a complete shock to the researchers whose livelihoods and life's work depended on them.

335.     The grant terminations have typically been conveyed in short, standardized missives containing boilerplate statements. For example, Plaintiff Jedda Foreman and other UC researchers all received the following termination letter:

> The U.S. National Science Foundation (NSF) has undertaken a review of its award portfolio. Each award was carefully and individually reviewed, and the agency has determined that termination of certain awards is necessary because they are not in alignment with current NSF priorities. Effective immediately, the following are terminated: [list of NSF Award IDs]. NSF is issuing this termination to protect the interests of the government pursuant to NSF Grant General Conditions (GC-1) term and condition entitled 'Termination and Enforcement,' on the basis that they no longer effectuate the program goals or agency priorities. This is the final agency decision and not subject to appeal.

336.     In an apparent attempt to justify its new war on science, the NSF published a "Statement of NSF Priorities" on April 18, 2025, explaining that NSF's activities "must aim to create opportunities for all Americans everywhere" and "[r]esearch projects with more narrow impact limited to subgroups of people based on protected class or characteristics do not effectuate NSF priorities."[106] Pursuant to this Directive, NSF began issuing termination notices *en masse* to research projects, including many grants to UC researchers, designed to implement Congress's express goals of increasing STEM participation, studying misinformation, and addressing environmental justice.

---

[105] Erin Socha, *New Database Tracks Canceled N.S.F. Research Grants*, U. Daily Kansan (April 25, 2025), https://www.kansan.com/news/new-database-tracks-canceled-n-s-f-research-grants/article_0a3d2a6c-97e5-43c3-96c0-db02dc609210.html.

[106] U.S. Nat'l Sci. Found., *Statement on NSF Priorities* (April 18, 2025), https://www.nsf.gov/updates-on-priorities#statement-of-nsf-priorities-09d.

46686\20709500

337.    NSF also issued an accompanying set of FAQ's, which indicated that awards not aligned with NSF priorities include, but are "not limited to those on diversity, equity, and inclusion (DEI) and misinformation/disinformation."

338.    The grant cancellations are one prong in what can only be described as an effort to radically shrink and marginalize the NSF. In mid-April it was announced that the NSF was freezing any new grants, and in early May, the NSF announced that its 37 research divisions were being abolished. Then, on April 24, 2025, the Director of NSF, Sethuraman Panchanathan, resigned 16 months early. Massive layoffs are now anticipated. Meanwhile, President Trump proposed cutting the NSF's budget for the 2026 fiscal year by 55%. As recently stated in *Forbes*, "This is not reform. It is a dismantling."[107]

339.    It appears that DOGE is behind the unlawful grant terminations at NSF. *See, e.g.,* Katrina Miller & Carl Zimmer, *National Science Foundation Terminates Hundreds of Active Research Awards*, New York Times (April 22, 2025) ("Last Wednesday, the magazine Science reported that all new research grants by the agency had been frozen, as ordered by the Department of Government Efficiency, or DOGE."); Dan Garisto, *Trump Team Freezes New NSF Awards – And Could Soon Axe Hundreds of Grants*, Nature (Apr. 17, 2025) ("All new research grants have been frozen at the US National Science Foundation (NSF) — an action apparently ordered by the Department of Government Efficiency (DOGE) . . . DOGE is also reviewing a list of active research grants, assessed in February by the NSF, for terms associated with diversity, equity and inclusion (DEI). It is considering terminating more than 200 of them, NSF staff members have told Nature.").

340.    Indeed, on May 13, 2025, Alondra Nelson, the Harold F. Linder Professor at Princeton University's Institute for Advanced Study, resigned her prestigious position on the National Science Foundation's board of directors. Explaining her decision to Time Magazine, she said: "Last week, as the Board held its 494th meeting, I listened to NSF staff say that DOGE had by fiat the authority to give thumbs up or down to grant applications

---

[107] John Drake, *The NSF Is Being Dismantled — With Broad Implications For The American Economy,* Forbes (May 9, 2025), https://www.forbes.com/sites/johndrake/2025/05/09/the-national-science-foundation-is-being-dismantled-what-the-economy-needs-is-more-investment.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

which had been systematically vetted by layers of subject matter experts. Our closed-to-the-public deliberations were observed by Zachary Terrell from the DOGE team. Through his Zoom screen, Terrell showed more interest in his water bottle and his cuticles than in the discussion."[108]

341.    These grant terminations are a disaster for the future of science in the United States. The gravity of the situation and illegality of the grant terminations were summarized in a letter from the House of Representatives' Committee on Science, Space, and Technology sent to the acting director of the NSF, Brian Stone, on May 8, 2025. The letter characterizes the Trump Administration's actions against the NSF as "chaos and destruction," and states that "[DOGE's] accusation that these terminated awards lack merit is a lie, as most, if not all these awards, carry a statement from the agency declaring that the award "reflects NSF's statutory mission and has been deemed worthy of support through evaluation using the Foundation's intellectual merit and broader impacts review criteria.'"[109]

342.    The House Committee Letter goes on to state: "The cancelation of these awards suggests instead that NSF is willing to apply political censorship of awards under direction from President Trump and the DOGE teenagers, which is a clear violation of the statutory mission of the agency." *Id.* It then provides a few examples of recently terminated grants to illustrate the folly, harmfulness, and in some instances absurdity of the Trump Administration's grant cancellations. The list of cancelled grants includes those for:

a.    A rural after-school program that gives middle school students an opportunity to use mathematics and design thinking to address agricultural issues, such as designing water catchment systems for drought conditions.[110]

---

[108] Alonda Nelson, *Why I'm Resigning From Positions at the National Science Foundation and Library of Congress,* Time Magazine, May 13, 2025; https://time.com/7285045/resigning-national-science-foundation-library-congress/.

[109] Letter from House of Representatives' Committee on Science, Space and Technology to Brian Stone (May 8, 2025), https://democrats-science.house.gov/imo/media/doc/2025-05-08%20Letter%20to%20Acting%20Director%20Stone.pdf.

[110] Nat'l Sci. Found., *Award Abstract #2215382 – Engaging Rural, Latinx Youth in an After School Program That Integrates Design Thinking, Making and Math*, https://www.nsf.gov/awardsearch/showAward?AWD_ID=2215382, (last visited May 27, 2025).

46686\20709500

b.      Research on developing a tool that uses machine learning to detect deepfakes, which are used for all manner of disinformation, be it political content planted by foreign adversaries or the creation of child sexual abuse material.[111]

c.      A grant to study improved mental health interventions for engineering students, who – across demographics – are statistically less likely than students in other disciplines to seek mental health treatment. This research was aimed at improving outcomes for engineering students in mental health distress and with mental health disabilities.[112]

d.      An industry-focused workforce development program that trains the next generation of quantum technicians, including through accessible experiential learning and certification opportunities for entry-level professionals.[113]

e.      A National Research Traineeship award, supporting 25 graduate students, to develop new interdisciplinary studies applying AI to better understand "legal system processes, impacts, and institutions" as well as to develop "tools and methods for leveraging newly available data from the criminal legal system, and ethical and social implications of big data and AI in the context of criminal justice."[114]

343.    The House Committee Letter condemns these grant terminations as "an abdication of NSF's mission and a betrayal of the scientific community, including the thousands of graduate students and early career researchers whose careers will be derailed. It also states that the terminations are of questionable legality. The grant terminations are in direct defiance of a court-ordered preliminary injunction enjoining NSF from impeding the disbursement of appropriated federal funds under awarded grants or other executed financial

---

[111] Andrea E Hickerson,, *Award Abstract #2310131 – Collaborative Research: SaTC: TTP: Small: DeFake: Deploying a Tool for Robust Deepfake Detection, Nat'l Sci. Found.,* https://www.nsf.gov/awardsearch/showAward?AWD_ID=2310131 (last visited May 27, 2025).
[112] Nat'l Sci. Found., *Award Abstract # 2225567 – Research: Identifying intervention targets to increase mental health help seeking in undergraduate engineers,* https://www.nsf.gov/awardsearch/showAward?AWD_ID=2225567 (last visited May 27, 2025).
[113] Nat'l Sci. Found., *Award Abstract # 2243822 - NRT-HDR: Computational Research for Equity in the Legal System" (CRELS),* https://www.nsf.gov/awardsearch/showAward?AWD-ID=2243822 (last visited May 29, 2025).
[114] *Id.*

obligations directed or implied by Executive Order 14151… or any other materially similar policy."[115]

### 4.    NSF Plaintiff and Other Grant Recipients Are Harmed by NSF's Illegal Grant Terminations

344.    Plaintiff Foreman and Class members have long relied on NSF grants to fund meritorious projects aimed at advancing scientific knowledge. The termination of previously approved grants has caused and continues to cause Plaintiff and Class members serious harm.

### a.    Plaintiff Jedda Foreman's Grant Terminations and Resulting Harm

345.    Jedda Foreman is the Director, Center for Environmental Learning, at the Lawrence Hall of Science at the University of California, Berkeley.

First Application for Grant Funding (2314075):

346.    On January 11, 2023, with her collaborators at the Lawrence Hall of Science, Foreman submitted (through the Regents of the University of California) a grant proposal to NSF's National Science Foundation Program NSF 22-626, Advancing Informal STEM Learning (AISL). The AISL program invests in research and practice on how people learn STEM outside of formal education. It seeks proposals that further the well-being of individuals and communities who have historically been and continue to be excluded, under-served, or underrepresented.

347.    Foreman's proposal, titled "Understanding the Impact of Outdoor Science and Environmental Learning Experiences Through Community-Driven Outcomes," was for a four-year Integrating Research and Practice project that would produce a set of science and environmental literacy measures for underrepresented communities.

First Award of Grant Funding (2314075)

---

[115] *New York v. Trump*, No. 25-cv-39-JJM-PAS, (D.R.I. Jan. 31, 2025), https://ag.ny.gov/sites/default/files/court-filings/state-of-new-york-et-al-v-trump-tro-2025.pdf (last visited May 27, 2025).

- 78 -

348.    On August 22, 2023, the NSF accepted Foreman's proposal and awarded her a grant (Award Number 2314075). The Award Notice stated that the NSF was obligated in the amount of $1,583,195, and that the total intended award was $2,149,437. The Award Notice provided: "Contingent on the availability of funds and scientific progress of the project, NSF expects to continue support at approximately the following level: Fiscal Year: 2026, Increment Amount: $566,242." The Award Notice was made as per the provisions of NSF Solicitation: "NSF 22-626 Advancing Informal STEM Learning," and provided that the period of performance was from January 1, 2024 through December 31, 2027.

349.    The award covered salaries and wages for three senior personnel: principal investigator Melissa Collins, Ph.D., co-principal investigator Valeria Romero, M.A., and Foreman. The award also covered salaries and wages for several other professional researchers and project coordinators at the Lawrence Hall of Science, UC Berkeley's public science center. The award further provided for support from an undergraduate research assistant.

<u>Second Application for Grant Funding (2315277)</u>

350.    On January 17, 2023, together with her collaborators at the Lawrence Hall of Science, Foreman submitted (through the Regents of the University of California) a proposal to the National Science Foundation Program NSF 22-634, Racial Equity in STEM Education (RESTEM), which aims to support groundbreaking projects that contribute to advancing racial equity in STEM education and workforce development.

351.    Foreman's proposal, titled "Working Toward Racial Equity: Building Capacity to Institutionalize Equity in Outdoor and Environmental Science Education," was designed to support a team of leaders from five organizations to facilitate and guide organization-wide discussions related to racial equity. The project was to develop a Tool Kit with three components—(1) a Facilitator's Reflection Guide, (2) a Foundations of Racial Equity Guide, and (3) Organization Systems Change Tools—that would produce a replicable model for broadening participation.

<u>Second Award of Grant Funding (2315277)</u>

352.    On September 13, 2023, the NSF accepted Foreman's proposal and awarded her a grant (Award Number 2315277). The Award Notice stated that the NSF was obligated in the amount of $1,701,416, and that the total intended award was $4,723,028. The Award Notice provided: "Contingent on the availability of funds and scientific progress of the project, NSF expects to continue support at approximately the following level: Fiscal Year: 2025, Increment Amount: $947,005, Fiscal Year: 2026, Increment Amount: $1,133,391, Fiscal Year: 2027, Increment Amount: $941,216." The award was made as per the provisions of NSF Solicitation: NSF 22-634 Racial Equity in STEM Education and provided that the period of performance was from January 1, 2024 through December 31, 2028.

Third Application for Grant Funding (2241805)

353.    On August 12, 2022, Foreman and her collaborators submitted a proposal (through the Regents of the University of California) to the National Science Foundation Program NSF 22-585, Innovative Technology Experiences for Students and Teachers (ITEST). This applied research and development program aims to advance the equitable integration of technology in the learning and teaching of science, technology, engineering, or mathematics from pre-kindergarten through high school.

354.    Foreman's proposal, titled "Supporting Rightful Presence in Museum Spaces: Youth as Participatory Designers of Indigenous Mixed Reality Science Exhibits," aimed to address the ongoing marginalization of Indigenous communities in informal science learning spaces by developing and studying a model that strengthens Indigenous youths' disposition towards, and capacity for STEM pathways.

355.    The project built on a partnership between the Lawrence Hall of Science and mak-'amham, an Indigenous Ohlone cultural organization. The project would engage Indigenous youth directly and investigate the impact of the participatory design model on their STEM learning, science identity, and interest in STEM careers. The project findings would be disseminated in informal science and technology learning communities to support the youth participatory design model in informal science education contexts.

Third Award of Grant Funding (2241805)

356.    On February 19, 2023, the NSF accepted Foreman's proposal and awarded a grant (Award Number 2241805). The Award Notice stated that the NSF was obligated in the amount of $1,292,298. The award was made in accordance with the provisions of NSF Solicitation: "NSF 22-585, Innovative Technology Experiences for Students and Teachers," and provided that the period of performance was from June 1, 2023 through May 31, 2026.

357.    The award covered salaries and wages for five senior personnel: Principal Investigator Ari Krakowski, Ph.D.; co-Principal Investigator Kimiko Ryokai, Ph.D.; co-Principal Investigator Sarah Olsen, Ph.D.; co-Principal Investigator Vincent Medina; and Foreman. The award also covered salaries and wages for several other professional researchers and project coordinators at the Lawrence Hall of Science. The award also provided $162,712 to support the work of graduate students.

Supplemental Award to Celebrate NSF's 75th Anniversary (2241805)

358.    Together with her collaborators, Foreman submitted (through the Regents of the University of California) to the NSF a proposal for a supplement to award number 2241805 to celebrate NSF's 75th anniversary on May 10, 2025. On January 15, 2025, the NSF accepted Foreman's proposal and awarded a grant supplement (Award Number 2241805). The Supplemental Award Notice stated that the NSF was obligated by an additional amount of $98,981, bringing the total funds awarded to $1,391,279. The Supplemental Award Notice also extended the end of the award period from May 31, 2026 to November 30, 2026.

Termination of Grant Funding (2315277, 2314075, and 2241805)

359.    On April 18, 2025, the University of California, Berkeley received an email (the "April 18 Termination Email") from the address "grants005@nsf.gov," purporting to be from Jamie H. French, Division Director, Office of Budget Finance and Award Management, Division of Grants and Agreements. The April 18 Termination Email stated that the NSF "ha[d] determined that termination of certain awards is necessary because they are not in alignment with current NSF priorities." It purported to terminate awards 2315277 and

[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

2314075. It further stated that "the basis" of the termination is that the awards "no longer effectuate the program goals or agency priorities. This is the final agency decision and not subject to appeal."

360.    On April 25, 2025, the University of California, Berkeley received an email (the "April 25 Termination Email") from the address "grants005@nsf.gov," purporting to be from Jamie H. French, Division Director, Office of Budget Finance and Award Management, Division of Grants and Agreements. The April 25 Termination Email again stated that "the agency ha[d] determined that termination of certain awards is necessary because they are not in alignment with current NSF priorities." It terminated, among others, award 2241805. This email likewise further stated that "the basis" of the termination is that the awards "no longer effectuate the program goals or agency priorities. This is the final agency decision and not subject to appeal."

Harm Suffered from Terminations of Grant Funding

361.    The Lawrence Hall of Science is UC Berkeley's public science center, with a mission to inspire and engage through science discovery and learning in ways that advance equity and opportunity. Nationwide, the Lawrence Hall reaches over 20% of U.S. students in grades K through 12 with its science curricula. The Lawrence Hall has successfully obtained significant federal funding (20-25% of its budget) to support the research and development to inspire young people, families, communities, and educators in STEM discovery and learning in ways that advance equity. Without federal grant funds, including the terminated grants, the Lawrence Hall's ability to carry out its public service mission is and will be significantly compromised.

362.    As to "Supporting Rightful Presence in Museum Spaces: Youth as Participatory Designers of Indigenous Mixed Reality Science Exhibits" (Award 2241805), $490,834.22 or 35% of the award remained unpaid at the time of termination. In addition, when this award was terminated, the supplemental funding for a celebration of the NSF's 75th anniversary on May 10, 2025 was terminated as well. Because promises had already been

46686\20709500

1    made to community members, the Hall still went forward with the event and incurred the

2    remaining costs.

3            363.    As to "Working Toward Racial Equity: Building Capacity to

4    Institutionalize Equity in Outdoor and Environmental Science Education" (Award 2315277),

5    approximately $3,769,075.24 or 80% of the award remained unpaid at the time of termination.

6            364.    As to "    Understanding the Impact of Outdoor Science and

7    Environmental Learning Experiences Through Community-Driven Outcomes" (Award

8    2314075), approximately $1,500,251.79 or 75% of the award remained unpaid at the time of

9    termination.

10           365.    The financial implications of these abrupt terminations are enormous,

11   representing millions of dollars of lost funding to the Lawrence Hall. It will likely need to

12   reduce the time basis of and/or lay off both academic personnel and staff if it is not able to

13   find alternative resources quickly.

14           366.    While the financial implications are debilitating, the human cost of the

15   termination of these awards is also profound. Taken together, the grant-funded projects are

16   important to the thousands of young people, educators, and partners that they are designed to

17   engage, serve, and/or impact. The abrupt termination of these grants means these public

18   benefits will go unrealized.

19   **D.    Department of Defense**

20           367.    The Department of Defense ("DOD") is a federal agency within the

21   meaning of the APA that was established to promote national security.

22       **1.    Congress Established DOD to Create a Comprehensive Program
             Dedicated to Ensuring the Future Security of the United States,
23           Including Through Research**

24           368.    Shortly after the end of World War II, President Truman urged

25   Congress to combine the War and Navy Departments under one single Department of

26   National Defense.[116] In his address to Congress, President Truman stated that creating the

---

[116] Harry S. Truman Library Museum, *Special Message to the Congress Recommending the Establishment of a Department of National Defense*, (Dec. 19, 1945) https://www.trumanlibrary.gov/library/public-papers/218/special-message-congress-

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

Department of National Defense was an "essential step … in the development of a comprehensive and continuous program for our future safety and for the peace and security of the world."[117]

369.    After months of deliberations regarding the role of the military in society and the possible threat of granting too much military power to the executive, Congress created the National Military Establishment through the National Security Act of 1947.[118] In 1949, the National Military Establishment was renamed the DOD.

370.    In passing the National Security Act of 1947, Congress intended to provide a "comprehensive program for the future security of the United States" and to unify the armed forces into "an efficient team of land, naval, and air forces."[119]

371.    Research was a critical component of the Act. The National Security Act established a Research and Development Board, which would advise the Secretary of Defense as to the status of scientific research relative to national security and to assist the Secretary of Defense in assuring adequate funding for research and development on scientific problems relating to national security.

372.    The Department of Defense Reorganization Act of 1958 amended the National Security Act of 1947 and created a Director of Defense Research and Engineering, who would supervise all research activities in DOD. The law further contemplated that DOD would contract with "educational or research institutions" to carry out its research mission.[120]

373.    Since 1961, Congress has annually updated the specific duties and functions of the DOD through the National Defense Authorization Act (NDAA).

374.    For example, the NDAA of Fiscal Year 2024 ("NDAA 2024") authorized the DOD to grant awards and funding for research activities related but not limited to topics such as microelectronics, artificial intelligence, thermal destruction of PFAS,

---

recommending-establishment-department-national.

[117] *Id.*

[118] National Security Act of 1947, Pub. L. No. 80-253, 61 Stat. 495.

[119] *Id.*

[120] Department of Defense Reorganization Act of 1958, Pub. L. No. 85-599, 72 Stat. 514.

quantum information, treatment of armed forces personnel with post-traumatic stress or traumatic brain injury using designated psychedelic substances, and the effect of the COVID-19 vaccine on service officers.[121]

375.    The NDAA for Fiscal Year 2021 ("NDAA 2021") required the Secretary of Defense, acting under the Secretary of Defense for Research and Engineering, to carry out a program of research and development in social science, management science, and information science.[122] The purpose of program was to:

(1)    To ensure that the Department of Defense has access to innovation and expertise in social science, management science, and information science to enable the Department to improve the effectiveness, efficiency, and agility of the Department's operational and management activities.

(2)    To develop and manage a portfolio of research initiatives in fundamental and applied social science, management science, and information science that is stable, consistent, and balanced across relevant disciplines.

(3)    To enhance cooperation and collaboration on research and development in the fields of social science, management science, and information science between the Department of Defense and appropriate private sector and international entities that are involved in research and development in such fields.

(4)    To accelerate the development of a research community and industry to support Department of Defense missions in the fields of social science, management science, and information science, including the development of facilities, a workforce, infrastructure, and partnerships in support of such missions.

(5)    To coordinate all research and development within the Department of Defense in the fields of social science, management science, and information science.

(6)    To collect, synthesize, and disseminate critical information on research and development in the fields of social science, management science, and information science.

(7)    To assess and appropriately share, with other departments and agencies of the Federal Government and appropriate entities in the private sector—

(A)    challenges within the Department of Defense that may be addressed through the application of advances in

---

[121] National Defense Authorization Act for Fiscal Year 2024, Pub. L. No. 118-31, 137 Stat. 136.
[122] National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388.

46686\20709500

social science, management science, and information science; and

    (B)    datasets related to such challenges.

(8)    To support the identification of organizational and institutional barriers to the implementation of management and organizational enhancements and best practices.

(9)    To accelerate efforts—

    (A)    to transition, and deploy within the Department of Defense, technologies and concepts derived from research and development in the fields of social science, management science, and information science; and

    (B)    to establish policies, procedures, and standards for measuring the success of such efforts.

(10)    To integrate knowledge from cross-disciplinary research on—

    (A)    how factors relating to social science, management science, and information science affect the global security environment; and

    (B)    best practices for management in the public and private sectors.

(11)    To apply principles, tools, and methods from social science, management science, and information science—

    (A)    to ensure the Department of Defense is more agile, efficient, and effective in organizational management and in deterring and countering current and emerging threats; and

    (B)    to support the National Defense Strategy.[123]

376.    In addition to the annual NDAAs, Congress has passed legislation instructing the DOD to award grants to institutions of higher education. For example, the David L. Boren National Security Education Act of 1991 ("NSEA") instructed the Secretary of Defense to create the National Security Education Program, which would award grants to institutions of higher education in order enable such institutions to establish, operate, or improve programs in foreign languages, area studies, counter proliferation studies, and other international fields that are critical areas of those disciplines through research.[124]

---

[123] *Id.*

[124] David L. Boren National Security Education Act of 1991, Pub. Law. No. 102-183, 105 Stat. 1271 (codified at 50 U.S.C. §1901 et seq.).

[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

377. The National Security Education Program is codified at 50 U.S.C. § 1902. Its goal is to create vital experience in language and cultures critical to U.S. National Security.

378. Moreover, in 2008, the Secretary of Defense created the Minerva Research Initiative ("MRI") to address challenges such as ethnic strife, failing or failed states, rise of new powers, rise of violent extremism, disease, poverty, climate change, as well other unprecedented social change.[125] MRI was built on the lessons learned after the September 11 terrorist attacks, and was billed by the Pentagon as funding "[s]ocial science for a safer world."[126]

379. MRI "brings together universities and other research institutions around the world and supports . . . projects addressing specific interest areas determined by the Department of Defense."[127] MRI "emphasizes questions of strategic importance to U.S. national security policy,"[128] including violent extremism, drug cartels, and similar threats to the nation's security.

380. Since its inception in 2008, MRI has filled a gap in the knowledge base of the National Security community by developing models of terrorism, insurgency, cybersecurity, information operations, deterrence and other relevant topics, validated using freshly collected data and modern methods. That research has been praised by combatant commanders for its relevance to their increasingly complex challenges in understanding the Social Science of modern conflict.

381. MRI-funded research has enabled a significant improvement in scholarly understanding of subnational conflicts, as reflected in a manyfold increase in

---

[125] The Minerva Initiative, https://web.archive.org/web/20090211034051/http://minerva.dtic.mil/.

[126] Kai Kupferschmidt, *Pentagon Guts National Security Program that Harnessed Social Science*, Science (Mar. 2, 2025), https://www.science.org/content/article/pentagon-guts-national-security-program-harnessed-social-science.

[127] Grants.Gov, *View Grant Opportunity* (Mar. 15, 2024), https://grants.gov/search-results-detail/351388.

[128] *Id.*

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

publications on these topics in the best peer-reviewed journals in Political Science and Economics.

382.    MRI employs a highly competitive process for the award of its grant funding. It solicits proposals in pre-defined topic areas and selects among them using peer and expert review.

383.    Since its inception, MRI has awarded various grants to UC researchers, including several examples in recent years.

384.    In September 2024, MRI awarded a Peace Scholar Fellowship to a UC Berkeley graduate student researching the intertwined political, economic, and social dynamics of international conflict and conflict management.[129] In August 2023, MRI awarded a Peace Scholar Fellowship to a UC Davis graduate student conducting doctoral research related to broad concerns in conflict management and peacebuilding, including security and stability.[130] In 2022, the Minerva Initiative awarded a Peace Scholar Dissertation Fellowship to UC Berkeley and UC San Diego graduate students whose research showed "great potential to advance the peacebuilding and security fields and to positively influence policy and practice."[131]

385.    In May 2023, the DOD announced that it would award $18 million in grants to 11 university-based faculty teams under its Minerva Initiative, including one UC San Diego team, one UC Davis team, and one UC Santa Barbara team.[132]

---

[129] *Department of Defense Selects 2024-2025 Minerva-USIP Peace and Security Fellows*, U.S. Dep't of Def. (Sept. 20, 2024), https://www.defense.gov/News/Releases/Release/Article/3912615/department-of-defense-selects-2024-2025-minerva-usip-peace-and-security-fellows/.

[130] *DOD Selects 2023-2024 Minerva-USIP Peace and Security Dissertation Fellows*, U.S. Dep't of Def. (Aug. 10, 2023), https://www.defense.gov/News/Releases/Release/Article/3490020/dod-selects-2023-2024-minerva-usip-peace-and-security-dissertation-fellows/.

[131] *Department of Defense Announces Awards for the 2022-2023 Cohort of the Minerva-United States Institute of Peace and Security Dissertation Fellows*, U.S. Dep't of Def. (Sept. 12, 2022), https://www.defense.gov/News/Releases/Release/Article/3155346/department-of-defense-announces-awards-for-the-2022-2023-cohort-of-the-minerva/.

[132] *DOD Awards $18 Million for Academic Research on the Socio-Political Drivers of Future Conflict,* U.S. Dep't of Def. (May 26, 2023), https://www.defense.gov/News/Releases/Release/Article/3408680/dod-awards-18-million-for-academic-research-on-the-socio-political-drivers-of-f/.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

386.     In February 2022, the DOD announced that it would award $28.7 million in grants to 17 university based faculty teams, including one UC Berkeley team, through the FY2021 Minerva Research Initiative to support research in social and behavioral science.[133] The 17 faculty awardees were selected from approximately 220 applicants using a merit competition. The research proposals were peer-reviewed and selected for scientific merit, relevance, and potential impact in conference between the Office of the Under Secretary of Defense for Research and Engineering and the Office of the Under Secretary of Defense for Policy.

387.     Outside of grants given through MRI, when deciding whether to award a grant, the DOD employs a merit review process in which the technical merits of the proposed research and its potential relationship with the missions of the DOD are evaluated. 32 C.F.R. § 22.315 (describing "[m]erit-based, competitive procedures").

388.     It is clear that Congress understood the importance of conducting research relating to national security when creating the DOD. The annual NDAAs and Acts like the NSEA make clear that Congress intended for funding to be allocated for the study of social issues since such research would further the DOD's mission: national security.

### 2.     In Response to Trump Administration Directives, DOD Improperly Changed Priorities and Canceled Existing Grants

389.     DOD quickly caved to President Trump's and DOGE's directives to eliminate grants relating to disfavored topics. On March 4, 2025, Chief Pentagon Spokesman Sean Parnell stated that DOD had been working "hand in hand with the DOGE team."[134]

390.     By March 7, the Department had terminated more than $30 million in grants that funded 91 studies. In a press release, the Department recognized "the value of academic research" but stated it was taking action "in response to President Trump's

---

[133] *Department of Defense Awards $28.7M in Grants for the FY2021 Minerva Research Initiative*, U.S. Dep't of Def. (Feb. 24, 2022), https://www.defense.gov/News/Releases/Release/Article/2944623/department-of-defense-awards-287m-in-grants-for-the-fy2021-minerva-research-ini/.

[134] C. Todd Lopez, *Initial DOGE Findings Reveal $80 Million in Wasteful Spending at DOD*, U.S. Dep't of Def. (Mar. 4, 2025), https://www.defense.gov/News/News-Stories/Article/Article/4096431/initial-doge-findings-reveal-80-million-in-wasteful-spending-at-dod/.

46686\20709500

1    Executive Orders."[135] The press release stated that the studies affected included research

2    focused on "global migration patterns, climate change impacts, and social trends."[136]

3            391.    By March 20, Secretary Hegseth had issued a memorandum directing

4    the immediate termination of over $360 million in additional grants in order to "implement

5    the President's orders."[137] The memorandum stated that funding would be cut to research

6    efforts in areas of "Diversity, Equity, and Inclusion and related social programs, climate

7    change, social science, Covid-19 pandemic response, and other areas – that are not aligned

8    with DOD priorities."[138]

9            392.    This termination essentially gutted MRI, which was partly created to

10   better understand climate change impacts and social trends. Beginning in March 2025, the

11   MRI's website, which included reports on finished and ongoing projects, became

12   unavailable.[139] Many, if not all, of the grants previously awarded through MRI have been

13   terminated.

14           393.    By terminating grants at the direction of the President, the DOD has

15   violated its congressional mandates, which require that the DOD fund social science research.

16   Such mandates include, for example, Congress's determination of DOD's funding through

17   legislation such as 50 U.S.C. § 1902 and the annual National Defense Authorization Acts.

---

22  [135] *Pentagon Culls Social Science Research, Prioritizes Fiscal Responsibility and Technologies for Future Battlefield*, U.S. Dep't of Def. (Mar. 7, 2025),
23  https://www.defense.gov/News/Releases/Release/Article/4113076/pentagon-culls-social-science-research-prioritizes-fiscal-responsibility-and-te/.
24  [136] *Id.*
25  [137] *Continuing Elimination of Wasteful Spending at the Department of Defense*, U.S. Dep't of Def. (Mar. 20, 2025), https://media.defense.gov/2025/Mar/20/2003673531/-1/-
26  1/0/CONTINUING-ELIMINATION-OF-WASTEFUL-SPENDING-AT-THE-DEPARTMENT-OF-DEFENSE.PDF.
27  [138] *Id.*
28  [139] Kai Kupferschmidt, *Pentagon abruptly ends all funding for social science research*, Science (Mar. 10, 2025), https://www.science.org/content/article/pentagon-abruptly-ends-all-funding-social-science-research.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

46686\20709500

1

2

3. **DOD Plaintiff and Other Grant Recipients Are Harmed by DOD's Illegal Grant Terminations**

3

4

394.    Plaintiff Berman and Class members have long relied on DOD grants to fund meritorious projects aimed at promoting national security. The termination of previously approved grants has caused and continues to cause Plaintiff and Class members serious harm.

5

6

a.    **Plaintiff Eli Berman's Grant Termination and Resulting Harm[140]**

7

8

9

10

11

395.    Dr. Eli Berman is a Professor of Economics at the University of California, San Diego ("UCSD") who studies economic development in fragile environments, with a focus on conflict. He is known particularly for his work applying rational choice analysis to the behavior of radical religious groups. He holds a dual appointment as a Professor in UCSD's School of Global Policy and Strategy.

12

13

14

15

16

396.    He also serves as the Research Director for International Securities Studies at the UC Institute on Global Conflict and Cooperation ("IGCC"), a research network comprised of scholars from across the University of California and the Los Alamos and Lawrence Livermore National Laboratories, who produce and use research to help build a more peaceful, prosperous world.

17

18

19

20

21

22

23

397.    Dr. Berman has published several books on national security economics including *Proxy Wars: Suppressing Violence through Local Agents* (with David Lake, Cornell University Press, 2019), *Small Wars, Big Data: The Information Revolution in Modern Conflict* (with Jacob N. Shapiro and Joseph H. Felter, Princeton U. Press, 2018), and *Radical, Religious and Violent: The New Economics of Terrorism* (Cambridge: MIT Press, 2009). He has also authored or co-authored dozens of articles, papers, and reviews on national security economics and other topics in economics.

24

25

398.    Over the past three decades, he has received grant funding from a variety of governmental and private sources. He has received federal grant funding from the

26

27

28

---

[140] Plaintiff Berman submitted a declaration, filed herewith, that further details his background and research, including information about his terminated grant.

[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

National Science Foundation, the Department of Homeland Security, the Office of Naval Research, USAID, the U.S. Institute of Peace, and the Department of Defense.

DOD Minerva Research Initiative and Past Grants

399.    Dr. Berman has previously served as a principal researcher on several Minerva Research Initiative projects.

400.    For example, Dr. Berman served as co-Principal Investigator of the MRI project "Terrorism, Governance, and Development," led by Professor Jacob Shapiro of Princeton University, directing a subcontract of $3,064,551 to IGCC, from March 2009 through August 2015. That project addressed how economic and political development are enabled when a government must also necessarily counter terrorism and insurgency. The research encompassed over a dozen scholarly empirical projects including original data collection in Afghanistan, Iraq, the Philippines, Colombia, Northern Ireland and the Palestinian Territories, among other sites. It resulted in over a dozen scholarly publications in leading journals and a book.

401.    Dr. Berman served as Principal Investigator on an MRI project for research on "Deterrence with Proxies," from 2014–2021. This research investigated how a powerful country can meet its security objectives by guiding the actions of proxy forces, while limiting the vulnerability of its own forces—as the U.S. has done over the last five decades. This grant resulted in multiple scholarly publications and an academic press book, trained postdoctoral fellows and PhD students, with a budget of $3,745,988.

402.    Dr. Berman received another grant from MRI, as the co-Principal Investigator with Stephen Biddle, for a one-year project entitled "Empirical Analysis for Meeting Great Power Challenges" in 2020. This grant funded research to evaluate the roles of technological advantage versus force strength in the success of naval battles, using data from the 16th Century through the present.

403.    Dr. Berman's prior MRI grant funding resulted in successful projects that furthered the DOD's understanding of national security.

DOD's 2023 Minerva Research Grant Application and Award

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

404.    On February 16, 2023, Dr. Berman, together with his colleagues, submitted an application for funding to MRI titled "Integrated Deterrence: Episodic Analysis" in response to an annual request for proposals. Dr. Berman was the Principal Investigator for the research, and the work was proposed to be done in collaboration with Professor Estaban Klor at Hebrew University, who was designated the co-Principal Investigator. Their work plan included hiring postdoctoral fellows, and both graduate and undergraduate research assistants.

405.    "Integrated Deterrence" is a national security concept that was the centerpiece of the 2022 National Defense Strategy. Integrated deterrence "involves using every tool at the Department [of Defense]'s disposal, in close collaboration with our counterparts across the U.S. Government, and with Allies and partners, to ensure that potential foes understand the folly of aggression."[141] Those tools include not only coercive measures but also economic, diplomatic, and intelligence instruments.

406.    Dr. Berman's proposal relied on data from the Israel/Gaza conflict discovered and collected as part of the "Deterrence with Proxies" project. Dr. Berman's team proposed: (1) coding textual data on incidents into digital form; (2) validating with social media and official sources; and (3) developing a game theoretic model to analyze the actions of combatants.

407.    This proposed research would continue and expand Dr. Berman's earlier Minerva project research funded during the Trump I and Biden administrations.

Award of Grant Funding (No. FA 9550-23-1-0437)

408.    On August 28, 2023, Dr. Berman and his team received notice of a Grant Award that would provide $1,032,529 in funding over three years.

409.    Progress between 2023 and 2025 was rapid. With the help of a PhD student, Dr. Berman's team solved a number of technical problems that had stymied previous researchers. The fine-grained nature of the team's data allowed unprecedented opportunities

---

[141] *2022 National Defense Strategy*, U.S. Dep't of Def. (Oct. 27, 2022), https://media.defense.gov/2022/Oct/27/2003103845/-1/-1/1/2022-NATIONAL-DEFENSE-STRATEGY-NPR-MDR.pdf.

46686\20709500

to test game-theoretic models of deterrence, specifically addressing whether episodes of attack and counter-attack tended to escalate or de-escalate, and whether de-escalation led to zero attacks or to some violent equilibrium. The team's understanding of the Gaza/Israel conflict in the period before October 7, 2023 vastly improved. More importantly, the team had a modeling tool to apply to other international conflicts stuck in violent equilibria.

410.    By late 2024, Dr. Berman's team was already circulating results and disseminating this research to policy and academic audiences, including within the U.S. Department of Defense, U.N. Peacekeeping Operations, and Israel's Institute on National Security Studies, as well as at invited academic seminars and conferences.

411.    The policy relevance of these results is manyfold. The game-theoretic model provides an analytical tool simple enough for an undergraduate with some training in economics, political science, or mathematics to use. It has broad applicability to numerous conflicts stuck in a mutual deterrence equilibrium that is not entirely peaceful. Disinformation campaigns and election interference have the same logic and reportedly the same perpetrators, so the results are applicable in that context as well. The model and results also beg two other questions: (1) can the same methods be applied to understand other conflicts?; and (2) can the integration of benign (in addition to coercive) instruments shift those conflicts to a less destructive equilibrium, or even to settlement? Dr. Berman was on the verge of answering these questions in early 2025.

Research Grant Termination (No. FA 9550-23-1-0437)

412.    On February 28, 2025, Dr. Berman received an email from the program officer for the Air Force Office of Scientific Research, which stated:

> In line with recent Presidential executive orders, [the Office of the Undersecretary of Defense for Research & Engineering] has determined that your grant award no longer effectuates Minerva program goals or DOD priorities. As such, we are letting you know that you will soon be hearing from the grants officer responsible for your award about terminating it.

413.    UCSD subsequently received a brief notice from the DOD Department of the Air Force that stated: "The Government intends to terminate this Award under the

46686\20709500

authority of 2 CFR 200.340(a)(4)." No explanation of any kind for the termination was provided.

414.    On March 3, 2025, DOD issued a Grant/Cooperative Agreement Modification. Again, it provided no explanation for the termination beyond form language:

> The subject grant award no longer effectuates the program goals or agency priorities as found in 2 CFR 200.340(a)(4) as incorporated into the DOD Research and Development General Terms and Conditions for grants by reference.

415.    As a result of the modification, the DOD eliminated the third year of funding on the grant ($248,991).

Harm from Grant Termination

416.    Dr. Berman and his team have suffered immediate harm as a result of the grant cancellation.

417.    Dr. Berman and his co-PI have been forced to significantly slow research progress and dissemination because they must now devote much of their time to writing grant applications.

418.    The researchers on Dr. Berman's grant have been unable to employ a postdoctoral fellow and have had to release from employment their research assistants. This has slowed the team's empirical and theoretical progress, and ceased their training of young scholars.

419.    Similarly, the loss of grant funding threatens the team's ability to retain essential support staff at the IGCC.

420.    The loss of grant funding also threatens the overall research and teaching operations of the University of California, which relies on Indirect Cost charges (currently 59% of total cost on new grants at UC San Diego) to cover activities such as building use, equipment depreciation, operation and maintenance of UC facilities, student services, departmental administration, or administrative support offices.

421.    Dr. Berman lost 22% of his annual compensation this calendar year due to grant termination.

1    422.    These personal and financial harms are ongoing.

2    423.    These harms are in addition to the loss of value to the public from Dr.

3    Berman's research—specifically the national security community, as Dr. Berman has lost

4    both time to travel and the resources to pay for travel to conferences and meetings.

5    **E.    Department of Transportation**

6    424.    The Department of Transportation ("DOT") is a federal agency within

7    the meaning of the APA established to protect and enhance the safety, adequacy, and

8    efficiency of the nation's transportation system and services.

9    **1.    Congress Established DOT to Promote the Safety, Quality, and
        Efficiency of the Nation's Transportation Services, Including Through**
10   **Research**

11   425.    Before the DOT was created in 1967, various federal programs devoted

12   nearly 100,000 employees and almost $6 billion to transportation across the United States.[142]

13   President Lyndon B. Johnson decried this decentralized system as "not good enough" for the

14   nation, and told Congress that system resulted in inefficient, congested, and unsafe

15   transportation.[143] An improved, coordinated system was essential to the nation's economic

16   health and well-being, including employment, standard of living, accessibility, and the

17   national defense.[144]

18   426.    Congress then passed the Department of Transportation Act ("the

19   Act"), Pub. L. No. 89-670, 80 Stat. 931 (1966), which President Johnson signed into law on

20   October 15, 1966. The Act centralized 31 federal agencies and functions, including the

21   Federal Aviation Agency, the Coast Guard, the Federal Railroad Administration, and many

22   others.[145]

23

24

25   [142] President Lyndon B. Johnson, *Special Message to Congress on Transportation* (March 2,
     1066), https://www.presidency.ucsb.edu/documents/special-message-the-congress-transportation-
26   0.
     [143] *Id.*
27   [144] *A Brief History of the DOT*, U.S. Dep't of Trans.,
     https://transportation.libguides.com/c.php?g=1154894&p=8441208.
28   [145] *Id.*

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

427.     Today, the DOT's operating administrations include the U.S. Department of Transportation Office of the Secretary (OST), National Highway Traffic Safety Administration (NHTSA), Federal Aviation Administration (FAA), Office of Inspector General (OIG), Federal Highway Administration (FHWA), Pipeline and Hazardous Materials Safety Administration (PHMSA), Federal Motor Carrier Safety Administration (FMCSA), Federal Railroad Administration (FRA), Great Lakes St. Lawrence Seaway Development Corporation (GLS), Federal Transit Administration (FTA), and the Maritime Administration (MARAD).[146]

428.     The Act provides "that the national objectives of general welfare, economic growth and stability, and security of the United States require the development of transportation policies and programs that contribute to providing fast, safe, efficient, and convenient transportation at the lowest cost consistent with those and other national objectives, including the efficient use and conservation of the resources of the United States." Pub. L. No. 97-449 (codified at 49 U.S.C. § 101(a)).

429.     The Act also provides that the DOT shall:

- ensure the coordinated and effective administration of the transportation programs of the United States Government;

- make easier the development and improvement of coordinated transportation service to be provided by private enterprise to the greatest extent feasible;

- encourage cooperation of Federal, State, and local governments, carriers, labor, and other interested persons to achieve transportation objectives;

- stimulate technological advances in transportation, through research and development or otherwise;

- provide general leadership in identifying and solving transportation problems; and

- develop and recommend to the President and Congress transportation policies and programs to achieve transportation objectives considering the needs of the public, users, carriers, industry, labor, and national defense.[147]

---

[146] *Id.*

[147] Pub. L. 97-449 (codified at 49 U.S.C. § 101(b)).

430. One way the DOT effectuates its mission is by providing funding to projects that invest in "transportation infrastructure, safety, and innovation across the country."[148] Congress appropriates these funds and authorizes transportation programs based on national priorities.[149] The DOT provides funding through Competitive Grant Funding Programs, Formula Grant Funding Programs (funding to states, tribes, and transit agencies), Loan Financing Programs, and Public-Private Partnerships (P3s).

431. The DOT administers competitive grant programs through its operating administrations ("OAs") and the Office of the Secretary of Transportation.[150] Each OA (e.g., Federal Highway Administration, Federal Transit Administration) solicits applications through a Notice of Funding Opportunity and selects projects based on program eligibility, evaluation criteria, and Departmental or program priorities. The Bipartisan Infrastructure Law alone provided billions of dollars for the DOT to distribute through competitive grant programs.[151]

432. Since the DOT's creation, Congress has continually provided funding and additional duties for the DOT to carry out its mission.[152] The Department's authorities are codified under U.S. Code Titles 23 (highways), 46 (maritime), and 49 (aviation, railroads, and other surface modes).[153]

433. In subsequent legislation, Congress has consistently affirmed that the DOT shall improve the nation's transportation system for all Americans, and has done so using language that the Trump Administration associates with "DEI" and "environmental justice."

---

[148] *Overview of Funding and Financing at USDOT*, U.S. Dep't of Trans., https://www.transportation.gov/grants/dot-navigator/overview-funding-and-financing-usdot.
[149] *Id.*
[150] *Id.*
[151] *The Bipartisan Infrastructure Law and Innovation,* U.S. Dep't of Trans., https://www.transportation.gov/priorities/innovation/bipartisan-infrastructure-law-and-innovation.
[152] *Strategic Plan for FY 2028-2022*, U.S. Dep't of Trans., (February 2018), https://www.transportation.gov/sites/dot.gov/files/docs/mission/administrations/office-policy/304866/dot-strategic-planfy2018-2022508.pdf.
[153] *Id.*

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

434.    For example, in 1991, Congress passed the Intermodal Surface Transportation Efficiency Act ("ISTEA") to develop a National Intermodal Transportation System. Pub. L. No. 102-240, 105 Stat. 1914 (Dec. 18, 1991). Congress declared that the system would include "significant improvements in public transportation necessary to achieve national goals for improved air quality, energy conservation, international competitiveness, and mobility for elderly persons, persons with disabilities, and economically disadvantaged persons in urban and rural areas of the country." Pub L. 102-240 § 2. Parts of the ISTEA directed the Secretary of the DOT ("the Secretary") to implement this system by leading and coordinating the research and development of high-speed rail, wooden bridges, and highway safety conditions. *Id*. Title I, Part A, §§ 1036, 1039. The ISTEA also authorized the Secretary of the DOT to collaborate with non-federal entities and to conduct research into areas such as underground pipes, buses, and construction materials. *Id*. Title VI, Part A §§ 6001, 6005, 6020, 6021.

435.    In 1998, Congress passed the Transportation Equity Act for the 21st Century ("TEA-21") to authorize funds for Federal-aid highways, highway safety programs, transit programs, and other transportation purposes. Pub. L. No. 105–178, 112 Stat. 107 (June 9, 1998).

436.    The TEA-21 reauthorized the Disadvantaged Business Enterprises ("DBE") provision, which was first introduced in DOT legislation beginning in 1983, and has been reauthorized at every opportunity since.[154] The TEA-21's DBE provision required that at least 10 percent of the funding made available by the statute was to be provided to small businesses controlled and owned by "socially and economically disadvantaged individuals." *Id*. Title I, Subtitle A, § 1101(b)(1).

437.    Most recently, in 2021, Congress passed the Infrastructure Investment and Jobs Act ("IIJA"), also known as the Bipartisan Infrastructure Law. Pub L. No. 117-85, 135 Stat. 429 (codified at 23 U.S.C § 101). Much of the IIJA requires the DOT to consider

---

[154]*Disadvantaged Business Enterprise (DBE) Program,* U.S. Dep't of Trans., https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

and prioritize projects that target disadvantaged communities and prioritize equitable outcomes.

438. The IIJA directed the Secretary to establish the Healthy Streets program, which would provide grants to mitigate urban heats islands and improve air quality. Pub L. No. 117-85, Title I, Subtitle D, § 11406. In awarding the grants, Congress specified that the Secretary should prioritize projects that target low-income or disadvantaged communities. *Id.* § 11406(f)(1).

439. The IIJA also directed the Secretary to make grants to organizations constructing safe and connected active transportation facilities. The IIJA also directed that in considering applications, the Secretary should consider the extent to which a proposal addresses "existing disparities in bicyclist and pedestrian fatality rates based on race or income level or provide access to jobs and services for low-income communities and disadvantaged communities." *Id.*

440. The IIJA also directed the Secretary to establish the Reconnecting Communities Pilot ("RCP") Grant Program to advance "community-centered transportation connection projects, with a priority for projects that benefit low-capacity communities."[155] The primary goal of the RCP is to "reconnect communities harmed by past transportation infrastructure decision."[156] In evaluating grant applications, the Secretary is required to consider a project's "opportunities for inclusive economic development." Pub L. 117-85 Title I, Subtitle E, § 11509 (d)(4)(B)(v).

441. The IIJA also directed the Secretary to establish the Rural Opportunities to Use Transportation for Economic Success Office ("ROUTES") which was tasked to "improve analysis of projects from rural areas, Indian Tribes, and historically disadvantaged communities in rural areas applying for Department discretionary grants." *Id.* §

---

[155] *Reconnecting Communities Pilot (RCP) Grant Program,* U.S. Dep't of Trans., https://www.transportation.gov/reconnecting.
[156] *Id.*

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

25010(b)(1)(A). The IIJA codified the ROUTES initiative, which was established under the first Trump administration in October 2019 with DOT Order 5050.1.[157]

442. The IIJA also amended the University Transportation Centers ("UTC") Program, which was established in 1987. The UTC program "advances the state-of-the-art in transportation research and technology, and develops the next generation of transportation professionals."[158] The program requires the Secretary to award grants to proposals that address six research priorities: improving mobility of people and goods; reducing congestion; promoting safety; improving the durability and extending the life of transportation infrastructure; preserving the environment; preserving the existing transportation system; and reducing transportation cybersecurity risks. 49 U.S.C. § 6503(c)(1). And the Secretary is required to select grants based in part on the recipient's "demonstrated commitment" to developing the transportation workforce through "outreach activities to attract new entrants into the transportation field, including women and underrepresented populations." *Id.* § 5505(b)(4)(B)(v)(II).

443. The IIJA also established the Safe Streets and Roads for All (SS4A) program with over $5 billion in funds to distribute to initiatives preventing roadway fatalities and serious injuries.[159] In awarding grants, the IIJA requires the Secretary to consider whether a project ensures "equitable investment in the safety needs of underserved communities in preventing transportation-related fatalities and injuries." Pub L. No. 117-85, Title IV, Subtitle A, § 24112(d)(3)(E).

444. The IIJA also required the Federal Motor Carrier Safety Administration, an administration of the DOT, to establish an advisory board focused on creating opportunities for women in the trucking industry. *Id.* § 23007.

---

[157] *Rural Opportunities to Use Transportation for Economic Success (ROUTES)*, U.S. Dep't of Trans., https://www.transportation.gov/rural.

[158] *University Transportation Centers,* U.S. Dep't of Trans., https://www.transportation.gov/content/university-transportation-centers.

[159] *Safe Streets and Roads for All (SS4A) Grant Program,* U.S. Dep't of Trans., https://www.transportation.gov/grants/SS4A.

46686\20709500

445.    The IIJA also reauthorized the DBE program, finding that "while significant progress has occurred due to the establishment of the disadvantaged business enterprise program, discrimination and related barriers continue to pose significant obstacles for minority- and women-owned businesses seeking to do business in Federally assisted" transportation markets. *Id.* Title I, Subtitle A, § 11101(e)(1)(A).

446.    These measures demonstrate that Congress directed the DOT to consider so-called "DEI" priorities in its initiatives, including in grant funding.

## 2.    In Response to Trump Administration Directives, DOT Improperly Changed Priorities and Canceled Existing Grants

447.    In January 2025, Sean Duffy was appointed as the Secretary of the DOT.[160] Duffy's first actions were to "advance[] President Donald Trump's agenda to rescind woke policies" and ensure that all DOT "policies align with the Administration's priorities."[161] He made no mention of the priorities set by Congress.

448.    To align with President Trump's executive orders, including E.O. 14148, the Secretary signed the "Woke Rescission" Memorandum, which directed DOT officials to "identify and eliminate all Biden-era programs, policies, activities, rules, and orders that promote climate change activism, Diversity, Equity, and Inclusion (DEI) initiatives, racial equity, gender identity policies, environmental justice, and other partisan objectives."[162]

449.    This alignment with the Trump administration included how the DOT defended its lawsuits.

450.    In October 2023, two DOT contractors had sued the DOT, challenging the constitutionality of the DBE program. *Mid-Am. Milling Co. v. United States Dep't of Transp.*, No. 3:23-CV-00072-GFVT-EBA, 2025 WL 1461818, at *1 (E.D. Ky. May 21,

---

[160] *U.S. Transportation Secretary Duffy Takes Action to Rescind "Woke" DEI Policies and Advance President Trump's Economic Agenda*, U.S. Dep't of Trans. (Jan. 29, 2025), https://www.transportation.gov/briefing-room/us-transportation-secretary-sean-duffy-takes-action-rescind-woke-dei-policies-and.

[161] *Id.*

[162] *Id.*

46686\20709500

2025). Any person may qualify as socially and economically disadvantaged, but certain racial groups and women are "rebuttably presumed" to be disadvantaged. *Id.* In September 2024, a district court judge issued a preliminary injunction enjoining the DOT from "mandating the use of race-and gender-based rebuttable presumptions for [DOT] contracts impacted by DBE goals." *Id.* at *2. In May 2025, after the change in administration, the DOT filed a proposed consent order stipulating that the DBE program's use of race- and sex-based presumptions is unconstitutional.[163] However, the district judge has not yet approved the order as intervenor-defendants continue to litigate the case on behalf of beneficiaries of the program. *Mid-Am. Milling Co,* 2025 WL 1461818, at *1.

451.     Secretary Duffy has been clear that he is targeting polices and grants that do not conform to the Administration's priorities.

452.     On April 24, 2025, the Secretary sent a letter to all DOT grant recipients instructing them to "Follow the Law."[164] The letter told recipients they had "entered into legally enforceable agreements with the United States Government and are obligated to comply fully with all applicable Federal laws and regulations."[165] The letter also provided that:

> "Whether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called "diversity, equity, and inclusion," or "DEI," goals, presumptively violates Federal law. Recipients of DOT financial assistance must ensure that the personnel practices (including hiring, promotions, and terminations) within their organizations are merit-based and do not discriminate based on prohibited categories. Recipients are also precluded from allocating money received under DOT awards—such as through contracts or the provision of other benefits—based on suspect classifications."[166]

---

[163] *Mid-Am. Milling Co. v. United States Dep't of Transp.* No. 3:23-CV-00072-GFVT-EBA, Dkt. 82-1, May 28, 2025.

[164] *Trump's Transportation Secretary Sean P. Duffy: Follow The Law*, U.S. Dep't of Trans. (Apr. 24, 2025), https://www.transportation.gov/briefing-room/trumps-transportation-secretary-sean-p-duffy-follow-law. The full text of the letter is available at https://www.transportation.gov/sites/dot.gov/files/2025-05/Follow%20the%20Law%20Letter%20to%20Applicants%204.24.25.pdf.

[165] *Id.*

[166] *Id.*

46686\20709500

453.    The letter told recipients they were required to cooperate with federal authorities, including cooperating and not impeding U.S. Immigration and Customs Enforcement ("ICE").[167] And it provided that "DOT may also terminate funding in response to substantiated breaches of the terms of the agreement, or if DOT determines that continued funding is no longer in the public interest."[168]

454.    In blatant contradiction of its enabling legislation in the IIJA, on April 1, 2025, the Secretary removed the "DEI/Climate Requirements" in the grant application for the SS4A grant program.[169] This action removed the definition of equity and language stating that the DOT was seeking projects that address equity and environmental justice from the notice of funding opportunity.[170] The Secretary said that "DEI and environmental justice requirements for the Safe Streets program weren't just unnecessary – they were bogging down the system and preventing money from going out to where it's needed."[171]

455.    On May 2, 2025, the Secretary announced that the DOT terminated "seven woke university grants" that were used to "advance a radical DEI and green agenda that were both wasteful and ran counter to the transportation priorities of the American people."[172] The Secretary explained that the "previous administration turned the [DOT] into the Department of Woke" and that Americans "have zero interest in millions of their tax dollars funding research on the intersection of gender non-conforming people and infrastructure inequality or whether road improvement projects are racist."[173] The terminations included grants to UC Davis for "accelerating equitable decarbonization research," to USC for research regarding how "the transportation system creates and

---

[167] *Id.*

[168] *Id.*

[169] *U.S. Transportation Secretary Sean P. Duffy Announces Funding for Communities to Improve Road Safety*, U.S. Dep't of Trans. (April 1, 2025), https://www.transportation.gov/briefing-room/us-transportation-secretary-sean-p-duffy-announces-funding-communities-improve-road.

[170] *Id.*

[171] *Id.*

[172] *U.S. Transportation Secretary Sean P. Duffy Defunds Woke University Grants*, U.S. Dep't of Trans. (May 2, 2025), https://www.transportation.gov/briefing-room/us-transportation-secretary-sean-p-duffy-defunds-woke-university-grants.

[173] *Id.*

46686\20709500

perpetuates inequities," and to Johns Hopkins for research on "pollution exposure inequality in New York City."[174]

456.    Plaintiff Handy received a letter containing the following form explanation for her grant's termination, which demonstrates that DOT replaced its Congressionally mandated directives for Defendant Trump's:

> At the time your grant was issued, the grant agreement and applicable regulations authorized termination by "the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 CFR § 200.340(a)(2). DOT's priorities presently include:
>
> • promoting traditional forms of energy and natural resources to the greatest extent possible,
>
> • ensuring that taxpayer dollars are used efficiently in ways that maximally benefit the American people and improve their quality of life, and
>
> • ceasing to promote divisive diversity, equity, and inclusion initiatives that discriminate on the basis of race, national origin, or another protected characteristic.
>
> Having individually reviewed your grant in light of DOT's priorities, the Office of the Secretary has determined that your grant is inconsistent with the priorities listed above.[175]

457.    On information and belief, all researchers received the same "rationale" for grant termination.

458.    The DOT's present priorities used to rescind research grants contradict Congress's mandate to the DOT in the IIJA and other directives.

459.    Many parts of the IIJA provide funding for clean energy projects, as opposed to "traditional forms of energy," and mandates that the DOT distribute these funds. For example, the IIJA appropriated "$1.1 billion for the Federal Transit Administration's Low or No Emission Vehicle Program and $50 million for the Electric or Low-emitting Ferry

---

[174] *Id.*
[175] Handy Decl. Ex. F.

46686\20709500

Program in FY 2022."[176] The IIJA also included billions of dollars to create additional charging stations for electric vehicles.[177]

460.    "Ceasing to promote divisive diversity, equity, and inclusion, initiatives" also violates the IIJA and other legislation. Specifically, applicants for the UTC program are required to be evaluated on their "demonstrated commitment" to developing the transportation workforce through "outreach activities to attract new entrants into the transportation field, including women and underrepresented populations." 49 U.S.C. § 5505(b)(4)(B)(v)(II).

461.    On July 2, 2025, the Secretary sent a second letter to all DOT grant recipients announcing that the "Trump Administration will not enforce Biden-era DEI and Green New Scam policies or requirements."[178] The Secretary wrote that the DOT will not enforce anything related to climate change, greenhouse gas emissions, racial equity, gender identity, diversity, equity, and inclusion goals, environmental justice, or the Justice 40 Initiative. This change was in response to several of President Trump's Executive Orders, including:

- E.O. 14170, Reforming the Federal Hiring Process and Restoring Merit to Government Service;

- E.O. 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing;

- E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;

- E.O. 14149, Restoring Freedom of Speech and Ending Federal Censorship;

- E.O. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity; and

---

[176] *Fact Sheet: Climate and Resilience in the Bipartisan Infrastructure Law,* U.S. Dep't of Trans., https://www.transportation.gov/bipartisan-infrastructure-law/fact-sheet-climate-and-resilience-bipartisan-infrastructure-law.

[177] *Id.*

[178] *President Trump's Transportation Secretary Sean P. Duffy to Recipients of Federal Funds: We're Tossing All Biden-Era DEI Directives*, U.S. Dep't of Trans. (July 9, 2025), https://www.transportation.gov/briefing-room/president-trumps-transportation-secretary-sean-p-duffy-recipients-federal-funds-were.

46686\20709500

- E.O. 14154, Unleashing American Energy.[179]

462.     The Trump DOT's drastic shift in priorities and purging of certain ideas deviates from the DOT's long-tradition of improving the nation's transportation for all Americans and violates Congressional statutes.

### 3.     DOT Plaintiff and Other Grant Recipients Are Harmed by DOT's Illegal Grant Terminations

463.     Plaintiff Handy and Class members have long relied on DOT grants to fund meritorious projects in the transportation space. The termination of previously approved grants has caused and continues to cause Plaintiff and Class members serious harm.

### b.     Plaintiff Susan Handy's Grant Terminations and Resulting Harm[180]

464.     Dr. Susan L. Handy is a Distinguished Professor in the Department of Environmental Science and Policy at the University of California, Davis who studies the relationship between transportation and land use, particularly the impact of land use on travel behavior and on strategies for reducing automobile dependence.

465.     Dr. Handy has served as the Center Director of the National Center for Sustainable Transportation (NCST) since its founding in 2013. She previously served as the Chair of the Transportation Technology and Policy Graduate Group, the Chair of the Department of Environmental Science and Policy, and the Director of the Sustainable Transportation Center at UC Davis. Her recent work includes projects for the California Air Resources Board and Caltrans.

466.     Dr. Handy is the author of the book Shifting *Gears: Toward a New Way of Thinking About Transportation* (MIT Press, 2023). She has also authored or co-authored dozens of articles, papers, and reviews on transportation and land use.

467.     Dr. Handy also serves as an Associate Editor of *Transportation Research Record* and serves on the Editorial Board of numerous other journals including

---

[179] *Id.*

[180] Plaintiff Handy submitted a declaration, filed herewith, that further details her background and research, including information about her terminated grant.

[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

46686\20709500

*Transport Reviews*, *Travel Behavior & Society*; *Transport Policy*; *Journal of Transportation and Land Use*; *Journal of Planning Education and Research*; and *Transportation Research*.

<u>The National Center for Sustainable Transportation (NCST)</u>

468.     Dr. Handy is the director of the National Center for Sustainable Transportation ("NCST"), which provides national leadership in advancing environmentally sustainable transportation through cutting-edge research, direct policy engagement, and education. The NCST was established in 2013 after being selected in a national competition to serve as one of five national transportation centers as part of the University Transportation Centers (UTC) program administered by the DOT under the Moving Ahead for Progress in the 21st Century Act. In 2016, the NCST successfully re-competed for the opportunity to continue serving as one of the DOT's national UTCs under the Fixing America's Surface Transportation Act

469.     The NCST is a powerful coalition of seven universities across the country. The Institute of Transportation Studies at the University of California, Davis, leads the NCST, with partner centers at California State University, Long Beach; Georgia Institute of Technology; Texas Southern University; the University of California, Riverside; the University of Southern California; and the University of Vermont.

470.     Since its founding, the NCST has been delivering results with timely, practical research that has produced 356 reports and white papers, 163 policy and research briefs—which make complex findings easy to understand for everyday Americans—and over 400 peer-reviewed publications. Over the past decade, the NCST has hosted 416 events, drawing nearly 30,000 participants from government agencies, industry leaders, and the public. Hundreds of students have taken part in NCST programs.

471.     Many of the NCST's studies target transportation challenges in small towns and farming communities, where good roads and access to jobs and services are essential to daily life and economic survival. NCST also supports American industry and supply chains by exploring better ways to move goods.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

472.    Moreover, the NCST's activities have had transformational impacts on the nation's transportation systems. Its work has contributed to accelerated adoption of vehicles and fuels that minimize greenhouse gas emissions, new approaches to infrastructure provision and systems operation that lessen environmental impacts, and a shift towards modes other than driving so as to reduce vehicle miles traveled while improving accessibility. These transformations help the United States reduce its greenhouse gas emissions while reducing other environmental harms, enhancing social equity, and supporting economic vitality.

473.    The NCST has received funding from the DOT, the California Department of Transportation, the California Air Resources Board, the California Energy Commission, the South Coast Air Quality Management District, sources in the States of Georgia, Texas, and Vermont, and private industry.

Award of NCST Grant Funding (Nos. 69A3552344814 and 69A3552348319)

474.    In 2022, Dr. Handy and her colleagues at the NCST submitted a grant proposal to the DOT to fund the NCST's research activities in the DOT Priority Area "Preserving the Environment," as set out by the Infrastructure Investment and Jobs Act ("IIJA").

475.    The NCST would support four kinds of research activities, all aimed at matching research to policy: (1) building tools; (2) developing policy; (3) conducting studies; and (4) undertaking basic research. The application explained that the NCST's research activities would relate to electrification, alternative fuels, air quality, and environmental justice.

476.    Dr. Handy was the Principal Investigator for this grant proposal.

477.    On June 1, 2023, Dr. Handy and her team received from DOT notice of Grant Award Nos. 69A3552344814 and 69A3552348319 awarding a total of $4,000,000 per funding year, for five annual allocations of funding.

478.    This award was made under the IIJA, through which the DOT awarded $90 million in funding per year for the competitively selected UTC programs, including the NCST's $4 million annual award. The NCST's funding was awarded to promote research

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

focused on accelerating equitable decarbonization that benefits both the transportation system and the well-being of people in overburdened and historically disadvantaged communities. The research activities were focused on three critical domains: (1) vehicle technology to accelerate lower greenhouse gas emissions; (2) infrastructure provision; and (3) reshaping travel demand.

Termination of NCST Grant Funding (Nos. 69A3552344814 and 69A3552348319)

479.    On May 2, 2025, Dr. Handy and her team learned of the termination of all of NCST's DOT funding—in effect the termination of the NCST itself—through a DOT press release titled "U.S. Transportation Secretary Sean P. Duffy Defunds Woke University Grants."[181]

480.    Also on May 2, 2025, UC Davis received a Notice of Termination announcing the termination of Award Nos. 69A3552344814 and 69A3552348319 on the grounds that the awards are "inconsistent" with current DOT "priorities," including "DOT's priority to cease promoting DEI initiatives that discriminate on the basis of race, national origin, or another protected characteristic."

481.    The Notice of Termination also apparently references the research activities of a different DOT grantee, C2SMARTER, in purporting to explain the reasons for the termination of NCST's grants.

Pacific Southwest Region University Transportation Center (PSR UTC) and Grant Funding

482.    The Pacific Southwest Region University Transportation Center is a regional UTC funded by the DOT. Established in 2016, the PSR UTC is led by the University of Southern California and includes nine research partner universities, including the University of California, Berkeley, the University of California, Davis, the University of California, Irvine, and the University of California, Los Angeles.

---

[181] *U.S. Transportation Secretary Sean P. Duffy Defunds Woke University Grants*, U.S. Dep't of Trans. (May 2, 2025), https://www.transportation.gov/briefing-room/us-transportation-secretary-sean-p-duffy-defunds-woke-university-grants.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

483.    Dr. Handy is the Principal Investigator on Subaward No. SCON-00005220 funded through PSR UTC's DOT Grant No. 69A3552348309. The subaward was for $245,000 for a budget period of June 1, 2023, through May 31, 2024; subsequently amended on July 1, 2024, to provide the second annual allocation of funding in the amount of $240,734.55, and to extend the subaward end date to May 31, 2025.

Termination of PSR UTC Grant Funding and Subaward

484.    The May 2, 2025 DOT press release announcing the termination of NCST's grants also announced the termination of PSR UTC's grants.

485.    On May 5, 2025, UC Davis's Sponsored Programs Office received a stop work notification relating to Subaward No. SCON-00005220. Attached to the email was the termination letter the University of Southern California received from DOT, terminating PSR UTC's Grant No. 69A3552348309.

486.    The language of this termination letter was similar to the language in the letter terminating NCST's grant funding. The PSR UTC termination letter similarly states that the "grant is inconsistent with the priorities" of DOT, including "DOT's priority to cease promoting DEI initiatives that discriminate on the basis of race, national origin, or another protected characteristic." The letter also labels PSR UTC's electric vehicle statement and "environmental justice themes" as "discriminatory consideration and 'green new deal' principles that are inconsistent with DOT's priorities."

Harm Suffered from Grant Terminations

487.    Dr. Handy and her collaborators at NCST and PSR UTC have suffered immediate harm as a result of the cancellation of their grants and the defunding of their research centers.

488.    Dr. Handy and the 77 other researchers funded by these grants at the time of cancellation have been forced to significantly slow both research progress and dissemination. As of the terminations of the grants, 79 research projects were in progress that now may not be completed. Rather than taking on pressing research questions, much of Dr. Handy's time and that of her fellow researchers has been taken up writing grant applications

46686\20709500

1    to replace lost funding. They have lost both time and funding needed to travel to meetings and

2    conferences to disseminate their research.

3          489.    The researchers on these grants have had to lay off or find new sources

4    of funding for more than 40 graduate and undergraduate research assistants who were

5    employed on research projects funded by these grants. Researchers have been unable to make

6    employment offers to graduate and undergraduate research assistants or to postdoctoral

7    fellows for the coming year. This not only has slowed Dr. Handy's research progress, it has

8    also ceased her training of these young scholars.

9          490.    Loss of grant funding similarly threatens Dr. Handy's ability to retain

10    essential support staff. The loss of grant funding resulted in the loss of the equivalent of

11    nearly 5 full time staff positions at UC Davis alone. The reduction in staffing is severely

12    limiting the active dissemination of findings from completed projects to agencies, industry,

13    and the public.

14          491.    Loss of grant funding threatens the overall research and teaching

15    operations of UC Davis, which relies on federal funding to further its educational and

16    scientific purposes.

17          492.    These personal and financial harms are ongoing. Nearly 10 percent of

18    Dr. Handy's annual compensation was lost this calendar year due to grant terminations.

19          493.    These harms are in addition to the loss of value to the public from the

20    research funded by these grants. The grant terminations put an end to research that is critical

21    to ensuring the environmental and financial sustainability of the nation's transportation

22    system and enhancing its ability to serve the needs of the U.S. population.

23    **F.      Department of Health and Human Services and National Institutes of Health**

24          494.    The Department of Health and Human Services ("HHS") is the federal

25    agency responsible for protecting public health and well-being in the United States.

26          495.    The National Institutes of Health ("NIH") is a subunit of HHS and is

27    the federal agency responsible for conducting and supporting biomedical and public health

28    research. Widely acknowledged as a "crown jewel" of America's scientific institutions—a

46686\20709500

characterization the agency's director recently reiterated[182]—NIH is the largest public funder of medical research in the world.

### 1. Congress Established NIH to Fund Medical Research on a Broad Scale to Advance Human Health and Well-Being in the United States

496.    NIH traces its origins to the 1887 establishment of the Hygienic Laboratory, a component of the Marine Hospital Service dedicated to the study of epidemic diseases. Subsequent statutes have transformed that single laboratory into a multifaceted agency at the center of this suit. In 1902, the laboratory assumed responsibility for testing and regulating vaccines and biologic products with the passage of the Biologics Control Act, ch. 1378, 32 Stat. 728 (1902). In 1930, Congress redesignated the laboratory as the National Institute (singular) of Health and established fellowships for biological and medical researchers. *See* Ransdell Act, ch. 251, 46 Stat. 379 (1930). In 1937, Congress created the National Cancer Institute, authorizing the new institute to award research grants to nonfederal scientists and to fund fellowships for young researchers. *See* National Cancer Institute Act, ch. 565, 50 Stat. 559 (1937). In 1944, Congress made the National Cancer Institute a division of NIH and expanded NIH's support for biomedical research. Public Health Service Act ("PHSA"), ch. 373, 58 stat. 682 (1944). And in 1948, following the creation of several additional subsidiary institutes, Congress gave the umbrella agency its current name: the National Institutes (plural) of Health. *See* National Heart Act, ch. 481, 62 Stat. 464 (1948).

497.    Today, NIH is made up of 27 institutes and centers ( "ICs" in NIH parlance), each focusing on a different disease or body system. NIH is the primary source of federal funding for biomedical and public health research in the United States. In fiscal year 2024, NIH spent over $36 billion on over 60,000 research grants, awarding recipients in each of the fifty States and the District of Columbia.[183]

---

[182] *Opening Statement of Dr. J. Bhattacharya, S. Comm. on Health, Educ., Lab. & Pensions* (March 5, 2025), https://bit.ly/Bhattacharya-Statement.

[183] *See United for Medical Research, NIH's Role in Sustaining the U.S. Economy, United for Medical Research*, at 5 (Mar. 2025), https://www.unitedformedicalresearch.org/wp-content/uploads/2025/03/UMR_NIH-Role-in-Sustaining-US-Economy-FY2024-2025-Update.pdf (tabulating NIH research grants awarded, FY2024); see also NIH, *NIH Awards by Location & Organization*, https://report.nih.gov/award/index.cfm (searchable results); NIH, *Research Project Grants*, https://report.nih.gov/nihdatabook/category/4 (identifying historical data

46686\20709500

498.    According to the agency, "NIH's mission is to seek fundamental knowledge about the nature and behavior of living systems and the application of that knowledge to enhance health, lengthen life, and reduce illness and disability."[184] NIH carries out its mission through both "intramural" research (that is, research conducted in-house at NIH) and "extramural" research (that is, research conducted at outside institutions with NIH financial support).

499.    In addition to supporting numerous scientific breakthroughs, NIH funds are also critical to the education and training of the next generation of scientists and researchers. NIH's financial awards support postdoctoral fellows, graduate students, and early-career investigators whose work advances scientific discovery and innovation. These funds not only provide financial support, but also enable mentorship, access to cutting-edge resources, and participation in collaborative research environments that are essential to developing the skills, experience, and professional networks needed to sustain the biomedical research enterprise.

500.    NIH's extramural research activities stem from statutory directives. Congress has enacted laws authorizing NIH and its constituent institutes and centers to conduct research and award grants, and it has supplied funding for those activities through regular appropriations.

501.    The PHSA contains Congress's overarching authorization for NIH (as a component of the "Public Health Service") to conduct research and award grants. 42 U.S.C. §241 (a)  states:

> The Secretary [of Health and Human Services] shall conduct in the [Public Health] Service, and encourage, cooperate with, and render assistance to other appropriate public authorities, scientific institutions, and scientists in the conduct of, and promote the coordination of, research, investigations, experiments, demonstrations, and studies relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments of man, including water purification, sewage treatment, and pollution of lakes and streams.

And 42 U.S.C. §241 (a)(3) states:

---

through  2023,  and  reporting  more than 40,000 competitive grant awards in 2022 and 2023).
[184] NIH, *Mission and Goals*, https://www.nih.gov/about-nih/what-we-do/mission-goals.

46686\20709500

1

2

3

4

> [The Secretary may] make grants-in-aid to universities, hospitals, laboratories, and other public or private institutions, and to individuals for such research projects as are recommended by the advisory council to the entity of the Department [of Health and Human Services] supporting such projects and make, upon recommendation of the advisory council to the appropriate entity of the Department, grants-in-aid to public or nonprofit universities, hospitals, laboratories, and other institutions for the general support of their research.

5

6

502.    Section 284 of the PHSA imposes similar responsibilities and confers

7

similar authority on the directors of NIH's institutes and centers. Among other things, each

8

director "shall encourage and support research, investigations, experiments, demonstrations,

9

and studies in the health sciences[,]" 42 U.S.C. § 284(b)(1)(A), and, to that end, "may make

10

grants and cooperative agreements . . . for research, training, or demonstrations[.]" *id.*

§284(b)(2)(A). *See also* 42 U.S.C. § 282 (similar, for the NIH director).

11

503.    Other sections of the PHSA provide more specific directives to each of

12

NIH's constituent institutes and centers, detailing the ICs' general purposes and establishing

13

initiatives and programs within each of them. *Cf.* 42 U.S.C. §284(b)(1)(A) (providing that, in

14

carrying out the purposes of section 301 of the PHSA, the Secretary, acting through the

15

Director of each research institute within NIH, "shall encourage and support research,

16

investigations, experiments, demonstrations, and studies in the health sciences" with respect

17

to the human disease or disorder or other aspects of human health for which the national

18

research institutes were established). Some of these statutory provisions are directly at odds

19

with the "policy priorities" Defendants HHS, Kennedy, NIH, and Bhattacharya now invoke to

20

terminate plaintiffs' NIH grants.

21

504.    In addition to the above statutory directives, Congress also established

22

a public process to identify the research priorities of NIH and its institutes and centers. Every

23

six years, the NIH director must "develop and submit to the appropriate committees of

24

Congress and post on the [NIH's website] a coordinated strategy (to be known as the

25

'National Institutes of Health Strategic Plan') to provide direction to the biomedical research

26

investments made by the National Institutes of Health, to facilitate collaboration across the

27

institutes and centers, to leverage scientific opportunity, and to advance biomedicine." 42

28

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

U.S.C. § 282(m)(1). Each of NIH's institutes and centers similarly develops and promulgates a strategic plan that publicly articulates its research priorities. *Id.* § 282(m)(3).

505.     NIH has previously followed Congress's direction and publicized its research priorities. In September 2019, the NIH director began the process of updating the agency's priorities in biomedical and behavioral research areas, research capacity, and research conduct. Between October 2019 and July 2020, NIH gathered feedback from its institutes and centers, their advisory councils, external stakeholders, and the general public. The Strategic Plan published in 2020 stated that, among other things, NIH would prioritize "improving minority health and reducing health disparities; enhancing women's health; addressing public health challenges across the lifespan; promoting collaborative science; and leveraging data science for biomedical discovery."[185] Similarly, the plan stated that NIH "supports a comprehensive spectrum of immunology and infectious disease research focused on developing improved or novel vaccines. [] including the rapid development of new vaccines to mitigate emerging infectious disease outbreaks, such as COVID-19, Ebola virus disease (EVD), and influenza (flu)."[186]

506.     Most of NIH's funding comes from annual discretionary appropriations from Congress.[187] For years, Congress has made appropriations for NIH research with this statutory and regulatory framework in mind and generally has appropriated specific amounts to each of NIH's institutes and centers to carry out the purposes set forth in the authorizing statutory provisions described above.[188]

---

[185] NIH, *NIH-Wide Strategic Plan, Fiscal Years 2021-2025* at 3 (2020), https://www.nih.gov/sites/default/files/2025-01/strategic-plan-fy2021-2025.pdf.

[186] *Id.* at 8.

[187] Some of NIH's funding is from mandatory funding sources or available due to specific transfer or budgetary rules, but the "vast majority" comes from annual discretionary Congressional appropriations. *National Institutes of Health Funding: FY1996-FY2025*, Cong. Research Serv. Rep. (June 25, 2024), https://www.congress.gov/crs-product/R43341.

[188] *See, e.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. H, tit. II, 136 Stat. 4459, 4861-4865; Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. H, tit. II, 136 Stat. 49, 448-452; Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. H, tit. II, 134 Stat. 1182, 1573-1577; Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, div. A, tit. II, 133 Stat. 2534, 2562-2565; Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, div. B, tit. II, 132 Stat. 2981, 3074-3076; Consolidated

46686\20709500

1          507.    In recent years, Congress has specifically rejected efforts to

2   significantly cut NIH's funding. For example, in 2017, as part of its fiscal year 2018 budget

3   proposal, the first Trump Administration sought to reduce NIH annualized spending by $5.8

4   billion, to $25.9 billion.[189] The proposal's primary method of achieving these cuts was by

5   slashing the "indirect cost rate" for NIH grants, capping it at 10% across the board. This

6   proposal drew bipartisan criticism. The Senate Appropriations Committee reported that the

7   proposal would "radically change the nature of the Federal Government's relationship with

8   the research community," would "abandon[]" the Government's "long-established

9   responsibility" for research infrastructure, and would jeopardize "biomedical research

10  nationwide." S. Rep. No. 115-150, at 109 (2017). To avoid this possibility, Congress enacted

11  statutory language (which it has readopted in every subsequent appropriations measure)

12  barring NIH or any other agency from restructuring or modifying the existing approach to

13  indirect costs. *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. H, §226,

14  132 Stat. 348, 740. And ultimately, rather than enacting the Administration's proposal of

15  cutting NIH funding to $25.9 billion, Congress's all-in appropriation to NIH for fiscal year

16  2018 was $37.3 billion—higher than the prior fiscal year's appropriation.[190]

17         508.    In subsequent budget proposals, the Administration generally sought to

18  increase, not decrease, NIH's funding. Its Fiscal Year 2020 budget proposal touted the

19  Administration's prioritization of "critical health research" and proposed a $33 billion

20  appropriation to NIH—about $6 billion higher than its 2017 proposal.[191] Similarly, the Fiscal

21  Year 2021 budget reiterated the Administration's commitment to prioritizing "critical health

22

23

24  Appropriations Act, 2018, Pub. L. No. 115-141, div. H, tit. II, 132 Stat. 348, 720-723;
    Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, div. H, tit. II, 131 Stat. 135, 524-

25  526; *see also, e.g.*, Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. G, tit. II,
    121 Stat. 1844, 2173-2177.

26  [189] *See* Off. of Mgmt. & Budget, *Major Savings and Reforms: Budget of the U.S. Government
    Fiscal Year 2018*, at 43 (2017), https://bit.ly/OMBFY18.

27  [190] NIH, *History of Congressional Appropriations, Fiscal Years 2010-2019*, at 1,
    https://bit.ly/42p9Lya.

28  [191] Off. of Mgmt. & Budget, *A Budget for a Better America, Budget of the U.S. Gov't, Fiscal Year
    2020*, at 46, https://bit.ly/OMBFY20.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

46686\20709500

research" and "support[ing] innovation," and proposed providing $38 billion to NIH.[192] Ultimately, Congress appropriated even more funds to NIH than the Administration requested for fiscal year 2021: about $42.9 billion.[193]

509.    Overall, from Fiscal Years 2017 through 2023, NIH funding increased annually, which is consistent with NIH's stable, and generally increasing, funding for more than 20 years:[194]



**Figure 1. NIH Funding, FY1998-FY2025 Request**
Program Level Funding in Current and Projected Constant (FY2023) Dollars.

510.    Congress's appropriations to NIH for Fiscal Year 2024 were no different. Consistent with past appropriations for NIH activities, the Further Consolidated Appropriations Act of 2024 (2024 CAA) appropriates to each of NIH's Institutes and Centers specific amounts "for carrying out section 301 and title IV of the [Public Health Service] Act" with respect to their specific, respective statutory purposes. Pub. L. 118-47, div. D, tit. II, 138 Stat. 460, 656-657. For example, the 2024 CAA appropriates $7,224,159,000 to the National

---

[192] Off. of Mgmt. & Budget, *A Budget for America's Future, Fiscal Year 2021*, at 52, https://bit.ly/OMBFY2021.

[193] NIH, *Supplementary Appropriation Data Table for History of Congressional Appropriations, Fiscal Years 2020-2025*, at 1, https://bit.ly/42dM1M4.

[194] *National Institutes of Health Funding: FY1996-FY2025*, Cong. Research Serv. Rep. (June 25, 2024), https://www.congress.gov/crs-product/R43341.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

Cancer Institute "for carrying out section 301 and title IV of the [PHSA] with respect to cancer"; $3,982,345,000 to the National Heart, Lung, and Blood Institute to carry out the same statutory purposes "with respect to cardiovascular, lung, and blood diseases, and blood and blood products"; and $2,603,925,000 to the National Institute for Neurological Disorders and Stroke to carry out the same statutory purposes "with respect to neurological disorders and stroke." *Id.*

511.    Congress has not enacted a Consolidated Appropriations Act for Fiscal Year 2025, but on March 15, 2025, the President signed the Full-Year Continuing Appropriations and Extensions Act, 2025, commonly known as a "Continuing Resolution" or "CR" (2025 CR). Pub. L. 119-4, 139 Stat. 9. Pursuant to the 2025 CR, Congress appropriated "[s]uch amounts as may be necessary . . . under the authority and conditions provided in applicable appropriations Acts for fiscal year 2024, for projects or activities . . . that are not otherwise specifically provided for, and for which appropriations, funds, or other authority were made available" in the specific appropriations Acts. *Id.*, div. A, §1101(a), 139 Stat. at 11. Congress made limited changes in the 2025 CR with respect to the appropriation to NIH, including rescission of a portion of NIH funding ($221,000,000 of a $1.25 billion appropriation) previously appropriated to the "NIH Innovation Account, CURES Act," which is separate from Congress's discretionary appropriations to NIH's Institutes and Centers. *Id.*, div. A, §1905, 139 Stat. at 32.[195] Otherwise, Congress did not rescind any amounts appropriated to NIH's institutes or centers and maintained the same level of funding as set forth in the 2024 CAA, through September 30, 2025. *See id.*, div. A, §1101(a)(8), 139 Stat. at 11.

---

[195] Appropriations to the account created by the Cures Act are, "[i]n effect," "not subject to discretionary spending limits." *Nat'l Insts. of Health Funding: FY1996-FY2025*, Cong. Research Serv. Rep. (June 25, 2024), https://www.congress.gov/crs-product/R43341. Funds may be transferred from the Cures Act account to other NIH accounts "only for the purposes specified in the Cures Act." *Id.* Congress exempted from any rescission amounts previously designated by Congress as for an "emergency requirement" under the Balanced Budget and Emergency Deficit Control Act of 1985. 2025 CR, div. A, §1101(a)(8), 139 Stat. at 11

46686\20709500

[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

512. NIH generally awards extramural grants through a competitive process. At any given time, NIH has over a thousand active funding opportunities supporting a broad range of programs.

513. The Department of Health and Human Services has promulgated regulations at 45 C.F.R. Part 75, governing the award of grants by HHS and its agencies, including NIH. This includes 45 C.F.R. §52.6(c), which allows HHS to notice a grant award for a "project period," during which HHS intends to support the project "without requiring the project to recompete for funds."

514. NIH uses three-character "activity codes" to group and classify these funding opportunities, with the first character typically identifying the major funding category or program type. "For example, activity codes for research and development often start with 'R,' training with 'T,' fellowship with 'F,' and career development with 'K.'[196] The "R01" code, for example, denotes grants "[t]o support a discrete, specified, circumscribed project to be performed by the named investigator(s) in an area representing his or her specific interest and competencies." *Id.*

515. The NIH competitive grantmaking process begins with a notice of funding opportunity ("NOFO"), a public announcement in which NIH declares its intention to award funds and outlines the program goals and objectives and conditions for applying. *See* U.S. Dep't of Health & Hum. Servs. *NIH Grants Policy Statement*, §2.3.5, at I-51 (Apr. 2024) ("NIHGPS"), https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

516. A researcher interested in responding to a NOFO will typically work with the "sponsored research" department at his or her institution to understand what NIH requires in its application submission. At the University of California Berkeley, for example, the Sponsored Projects Office assists faculty and staff in locating sources of funding, reviewing and approving proposals, and negotiating grants and contracts.

---

[196] NIH, *Activity Codes* (March 28, 2025), https://grants.nih.gov/funding/activity-codes; *see* NIH, *Funding Categories*, (Feb. 3, 2025), https://grants.nih.gov/funding/funding-categories.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

517.    Once a researcher develops a project proposal, that person then submits an electronic grant application to NIH. Applications must conform to 45 C.F.R. Part 75, and must include a detailed research plan outlining the study's objectives, methodology, and significance; a proposed budget and justification; biosketches for key investigators; and any necessary compliance documentation, such as Institutional Review Board approval for human subject research.

518.    A submitted grant application undergoes two layers of evaluation: an initial layer of review by a "scientific review group" (also known as a "study section"), followed by a round of review by an "advisory council." *See* 42 U.S.C. §§284a, 289a; *see also* NIHGPS §2.4, at I-71 ("The peer review system used by NIH, often referred to as the 'dual review system,' is based on two sequential levels of review for each application—initial review by [a study section], and a second level of review for scientific merit by the IC National Advisory Council/Board."). According to NIH, this process "is intended to ensure that applications for funding submitted to NIH are evaluated on the basis of a process that is fair, equitable, timely, and conducted in a manner that strives to eliminate bias." NIHGPS §2.4, at I-71.

519.    As noted, the first level of application review is carried out by a study section. The role of study sections is to assess applications' scientific merit and to determine the overall impact that proposed projects will likely have on the relevant field. Governing statutes and regulations require this layer of review—*i.e.*, a favorable study-section recommendation is a prerequisite to a final award of any NIH grant. *See* 42 U.S.C. §§ 284(b)(2)(B), 289a(a); 42 C.F.R. pt. 52h.

520.    These groups consist primarily of non-federal scientists who have expertise in relevant scientific disciplines and current research areas. 42 C.F.R. § 52h.4. NIH has hundreds of study sections, organized by specialty. In the field of chronic HIV infection, for example, NIH maintains study sections on (1) HIV Coinfections and HIV Associated Cancers, (2) HIV Comorbidities and Clinical, (3) HIV/AIDS Intra- and Inter-personal Determinants and Behavioral Interventions, (4) HIV Immunopathogenesis and Vaccine

46686\20709500

Development, (5) HIV molecular virology, cell biology, and drug development, and (6) Population and Public Health Approaches to HIV/AIDS.

521.    Study sections carry out their work, including review of pending applications, at regularly scheduled meetings. These meetings must be noticed in advance in the Federal Register. *See* 42 C.F.R. § 52h.3 ("To the extent applicable, the Federal Advisory Committee Act, as amended . . . shall govern the establishment and operation of peer review groups."); 5 U.S.C. §1009(a)(2) ("[T]imely notice of each meeting [subject to the Federal Advisory Committee Act] shall be published in the Federal Register . . . .").

522.    Study sections review and score each grant application according to established criteria set forth in regulations and the NOFO. In particular, the study section assesses the overall impact that the project could have on the research field involved, taking into account:

    a.    The significance of the goals of the proposed research, from a scientific or technical standpoint;

    b.    The adequacy of the approach and methodology proposed to carry out the research;

    c.    The innovativeness and originality of the proposed research;

    d.    The qualifications and experience of the principal investigator and proposed staff;

    e.    The scientific environment and reasonable availability of resources necessary to the research;

    f.    The adequacy of plans to include both genders, minorities, children and special populations as appropriate for the scientific goals of the research;

    g.    The reasonableness of the proposed budget and duration in relation to the proposed research; and

    h.    The adequacy of the proposed protection for humans, animals, and the environment, to the extent they may be adversely affected by the project proposed in the application.

42 C.F.R. §52h.8; *see also* 42 C.F.R. §52a.5 (describing review criteria for NIH research center grants); 42 C.F.R. §52h.11 (describing review criteria for NIH research contracts).

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

523.    As a result of that review, each grant application receives an "overall impact score" from 10 (the best score, denoting high impact) to 90 (the worst score, denoting low impact). Each application also receives a percentile rank expressing the impact score in relation to other applications in that particular institute. Projects deemed "unfundable" by the study section are not given a score and are removed from further consideration.

524.    Each fiscal year, NIH's institutes and centers publish guidance called "paylines" to help applicants interpret their study-section results. These paylines reflect a sort of cutoff: for each category of grants, the payline shows the impact score (or percentile) above which a project is highly likely to be funded. In Fiscal Year 2025, for example, published guidance from the National Institute of Allergy and Infectious Diseases ("NIAID") established a 16th-percentile payline for "R01" awards with new or early-stage principal investigators.[197] In other words, an applicant in that category who received a score from the relevant study section within the 12th percentile could anticipate that NIAID would likely fund his or her project. Study-section scores that meet or exceed the payline in this way are commonly referred to as "fundable" scores.

525.    In addition to providing scores and percentiles, study sections also provide each applicant with a "summary statement" that contains, among other things, a brief summary of the study section's discussion, bulleted critiques from assigned reviewers, and any administrative comments. Applicants can use these summary statements to revise applications and address concerns, if necessary.

526.    As noted, the second level of application review is carried out by an advisory council. Unlike the numerous study sections, each NIH institute or center that funds grants has a single advisory council (*i.e.*, there is one advisory council for NIAID, one for the National Cancer Institute, and so on). By statute, NIH advisory councils must meet at least three times per fiscal year. 42 U.S.C. §284a(e). Like study section meetings, advisory council

---

[197] NIH, *NIAID Paylines* (May 15, 2025), https://www.niaid.nih.gov/grants-contracts/niaid-paylines.

[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

meetings must be noticed in advance in the Federal Register. *See* 41 C.F.R. §102-3.150 (requiring 15 days' notice).

527.    Whereas a study section's review focuses on scientific merit, an advisory council's review weighs programmatic and institute-wide considerations. A council considers, among other things, the extent to which an application aligns with the institute or center's priorities, public health needs, and overall funding availability. The council also reviews the application for other potential barriers, such as ethical issues around human or animal test subjects.

528.    An advisory council makes one of three decisions on each application: an application is recommended for funding, not recommended for funding, or deferred for re-review by the study section. A favorable recommendation from the relevant institute's advisory council is a prerequisite to final award of any grant in excess of $50,000. 42 U.S.C. § 284(b)(2); *see also* §284a(a)(3)(A)(ii).

529.    The advisory council makes funding recommendations to the institute or center director, who ultimately makes the funding decision. In making that decision, the institute or center director shall consider, consistent with the peer-review process: (i) the mission of the national research institute or national center and the scientific priorities identified in the institute or center's strategic plan; (ii) programs or projects funded by other agencies on similar research topics; and (iii) advice by staff and the advisory council or board of such national research institute or national center. 42 U.S.C. § 284(b)(3).

530.    If the decision is in favor of funding, NIH issues a legally binding Notice of Award ("NoA") to the selected grant recipients stating that funds may be requested. NIHGPS §5, at IIA-59.

531.    NIH typically does not issue grants as lump-sum awards. Instead, NIH uses a cost-based accounting system, under which grant recipients are authorized to recover their actual, documented costs for conducting research after the grant is awarded. Institutions can then use awards—and indeed, rely on those awards—to obtain a line or letter of credit for the procurement of the resources needed for the project.

46686\20709500

532.    If NIH approves a project with a multi-year period, the agency typically awards the grant for the first year (the "award year") at the outset, with funding for subsequent years (the "out years") subject to a renewal process. In these "noncompetitive" renewals, the application does not undergo a fresh round of peer review—instead, applicants submit progress reports demonstrating that the grantee is making progress and complying with applicable policies and practices. *See* 42 C.F.R. § 52a.6. So long as grantees demonstrate progress and compliance with applicable policies and practices, noncompetitive renewals are approved as a matter of course.

533.    NIH's application and award process follows a predictable calendar

### Review and Award Cycles

| | Cycle I | Cycle II | Cycle III |
|---|---|---|---|
| Application Due Dates | January 25 - May 7 | May 25 - September 7 | September 25 - January 7 |
| Scientific Merit Review | June - July | October - November | February - March |
| Advisory Council Round | August or October * | January | May |
| Earliest Project Start Date | September or December * | April | July |

each year that is posted in advance. The agency has three standard application cycles per year, with published schedules identifying application due dates, the timing of study section and advisory council review, and the earliest permissible start date for the project. As reflected on the agency's website,[198] the current triannual schedule is as follows:

**2.    In Response to Trump Administration Directives, HHS Through NIH Improperly Changed Priorities and Canceled Existing Grants**

534.    The foregoing paragraphs describe NIH as it existed and functioned through the decades, from its original founding until January 20, 2025.

535.    HHS is now facing an existential threat: the Trump Administration has negated the HHS's core grant-making function by unilaterally, arbitrarily and illegally terminating billions of dollars in lawfully awarded research grants that the Administration views (often mistakenly) as having some connection to diversity, equity and inclusion (most

---

[198] HHS, *HHS Announces Transformation to Make America Healthy Again*, (Mar. 27, 2025), https://www.hhs.gov/press-room/hhs-restructuring-doge.html.

46686\20709500

broadly defined), as well as other subjects the Trump Administration dislikes, such as climate change, vaccines, HIV/AIDS, and COVID-19.

536.    HHS has been explicit about its adherence to Trump's and DOGE's orders. HHS announced on March 27, 2025 that it would begin "restructuring in accordance with President Trump's Executive Order" creating DOGE.[199] DOGE operatives have personally directed top NIH officials to terminate "hundreds" of grants, and the "Defend the Spend" collaboration between DOGE and HHS has frozen thousands of grants.[200]

537.    On February 10, Acting Secretary of Health and Human Services Dorothy Fink issued a new memorandum implementing the President's Executive Orders related to DEI. That memorandum "DIRECT[ED]" all HHS personnel, including NIH, to "pause all payments made to . . . grantees related to DEI and similar programs for internal review for payment integrity. . . . [I]f after review, the Department has determined that a contract is inconsistent with Department priorities and no longer in the interest of government . . . grants may be terminated in accordance with federal law."[201]

538.    Beginning no later than the second week of February, HHS developed a policy that required the termination of grants related to specific categories of research that were disfavored as a matter of Administration policy. These categories originally focused on "DEI-related" projects, but have evolved to include other disfavored categories, including projects related to gender identity, vaccine hesitancy, and COVID-19.

539.    On February 10, 2025, Acting Secretary Fink issued a "Secretarial Directive on DEI-Related Funding," which stated:

> The Department of Health and Human Services has an obligation to ensure that taxpayer dollars are used to advance the best interests of the government. This includes avoiding the expenditure of federal funds on programs, or with

---

[199] Chris Wright, *Unleashing the Golden Era of American Energy Dominance,* U.S. Dep't of Energy (Feb. 5, 2025), https://www.energy.gov/articles/secretary-wright-acts-unleash-golden-era-american-energy-dominance.

[200] Dan Diamond, et al., *DOGE, Trump Grants, HHS NIH Backlog*, Washington Post (Apr. 17, 2025), https://www.washingtonpost.com/politics/2025/04/17/doge-trump-grants-hhs-nih-backlog/.

[201] *See* District of Massachusetts' Findings of Fact, Rulings of Law, and Order For Partial Separate and Final Judgment in *Massachusetts v. Kennedy*, 25-10814-WGY (Dkt. 163).

1
2
3
4

contractors or vendors, that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Contracts and grants that support DEI and similar discriminatory programs can violate Federal civil rights law and are inconsistent with the Department's policy of improving the health and well-being of all Americans.

The directive went on to state:

5
6
7

For these reasons, pursuant to, among other authorities, FAR 12.403(b) and 49.101 and 45 C.F.R. §75.371- 372, the Secretary of Health and Human Services hereby DIRECTS as follows:

8
9
10
11
12
13

Agency personnel shall briefly pause all payments made to contractors, vendors, and grantees related to DEI and similar programs for internal review for payment integrity. Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy priorities. In addition, if after review the Department has determined that a contract is inconsistent with Department priorities and no longer in the interest of the government, such contracts may be terminated pursuant to the Department's authority to terminate for convenience contracts that are not "in the best interests of the Government," see FAR 49.101(b); 12.403(b). Furthermore, grants may be terminated in accordance with federal law.

14

The February 10 directive did not define the term "related to DEI and similar programs."

15
16
17
18
19

540.    On February 12, Mike Lauer, then NIH's Deputy Director for Extramural Research, sent a memo directing that "given recent court orders" in federal court actions related to funding freezes, NIH institutes and centers were "authorized, along with their respective grant management staff, to proceed with issuing awards for all competing, non-competing continuation, and administrative supplements . . . grants."

20
21
22
23
24
25
26

541.    On February 13, Mr. Lauer instructed Chief Grants Management Officers that "[i]f the sole purpose of the grant . . . supports DEI activities, then the award must be fully restricted." It also called for "hard funding restrictions" where the program promotes initiatives that "discriminate" on the basis of race, sex, or other protected characteristics, without defining what constituted such discrimination in a research program. That day, Mr. Lauer resigned from his position with NIH. On information and belief, Mr. Lauer was forced out because of his memorandum the previous day.

27
28

542.    On or about March 4, NIH issued an updated guidance on "Award Assessments for Alignment with Agency Priorities." It provided staff with the language that

46686\20709500

terminations must include when a grant is terminated for relation to China, DEI, or "[t]ransgender issues."

543.   The March 4 guidance also provided that "diversity supplements" would be canceled and not issued going forward. Diversity Supplements are grants meant to increase diversity in the scientific profession by providing training, mentorship and career development opportunities to individuals from underrepresented populations. In recent notices of funding opportunity, NIH has defined diversity broadly, to include not only "[i]ndividuals from racial and ethnic groups that have been shown by the [National Science Foundation] to be underrepresented in health-related sciences on a national basis," but also "[i]ndividuals with disabilities," and "[i]ndividuals from disadvantaged backgrounds," including those who have experienced homelessness, who were in foster care, who experienced poverty, or who are from rural areas.[202]

544.   By March 13, the list of scientific research disfavored by the Administration had grown to include yet another topic—vaccine hesitancy—and NIH's termination of awarded grants grew dramatically. On March 13, 2025, Michelle Bulls, NIH's Chief Grants Management Officer, instructed the individual institutes on how to issue termination letters, and on what bases. Ms. Bulls instructed that termination letters should include the following language: "It is the policy of NIH not to prioritize [insert termination category language]. Therefore, this project is terminated." The termination category language that Ms. Bulls provided included terminations for a program's relation to DEI, gender, and vaccine hesitancy. Hundreds of NIH grants were terminated in the ensuing days.[203]

545.   On information and belief, on or before March 19, 2025, the Office of Extramural Research and the Office of Policy for Extramural Research Administration provided additional guidance on how ICs should process grant terminations and communicate with grant recipients regarding such terminations. Included in these instructions was the

---

[202] NIH, *PA-20-222: Research Supplements to Promote Diversity in Health-Related Research*, , https://grants.nih.gov/grants/guide/pa-files/pa-20-222.html.
[203] U.S. Dep't of Health & Human Servs., *HHS Grants Terminated* (Aug. 22, 2025), https://taggs.hhs.gov/Content/Data/HHS_Grants_Terminated.pdf.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

46686\20709500

1   instruction to speak only of "changes in NIH and/or HHS priorities" and an instruction to "not

2   refer to any Executive Orders."

3           546.    On March 25, 2025, NIH again distributed updated guidance on grant

4   terminations—yet again expanding the list of politically disfavored subject matters. The

5   language for grant terminations continued to include language on DEI, transgender issues, and

6   vaccine hesitancy, but now included yet another topic—COVID-19. As to COVID, the

7   guidance stated that: "The end of the pandemic provides cause to terminate COVID-related

8   grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of

9   the pandemic. Now that the pandemic is over, the grant funds are no longer necessary."

10          547.    By May, HHS's database of grant terminations revealed that it had

11  terminated 104 grants to UC recipients.[204] A study published on May 8, 2025 identified UCSF

12  as being particularly hard-hit by HHS grant terminations.[205]

13          548.    On June 23, HHS and NIH were ordered in *National Institutes of

14  Health v. American Public Health Association*, No. 25-cv-10787 (D. Mass. June 23, 2025)

15  and *Massachusetts v. Kennedy*, No. 25-cv-10814 (D. Mass. June 23, 2025) to restore NIH

16  grants that had been terminated. HHS and NIH subsequently began restore certain NIH grants

17  listed in those actions.

18          549.    On July 31, 2025, HHS and NIH engaged in a new round of mass grant

19  terminations against UC researchers at the University of California, Los Angeles ("UCLA").

20  In this new action, via a single form letter and styled as a "suspension" by the agencies, HHS

21  and NIH terminated close to 500 NIH grants to UC researchers.

22          550.    In a July 31, 2025 letter to the Chancellor of UCLA, NIH stated that it

23  was "suspending" grants to UCLA for the following three reasons:

24

---

25  [204] U.S. Dep't of Health & Human Servs., *HHS Grants Terminated* (Aug. 22, 2025),
    https://taggs.hhs.gov/Content/Data/HHS_Grants_Terminated.pdf.

26  [205] Michael Liu et al.,, *Characterization of Research Grant Terminations at the National
    Institutes of Health*, JAMA Network (May 8, 2025),

27  https://jamanetwork.com/journals/jama/fullarticle/2833880?guestAccessKey=3a432109-6c9d-
    4ef2-9d10-

28  bf48d91fe441&utm_source=for_the_media&utm_medium=referral&utm_campaign=ftm_links&
    utm_content=tfl&utm_term=050825.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

a.      "UCLA engages in racism, in the form of illegal affirmative action;"

b.      "UCLA fails to promote a research environment free of antisemitism and bias;"

c.      "UCLA discriminates against and endangers women by allowing men in women's sports and private women-only spaces."

551.    By terminating grants to UC researchers at the direction of the President and DOGE, HHS has violated its congressional mandates. Such mandates include, for example, compliance with and effectuation of the legislative purposes implicit in congressional appropriations; spending required by 42 U.S.C. § 241; and directives to HHS subunits.

552.    HHS's mass grant terminations have caused serious harm to UC researchers, including those who received grants through HHS's subunits: NIH, the Centers for Disease Control (CDC), and the Food and Drug Administration (FDA).

553.    The CDC has terminated at least one grant awarded to a UC Berkeley Biostatistician/Epidemiologist for a project titled "Strengthening California's Public Health Workforce to Improve Decision Making and Health Equity Through Advanced Training and Academic Partnership."

554.    On information and belief, HHS and its subunits have effectuated mass terminations of grants to UC researchers without proper review or clear explanation, thereby acting unconstitutionally and unlawfully.

**3.      NIH Plaintiffs and Other Grant Recipients Are Harmed by NIH's Illegal Grant Terminations.**

555.    Plaintiffs and Class members have long relied on NIH grants to fund meritorious projects aimed at advancing public health and well-being. The termination of previously approved grants has caused and continues to cause Plaintiff and Class members serious harm.

46686\20709500

a.    **Plaintiff Marcus A. Horwitz's Grant Termination and Resulting Harm**

556.    Dr. Marcus A. Horwitz is a Distinguished Professor of Medicine and Microbiology, Immunology, and Molecular Genetics at the University of California, Los Angeles (UCLA). He researches the immunobiology of various diseases, including tuberculosis, and develops treatment regimens, vaccines, and antibiotics to combat them. Additionally, he currently serves as a fellow in the Infectious Diseases Society of America and is a member of the American Society for Clinical Investigation.

557.    Dr. Horwitz's research focuses on (1) the immunobiology of the disease components of Legionnaires' disease, leprosy, tuberculosis, and tularemia; (2) developing vaccines against those diseases; and (3) developing an ultra-short drug treatment regimen for treating tuberculosis. In recognition of his accomplishments, he was awarded the Oswald Avery (formerly Squibb) award for the Infectious Diseases Society of America and was elected to a Fellowship in the American Association for the Advancement of Science.

558.    Dr. Horwitz's research has been funded by research grants from governmental and private sources, including 34 research grants from NIH.

NIH TB Vaccine Grant Application and Award

559.    Dr. Horwitz submitted a grant application to NIH as a Principal Investigator for a project titled "Optimization and Advanced Proof-of-Concept Studies of a Listeria-vectored Multi-Antigenic Vaccine against Tuberculosis" (hereafter, the "TB Vaccine Project"). The grant project addressed the potential to develop a safer and more effective vaccine and booster vaccine against tuberculosis. The purpose of the project was to optimize and conduct advanced proof-of-concept studies in small animals and non-human primates of a second generation vaccine against tuberculosis.

560.    On November 29, 2017, NIH issued a Notice of Award and the Grant Agreement. The Notice of Award authorized funding for five years of work on the Tuberculosis Vaccine Project, from December of 2017 through November of 2022, for a total award of $5,424,173.

561.    NIH issued further Notices of Award for the Tuberculosis Vaccine Project, authorizing continued funding in November 2018, December 2019, and November 2020. The project's work with primates was delayed during COVID-19, so the project received three No-Cost Time Extensions. The Project's end date was revised to November 30, 2025.

### NIH Termination of TB Vaccine Grant Award

562.    On August 1, 2025, Dr. Horwitz received an email from UCLA's Office of Contract and Grant Administration instructing him to stop work on the Tuberculosis Vaccine Project as a result of NIH's July 31 grant suspension action against UCLA. The suspension of the project suspended approximately $143,594 in unfunded award still outstanding to complete the Tuberculosis Vaccine Project's work.

563.    As a result of this unilateral, unlawful termination, Dr. Horwitz has been unable to uncover the extent to which the vaccine worked. Despite having completed the live-animal component of the final definitive proof-of-concept vaccine study in non-human primates, Dr. Horwitz is unable to proceed with analyzing the results of the study to determine the correlation of vaccine function.

564.    Without completing his analysis of the study results, Dr. Horwitz is prevented from engaging in the next phase of his TB vaccine research: taking the vaccine into clinical trials. Dr. Horwitz's inability to do so impacts his career and substantially delays the development of a potent tuberculosis vaccine for which the primary purpose is to boost the immunity of the approximately 5 billion people in the world previously vaccinated with the previous vaccine and in whom most tuberculosis cases in the world develop.

565.    The project team's inability to complete the work and publish it also hinders the career of a project scientist in Dr. Horwitz's laboratory who developed the vaccine and the careers of their collaborators at the Texas Biomedical Research Institute.

### NIH Latent TB Treatment Grant Application and Award

566.    Dr. Horwitz submitted a grant application to the NIH as a Principal Investigator for the project titled "Efficacy and Safety of AI-enabled PRS Regimen VI

1    (Clofazimine, Bedaquiline and Pyrazinamide) as Ultra-Short Course Therapy of LTBI in

2    Non-Human Primates in a Setting Mimicking HIV co-infection" (hereafter, the "Latent TB

3    Treatment Project").

4    567.    The project's goal was to examine a short-term three-drug treatment

5    regimen for latent tuberculosis infection ("LBTI"), leveraging artificial intelligence platforms

6    to determine whether the treatment prevents reactivation of tuberculosis. Approximately 2

7    billion people on earth are infected but do not develop an active disease immediately, instead

8    reactivating tuberculosis later in life in tandem with some form of immunocompromised

9    status. Current treatments are long and burdensome, which negatively impacts treatment

10   completion. This study was intended to pave the way towards a much shorter regimen that

11   would eventually eliminate latent tuberculosis and tuberculosis itself.

12   568.    On February 27, 2024, NIH issued a Notice of Award and the Grant

13   Agreement. The Notice of Award authorized funding for three years of work from March

14   2024 through January 2027. The NIH's initial Notice of Award was superseded by a revised

15   Notice of Award sent on May 30, 2024, which provided for total funding of $2,798,273

16   during the project period. NIH issued a further Notice of Award for the Latent TB Treatment

17   Project, authorizing continued funding in February 2025.

18             NIH Termination of Latent TB Treatment Grant Award

19   569.    On August 1, 2025, Dr. Horwitz received an email from UCLA's

20   Office of Contract and Grant Administration instructing him to stop work on the Latent TB

21   Treatment Project as a result of NIH's July 31 grant suspension action against UCLA. The

22   suspension of the project suspended approximately $2,333,898 in unfunded award still

23   outstanding to complete the Latent TB Treatment Project's work.

24   570.    As a result of this unilateral, unlawful termination, Dr. Horwitz is

25   unable to support the salary components of collaborating individuals at the Subaward site

26   Texas Biomedical Research Institute, including two leading collaborating co-investigators, a

27   Staff Scientist, a Post-doctoral fellow, and two technicians. Despite making impressive

28   headway performing initial work on the pharmacodynamics and pharmacokinetics of the

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

treatment drugs, Dr. Horwitz is unable to complete the work in collaboration with another

collaborating co-investigator and specialist in this area at another collaborating institution.

571.    The premature termination of this grant has also foreclosed Dr.

Horwitz's ability to begin the critical study using already selected primates to uncover if the

drug regimen has efficacy against latent tuberculosis.

572.    These losses are in addition to the loss of value to the public from Dr.

Horwitz's research team's inability to revolutionize treatment of people with latent

tuberculosis worldwide, of which there are approximately 2 billion, and in whom tuberculosis

can reactivate at any point in their lives if not properly treated.

### NIH T7SS Drug Project Grant Application and Award

573.    Dr. Horwitz submitted a grant application to the NIH as a Principal

Investigator for the project titled "Identification by High Throughput Screening of Inhibitors

of the Mycobacterium tuberculosis ESX-1 and ESX-5 Type VII Secretion Systems – critical

virulence determinants and novel drug targets" (hereafter, the "T7SS Drug Project").

574.    The goal of the T7SS Drug project was to identify promising lead

compounds with the highest therapeutic ratio and study them to potentially develop a new

class of antibiotics to treat tuberculosis. With approximately 10.6 million active cases and 1.3

million deaths a year, better drugs are urgently needed to shorten the burdensomely long

treatment course and to combat the emergence of new tuberculosis causative agents that are

drug resistant.

575.    On July 17, 2025, NIH issued a Notice of Award, authorizing grant

funding for the T7SS Project. The Notice of Award authorized funding for two years of work

on the project, from July 2025 through June 2027, for a total award of $433,125.

### NIH Termination of T7SS Drug Project Grant Award

576.    On August 1, 2025, Dr. Horwitz received an email from UCLA's

Office of Contract and Grant Administration instructing him to stop work on the T7SS Drug

Project as a result of NIH's July 31 grant suspension action against UCLA. The suspension of

the project suspended approximately $429,518 in unfunded award still outstanding to complete the T7SS Drug Project's work.

577.    The premature termination of this grant means that Dr. Horwitz is unable to carry out the high throughput screens of molecules for their capacity to inhibit the T7SS of Mycobacterium tuberculosis, the causative agent of tuberculosis. Without this, Dr. Horwitz is prevented from discovering new drugs to treat this very important infectious disease, which kills more people than any other infectious agent and is rapidly developing resistance to currently available drugs.

578.    As a result of this unilateral, unlawful termination, Dr. Horwitz is unable to continue to support the salary component of several people in his laboratory. This includes himself, a co-investigator Professor, a co-investigator Project Scientist, and a collaborating co-investigating Professor in the high throughput screening facility and his Research Associate.

579.    These allegations are detailed and supported, with relevant documentation, in the Declaration of Dr. Marcus A. Horwitz, filed in this action.

**b.    Plaintiff Alexander Van Der Bliek's Grant Termination and Resulting Harm**

580.    Dr. Alexander van der Bliek is a Professor of Biological Chemistry at UCLA who examines the role of mitochondria in neurodegenerative diseases. For the past two decades he has also served as a regular member and temporary member of multiple NIH study sections; these expert bodies decide which grant applications get funded.

581.    Dr. van der Bliek's research focuses on the role that mitochondria serves in neurodegenerative diseases such as Alzheimer's and peripheral neuropathies (diseases that damage nerves outside the brain and spinal cord, causing chronic pain, tingling, and other symptoms). Having discovered the molecular basis of mitochondrial fission, which is essential for both cell survival and cell death, Dr. van der Bliek has continued research on mitochondrial dynamics that may illuminate mechanisms for many diseases that pose an enormous societal disease burden. His work is particularly recognized for its relevance to

neurodegenerative diseases and conditions with high energy demands, including cancer and diabetes.

582.    In recognition of his research, Dr. van der Bliek has been honored with a fellowship with EMBO (an international membership organization promoting excellence in the life sciences) and HFSPO (the Human Frontiers of Science Organization), and a five-year role as Research Scholar at the American Cancer Society.

583.    Dr. van der Bliek's research has been supported by multiple NIH Grants, as well as grants from non-governmental agencies.

Grant Application to NIH

584.    On April 29, 2020, Dr. van der Bliek submitted an Application for Federal Assistance to the NIH's National Institute of Neurological Disorders and Stroke (NINDS). The project, for which Dr. van der Bliek was identified as Project Director and Principal Investigator, was titled "Control of Calcium Flux and Mitochondrial Fission by the Charcot Marie Tooth Disease Protein Mfn2" (the "R01 Application").

585.    The proposal aimed to research the underlying causes of Charcot-Marie-Tooth (CMT) disease. CMT is an inherited condition that damages the nerves controlling movement and sensation. In the study, Dr. van der Bliek sought to study how mutations in a protein called Mfn2 affect the way mitochondria, the cell's "power plants," divide. Because the process is closely tied to nerve cell health, Dr. van der Bliek's research may help explain what causes CMT and point toward new ways to treat it. In addition to funding Dr. van der Bliek, the proposal would fund salaries for one lab technician and two postdoctoral researchers, as well as funding supplies, research costs, travel, and publishing.

586.    NIH issued a Notice of Award, authorizing grant funding for Dr. van der Bliek's CMT research project. The Notice of Award authorized funding for five years of work on the project, from January 2021 through December 2025, for a total award of $2,243,240.

- 136 -

587.    Dr. van der Bliek received his most recent Notice of Award Action from UCLA grant administrators on January 10, 2025, informing him that he was to receive the last installment of the grant ($342,488) to sustain the project's final year.

NIH Grant Termination

588.    On August 1, 2025, Dr. van der Bliek received an email from UCLA administrators instructing him to stop work on his NIH grant as a result of NIH's July 31 grant suspension action against UCLA.

589.    As a result of this unilateral, unlawful grant termination, Dr. van der Bliek is unable to capitalize on new insights from his research into the root causes of hereditary neuropathies. This research opens promising directions for future therapies for these often debilitating disorders. HE is also unable to further explore an important, unexpected research result: revelation of certain toxic cellular mechanisms linked to brain diseases such as Alzheimer's and frontotemporal dementia.

590.    Dr. van der Bliek is also no longer able to purchase supplies for his experiments and will have to soon let his staff go for lack of University support. With research in his lab grinded to a halt, Dr. van der Bliek will have to spend significant time to identify new postdocs to work with him as collaborators and wait for them to complete their PhD training if he were even able to identify new sources of funding. To do so, Dr. van der Bliek would have to close down the lab due to considerable delay, losing a large amount of exciting new data.

591.    The premature termination of this grant also means that the postdocs working with Dr. van der Bliek will be unable to complete their projects and publish associated papers. These postdocs are highly specialized, having trained for years in this area. A gap in publications resulting from layoffs will make them far less desirable in the job market and potentially make them unemployable. The field as a whole will suffer from the loss of these promising researchers. This will have an enduring adverse impact on research in Dr. van der Bliek's subfield of biological chemistry.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

592.    These harms are in addition to the loss of value to the public from Dr. van der Bliek's research team's inability to complete work on the root causes of hereditary neuropathies that would help advance public understanding of neurodegenerative and metabolic diseases, including Parkinson's, Alzheimer's, diabetes, and cancer.

593.    These allegations are detailed and supported, with relevant documentation, in the Declaration of Dr. Alexander van der Bliek, filed in this action.

**c.    Plaintiff Rhonda Voskuhl's Grant Termination and Resulting Harm**

594.    Dr. Rhonda Voskuhl is a Professor of Neurology at the UCLA School of Medicine, who examines how sex hormones and sex chromosomes cause sex differences in the onset and severity of neurodegenerative diseases. She currently holds the Jack. H. Skirball Chair and has served as the Director of the UCLA Multiple Sclerosis Program since 2000. Dr. Voskuhl is also a Faculty Neurologist for the UCLA Comprehensive Menopause Care Program.

595.    Dr. Voskuhl's research focuses on (1) determining how sex hormones and sex chromosomes cause sex differences in the onset and severity of neurodegenerative diseases and (2) investigating the role of brain aging on neurodegeneration, identifying a sex hormone by age interaction whereby being estrogen deficient and midlife combine to induce cognitive decline, dorsal hippocampal atrophy, glial activation, and synaptic loss. The goal of Dr. Voskuhl's research is to use a brain region-specific, cell-specific, and sex-specific approach to identify neuroprotective treatment targets, then design clinical trials to repair neurodegeneration that are optimally tailored for sex and age. In recognition of her research, Dr. Voskuhl was most recently awarded the John Dystel Prize in Multiple Sclerosis, 2024, from the American Academy of Neurology and the National MS Society, the most prestigious award in the field of MS. In addition to numerous national and international awards, Dr. Voskuhl was also awarded the Rachel Horne Prize for Women's Research in Multiple Sclerosis, 2023, from the European and American Committees for Treatment and Research in MS.

46686\20709500

596.    Dr. Voskuhl's research has been supported by governmental and private sources, including research grants from NIH.

Grant Application to the NIH

597.    On July 8, 2022, Dr. Voskuhl submitted a grant application to the NIH for a project titled "Neurodegeneration Underlying Distinct Disabilities in Multiple Sclerosis Using a Cell-Specific, Region-Specific, and Sex-Specific Approach" (the "R35 Application"). The R35 application aimed to (1) extend the cell-specific and region-specific transcriptomics in astrocytes and oligodendrocytes to microglia and neurons, with cell to cell interactions revealed in mice double-labelled to show gene expression changes in two distinct cell types in the same region in the same mouse, and (2) determine if there are effects of sex and/or age on the most differentially expressed cell-specific and region-specific pathways. The R35 proposal would take Dr. Voskuhl's research to the next level: identifying sex by age interactions in cell-specific and region-specific transcriptomics, neuropathology, and substructure atrophy on MRI. In doing so, the project would discover neurodegenerative targets optimized for each disability in MS models in females and males during young adulthood and aging. Dr. Voskuhl was the Project Director and Principal Investigator on the grant proposal, which included four co-investigators, one graduate student, one senior lab technician, and one MRI lab technician.

598.    The grant Application requested funding commensurate with the 8-year budget of $7,307,976 from April 2023 to March 2031.

NIH's Grant Award

599.    On May 8, 2023, NIH issued a Notice of Award, approving the R35 Application. The Agreement authorized the proposal for an amount of $876,448 for the 5/15/2023-4/30/2024 budget period, and additional awards of $913,497 for the next seven years. NIH approved continuing funding for the R35 Project in each of the subsequent years.

NIH's Grant Termination

600.     On August 1, 2025, Dr. Voskuhl received from UCLA's research administrators a "Stop Work Notice" for the R35 Grant Award as a result of NIH's July 31 grant suspension action against UCLA.

601.     As a result of this unilateral, unlawful termination, Dr. Voskuhl is unable to purchase supplies for her experiments. Dr. Voskuhl will soon have to let her staff go for lack of University support and research in her lab will stop.

602.     Dr. Voskuhl's co-investigators, who have highly specialized training but are more junior in their careers, will be harmed by a gap in publications, which will negatively impact their career progression and ability to secure future funding for their research. A pause in Dr. Voskuhl's research negatively impacts her subfield of neurology. The team will be unable to share their research findings at conferences and in scientific publications. In addition, Dr. Voskuhl is training the next generation of MS researchers, including young faculty, postdoctoral fellows, graduate students and undergraduates. The future of MS research will be harmed by an indefinite pause in training.

603.     These harms are in addition to the loss of value to the public from Dr. Voskuhl's research team's inability to complete work on new insights into the molecular basis for disability-specific disease progression in MS. Their research had already generated new insights that are indefinitely paused. Multiple sclerosis affects nearly one million people in the United States. Work supported by Dr. Voskuhl's grant is aimed at developing novel treatments targeting cells and processes within the central nervous system to confer neuroprotection and repair disabilities for MS patients. Dr. Voskuhl's research would also have helped advance public understanding of neurodegenerative conditions and autoimmunity and how sex differences can affect disease and treatment. NIH's withheld funding threatens the loss of research discoveries and treatment for MS patients.

604.     These allegations are detailed and supported, with relevant documentation, in the Declaration of Dr. Rhonda Voskuhl, filed in this action.

46686\20709500

1

2

3

### G.     The Department of Energy

#### 1.     Congress created the Department of Energy to promote energy research, innovation, and conservation; to promote U.S. energy independence; and to develop alternatives to fossil fuels.

605.     The Department of Energy ("DOE") is an executive department of the U.S. Federal Government that oversees the United States' national energy policy and energy production, the research and development of nuclear power, the military's nuclear weapons program, nuclear reactor production for the United States Navy, energy related research, and energy conservation. The DOE was created in 1977 in the aftermath of the 1973 oil crisis. In 1977, President Jimmy Carter signed into law the Department of Energy Organization Act which established the Department of Energy. President Carter proposed the Department of Energy with the goal of promoting energy conservation and energy independence, and developing alternative sources of energy to reduce the use of fossil fuels.

#### 2.     In Response to Trump Administration Directives, DOE Improperly Changed Priorities and Canceled Existing Grants

606.     DOE quickly began department-wide restructuring pursuant to Trump orders. On February 5, 2025, the Secretary of Energy announced that DOE would "take immediate action . . . in accordance with President Trump's executive orders."[206]

607.     By early spring 2025, DOE began implementing Defendant Trump's orders with help from DOGE. In a May 2025 press release, DOE announced that it was appointing the then-current head of DOGE at DOE, Carl Coe, as its new Chief of Staff. The press release specified that Coe "has worked closely with Secretary Wright" in order to effectuate "process improvement and cost savings," or what DOE referred to as "DOGE efforts."[207]

608.     In April 2025, DOE instituted a 15% cap on indirect costs for university research grants, even while acknowledging that "many grant recipients use indirect

---

[206] Chris Wright, *Unleashing the Golden Era of American Energy Dominance,* U.S. Dep't of Energy (Feb. 5, 2025), https://www.energy.gov/articles/secretary-wright-acts-unleash-golden-era-american-energy-dominance.

[207] U.S. Dep't of Energy, *DOE Announces New Leadership to Tackle Challenges of Growing Energy Demand* (May 2, 2025), https://www.energy.gov/articles/doe-announces-new-leadership-tackle-challenges-growing-energy-demand.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

cost payments to effectuate research funded by the Department's grant awards." This action was taken to "deliver[] on President Trump's commitment" to slash research grants.[208] In May 2025, a federal district court in Massachusetts preliminarily enjoined DOE's imposition of this rate cap on the ground that it was arbitrary and capricious and in likely violation of federal law.[209]

609.    On May 15, 2025, Secretary Wright issued a Secretarial Memorandum titled: "Secretarial Policy on Ensuring Responsibility for Financial Assistance."[210] The memo announced that DOE would be reviewing prior funding awards to ensure they are "consistent with . . . this Administration's policies and priorities." It also announced an intent to terminate projects.

610.    DOE stated its review would begin by reviewing 179 awards that totaled over $15 billion, and would then extend to other awards.[211]

611.    On October 2, 2025, DOE announced the termination of 321 awards supporting 223 projects that totaled over $7.56 billion. In a press release, Secretary Wright explained that "[o]n day one, the Energy Department began the critical task of reviewing billions of dollars in financial awards[ . . .]" in an effort to deliver on President Trump's promise "to protect taxpayer dollars and expand America's supply of affordable, reliable, and secure energy."[212] In that same press release, DOE foreshadowed more terminations: "Rest

---

[208] U.S. Dep't of Energy, *Department of Energy Overhauls Policy on College and University Research, Saving $405 Million Annually for American Taxpayers* (Apr. 11, 2025), https://www.energy.gov/articles/department-energy-overhauls-policy-college-and-university-research-saving-405-million.

[209] *Ass'n of Am. Univs. v. Dep't of Energy,* 789 F.Supp.3d 118, (D. Mass. 2025).

[210] Chris Wright, *Secretarial Policy on Ensuring Responsibility for Financial Assistance*, EXEC-2025-005990, U.S. Dep't of Energy (May 14, 2025), https://www.energy.gov/sites/default/files/2025-05/EXEC-2025-005990%20-%20Secretarial%20Policy%20-PRP%20-%205-14-25%20(FINAL)%20(2).pdf.

[211] U.S. Dep't of Energy, *Secretary Wright Announces New Policy for Increasing Accountability, Identifying Wasteful Spending of Taxpayer Dollars* (May 15, 2025), https://www.energy.gov/articles/secretary-wright-announces-new-policy-increasing-accountability-identifying-wasteful.

[212] U.S. Dep't of Energy, *Energy Department Announces Termination of 223 Projects, Saving Over $7.5 Billion* (Oct. 2, 2025), https://www.energy.gov/articles/energy-department-announces-termination-223-projects-saving-over-75-billion.

- 142 -

46686\20709500

1  assured, the Energy Department will continue reviewing awards to ensure that every dollar

2  works for the American people."[213]

3       **3.    DOE Terminates Funding to Awardees Exclusively in "Blue" States**

4       612.    In the days and weeks leading up to a possible lapse in appropriations

5  at the end of September 2025, President Trump threatened to retaliate against congressional

6  Democrats and their voters should they not agree to fund the government on the President's

7  terms. For instance, on September 30, President Trump told reporters: "We can do things

8  during the shutdown that are irreversible, that are bad for them and irreversible by them, like

9  cutting vast numbers of people out, cutting things that they like, cutting programs that they

10  like."[214]

11       613.    DOE and the Office of Management and Budget ("OMB") made good

12  on that threat the very first day of the shutdown. On October 1, the Director of OMB,

13  Defendant Russell Vought, announced on X:

14

15  

16  **Russ Vought** ✔ 🟦
     @russvought

17  Nearly $8 billion in Green New Scam funding to fuel the Left's climate
     agenda is being cancelled. More info to come from @ENERGY.

18  The projects are in the following states: CA, CO, CT, DE, HI, IL, MD, MA,
     MN, NH, NJ, NM, NY, OR, VT, WA

19  2:09 PM · Oct 1, 2025 · **6.1M** Views

20

21       614.    In all sixteen states listed by Vought where projects were terminated, the

22  citizens of that state voted for Vice President Harris over President Trump in the 2024 election.

23  And in all sixteen states, the citizens of that state currently have elected two Senators who caucus

24  with the Democratic party. Vought's post thus openly flaunted that, in terminating DOE awards,

25  the administration targeted states associated with the opposition party.

26  _____

27  [213] *Id.*

28  [214] Ricard Cowan, et al., *Trump Warns Democrats of "Irreversible" Actions in Government Shutdown,* Yahoo News (Sept. 30, 2025), https://www.yahoo.com/news/articles/trump-warns-democrats-irreversible-actions-223432584.html [https://perma.cc/UVV3-MXKS].

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

615. The data unmistakably confirms that Defendants targeted DOE grants for termination in October 2025 based on the political views of the citizens of the state associated with the grant.

616. On information and belief, on or around October 1, 2025, Defendants transmitted to members of Congress a list of the 321 awards slated for termination. That list was made public in various news reports.[215]

617. The website usaspending.gov contains authoritative information on every grant awarded by DOE and other agencies, including the address on file of each awardee and the primary place of performance of each award.

618. Of the 321 awards, six were terminated prior to October, and one was awarded to an awardee in Canada. For the remaining 314 awards, and for 100% of them, the grantee's address on file with the federal government is in a state that voted for the President's opponent in the 2024 election and has two Democratic-caucusing Senators.

619. In addition, the primary place of performance for 314 of the 321 awards slated for termination (*i.e.,* 98%) was a state that voted for Vice President Harris and has two Democratic- caucusing Senators.

620. According to public reporting, DOE had originally sent a broader list of more than 600 awards to OMB for potential termination.[216] The broader list included awards to grantees based in states throughout the country, including Arizona, Indiana, Florida, Ohio, Louisiana, North Carolina, North Dakota, Oklahoma, South Carolina, Tennessee, Texas, Utah, West Virginia, and Wisconsin—all of which voted for President Trump in the 2024 election.[217] But Defendants did not terminate *any* awards to grantees located in those states in October 2025.

---

[215] *See, e.g.,* Maeve Allsup, *Scoop: These Are the 321 Awards DOE Is Canceling,* Latitude Media (Oct. 2, 2025), https://www.latitudemedia.com/news/scoop-these-are-the-321-awards-doe-is-canceling/ [https://perma.cc/B9F7-483X].

[216] Brian Dabbs, et al., *DOE Floats New Cuts to Hundreds of Clean Energy Grants,* E&E News (Oct. 7, 2025), https://www.eenews.net/articles/doe-floats-new-cuts-to-hundreds-of-clean-energy-grants/ [https://perma.cc/5B76-VGQP].

[217] *Id*, https://www.latitudemedia.com/wp-content/uploads/2025/10/FILE_6460.pdf (list of awards) [https://perma.cc/GA87-D96M].

Instead, according to one energy lobbyist (and as the evidence demonstrates), "they basically just pulled out most, if not all, blue state projects, and that's what they announced as cuts."[218]

621.    Even in programs where awards were made across all 50 states, such as the Grid Resilience and Innovation Partnership program, only projects in states that voted for Vice President Harris were cancelled in October 2025, while similar projects in states that voted for President Trump were not.

622.    DOE terminated 79 projects in California alone, totaling more than $2 billion in federal funding. One of the projects would have provided backup battery power for a children's hospital in Madera, California.

623.    DOE's October 2025 termination of awards in states that voted against the President was a part of the administration's broader efforts to harm such states since the shutdown. As of October 14, the administration had "frozen or canceled nearly $28 billion that had been reserved for more than 200 projects primarily located in Democratic-led cities, congressional districts, and states."[219] An analysis by the New York Times showed that the vast majority of funding cuts during the shutdown have been to grantees in states—and even



---

[218] Dabbs, *supra*, n. 216.

[219] Tony Romm & Lazaro Gamio, *Trump Targets Democratic Districts by Halting Billions During Shutdown,* N.Y. Times (Oct. 14, 2025), https://www.nytimes.com/interactive/2025/10/14/us/trump-grants-democrat-districts-government-shutdown.html

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

congressional districts—that have recently voted for Democrats, especially in New York, California, and Chicago.[220]

### 4. DOE Plaintiffs and Other Grant Recipients Are Harmed by DOE's Illegal Grant Terminations

624. DOE is one of the largest funders of UC research. UC researchers have been or will be seriously harmed by DOE's imminent grant terminations.

625. DOE's October 2025 grant terminations adversely impacted 21 Full-Time-Equivalent UC personnel who can fairly be described as Principal Investigators or principal researchers at work on projects other than the ARCHES project, described below. The terminations also impacted 29 UC research personnel involved with ARCHES.

626. By terminating or imminently terminating grants to UC researchers at the direction of the President and DOGE, DOE has violated its congressional mandates. Such mandates include, for example, compliance with and effectuation of the legislative purposes implicit in congressional appropriations.

627. By effectuating mass terminations of grants to UC researchers without proper review or clear explanation, DOE acted unconstitutionally and unlawfully as set forth in the Claims for Relief asserted below.

### a. Plaintiff Plamen Atanassov's Grant Terminations and Resulting Harm

628. Plaintiff Plamen Atanassov is the Chancellor's Professor of Chemical & Biomolecular Engineering at the University of California Irvine ("UCI"). He holds a joint/courtesy appointment in Materials Science & Engineering at UCI.

629. Dr. Atanassov earned his MS in Chemical Physics & Theoretical Chemistry from the University of Sofia (Bulgaria) in 1987. He earned a Specialization in Bio-electrochemstry from Frumkin's Institute of Electrochemistry in Moscow (Russia) in 1988. He completed his PhD in Chemistry and Physical Chemistry from the Bulgarian Academy of Sciences in Sofia in 1992 (degree conferred in 1995).

---

[220] *Id.*

630.    Dr. Atanassov's research focuses on several technical fields related to innovation in engineered materials, development of novel electrocatalysts for fuel cells, and design of new materials and technologies for power production, energy conversation, and storage.

631.    Dr. Atanassov is a prolific scientist. He has published more than 490 peer-reviewed papers that have collectively been cited more than 45,000 times. He is also the inventor of 67 U.S. patents, many of which have been licensed and form the core of various catalyst products and catalyst processing and integration technologies.

632.    DOE's abrupt termination of three of Dr. Atanassov's grants has caused him and his collaborators financial harm and has harmed the U.S. public, which has lost the full benefit of his research. His three grants are described in further detail below.

ARCHES Project – DOE's termination of $1.2 billion in grants awarded through its Hydrogen Hubs ("H2") Program

633.    In September 2022, the DOE's Office of Clean Energy Demonstrations ("OCED") issued a Funding Opportunity Announcement (DE-FOA-0002779) soliciting projects that would meet the goal of its new Regional Clean Hydrogen Hubs Funding Program ("Hydrogen Hubs (or "H2") Program"). The purpose of the H2 Program was to demonstrate the production, processing, delivery, storage, and end-use of clean hydrogen to facilitate a clean hydrogen economy, in order to maximize the benefits of clean energy transition as the United States works to curb the climate crisis, empower workers, and advance environmental justice.

634.    The original authorizing statute for the H2 Program was the Energy Policy Act of 2005, Section 814 (Public Law 109-58). Then, in 2021, Congress required the Secretary of Energy to establish a program to support the development of "regional clean hydrogen hubs" that would together create "a network of clean hydrogen producers, potential clean hydrogen consumers, and connective infrastructure located in close proximity."[221] 42

---

[221] *See* Section 40314 of the Infrastructure Investment and Jobs Act of 2021, Pub. L. No. 117-58, 135 Stat. 429 (2021) (codified at 42 U.S.C. § 16161a).

46686\20709500

U.S.C. § 16161a(a), (b). The Infrastructure Investment and Jobs Act of 2021, also known as the Bipartisan Infrastructure Law ("BIL") appropriated $8 billion over five or more years to establish at least four of these regional hydrogen hubs.

635.    Because hydrogen fuel can be produced using any energy source and is typically produced with conventional energy sources (*e.g.,* natural gas, diesel, or nuclear power), the BIL additionally embodied Congress' desire to spur technological development of alternative fuel sources for hydrogen generation, by mandating that *a minimum of one H2 hub must focus on deriving hydrogen fuel from renewable sources, such as solar and wind energy.* 42 U.S.C. § 16161a(c)(3)(A)(ii) ("at least 1 regional clean hydrogen hub shall demonstrate the production of clean hydrogen from renewable energy").

636.    Consistent with this congressional directive, when DOE in October 2023 made assistance awards to seven hydrogen hubs, these included two "clean hydrogen" hubs: the Pacific Northwest Hydrogen Hub, and a California Hydrogen Hub.[222]

637.    California's Hydrogen Hub goes by the name "ARCHES" (Alliance for Renewable Clean Hydrogen Energy Systems), sometimes also described as "ARCHES H2." ARCHES is a statewide public-private partnership dedicated to advancing the hydrogen economy and clean energy innovation. California state participants in ARCHES include multiple UC campuses (UC Irvine, UC Davis, UC San Diego, UC Berkeley) and one of UC's affiliated national laboratories (Lawrence Berkeley National Laboratory), which effectively functions as a separate UC campus and whose workers are UC employees. These five UC loci form the core of the hydrogen hub's research and innovation apparatus.

638.    UC's partners in ARCHES include other state agencies, the state legislature, and local governments; nonprofit organizations, such as GO-Biz; and industry partners, all of which are essential collaborators in bringing technical skills, market knowledge, practical capacity, and political capability to support and deploy primarily-UC innovations necessary to build  the hydrogen network called for by the BIL.

---

[222] Fuel Cell and Hydrogen Energy Association, *H2 Award Fact Sheet* (Oct. 2023), https://fchea.org/wp-content/uploads/2023/10/H2Hub-Award-Factsheet.pdf .

639.    In July 2024, in reliance on DOE's statements and representation about the Regional Clean Hydrogen Hubs program, ARCHES H2 LLC (the limited liability entity for the ARCHES partnership) executed a cooperative agreement award for $1.2 billion with the DOE (DOE Award Number DE-CD0000041, the "ARCHES Award")) predicated on UC researchers' world-class scientific and engineering knowledge, and capacity to deliver the technological innovation required for the project's success.

640.    The ARCHES project, designed to advance the federal objectives set forth in the BIL by catalyzing the clean energy industry in California, was already doing important and indeed extraordinary work during Phase I of the award. The $1.2 billion that DOE had committed in summer 2024 had—just over one year later—catalyzed over $10 billion in committed private industry matching funds, a 10:1 multiplier that would maximize taxpayer value and deliver significant return on investment for the American people.

641.    This financial structure was built on 33 signed subrecipients partnering with hundreds of companies, connecting producers, distributors, and end-users in a short period of time. These partners advanced 150 distinct projects representing over $12 billion in total infrastructure investment.

642.    Transportation infrastructure also saw significant development, with a focus on developing hydrogen refueling stations to support deployment of over 1,000 fuel cell electric buses supported by this comprehensive infrastructure.

643.    UC researchers across four campuses and LBNL have immersed themselves in multiple, complex research projects to support ARCHES, including but by no means limited to: improving fuel cell catalyst technology and analyzing hydrogen markets (UC Irvine); researching how use of hydrogen in ports would improve local air (UC Berkeley); researching the air quality improvements that would accrue to the Los Angeles region if power plants switched from natural gas to hydrogen (UCLA); analyzing and projecting demand locations and routes for hydrogen-powered trucks (UC Davis); and studying how to create a first-of-its-kind hydrogen-powered marine research vessel that can

operate cleanly and quietly, enhancing underwater research (UC San Diego's Scripps Institute of Oceanography).

644.    Dr. Atanassov had planned to serve as Senior Advisor for Business Development to ARCHES, including an up-to-half-time transition to ARCHES so that he could actively participate in establishing ARCHES operations. In connection with this role, Dr. Atanassov would develop for ARCHES a Hydrogen Technology Certification for the State of California (and ultimately, for the whole United States) as a public-private partnership that could provide a stable source of future funding for ARCHES in the form of a direct industrial revenue stream.

645.    Moreover, ARCHES was likely to take a leading role in accelerating clean hydrogen technologies in time for deployment at the Los Angeles Olympic and Paralympic Games in 2028.

646.    On October 1, 2025, ARCHES received a letter from Virginia Crawford in the Office of Clean Energy Demonstrations, announcing that the ARCHES Award was being terminated "under the authority of 2 CFR § 200.340(a)(4)." The letter required ARCHES to "cease all project activities after the date of October 1, 2025," to "not incur any new project costs," and to "cancel as many outstanding obligations as possible." The basis for the termination was simply that the ARCHES Award "did not pass Standards" of the DOE's "Portfolio Review Process Committee," though it did not provide any further context.

647.    On October 11, 2025, Dr. Adam Weber, Chief Technology Officer of ARCHES, sent an administrative appeal letter to DOE questioning the basis for the termination of the major funding award to ARCHES. The letter described the fiscal soundness of ARCHES and the responsiveness of the transportation sector to the imminent development of clean hydrogen. It noted that there was "no legal justification or contractual basis for terminating the award and revoking the obligated funding." It further noted that termination would result in irreparable harm and urged a response by October 21, 2025 as to whether the termination would be held in abeyance or rescinded.

648.    As of November 22, 2025, ARCHES had received no response from DOE.

649.    In early October 2025, DOE also terminated the one other "green hydrogen" hub (the Pacific Northwest Hub),[223] notwithstanding the congressional instruction in the BIL requiring DOE to fund a minimum of one green hydrogen hub.

650.    Notably, as indicated in the graphic below (prepared by Plaintiffs' counsel), DOE has not to date terminated any other hydrogen hubs, all of which encompass significant portions of states that voted for Donald Trump in the 2024 election:



651.    The DOE's Hydrogen Hubs Program grants were the largest in the agency's history. Their abrupt termination has correspondingly dramatic consequences for the 29 involved UC researchers; for their scores of government and private project partners; and also, for taxpayers' and society's ability to benefit from the cutting edge, nonpolluting hydrogen infrastructure that ARCHES was in the midst of developing.

---

[223] Pacific Northwest Center for Clean Energy Excellence, *U.S. Department of Energy Terminates Projects, PNWH2 Included* (Oct. 7, 2025), https://www.cleanenergyexcellence.org/u-s-department-of-energy-terminates-projects-pnwh2-hub-included/.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

**Grants to advance fuel cell technology**

652.     As one of the world's top experts in his field, Dr. Atanassov had two additional DOE grants independent of ARCHES that were intended to advance the state of fuel cell technology—a critical need if hydrogen is to become a significant power source in the future.

653.     The widespread deployment of hydrogen fuel cell technology holds great environmental promise. First, the transportation sector is America's largest source of greenhouse gases and a major source of smog-forming and toxic air pollutants. Hydrogen fuel cells are a carbon-free, pollution-free alternative to conventional fossil fuels, thereby eliminating climate-forcing and ground-level pollution from any source they power. Second, hydrogen is an additional fuel source, which furthers the United States' energy self-sufficiency. Third, hydrogen can be deployed in vehicles that are otherwise hard to decarbonize, such as planes and cargo ships. Fourth, the United States has the potential to become a world leader in hydrogen fuel cell technology, thus increasing its global competitiveness.

Cathode catalysts

654.     On September 13, 2023, DOE granted to Dr. Atanassov Assistance Award # DE-EE0010751 to fund his work on the development of cathode catalysts. The grant was for approximately $3,000,000.

655.     The purpose of the project was to create a major fuel cell catalyst innovation locus. The project aimed to develop cutting-edge catalysts for integration into fuel cells.

656.     On October 2, 2025, DOE terminated the grant on the purported basis that it was "not consistent with this Administration's goals, policies and priorities." It added that "[t]his project does not effectuate the Department of Energy's priorities of ensuring affordable, reliable, and abundant energy to meet growing demand and/or addresses [sic] the national emergency declared pursuant to Executive Order 14156."

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

657.    Executive Order 14156 states that the United States "need[s] a reliable, diversified, and affordable supply of energy to drive our Nation's manufacturing, transportation, agriculture, and defense industries, and to sustain the basics of modern life and military preparedness." Declaring a National Energy Emergency, 90 Fed. Reg. 8433, 8433 (Jan. 20, 2025). Further, "[a]n affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation." *Id.*

658.    The basis for the termination is incongruous with the project's purpose, which sought to advance the goals in the Executive Order. Specifically, the project was intended to (a) lower the cost of hydrogen fuel cells ("affordability"), and (b) make feasible broader deployment of this energy technology ("abundance"), while also increasing U.S. market share and indeed creating the possibility of market dominance in this energy domain. DOE's termination letter does not attempt to address this contradiction.

Novel carbon supports

659.    On September 24, 2024, DOE granted Assistance Agreement for the Award DE-EE0011347 to fund Dr. Atanassov's work on developing novel carbon supports for metal catalysts. The grant amount of approximately $5,400,000 over three-and-a-half years.

660.    The project represented the opportunity to actualize a line of research contemplated since at least 2010 that involves use of specifically designed carbon materials (in which Cabot Corporation is a global leader) in innovative, scalable manufacturing of catalysts. More specifically, the project's aim was to produce the first industrial-scale, U.S.-manufactured fuel cell catalysts that would be able to fulfill the requirement for 30% "Made in USA" content (a percentage calculated based on manufacturing costs), which enables clean energy projects to receive bonus tax credits under the Inflation Reduction Act.

661.    On October 2, 2025, DOE terminated the grant on the basis that "this project is not consistent with this Administration's goals, policies and priorities." Further, "[t]his project does not effectuate the Department of Energy's priorities of ensuring affordable,

reliable, and abundant energy to meet growing demand and/or addresses the national emergency declared pursuant to Executive Order 14156."

662.    As with the termination of cathode catalysts, the basis for the termination is impossible to reconcile with the project's purpose, because both projects aimed to advance the goals of hydrogen fuel cell affordability, abundance, and U.S. success in the global fuel cell market.

### b.    **Plaintiff Louise Bedsworth's Grant Termination and Resulting Harm**

663.    Dr. Louise Bedsworth holds the following positions at the UC Berkeley School of Law: Executive Director at the Center for Law, Energy, and the Environment ("CLEE"), Director of the Land Use Program at the CLEE, and Senior Advisor at the California-China Climate Institute.

664.    Dr. Bedsworth submitted to DOE, as Principal Investigator, with the Regents of the University of California, on behalf of the UC Berkeley, a proposal for financial assistance ("Proposal") for a project titled "Feasibility Study to Co-Create a Community Alliance for Direct Air Capture" (the "CALDAC Project").

665.    As the Statement of Project Objectives for the CALDAC Project explained:

This project will undertake a comprehensive assessment of the technical, social and governance feasibility of establishing a Community Alliance for Direct Air Capture (CALDAC) in California. This innovative effort invites the local community to be the center of Direct Air Capture (DAC) Hub development. The feasibility assessment will include two intersecting and interconnected elements:

- Development of the DAC Hub structure and assessment of the technical feasibility of the DAC Hub, including technology partners, location, business model, and CO2 storage/utilization/conversion option(s), and
- Assessment of the social and governance feasibility of an innovative, community-led ownership model and community benefits plan that engages local stakeholders as core partners.

666.    The project was designed to test both the technical and social feasibility of a Direct Air Capture ("DAC") hub. The project included a diverse partnership of DAC companies, energy companies, carbon dioxide to product companies, community organizations (Valley Onward and Central California Asthma Collaborative), and researchers

46686\20709500

1  from UC Berkeley, California State University Bakersfield (CSU Bakersfield), California

2  State University Fresno (Fresno State), EPRI, AECOM, PSE Clean Energy, and Lawrence

3  Berkeley National Laboratory.

4  667.    The Proposal to the DOE for the CALDAC Project requested

5  $2,999,999 from the DOE for the entire project period, for a two-year period (August 1, 2024

6  – July 31, 2026); Dr. Bedsworth was identified in the Proposal as the Principal Investigator.

7  The requested funds were for the partial salary for Dr. Bedsworth as Principal Investigator,

8  the partial salary for a Project Manager, funding for two graduate student researchers, and

9  financial support for 13 sub-awardees, including: Lawrence Berkeley National Laboratory,

10  CSU Bakersfield, Fresno State University, and four DAC technology providers.

11  668.    The DOE granted an award to the Regents of the University of

12  California, Sponsored Projects Office for a total of two years, for an amount of $1,105,878 for

13  the first budget period (August 1, 2024 through April 30, 2025), and an additional award of

14  $1,538,928 for the second budget period (May 1, 2025 through July 31, 2026), for a total

15  award amount of $2,644,806.[224]

16  669.    Dr. Bedsworth and her team began work on the CALDAC Project on

17  August 1, 2024, focusing on stakeholder and community engagement, site selection, and

18  development of a framework to guide the project.

19  670.    On October 2, 2025, UC Berkeley was issued a letter from Vicki

20  Michetti, the Head of Contracting Activity at the Office of Fossil Energy and Carbon

21  Management at the DOE, indicating that the grant award was terminated in its entirety. The

22  termination letter instructed that UC Berkeley researchers "make every reasonable effort to

23  immediately discontinue project costs after the effective termination date of October 2, 2025."

24

25

26

---

[224] While the amount of $1,373,215 was requested for the first budget period, only $1,105,878 was awarded by the
27  DOE. The discrepancy is due to an error in how a cost share award from the California Energy Commission was
included in the project budget submitted with the application. The DOE recognized the error and confirmed that it
28  would adjust the award amount to the requested amount through an amendment. However, the amendment was never
amended due to disruptions at the DOE.

46686\20709500

671.    On October 10, 2025, a second letter was issued to UC Berkeley from Vicki Michetti, which was essentially identical in substance to the previous termination letter, but indicated that the effective termination date of the grant award was October 10, 2025.

672.    Both the October 2 letter and October 10 letter stated that the CALDAC Project no longer "effectuate[s] the Department of Energy's priorities," "is not consistent with this Administration's goals, policies and priorities," and that "DAC Hubs provide no tangible economic benefit. DAC hubs may raise natural gas prices if deployed at scale." This statement about DAC hubs is not supported by any evidence. Further, there is no coherent connection between DOE's reason for termination and what the CALDAC Project sought to accomplish, which would provide economic benefit as discussed below.

673.    Dr. Bedsworth, her team, and the public interest have all suffered harm as a result of the CALDAC Project's grant termination. Termination of this grant has resulted in financial harm to the CLEE by reducing funds available for researcher and staff salaries.

674.    Termination of this grant additionally resulted in the loss of a $300,000 grant from the California Energy Commission and significant cost share contributions from project partners, which further reduced or eliminated funding for researcher and staff salaries.

675.    The termination also results in a lost opportunity to conduct novel research on an emerging technology. This project took an innovative approach to co-develop the feasibility study with local partners, including local government and local non-profit organizations. If successful, this could have resulted in a replicable model to accelerate energy and infrastructure development that benefits project developers and host communities. The findings of this work would have provided significant opportunity to publish and share novel research with researchers and policymakers.

676.    Use of DAC and other carbon removal technologies are needed to reduce and/or offset carbon emissions. DAC is also an important area of growth in the United States. Failure to scale DAC will diminish domestic innovation and lead to a loss of job creation opportunities, which can be especially important in resource-dependent communities.

1

**H.    Allegations Against Additional Federal Agency Defendants**

2

677.    While Plaintiffs' grants were unlawfully terminated by EPA, NEH,

3

NSF, DOD, DOT, NIH, and DOE, these agencies are acting no differently than other federal

4

agencies choosing to ignore their congressional mandates in favor of political objectives.

5

Indeed, all are acting under the Executive Orders and other unlawful directives from

6

Defendants Trump and DOGE, rather than under the authority of their statutory mandates.

7

678.    The Federal Agency Defendants are acting in similar, categorical, and

8

lockstep fashion. Their uniform and categorically unlawful conduct usurps congressional

9

authority and the rights of Class members in the same unlawful way, and it will only increase,

10

absent the declaratory and injunctive relief requested in this Complaint. The violation of

11

separation of power principles is still more blatant now that Defendant Trump and the

12

members of his Cabinet collectively and directly run DOGE. The following allegations

13

demonstrate that all Federal Agency Defendants have engaged in the same course of conduct

14

and harmed the members of the UC researchers class in the same way as the Named Plaintiffs

15

have been harmed, under the same Executive Orders and DOGE directives.

16

679.    Class members (researchers in the UC system) receive funding from an

17

array of federal agencies, and have suffered the same type of harm (abrupt termination of

18

previously awarded grants under Executive Orders and/or other Trump administration

19

directives) from the universal terminations perpetuated by Defendants.

20

680.    At minimum, the following Federal Agency Defendants have

21

terminated or will imminently terminate grants to Class members:

22

**1.    Department of Agriculture**

23

681.    Early into President Trump's tenure, the Department of Agriculture

24

(USDA) ceded control to DOGE. Secretary of Agriculture Brooke Rollins announced on

25

February 14, 2025 that she "welcome[d]" DOGE's spending cuts, and that DOGE would have

26

"full access" as Rollins reviewed "thousands of …grants" over the first weeks of her tenure.

27

All of this, according to USDA, would be done "per the President's directives."[225]

28

---

[225] U.S. Dep't of Agric., *Secretary Rollins Takes Bold Action to Stop Wasteful Spending and*

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

682.    By March 13, 2025, USDA announced that Rollins had "worked with [DOGE] to streamline USDA operations by cutting wasteful spending," hyperlinking to a social media post about a terminated university research grant.[226]

683.    USDA also canceled its Partnerships for Climate-Smart Commodities program, which included research grants to universities.[227] USDA stated that recipients could re-apply for funding if their projects were "aligned with the priorities of this Administration."[228]

684.    USDA grants to UC researchers were terminated, causing serious harm. On information and belief, researchers received form termination letters.

685.    By terminating grants at the direction of the President and DOGE, USDA has violated its congressional mandates. Such mandates include, for example, compliance with and effectuation of the legislative purposes implicit in congressional appropriations, and 7 U.S.C. § 3157, which establishes a research grant program to "promote research in food, agriculture, and related areas."

686.    By effectuating mass terminations of grants to UC researchers without proper review or clear explanation, USDA acted unconstitutionally and unlawfully, as set forth in the Claims for Relief asserted below.

### 2.    AmeriCorps

687.    AmeriCorps has also mass terminated grants in response to President Trump's Executive Orders and DOGE directives.

---

*Optimize USDA to Better Serve American Agriculture* (Feb. 14, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/02/14/secretary-rollins-takes-bold-action-stop-wasteful-spending-and-optimize-usda-better-serve-american.

[226] U.S. Dep't of Agric., *Secretary Brooke Rollins Takes Bold Action in First 30 Days at USDA* (Mar. 13, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/03/13/secretary-brooke-rollins-takes-bold-action-first-30-days-usda.

[227] *See, e.g.*, Univ. of Idaho, *Secretary Brooke Rollins Takes Bold Action in First 30 Days at USDA* (Apr. 16, 2025), https://www.uidaho.edu/news/news-articles/news-releases/2025/041625-iamp-termination.

[228] U.S. Dep't of Agric., *USDA Cancels Biden Era Climate Slush Fund, Reprioritizes Existing Funding to Farmers* (Apr. 14, 2025), https://content.govdelivery.com/accounts/USDAOC/bulletins/3dbe363.https://content.govdelivery.com/accounts/USDAOC/bulletins/3dbe363.

46686\20709500

688.     AmeriCorps has stated that it is "taking proactive action to ensure alignment with . . . the Trump-Vance Administration priorities." AmeriCorps has also stated that all grants and grant applications "must comply with President Trump's executive orders," specifically listing the following Executive Orders: "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," "Unleashing American Energy," "Ending Radical and Wasteful Government DEI Programs and Preferencing," and "Ending Illegal Discrimination and Restoring Merit-Based Opportunity."[229]

689.     On April 25, 2025, news outlets reported that DOGE had ordered AmeriCorps to terminate almost $400 million in grants.[230] This constitutes roughly 41% of the agency's total grant funding.

690.     That same day, UC researchers received form termination letters that read:

> Effective immediately, the AmeriCorps award subrecipient(s) included in the attached spreadsheet is/are being terminated per 2 CFR 200.340(a)(4) because it has been determined that the award no longer effectuates agency priorities. You must immediately cease all award activities. This is a final agency action and is not administratively appealable.

691.     UC researchers have suffered serious harm as a result of Defendants' actions.

692.     By terminating grants at the direction of the President and DOGE, AmeriCorps has violated its congressional mandates. Such mandates include, for example, compliance with and effectuation of the legislative purposes implicit in congressional

---

[229] AmeriCorps, *Grantee and Sponsor Guidance on Compliance,* https://www.americorps.gov/grantees-sponsors/grantee-sponsor-guidance-compliance (last visited May 28, 2025).

[230] Teri Raji, *DOGE Orders major cut to AmeriCorps funding, imperiling agency's work*, The Washington Post (Apr. 25, 2025), https://www.washingtonpost.com/nation/2025/04/25/americorps-grant-cuts-doge/; Sophia Cai & Ben Johansen, *DOGE Hits Trump Country*, Politico (Apr. 30, 2025), https://www.politico.com/news/2025/04/30/doge-hits-trump-country-00319654.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

46686\20709500

appropriations, and 42 U.S.C. 12653 (describing activities AmeriCorps must carry out directly or through grants).

693.    By effectuating mass terminations of grants to UC researchers without proper review or clear explanation, AmeriCorps acted unconstitutionally and unlawfully, as set forth in the Claims for Relief asserted below.

### 3.    Department of Education

694.    Department of Education grants were an early DOGE target. On February 10, DOGE announced (on X, Elon Musk's social media platform) that it had terminated 29 "DEI training grants" totaling over $100 million.[231] DOGE also announced the termination of 89 other Department of Education contracts. This included contracts made by the Department's nonpartisan research arm, the Institute of Education Sciences.[232]

695.    When asked for comment on the terminations, a spokesperson for the Department stated: "We kindly point you to the X post from DOGE."[233]

696.    On information and belief, Department of Education grant terminations have caused serious harm to UC researchers.

697.    By terminating grants at the direction of the President and DOGE, the Department has violated its congressional mandates. Such mandates include, for example, compliance with and effectuation of the legislative purposes implicit in congressional appropriations, and specific directives such as 20 U.S.C. §§ 9511, 9512 (establishing Institute of Education Sciences).

---

[231] DOGE (@DOGE), *Also today, the Department Of Education terminated 89 contracts worth $881mm.* (Feb. 10, 2025), https://x.com/DOGE/status/1889113011282907434.

[232] Rebecca Carballo & Juan Perez Jr., *DOGE announces $881 million in cuts for Education Department Contracts*, Politico (Feb. 10, 2025), https://www.politico.com/news/2025/02/10/education-department-pauses-research-contracts-00203494.

[233] Kalyn Belsha, *Crucial research halted as DOGE abruptly terminates Education Department contracts*, Chalkbeat (Feb. 11, 2025), https://www.chalkbeat.org/2025/02/11/elon-musk-and-doge-cancel-education-department-research-contracts/.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

46686\20709500

698.    On information and belief, the Department effectuated mass terminations of grants to UC researchers without proper review or clear explanation, thereby acting unconstitutionally and unlawfully as set forth in the Claims for Relief asserted below

### 4.    Institute of Museum and Library Services

699.    Through an Executive Order, Defendant Trump called for the elimination of the Institute of Museum and Library Services (IMLS).[234] IMLS grant activities have been hit particularly hard by Defendants' illegal actions.

700.    On information and belief, IMLS's mass termination of grants likewise occurred at DOGE's direction. On its social media account X, IMLS wrote: "The era of using your taxpayer dollars to fund DEI grants is OVER." The post tagged DOGE and reposted a Fox News post asserting that "Trump's DOGE push slashes millions."[235]

701.    In early April 2025, UC researchers who had previously received IMLS grants received a form letter terminating their grants. It read:

> This letter provides notice that the Institute of Museum and Library Services (IMLS) is terminating your federal grant ([Grant Application No.]) effective April 8, 2025, in accordance with the termination clause in your Award Agreement. Upon further review, IMLS has determined that your grant is unfortunately no longer consistent with the agency's priorities and no longer serves the interest of the United States and the IMLS Program. IMLS is repurposing its funding allocations in a new direction in furtherance of the President's agenda. Independently and secondly, the President's March 14, 2025 executive order mandates that the IMLS eliminate all non-statutorily required activities and functions. See Continuing the Reduction of the Federal Bureaucracy, E.O. 14238 (Mar. 14, 2025). Therefore, the IMLS hereby terminates your grant in its entirety effective April 8, 2025. …. Please contact grant-notices@imls.gov with only urgent questions. We wish you well.

---

[234] Exec. Order No. 14238, *Continuing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 813043 (Mar. 14, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/continuing-the-reduction-of-the-federal-bureaucracy/.

[235] U.S. Inst. of Museum & Library Servs. (@US_IMLS), *The era of using your taxpayer dollars to fund DEI grants is OVER.* (Apr. 3, 2025), https://x.com/US_IMLS/status/1907814174693941660.

1      702.    UC researchers are concretely harmed by the termination of IMLS

2    grants.

3      703.    By terminating grants at the direction of the President and DOGE,

4    IMLS has violated its congressional mandates. Such mandates include, for example,

5    compliance with and effectuation of the legislative purposes implicit in congressional

6    appropriations, and the more general direction in 20 U.S.C. §§ 9108, 9162, 9165, 9175

7    (notably, the last two sections direct IMLS to "develop a diverse workforce" of library and

8    museum professionals).

9      704.    By effectuating mass terminations of grants to UC researchers without

10   proper review or clear explanation, IMLS acted unconstitutionally and unlawfully as set forth

11   in the Claims for Relief asserted below.

12      **5.      Department of the Interior, including National Park Service**

13      705.    The Department of the Interior (DOI) has worked closely with DOGE

14   to implement Defendant Trump's orders. DOI said that it was "committed to supporting

15   President Trump's Executive Order" creating DOGE.[236]

16      706.    DOI allowed a DOGE staffer to prepare lists of grants for termination,

17   flagging those that addressed "climate" or "D.E.I." As of May 7, 2025, a DOGE staff member

18   had earmarked many research grants from the National Park Service (NPS) and other DOI

19   subagencies for future termination.[237] DOI has carried out or will imminently carry out these

20   terminations.

21      707.    By terminating grants at the direction of the President and DOGE, DOI

22   has violated its congressional mandates. Such mandates include, for example, compliance

23

24

25

26   [236] U.S. Dep't of the Interior, *SO-3429 – Consolidation, Unification, and Optimization of Administrative Function* (Apr. 17, 2025), https://www.doi.gov/document-library/secretary-order/so-3429-consolidation-unification-and-optimization-administrative.

27   [237] Lisa Friedman, *Trump Administration is Said to Target Park Services*, The New York Times (May 7, 2025), https://www.nytimes.com/2025/05/07/climate/trump-park-service-grants-cuts.html.

28

46686\20709500

with and effectuation of the legislative purposes implicit in congressional appropriations, and

other legislation specifying the functions of individual DOI subunits, such as NPS.[238]

708.    DOI has terminated or will imminently terminate grants to UC

researchers, causing concrete harm.

709.    By effectuating mass terminations of grants to UC researchers without

proper review or clear explanation, DOI acted unconstitutionally and unlawfully as set forth

in the Claims for Relief asserted below.

### 6.    Department of State, including USAID

710.    Early into President Trump's tenure, DOGE set its sights on USAID,

essentially gutting the entire agency.[239]

711.    USAID terminated grants to UC researchers, causing serious harm.

712.    By terminating grants at the direction of the President and DOGE, the

State Department has violated its congressional mandates. Such mandates include, for

example, compliance with and effectuation of the legislative purposes implicit in

congressional appropriations, such as the fiscal year 2024 Department of State and Foreign

Operations Appropriations Act.

713.    By effectuating mass terminations of grants to UC researchers without

proper review or clear explanation, the State Department acted unconstitutionally and

unlawfully as set forth in the Claims for Relief asserted below.

## V.    The Trump Administration Is Threatening Additional, Illegal Funding Cuts to the UC System

714.    In the days leading up to the filing of this complaint, the head of DOJ's

"antisemitism task force," Leo Terrell, announced forthcoming "massive lawsuits" targeting

the UC system. According to Terrell, the DOJ is "going to go after [the UC system] where it

---

[238] *See, e.g.*, U.S. Nat'l Park Serv., *Grants for Cultural Resources, Consultation, and Repatriation*, https://www.nps.gov/history/grants.htm (last visited May 29, 2025), ("Grant programs fund projects as described or limited by their authorizing legislation.").

[239] Ellen Knickmeyer, *Trump Administration Fires at Least 1,600 USAID Workers*, AP News (Feb. 23, 2025), https://apnews.com/article/usaid-trump-musk-foreign-aid-firings-a3af8ce6ef17878b718c8e2ed3bf98e4.

46686\20709500

hurts them financially." If recent actions against other universities are any guide, this will likely include the revocation of additional congressionally allocated grants and funds. These anticipated cuts, while not directly implicated by this lawsuit, borrow from the same playbook and are part of the same executive branch scheme of illegally seizing and weaponizing the power of the purse to harm universities and their faculty, to the great detriment of the American public.

## VI. **Unless Enjoined, Grant Terminations Will Cause Irreparable Harm to Plaintiffs, the Class, and the Nation**

715.    Plaintiffs and the proposed Class have suffered and will continue to suffer the following injuries as a direct result of Defendants' conduct:

a.    Interruption or abandonment of ongoing research projects as a direct result of the loss of previously awarded grants;

b.    Attendant reduction of employment for or layoffs of researchers and their staff;

c.    Career disadvantage, including: loss of opportunities to publish research, inability to attend project-relevant conferences, and reduced ability to obtain related or follow-on grants;

d.    Expenditure of considerable time and effort to find substitute funding;

e.    The need to support project team members with discretionary funds, or to otherwise duct-tape solutions to a massive funding shortfall that first manifests as an immediate cash flow problem within affected campus research units; and

f.    Reputational injury, including loss of trust from the community partners so integral to ensuring that public university research is responsive and relevant to local needs.

716.    These direct, concrete injuries to Plaintiff researchers themselves have an inexorable and damaging ripple effect on the research mission of individual researchers and research teams; on the research mission of the UC system itself; on the citizens of California; and on all Americans, and indeed people throughout the world, who daily benefit from the fruits of UC discoveries, innovations, and inventions.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

# CLAIMS FOR RELIEF

## COUNT I
### Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions; Violation of Separation of Powers

717.    Plaintiffs reallege all paragraphs above as if fully set forth herein.

718.    This Court has jurisdiction to enjoin federal officials from violating the Constitution, including the separation of powers. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

719.    The Constitution empowers Congress to make laws, U.S. Const. art. 1, § 1, and requires the President to "take Care that the Laws be faithfully executed," *id.* art. II, § 3. The "Take Care Clause" assures that, consistent with the structural and functional separation of powers on which our system of government is based—and on which it depends—"Congress makes the laws and the President faithfully… executes them." *Utility Air Reg. Grp. v. Envtl. Prto. Agency*, 573 U.S. 302, 327 (2014) (cleaned up). The faithfulness the Constitution requires of the Executive is not to the President's views on priorities, but to the laws enacted by Congress as interpreted and enforced by the Courts. Congress's powers to set the policies of the nation are at their apex when it comes to spending money, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

720.    The executive branch has no constitutional authority to refuse to carry out laws enacted by Congress, and it has no constitutional authority to block, amend, subvert, or delay spending appropriations based on the President's own policy preferences. For nearly two hundred years, it has been established that a president violates the Take Care Clause when he overrides statutes enacted by Congress, or refuses to execute such statutes or their implementing regulations. *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838). The President "is without authority to set aside congressional legislation by executive order." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999).

721.    Defendants' decisions to unilaterally cancel duly awarded grants and withhold funding that Congress has appropriated precisely to fund such grants violates the separation of powers.

722.    Defendants' decisions to delay spending and outright refuse to spend the amounts Congress appropriated violates Congress's power of the purse and the separation of powers.

723.    Because Defendants' actions violate the separation of powers and are *ultra vires*, they should declared unconstitutional and enjoined.

## COUNT II
**Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions; Violation of First Amendment (Content and Viewpoint Discrimination)**

724.    Plaintiffs reallege all paragraphs above as if fully set forth herein.

725.    The First Amendment provides that the federal government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

726.    The First Amendment prohibits the government from "regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). "Discrimination against speech because of its message is presumed to be unconstitutional." *Id.* at 828.

727.    "[E]ven in the provision of subsidies, the Government may not 'ai[m]at the suppression of dangerous ideas.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quoting *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 550 (1983) (alteration in original)). In the grant-making context, the government may not reject "a whole class of projects" based on "viewpoint alone," or use Federal funding to "impose a disproportionate burden calculated to drive certain ideas or viewpoints from the marketplace." *Rhode Island Latino Arts v. Nat'l Endowment for the Arts*, No.25-cv-79-WES, 2025 WL 1009026, at *12 (D.R.I. Apr. 3, 2025) (quoting *Finley*, 524 U.S. at 587).

728.    Defendants' mass termination of grants to disadvantage or promote particular political and ideological viewpoints is "the product of invidious viewpoint

46686\20709500

1    discrimination." *Finley*, 524 U.S. at 587. In an effort to drive views they disfavored out of the

2    marketplace of ideas, Defendants terminated many grants based on the recipients' (presumed)

3    viewpoint as reflected in the subject matter of their research. This is most evident in the

4    Termination Notices' citation to Executive Orders purporting to combat "Radical

5    Indoctrination" and "Radical . . . DEI Programs," and to further "Biological Truth." The

6    Termination Notices make plain that Defendants believe that the content of Plaintiffs' speech

7    conflicts with the Administration's views, and Plaintiffs' grants were terminated at least in

8    part for this reason. The First Amendment does not tolerate such viewpoint discrimination.

9    729.    Accordingly, Defendants' actions are not in accordance with law and

10    are contrary to constitutional right or power.

## COUNT III
### Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions; Violation of Fifth Amendment (Due Process / Equal Protection)

730.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

731.    The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws. *See Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954).

732.    In identifying DOE grants to terminate in October 2025, Defendants intentionally treated Plaintiffs differently from similarly situated entities based on the political views of, and votes cast by, the citizens of the state where the prime grantee was located, and the state where the relevant award would be primarily performed.

733.    Defendants' reasons for treating Plaintiffs differently from similarly situated entities are arbitrary and irrational.

734.    Defendants' differential treatment of Plaintiffs is motivated by animus against the political views of and votes cast by the citizens of the states associated with the awards, based on the location of the prime grantee or where the award would be performed.

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

735.    Defendants lack any rational, legitimate, or compelling governmental interest in treating Plaintiffs differently from similarly situated entities.

736.    As a direct and proximate result of Defendants' differential treatment, Plaintiffs have suffered concrete economic and non-economic harm, including loss of funding, loss of funding opportunities, loss of access to federally funded programs and resources, loss of investments, costs of mitigation, diversion of resources, reputational harm, and chilled association.

737.    Through the actions above, Defendants have violated the Due Process Clause of the Fifth Amendment.

**COUNT IV**
**Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;**
**Violation of Fifth Amendment (Due Process / Void for Vagueness)**

738.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

739.    The Due Process Clause of the Fifth Amendment to the Constitution requires due process of law before the deprivation of a constitutionally protected interest.

740.    Plaintiffs have a constitutionally protected property interest in grant funding that supports their salaries and stipends, as well as their ongoing research. Plaintiffs have relied on this funding, and the protections of federal law governing this funding, in pursuing their research, in hiring staff, in making commitments to research partners, and in many other ways. Plaintiffs also have constitutionally protected liberty interests in their freedom of speech and expression, including academic freedom, and in pursuing their livelihoods.

741.    Defendants' cancellation or imminent cancellation of federal grant funding does not provide Plaintiffs fair notice or a reasonable opportunity to be heard.

742.    The Due Process Clause also prohibits government actions that fail to give fair notice of what conduct is forbidden or required. A government enactment is unconstitutionally vague if it fails to provide a reasonable opportunity to know what conduct is prohibited or is so indefinite as to allow arbitrary and discriminatory enforcement.

743.     Because of the vagueness in the language of Defendant Trump's Orders and the Federal Agency Defendants' chaotic efforts to give effect to those Orders, Plaintiffs are unsure, for example, which areas of study they can pursue, which populations they can focus on as study subjects, and what the demographics of study participants must be. This makes it impossible to determine how to reconfigure future research to stay within the bounds of the agencies' newest "priorities."

744.     Defendants' efforts to purge certain disfavored research from federal agencies' grant rolls accordingly violates the Due Process Clause.

### COUNT V
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C): Contrary to Law; Illegal Departure from Impoundment Control Act, Statutes, and Regulations**

745.     Plaintiffs reallege all paragraphs above as if fully set forth herein.

746.     The APA directs courts to "hold unlawful and set aside agency actions, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law … [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A),(C). Defendants' actions violate these provisions, calling on the Court to hold them unlawful and set them aside for several reasons, including those specified below.

747.     First, by refusing to spend money that Congress appropriated, Defendants are violating the Impoundment Control Act of 1974 (ICA), and the appropriations statutes underlying each agency's funding scheme. Under the ICA, a "deferral" includes any "withholding or delaying the obligation or expenditure of" appropriated funds, as well as "any other type of Executive action or inaction which effectively precludes the obligation or expenditure of" appropriated funds. 2 U.S.C. § 682(1). When the executive branch wishes to defer funds, it must send a special message to Congress detailing the money to be deferred and the reasons for deferral. There are only three permissible grounds for deferrals, *id.* § 684(b), none of which includes effort to ensure funds are spent consistent with the President's new policy priorities.

748.    Defendants' actions constitute a "deferral" because they reflect a "withholding or delaying [of] the obligation or expenditure of" funds that Congress appropriated. Defendants did not notify Congress of the deferrals as the ICA requires, nor did Defendants undertake the deferrals for reasons the ICA permits.

749.    Defendants' actions also constitute an unlawful "rescission" of the funds appropriated for agency action, including grant-making. Where the President seeks to "rescind" appropriated funds, the ICA requires, among other things, that the President send a special message to Congress specifying the funds he seeks to have rescinded and the reasons for his proposal. 2 U.S.C. § 683(a). The President did not do so.

750.    Second, Defendants are violating the agencies' enabling statutes and other laws passed by Congress that include grant-making as a directive to the agencies. The work that Plaintiffs and the Class were awarded grants to perform furthers agency missions and fulfills specific statutory requirements set by Congress. Withholding the appropriated funds contradicts Congress's directives.

751.    Third, where grants were issued in accordance with agency-specific rules and terminated for reasons inconsistent with those rules, Defendants are violating their own regulations and agreements.

**COUNT VI**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A): Arbitrary and Capricious Failure to Engage in Reasoned Decision-making**

752.    Plaintiffs reallege all paragraphs above as if fully set forth herein.

753.    A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Government agencies and officers act in an arbitrary and capricious manner if they fail to engage in "reasoned decision-making." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (citation omitted). Agency action is therefore lawful only if it rests "on a consideration of the relevant factors." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). This principle applies *a fortiori* to agency departures from long settled policy. *Id.*

754.     Further, agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*. Agency action is also arbitrary and capricious if, when departing from a prior policy, an agency does not "display awareness that it *is* changing position" or does not "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original).

755.     Defendants' mass termination of grants previously awarded to Plaintiffs and the Class was arbitrary and capricious for many reasons, including (but not limited to) the following:

a.     The Termination Notices do not provide a reasoned explanation for grant cancellations. Rather, the letters sent across all agencies generally state that the grant being cancelled no longer "effectuates" or is no longer "in alignment" with Agency priorities. That generic statement is not a reasoned explanation.

b.     The terminations ignore the reliance interests of grantees. For example, grantees who had already received some but not all of their awards had already spent significant time working on the projects funded by their grants. Similarly, many grantees—as their grants required—took leaves of absence from their jobs, cancelled teaching plans, or otherwise altered their employment status in reliance on the promise of receiving grant money to support them while they completed their projects.

c.     The grant terminations conflict with prior agency decisions to award the grants without providing adequate explanation for the change in agency position. All class members received their grants after a rigorous and objective application and review process that necessarily established that funded projects were meritorious and satisfied relevant criteria. Defendants have failed to provide any reason the grants fail to satisfy applicable criteria.

d.     The mass termination of grants "entirely failed to consider. . . important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. Among other things, Defendants ignored

1    the waste and inefficiency caused by the terminations, given the investment that Federal Agency

2    Defendants—and by extension, taxpayers—have already made in the terminated projects.

3          e.      Defendants likewise failed to consider the significant consequences grant

4    termination will have on the individuals and organizations involved in conducting research, the

5    durability of the institutions in which they work, and on the broader public that will be deprived

6    of benefits meant to accrue from the work accomplished with the grant funding.

7          756.    Defendants have failed to adequately justify their actions; have not

8    considered the substantial reliance interests at stake; have relied on factors that Congress did

9    not authorize them to consider; and have not acknowledged or justified their change from

10   prior agency positions.

11         757.    In sending standardized termination letters to terminate grants *en*

12   *masse*, Defendants failed to "examine[] 'the relevant data' and articulate[] 'a satisfactory

13   explanation' for [their] decision, 'including a rational connection between the facts found and

14   the choice made,'" *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019) (quoting *State*

15   *Farm*, 463 U.S. at 43). The terminations must be set aside under the APA as arbitrary and

16   capricious.

17                          **PRAYER FOR RELIEF**

18         WHEREFORE, Plaintiffs respectfully request that the Court certify a UC Researchers

19   Class pursuant to Fed. R. Civ. P. 23(a)(1)-(4) and 23(b)(2), enter judgment in favor of Plaintiffs

20   and the certified Form Termination Class, Equity Termination Class, Second Form Termination

21   Class, Second Equity Termination Class, Third Form Termination Class, and Equal Protection

22   Termination Class (the "Certified UC Researchers Class"), and award Plaintiffs and the Certified

23   UC Researchers Class the following relief:

24         A.      Declare as unlawful and set aside Defendants' Termination Notices that

25   terminated grants previously awarded to Plaintiffs and members of the UC Researchers Class, as

26   violative of the Constitutional separation of powers; the First and Fifth Amendment protections of

27   free speech and due process; the Impoundment Control Act; agency-specific statutes and

28   regulations, including congressional directives and appropriations acts; and the Administrative

46686\20709500

1  Procedure Act;

2        B.     Declare as *ultra vires* Defendants' decisions and implementation of the

3  mass termination of grants to Plaintiffs and the UC Researchers Class;

4        C.     Grant preliminary and ultimately final injunctive relief to enjoin

5  Defendants from cutting off agency and grantee access to congressionally appropriated funding,

6  from giving effect to the violative terminations, or undertaking any similar violative action to

7  terminate additional duly awarded agency grants; to restore such previously awarded grants; to

8  require Defendants to provide no-cost extensions to grantees for the time necessary to resume and

9  complete interrupted work; and to return to the lawful and orderly grant procedures they

10  employed prior to January 20, 2025;

11        D.     Appoint the Named Plaintiffs as Class Representatives, and the

12  undersigned counsel as Class Counsel, upon certification of a UC Researchers Class pursuant to

13  Fed. R. Civ. P. 23(g);

14        E.     Designate such additional class representatives, class counsel, and sub-

15  classes as the Court may deem appropriate at any time before final judgment, pursuant to Fed. R.

16  Civ. P. 23(c)(1)(C) and 23(c)(5);

17        F.     Award Plaintiffs and counsel for the Proposed Class reasonable costs and

18  attorneys' fees; and

19        G.     Issue such other relief as the Court deems just and proper.

20

21  Dated: November 24, 2025      By:    */s/ Claudia Polsky*

22            Erwin Chemerinsky (*pro hac vice*)
          echemerinsky@law.berkeley.edu

23            Claudia Polsky (CA Bar No. 185505)
          cpolsky@law.berkeley.edu

24            U.C. BERKELEY SCHOOL OF LAW
          Law Building

25            Berkeley, CA 94720-7200
          Telephone: 510.642.6483

26

27

28

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1

Dated: November 24, 2025          By:    /s/ Elizabeth J. Cabraser

2

3          Elizabeth J. Cabraser (CA Bar No. 83151)
          ecabraser@lchb.com
          Richard M. Heimann (CA Bar No. 63607)

4          rheimann@lchb.com
          Kevin R. Budner (CA Bar No. 287271)

5          kbudner@lchb.com
          Annie M. Wanless

6          awanless@lchb.com (CA Bar No. 339635)
          LIEFF CABRASER HEIMANN &

7          BERNSTEIN, LLP
          275 Battery Street, 29th Floor

8          San Francisco, CA 94111
          Telephone: 415.956.1000

9

10

Dated: November 24, 2025          By:    /s/ Anthony P. Schoenberg

11          Anthony P. Schoenberg (CA Bar No. 203714)
          tschoenberg@fbm.com

12          Donald E. Sobelman (CA Bar No. 184028)
          dsobelman@fbm.com

13          Dylan M. Silva (State Bar No. 306363)
          dmsilva@fbm.com

14          Linda S. Gilleran (CA Bar No. 307107)
          lgilleran@fbm.com

15          Kyle A. McLorg (CA Bar No. 332136)
          kmclorg@fbm.com

16          Katherine T. Balkoski (CA Bar No. 353366)
          kbalkoski@fbm.com

17          FARELLA BRAUN + MARTEL LLP
          One Bush Street, Suite 900

18          San Francisco, CA 94104
          Telephone: 415. 954.4400

19

20          *Attorneys for Plaintiffs and the Proposed Class*

21

22

23

24

25

26

27

28

- 174 -

1

2

3

## **FILER'S ATTESTATION**

4
I hereby attest that each Signatory has concurred in the filing of this document, as

5
indicated by their conformed signatures within this e-filed document.

6

7
Dated: November 24, 2025                    */s/ Anthony P. Schoenberg*
Anthony P. Schoenberg

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] THIRD AMENDED CLASS ACTION
COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

46686\20709500

# ATTACHMENT 2

1 Erwin Chemerinsky (*pro hac vice*)
echemerinsky@law.berkeley.edu
2 Claudia Polsky (CA Bar No. 185505)
cpolsky@law.berkeley.edu
3 U.C. BERKELEY SCHOOL OF LAW
Law Building
4 Berkeley, CA 94720-7200
Telephone: 510.642.6483
5
Elizabeth J. Cabraser (CA Bar No. 83151)
6 ecabraser@lchb.com
Richard M. Heimann (CA Bar No. 63607)
7 rheimann@lchb.com
LIEFF CABRASER HEIMANN &
8 BERNSTEIN, LLP
275 Battery Street, 29th Floor
9 San Francisco, CA 94111
Telephone: 415.956.1000
10
Anthony P. Schoenberg (CA Bar No. 203714)
11 tschoenberg@fbm.com
Linda S. Gilleran (CA Bar No. 307107)
12 lgilleran@fbm.com
FARELLA BRAUN + MARTEL LLP
13 One Bush Street, Suite 900
San Francisco, CA 94104
14 Telephone: 415. 954.4400

15 *Attorneys for Plaintiffs and the Proposed Class*
[Additional counsel listed on signature page]
16

17 **UNITED STATES DISTRICT COURT**

18 **NORTHERN DISTRICT OF CALIFORNIA**

19

20 NEETA THAKUR, KEN ALEX, NELL | Case No. 3:25-cv-4737
GREEN NYLEN, ROBERT HIRST,
21 CHRISTINE PHILLIOU, JEDDA FOREMAN,
ELI BERMAN, SUSAN HANDY, MARCUS
22 HORWITZ, ALEXANDER VAN DER BLIEK,
~~and~~ RHONDA VOSKUHL, PLAMEN | ~~SECOND~~[PROPOSED] THIRD
23 ATANASSOV, and LOUISE BEDSWORTH on | AMENDED CLASS ACTION
behalf of themselves and all others similarly | COMPLAINT FOR
24 situated, | DECLARATORY AND
INJUNCTIVE RELIEF
25 Plaintiffs,

26 v.

27 DONALD J. TRUMP, in his official capacity as
President of the United States;
28 DEPARTMENT OF GOVERNMENT
EFFICIENCY ("DOGE");

1    AMY GLEASON, in her official capacity as
     Acting Administrator of the Department of
2    Government Efficiency;
     NATIONAL SCIENCE FOUNDATION;
3    BRIAN STONE, in his official capacity as
     Acting Director of the National Science
4    Foundation;
     NATIONAL ENDOWMENT FOR THE
5    HUMANITIES;
     MICHAEL MCDONALD, in his official
6    capacity as Acting Chairman of the National
     Endowment for the Humanities;
7    UNITED STATES ENVIRONMENTAL
     PROTECTION AGENCY;
8    LEE ZELDIN, in his official capacity as
     Administrator of the U.S. Environmental
9    Protection Agency;
     UNITED STATES DEPARTMENT OF
10   AGRICULTURE;
     BROOKE ROLLINS, in her official capacity as
11   Secretary of the U.S. Department of Agriculture;
     AMERICORPS (a.k.a. the CORPORATION
12   FOR NATIONAL AND COMMUNITY
     SERVICE);
13   JENNIFER BASTRESS TAHMASEBI, in her
     official capacity as Interim Agency Head of
14   AmeriCorps;
     UNITED STATES DEPARTMENT OF
15   DEFENSE;
     PETE HEGSETH, in his official capacity as
16   Secretary of the U.S. Department of Defense;
     UNITED STATES DEPARTMENT OF
17   EDUCATION;
     LINDA MCMAHON, in her official capacity as
18   Secretary of the U.S. Department of Education;
     UNITED STATES DEPARTMENT OF
19   ENERGY;
     CHRIS WRIGHT, in his official capacity as
20   Secretary of Energy;
     UNITED STATES DEPARTMENT OF
21   HEALTH AND HUMAN SERVICES;
     ROBERT F. KENNEDY, JR., in his official
22   capacity as Secretary of the U.S. Department of
     Health and Human Services;
23   UNITED STATES CENTERS FOR DISEASE
     CONTROL;
24   MATTHEW BUZZELLI, in his official capacity
     as Acting Director of the Centers for Disease
25   Control;
     UNITED STATES FOOD AND DRUG
26   ADMINISTRATION;
     MARTIN A. MAKARY, in his official capacity
27   as Commissioner of the Food and Drug
     Administration;
28   UNITED STATES NATIONAL INSTITUTES

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1 | OF HEALTH;
JAYANTA BHATTACHARYA, in his official
2 | capacity as Director of the National Institutes of
Health;
3 | INSTITUTE OF MUSEUM AND LIBRARY
SERVICES;
4 | KEITH SONDERLING, in his official capacity
as Acting Director of the Institute of Museum
5 | and Library Services;
UNITED STATES DEPARTMENT OF THE
6 | INTERIOR;
DOUG BURGUM, in his official capacity as
7 | Secretary of the Interior;
UNITED STATES DEPARTMENT OF STATE;
8 | MARCO RUBIO, in his official capacity as
Secretary of the U.S. Department of State;
9 | DEPARTMENT OF TRANSPORTATION;
SEAN DUFFY, in his official capacity as
10 | Secretary for the U.S. Department of
Transportation,

11 

12 | Defendants.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

JURISDICTION AND VENUE .............................................................................. 6

THE PARTIES ........................................................................................................ 7

    A.    Plaintiffs .................................................................................................. 7

    B.    Defendants .............................................................................................. 8

CLASS ALLEGATIONS ...................................................................................... ~~11~~12

FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS ......................... ~~15~~17

I.    Throughout Decades of Federal Funding, the UC System Has Made Leading Contributions to Research that Benefit the Public ....................................... ~~15~~17

II.    Congress's Power of the Purse Makes Illegal the Mass Termination of Grants at the ~~Presidentw's~~President's Direction ........................................................ ~~19~~21

III.    President Trump Issues a Flurry of Executive Orders and Creates DOGE, Unlawfully Directing Agencies to Terminate Grants ..................................... ~~21~~23

IV.    Agencies that Terminated Lead Plaintiffs' Grants Have Acted According to a Common Unlawful Pattern ............................................................................. ~~25~~27

    A.    Environmental Protection Agency ...................................................... ~~26~~28

        1.    Congress Established the EPA to Protect the Environment, Including Through Research ......................................................... ~~26~~29

        2.    In Response to Trump Administration Directives, the EPA Improperly Changed Priorities and Canceled Existing Grants ............ ~~31~~33

        3.    EPA Plaintiffs and Other Grant Recipients Are Harmed by EPA's Illegal Grant Terminations ........................................................... ~~36~~38

            a.    Plaintiff Neeta Thakur's Grant Termination and Resulting Harm .............................................................................. ~~36~~39

            b.    Plaintiff Ken Alex's Grant Termination and Resulting Harm .. ~~40~~43

            c.    Plaintiff Nell Green Nylen's Grant Terminations and Resulting Harm ......................................................................... ~~42~~45

    B.    National Endowment for the Humanities ............................................. ~~48~~51

        1.    Congress Established NEH to Fund Projects to Support Humanities Research, Training, and Education ........................................... ~~48~~51

        2.    In Response to Trump Administration Directives, NEH Improperly Changed Priorities and Canceled Existing Grants ............................... ~~53~~56

        3.    NEH Plaintiffs And Other Grant Recipients Are Harmed by NEH's Illegal Grant Terminations ........................................................... ~~58~~61

            a.    Plaintiff Robert Hirst's Grant Termination and Resulting Harm ............................................................................. ~~58~~62

            b.    Plaintiff Christine Philliou's Grant Termination and Resulting Harm ......................................................................... ~~62~~66

    C.    National Science Foundation ............................................................... ~~64~~69

~~SECOND~~[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

**TABLE OF CONTENTS**
(continued)

Page

1~~1~~2. Congress Established the National Science Foundation to Promote Scientific Research on a Broad Scale to Advance the United States' National Interests ...................................................................... ~~65~~69

~~2~~3. In Response to Trump Administration Directives, NSF Improperly Changed Priorities and Canceled Existing Grants ................................ ~~69~~73

~~3~~4. NSF Plaintiff and Other Grant Recipients Are Harmed by NSF's Illegal Grant Terminations ......................................................... ~~73~~78

    a. Plaintiff Jedda Foreman's Grant Terminations and Resulting Harm ...................................................................................... ~~74~~78

D. Department of Defense .......................................................................... ~~79~~83

    1. Congress Established DOD to Create a Comprehensive Program Dedicated to Ensuring the Future Security of the United States, Including Through Research ...................................................... ~~79~~83

    2. In Response to Trump Administration Directives, DOD Improperly Changed Priorities and Canceled Existing Grants ................................ ~~84~~89

    3. DOD Plaintiff and Other Grant Recipients Are Harmed by DOD's Illegal Grant Terminations ......................................................... ~~86~~91

        a. Plaintiff Eli Berman's Grant Termination and Resulting Harm ...................................................................................... ~~86~~91

E. Department of Transportation ............................................................... ~~91~~96

    1. Congress Established DOT to Promote the Safety, Quality, and Efficiency of the Nation's Transportation Services, Including Through Research .................................................................... ~~91~~96

    2. In Response to Trump Administration Directives, DOT Improperly Changed Priorities and Canceled Existing Grants ............................ ~~96~~102

    3. DOT Plaintiff and Other Grant Recipients Are Harmed by DOT's Illegal Grant Terminations ..................................................... ~~101~~107

        b. Plaintiff Susan Handy's Grant Terminations and Resulting Harm ...................................................................................... ~~101~~107

F. Department of Health and Human Services and National Institutes of Health ...................................................................................................... ~~107~~112

    1. Congress Established NIH to Fund Medical Research on a Broad Scale to Advance Human Health and Well-Being in the United States ....................................................................................... ~~107~~113

    2. In Response to Trump Administration Directives, HHS Through NIH Improperly Changed Priorities and Canceled Existing Grants . ~~120~~125

    3. NIH Plaintiffs and Other Grant Recipients Are Harmed by NIH's Illegal Grant Terminations. ..................................................... ~~125~~130

        a. Plaintiff Marcus A. Horwitz's Grant Termination and Resulting Harm ......................................................................... ~~125~~131

        NIH TB Vaccine Grant Application and Award ................................... 131

        NIH Latent TB Treatment Grant Application and Award .................... 132

3301253.7
46686\20748993.1

~~SECOND~~[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

**TABLE OF CONTENTS**
(continued)

Page

b.    Plaintiff Alexander Van Der Bliek's Grant Termination and Resulting Harm ................................................................... ~~130~~135

c.    Plaintiff Rhonda Voskuhl's Grant Termination and Resulting Harm ................................................................... ~~132~~138

G.    The Department of Energy ................................................................... 141

    1.    Congress created the Department of Energy to promote energy research, innovation, and conservation; to promote U.S. energy independence; and to develop alternatives to fossil fuels. ...................... 141

    2.    In Response to Trump Administration Directives, DOE Improperly Changed Priorities and Canceled Existing Grants ................................ 141

    3.    DOE Terminates Funding to Awardees Exclusively in "Blue" States ................................................................................................. 143

    4.    DOE Plaintiffs and Other Grant Recipients Are Harmed by DOE's Illegal Grant Terminations ................................................................ 146

        a.    Plaintiff Plamen Atanassov's Grant Terminations and Resulting Harm ................................................................... 146

        b.    Plaintiff Louise Bedsworth's Grant Termination and Resulting Harm ................................................................... 154

~~G~~H.    Allegations Against Additional Federal Agency Defendants ...................... ~~135~~157

    1.    Department of Agriculture ................................................................. ~~135~~157

    2.    AmeriCorps ........................................................................................ ~~137~~158

    3.    Department of Education ................................................................... ~~138~~160

    ~~4.~~    ~~Department of Energy~~ ......................................................................... ~~139~~

    ~~5~~4.    Institute of Museum and Library Services ....................................... ~~140~~161

    ~~6~~5.    Department of the Interior, including National Park Service .......... ~~141~~162

    ~~7~~6.    Department of State, including USAID ........................................... ~~142~~163

V.    The Trump Administration Is Threatening Additional, Illegal Funding Cuts to the UC System ................................................................................................... ~~143~~163

VI.    Unless Enjoined, Grant Terminations Will Cause Irreparable Harm to Plaintiffs, the Class, and the Nation ................................................................................... ~~143~~164

CLAIMS FOR RELIEF ................................................................................................. ~~144~~165

COUNT I — Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions; Violation of Separation of Powers ........................................................................... ~~144~~165

COUNT II — Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions; Violation of First Amendment (Content and Viewpoint Discrimination) ............... ~~145~~166

COUNT III —Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions; Violation of Fifth Amendment (Due Process / Equal Protection) ................................. 167

COUNT IV Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions; Violation of Fifth Amendment (Due Process / Void for Vagueness) ....................... ~~146~~168

3301253.7
46686\20748993.1

**TABLE OF CONTENTS**
**(continued)**

Page

COUNT ~~IV~~ V  Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C):
    Contrary to Law; Illegal Departure from Impoundment Control Act, Statutes, and
    Regulations................................................................................................. ~~147~~169

COUNT ~~V~~ VI  Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A):
    Arbitrary and Capricious Failure to Engage in Reasoned Decision-making ........... ~~148~~170

PRAYER FOR RELIEF................................................................................................ ~~150~~172

3301253.7
46686\20748993.1

Plaintiffs, individually and on behalf of all others similarly situated, allege for their Complaint against the below-named Defendants as follows:

**INTRODUCTION**

1.      This class action for declaratory and injunctive relief is brought by and on behalf of University of California researchers whose previously approved grants from the federal agencies here named as Defendants have been or are threatened to be unlawfully terminated or suspended. These terminations and suspensions occurred pursuant to Executive Orders or other directives of Defendant President Donald J. Trump, issued from January 20, 2025 to present, that were implemented through Defendant Department of Government Efficiency ("DOGE") and then operationalized by myriad administrative agencies.

2.      Plaintiffs challenge these terminations and seek a declaration that they are unconstitutional and otherwise unlawful because they violate the bedrock constitutional principle of separation of powers; the First Amendment guarantee of free speech; the Fifth Amendment guarantee of due process; the Impoundment Control Act of 1974; statutes requiring agencies to fulfill congressionally defined missions; and the Administrative Procedure Act ("APA"). These terminations bypassed Congress, ignored or contradicted the purposes for which Congress created the granting agencies and appropriated funds, and dispensed with the regular procedures and due process afforded grantees under the APA, in implementing the Trump Administration's political "cost-cutting" agenda and ideological purity campaign.

3.      Plaintiffs seek, for themselves and the UC researchers class, an injunction that restores their lost funding, enjoins further unlawful grant terminations or suspensions, and provides the grant extensions necessary to enable them to effectively complete the work for which these grants were approved. Plaintiffs and the Class are suffering, or will imminently suffer, concrete harm to their research, their careers, and their professional standing.

4.      As used in this Complaint, "UC researchers" includes UC faculty, staff, academic appointees, and employees, across the ten-campus University of California system,

3301253.7
46686\20748993.1

1    who are or will imminently be suffering loss of research funding, research cessation or

2    interruption, or loss or reduction of employment, by the termination or suspension of

3    previously approved grants since January 20, 2025.

4         5.    Grants to UC researchers each year from federal agencies as diverse as

5    the National Science Foundation, National Institutes of Health, Department of Transportation,

6    and Food and Drug Administration, ranging from thousands to millions of dollars, fund the

7    production of new knowledge and fuel the development and deployment of discoveries useful

8    to society.

9         6.    Federal grants have been key to the innovation that has consistently

10   earned the UC system pride of place among research institutions, including first place in the

11   National Academy of Inventors' list of universities worldwide with the most utility patents[1]

12   and the UC Berkeley campus's rank of #1 public research in institution in the world for nine

13   of the past ten years.[2]

14        7.    Before President Trump took office, federal agency grant making

15   proceeded under the authority of Congress, which created agencies through its

16   constitutionally assigned exclusive legislative power, and appropriated taxpayer funds for

17   specific public purposes that the agencies were tasked to execute. For decades, agencies

18   carried out these statutory directives and observed due process in making, renewing, and (only

19   seldom) terminating grants. They each adhered to their own grant regulations, duly

20   promulgated through notice and comment rulemaking under the APA, and followed APA

21   procedures when modifying such regulations.

22        8.    As a corollary, on the rare occasions when agencies terminated grants,

23   they did so pursuant to predictable, regularized processes; based terminations on proper

---

[1] Univ. of Cal., Office of the President, *Federal Investment in UC Research 2025* (2025), https://ucop.edu/communications/_files/federal-investment-in-uc-research-2025.pdf.

[2] Public Affairs, *Times Higher Ed Ranks UC Berkeley No. 1 Public University in U.S.*, UC Berkeley News (Oct. 9, 2024), https://news.berkeley.edu/2024/10/09/times-higher-ed-ranks-uc-berkeley-no-1-public-university-in-u-s/#:~:text=Berkeley%20has%20held%20the%20ranking,industry%20engagement%20and%20international%20outlook.

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

review and evaluation of grantees' activities to assure compliance with the terms and purpose of the awarded grants; and terminated grants only for reasons stated in applicable regulations.

9.     All of this changed abruptly on January 20, 2025, when Defendant Trump attempted to seize direct control of federal agencies by bypassing Congress and upending the statutory and regulatory system under which federal agencies have historically and legally operated.

10.     On and after January 20, 2025, Defendants Trump and DOGE, through a flurry of Executive Orders and other directives, commanded the federal agencies named as Defendants in this Complaint ("Federal Agency Defendants") to terminate thousands of previously awarded research grants.

11.     Abrupt, wholesale, and unilateral termination of these grants has violated the Constitution's core principle of separation of powers and its guarantees of freedom of speech and due process; flouted the Impoundment Control Act limits on the Executive's ability to withhold or redirect congressionally appropriated money; ignored statutory requirements that agencies fulfill their substantive missions and fund congressionally specified activities; contravened agency-specific grant-making regulations that cannot by law be revised on an abrupt, unexplained, chaotic basis; and violated the APA through this arbitrary, capricious, and *ultra vires* conduct.

12.     The "Wall of Receipts" on the DOGE website boasts that federal agencies have terminated over 15,000 grants pursuant to DOGE's directions to date, reflecting terminations on a mass scale.[3]

13.     Agencies' proffered grounds for such terminations—if grounds were stated at all—were spurious. In some cases, agency correspondence to grantees asserted that grant termination would reduce public costs and promote government efficiency, although no evidence was provided to support this claim. In other cases, agency communications made it

---

[3] Department of Government Efficiency, *Wall of Receipts*, DOGE.gov, https://doge.gov/savings (last visited May 30, 2025). While of questionable accuracy, the data displayed on the DOGE website demonstrate the Trump/DOGE objective: massive cuts to already appropriated and approved grants, without regard to merit.

clear that grants were being terminated to further Defendant Trump's political objectives, which included the elimination of research on climate, environmental justice, "gender ideology," and "DEI" (diversity, equity, and inclusion), although the latter terms were not defined.

14.     The agencies that terminated grants did so on a categorical, *en masse* basis, without individual review or regard to a project's merit or a grantee's progress, and without any semblance of due process. The terminated and threatened grants that are the subject of this action were not terminated because they violated the terms of their grant applications or grant approvals, or strayed from the subject matter or purpose for which they were funded. Such deficiencies could have been addressed in the normal and ordered course of grant-making and review. To the contrary: these grant terminations were and are occurring, as their timing and reflection of the 2025 Executive Orders demonstrates, not because the research for which funding was approved had departed from its originally approved purpose, but because that purpose now offends the political agenda and ideological requirements of the Trump Administration.

15.     Plaintiffs do not seek an Order immunizing all grants from termination or review, or changing agency grantmaking procedures as they existed prior to January 20, 2025. They do seek a return to the *status quo ante* of ordered grant processes, aligned with congressionally authorized purposes, and affording due process to grant recipients. This return to procedures that prevailed prior to January 20, 2025, and conformed to the norms of due process and the APA, by federal agencies that defer not to unilateral Executive dictates but to congressional authority, is the essential relief Plaintiffs seek.

16.     Examining similar unlawful executive branch conduct by Defendants Trump and DOGE in the attempted reorganization (and gutting) of entire agencies, and the mass termination of hundreds of thousands of federal employees, the United States District Court (Illston, J.) stated in its May 22, 2025 Order Granting Preliminary Injunction in *American Federation of Government Employees*, *AFL-CIO v. Trump*, Case No. 25-cv-03698-

51 (Dkt. 124. 784 F. Supp. 3d 1316 (May 22, 2025), *vacated and remanded by Am. Fed'n of Gov't Emps. v. Trump*, __ F.4th __, 2025 WL 2716266 (Sept. 19, 2025)):

> Presidents may set policy priorities for the executive branch, and agency heads may implement them. This much is undisputed. But Congress creates federal agencies, funds them, and gives them duties that—by statute—they must carry out. Agencies may not conduct large-scale reorganizations and reductions in force in blatant disregard of Congress' mandates, and a President may not initiate large-scale executive branch reorganization without partnering with Congress. For this reason, nine Presidents over the last one hundred years have sought and obtained authority from Congress to reorganize the executive branch. Other Presidents—including President George W. Bush, President Obama, and President Trump in his first term—asked Congress for agency reorganization authority but did not receive it.

17.    In denying Defendants' request for a stay of the preliminary injunction in that case, the Ninth Circuit reaffirmed the bedrock principles that administrative agencies are creatures of Congress, not the President, and that "Congress has plenary control over the salary, duties, and even existence of federal offices." *Am. Fed'n of Gov't Emps. v. Trump*, — 139 F.4th— 1020, 1033 (May 30, 2025) (citing *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477,500 (2010)).

18.    Here, Defendants have engaged in the same unprecedented and unlawful overreach described and enjoined above, in the context of mass terminations of research grants. Their playbook involves a trifecta of illegal moves. First, Defendant Trump issued facially unconstitutional Executive Orders and directives that usurped congressional authority and unlawfully discriminated against disfavored speech. Second, acting on presidential instruction, Defendant DOGE commanded agencies to adopt Trump's policies as their own by terminating scores of already awarded grants, notwithstanding that DOGE (whose own status as a governmental entity remains unclear) lacks legal authority to supervise administrative agencies. Third and finally, Federal Agency Defendants terminated grants on the stated basis that they were inconsistent with *agency priorities*, or otherwise in tension with Executive Orders and directives, when in fact the grants' inconsistency was with *executive*

*preferences*. In so doing, agencies violated their statutory mandates, the APA, the constitutional Due Process guarantee, and their own regulations.

19.    Plaintiff UC researchers have suffered concrete financial, professional, and other harms from Federal Agency Defendants' unilateral termination of grants for projects to which they have already dedicated time and effort; for research upon which they have staked careers and reputations; and for work with research teams through which they endeavored to train a next generation. Without judicial relief, these researchers will suffer irreparable injury to their research and their careers.

20.    As profoundly, these terminations have impaired and will impair the public-serving research mission of the UC system and the concern for public welfare that undergirds it.

21.    All of the Defendants' conduct, and the Plaintiffs' and Class members' resulting harm, proceeds directly from Defendant Trump's determination to erase the constitutional boundaries that separate the branches of government and assign defined powers to each. Specifically, the mass termination of federal agency grants that is the subject of this action proceeds from Defendant Trump's efforts to arrogate the law-making powers of Congress to himself.

22.    Plaintiffs and the Proposed Class will continue to suffer harm on an ongoing basis and will experience increasing and irreparable harm absent the declaratory and injunctive relief here sought.

## **JURISDICTION AND VENUE**

23.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the United States Constitution, federal statutes, and the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*., and 5 U.S.C. §§ 702, 704. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705-06.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are officers and agencies of the United States served in their official capacities, no real property is at issue in this case, and ~~the~~many Plaintiffs and ~~many~~ members of the Proposed Class are citizens of California and are residents of this District, where many of the federal grant terminations that are the subject of this suit, and the resulting harms to Plaintiffs and the Class, have occurred and will continue to occur unless enjoined.

## THE PARTIES

### A.     Plaintiffs

25.     Individual Plaintiff and Class Representative Neeta Thakur is a citizen of the United States and the State of California, and a member of the faculty at the University of California, San Francisco ("UCSF"), who engages in research. She resides in the Northern District of California.

26.     Individual Plaintiff and Class Representative Ken Alex is a citizen of the United States and the State of California, and has an academic appointment as a researcher at the University of California, Berkeley ("UC Berkeley"). He resides in the Northern District of California.

27.     Individual Plaintiff and Class Representative Robert Hirst is a citizen of the United States and the State of California, and has an academic appointment as a researcher at the Bancroft Library at UC Berkeley. He resides in the Northern District of California.

28.     Individual Plaintiff and Class Representative Christine Philliou is a citizen of the United States and the State of California, and a member of the faculty at UC Berkeley who engages in research. She resides in the Northern District of California.

29.     Individual Plaintiff Nell Green Nylen is a citizen of the United States and the State of California, and has an academic appointment as a researcher at UC Berkeley. She resides in the Northern District of California.

30.     Individual Plaintiff and Class Representative Jedda Foreman is a citizen of the United States and the State of California, and has an academic appointment as a researcher at UC Berkeley. She resides in the Northern District of California.

31.     Individual Plaintiff and Class Representative Eli Berman is a citizen of the United States and the State of California, and has an academic appointment as a researcher at the University of California, San Diego. He resides in San Diego County.

32.     Individual Plaintiff and Class Representative Susan Handy is a citizen of the United States and the State of California, and a member of the faculty at the University of California, Davis. She resides in Yolo County.

33.     Individual Plaintiff and Class Representative Marcus Horwitz is a citizen of the United States and the State of California, and a member of the faculty at the University of California, Los Angeles ("UCLA"), who engages in research. He resides in the Central District of California.

34.     Individual Plaintiff and Class Representative Alexander van der Bliek is a citizen of the United States and the State of California, and a member of the faculty at UCLA, who engages in research. He resides in the Central District of California.

35.     Individual Plaintiff and Class Representative Rhonda Voskuhl is a citizen of the United States and the State of California, and a member of the faculty at UCLA, who engages in research. She resides in the Central District of California.

36. Individual Plaintiff and Class Representative Plamen Atanassov is a citizen of the United States, a resident of the State of California, and a member of the faculty at UC Irvine, who engages in research. He resides in the Central District of California.

37. Individual Plaintiff and Class Representative Louise Bedsworth is a citizen of the United States, a resident of the State of California, and a member of the faculty at UC Berkeley, who engages in research. She resides in the Northern District of California.

B.    **Defendants**

38. 36. Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

39. 37. Defendant Department of Government Efficiency ("DOGE") is a federal agency headquartered in Washington, D.C. DOGE is a federal agency within the

SECOND[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    meaning of the APA, 5 U.S.C. §551(1). Upon information and belief, DOGE is now headed

2    by Defendant Trump and every member of his cabinet.

3        40. 38. Defendant Amy Gleason is the Acting Administrator of DOGE and is

4    sued in her official capacity.

5        41. 39. The following federal departments and agencies, including their

6    identified leaders, are sometimes referred to collectively herein as the "Federal Agency

7    Defendants."

8        42. 40. Defendant National Science Foundation ("NSF") is a federal agency

9    headquartered in Alexandria, Virginia. NSF is a federal agency within the meaning of the

10    APA, 5 U.S.C. § 551(1).

11        43. 41. Defendant Brian Stone is Acting Director of NSF and is sued in his

12    official capacity.

13        44. 42. Defendant National Endowment for the Humanities ("NEH") is a

14    federal agency headquartered in Washington, D.C. NEH is a federal agency within the

15    meaning of the APA, 5 U.S.C. § 551(1).

16        45. 43. Defendant Michael McDonald is Acting Chairman of NEH and is sued

17    in his official capacity.

18        46. 44. Defendant United States Environmental Protection Agency ("EPA") is

19    a federal agency headquartered in Washington, D.C. EPA is a federal agency within the

20    meaning of the APA, 5 U.S.C. § 551(1).

21        47. 45. Defendant Lee Zeldin is the Administrator for the EPA and is sued in

22    his official capacity.

23        48. 46. Defendant United States Department of Agriculture ("USDA") is a

24    federal agency headquartered in Washington, D.C. USDA is a federal agency within the

25    meaning of the APA, 5 U.S.C. § 551(1).

26        49. 47. Defendant Brooke Rollins is Secretary of USDA and is sued in her

27    official capacity.

28

50. 48. Defendant AmeriCorps, also known as the Corporation for National and Community Service, is a federal agency headquartered in Washington, D.C. AmeriCorps is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

51. 49. Defendant Jennifer Bastress Tahmasebi is Interim Agency Head of AmeriCorps and is sued in her official capacity.

52. 50. Defendant United States Department of Defense ("Defense") is a federal agency headquartered in Washington, D.C. Defense is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

53. 51. Defendant Pete Hegseth is Secretary of Defense and is sued in his official capacity.

54. 52. Defendant United States Department of Education ("Education") is a federal agency headquartered in Washington, D.C. Education is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

55. 53. Defendant Linda McMahon is Secretary of Education and is sued in her official capacity.

56. 54. Defendant United States Department of Energy ("DOE") is federal agency headquartered in Washington, D.C. DOE is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

57. 55. Defendant Chris Wright is Secretary of DOE and is sued in his official capacity.

58. 56. Defendant United States Department of Health and Human Services ("HHS") is a federal agency headquartered in Washington, D.C. HHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

59. 57. Defendant Robert F. Kennedy, Jr. is Secretary of HHS and is sued in his official capacity.

60. 58. Defendant United States Centers for Disease Control ("CDC"), housed within HHS, is federal agency headquartered in Atlanta, Georgia. CDC is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

61. 59. Defendant Matthew Buzzelli is Acting Director of CDC and is sued in his official capacity.

62. 60. Defendant United States Food and Drug Administration ("FDA"), housed within HHS, is a federal agency headquartered in Silver Spring, Maryland. FDA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

63. 61. Defendant Martin Makary is Commissioner of the FDA and is sued in his official capacity.

64. 62. Defendant United States Institutes of Health ("NIH"), housed within HHS, is federal agency headquartered in Bethesda, Maryland. NIH is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

65. 63. Defendant Jayanta Bhattacharya is Director of NIH and is sued in his official capacity.

66. 64. Defendant Institute of Museum and Library Services ("IMLS") is a federal agency headquartered in Washington, D.C. ILMS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

67. 65. Defendant Keith Sonderling is Acting Director of IMLS and is sued in his official capacity.

68. 66. Defendant United States Department of the Interior ("Interior or DOI") is a federal agency headquartered in Washington, D.C. Interior is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

69. 67. Defendant Doug Burgum is Secretary of the Interior and is sued in his official capacity.

70. 68. Defendant United States Department of State ("State") is a federal agency headquartered in Washington, D.C. State is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

71. 69. Defendant Marco Rubio is Secretary of State and is sued in his official capacity.

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

72. 70. Defendant Department of Transportation ("DOT") is a federal agency headquartered in Washington, D.C. DOT is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

73. 71. Defendant Sean Duffy is Secretary of DOT and is sued in his official capacity.

**CLASS ALLEGATIONS**

74. 72. Neeta Thakur, Ken Alex, Nell Green Nylen, Robert Hirst, Christine Philliou, Jedda Foreman, Eli Berman, and Susan Handy, Marcus Horwitz, Alexander van der Bliek, Rhonda Voskuhl, Plamen Atanassov, and Louise Bedsworth ("Plaintiffs" or "Class Representatives") bring this action as a class action for declaratory and injunctive relief pursuant to Federal Rule of Civil Procedure 23(a)(1)-(4) and 23(b)(2). They bring this suit on behalf of themselves and all similarly situated University of California researchers whose federally funded grants have been or will be imminently terminated or suspended by Defendants absent (a) a declaratory judgment that such Executive Orders and directives are illegal; and (b) injunctive relief enjoining further terminations and restoring the terminated grants to enable class members to complete their interrupted work. These Class Representatives seek certification of two classes, as defined by the Court in her Order Granting Motion for Preliminary Injunction and Provisional Class Certification (ECF 54), modified to include the additional Federal Agency Defendants that terminated Plaintiff Berman's and Plaintiff Handy's grants:

75. On June 23, 2025, the Court ordered that a preliminary injunction be entered as to two classes. Dkt. 55.

The Form Termination Class consists of:

All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants by the EPA, NSF, or NEH (or their sub-agencies) that are terminated by means of a form termination notice that does not provide a grant-specific explanation for the termination that states the reason for the change to the original award decision and considers the reliance interests

at stake, from and after January 20, 2025.

Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.

The Equity Termination Class consists of:

All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants by the EPA, NEH, NSF, DOD, or DOTNEH (or their sub-agencies) that are terminated pursuant to Executive Orders 14151 or 14173, from and after January 20, 2025.

Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.

76. On September 22, 2025, the Court ordered that a second preliminary injunction be entered as to two classes. Dkt. 134.

The Second Form Termination Class consists of:

All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants by the EPA, NEH, NSF, DOD, or DOTon behalf of, DoD, DoT, and NIH (or their sub-agencies) that are terminated by means of a form termination notice that does not provide a grant-specific explanation for the termination that states the reason for the change to the original award decision and considers the reliance interests at stake, from and after January 20, 2025.

Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.

The Second Equity Termination Class consists of:

All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants by, or on behalf of, DoT (or its sub-agencies) that are terminated pursuant to Executive Orders 14151 or 14173 from and after January 20, 2025.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1     Excluded from the class are Defendants, the judicial officer(s)
      assigned to this case, and their respective employees, staffs, and
2     family members.

3

4          77. Plaintiffs seek a Third Form Termination Class consistent with the Court's

5     Order Granting Motion for Preliminary Injunction and Provisional Class Certification (Dkt.

6     54) and Order Granting Plaintiffs' Motions for Preliminary Injunction and Provisional Class

7     Certification as to Additional Agency Defendants, As Modified (Dkt. 133):

8          The Third Form Termination Class consists of:

9          All University of California researchers, including faculty, staff,
           academic appointees, and employees across the University of
10         California system who are named as principal researchers,
           investigators, or project leaders on the grant applications for
11         previously awarded research grants by the DOE that are terminated
           by means of a form termination notice that does not provide a
12         grant-specific explanation for the termination that states the reason
           for the change to the original award decision and considers the
13         reliance interests at stake, from and after January 20, 2025.

14         Excluded from the class are Defendants, the judicial officer(s)
           assigned to this case, and their respective employees, staffs, and
15         family members.

16         78. Plaintiffs further seek a new Equal Protection Termination Class relating to

17    DOE terminations that violate the equal protection guarantee provided in the Due Process

18    Clause of the Fifth Amendment:

19         All University of California researchers, including faculty, staff,
           academic appointees, and employees across the University of
20         California system who are named as principal researchers,
           investigators, or project leaders on the grant applications for
21         previously awarded research grants by the DOE that were included
           in the 314 grants that DOE terminated on or around October 2,
22         2025, which Plaintiffs allege was done in violation of the equal
           protection guarantee of the Fifth Amendment.

23
           Excluded from the class are Defendants, the judicial officer(s)
24         assigned to this case, and their respective employees, staffs, and
           family members.

25

26         79. 73. This action meets all of the Rule 23(a) prerequisites for maintaining a

27    class action. The Plaintiff Class is so numerous that individual joinder of all its members is

28    impracticable, satisfying Rule 23(a)(1). The ten-campus UC System has more than 265,000

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

faculty and staff,[4] hundreds to thousands of whom conduct billions of dollars of federally funded research annually. In 2024, for example, UC Berkeley researchers alone received nearly $1 billion in new research grants. Of this amount, 51% (approximately $420 million), came from federal grants. On this single campus, as of May 15, 2025, there were more than 2,000 open federal research grants (*i.e.,* ones whose termination date has not arrived). Many of these have now been terminated, suspended, or face imminent termination by the unlawful actions of Defendants. Plaintiffs do not yet know the exact number of the UC researchers whose work has been terminated or imminently threatened by the Defendants' conduct at issue in this suit, but are informed and believe that hundreds or thousands of researchers' grants and work, and their research staff's jobs, have been and will be impacted by such conduct. For example, the National Science Foundation (NSF) published a list of terminated grants that includes nearly 80 grants terminated across the UC System by *NSF alone*; a quick review of the terminated grants suggests terminations occurred because the grant titles contain now-suspect DEI-related words such as "equity."[5] A preliminary list of over 30 terminated grants across several federal agencies at UC Berkeley shows the same pattern. Further, databases compiled by news media and nonprofits have also identified over 100 National Institutes of Health (NIH) grants made to UCSF, UC Los Angeles, and UC San Diego researchers that have since been terminated.[6]

80. 74. The claims of the Plaintiff Class members share important and indeed pivotal common questions of law and fact, including but not limited to whether the Defendants' actions pursuant to the Executive Orders and directives described in this Complaint are unconstitutional and unlawful exercises of executive power, because they

---

[4] Univ. of California, *About Us*, https://www.universityofcalifornia.edu/about-us#:~:text=The%20University%20of%20California%20opened,and%20working%20around%20the%20world. (last visited May 28, 2025).

[5] NSF, *Is there a publicly available list of the awards NSF has terminated?*, https://www.nsf.gov/updates-on-priorities#termination-list (last updated May 23, 2025).

[6] Irena Hwang et al., *The Gutting of America's Medical Research: Here is Every Canceled or Delayed N.I.H. Grant*, N.Y. Times (June 4, 2025), https://www.nytimes.com/interactive/2025/06/04/health/trump-cuts-nih-grants-research.html?smid=nytcore-ios-share&referringSource=articleShare.

usurp Congress's spending authority and also violate the Impoundment Control Act of 1974; whether Defendants' actions are further unconstitutional because they violate Plaintiff Class members' First Amendment right to free speech and Fifth Amendment right to due process; whether they are further unlawful because they violate statutes through which Congress has created the defendant agencies and determined their purposes, functions, and goals, and additional statutes through which Congress gives agencies substantive instruction, usurping Congress's legislative authority; and whether Defendants' actions are arbitrary and capricious, an abuse of discretion, or otherwise contrary to law, in violation of the APA.

81. 75. Because the claims of the Plaintiff Class members share common issues of law and fact, they will not require individualized determinations of the circumstances of any plaintiff, and satisfy Rule 23(a)(2) for purposes of the requested declaratory and injunctive relief.

82. 76. The claims of the Class Representatives are typical of the claims of the members of the Plaintiff Class, because they arise out of the Defendants' common conduct, satisfying Rule 23(a)(3). Like other members of the class, the Class Representatives have been concretely harmed, economically, professionally, and reputationally, by Defendants' arbitrary, capricious, and unlawful actions in categorically terminating or delaying their research grants under color of Defendant Trump's Executive Orders and/or at the direction of DOGE. The timing and sheer volume of these terminations (DOGE boasts of over 15,0000 such terminations of grants nationwide in the space of less than 100 days) shows that these determinations were without due process or due regard for the individual merits, scientific importance, or public benefit of the projects affected. Class Representatives and the Plaintiff Class have been similarly and further harmed by Defendants' failure to adequately explain their actions and decisions. Each of these actions, independently and collectively, have caused harm to the Class Representatives and the Plaintiff Class members.

83. 77. The Class Representatives will fairly and adequately protect the interests of the Plaintiff Class, satisfying Rule 23(a)(4). They will defend the rights of all proposed class members fairly and adequately, and have no interest that is now or may be

potentially antagonistic to the interests of the Plaintiff Class. The attorneys representing the Plaintiff Class Representatives include constitutional, civil rights, environmental, and administrative law experts and litigators with decades of experience in their respective fields, and class action attorneys with similar experience and scores of court appointments as class counsel in federal litigation. These attorneys may and should be appointed as class counsel in this action.

84. 78. The members of the Plaintiff Class are readily ascertainable through Defendants' own grant records, and the grant-related communications they have issued to Class members pursuant to Executive Orders and/or at the direction of the Trump Administration and/or DOGE.

85. 79. Through federal research grant cancellations, suspensions, and delays imposed categorically, pursuant to Executive Orders or other Trump Administration directives, in violation of the APA, and in violation of other statutes and the Constitution as alleged in this Complaint, Defendants have acted, have threatened to act, and will continue to act on grounds generally applicable to the Plaintiff Class, thereby making final equitable and declaratory relief appropriate to the Class as a whole. The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(2).

86. 80. Numerous individual lawsuits alleging similar conduct and claims would disserve the interests of judicial economy, as well as the interests of litigants and the public in the just, speedy, and inexpensive determination of these claims.

**FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS**

I.     **Throughout Decades of Federal Funding, the UC System Has Made Leading Contributions to Research that Benefit the Public**

87. 81. The University of California (the "UC System") is the world's leading public research institution. Comprised of ten campuses, three affiliate national laboratories, and dozens of institutes, centers, and research laboratories across California, the UC System has made—and continues to make—outsize contributions to research that have changed the

world, and enhanced human knowledge, while contributing to the national security and global prominence of the United States, and the health and welfare of all Americans.

88. 82. Without the UC System's research, for example, the world would not have the internet,[7] plug-in hybrid cars,[8] or the world's largest 3-D map of the universe.[9]

89. 83. In the medical realm, UC System research has led to development of MRI machines,[10] cochlear implants that restore hearing,[11] a universal viral vaccine,[12] a brain implant that prevents Parkinson's symptoms,[13] and the use of CRISPR gene-editing to cure sickle cell disease.[14] In the past 30 years, decades of UC cancer research has saved nearly 4 million lives.[15]

---

[7] Pranay Bhattacharyya, *UCLA: Birthplace of the Internet*, US Tech News (April 28, 2021), https://uctechnews.ucop.edu/ucla-birthplace-of-the-internet/#:~:text=ARPANET%3A%20 The%20Beginning,first%20two%20letters%20were%20sent.

[8] USPath Center, *4 Unexpected Discoveries from UC*, UCPath Jobs, https://ucpathjobs.org/lifestyle/4-unexpected-discoveries-uc/ (last visited May 27, 2025).

[9] Michael Levi, *First Results from DESI Make the Most Precise Measurement of Our Expanding Universe*, Berkeley Lab News Center (April 4, 2024), https://newscenter.lbl.gov/2024/04/04/desi-first-results-make-most-precise-measurement-of-expanding-universe/.

[10] Kara Manke, *Jerome R. Singer, pioneer of magnetic resonance imaging, dies at 97*, US Berkeley News (August 6, 2019), https://news.berkeley.edu/2019/08/06/jerome-r-singer-pioneer-of-magnetic-resonance-imaging-dies-at-97/#:~:text=Jerome%20R.-,Singer%2C%20pioneer%20of%20magnetic%20resonance %20imaging%2C%20dies%20at%2097,and%20blood%20volume%20in%20mice.

[11] Pete Farley, *Neuroscientist Wins Prize for Cochlear Implant Contributions*, University of California (January 8, 2015), https://www.universityofcalifornia.edu/news/neuroscientist-wins-prize-cochlear-implant-contributions.

[12] Jules Bernstein, *Vaccine Breakthrough Means No More Chasing Strains*, University of California, Riverside (April 15, 2024), https://news.ucr.edu/articles/2024/04/15/vaccine-breakthrough-means-no-more-chasing-strains.

[13] Robin Marks, *New Parkinson's Treatment Helps Former Pro Keep Skateboarding*, U. of Cal. San Francisco (Apr. 19, 2024), https://www.ucsf.edu/news/2024/04/427391/new-parkinsons-treatment-helps-former-pro-keep-skateboarding.

[14] Robert Sanders, *FDA Approves First Test of CRISPR to Correct Genetic Defect Causing Sickle Cell Disease*, University of California (Apr. 1, 2021), https://www.universityofcalifornia.edu/news/fda-approves-first-test-crispr-correct-genetic-defect-causing-sickle-cell-disease.

[15] Julia Busiek, *What Cuts to NIH Funding Mean for Cancer Patients and Their Families*, University of California (Feb. 26, 2025), https://www.universityofcalifornia.edu/news/what-cuts-nih-funding-mean-cancer-patients-and-their-families.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

90. 84. The UC System has produced 70 Nobel Prize winners, 101 MacArthur "Genius" grant award winners, 66 National Medal of Science winners, and 42 Pulitzer Prize winners.[16] Since 2013, the UC System has topped the National Academy of Inventors' list of universities worldwide with the most utility patents.[17]

91. 85. Through continual development of new technologies, UC research stimulates the economy by creating jobs, companies, industries, and scientific advancements that continue to change the world. Entire industries have grown out of UC research, including biotechnology, computing, semiconductors, telecommunications, and agriculture.[18]

92. 86. UC research prowess has continued at breakneck speed. The UC System averages four new inventions *per day*. In 2023, 78 startups were launched using UC intellectual property or technology.[19] UC research quite literally shapes the future: 8.2% of all U.S. academic research is conducted by UC researchers.[20]

93. 87. Such achievements would not be possible without federal funding. For years, the UC System has partnered with the federal government to deliver groundbreaking innovations that have made the American public healthier, safer, smarter, and better able to compete in a global market.

94. 88. Federal funding is the single most important source of UC research funding, historically accounting for more than half of the UC System's total research awards.[21] In fiscal year 2024, the UC System received $4.069 *billion* in federal research awards. This covered 10,256 distinct awards.[22]

---

[16] Univ. of Cal., *The University of California at a Glance*, Univ. of Cal. (Feb. 25, 2025), https://ucop.edu/institutional-research-academic-planning/_files/uc-facts-at-a-glance.pdf.
[17] Univ. of Cal., *Federal Investment in UC Research,* Univ. of Cal. (Apr. 2025), https://ucop.edu/communications/_files/federal-investment-in-uc-research-2025.pdf.
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    95. 89. The UC System receives more National Institutes of Health ("NIH")

2    and National Science Foundation ("NSF") funding than any other institution.[23] And these are

3    far from the only agencies to offer significant support to UC research.

4    96. 90. In fiscal year 2024, the UC System received approximately the

5    following amounts by agency:[24]

6    • $2.54 billion – NIH

7    • $525 million – NSF

8    • $326 million – Defense

9    • $160 million – Energy

10    • $122 million – other HHS

11    • $104 million – NASA

12    • $86 million – USDA

13    • $68 million – Commerce

14    • $39 million – Interior

15    • $27 million – Education

16    • $20 million – State

17    • $47 million – other agencies

18    97. 91. These stable federal funding sources, and the research talent they attract

19    and empower, have enabled the UC System to make its outsize contributions to human

20    progress for decades. Because the very nature of research requires years of ongoing work, the

21    UC system has operated research programs across presidential administrations for

22    generations.

23    98. 92. The innovations described above are the result of a successful

24    partnership between the UC System and the federal government, and indeed would be

25    impossible if federal grant funding were terminated.

26

27

28

---

[23] *Id.*

[24] *Id.*

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

99. 93. This research, of course, is carried out by faculty members and other research personnel in the UC system. These individuals' careers—their hiring, their tenure, their advancement—all depend on research that is often supported by federal grants.

## II. Congress's Power of the Purse Makes Illegal the Mass Termination of Grants at the President's Direction

100. 94. The partnership between the UC System and the federal government is a product of Congress's powers, and by design insulated from political winds in the executive branch. Congress has repeatedly emphasized the importance of federally funded research as critical to the strength and security of the nation, and has used its powers to set research priorities and appropriate funds to federal agencies to carry out those priorities.

101. 95. Congress has the constitutional power to appropriate funds for such research and to create agencies necessary to implement federal policies. Article I vests Congress with the legislative power to create departments, agencies, and offices within the executive branch, to define their duties, and to fund their activities. U.S. Const. art. I, §1 ("All legislative Powers herein granted shall be vested in a Congress of the United States.").

102. 96. Congress's legislative power includes "the establishment of offices… [and] the determination of their functions." *Myers v. United States*, 272 U.S. 52, 129 (1926); U.S. Const. art I, § 8, cl. 18. "Administrative agencies are creatures of statute," and do not exist or have purpose without Congress's direction. *See Nat'l Fed'n of Indep. Bus v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022). Congress thus establishes executive agencies and crafts the statutes that govern each agency's administration. *See, e.g.*, 10 U.S.C. §§ 111, 113 (Defense); 16 U.S.C. § 551 (Agriculture); 42 U.S.C. §§ 202, 203 (HHS); 42 U.S.C. §§ 218, 282 (NIH); 42 U.S.C. § 7131 (Energy).

103. 97. Congress also holds the power of the federal purse. Indeed, Congress's powers to set the policies of the nation are at their apex when it comes to spending money, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

3301253.7
46686\20748993.1

1    Congress makes its priorities clear by appropriating funds to agencies to carry out specified

2    activities.

3    104.    98. The Constitution requires the President, meanwhile, to "take Care

4    that the Laws be faithfully executed." U.S. Const., art. II, § 3. The "Take Care Clause"

5    assures that "Congress makes the laws and the President faithfully executes them." *Utility Air*

6    *Reg. Grp. v. Envtl. Prot. Agency*, 573 U.S. 302, 327 (2014) (cleaned up). This includes

7    ensuring the appropriation of funds per Congress's direction.

8    105.    99. The executive branch has *no* constitutional authority to refuse to

9    carry out laws enacted by Congress, and it has no constitutional authority to block, amend,

10   subvert, or delay spending appropriated monies based on the President's own policy

11   preferences. For nearly two hundred years, it has been established that the Executive violates

12   the Take Care Clause when it ignores, refuses to execute, or purports to override statutes.

13   *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838).

14   106.    100. A President's Executive Order cannot override Congress's express

15   direction. The President "is without authority to set aside congressional legislation by

16   executive order." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir.

17   1999). Rather, the "President's power, if any, to issue [an] order must stem from either an act

18   of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343

19   U.S. 579, 585 (1952).

20   107.    101. The President has no power to order the rescission of funds. If the

21   President wants funds rescinded, he may *ask* Congress to do so pursuant to the Impoundment

22   Control Act ("ICA"), 2 U.S.C. § 681 *et seq.* Under the ICA, the President can "transmit to

23   both Houses of Congress a special message specifying," among other criteria, the amount of

24   budget authority he proposes be rescinded, the reasons why it should be rescinded, and the

25   effect of the proposed rescission on the "objects, purposes, and programs for which the budget

26   authority is provided." *Id.* § 683(a). Unless Congress passes a rescission bill that covers the

27   President's request within 45 days, however, the funds shall be made available. *Id.* § 683(b).

28

108. ~~102.~~ Even under the ICA—which clearly states it cannot interfere with the Constitutional separation of powers, § 681(1)—the President is constrained. His requests for rescission cannot "supersed[e] any provision of law which *requires* the obligation of budget authority or the making of outlays." 2 U.S.C. § 681 (emphasis added). Nor can the President request reductions of *already obligated* funds, including grants. *See id.* § 683; Congressional Budget Office, *CBO Explains How It Estimates Savings From Rescissions* (May 26, 2023), https://www.cbo.gov/publication/59209 (explaining a rescission will not impact funds that are obligated).

109. ~~103.~~ In short, once Congress has allocated money for grants or directed agencies to use funding to carry out research, the President cannot unilaterally refuse to spend or to redirect such funds. Nor can agency leaders, substituting the President's directives for Congress's, terminate without lawful cause grants that were awarded pursuant to congressional directives. Such refusal to spend money appropriated by Congress violates both the separation of powers and the Impoundment Control Act.

### III. President Trump Issues a Flurry of Executive Orders and Creates DOGE, Unlawfully Directing Agencies to Terminate Grants

110. ~~104.~~ Beginning on Inauguration Day (January 20, 2025), Defendant Trump issued a number of broad directives through Executive Orders (EOs). These included demands on federal agencies to take action to comply with the President's agenda.

111. ~~105.~~ In particular, Defendant Trump and his administration explicitly and implicitly called on federal agencies to "terminate" previously awarded grant funds. In so doing, the Administration did not comply with Congress's prior spending decisions and direction.

112. ~~106.~~ For example, Executive Order No. 14151, dated January 20, 2025 and titled "Ending Radical and Wasteful Government DEI Programs and Preferencing," instructs the Attorney General and others to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under

whatever name they appear." Additionally, it directs each federal agency head to "terminate, to the maximum extent allowed by law… all 'equity-related' grants or contracts" within 60 days.[25]

113.  107. EO No. 14173, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," addresses purported "immoral race- and sex-based preferences under the guise of so-called [DEI] or [DEIA]." The order requires the Director of OMB to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing  equity,' and like mandates, requirements, programs, or activities, as appropriate."[26]

114.  108. On January 20, 2025, Defendant Trump also issued EO No. 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," directing that "federal funds shall not be used to promote gender ideology," instructing federal agencies to revise grant conditions accordingly, and defining "gender ideology" as a "false claim" that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity," and that "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex."

115.  109. On January 20, 2025, Defendant Trump further issued EO No. 14154, "Unleashing American Energy," which directed federal agencies to "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58)."

---

[25] Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025), https://www.federalregister.gov/documents/2025/01/29/2025-01953/ending-radical-and-wasteful-government-dei-programs-and-preferencing.

[26] Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633, (Jan. 21, 2025), https://www.federalregister.gov/documents/2025/01/31/2025-02097/ending-illegal-discrimination-and-restoring-merit-based-opportunity.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

The EO called out specific grant programs, and more generally, directed the agencies to "review their processes, policies, and programs for issuing grants."[27]

116. 110. On February 19, 2025, Defendant Trump issued EO No. 14217, "Commencing the Reduction of the Federal Bureaucracy." The EO deemed several government entities "unnecessary," and directed that any non-statutory components or functions be "eliminated." The Order also stated that any "grant requests" by these entities should be denied.[28]

117. 111. On March 14, 2025, Defendant Trump issued EO No. 14238, "Continuing the Reduction of the Federal Bureaucracy." This order listed additional entities determined by Defendant Trump to be "unnecessary," and again directed that grant requests be rejected.[29]

118. 112. Moreover, to force agencies into complying with his personal agenda, Defendant Trump signed EO No. 14158 on January 20, 2025, "Establishing and Implementing the President's 'Department of Governmental Efficiency,'" commonly known as "DOGE." The EO required the head of each federal agency to establish a team of at least four DOGE employees within their agency.[30]

119. 113. According to the Order, DOGE would be "dedicated to advancing the President's 18-month DOGE agenda." *Id.* Although the "DOGE agenda" has never been publicly disclosed, DOGE's targets for ostensible "efficiency" improvements have, in practice, born considerable resemblance to the Executive agenda manifest in Defendant Trump's EOs.

---

[27] Exec. Order No. 14154, *Unleashing American Energy*, 90 Fed. Reg. 8353 (Jan. 29, 2025), https://www.federalregister.gov/documents/2025/01/29/2025-01956/unleashing-american-energy.

[28] Exec. Order No. 14217, *Commencing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 10577 (Feb. 25, 2025), https://www.federalregister.gov/documents/2025/02/25/2025-03133/commencing-the-reduction-of-the-federal-bureaucracy.

[29] Exec. Order No. 14238, *Continuing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 13043 (Mar. 20, 2025), https://www.federalregister.gov/documents/2025/03/20/2025-04868/continuing-the-reduction-of-the-federal-bureaucracy.

[30] Exec. Order No. 14158, *Establishing and Implementing the President's "Department of Government Efficiency"*, 90 Fed. Reg. 8441 (Jan. 29, 2025), https://www.federalregister.gov/documents/2025/01/29/2025-02005/establishing-and-implementing-the-presidents-department-of-government-efficiency.

3301253.7
46686\20748993.1

120. ~~114.~~ On February 26, 2025, Defendant Trump doubled down. He issued EO No. 14222, "Implementing the President's 'Department of Governmental Efficiency' Cost Efficiency Initiative."[31] Notwithstanding that the Constitution allocates spending power to Congress alone, the Order purported to begin the Executive's "transformation in Federal spending on contracts, grants, and loans." This Order required federal agencies to review all existing grants with an eye toward termination:

> Each Agency Head, in consultation with the agency's DOGE Team Lead, shall review all existing covered contracts and grants and, where appropriate and consistent with applicable law, terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of my Administration. This process shall commence immediately and shall prioritize the review of funds disbursed under covered contracts and grants to educational institutions and foreign entities for waste, fraud, and abuse. Each Agency Head shall complete this review within 30 days of the date of this order.

121. ~~115.~~ According to DOGE's self-described "Wall of Receipts," as of June 3, 2025, federal agencies had terminated over 15,000 grants, totaling roughly $44 billion in "savings." [32]

122. ~~116.~~ Despite multiple successful legal challenges to President Trump's EOs and related directives,[33] Defendants have unlawfully terminated grants and continue to terminate grants previously awarded to Plaintiffs and the Class.

---

[31] Exec. Order No. 14222, *Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*, 90 Fed. Reg. 11095 (Mar. 3, 2025), https://www.federalregister.gov/documents/2025/03/03/2025-03527/implementing-the-presidents-department-of-government-efficiency-cost-efficiency-initiative.

[32] Department of Government Efficiency, *Savings*, DOGE.gov, https://doge.gov/savings (last visited June 3, 2025).

[33] *See, e.g.*, *Nat'l Assn. of Diversity Officers in Higher Education v. Trump*, No. 25-cv-0333-ABA (D. Md. Feb. 21, 2025) ECF No. 45 (preliminarily enjoining provisions requiring agencies to terminate equity-related grants); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir. Mar. 14, 2025), ECF No. 29 (staying preliminary injunction pending appeal); *Washington v. Trump*, No. 2:25-cv-244-LK (W.D. Wash. Feb. 28, 2025) ECF No. 50 (on February 28, 2025, preliminary enjoining sections that condition, withhold, or end federal funding in Plaintiffs states Colorado, Minnesota, Oregon, and Washington); *PFLAG, Inc. v. Donald J. Trump*, No. 8:25-cv-00337-BAH (D. Md. Mar. 4, 2025) ECF No. 116 (on March 4, 2025, preliminarily enjoining the same nationwide); *New York v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I Jan. 31, 2025), ECF No. 50 (preliminarily enjoining federal agency defendants from "pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of

123. ~~117.~~ Indeed, according to data posted by DOGE, the federal government has already terminated over **$324 million**[34] in grants made to the UC system. The harm to UC researchers cannot be overstated.

124. ~~118.~~ This lawsuit arises because, in unilaterally terminating Plaintiffs' federal grants without lawful cause, Defendants are flouting constitutional limits on the Executive's authority; violating the First Amendment's prohibition on viewpoint discrimination; denying due process of law under the Fifth Amendment; ignoring agency-specific statutory directives; and violating the APA.

125. ~~119.~~ That these grant terminations violate the separation of powers became even clearer on May 28, 2025. Until then, DOGE was headed by Elon Musk. Now, according to the White House Press Secretary, DOGE will be led by "each and every member of the President's cabinet and the President himself, who is wholeheartedly committed to cutting waste, fraud and abuse from our government."[35] There is no longer any illusion that DOGE is more than a proxy for Defendant Trump and his priorities. The White House reiterated that each Cabinet secretary would work with DOGE employees at their agencies so that the "mission of DOGE will continue."[36] The DOGE Trojan Horse has been welcomed inside the gates of the Federal Agency Defendants, and the harms to Plaintiffs and the Class thus will continue and very likely increase.

126. ~~120.~~ In adopting, implementing, and enforcing Defendant Trump's "priorities" to illegally terminate grants, Defendants have caused and will continue to cause

___

appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations," based on both the OMB directive and Executive Orders, including the DEI and Gender Ideology Executive Orders).

[34] This number was produced by searching DOGE data posted at https://api.doge.gov/docs, which is accessible through DOGE's "Wall of Receipts" at https://doge.gov/savings. The $324 million was determined by looking at "Savings" under the "Grants" category, for entries in which the UC system was listed as a recipient.

[35] Diana Stancy, *White House Discloses Who Will Lead DOGE Efforts After Musk's Departure*, Fox News (May 29, 2025), https://www.foxnews.com/politics/white-house-discloses-who-lead-doge-efforts-after-musks-departure.

[36] *Id.*

1    significant concrete harm to Plaintiffs and the Class, as well as the UC System and the

2    broader public that benefits from UC research, discovery, and inventions.

3    **IV.    Agencies that Terminated Lead Plaintiffs' Grants Have Acted According to a Common Unlawful Pattern**

4

5         127.    121. On information and belief, all Federal Agency Defendants

6    similarly and abruptly failed to continue grants pursuant to Congress's directives, instead

7    substituting Defendant Trump's agenda. In place of reasoned decision-making, the federal

8    agencies took direction not only from the flurry of Executive Orders described herein, but in

9    most instances also took direction directly from DOGE staffers, who have no authority to

10   direct or redirect allocation of federal funds. Indeed, in other cases, the United States, per its

11   Department of Justice counsel, has on the record taken the position that Elon Musk—who

12   helmed DOGE until days ago—did not occupy an "office," lacked a title conferring formal

13   authority, and was thus beyond judicial review or legal consequence.[37]

14        128.    122. In terminating scores of already awarded federal grants, the

15   Federal Agency Defendants acted recklessly in disregarding the law, failing to consider

16   reliance interests, and failing to consider the harm resulting from immediately stopping

17   ongoing research studies. These included terminations of grants that would require halting

18   human drug trials midstream forcing researchers to breach basic principles of medical ethics.

19        129.    123. Moreover, the Federal Agency Defendants conducted no proper

20   review of grants, instead mass-terminating with form letters those grants they deemed (with

21   no explanation) to no longer "effectuate" agency priorities, notwithstanding that agencies

22   cannot substitute the President's agenda for their congressionally imposed statutory mandates.

23        130.    124. This Complaint examines the errant grant practices at the six seven

24   Agencies that terminated Named Plaintiffs' grants—EPA, NEH, NSF, DOD, and DOT, NIH,

25   and DOE—and then describes how this same pattern played out within each Federal Agency

26   Defendant, to the categorical and common detriment of the Class of UC researchers. There

27

28   [37] *New Mexico v. Musk*, 2025 WL 1502747, at *13 (D.D.C. May 27, 2025) ("Essentially, Defendants argue, so long as the Executive acts without Congressional authority, the court cannot review its conduct.").

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    are UC researchers with grants from each and all of these agencies, including grants that have

2    been or are very likely to be arbitrarily terminated.

3        A.    **Environmental Protection Agency**

4           131.  125. The Environmental Protection Agency ("EPA") is an independent

5    federal agency established to address environmental pollution and protect the environment.

6              1.    **Congress Established the EPA to Protect the Environment,**
                  **Including Through Research**

7

8           132.  126. Throughout the 1960s, the American public grew increasingly

9    concerned with air pollution, water pollution, and environmental degradation generally. This

10   concern was manifest most markedly in the multi-site celebration of the first Earth Day on

11   April 22, 1970, which drew an estimated 20 million Americans.[38] In response to such

12   pressure, President Nixon the same year presented Congress with a comprehensive message

13   on the environment and established a council to consider how to organize a federal response

14   to environmental concerns.[39]

15          133.  127. On July 9, 1970, President Nixon sent Congress "Reorganization

16   Plan No. 3 of 1970," which proposed consolidating several existing federal agency duties into

17   one Environmental Protection Agency.[40] In his transmittal to Congress, President Nixon wrote

18   that "it has become increasingly clear that we need to know more about the total

19   environment—land, water, and air. It also has become increasingly clear that only by

20   reorganizing our Federal efforts can we develop that knowledge, and effectively ensure the

21   protection, development and enhancement of the total environment itself."

22          134.  128. Under the Reorganization Plan, EPA was given a "broad mandate"

23   to "develop competence in areas of environmental protection that have not previously been

24   given enough attention." EPA would have the "capacity to do research on important

25   —————————————

26   [38] Earth Day Network, *The History of Earth Day*, https://www.earthday.org/history/ (last visited May 29, 2025).

27   [39] *See* U.S. Envtl. Prot. Agency, *The Origins of EPA* (May 31, 2024), https://www.epa.gov/history/origins-epa.

28   [40] U.S. Envtl. Prot. Agency, *The Reorganization Plan No. 3 of 1970* (Sept. 6, 2016), https://www.epa.gov/archive/epa/aboutepa/reorganization-plan-no-3-1970.html.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

pollutants irrespective of the media in which they appear, and on the impact of these pollutants on the total environment. Both by itself and together with other agencies, EPA would monitor the condition of the environment—biological as well as physical."[41]

135. 129. Although President Nixon (a Republican) disfavored the creation of new agencies, he broke his own rule "because arresting environmental deterioration is of great importance to the quality of life in our country and the world." He thus "believe[d] that in this case a strong, independent agency is needed."[42]

136. 130. The principal roles and functions of the new EPA would include:

- The establishment and enforcement of environmental protection standards consistent with national environmental goals.

- The conduct of research on the adverse effects of pollution and on methods and equipment for controlling it, the gathering of information on pollution, and the use of this information in strengthening environmental protection programs and recommending policy changes.

- Assisting others, through grants, technical assistance and other means in arresting pollution of the environment.

- Assisting the Council on Environmental Quality in developing and recommending to the President new policies for the protection of the environment.[43]

137. 131. After conducting hearings, Congress approved the proposal and EPA was created. Its first Administrator was sworn in on December 4, 1970.[44]

138. 132. EPA does not derive its regulatory authority from a single statute. Rather, a "number of laws serve as EPA's foundation for protecting the environment and public health." As Congress passes new environmental laws, EPA is most typically the agency tasked with writing regulations necessary to implement them.[45] Examples of key laws reflecting Congress's mandates to EPA include the Clean Air Act; the Clean Water Act; the

---

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] U.S. Envtl. Prot. Agency, *The Origins of EPA* (May 31, 2024), https://www.epa.gov/history/origins-epa.

[45] U.S. Envtl. Prot. Agency, *Laws and Executive Orders*, (Jan.29, 2025), https://www.epa.gov/laws-regulations/laws-and-executive-orders.

SECOND [PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    Safe Drinking Water Act; the Federal Fungicide, Insecticide, and Rodenticide Act; the Toxic

2    Substances Control Act; the Resource Conservation and Recovery Act; the Comprehensive

3    Environmental Response, Compensation, and Liability Act (Superfund); and many more. As a

4    recent example, when Congress enacted the Inflation Reduction Act of 2022, it gave EPA a

5    new mandate to administer an environmental and climate justice block grant program.[46]

6        139. 133. These laws all direct EPA to carry out its core mission: "to protect

7    human health and the environment."[47]

8        140. 134. Pursuant to this mission, EPA works to ensure that:

9    • Americans have clean air, land, and water;

10   • National efforts to reduce environmental risks are based on the best
         available scientific information;

11

12   • Federal laws protecting human health and the environment are
         administered and enforced fairly, effectively, and as Congress intended;

13   • Environmental stewardship is integral to U.S. policies concerning natural
         resources, human health, economic growth, energy, transportation,

14       agriculture, industry, and international trade, and these factors are similarly
         considered in establishing environmental policy;

15

16   • All parts of society—communities, individuals, and businesses, as well as
         state, local, and Tribal governments—have access to accurate information

17       sufficient to effectively participate in managing human health and
         environmental risks;

18   • Contaminated lands and toxic sites are cleaned up by potentially
         responsible parties and revitalized; and

19

20   • Chemicals in the marketplace are reviewed for safety.[48]

21       141. 135. To accomplish its mission, EPA implements Congress's

22   environmental laws by writing and enforcing regulations.[49]

23

24   [46] Marianne Lavelle & Peter Aldhous, *Trump's EPA Funding Cuts Target Disadvantaged
     Communities*, Inside Climate News (May 1, 2025),
     https://insideclimatenews.org/news/01052025/trump-epa-funding-cuts-target-disadvantaged-

25   communities/#:~:text=The%20EPA's%20declaration%20said%20it,environmental%20justice%2
     0is%20being%20terminated.

26   [47] U.S. Envtl. Prot. Agency, *Our Mission and What We Do* (Apr. 21, 2025),
     https://www.epa.gov/aboutepa/our-mission-and-what-we-do.

27

28   [48] *Id.*
     [49] *Id*

142. 136. EPA also carries out its mission by making grants. Indeed, "EPA's mission to protect human health and the environment is accomplished, in large part, by the awarding of funds to other organizations to conduct environmental program or projects."[50] EPA awards more than $4 billion in grants (called "assistance agreements") every year.

143. 137. According to EPA, its authority to make grants comes from three sources. First is the U.S. Constitution, which gives Congress the power of the purse in the Spending Clause. Second are statutes, in which Congress directs funds to be allocated to specific programs. Finally, the EPA derives grant-making power from regulations.[51]

144. 138. EPA makes many types of grants. One especially important type is research grants, which are often obtained by university researchers.

145. 139. EPA funds research through its Science to Achieve Results (STAR) program; its People, Prosperity, and the Planet (P3) Program; and its Small Business Innovation Research (SBIR) program. According to the agency, these "help to engage top research scientists, non-profit organizations, students, and small businesses that results in a strong scientific foundation to support the Agency's mission of protecting human health and the environment."[52]

146. 140. The STAR program is the "primary competitive, peer-reviewed extramural grant program that has awarded over 4,100 grants nationwide since 1995." The program "leverages the scientific and engineering expertise of academic and non-profit institutions to conduct high priority environmental and public health research," focusing on the effects of "air pollution, water quality and quantity, hazardous waste, toxic substances, pesticides, cumulative impacts, and more." [53]

---

[50] U.S. Envtl. Prot. Agency, *EPA Grants Overview for Applicants and Recipients*, https://www.epa.gov/grants/epa-grants-overview-applicants-and-recipients (last visited May 29, 2025).
[51] U.S. Envtl. Prot. Agency, *EPA Funding Instruments and Authorities*, https://www.epa.gov/grants/epa-funding-instruments-and-authorities (last visited May 29, 2025).
[52] U.S. Envtl. Prot. Agency, *About EPA's Research Grants*, https://www.epa.gov/research-grants/about-epas-research-grants (last visited May 29, 2025).
[53] *Id.*

SECOND [PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

147. 141. STAR research is funded through Requests for Applications (RFAs) that are derived from the EPA Office of Research and Development's Strategic Plan. These grants "concentrate on areas of special significance to the EPA mission."[54]

148. 142. EPA grants are highly competitive. Of the approximately 2,500 proposals for STAR research grants every year, it awards only around 150 research grants and 125 graduate fellowships.[55]

149. 143. EPA research grants have funded critical projects, including research to advance clean drinking water technologies, address knowledge gaps in antimicrobial resistance, and reduce exposure to wildfire smoke.[56]

**2.     In Response to Trump Administration Directives, the EPA Improperly Changed Priorities and Canceled Existing Grants**

150. 144. On his first day in office, President Trump signed Executive Order 14151, "Ending Radical and Wasteful Government DEI Programs and Preferencing" (Jan. 20, 2025). The Order instructs the Director of the Office of Management and Budget (OMB), assisted by the Attorney General and others, to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." The Order repeatedly mentions "environmental justice" as a target.[57]

151. 145. In particular, Executive Order 14151 directs each federal agency to "terminate, to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice' offices and positions… [and all] 'equity-related' grants or contracts" within 60 days.

---

[54] U.S. Envtl. Prot. Agency, *Learn About Research Grants*, https://www.epa.gov/research-grants/learn-about-research-grants (last visited May 29, 2025).

[55] *Id.*

[56] *See, e.g.*, U.S. Envtl. Prot. Agency, *Research Grants in the News* (Sept. 23, 2024), https://www.epa.gov/research-grants/research-grants-news.

[57] Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025), https://www.federalregister.gov/documents/2025/01/29/2025-01953/ending-radical-and-wasteful-government-dei-programs-and-preferencing.

152. ~~146.~~ The President also signed Executive Orders related to energy, including "Declaring a National Energy Emergency" and "Unleashing American Energy."

153. ~~147.~~ Shortly after President Trump took office, the EPA began working closely with DOGE.

154. ~~148.~~ By March 7, 2025, the Democratic Staff of the Senate Committee on Environment and Public Works reported that the EPA had issued guidance to senior staff indicating that "all [funding] actions greater than $50,000 now require approval from an EPA DOGE Team member."[58]

155. ~~149.~~ A huge part of this DOGE-EPA collaboration included mass-canceling grants. The EPA made no secret of DOGE's hand in EPA affairs, but rather, touted the DOGE partnership in press releases.

156. ~~150.~~ For example, on February 25, 2025, an EPA press release announced a "second round of EPA-DOGE partnered cancellations." EPA stated that these cancellations "represent more than $60 million saved as the EPA puts a stop to wasteful DEI and environmental justice programs."[59]

157. ~~151.~~ In a March 10, 2025 press release, EPA announced a fourth round of EPA-DOGE grant terminations, this time stating it was cancelling more than 400 grants "across nine unnecessary programs." This press release concluded, as have others, by stating: "EPA continues to work diligently to implement President Trump's Executive Orders."[60]

---

[58] Senate Envtl. & Pub. Works Comm., *Letter to EPA Administrator Lee Zeldin Regarding $50,000 Funding Approval Requirement* (Mar. 7, 2025), https://www.epw.senate.gov/public/_cache/files/b/c/bc3eafbf-38ea-4197-b655-8466b9901dce/00C154E2DBAFFDF3EF5063DA374406502B1835873497F8DE2F439A1710460D09.3.7.25-letter-to-epa-re-50k-attachments-002-.pdf.

[59] U.S. Envtl. Prot. Agency, *EPA Administrator Lee Zeldin Cancels 20 Grants in 2nd Round of Cuts with DOGE, Saving Americans More than $60M* (Feb. 25, 2025), https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-cancels-20-grants-2nd-round-cuts-doge-saving-americans.

[60] U.S. Envtl. Prot. Agency, *EPA Administrator Lee Zeldin Cancels 400+ Grants in 4th Round of Cuts with DOGE, Saving Americans More than $1.7B* (March 10, 2025), https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-cancels-400-grants-4th-round-cuts-doge-saving-americans.

~~SECOND~~[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

158. ~~152.~~ The EPA has aligned itself closely with the Trump Administration. For example, on March 12, 2025 alone, the EPA issued 10 press releases in which it referred to itself as the "Trump EPA."[61]

159. ~~153.~~ Also on March 12, EPA Acting Assistant Administrator Jeffrey Hall issued an internal memo regarding "Implementing National Enforcement and Compliance Initiatives Consistently with Executive Orders and Agency Priorities" (the "March 12 Administrator Memo").[62]

160. ~~154.~~ Among EPA's functions is to establish, every four years, National Enforcement and Compliance Initiatives ("NECIs") that are published in the Federal Register. These are "national initiatives, developed in a non-partisan way across administrations" after soliciting public input.[63] NECIs allow the EPA to focus its resources on widespread problems.[64]

161. ~~155.~~ NECIs for fiscal year 2023-2027 were set on August 17, 2023. The six NECIs—half of which were modified or continued from prior years—are: (1) mitigating climate change; (2) addressing exposure to PFAS; (3) protecting communities from coal ash contamination; (4) reducing air toxics in overburdened communities; (5) increasing compliance with drinking water standards; and (6) chemical accident risk reduction.[65]

162. ~~156.~~ While the March 12 Memo did not (yet) purport to eliminate the NECIs, it did state, ominously, that notwithstanding the robust and legally required public process used to produce them, "the focus of specific NECIs shall be adjusted to conform to the President's Executive Orders and the Administrator's Initiative."[66]

---

[61] U.S. Envtl. Prot. Agency, *Search News Release*, https://www.epa.gov/newsreleases/search?f%5B0%5D=year%3A2025-03&page=3 (last visited May 27, 2025).

[62] U.S. Envtl. Prot. Agency, *Implementing National Enforcement and Compliance Initiatives Consistently with Executive Orders and Agency Priorities* (Mar. 12, 2025), https://www.epa.gov/system/files/documents/2025-03/necimemo-20250312.pdf.

[63] U.S. Envtl. Prot. Agency, *FY 2024–2027 National Enforcement and Compliance Initiatives* (Aug. 17, 2023), https://www.epa.gov/system/files/documents/2023-08/fy2024-27necis.pdf.

[64] *Id.*

[65] *Id.*

[66] U.S. Envtl. Prot. Agency, *Implementing National Enforcement and Compliance Initiatives Consistently with Executive Orders and Agency Priorities* (Mar. 12, 2025),

163. 157. The "Administrator's Initiative" refers to EPA Administrator Lee Zeldin's "Powering the Great American Comeback" initiative, which he announced on February 4, 2025. The initiative has five major pillars: (1) Clean Air, Land, and Water for Every American; (2) Restore American Energy Dominance; (3) Permitting Reform, Cooperative Federalism, and Cross-Agency Partnership; (4) Make the United States the Artificial Intelligence Capital of the World; and (5) Protecting and Bringing Back American Auto Jobs.[67]

164. 158. More generally, the March 12 Memo made clear that the EPA would conform to President Trump's wishes, regardless of the agency's congressional mandates.

165. 159. In a court filing on April 23, 2025, an EPA Deputy Assistant Administrator (Dan Coogan) revealed that EPA leadership had conducted a review of grants to determine "which should be terminated based on alignment with Administration priorities." He stated that "EPA began this process for the Administration in January 2025."[68]

166. 160. Although the EPA asserted that this was an "individualized, grant-by-grant review," it provided no substantiation that this occurred, and there is no reason to believe that it did. Instead, Mr. Coogan revealed that EPA was slated to terminate entire grant programs and spheres of activity that Congress had mandated in the Inflation Reduction Act. These included: (a) the Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program; (b) Surveys, Studies, Investigations, Training and Special Purpose Activities Relating to Environmental Justice; (c) the Environmental Justice Government-to-Government Program; (d) the Environmental Justice Small Grant Program; (e) Financial Assistance for Community Support Activities To Address Environmental Justice Issues; (f)

---

https://www.epa.gov/system/files/documents/2025-03/necimemo-20250312.pdf.

[67] U.S. Envtl. Prot. Agency, *ICYMI: Administrator Zeldin's "Powering the Great American Comeback" Unveiled at the EPA* (Feb. 4, 2025). https://www.epa.gov/newsreleases/icymi-administrator-zeldins-powering-great-american-comeback-unveiled-epa.

[68] U.S. Envtl. Prot. Agency, *EPA Court Filing* (Apr. 23, 2025), https://www.documentcloud.org/documents/25919517-epa-court-filing-april-23-2025/?mode=document at ¶ 3.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

the Environmental Justice Thriving Communities Grantmaking Program; (g) the

Environmental and Climate Justice Block Grant Program; and (h) Reducing Embodied

Greenhouse Gas Emissions for Construction Materials and Products.[69]

167. 161. Despite a district court's issuance of a preliminary injunction on

April 15, 2025 preventing the EPA from indefinitely freezing grants previously awarded

under Biden-era legislation,[70] Mr. Coogan stated that the EPA would maintain its grant

terminations. He revealed that EPA had sent notices of termination to 377 grantees, and

would send termination letters to an additional 404 grantees within two weeks.[71]

168. 162. On information and belief, EPA turned its attention to universities

and other research grants on or around April 15, 2025. According to reports, Mr. Coogan on

that date sent an email directing staff to cancel existing grants awarded to universities and

research institutes.[72]

169. 163. Grant termination documents make plain that the agency is not

conducting any proper review of grants, but rather, baselessly terminating grants to promote

the President's agenda. Grants terminated because they supposedly do not "effectuate agency

priorities" (which mirror the President's priorities) include those intended to, for example,

provide clean drinking water in rural communities or provide air purifiers for children with

asthma.[73]

---

[69] *Id.* at ¶ 6.

[70] National Council of Nonprofits, *Statement in Response to Preliminary Injunction Issued in Woonasquatucket River Watershed Council et al v. Department of Agriculture et al* (Apr. 15, 2025), https://www.councilofnonprofits.org/pressreleases/statement-response-preliminary-injunction-issued-woonasquatucket-river-watershed.

[71] *Id.* at ¶ 5.

[72] *See* Erik Stokstad, *EPA Orders Staff to Begin Canceling Research Grants*, Science (Apr. 21, 2025), https://www.science.org/content/article/epa-orders-staff-begin-canceling-research-grants; and Hiriko Tabuchi, *E.P.A. Set to Cancel Grants Aimed at Protecting Children from Toxic Chemicals,* The New York Times (Apr. 21, 2025), https://www.nytimes.com/2025/04/21/climate/epa-cuts-forever-chemicals-grants.html.

[73] Hayley Smith, *California Nonprofits Suffer After EPA Cancels Hundreds of Environmental Grants,* Los Angeles Times (May 8, 2025*)*, https://www.latimes.com/environment/story/2025-05-08/california-nonprofits-suffer-after-epa-cancels-hundreds-of-environmental-grants.

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

170. ~~164.~~ Instead of providing researchers with reasoned explanations of termination decisions, the EPA is sending form termination letters. The letters are not personalized or even signed.

171. ~~165.~~ One such letter, received by Plaintiff Thakur on April 28, 2025, reads as follows:

**Subject:** Termination of EPA Assistance Agreement [Grant No.]
under 2 CFR 200.340
**From:** EPA Award Official
**To:** [Grant Recipient]

This EPA Assistance Agreement is terminated in its entirety effective immediately on the grounds that the award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities.

The EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In addition to complying with the law, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities.

172. ~~166.~~ This pro-forma explanation citing vague "Agency priorities" does not constitute reasoned decision-making nor explain why the terminated grants no longer effectuate such priorities.

**3.**    **EPA Plaintiffs and Other Grant Recipients Are Harmed by EPA's Illegal Grant Terminations**

173. ~~167.~~ Plaintiffs and Class members have long relied on EPA grants to fund meritorious projects aimed at protecting human health and the environment. The

3301253.7
46686\20748993.1

1    termination of previously approved grants has caused and continues to cause Plaintiffs and

2    Class members serious harm.

3            **a.**     **Plaintiff Neeta Thakur's Grant Termination and Resulting**
     **Harm**

4

5    174.    168. Dr. Neeta Thakur is a pulmonary and critical care specialist at the

6    University of California, San Francisco (UCSF) who examines the role of social and

7    environmental stressors on asthma and COPD in historically marginalized communities. She

8    currently serves as Medical Director of the Zuckerberg San Francisco General Hospital Chest

9    Clinic and is an associate professor of medicine and pulmonary and critical care clinician at

10    UCSF.

11    175.    169. Dr. Thakur's research focuses on (1) defining obstructive lung

12    disease phenotypes that exist in racially and ethnically diverse communities and how these are

13    shaped by social and environmental stressors; (2) identifying community-specific drivers that

14    place individuals at high risk for poor outcomes; and (3) co-developing place-based and

15    targeted interventions aimed at social and environmental stressors to improve respiratory

16    outcomes in historically marginalized populations. In recognition of her research leadership,

17    she was this year (2025) made faculty director of Clinical Research Operations for the

18    Clinical Trials Operations Unit at UCSF's Clinical & Translational Science Institute.

19    176.    170. Dr. Thakur's research has been supported by state grants, federal

20    grants from the National Institutes of Health (NIH), foundation grants, and other sources.

21    <u>Grant Application to EPA</u>

22    177.    171. In November 2021, Dr. Thakur submitted a grant application to

23    EPA in response to its announcement of funding opportunity EPA-G2021-STAR-H1. This

24    opportunity, made available through the agency's Science to Achieve Results (STAR)

25    program, focused on "Cumulative Health Impacts at the Intersection of Climate Change,

26    Environmental Justice, and Vulnerable Populations/Lifestages: Community-Based Research

27    for Solutions."

28

178. ~~172.~~ The grant application, titled "Partnering for Resilient Opportunities To Eliminate Toxic (PROTECT) Health Effects from Wildfire PM2.5 in Environmental Justice Communities," addressed the potential to prevent adverse health effects to environmental justice communities from the fine particulate matter (PM2.5) from wildfire smoke.

179. ~~173.~~ The proposal aimed to (1) estimate the health effects of sub-daily exposure to wildfire-specific PM2.5 in California, with particular focus on effects within environmental justice communities; (2) understand community recovery from short-term health effects following exposure; (3) understand indoor infiltration of wildfire smoke and the mitigating effect of housing quality and behaviors on health effects; and (4) identify acceptable, community-relevant interventions to mitigate exposure. Dr. Thakur was the Principal Investigator on the grant proposal, which included nine investigators across three institutions: UCSF, UC Berkeley, and California's Office of Environmental Health Hazard Assessment.

180. ~~174.~~ The grant Application requested funding commensurate with the cumulative 3-year budget of $1,330,536 to support this multi-campus, multi-agency, multi-nonprofit research collaboration.

EPA's Grant Award

181. ~~175.~~ On November 22, 2022, an EPA Senior Grants Management Specialist, Jennifer Brooks, sent Dr. Thakur a Notice of EPA's award and the Grant Agreement. The Agreement authorized the proposal for Project Period 12/01/2022-11/30/2025; committed an initial grant of $690,000 (approximately half of project costs); and explained that EPA was "funding this agreement incrementally."

182. ~~176.~~ On June 21, 2023, Brooks sent Dr. Thakur a second Notice of EPA Award and an Assistance Amendment. The Amendment likewise indicated that the team was authorized to proceed for Project Period 12/01/2022-11/30/2025. It stated that EPA was awarding $640,536, bringing the total federal funding award to $1,330, 536.

EPA's Grant Termination

3301253.7
46686\20748993.1

~~SECOND~~[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

183. 177. On April 28, 2025, EPA sent to the UC Regents an "Assistance Amendment" that instructed Thakur's team to "stop work; terminate the [grant] agreement; reduce performance period duration; [and] curtail scope of work." It stated that "(EPA hereby awards $0.00" towards any unfunded, as-yet-unincurred costs of the previously awarded $1,330,536.

184. 178. The Assistance Amendment stated: "The Agency is asserting its right under 2 C.F.R. 200.340 and the Termination General Term and Condition [sic] of this agreement to unilaterally terminate this award." The Amendment was accompanied by a memorandum from EPA to the Director of Contracts and Awards at UCSF titled "Termination of EPA Assistance Agreement RD 84048101 under 2 CFR 200.340."

185. 179. The memo stated that EPA terminated Dr. Thakur's grant because "the award no longer effectuates the program goals or agency priorities." It further asserted that the grant "provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities."

186. 180. This explanation does not explain why the grant would contradict agency priorities when EPA Director Zeldin has announced new priorities under his "Powering the Great American Comeback" initiative that align fully with the purpose of Dr. Thakur's grant. The first stated EPA priority is "Clean Air, Land, and Water for Every American."[74] Dr. Thakur's grant effectuates that purpose.

187. 181. As a result of this unilateral, unlawful grant termination, Dr. Thakur has been unable to complete health analyses with UC Berkeley grantee-colleagues, or to identify promising strategies to protect community health across California during wildfire smoke events.

---

[74] U.S. Envtl. Prot. Agency, *EPA Administrator Lee Zeldin Announces EPA's "Powering the Great American Comeback" Initiative* (Feb. 4, 2025), https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-announces-epas-powering-the-great-american-comeback.

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

188. 182. Instead, Dr. Thakur has had to spend significant time seeking alternate funding sources. This includes unexpected grant writing, and reaching out to other funding sources, including philanthropy groups. In addition, to support staff and avoid layoff of two individuals, she has had to use her own discretionary funds to support team members.

189. 183. The UCSF and UC Berkeley researchers on this grant have also been unable to complete the proposed analyses of the health impacts of wildfire smoke events across California. This is after considerable work by UC Berkeley researchers to develop a map unprecedented in its detail, showing hourly levels of wildfire smoke by location. As a consequence of termination, at least three research publications will go unpublished that have the potential for high impact for public health and for science more generally.

190. 184. The premature termination of this grant has also compromised the trust-building necessary for community-engaged participatory action research. It has taken years of effort for Dr. Thakur to develop relationships with the community based organizations and community-engaged individuals who assisted Dr. Thakur in obtaining this grant (by writing letters in support), with the expectation that her project would deliver tangible benefits to their low income communities in the form of improved respiratory health. EPA's termination of this grant will make it more difficult for her and her collaborators to partner with organizations such as the Central California Asthma Collaborative in Fresno and the environmental justice nonprofit Brightline in San Francisco, as well as a specific community-trusted scientist in Richmond.

191. 185. Additionally, were Dr. Thakur and her team to eventually find replacement funding for this project (a difficult proposition given the sums at stake), they would no longer be adequate to cover personnel, equipment and outreach expenses.

192. 186. These personal and financial harms are ongoing.

193. 187. These harms are in addition to the loss of value to the public from Dr. Thakur's research team's inability to complete work on studying health risks from the fine particulate matter associated with wildfire, and inability to design health-protective interventions for three of California's most health-vulnerable communities.

3301253.7
46686\20748993.1

b.      **Plaintiff Ken Alex's Grant Termination and Resulting Harm**

194.    188. Since 2019, Ken Alex has served as Director of Project Climate at the Center for Law, Energy & the Environment (CLEE) at UC Berkeley School of Law. He founded Project Climate, a think tank designed to move promising environmental research into the policy realm quickly.

195.    189. Prior to joining CLEE, Alex worked for many years for Governor Jerry Brown on climate-related policy and, before that, for the California Attorney General's Office. His roles as climate policy expert and gubernatorial advisor on the topic were the subject of a 2020 profile in CalMatters.[75]

EPA Grant Application

196.    190. In 2022, EPA's Office of Research and Development sought applications proposing research on air emissions from municipal solid waste (MSW) landfills, which are a significant source of methane emissions—one of Alex's areas of expertise. The grant solicitation was part of EPA's Science to Achieve Results (STAR) program, and was conducted in collaboration with the Air, Climate, and Energy (ACE) research program.

197.    191. EPA's request for applications solicited proposals that addressed EPA-identified research priorities, including "cost effective stationary, mobile, aerial, and remote sensing" technologies and measurements that could accurately quantify methane emissions from landfills and evaluate strategies to mitigate them. EPA also sought proposals that encompassed landfill emissions of "hazardous air pollutants (HAPs), and other air pollutant emissions from municipal solid waste (MSW) landfills."[76]

198.    192. In collaboration with a UC Berkeley engineer with specialized expertise in landfill design and other researchers, Alex developed a detailed proposal for applying cutting edge technologies, including satellites and AI, to improve the detection of methane and HAP releases from landfills and to improve the quality of policy responses. The

---

[75] *See* Julie Cart, *Meet Ken Alex, Gov. Brown's Climate Concierge* (updated June 23, 2020), https://calmatters.org/environment/2018/10 /ken-alex-jerry-brown-climate-change-california/.
[76] *See* EPA Solicitation for PA-G2023-STAR-B1, *Understanding and Control of Municipal Solid Waste Landfill Air Emissions*, https://cfpub.epa.gov/ncer_abstracts/index.cfm/fuseaction/display.rfatext/rfa_id/701.

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

Grant Application was submitted to EPA on December 21, 2022. It proposed a cumulative budget of $999,999 (later rounded to $1,000,000).

Award of Grant Funding

199. 193. On October 19, 2023, EPA notified UC Berkeley that it was awarding the grant, and provided the first of two installments of grant funding.

200. 194. On December 16, 2024, EPA notified UC Berkeley that it was awarding the second and final installment of grant funding, bringing the total funding awarded to $1,000,000.

201. 195. The EPA's web page, *Understanding and Control of Municipal Solid Waste Landfill Air Emissions Grants* (https://www.epa.gov/research-grants/understanding-and-control-municipal-solid-waste-landfill-air-emissions-grants) (accessed May 12, 2025) continues to publicize the grant as one among five awarded.

EPA's Grant Termination

202. 196. On April 29, 2025, EPA sent to the UC Regents an "Assistance Amendment" that instructed Alex's research team to "stop work; terminate the [grant] agreement; reduce performance period duration; [and] curtail scope of work." It stated that "(EPA) hereby awards $0.00" towards any unfunded, as-yet-unincurred costs of the previously awarded $1,000,000.

203. 197. The Assistance Amendment stated: "The Agency is asserting its right under 2 C.F.R. 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award." The Amendment was accompanied by a memorandum from EPA titled "Termination of EPA Assistance Agreement RD 84062301 under 2 CFR 200.340."

204. 198. The memo stated that EPA terminated Alex's grant because "the award no longer effectuates the program goals or agency priorities." The memo further asserted that the grant "provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise

1    fail to serve the best interests of the United States. The grant is inconsistent with, and no

2    longer effectuates, Agency priorities."

3        205. 199. The memo did not explain why Alex's grant no longer effectuates

4    EPA priorities, which currently include "Clean Air, Land, and Water for Every American."

5            Harm from EPA's Grant Termination

6        206. 200. Alex and his project team have suffered immediate harm as a

7    result of the unlawful unilateral cancellation of the grant. Specifically, the team has been

8    unable to continue and complete the novel work related to evaluating HAPs and their

9    relationship to methane emissions from landfills. Furthermore, some of his researchers and

10   graduate students have already lost hours and compensation, and one or more will likely be let

11   go.

12       207. 201. Even if Alex and his team were eventually to find replacement

13   funding for this project (a difficult proposition given the sum at stake), the delay and

14   uncertainty would preclude full recovery of the project.

15       **c.    Plaintiff Nell Green Nylen's Grant Terminations and Resulting
           Harm**

16

17       208. 202. Dr. Nell Green Nylen joined the Wheeler Water Institute at the

18   Center for Law, Energy & the Environment (CLEE) at UC Berkeley School of Law as a

19   Research Fellow in 2013. Since 2016, she has been a Senior Research Fellow at CLEE,

20   providing analysis and recommendations at the intersection of law, policy, and science to

21   inform water governance and management.

22       209. 203. Much of Dr. Green Nylen's work at CLEE has focused on

23   improving management of water resources across hydrologic extremes—from times of water

24   scarcity to times of abundance. This includes research on enhanced aquifer recharge ("EAR"),

25   a tool for capturing water to increase groundwater supply. Another area of her focus has been

26   improving the information and policy environment for implementing innovative water

27   management solutions, including water reuse.

28

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1   210. 204. EPA unilaterally terminated two large grants Dr. Green Nylen was

2   working on that were meant to fund collaborative work with other researchers on issues at the

3   core of her technical and legal expertise.

EPA Enhanced Aquifer Recharge Grant Application and Funding

5   211. 205. In 2021, EPA's Office of Research and Development sought

6   applications proposing research to develop cost-benefit tools to support EAR. The grant

7   solicitation was part of EPA's Science to Achieve Results (STAR) program and solicited

8   research proposals that would "identify the key economic, technological, institutional, and

9   legal factors that affect the ability to implement" EAR projects; identify best practices and

10  tools for implementing EAR projects to achieve different purposes; and, ultimately, "improve

11  life-cycle cost-benefits analysis to support cost-effective enhanced aquifer recharge."

12  212. 206. Dr. Green Nylen was part of a UC Berkeley team that collaborated

13  with a broader multi-disciplinary team of researchers from UC Davis, UC Santa Cruz, and UC

14  Law San Francisco to develop a proposal that they submitted to EPA on January 13, 2022.

15  213. 207. The proposal—titled "A Knowledge-to-Implementation

16  Framework for Enhanced Aquifer Recharge"—described a three-year project with outputs

17  including: (a) developing guidance on evaluating EAR sites, determining what conditions are

18  necessary to effectively maintain an EAR project, and ensuring that EAR projects maintain

19  aquifer water quality; (b) developing guidance on navigating the legal, policy, and

20  organizational contexts for EAR; (c) developing recommendations for legal and policy

21  changes that could facilitate EAR; (d) developing a generalized framework for cost-benefit

22  analysis of EAR projects; and (e) creating a capstone "Lifecycle Map" report on EAR. In

23  other words, the outputs would provide one-stop shopping for people interested in planning,

24  evaluating, and implementing EAR projects. The Grant Application proposed a cumulative

25  budget of $2,000,000 (later adjusted to $1,999,998).

26  214. 208. On July 20, 2022, EPA notified UC Berkeley that it was awarding

27  the grant. The award was publicized on EPA's web page, *Life-Cycle Analysis to Support*

28  *Cost-Effective Enhanced Aquifer Recharge Grant* (https://www.epa.gov/research-grants/life-

1    cycle-analysis-support-cost-effective-enhanced-aquifer-recharge-grant). The grant's original

2    end date was August 31, 2025. On April 10, 2025, Dr. Green Nylen's team requested a no-

3    cost extension of the grant for which they received verbal approval and were awaiting formal

4    written approval.

5              EPA's Termination of the Enhanced Aquifer Recharge Grant

6         215.    209. On May 7, 2025, EPA sent the UC Regents a document styled as

7    an "Assistance Amendment" that instructed Dr. Green Nylen's team to "stop work; terminate

8    the [grant] agreement; reduce performance period duration; [and] curtail scope of work." It

9    also stated that "(EPA) hereby awards $0.00" towards any as-yet-unincurred costs. Through

10   the Assistance Amendment, EPA was purportedly "asserting its right under 2 CFR 200.340

11   and the Termination General Term and Condition of this agreement to unilaterally terminate

12   this award."

13        216.    210. The Amendment was accompanied by a memorandum from EPA

14   to the Contracts and Grants Officer for the Regents of the University of California titled

15   "Termination of EPA Assistance Agreement RD- 84046301-1 under 2 CFR 200.340." The

16   memo stated that EPA terminated Dr. Green Nylen's grant because, according to the memo,

17   "the award no longer effectuates the program goals or agency priorities." The memo further

18   asserted that the grant "provides funding for programs that promote initiatives that conflict

19   with the Agency's policy of prioritizing merit, fairness, and excellence in performing our

20   statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise

21   fail to serve the best interests of the United States. The grant is inconsistent with, and no

22   longer effectuates, Agency priorities."

23        217.    211. The memo did not explain why EPA had concluded that Dr. Green

24   Nylen's award is "no longer consistent with EPA funding priorities," which are defined partly

25   by governing statutes, and federal statutes specifically identify EAR research as an EPA

26   funding priority and mandate. *See* 33 U.S.C § 1276. It also did not explain why the project

27   was inconsistent with the EPA's priority pillars, which include ensuring that "[e]very

28

1   American [has] access to clean air, land, and water" and prioritizing permitting reform.[77] The

2   core purpose of the team's research is promoting access to clean water.

3                          EPA Water Reuse Grant Application and Funding

4           218. 212. In 2021, EPA's Office of Research and Development sought

5   applications proposing research designed to "accelerate water innovation, information

6   availability, and engagement to advance clean and safe water reuse goals, promote better

7   understanding of the Nation's water and wastewater treatment and infrastructure, and enhance

8   the availability and efficient use of water resources through water reuse."

9           219. 213. In response to the solicitation, the Director of the Wheeler Water

10  Institute at CLEE and Dr. Green Nylen collaborated with a multi-disciplinary team of

11  researchers from Iowa State University and the University of Rhode Island to develop a

12  research proposal aimed at accelerating readiness for water reuse in small water systems

13  across the nation.

14          220. 214. The lead Principal Investigator at Iowa State University submitted

15  the grant proposal—titled "Accelerating Technical and Community Readiness for Water

16  Reuse in Small Systems"—to EPA on September 29, 2021. It described a four-year project

17  that would (a) develop methods to inventory sources of water for beneficial reuse across the

18  nation; (b) produce guidance on water source / treatment technology / end-use combinations

19  that may be appropriate for small communities; (c) support cost-benefit analysis of different

20  water reuse options in small communities; (d) survey small communities to assess public

21  attitudes towards different water reuse options; (e) produce guidance on opportunities for

22  fostering institutional innovation to overcome barriers to water reuse in small communities;

23  and (f) construct implementation roadmaps centered around windows of opportunity for water

24  reuse for several case-study communities.

25          221. 215. The Grant Application proposed a total budget of $4,057,500,

26  combining a request for $3,246,000 of federal funds with a commitment from the research

---

[77] *See Administrator Lee Zeldin Announces EPA's "Powering the Great American Comeback" Initiative*, EPA (Feb. 4, 2025), https://www.epa.gov/newsreleases/epa-administrator-lee-zeldin-announces-epas-powering-great-american-comeback.

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

team to provide an $811,500 cost share from other sources. The budget included (a) personnel and personnel travel costs; (b) participant support costs; (c) laboratory supplies and laboratory user fees; (d) support for consultants; (e) tuition remission for graduate students; and (f) indirect costs. This included a subaward of $559,941 to UC Berkeley.

222. 216. On August 8, 2022, EPA notified Iowa State University that it was awarding the grant, and Iowa State University notified the subrecipients, including UC Berkeley. The award was publicized on EPA's web page, *National Priorities: Water Innovation, Science and Engagement to Advance Water Reuse Grants* (https://www.epa.gov/research-grants/national-priorities-water-innovation-science-and-engagement-advance-water-reuse-1).

### EPA's Termination of the Water Reuse Grant

223. 217. On May 12, 2025, EPA sent to Iowa State University a document styled as an "Assistance Amendment" that instructed Dr. Green Nylen's team to "stop work; terminate the [grant] agreement; reduce performance period duration; [and] curtail scope of work." It also stated that "(EPA) hereby awards $0.00" towards any as-yet-unincurred costs. Through the Assistance Amendment, the EPA was purportedly "asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award."

224. 218. The Amendment was accompanied by a memorandum from EPA to the Pre-Award Administrator at Iowa State University titled "Termination of EPA Assistance Agreement CR- 84046101 under 2 CFR 200.340." The memo stated that EPA terminated Dr. Green Nylen's grant because, according to the memo, "the award no longer effectuates the program goals or agency priorities." The memo further asserted that the grant "provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates,

1   Agency priorities." The reasons provided for termination of the EPA Water Reuse Grant and

2   the EPA Enhanced Aquifer Recharge Grant were identical.

3   225. 219. As with the EPA Enhanced Aquifer Recharge Grant, the

4   termination memo for the EPA Water Reuse Grant did not explain how EPA concluded that

5   the award is "no longer consistent with EPA funding priorities," even though EPA states that

6   addressing the wastewater challenges of small, rural communities remains one of its ongoing

7   priorities.[78]

8   Harm from the Grant Terminations

9   226. 220. Dr. Green Nylen, and the larger project teams for both grant

10  projects, have suffered immediate harm as a result of the cancellation of these grants.

11  227. 221. For the Enhanced Aquifer Recharge Grant, the harms include: an

12  inability to proceed with the basic work of refining the team's analysis and distilling that

13  information for the capstone Lifecycle Map report and the team's inability to work together to

14  complete the capstone report and the accompanying cost-benefit analysis decision support

15  tool.

16  228. 222. For the Water Reuse Grant, the harms include an inability to

17  proceed with the basic work of the project. For example, the team has been unable to continue

18  their interview-based research. Further, if the funding is not reinstated, the work that has

19  already gone into the project will go to waste.

20  229. 223. For both grants, even if replacement funding is secured, the delay

21  will preclude full recovery of the project. The current teams are unlikely to be able to stay

22  together over a prolonged period. Further, time spent searching for replacement funding has

23  considerable opportunity and financial costs (as well as societal costs), as that time would

24  otherwise be allocated to work on other water-related research projects that confer public

25  benefit.

26  _____

27  [78] *See EPA Announces $49 Million in Technical Assistance to Help Rural, Small, and Tribal Communities Address Wastewater Challenges* (Apr. 29, 2025),

28  https://www.epa.gov/newsreleases/epa-announces-49-million-technical-assistance-help-rural-small-and-tribal-0.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

230. 224. In addition, at CLEE, the jobs of every member of the water team are currently threatened by these grant terminations. CLEE is a self-funded entity at UC Berkeley that does not receive general salary support from the University. Without grant and contract funding, the team members will not get paid their full salary and could lose their jobs. Absent the reinstatement of these grants, members of the team could likely be let go in the coming months.

## B.    National Endowment for the Humanities

231. 225. The National Endowment for the Humanities ("NEH") is an independent federal agency established to support the advancement of the humanities across the United States.

### 1.    Congress Established NEH to Fund Projects to Support Humanities Research, Training, and Education

232. 226. Congress created NEH in 1965, as part of the National Foundation on the Arts and Humanities Act of 1965 ("NFAHA"). Pub. L 89-209, 79 Stat. 845 (Sept. 29, 1965) (codified at 20 U.S.C. §§ 951-60).

233. 227. The legislation was the result of years of advocacy to ensure that arts and humanities were not left behind as the nation focused on scientific progress. As laid out in the enabling statute, a "high civilization must not limit its efforts to science and technology alone but must give full value and support to the other great branches of man's scholarly and cultural activity." P.L. 89-209, sec. 2(2). Congress further explained that it was necessary and appropriate for the federal government to create and sustain a "climate encouraging freedom of thought, imagination, and inquiry." *Id.* at (4).

234. 228. In the sixty years since NFAHA's passage, Congress has repeatedly reaffirmed its commitment to these goals. Last updated in 1990, the enabling statute makes clear that the "humanities belong to all people of the United States," 20 U.S.C. § 951(1), and that "[d]emocracy demands wisdom and vision in its citizens. It must therefore foster and support a form of education, and access to the arts and the humanities, designed to

make people of all backgrounds and wherever located masters of their technology and not its

unthinking servants." *Id.* at § 951(4).

235. ~~229.~~ In other words, congressional intent was to ensure that what is

now sometimes short-handed as "DEI," and branded by Defendants as illegal and undesirable,

was Congress's actual mandate, unchanged for 60 years, until upended on Inauguration Day.

236. ~~230.~~ Congress determined it is "necessary and appropriate for the

Federal Government to complement, assist, and add to programs for the advancement of the

humanities and the arts by local, State, regional, and private agencies and their organizations."

20 U.S.C. § 951(5). Congress created NEH and its sister agency the National Endowment for

the Arts ("NEA") so Americans could understand "the diversity of excellence that comprises

our cultural heritage." *Id.* at 951(9).

237. ~~231.~~ Accordingly, Congress established NEH to provide funding for

individuals involved in research, publication of scholarly works, and promotion of the

humanities. *See* 20 U.S.C. § 956. Under the statute, the Chairperson of the NEH is

"authorized to enter into arrangements, including contracts, grants, loans, and other forms of

assistance" to effectuate these goals. *Id.*

238. ~~232.~~ Congress's directives for NEH specifically require it to support

diverse and underrepresented viewpoints.

239. ~~233.~~ For example, one statutory function of NEH is to authorize grants

to "initiate and support programs and research which have substantial scholarly and cultural

significance and that reach, or reflect the diversity and richness of our American cultural

heritage, including the culture of, a minority, inner city, rural, or tribal community." 20 U.S.C.

§ 956(c)(4).

240. ~~234.~~ Likewise, in selecting recipients of funding, NEH's Chairperson

"shall give particular regard to scholars, and educational and cultural institutions, that have

traditionally been underrepresented." 20 U.S.C. § 956(c).

241. ~~235.~~ Congress's commitment to funding humanities initiatives that

mirror the breadth and diversity of American culture is clear in the structure of the grant-

1     making process. Under the statute, the Chairperson of the NEH determines funding "with the

2     advice of the National Council on the Humanities." 20 U.S.C. § 956(c).

3            242.     236. The Council is comprised of twenty-six members appointed by the

4     President, "selected from among private citizens of the United States who are recognized for

5     their broad knowledge of, expertise in, or commitment to the humanities," and who will

6     "provide a comprehensive representation of the view of scholars and professional

7     practitioners in the humanities and of the public throughout the United States." 20 U.S.

8     § 957(b). In making appointments, the "President shall give due regard to equitable

9     representation of women, minorities, and individuals with disabilities who are involved in the

10    humanities." *Id.*

11           243.     237. NEH's Chairperson "shall not approve or disapprove any such

12    application [for funding] until the Chairperson has received the recommendation of the

13    Council." *Id.* at § 957(f).

14           244.     238. NEH's other statutory functions include providing funding to:

15           a.     develop and encourage the pursuit of a national policy for the

16    promotion of progress and scholarship in the humanities;

17                  b.     initiate and support research and programs to strengthen the

18    research and teaching potential of the United States in the humanities by making arrangements

19    with individuals or groups to support such activities;

20                  c.     initiate and support training and workshops in the humanities by

21    making arrangements with institutions or individuals;

22                  d.     foster international programs and exchanges;

23                  e.     foster the interchange of information in the humanities;

24                  f.     foster, with groups, education in, and public understanding and

25    appreciation of the humanities;

26                  g.     support the publication of scholarly works in the humanities;

27

28

h.      ensure that the benefit of its programs will also be available to our citizens where such programs would otherwise be unavailable due to geographic or economic reasons; and

i.      foster programs and projects that provide access to, and preserve materials important to research, education, and public understanding of, the humanities.

20 U.S.C. § 956.

245. 239. For sixty years, NEH has carried out its duty to fund research, training, and education that advance the humanities. Since 1965, NEH has awarded over $6 billion to support "museums, historic sites, universities, teachers, libraries, documentary filmmakers, public TV and radio stations, research institutions, scholars, and local humanities programming."[79] Indeed, NEH is the largest federal funder of the humanities, and (at least until recently) offered 47 grant programs that support humanities work around the country.[80]

246. 240. Since its inception, NEH funding has contributed to over 70,000 projects in all 50 states and jurisdictions; over 9,000 books (including 20 Pulitzer Prize winners); and over 500 film and radio programs (including six Oscar nominees, 30 Peabody award winners, and 27 Emmy award winners).[81] NEH funding has also supported collecting the papers of twelve United States presidents and of several other notable American figures including Mark Twain, Thomas Edison, Martin Luther King Jr., and Ernest Hemingway.[82]

247. 241. NEH has long had a strong relationship with the UC system. In 1974, for example, NEH supported UC Berkeley as it launched what would become the National Writing Project, which trains teachers to help youth nationwide learn how to do research, form arguments, and write publicly on topics they care about.[83] And in 2011, NEH and China's Ministry of Culture hosted a "Bi-national Conversation on Bridging Cultures" at

---

[79] Nat'l Endowment for the Humanities, https://www.neh.gov/, (last visited May 27, 2025).

[80] Nat'l Endowment for the Humanities, *Grants,* https://www.neh.gov/grants (last visited May 27, 2025).

[81] Nat'l Endowment for the Humanities, NEH Funding by the Numbers (description of data on homepage), https://www.neh.gov/ (last visited May 27, 2025).

[82] *Id.*

[83] Nat'l Writing Project, https://www.nwp.org/ (last visited May 29, 2025).

SECOND[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

UC Berkeley, bringing together artists, writers, historians, and political theorists of both countries.[84]

248. ~~242.~~ As designed by statute, NEH funding supports a broad array of projects, including preserving endangered languages, digitizing early newspapers, depicting the history of the civil rights struggle through film, and detailing what life was like for early American colonists.[85]

249. ~~243.~~ Prior to January 20, 2025, NEH funding recipients were selected after a rigorous review process. Every year, NEH recruits over 1,000 experts from every state and organizes them into 200 review panels that evaluate roughly 5,700 grant applications. The panels are selected for their expertise in disciplines relevant to the grant programs.[86] The panels are announced in the Federal Register, and panelists' names are listed in NEH's annual reports.

250. ~~244.~~ This exacting review proceeded as follows: After a grant application was submitted, it was assigned to a specific peer-review panel based on academic discipline, institutional type, project area, or project type. The evaluators on the panel read all assigned applications and assigned them a rating based on "NEH's published review criteria and program guidelines." These criteria "emphasize humanities significance, the applicant's abilities and qualifications, the proposal's clarity of expression, and the project's feasibility, design, cost, and work plan."[87] After each evaluator assessed the application, the panel would meet to discuss the applications.

251. ~~245.~~ Next, NEH staff reviewed the panels' work and recommended the most meritorious applications to the National Council (described above). The Council meets three times a year to discuss the applications and finalize recommendations to the

---

[84] Nat'l Endowment for the Humanities, *NEH Timeline,* https://www.neh.gov/about/history/timeline (last visited May 27, 2025).
[85] *See, e.g.*, Nat'l Endowment for the Humanities, *NEH Essentials*, https://www.neh.gov/essentials (last visited May 27, 2025).
[86] Nat'l Endowment for the Humanities, *NEH's Application Review Process*, https://www.neh.gov/grants/application-process (last visited June 2, 2025).
[87] *Id.*

3301253.7
46686\20748993.1

~~SECOND~~ [PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    Chairperson.[88] The Chairperson made the final funding decisions, taking into account the

2    advice provided throughout the review process.[89]

3         252. ~~246.~~ Each year, NEH typically makes about 900 grants, ranging from

4    approximately $1,000 to $750,000 each. Across all grant programs, only about sixteen percent

5    of applications receive funding.[90] The projects selected for funding by NEH thus represent the

6    best of the best.

7         253. ~~247.~~ Congress has repeatedly affirmed its support for NEH's mission,

8    appropriating funds for grant-making every fiscal year.

9         254. ~~248.~~ In the 2024 Appropriations Act, for example, Congress

10   appropriated $207,000,000 to NEH, with $192,000,000 specifically designated for grants,

11   loans, contracts, and other assistance to further the purposes set forth under 20 U.S.C.

12   § 956(c), and $15,000,000 designated to carry out NEH's "matching grants" program. Pub. L.

13   118-42, 138 Stat. 25, 281-82 (Mar. 9, 2024).

14        255. ~~249.~~ On March 15, 2025, notwithstanding the Executive Orders or

15   DOGE's mandates, Congress enacted a Continuing Appropriations and Extensions Act, which

16   re-appropriated all of the funds appropriated to NEH under the 2024 Act. Pub. L. 119-4,

17   §§ 1101-08, 139 Stat. 9, 10-12 (Mar. 15, 2025). NEH thus received another roughly $200

18   million to spend on grants. NEH announced $22.6 million in grants for 219 humanities

19   projects across the country on January 14, 2025.[91]

20        **2.    <u>In Response to Trump Administration Directives, NEH Improperly</u>**
         **<u>Changed Priorities and Canceled Existing Grants</u>**

21

22        256. ~~250.~~ Around the very same time Congress was re-appropriating grant-

23   making funds to NEH, as noted above, the agency came under fire from the Trump

24   Administration.

25   _____

26   [88] *Id.*

27   [89] *Id*

28   [90] *Id*

[91] Nat'l Endowment for the Humanities, *NEH Announces $22.6 Million for 219 Humanities Projects Nationwide*, https://www.neh.gov/news/neh-announces-grant-awards-jan-2025 (last visited May 27, 2025)..

~~SECOND~~[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

~~3301253.7~~
46686\20748993.1

257. 251. On March 13, 2025, NEH Chair Shelly Low was directed by the White House to resign. Shortly thereafter, DOGE agents began visiting NEH. DOGE actors recommended dramatically cutting NEH staff and cancelling grants made under the Biden administration that had not been fully paid out.[92] According to reports, Acting NEH Chair Michael McDonald told staff that DOGE wanted to claw back $175 million in undispersed grant money.[93]

258. 252. On March 20, 2025, NEH posted a webpage titled "NEH Implementation of Recent Executive Orders." The page stated that NEH was updating the Funding Restrictions section of its Notices of Funding Opportunities ("NOFOs") in order "to comply with several recent Executive Orders, including 'Ending Radical and Wasteful Government DEI Programs and Preferencing,' 'Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government,' and 'Ending Radical Indoctrination in K-12 Schooling.'" [94]

259. 253. The page provided "Frequently Asked Questions," including, for example, Q: "Does the addition of the new guidance on gender ideology … mean that NEH will not fund projects on … the suffragist movement?" A: "No, not necessarily. The restrictions only apply to the categories mentioned in the relevant Executive Orders. We encourage you to read the relevant Executive Orders and consider whether your project's topic – joining with its goals, methodology, activities, and intended audience – seems allowable."

260. 254. The page only discussed the implication of the Executive Orders on grant applications, not terminations of existing grants.

---

[92] Jennifer Schuessler, *DOGE Demands Deep Cuts at Humanities Endowment*, N.Y. Times (Apr. 1, 2025), https://www.nytimes.com/2025/04/01/arts/trump-doge-federal-cuts-humanities.html.

[93] Elizabeth Blair, *Cultural groups across U.S. told that federal humanities grants are terminated*, NPR (Apr. 3, 2025), https://www.npr.org/2025/04/03/nx-s1-5350994/neh-grants-cut-humanities-doge-trump.

[94] Nat'l Endowment for the Humanities, *Implementation of Recent Executive Orders* (Mar. 20, 2025), https://www.neh.gov/executive-orders.

3301253.7
46686\20748993.1

261. 255. Nonetheless, on or around April 2, 2025, recipients of NEH grant funding began receiving emails informing them that their grants had been terminated. Peculiarly, these emails did not come from an NEH server or government email address, but rather, from "Grant_Notifications@nehemail.onmicrosoft.com."[95] The terminations were not made through NEH's grants management system.

262. 256. The emails attached a form termination letter. On information and belief, the termination letters sent to all grantees on April 2 and thereafter were nearly identical and lacked any individualized analysis or discussion of any terminated grant.

263. 257. The termination letters received by Plaintiffs and Class members contained the following "explanation" for the terminations:

> Your grant no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement and is subject to termination due to several reasonable causes, as outlined in *2CFR§200.340*. NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda. The President's February 19, 2025 executive order mandates that the NEH eliminate all non-statutorily required activities and functions. *See Commencing the Reduction of the Federal Bureaucracy*, E.O. 14217 (Feb. 19, 2025). Your grant's immediate termination is necessary to safeguard the interests of the federal government, including its fiscal priorities. The termination of your grant represents an urgent priority for the administration, and due to exceptional circumstances, adherence to the traditional notification process is not possible. Therefore, the NEH hereby terminates your grant in its entirety effective April 1, 2025.

264. 258. Although the termination letter to NEH grantees states that Executive Order 14217 "mandates that the NEH eliminate all non-statutorily required activities and functions," that Order in fact makes no mention of NEH (despite mentioning other agencies).[96]

---

[95] Adding yet another layer of irregularity, the "onmicrosoft.com" domain is notoriously used by cybercriminals and other malicious actors to carry out phishing attacks. *See, e.g.*, Smedh Arun Patil, Cloud That, *Proactive Strategies Against ".onmicrosoft.com" Phishing Attacks* (Dec. 13, 2023), https://www.cloudthat.com/resources/blog/proactive-strategies-against-onmicrosoft-com-phishing-attacks

[96] *See* Exec. Order No. 14217, *Commencing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 10577 (Feb. 25, 2025), https://www.federalregister.gov/documents/2025/02/25/2025-03133/commencing-the-reduction-of-the-federal-bureaucracy. President Trump also issued Exec. Order 14238, *Continuing the Reduction of the Federal Bureaucracy*, on March 14, 2025, https://www.federalregister.gov/documents/2025/03/20/2025-04868/continuing-the-reduction-of-

265. 259. The termination letters make no effort to explain how or why the relevant grant fails to "effectuate[] the agency's needs and priorities" or otherwise warrant termination. Nor did they address NEH's prior assessment—through its comprehensive panel and Council review process—that these projects *do* effectuate agency priorities and are aligned with the statutory mandate and goals of NEH.

266. 260. The termination letters likewise fail to explain what "exceptional circumstances" preclude adherence to ordinary notification procedures.

267. 261. Additionally, the termination letters included no reference to any method for appeal or to seek reconsideration, even though NEH's General Terms and Conditions require that grantees have a right to appeal a termination.[97]

268. 262. On April 24, 2025—three weeks *after* NEH began terminating existing grants—the agency issued a press release titled: "An Update on NEH Funding Priorities and the Agency's Recent Implementation of Trump Administration Executive Orders."[98]

269. 263. The press release stated that NEH had, in recent weeks, "taken several internal operational steps to improve efficiency, eliminate offices that are not essential to fulfilling its statutory requirements, and to return to being a responsible steward of taxpayer funds."[99] It further stated that NEH had also taken steps to "ensure that all future awards will, among other things, be merit-based, awarded to projects that do not promote extreme

---

the-federal-bureaucracy. This Order also made no mention of NEH.

[97] *See* Nat'l Endowment for the Humanities, *General Terms and Conditions for Awards to Organizations (for grants and cooperative agreements issued between January 1, 2022, and September 30, 2024* (Mar. 15, 2025), https://www.neh.gov/general-terms-and-conditions-awards-organizations-grants-and-cooperative-agreements-issued-january-2022#_Toc92721724, section 13 (terms for grants issued January 1, 2022 to September 30, 2024) and Nat'l Endowment for the Humanities, *General Terms and Conditions for Awards to Organizations (for grants and cooperative agreements issued October 1, 2024, or later)* (Mar. 13, 2025), https://www.neh.gov/general-terms-and-conditions-grants-after-oct-2024, section XIII (terms for grants issued October 1, 2024 or later).

[98] Nat'l Endowment for the Humanities, *An Update on NEH Funding Priorities and the Agency's Recent Implementation of Trump Administration Executive Orders*, https://www.neh.gov/news/update-neh-funding-priorities-and-agencys-recent-implementation-trump-administration-executive (last visited May 27, 2025).

[99] *Id.*

SECOND[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

3301253.7
46686\20748993.1

ideologies based upon race or gender, and that help to instill an understanding of the founding principles and ideals that make America an exceptional country."

270. 264. As part of the press release, NEH issued a new "Statement on NEH Priorities" and "Frequently Asked Questions."[100]

271. 265. The "Statement on NEH Priorities" reads as follows:

> Founded in 1965, the National Endowment for the Humanities (NEH) is a grant-making agency of the U.S. government dedicated to supporting exemplary humanities research and programming in service of the American people. It does so by investing in the most meritorious proposals for the advancement and dissemination of humanities learning.
>
> As set forth in NEH's enabling legislation, the humanities include the study of modern and classical languages, linguistics, literature, history, jurisprudence, philosophy, archaeology, comparative religion, ethics, the history of the arts, and those aspects of the social sciences which have humanistic content and use humanistic methods, as well as other areas.
>
> To bring the wisdom of the humanities to all Americans, NEH supports research projects that advance humanistic learning, preservation projects that ensure access to significant humanities resources, education projects that strengthen teaching in the humanities, and public programing that conveys the best of the humanities to all Americans.
>
> Moving forward, NEH is especially interested in projects on the nation's semiquincentennial and U.S. history more generally. In addition, the agency will be more finely attuned to its statutory responsibility that "funding should contribute to public support and confidence in the use of taxpayer funds."
>
> As per longstanding agency policy, NEH-supported projects must not promote a particular political, religious, or ideological point of view and must not engage in political or social advocacy. NEH-supported projects should not preference some groups at the expense of others and should ultimately support public purposes.
>
> The principles of intellectual significance, merit, competition, and equal opportunity lie at the heart of NEH's mission.

272. 266. Two of the posted "Frequently Asked Questions" addressed the terminated grants:

Q:     Why is NEH cancelling awards?

---

[100] Nat'l Endowment for the Humanities, *Updates on NEH Priorities* (Apr. 24, 2025), https://www.neh.gov/updates-neh-priorities.

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

A:   All federal grantmaking agencies, including NEH, must ensure that taxpayer dollars are spent effectively and are consistent with each agency's mission. This requires that NEH regularly evaluate its funding priorities within the policy framework established by Congress, the Administration, and the head of NEH. Awards and programming must align with these priorities.

Q:   What types of awards are being cancelled?

A:   In collaboration with the Administration, NEH has cancelled awards that are at variance with agency priorities, including but not limited to those on diversity, equity, and inclusion (or DEI) and environmental justice, as well as awards that may not inspire public confidence in the use of taxpayer funds.

273. 267. This post-hoc explanation does not constitute reasoned decision-making, nor could it provide appropriate notice to grant recipients that their grants would be terminated, or constitute sufficient rationale therefor.

274. 268. NEH's new "priorities" also directly contradict its statutory mandate to make grants that "reflect the diversity and richness of our American cultural heritage" and "give particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented." 20 U.S.C. § 956(c).

275. 269. As it explains in its new statements, NEH has dramatically narrowed its definition of agency "priorities" based on Defendant Trump's Executive Orders or otherwise in "collaboration with the Administration."

276. 270. In so doing, NEH improperly ignores the statutory priorities Congress set out in 20 U.S.C. § 956, which Congress reaffirmed by allocating additional grant-making funds to NEH in March 2025.

3.   **NEH Plaintiffs And Other Grant Recipients Are Harmed by NEH's Illegal Grant Terminations**

277. 271. Plaintiffs and Class members have long relied on NEH grants to fund meritorious projects in the humanities. The termination of nearly all previously awarded grants has caused and continues to cause Plaintiffs and class members serious harm.

3301253.7
46686\20748993.1

a.    **Plaintiff Robert Hirst's Grant Termination and Resulting Harm**

278.    272. Plaintiff Robert Hirst is the curator of the Mark Twain Papers and general editor of the Mark Twain Project at the Bancroft Library at the University of California, Berkeley. He has served in this role since 1980.

279.    273. The Mark Twain Papers contain the voluminous private papers of Samuel Langhorne Clemens, known to all Americans by his pen name, "Mark Twain." He has long been considered one of the most important writers of the 19th Century. His papers were bequeathed to the University of California in 1962; hundreds of original documents have since been added to that core collection. The collection makes it possible to read, in a single location, virtually every surviving document in Mark Twain's hand.

280.    274. The Mark Twain Project, a major editorial and publishing program of the Bancroft Library, is housed within the Mark Twain Papers archive. The aim of this Project is to create, maintain, correct, and update a permanent, globally accessible resource for the life and writings of Mark Twain. The Project hosts over 200 in-person and online visits to the Papers each year. In addition, the editors routinely go out to speak about the collection and the edition to students and to a variety of other interested groups. In order to maintain this collection and conduct ongoing research, the Mark Twain Papers and Project employ five full-time editors.

281.    275. Since 2001, the Mark Twain Project has focused much of its effort on the Mark Twain Project Online (the "Online Project"), which is intended to make available all of the Project's edited texts. Its original online website platform has become obsolete and work is underway to migrate the website and database to a modern, technologically supportable platform.

282.    276. In his recently published biography of Mark Twain, writer Ron Chernow—a Pulitzer Prize-winning biographer—wrote: "Perhaps no other American author can boast such a richly documented record. . . . With its learned editions and digitized website, the Mark Twain Papers ranks as one of the foremost scholarly achievements of our era."

1    283.    277. NEH has awarded more than $11,000,000 to support the editorial

2    work of the Mark Twain Project, without interruption, since 1967, and has also made a

3    generous challenge grant for the renovation of the Online Project.

4    284.    278. On the occasion of the NEH's 50th birthday in 2015, the agency

5    honored the Mark Twain Papers and Project as one among fifty nationwide across five

6    decades that "'have shaped what we think and what we know about ourselves and our culture'

7    since 1965."[101]

8    Application (RQ-300297) for Grant Funding

9    285.    279. On November 29, 2023, the Mark Twain Project, through the

10    Regents of the University of California, submitted to the NEH an Application for Federal

11    Domestic Assistance—application RQ-300297, titled "Mark Twain Project." Dr. Hirst's

12    Grant Application sought to draw the Mark Twain Project nearer to its goal of making all of

13    Twain's works available to the public for free through the Online Project.

14    286.    280. The Grant Application proposed a cumulative budget of $900,000,

15    including $450,000 in NEH funds. This budget would fund roughly half the salaries for three

16    editors and a digital publications manager for three years. The other half of the staff salaries

17    would need to be paid by private funds raised by Dr. Hirst.

18    Award of Grant (RQ-300297) Funding

19    287.    281. On August 28, 2024, UC Berkeley received a letter from the chair

20    of the NEH, approving the Mark Twain Project's application RQ-300297 to receive an offer

21    for funding ("Offer Letter").

22    288.    282. The Offer Letter provided UC Berkeley up to $450,000 in federal

23    matching funds if Dr. Hirst raised an equal amount of eligible non-federal, third-party gifts,

24    and certified their availability, and if NEH had available to it sufficient funds allocated for

25    matching purposes. The Offer Letter provided: "If you wish to accept this offer of support,

26    your response to the above condition(s) and the Gift Certification Form must be submitted via

---

[101] Sharon Goetz, *Mark Twain Papers and Project Honored by NEH*, UC Berkeley Library UPDATE (Oct. 9, 2015), https://update.lib.berkeley.edu/2015/10/09/mark-twain-papers-and-project-honored-by-neh/.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

3301253.7
46686\20748993.1

eGMS Reach, NEH's online electronic grant management system no later than June 30, 2027."

289. 283. On October 31, 2024, the university's Sponsored Projects Office ("SPO") accepted the NEH offer and sent in the required certification, signed by Dr. Hirst.

Termination of Grant (RQ-300297) Funding

290. 284. On April 2, 2025, UC Berkeley received an email from the address "Grant_Notifications@nehemail.onmicrosoft.com," purporting to be from Michael McDonald, Acting Chairman for the National Endowment for the Humanities (the "Termination Email"). This is not an e-mail domain that NEH has ever used to communicate with Dr. Hirst or the university regarding the Mark Twain Project.

291. 285. Attached to the Termination Email was a letter from Michael McDonald, Acting Chairman for the National Endowment for the Humanities, cancelling the Mark Twain Project's grant, Award No. RQ-300297-25, in its entirety effective April 1, 2025 (the "Termination Letter").

292. 286. The Termination Letter reads in relevant part:

> Your grant no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement and is subject to termination due to several reasonable causes, as outlined in *2CFR200.340*. NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda. The President's February 19, 2024 executive order mandates that the NEH eliminate all non-statutorily required activities and functions. *See Commencing the Reduction of the Federal Bureaucracy*, E.O. 14217 (Feb. 19, 2025). Your grant's immediate termination is necessary to safeguard the interests of the federal government, including its fiscal priorities. The termination of your grant represents an urgent priority for the administration, and due to exceptional circumstances, adherence to the traditional notification process is not possible. Therefore, the NEH hereby terminates your grant in its entirety effective April 1, 2025.

293. 287. Dr. Hirst then searched for the Mark Twain Project's grant on eGMS Reach, NEH's online electronic grant management system. He could find no record of the grant or his many communications about it on eGMS Reach: It had apparently been

deleted entirely from the system. Agency erasure of grant records was unprecedented in Dr. Hirst's multi-decade relationship with NEH.

294. 288. Dr. Hirst spoke with his longtime NEH program officer, Jason Boffetti, who told him that DOGE had required NEH to lay off most of its staff if the agency wanted to continue to operate.

Harm Suffered from Termination of Grant (RQ-300297)

295. 289. Dr. Hirst, the Mark Twain Papers and Project, and project staff, have suffered immediate harm as a result of the cancellation of their NEH grant, which will continue into the future.

296. 290. In lieu of conducting his editorial work, Dr. Hirst will have to refocus his time on fundraising to replace the cancelled grant funding ($450,000).

297. 291. The financial uncertainty created by this grant cancellation significantly threatens his ability to retain the highly trained and experienced staff working on the Mark Twain Project. These individuals are among the world's experts on Mark Twain, and their knowledge of the collection is irreplaceable.

298. 292. The cancellation threatens the migration of the collection to new platforms as the existing ones have become obsolete. Because the online platform allows scholars and students from all over the world to access these original documents, any interruption or delay in this work is very harmful to the Project and to the many who regularly access or will want to access these materials in the future.

299. 293. In addition, Dr. Hirst and his staff will have less ability to go out to schools and universities to share the incomparable work of Mark Twain.

300. 294. The termination of Plaintiff Hirst's grant is especially ironic given then NEH continues to promote the collection of Mark Twain's papers as a significant achievement on its website's homepage.[102] Moreover, Mark Twain is included in the list of individuals in Executive Order 13987, "Building the National Garden of American Heroes,"

---

[102] Nat'l Endowment for the Humanities, NEH Funding by the Numbers (description of data on homepage), https://www.neh.gov/ (last visited May 27, 2025).

3301253.7
46686\20748993.1

which seeks to create a statue garden of such heroes, and which NEH now says it will provide grant funding to support.[103]

**b.   Plaintiff Christine Philliou's Grant Termination and Resulting Harm**

301.   ~~295.~~ Dr. Christine Philliou is a Professor of History at the University of California, Berkeley. Previously, she was a professor at Columbia University and Yale University.

302.   ~~296.~~ She is the author of two books: *Turkey: A Past Against History* (University of California Press, 2021), and *Biography of an Empire: Governing Ottomans in an Age of Revolution* (University of California Press, 2010), as well as dozens of articles and book chapters. Her work has received numerous recognitions, including a Fulbright-Hays Research Fellowship, a Brookings Institution Research Award, and the Lenfest Distinguished Faculty Award, and has led to offers of fellowships from Stanford University and the American Council of Learned Societies.

303.   ~~297.~~ In addition to her research and teaching, Dr. Philliou founded the Program in Modern Greek and Hellenic Studies at the Institute for European Studies; the Turkish Ottoman and Post-Ottoman Studies Initiative at the Center for Middle Eastern Studies; and the Istan-Polis collaborative research project. All are designed to broaden and deepen appreciation for the history of Turkey, Greece, and the Ottoman Empire.

Application for Grant Funding (RZ-292650-23)

304.   ~~298.~~ On November 29, 2022, through the Regents of the University of California, Dr. Philliou submitted to the NEH an Application for Federal Domestic Assistance titled "Visualizing Local Christian Communities in Muslim Cosmopolitan Istanbul in the 19th and 20th Centuries."

---

[103] Nat'l Endowment for the Humanities, *National Garden of American Heroes: Statues*, https://www.neh.gov/program/national-garden-american-heroes-statues (last visited May 27, 2025); Exec. Order No. 13978, *Building the National Garden of American Heroes*, 86 Fed. Reg. 6809 (Jan. 22, 2021), https://www.federalregister.gov/documents/2021/01/22/2021-01643/building-the-national-garden-of-american-heroes.

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

305. 299. The purpose of the grant was to help fund the Istan-Polis Project, an effort to reconstruct and analyze the history of Istanbul's Orthodox Christian communities in the final Ottoman century. The grant would also fund development of a public-facing website to display the results of data projects and to feed further research and collaboration. The focus on the experience of Istanbul's Christian minority in the final stage of the Ottoman Empire was intended to provide new tools for scholars seeking to clarify how the tensions between cosmopolitanism and nationalism were historically manifested in cities globally. Such work has obvious relevance to pressing questions of nationalism versus broader inclusion of minority groups today.

### Award of Grant Funding (RZ-292650-23)

306. 300. On September 22, 2023, the University of California, Berkeley and Dr. Philliou received a letter from Shelly Lowe, the chair of the NEH, approving Project Application RZ-292650-23 for funding (the "Offer Letter") for an award of $246,347.00 over three years.

307. 301. In response to the award of the grant, Dr. Philliou's team planned for and then began executing the steps laid out in the grant application. This included team members' travel to Berkeley for a winter meeting in January 2024, to Europe in June 2024 for a related seminar, and to Istanbul in June-July 2024 for an *in situ* seminar. The team hired and contracted with project managers to coordinate transcription and other work on the census register project, and spent funds on the project's website infrastructure. This included contracting with independent contractors, purchasing airline tickets, reimbursing expenses for international and domestic travel, hiring student workers, and paying vendors for lodging and catering.

308. 302. Overall, in Year 1 the team focused on the Old City of Istanbul. The resulting website has become a treasure to people with Greek heritage and other heritages tracing their lineage to Istanbul around the world, and received special recognition from the Archbishop of North and South America, Elpidophoros. The team's Year 1 *in situ* seminar

1    was also life-changing for the undergraduate and graduate students who accompanied the

2    research team.

3           309.    303. Years 2 and 3 of the grant were to focus on the Frankish Quarter

4    and other neighborhoods up and down the Bosporus. They would have produced similarly

5    dramatic, perspective-changing results.

6                     Termination of Grant Funding (RZ-292650-23)

7           310.    304. On April 2, 2025, UC Berkeley received an email from the address

8    "Grant_Notifications@nehemail.onmicrosoft.com," sent on behalf of Michael McDonald,

9    Acting Chairman for the NEH (the "Termination Email"). Attached to the Termination Email

10   was a letter cancelling grant RZ-292650-23, effective the prior day, April 1.

11          311.    305. The Termination Letter states that the grant "no longer effectuates

12   the agency's needs and priorities . . . in light of the fact that the NEH is repurposing its

13   funding allocations in a new direction in furtherance of the President's agenda. The

14   President's February 19, 2025 executive order mandates that the NEH eliminate all non-

15   statutorily required activities and functions. See Commencing the Reduction of the Federal

16   Bureaucracy, E.O. 14217 (Feb. 19, 2025)." It further stated that "adherence to the traditional

17   notification process is not possible" because of "exceptional circumstances."

18                     Harm Suffered from Termination of Grant Funding

19          312.    306. The Istan-Polis Project, its staff, and Dr. Philliou have suffered

20   direct and immediate harm as a result of the cancellation of the grant. Work on the website

21   has been disrupted. A seminar in Istanbul for this summer very likely will not proceed. Staff

22   who were depending on funds provided by the grant may be without a livelihood. Researchers

23   may not even be paid for work they have already performed. In addition, the team incurred

24   $46,750 in project expenses that remain unreimbursed. Further, the end of the grant will likely

25   mean an end to the project as a whole and the closing of a remarkable window on history that

26   had just opened.

27

28

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

C.      **National Science Foundation**

313.   ~~307.~~ The National Science Foundation ("NSF") is an independent federal agency intended to promote the progress of science in the United States.

**2.   ~~1.~~ Congress Established the National Science Foundation to Promote Scientific Research on a Broad Scale to Advance the United States' National Interests**

314.   ~~308.~~ NSF was created after World War II when it became clear that federally funded scientific research was key to the nation's national security interests. Describing it as an Act "[t]o promote the progress of science; to advance the national health, prosperity, and welfare; to secure the national defense; and for other purposes," Congress established NSF in 1950 through the enactment of the National Science Foundation Act of 1950 (the "Act"). Public Law 81-507 (codified at 42 U.S.C. § 1861 et seq.).

315.   ~~309.~~ The NSF's core function is making grants to fund innovative scientific research. The NSF awards grants through an apolitical merit review process, under which panels of disinterested scientific experts vet grant applications and make award decisions. The NSF's merit review process is often referred to as the "gold standard" of scientific review, and NSF-funded research has contributed to some of the most important scientific advances of the past 70 years.

316.   ~~310.~~ The Act arose out of the growing awareness during World War II that science was crucial to the Unites States' national interest and security, as science was key to the Allied successes in the war. Indeed, during World War II, federal government support of scientific research accelerated dramatically, and a growing consensus emerged in favor of continuing government support of basic scientific research after the end of the war.

317.   ~~311.~~ The NSF's statutorily defined mission "is to provide Federal support for basic scientific and engineering research, and to be a primary contributor to mathematics, science, and engineering education at academic institutions in the United States." 42 U.S.C. § 1862k(a)(6)(A).

318.   ~~312.~~ The Act establishes a series of core "functions" for the NSF. Chief among them, the Act authorizes and directs the NSF to "initiate and support basic scientific

research in the mathematical, physical, medical, biological, engineering, and other sciences," as well as "specific scientific research activities in connection with matters relating to the national defense."

319. 313. The Act also directs the NSF to provide "grants, loans, and other forms of assistance" to support scientific research" and award "scholarships and graduate fellowships in the mathematical, physical, medical, biological, engineering, and other sciences."

320. 314. The Act has been amended at various times since 1950. Since at least 1980, Congress has recognized that for the United States to maintain its competitive edge, it would need to encourage and prepare people from groups traditionally underrepresented in STEM to acquire skills and pursue careers in science and engineering fields. Congress consequently declared that "the highest quality science over the long-term requires substantial support, from currently available research and education funds, for increased participation in science and technology by women and minorities." Pub. L. 96-516, § 32. Congress later *expanded* this declaration to include increasing participation for people with disabilities. 42 U.S.C. § 1885(b). The importance of STEM to the interests of the United States prompted Congress, in 1980, to prescribe a national policy to promote "full use of the human resources of the Nation" in STEM fields:

> The Congress declares it is the policy of the United States to encourage men and women, equally, of all ethnic, racial, and economic backgrounds to acquire skills in science and mathematics, to have equal opportunity in education, training, and employment in scientific and technical fields, and thereby to promote scientific literacy and the full use of the human resources of the Nation in science and technology.

Pub. L. 96-516 § 32. In other words, Congress has consistently acted to consciously *expand* STEM access rather than to narrow it, by affirmative outreach to groups not traditionally invited or encouraged to contribute to STEM initiatives.

321. 315. One such act was the National Science Foundation Authorization Act of 1998 (the "1998 Amendment"). The 1998 Amendment to the Act reaffirmed the NSF's

statutory commitment to making the United States a leader in STEM fields, and it set as long-term goals for the NSF to provide leadership to:

       a.     enable the United States to maintain a position of world leadership in all aspects of science, mathematics, engineering, and technology;

       b.     promote the discovery, integration, dissemination, and application of new knowledge in service to society; and

       c.     achieve excellence in United States science, mathematics, engineering, and technology education at all levels. 42 U.S.C. § 1862k(a)(6)(B).

322. 316. Pursuant to these congressional directives, much of the NSF-funded research at universities has, for decades, supported the participation in STEM fields by women, minorities, and people with disabilities.

323. 317. Notably, the 1998 Amendment sets forth several "core strategies" for achieving the above goals, which include a focus on ensuring diversity in entrants to STEM fields: "Develop intellectual capital, both people and ideas, with particular emphasis on groups and regions that traditionally have not participated fully in science, mathematics, and engineering." 42 U.S.C. § 1862k(b)(1).

324. 318. The Act was again amended in 2007 as part of the "America COMPETES Act," which sought to bolster the competitiveness of the United States in scientific research and innovation. It instructed the NSF to "give priority" in granting awards to research activities "that can be expected to make contributions in physical or natural science, technology, engineering, social sciences, or mathematics, or that enhance competitiveness, innovation, or safety and security in the United States." 42 U.S.C. § 1862o-5(b).

325. 319. The NSF seeks to fulfill its mission chiefly by issuing competitive, limited-term grants in response to specific proposals from researchers and research organizations. The NSF receives over 50,000 such proposals each year, and funds about 10,000 of them.

326. 320. The NSF employs a merit review process in which reviews of grant applications are carried out by panels of independent scientists, engineers, and educators who are experts in the relevant scientific field, and they are vetted to avoid conflicts of interest. Reviewers judge grant applications for both "intellectual merit" and "broader societal impact."

327. 321. NSF grants are highly competitive and prestigious, and its pre-January 20, 2025 merit review process is often credited for the profound success of the NSF throughout its history. Indeed, it is no exaggeration to say that the world as we know it today would not exist without the NSF. NSF grants have contributed to an extraordinary number of scientific and technological innovations and achievements over the past 75 years, including:

a.  The Internet
b.  Semiconductors (i.e., computer chips)
c.  Supercomputers
d.  Artificial intelligence
e.  3-D printing
f.  American Sign Language
g.  Captcha
h.  Deep ocean exploration and drilling
i.  Detecting gravitational waves
j.  DNA amplification (central to biotech)
k.  Doppler radar
l.  Duolingo
m.  Fusion energy
n.  Geographic Information Systems (GIS)
o.  Kidney matching
p.  LASIK eye surgery
q.  MRI
r.  Seeing black holes

328. 322. To date, at least 268 Nobel laureates have been supported by NSF grants. In 2024 alone, NSF grant recipients received Nobel prizes in physiology or medicine, physics, chemistry, and economics.

329. 323. The NSF has also funded numerous national observatories, has had responsibility for U.S. research operations in the Antarctic, and has been heavily involved in United States deep sea exploration. The NSF also managed laboratories from the Defense

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    Department's Advanced Research Projects Agency (DARPA), which lead to the creation of

2    the Internet.

3        330.    324. The enormous impact of the NSF grant-making process is

4    summarized neatly in this statement from Forbes: "For 75 years, the National Science

5    Foundation has been the quiet backbone of American scientific progress. It funds a substantial

6    share of all federally supported basic research outside the biomedical sphere, supporting

7    discoveries in climate science, artificial intelligence, cybersecurity and quantum materials

8    among many, many others. Its grants train graduate students, launch early-career faculty and

9    sustain the open, reproducible research that fuels U.S. competitiveness."[104]

10       **3.    2. In Response to Trump Administration Directives, NSF Improperly
         Changed Priorities and Canceled Existing Grants**

11

12       331.    325. The foregoing paragraphs describe the NSF as it existed and

13   functioned through the decades, from its original founding until January 20, 2025.

14       332.    326. The NSF is now facing an existential threat: the Trump

15   Administration has negated the NSF's core grant-making function by unilaterally, arbitrarily

16   and illegally terminating billions of dollars in lawfully awarded scientific grants that the

17   Administration views (often mistakenly) as having some connection to diversity, equity and

18   inclusion (most broadly defined), as well as other subjects the Trump Administration dislikes,

19   such as climate change, vaccines, HIV/AIDS, and COVID-19.

20       333.    327. At Defendants Trump and DOGE's direction, NSF has taken aim

21   at the pillars sustaining the United States' STEM preeminence. These actions violate the law

22   and jeopardize America's longstanding global leadership in STEM. NSF has announced that it

23   will no longer abide by Congress's longstanding mandates.

24       334.    328. Since the Trump Administration took office in January 2025, the

25   NSF has terminated more than a billion dollars in scientific grants that had previously been

26   approved and awarded through the merit review process and which the NSF was legally

27

28   [104] John Drake, *The NSF Is Being Dismantled — With Broad Implications For The American
     Economy,* Forbes (May 9, 2025), https://www.forbes.com/sites/johndrake/2025/05/09/the-
     national-science-foundation-is-being-dismantled-what-the-economy-needs-is-more-investment.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

obligated to provide. The pace of the terminations has escalated rapidly since mid-April, as the Trump Administration has taken a wrecking ball to the NSF. During that brief time period, more than 1,400 grants have been terminated. NSF terminated over 430 grants *in one week*.[105] The grant terminations were generally not preceded by warnings, and thus came as a complete shock to the researchers whose livelihoods and life's work depended on them.

335. ~~329.~~ The grant terminations have typically been conveyed in short, standardized missives containing boilerplate statements. For example, Plaintiff Jedda Foreman and other UC researchers all received the following termination letter:

> The U.S. National Science Foundation (NSF) has undertaken a review of its award portfolio. Each award was carefully and individually reviewed, and the agency has determined that termination of certain awards is necessary because they are not in alignment with current NSF priorities. Effective immediately, the following are terminated: [list of NSF Award IDs]. NSF is issuing this termination to protect the interests of the government pursuant to NSF Grant General Conditions (GC-1) term and condition entitled 'Termination and Enforcement,' on the basis that they no longer effectuate the program goals or agency priorities. This is the final agency decision and not subject to appeal.

336. ~~330.~~ In an apparent attempt to justify its new war on science, the NSF published a "Statement of NSF Priorities" on April 18, 2025, explaining that NSF's activities "must aim to create opportunities for all Americans everywhere" and "[r]esearch projects with more narrow impact limited to subgroups of people based on protected class or characteristics do not effectuate NSF priorities."[106] Pursuant to this Directive, NSF began issuing termination notices *en masse* to research projects, including many grants to UC researchers, designed to implement Congress's express goals of increasing STEM participation, studying misinformation, and addressing environmental justice.

---

[105] Erin Socha, *New Database Tracks Canceled N.S.F. Research Grants*, U. Daily Kansan (April 25, 2025), https://www.kansan.com/news/new-database-tracks-canceled-n-s-f-research-grants/article_0a3d2a6c-97e5-43c3-96c0-db02dc609210.html.

[106] U.S. Nat'l Sci. Found., *Statement on NSF Priorities* (April 18, 2025), https://www.nsf.gov/updates-on-priorities#statement-of-nsf-priorities-09d.

3301253.7
46686\20748993.1

~~SECOND~~[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

337. 331. NSF also issued an accompanying set of FAQ's, which indicated that awards not aligned with NSF priorities include, but are "not limited to those on diversity, equity, and inclusion (DEI) and misinformation/disinformation."

338. 332. The grant cancellations are one prong in what can only be described as an effort to radically shrink and marginalize the NSF. In mid-April it was announced that the NSF was freezing any new grants, and in early May, the NSF announced that its 37 research divisions were being abolished. Then, on April 24, 2025, the Director of NSF, Sethuraman Panchanathan, resigned 16 months early. Massive layoffs are now anticipated. Meanwhile, President Trump proposed cutting the NSF's budget for the 2026 fiscal year by 55%. As recently stated in *Forbes*, "This is not reform. It is a dismantling."[107]

339. 333. It appears that DOGE is behind the unlawful grant terminations at NSF. *See, e.g.,* Katrina Miller & Carl Zimmer, *National Science Foundation Terminates Hundreds of Active Research Awards*, New York Times (April 22, 2025) ("Last Wednesday, the magazine Science reported that all new research grants by the agency had been frozen, as ordered by the Department of Government Efficiency, or DOGE."); Dan Garisto, *Trump Team Freezes New NSF Awards – And Could Soon Axe Hundreds of Grants*, Nature (Apr. 17, 2025) ("All new research grants have been frozen at the US National Science Foundation (NSF) — an action apparently ordered by the Department of Government Efficiency (DOGE) . . . DOGE is also reviewing a list of active research grants, assessed in February by the NSF, for terms associated with diversity, equity and inclusion (DEI). It is considering terminating more than 200 of them, NSF staff members have told Nature.").

340. 334. Indeed, on May 13, 2025, Alondra Nelson, the Harold F. Linder Professor at Princeton University's Institute for Advanced Study, resigned her prestigious position on the National Science Foundation's board of directors. Explaining her decision to Time Magazine, she said: "Last week, as the Board held its 494th meeting, I listened to NSF staff say that DOGE had by fiat the authority to give thumbs up or down to grant applications

---

[107] John Drake, *The NSF Is Being Dismantled — With Broad Implications For The American Economy,* Forbes (May 9, 2025), https://www.forbes.com/sites/johndrake/2025/05/09/the-national-science-foundation-is-being-dismantled-what-the-economy-needs-is-more-investment.

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

which had been systematically vetted by layers of subject matter experts. Our closed-to-the-public deliberations were observed by Zachary Terrell from the DOGE team. Through his Zoom screen, Terrell showed more interest in his water bottle and his cuticles than in the discussion."[108]

341. 335. These grant terminations are a disaster for the future of science in the United States. The gravity of the situation and illegality of the grant terminations were summarized in a letter from the House of Representatives' Committee on Science, Space, and Technology sent to the acting director of the NSF, Brian Stone, on May 8, 2025. The letter characterizes the Trump Administration's actions against the NSF as "chaos and destruction," and states that "[DOGE's] accusation that these terminated awards lack merit is a lie, as most, if not all these awards, carry a statement from the agency declaring that the award "reflects NSF's statutory mission and has been deemed worthy of support through evaluation using the Foundation's intellectual merit and broader impacts review criteria.'"[109]

342. 336. The House Committee Letter goes on to state: "The cancelation of these awards suggests instead that NSF is willing to apply political censorship of awards under direction from President Trump and the DOGE teenagers, which is a clear violation of the statutory mission of the agency." *Id.* It then provides a few examples of recently terminated grants to illustrate the folly, harmfulness, and in some instances absurdity of the Trump Administration's grant cancellations. The list of cancelled grants includes those for:

a.    A rural after-school program that gives middle school students an opportunity to use mathematics and design thinking to address agricultural issues, such as designing water catchment systems for drought conditions.[110]

---

[108] Alonda Nelson, *Why I'm Resigning From Positions at the National Science Foundation and Library of Congress,* Time Magazine, May 13, 2025; https://time.com/7285045/resigning-national-science-foundation-library-congress/.

[109] Letter from House of Representatives' Committee on Science, Space and Technology to Brian Stone (May 8, 2025), https://democrats-science.house.gov/imo/media/doc/2025-05-08%20Letter%20to%20Acting%20Director%20Stone.pdf.

[110] Nat'l Sci. Found., *Award Abstract #2215382 – Engaging Rural, Latinx Youth in an After School Program That Integrates Design Thinking, Making and Math*, https://www.nsf.gov/awardsearch/showAward?AWD_ID=2215382, (last visited May 27, 2025).

1          b.     Research on developing a tool that uses machine learning to detect

2  deepfakes, which are used for all manner of disinformation, be it political content planted by

3  foreign adversaries or the creation of child sexual abuse material.[111]

4          c.     A grant to study improved mental health interventions for

5  engineering students, who – across demographics – are statistically less likely than students in

6  other disciplines to seek mental health treatment. This research was aimed at improving outcomes

7  for engineering students in mental health distress and with mental health disabilities.[112]

8          d.     An industry-focused workforce development program that trains the

9  next generation of quantum technicians, including through accessible experiential learning and

10  certification opportunities for entry-level professionals.[113]

11          e.     A National Research Traineeship award, supporting 25 graduate

12  students, to develop new interdisciplinary studies applying AI to better understand "legal system

13  processes, impacts, and institutions" as well as to develop "tools and methods for leveraging

14  newly available data from the criminal legal system, and ethical and social implications of big

15  data and AI in the context of criminal justice."[114]

16          343.  337. The House Committee Letter condemns these grant terminations

17  as "an abdication of NSF's mission and a betrayal of the scientific community, including the

18  thousands of graduate students and early career researchers whose careers will be derailed. It

19  also states that the terminations are of questionable legality. The grant terminations are in

20  direct defiance of a court-ordered preliminary injunction enjoining NSF from impeding the

21  disbursement of appropriated federal funds under awarded grants or other executed financial

22

23

---

[111] Andrea E Hickerson,, *Award Abstract #2310131 – Collaborative Research: SaTC: TTP: Small: DeFake: Deploying a Tool for Robust Deepfake Detection, Nat'l Sci. Found.,* https://www.nsf.gov/awardsearch/showAward?AWD_ID=2310131 (last visited May 27, 2025).

[112] Nat'l Sci. Found., *Award Abstract # 2225567 – Research: Identifying intervention targets to increase mental health help seeking in undergraduate engineers,* https://www.nsf.gov/awardsearch/showAward?AWD_ID=2225567 (last visited May 27, 2025).

[113] Nat'l Sci. Found., *Award Abstract # 2243822 - NRT-HDR: Computational Research for Equity in the Legal System" (CRELS),* https://www.nsf.gov/awardsearch/showAward?AWD-ID=2243822 (last visited May 29, 2025).

[114] *Id.*

3301253.7
46686\20748993.1

1    obligations directed or implied by Executive Order 14151… or any other materially similar

2    policy."[115]

3    **4.**    ~~3.~~ **NSF Plaintiff and Other Grant Recipients Are Harmed by NSF's**
         **Illegal Grant Terminations**

4

5    344.    ~~338.~~ Plaintiff Foreman and Class members have long relied on NSF

6    grants to fund meritorious projects aimed at advancing scientific knowledge. The termination

7    of previously approved grants has caused and continues to cause Plaintiff and Class members

8    serious harm.

9    a.    **Plaintiff Jedda Foreman's Grant Terminations and Resulting**
         **Harm**

10

11    345.    ~~339.~~ Jedda Foreman is the Director, Center for Environmental

12    Learning, at the Lawrence Hall of Science at the University of California, Berkeley.

13    First Application for Grant Funding (2314075):

14    346.    ~~340.~~ On January 11, 2023, with her collaborators at the Lawrence Hall

15    of Science, Foreman submitted (through the Regents of the University of California) a grant

16    proposal to NSF's National Science Foundation Program NSF 22-626, Advancing Informal

17    STEM Learning (AISL). The AISL program invests in research and practice on how people

18    learn STEM outside of formal education. It seeks proposals that further the well-being of

19    individuals and communities who have historically been and continue to be excluded, under-

20    served, or underrepresented.

21    347.    ~~341.~~ Foreman's proposal, titled "Understanding the Impact of Outdoor

22    Science and Environmental Learning Experiences Through Community-Driven Outcomes,"

23    was for a four-year Integrating Research and Practice project that would produce a set of

24    science and environmental literacy measures for underrepresented communities.

25    First Award of Grant Funding (2314075)

26

27

28    ---
      [115] *New York v. Trump*, No. 25-cv-39-JJM-PAS, (D.R.I. Jan. 31, 2025),
      https://ag.ny.gov/sites/default/files/court-filings/state-of-new-york-et-al-v-trump-tro-2025.pdf
      (last visited May 27, 2025).

3301253.7
46686\20748993.1

~~SECOND~~[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

348. 342. On August 22, 2023, the NSF accepted Foreman's proposal and awarded her a grant (Award Number 2314075). The Award Notice stated that the NSF was obligated in the amount of $1,583,195, and that the total intended award was $2,149,437. The Award Notice provided: "Contingent on the availability of funds and scientific progress of the project, NSF expects to continue support at approximately the following level: Fiscal Year: 2026, Increment Amount: $566,242." The Award Notice was made as per the provisions of NSF Solicitation: "NSF 22-626 Advancing Informal STEM Learning," and provided that the period of performance was from January 1, 2024 through December 31, 2027.

349. 343. The award covered salaries and wages for three senior personnel: principal investigator Melissa Collins, Ph.D., co-principal investigator Valeria Romero, M.A., and Foreman. The award also covered salaries and wages for several other professional researchers and project coordinators at the Lawrence Hall of Science, UC Berkeley's public science center. The award further provided for support from an undergraduate research assistant.

Second Application for Grant Funding (2315277)

350. 344. On January 17, 2023, together with her collaborators at the Lawrence Hall of Science, Foreman submitted (through the Regents of the University of California) a proposal to the National Science Foundation Program NSF 22-634, Racial Equity in STEM Education (RESTEM), which aims to support groundbreaking projects that contribute to advancing racial equity in STEM education and workforce development.

351. 345. Foreman's proposal, titled "Working Toward Racial Equity: Building Capacity to Institutionalize Equity in Outdoor and Environmental Science Education," was designed to support a team of leaders from five organizations to facilitate and guide organization-wide discussions related to racial equity. The project was to develop a Tool Kit with three components—(1) a Facilitator's Reflection Guide, (2) a Foundations of Racial Equity Guide, and (3) Organization Systems Change Tools—that would produce a replicable model for broadening participation.

Second Award of Grant Funding (2315277)

SECOND [PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    352.    346. On September 13, 2023, the NSF accepted Foreman's proposal

2    and awarded her a grant (Award Number 2315277). The Award Notice stated that the NSF

3    was obligated in the amount of $1,701,416, and that the total intended award was $4,723,028.

4    The Award Notice provided: "Contingent on the availability of funds and scientific progress

5    of the project, NSF expects to continue support at approximately the following level: Fiscal

6    Year: 2025, Increment Amount: $947,005, Fiscal Year: 2026, Increment Amount: $1,133,391,

7    Fiscal Year: 2027, Increment Amount: $941,216." The award was made as per the provisions

8    of NSF Solicitation: NSF 22-634 Racial Equity in STEM Education and provided that the

9    period of performance was from January 1, 2024 through December 31, 2028.

10                    Third Application for Grant Funding (2241805)

11    353.    347. On August 12, 2022, Foreman and her collaborators submitted a

12    proposal (through the Regents of the University of California) to the National Science

13    Foundation Program NSF 22-585, Innovative Technology Experiences for Students and

14    Teachers (ITEST). This applied research and development program aims to advance the

15    equitable integration of technology in the learning and teaching of science, technology,

16    engineering, or mathematics from pre-kindergarten through high school.

17    354.    348. Foreman's proposal, titled "Supporting Rightful Presence in

18    Museum Spaces: Youth as Participatory Designers of Indigenous Mixed Reality Science

19    Exhibits," aimed to address the ongoing marginalization of Indigenous communities in

20    informal science learning spaces by developing and studying a model that strengthens

21    Indigenous youths' disposition towards, and capacity for STEM pathways.

22    355.    349. The project built on a partnership between the Lawrence Hall of

23    Science and mak-'amham, an Indigenous Ohlone cultural organization. The project would

24    engage Indigenous youth directly and investigate the impact of the participatory design model

25    on their STEM learning, science identity, and interest in STEM careers. The project findings

26    would be disseminated in informal science and technology learning communities to support

27    the youth participatory design model in informal science education contexts.

28                    Third Award of Grant Funding (2241805)

356. 350. On February 19, 2023, the NSF accepted Foreman's proposal and awarded a grant (Award Number 2241805). The Award Notice stated that the NSF was obligated in the amount of $1,292,298. The award was made in accordance with the provisions of NSF Solicitation: "NSF 22-585, Innovative Technology Experiences for Students and Teachers," and provided that the period of performance was from June 1, 2023 through May 31, 2026.

357. 351. The award covered salaries and wages for five senior personnel: Principal Investigator Ari Krakowski, Ph.D.; co-Principal Investigator Kimiko Ryokai, Ph.D.; co-Principal Investigator Sarah Olsen, Ph.D.; co-Principal Investigator Vincent Medina; and Foreman. The award also covered salaries and wages for several other professional researchers and project coordinators at the Lawrence Hall of Science. The award also provided $162,712 to support the work of graduate students.

### Supplemental Award to Celebrate NSF's 75th Anniversary (2241805)

358. 352. Together with her collaborators, Foreman submitted (through the Regents of the University of California) to the NSF a proposal for a supplement to award number 2241805 to celebrate NSF's 75th anniversary on May 10, 2025. On January 15, 2025, the NSF accepted Foreman's proposal and awarded a grant supplement (Award Number 2241805). The Supplemental Award Notice stated that the NSF was obligated by an additional amount of $98,981, bringing the total funds awarded to $1,391,279. The Supplemental Award Notice also extended the end of the award period from May 31, 2026 to November 30, 2026.

### Termination of Grant Funding (2315277, 2314075, and 2241805)

359. 353. On April 18, 2025, the University of California, Berkeley received an email (the "April 18 Termination Email") from the address "grants005@nsf.gov," purporting to be from Jamie H. French, Division Director, Office of Budget Finance and Award Management, Division of Grants and Agreements. The April 18 Termination Email stated that the NSF "ha[d] determined that termination of certain awards is necessary because they are not in alignment with current NSF priorities." It purported to terminate awards

2315277 and 2314075. It further stated that "the basis" of the termination is that the awards "no longer effectuate the program goals or agency priorities. This is the final agency decision and not subject to appeal."

360. 354. On April 25, 2025, the University of California, Berkeley received an email (the "April 25 Termination Email") from the address "grants005@nsf.gov," purporting to be from Jamie H. French, Division Director, Office of Budget Finance and Award Management, Division of Grants and Agreements. The April 25 Termination Email again stated that "the agency ha[d] determined that termination of certain awards is necessary because they are not in alignment with current NSF priorities." It terminated, among others, award 2241805. This email likewise further stated that "the basis" of the termination is that the awards "no longer effectuate the program goals or agency priorities. This is the final agency decision and not subject to appeal."

### Harm Suffered from Terminations of Grant Funding

361. 355. The Lawrence Hall of Science is UC Berkeley's public science center, with a mission to inspire and engage through science discovery and learning in ways that advance equity and opportunity. Nationwide, the Lawrence Hall reaches over 20% of U.S. students in grades K through 12 with its science curricula. The Lawrence Hall has successfully obtained significant federal funding (20-25% of its budget) to support the research and development to inspire young people, families, communities, and educators in STEM discovery and learning in ways that advance equity. Without federal grant funds, including the terminated grants, the Lawrence Hall's ability to carry out its public service mission is and will be significantly compromised.

362. 356. As to "Supporting Rightful Presence in Museum Spaces: Youth as Participatory Designers of Indigenous Mixed Reality Science Exhibits" (Award 2241805), $490,834.22 or 35% of the award remained unpaid at the time of termination. In addition, when this award was terminated, the supplemental funding for a celebration of the NSF's 75th anniversary on May 10, 2025 was terminated as well. Because promises had already been

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

made to community members, the Hall still went forward with the event and incurred the remaining costs.

363. 357. As to "Working Toward Racial Equity: Building Capacity to Institutionalize Equity in Outdoor and Environmental Science Education" (Award 2315277), approximately $3,769,075.24 or 80% of the award remained unpaid at the time of termination.

364. 358. As to " Understanding the Impact of Outdoor Science and Environmental Learning Experiences Through Community-Driven Outcomes" (Award 2314075), approximately $1,500,251.79 or 75% of the award remained unpaid at the time of termination.

365. 359. The financial implications of these abrupt terminations are enormous, representing millions of dollars of lost funding to the Lawrence Hall. It will likely need to reduce the time basis of and/or lay off both academic personnel and staff if it is not able to find alternative resources quickly.

366. 360. While the financial implications are debilitating, the human cost of the termination of these awards is also profound. Taken together, the grant-funded projects are important to the thousands of young people, educators, and partners that they are designed to engage, serve, and/or impact. The abrupt termination of these grants means these public benefits will go unrealized.

### D.    Department of Defense

367. 361. The Department of Defense ("DOD") is a federal agency within the meaning of the APA that was established to promote national security.

#### 1.    Congress Established DOD to Create a Comprehensive Program Dedicated to Ensuring the Future Security of the United States, Including Through Research

368. 362. Shortly after the end of World War II, President Truman urged Congress to combine the War and Navy Departments under one single Department of National Defense.[116] In his address to Congress, President Truman stated that creating the

---

[116] Harry S. Truman Library Museum, *Special Message to the Congress Recommending the Establishment of a Department of National Defense*, (Dec. 19, 1945) https://www.trumanlibrary.gov/library/public-papers/218/special-message-congress-

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

Department of National Defense was an "essential step … in the development of a comprehensive and continuous program for our future safety and for the peace and security of the world."[117]

369. 363.After months of deliberations regarding the role of the military in society and the possible threat of granting too much military power to the executive, Congress created the National Military Establishment through the National Security Act of 1947.[118] In 1949, the National Military Establishment was renamed the DOD.

370. 364.In passing the National Security Act of 1947, Congress intended to provide a "comprehensive program for the future security of the United States" and to unify the armed forces into "an efficient team of land, naval, and air forces."[119]

371. 365.Research was a critical component of the Act. The National Security Act established a Research and Development Board, which would advise the Secretary of Defense as to the status of scientific research relative to national security and to assist the Secretary of Defense in assuring adequate funding for research and development on scientific problems relating to national security.

372. 366.The Department of Defense Reorganization Act of 1958 amended the National Security Act of 1947 and created a Director of Defense Research and Engineering, who would supervise all research activities in DOD. The law further contemplated that DOD would contract with "educational or research institutions" to carry out its research mission.[120]

373. 367.Since 1961, Congress has annually updated the specific duties and functions of the DOD through the National Defense Authorization Act (NDAA).

374. 368.For example, the NDAA of Fiscal Year 2024 ("NDAA 2024") authorized the DOD to grant awards and funding for research activities related but not limited

---

recommending-establishment-department-national.
[117] *Id.*
[118] National Security Act of 1947, Pub. L. No. 80-253, 61 Stat. 495.
[119] *Id.*
[120] Department of Defense Reorganization Act of 1958, Pub. L. No. 85-599, 72 Stat. 514.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    to topics such as microelectronics, artificial intelligence, thermal destruction of PFAS,

2    quantum information, treatment of armed forces personnel with post-traumatic stress or

3    traumatic brain injury using designated psychedelic substances, and the effect of the COVID-

4    19 vaccine on service officers.[121]

5        375.    369. The NDAA for Fiscal Year 2021 ("NDAA 2021") required the

6    Secretary of Defense, acting under the Secretary of Defense for Research and Engineering, to

7    carry out a program of research and development in social science, management science, and

8    information science.[122] The purpose of program was to:

(1)    To ensure that the Department of Defense has access to innovation and expertise in social science, management science, and information science to enable the Department to improve the effectiveness, efficiency, and agility of the Department's operational and management activities.

(2)    To develop and manage a portfolio of research initiatives in fundamental and applied social science, management science, and information science that is stable, consistent, and balanced across relevant disciplines.

(3)    To enhance cooperation and collaboration on research and development in the fields of social science, management science, and information science between the Department of Defense and appropriate private sector and international entities that are involved in research and development in such fields.

(4)    To accelerate the development of a research community and industry to support Department of Defense missions in the fields of social science, management science, and information science, including the development of facilities, a workforce, infrastructure, and partnerships in support of such missions.

(5)    To coordinate all research and development within the Department of Defense in the fields of social science, management science, and information science.

(6)    To collect, synthesize, and disseminate critical information on research and development in the fields of social science, management science, and information science.

(7)    To assess and appropriately share, with other departments and agencies of the Federal Government and appropriate entities in the private sector—

---

[121] National Defense Authorization Act for Fiscal Year 2024, Pub. L. No. 118-31, 137 Stat. 136.
[122] National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388.

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

(A)    challenges within the Department of Defense that may be addressed through the application of advances in social science, management science, and information science; and

(B)    datasets related to such challenges.

(8)    To support the identification of organizational and institutional barriers to the implementation of management and organizational enhancements and best practices.

(9)    To accelerate efforts—

(A)    to transition, and deploy within the Department of Defense, technologies and concepts derived from research and development in the fields of social science, management science, and information science; and

(B)    to establish policies, procedures, and standards for measuring the success of such efforts.

(10)    To integrate knowledge from cross-disciplinary research on—

(A)    how factors relating to social science, management science, and information science affect the global security environment; and

(B)    best practices for management in the public and private sectors.

(11)    To apply principles, tools, and methods from social science, management science, and information science—

(A)    to ensure the Department of Defense is more agile, efficient, and effective in organizational management and in deterring and countering current and emerging threats; and

(B)    to support the National Defense Strategy.[123]

376. 370. In addition to the annual NDAAs, Congress has passed legislation instructing the DOD to award grants to institutions of higher education. For example, the David L. Boren National Security Education Act of 1991 ("NSEA") instructed the Secretary of Defense to create the National Security Education Program, which would award grants to institutions of higher education in order enable such institutions to establish, operate, or

---

[123] *Id.*

SECOND[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

3301253.7
46686\20748993.1

improve programs in foreign languages, area studies, counter proliferation studies, and other international fields that are critical areas of those disciplines through research.[124]

377. ~~371.~~ The National Security Education Program is codified at 50 U.S.C. § 1902. Its goal is to create vital experience in language and cultures critical to U.S. National Security.

378. ~~372.~~ Moreover, in 2008, the Secretary of Defense created the Minerva Research Initiative ("MRI") to address challenges such as ethnic strife, failing or failed states, rise of new powers, rise of violent extremism, disease, poverty, climate change, as well other unprecedented social change.[125] MRI was built on the lessons learned after the September 11 terrorist attacks, and was billed by the Pentagon as funding "[s]ocial science for a safer world."[126]

379. ~~373.~~ MRI "brings together universities and other research institutions around the world and supports . . . projects addressing specific interest areas determined by the Department of Defense."[127] MRI "emphasizes questions of strategic importance to U.S. national security policy,"[128] including violent extremism, drug cartels, and similar threats to the nation's security.

380. ~~374.~~ Since its inception in 2008, MRI has filled a gap in the knowledge base of the National Security community by developing models of terrorism, insurgency, cybersecurity, information operations, deterrence and other relevant topics, validated using freshly collected data and modern methods. That research has been praised by combatant commanders for its relevance to their increasingly complex challenges in understanding the Social Science of modern conflict.

---

[124] David L. Boren National Security Education Act of 1991, Pub. Law. No. 102-183, 105 Stat. 1271 (codified at 50 U.S.C. §1901 et seq.).

[125] The Minerva Initiative, https://web.archive.org/web/20090211034051/http://minerva.dtic.mil/.

[126] Kai Kupferschmidt, *Pentagon Guts National Security Program that Harnessed Social Science*, Science (Mar. 2, 2025), https://www.science.org/content/article/pentagon-guts-national-security-program-harnessed-social-science.

[127] Grants.Gov, *View Grant Opportunity* (Mar. 15, 2024), https://grants.gov/search-results-detail/351388.

[128] *Id.*

3301253.7
46686\20748993.1

~~SECOND~~[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

381. 375. MRI-funded research has enabled a significant improvement in scholarly understanding of subnational conflicts, as reflected in a manyfold increase in publications on these topics in the best peer-reviewed journals in Political Science and Economics.

382. 376. MRI employs a highly competitive process for the award of its grant funding. It solicits proposals in pre-defined topic areas and selects among them using peer and expert review.

383. 377. Since its inception, MRI has awarded various grants to UC researchers, including several examples in recent years.

384. 378. In September 2024, MRI awarded a Peace Scholar Fellowship to a UC Berkeley graduate student researching the intertwined political, economic, and social dynamics of international conflict and conflict management.[129] In August 2023, MRI awarded a Peace Scholar Fellowship to a UC Davis graduate student conducting doctoral research related to broad concerns in conflict management and peacebuilding, including security and stability.[130] In 2022, the Minerva Initiative awarded a Peace Scholar Dissertation Fellowship to UC Berkeley and UC San Diego graduate students whose research showed "great potential to advance the peacebuilding and security fields and to positively influence policy and practice."[131]

385. 379. In May 2023, the DOD announced that it would award $18 million in grants to 11 university-based faculty teams under its Minerva Initiative, including one UC San Diego team, one UC Davis team, and one UC Santa Barbara team.[132]

---

[129] *Department of Defense Selects 2024-2025 Minerva-USIP Peace and Security Fellows*, U.S. Dep't of Def. (Sept. 20, 2024), https://www.defense.gov/News/Releases/Release/Article/3912615/department-of-defense-selects-2024-2025-minerva-usip-peace-and-security-fellows/.

[130] *DOD Selects 2023-2024 Minerva-USIP Peace and Security Dissertation Fellows*, U.S. Dep't of Def. (Aug. 10, 2023), https://www.defense.gov/News/Releases/Release/Article/3490020/dod-selects-2023-2024-minerva-usip-peace-and-security-dissertation-fellows/.

[131] *Department of Defense Announces Awards for the 2022-2023 Cohort of the Minerva-United States Institute of Peace and Security Dissertation Fellows*, U.S. Dep't of Def. (Sept. 12, 2022), https://www.defense.gov/News/Releases/Release/Article/3155346/department-of-defense-announces-awards-for-the-2022-2023-cohort-of-the-minerva/.

[132] *DOD Awards $18 Million for Academic Research on the Socio-Political Drivers of Future*

386.    380. In February 2022, the DOD announced that it would award $28.7 million in grants to 17 university based faculty teams, including one UC Berkeley team, through the FY2021 Minerva Research Initiative to support research in social and behavioral science.[133] The 17 faculty awardees were selected from approximately 220 applicants using a merit competition. The research proposals were peer-reviewed and selected for scientific merit, relevance, and potential impact in conference between the Office of the Under Secretary of Defense for Research and Engineering and the Office of the Under Secretary of Defense for Policy.

387.    381. Outside of grants given through MRI, when deciding whether to award a grant, the DOD employs a merit review process in which the technical merits of the proposed research and its potential relationship with the missions of the DOD are evaluated. 32 C.F.R. § 22.315 (describing "[m]erit-based, competitive procedures").

388.    382. It is clear that Congress understood the importance of conducting research relating to national security when creating the DOD. The annual NDAAs and Acts like the NSEA make clear that Congress intended for funding to be allocated for the study of social issues since such research would further the DOD's mission: national security.

### 2.    In Response to Trump Administration Directives, DOD Improperly Changed Priorities and Canceled Existing Grants

389.    383. DOD quickly caved to President Trump's and DOGE's directives to eliminate grants relating to disfavored topics. On March 4, 2025, Chief Pentagon Spokesman Sean Parnell stated that DOD had been working "hand in hand with the DOGE team."[134]

---

*Conflict,* U.S. Dep't of Def. (May 26, 2023), https://www.defense.gov/News/Releases/Release/Article/3408680/dod-awards-18-million-for-academic-research-on-the-socio-political-drivers-of-f/.

[133] *Department of Defense Awards $28.7M in Grants for the FY2021 Minerva Research Initiative,* U.S. Dep't of Def. (Feb. 24, 2022), https://www.defense.gov/News/Releases/Release/Article/2944623/department-of-defense-awards-287m-in-grants-for-the-fy2021-minerva-research-ini/.

[134] C. Todd Lopez, *Initial DOGE Findings Reveal $80 Million in Wasteful Spending at DOD,* U.S. Dep't of Def. (Mar. 4, 2025), https://www.defense.gov/News/News-Stories/Article/Article/4096431/initial-doge-findings-reveal-80-million-in-wasteful-spending-at-dod/.

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

390. 384. By March 7, the Department had terminated more than $30 million in grants that funded 91 studies. In a press release, the Department recognized "the value of academic research" but stated it was taking action "in response to President Trump's Executive Orders."[135] The press release stated that the studies affected included research focused on "global migration patterns, climate change impacts, and social trends."[136]

391. 385. By March 20, Secretary Hegseth had issued a memorandum directing the immediate termination of over $360 million in additional grants in order to "implement the President's orders."[137] The memorandum stated that funding would be cut to research efforts in areas of "Diversity, Equity, and Inclusion and related social programs, climate change, social science, Covid-19 pandemic response, and other areas – that are not aligned with DOD priorities."[138]

392. 386. This termination essentially gutted MRI, which was partly created to better understand climate change impacts and social trends. Beginning in March 2025, the MRI's website, which included reports on finished and ongoing projects, became unavailable.[139] Many, if not all, of the grants previously awarded through MRI have been terminated.

393. 387. By terminating grants at the direction of the President, the DOD has violated its congressional mandates, which require that the DOD fund social science research. Such mandates include, for example, Congress's determination of DOD's funding

---

[135] *Pentagon Culls Social Science Research, Prioritizes Fiscal Responsibility and Technologies for Future Battlefield*, U.S. Dep't of Def. (Mar. 7, 2025), https://www.defense.gov/News/Releases/Release/Article/4113076/pentagon-culls-social-science-research-prioritizes-fiscal-responsibility-and-te/.

[136] *Id.*

[137] *Continuing Elimination of Wasteful Spending at the Department of Defense*, U.S. Dep't of Def. (Mar. 20, 2025), https://media.defense.gov/2025/Mar/20/2003673531/-1/-1/0/CONTINUING-ELIMINATION-OF-WASTEFUL-SPENDING-AT-THE-DEPARTMENT-OF-DEFENSE.PDF.

[138] *Id.*

[139] Kai Kupferschmidt, *Pentagon abruptly ends all funding for social science research*, Science (Mar. 10, 2025), https://www.science.org/content/article/pentagon-abruptly-ends-all-funding-social-science-research.

SECOND [PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

through legislation such as 50 U.S.C. § 1902 and the annual National Defense Authorization Acts.

### 3.    DOD Plaintiff and Other Grant Recipients Are Harmed by DOD's Illegal Grant Terminations

394.    ~~388.~~ Plaintiff Berman and Class members have long relied on DOD grants to fund meritorious projects aimed at promoting national security. The termination of previously approved grants has caused and continues to cause Plaintiff and Class members serious harm.

### a.    Plaintiff Eli Berman's Grant Termination and Resulting Harm[140]

395.    ~~389.~~ Dr. Eli Berman is a Professor of Economics at the University of California, San Diego ("UCSD") who studies economic development in fragile environments, with a focus on conflict. He is known particularly for his work applying rational choice analysis to the behavior of radical religious groups. He holds a dual appointment as a Professor in UCSD's School of Global Policy and Strategy.

396.    ~~390.~~ He also serves as the Research Director for International Securities Studies at the UC Institute on Global Conflict and Cooperation ("IGCC"), a research network comprised of scholars from across the University of California and the Los Alamos and Lawrence Livermore National Laboratories, who produce and use research to help build a more peaceful, prosperous world.

397.    ~~391.~~ Dr. Berman has published several books on national security economics including *Proxy Wars: Suppressing Violence through Local Agents* (with David Lake, Cornell University Press, 2019), *Small Wars, Big Data: The Information Revolution in Modern Conflict* (with Jacob N. Shapiro and Joseph H. Felter, Princeton U. Press, 2018), and *Radical, Religious and Violent: The New Economics of Terrorism* (Cambridge: MIT Press, 2009). He has also authored or co-authored dozens of articles, papers, and reviews on national security economics and other topics in economics.

---

[140] Plaintiff Berman submitted a declaration, filed herewith, that further details his background and research, including information about his terminated grant.

398. 392. Over the past three decades, he has received grant funding from a variety of governmental and private sources. He has received federal grant funding from the National Science Foundation, the Department of Homeland Security, the Office of Naval Research, USAID, the U.S. Institute of Peace, and the Department of Defense.

### DOD Minerva Research Initiative and Past Grants

399. 393. Dr. Berman has previously served as a principal researcher on several Minerva Research Initiative projects.

400. 394. For example, Dr. Berman served as co-Principal Investigator of the MRI project "Terrorism, Governance, and Development," led by Professor Jacob Shapiro of Princeton University, directing a subcontract of $3,064,551 to IGCC, from March 2009 through August 2015. That project addressed how economic and political development are enabled when a government must also necessarily counter terrorism and insurgency. The research encompassed over a dozen scholarly empirical projects including original data collection in Afghanistan, Iraq, the Philippines, Colombia, Northern Ireland and the Palestinian Territories, among other sites. It resulted in over a dozen scholarly publications in leading journals and a book.

401. 395. Dr. Berman served as Principal Investigator on an MRI project for research on "Deterrence with Proxies," from 2014–2021. This research investigated how a powerful country can meet its security objectives by guiding the actions of proxy forces, while limiting the vulnerability of its own forces—as the U.S. has done over the last five decades. This grant resulted in multiple scholarly publications and an academic press book, trained postdoctoral fellows and PhD students, with a budget of $3,745,988.

402. 396. Dr. Berman received another grant from MRI, as the co-Principal Investigator with Stephen Biddle, for a one-year project entitled "Empirical Analysis for Meeting Great Power Challenges" in 2020. This grant funded research to evaluate the roles of technological advantage versus force strength in the success of naval battles, using data from the 16th Century through the present.

403. 397. Dr. Berman's prior MRI grant funding resulted in successful projects that furthered the DOD's understanding of national security.

DOD's 2023 Minerva Research Grant Application and Award

404. 398. On February 16, 2023, Dr. Berman, together with his colleagues, submitted an application for funding to MRI titled "Integrated Deterrence: Episodic Analysis" in response to an annual request for proposals. Dr. Berman was the Principal Investigator for the research, and the work was proposed to be done in collaboration with Professor Estaban Klor at Hebrew University, who was designated the co-Principal Investigator. Their work plan included hiring postdoctoral fellows, and both graduate and undergraduate research assistants.

405. 399. "Integrated Deterrence" is a national security concept that was the centerpiece of the 2022 National Defense Strategy. Integrated deterrence "involves using every tool at the Department [of Defense]'s disposal, in close collaboration with our counterparts across the U.S. Government, and with Allies and partners, to ensure that potential foes understand the folly of aggression."[141] Those tools include not only coercive measures but also economic, diplomatic, and intelligence instruments.

406. 400. Dr. Berman's proposal relied on data from the Israel/Gaza conflict discovered and collected as part of the "Deterrence with Proxies" project. Dr. Berman's team proposed: (1) coding textual data on incidents into digital form; (2) validating with social media and official sources; and (3) developing a game theoretic model to analyze the actions of combatants.

407. 401. This proposed research would continue and expand Dr. Berman's earlier Minerva project research funded during the Trump I and Biden administrations.

Award of Grant Funding (No. FA 9550-23-1-0437)

408. 402. On August 28, 2023, Dr. Berman and his team received notice of a Grant Award that would provide $1,032,529 in funding over three years.

---

[141] *2022 National Defense Strategy*, U.S. Dep't of Def. (Oct. 27, 2022), https://media.defense.gov/2022/Oct/27/2003103845/-1/-1/1/2022-NATIONAL-DEFENSE-STRATEGY-NPR-MDR.pdf.

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

409. 403. Progress between 2023 and 2025 was rapid. With the help of a PhD student, Dr. Berman's team solved a number of technical problems that had stymied previous researchers. The fine-grained nature of the team's data allowed unprecedented opportunities to test game-theoretic models of deterrence, specifically addressing whether episodes of attack and counter-attack tended to escalate or de-escalate, and whether de-escalation led to zero attacks or to some violent equilibrium. The team's understanding of the Gaza/Israel conflict in the period before October 7, 2023 vastly improved. More importantly, the team had a modeling tool to apply to other international conflicts stuck in violent equilibria.

410. 404. By late 2024, Dr. Berman's team was already circulating results and disseminating this research to policy and academic audiences, including within the U.S. Department of Defense, U.N. Peacekeeping Operations, and Israel's Institute on National Security Studies, as well as at invited academic seminars and conferences.

411. 405. The policy relevance of these results is manyfold. The game-theoretic model provides an analytical tool simple enough for an undergraduate with some training in economics, political science, or mathematics to use. It has broad applicability to numerous conflicts stuck in a mutual deterrence equilibrium that is not entirely peaceful. Disinformation campaigns and election interference have the same logic and reportedly the same perpetrators, so the results are applicable in that context as well. The model and results also beg two other questions: (1) can the same methods be applied to understand other conflicts?; and (2) can the integration of benign (in addition to coercive) instruments shift those conflicts to a less destructive equilibrium, or even to settlement? Dr. Berman was on the verge of answering these questions in early 2025.

Research Grant Termination (No. FA 9550-23-1-0437)

412. 406. On February 28, 2025, Dr. Berman received an email from the program officer for the Air Force Office of Scientific Research, which stated:

> In line with recent Presidential executive orders, [the Office of the Undersecretary of Defense for Research & Engineering] has determined that your grant award no longer effectuates Minerva

3301253.7
46686\20748993.1

SECOND [PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

program goals or DOD priorities. As such, we are letting you know that you will soon be hearing from the grants officer responsible for your award about terminating it.

413. 407. UCSD subsequently received a brief notice from the DOD Department of the Air Force that stated: "The Government intends to terminate this Award under the authority of 2 CFR 200.340(a)(4)." No explanation of any kind for the termination was provided.

414. 408. On March 3, 2025, DOD issued a Grant/Cooperative Agreement Modification. Again, it provided no explanation for the termination beyond form language:

The subject grant award no longer effectuates the program goals or agency priorities as found in 2 CFR 200.340(a)(4) as incorporated into the DOD Research and Development General Terms and Conditions for grants by reference.

415. 409. As a result of the modification, the DOD eliminated the third year of funding on the grant ($248,991).

Harm from Grant Termination

416. 410. Dr. Berman and his team have suffered immediate harm as a result of the grant cancellation.

417. 411. Dr. Berman and his co-PI have been forced to significantly slow research progress and dissemination because they must now devote much of their time to writing grant applications.

418. 412. The researchers on Dr. Berman's grant have been unable to employ a postdoctoral fellow and have had to release from employment their research assistants. This has slowed the team's empirical and theoretical progress, and ceased their training of young scholars.

419. 413. Similarly, the loss of grant funding threatens the team's ability to retain essential support staff at the IGCC.

420. 414. The loss of grant funding also threatens the overall research and teaching operations of the University of California, which relies on Indirect Cost charges (currently 59% of total cost on new grants at UC San Diego) to cover activities such as

building use, equipment depreciation, operation and maintenance of UC facilities, student

services, departmental administration, or administrative support offices.

421. 415. Dr. Berman lost 22% of his annual compensation this calendar

year due to grant termination.

422. 416. These personal and financial harms are ongoing.

423. 417. These harms are in addition to the loss of value to the public from

Dr. Berman's research—specifically the national security community, as Dr. Berman has lost

both time to travel and the resources to pay for travel to conferences and meetings.

**E.      Department of Transportation**

424. 418. The Department of Transportation ("DOT") is a federal agency

within the meaning of the APA established to protect and enhance the safety, adequacy, and

efficiency of the nation's transportation system and services.

**1.      Congress Established DOT to Promote the Safety, Quality, and Efficiency of the Nation's Transportation Services, Including Through Research**

425. 419. Before the DOT was created in 1967, various federal programs

devoted nearly 100,000 employees and almost $6 billion to transportation across the United

States.[142] President Lyndon B. Johnson decried this decentralized system as "not good

enough" for the nation, and told Congress that system resulted in inefficient, congested, and

unsafe transportation.[143] An improved, coordinated system was essential to the nation's

economic health and well-being, including employment, standard of living, accessibility, and

the national defense.[144]

426. 420. Congress then passed the Department of Transportation Act ("the

Act"), Pub. L. No. 89-670, 80 Stat. 931 (1966), which President Johnson signed into law on

October 15, 1966. The Act centralized 31 federal agencies and functions, including the

---

[142] President Lyndon B. Johnson, *Special Message to Congress on Transportation* (March 2, 1066), https://www.presidency.ucsb.edu/documents/special-message-the-congress-transportation-0.

[143] *Id.*

[144] *A Brief History of the DOT*, U.S. Dep't of Trans., https://transportation.libguides.com/c.php?g=1154894&p=8441208.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1   Federal Aviation Agency, the Coast Guard, the Federal Railroad Administration, and many

2   others.[145]

3   427. 421. Today, the DOT's operating administrations include the U.S.

4   Department of Transportation Office of the Secretary (OST), National Highway Traffic

5   Safety Administration (NHTSA), Federal Aviation Administration (FAA), Office of Inspector

6   General (OIG), Federal Highway Administration (FHWA), Pipeline and Hazardous Materials

7   Safety Administration (PHMSA), Federal Motor Carrier Safety Administration (FMCSA),

8   Federal Railroad Administration (FRA), Great Lakes St. Lawrence Seaway Development

9   Corporation (GLS), Federal Transit Administration (FTA), and the Maritime Administration

10  (MARAD).[146]

11  428. 422. The Act provides "that the national objectives of general welfare,

12  economic growth and stability, and security of the United States require the development of

13  transportation policies and programs that contribute to providing fast, safe, efficient, and

14  convenient transportation at the lowest cost consistent with those and other national

15  objectives, including the efficient use and conservation of the resources of the United States."

16  Pub. L. No. 97-449 (codified at 49 U.S.C. § 101(a)).

17  429. 423. The Act also provides that the DOT shall:

18
19
    - ensure the coordinated and effective administration of the transportation
      programs of the United States Government;

20
    - make easier the development and improvement of coordinated
      transportation service to be provided by private enterprise to the greatest
      extent feasible;
21

22
    - encourage cooperation of Federal, State, and local governments, carriers,
      labor, and other interested persons to achieve transportation objectives;
23

24
    - stimulate technological advances in transportation, through research and
      development or otherwise;
25
    - provide general leadership in identifying and solving transportation
      problems; and

26
    - develop and recommend to the President and Congress transportation
      policies and programs to achieve transportation objectives considering the
27

28  ─────────────────
    [145] *Id.*
    [146] *Id.*

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

needs of the public, users, carriers, industry, labor, and national defense.[147]

430. 424. One way the DOT effectuates its mission is by providing funding to projects that invest in "transportation infrastructure, safety, and innovation across the country."[148] Congress appropriates these funds and authorizes transportation programs based on national priorities.[149] The DOT provides funding through Competitive Grant Funding Programs, Formula Grant Funding Programs (funding to states, tribes, and transit agencies), Loan Financing Programs, and Public-Private Partnerships (P3s).

431. 425. The DOT administers competitive grant programs through its operating administrations ("OAs") and the Office of the Secretary of Transportation.[150] Each OA (e.g., Federal Highway Administration, Federal Transit Administration) solicits applications through a Notice of Funding Opportunity and selects projects based on program eligibility, evaluation criteria, and Departmental or program priorities. The Bipartisan Infrastructure Law alone provided billions of dollars for the DOT to distribute through competitive grant programs.[151]

432. 426. Since the DOT's creation, Congress has continually provided funding and additional duties for the DOT to carry out its mission.[152] The Department's authorities are codified under U.S. Code Titles 23 (highways), 46 (maritime), and 49 (aviation, railroads, and other surface modes).[153]

433. 427. In subsequent legislation, Congress has consistently affirmed that the DOT shall improve the nation's transportation system for all Americans, and has done so

---

[147] Pub. L. 97-449 (codified at 49 U.S.C. § 101(b)).

[148] *Overview of Funding and Financing at USDOT*, U.S. Dep't of Trans., https://www.transportation.gov/grants/dot-navigator/overview-funding-and-financing-usdot.

[149] *Id.*

[150] *Id.*

[151] *The Bipartisan Infrastructure Law and Innovation,* U.S. Dep't of Trans., https://www.transportation.gov/priorities/innovation/bipartisan-infrastructure-law-and-innovation.

[152] *Strategic Plan for FY 2028-2022*, U.S. Dep't of Trans., (February 2018), https://www.transportation.gov/sites/dot.gov/files/docs/mission/administrations/office-policy/304866/dot-strategic-planfy2018-2022508.pdf.

[153] *Id.*

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

using language that the Trump Administration associates with "DEI" and "environmental justice."

434. 428. For example, in 1991, Congress passed the Intermodal Surface Transportation Efficiency Act ("ISTEA") to develop a National Intermodal Transportation System. Pub. L. No. 102-240, 105 Stat. 1914 (Dec. 18, 1991). Congress declared that the system would include "significant improvements in public transportation necessary to achieve national goals for improved air quality, energy conservation, international competitiveness, and mobility for elderly persons, persons with disabilities, and economically disadvantaged persons in urban and rural areas of the country." Pub L. 102-240 § 2. Parts of the ISTEA directed the Secretary of the DOT ("the Secretary") to implement this system by leading and coordinating the research and development of high-speed rail, wooden bridges, and highway safety conditions. *Id*. Title I, Part A, §§ 1036, 1039. The ISTEA also authorized the Secretary of the DOT to collaborate with non-federal entities and to conduct research into areas such as underground pipes, buses, and construction materials. *Id*. Title VI, Part A §§ 6001, 6005, 6020, 6021.

435. 429. In 1998, Congress passed the Transportation Equity Act for the 21st Century ("TEA-21") to authorize funds for Federal-aid highways, highway safety programs, transit programs, and other transportation purposes. Pub. L. No. 105–178, 112 Stat. 107 (June 9, 1998).

436. 430. The TEA-21 reauthorized the Disadvantaged Business Enterprises ("DBE") provision, which was first introduced in DOT legislation beginning in 1983, and has been reauthorized at every opportunity since.[154] The TEA-21's DBE provision required that at least 10 percent of the funding made available by the statute was to be provided to small businesses controlled and owned by "socially and economically disadvantaged individuals." *Id*. Title I, Subtitle A, § 1101(b)(1).

---

[154] *Disadvantaged Business Enterprise (DBE) Program,* U.S. Dep't of Trans., https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise.

SECOND[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    437. 431. Most recently, in 2021, Congress passed the Infrastructure

2    Investment and Jobs Act ("IIJA"), also known as the Bipartisan Infrastructure Law. Pub L.

3    No. 117-85, 135 Stat. 429 (codified at 23 U.S.C § 101). Much of the IIJA requires the DOT to

4    consider and prioritize projects that target disadvantaged communities and prioritize equitable

5    outcomes.

6    438. 432. The IIJA directed the Secretary to establish the Healthy Streets

7    program, which would provide grants to mitigate urban heats islands and improve air quality.

8    Pub L. No. 117-85, Title I, Subtitle D, § 11406. In awarding the grants, Congress specified

9    that the Secretary should prioritize projects that target low-income or disadvantaged

10   communities. *Id.* § 11406(f)(1).

11   439. 433. The IIJA also directed the Secretary to make grants to

12   organizations constructing safe and connected active transportation facilities. The IIJA also

13   directed that in considering applications, the Secretary should consider the extent to which a

14   proposal addresses "existing disparities in bicyclist and pedestrian fatality rates based on race

15   or income level or provide access to jobs and services for low-income communities and

16   disadvantaged communities." *Id.*

17   440. 434. The IIJA also directed the Secretary to establish the Reconnecting

18   Communities Pilot ("RCP") Grant Program to advance "community-centered transportation

19   connection projects, with a priority for projects that benefit low-capacity communities."[155]

20   The primary goal of the RCP is to "reconnect communities harmed by past transportation

21   infrastructure decision."[156] In evaluating grant applications, the Secretary is required to

22   consider a project's "opportunities for inclusive economic development." Pub L. 117-85 Title

23   I, Subtitle E, § 11509 (d)(4)(B)(v).

24   441. 435. The IIJA also directed the Secretary to establish the Rural

25   Opportunities to Use Transportation for Economic Success Office ("ROUTES") which was

26   tasked to "improve analysis of projects from rural areas, Indian Tribes, and historically

---

27   [155] *Reconnecting Communities Pilot (RCP) Grant Program,* U.S. Dep't of Trans.,
28   https://www.transportation.gov/reconnecting.
     [156] *Id.*

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

3301253.7
46686\20748993.1

disadvantaged communities in rural areas applying for Department discretionary grants." *Id.* §

25010(b)(1)(A). The IIJA codified the ROUTES initiative, which was established under the

first Trump administration in October 2019 with DOT Order 5050.1.[157]

442. ~~436.~~ The IIJA also amended the University Transportation Centers

("UTC") Program, which was established in 1987. The UTC program "advances the state-of-

the-art in transportation research and technology, and develops the next generation of

transportation professionals."[158] The program requires the Secretary to award grants to

proposals that address six research priorities: improving mobility of people and goods;

reducing congestion; promoting safety; improving the durability and extending the life of

transportation infrastructure; preserving the environment; preserving the existing

transportation system; and reducing transportation cybersecurity risks. 49 U.S.C. §

6503(c)(1). And the Secretary is required to select grants based in part on the recipient's

"demonstrated commitment" to developing the transportation workforce through "outreach

activities to attract new entrants into the transportation field, including women and

underrepresented populations." *Id.* § 5505(b)(4)(B)(v)(II).

443. ~~437.~~ The IIJA also established the Safe Streets and Roads for All

(SS4A) program with over $5 billion in funds to distribute to initiatives preventing roadway

fatalities and serious injuries.[159] In awarding grants, the IIJA requires the Secretary to

consider whether a project ensures "equitable investment in the safety needs of underserved

communities in preventing transportation-related fatalities and injuries." Pub L. No. 117-85,

Title IV, Subtitle A, § 24112(d)(3)(E).

444. ~~438.~~ The IIJA also required the Federal Motor Carrier Safety

Administration, an administration of the DOT, to establish an advisory board focused on

creating opportunities for women in the trucking industry. *Id.* § 23007.

---

[157] *Rural Opportunities to Use Transportation for Economic Success (ROUTES)*, U.S. Dep't of Trans., https://www.transportation.gov/rural.

[158] *University Transportation Centers,* U.S. Dep't of Trans., https://www.transportation.gov/content/university-transportation-centers.

[159] *Safe Streets and Roads for All (SS4A) Grant Program,* U.S. Dep't of Trans., https://www.transportation.gov/grants/SS4A.

~~SECOND~~[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

445. 439. The IIJA also reauthorized the DBE program, finding that "while significant progress has occurred due to the establishment of the disadvantaged business enterprise program, discrimination and related barriers continue to pose significant obstacles for minority- and women-owned businesses seeking to do business in Federally assisted" transportation markets. *Id.* Title I, Subtitle A, § 11101(e)(1)(A).

446. 440. These measures demonstrate that Congress directed the DOT to consider so-called "DEI" priorities in its initiatives, including in grant funding.

### 2.    In Response to Trump Administration Directives, DOT Improperly Changed Priorities and Canceled Existing Grants

447. 441. In January 2025, Sean Duffy was appointed as the Secretary of the DOT.[160] Duffy's first actions were to "advance[] President Donald Trump's agenda to rescind woke policies" and ensure that all DOT "policies align with the Administration's priorities."[161] He made no mention of the priorities set by Congress.

448. 442. To align with President Trump's executive orders, including E.O. 14148, the Secretary signed the "Woke Rescission" Memorandum, which directed DOT officials to "identify and eliminate all Biden-era programs, policies, activities, rules, and orders that promote climate change activism, Diversity, Equity, and Inclusion (DEI) initiatives, racial equity, gender identity policies, environmental justice, and other partisan objectives."[162]

449. 443. This alignment with the Trump administration included how the DOT defended its lawsuits.

450. 444. In October 2023, two DOT contractors had sued the DOT, challenging the constitutionality of the DBE program. *Mid-Am. Milling Co. v. United States Dep't of Transp.*, No. 3:23-CV-00072-GFVT-EBA, 2025 WL 1461818, at *1 (E.D. Ky. May

---

[160] *U.S. Transportation Secretary Duffy Takes Action to Rescind "Woke" DEI Policies and Advance President Trump's Economic Agenda*, U.S. Dep't of Trans. (Jan. 29, 2025), https://www.transportation.gov/briefing-room/us-transportation-secretary-sean-duffy-takes-action-rescind-woke-dei-policies-and.

[161] *Id.*

[162] *Id.*

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

21, 2025). Any person may qualify as socially and economically disadvantaged, but certain racial groups and women are "rebuttably presumed" to be disadvantaged. *Id*. In September 2024, a district court judge issued a preliminary injunction enjoining the DOT from "mandating the use of race-and gender-based rebuttable presumptions for [DOT] contracts impacted by DBE goals." *Id*. at *2. In May 2025, after the change in administration, the DOT filed a proposed consent order stipulating that the DBE program's use of race- and sex-based presumptions is unconstitutional.[163] However, the district judge has not yet approved the order as intervenor-defendants continue to litigate the case on behalf of beneficiaries of the program. *Mid-Am. Milling Co,* 2025 WL 1461818, at *1.

451. ~~445.~~ Secretary Duffy has been clear that he is targeting polices and grants that do not conform to the Administration's priorities.

452. ~~446.~~ On April 24, 2025, the Secretary sent a letter to all DOT grant recipients instructing them to "Follow the Law."[164] The letter told recipients they had "entered into legally enforceable agreements with the United States Government and are obligated to comply fully with all applicable Federal laws and regulations."[165] The letter also provided that:

> "Whether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called "diversity, equity, and inclusion," or "DEI," goals, presumptively violates Federal law. Recipients of DOT financial assistance must ensure that the personnel practices (including hiring, promotions, and terminations) within their organizations are merit-based and do not discriminate based on prohibited categories. Recipients are also precluded from allocating money received under DOT awards—such as through contracts or the provision of other benefits—based on suspect classifications."[166]

---

[163] *Mid-Am. Milling Co. v. United States Dep't of Transp.* No. 3:23-CV-00072-GFVT-EBA, Dkt. 82-1, May 28, 2025.

[164] *Trump's Transportation Secretary Sean P. Duffy: Follow The Law*, U.S. Dep't of Trans. (Apr. 24, 2025), https://www.transportation.gov/briefing-room/trumps-transportation-secretary-sean-p-duffy-follow-law. The full text of the letter is available at https://www.transportation.gov/sites/dot.gov/files/2025-05/Follow%20the%20Law%20Letter%20to%20Applicants%204.24.25.pdf.

[165] *Id.*

[166] *Id.*

~~SECOND~~[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

453. 447. The letter told recipients they were required to cooperate with federal authorities, including cooperating and not impeding U.S. Immigration and Customs Enforcement ("ICE").[167] And it provided that "DOT may also terminate funding in response to substantiated breaches of the terms of the agreement, or if DOT determines that continued funding is no longer in the public interest."[168]

454. 448. In blatant contradiction of its enabling legislation in the IIJA, on April 1, 2025, the Secretary removed the "DEI/Climate Requirements" in the grant application for the SS4A grant program.[169] This action removed the definition of equity and language stating that the DOT was seeking projects that address equity and environmental justice from the notice of funding opportunity.[170] The Secretary said that "DEI and environmental justice requirements for the Safe Streets program weren't just unnecessary – they were bogging down the system and preventing money from going out to where it's needed."[171]

455. 449. On May 2, 2025, the Secretary announced that the DOT terminated "seven woke university grants" that were used to "advance a radical DEI and green agenda that were both wasteful and ran counter to the transportation priorities of the American people."[172] The Secretary explained that the "previous administration turned the [DOT] into the Department of Woke" and that Americans "have zero interest in millions of their tax dollars funding research on the intersection of gender non-conforming people and infrastructure inequality or whether road improvement projects are racist."[173] The terminations included grants to UC Davis for "accelerating equitable decarbonization

---

[167] *Id.*

[168] *Id.*

[169] *U.S. Transportation Secretary Sean P. Duffy Announces Funding for Communities to Improve Road Safety*, U.S. Dep't of Trans. (April 1, 2025), https://www.transportation.gov/briefing-room/us-transportation-secretary-sean-p-duffy-announces-funding-communities-improve-road.

[170] *Id.*

[171] *Id.*

[172] *U.S. Transportation Secretary Sean P. Duffy Defunds Woke University Grants*, U.S. Dep't of Trans. (May 2, 2025), https://www.transportation.gov/briefing-room/us-transportation-secretary-sean-p-duffy-defunds-woke-university-grants.

[173] *Id.*

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

research," to USC for research regarding how "the transportation system creates and perpetuates inequities," and to Johns Hopkins for research on "pollution exposure inequality in New York City."[174]

456. ~~450.~~ Plaintiff Handy received a letter containing the following form explanation for her grant's termination, which demonstrates that DOT replaced its Congressionally mandated directives for Defendant Trump's:

> At the time your grant was issued, the grant agreement and applicable regulations authorized termination by "the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 CFR § 200.340(a)(2). DOT's priorities presently include:
>
> • promoting traditional forms of energy and natural resources to the greatest extent possible,
>
> • ensuring that taxpayer dollars are used efficiently in ways that maximally benefit the American people and improve their quality of life, and
>
> • ceasing to promote divisive diversity, equity, and inclusion initiatives that discriminate on the basis of race, national origin, or another protected characteristic.
>
> Having individually reviewed your grant in light of DOT's priorities, the Office of the Secretary has determined that your grant is inconsistent with the priorities listed above.[175]

457. ~~451.~~ On information and belief, all researchers received the same "rationale" for grant termination.

458. ~~452.~~ The DOT's present priorities used to rescind research grants contradict Congress's mandate to the DOT in the IIJA and other directives.

459. ~~453.~~ Many parts of the IIJA provide funding for clean energy projects, as opposed to "traditional forms of energy," and mandates that the DOT distribute these funds. For example, the IIJA appropriated "$1.1 billion for the Federal Transit Administration's Low or No Emission Vehicle Program and $50 million for the Electric or

---

[174] *Id.*

[175] Handy Decl. Ex. F.

Low-emitting Ferry Program in FY 2022."[176] The IIJA also included billions of dollars to create additional charging stations for electric vehicles.[177]

460. 454. "Ceasing to promote divisive diversity, equity, and inclusion, initiatives" also violates the IIJA and other legislation. Specifically, applicants for the UTC program are required to be evaluated on their "demonstrated commitment" to developing the transportation workforce through "outreach activities to attract new entrants into the transportation field, including women and underrepresented populations." 49 U.S.C. § 5505(b)(4)(B)(v)(II).

461. 455. On July 2, 2025, the Secretary sent a second letter to all DOT grant recipients announcing that the "Trump Administration will not enforce Biden-era DEI and Green New Scam policies or requirements."[178] The Secretary wrote that the DOT will not enforce anything related to climate change, greenhouse gas emissions, racial equity, gender identity, diversity, equity, and inclusion goals, environmental justice, or the Justice 40 Initiative. This change was in response to several of President Trump's Executive Orders, including:

- E.O. 14170, Reforming the Federal Hiring Process and Restoring Merit to Government Service;
- E.O. 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing;
- E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;
- E.O. 14149, Restoring Freedom of Speech and Ending Federal Censorship;
- E.O. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity; and

---

[176] *Fact Sheet: Climate and Resilience in the Bipartisan Infrastructure Law,* U.S. Dep't of Trans., https://www.transportation.gov/bipartisan-infrastructure-law/fact-sheet-climate-and-resilience-bipartisan-infrastructure-law.

[177] *Id.*

[178] *President Trump's Transportation Secretary Sean P. Duffy to Recipients of Federal Funds: We're Tossing All Biden-Era DEI Directives,* U.S. Dep't of Trans. (July 9, 2025), https://www.transportation.gov/briefing-room/president-trumps-transportation-secretary-sean-p-duffy-recipients-federal-funds-were.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

- E.O. 14154, Unleashing American Energy.[179]

462. ~~456.~~ The Trump DOT's drastic shift in priorities and purging of certain ideas deviates from the DOT's long-tradition of improving the nation's transportation for all Americans and violates Congressional statutes.

### 3. DOT Plaintiff and Other Grant Recipients Are Harmed by DOT's Illegal Grant Terminations

463. ~~457.~~ Plaintiff Handy and Class members have long relied on DOT grants to fund meritorious projects in the transportation space. The termination of previously approved grants has caused and continues to cause Plaintiff and Class members serious harm.

### b. Plaintiff Susan Handy's Grant Terminations and Resulting Harm[180]

464. ~~458.~~ Dr. Susan L. Handy is a Distinguished Professor in the Department of Environmental Science and Policy at the University of California, Davis who studies the relationship between transportation and land use, particularly the impact of land use on travel behavior and on strategies for reducing automobile dependence.

465. ~~459.~~ Dr. Handy has served as the Center Director of the National Center for Sustainable Transportation (NCST) since its founding in 2013. She previously served as the Chair of the Transportation Technology and Policy Graduate Group, the Chair of the Department of Environmental Science and Policy, and the Director of the Sustainable Transportation Center at UC Davis. Her recent work includes projects for the California Air Resources Board and Caltrans.

466. ~~460.~~ Dr. Handy is the author of the book Shifting *Gears: Toward a New Way of Thinking About Transportation* (MIT Press, 2023). She has also authored or co-authored dozens of articles, papers, and reviews on transportation and land use.

467. ~~461.~~ Dr. Handy also serves as an Associate Editor of *Transportation Research Record* and serves on the Editorial Board of numerous other journals including

---

[179] *Id.*

[180] Plaintiff Handy submitted a declaration, filed herewith, that further details her background and research, including information about her terminated grant.

3301253.7
46686\20748993.1

~~SECOND~~[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

*Transport Reviews*, *Travel Behavior & Society*; *Transport Policy*; *Journal of Transportation and Land Use*; *Journal of Planning Education and Research*; and *Transportation Research*.

The National Center for Sustainable Transportation (NCST)

468. 462. Dr. Handy is the director of the National Center for Sustainable Transportation ("NCST"), which provides national leadership in advancing environmentally sustainable transportation through cutting-edge research, direct policy engagement, and education. The NCST was established in 2013 after being selected in a national competition to serve as one of five national transportation centers as part of the University Transportation Centers (UTC) program administered by the DOT under the Moving Ahead for Progress in the 21st Century Act. In 2016, the NCST successfully re-competed for the opportunity to continue serving as one of the DOT's national UTCs under the Fixing America's Surface Transportation Act

469. 463. The NCST is a powerful coalition of seven universities across the country. The Institute of Transportation Studies at the University of California, Davis, leads the NCST, with partner centers at California State University, Long Beach; Georgia Institute of Technology; Texas Southern University; the University of California, Riverside; the University of Southern California; and the University of Vermont.

470. 464. Since its founding, the NCST has been delivering results with timely, practical research that has produced 356 reports and white papers, 163 policy and research briefs—which make complex findings easy to understand for everyday Americans— and over 400 peer-reviewed publications. Over the past decade, the NCST has hosted 416 events, drawing nearly 30,000 participants from government agencies, industry leaders, and the public. Hundreds of students have taken part in NCST programs.

471. 465. Many of the NCST's studies target transportation challenges in small towns and farming communities, where good roads and access to jobs and services are essential to daily life and economic survival. NCST also supports American industry and supply chains by exploring better ways to move goods.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

472. 466. Moreover, the NCST's activities have had transformational impacts on the nation's transportation systems. Its work has contributed to accelerated adoption of vehicles and fuels that minimize greenhouse gas emissions, new approaches to infrastructure provision and systems operation that lessen environmental impacts, and a shift towards modes other than driving so as to reduce vehicle miles traveled while improving accessibility. These transformations help the United States reduce its greenhouse gas emissions while reducing other environmental harms, enhancing social equity, and supporting economic vitality.

473. 467. The NCST has received funding from the DOT, the California Department of Transportation, the California Air Resources Board, the California Energy Commission, the South Coast Air Quality Management District, sources in the States of Georgia, Texas, and Vermont, and private industry.

Award of NCST Grant Funding (Nos. 69A3552344814 and 69A3552348319)

474. 468. In 2022, Dr. Handy and her colleagues at the NCST submitted a grant proposal to the DOT to fund the NCST's research activities in the DOT Priority Area "Preserving the Environment," as set out by the Infrastructure Investment and Jobs Act ("IIJA").

475. 469. The NCST would support four kinds of research activities, all aimed at matching research to policy: (1) building tools; (2) developing policy; (3) conducting studies; and (4) undertaking basic research. The application explained that the NCST's research activities would relate to electrification, alternative fuels, air quality, and environmental justice.

476. 470. Dr. Handy was the Principal Investigator for this grant proposal.

477. 471. On June 1, 2023, Dr. Handy and her team received from DOT notice of Grant Award Nos. 69A3552344814 and 69A3552348319 awarding a total of $4,000,000 per funding year, for five annual allocations of funding.

478. 472. This award was made under the IIJA, through which the DOT awarded $90 million in funding per year for the competitively selected UTC programs,

including the NCST's $4 million annual award. The NCST's funding was awarded to promote

research focused on accelerating equitable decarbonization that benefits both the

transportation system and the well-being of people in overburdened and historically

disadvantaged communities. The research activities were focused on three critical domains:

(1) vehicle technology to accelerate lower greenhouse gas emissions; (2) infrastructure

provision; and (3) reshaping travel demand.

<u>Termination of NCST Grant Funding (Nos. 69A3552344814 and 69A3552348319)</u>

479.    473. On May 2, 2025, Dr. Handy and her team learned of the

termination of all of NCST's DOT funding—in effect the termination of the NCST itself—

through a DOT press release titled "U.S. Transportation Secretary Sean P. Duffy Defunds

Woke University Grants."[181]

480.    474. Also on May 2, 2025, UC Davis received a Notice of Termination

announcing the termination of Award Nos. 69A3552344814 and 69A3552348319 on the

grounds that the awards are "inconsistent" with current DOT "priorities," including "DOT's

priority to cease promoting DEI initiatives that discriminate on the basis of race, national

origin, or another protected characteristic."

481.    475. The Notice of Termination also apparently references the research

activities of a different DOT grantee, C2SMARTER, in purporting to explain the reasons for

the termination of NCST's grants.

<u>Pacific Southwest Region University Transportation Center (PSR UTC) and Grant Funding</u>

482.    476. The Pacific Southwest Region University Transportation Center is

a regional UTC funded by the DOT. Established in 2016, the PSR UTC is led by the

University of Southern California and includes nine research partner universities, including

---

[181] *U.S. Transportation Secretary Sean P. Duffy Defunds Woke University Grants*, U.S. Dep't of Trans. (May 2, 2025), https://www.transportation.gov/briefing-room/us-transportation-secretary-sean-p-duffy-defunds-woke-university-grants.

SECOND [PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    the University of California, Berkeley, the University of California, Davis, the University of

2    California, Irvine, and the University of California, Los Angeles.

3        483.    477. Dr. Handy is the Principal Investigator on Subaward No. SCON-

4    00005220 funded through PSR UTC's DOT Grant No. 69A3552348309. The subaward was

5    for $245,000 for a budget period of June 1, 2023, through May 31, 2024; subsequently

6    amended on July 1, 2024, to provide the second annual allocation of funding in the amount of

7    $240,734.55, and to extend the subaward end date to May 31, 2025.

8                Termination of PSR UTC Grant Funding and Subaward

9        484.    478. The May 2, 2025 DOT press release announcing the termination

10   of NCST's grants also announced the termination of PSR UTC's grants.

11       485.    479. On May 5, 2025, UC Davis's Sponsored Programs Office received

12   a stop work notification relating to Subaward No. SCON-00005220. Attached to the email

13   was the termination letter the University of Southern California received from DOT,

14   terminating PSR UTC's Grant No. 69A3552348309.

15       486.    480. The language of this termination letter was similar to the language

16   in the letter terminating NCST's grant funding. The PSR UTC termination letter similarly

17   states that the "grant is inconsistent with the priorities" of DOT, including "DOT's priority to

18   cease promoting DEI initiatives that discriminate on the basis of race, national origin, or

19   another protected characteristic." The letter also labels PSR UTC's electric vehicle statement

20   and "environmental justice themes" as "discriminatory consideration and 'green new deal'

21   principles that are inconsistent with DOT's priorities."

22                Harm Suffered from Grant Terminations

23       487.    481. Dr. Handy and her collaborators at NCST and PSR UTC have

24   suffered immediate harm as a result of the cancellation of their grants and the defunding of

25   their research centers.

26       488.    482. Dr. Handy and the 77 other researchers funded by these grants at

27   the time of cancellation have been forced to significantly slow both research progress and

28   dissemination. As of the terminations of the grants, 79 research projects were in progress that

now may not be completed. Rather than taking on pressing research questions, much of Dr. Handy's time and that of her fellow researchers has been taken up writing grant applications to replace lost funding. They have lost both time and funding needed to travel to meetings and conferences to disseminate their research.

489. 483. The researchers on these grants have had to lay off or find new sources of funding for more than 40 graduate and undergraduate research assistants who were employed on research projects funded by these grants. Researchers have been unable to make employment offers to graduate and undergraduate research assistants or to postdoctoral fellows for the coming year. This not only has slowed Dr. Handy's research progress, it has also ceased her training of these young scholars.

490. 484. Loss of grant funding similarly threatens Dr. Handy's ability to retain essential support staff. The loss of grant funding resulted in the loss of the equivalent of nearly 5 full time staff positions at UC Davis alone. The reduction in staffing is severely limiting the active dissemination of findings from completed projects to agencies, industry, and the public.

491. 485. Loss of grant funding threatens the overall research and teaching operations of UC Davis, which relies on federal funding to further its educational and scientific purposes.

492. 486. These personal and financial harms are ongoing. Nearly 10 percent of Dr. Handy's annual compensation was lost this calendar year due to grant terminations.

493. 487. These harms are in addition to the loss of value to the public from the research funded by these grants. The grant terminations put an end to research that is critical to ensuring the environmental and financial sustainability of the nation's transportation system and enhancing its ability to serve the needs of the U.S. population.

**F.    Department of Health and Human Services and National Institutes of Health**

494. 488. The Department of Health and Human Services ("HHS") is the federal agency responsible for protecting public health and well-being in the United States.

3301253.7
46686\20748993.1

SECOND [PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

495. 489. The National Institutes of Health ("NIH") is a subunit of HHS and is the federal agency responsible for conducting and supporting biomedical and public health research. Widely acknowledged as a "crown jewel" of America's scientific institutions—a characterization the agency's director recently reiterated[182]—NIH is the largest public funder of medical research in the world.

### 1. Congress Established NIH to Fund Medical Research on a Broad Scale to Advance Human Health and Well-Being in the United States

496. 490. NIH traces its origins to the 1887 establishment of the Hygienic Laboratory, a component of the Marine Hospital Service dedicated to the study of epidemic diseases. Subsequent statutes have transformed that single laboratory into a multifaceted agency at the center of this suit. In 1902, the laboratory assumed responsibility for testing and regulating vaccines and biologic products with the passage of the Biologics Control Act, ch. 1378, 32 Stat. 728 (1902). In 1930, Congress redesignated the laboratory as the National Institute (singular) of Health and established fellowships for biological and medical researchers. *See* Ransdell Act, ch. 251, 46 Stat. 379 (1930). In 1937, Congress created the National Cancer Institute, authorizing the new institute to award research grants to nonfederal scientists and to fund fellowships for young researchers. *See* National Cancer Institute Act, ch. 565, 50 Stat. 559 (1937). In 1944, Congress made the National Cancer Institute a division of NIH and expanded NIH's support for biomedical research. Public Health Service Act ("PHSA"), ch. 373, 58 stat. 682 (1944). And in 1948, following the creation of several additional subsidiary institutes, Congress gave the umbrella agency its current name: the National Institutes (plural) of Health. *See* National Heart Act, ch. 481, 62 Stat. 464 (1948).

497. 491. Today, NIH is made up of 27 institutes and centers ( "ICs" in NIH parlance), each focusing on a different disease or body system. NIH is the primary source of federal funding for biomedical and public health research in the United States. In fiscal year

---

[182] *Opening Statement of Dr. J. Bhattacharya, S. Comm. on Health, Educ., Lab. & Pensions* (March 5, 2025), https://bit.ly/Bhattacharya-Statement.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

2024, NIH spent over $36 billion on over 60,000 research grants, awarding recipients in each of the fifty States and the District of Columbia.[183]

498. 492. According to the agency, "NIH's mission is to seek fundamental knowledge about the nature and behavior of living systems and the application of that knowledge to enhance health, lengthen life, and reduce illness and disability."[184] NIH carries out its mission through both "intramural" research (that is, research conducted in-house at NIH) and "extramural" research (that is, research conducted at outside institutions with NIH financial support).

499. 493. In addition to supporting numerous scientific breakthroughs, NIH funds are also critical to the education and training of the next generation of scientists and researchers. NIH's financial awards support postdoctoral fellows, graduate students, and early-career investigators whose work advances scientific discovery and innovation. These funds not only provide financial support, but also enable mentorship, access to cutting-edge resources, and participation in collaborative research environments that are essential to developing the skills, experience, and professional networks needed to sustain the biomedical research enterprise.

500. 494. NIH's extramural research activities stem from statutory directives. Congress has enacted laws authorizing NIH and its constituent institutes and centers to conduct research and award grants, and it has supplied funding for those activities through regular appropriations.

501. 495. The PHSA contains Congress's overarching authorization for NIH (as a component of the "Public Health Service") to conduct research and award grants. 42 U.S.C. §241 (a) states:

---

[183] *See United for Medical Research, NIH's Role in Sustaining the U.S. Economy, United for Medical Research*, at 5 (Mar. 2025), https://www.unitedformedicalresearch.org/wp-content/uploads/2025/03/UMR_NIH-Role-in-Sustaining-US-Economy-FY2024-2025-Update.pdf (tabulating NIH research grants awarded, FY2024); see also NIH, *NIH Awards by Location & Organization*, https://report.nih.gov/award/index.cfm (searchable results); NIH, *Research Project Grants*, https://report.nih.gov/nihdatabook/category/4 (identifying historical data through 2023, and reporting more than 40,000 competitive grant awards in 2022 and 2023).

[184] NIH, *Mission and Goals*, https://www.nih.gov/about-nih/what-we-do/mission-goals.

3301253.7
46686\20748993.1

The Secretary [of Health and Human Services] shall conduct in the [Public Health] Service, and encourage, cooperate with, and render assistance to other appropriate public authorities, scientific institutions, and scientists in the conduct of, and promote the coordination of, research, investigations, experiments, demonstrations, and studies relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments of man, including water purification, sewage treatment, and pollution of lakes and streams.

And 42 U.S.C. §241 (a)(3) states:

[The Secretary may] make grants-in-aid to universities, hospitals, laboratories, and other public or private institutions, and to individuals for such research projects as are recommended by the advisory council to the entity of the Department [of Health and Human Services] supporting such projects and make, upon recommendation of the advisory council to the appropriate entity of the Department, grants-in-aid to public or nonprofit universities, hospitals, laboratories, and other institutions for the general support of their research.

502. ~~496.~~ Section 284 of the PHSA imposes similar responsibilities and confers similar authority on the directors of NIH's institutes and centers. Among other things, each director "shall encourage and support research, investigations, experiments, demonstrations, and studies in the health sciences[,]" 42 U.S.C. § 284(b)(1)(A), and, to that end, "may make grants and cooperative agreements . . . for research, training, or demonstrations[.]" *id.* §284(b)(2)(A). *See also* 42 U.S.C. § 282 (similar, for the NIH director).

503. ~~497.~~ Other sections of the PHSA provide more specific directives to each of NIH's constituent institutes and centers, detailing the ICs' general purposes and establishing initiatives and programs within each of them. *Cf.* 42 U.S.C. §284(b)(1)(A) (providing that, in carrying out the purposes of section 301 of the PHSA, the Secretary, acting through the Director of each research institute within NIH, "shall encourage and support research, investigations, experiments, demonstrations, and studies in the health sciences" with respect to the human disease or disorder or other aspects of human health for which the national research institutes were established). Some of these statutory provisions are directly at odds with the "policy priorities" Defendants HHS, Kennedy, NIH, and Bhattacharya now invoke to terminate plaintiffs' NIH grants.

504. ~~498.~~ In addition to the above statutory directives, Congress also established a public process to identify the research priorities of NIH and its institutes and

centers. Every six years, the NIH director must "develop and submit to the appropriate committees of Congress and post on the [NIH's website] a coordinated strategy (to be known as the 'National Institutes of Health Strategic Plan') to provide direction to the biomedical research investments made by the National Institutes of Health, to facilitate collaboration across the institutes and centers, to leverage scientific opportunity, and to advance biomedicine." 42 U.S.C. § 282(m)(1). Each of NIH's institutes and centers similarly develops and promulgates a strategic plan that publicly articulates its research priorities. *Id.* § 282(m)(3).

505.    499. NIH has previously followed Congress's direction and publicized its research priorities. In September 2019, the NIH director began the process of updating the agency's priorities in biomedical and behavioral research areas, research capacity, and research conduct. Between October 2019 and July 2020, NIH gathered feedback from its institutes and centers, their advisory councils, external stakeholders, and the general public. The Strategic Plan published in 2020 stated that, among other things, NIH would prioritize "improving minority health and reducing health disparities; enhancing women's health; addressing public health challenges across the lifespan; promoting collaborative science; and leveraging data science for biomedical discovery."[185] Similarly, the plan stated that NIH "supports a comprehensive spectrum of immunology and infectious disease research focused on developing improved or novel vaccines. [] including the rapid development of new vaccines to mitigate emerging infectious disease outbreaks, such as COVID-19, Ebola virus disease (EVD), and influenza (flu)."[186]

506.    500. Most of NIH's funding comes from annual discretionary appropriations from Congress.[187] For years, Congress has made appropriations for NIH

---

[185] NIH, *NIH-Wide Strategic Plan, Fiscal Years 2021-2025* at 3 (2020), https://www.nih.gov/sites/default/files/2025-01/strategic-plan-fy2021-2025.pdf.
[186] *Id.* at 8.
[187] Some of NIH's funding is from mandatory funding sources or available due to specific transfer or budgetary rules, but the "vast majority" comes from annual discretionary Congressional appropriations. *National Institutes of Health Funding: FY1996-FY2025*, Cong. Research Serv. Rep. (June 25, 2024), https://www.congress.gov/crs-product/R43341.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    research with this statutory and regulatory framework in mind and generally has appropriated

2    specific amounts to each of NIH's institutes and centers to carry out the purposes set forth in

3    the authorizing statutory provisions described above.[188]

4        507.    501. In recent years, Congress has specifically rejected efforts to

5    significantly cut NIH's funding. For example, in 2017, as part of its fiscal year 2018 budget

6    proposal, the first Trump Administration sought to reduce NIH annualized spending by $5.8

7    billion, to $25.9 billion.[189] The proposal's primary method of achieving these cuts was by

8    slashing the "indirect cost rate" for NIH grants, capping it at 10% across the board. This

9    proposal drew bipartisan criticism. The Senate Appropriations Committee reported that the

10   proposal would "radically change the nature of the Federal Government's relationship with

11   the research community," would "abandon[]" the Government's "long-established

12   responsibility" for research infrastructure, and would jeopardize "biomedical research

13   nationwide." S. Rep. No. 115-150, at 109 (2017). To avoid this possibility, Congress enacted

14   statutory language (which it has readopted in every subsequent appropriations measure)

15   barring NIH or any other agency from restructuring or modifying the existing approach to

16   indirect costs. *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. H, §226,

17   132 Stat. 348, 740. And ultimately, rather than enacting the Administration's proposal of

18   cutting NIH funding to $25.9 billion, Congress's all-in appropriation to NIH for fiscal year

19   2018 was $37.3 billion—higher than the prior fiscal year's appropriation.[190]

20

---

21   [188] *See, e.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. H, tit. II, 136 Stat.
22   4459, 4861-4865; Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. H, tit. II,
     136 Stat. 49, 448-452; Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. H, tit.
23   II, 134 Stat. 1182, 1573-1577; Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-
     94, div. A, tit. II, 133 Stat. 2534, 2562-2565; Department of Defense and Labor, Health and
24   Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act,
     2019, Pub. L. No. 115-245, div. B, tit. II, 132 Stat. 2981, 3074-3076; Consolidated
25   Appropriations Act, 2018, Pub. L. No. 115-141, div. H, tit. II, 132 Stat. 348, 720-723;
     Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, div. H, tit. II, 131 Stat. 135, 524-
26   526; *see also, e.g.*, Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. G, tit. II,
     121 Stat. 1844, 2173-2177.
27   [189] *See* Off. of Mgmt. & Budget, *Major Savings and Reforms: Budget of the U.S. Government Fiscal Year 2018*, at 43 (2017), https://bit.ly/OMBFY18.
28   [190] NIH, *History of Congressional Appropriations, Fiscal Years 2010-2019*, at 1,
     https://bit.ly/42p9Lya.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

508. 502. In subsequent budget proposals, the Administration generally sought to increase, not decrease, NIH's funding. Its Fiscal Year 2020 budget proposal touted the Administration's prioritization of "critical health research" and proposed a $33 billion appropriation to NIH—about $6 billion higher than its 2017 proposal.[191] Similarly, the Fiscal Year 2021 budget reiterated the Administration's commitment to prioritizing "critical health research" and "support[ing] innovation," and proposed providing $38 billion to NIH.[192] Ultimately, Congress appropriated even more funds to NIH than the Administration requested for fiscal year 2021: about $42.9 billion.[193]

509. 503. Overall, from Fiscal Years 2017 through 2023, NIH funding increased annually, which is consistent with NIH's stable, and generally increasing, funding for more than 20 years:[194]

---

[191] Off. of Mgmt. & Budget, *A Budget for a Better America, Budget of the U.S. Gov't, Fiscal Year 2020*, at 46, https://bit.ly/OMBFY20.

[192] Off. of Mgmt. & Budget, *A Budget for America's Future, Fiscal Year 2021*, at 52, https://bit.ly/OMBFY2021.

[193] NIH, *Supplementary Appropriation Data Table for History of Congressional Appropriations, Fiscal Years 2020-2025*, at 1, https://bit.ly/42dM1M4.

[194] *National Institutes of Health Funding: FY1996-FY2025*, Cong. Research Serv. Rep. (June 25, 2024), https://www.congress.gov/crs-product/R43341.

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13



14  510. 504. Congress's appropriations to NIH for Fiscal Year 2024 were no

15 different. Consistent with past appropriations for NIH activities, the Further Consolidated

16 Appropriations Act of 2024 (2024 CAA) appropriates to each of NIH's Institutes and Centers

17 specific amounts "for carrying out section 301 and title IV of the [Public Health Service] Act"

18 with respect to their specific, respective statutory purposes. Pub. L. 118-47, div. D, tit. II, 138

19 Stat. 460, 656-657. For example, the 2024 CAA appropriates $7,224,159,000 to the National

20 Cancer Institute "for carrying out section 301 and title IV of the [PHSA] with respect to

21 cancer"; $3,982,345,000 to the National Heart, Lung, and Blood Institute to carry out the

22 same statutory purposes "with respect to cardiovascular, lung, and blood diseases, and blood

23 and blood products"; and $2,603,925,000 to the National Institute for Neurological Disorders

24 and Stroke to carry out the same statutory purposes "with respect to neurological disorders

25 and stroke." *Id.*

26 511. 505. Congress has not enacted a Consolidated Appropriations Act for

27 Fiscal Year 2025, but on March 15, 2025, the President signed the Full-Year Continuing

28 Appropriations and Extensions Act, 2025, commonly known as a "Continuing Resolution" or

"CR" (2025 CR). Pub. L. 119-4, 139 Stat. 9. Pursuant to the 2025 CR, Congress appropriated "[s]uch amounts as may be necessary . . . under the authority and conditions provided in applicable appropriations Acts for fiscal year 2024, for projects or activities . . . that are not otherwise specifically provided for, and for which appropriations, funds, or other authority were made available" in the specific appropriations Acts. *Id.*, div. A, §1101(a), 139 Stat. at 11. Congress made limited changes in the 2025 CR with respect to the appropriation to NIH, including rescission of a portion of NIH funding ($221,000,000 of a $1.25 billion appropriation) previously appropriated to the "NIH Innovation Account, CURES Act," which is separate from Congress's discretionary appropriations to NIH's Institutes and Centers. *Id.*, div. A, §1905, 139 Stat. at 32.[195] Otherwise, Congress did not rescind any amounts appropriated to NIH's institutes or centers and maintained the same level of funding as set forth in the 2024 CAA, through September 30, 2025. *See id.*, div. A, §1101(a)(8), 139 Stat. at 11.

512. 506. NIH generally awards extramural grants through a competitive process. At any given time, NIH has over a thousand active funding opportunities supporting a broad range of programs.

513. 507. The Department of Health and Human Services has promulgated regulations at 45 C.F.R. Part 75, governing the award of grants by HHS and its agencies, including NIH. This includes 45 C.F.R. §52.6(c), which allows HHS to notice a grant award for a "project period," during which HHS intends to support the project "without requiring the project to recompete for funds."

514. 508. NIH uses three-character "activity codes" to group and classify these funding opportunities, with the first character typically identifying the major funding category or program type. "For example, activity codes for research and development often

---

[195] Appropriations to the account created by the Cures Act are, "[i]n effect," "not subject to discretionary spending limits." *Nat'l Insts. of Health Funding: FY1996-FY2025*, Cong. Research Serv. Rep. (June 25, 2024), https://www.congress.gov/crs-product/R43341. Funds may be transferred from the Cures Act account to other NIH accounts "only for the purposes specified in the Cures Act." *Id.* Congress exempted from any rescission amounts previously designated by Congress as for an "emergency requirement" under the Balanced Budget and Emergency Deficit Control Act of 1985. 2025 CR, div. A, §1101(a)(8), 139 Stat. at 11

3301253.7
46686\20748993.1

- 120 -

SECOND [PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

start with 'R,' training with 'T,' fellowship with 'F,' and career development with 'K.'[196] The "R01" code, for example, denotes grants "[t]o support a discrete, specified, circumscribed project to be performed by the named investigator(s) in an area representing his or her specific interest and competencies." *Id.*

515.    509. The NIH competitive grantmaking process begins with a notice of funding opportunity ("NOFO"), a public announcement in which NIH declares its intention to award funds and outlines the program goals and objectives and conditions for applying. *See* U.S. Dep't of Health & Hum. Servs. *NIH Grants Policy Statement*, §2.3.5, at I-51 (Apr. 2024) ("NIHGPS"), https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

516.    510. A researcher interested in responding to a NOFO will typically work with the "sponsored research" department at his or her institution to understand what NIH requires in its application submission. At the University of California Berkeley, for example, the Sponsored Projects Office assists faculty and staff in locating sources of funding, reviewing and approving proposals, and negotiating grants and contracts.

517.    511. Once a researcher develops a project proposal, that person then submits an electronic grant application to NIH. Applications must conform to 45 C.F.R. Part 75, and must include a detailed research plan outlining the study's objectives, methodology, and significance; a proposed budget and justification; biosketches for key investigators; and any necessary compliance documentation, such as Institutional Review Board approval for human subject research.

518.    512. A submitted grant application undergoes two layers of evaluation: an initial layer of review by a "scientific review group" (also known as a "study section"), followed by a round of review by an "advisory council." *See* 42 U.S.C. §§284a, 289a; *see also* NIHGPS §2.4, at I-71 ("The peer review system used by NIH, often referred to as the 'dual review system,' is based on two sequential levels of review for each application—initial review by [a study section], and a second level of review for scientific merit by the IC

---

[196] NIH, *Activity Codes* (March 28, 2025), https://grants.nih.gov/funding/activity-codes; *see* NIH, *Funding Categories*, (Feb. 3, 2025), https://grants.nih.gov/funding/funding-categories.

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

National Advisory Council/Board."). According to NIH, this process "is intended to ensure that applications for funding submitted to NIH are evaluated on the basis of a process that is fair, equitable, timely, and conducted in a manner that strives to eliminate bias." NIHGPS §2.4, at I-71.

519. ~~513.~~ As noted, the first level of application review is carried out by a study section. The role of study sections is to assess applications' scientific merit and to determine the overall impact that proposed projects will likely have on the relevant field. Governing statutes and regulations require this layer of review—*i.e.*, a favorable study-section recommendation is a prerequisite to a final award of any NIH grant. *See* 42 U.S.C. §§ 284(b)(2)(B), 289a(a); 42 C.F.R. pt. 52h.

520. ~~514.~~ These groups consist primarily of non-federal scientists who have expertise in relevant scientific disciplines and current research areas. 42 C.F.R. § 52h.4. NIH has hundreds of study sections, organized by specialty. In the field of chronic HIV infection, for example, NIH maintains study sections on (1) HIV Coinfections and HIV Associated Cancers, (2) HIV Comorbidities and Clinical, (3) HIV/AIDS Intra- and Inter-personal Determinants and Behavioral Interventions, (4) HIV Immunopathogenesis and Vaccine Development, (5) HIV molecular virology, cell biology, and drug development, and (6) Population and Public Health Approaches to HIV/AIDS.

521. ~~515.~~ Study sections carry out their work, including review of pending applications, at regularly scheduled meetings. These meetings must be noticed in advance in the Federal Register. *See* 42 C.F.R. § 52h.3 ("To the extent applicable, the Federal Advisory Committee Act, as amended . . . shall govern the establishment and operation of peer review groups."); 5 U.S.C. §1009(a)(2) ("[T]imely notice of each meeting [subject to the Federal Advisory Committee Act] shall be published in the Federal Register . . . .").

522. ~~516.~~ Study sections review and score each grant application according to established criteria set forth in regulations and the NOFO. In particular, the study section assesses the overall impact that the project could have on the research field involved, taking into account:

a.    The significance of the goals of the proposed research, from a scientific or technical standpoint;

b.    The adequacy of the approach and methodology proposed to carry out the research;

c.    The innovativeness and originality of the proposed research;

d.    The qualifications and experience of the principal investigator and proposed staff;

e.    The scientific environment and reasonable availability of resources necessary to the research;

f.    The adequacy of plans to include both genders, minorities, children and special populations as appropriate for the scientific goals of the research;

g.    The reasonableness of the proposed budget and duration in relation to the proposed research; and

h.    The adequacy of the proposed protection for humans, animals, and the environment, to the extent they may be adversely affected by the project proposed in the application.

42 C.F.R. §52h.8; *see also* 42 C.F.R. §52a.5 (describing review criteria for NIH research center grants); 42 C.F.R. §52h.11 (describing review criteria for NIH research contracts).

523.    517. As a result of that review, each grant application receives an "overall impact score" from 10 (the best score, denoting high impact) to 90 (the worst score, denoting low impact). Each application also receives a percentile rank expressing the impact score in relation to other applications in that particular institute. Projects deemed "unfundable" by the study section are not given a score and are removed from further consideration.

524.    518. Each fiscal year, NIH's institutes and centers publish guidance called "paylines" to help applicants interpret their study-section results. These paylines reflect a sort of cutoff: for each category of grants, the payline shows the impact score (or percentile) above which a project is highly likely to be funded. In Fiscal Year 2025, for example, published guidance from the National Institute of Allergy and Infectious Diseases ("NIAID") established a 16th-percentile payline for "R01" awards with new or early-stage principal

investigators.[197] In other words, an applicant in that category who received a score from the relevant study section within the 12th percentile could anticipate that NIAID would likely fund his or her project. Study-section scores that meet or exceed the payline in this way are commonly referred to as "fundable" scores.

525. 519. In addition to providing scores and percentiles, study sections also provide each applicant with a "summary statement" that contains, among other things, a brief summary of the study section's discussion, bulleted critiques from assigned reviewers, and any administrative comments. Applicants can use these summary statements to revise applications and address concerns, if necessary.

526. 520. As noted, the second level of application review is carried out by an advisory council. Unlike the numerous study sections, each NIH institute or center that funds grants has a single advisory council (*i.e.*, there is one advisory council for NIAID, one for the National Cancer Institute, and so on). By statute, NIH advisory councils must meet at least three times per fiscal year. 42 U.S.C. §284a(e). Like study section meetings, advisory council meetings must be noticed in advance in the Federal Register. *See* 41 C.F.R. §102-3.150 (requiring 15 days' notice).

527. 521. Whereas a study section's review focuses on scientific merit, an advisory council's review weighs programmatic and institute-wide considerations. A council considers, among other things, the extent to which an application aligns with the institute or center's priorities, public health needs, and overall funding availability. The council also reviews the application for other potential barriers, such as ethical issues around human or animal test subjects.

528. 522. An advisory council makes one of three decisions on each application: an application is recommended for funding, not recommended for funding, or deferred for re-review by the study section. A favorable recommendation from the relevant

---

[197] NIH, *NIAID Paylines* (May 15, 2025), https://www.niaid.nih.gov/grants-contracts/niaid-paylines.

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

institute's advisory council is a prerequisite to final award of any grant in excess of $50,000. 42 U.S.C. § 284(b)(2); *see also* §284a(a)(3)(A)(ii).

529. ~~523.~~ The advisory council makes funding recommendations to the institute or center director, who ultimately makes the funding decision. In making that decision, the institute or center director shall consider, consistent with the peer-review process: (i) the mission of the national research institute or national center and the scientific priorities identified in the institute or center's strategic plan; (ii) programs or projects funded by other agencies on similar research topics; and (iii) advice by staff and the advisory council or board of such national research institute or national center. 42 U.S.C. § 284(b)(3).

530. ~~524.~~ If the decision is in favor of funding, NIH issues a legally binding Notice of Award ("NoA") to the selected grant recipients stating that funds may be requested. NIHGPS §5, at IIA-59.

531. ~~525.~~ NIH typically does not issue grants as lump-sum awards. Instead, NIH uses a cost-based accounting system, under which grant recipients are authorized to recover their actual, documented costs for conducting research after the grant is awarded. Institutions can then use awards—and indeed, rely on those awards—to obtain a line or letter of credit for the procurement of the resources needed for the project.

532. ~~526.~~ If NIH approves a project with a multi-year period, the agency typically awards the grant for the first year (the "award year") at the outset, with funding for subsequent years (the "out years") subject to a renewal process. In these "noncompetitive" renewals, the application does not undergo a fresh round of peer review—instead, applicants submit progress reports demonstrating that the grantee is making progress and complying with applicable policies and practices. *See* 42 C.F.R. § 52a.6. So long as grantees demonstrate progress and compliance with applicable policies and practices, noncompetitive renewals are approved as a matter of course.

533. ~~527.~~ NIH's application and award process follows a predictable calendar each year that is posted in advance. The agency has three standard application cycles per year, with published schedules identifying application due dates, the timing of study

~~SECOND~~[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    section and advisory council review, and the earliest permissible start date for the project. As

2    reflected on the agency's website,[198] the current triannual schedule is as follows:

| Review and Award Cycles | | | |
| --- | --- | --- | --- |
| | **Cycle I** | **Cycle II** | **Cycle III** |
| Application Due Dates | January 25 - May 7 | May 25 - September 7 | September 25 - January 7 |
| Scientific Merit Review | June - July | October - November | February - March |
| Advisory Council Round | August or October * | January | May |
| Earliest Project Start Date | September or December * | April | July |

### 2.    In Response to Trump Administration Directives, HHS Through NIH Improperly Changed Priorities and Canceled Existing Grants

534.    528. The foregoing paragraphs describe NIH as it existed and

functioned through the decades, from its original founding until January 20, 2025.

535.    529. HHS is now facing an existential threat: the Trump Administration

has negated the HHS's core grant-making function by unilaterally, arbitrarily and illegally

terminating billions of dollars in lawfully awarded research grants that the Administration

views (often mistakenly) as having some connection to diversity, equity and inclusion (most

broadly defined), as well as other subjects the Trump Administration dislikes, such as climate

change, vaccines, HIV/AIDS, and COVID-19.

536.    530. HHS has been explicit about its adherence to Trump's and

DOGE's orders. HHS announced on March 27, 2025 that it would begin "restructuring in

accordance with President Trump's Executive Order" creating DOGE.[199] DOGE operatives

have personally directed top NIH officials to terminate "hundreds" of grants, and the "Defend

the Spend" collaboration between DOGE and HHS has frozen thousands of grants.[200]

---

[198] HHS, *HHS Announces Transformation to Make America Healthy Again*, (Mar. 27, 2025), https://www.hhs.gov/press-room/hhs-restructuring-doge.html.

[199] Chris Wright, *Unleashing the Golden Era of American Energy Dominance,* U.S. Dep't of Energy (Feb. 5, 2025), https://www.energy.gov/articles/secretary-wright-acts-unleash-golden-era-american-energy-dominance.

[200] Dan Diamond, et al., *DOGE, Trump Grants, HHS NIH Backlog*, Washington Post (Apr. 17, 2025), https://www.washingtonpost.com/politics/2025/04/17/doge-trump-grants-hhs-nih-backlog/.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

537. ~~531.~~ On February 10, Acting Secretary of Health and Human Services Dorothy Fink issued a new memorandum implementing the President's Executive Orders related to DEI. That memorandum "DIRECT[ED]" all HHS personnel, including NIH, to "pause all payments made to . . . grantees related to DEI and similar programs for internal review for payment integrity. . . . [I]f after review, the Department has determined that a contract is inconsistent with Department priorities and no longer in the interest of government . . . grants may be terminated in accordance with federal law."[201]

538. ~~532.~~ Beginning no later than the second week of February, HHS developed a policy that required the termination of grants related to specific categories of research that were disfavored as a matter of Administration policy. These categories originally focused on "DEI-related" projects, but have evolved to include other disfavored categories, including projects related to gender identity, vaccine hesitancy, and COVID-19.

539. ~~533.~~ On February 10, 2025, Acting Secretary Fink issued a "Secretarial Directive on DEI-Related Funding," which stated:

> The Department of Health and Human Services has an obligation to ensure that taxpayer dollars are used to advance the best interests of the government. This includes avoiding the expenditure of federal funds on programs, or with contractors or vendors, that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Contracts and grants that support DEI and similar discriminatory programs can violate Federal civil rights law and are inconsistent with the Department's policy of improving the health and well-being of all Americans.

The directive went on to state:

> For these reasons, pursuant to, among other authorities, FAR 12.403(b) and 49.101 and 45 C.F.R. §75.371- 372, the Secretary of Health and Human Services hereby DIRECTS as follows:

> Agency personnel shall briefly pause all payments made to contractors, vendors, and grantees related to DEI and similar programs for internal review for payment integrity. Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy priorities. In addition, if after review the Department has determined that a contract is inconsistent with Department priorities and no longer in the interest of the government,

---

[201] *See* District of Massachusetts' Findings of Fact, Rulings of Law, and Order For Partial Separate and Final Judgment in *Massachusetts v. Kennedy*, 25-10814-WGY (Dkt. 163).

such contracts may be terminated pursuant to the Department's authority to terminate for convenience contracts that are not "in the best interests of the Government," see FAR 49.101(b); 12.403(b). Furthermore, grants may be terminated in accordance with federal law.

The February 10 directive did not define the term "related to DEI and similar programs."

540. ~~534.~~ On February 12, Mike Lauer, then NIH's Deputy Director for Extramural Research, sent a memo directing that "given recent court orders" in federal court actions related to funding freezes, NIH institutes and centers were "authorized, along with their respective grant management staff, to proceed with issuing awards for all competing, non-competing continuation, and administrative supplements . . . grants."

541. ~~535.~~ On February 13, Mr. Lauer instructed Chief Grants Management Officers that "[i]f the sole purpose of the grant . . . supports DEI activities, then the award must be fully restricted." It also called for "hard funding restrictions" where the program promotes initiatives that "discriminate" on the basis of race, sex, or other protected characteristics, without defining what constituted such discrimination in a research program. That day, Mr. Lauer resigned from his position with NIH. On information and belief, Mr. Lauer was forced out because of his memorandum the previous day.

542. ~~536.~~ On or about March 4, NIH issued an updated guidance on "Award Assessments for Alignment with Agency Priorities." It provided staff with the language that terminations must include when a grant is terminated for relation to China, DEI, or "[t]ransgender issues."

543. ~~537.~~ The March 4 guidance also provided that "diversity supplements" would be canceled and not issued going forward. Diversity Supplements are grants meant to increase diversity in the scientific profession by providing training, mentorship and career development opportunities to individuals from underrepresented populations. In recent notices of funding opportunity, NIH has defined diversity broadly, to include not only "[i]ndividuals from racial and ethnic groups that have been shown by the [National Science Foundation] to be underrepresented in health-related sciences on a national basis," but also "[i]ndividuals with disabilities," and "[i]ndividuals from disadvantaged backgrounds," including those who

have experienced homelessness, who were in foster care, who experienced poverty, or who are from rural areas.[202]

544. 538. By March 13, the list of scientific research disfavored by the Administration had grown to include yet another topic—vaccine hesitancy—and NIH's termination of awarded grants grew dramatically. On March 13, 2025, Michelle Bulls, NIH's Chief Grants Management Officer, instructed the individual institutes on how to issue termination letters, and on what bases. Ms. Bulls instructed that termination letters should include the following language: "It is the policy of NIH not to prioritize [insert termination category language]. Therefore, this project is terminated." The termination category language that Ms. Bulls provided included terminations for a program's relation to DEI, gender, and vaccine hesitancy. Hundreds of NIH grants were terminated in the ensuing days.[203]

545. 539. On information and belief, on or before March 19, 2025, the Office of Extramural Research and the Office of Policy for Extramural Research Administration provided additional guidance on how ICs should process grant terminations and communicate with grant recipients regarding such terminations. Included in these instructions was the instruction to speak only of "changes in NIH and/or HHS priorities" and an instruction to "not refer to any Executive Orders."

546. 540. On March 25, 2025, NIH again distributed updated guidance on grant terminations—yet again expanding the list of politically disfavored subject matters. The language for grant terminations continued to include language on DEI, transgender issues, and vaccine hesitancy, but now included yet another topic—COVID-19. As to COVID, the guidance stated that: "The end of the pandemic provides cause to terminate COVID-related grant funds. These grant funds were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grant funds are no longer necessary."

---

[202] NIH, *PA-20-222: Research Supplements to Promote Diversity in Health-Related Research*, , https://grants.nih.gov/grants/guide/pa-files/pa-20-222.html.

[203] U.S. Dep't of Health & Human Servs., *HHS Grants Terminated* (Aug. 22, 2025), https://taggs.hhs.gov/Content/Data/HHS_Grants_Terminated.pdf.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

547. 541. By May, HHS's database of grant terminations revealed that it had terminated 104 grants to UC recipients.[204] A study published on May 8, 2025 identified UCSF as being particularly hard-hit by HHS grant terminations.[205]

548. 542. On June 23, HHS and NIH were ordered in *National Institutes of Health v. American Public Health Association*, No. 25-cv-10787 (D. Mass. June 23, 2025) and *Massachusetts v. Kennedy*, No. 25-cv-10814 (D. Mass. June 23, 2025) to restore NIH grants that had been terminated. HHS and NIH subsequently began restore certain NIH grants listed in those actions.

549. 543. On July 31, 2025, HHS and NIH engaged in a new round of mass grant terminations against UC researchers at the University of California, Los Angeles ("UCLA"). In this new action, via a single form letter and styled as a "suspension" by the agencies, HHS and NIH terminated close to 500 NIH grants to UC researchers.

550. 544. In a July 31, 2025 letter to the Chancellor of UCLA, NIH stated that it was "suspending" grants to UCLA for the following three reasons:

    a.    "UCLA engages in racism, in the form of illegal affirmative action;"

    b.    "UCLA fails to promote a research environment free of antisemitism and bias;"

    c.    "UCLA discriminates against and endangers women by allowing men in women's sports and private women-only spaces."

551. 545. By terminating grants to UC researchers at the direction of the President and DOGE, HHS has violated its congressional mandates. Such mandates include, for example, compliance with and effectuation of the legislative purposes implicit in

---

[204] U.S. Dep't of Health & Human Servs., *HHS Grants Terminated* (Aug. 22, 2025), https://taggs.hhs.gov/Content/Data/HHS_Grants_Terminated.pdf.
[205] Michael Liu et al.,, *Characterization of Research Grant Terminations at the National Institutes of Health*, JAMA Network (May 8, 2025), https://jamanetwork.com/journals/jama/fullarticle/2833880?guestAccessKey=3a432109-6c9d-4ef2-9d10-bf48d91fe441&utm_source=for_the_media&utm_medium=referral&utm_campaign=ftm_links&utm_content=tfl&utm_term=050825.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

congressional appropriations; spending required by 42 U.S.C. § 241; and directives to HHS subunits.

552. 546. HHS's mass grant terminations have caused serious harm to UC researchers, including those who received grants through HHS's subunits: NIH, the Centers for Disease Control (CDC), and the Food and Drug Administration (FDA).

553. 547. The CDC has terminated at least one grant awarded to a UC Berkeley Biostatistician/Epidemiologist for a project titled "Strengthening California's Public Health Workforce to Improve Decision Making and Health Equity Through Advanced Training and Academic Partnership."

554. 548. On information and belief, HHS and its subunits have effectuated mass terminations of grants to UC researchers without proper review or clear explanation, thereby acting unconstitutionally and unlawfully.

**3.    NIH Plaintiffs and Other Grant Recipients Are Harmed by NIH's Illegal Grant Terminations.**

555. 549. Plaintiffs and Class members have long relied on NIH grants to fund meritorious projects aimed at advancing public health and well-being. The termination of previously approved grants has caused and continues to cause Plaintiff and Class members serious harm.

**a.    Plaintiff Marcus A. Horwitz's Grant Termination and Resulting Harm**

556. 550. Dr. Marcus A. Horwitz is a Distinguished Professor of Medicine and Microbiology, Immunology, and Molecular Genetics at the University of California, Los Angeles (UCLA). He researches the immunobiology of various diseases, including tuberculosis, and develops treatment regimens, vaccines, and antibiotics to combat them. Additionally, he currently serves as a fellow in the Infectious Diseases Society of America and is a member of the American Society for Clinical Investigation.

557. 551. Dr. Horwitz's research focuses on (1) the immunobiology of the disease components of Legionnaires' disease, leprosy, tuberculosis, and tularemia; (2) developing vaccines against those diseases; and (3) developing an ultra-short drug treatment

3301253.7
46686\20748993.1

regimen for treating tuberculosis. In recognition of his accomplishments, he was awarded the Oswald Avery (formerly Squibb) award for the Infectious Diseases Society of America and was elected to a Fellowship in the American Association for the Advancement of Science.

558. 552. Dr. Horwitz's research has been funded by research grants from governmental and private sources, including 34 research grants from NIH.

<u>NIH TB Vaccine Grant Application and Award</u>

559. 553. Dr. Horwitz submitted a grant application to NIH as a Principal Investigator for a project titled "Optimization and Advanced Proof-of-Concept Studies of a Listeria-vectored Multi-Antigenic Vaccine against Tuberculosis" (hereafter, the "TB Vaccine Project"). The grant project addressed the potential to develop a safer and more effective vaccine and booster vaccine against tuberculosis. The purpose of the project was to optimize and conduct advanced proof-of-concept studies in small animals and non-human primates of a second generation vaccine against tuberculosis.

560. 554. On November 29, 2017, NIH issued a Notice of Award and the Grant Agreement. The Notice of Award authorized funding for five years of work on the Tuberculosis Vaccine Project, from December of 2017 through November of 2022, for a total award of $5,424,173.

561. 555. NIH issued further Notices of Award for the Tuberculosis Vaccine Project, authorizing continued funding in November 2018, December 2019, and November 2020. The project's work with primates was delayed during COVID-19, so the project received three No-Cost Time Extensions. The Project's end date was revised to November 30, 2025.

<u>NIH Termination of TB Vaccine Grant Award</u>

562. 556. On August 1, 2025, Dr. Horwitz received an email from UCLA's Office of Contract and Grant Administration instructing him to stop work on the Tuberculosis Vaccine Project as a result of NIH's July 31 grant suspension action against UCLA. The suspension of the project suspended approximately $143,594 in unfunded award still outstanding to complete the Tuberculosis Vaccine Project's work.

1    563. 557. As a result of this unilateral, unlawful termination, Dr. Horwitz

2    has been unable to uncover the extent to which the vaccine worked. Despite having completed

3    the live-animal component of the final definitive proof-of-concept vaccine study in non-

4    human primates, Dr. Horwitz is unable to proceed with analyzing the results of the study to

5    determine the correlation of vaccine function.

6    564. 558. Without completing his analysis of the study results, Dr. Horwitz

7    is prevented from engaging in the next phase of his TB vaccine research: taking the vaccine

8    into clinical trials. Dr. Horwitz's inability to do so impacts his career and substantially delays

9    the development of a potent tuberculosis vaccine for which the primary purpose is to boost the

10   immunity of the approximately 5 billion people in the world previously vaccinated with the

11   previous vaccine and in whom most tuberculosis cases in the world develop.

12   565. 559. The project team's inability to complete the work and publish it

13   also hinders the career of a project scientist in Dr. Horwitz's laboratory who developed the

14   vaccine and the careers of their collaborators at the Texas Biomedical Research Institute.

15   NIH Latent TB Treatment Grant Application and Award

16   566. 560. Dr. Horwitz submitted a grant application to the NIH as a

17   Principal Investigator for the project titled "Efficacy and Safety of AI-enabled PRS Regimen

18   VI (Clofazimine, Bedaquiline and Pyrazinamide) as Ultra-Short Course Therapy of LTBI in

19   Non-Human Primates in a Setting Mimicking HIV co-infection" (hereafter, the "Latent TB

20   Treatment Project").

21   567. 561. The project's goal was to examine a short-term three-drug

22   treatment regimen for latent tuberculosis infection ("LBTI"), leveraging artificial intelligence

23   platforms to determine whether the treatment prevents reactivation of tuberculosis.

24   Approximately 2 billion people on earth are infected but do not develop an active disease

25   immediately, instead reactivating tuberculosis later in life in tandem with some form of

26   immunocompromised status. Current treatments are long and burdensome, which negatively

27   impacts treatment completion. This study was intended to pave the way towards a much

28   shorter regimen that would eventually eliminate latent tuberculosis and tuberculosis itself.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

568. 562. On February 27, 2024, NIH issued a Notice of Award and the Grant Agreement. The Notice of Award authorized funding for three years of work from March 2024 through January 2027. The NIH's initial Notice of Award was superseded by a revised Notice of Award sent on May 30, 2024, which provided for total funding of $2,798,273 during the project period. NIH issued a further Notice of Award for the Latent TB Treatment Project, authorizing continued funding in February 2025.

<u>NIH Termination of Latent TB Treatment Grant Award</u>

569. 563. On August 1, 2025, Dr. Horwitz received an email from UCLA's Office of Contract and Grant Administration instructing him to stop work on the Latent TB Treatment Project as a result of NIH's July 31 grant suspension action against UCLA. The suspension of the project suspended approximately $2,333,898 in unfunded award still outstanding to complete the Latent TB Treatment Project's work.

570. 564. As a result of this unilateral, unlawful termination, Dr. Horwitz is unable to support the salary components of collaborating individuals at the Subaward site Texas Biomedical Research Institute, including two leading collaborating co-investigators, a Staff Scientist, a Post-doctoral fellow, and two technicians. Despite making impressive headway performing initial work on the pharmacodynamics and pharmacokinetics of the treatment drugs, Dr. Horwitz is unable to complete the work in collaboration with another collaborating co-investigator and specialist in this area at another collaborating institution.

571. 565. The premature termination of this grant has also foreclosed Dr. Horwitz's ability to begin the critical study using already selected primates to uncover if the drug regimen has efficacy against latent tuberculosis.

572. 566. These losses are in addition to the loss of value to the public from Dr. Horwitz's research team's inability to revolutionize treatment of people with latent tuberculosis worldwide, of which there are approximately 2 billion, and in whom tuberculosis can reactivate at any point in their lives if not properly treated.

<u>NIH T7SS Drug Project Grant Application and Award</u>

573. 567. Dr. Horwitz submitted a grant application to the NIH as a Principal Investigator for the project titled "Identification by High Throughput Screening of Inhibitors of the Mycobacterium tuberculosis ESX-1 and ESX-5 Type VII Secretion Systems – critical virulence determinants and novel drug targets" (hereafter, the "T7SS Drug Project").

574. 568. The goal of the T7SS Drug project was to identify promising lead compounds with the highest therapeutic ratio and study them to potentially develop a new class of antibiotics to treat tuberculosis. With approximately 10.6 million active cases and 1.3 million deaths a year, better drugs are urgently needed to shorten the burdensomely long treatment course and to combat the emergence of new tuberculosis causative agents that are drug resistant.

575. 569. On July 17, 2025, NIH issued a Notice of Award, authorizing grant funding for the T7SS Project. The Notice of Award authorized funding for two years of work on the project, from July 2025 through June 2027, for a total award of $433,125.

NIH Termination of T7SS Drug Project Grant Award

576. 570. On August 1, 2025, Dr. Horwitz received an email from UCLA's Office of Contract and Grant Administration instructing him to stop work on the T7SS Drug Project as a result of NIH's July 31 grant suspension action against UCLA. The suspension of the project suspended approximately $429,518 in unfunded award still outstanding to complete the T7SS Drug Project's work.

577. 571. The premature termination of this grant means that Dr. Horwitz is unable to carry out the high throughput screens of molecules for their capacity to inhibit the T7SS of Mycobacterium tuberculosis, the causative agent of tuberculosis. Without this, Dr. Horwitz is prevented from discovering new drugs to treat this very important infectious disease, which kills more people than any other infectious agent and is rapidly developing resistance to currently available drugs.

578. 572. As a result of this unilateral, unlawful termination, Dr. Horwitz is unable to continue to support the salary component of several people in his laboratory. This includes himself, a co-investigator Professor, a co-investigator Project Scientist, and a

SECOND [PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

collaborating co-investigating Professor in the high throughput screening facility and his Research Associate.

579. 573. These allegations are detailed and supported, with relevant documentation, in the Declaration of Dr. Marcus A. Horwitz, filed in this action.

b. **Plaintiff Alexander Van Der Bliek's Grant Termination and Resulting Harm**

580. 574. Dr. Alexander van der Bliek is a Professor of Biological Chemistry at UCLA who examines the role of mitochondria in neurodegenerative diseases. For the past two decades he has also served as a regular member and temporary member of multiple NIH study sections; these expert bodies decide which grant applications get funded.

581. 575. Dr. van der Bliek's research focuses on the role that mitochondria serves in neurodegenerative diseases such as Alzheimer's and peripheral neuropathies (diseases that damage nerves outside the brain and spinal cord, causing chronic pain, tingling, and other symptoms). Having discovered the molecular basis of mitochondrial fission, which is essential for both cell survival and cell death, Dr. van der Bliek has continued research on mitochondrial dynamics that may illuminate mechanisms for many diseases that pose an enormous societal disease burden. His work is particularly recognized for its relevance to neurodegenerative diseases and conditions with high energy demands, including cancer and diabetes.

582. 576. In recognition of his research, Dr. van der Bliek has been honored with a fellowship with EMBO (an international membership organization promoting excellence in the life sciences) and HFSPO (the Human Frontiers of Science Organization), and a five-year role as Research Scholar at the American Cancer Society.

583. 577. Dr. van der Bliek's research has been supported by multiple NIH Grants, as well as grants from non-governmental agencies.

Grant Application to NIH

584. 578. On April 29, 2020, Dr. van der Bliek submitted an Application for Federal Assistance to the NIH's National Institute of Neurological Disorders and Stroke

(NINDS). The project, for which Dr. van der Bliek was identified as Project Director and Principal Investigator, was titled "Control of Calcium Flux and Mitochondrial Fission by the Charcot Marie Tooth Disease Protein Mfn2" (the "R01 Application").

585. 579. The proposal aimed to research the underlying causes of Charcot-Marie-Tooth (CMT) disease. CMT is an inherited condition that damages the nerves controlling movement and sensation. In the study, Dr. van der Bliek sought to study how mutations in a protein called Mfn2 affect the way mitochondria, the cell's "power plants," divide. Because the process is closely tied to nerve cell health, Dr. van der Bliek's research may help explain what causes CMT and point toward new ways to treat it. In addition to funding Dr. van der Bliek, the proposal would fund salaries for one lab technician and two postdoctoral researchers, as well as funding supplies, research costs, travel, and publishing.

586. 580. NIH issued a Notice of Award, authorizing grant funding for Dr. van der Bliek's CMT research project. The Notice of Award authorized funding for five years of work on the project, from January 2021 through December 2025, for a total award of $2,243,240.

587. 581. Dr. van der Bliek received his most recent Notice of Award Action from UCLA grant administrators on January 10, 2025, informing him that he was to receive the last installment of the grant ($342,488) to sustain the project's final year.

NIH Grant Termination

588. 582. On August 1, 2025, Dr. van der Bliek received an email from UCLA administrators instructing him to stop work on his NIH grant as a result of NIH's July 31 grant suspension action against UCLA.

589. 583. As a result of this unilateral, unlawful grant termination, Dr. van der Bliek is unable to capitalize on new insights from his research into the root causes of hereditary neuropathies. This research opens promising directions for future therapies for these often debilitating disorders. HE is also unable to further explore an important, unexpected research result: revelation of certain toxic cellular mechanisms linked to brain diseases such as Alzheimer's and frontotemporal dementia.

590. ~~584.~~ Dr. van der Bliek is also no longer able to purchase supplies for his experiments and will have to soon let his staff go for lack of University support. With research in his lab grinded to a halt, Dr. van der Bliek will have to spend significant time to identify new postdocs to work with him as collaborators and wait for them to complete their PhD training if he were even able to identify new sources of funding. To do so, Dr. van der Bliek would have to close down the lab due to considerable delay, losing a large amount of exciting new data.

591. ~~585.~~ The premature termination of this grant also means that the postdocs working with Dr. van der Bliek will be unable to complete their projects and publish associated papers. These postdocs are highly specialized, having trained for years in this area. A gap in publications resulting from layoffs will make them far less desirable in the job market and potentially make them unemployable. The field as a whole will suffer from the loss of these promising researchers. This will have an enduring adverse impact on research in Dr. van der Bliek's subfield of biological chemistry.

592. ~~586.~~ These harms are in addition to the loss of value to the public from Dr. van der Bliek's research team's inability to complete work on the root causes of hereditary neuropathies that would help advance public understanding of neurodegenerative and metabolic diseases, including Parkinson's, Alzheimer's, diabetes, and cancer.

593. ~~587.~~ These allegations are detailed and supported, with relevant documentation, in the Declaration of Dr. Alexander van der Bliek, filed in this action.

      **c.**    **Plaintiff Rhonda Voskuhl's Grant Termination and Resulting Harm**

594. ~~588.~~ Dr. Rhonda Voskuhl is a Professor of Neurology at the UCLA School of Medicine, who examines how sex hormones and sex chromosomes cause sex differences in the onset and severity of neurodegenerative diseases. She currently holds the Jack. H. Skirball Chair and has served as the Director of the UCLA Multiple Sclerosis Program since 2000. Dr. Voskuhl is also a Faculty Neurologist for the UCLA Comprehensive Menopause Care Program.

595. 589. Dr. Voskuhl's research focuses on (1) determining how sex hormones and sex chromosomes cause sex differences in the onset and severity of neurodegenerative diseases and (2) investigating the role of brain aging on neurodegeneration, identifying a sex hormone by age interaction whereby being estrogen deficient and midlife combine to induce cognitive decline, dorsal hippocampal atrophy, glial activation, and synaptic loss. The goal of Dr. Voskuhl's research is to use a brain region-specific, cell-specific, and sex-specific approach to identify neuroprotective treatment targets, then design clinical trials to repair neurodegeneration that are optimally tailored for sex and age. In recognition of her research, Dr. Voskuhl was most recently awarded the John Dystel Prize in Multiple Sclerosis, 2024, from the American Academy of Neurology and the National MS Society, the most prestigious award in the field of MS. In addition to numerous national and international awards, Dr. Voskuhl was also awarded the Rachel Horne Prize for Women's Research in Multiple Sclerosis, 2023, from the European and American Committees for Treatment and Research in MS.

596. 590. Dr. Voskuhl's research has been supported by governmental and private sources, including research grants from NIH.

Grant Application to the NIH

597. 591. On July 8, 2022, Dr. Voskuhl submitted a grant application to the NIH for a project titled "Neurodegeneration Underlying Distinct Disabilities in Multiple Sclerosis Using a Cell-Specific, Region-Specific, and Sex-Specific Approach" (the "R35 Application"). The R35 application aimed to (1) extend the cell-specific and region-specific transcriptomics in astrocytes and oligodendrocytes to microglia and neurons, with cell to cell interactions revealed in mice double-labelled to show gene expression changes in two distinct cell types in the same region in the same mouse, and (2) determine if there are effects of sex and/or age on the most differentially expressed cell-specific and region-specific pathways. The R35 proposal would take Dr. Voskuhl's research to the next level: identifying sex by age interactions in cell-specific and region-specific transcriptomics, neuropathology, and substructure atrophy on MRI. In doing so, the project would discover neurodegenerative

targets optimized for each disability in MS models in females and males during young

adulthood and aging. Dr. Voskuhl was the Project Director and Principal Investigator on the

grant proposal, which included four co-investigators, one graduate student, one senior lab

technician, and one MRI lab technician.

598. 592. The grant Application requested funding commensurate with the

8-year budget of $7,307,976 from April 2023 to March 2031.

NIH's Grant Award

599. 593. On May 8, 2023, NIH issued a Notice of Award, approving the

R35 Application. The Agreement authorized the proposal for an amount of $876,448 for the

5/15/2023-4/30/2024 budget period, and additional awards of $913,497 for the next seven

years. NIH approved continuing funding for the R35 Project in each of the subsequent years.

NIH's Grant Termination

600. 594. On August 1, 2025, Dr. Voskuhl received from UCLA's research

administrators a "Stop Work Notice" for the R35 Grant Award as a result of NIH's July 31

grant suspension action against UCLA.

601. 595. As a result of this unilateral, unlawful termination, Dr. Voskuhl is

unable to purchase supplies for her experiments. Dr. Voskuhl will soon have to let her staff go

for lack of University support and research in her lab will stop.

602. 596. Dr. Voskuhl's co-investigators, who have highly specialized

training but are more junior in their careers, will be harmed by a gap in publications, which

will negatively impact their career progression and ability to secure future funding for their

research. A pause in Dr. Voskuhl's research negatively impacts her subfield of neurology.

The team will be unable to share their research findings at conferences and in scientific

publications. In addition, Dr. Voskuhl is training the next generation of MS researchers,

including young faculty, postdoctoral fellows, graduate students and undergraduates. The

future of MS research will be harmed by an indefinite pause in training.

603. 597. These harms are in addition to the loss of value to the public from

Dr. Voskuhl's research team's inability to complete work on new insights into the molecular

basis for disability-specific disease progression in MS. Their research had already generated

new insights that are indefinitely paused. Multiple sclerosis affects nearly one million people

in the United States. Work supported by Dr. Voskuhl's grant is aimed at developing novel

treatments targeting cells and processes within the central nervous system to confer

neuroprotection and repair disabilities for MS patients. Dr. Voskuhl's research would also

have helped advance public understanding of neurodegenerative conditions and autoimmunity

and how sex differences can affect disease and treatment. NIH's withheld funding threatens

the loss of research discoveries and treatment for MS patients.

604. ~~598.~~ These allegations are detailed and supported, with relevant

documentation, in the Declaration of Dr. Rhonda Voskuhl, filed in this action.

**G.    The Department of Energy**

**1.    Congress created the Department of Energy to promote energy research, innovation, and conservation; to promote U.S. energy independence; and to develop alternatives to fossil fuels.**

605.    The Department of Energy ("DOE") is an executive department of the

U.S. Federal Government that oversees the United States' national energy policy and energy

production, the research and development of nuclear power, the military's nuclear weapons

program, nuclear reactor production for the United States Navy, energy related research, and

energy conservation. The DOE was created in 1977 in the aftermath of the 1973 oil crisis. In

1977, President Jimmy Carter signed into law the Department of Energy Organization Act

which established the Department of Energy. President Carter proposed the Department of

Energy with the goal of promoting energy conservation and energy independence, and

developing alternative sources of energy to reduce the use of fossil fuels.

**2.    In Response to Trump Administration Directives, DOE Improperly Changed Priorities and Canceled Existing Grants**

606.    DOE quickly began department-wide restructuring pursuant to Trump

orders. On February 5, 2025, the Secretary of Energy announced that DOE would "take

immediate action . . . in accordance with President Trump's executive orders."[206]

---

[206] Chris Wright, *Unleashing the Golden Era of American Energy Dominance,* U.S. Dep't of
Energy (Feb. 5, 2025), https://www.energy.gov/articles/secretary-wright-acts-unleash-golden-era-

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

607.    By early spring 2025, DOE began implementing Defendant Trump's orders with help from DOGE. In a May 2025 press release, DOE announced that it was appointing the then-current head of DOGE at DOE, Carl Coe, as its new Chief of Staff. The press release specified that Coe "has worked closely with Secretary Wright" in order to effectuate "process improvement and cost savings," or what DOE referred to as "DOGE efforts."[207]

608.    In April 2025, DOE instituted a 15% cap on indirect costs for university research grants, even while acknowledging that "many grant recipients use indirect cost payments to effectuate research funded by the Department's grant awards." This action was taken to "deliver[] on President Trump's commitment" to slash research grants.[208] In May 2025, a federal district court in Massachusetts preliminarily enjoined DOE's imposition of this rate cap on the ground that it was arbitrary and capricious and in likely violation of federal law.[209]

609.    On May 15, 2025, Secretary Wright issued a Secretarial Memorandum titled: "Secretarial Policy on Ensuring Responsibility for Financial Assistance."[210] The memo announced that DOE would be reviewing prior funding awards to ensure they are "consistent with . . . this Administration's policies and priorities." It also announced an intent to terminate projects.

610.    DOE stated its review would begin by reviewing 179 awards that totaled over $15 billion, and would then extend to other awards.[211]

---

american-energy-dominance.

[207] U.S. Dep't of Energy, *DOE Announces New Leadership to Tackle Challenges of Growing Energy Demand* (May 2, 2025), https://www.energy.gov/articles/doe-announces-new-leadership-tackle-challenges-growing-energy-demand.

[208] U.S. Dep't of Energy, *Department of Energy Overhauls Policy on College and University Research, Saving $405 Million Annually for American Taxpayers* (Apr. 11, 2025), https://www.energy.gov/articles/department-energy-overhauls-policy-college-and-university-research-saving-405-million.

[209] *Ass'n of Am. Univs. v. Dep't of Energy,* 789 F.Supp.3d 118, (D. Mass. 2025).

[210] Chris Wright, *Secretarial Policy on Ensuring Responsibility for Financial Assistance,* EXEC-2025-005990, U.S. Dep't of Energy (May 14, 2025), https://www.energy.gov/sites/default/files/2025-05/EXEC-2025-005990%20-%20Secretarial%20Policy%20-PRP%20-%205-14-25%20(FINAL)%20(2).pdf.

[211] U.S. Dep't of Energy, *Secretary Wright Announces New Policy for Increasing Accountability,*

611.    On October 2, 2025, DOE announced the termination of 321 awards supporting 223 projects that totaled over $7.56 billion. In a press release, Secretary Wright explained that "[o]n day one, the Energy Department began the critical task of reviewing billions of dollars in financial awards[ . . .]" in an effort to deliver on President Trump's promise "to protect taxpayer dollars and expand America's supply of affordable, reliable, and secure energy."[212] In that same press release, DOE foreshadowed more terminations: "Rest assured, the Energy Department will continue reviewing awards to ensure that every dollar works for the American people."[213]

### 3.    DOE Terminates Funding to Awardees Exclusively in "Blue" States

612.    In the days and weeks leading up to a possible lapse in appropriations at the end of September 2025, President Trump threatened to retaliate against congressional Democrats and their voters should they not agree to fund the government on the President's terms. For instance, on September 30, President Trump told reporters: "We can do things during the shutdown that are irreversible, that are bad for them and irreversible by them, like cutting vast numbers of people out, cutting things that they like, cutting programs that they like."[214]

---

*Identifying Wasteful Spending of Taxpayer Dollars* (May 15, 2025), https://www.energy.gov/articles/secretary-wright-announces-new-policy-increasing-accountability-identifying-wasteful.

[212] U.S. Dep't of Energy, *Energy Department Announces Termination of 223 Projects, Saving Over $7.5 Billion* (Oct. 2, 2025), https://www.energy.gov/articles/energy-department-announces-termination-223-projects-saving-over-75-billion.

[213] *Id.*

[214] Ricard Cowan, et al., *Trump Warns Democrats of "Irreversible" Actions in Government Shutdown,* Yahoo News (Sept. 30, 2025), https://www.yahoo.com/news/articles/trump-warns-democrats-irreversible-actions-223432584.html [https://perma.cc/UVV3-MXKS].

SECOND[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

613.    DOE and the Office of Management and Budget ("OMB") made good on that threat the very first day of the shutdown. On October 1, the Director of OMB, Defendant Russell Vought, announced on X:



614.    In all sixteen states listed by Vought where projects were terminated, the citizens of that state voted for Vice President Harris over President Trump in the 2024 election. And in all sixteen states, the citizens of that state currently have elected two Senators who caucus with the Democratic party. Vought's post thus openly flaunted that, in terminating DOE awards, the administration targeted states associated with the opposition party.

615.    The data unmistakably confirms that Defendants targeted DOE grants for termination in October 2025 based on the political views of the citizens of the state associated with the grant.

616.    On information and belief, on or around October 1, 2025, Defendants transmitted to members of Congress a list of the 321 awards slated for termination. That list was made public in various news reports.[215]

617.    The website usaspending.gov contains authoritative information on every grant awarded by DOE and other agencies, including the address on file of each awardee and the primary place of performance of each award.

618.    Of the 321 awards, six were terminated prior to October, and one was awarded to an awardee in Canada. For the remaining 314 awards, and for 100% of them, the

---

[215] *See, e.g.,* Maeve Allsup, *Scoop: These Are the 321 Awards DOE Is Canceling,* Latitude Media (Oct. 2, 2025), https://www.latitudemedia.com/news/scoop-these-are-the-321-awards-doe-is-canceling/ [https://perma.cc/B9F7-483X].

3301253.7
46686\20748993.1

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1   grantee's address on file with the federal government is in a state that voted for the President's

2   opponent in the 2024 election and has two Democratic-caucusing Senators.

3          619.    In addition, the primary place of performance for 314 of the 321 awards

4   slated for termination (*i.e.*, 98%) was a state that voted for Vice President Harris and has two

5   Democratic- caucusing Senators.

6          620.    According to public reporting, DOE had originally sent a broader list of

7   more than 600 awards to OMB for potential termination.[216] The broader list included awards to

8   grantees based in states throughout the country, including Arizona, Indiana, Florida, Ohio,

9   Louisiana, North Carolina, North Dakota, Oklahoma, South Carolina, Tennessee, Texas, Utah,

10   West Virginia, and Wisconsin—all of which voted for President Trump in the 2024 election.[217]

11   But Defendants did not terminate *any* awards to grantees located in those states in October 2025.

12   Instead, according to one energy lobbyist (and as the evidence demonstrates), "they basically just

13   pulled out most, if not all, blue state projects, and that's what they announced as cuts."[218]

14          621.    Even in programs where awards were made across all 50 states, such as the

15   Grid Resilience and Innovation Partnership program, only projects in states that voted for Vice

16   President Harris were cancelled in October 2025, while similar projects in states that voted for

17   President Trump were not.

18          622.    DOE terminated 79 projects in California alone, totaling more than $2

19   billion in federal funding. One of the projects would have provided backup battery power for a

20   children's hospital in Madera, California.

21

22

23

24

25

---

26  [216] Brian Dabbs, et al., *DOE Floats New Cuts to Hundreds of Clean Energy Grants,* E&E News (Oct. 7, 2025), https://www.eenews.net/articles/doe-floats-new-cuts-to-hundreds-of-clean-energy-grants/ [https://perma.cc/5B76-VGQP].

27  [217] *Id*, https://www.latitudemedia.com/wp-content/uploads/2025/10/FILE_6460.pdf (list of awards) [https://perma.cc/GA87-D96M].

28  [218] Dabbs, *supra*, n. 216.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

623.    DOE's October 2025 termination of awards in states that voted against the President was a part of the administration's broader efforts to harm such states since the shutdown. As of October 14, the administration had "frozen or canceled nearly $28 billion that had been reserved for more than 200 projects primarily located in Democratic-led cities, congressional districts, and states."[219] An analysis by the New York Times showed that the vast majority of funding cuts during the shutdown have been to grantees in states—and even congressional districts—that have recently voted for Democrats, especially in New York, California, and Chicago.[220]



### 4.    DOE Plaintiffs and Other Grant Recipients Are Harmed by DOE's Illegal Grant Terminations

624.    DOE is one of the largest funders of UC research. UC researchers have been or will be seriously harmed by DOE's imminent grant terminations.

625.    DOE's October 2025 grant terminations adversely impacted 21 Full-Time-Equivalent UC personnel who can fairly be described as Principal Investigators or

---

[219] Tony Romm & Lazaro Gamio, *Trump Targets Democratic Districts by Halting Billions During Shutdown,* N.Y. Times (Oct. 14, 2025), https://www.nytimes.com/interactive/2025/10/14/us/trump-grants-democrat-districts-government-shutdown.html

[220] *Id.*

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1   principal researchers at work on projects other than the ARCHES project, described below.

2   The terminations also impacted 29 UC research personnel involved with ARCHES.

3           626.    By terminating or imminently terminating grants to UC researchers at

4   the direction of the President and DOGE, DOE has violated its congressional mandates. Such

5   mandates include, for example, compliance with and effectuation of the legislative purposes

6   implicit in congressional appropriations.

7           627.    By effectuating mass terminations of grants to UC researchers without

8   proper review or clear explanation, DOE acted unconstitutionally and unlawfully as set forth

9   in the Claims for Relief asserted below.

10          **a.    Plaintiff Plamen Atanassov's Grant Terminations and Resulting
                    Harm**

11

12          628.    Plaintiff Plamen Atanassov is the Chancellor's Professor of Chemical

13   & Biomolecular Engineering at the University of California Irvine ("UCI"). He holds a

     joint/courtesy appointment in Materials Science & Engineering at UCI.

14
15          629.    Dr. Atanassov earned his MS in Chemical Physics & Theoretical

16   Chemistry from the University of Sofia (Bulgaria) in 1987. He earned a Specialization in Bio-

     electrochemstry from Frumkin's Institute of Electrochemistry in Moscow (Russia) in 1988.

17   He completed his PhD in Chemistry and Physical Chemistry from the Bulgarian Academy of

18   Sciences in Sofia in 1992 (degree conferred in 1995).

19
20          630.    Dr. Atanassov's research focuses on several technical fields related to

21   innovation in engineered materials, development of novel electrocatalysts for fuel cells, and

     design of new materials and technologies for power production, energy conversation, and

22   storage.

23
24          631.    Dr. Atanassov is a prolific scientist. He has published more than 490

25   peer-reviewed papers that have collectively been cited more than 45,000 times. He is also the

     inventor of 67 U.S. patents, many of which have been licensed and form the core of various

26   catalyst products and catalyst processing and integration technologies.

27

28

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

632.    DOE's abrupt termination of three of Dr. Atanassov's grants has caused him and his collaborators financial harm and has harmed the U.S. public, which has lost the full benefit of his research. His three grants are described in further detail below.

ARCHES Project – DOE's termination of $1.2 billion in grants awarded through its Hydrogen Hubs ("H2") Program

633.    In September 2022, the DOE's Office of Clean Energy Demonstrations ("OCED") issued a Funding Opportunity Announcement (DE-FOA-0002779) soliciting projects that would meet the goal of its new Regional Clean Hydrogen Hubs Funding Program ("Hydrogen Hubs (or "H2") Program"). The purpose of the H2 Program was to demonstrate the production, processing, delivery, storage, and end-use of clean hydrogen to facilitate a clean hydrogen economy, in order to maximize the benefits of clean energy transition as the United States works to curb the climate crisis, empower workers, and advance environmental justice.

634.    The original authorizing statute for the H2 Program was the Energy Policy Act of 2005, Section 814 (Public Law 109-58). Then, in 2021, Congress required the Secretary of Energy to establish a program to support the development of "regional clean hydrogen hubs" that would together create "a network of clean hydrogen producers, potential clean hydrogen consumers, and connective infrastructure located in close proximity."[221] 42 U.S.C. § 16161a(a), (b). The Infrastructure Investment and Jobs Act of 2021, also known as the Bipartisan Infrastructure Law ("BIL") appropriated $8 billion over five or more years to establish at least four of these regional hydrogen hubs.

635.    Because hydrogen fuel can be produced using any energy source and is typically produced with conventional energy sources (*e.g.*, natural gas, diesel, or nuclear power), the BIL additionally embodied Congress' desire to spur technological development of alternative fuel sources for hydrogen generation, by mandating that *a minimum of one H2 hub must focus on deriving hydrogen fuel from renewable sources, such as solar and wind energy.*

---

[221] *See* Section 40314 of the Infrastructure Investment and Jobs Act of 2021, Pub. L. No. 117-58, 135 Stat. 429 (2021) (codified at 42 U.S.C. § 16161a).

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

42 U.S.C. § 16161a(c)(3)(A)(ii) ("at least 1 regional clean hydrogen hub shall demonstrate the production of clean hydrogen from renewable energy").

636.    Consistent with this congressional directive, when DOE in October 2023 made assistance awards to seven hydrogen hubs, these included two "clean hydrogen" hubs: the Pacific Northwest Hydrogen Hub, and a California Hydrogen Hub.[222]

637.    California's Hydrogen Hub goes by the name "ARCHES" (Alliance for Renewable Clean Hydrogen Energy Systems), sometimes also described as "ARCHES H2." ARCHES is a statewide public-private partnership dedicated to advancing the hydrogen economy and clean energy innovation. California state participants in ARCHES include multiple UC campuses (UC Irvine, UC Davis, UC San Diego, UC Berkeley) and one of UC's affiliated national laboratories (Lawrence Berkeley National Laboratory), which effectively functions as a separate UC campus and whose workers are UC employees. These five UC loci form the core of the hydrogen hub's research and innovation apparatus.

638.    UC's partners in ARCHES include other state agencies, the state legislature, and local governments; nonprofit organizations, such as GO-Biz; and industry partners, all of which are essential collaborators in bringing technical skills, market knowledge, practical capacity, and political capability to support and deploy primarily-UC innovations necessary to build  the hydrogen network called for by the BIL.

639.    In July 2024, in reliance on DOE's statements and representation about the Regional Clean Hydrogen Hubs program, ARCHES H2 LLC (the limited liability entity for the ARCHES partnership) executed a cooperative agreement award for $1.2 billion with the DOE (DOE Award Number DE-CD0000041, the "ARCHES Award")) predicated on UC researchers' world-class scientific and engineering knowledge, and capacity to deliver the technological innovation required for the project's success.

640.    The ARCHES project, designed to advance the federal objectives set forth in the BIL by catalyzing the clean energy industry in California, was already doing

---

[222] Fuel Cell and Hydrogen Energy Association, *H2 Award Fact Sheet* (Oct. 2023), https://fchea.org/wp-content/uploads/2023/10/H2Hub-Award-Factsheet.pdf .

SECOND[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    important and indeed extraordinary work during Phase I of the award. The $1.2 billion that

2    DOE had committed in summer 2024 had—just over one year later—catalyzed over $10

3    billion in committed private industry matching funds, a 10:1 multiplier that would maximize

4    taxpayer value and deliver significant return on investment for the American people.

5        641.    This financial structure was built on 33 signed subrecipients partnering

6    with hundreds of companies, connecting producers, distributors, and end-users in a short

7    period of time. These partners advanced 150 distinct projects representing over $12 billion in

8    total infrastructure investment.

9        642.    Transportation infrastructure also saw significant development, with a

10   focus on developing hydrogen refueling stations to support deployment of over 1,000 fuel cell

11   electric buses supported by this comprehensive infrastructure.

12       643.    UC researchers across four campuses and LBNL have immersed

13   themselves in multiple, complex research projects to support ARCHES, including but by no

14   means limited to: improving fuel cell catalyst technology and analyzing hydrogen markets

15   (UC Irvine); researching how use of hydrogen in ports would improve local air (UC

16   Berkeley); researching the air quality improvements that would accrue to the Los Angeles

17   region if power plants switched from natural gas to hydrogen (UCLA); analyzing and

18   projecting demand locations and routes for hydrogen-powered trucks (UC Davis); and

19   studying how to create a first-of-its-kind hydrogen-powered marine research vessel that can

20   operate cleanly and quietly, enhancing underwater research (UC San Diego's Scripps Institute

21   of Oceanography).

22       644.    Dr. Atanassov had planned to serve as Senior Advisor for Business

23   Development to ARCHES, including an up-to-half-time transition to ARCHES so that he

24   could actively participate in establishing ARCHES operations. In connection with this role,

25   Dr. Atanassov would develop for ARCHES a Hydrogen Technology Certification for the

26   State of California (and ultimately, for the whole United States) as a public-private

27   partnership that could provide a stable source of future funding for ARCHES in the form of a

28   direct industrial revenue stream.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

645.    Moreover, ARCHES was likely to take a leading role in accelerating clean hydrogen technologies in time for deployment at the Los Angeles Olympic and Paralympic Games in 2028.

646.    On October 1, 2025, ARCHES received a letter from Virginia Crawford in the Office of Clean Energy Demonstrations, announcing that the ARCHES Award was being terminated "under the authority of 2 CFR § 200.340(a)(4)." The letter required ARCHES to "cease all project activities after the date of October 1, 2025," to "not incur any new project costs," and to "cancel as many outstanding obligations as possible." The basis for the termination was simply that the ARCHES Award "did not pass Standards" of the DOE's "Portfolio Review Process Committee," though it did not provide any further context.

647.    On October 11, 2025, Dr. Adam Weber, Chief Technology Officer of ARCHES, sent an administrative appeal letter to DOE questioning the basis for the termination of the major funding award to ARCHES. The letter described the fiscal soundness of ARCHES and the responsiveness of the transportation sector to the imminent development of clean hydrogen. It noted that there was "no legal justification or contractual basis for terminating the award and revoking the obligated funding." It further noted that termination would result in irreparable harm and urged a response by October 21, 2025 as to whether the termination would be held in abeyance or rescinded.

648.    As of November 22, 2025, ARCHES had received no response from DOE.

649.    In early October 2025, DOE also terminated the one other "green hydrogen" hub (the Pacific Northwest Hub),[223] notwithstanding the congressional instruction in the BIL requiring DOE to fund a minimum of one green hydrogen hub.

---

[223] Pacific Northwest Center for Clean Energy Excellence, *U.S. Department of Energy Terminates Projects, PNWH2 Included* (Oct. 7, 2025), https://www.cleanenergyexcellence.org/u-s-department-of-energy-terminates-projects-pnwh2-hub-included/.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

650.    Notably, as indicated in the graphic below (prepared by Plaintiffs' counsel), DOE has not to date terminated any other hydrogen hubs, all of which encompass significant portions of states that voted for Donald Trump in the 2024 election:



651.    The DOE's Hydrogen Hubs Program grants were the largest in the agency's history. Their abrupt termination has correspondingly dramatic consequences for the 29 involved UC researchers; for their scores of government and private project partners; and also, for taxpayers' and society's ability to benefit from the cutting edge, nonpolluting hydrogen infrastructure that ARCHES was in the midst of developing.

**Grants to advance fuel cell technology**

652.    As one of the world's top experts in his field, Dr. Atanassov had two additional DOE grants independent of ARCHES that were intended to advance the state of fuel cell technology—a critical need if hydrogen is to become a significant power source in the future.

653.    The widespread deployment of hydrogen fuel cell technology holds great environmental promise. First, the transportation sector is America's largest source of

greenhouse gases and a major source of smog-forming and toxic air pollutants. Hydrogen fuel cells are a carbon-free, pollution-free alternative to conventional fossil fuels, thereby eliminating climate-forcing and ground-level pollution from any source they power. Second, hydrogen is an additional fuel source, which furthers the United States' energy self-sufficiency. Third, hydrogen can be deployed in vehicles that are otherwise hard to decarbonize, such as planes and cargo ships. Fourth, the United States has the potential to become a world leader in hydrogen fuel cell technology, thus increasing its global competitiveness.

Cathode catalysts

654.    On September 13, 2023, DOE granted to Dr. Atanassov Assistance Award # DE-EE0010751 to fund his work on the development of cathode catalysts. The grant was for approximately $3,000,000.

655.    The purpose of the project was to create a major fuel cell catalyst innovation locus. The project aimed to develop cutting-edge catalysts for integration into fuel cells.

656.    On October 2, 2025, DOE terminated the grant on the purported basis that it was "not consistent with this Administration's goals, policies and priorities." It added that "[t]his project does not effectuate the Department of Energy's priorities of ensuring affordable, reliable, and abundant energy to meet growing demand and/or addresses [sic] the national emergency declared pursuant to Executive Order 14156."

657.    Executive Order 14156 states that the United States "need[s] a reliable, diversified, and affordable supply of energy to drive our Nation's manufacturing, transportation, agriculture, and defense industries, and to sustain the basics of modern life and military preparedness." Declaring a National Energy Emergency, 90 Fed. Reg. 8433, 8433 (Jan. 20, 2025). Further, "[a]n affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation." *Id.*

658.    The basis for the termination is incongruous with the project's purpose, which sought to advance the goals in the Executive Order. Specifically, the project was

- 153 -

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    intended to (a) lower the cost of hydrogen fuel cells ("affordability"), and (b) make feasible

2    broader deployment of this energy technology ("abundance"), while also increasing U.S.

3    market share and indeed creating the possibility of market dominance in this energy domain.

4    DOE's termination letter does not attempt to address this contradiction.

5                                                    Novel carbon supports

6            659.    On September 24, 2024, DOE granted Assistance Agreement for the

7    Award DE-EE0011347 to fund Dr. Atanassov's work on developing novel carbon supports

8    for metal catalysts. The grant amount of approximately $5,400,000 over three-and-a-half

9    years.

10           660.    The project represented the opportunity to actualize a line of research

11   contemplated since at least 2010 that involves use of specifically designed carbon materials

12   (in which Cabot Corporation is a global leader) in innovative, scalable manufacturing of

13   catalysts. More specifically, the project's aim was to produce the first industrial-scale, U.S.-

14   manufactured fuel cell catalysts that would be able to fulfill the requirement for 30% "Made

15   in USA" content (a percentage calculated based on manufacturing costs), which enables clean

16   energy projects to receive bonus tax credits under the Inflation Reduction Act.

17           661.    On October 2, 2025, DOE terminated the grant on the basis that "this

18   project is not consistent with this Administration's goals, policies and priorities." Further,

19   "[t]his project does not effectuate the Department of Energy's priorities of ensuring affordable,

20   reliable, and abundant energy to meet growing demand and/or addresses the national

21   emergency declared pursuant to Executive Order 14156."

22           662.    As with the termination of cathode catalysts, the basis for the

23   termination is impossible to reconcile with the project's purpose, because both projects aimed

24   to advance the goals of hydrogen fuel cell affordability, abundance, and U.S. success in the

25   global fuel cell market.

26

27

28

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

### b. Plaintiff Louise Bedsworth's Grant Termination and Resulting Harm

663. Dr. Louise Bedsworth holds the following positions at the UC Berkeley School of Law: Executive Director at the Center for Law, Energy, and the Environment ("CLEE"), Director of the Land Use Program at the CLEE, and Senior Advisor at the California-China Climate Institute.

664. Dr. Bedsworth submitted to DOE, as Principal Investigator, with the Regents of the University of California, on behalf of the UC Berkeley, a proposal for financial assistance ("Proposal") for a project titled "Feasibility Study to Co-Create a Community Alliance for Direct Air Capture" (the "CALDAC Project").

665. As the Statement of Project Objectives for the CALDAC Project explained:

This project will undertake a comprehensive assessment of the technical, social and governance feasibility of establishing a Community Alliance for Direct Air Capture (CALDAC) in California. This innovative effort invites the local community to be the center of Direct Air Capture (DAC) Hub development. The feasibility assessment will include two intersecting and interconnected elements:

- Development of the DAC Hub structure and assessment of the technical feasibility of the DAC Hub, including technology partners, location, business model, and CO2 storage/utilization/conversion option(s), and
- Assessment of the social and governance feasibility of an innovative, community-led ownership model and community benefits plan that engages local stakeholders as core partners.

666. The project was designed to test both the technical and social feasibility of a Direct Air Capture ("DAC") hub. The project included a diverse partnership of DAC companies, energy companies, carbon dioxide to product companies, community organizations (Valley Onward and Central California Asthma Collaborative), and researchers from UC Berkeley, California State University Bakersfield (CSU Bakersfield), California State University Fresno (Fresno State), EPRI, AECOM, PSE Clean Energy, and Lawrence Berkeley National Laboratory.

667. The Proposal to the DOE for the CALDAC Project requested $2,999,999 from the DOE for the entire project period, for a two-year period (August 1, 2024 – July 31, 2026); Dr. Bedsworth was identified in the Proposal as the Principal Investigator.

3301253.7
46686\20748993.1

1    The requested funds were for the partial salary for Dr. Bedsworth as Principal Investigator,

2    the partial salary for a Project Manager, funding for two graduate student researchers, and

3    financial support for 13 sub-awardees, including: Lawrence Berkeley National Laboratory,

4    CSU Bakersfield, Fresno State University, and four DAC technology providers.

5                668.    The DOE granted an award to the Regents of the University of

6    California, Sponsored Projects Office for a total of two years, for an amount of $1,105,878 for

7    the first budget period (August 1, 2024 through April 30, 2025), and an additional award of

8    $1,538,928 for the second budget period (May 1, 2025 through July 31, 2026), for a total

9    award amount of $2,644,806.[224]

10               669.    Dr. Bedsworth and her team began work on the CALDAC Project on

11   August 1, 2024, focusing on stakeholder and community engagement, site selection, and

12   development of a framework to guide the project.

13               670.    On October 2, 2025, UC Berkeley was issued a letter from Vicki

14   Michetti, the Head of Contracting Activity at the Office of Fossil Energy and Carbon

15   Management at the DOE, indicating that the grant award was terminated in its entirety. The

16   termination letter instructed that UC Berkeley researchers "make every reasonable effort to

17   immediately discontinue project costs after the effective termination date of October 2, 2025."

18               671.    On October 10, 2025, a second letter was issued to UC Berkeley from

19   Vicki Michetti, which was essentially identical in substance to the previous termination letter,

20   but indicated that the effective termination date of the grant award was October 10, 2025.

21               672.    Both the October 2 letter and October 10 letter stated that the

22   CALDAC Project no longer "effectuate[s] the Department of Energy's priorities," "is not

23   consistent with this Administration's goals, policies and priorities," and that "DAC Hubs

24   provide no tangible economic benefit. DAC hubs may raise natural gas prices if deployed at

25   scale." This statement about DAC hubs is not supported by any evidence. Further, there is no

26
_____

27   [224] While the amount of $1,373,215 was requested for the first budget period, only $1,105,878 was awarded by the DOE. The discrepancy is due to an error in how a cost share award from the California Energy Commission was included in the project budget submitted with the application. The DOE recognized the error and confirmed that it would adjust the award amount to the requested amount through an amendment. However, the amendment was never amended due to disruptions at the DOE.

28

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1      coherent connection between DOE's reason for termination and what the CALDAC Project

2      sought to accomplish, which would provide economic benefit as discussed below.

3              673.    Dr. Bedsworth, her team, and the public interest have all suffered harm

4      as a result of the CALDAC Project's grant termination. Termination of this grant has resulted

5      in financial harm to the CLEE by reducing funds available for researcher and staff salaries.

6              674.    Termination of this grant additionally resulted in the loss of a $300,000

7      grant from the California Energy Commission and significant cost share contributions from

8      project partners, which further reduced or eliminated funding for researcher and staff salaries.

9              675.    The termination also results in a lost opportunity to conduct novel

10     research on an emerging technology. This project took an innovative approach to co-develop

11     the feasibility study with local partners, including local government and local non-profit

12     organizations. If successful, this could have resulted in a replicable model to accelerate energy

13     and infrastructure development that benefits project developers and host communities. The

14     findings of this work would have provided significant opportunity to publish and share novel

15     research with researchers and policymakers.

16             676.    Use of DAC and other carbon removal technologies are needed to

17     reduce and/or offset carbon emissions. DAC is also an important area of growth in the United

18     States. Failure to scale DAC will diminish domestic innovation and lead to a loss of job

19     creation opportunities, which can be especially important in resource-dependent communities.

20     **H.    G.Allegations Against Additional Federal Agency Defendants**

21             677.    599.While Plaintiffs' grants were unlawfully terminated by EPA,

22     NEH, NSF, DOD, and DOT, NIH, and DOE, these agencies are acting no differently than

23     other federal agencies choosing to ignore their congressional mandates in favor of political

24     objectives. Indeed, all are acting under the Executive Orders and other unlawful directives

25     from Defendants Trump and DOGE, rather than under the authority of their statutory

26     mandates.

27             678.    600.The Federal Agency Defendants are acting in similar, categorical,

28     and lockstep fashion. Their uniform and categorically unlawful conduct usurps congressional

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    authority and the rights of Class members in the same unlawful way, and it will only increase,

2    absent the declaratory and injunctive relief requested in this Complaint. The violation of

3    separation of power principles is still more blatant now that Defendant Trump and the

4    members of his Cabinet collectively and directly run DOGE. The following allegations

5    demonstrate that all Federal Agency Defendants have engaged in the same course of conduct

6    and harmed the members of the UC researchers class in the same way as the Named Plaintiffs

7    have been harmed, under the same Executive Orders and DOGE directives.

8        679.  601. Class members (researchers in the UC system) receive funding

9    from an array of federal agencies, and have suffered the same type of harm (abrupt

10   termination of previously awarded grants under Executive Orders and/or other Trump

11   administration directives) from the universal terminations perpetuated by Defendants.

12       680.  602. At minimum, the following Federal Agency Defendants have

13   terminated or will imminently terminate grants to Class members:

14       1.    **Department of Agriculture**

15       681.  603. Early into President Trump's tenure, the Department of

16   Agriculture (USDA) ceded control to DOGE. Secretary of Agriculture Brooke Rollins

17   announced on February 14, 2025 that she "welcome[d]" DOGE's spending cuts, and that

18   DOGE would have "full access" as Rollins reviewed "thousands of …grants" over the first

19   weeks of her tenure. All of this, according to USDA, would be done "per the President's

20   directives."[206][225]

21       682.  604. By March 13, 2025, USDA announced that Rollins had "worked

22   with [DOGE] to streamline USDA operations by cutting wasteful spending," hyperlinking to

23   a social media post about a terminated university research grant.[207][226]

24

25   _____

     [206][225] U.S. Dep't of Agric., *Secretary Rollins Takes Bold Action to Stop Wasteful Spending and*
26   *Optimize USDA to Better Serve American Agriculture* (Feb. 14, 2025),
     https://www.usda.gov/about-usda/news/press-releases/2025/02/14/secretary-rollins-takes-bold-
27   action-stop-wasteful-spending-and-optimize-usda-better-serve-american.
     [207][226] U.S. Dep't of Agric., *Secretary Brooke Rollins Takes Bold Action in First 30 Days at USDA*
28   (Mar. 13, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/03/13/secretary-
     brooke-rollins-takes-bold-action-first-30-days-usda.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

683. 605. USDA also canceled its Partnerships for Climate-Smart Commodities program, which included research grants to universities.[208][227] USDA stated that recipients could re-apply for funding if their projects were "aligned with the priorities of this Administration."[209][228]

684. 606. USDA grants to UC researchers were terminated, causing serious harm. On information and belief, researchers received form termination letters.

685. 607. By terminating grants at the direction of the President and DOGE, USDA has violated its congressional mandates. Such mandates include, for example, compliance with and effectuation of the legislative purposes implicit in congressional appropriations, and 7 U.S.C. § 3157, which establishes a research grant program to "promote research in food, agriculture, and related areas."

686. 608. By effectuating mass terminations of grants to UC researchers without proper review or clear explanation, USDA acted unconstitutionally and unlawfully, as set forth in the Claims for Relief asserted below.

### 2. AmeriCorps

687. 609. AmeriCorps has also mass terminated grants in response to President Trump's Executive Orders and DOGE directives.

688. 610. AmeriCorps has stated that it is "taking proactive action to ensure alignment with . . . the Trump-Vance Administration priorities." AmeriCorps has also stated that all grants and grant applications "must comply with President Trump's executive orders," specifically listing the following Executive Orders: "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," "Unleashing American Energy," "Ending Radical and Wasteful Government DEI Programs

---

[208][227] *See, e.g.*, Univ. of Idaho, *Secretary Brooke Rollins Takes Bold Action in First 30 Days at USDA* (Apr. 16, 2025), https://www.uidaho.edu/news/news-articles/news-releases/2025/041625-iamp-termination.

[209][228] U.S. Dep't of Agric., *USDA Cancels Biden Era Climate Slush Fund, Reprioritizes Existing Funding to Farmers* (Apr. 14, 2025), https://content.govdelivery.com/accounts/USDAOC/bulletins/3dbe363.https://content.govdelivery.com/accounts/USDAOC/bulletins/3dbe363.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

and Preferencing," and "Ending Illegal Discrimination and Restoring Merit-Based

Opportunity."~~210~~229

689. ~~611.~~ On April 25, 2025, news outlets reported that DOGE had ordered

AmeriCorps to terminate almost $400 million in grants.~~211~~230 This constitutes roughly 41% of

the agency's total grant funding.

690. ~~612.~~ That same day, UC researchers received form termination letters

that read:

> Effective immediately, the AmeriCorps award subrecipient(s)
> included in the attached spreadsheet is/are being terminated per 2
> CFR 200.340(a)(4) because it has been determined that the award no
> longer effectuates agency priorities. You must immediately cease all
> award activities. This is a final agency action and is not
> administratively appealable.

691. ~~613.~~ UC researchers have suffered serious harm as a result of

Defendants' actions.

692. ~~614.~~ By terminating grants at the direction of the President and DOGE,

AmeriCorps has violated its congressional mandates. Such mandates include, for example,

compliance with and effectuation of the legislative purposes implicit in congressional

appropriations, and 42 U.S.C. 12653 (describing activities AmeriCorps must carry out directly

or through grants).

693. ~~615.~~ By effectuating mass terminations of grants to UC researchers

without proper review or clear explanation, AmeriCorps acted unconstitutionally and

unlawfully, as set forth in the Claims for Relief asserted below.

---

~~210~~229 AmeriCorps, *Grantee and Sponsor Guidance on Compliance,*
https://www.americorps.gov/grantees-sponsors/grantee-sponsor-guidance-compliance (last visited
May 28, 2025).
~~211~~230 Teri Raji, *DOGE Orders major cut to AmeriCorps funding, imperiling agency's work*, The
Washington Post (Apr. 25, 2025),
https://www.washingtonpost.com/nation/2025/04/25/americorps-grant-cuts-doge/; Sophia Cai &
Ben Johansen, *DOGE Hits Trump Country*, Politico (Apr. 30, 2025),
https://www.politico.com/news/2025/04/30/doge-hits-trump-country-00319654.

~~SECOND~~[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

~~3301253.7~~
46686\20748993.1

### 3.    **Department of Education**

694. 616. Department of Education grants were an early DOGE target. On February 10, DOGE announced (on X, Elon Musk's social media platform) that it had terminated 29 "DEI training grants" totaling over $100 million.[212][231] DOGE also announced the termination of 89 other Department of Education contracts. This included contracts made by the Department's nonpartisan research arm, the Institute of Education Sciences.[213][232]

695. 617. When asked for comment on the terminations, a spokesperson for the Department stated: "We kindly point you to the X post from DOGE."[214][233]

696. 618. On information and belief, Department of Education grant terminations have caused serious harm to UC researchers.

697. 619. By terminating grants at the direction of the President and DOGE, the Department has violated its congressional mandates. Such mandates include, for example, compliance with and effectuation of the legislative purposes implicit in congressional appropriations, and specific directives such as 20 U.S.C. §§ 9511, 9512 (establishing Institute of Education Sciences).

698. 620. On information and belief, the Department effectuated mass terminations of grants to UC researchers without proper review or clear explanation, thereby acting unconstitutionally and unlawfully as set forth in the Claims for Relief asserted below.

4. Department of Energy

621. The Department of Energy (DOE) quickly began department-wide restructuring pursuant to Trump orders. On February 5, 2025, the Secretary of Energy announced

---

[212][231] DOGE (@DOGE), *Also today, the Department Of Education terminated 89 contracts worth $881mm.* (Feb. 10, 2025), https://x.com/DOGE/status/1889113011282907434.

[213][232] Rebecca Carballo & Juan Perez Jr., *DOGE announces $881 million in cuts for Education Department Contracts*, Politico (Feb. 10, 2025), https://www.politico.com/news/2025/02/10/education-department-pauses-research-contracts-00203494.

[214][233] Kalyn Belsha, *Crucial research halted as DOGE abruptly terminates Education Department contracts*, Chalkbeat (Feb. 11, 2025), https://www.chalkbeat.org/2025/02/11/elon-musk-and-doge-cancel-education-department-research-contracts/.

1    that DOE would "take immediate action . . . in accordance with President Trump's executive

2    orders."[215]

3              622. DOE began implementing Defendant Trump's orders with help from DOGE.

4    In a press release, DOE announced that it was appointing the then-current head of DOGE at DOE,

5    Carl Coe, as its new Chief of Staff. The press release specified that Coe "has worked closely with

6    Secretary Wright" in order to effectuate "process improvement and cost savings," or what DOE

7    referred to as "DOGE efforts."[216]

8              623. Soon thereafter, DOE instituted a 15% cap on indirect costs for university

9    research grants, even while acknowledging that "many grant recipients use indirect cost payments

10   to effectuate research funded by the Department's grant awards." This action was taken to

11   "deliver[] on President Trump's commitment" to slash research grants.[217] The cap has been

12   temporarily enjoined.[218]

13             624. On May 15, 2025, Secretary Wright issued a Secretarial Memorandum titled:

14   "Secretarial Policy on Ensuring Responsibility for Financial Assistance."[219] The memo announced

15   that DOE would be reviewing prior funding awards to ensure they are "consistent with… this

16   Administration's policies and priorities." It also announced an intent to terminate projects.

17             625. DOE stated its review would begin by reviewing 179 awards that totaled over

18   $15 billion, and would then extend to other awards.[220]

19

20   [215] Chris Wright, *Unleashing the Golden Era of American Energy Dominance,* U.S. Dep't of
     Energy (Feb. 5, 2025), https://www.energy.gov/articles/secretary-wright-acts-unleash-golden-era-
     american-energy-dominance.

21   [216] U.S. Dep't of Energy, *DOE Announces New Leadership to Tackle Challenges of Growing
     Energy Demand* (May 2, 2025), https://www.energy.gov/articles/doe-announces-new-leadership-

22   tackle-challenges-growing-energy-demand.

23   [217] U.S. Dep't of Energy, *Department of Energy Overhauls Policy on College and University
     Research, Saving $405 Million Annually for American Taxpayers* (Apr. 11, 2025),
     https://www.energy.gov/articles/department-energy-overhauls-policy-college-and-university-

24   research-saving-405-million.

25   [218] *Id.*

     [219] Chris Wright, *Secretarial Policy on Ensuring Responsibility for Financial Assistance*, EXEC-

26   2025-005990, U.S. Dep't of Energy (May 14, 2025),
     https://www.energy.gov/sites/default/files/2025-05/EXEC-2025-005990%20-

27   %20Secretarial%20Policy%20-PRP%20-%205-14-25%20(FINAL)%20(2).pdf.

     [220] U.S. Dep't of Energy, *Secretary Wright Announces New Policy for Increasing Accountability,

28   Identifying Wasteful Spending of Taxpayer Dollars* (May 15, 2025),
     https://www.energy.gov/articles/secretary-wright-announces-new-policy-increasing-

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    626. DOE is one of the largest funders of UC research. UC researchers have been

2    or will be seriously harmed by DOE's imminent grant terminations.

3    627. By terminating or imminently terminating grants to UC researchers at the

4    direction of the President and DOGE, DOE has violated its congressional mandates. Such

5    mandates include, for example, compliance with and effectuation of the legislative purposes

6    implicit in congressional appropriations.

7    628. By effectuating mass terminations of grants to UC researchers without proper

8    review or clear explanation, DOE acted unconstitutionally and unlawfully as set forth in the

9    Claims for Relief asserted below.

10   **4.** ~~5.~~ **Institute of Museum and Library Services**

11   699. ~~629.~~ Through an Executive Order, Defendant Trump called for the

12   elimination of the Institute of Museum and Library Services (IMLS).[221][234] IMLS grant

13   activities have been hit particularly hard by Defendants' illegal actions.

14   700. ~~630.~~ On information and belief, IMLS's mass termination of grants

15   likewise occurred at DOGE's direction. On its social media account X, IMLS wrote: "The era

16   of using your taxpayer dollars to fund DEI grants is OVER." The post tagged DOGE and

17   reposted a Fox News post asserting that "Trump's DOGE push slashes millions."[222][235]

18   701. ~~631.~~ In early April 2025, UC researchers who had previously received

19   IMLS grants received a form letter terminating their grants. It read:

20   This letter provides notice that the Institute of Museum and Library
     Services (IMLS) is terminating your federal grant ([Grant
21   Application No.]) effective April 8, 2025, in accordance with the
     termination clause in your Award Agreement.  Upon further review,
22   IMLS has determined that your grant is unfortunately no longer
     consistent with the agency's priorities and no longer serves the
23   interest of the United States and the IMLS Program. IMLS is

24   ─────────────────────

     ~~accountability identifying wasteful.~~
25   [221][234] Exec. Order No. 14238, *Continuing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg.
     813043 (Mar. 14, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/continuing-
26   the-reduction-of-the-federal-bureaucracy/.

27   [222][235] U.S. Inst. of Museum & Library Servs. (@US_IMLS), *The era of using your taxpayer
     dollars to fund DEI grants is OVER.* (Apr. 3, 2025),
28   https://x.com/US_IMLS/status/1907814174693941660.

3301253.7
46686\20748993.1

~~SECOND~~[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

repurposing its funding allocations in a new direction in furtherance of the President's agenda. Independently and secondly, the President's March 14, 2025 executive order mandates that the IMLS eliminate all non-statutorily required activities and functions. *See* Continuing the Reduction of the Federal Bureaucracy, E.O. 14238 (Mar. 14, 2025). Therefore, the IMLS hereby terminates your grant in its entirety effective April 8, 2025. …. Please contact grant-notices@imls.gov with only urgent questions. We wish you well.

702. 632. UC researchers are concretely harmed by the termination of IMLS grants.

703. 633. By terminating grants at the direction of the President and DOGE, IMLS has violated its congressional mandates. Such mandates include, for example, compliance with and effectuation of the legislative purposes implicit in congressional appropriations, and the more general direction in 20 U.S.C. §§ 9108, 9162, 9165, 9175 (notably, the last two sections direct IMLS to "develop a diverse workforce" of library and museum professionals).

704. 634. By effectuating mass terminations of grants to UC researchers without proper review or clear explanation, IMLS acted unconstitutionally and unlawfully as set forth in the Claims for Relief asserted below.

### 5. 6. Department of the Interior, including National Park Service

705. 635. The Department of the Interior (DOI) has worked closely with DOGE to implement Defendant Trump's orders. DOI said that it was "committed to supporting President Trump's Executive Order" creating DOGE.[223][236]

706. 636. DOI allowed a DOGE staffer to prepare lists of grants for termination, flagging those that addressed "climate" or "D.E.I." As of May 7, 2025, a DOGE staff member had earmarked many research grants from the National Park Service (NPS) and other DOI subagencies for future termination.[224][237] DOI has carried out or will imminently carry out these terminations.

---

[223][236] U.S. Dep't of the Interior, *SO-3429 – Consolidation, Unification, and Optimization of Administrative Function* (Apr. 17, 2025), https://www.doi.gov/document-library/secretary-order/so-3429-consolidation-unification-and-optimization-administrative.

[224][237] Lisa Friedman, *Trump Administration is Said to Target Park Services*, The New York

SECOND[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

707.    637. By terminating grants at the direction of the President and DOGE, DOI has violated its congressional mandates. Such mandates include, for example, compliance with and effectuation of the legislative purposes implicit in congressional appropriations, and other legislation specifying the functions of individual DOI subunits, such as NPS.225238

708.    638. DOI has terminated or will imminently terminate grants to UC researchers, causing concrete harm.

709.    639. By effectuating mass terminations of grants to UC researchers without proper review or clear explanation, DOI acted unconstitutionally and unlawfully as set forth in the Claims for Relief asserted below.

**6.    7. Department of State, including USAID**

710.    640. Early into President Trump's tenure, DOGE set its sights on USAID, essentially gutting the entire agency.226239

711.    641. USAID terminated grants to UC researchers, causing serious harm.

712.    642. By terminating grants at the direction of the President and DOGE, the State Department has violated its congressional mandates. Such mandates include, for example, compliance with and effectuation of the legislative purposes implicit in congressional appropriations, such as the fiscal year 2024 Department of State and Foreign Operations Appropriations Act.

713.    643. By effectuating mass terminations of grants to UC researchers without proper review or clear explanation, the State Department acted unconstitutionally and unlawfully as set forth in the Claims for Relief asserted below.

---

Times (May 7, 2025), https://www.nytimes.com/2025/05/07/climate/trump-park-service-grants-cuts.html.

225238 *See, e.g.*, U.S. Nat'l Park Serv., *Grants for Cultural Resources, Consultation, and Repatriation*, https://www.nps.gov/history/grants.htm (last visited May 29, 2025), ("Grant programs fund projects as described or limited by their authorizing legislation.").

226239 Ellen Knickmeyer, *Trump Administration Fires at Least 1,600 USAID Workers*, AP News (Feb. 23, 2025), https://apnews.com/article/usaid-trump-musk-foreign-aid-firings-a3af8ce6ef17878b718c8e2ed3bf98e4.

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

V.    **The Trump Administration Is Threatening Additional, Illegal Funding Cuts to the UC System**

714.    644. In the days leading up to the filing of this complaint, the head of DOJ's "antisemitism task force," Leo Terrell, announced forthcoming "massive lawsuits" targeting the UC system. According to Terrell, the DOJ is "going to go after [the UC system] where it hurts them financially." If recent actions against other universities are any guide, this will likely include the revocation of additional congressionally allocated grants and funds. These anticipated cuts, while not directly implicated by this lawsuit, borrow from the same playbook and are part of the same executive branch scheme of illegally seizing and weaponizing the power of the purse to harm universities and their faculty, to the great detriment of the American public.

VI.    **Unless Enjoined, Grant Terminations Will Cause Irreparable Harm to Plaintiffs, the Class, and the Nation**

715.    645. Plaintiffs and the proposed Class have suffered and will continue to suffer the following injuries as a direct result of Defendants' conduct:

a.    Interruption or abandonment of ongoing research projects as a direct result of the loss of previously awarded grants;

b.    Attendant reduction of employment for or layoffs of researchers and their staff;

c.    Career disadvantage, including: loss of opportunities to publish research, inability to attend project-relevant conferences, and reduced ability to obtain related or follow-on grants;

d.    Expenditure of considerable time and effort to find substitute funding;

e.    The need to support project team members with discretionary funds, or to otherwise duct-tape solutions to a massive funding shortfall that first manifests as an immediate cash flow problem within affected campus research units; and

f.    Reputational injury, including loss of trust from the community partners so integral to ensuring that public university research is responsive and relevant to local needs.

716. 646. These direct, concrete injuries to Plaintiff researchers themselves have an inexorable and damaging ripple effect on the research mission of individual researchers and research teams; on the research mission of the UC system itself; on the citizens of California; and on all Americans, and indeed people throughout the world, who daily benefit from the fruits of UC discoveries, innovations, and inventions.

## CLAIMS FOR RELIEF

### COUNT I –
### Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions; Violation of Separation of Powers

717. 647. Plaintiffs reallege all paragraphs above as if fully set forth herein.

718. 648. This Court has jurisdiction to enjoin federal officials from violating the Constitution, including the separation of powers. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

719. 649. The Constitution empowers Congress to make laws, U.S. Const. art. 1, § 1, and requires the President to "take Care that the Laws be faithfully executed," *id.* art. II, § 3. The "Take Care Clause" assures that, consistent with the structural and functional separation of powers on which our system of government is based—and on which it depends—"Congress makes the laws and the President faithfully… executes them." *Utility Air Reg. Grp. v. Envtl. Prto. Agency*, 573 U.S. 302, 327 (2014) (cleaned up). The faithfulness the Constitution requires of the Executive is not to the President's views on priorities, but to the laws enacted by Congress as interpreted and enforced by the Courts. Congress's powers to set the policies of the nation are at their apex when it comes to spending money, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

720. 650. The executive branch has no constitutional authority to refuse to carry out laws enacted by Congress, and it has no constitutional authority to block, amend, subvert, or delay spending appropriations based on the President's own policy preferences. For nearly two hundred years, it has been established that a president violates the Take Care Clause when he overrides statutes enacted by Congress, or refuses to execute such statutes or

3301253.7
46686\20748993.1

their implementing regulations. *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838).

The President "is without authority to set aside congressional legislation by executive order."

*In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999).

721. 651. Defendants' decisions to unilaterally cancel duly awarded grants

and withhold funding that Congress has appropriated precisely to fund such grants violates the

separation of powers.

722. 652. Defendants' decisions to delay spending and outright refuse to

spend the amounts Congress appropriated violates Congress's power of the purse and the

separation of powers.

723. 653. Because Defendants' actions violate the separation of powers and

are *ultra vires*, they should declared unconstitutional and enjoined.

### COUNT II –
### Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;
### Violation of First Amendment (Content and Viewpoint Discrimination)

724. 654. Plaintiffs reallege all paragraphs above as if fully set forth herein.

725. 655. The First Amendment provides that the federal government "shall

make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

726. 656. The First Amendment prohibits the government from "regulating

speech when the specific motivating ideology or the opinion or perspective of the speaker is

the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S.

819, 829 (1995). "Discrimination against speech because of its message is presumed to be

unconstitutional." *Id.* at 828.

727. 657. "[E]ven in the provision of subsidies, the Government may not

'ai[m]at the suppression of dangerous ideas.'" *Nat'l Endowment for the Arts v. Finley*, 524

U.S. 569, 587 (1998) (quoting *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540,

550 (1983) (alteration in original)). In the grant-making context, the government may not

reject "a whole class of projects" based on "viewpoint alone," or use Federal funding to

"impose a disproportionate burden calculated to drive certain ideas or viewpoints from the

1  marketplace." *Rhode Island Latino Arts v. Nat'l Endowment for the Arts*, No.25-cv-79-WES,

2  2025 WL 1009026, at *12 (D.R.I. Apr. 3, 2025) (quoting *Finley*, 524 U.S. at 587).

3  728. 658. Defendants' mass termination of grants to disadvantage or

4  promote particular political and ideological viewpoints is "the product of invidious viewpoint

5  discrimination." *Finley*, 524 U.S. at 587. In an effort to drive views they disfavored out of the

6  marketplace of ideas, Defendants terminated many grants based on the recipients' (presumed)

7  viewpoint as reflected in the subject matter of their research. This is most evident in the

8  Termination Notices' citation to Executive Orders purporting to combat "Radical

9  Indoctrination" and "Radical . . . DEI Programs," and to further "Biological Truth." The

10 Termination Notices make plain that Defendants believe that the content of Plaintiffs' speech

11 conflicts with the Administration's views, and Plaintiffs' grants were terminated at least in

12 part for this reason. The First Amendment does not tolerate such viewpoint discrimination.

13 729. 659. Accordingly, Defendants' actions are not in accordance with law

14 and are contrary to constitutional right or power.

**COUNT III—**
**Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;**
**Violation of Fifth Amendment (Due Process / Equal Protection)**

17 730. Plaintiffs re-allege and incorporate by reference all prior and subsequent

18 paragraphs.

19 731. The Due Process Clause of the Fifth Amendment prohibits the federal

20 government from denying equal protection of the laws. *See Bolling v. Sharpe*, 347 U.S. 497,

21 499–500 (1954).

22 732. In identifying DOE grants to terminate in October 2025, Defendants

23 intentionally treated Plaintiffs differently from similarly situated entities based on the political

24 views of, and votes cast by, the citizens of the state where the prime grantee was located, and

25 the state where the relevant award would be primarily performed.

26 733. Defendants' reasons for treating Plaintiffs differently from similarly

27 situated entities are arbitrary and irrational.

28

- 169 -

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

734. Defendants' differential treatment of Plaintiffs is motivated by animus against the political views of and votes cast by the citizens of the states associated with the awards, based on the location of the prime grantee or where the award would be performed.

735. Defendants lack any rational, legitimate, or compelling governmental interest in treating Plaintiffs differently from similarly situated entities.

736. As a direct and proximate result of Defendants' differential treatment, Plaintiffs have suffered concrete economic and non-economic harm, including loss of funding, loss of funding opportunities, loss of access to federally funded programs and resources, loss of investments, costs of mitigation, diversion of resources, reputational harm, and chilled association.

737. Through the actions above, Defendants have violated the Due Process Clause of the Fifth Amendment.

**COUNT IV**
**Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;**
**Violation of Fifth Amendment (Due Process /** Void for Vagueness)

738. ~~660.~~ Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

739. ~~661.~~ The Due Process Clause of the Fifth Amendment to the Constitution requires due process of law before the deprivation of a constitutionally protected interest.

740. ~~662.~~ Plaintiffs have a constitutionally protected property interest in grant funding that supports their salaries and stipends, as well as their ongoing research. Plaintiffs have relied on this funding, and the protections of federal law governing this funding, in pursuing their research, in hiring staff, in making commitments to research partners, and in many other ways. Plaintiffs also have constitutionally protected liberty interests in their freedom of speech and expression, including academic freedom, and in pursuing their livelihoods.

741. ~~663.~~ Defendants' cancellation or imminent cancellation of federal grant funding does not provide Plaintiffs fair notice or a reasonable opportunity to be heard.

742. 664. The Due Process Clause also prohibits government actions that fail to give fair notice of what conduct is forbidden or required. A government enactment is unconstitutionally vague if it fails to provide a reasonable opportunity to know what conduct is prohibited or is so indefinite as to allow arbitrary and discriminatory enforcement.

743. 665. Because of the vagueness in the language of Defendant Trump's Orders and the Federal Agency Defendants' chaotic efforts to give effect to those Orders, Plaintiffs are unsure, for example, which areas of study they can pursue, which populations they can focus on as study subjects, and what the demographics of study participants must be. This makes it impossible to determine how to reconfigure future research to stay within the bounds of the agencies' newest "priorities."

744. 666. Defendants' efforts to purge certain disfavored research from federal agencies' grant rolls accordingly violates the Due Process Clause.

## COUNT IV V
### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C): Contrary to Law; Illegal Departure from Impoundment Control Act, Statutes, and Regulations

745. 667. Plaintiffs reallege all paragraphs above as if fully set forth herein.

746. 668. The APA directs courts to "hold unlawful and set aside agency actions, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law … [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A),(C). Defendants' actions violate these provisions, calling on the Court to hold them unlawful and set them aside for several reasons, including those specified below.

747. 669. First, by refusing to spend money that Congress appropriated, Defendants are violating the Impoundment Control Act of 1974 (ICA), and the appropriations statutes underlying each agency's funding scheme. Under the ICA, a "deferral" includes any "withholding or delaying the obligation or expenditure of" appropriated funds, as well as "any other type of Executive action or inaction which effectively precludes the obligation or expenditure of" appropriated funds. 2 U.S.C. § 682(1). When the executive branch wishes to

defer funds, it must send a special message to Congress detailing the money to be deferred and the reasons for deferral. There are only three permissible grounds for deferrals, *id.* § 684(b), none of which includes effort to ensure funds are spent consistent with the President's new policy priorities.

748. 670. Defendants' actions constitute a "deferral" because they reflect a "withholding or delaying [of] the obligation or expenditure of" funds that Congress appropriated. Defendants did not notify Congress of the deferrals as the ICA requires, nor did Defendants undertake the deferrals for reasons the ICA permits.

749. 671. Defendants' actions also constitute an unlawful "rescission" of the funds appropriated for agency action, including grant-making. Where the President seeks to "rescind" appropriated funds, the ICA requires, among other things, that the President send a special message to Congress specifying the funds he seeks to have rescinded and the reasons for his proposal. 2 U.S.C. § 683(a). The President did not do so.

750. 672. Second, Defendants are violating the agencies' enabling statutes and other laws passed by Congress that include grant-making as a directive to the agencies. The work that Plaintiffs and the Class were awarded grants to perform furthers agency missions and fulfills specific statutory requirements set by Congress. Withholding the appropriated funds contradicts Congress's directives.

751. 673. Third, where grants were issued in accordance with agency-specific rules and terminated for reasons inconsistent with those rules, Defendants are violating their own regulations and agreements.

## COUNT V VI
### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A): Arbitrary and Capricious Failure to Engage in Reasoned Decision-making

752. 674. Plaintiffs reallege all paragraphs above as if fully set forth herein.

753. 675. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Government agencies and officers act in an arbitrary and capricious manner if they fail to engage in "reasoned decision-making." *Michigan v. EPA*,

- 172 -

576 U.S. 743, 750 (2015) (citation omitted). Agency action is therefore lawful only if it rests "on a consideration of the relevant factors." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). This principle applies *a fortiori* to agency departures from long settled policy. *Id.*

754. ~~676.~~ Further, agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* Agency action is also arbitrary and capricious if, when departing from a prior policy, an agency does not "display awareness that it *is* changing position" or does not "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original).

755. ~~677.~~ Defendants' mass termination of grants previously awarded to Plaintiffs and the Class was arbitrary and capricious for many reasons, including (but not limited to) the following:

a.      The Termination Notices do not provide a reasoned explanation for grant cancellations. Rather, the letters sent across all agencies generally state that the grant being cancelled no longer "effectuates" or is no longer "in alignment" with Agency priorities. That generic statement is not a reasoned explanation.

b.      The terminations ignore the reliance interests of grantees. For example, grantees who had already received some but not all of their awards had already spent significant time working on the projects funded by their grants. Similarly, many grantees—as their grants required—took leaves of absence from their jobs, cancelled teaching plans, or otherwise altered their employment status in reliance on the promise of receiving grant money to support them while they completed their projects.

c.      The grant terminations conflict with prior agency decisions to award the grants without providing adequate explanation for the change in agency position. All class members received their grants after a rigorous and objective application and review process that

1    necessarily established that funded projects were meritorious and satisfied relevant criteria.

2    Defendants have failed to provide any reason the grants fail to satisfy applicable criteria.

3           d.      The mass termination of grants "entirely failed to consider. . . important

4    aspect[s] of the problem." *State Farm*, 463 U.S. at 43. Among other things, Defendants ignored

5    the waste and inefficiency caused by the terminations, given the investment that Federal Agency

6    Defendants—and by extension, taxpayers—have already made in the terminated projects.

7           e.      Defendants likewise failed to consider the significant consequences grant

8    termination will have on the individuals and organizations involved in conducting research, the

9    durability of the institutions in which they work, and on the broader public that will be deprived

10   of benefits meant to accrue from the work accomplished with the grant funding.

11          756.    678. Defendants have failed to adequately justify their actions; have not

12   considered the substantial reliance interests at stake; have relied on factors that Congress did

13   not authorize them to consider; and have not acknowledged or justified their change from

14   prior agency positions.

15          757.    679. In sending standardized termination letters to terminate grants *en*

16   *masse*, Defendants failed to "examine[] 'the relevant data' and articulate[] 'a satisfactory

17   explanation' for [their] decision, 'including a rational connection between the facts found and

18   the choice made,'" *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019) (quoting *State*

19   *Farm*, 463 U.5.S. at 43). The terminations must be set aside under the APA as arbitrary and

20   capricious.

21                              **PRAYER FOR RELIEF**

22          WHEREFORE, Plaintiffs respectfully request that the Court certify a UC Researchers

23   Class pursuant to Fed. R. Civ. P. 23(a)(1)-(4) and 23(b)(2), enter judgment in favor of Plaintiffs

24   and the certified Form Termination Class, Equity Termination Class, Second Form Termination

25   Class, Second Equity Termination Class, Third Form Termination Class, and Equal Protection

26   Termination Class (the "Certified UC Researchers Class"), and award Plaintiffs and the Certified

27   UC Researchers Class the following relief:

28          A.      Declare as unlawful and set aside Defendants' Termination Notices that

1    terminated grants previously awarded to Plaintiffs and members of the UC Researchers Class, as

2    violative of the Constitutional separation of powers; the First and Fifth Amendment protections of

3    free speech and due process; the Impoundment Control Act; agency-specific statutes and

4    regulations, including congressional directives and appropriations acts; and the Administrative

5    Procedure Act;

6           B.       Declare as *ultra vires* Defendants' decisions and implementation of the

7    mass termination of grants to Plaintiffs and the UC Researchers Class;

8           C.       Grant preliminary and ultimately final injunctive relief to enjoin

9    Defendants from cutting off agency and grantee access to congressionally appropriated funding,

10   from giving effect to the violative terminations, or undertaking any similar violative action to

11   terminate additional duly awarded agency grants; to restore such previously awarded grants; to

12   require Defendants to provide no-cost extensions to grantees for the time necessary to resume and

13   complete interrupted work; and to return to the lawful and orderly grant procedures they

14   employed prior to January 20, 2025;

15          D.       Appoint the Named Plaintiffs as Class Representatives, and the

16   undersigned counsel as Class Counsel, upon certification of a UC Researchers Class pursuant to

17   Fed. R. Civ. P. 23(g);

18          E.       Designate such additional class representatives, class counsel, and sub-

19   classes as the Court may deem appropriate at any time before final judgment, pursuant to Fed. R.

20   Civ. P. 23(c)(1)(C) and 23(c)(5);

21          F.       Award Plaintiffs and counsel for the Proposed Class reasonable costs and

22   attorneys' fees; and

23          G.       Issue such other relief as the Court deems just and proper.

24

25

26

27

28

SECOND[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    Dated: ~~August 29~~November 24, 2025    By:    _/s/ Claudia Polsky_

2                                                      Erwin Chemerinsky (*pro hac vice ~~forthcoming~~*)
                                                      echemerinsky@law.berkeley.edu
3                                                      Claudia Polsky (CA Bar No. 185505)
                                                      cpolsky@law.berkeley.edu
4                                                      U.C. BERKELEY SCHOOL OF LAW
                                                      Law Building
5                                                      Berkeley, CA 94720-7200
                                                      Telephone: 510.642.6483
6

7    Dated: ~~August 29~~November 24, 2025    By:    _/s/ Elizabeth J. Cabraser_

8                                                      Elizabeth J. Cabraser (CA Bar No. 83151)
                                                      ecabraser@lchb.com
9                                                      Richard M. Heimann (CA Bar No. 63607)
                                                      rheimann@lchb.com
10                                                     Kevin R. Budner (CA Bar No. 287271)
                                                      kbudner@lchb.com
11                                                     Annie M. Wanless
                                                      awanless@lchb.com (CA Bar No. 339635)
12                                                     LIEFF CABRASER HEIMANN &
                                                      BERNSTEIN, LLP
13                                                     275 Battery Street, 29th Floor
                                                      San Francisco, CA 94111
14                                                     Telephone: 415.956.1000

15
     Dated: ~~August 29~~November 24, 2025    By:    _/s/ Anthony P. Schoenberg_
16
                                                      Anthony P. Schoenberg (CA Bar No. 203714)
17                                                     tschoenberg@fbm.com
                                                      Donald E. Sobelman (CA Bar No. 184028)
18                                                     dsobelman@fbm.com
                                                      Dylan M. Silva (State Bar No. 306363)
19                                                     dmsilva@fbm.com
                                                      Linda S. Gilleran (CA Bar No. 307107)
20                                                     lgilleran@fbm.com
                                                      Kyle A. McLorg (CA Bar No. 332136)
21                                                     kmclorg@fbm.com
                                                      ~~John J. Darin (CA Bar No. 323730)~~
22                                                     ~~jdarin@fmb.com~~
                                                      Katherine T. Balkoski (CA Bar No. 353366)
23                                                     kbalkoski@fbm.com
                                                      FARELLA BRAUN + MARTEL LLP
24                                                     One Bush Street, Suite 900
                                                      San Francisco, CA 94104
25                                                     Telephone: 415. 954.4400

26                                                     *Attorneys for Plaintiffs and the Proposed Class*

27

28

~~SECOND~~[PROPOSED] THIRD AMENDED CLASS
ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1

2

3
### FILER'S ATTESTATION

4
I hereby attest that each Signatory has concurred in the filing of this document, as

5
indicated by their conformed signatures within this e-filed document.

6

7
Dated: ~~August 29~~November 24, 2025                    /s/ *~~Elizabeth J.~~*
~~*Cabraser*~~*Anthony P. Schoenberg*

8
                                                            — ~~Elizabeth J. Cabraser~~

9
Anthony P. Schoenberg

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

~~3301253.7~~
46686\20748993.1

| Summary report: Litera Compare for Word 11.10.1.2 Document comparison done on 11/24/2025 12:36:50 PM | |
|---|---|
| **Style name:** FBM | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** FOR COMPARISON - UC Researchers Second AMENDED Complaint - 8.29.25 (3301253v7).docx | |
| **Modified filename:** 2025-11-23 - UC Researchers Third AMENDED Complaint (DRAFT)(20709500.4).docx | |
| **Changes:** | |
| Add | 1089 |
| Delete | 825 |
| Move From | 28 |
| Move To | 28 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 3 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1973 |