Erwin Chemerinsky (*pro hac vice*)
echemerinsky@law.berkeley.edu
Claudia Polsky (CA Bar No. 185505)
cpolsky@law.berkeley.edu
U.C. BERKELEY SCHOOL OF LAW
Law Building
Berkeley, CA 94720-7200
Telephone: 510.642.6483

Elizabeth J. Cabraser (CA Bar No. 83151)
ecabraser@lchb.com
Richard M. Heimann (CA Bar No. 63607)
rheimann@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000

Anthony P. Schoenberg (CA Bar No. 203714)
tschoenberg@fbm.com
Linda S. Gilleran (CA Bar No. 307107)
lgilleran@fbm.com
Kyle A. McLorg (CA Bar No. 332136)
kmclorg@fbm.com
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, CA 94104
Telephone: 415.954.4400

*Attorneys for Plaintiffs and the Proposed Classes*
[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEETA THAKUR, *et al.*, | Case No. 3:25-cv-4737 |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION AS TO DEPARTMENT OF ENERGY AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |
| | Date:  December 18, 2025
Time: 10:00 AM
Judge: Hon. Rita F. Lin |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................3

I.    Department of Energy .................................................................................................3

II.   DOE's Grant Terminations. .......................................................................................3

A.    Dr. Atanassov's and Dr. Bedsworth's Grant Terminations ......................................4

    1.    Dr. Atanassov: Grants, Terminations, and Harm ...............................................5

    2.    Dr. Louise Bedsworth: Grant, Termination, and Harm ......................................7

ARGUMENT ........................................................................................................................8

I.    Drs. Atanassov and Bedsworth Have Standing. ........................................................8

II.   The Court Should Provisionally Certify Form Termination and Equal Protection
      Termination Classes for UC Researchers Whose Grants Were Terminated by DOE. ..........9

A.    The Class Definitions. ................................................................................................9

B.    The Proposed Classes Satisfy the Requirements of Class Certification. .................10

    1.    Individual Joinder Is Impracticable. ...............................................................10

    2.    This Case Involves Defendants' Common Conduct Against the Classes and
          Satisfies All Rule 23(a) and 23(b)(2) Requirements. ....................................12

    3.    Plaintiffs' Claims Are Typical of Those of the Proposed Classes. .................13

    4.    Plaintiffs and Class Counsel Will Adequately Represent the Proposed
          Classes. ...........................................................................................................13

III.  The Court Should Issue a Preliminary Injunction as to DOE. .................................14

A.    Plaintiffs Are Likely To Succeed on the Merits of Their Claims that DOE Grant
      Terminations Are Unlawful. ....................................................................................15

    1.    DOE's Grant Terminations Are Contrary to Law Under the APA. ................15

    2.    Defendants' Grant Terminations Are Arbitrary and Capricious Under the
          APA. ................................................................................................................17

    3.    Defendants' Termination of Grants Exclusively in Blue States Violates the
          Fifth Amendment's Equal Protection Guarantee. ...........................................19

B.    The Harms Caused by DOE's Unlawful Conduct Will Become Irreparable Absent
      The Court's Intervention. .........................................................................................23

C.    The Balance of Equities Weigh in Plaintiffs' Favor, and An Expanded Preliminary
      Injunction Is in the Public Interest. ..........................................................................24

CONCLUSION ...................................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### FEDERAL CASES

*Jones ex rel. A.H. v. District of Columbia*,
No. 20-cv-128, 2025 WL 2774107 (D.D.C. Sept. 29, 2025) .....................................................21

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995) ....................................................................................................................19

*American Association of University Professors, et al. v. Donald J. Trump, et al.*,
No. 25-CV-07864-RFL, 2025 WL 3187762 (N.D. Cal. Nov. 14, 2025) ...................................15

*Armstrong v. Davis*,
275 F.3d 849 (9th Cir. 2001)......................................................................................................12

*Arnold v. United Artists Theatre Cir., Inc.*,
158 F.R.D. 439 (N.D. Cal. 1994) ..............................................................................................11

*Avenue 6E Invs., LLC v. City of Yuma*,
818 F.3d 493 (9th Cir. 2016)...........................................................................................20, 21, 22

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
462 U.S. 87 (1983) .....................................................................................................................18

*Bame v. Dillard*,
No. 05-1833, 2008 WL 2168393 (D.D.C. May 22, 2008) .........................................................10

*Barbara v. Trump*,
790 F. Supp. 3d 80 (D.N.H. 2025) .............................................................................................10

*Bolling v. Sharpe*,
347 U.S. 497 (1954) ...................................................................................................................19

*Buckley v. Valeo*,
424 U.S. 1 (1976) .......................................................................................................................19

*Buttino v. F.B.I*,
1992 WL 12013803 (N.D. Cal. Sept. 25, 1992).........................................................................11

*City & Cnty. of S.F. v. U.S Citizenship & Immigr. Servs.*,
408 F. Supp. 3d 1057 (N.D. Cal. 2019) .....................................................................................24

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ...................................................................................................................20

*Clarke v. Off. of Fed. Housing Enter. Oversight*,
355 F. Supp. 2d 56 (D.D.C. 2004) .............................................................................................25

*Coreas v. Bounds*,
    No. TDC-20-0780, 2020 WL 5593338 (D. Md. Sept. 18, 2020) ...............................14

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ..................................................................................................18

*Diamond Alternative Energy, LLC v. Env't Prot. Agency*,
    606 U.S. 100 (2025) .................................................................................................9

*Does 1-10 v. Univ. of Washington*,
    326 F.R.D. 669 (W.D. Wash. 2018) .......................................................................11

*Foon v. Centene Mgmt. Co.*,
    No. 2:19-cv-01420 AC, 2023 WL 1447922 (E.D. Cal. Feb. 1, 2023) ......................11

*Free the Nipple-Fort Collins v. City of Fort Collins*,
    916 F.3d 792 (10th Cir. 2019) ...............................................................................23

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ...............................................................................13

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) .................................................................................13

*Hansberry v. Lee*,
    311 U.S. 32 (1940) ................................................................................................13

*Health Ins. Ass'n of Am., Inc. v. Shalala*,
    23 F.3d 412 (D.C. Cir. 1994) ................................................................................17

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) .................................................................................23

*Kalispel Tribe of Indians v. U.S. Dep't of the Interior*,
    999 F.3d 683 (9th Cir. 2021) .................................................................................17

*Kaweah Delta Health Care Dist. v. Becerra*,
    123 F.4th 939 (9th Cir. 2024) ...........................................................................16, 17

*Kim v. Allison*,
    87 F.4th 994 (9th Cir. 2023) .................................................................................13

*Lyon v. U.S. Immigr. & Customs Enf't*,
    308 F.R.D. 203 (N.D. Cal. 2015) ......................................................................10, 14

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) .................................................................................12

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) .................................................................................25

*Meyer v. Portfolio Recovery Assocs., LLC*,
   707 F.3d 1036 (9th Cir. 2012) .................................................................10

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ...................................................................................18

*Nat'l TPS All. v. Noem*,
   773 F. Supp. 3d 807 ............................................................................20, 21

*Nat'l Treasury Emps. Union v. U.S. Dep't of Treasury*,
   838 F. Supp. 631 (D.D.C. 1993) .............................................................25

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022).....................................................................12

*Perkins Coie LLP v. U.S. DOJ*,
   783 F. Supp. 3d 105 (D.D.C. 2025) .........................................................20

*R.I.L-R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) ...........................................................10

*Rannis v. Recchia*,
   380 Fed. Appx. 646 (9th Cir. 2010) .........................................................11

*Rogers v. Lodge*,
   458 U.S. 613 (1982) .................................................................................21

*Romer v. Evans*,
   517 U.S. 620 (1996).............................................................................19, 20

*Scholl v. Mnuchin*,
   489 F. Supp. 3d 1008 (N.D. Cal. 2020) ...................................................14

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)...................................................................................9

*Thakur v. Trump*,
   148 F.4th 1096 (9th Cir. 2025)..............................................................2, 15

*Thakur v. Trump*,
   2025 WL 2696424 (N.D. Cal. Sept. 22, 2025)................................. *passim*

*Thakur v. Trump*,
   787 F. Supp. 3d 955 (N.D. Cal. 2025) ............................................. *passim*

*Trump v. CASA, Inc.*,
   145 S. Ct. 2540 (2025)..............................................................................10

*U.S. Dep't of Agric. v. Moreno*,
   413 U.S. 528 (1973)............................................................................20, 21

*United States v. Windsor*,
    570 U.S. 774 (2013) ................................................................................20

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ................................................................................20

*Vill. Of Willowbrook v. Olech*,
    528 U.S. 562 (2000) ................................................................................20

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................................12

*Winter v. Nat'l Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...........................................................................15, 23

*Wolford v. Lopez*,
    116 F.4th 959 (9th Cir. 2024) ................................................................24

