BRETT A. SHUMATE
Assistant Attorney General
Civil Division
ERIC J. HAMILTON
Deputy Assistant Attorney General
JOSEPH E. BORSON
Assistant Branch Director
KATHRYN BARRAGAN (D.C. Bar No. 90026294)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 598-7696
Email: kathryn.e.barragan@usdoj.gov
JASON ALTABET (Md. Bar No. 2211280012)
Tel.: (202) 305-0727
Email: Jason.k.altabet2@usdoj.gov

*Attorneys for United States*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| NEETA THAKUR, *et al.,* | Case No. 25-cv-4737-RFL |
| Plaintiffs, | DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT AND MOTION FOR THIRD PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.,* | |
| Defendants. | Hearing Date: December 18, 2025 |
| | Time: 10:00 AM |
| | Judge: Hon. Rita F. Lin |
| | Place: San Francisco Courthouse |
| | Courtroom 15 |

1

## TABLE OF CONTENTS

2

3    **INTRODUCTION** .................................................................................................................. 1

4    **STATEMENT OF THE ISSUES TO BE DECIDED** ................................................................ 3

5    **BACKGROUND** ..................................................................................................................... 3

6    **ARGUMENT** ......................................................................................................................... 8

7    I.    Plaintiffs' Motion for Leave to Amend Their Complaint a Third Time Should be
       Denied. ............................................................................................................................ 9
8

9    II.   Plaintiffs Have Not Shown Standing as to the California Hydrogen Hub Grant ......... 12

10   III.  Plaintiffs Have Not Met Their Burden for Provisional Class Certification ................ 13

11         A.    Plaintiffs Have Failed to Establish Numerosity .............................................. 14

12         B.    Plaintiffs Have Failed to Establish Commonality and Typicality .................... 19

13   IV.   Even Under the Court's Prior Reasoning, DOE Should Not be Enjoined. ................. 20

14         A.    The Form Termination Class Should Not Apply Here ..................................... 20

15         B.    The Terminations Are Not Contrary to Law under the APA ............................ 23

16         C.    The Equal Protection Class Should Not Apply. .............................................. 24

17   V.    Plaintiffs Have Not Shown Irreparable Injuries, and the Balance of the Equities
       Weighs in the Government's Favor. ................................................................................ 28
18

19   VI.   Injunctive Relief Should Be Stayed Pending Appeal and Be Accompanied by a Bond ............. 29

20   **CONCLUSION** .................................................................................................................... 29

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**CASES**

3

*Allen v. City of Beverly Hills*,
4    911 F.2d 367 (9th Cir. 1990) ....................................................................................... 9

5

*Am. Ass'n of Univ. Professors  v. Donald J. Trump.*,
6    No. 25-cv-07864-RFL, 2025 WL 3187762 (N.D. Cal. Nov. 14, 2025) ........................... 16

*Am. Bus Ass'n v. Rogoff*,
7    649 F.3d 734 (D.C. Cir. 2011) ................................................................................... 27

8

*Am. Med. Ass'n v. Reno*,
9    57 F.3d 1129 (D.C. Cir. 1995) .................................................................................... 23

10

*Ascon Props., Inc. v. Mobil Oil Co.*,
11    866 F.2d 1149 (9th Cir. 1989) ..................................................................................... 9

12

*Betts v. Reliable Collection Agency, Ltd.*,
659 F.2d 1000 (9th Cir. 1981) .................................................................................... 14

13

*Biden v. Texas*,
14    597 U.S. 785 (2022) ................................................................................................. 24

15

*Buttino v. Fed. Bureau of Investigation*,
16    No. C-90-1639SBA, 1992 WL 12013803 (N.D. Cal. Sep. 25, 1992) ............................. 18

17

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ................................................................................................. 28

18

*City of Cleburne v. Cleburne Living Ctr.*,
19    473 U.S. 432 (1985) ................................................................................................. 25

20

*Dept of Educ. v. California*,
21    604 U.S. 650 (2025) ......................................................................................... 8, 28, 29

22

*Doe v. Kamehameha Schs.*,
596 F.3d 1036 (9th Cir. 2010),
23    *objections overruled by*, 2025 WL 143722 (C.D. Cal. Apr. 8, 2025). ........................... 18

24

*Does 1-10 v. Univ. of Wash.*,
25    326 F.R.D. 669 (W.D. Wash. 2018) ............................................................................ 18

26

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ................................................................................... 11

27

*Experexchange, Inc. v. Doculex, Inc.*,
28    No. C-08-3875 JCS, 2009 WL 3837275 (N.D. Cal. Nov. 16, 2009) .............................. 10

*Faculty Senate of Fla. Int'l Univ. v. Winn*,
    477 F. Supp. 2d 1198 (S.D. Fla. 2007) ............................................................ 28

*FCC v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993) ...................................................................................... 24

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ...................................................................................... 22

*Harik v. Cal. Tchrs. Ass'n*,
    326 F.3d 1042 (9th Cir. 2003) ....................................................................... 14

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ...................................................................................... 20

*In re Fritz Cos. Secs. Litig.*,
    282 F. Supp. 2d 1105 (N.D. Cal. 2003) ......................................................... 11

*In re W. States Wholesale Nat. Gas Antitrust Litig.*,
    715 F.3d 716 (9th Cir. 2013) ........................................................................... 9

*Jackson v. Bank of Haw.*,
    902 F.2d 1385 (9th Cir. 1990) ......................................................................... 9

*Jones v. Cmty. Redevelopment Agency of City of L.A.*,
    733 F.2d 646 (9th Cir. 1984) ........................................................................... 9

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ...................................................................................... 12

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ...................................................................................... 20

*Louisiana v. Biden*,
    64 F.4th 674 (5th Cir. 2023) ............................................................................ 9

*Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*,
    485 U.S. 360 (1988) ...................................................................................... 27

*Milk Train, Inc. v. Veneman*,
    310 F.3d 747 (D.C. Cir. 2002) ................................................................. 20, 21

*Motor Vehicle Mfrs.rs Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983) ........................................................................................ 24

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
    145 S. Ct. 2658 (2025) ...................................................................... 11, 28, 29

*Parkerson v. Ferns*,
   No. 1:15-CV-01695-MO, 2016 WL 6662700 (D. Or. Nov. 10, 2016) .................................. 9

*Partington v. Bugliosi*,
   56 F.3d 1147 (9th Cir. 1995) .................................................................................................. 9

*PCR Distrib. Co. v. Does*,
   No. 2:24-CV-07453-CV-AJR, 2025 WL 819674 (C.D. Cal. Feb. 7, 2025) ........................ 18

*Perkins Coie LLP v. U.S. Dep't of Just.*,
   783 F. Supp. 3d 105 (D.D.C. 2025) ...................................................................................... 25

*Rannis v. Recchia*,
   380 F. App'x. 646 (9th Cir. 2010) ................................................................................ 14, 17

*Refuerzo v. Sw. Airlines Co.*,
   No. 22-CV-00868-JSC, 2024 WL 4177936 (N.D. Cal. Sep. 12, 2024) ....................... 2, 14, 17

*Ries v. Ariz. Beverages USA LLC*,
   287 F.R.D. 523 (N.D. Cal. 2012) .............................................................................. 2, 14, 16

*Rodriguez v. Popular Democratic Party*,
   457 U.S. 1 (1982) ................................................................................................................ 27

*Rucho v. Common Cause*,
   588 U.S. 684 (2019) ............................................................................................................ 26

*Rutledge v. Elec. Hose & Rubber Co.*,
   511 F.2d 668 (9th Cir. 1975) .............................................................................................. 14

*Sako v. Wells Fargo Bank, Nat. Ass'n*,
   No. 14CV1034-GPC JMA, 2015 WL 5022326 (S.D. Cal. Aug. 24, 2015) ........................ 10

*Sampson v. Murray*,
   415 U.S. 61 (1974) .............................................................................................................. 28

*Sanchez v. Off. of State Superintendent of Educ.*,
   45 F.4th 388 (D.C. Cir. 2022) ............................................................................................ 24

*Schwerdt v. Int'l Fidelity Ins. Co.*,
   28 F. App'x 715 (9th Cir. 2002) ......................................................................................... 10

*Small v. Allianz Life Ins. Co. of N. Am.*,
   122 F.4th 1182 (9th Cir. 2024),
   *cert. denied*, No. 24-1225, 2025 WL 1787755 (U.S. June 30, 2025) ........................... 13, 18

*Smiley v. Citibank, (S.D.)*,
   517 U.S. 735 (1996) ............................................................................................................ 23

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966) ......................................................................................... 24

*Sueoka v. United States*,
    101 F. App'x 649 (9th Cir. 2004) ..................................................................... 14

*Trump v. Boyle*,
    145 S. Ct. 2653 (2025) ...................................................................................... 29

*Trump v. Hawaii*,
    585 U.S. 667 (2018) .......................................................................................... 25

*Trump v. Orr*,
    ---S. Ct. ---, 2025 WL 3097824 (U.S. Nov. 6, 2025) ....................................... 25

*Tucson Airport Auth. v. Gen.l Dynamic.*,
    136 F.3d 641 (9th Cir. 1998) ............................................................................... 8

*U.S. Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973) .......................................................................................... 26

*United States v. Am. Libr. Ass'n*,
    539 U.S. 194 (2003) .......................................................................................... 27

*United States v. Windsor*,
    570 U.S. 744 (2013) .......................................................................................... 26

*Vill. of Willowbrook v. Olech*,
    528 U.S. 562 (2000) .......................................................................................... 24

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ..................................................................................... 19, 20

*XP Vehicles, Inc. v. Dep't of Energy*,
    118 F. Supp. 3d 38 (D.D.C. 2015) .................................................................... 28

**CONSTITUTION**

U.S. Const. amend. XIV, § 1 ......................................................................... 24, 26

**STATUTES**

5 U.S.C. § 701 ...................................................................................................... 20

5 U.S.C. § 702 ...................................................................................................... 20

5 U.S.C. § 706 ...................................................................................................... 20

31 U.S.C. § 503 ...................................................................................................... 4

31 U.S.C. § 6307 ................................................................................................................ 4

