Erwin Chemerinsky (*pro hac vice*)
echemerinsky@law.berkeley.edu
Claudia Polsky (CA Bar No. 185505)
cpolsky@law.berkeley.edu
U.C. BERKELEY SCHOOL OF LAW
Law Building
Berkeley, CA 94720-7200
Telephone: 510.642.6483

Elizabeth J. Cabraser (CA Bar No. 83151)
ecabraser@lchb.com
Richard M. Heimann (CA Bar No. 63607)
rheimann@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000

Anthony P. Schoenberg (CA Bar No. 203714)
tschoenberg@fbm.com
Donald E. Sobelman (CA Bar No. 184028)
dsobelman@fbm.com
Linda S. Gilleran (CA Bar No. 307107)
lgilleran@fbm.com
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, CA 94104
Telephone: 415.954.4400

*Attorneys for Plaintiffs and the Proposed Classes*
[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NEETA THAKUR, *et al.*, | Case No. 3:25-cv-4737 |
| Plaintiffs, | |
| v. | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION AS TO DEPARTMENT OF ENERGY** |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |

46686\20771427.7

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................1

I.     PLAINTIFFS HAVE STANDING ..............................................................................1

II.    THE PROPOSED DOE CLASSES SATISFY ALL APPLICABLE REQUIREMENTS OF RULE 23 ..........................................................................3

    A.    The Proposed DOE Classes Are So Numerous That Joinder of All Members Is Impracticable. ..................................................................................4

    B.    The Proposed Classes Satisfy Typicality and Commonality. ...................................6

III.   THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION AS TO DOE.............7

    A.    Plaintiffs Are Likely To Succeed on Their APA Claims. ...........................................7

        1.    DOE's Grant Terminations Are Contrary to Law Under the APA. ...............7

        2.    DOE's Terminations Are Arbitrary and Capricious Under the APA.............9

        3.    DOE's Actions Are Not Committed to Agency Discretion. .........................9

    B.    Plaintiffs Are Likely to Succeed on Their Equal Protection Claim. .......................10

        1.    The Government Does Not Contest That It Selectively Terminated Grants in October Because the Awardees Are Located in Blue States. .....................................................................................................10

        2.    Terminating Grants Exclusively in Blue States Violates the Fifth Amendment's Equal Protection Guarantee ...................................................11

            a.    The Differential Treatment of Grantees in Blue States Is Not Rationally Related to Any Legitimate State Interest.......................11

            b.    The Terminations Violate Equal Protection Regardless of the Governing Standard for Animus Claims .........................................13

    C.    The Balance of Equities and Public Interest Favor Plaintiffs. ...............................14

IV.   THE COURT SHOULD DENY DOE'S REQUEST FOR A STAY, AND NO ADDITIONAL BOND IS NECESSARY ...................................................................15

CONCLUSION ...............................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*A. B. v. Hawaii State Dep't of Educ.*,
  30 F.4th 828 (9th Cir. 2022) ........................................................................4

*In re Aiken Cnty.*,
  725 F.3d 255 (D.C. Cir. 2013) ......................................................................8

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*,
  462 U.S. 87 (1983) ........................................................................................9

*California v. U.S. Dep't of Educ.*,
  132 F.4th 92 (1st Cir. 2025) ..........................................................................9

*Chinitz v. Intero Real Est. Servs.*,
  2020 WL 7391299 (N.D. Cal. July 22, 2020) ...............................................4

*City of Cleburne v. Cleburne Living Ctr., Inc.*,
  473 U.S. 432 (1985) ...............................................................................12, 14

*Civil Rights Educ. & Enf't Ctr. v. Hosp. Properties Tr.*,
  317 F.R.D. 91 (N.D. Cal. 2016), *aff'd*, 867 F.3d 1093 (9th Cir. 2017) .......4

*Department of Education v. California*,
  604 U.S. 650 (2025) .....................................................................................15

*DHS v. Regents of the University of California*,
  591 U.S. 1 (2020) .........................................................................................14

*Diamond Alternative Energy, LLC v. Environmental Protection Agency*,
  606 U.S. 100 (2025) ...................................................................................2, 3

*Doe #1 v. Trump*,
  335 F.R.D. 416 (D. Or. 2020) .......................................................................4

*Fiallo v. Bell*,
  430 U.S. 787 (1977) .....................................................................................13

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) .........................................................................6

*Heffernan v. City of Paterson*,
  578 U.S. 266 (2016) .....................................................................................12

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) .......................................................................15

ii

*Jackson v. Danbury*,
   240 F.R.D. 145 (D. Del. 2007)........................................................................4

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ......................................................................................2

*Monterey Mech. Co. v. Wilson*,
   125 F.3d 702 (9th Cir. 1997)........................................................................15

*National Institutes of Health v. American Public Health Ass'n*,
   145 S. Ct. 2658 (2025) ................................................................................15

*Nightingale v. U.S. Citizenship & Immigration Servs.*,
   333 F.R.D. 449 (N. D. Cal. 2019) .................................................................4

*People v. Garcetti*,
   No. LA CV 21-06003-DOC (KES), 2025 WL 819666 (C.D. Cal. Feb. 26, 2025)....................2

*Police Dep't of Chicago v. Mosley*,
   408 U.S. 92 (1972) ......................................................................................11

*Romer v. Evans*,
   517 U.S. 620 (1996) ...............................................................................12, 14

*Rucho v. Common Cause*,
   588 U.S. 684 (2019) ....................................................................................12

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
   802 F. Supp. 2d 1125 (C.D. Cal. 2011)...........................................................2

*Sueoka v. United States*,
   101 F. App'x 649 (9th Cir. 2004)...................................................................4

