**Pages 1 - 52**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Rita F. Lin, Judge

NEETA THAKUR, on behalf of themselves and all others similarly situated,

Plaintiffs,

VS.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

Defendants.

**NO. 3:25-cv-04737-RFL**

San Francisco, California
Thursday, December 18, 2025

**TRANSCRIPT OF REMOTE PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
275 Battery Street - 29th Floor
San Francisco, California 94111
**BY: KEVIN R. BUDNER, ATTORNEY AT LAW**
**ANNIE M. WANLESS, ATTORNEY AT LAW**

FARELLA, BRAUN & MARTEL LLP
One Bush Street - Suite 900
San Francisco, California 94104
**BY: ANTHONY P. SCHOENBERG, ATTORNEY AT LAW**
**KYLE ANDREW MCLORG, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
Official Reporter, CSR No. 12219

**APPEARANCES**: **(CONTINUED)**

For Plaintiffs:

UC BERKELEY SCHOOL OF LAW
Environmental Law Clinic
434 Boalt Hall (North Addition)
Berkeley, California 94720

**BY: CLAUDIA POLSKY, ATTORNEY AT LAW**

For Defendants:

DEPARTMENT OF JUSTICE
Civil Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530

**BY: JASON K. ALTABET, TRIAL ATTORNEY**
**KATHRYN BARRAGAN, TRIAL ATTORNEY**

**Thursday - December 18, 2025** **10:04 a.m.**

**P R O C E E D I N G S**

---o0o---

**THE COURTROOM DEPUTY:** All rise. Court is now in session. The Honorable Rita F. Lin is presiding.

Please be seated.

Calling Civil Action 25-4737, Thakur et al. versus Trump, et al.

Counsel, please approach the podium and state your appearances for the record, beginning with counsel for plaintiffs.

**MS. POLSKY:** Good morning, Your Honor. Claudia Polsky, UC Berkeley Law, representing plaintiff UC researchers.

**MS. BARRAGAN:** Good morning, Your Honor. Kathryn Barragan from the Department of Justice. I'm here with my colleague Jason Altabet representing the federal defendants.

**MS. POLSKY:** And also my colleague Kevin Budner is here from Lieff Cabraser representing researcher plaintiffs.

**THE COURT:** Good morning to all of you.

I want to give you some initial thoughts about where I see us and then walk through some of the questions that I provided to you earlier in the week.

As you all already know, I already granted a preliminary injunction as to six federal agencies barring them from terminating grants to UC researchers using these types of

boilerplate form letters. The ruling was based on a finding that these letters are arbitrary and capricious, they don't contain the reasoned decision-making that is required under the Administrative Procedures Act.

Department of Energy has always been a defendant in this case, but it was not enjoined because there was no class representative who had a grant from that agency terminated. Then in October, the Department of Energy terminated $7 billion in grants en masse, nationwide, using basically the same form letters that I had previously found to be illegal.

It seems to me that on the arbitrary and capricious issue the claim is basically identical to what I dealt with before. I know the government disagrees and believes that the NIH opinion is an intervening authority that is important for the Court to consider. But we have been through that issue in this litigation already. And I don't see a real distinction between the claim here and the situation we've dealt with in the past.

But I do have questions about some of the other claims that have been asserted by plaintiffs in this latest set of grant terminations. Particularly, I have questions about the equal protection claim.

I understand that there are public statements about cutting climate-related grants in blue states. And as I understand it, plaintiffs' argument is essentially that it's unconstitutional to target citizens of blue states for funding

cuts. But I have a lot of questions about that theory so I want to start there.

My first question is: The termination letters state that the grants were terminated to align funding decisions with the new administration's priorities. And the accompanying public statement refers to the, quote, left's climate agenda as the reason for the cancellations. On what basis can the Court conclude that the termination decisions had no rational relationship to legitimate government interests like cost-cutting or policy priorities?

Let's start with plaintiffs on that question.

**MS. POLSKY:** Absolutely. Thank you, Your Honor, for the opportunity.

I will start with cost-cutting, and I think we can best examine that potentially legitimate government rationale by looking granularly at the correspondence that ostensibly the Department of Energy -- but actually the Office of Management and Budget -- sent to the UC Regents on October 2nd informing them of Dr. Bedsworth's grant termination, one of our two plaintiff declarants.

And there is a citation there to the executive order -- excuse me -- the policy memorandum from DOE entitled "Ensuring Responsibility for Financial Assistance," which describes how projects are supposed to be, among other things, financially sound and economically viable. There is then a cursory

statement that this grant does not meet those financial responsibility criteria, with absolutely no analysis. The -- I will cite, the totality of the analysis.

Specifically, the Department has determined direct air capture hubs provide no tangible economic benefit.

No analysis. No numbers.

Direct air capture hubs may raise natural gas prices if deployed at scale.

They may also lower them. You do not cancel a climate satellite because it may occasionally forecast snow when, in fact, it rains. That's the nature of weather forecasting.

So absolutely no analysis. This is a grant of over a million dollars. This is two short declarative sentences. So there is absolutely no cost-cutting basis.

Furthermore, when you actually look at the contemporaneous statements of the OMB director Russel Vought and President Trump, which are in our exhibits to the McLorg declaration, there is no mention whatsoever about fiscal prudence, cost-cutting as a rationale.

And this is a marked distinction to the much earlier period of grant terminations including some May 2025 grant terminations by the Department of Energy, when DOGE, rather than OMB, was calling the shots, and there were references to cutting 10 percent, cutting fat, and so forth. There is not even a pretext of a cost-cutting rationale in any of the

communications that accompanied these -- these mass grant terminations on October 2nd.

And what is extraordinary here in terms of the level of procedural irregularity that raises serious questions about the degree to which there could be any legitimate government interest, is if you compare Exhibit D in Dr. Bedsworth's declaration with Exhibit E, you will find these seem to be two termination letters about basically exactly the same thing. And plaintiffs were initially scratching their heads as to why there would be two letters a mere eight days apart terminating the same grant.

The October 2nd letter says that this is essentially effective immediately. Then there is a new letter issued on October 10th that says: This will serve as a correction and a confirmation of the notice you received on October 2nd, and it will serve as the effective date of termination.

Now, why in the world would a busy federal agency write a new letter eight days later to say, "Oh, by the way, your grant is essentially recanceled"?

Well, the reason is actually above the text of the letter. It's the letterhead. The letterhead, in quotations, from October 2nd, is simply a typed version of "United States Department of Energy." This is very clearly not from the Department of Energy.

