UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEETA THAKUR, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, et al., <br><br> Defendants. | Case No. 25-cv-04737-RFL <br><br> **ORDER GRANTING MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT AND DENYING MOTION FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION** <br><br> Re: Dkt. Nos. 154, 156 |

## I.   INTRODUCTION

This action was filed in June of 2025 by University of California ("UC") researchers, after a wave of *en masse* federal grant terminations via form letters abruptly cancelled the funding for many of the researchers' projects. Department of Energy ("DoE") has been a Defendant from the start, but none of the named Plaintiffs had grants terminated by DoE. In early October 2025, however, DoE terminated more than $7 billion in grant funding *en masse* nationwide, including grants to two new proposed named Plaintiffs. The record shows that DoE's terminations in October 2025 heavily impacted grantees and projects located in Blue States.[1] There is also evidence that this was by design. Just before the terminations were announced, the President threatened congressional Democrats that he could do "irreversible" harm by "cutting things that they like, cutting programs that they like," and Russell Vought, the Director of the Office of Management and Budget ("OMB"), stated that funding for the "Left's

---

[1] The parties refer to those states where the majority of the electorate voted for the Democratic presidential candidate in 2024 as "Blue States" and to those states where the majority voted for the Republican candidate as "Red States," so this Order does so as well.

climate agenda is being cancelled" and listed 16 Blue States as the location for DoE projects targeted for termination.  (Dkt. Nos. 159-3, 159-5.)  In its termination letters, however, DoE claimed in boilerplate fashion that the terminations were based on changes in agency priorities.

Plaintiffs seek leave to file a Third Amended Complaint, adding the two proposed named Plaintiffs whose project funding was summarily terminated by DoE in early October 2025.  (Dkt. No. 154.)  The proposed named Plaintiffs seek to assert several class claims against DoE, including claims under the Administrative Procedure Act ("APA") that DoE's *en masse* termination of grants using form letters was arbitration and capricious and contrary to law, and that DoE violated the Equal Protection Clause of the Fifth Amendment when it terminated grants for projects being performed in Blue States.  Plaintiffs also bring a Motion for Preliminary Injunction based on their equal protection claim and seek provisional class certification in order to support a classwide grant of preliminary injunctive relief.  (Dkt. No. 156.)[2]

Plaintiffs are entitled to amend their complaint.  However, at this stage, there is not enough information in the record to support a finding that the terminations likely violated the Equal Protection Clause.  No administrative record is available at this early stage, and Plaintiffs have not submitted sufficient evidence to support a determination that the terminations likely lacked any conceivable legitimate purpose and were based *solely* on political animus.  Therefore, no preliminary injunctive relief will issue and no provisional class is certified.  At the same time, as a matter of case management, the Court recognizes the importance of the issues raised and the urgency of promptly resolving the claim on the merits.  A separate order will issue setting a case schedule to proceed directly to cross-motions for summary judgment on the equal protection claim after production of the administrative record and discovery, in line with the schedule set for the other constitutional claims in the case.

---

[2] Plaintiffs' motion initially sought class certification and preliminary injunctive relief on behalf of a class of Plaintiffs asserting APA claims as well.  However, as discussed below, the parties have now jointly requested that the Court instead withhold ruling on this issue.

## II.     BACKGROUND

### A.     Procedural History

In this action, four classes have been provisionally certified, and two preliminary injunctions have issued, that together (i) prohibit the EPA, NEH, NSF, DoT, DoD, and HHS-NIH from "giving effect to any grant termination" that is "communicated by means of a form termination notice" that lacks a reasoned explanation; and (ii) prohibit the EPA, NEH, NSF, and DoT from "giving effect to any grant termination" pursuant to Executive Orders 14151 or 14173, which bar funding of research on certain DEI-related topics. *Thakur v. Trump*, 787 F. Supp. 3d 955, 1006 (N.D. Cal. 2025) ("*Thakur I*"); *Thakur v. Trump*, 800 F.Supp.3d 1044, 1065–67, 1072–75 (N.D. Cal. 2025) ("*Thakur III*").[3]

