**FILED**

5/26/2026

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NEETA THAKUR, on behalf of themselves and all others similarly situated; KEN ALEX; NELL GREEN NYLEN; ROBERT HIRST; CHRISTINE PHILLIOU; JEDDA FOREMAN; ELI BERMAN; SUSAN HANDY, | No. 25-4249 D.C. No. 3:25-cv-04737-RFL |
| *Plaintiffs - Appellees*, | |
| v. | OPINION |
| DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES DEPARTMENT OF GOVERNMENT EFFICIENCY; AMY GLEASON, in her official capacity as Acting Administrator of the Department of Government Efficiency; NATIONAL SCIENCE FOUNDATION; BRIAN STONE, in his official capacity as Acting Director of the National Science Foundation; NATIONAL ENDOWMENT FOR THE HUMANITIES; MICHAEL MCDONALD, in his official capacity as Acting Chairman of the National | |

2                           THAKUR V. TRUMP

Endowment for the Humanities;
UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY; LEE ZELDIN, in his
official capacity as Administrator of
the U.S. Environmental Protection
Agency; UNITED STATES
DEPARTMENT OF
AGRICULTURE; BROOKE
ROLLINS, in her official capacity as
Secretary of the U.S. Department of
Agriculture; AMERICORPS, aka the
Corporation for National and
Community Service; JENNIFER
BASTRESS TAHMASEBI, in her
official capacity as Interim Agency
Head of AmeriCorps; UNITED
STATES DEPARTMENT OF
DEFENSE; PETER HEGSETH, in his
official capacity as Secretary of the
U.S. Department of Defense; UNITED
STATES DEPARTMENT OF
EDUCATION; LINDA MCMAHON,
in her official capacity as Secretary of
the U.S. Department of Education;
UNITED STATES DEPARTMENT
OF ENERGY; CHRIS WRIGHT, in
his official capacity as Secretary of
Energy; UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; ROBERT F.
KENNEDY, Jr., in his official
capacity as Secretary of the U.S.

Department of Health and Human
Services; UNITED STATES
CENTERS FOR DISEASE
CONTROL; MATTHEW BUZZELLI,
in his official capacity as Acting
Director of the Centers for Disease
Control; UNITED STATES FOOD
AND DRUG ADMINISTRATION;
MARTIN A. MAKARY, in his
official capacity as Commissioner of
the Food and Drug Administration;
UNITED STATES NATIONAL
INSTITUTES OF HEALTH;
JAYANTA BHATTACHARYA, in
his official capacity as Director of the
National Institutes of Health;
INSTITUTE OF MUSEUM AND
LIBRARY SERVICES; KEITH
SONDERLING, in his official
capacity as Acting Director of the
Institute of Museum and Library
Services; UNITED STATES
DEPARTMENT OF THE INTERIOR;
DOUG BURGUM, in his official
capacity as Secretary of the Interior;
UNITED STATES DEPARTMENT
OF STATE; MARCO RUBIO, in his
official capacity as Secretary of the
U.S. Department of State; UNITED
STATES DEPARTMENT OF
TRANSPORTATION; SEAN
DUFFY, in his official capacity as
Secretary for the U.S. Department of

4                              THAKUR V. TRUMP

Transportation,

                    *Defendants - Appellants*.

                Appeal from the United States District Court
                   for the Northern District of California
                  Rita F. Lin, District Judge, Presiding

                Argued and Submitted November 14, 2025
                        San Francisco, California

                          Filed May 26, 2026

          Before: Richard A. Paez, Morgan B. Christen, and Roopali
                     H. Desai, Circuit Judges.

                        Per Curiam Opinion;
                   Concurrence by Judge Christen

# SUMMARY[*]

## Standing / Preliminary Injunction

The panel affirmed in part and reversed in part the district court's preliminary injunction ordering the Environmental Protection Agency, the National Science Foundation, and the National Endowment for the Humanities to reinstate University of California (UC) research grants that the agencies had terminated pursuant to certain Executive Orders, and remanded.

The district court granted a preliminary injunction and provisionally certified two classes of UC researchers: (1) those whose grants were terminated by form letter without any grant-specific explanation (the Form Termination Class); and (2) those whose grants were terminated because of DEI Executive Orders that sought to eliminate diversity, equity, and inclusion (DEI) and diversity, equity, inclusion, and accessibility (DEIA) policies and initiatives from all aspects of the federal government (DEI Termination Class). The government appealed, contending that plaintiffs lacked Article III standing and that the district court abused its discretion by awarding preliminary injunctive relief to the Form Termination Class and the DEI Termination Class.

The panel held that plaintiffs established Article III standing. Plaintiffs adequately alleged injury flowing from the government's grant terminations where they alleged the grant terminations resulted in a loss of funding and declared

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that no alternative funding was readily available. Moreover, plaintiffs alleged that the grant terminations caused injuries beyond the loss of grant funding, such as harm to reputation, disruption of projects, and the need to expend time and resources seeking alternative sources of funding.

The panel reversed the preliminary injunction with respect to the Form Termination Class, concluding that the Form Termination Class is not likely to succeed on the merits of its Administrative Procedure Act (APA) claim. The Tucker Act bars district court jurisdiction for an APA claim if that APA claim is at its essence a contract action. Here, as in *Nat'l Insts. of Health v. Am. Pub. Health Ass'n (NIH)*, 145 S. Ct. 2658 (2025), plaintiffs challenge the government's termination of research grants as arbitrary and capricious under the APA and seek relief designed to enforce an obligation to pay money pursuant to the grants at issue. Therefore, consistent with *NIH*, the panel held that the district court likely lacks jurisdiction over the Form Termination Class's APA claim.

The panel affirmed the preliminary injunction with respect to the DEI Termination Class. The panel held that the DEI Termination Class is likely to succeed on the merits of its First Amendment claim, where the agencies selected particular grants for termination regardless of the programs through which they were funded, and made decisions to terminate based only on the recipients' perceived expression of DEI, DEIA, or environmental justice viewpoints. Because the agencies' termination of grants was aimed at the suppression of viewpoints with which the government disagrees, it likely violates the First Amendment.