## FEDERAL STATUTES

2 U.S.C.
    § 681 ........................................................................................................16

5 U.S.C.
    § 706(2) .............................................................................................16, 17

42 U.S.C. ...........................................................................................................16, 17

42 U.S.C.
    § 7101 ........................................................................................................3
    § 7112 .....................................................................................................3,5
    § 16161a(a) & (b) ....................................................................................16
    § 16298d ..............................................................................................8,16
    § 16298d(j) ...........................................................................................8,16

APA ........................................................................................................... *passim*

Inflation Reduction Act ...................................................................................6, 7

## FEDERAL RULES AND REGULATIONS

90 Fed. Reg. 8433 (Jan. 20, 2025) ...........................................................................4

Fed. R. Civ. P.
    Rule 23(a) ................................................................................................12
    Rule 23(a)(1) ...........................................................................................11
    Rule 23(a)(2) ...........................................................................................12
    Rule 23(a)(3) ...........................................................................................13
    Rule 23(a)(4) ...........................................................................................13
    Rule 23(b)(2) .....................................................................................12, 15

# OTHER AUTHORITIES

World Bank, GDP (Current U.S. Dollar),
    https://data.worldbank.org/indicator/NY.GDP.MKTP.CD .......................................................19

U.S. Department of Energy, *Grid Resilience and Innovation Partnerships* (*GRIP*)
    *Program Projects*, https://perma.cc/4WZ5-YCWN.....................................................22

U.S. Department of Energy, *Project Selections for FOA 3256: Methane Emissions
    Reduction Program Oil and Gas Methane Monitoring and Mitigation*,
    https://perma.cc/SZ7T-LUGC ........................................................................................22

U.S. Department of Energy, *Regional Clean Hydrogen Hubs*,
    https://www.energy.gov/oced/regional-clean-hydrogen-hubs-0 .................................17

1 *Newberg and Rubenstein on Class Actions* § 3:12 (6th ed., 2022 & Supp. 2025)......................11

*University of California Sets World Record With Five Nobel Prizes In One Week,*
    Oct. 10, 2025, https://www.sfchronicle.com/california/article/uc-nobel-prizes-
    record-21094964.php ....................................................................................................24

*Review*, ARCHES, https://archesh2.org/year-in-review/ (last visited Nov. 22, 2025) ...............7, 24

*For Trump, Nothing Was Off Limits During the Shutdown*, Nov. 10, 2025,
    https://www.nytimes.com/2025/11/10/us/politics/trump-government-
    shutdown.html ..............................................................................................................23

*Two Hydrogen Hubs Respond to Sudden Federal Funding Cuts,* Engineering News
    Record (Nov. 6, 2025), https://www.enr.com/articles/61853-two-hydrogen-
    hubs-respond-to-sudden-federal-funding-cuts ...........................................................22

**TO ALL DEFENDANTS: PLEASE TAKE NOTICE** that, on December 18, 2025 at 10:00 AM in the Courtroom of the Honorable Rita F. Lin, Courtroom 15, United States District Court, Northern District of California, 450 Golden Gate Avenue, 18th Floor, San Francisco, California, Plaintiffs will and hereby do move the Court for an Order granting a preliminary injunction and provisional class certification.

Plaintiffs seek a preliminary injunction and provisional class certification for University of California ("UC") researchers whose Department of Energy ("DOE") grants Plaintiffs allege were terminated in violation of the Administrative Procedure Act and the Constitution.

## INTRODUCTION

Yet again the federal government has exceeded expectations of legal dereliction in how far it is willing to go to harm researchers. This time, it is targeting DOE awardees researching clean energy, but only in states where a majority of the citizens voted for the opposition political party in the 2024 election, *i.e.*, "Blue States." This latest batch of terminations, which began on October 1, 2025, includes the single largest grant termination that any Agency Defendant has imposed on UC researchers: cancellation of a financial assistance award worth up to **$1.2 <u>billion</u>** to the Alliance for Renewable Clean Hydrogen Energy Systems ("ARCHES") program. ARCHES supports more than twenty-nine researchers at five UC campuses and laboratories. Decl. of Claudia Polsky ("Polsky Decl.") ¶ 6, Exh. B.

The termination letters fail to meet the requirements of the Administrative Procedure Act ("APA") as they do not "provide a grant-specific explanation for the termination that states the reason for the change to the original award decision" nor do they "consider[] the reliance interests at stake." Dkt. Nos. 55, 134.

Further, due to their targeted attack on Blue States, they also suffer from a novel legal infirmity, premised on the Equal Protection guarantee of the Fifth Amendment, that is more startling and troubling than any yet encountered. When announcing the terminations, Director of the Office of Management and Budget ("OMB"), Russell Vought, openly admitted that Defendants were targeting "the Left's climate agenda." Decl. of Kyle McLorg ("McLorg Decl."), Exh. E. He then deliberately emphasized the partisan nature of these actions by specifically

highlighting that "[t]he projects are in the following states," before listing sixteen states all of which voted for Democratic candidates in the most recent presidential and senatorial elections. *Id*. This was no coincidence. Vought made this announcement just one day after President Trump explicitly stated: "We can do things during the shutdown that are irreversible, that are bad for [Democrats] and irreversible by them, like [. . .] cutting things that they like, cutting programs that they like." McLorg Decl., Exh. C at 2.

The sequence of events speaks for itself: the President announced his intention to use the shutdown to inflict irreversible harm on Democratic priorities, and one day later DOE terminated projects exclusively in Democratic-voting states. This is not neutral decision making — it is the weaponization of executive power for partisan retaliation. Plaintiffs accordingly seek to certify a Third Form Termination Class and an Equal Protection Termination Class.

For the proposed Third Form Termination Class, the issues presented in this motion for a preliminary injunction and for class certification are identical to those already decided by this Court with regard to National Science Foundation ("NSF"), National Endowment for the Humanities ("NEH"), Environmental Protection Agency ("EPA"), Department of Defense ("DOD"), Department of Transportation ("DOT"), and Department of Health and Human Services ("HHS"), through its sub-agency National Institutes of Health ("NIH"). *Thakur v. Trump*, 787 F. Supp. 3d 955 (N.D. Cal. 2025) (Dkt. No. 54) ("1st PI Order"); *Thakur v. Trump*, 2025 WL 2696424 (N.D. Cal. Sept. 22, 2025) (Dkt. No. 133) ("2nd PI Order").[1] Thus, this motion seeks to apply what the Court has already decided to an additional federal agency—the DOE—that has terminated grants to numerous UC researchers in a manner that this Court has deemed to violate the APA. Plaintiffs propose Drs. Plamen Atanassov and Louise Bedsworth as class representatives for this Third Form Termination Class.

---

[1] The Ninth Circuit denied the government's motion to stay the preliminary injunction and indeed agreed with this Court on every issue. *Thakur v. Trump*, 148 F.4th 1096 (9th Cir. 2025), *motion for reconsideration pending*. On September 4, 2025, Defendants filed a Motion for Panel Reconsideration or Reconsideration En Banc of Published Order Denying Stay Pending Appeal. The Ninth Circuit held oral argument on November 14, 2025. As of the date of this filing, the Ninth Circuit has not issued a decision. On November 20, 2025, Defendants filed a Notice of Appeal relating to the Court's Second PI Order and decision (Dkt. Nos. 133 & 134).

1    The proposed Equal Protection Termination Class is predicated on the overtly partisan
2  political basis upon which DOE targeted awards for termination. Specifically, DOE terminated
3  *only those grants awarded to recipients in states that voted for Democratic candidate Kamala*
4  *Harris in the 2024 election*. For the new Equal Protection Class, Plaintiffs likewise propose Drs.
5  Atanassov and Bedsworth as class representatives.

6    Plaintiffs seek a preliminary injunction on behalf of the Third Form Termination Class and
7  the Equal Protection Termination Class.

8                                **BACKGROUND**

9  **I.    Department of Energy**

10    DOE is an executive department that oversees the United States' national energy policy
11  and energy production, the research and development of nuclear power, the military's nuclear
12  weapons program, nuclear reactor production for the United States Navy, energy-related research,
13  and energy conservation. DOE was created in 1977 in the aftermath of the 1973 oil crisis. In 1977,
14  President Jimmy Carter signed into law the Department of Energy Organization Act, Pub. L. No.
15  95–91, 91 Stat. 565 (1977) (42 U.S.C. § 7101 *et seq*.), which established the DOE and set, *inter*
16  *alia*, the following goals: **(1)** "To promote the interests of consumers through the provision of an
17  adequate and reliable supply of energy at the lowest reasonable cost." *Id.* at § 7112(9); **(2)** "To
18  assure incorporation of national environmental protection goals in the formulation and
19  implementation of energy programs, and to advance the goals of restoring, protecting, and
20  enhancing environmental quality, and assuring public health and safety." *Id.* at § 7112(13);
21  **(3)** "To foster insofar as possible the continued good health of the Nation's small business firms [.
22  . .] and private cooperatives involved in energy production, transportation, research, development,
23  demonstration, marketing, and merchandising." *Id.* at § 7112(17).