42 U.S.C. § 7256 .......................................................................................................... 21, 22

42 U.S.C. § 16161a .............................................................................................. 8, 13, 22, 24

42 U.S.C. § 16298d ....................................................................................................... 22, 23

**RULES**

Fed. R. Civ. P. 15 ............................................................................................................... 9

Fed. R. Civ. P. 23 ......................................................................................................... 14, 15

Fed. R. Civ. P. 65 ............................................................................................................ 29

**REGULATIONS**

2 C.F.R. Part 200 ............................................................................................................... 3

2 C.F.R. § 200.309 ............................................................................................................. 3

2 C.F.R. § 200.339 ............................................................................................................. 3

2 C.F.R. § 200.340 ......................................................................................................... 3, 25

2 C.F.R. § 200.341 ............................................................................................................ 22

2 C.F.R. § 200.343 ............................................................................................................. 3

2 C.F.R. § 910.130 ....................................................................................................... 12, 13

**OTHER AUTHORITIES**

Andrew H. Sidman, Pork Barrel Politics: How Government Spending Determines Elections in a
    Polarized Era (2019) ................................................................................................ 27

Arches H2, *California Pauses Hydrogen Hub Activities Amid Federal Funding Changes* (Nov. 4, 2025),
    https://archesh2.org/california-pauses-hydrogen-hub-activities-amid-federal-funding-changes/. ...... 10

Diana Evans, Greasing the Wheels: Using Pork Barrel Projects to Build Majority Coalitions in Congress
    (2004) ...................................................................................................................... 28

EFI Foundation, *Unpacking DOE's October Award Cancellations* (Oct. 23, 2025),
    https://efifoundation.org/topics/innovation/unpacking-does-cancellations/ ....................................... 7

EFI Foundation, *Unpacking DOE's October Award Cancellations* (Oct. 23, 2025),
    https://efifoundation.org/wp-content/uploads/sites/3/2025/10/EFI-Foundation-Unpacking-DOEs-
    October-Award-Cancellations.pdf. ........................................................................................ 7, 27

Governor Gavin Newsom, *Governor Newsom statement on Trump administration's decision to cut hydrogen hub funding* (Oct. 1, 2025), https://www.gov.ca.gov/2025/10/01/governor-newsom-statement-on-trump-administrations-decision-to-cut-hydrogen-hub-funding/. ..................................................................................................... 10

Jonathan Allen, *The Case for Earmarks*, Vox (June 30, 2015), https://www.vox.com/2015/6/30/8864869/earmarks-pork-congress. ................................................. 28

Maeve Allsup, *Scoop: These Are the 321 Awards DOE is Canceling*, Latitude Media (Oct. 2, 2025), https://perma.cc/B9F7-483X ........................................................................................................ 7

Tyler Cowen, *Congress Needs to Bring Back Earmarks*, Bloomberg (Jan. 9, 2018), https://www.bloomberg.com/view/articles/2018-01-09/congress-needs-to-bring-back-earmarks ...... 27

U.S. Dep't of Energy, Energy Department Announces Termination of 223 Projects, Saving Over $7.5 Billion (Oct. 2, 2025), https://www.energy.gov/articles/energy-department-announces-termination-223-projects-saving-over-75-billion.................................................................................................................................. 6

U.S. Dep't of Energy, *Secretary Wright Announces New Policy for Increasing Accountability, Identifying Wasteful Spending of Taxpayer Dollars* (May 15, 2025), https://www.energy.gov/ articles/secretary-wright-announces-new-policy-increasing-accountability-identifying-wasteful. ........................................................................................................................ 5

U.S. Dep't of Energy, *Secretary Wright Announces Termination of 24 Projects, Generating Over $3 Billion in Taxpayer Savings* (May 30, 2025), https://www.energy.gov/articles/secretary-wrightannounces-termination-24-projects-generating-over-3-billion-taxpayer. ........................................................................................................................ 6

# INTRODUCTION

The U.S. Department of Energy ("DOE" or "Department") administers many discretionary spending programs to support energy research, technology, and infrastructure. In May 2025, the Secretary of Energy announced a new process for evaluating financial assistance awards on a case-by-case basis aimed at ensuring that DOE's programs expend public funds wisely and responsibly. As part of that ongoing review process, both later in May 2025 and in October 2025, DOE announced the cancellation of multiple projects because they no longer effectuated the agency's priorities or the program's goals.

Now, Plaintiffs seek leave to amend their Complaint a third time, and move to certify yet another set of classes and obtain a third preliminary injunction against DOE. Their motion would again postpone summary judgment briefing—originally scheduled to begin in August—and further delay timely resolution of this case. Because additional delay would unfairly prejudice the government, the Court should deny Plaintiffs' request for leave to amend.

Leave to amend should be also denied because it is futile. Plaintiffs lack standing to challenge the largest grant termination at issue here, a $1.2 billion DOE grant to support an infrastructure project with strong involvement from the state of California government, implemented via a cost-sharing, cooperative agreement. The research grants subject to this Court's previous injunctions are wholly different. This Court's reasoning rests on the premise that the "object" of the government's review and termination decisions were Plaintiffs' own research grants, for which Plaintiffs prepared the grant applications and over which Plaintiffs had substantial ownership. *See* Order Granting Motion for Preliminary Injunction and Class Certification ("First Mem. Op."), ECF No. 54, at 45–46. The California Hydrogen Hub project bears no resemblance to those awards: it is a large-scale infrastructure deployment grant generally involving private sector companies and financial institutions, not a research grant held by an academic investigator. Even if Plaintiffs could establish standing, the material differences between the California Hydrogen Hub project and the other research grants at issue defeat commonality and typicality. And Plaintiffs themselves contend they could bring another lawsuit to challenge the California Hydrogen Hub grant termination. *See* Pls.' Mot. for Leave to File Third Am. Complaint ("Pls.' Mot. for Leave") at 2 n.2, ECF No. 154. Class certification should therefore be denied.

1    Class certification should also be denied because Plaintiffs fail to establish numerosity. Their

2    evidence identifies only fourteen UC researchers who served as principal investigators ("PIs"), co-PIs, or

3    lead researchers on applications for terminated DOE awards—an amount that cannot satisfy numerosity's

4    general 40-member threshold under Rule 23. *See Refuerzo v. Sw. Airlines Co.*, No. 22-CV-00868-JSC,

5    2024 WL 4177936, at *4 (N.D. Cal. Sep. 12, 2024) ("While there is no fixed number that satisfies the

6    numerosity requirement, as a general matter, a class greater than forty often satisfies the requirement,

7    while one less than twenty-one does not." (quoting *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 536

8    (N.D. Cal. 2012)).

9    Even assuming class certification were granted, Plaintiffs have not shown that they are entitled to

10    a preliminary injunction as to DOE. Plaintiffs fail to show the DOE terminations—which were explained

11    in detailed letters that DOE issued after evaluating each award against specific criteria—are arbitrary and

12    capricious under the APA. Nor are Plaintiffs likely to succeed on the merits of their new Fifth Amendment

13    claim, which contends that Defendants acted with "animus" against states whose electoral votes went to

14    the Democratic nominee in the most recent presidential election (*i.e.,* "Blue States"). But states are a not

15    "politically unpopular group" subject to equal protection's animus case law; they are separate sovereigns

16    fully capable of representing their interests. Accordingly, even assuming for argument's sake that

17    Defendants terminated grants for geographic or political considerations rather than the rationales stated in

18    DOE's letters, Plaintiffs still cannot prevail. The political branches may base spending decisions based on

19    geographic and even politically informed considerations, as the long tradition of earmarks (sometimes

20    called "pork barrel" spending) shows. This court should reject Plaintiffs' implicit invitation to hold such

21    actions unconstitutional.

22    Nor are the other Rule 65 factors satisfied. Plaintiffs' claimed harms, stated in economic terms,

23    are not irreparable. And because they are not likely to succeed on their constitutional claim, they have not

24    established constitutional injury. For these reasons, and because the balance of equities favors the United

25    States when injunctive relief would require it to pay out potentially unrecoverable grant funds, Defendants

26    respectfully request that Plaintiffs' motions be denied.

27    //

28

FED. DEFS.' OPP'N TO PLS.' MOT. FOR LEAVE TO AMEND AND THIRD PRELIM. INJUNCTION MOT.
CASE NO. 25-CV-4737

## STATEMENT OF THE ISSUES TO BE DECIDED

1. Have Plaintiffs successfully shown that good cause exists to grant leave to amend their Complaint a third time?

Assuming the Court concludes that leave to amend the Complaint a third time should be granted:

2. Do Plaintiffs, whose asserted injuries arise from their research grants currently subject to termination, have standing to challenge the termination of the California Hydrogen Hub grant, which is a cost-sharing infrastructure project between a California public-private partnership and the Department of Energy?

3. Have Plaintiffs successfully established the requirements of provisional class certification with respect to the Third Form Termination Class and the Equal Protection Class, even though the class size, as a matter of arithmetic, does not satisfy numerosity?

Assuming the Court concludes provisional certification is proper and maintains the reasoning underlying its preliminary injunction:

4. For the Third Form Termination Class, which is premised on APA review, were DOE's actions committed to agency discretion by law such that APA review is barred? If APA review applies, were DOE's suspension letters sufficient to exclude the action from the Third Form Termination Class?

5. For the Equal Protection class, are the Plaintiffs likely to prevail on their equal protection claims based on alleged animus toward "Blue States," which are not themselves protected entities under the Fifth Amendment?

## BACKGROUND

*Factual Background*

When President Trump assumed the office of President of the United States, the Executive Branch agencies adopted new policy priorities in conformity with the President's objectives. And federal agencies have, over the last several months, exercised their significant legal discretion to review existing spending programs to ensure they effectuate this Administration's changed policy priorities.