*Thakur v. Trump*,
   148 F.4th 1096 (9th Cir. 2025)......................................................1, 9, 10, 15

*Thakur v. Trump*,
   2025 WL 2696424 (N.D. Cal. Sept. 22, 2025)................................................15

*Thakur v. Trump*,
   787 F. Supp. 3d 955 (N.D. Cal. 2025) (Dkt. 54)....................................2, 3, 15

*Thakur v. Trump*,
   No. 25-4249 (9th Cir. Aug. 26, 2025)........................................................1, 15

*Trimble v. Gordon*,
   430 U.S. 762 (1977) ....................................................................................11

*Trout Unlimited v. Pirzadeh*,
   1 F.4th 738 (9th Cir. 2021)...........................................................................10

46686\20771427.7

PLAINTIFFS' REPLY ISO MOTION FOR PRELIM. INJUNCTION
& CLASS CERTIFICATION AS TO DOE - Case No. 3:25-cv-04737

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ...................................................................................13, 14

*Trump v. Orr*,
    No. 25A319 (U.S. Nov. 6, 2025) (per curiam order) ...................................................14

*U.S. Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973) ...................................................................................11, 14

*United States v. Windsor*,
    570 U.S. 744 (2013) ...................................................................................12

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ...................................................................................14

## FEDERAL STATUTES

42 U.S.C.
    § 7256 ...................................................................................8
    § 16161a(a)-(d) ...................................................................................8
    § 16298d ...................................................................................8

## FEDERAL RULES AND REGULATIONS

Fed. R. Civ. P. 23 ...................................................................................3, 7

2 C.F.R. §§ 200.340, 200.341, 200.343, and 200.345 ...................................................9

## OTHER AUTHORITIES

*Newberg and Rubenstein on Class Actions* (6th ed. 2025) ...................................................4

Wirtz & Clement, *Both sides of the pork trough*, Fed. Reserve Bank of Minneapolis
    (Mar. 1, 2008) *available at* https://perma.cc/8N9T-AWP6 ...................................................12

Latitude Media (Oct. 2, 2025), https://perma.cc/B9F7-483X ...................................................11

OCED, *Awardee Fact Sheet: California Clean Hydrogen Hub* (July 2024),
    *available at* https://www.energy.gov/sites/default/files/2024-
    07/H2Hubs%20ARCHES_Award%20Fact%20Sheet.pdf ...................................................7

# INTRODUCTION

The issues presented in Plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification ("Motion") are largely identical to those already decided in this case. The facts differ only as to the government's increasing brazenness and animus: the Department of Energy's ("DOE") October 2025 grant terminations totaled $7.5 billion, including up to $1.2 billion for the Alliance for Renewable Clean Hydrogen Energy Systems ("ARCHES") hydrogen hub project. The purpose of these terminations, made explicit by both Office of Management and Budget Director Russell Vought and President Trump, was to punish their political opposition in Blue States, while leaving identical programs in Red States untouched, due solely to partisan animus.

The government does not deny any of these facts. Indeed, it embraces them, arguing once again that the Executive enjoys unfettered power to allocate federal funds in any way it pleases, even if it means terminating billions of dollars in already-promised research funding, *en masse*, via form letter, for the express purpose of punishing citizens of States that cast votes for the President's political opponents. The government is wrong. As with the other Defendants, DOE's terminations are contrary to law and arbitrary and capricious in violation of the Administrative Procedure Act ("APA"). Additionally, they violate Plaintiffs' Fifth Amendment rights to equal protection under the laws.

The Opposition offers no meritorious factual or legal reasons to oppose certification of the proposed classes, or to delay issuing an injunction that would prevent further harm to Plaintiffs and the class. Plaintiffs respectfully request that their Motion be granted.

# ARGUMENT

## I.    PLAINTIFFS HAVE STANDING[1]

The government urges that Plaintiffs lack standing only as to the ARCHES grant

---

[1] The government "preserve[s] and re-assert[s]" its arguments that Plaintiffs lack standing as non-parties to the grants. Opp. at 12 n. 15. This argument has been thoroughly briefed and rejected by both this Court and the Ninth Circuit. *See* Dkt. 54 at 41-43; *Thakur v. Trump*, 148 F.4th 1096, 1104-05 (9th Cir. 2025). Plaintiffs incorporate by reference their previous responses on this issue, as well as the Courts' holdings. *See* Dkt. 40 at 5-8; *Appellees' Answering Br.*, Dkt. 45.1 at 32, *Thakur v. Trump,* No. 25-4249 (9th Cir. Aug. 26, 2025).

46686\20771427.7

termination.[2] In so doing, it misreads the Court's prior ruling on standing. As the Court explained, "Article III requires a plaintiff to answer [only] a basic question: 'What's it to you?'" *Thakur v. Trump*, 787 F. Supp. 3d 955, 992 (N.D. Cal. 2025) (Dkt. 54).

Dr. Atanassov, one of ten listed Co-Principal Investigators for the ARCHES project, has an immense personal stake in his claims against DOE. Declaration of Plamen Atanassov ("Atanassov Decl.) ¶ 24. DOE's termination of the ARCHES project has disrupted his research and career. It has lost him partnerships that took him years to cultivate; cost him future opportunities to innovate in the laboratory and serve in leadership roles (*e.g.*, Senior Advisor for Business Development to ARCHES); and deprived him of the opportunity to develop a new Hydrogen Technology Certification that would have been "a significant career achievement." *Id*. ¶¶ 36-37. There is also the impact on the taxpaying public, which has lost the benefit of research investment into the project to date. *Id.* ¶¶ 38-39. The Court's first Preliminary Injunction Order already found these same types of harms "are concrete and actual, and the harm to Plaintiffs can be redressed by a reversal of the allegedly illegal grant terminations." *See* Dkt. 54 at 41. So too here.