And I'm sure if we were able to conduct discovery in this

matter, it would become clear that this is directed by OMB or by someone other than the Department of Energy, because what's really distinct about the October 10th letter is that it is actual Department of Energy letterhead. So somebody seems to have noticed a procedural irregularity, issued this completely superfluous letter.

And I raise it just to show the process infirmity that infects all of this termination activity on October 2nd; termination activity that is occurring when the government is newly shut down, and when those administering SNAP benefits are literally unable to report to work to disperse food to hungry children. So the urgent activity at the Department of Energy was to mass-terminate these grants because that apparently could not wait until the government resumed operations.

In terms of policy priorities, which is at least an intuitively much more reasonable reason that the Administration might revisit these prior grant commitments -- obviously elections have consequences; we readily concede that.

The Administration is absolutely free to issue executive orders and pursue policies that are markedly different from those of the prior administration. So, for example, as articulated in the relevant executive order, it is free to pursue energy independence for America. It's free to pursue energy dominance. We want to be competitive in the energy sphere. We don't want to be importing oil from

conflict-riddled regions. And it's free to pursue climate stabilization or not, as it chooses.

But what's remarkable here is when you actually look at these stated priorities in the executive order, there is a 100 percent non-match between the substance of what these researchers were doing and the asserted goals of the Administration.

So, for example, there is no better way to establish energy independence in America than to produce energy solely from renewable sources like solar or wind. Those belong to no sovereign. They're super abundant in America, and it's actually the express purpose of the ARCHES hydrogen hub project to use unlimited solar and to use wind energy to produce so-called green hydrogen as opposed to producing hydrogen from fossil fuels. So that's energy independence for you.

In terms of energy dominance, we need look no farther than the grant terminations of not Dr. Atanassov's ARCHES grant, but actually his other grants which relate to fuel cell catalysts. And he identifies in his declaration the innovations he is pursuing in how fuel cells are made as giving the United States a shot at being the global leader in producing efficient, long-lasting fuel cells that would, for example, enable us to switch to diesel trucking to trucks powered by hydrogen that get tens of thousands hundreds of thousands of miles without a service. And so here, too, we show that energy dominance would

be furthered, not inhibited, by the grants at issue.

And then when we look as Dr. Louise Bedsworth's research, it's actually not at all related to climate change, although perhaps, you know, Russell Vought at OMB misconstrued it that way. Direct air capture of carbon relates to trying to stabilize the climate by removing excess heat-trapping gases whether or not you think human industry has put those excess gases there. God could have put those gases there. But it's just the fundamental feature of how a greenhouse works that, when you have heat-trapping gases in the stratosphere it gets hotter. And that's why, for example, I think it's over 60 degrees today in San Francisco in mid-to-late December.

So there's just a complete non-match between the administration's asserted priorities with respect to energy as articulated in the executive order on American energy dominance, unleashing American energy dominance, and the terminations at issue. And there's no attempt whatsoever in, as you said, these cursory, arbitrary form letters to articulate how those two things connect to each other.

So --

**THE COURT:** So the question I have, though, is -- I understand what you're saying from an APA arbitrary and capricious analysis perspective. They didn't really explain what the match is between what they did and the reasoning that is in the executive orders.

But for the purposes of equal protection on a rational basis test, what I'm supposed to do is look at what they did and say: Is it connected to a -- to a legitimate government interest, and is it rationally related to that interest?

And so I can understand from the Administration's perspective that what they're saying is they terminated these grants because it furthers the, quote, left's climate agenda. I believe the quote from OMB was, "Nearly $8 billion in green new scam funding to fuel the left's climate agenda is being canceled."

So that phrasing sounds to me like the government is saying: We don't believe this is a good use of taxpayer money to fund the -- grants that seek to reduce carbon in the climate, and we're going to pursue energy independence through some other means, whether it be fuel extraction or some other methodology.

It's not: We're not going to pursue energy independence through altering the atmosphere.

Why isn't that a legitimate government interest for which these grant funding cuts are rationally related?

**MS. POLSKY:** Understood, Your Honor.

And I want to speak first to the administration's ability to change its funding priorities before I get to the specific issue of the equal protection analysis and whether some interest other than the ones I've identified might save these

terminations from constitutional infirmity.

So the first thing I just wanted to mention is prospectively the Administration can absolutely choose not to fund direct air capture of carbon dioxide, not to fund fuel cell innovation, not to fund fuel cell --

(Reporter interruption for clarity of the record.)

**MS. POLSKY:** So prospectively, the Administration absolutely can choose not to fund grants like Dr. Bedsworth's, which addresses climate stabilization. It can choose not to fund hydrogen hubs like ARCHES, except footnote to the extent Congress expressly directed that you must fund some. And it may choose not to fund, say, fuel cell innovations of the type at issue in Dr. Atanassov's non-hydrogen hub awards.

However, as you have previously ruled, there are tremendously substantial reliance interests that need to be considered where these are already awarded grants, so the Administration is not writing on a blank slate with respect to implementing policy priorities.

But to go directly to your question about the equal protection analysis here, I think this brings us to your Question 2: Is it plaintiffs' position that funding decisions involve impermissible animus, not just -- if political affiliation of the affected constituents is one of several factors in the decision-making process?

And it absolutely is, Your Honor.

And I will explain that with reference to, I believe, three cases that are quite helpful in elucidating this, none of which involve a suspect classification such as discrimination on the basis of race or gender. So those cases, which I will elaborate, are *Romer versus* Evans, and *Shelby County versus Holder*.

Before I describe the relevance of those cases here to the equal protection analysis, however, I would like to call Your Honor's attention to something that I hope opposing counsel is aware of because it involves their client in a case in a very similar posture to this one about the Department of Energy October 2nd terminations; and that is a case currently pending before Judge Mehta in the DC district court where there have been three hearings on this equal protection issue, the latest one of which was this morning. And I would like to read to you and to opposing counsel what plaintiffs' counsel in that case e-mailed me and said was a concession made by the government at the hearing this morning. And, of course, you can confirm this with reference to the transcript, it is not yet available; this hearing just concluded.

But in plaintiff counsel's technology, the government said that (as read):

"If the Court determines as, a matter of law, that the blue versus red state residence of a grant awardee is not a legitimate government basis for

treating similarly situated awardees differently, so long as that was a primary reason" -- not the primary reason, "a primary reason for the differential treatment, that violates equal protection."