The government moved to stay the *Thakur I* injunction pending appeal. The Ninth Circuit initially denied the government's request, *Thakur v. Trump*, 148 F.4th 1096 (9th Cir. 2025) ("*Thakur II*"), but it recently issued an amended order granting the stay with respect to Plaintiffs' arbitrary and capricious claim under the APA. *Thakur v. Trump*, No. 25-4249, 2025 WL 3760650 (9th Cir. Dec. 23, 2025) ("Amended Order"). In the Amended Order, the Ninth Circuit explained that it was bound by the Supreme Court's intervening decision in *National Institutes of Health v. American Public Health Ass'n*, 145 S. Ct. 2658 (2025) ("*NIH*"), which held that the "APA's limited waiver of sovereign immunity did 'not provide the District Court with jurisdiction to adjudicate' similar APA claims challenging grant terminations." Amended Order, 2025 WL 3760650, at * 3 (citing *NIH*, 145 S. Ct. at 2660). The Ninth Circuit did not disturb its denial of the government's stay request with respect to the viewpoint discrimination claim. *Id.* at *6.

Plaintiffs have requested reconsideration or *en banc* review of the Amended Order. *See* Motion, *Thakur v. Trump*, No. 25-4249 (9th Cir. Dec. 29, 2025), Dkt. No. 74.1. The government has appealed both the Court's preliminary injunction orders. *Thakur v. Trump*, No. 25-4249 (9th

---

[3] Capitalized terms not defined in this Order are defined in *Thakur I* and *Thakur III*. All citations to page numbers refer to ECF pagination.

Cir. July 10, 2025); *Thakur v. Trump*, No. 25-7342 (9th Cir. Nov. 21, 2025).  In light of these ongoing appellate proceedings, the parties have asked the Court to withhold ruling on Plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification with respect to Plaintiffs' APA claims against DoE, pending further guidance from the Ninth Circuit.  (Dkt. No. 180 at 2.) Therefore, the motion is denied without prejudice as to those claims, so that it may be re-raised at a later juncture if appropriate.

### B.    Factual Background

In late September 2025, the President responded to a likely lapse in congressional appropriations by threatening to retaliate against congressional Democrats.  Shortly before the terminations at issue, on September 30, 2025, the President stated "[w]e can do things during the shutdown that are irreversible, that are bad for them and irreversible by them, like cutting vast numbers of people out, cutting things that they like, cutting programs that they like."  (Dkt. No. 159-3 at 3; *see also* Dkt. No. 159-4 at 2 (statement by the President on October 9, 2025, after the terminations at issue, reiterating that "[w]e're only cutting Democrat programs").)  On October 1, 2025, the first day of the federal government shutdown, OMB Director Russell Vought issued the following statement on X:

> Nearly $8 billion in Green New Scam funding to fuel the Left's climate agenda is being cancelled.  More info to come from @ENERGY.
>
> The projects are in the following states: CA, CO, CT, DE, HI, IL, MD, MA, MN, NH, NJ, NM, NY, OR, VT, WA

(Dkt. No. 159-5 at 2.)  The following day, DoE announced the termination of 321 financial awards totaling more than $7.5 billion.[4]  Although the record indicates that DoE initially selected more than 600 awards for potential termination—including projects in states with a Republican voting history—Plaintiffs have presented evidence that 98% of the awards actually terminated in October supported projects with a primary place of performance listed as a state where the

---

[4] (Dkt. No. 159 ¶ 3); https://www.energy.gov/articles/energy-department-announces-termination-223-projects-saving-over-75-billion. All websites were last visited January 29, 2026.

majority voted for the Democratic candidate in the 2024 presidential election and have two Democratic-caucusing Senators.[5]  Defendants have introduced a report from the nonprofit Energy Futures Initiative Foundation, finding that the October terminations ultimately impacted projects in 49 states, and that many of the impacted projects span multiple states.[6]  However, the analysis appears to incorporate downstream effects, and includes five grants terminated in May 2025 but announced in October 2025, making a precise comparison difficult.[7]

Dr. Plamen Atanassov is the Chancellor's Professor of Chemical & Biomolecular Engineering at UC Irvine.  (Dkt. No. 158 ¶ 2.)  His research spans engineered materials, fuel cell electrocatalysts, and materials for power production, energy conversion, and storage.  (*Id.* ¶ 5.)  In 2023 and 2024, Atanassov and his team received DoE funding for three largescale projects to be implemented in collaboration with private sector partners.  The projects include the production of "the first industrial-scale, U.S.-manufactured fuel cell catalysts [with] . . . 30% 'Made in USA' content" and $1.2 billion in funding to create a hydrogen hub in California.  (*Id.* ¶¶ 17, 27.)