Because the panel concluded the Form Termination Class did not establish a likelihood of success, it addressed the remaining equitable factors only as to the DEI Termination Class. Recognizing that both the government and plaintiffs asserted colorable arguments that they will suffer some harm if the preliminary injunction is either upheld or vacated, the panel held the district court did not abuse its discretion by concluding that the remaining equitable factors favored entry of a preliminary injunction where the DEI Termination Class demonstrated likely success on the merits of its First Amendment claim.

Addressing the scope of the preliminary injunction, the panel held that the district court did not abuse its discretion by concluding that reinstatement of the terminated grants was necessary to provide complete relief.

Fully concurring in the per curiam opinion, Judge Christen wrote separately to address the legal error at the core of plaintiffs' position that the district court had jurisdiction over the Form Termination Class's APA claim. In Judge Christen's view, the identity of the party bringing a claim is immaterial to whether the claim is contractual in nature. Because the Form Termination Class's APA claim is based on research-related grants and seeks to enforce an obligation to pay money pursuant to those grants, the claim is contractual, and the claim does not become non-contractual in nature merely because it is brought by a party that is not in privity with the government.

## COUNSEL

Erwin Chemerinsky (argued) and Claudia Polsky, UC Berkeley School of Law, Berkeley, California; Linda S. Gilleran, Dylan M. Silva, Kyle A. McLorg, Katherine T. Balkoski, Anthony P. Schoenberg, and Donald E. Sobelman, Farella Braun & Martel LLP, San Francisco, California; Nabila M. Abdallah, Annie M. Wanless, Kevin R. Budner, Elizabeth J. Cabraser, and Richard M. Heimann, Lieff Cabraser Heimann & Bernstein LLP, San Francisco, California; for Plaintiffs-Appellees.

Yaakov M. Roth (argued), Principal Deputy Assistant Attorney General; Sophia Shams, Derek Weiss, Mark R. Freeman, and Daniel Tenny, Attorneys, Appellate Staff; Kathryn Barragan, Trial Attorney, Federal Programs Branch; Eric D. McArthur, Deputy Assistant Attorney General; Brett A. Shumate, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

**OPINION**

PER CURIAM:

In early 2025, three federal agencies terminated research grants en masse via form letters pursuant to certain Executive Orders issued by the President. Six researchers at the University of California (UC) who had their research grants terminated filed suit against the government on behalf of a class of similarly situated UC researchers, raising constitutional and statutory claims. The district court issued a preliminary injunction on behalf of two provisional classes, ordering the agencies to reinstate the terminated grants. The government appeals. We affirm in part, reverse in part, and remand.

**I**

**A**

The named Plaintiffs are six UC researchers who applied for and received multi-year research grants from three federal agencies: the Environmental Protection Agency (EPA), the National Science Foundation (NSF), and the National Endowment for the Humanities (NEH). Christine Philliou is a history professor at UC Berkeley who received NEH grant funding. Ken Alex is a climate policy researcher at UC Berkeley School of Law who received EPA grant funding. Neeta Thakur is a physician and associate professor of medicine at UC San Francisco who received EPA grant funding. Nell Green Nylen is a water management researcher at UC Berkeley School of Law who received EPA grant funding. Jedda Foreman is an environmental researcher at UC Berkeley who received NSF grant funding.

10                          THAKUR V. TRUMP

Robert Hirst is the editor of the Mark Twain Project at UC Berkeley and received NEH grant funding.

In April 2025, EPA, NSF, and NEH sent form letters to UC Berkeley that purported to terminate Plaintiffs' research grants.  The EPA form letter states that each terminated grant award "no longer effectuates the program goals or agency priorities" and that the "objectives of the award are no longer consistent with EPA funding priorities."  The NSF form letter states "that termination of certain [grant] awards is necessary because they are not in alignment with current NSF priorities" and that the terminated grant awards "no longer effectuate the program goals or agency priorities." The NEH form letter states that each terminated grant "no longer effectuates the agency's needs and priorities" and that "NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda."

Plaintiffs allege that these terminations resulted from the agencies' implementation of at least eight Executive Orders the President issued in January and February of 2025: Executive Order Nos. 14173, 14151, 14168, 14154, 14217, 14238, 14158, and 14222.  Executive Order Nos. 14173 and 14151 (DEI Executive Orders) seek to eliminate diversity, equity, and inclusion (DEI) and diversity, equity, inclusion, and accessibility (DEIA) policies and initiatives from all aspects of the federal government.  Executive Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, states that "critical and influential institutions of American society," including the federal government and institutions of higher education, "have adopted and actively use dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) that

can violate the civil-rights laws of this Nation." 90 Fed. Reg. 8633, 8633 (Jan. 21, 2025). The Executive Order directs the Office of Management and Budget (OMB) to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear," including grants. *Id.* at 8634. Executive Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, instructs "[e]ach agency, department, or commission head" to provide the director of OMB with a list of all "[f]ederal grantees who received [f]ederal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities since January 20, 2021." 90 Fed. Reg. 8339, 8339–40 (Jan. 20, 2025). The Executive Order directs agency heads to "assess the operational impact" and cost of those grants and "recommend actions." *Id.* at 8340. Similarly, Executive Order No. 14168, titled *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, directs that "[f]ederal funds shall not be used to promote gender ideology." 90 Fed. Reg. 8615, 8616 (Jan. 20, 2025).

The remaining Executive Orders reflect the various ways in which the government seeks to refocus or reduce government spending, including by establishing the Department of Government Efficiency (DOGE). For example, Executive Order Nos. 14217, 14158, and 14222 instruct OMB and federal agencies to work with DOGE to review existing grants and terminate those considered unnecessary in an effort to reduce federal spending. 90 Fed. Reg. 10577, 10577 (Feb. 19, 2025); 90 Fed. Reg. 8441, 8441 (Jan. 20, 2025); 90 Fed. Reg. 11095, 11095–96 (Feb. 26, 2025).