24    Each of these goals was intended to serve "the public interest" and to "promote the general
25  welfare" by ensuring "coordinated and effective administration of Federal energy policy and
26  programs." *Id.* at § 7112 ("Congressional declaration of purpose").

27  **II.    DOE's Grant Terminations.**

28    On January 20, 2025, President Trump issued Executive Order No. 14156, "Declaring a

3

National Energy Emergency," which states that the United States "need[s] a reliable, diversified, and affordable supply of energy to drive our Nation's manufacturing, transportation, agriculture, and defense industries, and to sustain the basics of modern life and military preparedness." 90 Fed. Reg. 8433 (Jan. 20, 2025). Thereafter, DOE's campaign to terminate federal grants began with Secretary of Energy Chris Wright's policy memorandum dated May 15, 2025,[2] entitled "Ensuring Responsibility for Financial Assistance" ("Policy"), which purportedly sought to ensure that award recipients and individual projects were "financially sound and economically viable, aligned with national and economic security interests, and consistent with Federal law and this Administration's policies and priorities and program goals and priorities (Standards)." *See* Atanassov Decl., Exh. M. The Policy established a Portfolio Review Process ("PRP") to review existing and future awards through an advisory body called the PRP Committee. *See id.*

On October 2, 2025, Secretary Wright announced that DOE had terminated 321 financial awards totaling roughly $7.5 billion. McLorg Decl. ¶ 3. Of the 321 awards, six were terminated prior to October, and one was awarded to an awardee in Canada. *Id.* at ¶ 3. For the remaining 314 awards, and for 100% of them, the grantee's address on file with the federal government is in a state that voted for the President's opponent in the 2024 election and has two Democratic-caucusing Senators. *Id.* at ¶ 4. And nearly 98% of the terminated awards had a primary place of performance in a state with that same voting history. *Id.* at ¶ 5

### A. Dr. Atanassov's and Dr. Bedsworth's Grant Terminations

Dr. Atanassov had three grants terminated. Atanassov Decl., Exhs. E, H, & M. Dr. Bedsworth had one grant terminated. Decl. of  Louise Wells Bedsworth ("Bedsworth Decl."), Exhs. D & E. Each termination letter lacks project-specific findings that the research was financial unsound or otherwise deficient, or a demonstration that DOE considered researchers' reliance interests. This violates the APA. Additionally, Dr. Atanssov's projects and Dr. Bedsworth's project are in a Blue State.[3]

---

[2] This Policy is sometimes dated May 14, 2025. Decl. of Plamen Atanassov ("Atanassov Decl."), Exh. H.

[3] Dr. Bedsworth's project is in California. Bedsworth Decl., Exh. C. Two of Dr. Atanassov's

1          **1.    Dr. Atanassov: Grants, Terminations, and Harm**

2          Dr. Plamen Atanassov is the Chancellor's Professor of Chemical & Biomolecular

3    Engineering at UC Irvine, where he also holds a joint/courtesy appointment in Materials Science

4    & Engineering. Atanassov Decl. ¶ 4, Exh. B. He joined UC Irvine in 2018 after prior service at the

5    University of New Mexico as a researcher, faculty member, and Associate Dean for Research. *Id*.

6    His research spans engineered materials, fuel cell electrocatalysts, and materials for power

7    production, energy conversion, and storage, with over 490 peer-reviewed papers and over 45,000

8    citations. *Id.* at ¶ 5. He is an inventor on 67 U.S. patents with many that have been licensed and

9    form the core of various catalyst products and related technologies. *Id.* at ¶ 6.

10         Dr. Atanassov's career represents decades of leadership in precisely the technologies DOE

11   purports to prioritize: affordable energy, U.S. technological dominance, and domestic

12   manufacturing. *See* 42 U.S.C. § 7112. His extensive patent portfolio, with many technologies

13   already licensed, demonstrates a proven track record of translating federally funded research into

14   market-ready innovations that advance American competitiveness.

15         Dr. Atanassov had three grants terminated in October 2025, for: (1) the Advanced Low-

16   PGM Cathode Catalysts project; (2) the Novel Carbon Supports for Metal Catalysts for Fuel Cells

17   project; and (3) the ARCHES Hydrogen Hub project. Atanassov Decl., Exhs. E, H, & M.

18         The first project, "Advanced Low-PGM Cathode Catalysts with Self-Healing Properties

19   for High Performing and Highly Durable MEAs," was a collaboration among Dr. Atanassov's

20   research group; the research groups of his UC Irvine colleagues Professors Vojislav Stamenkovic

21   (the Principal Investigator) and Iryna Zenyuk (Co-Principal Investigator); and private sector

22   partners and technology validators, all working together to create a major fuel cell catalyst

23   innovation locus. *Id.* at ¶ 10.

24         On October 2, 2025, DOE notified UC Irvine that this award would be terminated; the

25   termination was confirmed on October 9, 2025. *Id.* at ¶ 12. Per the termination letter, "this project

26   _____

27   projects are based in California. Atanassov Decl., Exhs. D, K. His third project, with the Cabot
     Corporation, is based in Massachusetts. *Id.,* at Exh. F. Massachusetts and California are two states
28   targeted by Vought. McLorg Decl. at Exh. E.

is not consistent with this Administration's goals, policies and priorities." *Id.*, at Exh. E. The termination letter then adds: "More specifically, the Department has determined: This project does not effectuate the Department of Energy's priorities of ensuring affordable, reliable, and abundant energy to meet growing demand and/or addresses the national emergency declared pursuant to Executive Order 14156." *Id.*

However, DOE's stated rationale for termination cannot be reconciled with the project's goals, which were to simultaneously (a) lower the cost of hydrogen fuel cells ("affordability"), and (b) make feasible broader deployment of this energy technology ("abundance"), while also increasing U.S. market share and indeed creating the possibility of market dominance in this energy domain (a key thrust of the cited Executive Order). The funding loss to Dr. Atanassov's research group was $500,000, including $57,000 in lost summer salary and financial support for two UC Irvine PhD students. *Id.* at ¶ 14.

The second project, Novel Carbon Supports for Metal Catalysts for Fuel Cells, a collaboration with Cabot Corporation (Boston, MA), sought to produce the first industrial-scale, U.S.-manufactured fuel cell catalysts that would be able to fulfill the requirement for 30% "Made in USA" content (a percentage calculated based on manufacturing costs) that enables clean energy projects to receive bonus tax credits under the Inflation Reduction Act. *Id.* at ¶ 17. Dr. Atanassov is the Principal Investigator for the UC Irvine subcontract. *Id.* at ¶ 18, Exh. G.

On October 2, 2025, DOE issued a termination letter to Cabot Corporation for this project, effective immediately. *Id.* at ¶ 19, Exh. H. The reasons DOE provided for the award termination were verbatim identical to those in the termination for Dr. Atanassov's cathode catalysts project. Again, DOE's stated rationale cannot be reconciled with the project's goals, which were to promote hydrogen fuel cell technology and increase U.S. dominance in this technology. *See id.* at ¶ 17. The funding loss to Dr. Atanassov's research group was $727,000, including $85,500 in lost summer salary and financial support for two PhD students. *Id.* at ¶ 22.

The third project, ARCHES Hydrogen Hub, was an award of up to $1.2 billion, including an initial Phase 1 award of $30 million with up to $186 million available thereafter. *Id.* at ¶¶ 24, 27, Exh. K. ARCHES is a public-private nonprofit corporation founded by the UC system, the CA

1  Governor's Office of Business and Economic Development, and the nonprofit Renewables 100

2  Policy Institute. *Id.* at ¶ 24.  Its goal is to unleash dramatic growth in hydrogen production and

3  consumption by 2045 to decarbonize the world's energy sources. *Id.* A specific sub-goal is to

4  develop and commercialize at scale the use of hydrogen in the transportation sector

5  (vehicles/buses/planes/ships), which is America's largest source of greenhouse gas emissions. *Id.*

6       DOE's award of $1.2 billion to ARCHES, which encompassed additional research phases

7  beyond Phase 1 worth hundreds of millions of dollars, further catalyzed the "[s]igning of [a] $12.6

8  billion cooperative agreement—the largest in the DOE history, with a 10:1 cost-share match of

9  federal funds with State and private investment."[4]

10      DOE abruptly terminated the ARCHES award on October 1, 2025, stating the award "did

11 not pass Standards of the PRP Committee review and will not proceed." Atanassov Decl., Exh. M.