In May 2025, the Secretary of Energy announced a new process for evaluating financial assistance awards on a case-by-case basis to increase accountability and to promote the responsible expenditure of money in its discretionary funding programs.[1] In a memorandum entitled "Ensuring Responsibility for Financial Assistance," the Secretary explained that it is DOE's policy "to ensure that financial assistance award recipients and . . . individual projects are, among other things, financially sound and economically viable, aligned with national and economic security interests, and consistent with Federal law and this Administration's policies and priorities and program goals . . . (Standards)."[2] The memorandum announced DOE's intent to "conduct focused reviews of awards and other forms of financial assistance on a case-by-case basis, especially for . . . large complex awards, or on groups of homogenous awards if DOE determines that such a review will adequately address" these goals.[3] The Secretary's memorandum further explained: "If it is determined that a project meets Standards, then those projects will proceed. If it is determined that projects do not meet Standards, DOE may modify the project or, DOE in its discretion, may terminate the project based on the outcome of DOE's evaluation, as allowed by law."[4] The overarching purpose of the review process is to ensure that DOE, consistent with statutory authority, is prudently spending taxpayer dollars to generate the largest possible benefit to the Department's missions, including protecting America's national security and unleashing affordable, reliable, and secure energy.[5]

The Department-wide review of financial awards began in May 2025 and remains on-going. Consistent with this memorandum, both later in May 2025 and in October 2025, DOE announced the termination of multiple projects. After evaluating each award individually against specific criteria— including, for example, whether a project continues to effectuate the purpose of the program or the

---

[1] U.S. Dep't of Energy, *Secretary Wright Announces New Policy for Increasing Accountability, Identifying Wasteful Spending of Taxpayer Dollars* (May 15, 2025), https://www.energy.gov/articles/secretary-wright-announces-new-policy-increasing-accountability-identifying-wasteful.

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] *See id.*

Department's priorities under 2 CFR § 200.340(a)(4), the Department decides whether to continue, terminate, or attempt to modify that award. If DOE decides to terminate an award, the rationale for its termination is identified in a letter transmitted to the awardee.

As part of this review process, in May 2025, DOE announced the termination of 24 awards issued by the Office of Clean Energy Demonstrations during the prior administration that totaled over $3.7 billion.[6] Of these 24 grantee awardees terminated in May, 16 of the States in which they are primarily operated awarded their electoral votes to the Republican nominee for President in 2024.

As part of this same review process, on October 2, 2025, the Department announced the termination of an additional 321 additional financial awards, totaling approximately $7.5 billion.[7] Many of the projects cancelled in October 2025 affect individuals residing in multiple States, including States with at least one Republican Senator or States in which President Trump prevailed in the electoral college in 2024.[8] The nonprofit, nonpartisan Energy Futures Initiative ("EFI") Foundation has prepared an analysis of the award terminations announced by DOE in October 2025. According to this independent analysis, the October terminations will affect 49 States, with many projects receiving funding "that spans multiple states. For example, the Department of Commerce [of] Minnesota's Grid Resilience and Innovation Partnerships award supported a transmission study spanning seven Midwest states. Other

---

[6] U.S. Dep't of Energy, Secretary Wright Announces Termination of 24 Projects, Generating Over $3 Billion in Taxpayer Savings (May 30, 2025), https://www.energy.gov/articles/secretary-wright-announces-termination-24-projects-generating-over-3-billion-taxpayer. The functions of the Office of Clean Energy Demonstrations are currently being transferred elsewhere within DOE.

[7] U.S. Dep't of Energy, *Energy Department Announces Termination of 223 Projects, Saving Over $7.5 Billion* (Oct. 2, 2025), https://www.energy.gov/articles/energy-department-announces-termination-223-projects-saving-over-75-billion.

[8] *See* Maeve Allsup, *Scoop: These Are the 321 Awards DOE is Canceling*, Latitude Media (Oct. 2, 2025), https://perma.cc/B9F7-483X (noting that "the Grid Deployment Office is canceling 25 awards, including $464 million in Grid Resilience and Innovation Partnerships funding (or GRIP) that was earmarked for the transmission stud process for five high-voltage transmission lines spanning seven states — Iowa, Kansas, Minnesota, Missouri, Nebraska, North Dakota, and South Dakota" and that "[s]everal awards, including the GDO award to the Minnesota Department of Commerce and its partners MISO and SPP for transmission studies, and a $90 million award to Mineral Basin Solar Power, . . . were actually slated to support the buildout of physical projects in states that voted for President Trump, in this case Louisiana and Pennsylvania, respectively").

projects are headquartered in one state, but the project is sited in another state."[9] EFI's analysis also determined that of the 321 awards, 134 awards, totaling $794 million, had concluded their performance period before cancellation;[10] and that most of the canceled awards (165 of 321) had an end date in 2025.[11]

One such state project that was terminated, and that Plaintiffs seek to reinstate here, was a $1.2 billion federal award made to the California Hydrogen Hub project, administered via a cooperative, cost-sharing agreement between the Alliance for Renewable Clean Hydrogen Energy Systems (ARCHES) and DOE. *See* Plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification as to Department of Energy ("Pls.' Third Mot."), ECF No. 156, at 1, 5; *see also* Atanassov Decl., Exs. E, H, & M. This award was terminated on October 1, 2025. *See* Atanassov Decl., Ex. M. The California Hydrogen Hub was not a research grant; rather, it was a large, complex infrastructure project to produce, store, and convert hydrogen throughout the state of California. *See* 42 U.S.C. § 16161a.

*Grant Termination Authority*

By way of background, agencies are broadly empowered, through terms and conditions of federal grants, and statutes and regulation, to reorient grant portfolios in response to changing priorities. As a default matter, Office of Management and Budget ("OMB") regulations generally govern a variety of terms for federal grants. *See generally* 2 C.F.R. Part 200 (titled "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards"). For example, the regulations reference and generally provide terms for the termination of awarded federal grants. *See, e.g.*, *id.* § 200.309 ("If termination occurs, the period of performance will be amended to end upon the effective date of termination."); *id.* § 200.339(c) (noting suspension or termination is a remedy for noncompliance); *id.* § 200.343 (discussing the effects of suspension or termination).

Section 200.340, simply titled "[t]ermination" provides the key substantive and procedural

---

[9] EFI Foundation, *Unpacking DOE's October Award Cancellations* at fig. 8 (Oct. 23, 2025), https://efifoundation.org/wp-content/uploads/sites/3/2025/10/EFI-Foundation-Unpacking-DOEs-October-Award-Cancellations.pdf

[10] *Id.* at fig. 7.

[11] EFI Foundation, *Unpacking DOE's October Award Cancellations* (Oct. 23, 2025), https://efifoundation.org/topics/innovation/unpacking-does-cancellations/

guidelines for terms governing termination of awarded grants. Crucially, the Federal Government has preserved the authority to terminate "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, <u>if an award no longer effectuates the program goals or agency priorities</u>." *Id.* § 200.340 (emphasis added). This termination authority has been promulgated consistent with federal statutes authorizing OMB to manage various aspects of federal grants and contracts, including termination. *See* 31 U.S.C. § 503; *id.* § 6307. Awardees are accordingly informed in their terms and conditions of the contracts they enter into that awards may be terminated based on changes in agency priorities.

### *Procedural Background*

On June 5, 2025, Plaintiffs filed this suit naming 16 grantmaking agencies as defendants, moved for a temporary restraining order, and sought to certify a class. Compl., ECF No. 1; Pls.' Mem. in Supp. of Mot. for TRO ("Pls.' PI Mem."), ECF No. 7-1; Pls.' Mot. for Class Certification, ECF No. 18. Plaintiffs brought claims under ultra vires review alleging that Defendants have violated the Take Care Clause and Appropriations Clause, the First Amendment's bar on viewpoint discrimination, and the Fifth Amendment's Due Process Clause. Compl. ¶¶ 433-52. Plaintiffs also sought APA review for alleged violations of the Impoundment Control Act, agencies' governing statutes, unspecified regulations, and the bar on arbitrary and capricious final agency action. *Id.* ¶¶ 453-65.

After a hearing, the Court granted preliminary injunctive relief but limited both the scope and reach. The Court extended relief to only those agencies where named plaintiffs were listed "as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants," First Prelim. Inj. ¶¶ 1, 3; *see also* Second Prelim. Inj. ¶¶ 1, 3. Moreover, the injunction was limited to the Environmental Protection Agency ("EPA"), National Science Foundation ("NSF"), and National Endowment for the Humanities ("NEH"). As to those three agencies, the Court certified two classes. The Equity Termination Class, based on Plaintiffs' First Amendment claim, and part of their APA contrary to law claim, covers "grants terminated by Agency Defendants pursuant to Executive Orders 14151 or 14173." First Prelim. Inj. ¶ 4a. The Form Termination Class, based on Plaintiffs' arbitrary and capricious claim under the APA, covers "grant terminations . . . communicated by means of a form termination notice that does not provide a grant-specific explanation for the termination that states the reason for the change

to the original award decision and considers the reliance interests at stake[.]" *Id.* ¶ 2a. The Court also explained the basis for its injunction and provisional class certification. First Mem. Op.

Following the first preliminary injunction, Plaintiffs sought to amend their complaint to encompass grant terminations as to additional agencies. On August 26, 2025, the Court granted their motion for leave to amend their complaint a second time, and their second preliminary injunction motion. *See* August 26, 2025 Order, ECF No. 107; *see also* Second Order Granting Mot. for Prelim. Inj. & Class Certification ("2nd Mem. Op."), ECF No. 133; Second Prelim. Inj. The Court's Second Preliminary Injunction was limited to the Department of Defense ("DOD") the Department of Transportation ("DOT"), and the National Institute of Health within the Department of Health and Human Services ("NIH"). *See* Second Prelim. Inj. As to those three agencies, the Court certified two additional classes. *Id.* ¶¶ 2a, 4a.