The government is incorrect to imply that a Plaintiff's own research must have been "**the** 'object' of agencies' cancellation decisions," rather than the ARCHES project more broadly, in order to have standing. Opp. at 12 (emphasis added). This misunderstands the standard in the Court's first Preliminary Injunction Order, as drawn from *Diamond Alternative Energy, LLC v. Environmental Protection Agency*, 606 U.S. 100 (2025).[3] Regardless, the Court in *Diamond* did

_____

[2] The government **does not** argue that Drs. Atanassov and Bedsworth lack standing to challenge the non-ARCHES grant terminations, leaving the issue of standing as to those grants conceded. *See* Opp. at 12-13; *People v. Garcetti*, No. LA CV 21-06003-DOC (KES), 2025 WL 819666, at *9 (C.D. Cal. Feb. 26, 2025) ("Courts in this District, and many others, have found that a failure to address an argument in opposition briefing constitutes a concession of that argument."); *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) ("[I]n most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue.").

[3] "**The** object" is not the standard: this Court and the Supreme Court held that "if a plaintiff is '**an** object of the action (or forgone action) at issue,' then 'there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" *Diamond*, 606 U.S. at 112 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992)) (all emphasis added); *see Thakur*, 787 F. Supp. 3d at 994.

46686\20771427.7

not even rely on the "object of the action" rationale to find standing for the plaintiff fuel producers there (just as this Court did not in its first Preliminary Injunction Order). In *Diamond*, the Court found that even if the automakers were the *only* object of the challenged regulations, a traditional causation and redressability analysis demonstrated that the government's regulations "may be likely to cause injuries to other linked businesses." *Id.* at 116 (citations modified). The plaintiff fuel producers had standing under "commonsense economic principles," because the regulation of the automakers would "likely cause downstream or upstream economic injuries to others in the chain, such as producers of gasoline and other liquid fuels." *Id.* at 117. "It may not be certain, but it is at least 'predictable' that invalidating the California regulations would likely result in the fuel producers ultimately selling more gasoline and other liquid fuels." *Id.* at 124.

The same is true here. The ARCHES project termination was not just "likely" but certain "to cause injuries to other linked [parties]": in this case, to hydrogen fuel cell researchers like Dr. Atanassov, who relied upon the ARCHES project to "unleash dramatic growth in hydrogen production and consumption," and for whom such growth would have been research-sustaining. Atanassov Decl. ¶¶ 24, 38. Under "commonsense economic principles," the ARCHES project termination "cause[d] downstream [] economic injuries to others in the chain," by broadcasting the United States' lack of support for clean hydrogen. *Id.* at ¶ 38. Here, Plaintiffs would have standing even if the grant terminations were directed solely to the overall ARCHES project, because the terminations will "likely" have a "predictable effect" on the continued funding of Dr. Atanassov's and other class members' research into hydrogen technology, as well as their career prospects in this field. *Thakur*, 787 F. Supp. 3d at 995; *Diamond*, 606 U.S. at 124.

Plaintiffs have standing to pursue their claims against DOE.

## II. THE PROPOSED DOE CLASSES SATISFY ALL APPLICABLE REQUIREMENTS OF RULE 23

The government challenges two elements of class certification: numerosity and commonality/typicality. Neither challenge has merit.

**A.**  **The Proposed DOE Classes Are So Numerous That Joinder of All Members Is Impracticable.**

According to the government, the proposed DOE classes cannot satisfy Fed. R. Civ. P 23(a)(1) because there are fewer than 20 class members. Opp. at 14 (acknowledging that courts may certify a Rule 23(b)(2) class with only 21 members). This argument fails as a matter of law and fact.

Rule 23(a)(1) is "an impracticability-of-joinder rule, not a strict numerosity rule." Introduction to Rule 23(a)(1)—Impracticability of joinder, 1 *Newberg and Rubenstein on Class Actions* § 3:11 (6th ed. 2025). And while courts often use a rule-of-thumb threshold—typically between 20 and 40 class members—there is no "clear formula" or "magic number" to establish impracticability. *Id.* In injunctive and declaratory relief cases, "the practical value of joining *each* of the [ ] class members as a formal party is slim to non-existent and is plainly outweighed by the substantial logistical burdens that would entail." *A. B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 837 (9th Cir. 2022). Thus, for Rule 23(b)(2) classes, "the numerosity requirement is relaxed." *Chinitz v. Intero Real Est. Servs.*, 2020 WL 7391299, at *8 (N.D. Cal. July 22, 2020) (citing *Civil Rights Educ. & Enf't Ctr. v. Hosp. Properties Tr.*, 317 F.R.D. 91, 100 (N.D. Cal. 2016), *aff'd*, 867 F.3d 1093 (9th Cir. 2017); *Jackson v. Danbury*, 240 F.R.D. 145, 147-48 (D. Del. 2007) (numerosity met by class of 16 members in injunctive relief action).[4]

Rule 23(b)(2), by design, protects those at risk of harm from the ongoing violative conduct that a classwide injunction halts. These are the "future" members of a Rule 23(b)(2) class who cannot be identified or enumerated, and the reason that for Rule 23(b)(2) classes the Rule 23(a)(1) factor is not a counting game. *See, e.g.*, Fed. R. Civ. P. 23(b)(2) advisory committee's note; *1 Newberg and Rubenstein on Class Actions* § 3:12 (6th ed.). The government cites a handful of

---

[4] *See also, e.g.*, *Doe #1 v. Trump*, 335 F.R.D. 416, 431 (D. Or. 2020) (citing *Sueoka v. United States*, 101 F. App'x 649, 653 (9th Cir. 2004)) ("[W]hen plaintiffs seek injunctive or declaratory relief, 'the numerosity requirement is relaxed and plaintiffs may rely on the reasonable inference arising from plaintiffs' other evidence that the number of unknown and future members [of the proposed class] is sufficient to make joinder impracticable"); *Nightingale v. U.S. Citizenship & Immigration Servs.*, 333 F.R.D. 449, 457 (N. D. Cal. 2019) (similar).