So I just wanted to put that out there, that the government has essentially conceded -- to the extent you trust this e-mail that can be readily confirmed soon -- the government has conceded that animus need not be the sole motivation for terminating grants, even whereas here that animus is manifest in the types of social media posts and news reports you've identified -- as long as it was a primary reason if the Court finds that essentially it is illegal for the government to punish or disfavor blue states because it's not a legitimate government interest, then there is an equal protection violation.

And so now I would like to return to the three cases I mentioned which I think essentially set the precedent and the standards for this Court to apply in resolving this issue.

So as Your Honor has indicated, and as the briefing has assumed, we're dealing with a rational basis standard of review here -- which is, of course, quite deferential to the government. However, as described in *Romer versus Evans*, it really is rational basis with a bite, insofar as the government has made a classification and it treated a group that is politically unpopular less favorably based on that

classification.

And as surely the Court knows, in *Romer versus Evans*, the Court invalidated a Colorado state law that barred state and local enactments to protect lesbian gay and bisexual people from discrimination, essentially a law that said there shall be no further laws within our state to do this thing.

And there the Court says that the government need not create a new -- they needn't create a new suspect class to find an equal protection violation where there is a, quote, bare desire to harm a politically unpopular group, because that is not a legitimate government interest. And plaintiffs would submit that, here, Democrats seem to be a politically unpopular group with this Administration. They have therefore created a classification "Are you a researcher in a blue state versus a researcher in a red state," and they have used that to guide their terminations.

**THE COURT:** One question I have about that is I had understood *Romer v. Evans* as having sort of an elevated version of rational basis review, "rational basis with a bite --"

**MS. POLSKY:** Right.

**THE COURT:** -- because it involved a group that would persistently be in the political minority. In other words, a group that -- it would be difficult to imagine would ever have the sufficient numbers to, on its own, be able to defend itself politically. And I -- it's hard for me to understand how the

Democratic Party fits into that model.

Help me understand that.

**MS. POLSKY:** Absolutely. I think, among the three cases that I will go through, *Romer* is the most difficult for us because it is the closest to a suspect classification; right? It's where the law is coming close. That's why this is a 7-2 decision by Justice Kennedy. Clearly, we're not quite at the point where we say LGBTQ+ people are -- you know, are entitled special protections because of this invidious discrimination.

But I hear that. I mean, we could discuss whether the scheme of having a two senators per state irrespective of population means that Democrats will always struggle, but I am not going to go there.

Let me instead go to a different case that I think makes this clearer which is *Mount Healthy versus Doyle*. And in that case there was absolutely no issue of any kind of group that was persistently disadvantaged. This was essentially a case where a teacher exercised free speech rights, so it was a fundamental right; and there was no evidence that, you know, the teacher was in any way disfavored by his administration, but then the Administration attempted to fire him. And ultimately, this was held to violate equal protection because there was animus against him for exercising a fundamental right, his First Amendment right of free speech.

And most important in that case, the Court held that that animus need not be the only reason for the termination. It essentially dealt with and established a standard for a mixed-motive actions by the government; there it was a public school system. And that's absolutely applicable here.

It could be that this administration doesn't want to stabilize the climate and want to save some money but cutting already awarded grants and doesn't care about reliance interests. But this is obviously infected to the core with partisan animus, and that is not legitimate. And so that is -- that is why that case is fairly -- fairly similar to this one. There's nothing akin to a protected class at issue.

And then, I think, the case that maybe makes it even clearer is *Shelby County*, where albeit a closely divided court said you can't discriminate against states without a rational basis. Essentially this is a case involving preclearance under the Voting Rights Act. And essentially nine states are required to say sort of, you know, "Mother, may I," to the Federal government, "May I run my elections this way," but 41 states are not.

And the Court said, in *Shelby County*, that this is not rational, that states enter the country on an equal footing, and, you know, there essentially has to be a very, very clear reason that they're being treated differently. It can't just be some animus towards -- towards some.

And in this case we essentially have red states and blue states, and by extension, in the administration's view, their residents, whether or not they're even Republicans or Democrats, being disfavored because of that group affiliation.

And so I think all of these cases give us some purchase on this notion of, even if you're not in a protected class, if the government has potentially a legitimate rationale, as you've identified, and then it creates some classification and the classification doesn't in any way further that purported purpose, then there's no rational basis.

And what I think makes that crystal clear here is when you compare plaintiffs' exhibit showing the list of grants that were initially proposed for termination in October, with the list of grants that were ultimately terminated, the 312 to blue states, you can see that projects that are absolutely identical, but for the fact that some occur in blue states and some occur in reds states, get different treatment.

There is no rational basis for that in plaintiffs' view.

**THE COURT:** So one question I have, then, under this theory is, let's say you have a situation where the government is in a budget crunch and they need to cut $200 million from the budget. They got to find someplace to do it. There are six grants that are out there that could all be cut. And between those six they're basically all the same; it doesn't matter which one we cut.

So they decide which ones to cut based on, well, Senator So and So is going to have the administration's back on this future initiative that we want to get through Congress, and so we're not going to cut the grants in Senator So and So's state. But this other senator has been a real problem for us and has been an antagonist to the Administration, and we're going to be less considerate to his constituents' needs because we don't need Senator So and So's votes because Senator So and So never votes with us anyway.

Do you think that the administration's decision to consider the political affiliations of the various senators in calculating which grants to cut violates equal protection?

It just sounds to me like regular politics. But you tell me. If I find this to be equal protection violation, doesn't that make the legislative process and the horse-trading that happens in it, on some level, just unconstitutional?

**MS. POLSKY:** No, Your Honor. But I appreciate the invitation to explain why.

First of all, what's going on here is not legislation. This is executive action. This is not any kind of horse-trading in Congress.

And importantly when, for example, to use defendants' example, there are pork barrel politics going on -- you know, you can build your bridge to nowhere if I can have money for something else that you don't care about but my constituents

do -- that's ordinary politics, and we have no desire to constitutionalize that. And there's no violation there.

But one thing that's really distinct is that there's no animus there. There is no group being treated differently. There is just retail-level bargaining over outcomes.

And to move it back to the executive theater where this problem resides, what's happening here is something that is happening across the board. It's happening to every single democratic state irrespective of the state of play.

If there are Republican senators or Congresspeople who are voting with or against the president, that doesn't seem to be affecting what gets terminated. Certainly the president has some red state detractors on issues. Perhaps Lisa Murokowski, et cetera, has some blue state defenders on some issues. And so there is, again, nothing in the pattern of grant terminations that even aligns with that, if that were permissible motive.