Dr. Louise Wells Bedsworth is the Executive Director at the Center for Law, Energy, and the Environment ("CLEE"), the Director of the Land Use Program at the CLEE, and Senior Advisor at the California-China Climate Institute at UC Berkeley School of Law.  (Dkt. No. 157 ¶ 2.)  In August 2024, DoE approved Bedsworth and her team's proposal to conduct a "Feasibility Study to Co-Create a Community Alliance for Direct Air Capture," and executed an assistance agreement to provide more than $2.6 million in funding between 2024 and 2026.  (*Id.* ¶¶ 8, 13.)

Between October 1–2, 2025, DoE terminated all four projects via brief form letters as

---

[5] (Dkt. No. 159 ¶¶ 3–6, 10); *DOE Floats New Cuts to Hundreds of Clean Energy Grants,* E&E News, https://perma.cc/5B76-VGQP.

[6] https://efifoundation.org/wp-content/uploads/sites/3/2025/11/EFI-Foundation-Unpacking-DOEs-October-Award-Cancellations.pdf, at fig. 8.

[7] *Id.*, at fig. 1.

part of its *en masse* termination of grants.  The letters each included language to the effect that the projects were not consistent with DoE's or the Administration's goals, policies, and priorities.  (Dkt. No. 158-5 at 2; Dkt. No. 158-8 at 2; Dkt. No. 158-13 at 2; Dkt. No. 157-4 at 2; Dkt. No. 157-5 at 2.)  Termination was effective immediately, and Atanassov and Wells Bedsworth assert that they lost professional opportunities, funding to pay their staff and graduate students, and the ability to continue their research.  (Dkt. No. 158 ¶¶ 14, 22, 36–37; Dkt. No. 157 ¶¶ 18–19.)

## III.    LEAVE TO FILE THIRD AMENDED COMPLAINT

Pursuant to Federal Rule of Civil Procedure 15(a), parties are permitted a short window during which they may amend their pleading once as a matter of course.  Fed. R. Civ. P. 15(a)(1).  After that initial period has passed, amendment is permitted only with the opposing party's written consent or leave of the court.  *Id.* at 15(a)(2).[8]  Rule 15 instructs that "[t]he court should freely give leave when justice so requires."  *Id.*  The factors considered when determining whether to grant leave to amend under Federal Rule of Civil Procedure 15(a)(2) include: "(1) bad faith on the part of the movant; (2) undue delay; (3) prejudice to the opposing party; and (4) futility of the proposed amendment."  *Ciampi v. City of Palo Alto*, No. 09-cv-2655-LHK, 2010 WL 5174013, at *2 (N.D. Cal. Dec. 15, 2010) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Each of these factors supports granting Plaintiffs leave to amend.

First, there is no evidence of bad faith or undue delay.  Plaintiffs' counsel has submitted a declaration stating that Plaintiffs have continuously sought information related to DoE's termination of grants to UC researchers, including through a California Public Records Act request.  (Dkt. No. 160 ¶¶ 2, 8.)  However, it was not until the recent wave of terminations on October 1–2, 2025 that they were able to identify individuals they believed could properly assert

---

[8] Defendants do not argue that Plaintiffs are required to show good cause under Rule 16(b)(4), as an extension of the case schedule to accommodate amendment had already been authorized, per the parties' stipulation.  (Dkt. Nos. 151–52.)  Regardless, even if Plaintiffs were required to show good cause, they have shown the necessary diligence for the reasons stated in this section. *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992).

claims on behalf of a class, as well as a sufficiently high volume of terminations to merit class treatment. (*Id.*) Counsel states that the recent government shutdown and information access issues caused by the terminations themselves further delayed Plaintiffs' ability to file their proposed Third Amended Complaint. (*Id.* ¶¶ 5, 9.)