**B**

On June 4, 2025, Plaintiffs initiated a class action on behalf of similarly situated UC researchers whose federally funded grants had been or imminently would be terminated or suspended.[1]  Plaintiffs named numerous federal agencies and officers as defendants, and alleged violations of free speech, due process, separation-of-powers principles, and the Administrative Procedure Act (APA).  Plaintiffs sought a declaration that the grant terminations were unlawful and to enjoin the grant terminations.  Plaintiffs moved for a temporary restraining order and to certify a class.

On June 23, the district court granted a preliminary injunction and provisionally certified two classes of UC researchers: (1) those whose grants were terminated by form letter without any grant-specific explanation (the Form Termination Class); and (2) those whose grants were terminated because of the DEI Executive Orders (DEI Termination Class).  The district court concluded that the Form Termination Class was likely to succeed on its claim that the grant terminations were arbitrary and capricious, and that the DEI Termination Class was likely to succeed on its claims that the grant terminations violated the First Amendment and were contrary to the agencies' congressionally mandated directives.

The government appealed and sought a stay pending appeal.  On August 21, this court denied the government's motion for a stay pending appeal.  *Thakur v. Trump*, 148 F.4th 1096, 1110 (9th Cir.), *withdrawn and superseded by* 163 F.4th 1198 (9th Cir. 2025).  Several hours after the

---

[1] Plaintiffs have since amended their complaint to include additional plaintiffs who received termination letters from other agencies.

issuance of that order, the Supreme Court decided *National Institutes of Health v. American Public Health Association* (*NIH*), 145 S. Ct. 2658 (2025). The government moved for reconsideration of the court's order in light of *NIH*. Our court withdrew its prior order and issued an amended order that granted in part and denied in part the government's request for a stay pending appeal. *Thakur v. Trump*, 163 F.4th 1198, 1208 (9th Cir. 2025).

## II

We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1). We review the district court's issuance of a preliminary injunction for abuse of discretion. *California v. Azar*, 911 F.3d 558, 568 (9th Cir. 2018). We review underlying legal issues de novo and factual findings for clear error. *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 753 (9th Cir. 2018).

## III

The government contends that Plaintiffs lack Article III standing and that the district court abused its discretion by awarding preliminary injunctive relief to the Form Termination Class and the DEI Termination Class. We begin with standing and then turn to the preliminary injunction.

## A

The government argues that Plaintiffs' injuries are too attenuated and speculative to establish Article III standing because some grant recipients may be able to avoid injury by reducing expenses or securing replacement funding. The government separately contends that Plaintiffs lack standing to seek full reinstatement of the terminated grants because

14                         THAKUR V. TRUMP

no member of the class has shown an injury commensurate with that relief.  We disagree with both arguments.

The injury in fact element of standing requires a plaintiff to show "that he suffered an injury in fact that is concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  When evaluating this element, the court "must look at the facts as they exist at the time the complaint was filed."  *Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1047 (9th Cir. 2014) (citation modified).

Here, Plaintiffs allege that the grant terminations resulted in a loss of funding.  A loss of funding constitutes a cognizable economic injury.  *See Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 950–52 (9th Cir. 2013) (recognizing a cognizable economic injury arising from rights held under contract).  The government insists that Plaintiffs might ultimately be able to elude or mitigate injury by replacing lost funding or by cutting expenses.  But Plaintiffs have shown at least a "substantial risk" that they will suffer economic harm. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation modified).  Because Plaintiffs have declared that no alternative funding is readily available, "it is at least 'predictable'" that termination of the grants will "likely result" in the loss of at least some funds.  *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 124 (2025) (citation modified).

Moreover, Plaintiffs allege injuries beyond the loss of grant funding.  They contend that the grant terminations harmed their reputations, disrupted their projects, and required them to expend time and resources seeking alternative sources of funding.  *See Meese v. Keene*, 481 U.S.

465, 473–77 (1987) (recognizing the risk of reputational harm as a cognizable injury); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262 (1977) (finding standing because the plaintiff "expended thousands of dollars" on construction plans and studies, many of which would be "worthless" absent relief); *United States v. Texas*, 599 U.S. 670, 676 (2023) ("Monetary costs are of course an injury."). We conclude that Plaintiffs have adequately alleged injury flowing from the government's grant terminations.

Separately, the government contends that Plaintiffs cannot establish injury sufficient to justify their requested relief—i.e., full reinstatement of the terminated grants. In the government's view, Plaintiffs failed to demonstrate that at least one class member requires full reinstatement to remedy his or her injury. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (noting rule that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"); *Trump v. CASA, Inc.*, 606 U.S. 831, 851–55 (2025) (recognizing this principle).

The government's argument goes to the scope of the preliminary injunction, not Plaintiffs' Article III standing. Standing is a "constitutional minimum." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). That jurisdictional inquiry is distinct from the scope of an injunction, which "is based on the merits." *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 958 (9th Cir. 2025); *Kirola v. City & County of San Francisco*, 860 F.3d 1164, 1176 (9th Cir. 2017); *see also CASA*, 606 U.S. at 861 (staying universal preliminary injunctions "to the extent that the injunctions [we]re broader than necessary to provide complete relief to each plaintiff with standing to sue"). We thus reject the

government's "efforts to cloak [the scope of the injunction] as a jurisdictional issue." *See In re Google Play Store Antitrust Litig.*, 147 F.4th at 957.

We conclude that Plaintiffs have Article III standing. We will consider the government's scope-of-injunction arguments in our analysis of the district court's preliminary injunction.

**B**

Turning to the preliminary injunction, "[a] party can obtain a preliminary injunction by showing that (1) it is 'likely to succeed on the merits,' (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in [its] favor,' and (4) 'an injunction is in the public interest.'" *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (alteration in original) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). We begin by analyzing each provisional class's likelihood of success on the merits and then turn to the other equitable factors and the scope of the injunction.