12 DOE did not provide the Standards or explain the Portfolio Review Process. *Id.* at ¶ 31.

13      Dr. Atanassov lost current and anticipated compensation, including an opportunity to

14 develop a Hydrogen Technology Certification program and transition to a 0.5 FTE role as Senior

15 Advisor for Business Development to ARCHES. *Id.* at ¶¶ 36-37.

16               **2.      Dr. Louise Bedsworth: Grant, Termination, and Harm**

17      Dr. Louise Bedsworth currently holds these positions at the University of California,

18 Berkeley School of Law: Executive Director at the Center for Law, Energy, and the Environment

19 ("CLEE"), Director of the Land Use Program at the Center for Law, Energy, and the Environment,

20 and Senior Advisor at the California-China Climate Institute. Bedsworth Decl. ¶ 2.

21      Dr. Bedsworth submitted, as Principal Investigator, a proposal for financial assistance to

22 DOE for a project titled "Feasibility Study to Co-Create a Community Alliance for Direct Air

23 Capture." *Id.* at ¶ 8. The project would undertake a comprehensive assessment of the technical,

24 social, and governance feasibility of establishing a Community Alliance for Direct Air Capture

25 ("CALDAC") in California, inviting the local community to be the center of Direct Air Capture

26 ("DAC") Hub development. *Id.* at ¶ 9. Direct air capture is a form of carbon removal. *Id.* at ¶ 20;

27

28
_____

[4] *Year in Review*, ARCHES (last visited Nov. 22, 2025), *https://archesh2.org/year-in-review/*.

1    *see also* 42 U.S.C. § 16298d. The statutory authority for the award was 42 U.S.C. 16298d. *Id.* at

2    ¶¶ 13,14, Exh. C. Per Section 16298d(j), the Congressionally-appropriated funds were "to remain

3    available until expended." *Id.* at 16298d(j)(4).

4        On October 2, 2025, DOE terminated the CALDAC project. Bedsworth Decl. ¶ 16. The

5    letter used the same termination language as for Dr. Atanassov's non-ARCHES project

6    terminations: "This project does not effectuate [DOE's] priorities of ensuring affordable, reliable,

7    and abundant energy to meet growing demand and/or addresses the national emergency declared

8    pursuant to Executive Order 14156." *Id.* at Exh. D; *see also id.* at Exh. E. However, unlike Dr.

9    Atanassov's terminations, DOE further stated: "More specifically, the Department determined:

10   DAC hubs provide no tangible economic benefit. DAC hubs may raise natural gas prices if

11   deployed at scale." *Id.*, Exhs. D-E.

12       DOE's statement that DAC hubs provide no tangible economic benefit cannot be

13   reconciled with the CALDAC project's aims. *Id.* at ¶¶ 9, 20. As Dr. Bedsworth states: "Failure to

14   scale DAC will diminish domestic innovation and lead to a loss of job creation opportunities,

15   which can be especially important in resource-dependent communities." *Id.* at ¶ 20. DOE fails to

16   explain or support its assertion that DAC hubs potentially raise natural gas prices.

17       Dr. Bedsworth, her team, and the public interest have all suffered harm as a result of the

18   CALDAC project's grant termination. *Id.* at ¶ 18. Termination of this grant resulted in financial

19   harm to CLEE by reducing funds available for researcher and staff salaries. *Id.* Termination of this

20   grant also resulted in the loss of a $300,000 grant from the California Energy Commission and

21   significant cost share contributions from project partners, further reducing or eliminating funding

22   for researcher and staff salaries. *Id.*

23       None of DOE's termination letters to Drs. Atanassov of Bedsworth provided coherent

24   rationales for termination. Neither did they consider the researchers' reliance interests.

25                              **ARGUMENT**

26   **I.    Drs. Atanassov and Bedsworth Have Standing.**

27       To establish standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly

28   traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). This Court has already held that the original Plaintiffs have Article III standing. *See* 1st PI Order at 47 (citing *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100 (2025)). The same is true for Drs. Atanassov and Bedsworth, who are each the Principal Investigators for at least one terminated project. Bedsworth Decl. ¶¶ 8, 14, 16-17, Exhs. C-E; Atanassov Decl. ¶¶ 18-19, Exhs. G-H ("Prof. Plamen Atanassov – PI UCI subcontract").

The wrongful termination of their grants has caused great harm to their careers and livelihood that can be redressed through the same injunctive and declaratory relief as the other Plaintiffs. Atanassov Decl., ¶¶ 14-15, 22-23, 36-40; Bedsworth Decl., ¶¶ 18-20. In short, Drs. Atanassov and Bedsworth "assert[] invasions of traditionally cognizable interests sufficient to confer standing" that "can be redressed by a reversal of the allegedly illegal grant terminations." 1st PI Order at 42. In denying Defendants' motion for partial stay, the Ninth Circuit recognized the standing of the representative UC researcher plaintiffs to redress researchers' own harms. *Thakur*, 148 F.4 at 1105.

## II.    The Court Should Provisionally Certify Form Termination and Equal Protection Termination Classes for UC Researchers Whose Grants Were Terminated by DOE.

### A.    The Class Definitions.

The Court has provisionally certified the Equity Termination Class, the Form Termination Class, the Second Equity Termination Class, and the Second Form Termination Class. 1st PI Order at 51-52; 2nd PI Order at 28-29. In this Motion, Plaintiffs propose two additional classes relating to DOE:

> **Third Form Termination Class.** All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants by the DOE that are terminated by means of a form termination notice that does not provide a grant-specific explanation for the termination that states the reason for the change to the original award decision and considers the reliance interests at stake, from and after January 20, 2025.

> Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.

**Equal Protection Termination Class.** All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants by the DOE that were included in the 314 grants that DOE terminated on or around October 2, 2025, which Plaintiffs allege was done in violation of the equal protection guarantee of the Fifth Amendment.

Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.

**B.    The Proposed Classes Satisfy the Requirements of Class Certification.**

In granting provisional certification, the Court must determine that the requirements of Rule 23 have been met, although "its analysis is tempered [. . .] by the understanding that 'such certifications may be altered or amended before the decision on the merits.'" *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 179–80 (D.D.C. 2015) (quoting *Bame v. Dillard*, No. 05-1833, 2008 WL 2168393, at \*5 (D.D.C. May 22, 2008)). This Court has already determined that Plaintiffs have satisfied the requirements for provisional class certification as to NSF, NEH, EPA, DOD, DOT, and NIH. 1st PI Order at 54-59; 2nd PI Order at 29-32. It should also do so here, where Plaintiffs' proposed Third Form Termination Class and Equal Protection Termination Class satisfy all Rule 23(a) factors as well as the requirements of Rule 23(b)(2). *See Lyon v. U.S. Immigr. & Customs Enf't*, 308 F.R.D. 203, 210-11 (N.D. Cal. 2015). As one district court recently noted in *Barbara v. Trump*, "[c]ourts routinely grant provisional class certification for purposes of entering injunctive relief." 790 F. Supp. 3d 80, 90 (D.N.H. 2025) (citation omitted) (collecting instances of provisional class certification, including *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041-43 (9th Cir. 2012)).[5]

**1.    Individual Joinder Is Impracticable.**

Plaintiffs in a putative class action typically must demonstrate that "the class is so

_____

[5] Quoting *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2567 (2025) (Kavanaugh, J. concurring), the *Barbara* court noted that "plaintiffs who challenge the legality of a new federal statute or executive action and request preliminary injunctive relief may sometimes seek to proceed by class action under [R]ule 23(b)(2) and ask a court to award preliminary classwide relief that may, for example, be statewide, regionwide, or even nationwide." *Barbara*, 790 F. Supp. 3d at 100. The court did just that, holding that it could "later modify or amend the order granting class certification." *Id.*

numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although numbers alone are not controlling, "a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone." 1 *Newberg and Rubenstein on Class Actions* § 3:12 (6th ed., 2022 & Supp. 2025); *see also Rannis v. Recchia*, 380 Fed. Appx. 646, 651-652 (9th Cir. 2010). "Plaintiffs 'need not state the exact number of potential members nor identify all the members of the class so long as the putative class is not amorphous.'" *Foon v. Centene Mgmt. Co.*, No. 2:19-cv-01420 AC, 2023 WL 1447922, at *4 (E.D. Cal. Feb. 1, 2023) (quoting *Arnold v. United Artists Theatre Cir., Inc.*, 158 F.R.D. 439, 449 (N.D. Cal. 1994)). As the Third Amended Complaint ("TAC") alleges, DOE grant terminations adversely impacted 21 Full-Time-Equivalent ("FTE") UC personnel who can fairly be described as Principal Investigators or principal researchers at work on projects other than the ARCHES project. TAC ¶ 625; Polsky Decl. ¶ 3. These 21 FTE encompass an unspecified larger number of individuals—and likely, a far larger number—because individuals devoting less than full-time to a project count as a fractional contribution to an FTE. Polsky Decl. ¶ 3. Indeed, Dr. Adam Weber, a UC researcher at Lawrence Berkeley National Laboratory and the Chief Technology Officer of ARCHES, identified 29 UC research personnel involved with ARCHES and 34 DOE-termination-impacted UC researchers for non-ARCHES grants known to him. *Id.* at ¶ 6. The proposed classes satisfy numerosity.