*Plaintiffs' Motions*

Plaintiffs now move to file a third amended complaint, and for additional preliminary injunction and additional provisional class certifications as to the DOE. *See* Pls.' Mot. for Leave, ECF No. 154; Mot. for Preliminary Injunction & Provisional Class Certification as to Additional Agency Defendants ("Pls.' 3rd PI Mot."), ECF No. 156. Plaintiffs seek to certify two additional classes as to DOE: a Third Form Termination Class, which seeks to include UC researchers listed as PIs, Co-PIs, or lead researchers on DOE grants terminated via a "form termination" since January 2025, and an Equal Protection Class, which seeks to include UC researchers listed as PIs, Co-PIs, or lead researchers on DOE grants terminated in October 2025. *See* Pls.' 3rd PI Mot. at 9-11. Defendants oppose.

# ARGUMENT

Plaintiffs' motion for leave to amend their complaint a third time should be denied. Plaintiffs have unduly delayed in moving to amend, having waited nearly six months after initiating this action and two months after the October 2025 DOE terminations, and their delay results in unfair prejudice to the government. If Plaintiffs' motion is granted, however, Defendants maintain and preserve their original objections to the first and second preliminary injunctions.[12] Even if the Court maintains the reasoning

---

[12] In addition, Defendants preserve and incorporate by reference their arguments previously made in opposition to the First and Second Preliminary Injunction motions. First, Defendants maintain that this Court lacks jurisdiction over each claim—and particularly the APA claims—because Congress has

underlying the previous preliminary injunctions, the Court should still deny Plaintiffs' third motion as to DOE.

## I.     Plaintiffs' Motion for Leave to Amend Their Complaint a Third Time Should be Denied.

The Federal Rules of Civil Procedure allow a party to amend its pleading "once as a matter of course" either (1) within 21 days after filing it, or (2) 21 days after a defendant files a motion to dismiss under Rule 12(b). *See* Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Whether to grant leave to amend is within the trial court's sound discretion. "Five factors are frequently used to assess the propriety of a motion for leave to amend: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment; and (5) whether plaintiff has previously amended his complaint." *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990). Leave to amend may be properly denied on grounds of futility if the amendment fails to state a valid claim. *Jones v. Cmty. Redevelopment Agency of City of L.A.*, 733 F.2d 646, 650 (9th Cir. 1984); *Partington v. Bugliosi*, 56 F.3d 1147, 1162 (9th Cir. 1995).

As the Ninth Circuit has noted, "[a]lthough [Rule] 15(a) provides that leave to amend 'shall be freely given when justice so requires,' it 'is not to be granted automatically.'" *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 738 (9th Cir. 2013) (quoting *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1387 (9th Cir. 1990)). The court's "discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989); *see also Parkerson v. Ferns*, No. 1:15-CV-01695-MO, 2016 WL 6662700, at *3 (D. Or. Nov. 10, 2016) (finding that plaintiff's "previous amendment of his Complaint . . . weighs against granting his current motion to amend").

---

specifically divested federal courts of jurisdiction, because this case involves termination of a federal contract. *See Dept of Educ. v. California*, 604 U.S. 650, 650–51 (2025); *see also* ECF No. 126 at 7–9. District Courts lack jurisdiction regardless of whether plaintiffs could bring a claim in the Court of Federal Claims. *See Tucson Airport Auth. v. Gen.l Dynamic.*, 136 F.3d 641, 646–77 (9th Cir. 1998). Second, Defendants contend that Plaintiffs' APA are foreclosed for lack of final agency action. See ECF No. 126 at 9. While each individual termination may eventually represent a final agency action (directed at nonparties) a plaintiff may not "in a single swipe at the duly elected executive" seek judicial superintendence over the entire grantmaking structure of the Executive Branch. *See Louisiana v. Biden*, 64 F.4th 674, 684 (5th Cir. 2023). Plaintiffs' attempt to categorically enjoin alleged future terminations is thus barred.

Plaintiffs acknowledge a nearly six-month delay in seeking leave to amend their Complaint to add claims regarding DOE since initiating this lawsuit, and a nearly two-month delay in seeking leave after DOE's termination of grants in October 2025. Pl.'s Mot. for Leave at 4. "Courts have held that waiting two months after discovering new facts to bring a motion to amend does not constitute diligence under Rule 16." *Sako v. Wells Fargo Bank, Nat. Ass'n*, No. 14CV1034-GPC JMA, 2015 WL 5022326, at *2 (S.D. Cal. Aug. 24, 2015) (citing *Schwerdt v. Int'l Fidelity Ins. Co.*, 28 F. App'x 715, 719 (9th Cir. 2002) (delay of one month after learning of facts from a witness' deposition does not constitute diligence under Rule 16 in raising claim); *Experexchange, Inc. v. Doculex, Inc.*, No. C–08–3875 JCS, 2009 WL 3837275, at *29 (N.D. Cal. Nov. 16, 2009) (delay of two months after discovering new facts to file motion to amend and after fully briefed summary judgment motion did not meet the good cause standard under Rule 16)). Plaintiffs were not diligent in filing this motion for leave to amend six months after this lawsuit was filed, and nearly two months after DOE's October 1 and 2, 2025 terminations.

Nevertheless, Plaintiffs contend the delay was justified because UC researchers with DOE terminated grants have "been few in number and thus ill-suited to inclusion in a class action lawsuit" until the terminations that occurred in October 2025. Pls.' Mot. for Leave at 4. Plaintiffs further argue that their delay in seeking leave to amend following the October 2, 2025, terminations is due to Plaintiffs' counsel's difficulty ascertaining named Plaintiffs with terminated grants, as well as difficulties contacting ARCHES personnel. *See id.* at 5. These delays may have arisen because Plaintiffs are not parties to the grants at issue, which prevented them from readily obtaining the information needed to amend. That lack of access underscores that Plaintiffs are not the proper parties to bring this case; it does not excuse their undue delay.

California, moreover, did not decide to pause the California Hydrogen Hub project until early November, one month after the October 1, 2025 federal termination of the grant to ARCHES.[13] California had previously announced it would continue the project despite the federal termination.[14] It is therefore

---

[13] Arches H2, *California Pauses Hydrogen Hub Activities Amid Federal Funding Changes* (Nov. 4, 2025), https://archesh2.org/california-pauses-hydrogen-hub-activities-amid-federal-funding-changes/.

[14] Governor Gavin Newsom, *Governor Newsom statement on Trump administration's decision to cut hydrogen hub funding* (Oct. 1, 2025), https://www.gov.ca.gov/2025/10/01/governor-newsom-statement-on-trump-administrations-decision-to-cut-hydrogen-hub-funding/.

1  plausible that California's November decision, not DOE's October terminations, spurred Plaintiffs'
2  attempt to amend. In any event, the record shows that Plaintiffs unreasonably waited more than six months
3  from filing suit, and nearly two months after the DOE terminations, to seek amendment.

4  A third amendment would also unfairly prejudice the government. On a motion for leave to amend,
5  "the factor carrying the greatest weight is whether the proposed amendment will unduly prejudice the
6  opposing party." *In re Fritz Cos. Secs. Litig.*, 282 F. Supp. 2d 1105, 1109 (N.D. Cal. 2003) (citing
7  *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)). Since June 2025, the
8  government has been subject to a preliminary injunction requiring it to expend funds on grants it lawfully
9  terminated and needs for agency priorities. *See* First Prelim. Inj. & Second Prelim. Inj. There is no
10 evidence these funds can be recovered once spent; they are likely "irrevocably expended," an irreparable
11 harm. *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) (Mem.). The government's
12 harm compounds each day the injunction remains in place and final judgment is further delayed.

13 Plaintiffs assert that because the government stipulated to producing the administrative record and
14 to a proposed briefing schedule, it "conceded" that it "will suffer no prejudice" from a third amendment.
15 Pls.' Mot. for Leave at 6. Accepting that argument would penalize good faith efforts to negotiate efficient
16 schedules. The government's willingness to negotiate does not mean it concedes the absence of harm.
17 Rather, continued delay of final resolution imposes real and increasing prejudice.

18 Under the Court's July 2, 2025, scheduling order, summary-judgment briefing would have
19 concluded by November 21, 2025, with a hearing on December 16, 2025. *See* Minute Order, ECF No. 60.
20 Even accounting for the 43-day stay based on the lapse in appropriations, the schedule would have shifted
21 only modestly. However, Plaintiffs have sought repeated amendments and additional preliminary
22 injunctions. If Plaintiffs are permitted a third amendment now, summary judgment briefing will not
23 conclude until mid-2026, nearly a year after the preliminary injunction issued. By then, many challenged
24 grants may expire naturally, mooting the case in significant part and ensuring that a *preliminary* injunction
25 become, by default, a *permanent* one. Further amendments thus substantially harm the government.

26 By contrast, Plaintiffs face minimal prejudice as amending the complaint to add the DOE grant
27 terminations. They concede they "could file this [challenge to DOE grants] as a new lawsuit against DOE,"

28

allowing this case to proceed on schedule. Pls.' Mot. for Leave at 2 n.2. Their alleged harms are monetary and therefore not irreparable. Plaintiffs' motion should be denied on prejudice grounds alone.

The motion should also be denied because the proposed amendments are futile. As explained below, Plaintiffs lack standing to challenge the California Hydrogen Hub termination, cannot satisfy the requirements for class certification as to DOE, and fail on the merits: the DOE termination letters withstand APA review, and Plaintiffs' equal-protection claim cannot succeed. There is no basis to permit another amendment.

## II. Plaintiffs Have Not Shown Standing as to the California Hydrogen Hub Grant.[15]

This Court previously held that, although Plaintiffs were not parties to the grants at issue, they nevertheless had standing because they led the research projects funded by those grants. The Court emphasized that Defendants' reviews leading to termination focused on Plaintiffs' own research projects. First Mem. Op. at 42. The grants were awarded only after Plaintiffs undertook the "exhaustive process" of preparing "detailed applications laying out their planned multi-year research proposals," and the grants were "expressly made to fund Plaintiffs' projects." *Id.* at 42–46. Because Plaintiffs' research was the "object" of agencies' cancellation decisions, the Court found standing. *Id.* at 45–46.