4

46686\20771427.7

cases for the contrary proposition (Opp. at 14), but none of them actually held that it would be inappropriate to certify a Rule 23(b)(2) class with fewer than 21 members.

Regardless—and although the precise number of class members is not yet known—there are certainly more than 20, and likely more than 40. To recap: Plaintiffs submitted evidence identifying at least 21 UC researchers associated with non-ARCHES DOE grants awarded to a UC campus (Polsky Decl., Ex. A), and an additional 29 researchers associated with ARCHES (*id.*, Ex. B). As to the non-ARCHES class members, the government counts just 14, but by its own admission, this tally is incomplete as to six grants and completely excludes any class members associated with a seventh. Opp. at 17 n.19; Davis Decl. ¶¶ 7, 13. And, although DOE could have conducted a more fulsome analysis of its own grant records, its count is limited to a spreadsheet that Plaintiffs obtained from the UC through a public records request that is demonstrably incomplete. That list excludes, as just three examples found through additional research, Grant #DE-FOA-0003213 81.087 and #DE-EE0011656 to Dr. Jacob Brouwer at UC Irvine and Grant #DE-FE0032667 to Dr. Fudong Liu at UC Riverside.[5]

But that's not all. The government also significantly undercounts the number of proposed class members associated with each terminated grant. As one example, the government attributes just one class member to Dr. Bedsworth's CALDAC grant, but Dr. Bedsworth's declaration and attached materials explain that this grant included "additional researchers from UC Berkeley," funding for a "Project Manager" (also from UC Berkeley), as well as a sub-award to UC's Lawrence Berkeley National Laboratory that at bare minimum encompasses at least one UC researcher. Bedsworth Decl. ¶¶ 10-11, Ex. C. The government's non-ARCHES estimate of 14 class members is plainly only a small fraction of the total.

The ARCHES project adds many more. The government notes that five of the 29 ARCHES researchers may no longer work on the project, and argues that the remaining 24 should be disregarded because their individual names may not appear in the initial grant materials. Opp.

---

[5] Dr. Liu's grant is included on DOE's spreadsheet of 321 terminated Blue-State awards, sent to Congress on or around October 2, 2025. *See* McLorg Decl. ¶ 3 and Ex. A (spreadsheet reflecting those 321 terminated awards; Dr. Liu's is the grant to UC Riverside in Row 109).

at 17-18. But this reflects both a misunderstanding (or misdescription) of grant applications for complex, multi-year projects, and an overly restrictive reading of the class definition. Grant applications commonly describe roles contemplated to effectuate the research without naming all the specific individuals, particularly since those individuals may not have been identified at the time of the application. All 24 UC researchers still working on the ARCHES project are directors, scientists, or graduate-level students—precisely the kind of "principal researchers, investigators, and project leaders" contemplated in the class definitions. Dkt. 55, 134. They are members of the proposed class.

With all this in mind, it is reasonable to project a class size of at least 21—and almost certainly greater than 40—easily satisfying even the government's bean-counting interpretation of "numerosity." In any case, this is little more than an academic exercise given the probability the DOE classes will be consolidated with the DOD/DOT and NSF/NEH/EPA classes (and the hundreds of members of those classes) post-appeal. The DOE classes satisfy Rule 23(a)(1).

**B.    The Proposed Classes Satisfy Typicality and Commonality.**

Plaintiffs have asked the same "common questions" the Court already recognized were sufficient to establish Rule 23(a)(2) commonality. These include: whether an Agency Defendant followed Trump directives in terminating grants to two putative Classes; whether grant terminations violated constitutional rights of putative class members; and whether an Agency Defendant's terminations of grants to the Form Termination Class were arbitrary and capricious in violation of the APA. *See* Mot. at 12. Plaintiffs with grants for ARCHES and non-ARCHES projects have clearly satisfied commonality. Likewise for typicality, the purpose of which is simply to "assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). There is precise alignment of interests here.

The government's limited challenge to these prongs is based on the perfunctory assertion that there are "fundamental differences" between the California Hydrogen Hub grant and others. Opp. at 19. This pretextual effort to shirk payment on *the largest DOE Financial Assistance*

46686\20771427.7

*Award in California history* is factually incorrect.[6] The modest statements to which a DOE declarant was willing to attest confirm only that the purpose of ARCHES—which has more than two dozen world-class UC energy researchers studying a renewable-hydrogen-powered energy system—is to "deliver 'commercial-scale energy demonstration projects.'" Opp at 13, citing Dickenson Decl., ¶ 4 & Ex. A at 2. This simply reflects the truism that some research is "basic" (*i.e.*, R&D) and some is "applied." This distinction has no bearing on whether the research produces new knowledge. Further, and most salient in a Rule 23(b)(2) action: whether Plaintiffs' grant-funded work constitutes basic or applied research is irrelevant to the present inquiry, which is whether DOE "acted or refused to act on grounds that apply generally to the class" (they did) and whether Plaintiffs are harmed in a common and typical manner by DOE's unreasoned, animus-motivated grant terminations via identical form letters (they are). Rule 23 is satisfied.