**THE COURT:** What about the fact that this is occurring during the shutdown, and the evidence in the record is that this is related to the desire to motivate congressional Democrats to cooperate with the Administration to reopen government on some level? What -- doesn't that bring it back into the political horse-trading realm?

**MS. POLSKY:** I don't think so, Your Honor. I think that it is not constitutionalizing politics to say there is a

line beyond which we can't politicize the Constitution. We don't lose all of our constitutional rights in terms of -- including the right we have as individuals to fundamental freedom like voting, like speech, simply because there is political dispute in Washington and it's high stakes.

**THE COURT:** But I'm having a hard time understanding why this situation is necessarily different from a constitutional law perspective than legislative horse-trading.

If the objective the executive action is to motivate political cooperation on the legislative front, why is it not okay for them to allow political considerations to enter into which grants and which projects are canceled?

**MS. POLSKY:** Well, Your Honor, it could certainly be effective. We don't deny that there is a political relationship between this raft of terminations and what the Administration was hoping would happen with resolving the shutdown in terms of congressional dynamics.

But we submit that it is not a legitimate government interest to punish your political enemies to get your way. That would seem to be a limitless proposition where we're going to terminate benefits, SNAP benefits, only to students with -- with brown hair because we think they are less likely to be Aryan, and we suspect their parents are more likely to be Democrats.

We would all finds that extremely problematic even though

people with brown hair are not a protected class.

**THE COURT:** Because it would be a pretext for prohibited discrimination.

**MS. POLSKY:** Exactly. Because it would be -- there would just be no legitimate government interest in feeding children with one hair color and not another. And here, there's just no legitimate interest, as we see it, in terminating a hydrogen hub that Congress has said you must create in one place and not terminating one in the other.

**THE COURT:** So in your view, would it be constitutional for the Administration to, when choosing between four different projects to terminate, choose a particular project because that senator has been the least cooperative among the four senators who are -- whose constituencies would be affected, that senator has been the least cooperative so we're going to terminate the grant in that state. Let's say it's not red states blue states, it's just about trying to get Senator So and So to start cooperating with the Administration.

**MS. POLSKY:** And if we talk specifically about equal protection, not any other potential legal infirmity with that termination, reliance, arbitrariness, and so forth, no articulation of reason, that's just why -- why it's done, I think the fewer grants --

**THE COURT:** Yes, for the record, I'm just stalking about equal protection.

**MS. POLSKY:** Yes. And so I think the fewer actions there are like that, the more difficult it is to show an impermissible type of animus based on a group classification. If you have one or two data points, then there could be some reason the Administration might offer that is somehow plausible.

I think somehow, here, when you have over 300 grants being terminated exclusively based on group membership, the -- and absolutely no effort whatsoever to articulate a reason that these grants and not substantively identical ones elsewhere are being terminated, it rises to the level of equal protection violation.

So it is somehow a gradient, but we're talking about group classification. When you have only one or two data points those persons patterns are really hard to see.

**THE COURT:** One question I have for you then is the defendants cited this study that was performed by an outside nonprofit where they said that the terminated grants affected projects in 49 states.

What is plaintiffs' response to that analysis?

**MS. POLSKY:** I mean, essentially saying, well, there will be -- there are a couple of different things going on. There's an argument: Well, if you look downstream enough there are going to be some Republicans affected. For example, there might be Republican researchers on these grounds so it's not

totally democratic.

But leaving aside that type of hyperattenuation argument, what the Department of Energy has down here which is clever, but I think quite disingenuous, is that they have endeavored to lump together Department of Energy grant terminations that did not occur on October 2nd in the context of these shutdown maneuvers with these to get a very big denominator and an appearance of political neutrality.

And to be more specific, for example, when we look at Department of Energy grant terminations in, say, May of 2025 -- of which there were some but not enough for us to believe we could bring a putative DOE class before you -- or when you look at the three DOE grants that were suspended at UCLA -- that you have since, by junction, reinstated -- those grants were -- that had nothing to do with political partisanship, as far as the records reflect.

What happened on October 2nd was a discrete action that was being directed not by DOGE, which was no longer in the picture, Elon Musk was nowhere to be found, but instead being directed by OMB -- see the faux letterhead. And there was no cost-cutting motive. There was, instead, this partisan animus that need not be inferred because it was stated so baldly, unashamedly, even gloatingly by both OMB's director Russel Vought and by the president saying: We're going to get them where it hurts. We're going to get the blue states.

There's absolutely no pretext of rational decision-making. So that's what that study is all about. It's not about these grants.

**THE COURT:** Let me give the government an opportunity to respond.

**MR. ALTABET:** So I'm going to try to move sequentially through the questions, and hopefully address some of the points that have been raised.

So to start, I think, as Your Honor pointed out, this is not arbitrary and capricious review. This is equal protection review. And one very important part of that is that's going to affect both states and federal government both legislatures and executive officers in both states and federal levels.

So we're not dealing with arbitrary and capricious analysis. We're dealing with this, you know, concededly from the plaintiffs' side, the rational basis version of equal protection review. And as is stated throughout the cases, that is -- suggests that any -- that plaintiffs have to negate any conceivable basis for the action taken by the government.

It's, you know, black letter law that this does not depend on what the Government's actually asserted reason was. It's actually any conceivable reason that could be brought out as the legitimate state interests. And it's entirely irrelevant whether it was a conceived reason, say, in litigation versus before or anywhere in between.

And so I want to start with that because Your Honor's first question goes to this: Well, there's these clearly legitimate state interests like cost-cutting or reorienting grant portfolios to match policy priorities.

And here these grant terminations rather plainly match either a cost-cutting rationale or reorientation of a policy portfolio rationale.

And given that there is then a conceivable rational basis supporting them. And under *FCC v. Beach Communications*, or any of these classic equal protection rationale basis cases, that sufficient to sustain the Government's action.

And so I do think that brings us to that second point because one thing plaintiffs point out, and I don't -- you know, I don't know what happened in the hearing earlier today. I heard the quote "a primary reason would be sufficient."

I don't know about the DC circuit case law, but based on Your Honor's second question I double-checked the Ninth Circuit case law. I have one case that's not the briefing that I just want to read out since I think it answers this question. It's *Olson v. California*, an *en banc* decision from last year, 104 F.4th 66, pin cite 81.