Defendants respond that Plaintiffs could have sought amendment six months earlier, but it is undisputed that very few DoE terminations impacted UC researchers prior to October 2025, and that none impacted existing named plaintiffs. (Dkt. No. 165 at 13 (identifying a total of 24 DoE awards terminated in May 2025, compared to more than 300 in October); *id.* at 24 (identifying only three awards funding UC researchers suspended before October 2025).) Therefore, the relevant start date for the timeliness analysis is early October 2025, when DoE engaged in an *en masse* termination of grants. Plaintiffs' delay of less than two months to file this motion does not constitute undue delay, in light of Plaintiffs' counsel's diligent efforts to identify potential named plaintiffs, and to gather the necessary information to support their complaint and request for class-wide preliminary injunctive relief. Defendants submit no evidence to contradict Plaintiffs' counsel's description of these efforts, and only speculate that the delay was the result of Plaintiffs' non-party status to the grants at issue, or that it was a tactical decision by counsel. (*Id.* at 18–19.) None of this raises an inference of bad faith or undue delay.

The prejudice factor also favors amendment. The parties have stipulated to an amended case schedule. (Dkt. Nos. 151–52.) Furthermore, Defendants have separately proposed delaying briefing of dispositive motions in this action pending finalization of the *en banc* process in the Ninth Circuit. (Dkt. No. 180 at 3.) Finally, while the Ninth Circuit has declined to stay the Court's injunction relating to Plaintiffs' First Amendment claim, the government "cannot suffer harm from an injunction that merely ends an unlawful practice." Amended Order, 2025 WL 3760650, at *5 (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). Therefore, the brief delay caused by the amendment does not unfairly prejudice Defendants.

Finally, Plaintiffs' proposed amendments are not futile. As further explained below,

although there is insufficient evidence to issue a preliminary injunction on the equal protection claim, Plaintiffs' allegations plausibly identify signs that the terminations were indeed based purely on partisan animus and lacked any rational connection to a conceivable legitimate government purpose.  *See Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988) ("[A] proposed amendment is futile only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim.").  Moreover, the jurisdictional issues concerning Plaintiffs' APA claims are still being litigated in the Ninth Circuit, and are sufficiently complex that both parties have requested the Court withhold ruling pending resolution of those proceedings.  *See*, *e.g.*, *Green Valley Corp. v. Caldo Oil Co.*, No. 09-cv-04028-LHK, 2011 WL 1465883, at *6 (N.D. Cal. 2011) (identifying the "general preference against denying a motion for leave to amend based on futility").  The motion for leave to file a Third Amended Complaint is granted.

## IV.    PRELIMINARY INJUNCTION

"[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).  In order to obtain a preliminary injunction, Plaintiffs must establish that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest.  *Id.* at 20.[9]  When the nonmoving party is the government, the final two factors merge.  *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

---

[9] Preliminary injunctive relief may also issue where a plaintiff shows "serious questions going to the merits" of their claim, that the "balance of hardships tips *sharply* in the plaintiff's favor," and that the two other *Winters* factors are met.  *All. for the Wild Rockies v. Peña*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quotations omitted and emphasis in original).  "Serious questions are issues that cannot be resolved one way or the other at the hearing on the injunction because they require more deliberative investigation" and "parties do not show serious questions when they raise a merely plausible claim."  *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024) (quotations omitted).  It is not clear from Plaintiffs' Motion whether they seek relief under the serious questions standard.  To the extent they do, the standard is not met for the reasons described below.

### A.    Likelihood of Success on the Merits

Plaintiffs have presented evidence that 98% of the more than 300 financial awards that the DoE terminated in October 2025 supported projects with a primary place of performance listed as a Blue State.  At the time, the President described this effort as "cutting things that [Democrats] like," and OMB Director Vought stated that funding for the "Left's climate agenda is being cancelled."  (Dkt. Nos. 159-3, 159-5.)  Plaintiffs argue that these facts amount to an equal protection violation on the following theory:  Defendants, guided by partisan animus, chose DoE grants for termination based principally on their location in a Blue State—a factor that bears no rational relationship to a legitimate government interest.  As a result, Plaintiffs are allegedly being treated differently from other researchers based on the fact that they are working on projects in Blue States.