**1**

The government argues the Form Termination Class is not likely to succeed on the merits because: (i) the Tucker Act precludes district court jurisdiction over Plaintiffs' APA claim, (ii) Plaintiffs' APA claim is not reviewable, and (iii) the challenged grant termination decisions were not arbitrary and capricious. We conclude that the district court likely lacks jurisdiction over the Form Termination Class's APA claim. This conclusion obviates the need to address the government's remaining arguments.

### a

We start with some background on the applicable legal framework. "Sovereign immunity shields the United States from suit absent a consent to be sued that is 'unequivocally expressed.'" *United States v. Bormes*, 568 U.S. 6, 9–10 (2012) (citation modified). A plaintiff "may sue the United States only if Congress has waived sovereign immunity for the lawsuit, and may bring its claim in federal district court only if Congress has provided for jurisdiction there." *N. Star Alaska v. United States*, 9 F.3d 1430, 1432 (9th Cir. 1993) (en banc) (per curiam).

The APA waives sovereign immunity for suits "seeking relief other than money damages" against a federal agency, provided that—among other limitations—no other statute "expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702; *see also United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1022 (9th Cir. 2023). This limitation on the APA's waiver of sovereign immunity "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012).

The Tucker Act provides that the United States Court of Federal Claims "shall have jurisdiction" over claims "against the United States" that are "founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).[2] "Generally speaking, the Tucker Act does not permit the claims court to grant equitable or

---

[2] Pursuant to the Little Tucker Act, district courts have "concurrent jurisdiction with the claims court for actions not exceeding $10,000." *N. Star Alaska*, 9 F.3d at 1432 (citing 28 U.S.C. § 1346(a)(2)).

declaratory relief in a contract dispute case." *N. Star Alaska*, 9 F.3d at 1432; *see also Richardson v. Morris*, 409 U.S. 464, 465 (1973) (per curiam) (noting that the Tucker Act authorizes "only actions for money judgments and not suits for equitable relief against the United States"). Thus, for contract claims against the United States, the Tucker Act "grants consent to suit" and "impliedly forbids" declaratory and injunctive relief. *See* § 702. The Tucker Act therefore bars district court jurisdiction and "precludes a § 702 waiver of sovereign immunity" for contract claims against the United States. *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646 (9th Cir. 1998) (citation modified).

The Form Termination Class brings an APA claim and seeks declaratory and injunctive relief against all the agencies. The Tucker Act "'impliedly forbid[s]' an APA action seeking injunctive and declaratory relief only if that action is a 'disguised' breach-of-contract claim." *United Aeronautical*, 80 F.4th at 1026 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). In other words, the Tucker Act bars district court jurisdiction for an APA claim only if that APA claim is "at its essence a contract action." *N. Star Alaska v. United States*, 14 F.3d 36, 37 (9th Cir. 1994) (citation modified). To decide whether it is, we apply the two-part *Megapulse* test, which examines "(1) the source of the rights upon which the plaintiff bases its claims and (2) the type of relief sought (or appropriate)." *United Aeronautical*, 80 F.4th at 1026 (citation modified); *see also Megapulse*, 672 F.2d at 968. If the plaintiff's "rights and remedies are *statutorily* or *constitutionally* based, then district courts have jurisdiction," but if those "rights and remedies are *contractually* based then only the Court of Federal Claims does." *United Aeronautical*, 80 F.4th at 1026.

**b**

The Supreme Court recently confronted similar circumstances in *NIH*, and that decision binds us here.[3] There, plaintiffs challenged NIH's termination of scientific research grants and the policy directives pursuant to which those grants were terminated. *NIH*, 145 S. Ct. at 2658. The district court entered final judgments declaring that the policy directives and grant terminations were unlawful. *See id.* The government sought a stay of the judgment, which the Supreme Court granted in part. *Id.* The Supreme Court granted a stay "as to the District Court's judgments vacating the Government's termination of various research-related grants" and denied a stay as to the district court's judgments vacating the policy directives. *Id.* With respect to the grant terminations, the Supreme Court reasoned that the APA's limited waiver of sovereign immunity "does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *Id.* (quoting *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam)). Such claims seek "to enforce a contractual obligation to pay money." *Dep't of Educ.*, 604 U.S. at 651 (citation modified).

Here, the Form Termination Class challenges the government's termination of research grants as arbitrary and capricious under the APA. *NIH* held that similar claims were "based on the research-related grants." 145 S. Ct. at 2658 (citation modified). Further, the Form Termination Class seeks—and the district court preliminarily awarded—vacatur of the termination notices and reinstatement of the

---

[3] Indeed, prior to the issuance of the Supreme Court's decision, Plaintiffs in this case argued that *NIH* involved "nearly identical facts."

20 THAKUR V. TRUMP

terminated grants. As in *NIH*, this relief is "designed to enforce an[] obligation to pay money pursuant to [the] grants" at issue. *Id.* (citation modified). Therefore, consistent with *NIH*, the district court likely lacks jurisdiction over the Form Termination Class's APA claim. *See id.*

Plaintiffs seek to distinguish *NIH* on the ground that they are not parties to the grant agreements at issue. Relying on the proposition that a "contract must be between the plaintiff and the government" to support a cause of action under the Tucker Act, Plaintiffs argue that because they are not in privity of contract with the government, the Tucker Act does not bar district court jurisdiction. *See Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998) (citation modified).

The plaintiffs in *NIH* also included non-parties to the grant agreements, and the Supreme Court's reasoning did not turn on whether the plaintiffs were parties to the contracts at issue. The Supreme Court held that district courts lack jurisdiction "to adjudicate claims based on . . . research-related grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *NIH*, 145 S. Ct. at 2658 (citation modified). We are bound by the Court's holding.[4]

---

[4] We note that Plaintiffs' reliance on *Community Legal Services in East Palo Alto v. United States Department of Health and Human Services* (*CLSEPA*), 137 F.4th 932 (9th Cir. 2025) is misplaced. The core holding of *CLSEPA* was that the plaintiffs' claim was not contractual. The plaintiffs there sought to enforce the government's *statutory* obligation to provide counsel to unaccompanied children in immigration custody, however that obligation could be satisfied. *Id.* at 938. *CLSEPA* established that where a plaintiff does not bring a *contract* claim, the

Accordingly, the district court likely lacks jurisdiction over the Form Termination Class's APA claim.