While the members of the proposed classes are sufficiently numerous to meet any application of 23(a)(1), other impracticability factors, unique to the purposes of Rule 23(b)(2) class certification, underscore the appropriateness and necessity of class treatment. The Rule 23(b)(2) class offers a necessary haven in cases such as this for those who fear retaliation. As at least two district courts (including this one) have observed, "in determining numerosity, the court [. . .] considers whether 'individual claimants would have difficulty filing individual lawsuits out of fear of retaliation, exposure, and/or prejudice, such that it is unlikely that individual class members would institute separate suits.'" *Does 1-10 v. Univ. of Washington*, 326 F.R.D. 669, 679 (W.D. Wash. 2018) (quoting *Buttino v. F.B.I*, 1992 WL 12013803, at *2 (N.D. Cal. Sept. 25, 1992) (finding numerosity where an unknown number of gay employees worked under the FBI's anti-gay policies and were unlikely to come forward individually)).

### 2.    This Case Involves Defendants' Common Conduct Against the Classes and Satisfies All Rule 23(a) and 23(b)(2) Requirements.

Plaintiffs must demonstrate "the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)), *overruled on other grounds by Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 670 (9th Cir. 2022) (citation modified). As this Court previously noted, commonality is satisfied where, as here, plaintiffs challenge "a system-wide practice or policy that affects all of the putative class members." 1st PI Order at 54 (quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *overruled on other grounds by Johnson v. California*, 543 U.S. 499 (2005)).

By amending their complaint to allege unlawful DOE grant terminations alongside unlawful grant terminations by EPA, NEH, NSF, DOD, DOT, and NIH, Plaintiffs have asked the same "common questions" that the Court already recognized were sufficient to establish Rule 23(a)(2) commonality. For example: whether Agency Defendants followed Trump and DOGE directives in terminating grants to both classes; whether Defendants violated the Plaintiffs' constitutional rights (in this case, to equal protection under the law, by targeting their grants for termination based on their location in Blue States); and whether the Agency Defendants' terminations to the Form Termination Class were arbitrary and capricious in violation of the APA. *See* 1st PI Order at 54, 55, 58; TAC, ¶¶ 606-611 (alleging that DOE terminated grants at the behest of President Trump and DOGE), ¶¶ 612-623 (alleging that Defendants, including DOE, violated the Equal Protection Clause in terminating grants), ¶¶ 632-662, 663-676 (alleging that Defendants violated the APA by distributing generic form letters to class members).

The Rule 23(b)(2) requirement is satisfied for the same reasons. Plaintiffs must show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2). Plaintiffs have done so. The Third Amended Complaint focuses *entirely* on Defendants' general course of conduct that caused substantially similar class-wide injuries to all class members. *See, e.g.*, TAC at ¶¶ 150–230 (EPA), ¶¶ 256–312 (NEH), ¶¶ 331–

366 (NSF), ¶¶ 389–423 (DOD), ¶¶ 447–93 (DOT), ¶¶ 534-604 (NIH); and ¶¶ 606-676 (DOE). The proposed Third Form Termination Class and Equal Protection Termination Class, then, satisfy Rule 23(b)(2) for identical reasons as the current Classes.

### 3.    Plaintiffs' Claims Are Typical of Those of the Proposed Classes.

To satisfy typicality, Plaintiffs must show that their claims are "typical of the claims or defenses of the class." Fed R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted).  Drs. Atanssov and Bedsworth satisfy the typicality inquiry for the Third Form Termination Class and Equal Protection Termination Class.

Indeed, typicality is easily met here because the grants of the two proposed class representatives and the entire proposed classes were terminated in the exact same way: DOE identified grants based on the grantee's Blue State location, issued form termination letters, with no coherent grant-specific explanation or consideration of reliance interests, and ordered the grantees to cease doing work pursuant to the grants. McLorg Decl. ¶¶ 2-6; Atanassov Decl., ¶¶ 12-13, 19, 31, Exhs. E, H, M; Bedsworth Decl., ¶¶ 16-17, Exhs. D-E. As such, Drs. Atanassov's and Bedsworth's grants were terminated in a way typical of the members in the Third Form Termination Class and Equal Protection Termination Class.

### 4.    Plaintiffs and Class Counsel Will Adequately Represent the Proposed Classes.

Absent class members must be adequately represented for a judgment to bind them. *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940). This prerequisite is satisfied if a representative party "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Resolution of the adequacy issue requires the Court to address two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Kim v. Allison*, 87 F.4th 994, 1000 (9th Cir. 2023) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds*). The Court already found class counsel and the original

Plaintiffs are adequate representatives. *See* 1st PI Order at 57–60. That same logic applies here.

As their accompanying Declarations demonstrate, Drs. Atanassov and Bedsworth are adequate class representatives for the same reasons as the original Plaintiffs. They have no conflicts of interest with absent class members. They are committed to the vigorous prosecution of this action, as evidenced in their Declarations. And their interests are aligned with those of the existing Form Termination class members, as well as the prospective members of the Equal Protection Termination class. *See id.* at 57–59.

Further, even if Drs. Atanassov's and Bedsworth's grant terminations were different in some ways from those of other class representatives, Plaintiffs need not advance representatives that experienced every single variety of harm suffered by the class. *Lyon*, 308 F.R.D. at 214 (certifying a Rule 23(b)(2) class where "Plaintiffs do not seek individualized relief for each class member, but rather ask for systemic changes consistent with a single overarching constitutional standard that will be applicable to all class members"); *Coreas v. Bounds*, No. TDC-20-0780, 2020 WL 5593338, at *15 (D. Md. Sept. 18, 2020) (rejecting the defendants' argument against certification that "different subsets of putative class members may be entitled to relief where others would not" because "there is available relief that would benefit the entire class or an entire subclass"); *Scholl v. Mnuchin*, 489 F. Supp. 3d 1008, 1046 (N.D. Cal. 2020) ("Plaintiffs assert that Rule 23(b)(2) is met [ ] because defendants implemented a generally applicable policy of denying CARES Act payments to incarcerated persons. . . . The court agrees with plaintiffs that defendants' policy is generally applicable to the class as a whole.").

Plaintiffs have demonstrated that all Rule 23(a) requirements, as well as the Rule 23(b)(2) requirement, are satisfied for the new proposed classes. The Court should provisionally certify the Third Form Termination Class and Equal Protection Termination Class and appoint Drs. Atanassov and Bedsworth as class representatives.

## III. __The Court Should Issue a Preliminary Injunction as to DOE.__

A preliminary injunction is warranted where the moving party establishes that (1) it is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest.

1st PI Order at 17; *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the present case, these factors strongly favor Plaintiffs, and the Court should issue an additional preliminary injunction that extends its previous decisions to DOE for the same reasons it has already enjoined six other agencies engaged in unlawful grant terminations,[6] (Dkt. Nos. 55, 134) and on the additional basis of violation of the Equal Protection guarantee.[7]

**A.**    **Plaintiffs Are Likely To Succeed on the Merits of Their Claims that DOE Grant Terminations Are Unlawful.**

This Court already determined that NSF and NEH's grant terminations "were contrary to congressionally mandated directives to both agencies under the APA," and both this Court and the Ninth Circuit found Plaintiffs are "likely to succeed in showing that the mass grant terminations carried out via form letters were conducted in a manner that was arbitrary and capricious." 1st PI Order at 17, 25; *Thakur*, 148 F.4th at 1107. For nearly identical reasons, the Court should rule that Plaintiffs are likely to succeed on their APA claims against DOE. And, because DOE selected all 314 grants for termination based on animus toward Blue States, the Court should find that Plaintiffs are likely to succeed on their claim that the terminations violated the Fifth Amendment's guarantee of equal protection under the law.

**1.**    **DOE's Grant Terminations Are Contrary to Law Under the APA.**

The APA prohibits agency action that exceeds statutory or constitutional authority or is

---

[6] Further, in the related case *American Association of University Professors, et al. v. Donald J. Trump, et al.,* No. 25-CV-07864-RFL, 2025 WL 3187762 (N.D. Cal. Nov. 14, 2025), this Court found on the same logic that DOE was among three federal agencies that acted unlawfully in "suspending" grants previously awarded to UCLA researchers. *Id.*, at *34. Among other relief, the Court specifically vacated "suspensions" (or terminations) of DOE (as well as NSF and NIH) research grants to UCLA researchers that took place on or around July 30, 2025, as well as the associated blanket policy of denying any future grants to UCLA. *AAUP*, 25-CV-07864-RFL, Dkt. No. 91 at 4 (Nov. 14, 2025).