The same reasoning does not apply to the California Hydrogen Hub award. Plaintiffs' research is not the "object" of the California Hydrogen Hub award, which is not a research grant "expressly made to fund Plaintiffs' projects" at all. *Id.* at 45–46. Instead, the Hydrogen Hub is a multi-billion-dollar infrastructure initiative to produce, store, and distribute hydrogen across California, operating under a cost-sharing agreement between ARCHES, LLC, which is a public-private partnership, and the federal government. *See* Dickenson Decl. ¶ 4 & Ex. A at 15.

The statutory authority confirms this distinction. Section 16161a directs the Secretary to "establish a program to support the development of at least 4 regional clean hydrogen hubs" that "demonstrate the

---

[15] Defendants preserve and re-assert their arguments, previously raised (*see* ECF No. 86, at 7–8), that Plaintiffs also lack standing as to their DOE terminated grants generally because they are not parties to the contracts they seek to enforce. It is well established that each party generally "must assert his own legal rights" and may not invoke the rights of "third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004).

production, processing, delivery, storage, and end-use of clean hydrogen," and authorizes grants to accelerate commercialization and demonstration activities. 42 U.S.C. § 16161a. This is not a research program.

The California Hydrogen Hub is classified as a "demonstration project"—not a research grant. DOE's regulations expressly distinguish "demonstration" projects from research and development, defining demonstrations as projects "designed to determine the technical feasibility and economic potential of a technology on either a pilot or prototype scale." 2 C.F.R. § 910.130.

Congressional appropriations reinforce this point. The Office of Clean Energy Demonstrations (OCED), which administers the hydrogen hub program under § 16161a, is funded to deliver "commercial-scale energy demonstration projects," not research grants. *See* Declaration of Howard Dickenson ("Dickenson Decl.") ¶ 4 & Ex. A at 2. OCED was appropriated $0 for research and development in FY2023 and requested $0 for FY2024. Dickenson Decl. Ex. A, at 13. Because the Hydrogen Hub is funded through FY2024 appropriations to OCED, it cannot be construed as a research grant.

Cost-sharing requirements further confirm the project's classification. DOE regulations require a minimum 20% cost share for research and development projects, but 50% for demonstration projects. 2 C.F.R. § 910.130(b)–(c). ARCHES's signed agreement with DOE stipulated the government would fund $1,200,000,000 (9.5 percent) and ARCHES would fund $11,422,716,001 (90.5 percent), for a total project value of $12,622,716,001, consistent with the requirement for demonstration—not research—projects. *See* Dickenson Decl. ¶ 3.

Finally, the project materials themselves underscore that this is an infrastructure project in the state of California with strong involvement from the government of the state of California, not a research endeavor. For example, Dr. Atanassov, the only UC-affiliated individual on the listed on the project's grant application, is identified as a "Senior Advisor for Business Development and Production," not as a Co-PI on a research grant. *Compare* Atanassov Decl. ¶ 24 *with* Ex. I at 45–47.

## III.    Plaintiffs Have Not Met Their Burden for Provisional Class Certification.

Critically, "plaintiffs must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23 by a preponderance of the evidence." *Small v. Allianz Life Ins. Co. of N.*

*Am.*, 122 F.4th 1182, 1197 (9th Cir. 2024) (internal quotation marks omitted), *cert. denied,* No. 24-1225, 2025 WL 1787755 (U.S. June 30, 2025). This is "a rigorous analysis." *Id.* (citation omitted). And the failure to meet "any one of Rule 23's requirements destroys the alleged class action." *Rutledge v. Elec. Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir. 1975).

Plaintiffs ask the Court to "certify two new provisional classes." Pls.' 3rd PI Mot. at 9–10. Each class must meet the requirements of Rule 23. Fed. R. Civ. P. 23(a) (defining the requirements as to "the class"). And even if the Court were to consider these subclasses, the Ninth Circuit is clear: "each subclass must independently meet the requirements of Rule 23 for the maintenance of a class action." *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981); *accord Sueoka v. United States*, 101 F. App'x 649, 652 (9th Cir. 2004) (unpublished). Plaintiffs have failed to establish, by a preponderance of the evidence, numerosity, commonality, and typicality for each class. So provisional certification is inappropriate.

### A.      Plaintiffs Have Failed to Establish Numerosity.

Based on a review of Plaintiffs' exhibits, there appear to be only fourteen putative class members. By rule, Plaintiffs must show that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). As this Court has repeatedly noted, "courts find the numerosity requirements satisfied when a class includes at least 40 members." Mem. Op. at 54 (quoting and citing *Rannis v. Recchia*, 380 F. App'x. 646, 651 (9th Cir. 2010) (unpublished)); 2nd Mem. Op. at 32. After all, 40 members would generally make joinder an impracticable mechanism for continuing litigation. On the other hand, even in the (b)(2) context, "[w]hile there is no fixed number that satisfies the numerosity requirement, as a general matter, . . . one less than twenty-one does not." *Refuerzo v. Sw. Airlines Co.*, No. 22-cv-00868-JSC, 2024 WL 4177936, at *4 (N.D. Cal. Sep. 12, 2024) (quoting *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 536 (N.D. Cal. 2012)) (considering numerosity in a (b)(2) class action); *see also Ries*, 287 F.R.D. at 536 (stating the same in the (b)(2) class action context); *see also Harik v. Cal. Tchrs. Ass'n*, 326 F.3d 1042, 1051 (9th Cir. 2003) (rejecting classes of seven, nine, and ten members because "the Supreme Court has held fifteen is too small").

Plaintiffs propose two DOE-related classes consisting of UC "researchers . . . who are named as

principal researchers, investigators, or project leaders on the grant applications" for certain terminated awards. Pls.' 3rd PI Mot. at 9–10; *see also* Second Prelim. Inj. at ¶¶ 1, 3. As the Court has already explained, and under Plaintiffs' own proposed class definitions, numerosity must be measured by the number of lead researchers identified on grant applications for terminated grants, not by the total number of individuals who may have worked on those projects in some capacity. 2nd Mem. Op. at 32. Under that metric, Plaintiffs have not established numerosity.

Plaintiffs have failed to show there are enough members to make joinder impracticable as to either of the proposed classes. Plaintiffs propose two classes as to DOE that would both include "[UC] researchers . . . who are named as principal researchers, investigators, or project leaders on the grant applications" for certain terminated grants. Pls.' Third PI Mot. At 9–10; *see also* 2nd Mem. Op. at 32. As Plaintiffs' proposed classes show, and as the Court explained in its Second Opinion, numerosity should be measured by how many class members are researchers identified on grant applications for terminated grants.2nd Mem. Op. at 32. Plaintiffs have not made an adequate showing for numerosity.

Plaintiffs first rely on a spreadsheet produced by the University of California in response to a California Public Records Act request, which appears to list UC awards from the Department of Energy that were terminated or suspended. Polsky Decl. ¶¶ 2–3, ECF No. 160 & Ex. A, ECF No. 160-1. Page 5 of Exhibit A includes columns listing "full time equivalent" (FTE) UC personnel, seemingly encompassing graduate students, undergraduates, faculty, and staff. The FTE metric appears to measure time allocation on a project, and includes entries such as "0.138" and "0.04" FTE. Without explaining their methodology, Plaintiffs assert that this chart reflects "21 Full-Time-Equivalent" researchers who "can fairly be described as Principal Investigators ("PIs") or principal researchers." *Id.* ¶ 3.

That approach is inconsistent with Plaintiffs' own class definition and this Court's prior guidance. Counting FTEs across all UC personnel on a project—many of whom devote only a small fraction of their time—does not identify individuals "named as principal researchers, investigators, or project leaders on the grant applications." Pls. Third PI Mot. at 9–10; 2nd Mem. Op. at 32. An individual with "0.04" time on a project cannot be a project leader. FTE totals thus are not the relevant metric for numerosity.

DOE instead pulled information regarding the awards listed in Exhibit A using the "Federal Award

Identifier" column, to identify UC personnel actually named as principal investigators, co-PIs, or lead researchers. *See* Declaration of Janella Davis (Davis Decl.), ¶¶ 2-13. DOE's review shows that termination or suspension letters were never issued with respect to eleven of the awards listed in Exhibit A. *Id.* ¶ 9. In addition, three listed awards that were suspended on July 30, 2025, were reinstated by a preliminary injunction in other litigation. *Id.* ¶ 12 (citing *Am. Ass'n of Univ. Professors v. Donald J. Trump.*, No. 25-cv-07864-RFL, 2025 WL 3187762 (N.D. Cal. Nov. 14, 2025)). [16] DOE's review and Plaintiffs' supporting documents show that only thirteen awards in Exhibit A are, in fact, terminated, and one award is under review and payments are currently suspended. *Id.* ¶¶ 11, 13 (listing nine terminated awards identified Exhibit A); *see also* Atanassov Decl. (listing three terminated awards also identified in Exhibit A); Bedsworth Decl. (listing one terminated award also identified in Exhibit A). [17]

Of those thirteen awards, four are identified in the declarations of named Plaintiffs, Drs. Atanassov and Bedsworth. [18] *See generally* Atanassov Decl.; Bedsworth Decl., ECF No. 157. Dr. Bedsworth and her supporting materials confirm that she is the sole principal investigator on her terminated grant. *See* Bedsworth Decl. ¶¶ 8, 11 & Ex. C, ECF No. 157-3. For numerosity purposes, that grant thus contributes only one putative class member.

Dr. Atanassov's first grant application lists himself and two additional UC researchers, Drs. Iryna Zenyuk and Vojislav Stamenkovic, as PIs. *See* Atanassov Decl. ¶ 10 & Ex. C, ECF No. 158-3. His second grant application, a subcontract on a grant with Cabot Corporation, lists himself and Dr. Zenyuk, as part of the UC team, along with three additional UC researchers who may or may not be lead researchers on the project. *See id.* at ¶ 18 & Ex. G, ECF No. 158-7. The third grant application—for the California Hydrogen Hub award to ARCHES—does not list him as a PI, co-PI, or lead researcher at all, but instead identifies him as a "Senior Advisor for Business Development and production" and lists no UC PIs, co-

---

[16] The three reinstated grants are not included in the numerosity calculation, but if included, they would add two additional putative class members. *See* Davis Decl. ¶ 12.