## III.    THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION AS TO DOE

### A.    Plaintiffs Are Likely To Succeed on Their APA Claims.

#### 1.    DOE's Grant Terminations Are Contrary to Law Under the APA.

This Court has already determined that Plaintiffs are likely to succeed in showing that their NEH, NSF and DOT grant terminations were contrary to law, and thus in violation of the APA. Dkt. 54 at 22-25 (grant terminations by NSF and NEH were contrary to law); *id.* at 22 ("[T]erminations were based on Plaintiffs' pursuit of the very goals that Congress had mandated."); Dkt. 133 at 22-23 (grant terminations by DOT were contrary to law). The government cannot meaningfully show that DOE's grant terminations are not similarly violative.

Congress mandated that the Secretary of Energy "shall establish" a program and "shall

---

[6] The public-private ARCHES collaboration envisions a total of $12.6 billion, including $1.2 billion of DOE investment matched by $11 billion in private investment. All of this is to be directed towards fulfilling stated purposes of President Trump's EOs: promoting domestic energy production, energy security, and economic growth. As DOE previously understood, "H2Hubs will . . . help to enable the development of diverse, domestic clean energy pathways across multiple sectors of the economy and serve as a central driver in helping communities benefit from clean energy investments, good-paying jobs, and improved energy security." OCED, *Awardee Fact Sheet: California Clean Hydrogen Hub* (July 2024), *available at* https://www.energy.gov/sites/default/files/2024-07/H2Hubs%20ARCHES_Award%20Fact%20Sheet.pdf.

46686\20771427.7

1   provide funding" for eligible projects that contribute to the development of four regional DAC

2   hubs, appropriating $3.5 billion "to remain available until expended" under 42 U.S.C. § 16298d.

3   42 U.S.C. §§ 16298d(j)(2)(A) & (j)(4). DOE terminated Dr. Bedsworth's award by asserting that

4   DAC hubs "provide no tangible economic benefit" and also "may raise natural gas prices,"

5   without reconciling that view with Congress's command to fund DAC hubs. Bedsworth Decl.,

6   Exs. D-E. An agency's change in policy preferences and asserted fiscal prudence cannot override

7   clear statutory authority.

8           With respect to ARCHES, Congress required DOE to, *inter alia*, establish a program of

9   regional "clean hydrogen" hubs; to select at least four hubs within a specified time interval; and to

10  ensure geographic diversity. 42 U.S.C. § 16161a(a)-(d). Crucially, at least one hub must use

11  renewable energy as its feedstock. *Id.* at § 16161a(c)(3)(A)(ii). Congress authorized $8 billion for

12  FY 2022–2026 for this purpose. *Id.* at 16161a(d). DOE nevertheless terminated ARCHES—*along*

13  *with the only other renewable-energy hub* (the Pacific Northwest Hub)—with a bare statement that

14  this California hub "did not pass Standards" of a Portfolio Review Process. The agency nowhere

15  acknowledged the governing statute that compelled DOE to fund at least one hub that generated

16  hydrogen using renewable energy. Atanassov Decl., Exh. M. DOE's reliance on internal

17  "Standards" from a newly invented and opaque Portfolio Review Process cannot supersede

18  Congress's clear command to fund a renewably powered hydrogen hub.

19          DOE claims it is entitled to discretion in evaluating "which criteria are appropriate,

20  including whether a program advances broader DOE priorities." Opp. at 23 (citing 42 U.S.C. §

21  7256 for the proposition that DOE has discretion to award grants it "may deem to be necessary or

22  appropriate to carry out functions now or hereafter vested in the Secretary."). This argument fails

23  here, however, because DOE "does not have the authority to 'decline to follow a statutory

24  mandate or prohibition simply because of policy objections.' *In re Aiken Cnty.*, 725 F.3d 255, 259

25  (D.C. Cir. 2013)." Dkt. 54 at 23-24. Congress used mandatory language, appropriated dedicated

26  multi-year funds, established program parameters, and required DOE to support regional DAC

27  hubs and a renewably-powered hydrogen hub. DOE's terminations nullify the crystal clear

28  statutory instructions.

46686\20771427.7

**2.      DOE's Terminations Are Arbitrary and Capricious Under the APA.**

The government concedes that DOE (just like DOT and DOD) "did not explicitly consider reliance interests." Opp. at 23. Nor did DOE "introduce[] any evidence indicating that [it] considered other important factors, including the waste that would result from projects halted before completion, or the loss to the public of critical research that will go unpublished." Dkt. 54 at 30 (citing *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 99 (1st Cir. 2025)). This concession, in itself, demonstrates Plaintiffs' likelihood of success on the merits of their claim that DOE acted arbitrarily and capriciously.

To make matters worse, DOE also failed to provide a reasoned explanation. As with all the other agencies' termination letters, DOE told grantees only that their grants "no longer effectuate[] the Department of Energy's priorities" and are "not consistent with this Administration's goals, policies and priorities." *See* Atanassov Decl. Exs. E, H, & M; Bedsworth Decl. Exs. D & E. But DOE provides no substantiating facts or discussion as to why this is so. *See, e.g.*, Bedsworth Decl., Exs. D-E. This is hardly a fair "articulat[ion]" of a "rational connection between the facts found and the choice made[.]" *See* Dkt. 54 at 27 (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc*., 462 U.S. 87, 105 (1983)). Neither does DOE make any effort to explain "why the agency changed its view of how the grant serves statutory priorities." *Id*. All of this spotlights the reality that DOE engaged in only "cursory review," resulting in precisely the "arbitrary-and-capricious agency decisionmaking" that the APA "was meant to address." *Id*. at 28