And that case makes clear, in reversing a panel decision, which found animus based on a primary reason being animus against the company Uber. The *en banc* panel reversing said if

the statute or government action serves no legitimate governmental purpose and -- and it italicized "and" -- if impermissible animus toward an unpopular group prompted the government action, only then does equal protection rational basis fail.

And it says as well: We ask only whether plausible reasons exist supporting the governmental action.

So I think, then, turning to the cases dealing with animus in the rational basis context, it makes sense within that test. The rational basis test is whether there's a conceivable basis. And the cases that found animus and found that there was no conceivable basis, *Clayburn*, *Moreno*, *Windsor*, and *Romer*, were cases where the Court said that there was no conceivable basis except for inexplicable community prejudice or animus.

And Your Honor knows the cases from the briefing, but *Moreno*, we're dealing with, quote, hippy communities. In *Clayburn*, we're dealing with intellectually disabled people trying to live in a home and having their permit denied. And in *Romer* and *Windsor*, we're dealing with the LGB community.

And, you know, we have nothing like that here. When we look at the -- sort of that very narrow times where the Court has found there's no conceivable basis, here we have many conceivable bases, as Your Honor spoke with opposing counsel about.

I also want to just briefly address the cases that

opposing counsel brought up. *Mount Healthy*, I believe it is or Mount Healy [sic] and *Shelby County*. Those cases were not rational basis/equal protection cases. One was a First Amendment case, a personal retaliation case as best I can tell. And the other, *Shelby County*, was an equal sovereignty case dealing with states.

Plaintiffs have said they're not relying on any state rights or any state protections in the Constitution, so *Shelby County* plainly doesn't apply.

And the case that opposing counsel said was difficult for them, *Romer*, is the only case of those three that actually deals with equal protection/rational basis scrutiny. And that's the one where it has to be inexplicably -- at no basis conceivable, except inexplicable community prejudice or animus.

So I want to -- and I had sort of a longer answer to Question Number 2, but I want to make sure I address what Your Honor is interested in.

**THE COURT:** Let me just ask you, as I understand what plaintiffs are saying, they're saying that the classification isn't just "You terminated the following grants. Was it patly because of cost-cutting and policy issues?"

But instead the classification here is that you terminated Grant A because it came from a blue state, and you did not terminate Grant B because it came from a red state. And was there a legitimate government interest in distinguishing

between Grant A and Grant B.

And I think everybody would agree that simply the fact that it is red state recipient or a blue state recipient is not itself a legitimate government interest.

What's your response to that?

**MR. ALTABET:** So I have a couple of points there. The first is we don't think that this is, quote, invidious animus at all to base a decision on political or partisan considerations, as Your Honor sort of went through in the questioning; that these are sort of a part of a larger, legitimate rationale when there are several factors at play. We're cutting based on cost. We're reorienting grant portfolios. As we go through that, we're going to take into account partisan considerations. That is a legitimate part of a larger consideration.

And so I guess the first argument is that it's not invidious animus at all. And if it were held to be invidious animus given that equal protection covers state and federal legislatures and state and federal executive actions, it would unconstitutionalize a large swath of the most regular of politics.

It would mean that if I were to be a governor of a state and I were choosing who is going to be on a state commission and I have two equally qualified candidates, one is from my partisan political party and one is not, that is violates equal

protection for the reason -- picking between two equally situated people, to pick the one from my party versus someone else.

The horse-trading and earmark context as well, given that there is a limited pot of money, and obviously when you're building a bridge to nowhere to one person's district, you're not building a bridge to nowhere in another person's district, to use that fairly classic example.

And so that's the first argument here. It's not invidious animus at all to use partisan considerations. But even if the Court determines that, A, it is not permissible in one aspect, if a decision was solely based on partisan considerations, that that is not -- that that itself could trigger an invidious animus analysis, as I sort of cited earlier this *Olson* case, or more broadly, these rational basis animus or equal protection cases say is that as long as there is a legitimate conceivable interest, even if there is an additional illegitimate interest, then that's fine; then that still passes equal protection rational basis scrutiny.

I know there's a little back-and-forth in the briefing about *Arlington Heights versus Trump v. Hawai'i*. And I would just point out, I think, *Olson* and, I think, all the other rational basis cases like *Windsor* and the like use, this a rational basis formulation. *Arlington Heights* and *DHS v. Regents*, were cases involving smoking out discriminatory intent

involving race or ethnicity, and so that is inapplicable here.

And if you look at the case law, I don't think you see that sort of formulation being used in these animus non-suspect class, nonfundamental rights, just sort of the basic rational bases analysis.

And so finally, if Your Honor -- I guess, I have one other sort of generalized point here which is going to this conceivable rational basis. There is also a generalization, permissible rational basis here in regards to terminating grants where the primary recipient is in a, quote, blue state. And that's this idea that -- we cited *American Bus Association*, but *Olson*, *FCC versus Beach Communications*, talk about how an officer making a decision or a legislature making a decision, can make generalization that are under- and overinclusive to some sort of conceivable interest.

And here it's conceivable that projects headquartered in states generally considered, quote, blue states are going to be more likely to have policy interests and priorities or be based on projects that are against the policy priorities of the Administration here because the Administration here, for example, is interested in oil and gas, and generally speaking, projects in blue states are going to be interested in solar and renewable energy.

And I think everyone agrees that the Administration is allowed to reorient from renewable energy, or policies that are

associated with blue states, to policies that are associated with oil and natural gas, and sort of an alternative way of looking at the energy environment.

So I hope that answers Your Honor's question.

**THE COURT:** Last word on the equal protection issue for plaintiff.

**MS. POLSKY:** Yes, I'll keep it brief, Your Honor.

We would submit that once it has been shown that there could be mixed motives and animus is in the mix, that is a problem under the equal protection clause. And what I would say is because we believe under *Mount Healthy* and other law, the burden shifts to the government once there appears to be no legitimate interest, and animus is clearly in the mix to show that the government would have made the same decision but for that animus.

What is striking here is the two dogs that did not bark in the night, and those are the two declarations defendants submit. One declaration talks about why it is difficult for the Department of Energy to determine how many researchers are affected by the grants it has terminated and even, in fact, to track whether there are UC recipients of some of those grants.

The other declaration makes the case that because ARCHES is a different kind of research than Dr. Bedsworth's research grant, or some of the other DOE research grants, somehow they don't belong together. We see absolutely no declaration

discussing any conceivable legitimate government interest for treating like grants to blue and red states unlike.

They have not managed to carry even their tiny burden of differentiation where there appear, in the most generous of imaginings, a mixed motive.