Rational basis review applies to Plaintiffs' claim, as Plaintiffs concede.  (Dkt. No. 167 at 16.)  Although heightened scrutiny is required for classifications that "proceed[ ] along suspect lines[ ] or infringe[ ] fundamental constitutional rights," *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993), those exceptions do not apply here.  In this context, residents of states that voted for Democrats do not represent a suspect class, and Plaintiffs do not contend that their interest in continued federal funding constitutes a fundamental right.[10]  Therefore, the question is whether "any reasonably conceivable state of facts [] could provide a rational basis for the classification."  *Heller v. Doe*, 509 U.S. 312, 320 (1993) (quotation omitted).  That standard is highly deferential and requires the courts to begin with a "strong presumption of validity" in favor of the government action.  *Beach Commc'ns*, 508 U.S. at 313–14.

To prevail on their claim, Plaintiffs bear the burden to demonstrate "that a class that is similarly situated has been treated disparately."  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1063–64 (9th Cir. 2014) (quoting *Christian Gospel Church, Inc. v. City & Cnty. of San*

---

[10] Plaintiffs are not asserting a First Amendment challenge based on the October 2025 DoE terminations.  *Cf. Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 269–70 (2016); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283 (1977).

9

*Francisco*, 896 F.2d 1221, 1225 (9th Cir. 1990)).  The comparator group "need not be similar in all respects, but they must be similar in those respects relevant to the Defendants' policy."  *Id.* at 1064 (citing *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).  Next, Plaintiffs must negate "every conceivable [rational] basis which might support" such disparate treatment.  *See Olson v. California*, 104 F.4th 66, 77 (9th Cir. 2024) (en banc) (quoting *Armour v. City of Indianapolis*, 566 U.S. 673, 685 (2012)), *cert. denied*, 145 S. Ct. 382 (2024).

Plaintiffs have not carried their burden of showing a likelihood of disparate treatment with no possible rational basis.  Defendants contend that DoE has shifted its priorities to align with those of the new Administration, and that it terminated projects that did not further its priorities.  (Dkt. No. 165 at 32–33.)  The termination letters are consistent with this stated rationale, as is Vought's public statement discussing canceling the "Left's climate agenda."  Plaintiffs concede that re-orienting agency priorities would be a legitimate government interest, and the current record does not foreclose that DoE selected grants for termination in a manner rationally related to this basis.  It is conceivable that DoE's new priorities generally align with projects in Red States, and not with projects in Blue States—which would account for the high number of Blue State terminations Plaintiffs have identified.  Atanassov's hydrogen hub project provides an apt example.  The record shows that, as part of the October 2025 terminations, DoE cancelled the only two hubs that could produce clean hydrogen from renewable energy (which Plaintiffs call "green" hydrogen hubs), but did not cancel five other hydrogen hubs, which are not green.  (Dkt. No. 160 ¶ 11; Dkt. No. 167 at 13.)  The green hydrogen hubs are both in Blue States, while the non-green hydrogen hubs are at least partly located in Red States.  (Dkt. No. 160 ¶ 11.)  Therefore, on the current record, it is conceivable that Atanassov's hydrogen hub project was cancelled not because it is located in California, but because DoE no longer prioritizes green hydrogen hubs.

Plaintiffs dispute whether this is a plausible basis for the classification on the existing record.  They note that DoE initially compiled a list of 600 grants to terminate, but ultimately terminated almost exclusively Blue State grants, while declining to cancel some Red States'

renewable energy projects on the list.  *See* Section II.B.  While a close call, Plaintiffs have not submitted evidence sufficient to conclude that the Court will likely be able to rule out Defendants' proffered basis for the classification.  For example, Plaintiffs have not submitted evidence that the bulk of the non-terminated grants funded Red State projects, and that those projects were materially similarly situated to the terminated projects, such that the only conceivable distinction between terminated and non-terminated projects was the projects' geographic location in a Blue State.[11]  Rational basis review permits DoE to draw lines that are "to some extent both underinclusive and overinclusive."  *Vance v. Bradley*, 440 U.S. 93, 108 (1979).  "[C]ourts are compelled under rational-basis review to accept [] generalizations even when there is an imperfect fit between means and ends."  *Heller*, 509 U.S. at 321.  On the existing record, there is not enough information to determine that Defendants' classification was likely based *solely* on a distinction between Red States versus Blue States, though there are certainly some signs of that.