**2**

The government argues that the DEI Termination Class is not likely to prevail on the merits because: (i) its First Amendment claim fails; and (ii) its APA claim that the grant terminations are contrary to law also fails. We conclude that the DEI Termination Class is likely to succeed on the merits of its First Amendment claim. Because this is a sufficient basis to affirm the district court's preliminary injunction with respect to the DEI Termination Class, we need not address the DEI Termination Class's contrary-to-law APA claim.

**a**

The First Amendment prohibits the government from using its power "to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024) (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995)). The government's regulation of speech "based on its subject matter or 'communicative content'" is "presumptively unconstitutional." *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Even "greater dangers" are present when the government discriminates "based on [a] speaker's point of view." *Id.* Viewpoint discrimination—where "the government targets not subject matter, but particular views taken by speakers on a subject"—is "an egregious form" of content regulation that represents an even "more blatant"

---

Tucker Act does not provide consent to suit and does not impliedly forbid the plaintiff's non-contract claim, *see* § 1491(a)(1).

violation of the First Amendment.  *Rosenberger*, 515 U.S. at 829.  Because "viewpoint discrimination is uniquely harmful to a free and democratic society," *Vullo*, 602 U.S. at 187, the government "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale," *Rosenberger*, 515 U.S. at 829; *see also Chiles*, 146 S. Ct. at 1021.

The risk that content-based distinctions will interfere with free speech "is sometimes attenuated when the government is acting in a capacity other than as a regulator." *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188 (2007). The government "can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest" at the exclusion of other activities. *Rust v. Sullivan*, 500 U.S. 173, 193 (1991); *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 549 (1983).  Thus, the government has discretion to define subsidy programs in a way that reflects its preference to fund (or not fund) particular activities.  *See, e.g.*, *Regan*, 461 U.S. at 550 (rejecting challenge to the IRS's requirement that § 501(c)(3) organizations refrain from lobbying); *Rust*, 500 U.S. at 178–81, 192–93 (rejecting challenge to regulations that permitted Health and Human Services to award grants to entities so long as no funds were used for abortion services); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (rejecting challenge to National Endowment for the Arts reauthorization statute that required consideration of standards of decency and respect in awarding grants).[5]

---

[5] The Supreme Court has also recognized "that viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001).

"[E]ven in the provision of subsidies," however, "the Government may not" engage in viewpoint discrimination by "aim[ing] at the suppression of dangerous ideas." *Finley*, 524 U.S. at 587 (citation modified).  "[I]deologically driven attempts to suppress a particular point of view are presumptively unconstitutional in funding, as in other contexts." *Rosenberger*, 515 U.S. at 830 (citation modified); *see also Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548–49 (2001) (recognizing that "[w]here private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest").  The Supreme Court has explained that where the government establishes a subsidy program, it may not discriminate between speakers within that program to suppress viewpoints with which it disagrees. *See Rosenberger*, 515 U.S. at 833, 835 (noting that where a state university offers funds to student organizations "who convey their own messages," it "may not silence the expression of selected viewpoints" by denying funding to a religious student organization because of its religious viewpoint).[6]

---

Where the government "appropriates public funds to promote a particular policy" using private speakers, "it is entitled to say what it wishes."  *Rosenberger*, 515 U.S. at 833 (citing *Rust*, 500 U.S. at 194). Here, the government has not argued that the grant programs at issue use "private speakers to transmit specific information pertaining to its own program," *id.*, nor that the grant programs enable the government "to promote its own policies or to advance a particular idea," *Bd. of Regents of the Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000).

[6] The Supreme Court has sometimes analyzed government initiatives supporting expression under the limited forum rubric articulated in cases like *Rosenberger*, 515 U.S. at 829–30, *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993), and *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561

24                         THAKUR V. TRUMP

**b**

The government argues that its termination of research grants reflects its decision to stop funding "DEI programs" that it does not believe are in the public interest.  Plaintiffs respond that the government has not merely exercised its power to choose the programs it funds but has instead terminated individual grants in existing programs based on the perceived viewpoints of individual speakers.  We agree with Plaintiffs.

As an initial matter, the government does not dispute that the agencies terminated the grants at issue because of the recipients' perceived expression of DEI, DEIA, or environmental justice viewpoints.  Nor could it.  First, the terms DEI, DEIA, and environmental justice are inherently directional; they reflect "perspective[s]," rather than neutral topics.  *Rosenberger*, 515 U.S. at 829.  They convey the viewpoint that the exclusion of historically disadvantaged groups is undesirable.[7]  Second, the district court expressly

---

U.S. 661 (2010).  Under that framework, restrictions on access to government initiatives "must be reasonable and viewpoint neutral." *Martinez*, 561 U.S. at 679.  Although limited forum cases "may not be controlling in a strict sense" in subsidy cases, "they do provide some instruction." *Velazquez*, 531 U.S. at 544.

[7]     *diversity,     equity     and     inclusion*,     Merriam-Webster, https://perma.cc/5S2F-RKRC (last visited Apr. 21, 2026) ("a set of values and related policies and practices focused on establishing a group culture of equitable and inclusive treatment and on attracting and retaining a diverse group of participants, including people who have historically been excluded or discriminated against"); *diversity, equity and inclusion*, Cambridge English Dictionary, https://perma.cc/AR64-MN3Q (last visited Apr. 21, 2026) ("the idea that all people should have equal rights and treatment and be welcomed and included, so that they do not experience any disadvantage because of belonging to a particular group, and that each person should be given the same opportunities as

found that the purpose of the grant terminations was to suppress the particular point of view the grant recipients promoted. *See id.* at 830. That finding is well supported by the record. For example, NEH's "policy for selecting grants for termination . . . focused first on identifying open grants that focused on or promoted (in whole or in part) 'environmental justice,' 'diversity, equity, and inclusion,' or 'diversity, equity, inclusion and accessibility,' and 'gender ideology.'" The EPA announced that it "cancelled grants and contracts related to DEI and environmental justice." *EPA Administrator Lee Zeldin Cancels 400+ Grants in 4th Round of Cuts with DOGE, Saving Americans More than $1.7B*, EPA (Mar. 10, 2025), https://perma.cc/SG2D-AH9J. NSF identified grants for termination "through keyword searches and analytics," and a review of terminated grants strongly suggests that NSF targeted grants with words like "equity," "diversity," "inclusion," and "justice."