[7] Plaintiffs note that the DOE terminations challenged here encompass financial awards to UC researchers that are denominated as "grants," and those instead denominated as "cooperative agreements." Because a suit for injunctive relief under Rule 23(b)(2) focuses on the pattern of conduct of defendant(s), any small distinctions between these award types are here immaterial. Additionally, to the extent the Court deems award nomenclature relevant, plaintiffs note that the check-boxes on award documents make plain that both "grants" and "cooperative agreements" are distinct from "contracts." *See, e.g.,* Atanassov Decl., Exh. D at 1.

otherwise contrary to law. 5 U.S.C. § 706(2)(A), (C); *Kaweah Delta Health Care Dist. v. Becerra*, 123 F.4th 939, 944 (9th Cir. 2024) ("[U]nder our system of separation of powers, neither good intentions nor pressing policy problems can substitute for an agency's lack of statutory authority to act."). By refusing to spend money that Congress appropriated in the manner that Congress specified, Defendants are violating the Impoundment Control Act of 1974 and the appropriations statutes underlying DOE's funding schemes. *See* 2 U.S.C. § 681 *et seq.*

Defendants are also violating DOE's enabling statutes and other laws passed by Congress that include grantmaking as a directive. For example, Dr. Bedsworth's CALDAC project was authorized pursuant to 42 U.S.C. Section 16298d, which establishes a comprehensive statutory framework for regional DAC hubs. 42 U.S.C. § 16298d(j); Bedsworth Decl., ¶ 13. Congress mandated that the Secretary of Energy "**shall** establish a program under which the Secretary **shall** provide funding for eligible projects that contribute to the development of 4 regional [DAC] hubs." 42 U.S.C. at § 16298d(j)(2)(A) (emphasis added). "Shall" is a command, not a suggestion.

The statute prescribes detailed requirements for these hubs. *Id.* at § 16298d(j)(2)(B). Congress further mandated specific selection criteria, requiring DOE to consider the carbon intensity of the local industry; geographic diversity; carbon potential; hubs in fossil-producing regions that are economically distressed; scalability; creation of employment opportunities; and other factors. *Id.* at § 16298d(j)(3)(C). Congress appropriated $3.5 billion specifically for this program for fiscal years 2022 through 2026, "to remain available until expended." *Id.* at § 16298d(j)(4). DOE's policy preferences cannot override Congress's explicit mandate to fund DAC projects, nor wipe clean Congress's appropriation of $3.5 billion for this purpose.

Similarly, DOE has acted contrary to statute in terminating funding for the only two green hydrogen hubs in America (ARCHES Hydrogen Hub and the also-summarily-terminated Pacific Northwest Hub). Congress required the Secretary of Energy to establish a program to support the development of "regional clean hydrogen hubs": "a network of clean hydrogen producers, potential clean hydrogen consumers, and connective infrastructure located in close proximity." 42 U.S.C. § 16161a(a) & (b). These hubs must demonstrably aid the achievement of clean hydrogen production standards; demonstrate the production, processing, delivery, storage, and end-use of

clean hydrogen; and be capable of developing into a national clean hydrogen network to facilitate a clean hydrogen economy.

Congress also imposed strict timelines on DOE, requiring the Secretary to solicit proposals for regional clean hydrogen hubs not later than 180 days after November 15, 2021, and to select at least four regional clean hydrogen hubs not later than one year after the deadline for submission of proposals. *Id.* § 16161a(c)(1) & (2). Congress further mandated geographic diversity, requiring that each regional clean hydrogen hub be located in a different region of the United States and use energy resources that are abundant in that region. *Id.* § 16161a(c)(3)(C). Congress authorized an appropriation of $8 billion to the Secretary to carry out the regional clean hydrogen hubs program for the period of fiscal years 2022 through 2026. *Id.* at § 16161a(d).

Without reference to Section 16161a, the ARCHES termination letter states that the project "did not pass Standards." Atanassov Decl., Exh. M. But the project had already been selected per statutory mandate, and cannot lawfully be summarily terminated on unexplained grounds pursuant to undisclosed "Standards." *See id.* at Exh. N (administrative appeal of ARCHES termination).[8] Indeed, as to the ARCHES project, DOE's Office of Clean Energy Demonstrations website to this day touts the virtues of green hydrogen hubs.[9]

The APA does not allow an agency to flout Congress's clear directives in this way. *See, e.g.*, *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994) (explaining that a court may not accept "the agency's policy judgments . . . if they conflict with the policy judgments that undergird the statutory scheme"). DOE has exceeded its own statutory authority and has therefore violated 5 U.S.C. Section 706(2)(A) and (C). Accordingly, "the only appropriate remedy is vacatur." *Kaweah*, 123 F.4th at 944. DOE's actions violate statutes and are *ultra vires*.

### 2. Defendants' Grant Terminations Are Arbitrary and Capricious Under the APA.

The APA prohibits arbitrary and capricious action. 5 U.S.C. §706(2)(A). *Kalispel Tribe of*

---

[8] As of November 22, 2025, ARCHES had received no response from DOE to its administrative appeal. Atanassov Decl., ¶ 33.

[9] *See Regional Clean Hydrogen Hubs*, DOE (last accessed Nov. 22, 2025), https://www.energy.gov/oced/regional-clean-hydrogen-hubs-0.

*Indians v. U.S. Dep't of the Interior*, 999 F.3d 683, 688 (9th Cir. 2021). It requires federal agencies to engage in "reasoned decisionmaking" (*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020)), meaning an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified).

DOE's mass termination of grants awarded to Drs. Atanassov and Bedsworth and the proposed Third Form Termination Class was arbitrary and capricious. Defendants do not provide coherent, grant-specific reasoning for the terminations. The DOE termination letter "provide[s] no indication that Defendants have 'considered the relevant factors' and do[es] not 'articulate a rational connection between the facts found and the choice made.'" 1st PI Order at 27 (citing *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983)) (citation modified). Just as the individualized termination letters at issue in the first preliminary injunction order (1st PI Order) stated that grant funding "no longer effectuates the program goals or agency priorities," the DOE letters state simply that the projects "no longer effectuate[] the Department of Energy's priorities" and are "not consistent with this Administration's goals, policies and priorities." Bedsworth Decl., Ex. E; *see also*, *e.g.*, Atanassov Decl., Ex. H.

And while Dr. Bedsworth's termination letter attempts to provide project-specific information, the rationale is superficial: a mere two sentences to explain summary termination of a grant of more than $2 million, *i.e.,* one sentence per $1+ million in cancelled funding. DOE's ostensible rationale is also factually unsupported. In asserting that "DAC hubs provide no tangible economic benefit," and that "DAC hubs may raise natural gas prices if deployed at scale" (Bedsworth Decl., Exh. E), DOE cites no substantiating facts. Nor is there a discussion of why Dr. Bedsworth's project would even implicate DOE's purported objections. Bedsworth Decl., ¶¶ 19-20. Such conclusory statements cannot constitute reasoned explanations for agency action.

Equally important, the DOE termination letters show the agencies failed to consider the reliance interests of grantees. *See* 1st PI Order at 26-28. Instead, Plaintiffs — and indeed, entire multi-campus UC programs with dozens of also-reliant partner organizations, agencies, and

companies — were left stranded, without funding, in the middle of ambitious multi-year research projects they were told would be fully funded. Atanassov Decl., ¶¶ 11-17, 19-23, 26-27, 36-40; Bedsworth Decl., ¶¶ 8-20. Grantees who had received portions of their awards had already invested significant time in their projects. Grantees had been using their federal funds to pay for their own salaries, and those of their staff and research assistants. Without those funds, progress has halted. *See, e.g.,* Atanassov Decl., ¶ 23; Bedsworth Decl. ¶ 19.

In the case of ARCHES, the UC grantees had additionally leveraged DOE's funding commitment to make their own commitments to myriad non-UC parties who collectively brought over twelve billion dollars in funding commitments to the project — a figure larger than the GDP of more than 20 nations.[10] Atanassov Decl. ¶ 32. Defendants have failed to introduce any evidence that they considered the consequences of prematurely terminating partially funded research projects that would have benefited grantees, downstream affiliates, and members of the public. *See* 1st PI Order at 30; 2nd PI Order at 21 (noting no evidence that NIH "considered important issues such as waste of taxpayer funds or loss of research that is significant to the public").

### 3. Defendants' Termination of Grants Exclusively in Blue States Violates the Fifth Amendment's Equal Protection Guarantee.

Defendants' selective termination of DOE awards — limited to awards to grantees in Blue States — violates the Fifth Amendment, because it is based on irrational and illegitimate animus.