[17] An additional six awards listed in Exhibit A do not appear to include a Federal Award Identifier. *See* Davis Decl., ¶ 7.

[18] The four awards identified by the name Plaintiffs have the following Federal Award Identifiers: FE0032382, EE0011347, EE0010751, and DE-CD0000041. *See* Polsky Ex. A at 3; Bedsworth Decl. ¶¶ 13–15; *see also* Bedsworth Ex. C at 2 (listing FAIN as DE-FE0032382); Atanassov Decl. ¶¶ 10–34.

1    PIs, or lead researchers. *Id.* at ¶ 25 & Ex. I, ECF No. 158-9, at 46. Across these three grants, there appear

2    to be, at most, six distinct UC individuals who could qualify as putative class members, because Drs.

3    Atanassov and Zenyuk are named on multiple awards but can each count as one putative class member.

4           DOE reviewed award and application materials for the terminated awards in Exhibit A. *See* Davis

5    Decl. ¶ 13. There appear to be seven additional UC researchers who are named as PIs, co-PIs, or lead

6    researchers and thus could qualify as members of Plaintiffs' proposed DOE classes. *Id.*

7           Exhibit A seemingly supports the existence of only fourteen UC researchers who are actually

8    named as PIs, co-PIs, or lead researchers on the relevant grant applications.[19] *See* Bedsworth Decl.;

9    Atanassov Decl; Davis Decl. ¶¶ 11, 13. That number falls well below the Ninth Circuit's general

10    benchmark of approximately forty members and even below the "outer limit" generally recognized for

11    small classes of fewer than twenty-one members. *Rannis*, 380 F. App'x at 651; *Refuerzo*, 2024 WL

12    4177936, at 4 (quoting *Ries*, 287 F.R.D. at 536). Numerosity is therefore not satisfied on the basis of

13    Exhibit A.

14           Plaintiffs also rely on a November 11, 2025 email from a Berkeley National Lab researcher, Dr.

15    Adam Weber, purporting to list "34 DOE-terminated-impacted researchers." *See* Polsky Decl. ¶¶ 6 & Ex.

16    B, ECF No. 160-2. That email does not cure Plaintiffs' numerosity defect.

17           First, as with Exhibit A, most of the individuals in Dr. Weber's list are not named as PIs, co-PIs,

18    or lead researchers on terminated grants. For example, of the twenty-nine "California Hydrogen Hub-

19    related" individuals listed, only one—Dr. Atanassov—is named in the grant application, and he appears

20    not as a PI or co-PI, but in a business-development advisory role. *See* Polsky Ex. B at 3, ECF No. 160-2;

21    Atanassov Decl. Ex. I, at 46. The remainder cannot qualify as class members under Plaintiffs' own

22    proposed definitions and under the Court's prior numerosity analysis. Dr. Weber's email therefore is not

23    probative of the number of actual class members.

24

25        [19] However, this number (14) may increase. DOE is still working diligently to review the six awards listed in Exhibit A that did not include Federal Award Identifiers, and it is possible that additional

26    putative class members will be identified based on that review. *See* Davis Decl. ¶ 7. Additionally, DOE confirmed that DE-EE0010724 has been terminated, and is working diligently to pull information related

27    to that award. *See* Davis Decl. ¶ 13(h); *see also* Polsky Decl. Ex. A at 3 (citing "Sub 63650993-285652

28    (DE-EE0010724)").

Even if the Court were to assume, contrary to Plaintiffs' class definition, that any individual with some involvement in a project could be counted, Dr. Weber's email would still be insufficient. The email itself indicates that multiple individuals have "left [the] project," have "graduated," or are "former." *See* Polsky Ex. B at 2–3. Plaintiffs provide no declarations or other evidence regarding these individuals' current status, their relationship to the projects, or the extent to which their work was funded by the terminated grants. Without such evidence, Dr. Weber's email is, at most, an uncorroborated list, not a reliable basis for establishing numerosity. And "plaintiffs must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23 by a preponderance of the evidence." *Small*, 122 F.4th at 1197 (internal quotation marks omitted). Finally, Plaintiffs' contention that additional researchers, allegedly named as PIs, co-PIs, or lead researchers on terminated awards, decline to come forward because they fear retaliation (*see* Pls.' Third PI Mot. at 11), is unsupported by the record.

As noted, DOE has reviewed the UC grants and terminations identified in Exhibit A. Based on that review, there do not appear to be additional, unidentified UC researchers who are named as PIs, co-PIs, or lead researchers on terminated grants beyond the fourteen individuals already counted. *See* Bedsworth Decl.; Atanassov Decl; Davis Decl. ¶¶ 11, 13. These individuals are inherently identifiable from the face of the award and application documents; there is no hidden pool of unknown class members. Moreover, Plaintiffs' own evidence undermines their theory that individuals fear retaliation: Exhibit B to the Polsky Declaration publicly circulates a list of individuals that Dr. Weber believes may be affected, which is inconsistent with any pervasive reluctance to identify oneself. *See* Polsky Decl. & Ex. B.

Moreover, the "fear of retaliation" cases on which Plaintiffs rely are inapposite. *See, e.g.*, *Does 1-10 v. Univ. of Wash.*, 326 F.R.D. 669, 674–75 (W.D. Wash. 2018) (allowing anonymity where disclosure of involvement in fetal tissue procurement could expose plaintiffs to harassment and violence by the public); *Buttino v. Fed. Bureau of Investigation*, No. C-90-1639SBA, 1992 WL 12013803 (N.D. Cal. Sep. 25, 1992) (involving alleged employment retaliation against gay FBI employees). Those cases typically concern threats of violence, harassment, or concrete employment retaliation—none of which is present here. UC researchers are not employees of the Department of Energy, no researcher is alleged to have been targeted by DOE based on protected characteristics or the subject matter of their research, and

1  Plaintiffs have made no showing of public harassment or violence connected to participation in this

2  litigation. *Cf. PCR Distrib. Co. v. Does*, No. 2:24-CV-07453-CV-AJR, 2025 WL 819674, at *2 (C.D. Cal.

3  Feb. 7, 2025) ("In order to proceed anonymously, a plaintiff must show (1) a fear of severe harm, and (2)

4  that the fear of severe harm is reasonable." (quoting *Doe v. Kamehameha Schs.*, 596 F.3d 1036, 1043 (9th

5  Cir. 2010)), *objections overruled by*, 2025 WL 143722 (C.D. Cal. Apr. 8, 2025). And, of course, Plaintiffs

6  could have—if they truly had a basis for this fear—submitted such information under seal to this court,

7  including an attorneys-eyes only filing, as has been done in other cases. *See, e.g., AAUP v. Trump*, No.

8  25-cv-07864-RFL, Administrative Motion to File Under Seal, ECF No. 30 (N.D. Cal. October 9, 2025).

9  Accordingly, Plaintiffs' speculation about unnamed class members who purportedly fear

10  retaliation does not provide a basis to satisfy Rule 23(a)(1). In sum, there appear to be approximately

11  fourteen UC researchers who fall within Plaintiffs' own proposed class definitions. That number is far

12  below the level at which courts typically find numerosity satisfied and even below the lower bounds

13  recognized for very small classes. Plaintiffs have therefore failed to establish numerosity, and their motion

14  for class certification should be denied.

15  **B.  Plaintiffs Have Failed to Establish Commonality and Typicality.**

16  The commonality and typicality requirements of Rule 23(a) are interrelated and, in some instances,

17  merge. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 n. 5 (2011). Commonality requires that "claims

18  must depend upon a common contention . . . of such a nature that it is capable of classwide resolution."

19  *Id.* at 350. "What matters to class certification is not the raising of common 'questions' – even in droves

20  – but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the

21  resolution of the litigation." *Id.* (cleaned up). "Dissimilarities within the proposed class are what have the

22  potential to impede the generation of common answers." *Id.* (citation omitted).

23  Here, commonality and typicality are lacking for both the Third Form Termination Class and the

24  Equal Protection Class. Both proposed classes rest in part on a challenge to the termination of the

25  California Hydrogen Hub grant. As explained above, however, Plaintiffs lack standing to challenge that

26  termination. But even if they do have standing, fundamental differences in this project make the California

27  Hydrogen Hub grant neither common to, nor typical of, the circumstances of the putative class members,

28

1  and it is precisely the kind of "dissimilarit[y]" that "impede[s] the generation of common answers." *Id.*

2  (citation omitted). Plaintiffs therefore have not carried their burden to establish commonality or typicality

3  for either proposed class.

4  **IV.    Even Under the Court's Prior Reasoning, DOE Should Not be Enjoined.**

5            **A.    The Form Termination Class Should Not Apply Here.**

6            As to the Form Termination Class, the APA's committed to agency discretion by law exception

7  bars APA review for both agencies. Moreover, DOE's termination notices are sufficient to satisfy arbitrary

8  and capricious review.

9            *DOE's Decisions Were Committed to Agency Discretion by Law*

10           Withdrawal of funding is quintessential agency action "committed to agency discretion by law,"

11  for which the APA does not provide an avenue for review. 5 U.S.C. § 701(a)(2). While the APA

12  establishes a waiver of sovereign immunity and a cause of action for injunctive relief for parties adversely

13  affected by either final agency action or an agency's failure to act, *id.* §§ 702, 706(1)–(2), the waiver of

14  sovereign immunity is limited. It does not apply in circumstances where "agency action is committed to

15  agency discretion by law[,]" *id.* § 701(a)(2). Review under the APA therefore is unavailable "if the statute

16  is drawn so that a court would have no meaningful standard against which to judge the agency's exercise

17  of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

18           The Supreme Court has long recognized that an agency's determination of how to allocate

19  appropriated funds among competing priorities and recipients—precisely what Plaintiffs challenge here—

20  is classic discretionary agency action. *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). In *Lincoln*, the Court

21  explained that there is no waiver of sovereign immunity where agency action requires "a complicated

22  balancing of a number of factors which are peculiarly within [the agency's] expertise," including whether

23  "resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory

24  mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the

25  agency has enough resources to fund a program at all." *Id.* (internal quotation marks omitted). An "agency

26  is far better equipped than the courts to deal with the many variables involved in the proper ordering of its

27  priorities." *Id.* (citation omitted). The APA "gives the courts no leave to intrude" via arbitrary-and-

28

capricious review. *Id.*

The Court previously rejected application of this exception, in large part, because of the agency statutes at issue. First Mem. Op. at 34–35; 2nd Mem. Op. at 21–22. The statute for DOE is distinct, however, and leaves the DOE with complete discretion over how "the decision about how the moneys" for their program "could best be distributed." *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions "clearly require[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752 (internal quotation marks omitted). As a result, the grant funding decisions are committed to DOE's discretion.