**3.      DOE's Actions Are Not Committed to Agency Discretion.**

The government rehashes its argument that grant terminations are "committed to agency discretion by law" under Section 701(a)(2) of the APA and are therefore unreviewable. This Court and the Ninth Circuit have repeatedly rejected this position. *See* Dkt. 54 at 33-35; *Thakur v. Trump*, 148 F.4th 1096, 1105-06 (9th Cir. 2025) (Ninth Circuit Order). And, just like the government's argument with respect to the NIH terminations, DOE's additional argument that its own statutory scheme is distinguishable from that of other agencies is without merit. Opp. at 21. Both this Court and the Ninth Circuit have held that 2 C.F.R. Sections 200.340, 200.341, 200.343, and 200.345 "provide a meaningful standard by which courts may review the agencies' exercise of

discretion." *Thakur*, 148 F.4th at 1105-06; *see also* Dkt. 54 at 34-35. The government's reliance on a statutory provision that provides DOE with discretion to administer its grant programs is therefore misplaced: nowhere in that section is the Secretary granted "*unreviewable* discretion," as the government erroneously claims. Opp. at 21 (emphasis added). In any event, DOE's actions can "nonetheless be reviewed" because "regulations or agency practice provide a meaningful standard by which this court may review [DOE's] exercise of discretion." *See Thakur*, 148 F.4th at 1105 (quoting *Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 751 (9th Cir. 2021)).

## B. Plaintiffs Are Likely to Succeed on Their Equal Protection Claim.

### 1. The Government Does Not Contest That It Selectively Terminated Grants in October Because the Awardees Are Located in Blue States.

The government does not contest the key factual allegations here: that it terminated DOE grants out of animus toward the political views of citizens of Blue States, and that it chose specific grants to terminate solely because the grantees reside in Blue States. Director Vought's own words establish this, as does the statistical impossibility that DOE did *not* target Blue State residents, given that **all 314 grants terminated in early October had prime grantees in Blue States**. Mot. at 4. Tellingly, neither of DOE's two declarations from high-level agency decision makers deny animus-based decision making. *See* Dkt. 165-1 (Davis Decl.) and Dkt. 165-2 (Dickenson Decl.).

The government suggests that the grants terminated in October were originally examined as part of an ongoing review process that began in May, and that others purportedly terminated "as part of this review process" had recipients outside of Blue States. Opp. at 4-5. This is irrelevant given that the government chose to terminate the 314 grants on October 2 solely based on animus. And the government does not dispute that although DOE's review process reportedly identified more than 600 grants for potential termination, the agency took concurrent action against only 314 of them, all in Blue States. Mot. at 4. On the very first day of the government shutdown, Director Vought announced the October terminations as targeting specific states. This statement came immediately after President Trump and Director Vought publicly said they would target programs affiliated with the Democratic Party in the event of a shutdown. Mot. at 1-2, 21.

Relying on a media report and an "independent analysis," the government also notes that

the October terminations would have produced downstream benefits in some Red States. Opp. at 5-6. Yet those third-party materials confirm the central factual premise of Plaintiffs' Motion: that "every single canceled award was for a project led by a company based in a Democrat-led state." Maeve Allsup, *Scoop: These are the 321 Awards DOE is Canceling*, Latitude Media (Oct. 2, 2025), https://perma.cc/B9F7-483X (cited in Opp. at 5 n.8). Moreover, Vought specifically identified the states *the government* associated with the terminated grants and whose citizens the government was targeting in carrying out the terminations. The constitutional question here concerns that targeting, not whether some downstream impacts would affect additional states.

### 2. Terminating Grants Exclusively in Blue States Violates the Fifth Amendment's Equal Protection Guarantee.

#### a. *The Differential Treatment of Grantees in Blue States Is Not Rationally Related to Any Legitimate State Interest.*

The government misapprehends the nature of the equal protection claim in arguing that the challenged terminations pass rational basis review because, hypothetically, the government could have a rational basis for terminating the relevant grants (such as, effectuating the President's "goals and priorities"). Opp. at 25. Rather, "[a]s in all equal protection cases . . . the crucial question is whether there is an appropriate governmental interest suitably furthered by the differential treatment." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). Even in the absence of heightened scrutiny, equal protection requires that a "classification bear some rational relationship to a legitimate state purpose." *Trimble v. Gordon*, 430 U.S. 762 (1977).

The government does not dispute that the 314 terminated grants are similarly situated to the roughly 350 other, non-terminated grants on DOE's list of over 600 grants it considered for termination. *See* Mot. at 21. The government has likewise identified no legitimate government interest for this differential treatment, because it cannot plausibly claim that *only* the 314 terminated grants to recipients in Blue States do not further the Administration's goals and priorities, while the roughly 350 remaining grants do. There is no reasonable dispute that the only reason DOE treated these similarly situated grantees differently is animosity toward the political views of the citizens of certain states.

Animus of any kind is not a legitimate basis for official government action. *See U.S. Dep't*

46686\20771427.7

*of Agric. v. Moreno,* 413 U.S. 528, 534–38 (1973); *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 447–50 (1985); *Romer v. Evans,* 517 U.S. 620, 632–35 (1996); *United States v. Windsor,* 570 U.S. 744, 770–74 (2013). Nor is disdain or disfavor for certain political views, or a desire for retribution against those holding such views. *See Heffernan v. City of Paterson,* 578 U.S. 266, 270–73 (2016).