**THE COURT:** What's your response to the government's hypothetical about a governor who is trying to fill seats on a commission a selects someone from her political party rather than the opposing political party? Do you think that that would be unconstitutional under the equal protection clause because it's animus towards the other party?

**MS. POLSKY:** Insofar as only one person can fill the seat, it inheres in hiring that you can only hire one person for a seat, and necessarily candidates will differ along a variety of, you know, grounds. So that is difficult. Again, I've discussed the difference between a one-off event and creating a classification. If the government -- if the governor said, "I will never appoint anyone to a commission who is not of my political party," that might be a problem. But that's not the situation that opposing counsel posits.

**THE COURT:** So in his hypothetical, would you -- would it be plaintiffs' view that that's a violation of equal protection?

**MS. POLSKY:** That -- sorry, Your Honor. I'm taking -- I'm taking a moment because it's dissimilar to this situation

in so many respects. Not only do we have many more data here, but it is not only possible to accommodate all of these researchers; they are already accommodated through congressional appropriations and through prior agency grant-making. So there's no choice to be made. All of these things can be funded. So would it be an equal protection violation in that -- in that instance?

If the government -- if the government could show that it would have made the same decision but for that political rationale, no. And my guess is the government would almost always be able to show that two job candidates are never ever identical. But that is a very tough hypothetical that, as I said, is not like even on all-twos with this case.

**THE COURT:** So -- but just to be clear, let's say we have a straight-up admission from the governor "I picked so and so over the other person because they're from the Democratic Party and not from the Republican party."

Is your view that that would be unconstitutional under equal protection?

**MS. POLSKY:** I think that would likely not be, Your Honor. And I think that is because we are really in -- more in the realm of political decision-making.

This here in terms of personnel ability to work with those people, it's commonplace when executives are given the ability to replace people on boards and commissions, that those people

are of their own party even if they're not by statute required to be. So I think that does bring us more into the realm of normal politics.

What we're seeing here looks much more like of the doctrine of unconstitutional conditions; i.e., you are only eligible for federal money prospectively and apparently retrospectively if it turns out that your state was smart enough to vote for the winner in the last presidential election.

**THE COURT:** In a situation where the -- I think you were saying that this isn't a situation where there's scares resources because there's already been an appropriation.

But isn't it the case that if they are terminating some grants either that money is going to be reallocated or it's going to return to the taxpayer in some sense?

So help me understand why they could -- the government couldn't make the argument that it's selecting -- among the many grants that have been given under this program, it's selecting the blue state grants in order to further its agenda in other legislation.

**MS. POLSKY:** Absolutely. Two responses, Your Honor.

One is, if the government were making a rational decision to eliminate some expenditures it doesn't want to incur -- again, supposing we can get around the issue that this is already-promised money -- the government would not terminate a

lot of low-dollar grants while leaving very high-dollar grants in place in red states. That's very hard to describe as legitimate.

So, for example, the uncanceled hydrogen hubs in red states are vastly larger grants than most of the grants that are on the list of three-hundred-plus grants in blue states. So this can't be justified as physical stringency.

And second this brings us to Your Honor's Question 3, I'm not sure if we're there yet, but the issue of whether we are seeking to certify a class with respect to a contrary to law claim.

In certain cases here -- and I would, again, bring us back to direct air capture, Dr. Bedworth's grant, what's being terminated is something that Congress said must be funded.

So, no, the money doesn't go back to the taxpayer. This is impoundment. There's a statutory section that you cite in Your Honor's question that says we're going to have these direct air capture projects because it is essentially a national emergency to stabilize the climate.

**THE COURT:** Let's go to Question 3. I think we have had a thorough enough discussion on the equal protection clause.

So my Question 3 is: Are plaintiffs seeking to certify a class with respect to that contrary to law claim under the Administrative Procedures Act; and if so does any evidence in

the record indicate that there are other projects involving the UC researchers beyond the CALDAC project and the ARCHES project that have been terminated in a manner inconsistent with 42 United States Code Section 1629(8)(d) or 42 United States Code 1616(1)(a)?

Those are the sections requiring funding of direct air capture hubs and funding at least one renewable energy hydrogen hub.

**MS. POLSKY:** Yes, Your Honor.

The simple answer is we are not presently seeking to certify a class with respect to a contrary to law claim because we think that would fail for numerosity for the reason you say. Generally, Congress is not that specific. And it's striking and arguably elevates the Government's burden of justification in trying to terminate these grants that Congress specifically said, "We need hydrogen hubs and we need direct air capture." So it was very specific decision-making. Most of these grants are not of that type.

However, the APA contrary to law prong contemplates violation of regulations in addition to statutes and we believe that as this case progresses we are very likely to find that there are clear violations of DOE's own regulations about grant termination, in which case we might, at some future point, be seeking to certify a contrary to law class.

And this is not only a supposition based on the things

I've described like the faux letterhead, and the haste and so forth and the public statements. There is an item that I have just shared with opposing counsel and that I would like to bring to the Court's attention that was breaking news yesterday. I had to obtain this from a reporter because it's not widely available, and this is a news announcement from the office of Senator Adam Schiff. And may I approach?

**THE COURT:** You may pass it to my courtroom deputy. Thank you. And you've already provided a copy to opposing counsel?

**MS. POLSKY:** Yes, I did, just before the hearing.

And there are three items here, Your Honor. I've put them in chronological order to make it intelligible. But the one that I want to talk about, the very last, I've put a yellow flag on that at the top.

And so this -- there was an announcement yesterday that the Department of Energy's Office of Inspector General has decided to launch an independent investigation into the unlawful termination of DOE grants to California because there my be procedural irregularity.

If -- the second document here is the October 20th letter in which California's two senators and a number of California congressional representatives wrote to Ms. Sarah Nelson, the acting IG for the Department of Energy, and requested this investigation describing a number of what they perceived to be

procedural irregularities through creation of this classification that we've been amply discussing.

The final item here, and this is the one that was issued just yesterday is a communication back from Ms. Nelson, who's identified as performing the duties of the inspector general for the Department of Energy, opposing counsel's client. This is addressed to the Honorable George Whitesides of the U.S. House of Representatives. It thanks the representatives for their letter raising concerns about these cancellations and it says the Officer of Inspector General, quote, recently announced an audit which will review the Department of Energy's processes when cancelling financial assistance and whether these cancellations were in accordance with established criteria.

And so we think when the results of this audit are known, it may well be that the IG is compelled to find that there were a number of procedural violations, and then we might be back with a contrary to law claim; but we do not have one at this time, Your Honor.