Plaintiffs also argue that the terminations amount to an equal protection violation if one motivating factor was animus towards residents of Blue States, even if it was not the only factor.  But in the context of pure rational basis review, "so long as there is some conceivable legitimate purpose" behind the decision, courts "need not inquire into the [decisionmaker's] actual purpose."  *Olson*, 104 F.4th at 78; *see also id.* at 81 (declining to address "impermissible animus" argument because "we have identified plausible legitimate purposes" behind the statute).  By contrast, a different analysis applies when courts assess whether the government has acted based on a form of invidious discrimination that triggers heightened scrutiny, such as race.  When race discrimination is a "motivating factor" in the government's actions, strict scrutiny applies even if it cannot be proven that the decision was "motivated solely" by that purpose.

---

[11] Plaintiffs identify two multi-state initiatives where, they assert, DOE terminated grants for projects in Blue States but not Red States.  (Dkt. No. 156 at 29 nn.12–13.)  However, the websites cited do not provide enough information for the Court to determine that the various awardees in those programs were materially similarly situated.

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).  That line of cases, however, is inapplicable because rational basis review undisputedly applies here, even assuming Blue State grantees were targeted.[12]

      *Cleburne*, *Moreno* and *Romer*, on which Plaintiffs rely, are not contrary.  Each of those cases involved a finding of a "bare desire to harm a politically unpopular group," and no conceivable legitimate government interest.  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 445, 447 (1985) (individuals with intellectual disabilities) (cleaned up); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534–35 (1973) (members of "hippie communes"); *Romer v. Evans*, 517 U.S. 620, 634–35 (1996) ("gays and lesbians").  No such record exists here.  Plaintiffs have not identified a persistently "politically unpopular group" being targeted in this action.  Rather, they have identified voters of a party that won 48.32% of the popular vote in the 2024 presidential election.[13]  Nor, as described above, have Plaintiffs carried their burden to show a likelihood that the only conceivable basis for the terminations was animus toward Blue State residents.

      Because the existing record does not suffice to support a finding that Plaintiffs are likely to succeed on the merits of the equal protection claim, this Order does not reach the remaining *Winters* factors, no preliminary injunctive relief will issue, and an equal protection class is not provisionally certified.

---

[12] In *City of Saint Paul, Minnesota v. Wright*, No. 25-cv-03899, 2026 WL 88193 (D.D.C. Jan. 12, 2026), the court found an equal protection violation based on a subset of DoE's October 2025 grant terminations after the government conceded (1) that the "only identifiable difference" between terminated and non-terminated grants was the "recipient's state's political identity," and (2) "it would be legally sufficient for equal protection purposes to find that a primary reason for the termination decisions at issue here is because of location in blue states."  *Id.* at *5 (cleaned up).  However, DoE has not made the same concessions in this case.  In fact, at oral argument government counsel in this case argued that the reasoning of the Ninth Circuit's *en banc* decision in *Olson v. California*, 104 F.4th 66 (9th Cir. 2024), foreclosed the second concession made in *City of Saint Paul*.

[13] https://www.fec.gov/resources/cms-content/documents/2024presgeresults.pdf, at 3.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Leave to File Third Amended Complaint is **GRANTED**.  With respect to Plaintiffs' equal protection claim, the Motion for Provisional Class Certification and Preliminary Injunction is **DENIED** for the reasons explained above. With respect to Plaintiffs' APA claims, the Court declines to reach these claims pursuant to the parties' agreement, and the Motion for Provisional Class Certification and Preliminary Injunction is **DENIED** without prejudice on this basis.

**IT IS SO ORDERED.**

Dated: January 30, 2026

RITA F. LIN
United States District Judge

13