Accepting that the grant recipients' perceived "ideology" was "the rationale" for the agencies' grant terminations, *Rosenberger*, 515 U.S. at 829, the government nonetheless contends that it is entitled to cease funding programs it no longer believes are in the public interest. This overlooks that there is a critical distinction between creating or ceasing a particular program (or subsidy, or forum), on one hand, and discriminating against disfavored speaker viewpoints within a program (or subsidy, or forum), on the other. The government may impose restrictions on subsidies "to define the limits and purposes of [that] program."

---

others according to their needs"); *environmental justice*, Cambridge English Dictionary, https://perma.cc/S836-MXHR (last visited Apr. 21, 2026) ("the idea that all groups of people deserve to live in a clean and safe environment").

26                    THAKUR V. TRUMP

*Velazquez*, 531 U.S. at 543; *see also Rust*, 500 U.S. at 193–95.  But it cannot "leverage its power to award subsidies . . . into a penalty on disfavored viewpoints."  *Finley*, 524 U.S. at 587; *see also Velazquez*, 531 U.S. at 548–49.  Indeed, the Supreme Court has repeatedly affirmed "the requirement of viewpoint neutrality in the Government's provision of financial benefits."  *Rosenberger*, 515 U.S. at 834.

The Supreme Court explained this distinction in *Finley*.  There, Congress amended the National Endowment for the Arts' (NEA) reauthorization statute to require that grant applications be evaluated by "taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public."  *Finley*, 524 U.S. at 572 (citation modified).  The plaintiffs, performance artists who applied for grants, brought a facial First Amendment challenge to the statutory amendment and argued that it impermissibly discriminated on the basis of viewpoint.  *Id.* at 577, 580.  The Supreme Court rejected the plaintiffs' claim.  *Id.* at 589–90.  It was unpersuaded that the statute would "give rise to the suppression of protected expression" because "[a]ny content-based considerations that may be taken into account in the grant-making process are a consequence of the nature of arts funding."  *Id.* at 585.

The Supreme Court emphasized, however, that because the plaintiffs "d[id] not allege discrimination in any particular funding decision," the Court "ha[d] no occasion . . . to address an as-applied challenge . . . where the denial of a grant may be shown to be the product of invidious viewpoint discrimination."  *Id.* at 586–87.  Thus, the Supreme Court upheld the constitutionality of the NEA reauthorization statute "[u]nless" it was "applied in a manner that raises concern about the suppression of disfavored viewpoints."  *Id.* at 587.  "If the NEA were to leverage its

power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints," the Court cautioned, it "would confront a different case" because "even in the provision of subsidies, the Government may not aim at the suppression of dangerous ideas." *Id.* (citation modified); *see also Regan*, 461 U.S. at 548 (explaining that Congress may not "discriminate invidiously in its subsidies in such a way as to aim at the suppression of dangerous ideas" (citation modified)).

Plaintiffs specifically "allege discrimination in a[] particular funding decision." *See Finley*, 524 U.S. at 586. They contend that the agencies terminated their existing grants based solely on their perceived viewpoints regarding DEI, DEIA, and environmental justice, and do not challenge the scope of the grant program, its requirements, or any conditions the agencies placed on the award of their grants. *See id.* at 577, 580. The government erroneously characterizes each individual grant as a "program" that it may choose to fund or not fund. *See Rust*, 500 U.S. at 193 (noting that Congress may "selectively fund a program"). But the agencies selected particular grants for termination regardless of the programs through which they were funded, and the record shows the agencies made the decisions to terminate based only on the recipients' perceived expression of DEI, DEIA, or environmental justice viewpoints. Because the agencies' termination of grants is aimed at the suppression of viewpoints with which the government disagrees, it likely violates the First Amendment. *See Finley*, 524 U.S. at 586–87; *Rosenberger*, 515 U.S. at 829–30. The government's arguments to the contrary are unavailing.

First, the government contends that the constitutional requirement of viewpoint neutrality does not apply to

selective funding decisions in competitive grant processes. In the government's view, what distinguishes the constitutional NEA grant program in *Finley* from the unconstitutional provision of student activities funds in *Rosenberger* is "the competitive process according to which the grants are allocated." *Finley*, 524 U.S. at 586. We are not persuaded.

As explained, the performance artist plaintiffs in *Finley* brought a facial challenge to the requirement that the NEA consider general standards of decency and respect in its grant decisions, arguing that the provision was an "example of viewpoint discrimination because it rejects any artistic speech that either fails to respect mainstream values or offends standards of decency." *Id.* at 580. The *Finley* plaintiffs relied on *Rosenberger*, where the Supreme Court held that the University of Virginia engaged in unconstitutional viewpoint discrimination by barring all publications with religious viewpoints from eligibility for student activity funds. *Finley*, 524 U.S. at 586; *Rosenberger*, 515 U.S. at 837.[8] *Finley* explained that the NEA's "competitive process" of awarding grants was unlike the subsidy at issue in *Rosenberger* because the latter was generally available to all student organizations. *Finley*, 524

---

[8] In *Rosenberger*, the University of Virginia denied student activities funds to a Christian newspaper, while continuing to fund other student organizations. 515 U.S. at 823–24. The University argued that the state "must have substantial discretion in determining how to allocate scarce resources to accomplish its educational mission." *Id.* at 832. The Supreme Court rejected this argument, reasoning that it had already "reaffirmed the requirement of viewpoint neutrality in the Government's provision of financial benefits" and that the government is not permitted "to discriminate invidiously in its subsidies in such a way as to 'ai[m] at the suppression of dangerous ideas.'" *Id.* at 834 (quoting *Regan*, 461 U.S. at 548).