The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws. *See Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954). "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995) (quoting *Buckley v. Valeo*, 424 U.S. 1, 93 (1976)). At its core, equal protection guarantees that the government must remain "open on impartial terms to all who seek its assistance." *Romer v. Evans*, 517 U.S. 620, 633 (1996). The government cannot treat similarly situated groups differently without, at a

---

[10] *See GDP (current US $)*, World Bank Group, (last visited Nov. 22, 2025), *https://data.worldbank.org/indicator/NY.GDP.MKTP.CD* (curating most recent available global data)).

minimum, a rational reason or legitimate governmental interest for the difference in treatment. *See*

*Vill. Of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

      The Supreme Court has repeatedly affirmed that it is irrational and illegitimate — and thus

unconstitutional — for the government to treat a group differently on the basis of "animus,"

*Romer*, 517 U.S. at 632, or a "bare . . . desire to harm a politically unpopular group." *U.S. Dep't of*

*Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *see also*, *e.g.*, *United States v. Windsor*, 570 U.S.

774, 770, 772, 775 (2013); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447, 450

(1985). The federal government therefore violates the Fifth Amendment when it treats similarly

situated groups differently based on political animus or "interest of retaliation" against political

adversaries. *Perkins Coie LLP v. U.S. DOJ*, 783 F. Supp. 3d 105, 168 (D.D.C. 2025).

      To prevail on an equal protection claim, plaintiffs need not prove that animus was the sole,

or even the primary, factor behind the government's disparate treatment; animus need only be "a

motivating factor" behind the government's decision. *See Vill. of Arlington Heights v. Metro.*

*Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977). Plaintiffs can prove animus based on either direct

or circumstantial evidence, including the historical background of the challenged decision, the

specific sequence of events leading up to that decision, and any departures from the normal

procedural sequence. *Avenue 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016)

(discussing *Arlington Heights*, *supra*). Thus, this Court has relied on contemporaneous statements

by policymakers (including, specifically, in social media posts), as well as departures from normal

procedure, to determine that an executive action was based on animus. *See*, *e.g.*, *Nat'l TPS All. v.*

*Noem*, 773 F. Supp. 3d 807, 858-863; 866-67 (N.D. Cal. 2025). Once animus is shown as a

motivating factor, the government must prove it would have enacted the same policy absent the

discriminatory purpose. *Arlington Heights*, 429 U.S. at 270-71 n.21.

      Here, Defendants treated one group, DOE awardees in Blue States and the entities carrying

out those awards, differently from the similarly situated Red State awardees whose awards DOE

did not terminate on October 2. There is clear evidence that this differential treatment was based

on political animus. Indeed, "there is no need" for the Court "to 'infer animus' in this case." *See*

*Perkins Coie*, 783 F. Supp. 3d at 167-68. Defendants openly and obviously chose to terminate the

315 awards, including those connected to Plaintiffs, based on a "bare … desire to harm a politically unpopular group." *Moreno*, 413 U.S. at 534.

Specifically: In announcing the terminations, OMB's Vought proclaimed that Defendants were targeting "the Left's climate agenda." McLorg Decl., Exh. E. He then went out of his way to highlight that "[t]he projects are in the following states," listing sixteen states that voted for the Democratic candidates in the most recent election, including California and Massachusetts. *Id.* Vought made this announcement the day after President Trump stated: "We can do things during the shutdown that are irreversible, that are bad for [Democrats] and irreversible by them, like . . . cutting things that they like, cutting programs that they like." *Id.* Exh. C.

Leaving nothing to imagination or inference, the same day that DOE was issuing some of the termination notices here challenged, the President reiterated: "We're only cutting Democrat programs." *Id.*, Exh. D. While "discriminatory intent need not be proved by direct evidence," (*Rogers v. Lodge*, 458 U.S. 613, 618 (1982)), the record here is full of "smoking gun admission[s] from [federal] officials" that they acted "out of discriminatory animus." *Jones ex rel. A.H. v. District of Columbia*, No. 20-cv-128, 2025 WL 2774107, at *16 (D.D.C. Sept. 29, 2025).

Defendants' own words establish intent. So too does the unmistakable and otherwise-inexplicable disparate impact of the award terminations on Blue State recipients, coupled with the procedural irregularity of mass-terminating grants during a 34-day shutdown of all non-emergency government services, amply demonstrate Defendants' animus. *See Avenue 6E Invs.,* 818 F.3d at 504; *Nat'l TPS All.,* 773 F. Supp. 3d at 858-863; 866-67.

As to the disparate impact: DOE submitted to OMB a list of over 600 awards for potential termination, but every one of the U.S.-based recipients of the 314 awards that were actually terminated in October 2025 resides in a Blue State. McLorg Decl. ¶¶ 2-6, 10; Exs. A, B, and F. One need not be a statistician to understand this partisan skew did not happen by chance. But a statistician could confirm the odds are not just one in a million, but well beyond one in a trillion.

1      As further evidence of Defendants' animus, they distinguished among essentially identical

2  awards in a way that makes no sense except in light of their antipathy towards Blue States. Dr.

3  Atanassov's experience exemplifies this: DOE terminated ARCHES—the Hydrogen Hub

4  programs in California for which Dr. Atanassov does his work—as well as the Hydrogen Hub

5  program in Oregon and Washington (the Pacific Northwest Hydrogen Hub), while leaving the

6  remaining hubs on the Gulf Coast, Midwest, Appalachia, and Intermountain West intact.[11] *See*

7  Polsky Decl. ¶ 11 (map showing terminated and unterminated Hydrogen Hub programs).



15      In other nationwide programs, such as the Grid Resilience and Innovation Partnership

16  program, Defendants terminated only awards to recipients in Blue States.[12] Similarly, DOE

17  cancelled awards to California and Illinois-based awardees working on a DOE initiative in

18  Appalachia while leaving substantively identical awards to Oklahoma and Pennsylvania awardees

19  in place.[13] Animus is the only explanation for these disparities.

20      Defendants also "departure[d] from normal procedures." *Avenue 6E Investments,* 818 F.3d

21

22  [11] *See* Tim Newcomb, *Two Hydrogen Hubs Respond to Sudden Federal Funding Cuts,*
    Engineering News Record, (Nov. 6, 2025), https://www.enr.com/articles/61853-two-hydrogen-
23  hubs-respond-to-sudden-federal-funding-cuts.

24  [12] *See*, *e.g.*, *GRIP Program Projects*, DOE (last visited Nov. 23, 2025),
    https://www.energy.gov/gdo/grid-resilience-and-innovation-partnerships-grip-program-projects
25  [https://perma.cc/4WZ5-YCWN] (showing awards in all 50 states).

26  [13] *See Project Selections for FOA 3256: Methane Emissions Reduction Program Oil and Gas
    Methane Monitoring and Mitigation, Areas of Interest 3a: Improving Access to Monitoring Data
27  for Impacted Communities*, DOE (last visited Nov. 23, 2025),
    https://www.energy.gov/fecm/project-selections-foa-3256-methane-emissions-reduction-program-
28  oil-and-gas-methane-monitoring [https://perma.cc/SZ7T-LUGC].

at 507. The 315 terminations were announced from the White House (on the first day of the shutdown) by OMB Director Vought—not by DOE or Secretary Wright. McLorg Decl., Exh. E. The next day, DOE issued form termination letters that were not on official DOE letterhead, simply displaying "UNITED STATES DEPARTMENT OF ENERGY" at the top of the page. Bedsworth Decl., Exh. D; Atanassov Decl., Exh. H. Over the following weeks, DOE issued superseding termination letters without explanation. Those letters were substantially identical to the original ones, except that they were on official letterhead, signed by different DOE officials, and changed each termination's effective date to the date of the second letter. *See*, *e.g.*, Bedsworth Decl., Exhs. D, E. All of these procedural irregularities took place during the longest government shutdown in our nation's history, where the Administration took actions that have never been taken during a lapse in appropriations before.[14] Because DOE terminated the awards at issue for irrational and illegitimate reasons, Plaintiffs are likely to prevail on their equal protection claim.

### B.     The Harms Caused by DOE's Unlawful Conduct Will Become Irreparable Absent The Court's Intervention.

Plaintiffs must demonstrate that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. They are able to do so here. DOE is causing the exact same irreparable harm as did EPA, NEH, NSF, DOD, DOT, and NIH. *See* 1st PI Order at 47–48; 2nd PI Order at 26-27. Defendants have denied Drs. Atanassov and Bedsworth, as well as all members of the proposed Equal Protection Termination Class, equal protection of the law as required by the Fifth Amendment; this constitutes irreparable harm. *See Hernandez v. Sessions*, 872 F.3d 976, 994-95 (9th Cir. 2017) (deprivation of constitutional rights "unquestionably constitutes irreparable injury"); *Free the Nipple-Fort Collins v. City of Fort Collins,* 916 F.3d 792, 806 (10th Cir. 2019). The other irreparable harms DOE has caused include sizable monetary losses, including for salaries for Ph.D. students, injury to professional reputation, and potential cancellation of research altogether. *See* Atanassov Decl., ¶¶ 22, 38; Bedsworth Decl., ¶ 18; *see also* 1st PI Order  at 47–48. Last and critically: the harms to the public cannot be overstated. UC

---

[14] Luke Broadwater, *For Trump, Nothing Was Off Limits During the Shutdown*, Nov. 10, 2025, https://www.nytimes.com/2025/11/10/us/politics/trump-government-shutdown.html.