Congress empowered DOE to make financial assistance awards in the Department of Energy Organization Act, 42 U.S.C. § 7256, which explicitly provides the Secretary with unreviewable discretion in the entry and performance of the awards:

> (a) The Secretary is authorized to enter and perform such contracts, leases, cooperative agreements, or other similar transactions with public agencies and private organizations and persons, and to make such payments (in lump sum or installments, and by way of advance or reimbursement) as he may deem to be necessary or appropriate to carry out functions now or hereafter vested in the Secretary.
>
> (b) Notwithstanding any other provision of this [title], no authority to enter into contracts or to make payments under this [title] shall be effective to such extent or in such amounts as are provided in advance in appropriations Acts.

*Id.* § 7256.

The statutes authorizing the named Plaintiffs' grants similarly show that DOE had significant discretion in administering their grant programs. For example, the statute authorizing Dr. Bedsworth's research grant delineates criteria for DOE to consider in carrying out its grant program, but notes that DOE "may take into consideration other criteria that, in the judgment of the Secretary, are necessary or appropriate to carry out this subsection." 42 U.S.C. § 16298d(j)(3)(C)(vii). The statue authorizing the California Hydrogen Hub grant is similarly permissive: it states DOE "may" award grants that "accelerate commercialization of, and demonstrate the production, processing, delivery, storage, and end-use of, clean hydrogen." 42 U.S.C. § 16161a(c)(4). These statutes thus vest DOE with significant discretion to decide

1  "how the moneys" for their program "could best be distributed." *Milk Train, Inc*., 310 F.3d at 751.[20]

2  In sum, DOE termination decisions are not subject to APA review, and the Form Termination

3  Class fails as to DOE. At the very least, the broad statutory discretion means the Court can only provide

4  very limited review tied solely to compliance with Section 200.341. And the agencies complied with the

5  import of Section 200.341 in written notices of termination.

6  *DOE's Terminations Were Not Arbitrary and Capricious*

7  The arbitrary and capricious standard "requires that agency action be reasonable and reasonably

8  explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "Judicial review under that

9  standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Id*.

10  DOE's detailed termination letters satisfy the arbitrary and capricious framework. First, all of the

11  grants list three agency policies that the projects failed to adhere to, including ensuring that the projects

12  are (1) financially sound and economically viable; (2) aligned with national and economic security

13  interests; and (3) consistent with Federal law and this Administration's policies and priorities and program

14  goals and priorities. First Termination Letter at 1, Bedsworth Ex. D, ECF No. 157-4; Second Termination

15  Letter at 1, Atanassov Decl. Ex. E; ECF No. 158-5; Third Termination Letter at 1, Atanassov Decl. Ex.

16  H, ECF No. 158-8, Fourth Termination Letter at 1, Atanassov Decl. Ex. M, ECF No. 158-13. All four

17  letters clarify that the reason for the termination was a determination, upon an individualized review of

18  the grant agreement, that "this project is not consistent with this Administration's goals, policies, and

19  priorities." *Id*. Two letters clarify that the projects did not further the Department of Energy's goals of

20  providing energy that is affordable, reliable, and plentiful enough to meet rising demand and respond to

21  the national emergency declared under Executive Order 14156. *See* Second Termination Letter, at 1; Third

22  Termination Letter, at 1. One letter clarifies that the department determined the grant's purposes "provide

23  no tangible economic benefit" and "may raise natural gas prices if deployed at scale." First Termination

24

---

25  [20] Defendants preserve their previously raised argument that the fact that regulations provide for
termination in accordance with agency priorities does not limit this discretion. ECF No. 126 at 18–19.

26  Even if the regulations provided a meaningful standard for review, 2 C.F.R. § 200.341 merely sets a
reference point for review of compliance with its three elements—reasons for termination, effective date,

27  and portion of the award—while the agency's informed judgment on priorities remains unreviewable.
Here, DOE's termination letters met these criteria, so no violation occurred.

28

Letter, at 1. And the California Hydrogen Hub letter states that a Portfolio Review Process Committee "has conducted an individualized review and analysis" and the project "did not pass Standards" of the Committee review. Fourth Termination Letter, at 1. In sum, these letters more than suffice under the arbitrary and capricious standard. They clearly explain DOE's termination decisions were based on an explained, individualized review, and were accordingly not arbitrary or capricious.

While it is true that the agency did not explicitly consider reliance interests, that should not lead this Court to conclude the decision was arbitrary and capricious. An agency need only consider reliance interests to the extent warranted in each instance. *See Smiley v. Citibank (S.D.)*, 517 U.S. 735, 742 (1996) (requiring agencies to consider "legitimate reliance"). The termination provision cited by DOE permitted a mid-stream termination and citing the provision is sufficient. *See, e.g., Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1134 (D.C. Cir. 1995) (discussing how the need to explain varies with context).

**B.    The Terminations Are Not Contrary to Law under the APA.**

Plaintiffs argue that DOE acted contrary to the statutes the named Plaintiffs' grants. Plaintiffs specifically point to the statutes authorizing DOE's discretionary decisions to award Dr. Bedsworth's research grant and the California Hydrogen Hub grant. Pls.' Third PI Mot. at 16–17.

The statute providing DOE with discretion to award Dr. Bedsworth's grant directs DOE to fund "eligible projects" and sets out criteria to consider, but explicitly grants DOE discretion in determining eligibility. *See* 42 U.S.C. § 16298d(j)(3)(C)(vii) ("The Secretary may take into consideration other criteria that, in the judgment of the Secretary, are necessary or appropriate to carry out this subsection."). Similarly, the statute authorizing the California Hydrogen Hub grant lists several criteria DOE must consider but also makes clear that grant administration is at DOE's discretion. *See* 42 U.S.C. § 16161a(c)(3)(F) ("The Secretary may take into consideration other criteria that, in the judgment of the Secretary, are necessary or appropriate to carry out this subchapter.").

In short, DOE was statutorily permitted to exercise discretion in evaluating which criteria are appropriate, including whether a program advances broader DOE priorities. Moreover, these grant statutes must be read in light of the general authority Congress delegated to DOE, allowing the Department to enter into grants it "may deem to be necessary or appropriate to carry out functions now or hereafter vested

in the Secretary." 42 U.S.C. § 7256.

### C.     The Equal Protection Class Should Not Apply.

Plaintiffs have not demonstrated that they are likely to prevail on their Fifth Amendment equal protection claims with respect to the Equal Protection Class. Plaintiffs argue that the terminations are unconstitutional because they were motivated by animus against so-called Blue States (despite the fact that no "Blue States" are parties to this litigation). Pls.' Third PI Mot. at 21–23.

It is black letter law that "[t]he word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union." *South Carolina v. Katzenbach*, 383 U.S. 301, 323 (1966); U.S. Const. amend. XIV, § 1 ("No State shall make or enforce any law which shall . . . deny to any *person* within its jurisdiction the equal protection of the laws.") (emphasis added). So Plaintiffs' argument fails, because States are not protected by the Equal Protection Clause and partisan considerations do not evidence animus.

And as Plaintiffs appear to recognize, terminations are only subject to rational-basis review. *See* Pls.' Third PI Mot. at 19–20 (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)) (acknowledging that the relevant standard is whether the government can point to "a rational reason" for the difference in treatment). "Rational-basis review affords the policy choices of the political branches 'a strong presumption of validity.'" *Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 395 (D.C. Cir. 2022) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993). In order for Plaintiffs to satisfy this "demanding standard," they must demonstrate that "no conceivable set of facts could support the challenged policy." *Id.* at 395–96. The government's action is constitutional so long as it is "plausibly related to the Government's stated objective." *Trump v. Hawaii*, 585 U.S. 667, 704–05 (2018).

Here, the terminations are rationally related to a legitimate government interest. The Government has a legitimate interest in administering federal programs consistent with program goals set by a democratically elected political branch. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 59 (1983) ("A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations.") (Rehnquist, J., concurring in part and dissenting in part) (cited favorably in

*Biden v. Texas*, 597 U.S. 785, 812 (2022)). And the terminations were made pursuant to the DOE's contractual authority under 2 C.F.R. 200.340(a)(4) to terminate awards that "no longer effectuate[] the program goals or agency priorities." With respect to individual terminations, the agency explained how the termination was based on appropriate policy considerations. *See, e.g.*, First Termination Letter at 1 (terminating Plaintiffs' grant on the basis that it "does not effectuate the Department of Energy's priorities of ensuring affordable, reliable, and abundant energy to meet growing demand and/or addresses the national emergency declared pursuant to Executive Order 14156"). Thus, the termination of the awards was rationally related to the Government's interest in effectuating its goals and priorities.

Plaintiffs argue that the terminations are unconstitutional if animus was "not the sole, or even the primary, factor," but just one "motivating factor[.]" Pls.' Third PI Mot. at 20. Binding Supreme Court precedent forecloses this argument. Under *Trump v. Hawaii*, the question is whether the challenged actions "can reasonably be understood to result from a justification independent of unconstitutional grounds," not whether animus is one motivating factor. 585 U.S. at 705; *see also Trump v. Orr*, ---S. Ct. ---, 2025 WL 3097824, at *1 (U.S. Nov. 6, 2025) (holding that Plaintiffs were unlikely to prevail on the merits of an animus claim where they had failed to establish that the Government's decision "lack[s] any purpose other than a bare . . . desire to harm a politically unpopular group" (quoting *Hawaii*, 585 U.S. at 705)). Because, as explained above, the terminations satisfy rational basis review, the terminations are constitutional.