Notwithstanding this clear Supreme Court precedent, the government suggests otherwise, asserting that "political considerations are routine when it comes to spending federal funds." Opp. at 27. But its analogy to political-dealmaking spending, in the form of budget earmarks and pork-barrel projects (Opp. at 27-28), is specious. Earmarks and pork-barrel spending refer to "a government appropriation for a project or program that will benefit a legislator's *constituents."* Wirtz & Clement, *Both sides of the pork trough,* Fed. Reserve Bank of Minneapolis, (Mar. 1, 2008) *available at* https://perma.cc/8N9T-AWP6 (emphasis added). There is no animus involved in members of Congress seeking to increase funding for their own constituents, nor is animus implicated when the President or congressional leaders secure the vote of a legislator by directing funds to the legislator's district. Those routine forms of coalition building and legislative self-interest bear no resemblance to the government singling out 314 already-awarded grants for *disfavored* treatment because of the political views of the citizens of the States where the grantees are located. That is not ordinary spending that "benefits entities residing in one geographical location over another." Opp. at 27.[7]

The government further argues that there can be no equal protection violation because States are not protected by the Equal Protection Clause, stating incorrectly that "[Plaintiffs'] allegations of animus pertain to *States*, which are not protected by the Equal Protection Clause." Opp. at 25. An honest reading of the facts and Plaintiffs' argument is that DOE terminated UC researchers' grants based on animus against the political views of *citizens* of Blue States, not

---

[7] The government is incorrect in asserting that the Supreme Court held that the Equal Protection Clause allows partisan discrimination in redistricting. Opp. at 26-27. The Court held only that, in the unique context of redistricting, there were no "judicially manageable standards" for courts to police equal protection violations. *Rucho v. Common Cause*, 588 U.S. 684, 691 (2019).

46686\20771427.7

1    animus against the States themselves. More importantly, Plaintiffs assert their *own* equal

2    protection rights, not the equal protection rights of States or anyone else.

3        **b.    *The Terminations Violate Equal Protection Regardless of the Governing Standard for Animus Claims.***

4

5        Because the government points to no legitimate state interest for differential treatment of

6    Blue State and Red State grants to advance identical research priorities, its arguments over the

7    proper legal standard in "animus" cases (at Opp. at 25) is academic. Even if the Court were to

8    apply the government's proposed standard, drawn from *Trump v. Hawaii,* 585 U.S. 667 (2018)—

9    that is, "whether the challenged actions 'can reasonably be understood to result from a justification

10   independent of unconstitutional grounds,' not whether animus is one motivating factor" (Opp. at

11   25:12)—Plaintiffs are still likely to succeed on the merits. The presidential proclamation upheld in

12   *Trump v. Hawaii* (restricting U.S. entry to travelers from several predominantly Muslim countries)

13   followed a 50-day, multi-agency worldwide review and a cabinet-level recommendation; was

14   premised on identified deficiencies in targeted nations' information-sharing and vetting; and was

15   reexamined and revised over time to add and remove countries. The proclamation survived

16   constitutional scrutiny, the Supreme Court explained, because "there [was] *persuasive evidence*

17   that the entry suspension has a legitimate grounding in national security concerns, quite apart from

18   any religious hostility," such that it could "reasonably be understood to result from a justification

19   independent of unconstitutional grounds." 585 U.S. at 705–06.

20       There is no analogous justification for the differential treatment here. The government

21   identifies no contemporaneous action memoranda, selection criteria, analyses, or records showing

22   why particular grants and grantees, including Plaintiffs—all residing in States singled out for

23   political punishment—were selected for termination while similarly situated grantees elsewhere

24   were not. Unlike in *Trump v. Hawaii,* there is zero record evidence that the selective October

25   terminations resulted from "a justification independent of unconstitutional grounds." *Id.*[8]

26   _____

27   [8] Although unnecessary for the Court to resolve Plaintiffs' equal protection claims, the
     government is additionally wrong that *Trump v. Hawaii* changed the law governing equal

28   protection claims based on alleged animus. The Court's analysis there rested on the principle that
     the "fundamental sovereign attribute" of admitting and excluding foreign nationals is "largely

46686\20771427.7

1      Moreover, nothing in *Trump v. Hawaii* suggests that courts must abandon the *Arlington*

2  *Heights* "motivating factor" analysis when reviewing domestic classifications and spending

3  decisions where no immigration or foreign-affairs prerogative is in play. Indeed, the Supreme

4  Court itself has continued to invoke the *Arlington Heights* "motivating factor" standard as the

5  governing framework in the domestic policymaking context. *See*, *e.g.*, *DHS v. Regents of the*

6  *University of California,* 591 U.S. 1, 34 (2020) ("[t]o plead animus, a plaintiff must raise a

7  plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the

8  relevant decision" (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252,

9  266 (1977)). Nor does the Court's more recent order in *Trump v. Orr* change the equal protection

10  standard. That decision is an emergency stay order concerning federal passport policy "with

11  foreign affairs implications," not a merits decision redefining domestic equal protection law. *See*

12  *Trump v. Orr,* No. 25A319 (U.S. Nov. 6, 2025) (per curiam order). The entirety of the Court's

13  animus analysis is a single sentence, which stated that "on this record, respondents have failed to

14  establish that the Government's choice to display [passport holders' sex at birth] 'lack[s] any

15  purpose other than a bare … desire to harm a politically unpopular group.'" *Id.*

16      *Arlington Heights* remains good law, as do *Moreno, Cleburne,* and *Romer,* which define

17  the animus line outside the immigration and national security context. Plaintiffs easily meet the

18  standards under these cases to show that animus was a motivating, but-for factor in the selective

19  termination of the relevant grants. The burden therefore shifts to the government to show that it

20  would have made the same decision to selectively terminate these grants absent that improper

21  motive. DOE has not even tried to carry this burden. Plaintiffs are accordingly likely to succeed on

22  their claim that DOE's terminations violated their Fifth Amendment rights to equal protection.