**THE COURT:** Given that plaintiffs are not pursuing that claim, I don't have questions for defendants on that issue. But let me know if there's something else you think I ought to know about that issue.

**MS. BARRAGAN:** So I can just briefly state, Your Honor, that I think plaintiffs agree that the two statutes

could only be attributed to the named plaintiffs' grants, and they wouldn't apply to the class, generally.

And in terms of future regulations that may be violated, it seems like, at least to the equal protection class, that's a discrete set class based on October terminations. So I'm not really sure how future regulatory violations might occur with respect to that class.

**THE COURT:** Let me just move month Question 4 which is about the third form termination class. And just to be clear, I'll have a little time at the end for you to tell me anything else that you think is important before I take the matter under submission.

So let's move to Question 4.

Is there any more of an update from the parties on the number of putative third form termination class members? It looked like, from the Government's brief, that the government was continuing to assess is that issue. So I'm curious if the government or plaintiffs have an update.

And also I would like to know if the government agrees that two individuals named, Dr. Brouwer and Dr. Liu, would fall within the list of putative class members.

Let me start with the government on that.

**MS. BARRAGAN:** Thank you, Your Honor.

Just to preface, before I answer your question, I just wanted to note, during the second set of provisional class

certification, the government conceded numerosity, after we looked into it and were convinced that it had been satisfied. And, again, we took a similar, careful approach here, and we determined after an investigation that there are issues with numerosity here. And so that is why we're continuing to raise it.

And so we included the Davis declaration with our opposition brief. And I can go through the methodology that we used there. We essentially pulled the grant application materials for the grants that were named in Exhibit A to Professor Polsky's declaration, and these grant application materials they typically include an award summary document that explicitly lists the principal investigators or co-PIs who are on the grant application and will be working on the grant.

And there's also typically a list of resumes of the PIs and co-PIs. And so we looked through those resumes and we looked through the summary documents to determine if there are any UC individuals who were listed as PIs, co-PIs, or lead researchers on the grant application materials.

And we think this methodology tracks exactly what the previous class definitions have been in this case which is simply UC individuals who are listed as PIs, co-PIs, or lead researchers on the grant application materials. That's generally been the class definition and so that's what we used for our methodology.

And I'll last note that DOE is happy to share these grant application materials with the Court and with plaintiffs' counsel, but we just want to be careful about that because as you might understand there's a lot of trade secret information in these materials, confidential information, so we need to do this carefully. That's why we haven't been able to share it at this time, but we're happy to do so.

So now I'll get into the first part of your Question 4.

So we can provide an update on the six grants that we listed in paragraph 7 of the Davis declaration which is ECF Number 165-1. And these are the six grants in Exhibit A of Professor Polsky's declaration that didn't federal award identifiers in the exhibit, so it took DOE a bit longer to track down these awards, but we were able to track them down. I can go through each of those six briefly.

**THE COURT:** That's fine.

**MS. BARRAGAN:** So I'll start with sub-2024-10252. We determined that the period of performance for this grant ended naturally by its terms on December 31st, 2024. So the grant has been fully paid out. It doesn't look like there's any termination with respect to that grant.

Same with the grant ending in Exhibit A with 228132. So for that grant we determined there is one UC researcher in the grant application materials, that's Dr. Zenyuk. However, in the Davis declaration she's already included for purposes of

numerosity. She's named PI on a number of the grants that have been terminated so we didn't include her as an update to the numerosity count.

Moving the grant ending in A144556, it looks like this grant actually is grants with two particular federal award identifiers and we confirmed both of these are still active, and there's been no termination letter issued with respect to these grants.

Similarly, A140373 expired by its terms on July 31t, 2025.

And there are two grants left of these six, and those both -- the two remaining both have UC individuals listed as PI -- PIs on the application materials, and these are new individuals so we would add them to numerosity. And those are grants ending in MA2057 and 1564668.

So our original count in opposition was 14 putative class members. This adds two.

And the last bit of this is that in the Davis declaration there was one grant with a federal award identifier that just took DOE a bit long together to pull application materials for, and that is the grant with the federal identifier DEEEE0010724. That is in paragraph 13H of the Davis declaration.

And we determined there's one additional UC individual listed as a PI on that grant. That's Dr. David G. Victor at UC San Diego.

So just to summarize that, DOE has identified an addition

three UC researchers who we think would fit the class definition here that plaintiffs have proposed. That puts our total at 17 researchers.

Now, I'll address the second part of Your Honor's question which is as to the three additional grants that the plaintiffs identified in their reply brief that are attributed to Dr. Brouwer and Dr. Liu.

We looked into these grants and we don't think either of these individuals should be included as putative class members because DOE's determined that none of these grants have been terminated, and I can walk through that as well.

So one of them is ending in 00321381.087. This seems to be funding opportunity announcement, not a final award. And DOE provided me a link to that opportunity announcement. I'm happy to share that with the Court. We determined there's no executed award here with respect to UC Irvine, which I believe that's Dr. Brouwer's university, so we think that's the selection that the plaintiffs are referring to here. But there's no termination letter with respect to any selection here because there's no final award to UC Irvine, so we don't think there's anything that could have been terminated here.

Now, moving to the grant ending in 11656, DOE's determined that is an active grant and has not been terminated.

And finally as to the third grant which ends in 32667, again, DOE has determined that negotiations as to this award

have not been completed and there's no execution of this award. And so, again, there's no termination letter because there's nothing to terminate here.

And I can also briefly address some of the arguments that plaintiffs made in reply with respect to numerosity.

Again, the Ninth Circuit -- courts in the Ninth Circuit have just held as a general rule that classes under 21 putative class members are too small, and the general benchmark is 40 putative class members. We don't think that plaintiffs have met their burden to show that either the third form termination class or the proposed equal protection class are sufficiently numerous.

And, again, class actions are generally only warranted where joinder is impracticable here, and we think here individual lawsuits are perfectly feasible. There's a small enough number of individuals and they're all readily identifiable.

**THE COURT:** Anything further from plaintiffs?

**MS. POLSKY:** A number of things. I apologize, Your Honor. There are many factual developments here.

Starting with Dr. Iryna Zenyuk, who is a world leading hydrogen and fuel cell researchers at UC Irvine, I had the opportunity to speak with her and specifically ask her about this question of whether -- of how we determine how many critical researchers are actually implicated by a given grant.