U.S. at 586.  The Court noted that the NEA was required to make aesthetic judgments and content-based decisions about artistic "excellence." *Id.*  For that reason, consideration of general standards of decency and respect in those decisions did not necessarily—as a matter of facial unconstitutionality—constitute viewpoint discrimination. *Id.*  As explained, the Court did not rule out a future as-applied challenge. *Id.* at 587.

Contrary to the government's suggestion, the important distinction between *Finley* and *Rosenberger* is not between competitive grants and generally available subsidies. Rather, the critical difference is between a facial challenge to a program that by its design excludes categories of activities or speakers (e.g., those that tend to violate general standards of decency and respect), and an as-applied challenge to the government's decision to discriminate on the basis of viewpoint in a particular funding decision (e.g., as Plaintiffs allege here).

Second, the government insists that its funding decisions are subject to a constitutional constraint only when the government "seek[s] to leverage funding to regulate speech outside the contours of the program itself." *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* (*AID*), 570 U.S. 205, 214–15 (2013).  Supreme Court precedent defeats this argument.

In cases like *Rust* and *AID*, the Supreme Court recognized that "the government may constitutionally preclude recipients of federal funds from addressing specified subjects so long as the limitation does not interfere with a recipient's conduct outside the scope of the federally funded program." *California ex rel. Becerra v. Azar*, 950 F.3d 1067, 1093 n.24 (9th Cir. 2020) (en banc).  This line of

30                              THAKUR V. TRUMP

"'unconstitutional conditions' cases involve[s] situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service." *Rust*, 500 U.S. at 197; *see also Youth 71Five Ministries v. Williams*, 160 F.4th 964, 988 (9th Cir. 2025) (noting that "[w]hen a policy attaches strings not only to government-funded speech, but to the speaker itself, we must further scrutinize the constitutionality of those strings").

To be sure, the government may violate unconstitutional-conditions principles when it imposes restrictions on speech outside the contours of a program, but the government offers no support for the assertion that this is the *only* constraint on the government's funding decisions. If that were so, it would be hard to reconcile with the Supreme Court's cautionary warning in *Finley* that "even *in the provision of subsidies*, the Government may not 'ai[m] at the suppression of dangerous ideas.'" *Finley*, 524 U.S. at 587 (emphasis added) (quoting *Regan*, 461 U.S. at 550). The government's argument is also at odds with the Supreme Court's decision in *Rosenberger*, which "reaffirmed the requirement of viewpoint neutrality in the Government's *provision of financial benefits*." *Rosenberger*, 515 U.S. at 834 (emphasis added) (citing *Regan*, 461 U.S. at 548); *see also Velazquez*, 531 U.S. at 548–49 (holding that a condition on the use of legal assistance funds violated the First Amendment because "Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest").

We conclude that the DEI Termination Class is likely to succeed on the merits of its viewpoint discrimination claim.

**3**

The government argues that Plaintiffs have not established irreparable harm, and that the balance of equities and public interest weigh against preliminary injunctive relief. We conclude that the district court did not abuse its discretion in its weighing of the *Winter* factors as to the DEI Termination Class.[9]

The likelihood of success on the merits "is the most important" *Winter* factor, and "if a movant fails to meet this 'threshold inquiry,'" the court "need not consider the other factors." *Azar*, 911 F.3d at 575 (citation modified). But "even if the plaintiff demonstrates likely success on the merits, the plaintiff still must demonstrate irreparable injury, a favorable balance of equities, and the tipping of the public interest in favor of an injunction," *Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 577 (9th Cir. 2014). Because "[a]n injunction is a matter of equitable discretion," the "assignment of weight to particular harms is a matter for district courts to decide." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010). Where, as here, the party opposing a preliminary injunction "is the government, the last two *Winter* factors 'merge.'" *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citation modified).

The government argues that Plaintiffs have not established irreparable harm because they seek monetary relief. In the government's view, "the grant recipients who employ [P]laintiffs will receive any funds they are owed if they ultimately prevail in an appropriate forum." The

---

[9] Because we conclude that the Form Termination Class did not establish a likelihood of success, we address the remaining equitable factors only as to the DEI Termination Class. *See Azar*, 911 F.3d at 575.

government overlooks that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) ("A colorable First Amendment claim is irreparable injury sufficient to merit the grant of relief." (citation modified)). Moreover, the government does not grapple with the district court's recognition of Plaintiffs' non-monetary irreparable harms, including "layoffs of team members, interruption of graduate programs, and the potential complete loss of projects, all of which will harm Plaintiffs' professional reputations."

As to the balancing of equities and the public interest, the government contends that any harm to Plaintiffs is outweighed by two irreparable harms to the government: (i) interference with the President's ability to carry out Executive Branch policies, and (ii) the loss of disbursed grant funds that the government is unlikely to recover. As to the first asserted harm, Plaintiffs have shown they are likely to succeed on the merits, and the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). As to the government's second asserted harm— the inability to recoup grant funds—the Supreme Court in *NIH* recognized that "while the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped' and are thus 'irrevocably expended.'" 145 S. Ct. at 2658 (citation modified). *NIH* concluded that the government's compelled payment of grant funds was such a harm for purposes of the *Winter* analysis because the "plaintiffs [did] not state that they [would] repay grant money if the Government ultimately prevail[ed]." *Id.* Plaintiffs do not distinguish the present case from *NIH*.

Even though the government has established that the preliminary injunction may inflict some irreparable harm on it, *see id.*, that alone does not demonstrate that the district court abused its discretion in weighing the balance of equities and the public interest because Plaintiffs also face irreparable harms in the absence of injunctive relief.  The government also fails to acknowledge that a likelihood of success on a First Amendment claim "compels a finding that the balance of hardships tips sharply in Plaintiffs' favor" and that "it is always in the public interest to prevent the violation of a party's constitutional rights."  *Am. Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc) (citation modified).