1  researchers with DOE grants are at the forefront of research into energy solutions. *See* Bedsworth

2  Decl. ¶ 19; Atanassov Decl. ¶ 38. With respect to a single salutary effect anticipated from the

3  ARCHES project alone, researchers project that if the project were to continue as originally

4  proposed and funded, it would yield "$3 billion in annual health cost savings from reduced [air]

5  emissions by 2032."[15]

6      Additional public benefits associated with contemplated UC research include, but are not

7  limited to, ways to capture the excess carbon definitively implicated in climate change

8  (exemplified by Dr. Bedsworth's grant), and in the case of ARCHES, ways to radically reduce

9  atmospheric carbon-loading, and ground-level smog and toxic exposures by developing

10 commercially viable clean hydrogen as an energy source (exemplified by Dr. Atanassov's grants

11 for necessary fuel-cell innovations). Bedsworth Decl., ¶ 20; Atanassov Decl., ¶¶ 28-29. This

12 cutting-edge and potentially societally transformative work exemplifies the best of the University

13 of California's mission-oriented research—research that, *during the very same month as DOE's*

14 *mass grant cancellation,* enabled UC to break a world record by winning five Nobel Prizes.[16]

15     DOE's grant terminations have and will continue to cause concrete harm and create

16 uncertainty (including to the point of operational chaos and imminent program collapse) for Drs.

17 Atanassov and Bedsworth, and for the proposed class members. This Court and others have

18 recognized these types of harms warrant preliminary injunctive relief. *See* 1st PI Order at 47-49;

19 2nd PI Order at 26-27; *City & Cnty. of S.F. v. U.S Citizenship & Immigr. Servs.*, 408 F. Supp. 3d

20 1057, 1123 (N.D. Cal. 2019) (recognizing "burdens on . . . ongoing operations" for public entities

21 as constituting irreparable harm).

22     **C.**    **The Balance of Equities Weigh in Plaintiffs' Favor, and An Expanded Preliminary Injunction Is in the Public Interest.**

23     The equities and the public interest, which merge when the government is a party, tip

24 sharply in favor of Plaintiffs. *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024). The threatened

25

---

26 [15] *Year in Review*, ARCHES(last visited Nov. 22, 2025), at *https://archesh2.org/year-in-review/*.

27 [16] Aidan Vazir, *University of California Sets World Record with Five Nobel Prizes in One Week,*
28 S.F. CHRONICLE (Oct. 10, 2025), https://www.sfchronicle.com/california/article/uc-nobel-prizes-record-21094964.php.

and actual harm to Plaintiffs far outweighs the federal government's interests in immediately enforcing these grant terminations. Further, preserving Plaintiffs' constitutional and statutory rights is in the public interest. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights" (citation omitted)); *Nat'l Treasury Emps. Union v. U.S. Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993) ("The preservation of . . . the legality of the process by which government agencies function certainly weighs heavily in the public interest."); *Clarke v. Off. of Fed. Housing Enter. Oversight*, 355 F. Supp. 2d 56, 66 (D.D.C. 2004) ("[T]here is a substantial public interest in ensuring that [an agency] acts within the limits of its authority.").

The government will suffer no harm from ceasing to terminate already authorized grants for which Congress has already appropriated funds, nor from returning to the orderly and legally compliant grant administration processes in place prior to Inauguration Day. The government will certainly continue to function—and indeed, will function better—if the status quo ante is restored. *See* 1st PI Order at 49 ("An agency is not harmed by an order prohibiting it from violating the law."); 2nd PI Order at 28 ("the balance of harms and public interest favor granting a preliminary injunction"). The balance of equities therefore strongly supports a preliminary injunction. *See id.* at 48; *see also Thakur*, 148 F.4 at 1106-07.

## **CONCLUSION**

For all of these reasons, Plaintiffs respectfully request that the Court grant their Motion to provisionally certify the Third Form Termination and Equal Protection Termination Classes; appoint Drs. Atanassov and Bedsworth as additional Class Representatives; appoint the undersigned Counsel to represent these classes; and issue an additional preliminary injunction applicable to DOE.

1

2

Dated: November 24, 2025          By:   /s/ Linda S. Gilleran

3                                    Anthony P. Schoenberg (CA Bar No. 203714)
                                     tschoenberg@fbm.com

4                                    Donald E. Sobelman (CA Bar No. 184028)
                                     dsobelman@fbm.com

5                                    Linda S. Gilleran (CA Bar No. 307107)
                                     lgilleran@fbm.com

6                                    Dylan M. Silva (State Bar No. 306363)
                                     dmsilva@fbm.com

7                                    Kyle A. McLorg (CA Bar No. 332136)
                                     kmclorg@fbm.com

8                                    Katherine T. Balkoski (CA Bar No. 353366)
                                     kbalkoski@fbm.com

9                                    FARELLA BRAUN + MARTEL LLP
                                     One Bush Street, Suite 900

10                                   San Francisco, CA 94104
                                     Telephone: 415. 954.4400

11                                   By:   /s/ Claudia Polsky

12                                   Erwin Chemerinsky (*pro hac vice*)
                                     echemerinsky@law.berkeley.edu

13                                   Claudia Polsky (CA Bar No. 185505)
                                     cpolsky@law.berkeley.edu

14                                   U.C. BERKELEY SCHOOL OF LAW
                                     Law Building

15                                   Berkeley, CA 94720-7200
                                     Telephone: 510.642.6483

16                                   Elizabeth J. Cabraser (CA Bar No. 83151)
                                     ecabraser@lchb.com

17                                   Richard M. Heimann (CA Bar No. 63607)
                                     rheimann@lchb.com

18                                   Kevin R. Budner (CA Bar No. 287271)
                                     kbudner@lchb.com

19                                   Annie M. Wanless (CA Bar No. 339635)
                                     awanless@lchb.com

20                                   Nabila M. Abdallah (CA Bar No. 347764)
                                     nabdallah@lchb.com

21                                   LIEFF CABRASER HEIMANN &
                                     BERNSTEIN, LLP

22                                   275 Battery Street, 29th Floor
                                     San Francisco, CA 94111

23                                   Telephone: 415.956.1000

24                                   *Attorneys for Plaintiffs and the Proposed Classes*

25

26

27

28

1

## **FILER'S ATTESTATION**

2

Pursuant to Civil Local Rule 5.1, the undersigned attests that all parties have concurred in

3    the filing of this PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND

4    PROVISIONAL CLASS CERTIFICATION AS TO DEPARTMENT OF ENERGY AND

5    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT.

6    Dated: November 24, 2025            By:  */s/ Linda S. Gilleran*

7                                       Anthony P. Schoenberg (State Bar No. 203714)
                                        tschoenberg@fbm.com
8                                       Donald Sobelman (State Bar No. 184028)
                                        dsobelman@fbm.com
9                                       Linda S. Gilleran (State Bar No. 307107)
                                        lgilleran@fbm.com
10                                      Dylan M. Silva (State Bar No. 306363)
                                        dmsilva@fbm.com
11                                      Kyle A. McLorg (State Bar No. 332136)
                                        kmclorg@fbm.com
12                                      Katherine T. Balkoski (State Bar No. 353366)
                                        kbalkoski@fbm.com
13                                      FARELLA BRAUN + MARTEL LLP
                                        One Bush Street, Suite 900
14                                      San Francisco, CA 94104
                                        Telephone: (415) 954-4400
15
                                        Erwin Chemerinsky (*pro hac vice*)
16                                      echemerinsky@law.berkeley.edu
                                        Claudia Polsky (State Bar No. 185505)
17                                      cpolsky@law.berkeley.edu
                                        U.C. BERKELEY SCHOOL OF LAW
18                                      Law Building
                                        Berkeley, CA 94720-7200
19                                      Telephone: (510) 642-6483

20                                      Elizabeth J. Cabraser (State Bar No.  83151)
                                        ecabraser@lchb.com
21                                      Richard M. Heimann (State Bar No. 63607)
                                        rheimann@lchb.com
22                                      Kevin R. Budner (State Bar No. 287271)
                                        kbudner@lchb.com
23                                      Annie M. Wanless (State Bar No. 339635)
                                        awanless@lchb.com
24                                      Nabila M. Abdallah (State Bar No. 347764)
                                        nabdallah@lchb.com
25                                      LIEFF CABRASER HEIMANN &
                                        BERNSTEIN, LLP
26                                      275 Battery Street, 29th Floor
                                        San Francisco, CA  94111
27                                      Telephone: (415) 956-1000

28                                      *Attorneys for Plaintiffs and the Proposed Class*