Even if "animus" in a colloquial sense had been the purpose of the terminations, it was not the type of animus that the Constitution prohibits. Plaintiffs do not allege that the Defendants had animus against the grantees (or the Plaintiffs themselves). Rather, their allegations of animus pertain to *States*, which are not protected by the Equal Protection Clause. Plaintiffs argue that terminations were motivated by a "bare desire to harm a politically unpopular group[.]" *See* Pls.' Third PI Mot. at 20–21. This putatively "politically unpopular group" consists of so-called "Blue States," as defined by Plaintiffs—separate sovereign entities with structural roles in the constitutional process. Defendants are not aware of any case that has ever concluded that sovereign states can be a "politically unpopular group" for purposes of equal protection. Indeed, the cases Plaintiff rely on involve the litigation of rights of individual entities. *See U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) (individuals who live in housing with people to

1   whom they are not related); *United States v. Windsor*, 570 U.S. 744, 770 (2013) (same-sex couples); *City*

2   *of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) (individuals with mental disabilities); *Perkins*

3   *Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 168 (D.D.C. 2025). As stated above, states, unlike

4   the individuals in those cases, are political and sovereign entities and do not, themselves, have equal

5   protection rights. U.S. Const. amend. XIV, § 1 ("No State shall make or enforce any law which shall . . .

6   deny to any *person* within its jurisdiction the equal protection of the laws.") (emphasis added). It is

7   therefore impossible for the federal government to direct unconstitutional animus against States in

8   violation of equal protection. This makes sense: animus caselaw is about groups that may lack the ability

9   to represent their interests; the States are necessary players in our federal system of government, with

10   innumerate abilities to represent their interests. Indeed, California has the most members of Congress of

11   any State in the Union.

12        But even assuming that animus directed at States, rather than at the grantees themselves, could

13   form the basis for Plaintiffs' claims with regard to these grant terminations, the evidence Plaintiffs cite

14   does not establish animus. Plaintiffs cite statements by Director Vought and President Trump referencing

15   funding for "the Left's climate agenda" and "cutting programs that [Democrats] like." Pls.' Third PI Mot.

16   at 21. However, emphasizing these statements misses the effect of the terminations, which implicate 49

17   States—including a host of congressional districts represented by Republicans—as well as previous grant

18   terminations that cut billions of dollars from "Red States."[21]  Ultimately, it is a core feature of the

19   American political system that a president will enact policies favored by his party and that may be

20   disfavored by the opposing party. Statements to that effect are not evidence of unconstitutional animus

21   towards the opposing party (much less, as relevant here, States that may support the President to a lesser

22   extent than other States); rather, they are a routine expression of the political process. Such an extreme

23   position would render many government actions at the federal and state level unconstitutional. Courts

24   have recognized that consideration of partisan politics by the political branches does not violate the Equal

25

26   [21] EFI Foundation, *Unpacking DOE's October Award Cancellations* at fig. 8 (Oct. 23, 2025),

27   https://efifoundation.org/wp-content/uploads/sites/3/2025/10/EFI-Foundation-Unpacking-DOEs-
  October-Award-Cancellations.pdf.

28

  FED. DEFS.' OPP'N TO PLS.' MOT. FOR LEAVE TO AMEND AND THIRD PRELIM. INJUNCTION MOT.
  CASE NO. 25-CV-4737

Protection Clause. For example, in the context of districting, the Supreme Court has held that government consideration of a jurisdiction's political partisanship is insufficient to establish an equal protection violation. *Rucho v. Common Cause*, 588 U.S. 684, 701 (2019) (explaining that political partisanship can be taken into account when drawing congressional districts without violating the Equal Protection Clause); *see also Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 12 (1982) (holding that the use of political party to determine appointments did not violate equal protection).

Further, political considerations are routine when it comes to spending federal funds. For purposes of constitutional challenges, the administration of a discretionary federal subsidy program is fundamentally different from direct state interference with a particular activity. *See, e.g.*, *United States v. Am. Libr. Ass'n,*, 539 U.S. 194, 211 (2003) (rejecting constitutional challenge to condition on federal funding of libraries requiring installation of software blocking obscene images, and explaining that "[a] refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity" (citation omitted)). And political actors have funneled federal funds based on political or geographical conditions for decades, as longstanding debates over "earmarks" and "pork barrel" spending make clear. *See, e.g.*, Andrew H. Sidman, Pork Barrel Politics: How Government Spending Determines Elections in a Polarized Era (2019); Tyler Cowen, *Congress Needs to Bring Back Earmarks*, Bloomberg (Jan. 9, 2018);[22] Jonathan Allen, *The Case for Earmarks*, Vox (June 30, 2015);[23] Diana Evans, Greasing the Wheels: Using Pork Barrel Projects to Build Majority Coalitions in Congress (2004).

When the political branches exercise their authority under the Spending Clause to make discretionary funding decisions, they "make allocations from a finite pool of resources," and judicial review of such decisions "must be deferential." *Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 485 U.S. 360, 373 (1988). It has long been established practice that in making discretionary funding decisions, Congress and the executive branch may earmark certain funds or engage in "pork barrel" spending that benefits entities residing in one geographical location over another, and that

---

[22] https://www.bloomberg.com/view/articles/2018-01-09/congress-needs-to-bring-back-earmarks.

[23] https://www.vox.com/2015/6/30/8864869/earmarks-pork-congress.

1    such decisions may take political interests into account. If Plaintiffs' equal protection challenge had merit,

2    then every entity that lost out on such an appropriation or an earmark when arguably similar groups

3    received funds would have an equal protection claim. But that is not the law. *See, e.g.*, *Am. Bus Ass'n v.*

4    *Rogoff*, 649 F.3d 734 (D.C. Cir. 2011). In *American Bus Association*, although federal law prohibited

5    funding to public transportation systems outside the urban area they regularly service, a congressional

6    appropriations amendment disallowed funding for agency enforcement of this restriction solely as to one

7    entity—Seattle's public transportation system—for the purpose of allowing special local bus service to

8    Seattle Mariners baseball games. *Id*. at 735–36. Applying rational basis review, the D.C. Circuit rejected

9    an equal protection challenge to this congressional appropriation allowing subsidization of one bus

10   company but not others. *Id*. at 741–43.

11       Similarly, here, it is undisputed that DOE's discretionary spending decisions are subject only to

12   rational basis review, even if—as Plaintiffs allege—the effect of a swath of those decisions results in some

13   entities receive funding while other arguably similar entities do not.   And as explained above, Plaintiffs

14   are unlikely to succeed on their equal protection claim because DOE's termination decisions satisfy

15   rational basis review. *See also XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 75–78 (D.D.C.

16   2015) (dismissing equal protection claim because even if clean-energy vehicle manufacturers had been

17   denied DOE loan due to the agency's desire to preserve funds for "government-favored companies," that

18   would not overcome the rationality of the government's explanation).

19   **V.    Plaintiffs Have Not Shown Irreparable Injuries, and the Balance of the Equities Weighs in**
20        **the Government's Favor.**

21       Finally, irreparable harm and the balance of the equities counsel against issuing an additional

22   injunction. "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide

23   complete relief to the plaintiffs" before the court. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And

24   "mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not

25   enough." *See Sampson v. Murray*, 415 U.S. 61, 90 (1974); *see also Faculty Senate of Fla. Int'l Univ. v.*

26   *Winn*, 477 F. Supp. 2d 1198, 1208 (S.D. Fla. 2007) ("There is no irreparable harm here because the

27   plaintiffs can fund the desired travel themselves and then, if they prevail in this suit, obtain reimbursement.

28   In other words, the harm is financial."). Plaintiffs' alleged harms are necessarily financial and insufficient

for irreparable harm. As for the balance of the equities, the Supreme Court in *California* and *NIH* squarely explained that it favors the Federal Government in this context. The public interest is harmed when the United States is forced to pay out funds that it may not be able to recover. *NIH,* 145 S. Ct. at 2658; *see also California*, 604 U.S. at 651–52. The Court recently clarified that such reasoning is binding on the lower courts. *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) ("Although our interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases.").

## VI.    Injunctive Relief Should Be Stayed Pending Appeal and Be Accompanied by a Bond.

To the extent the Court expands injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

Defendants also respectfully request that any additional injunctive relief accompany a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A bond is appropriate here given that any preliminary relief would potentially mandate that the Executive spend money that may be lost forever once distributed. *NIH*, 145 S. Ct. at 2658; *California*, 604 U.S. at 651-52.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for leave to amend their complaint a third time, and for a preliminary injunction as to DOE.

DATED: December 8, 2025                    Respectfully submitted,

                                           BRETT A. SHUMATE
                                           Assistant Attorney General
                                           Civil Division

                                           ERIC J. HAMILTON
                                           Deputy Assistant Attorney General

                                           JOSEPH E. BORSON
                                           Assistant Branch Director

FED. DEFS.' OPP'N TO PLS.' MOT. FOR LEAVE TO AMEND AND THIRD PRELIM. INJUNCTION MOT.
CASE NO. 25-CV-4737

1

2                                                          */s/ Kathryn Barragan*

3                                                          KATHRYN BARRAGAN (D.C. Bar No. 90026294)
                                                           Trial Attorney, U.S. Department of Justice
4                                                          Civil Division, Federal Programs Branch
                                                           1100 L Street, N.W.
5                                                          Washington, D.C. 20005
                                                           Tel.: (202) 598-7696
6                                                          Email: kathryn.e.barragan@usdoj.gov

7                                                          JASON ALTABET (Md. Bar No. 2211280012)
                                                           Trial Attorney, U.S. Department of Justice
8                                                          Tel.: (202) 305-0727
                                                           Email: jason.k.altabet2@usdoj.gov
9

10                                                         *Attorneys for the United States*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28