23      **C.      The Balance of Equities and Public Interest Favor Plaintiffs.**

24      This Court and the Ninth Circuit have already rejected the government's arguments that

25  Plaintiffs' harms are "necessarily financial" (Opp. at 28), holding that grant terminations result in

26  _____

27  immune from judicial control." 585 U.S. at 702 (quoting *Fiallo v. Bell,* 430 U.S. 787, 792 (1977)).
The Court thus upheld the Administration's action only because it applied a form of rational-basis

28  review specially tailored to the admissions and national security context. *Id.* at 705.

harms to Plaintiffs' careers, reputations, and research, as well as harms to scientific advancement and to taxpayers' investment. Dkt. 54 at 47-48; Thakur, 148 F.4th at 1110 (Ninth Circuit Order). Crucially, "[i]t is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017); *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (holding that an equal protection violation constitutes irreparable harm).

The government also contends that *Department of Education v. California*, 604 U.S. 650 (2025) and *National Institutes of Health v. American Public Health Ass'n*, 145 S. Ct. 2658 (2025) control this Court's weighing of the equities, and that the government will be harmed by paying out funds it cannot recover. Opp. at 17. Those cases are distinguishable, however, as this Court recognized in its Order enjoining DOT, DOD, and NIH's grant terminations. *Thakur v. Trump*, 2025 WL 2696424, at *15-16 (N.D. Cal. Sept. 22, 2025). The Ninth Circuit's stay decision is in accord. *See Thakur v. Trump*, 148 F.4th 1096, 1109-1110 & n.8 (9th Cir. 2025). The equities and public interest both tip in favor of Plaintiffs here, who have no ability to obtain funds to replace those DOE has illegally denied them.

## IV.    THE COURT SHOULD DENY DOE'S REQUEST FOR A STAY, AND NO ADDITIONAL BOND IS NECESSARY

The government's single-sentence stay request (Opp. at 29) should be denied, because no supporting facts or rationale are provided. The government "[has] not carried their burden of showing that they are likely to face irreparable injury … during the period before the appeal is decided." *Thakur*, 787 F. Supp. 3d at 1005 (citation modified). The Court should also deny the government's request for a bond, or at most order a nominal bond as in prior Orders, "because this litigation is brought to protect the public interest and ensure compliance with federal law." *Id.*

## CONCLUSION

Plaintiffs respectfully request that the Court grant their Motion for Preliminary Injunction and Provisional Class Certification.

1 | Dated: December 12, 2025         By:     */s/ Linda S. Gilleran*

2

Anthony P. Schoenberg (CA Bar No. 203714)
tschoenberg@fbm.com
3

Donald E. Sobelman (CA Bar No. 184028)
dsobelman@fbm.com
4

Linda S. Gilleran (CA Bar No. 307107)
lgilleran@fbm.com
5

Dylan M. Silva (State Bar No. 306363)
dmsilva@fbm.com
6

Kyle A. McLorg (CA Bar No. 332136)
kmclorg@fbm.com
7

Katherine T. Balkoski (CA Bar No. 353366)
kbalkoski@fbm.com
8

FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
9

San Francisco, CA 94104
Telephone: 415. 954.4400
10

By:     */s/ Claudia Polsky*
11

Erwin Chemerinsky (*pro hac vice*)
echemerinsky@law.berkeley.edu
12

Claudia Polsky (CA Bar No. 185505)
cpolsky@law.berkeley.edu
13

U.C. BERKELEY SCHOOL OF LAW
Law Building
14

Berkeley, CA 94720-7200
Telephone: 510.642.6483
15

Elizabeth J. Cabraser (CA Bar No. 83151)
16

ecabraser@lchb.com
Richard M. Heimann (CA Bar No. 63607)
17

rheimann@lchb.com
Kevin R. Budner (CA Bar No. 287271)
18

kbudner@lchb.com
Annie M. Wanless (CA Bar No. 339635)
19

awanless@lchb.com
Nabila M. Abdallah (CA Bar No. 347764)
20

nabdallah@lchb.com
LIEFF CABRASER HEIMANN &
21

BERNSTEIN, LLP
275 Battery Street, 29th Floor
22

San Francisco, CA 94111
Telephone: 415.956.1000
23

*Attorneys for Plaintiffs and the Proposed Classes*
24

25

26

27

28

46686\20771427.7

## <u>FILER'S ATTESTATION</u>

Pursuant to Civil Local Rule 5.1, the undersigned attests that all parties have concurred in the filing of this PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AND MOTION FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION AS TO DEPARTMENT OF ENERGY.

Dated: December 12, 2025      By: *<u>/s/ Linda S. Gilleran</u>*

Anthony P. Schoenberg (State Bar No. 203714)
tschoenberg@fbm.com
Donald Sobelman (State Bar No. 184028)
dsobelman@fbm.com
Linda S. Gilleran (State Bar No. 307107)
lgilleran@fbm.com
Dylan M. Silva (State Bar No. 306363)
dmsilva@fbm.com
Kyle A. McLorg (State Bar No. 332136)
kmclorg@fbm.com
Katherine T. Balkoski (State Bar No. 353366)
kbalkoski@fbm.com
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 954-4400

Erwin Chemerinsky (*pro hac vice*)
echemerinsky@law.berkeley.edu
Claudia Polsky (State Bar No. 185505)
cpolsky@law.berkeley.edu
U.C. BERKELEY SCHOOL OF LAW
Law Building
Berkeley, CA 94720-7200
Telephone: (510) 642-6483

Elizabeth J. Cabraser (State Bar No.  83151)
ecabraser@lchb.com
Richard M. Heimann (State Bar No. 63607)
rheimann@lchb.com
Kevin R. Budner (State Bar No. 287271)
kbudner@lchb.com
Annie M. Wanless (State Bar No. 339635)
awanless@lchb.com
Nabila M. Abdallah (State Bar No. 347764)
nabdallah@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone: (415) 956-1000

*Attorneys for Plaintiffs and the Proposed Class*