As you know from the briefing we believe that Department of Energy is considerably undercounting by essentially just looking at PIs and co-PIs. And if you look at something like ARCHES or even Dr. Bedsworth's award, which is for well over a million dollars, I'm sure she would love to be funded to that tune. This is obviously going to multiple people. I believe, in her case that's about seven people.

So I said to Dr. Zenyuk, to what extent are Ph.D. students, post-docs, and senior researchers typically or always identified by function in a grant application or identified by name, because this goes to the existing class definition which speaks about these key researchers being named.

And she said: Well, we must budget for them as part of the application as part of the budget.

So impliedly there are more than the PIs who are integral to doing the project contemplated. She said (as read):

"So every proposal will have a budget and they must be budgeted for. Function is identified as each person in the budget should be attached to a task number. We have to provide DOE with their nationality as part of supplementary documents."

So names are identified in supplementary documents, functionality in the main document.

And so what we have here, essentially, is a case where we do not have in the record the communications between DOE and

grantees that are subsequent to the award announcement, when the identification of the specific individuals performing research critical budgeted tasks will be identified.

And so this is an issue that we were not contemplating, Your Honor, based on the early agencies we brought before you because, for example, a National Endowment for the Humanities award, typically is not a multiyear award involving a lab and equipment and techs, and people have to know how to use certain statistical programs, and there's not a whole cast in the wings critical to consummating the project on, in our case, Middle Eastern History.

And so when we get to awards like DOE's in particular that are vast -- you know, six-, seven-figure awards, nine-figure awards in the case of ARCHES -- there -- there are enormous number of critical researchers with unique expertise who are identified by name later on.

And similarly in any multiyear award -- most of these are multiyear awards -- there will be Ph.D. students, post-docs, even primary researchers who come and go. You know, they move to another university; typically, they don't take their grant with them, so there will be substitutions. So it's impossible to confine the universe to people who are actually named on the application and have it be reasonably reflective of the number of UC researchers affected.

So that might be a matter of just tweaking the class

definition a little bit by saying, you know, identified by function in a grant application, or named in a grant application or subsequent -- or communication subsequent to the award. But, again, this is relatively new issue that's implicated but these big multiyear awards.

**THE COURT:** So are you proposing a different class definition than what you had originally proposed in the papers?

**MS. POLSKY:** We could address this in a number of ways, Your Honor. That's -- that's one possibility with respect to these awards. But it is also possible that simply between now and the time of our motion for summary judgment, we identify and describe these additional actors who we define as principal researchers. As opposing counsel has indicated, it takes some time to figure out all the people on these awards. So we can just consider this a provisionally certified class in terms of the numerosity issue. And we are absolutely confident we will be back to you with well more than 21, and I'm confident more than 40 people based on what I understand.

Dr. Zenyuk alone said every time there's PI or a co-PI, it is a guarantee that there are one-plus devoted post-docs or doctoral students with specialized expertise on that project. So I think overnight we can double that. Obviously, we need to get that in via declaration, but I'm just forecast that even without changing the class definition, we will be at a much larger number soon.

A final issue, if you don't mind, that I might want to raise at the risk of overcomplicating things is just responsive to what opposing counsel said about why we might not be able to count the Dr. Brouwer/Dr. Liu grants for purposes of numerosity because this will apply to other researchers. There appear to be many grants at DOE that are essentially in limbo where DOE, under the Biden Administration, communicated that they would be funded. There was an assistance award, but ultimately there was not the contracting communication that would be predicate to issuing a termination notice.

So, for example, when I had communication with Dr. Liu, he said, "We have not received any termination notice although our grant number has shown up several times in the online news as one that was being terminated. However, the funding has not arrived at UC Riverside, so we cannot start the project or incur any expense. When I inquire it's 'No updates yet, still tracking this as being under DOE review.'"

And I have had these kind of communications with a number of researchers including Dr. Brouwer, who made for me a list of his federal DOE awards that were canceled or terminated. There were five of them. One was ARCHES. We counted him towards our ARCHES number of affected researchers. The other two had FAIN numbers that we were able to cite and provide which enabled opposing counsel to confirm that they were officially terminated.

But then there are additional awards, two additional awards that are essentially in this purgatory where essentially the Department has said "We will be funding this," but the -- the awards seems to have lapsed because DOE is not processing the next budget period that was contemplated. And for one of these Dr. Brouwer says, our go/no-go decision point is January 2026. So like if we don't hear from DOE "You have the money," we can't do the project.

In our view, that is a constructive termination. If they choose not to call it a termination because there's no termination letter issued, that to me sounds awfully reminiscent of calling something a suspension rather than a termination. The researchers do not have the money. They cannot get communication from program officers about when they will have the money. They cannot plan. They cannot spend. That is constructive termination.

So I don't think we will even need to include those to get well above the numerosity threshold. But I wanted to explain that as a reason there's some discrepancy in our accountings of who's been affected. The universe is much, much larger.

Thank you, Your Honor.

**THE COURT:** Last word for defendants.

**MS. BARRAGAN:** Thank you, Your Honor.

So just to address a few of the points that plaintiffs' counsel has made. We reviewed -- DOE reviewed all grant

application materials including budget information that was submitted as part of the grant application. And that's what we used to determine whether there were UC researchers named on the grant application materials. So we did including, you know, budget information that was submitted in our numerosity calculation.

And it seems like plaintiffs are suggesting that the class definition should be broadened to include non-lead researchers on certain projects, such as graduate students, and we think that would affect the standing analysis in this case, which is really predicated on the idea that these grants, the researchers -- you know, these are their projects and they have ownership over these projects. And I think that becomes increasingly difficult to justify as we start to include individuals who, for example, in Exhibit A are listed with time as small as .04 full-time equivalent hours on a particular grant. You know, that person can't be considered part of the current class definition. And so I think that just introduces some issues with the Court's prior reasoning in this case.

And then finally I'll just briefly address plaintiffs' points as to Dr. Liu and Dr. Brouwer's applications. You know, DOE's determined that there aren't final awards in this case, so there haven't been termination letters issued as to these awards because there's no final award with agreed-upon terms.

**THE COURT:** Thank you all for the argument. It was

very helpful, and for the briefing. I'm going to take the matter under submission and issue a written order.

Be well.

**MS. POLSKY:** Thank you, Your Honor.

**MS. BARRAGAN:** Thank you, Your Honor.

**THE COURTROOM DEPUTY:** Court is adjourned.

(Proceedings adjourned at 11:18 a.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Monday, December 22, 2025

Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court