While we recognize that both sides assert colorable arguments that they will suffer some harm if the preliminary injunction is either upheld or vacated, the district court did not abuse its discretion by concluding that the remaining equitable factors favored entry of a preliminary injunction.

**4**

The government argues that the district court's preliminary injunction is impermissibly overbroad because Plaintiffs failed to show that full reinstatement of the terminated grants was necessary to afford complete relief. *See Califano*, 442 U.S. at 702; *CASA*, 606 U.S. at 852.[10]  The government reasons that Plaintiffs might be able to find replacement funding or reduce expenses.  We disagree.

"We review the scope of a preliminary injunction for abuse of discretion."  *L.A. Press Club v. Noem*, 171 F.4th 1179, 1190 (9th Cir. 2026).  Our review of an injunction's

---

[10] As discussed, the government erroneously framed this argument as one premised on standing.

scope is "narrow" because the district court "has considerable discretion in fashioning suitable relief and defining the terms of an injunction." *Washington v. Trump*, 145 F.4th 1013, 1037–38 (9th Cir. 2025) (citation modified); *see also Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017). It is well established that the "scope of a preliminary injunction must be no broader than necessary to provide complete relief to the named plaintiffs." *L.A. Press Club*, 171 F.4th at 1190 (citation modified); *see also CASA*, 606 U.S. at 852.

Here, the government falls well short of establishing that the district court abused its discretion by entering an overbroad injunction. The government contends that full reinstatement of the grants might prove unnecessary if Plaintiffs are able to obtain replacement funding or reduce expenses. But Plaintiffs' declarations make clear that alternative funding is not readily available and that the uncertainty and delay associated with seeking replacement funding risks irrevocable damage to their research projects. In light of this uncontested evidence, the government's speculation does not establish that the district court exceeded its considerable discretion in crafting the "interim equitable relief" necessary "to balance the equities as the litigation moves forward." *Int'l Refugee Assistance Project*, 582 U.S. at 580; *see also Washington*, 145 F.4th at 1037–38. Moreover, the government's position is premised on the mistaken assumption that Plaintiffs' alleged injuries stem from only that portion of the grant funds for which Plaintiffs have not found, or will not likely find, replacement funding. But Plaintiffs allege injuries apart from the loss of grant funds. The government does not advance any argument with respect to these alleged injuries. Accordingly, the district court did not abuse its discretion by concluding that

reinstatement of the terminated grants was necessary to provide complete relief. *See CASA*, 606 U.S. at 852.

## IV

We affirm the preliminary injunction with respect to the DEI Termination Class, reverse the preliminary injunction with respect to the Form Termination Class, and remand for further proceedings.

**AFFIRMED in part, REVERSED in part, and REMANDED.**[11]

---

CHRISTEN, Circuit Judge, concurring:

I fully concur in the court's per curiam opinion and write separately only because I view it as incomplete in one important respect.    As to the Tucker Act, Plaintiffs repeatedly argued that the district court had jurisdiction over the Form Termination Class's APA claim because the Court of Federal Claims lacks jurisdiction to adjudicate claims brought by parties who, like Plaintiffs, are not in privity of contract with the government.    Indeed, this was the sole ground on which Plaintiffs sought to distinguish the Supreme Court's order in *Nat'l Insts. of Health v. Am. Pub. Health Ass'n* (*NIH*), 145 S. Ct. 2658 (2025).  The per curiam opinion rejects this argument, relying on the strong factual similarity between this case and *NIH*.  Critically, the per curiam opinion does not explain the legal error at the core of Plaintiffs' position, which, in my view, is that the identity of the party bringing a claim is immaterial to whether the claim is contractual in nature.  Our adversarial system "assign[s]

---

[11] Each side shall bear its own costs.

36                          THAKUR V. TRUMP

to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). Just as we are duty-bound to "decide only questions presented by the parties," we are obliged to answer the questions the parties present. *See United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020) (citation modified).

As our per curiam opinion explains, *NIH* held that that the APA's "limited waiver of sovereign immunity does not provide" district courts "with jurisdiction to adjudicate claims based on . . . research-related grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *NIH*, 145 S. Ct. at 2658 (citation modified). The Court's conclusion follows from two premises: (a) contract claims against the government must be brought in the Court of Federal Claims; (b) claims that are either based on research-related grants or designed to enforce an obligation to pay money pursuant to those grants are contract claims.

The Form Termination Class's APA claim is based on research-related grants and seeks to enforce an obligation to pay money pursuant to those grants. *See NIH*, 145 S. Ct. at 2658. *NIH* tells us that such a claim is contractual, and the claim does not become non-contractual in nature merely because it is brought by a party that is not in privity with the government. The Court's rationale applies to particular claims (i.e., those based on contractual obligations) irrespective of the party who brings such claims, and regardless of whether that party might face other jurisdictional obstacles. Plaintiffs' lack of privity with the government may be a reason the Court of Federal Claims cannot hear the Form Termination Class's APA claim, *see Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998), but that merely suggests that Plaintiffs may

face a *separate* jurisdictional hurdle. Importantly, the APA's limited waiver of sovereignty immunity does not "guarantee . . . a federal forum" for every APA claim brought by every plaintiff. *Allen v. Milas*, 896 F.3d 1094, 1099 (9th Cir. 2018).

This result accords with the relevant statutory scheme. The APA's limited waiver of sovereign immunity precludes district court jurisdiction where another statute "grants consent to suit" and "impliedly forbids" the relief sought. 5 U.S.C. § 702. The Tucker Act is one such statute. It grants consent to suit with respect to claims "against the United States" that are "founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). So long as a claim is "against the United States" and "founded . . . upon" a contract with the United States, it falls within the scope of § 1491(a)(1). The mere absence of jurisdiction in the Court of Federal Claims for other reasons does not negate § 1491(a)(1) or otherwise establish district court jurisdiction.

I reiterate my full agreement with all that the per curiam opinion states and concludes. I write separately only to address the arguments it does not.