Erwin Chemerinsky (admitted *pro hac vice*)
echemerinsky@law.berkeley.edu
Claudia Polsky (State Bar No. 185505)
cpolsky@law.berkeley.edu
U.C. BERKELEY SCHOOL OF LAW
Law Building
Berkeley, CA 94720-7200
Telephone: (510) 642-6483

Elizabeth J. Cabraser (State Bar No. 83151)
ecabraser@lchb.com
Richard M. Heimann (State Bar No. 63607)
rheimann@lchb.com
Kevin R. Budner (State Bar No. 287271)
kbudner@lchb.com
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000

Anthony P. Schoenberg (State Bar No. 203714)
tschoenberg@fbm.com
Linda S. Gilleran (State Bar No. 307107)
lgilleran@fbm.com
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, California 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEETA THAKUR, et al.,<br><br>              Plaintiffs,<br><br>      v.<br><br>DONALD J. TRUMP, et al.,<br><br>              Defendants. | Case No. 3:25-cv-04737-RL<br><br>**PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Judge:       The Honorable Rita F. Lin<br><br>Hearing Date:   October 20, 2026<br>Hearing Time:   10:00 AM<br>Courtroom:     4 – 17th Floor |

46686\21195329

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND  CLASS
    CERTIFICATION...................................................................................................... 1

RELIEF REQUESTED .................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 2

FACTUAL BACKGROUND ........................................................................................... 4

    I.    At the Executive's Behest, Defendant Agencies Terminate Grants Based on
        Viewpoint and Subject Matter. ................................................................... 4

    II.    Plaintiffs and Their Research Teams Suffer Harm as a Result of
        Defendants' Viewpoint-Based Grant Terminations. .................................... 8

    III.    Department of Energy Terminated 283 Grants "Based Solely on the
        Political Identity of the Grant Recipient's State". ..................................... 11

    IV.    The Executive Branch Terminated Grants that Congress Had Specifically
        Authorized. ................................................................................................ 15

ARGUMENT ................................................................................................................. 18

    I.    Plaintiffs Have Standing. ........................................................................... 18

    II.    Plaintiffs' Motion for Summary Judgment Should Be Granted. ............... 19

        A.    Legal Standard................................................................................ 19

        B.    The Grant Terminations Violated the First Amendment. ............... 20

            1.    Defendants Illegally Terminated Grants Based on Viewpoint. ....... 22

                i.    The grants funded private expression, not
                    government speech................................................. 23

                ii.    The targeted concepts are viewpoints, not simply
                    subjects................................................................. 23

                iii.    The agencies admitted that they acted because of
                    those viewpoints................................................... 24

                iv.    An agency's ex ante discretion in grant funding is
                    materially different from its engagement in post
                    award, viewpoint-based grant cancellation. ......... 26

            2.    Defendants' Terminations also Constitute Unconstitutional
                First Amendment Retaliation. ........................................... 29

            3.    DOE Separately Violated the First Amendment by Targeting
                 Grants Based on Political Association. .............................. 30

46686\21195329

C.    DOE Violated the Equal Protection Clause by Terminating 283 Blue State Grants "Based Solely on the Political Identity of the Grant Recipient's State." ............................................................. 31

D.    Defendants' Grant Terminations Violated the Separation of Powers. .......... 35

     1.    DOD, NEH, NIH-HHS, NSF, and DOT terminated all relevant grants in defiance of congressional mandates and illegally withheld congressionally authorized funds. ..................... 37

     2.    DOE, DOT, and NIH terminated specific grants expressly appropriated by Congress. ................................................. 38

E.    Plaintiffs Reserve Their Right to Seek Leave to File a Supplemental Motion for Summary Judgment on Their APA Arbitrary and Capricious Claim. ................................................................. 42

III.    The Classes Should Be Certified. .................................................. 43

A.    Proposed Class Definitions ................................................... 43

     1.    The Viewpoint Discrimination Class (NSF, NEH, DOD, DOT, and NIH) .................................................... 43

     2.    Separation of Powers Class (NSF, NEH, DOD, DOT, and NIH) .................................................................. 44

     3.    The Department of Energy (Equal Protection and First Amendment) ............................................................... 44

     4.    The Form Termination Class ............................................ 44

B.    Legal Standard for Certification ............................................. 45

C.    Plaintiffs Satisfy All Rule 23(a) Factors. ..................................... 46

     1.    Rule 23(a)(1): The Proposed Classes Are Sufficiently Numerous. ................................................................... 46

         i.    The Viewpoint Discrimination Class & Separation of Powers Classes ................................................ 47

         ii.    The Department of Energy Class ........................... 47

     2.    Rule 23(a)(2): The Proposed Classes Are Bound by Common Questions of Law and Fact. ............................... 48

         i.    The Viewpoint Discrimination Class ..................... 49

         ii.    The Separation of Powers Class ........................... 50

         iii.    The Department of Energy Class ......................... 50

     3.    Rule 23(a)(3): Plaintiffs' Claims Are Typical of Those of the Classes. .................................................................. 51

46686\21195329

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

|  | i. | The Viewpoint Discrimination Class | 52 |
|  | ii. | The Separation of Powers Class | 54 |
|  | iii. | The Department of Energy Class | 55 |
| 4. | | Rule 23(a)(4): Plaintiffs and Class Counsel Will Adequately Represent the Classes. | 55 |
| D. | | Plaintiffs Satisfy Rule 23(b)(2). | 56 |
| | 1. | The Viewpoint Discrimination Class | 57 |
| | 2. | The Separation of Powers Class | 58 |
| | 3. | The Department of Energy Class | 58 |
| E. | | Request to Add Class Representatives Stuart Gansky, Matthew Spinelli, and Shannon Boettcher | 58 |
| F. | | Class Counsel Should Be Appointed Under Rule 23(g). | 60 |
| CONCLUSION | | | 60 |

46686\21195329

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

**TABLE OF AUTHORITIES**

**Cases**

*"Barbara" v. Trump*,
   790 F. Supp. 3d 80 (D.N.H. 2025) *aff'd sub nom*, *Trump v. Barbara*, 609 U.S. -
   --, 2026 WL 1870543 (June 30, 2026) ..................................................................56

*A. B. v. Hawaii State Dep't of Educ.*,
   30 F.4th 828 (9th Cir. 2022) ......................................................................46, 48

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013) ............................................................................... *passim*

*In re Aiken Cnty.*,
   725 F.3d 255 (D.C. Cir. 2013) ................................................ 35, 36, 39, 41

*All. for Open Soc'y Int'l, Inc. v. USAID*,
   430 F. Supp. 2d 222 (S.D.N.Y. 2006) ..............................................................31

*Am. Council of Learned Soc'ys v. Nat'l Endowment for the Humanities*,
   No. 25-cv-3657(CM), 2026 WL 1256545 (S.D.N.Y. May 7, 2026) ................................ *passim*

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ..................................................................................55

*Aref v. Lynch*,
   833 F.3d 242 (D.C. Cir. 2016) .......................................................................29

*Arevalo Millan v. Trump*,
   785 F. Supp. 3d 644 (C.D. Cal. 2025) ..............................................................57

*Ariz. Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) .......................................................................32

*Armstrong v. Davis*,
   275 F.3d 849 (9th Cir. 2001), *overruled on other grounds*, *Johnson v. Cal.*, 543
   U.S. 499 (2005) ......................................................................................49

*Arnold v. United Artists Theatre Cir., Inc.*,
   158 F.R.D. 439 (N.D. Cal. 1994) ....................................................................46

*Buckley v. Valeo*,
   424 U.S. 1 (1976) ....................................................................................30

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ..................................................................................20

*Chinitz v. Intero Real Est. Servs.*,
   No. 2018-cv-05623, 2020 WL 7391299 (N.D. Cal. July 22, 2020) ....................................46

46686\21195329

*Christian Science Reading Room Jointly Maintained v. City & Cnty. of S.F.*,
792 F.2d 124 (9th Cir. 1986) (amending *Christian Science Reading Room
Jointly Maintained v. City & Cnty. of S.F.*, 784 F.2d 1010, 1013 (9th Cir. 1986)...................33

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) ...................................................................................................30

*City & Cnty. of S.F. v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ........................................................................... *passim*

*City of St. Paul, Minnesota v. Wright*,
816 F. Supp. 3d 65 (D.D.C. 2026) ................................................................................33, 34

*Civil Rights Educ. & Enf't Ctr. v. Hosp. Properties Tr.*,
317 F.R.D. 91 (N.D. Cal. 2016), *aff'd*, 867 F.3d 1093 (9th Cir. 2017) ...................................46

*Clark v. Jeter*,
486 U.S. 456 (1988) ................................................................................................33, 34

*Clinton v. City of New York*,
524 U.S. 417 (1998) ...................................................................................................35

*Cnty. of Santa Clara v. Noem*,
815 F. Supp. 3d 979 (N.D. Cal. 2025) ...........................................................................36

*Coreas v. Bounds*,
No. 20-cv-00780, 2020 WL 5593338, at *15 (D. Md. Sept. 18, 2020)...................................57

*D.B.U. v. Trump*,
349 F.R.D. 228 (D. Colo. 2025) ..................................................................................57

*D.V.D. v. U.S. Dep't of Homeland Sec.*,
778 F. Supp. 3d 355 (D. Mass. 2025) ..........................................................................56

*De Malherbe v. Int'l Union of Elevator Constructors*,
438 F. Supp. 1121 (N.D. Cal. 1977) ...........................................................................59

*Diamond Alt. Energy LLC v. EPA*,
606 U.S. 100 (2025) ...................................................................................................18

*Doe #1 v. Trump*,
335 F.R.D. 416 (D. Or. 2020)......................................................................................46

*Elrod v. Burns*,
427 U.S. 347 (1976) ...................................................................................................11

*Escobar Molina v. U.S. Dep't of Homeland Sec.*,
808 F. Supp. 3d 167, 187 (D.D.C. 2025) ......................................................................57

v

46686\21195329

*Foon v. Centene Mgmt. Co.*,
No. 2:19-cv-01420, 2023 WL 1447922 (E.D. Cal. Feb. 1, 2023)............................................46

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ..............................................................................................................51

*Goodlaxson v. Mayor & City Council of Baltimore*,
776 F. Supp. 3d 311 (D. Md. 2025) ......................................................................................56

*Guerrero Orellana v. Moniz*,
808 F. Supp. 3d 167 (D. Mass. 2025) ...................................................................................57

*Hanlon v. Chrysler Corp.*,
150 F.3d. 1011 (9th Cir. 1998) ..............................................................................................51

*Hanlon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) .................................................................................................51

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*,
No. 19-cv-2918, 2021 WL 5848055 (N.D. Cal. Dec. 9, 2021) ........................................59, 60

*Healthy Futures of Tex. v. Dep't of Health & Human Servs.*,
326 F.R.D. 1 (D.D.C. 2018)...................................................................................................57

*Heller v. Doe*,
509 U.S. 312 (1993) ..............................................................................................................32

*Hous. Auth. of City & Cnty. of S.F. v. Turner*,
No. 25-CV-08859-JST, 2025 WL 3187761 (N.D. Cal. Nov. 14, 2025)..................................36

*Houston Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022) ..............................................................................................................29

*Human Life of Wash. Inc. v. Brumsickle*,
624 F.3d 990 (9th Cir. 2010) .................................................................................................18

*Jackson v. Danbury*,
240 F.R.D. 145 (D. Del. 2007) .........................................................................................46, 48

*LaDuke v. Nelson*,
762 F.2d 1318 (9th Cir. 1985) ...............................................................................................18

*Legal Servs. Corp. v. Velazquez*,
531 U.S. 533 (2001) .........................................................................................................23, 26

*In re: Lithium Ion Batteries Antitrust Litig.*,
No. 13-cv-2420, 2016 WL 948874 (N.D. Cal. Mar. 14, 2016)...............................................59

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ..............................................................................................................18

46686\21195329

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS
CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

*Lyon v. U.S. Immigr. & Customs Enf't*,
   308 F.R.D. 203 (N.D. Cal. 2015) ................................................................................... 57

*M.A.P.S. v. Garite*,
   349 F.R.D. 631 (W.D. Tex. 2025) .................................................................................. 57

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ....................................................................................................... 36

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) .......................................................................... 48, 49, 50

*Moore v. Kayport Package Exp., Inc.*,
   885 F.2d 531 (9th Cir. 1989) ......................................................................................... 59

*Mt. Healthy City Sch. Dist. Bd. v. Doyle*,
   429 U.S. 274 (1977) ....................................................................................................... 28

*Nat'l Endowment for the Arts v. Finley*,
   524 U.S. 569 (1998) ................................................................................................ *passim*

*Nat'l Pub. Radio, Inc. v. Trump*,
   No. 2025-cv-01674, 2026 WL 877434 (D.D.C. Mar. 31, 2026) .................................. 28, 29, 30

*Nat'l Rifle Ass'n of Am. v. Vullo*,
   602 U.S. 175 (2024) ....................................................................................................... 21

*Nightingale v. U.S. Citizenship & Immigration Servs.*,
   333 F.R.D. 449 (N.D. Cal. 2019) .................................................................................. 46

*NIH v. American Public Health Association*,
   145 S. Ct. 2658 (2025) ................................................................................................... 42

*Nordlinger v. Hahn*,
   505 U.S. 1 (1992) ........................................................................................................... 32

*Orr v. Trump*,
   786 F. Supp. 3d 397 (D. Mass. 2025) ........................................................................... 57

*Pablo Sequen v. Albarran*,
   No. 25-cv-06487-PCP, 2026 WL 1805114 (N.D. Cal. June 23, 2026) ........................ 57

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) .......................................................................... 48, 50, 56

*Patchak v. Zinke*,
   583 U.S. 244 (2018) ....................................................................................................... 36

*Patton v. Experian Data Corp.*,
   No. 15-cv-01871, 2019 WL 13034866 (C.D. Cal. Jan. 22, 2019) ................................ 60

46686\21195329

*Perry v. Sindermann*,
408 U.S. 593 (1972) ................................................................................................21, 30

*Planned Parenthood of Md., Inc. v. Azar*,
No. CCV-20-00361, 2020 WL 3893241 (D. Md. July 10, 2020) ............................................57

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009) ................................................................................................23

*Police Dep't of City of Chicago v. Mosley*,
408 U.S. 92 (1972) ................................................................................................21

*Ramirez Ovando v. Noem*,
810 F. Supp. 3d 1209 (D. Colo. 2025) ................................................................................................57

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015) ................................................................................................30

*Refuerzo v. Sw. Airlines Co.*,
No. 22-cv-00868-JSC, 2024 WL 4177936 (N.D. Cal. Sep. 12, 2024) ...................................46

*Refugee & Immigrant Center for Educ. & Legal Servs. v. Noem*,
793 F. Supp. 3d 19 (D.D.C. 2025) ................................................................................................57

*Rhode Island Latino Arts v. Nat. Endowment for the Arts*,
777 F. Supp. 3d 87 (D.R.I. 2025) ................................................................................................26

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) ................................................................................................ *passim*

*Ruiz Torres v. Mercer Canyons Inc.*,
835 F.3d 1125 (9th Cir. 2016) ................................................................................................51

*Rust v. Sullivan*,
500 U.S. 173 (1991) ................................................................................................22, 26

*Scholl v. Mnuchin*,
489 F. Supp. 3d 1008 (N.D. Cal. 2020) ................................................................................................56

*Shakhnes ex rel. Shakhnes v. Eggleston*,
740 F. Supp. 2d 602 (S.D.N.Y. 2010), *aff'd in part, vacated in part on other
grounds sub nom. Shakhnes v. Berlin*, 689 F.3d 244 (2d Cir. 2012) ........................................56

*Shelby Cnty., Ala. v. Holder*,
570 U.S. 529 (2013) ................................................................................................35

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022) ................................................................................................23

46686\21195329

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS
CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

*Sueoka v. United States*,
101 F. App'x 649 (9th Cir. 2004)................................................................................46

*Thakur v. Trump*,
163 F.4th 1198 (9th Cir. 2025) ....................................................................................6

*Thakur v. Trump*,
176 F.4th 1187 (9th Cir. 2026) ........................................................................... *passim*

*Thakur v. Trump*,
787 F. Supp. 3d 955 (N.D. Cal. 2025*), aff'd in part, rev'd in part & remanded*,
176 F.4th 1187 (9th Cir. 2026) ....................................................................................4

*Thakur v. Trump*,
800 F. Supp. 3d 1044 (N.D. Cal. 2025) ......................................................................4

*Thakur v. Trump*,
823 F. Supp. 3d 974 (N.D. Cal. 2026) ........................................................................4

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ................................................................................. 45, 49, 56

*Xiufang Situ v. Leavitt*,
240 F.R.D. 551 (N.D. Cal. 2007) .........................................................................48, 49

*Yates v. NewRez LLC*,
686 F. Supp. 3d 397 (D. Md. 2023) ...........................................................................55

**Statutes**

20 U.S.C. § 956(c)(4) .................................................................................................37

31 U.S.C. § 6305..........................................................................................................38

42 U.S.C.
§ 241(a) ...............................................................................................................38
§ 286(b)(7) ..........................................................................................................38
§ 288.....................................................................................................................38
§ 16161a(a) ...................................................................................................15, 39
§ 16161a(c) ....................................................................................................16, 39
§ 16161a(d) ...................................................................................................16, 39
§ 16161c ...................................................................................................16, 17, 40
§ 16161d................................................................................................16, 17, 39, 40
§ 16298d...........................................................................................................16, 38
§ 16298d(j)......................................................................................................16, 38
§ 16298d(k)...........................................................................................................38

46686\21195329

49 U.S.C.
   § 101(b) ........................................................................................................................ 38
   § 5505 .......................................................................................................................... 41
   § 5505(a)(1) ................................................................................................................. 38
   § 5505(a)(2)(A) ........................................................................................................... 38
   § 5505(c)(2)(A) ............................................................................................... 17, 40, 41
   § 5505(c)(3) .................................................................................................... 17, 40, 41
   § 6503(c)(1) .................................................................................................... 17, 40, 41

**Court Rules**

Fed. R. Civ. P.
   § 15(a) ......................................................................................................................... 59
   § 15(a)(2) ..................................................................................................................... 59
   § 21 .............................................................................................................................. 59
   § 23(a) ............................................................................................................. 45, 46, 51
   § 23(a)(1) ..................................................................................................................... 46
   § 23(a)(1)-4 (b)(2), and (g) ........................................................................................... 1
   § 23(a)(2) ..................................................................................................................... 48
   § 23(a)(3) ..................................................................................................................... 51
   § 23(a)(4) ............................................................................................................... 55, 56
   § 23(b) ..................................................................................................................... 45, 46
   § 23(b)(2) .............................................................................................................. *passim*
   § 23(c) ......................................................................................................................... 43
   § 23(e) ........................................................................................................................... 2
   § 23(g) ......................................................................................................................... 60
   § 56 ................................................................................................................................ 1
   § 56(a) ......................................................................................................................... 20
   § 56(c) ......................................................................................................................... 20

**Regulations**

42 C.F.R. § 52 ................................................................................................................... 38

42 C.F.R. § 66 ................................................................................................................... 38

87 Fed. Reg. 78667 (Dec. 22, 2022) ................................................................................ 16

90 Fed. Reg. 8339 (Jan. 20, 2025) ..................................................................................... 5

90 Fed. Reg. 8441 (Jan. 20, 2025) ..................................................................................... 5

90 Fed. Reg. 8615 (Jan. 20, 2025) ..................................................................................... 5

90 Fed. Reg. 8633 (Jan. 21, 2025) ..................................................................................... 4

90 Fed. Reg. 10577 (Feb. 19, 2025) ................................................................................... 5

90 Fed. Reg. 11095 (Feb. 26, 2025) ................................................................................... 5

x                                                                                          46686\21195329

**Treatises**

1 Newberg and Rubenstein on Class Actions § 3:11, 3:12 (6th ed. 2025) ........................ 46, 48, 55

6 Fed. Prac. & Proc. Civ. § 1479 (3d ed.) ................................................................. 59

**Constitutional Authority**

U.S. Const. Article 1, § 1 ................................................................................ 35

U.S. Const. Article II, § 3 ................................................................................ 35

First Amendment ............................................................................... *passim*

Fifth Amendment .......................................................................................12, 50

**Executive Orders**

Executive Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*................................................................4, 5

Executive Order No. 14154.................................................................................4

Executive Order No. 14158.............................................................................4, 5

Executive Order No. 14168.............................................................................4, 5

Executive Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*....................................................................................4

Executive Order No. 14217.............................................................................4, 5

Executive Order No. 14222.............................................................................4, 5

Executive Order No. 14238.................................................................................4

**Other Authorities**

Bipartisan Infrastructure Law § 40314....................................................... 16

Pub. L. No. 116-260 ................................................................................18, 42

46686\21195329

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION

**TO ALL DEFENDANTS: PLEASE TAKE NOTICE** that, on October 20, 2026, at 10:00 a.m., in the Courtroom of the Honorable Rita F. Lin, Courtroom 4, United States District Court, Northern District of California, 450 Golden Gate Avenue, 17th Floor, San Francisco California, Plaintiffs in the above-captioned action do move the Court for an Order granting Plaintiffs' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 and certifying the proposed classes and appointing Plaintiffs and their counsel to represent the classes pursuant to Federal Rules of Civil Procedure 23(a)(1)-4, (b)(2), and (g).

This Motion is based on this Notice of Motion, the Memorandum of Points and Authorities, any opposition and reply briefs, the Declarations of Kyle A. McLorg, Claudia Polsky, Plamen Atanassov, Louise Bedsworth, Shannon Boettcher, Stuart Gansky, and Matthew Spinelli, and all exhibits thereto, all pleadings and records on file herein, and such other evidence and arguments as may be presented to the Court prior to or at the hearing of this Motion.

### RELIEF REQUESTED

Plaintiffs respectfully request that the Court grant summary judgment against Defendants on Plaintiffs' claims for (a) violation of the First Amendment; (b) violation of the Equal Protection Clause; and (c) violation of the Separation of Powers doctrine.

Plaintiffs further request that the Court certify the following classes, appoint the class representatives, and appoint the undersigned counsel to represent the classes:

(1)     The Viewpoint Discrimination Class (provisionally certified as the Equity Termination Class), represented by Plaintiffs Susan Handy, Jedda Foreman, Christine Philliou, Robert Hirst, Eli Berman, Stuart Gansky, and Matthew Spinelli.

(2)     The Department of Energy (Equal Protection and First Amendment) Class, represented by Plaintiffs Plamen Atanassov, Louise Bedsworth, and Shannon Boettcher.

(3)     The Separation of Powers Class, represented by all Named Plaintiffs, other than the Department of Energy Class representatives.

(4)     The Form Termination Class, represented by all Named Plaintiffs.

1

46686\21195329

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

**MEMORANDUM OF POINTS AND AUTHORITIES**

This case poses profound constitutional questions about the authority of the President to unilaterally terminate billions of dollars of federal grants. First, does the Constitution allow President Trump and the Defendant Agencies acting at his behest to terminate grants *en masse* because they disfavor the perceived viewpoints expressed in the underlying research? Second, does the Constitution allow President Trump and the Department of Energy to terminate grants based on their desire to punish states that did not support the President in the 2024 election? Third, does the Constitution allow Defendants to act in an *ultra vires* manner by terminating grant funds appropriated by Congress?

The answer to each of these questions is undoubtedly: *No.* And the answer no longer needs to be given in the abstract, because the facts are undisputed. Each Defendant Agency has submitted stipulations admitting that they terminated grants in exactly these ways, and for exactly these purposes.

The Department of Defense ("DOD"), Department of Transportation ("DOT"), National Endowment for the Humanities ("NEH"), National Institutes of Health-Health and Human Services ("NIH-HHS"), and National Science Foundation ("NSF") all admit that "[w]hen identifying grants for termination," those Defendant Agencies "selected those that expressed, or were presumed to express, viewpoints disfavored by the Administration, as set forth in Executive Orders or" executive directives, and then they terminated those grants. *See* Decl. of Kyle A. McLorg in Supp. of this Mot. ("McLorg Decl.") ¶¶ 4-9, Exs. A-F.[1] The Department of Energy ("DOE") admits that it terminated 283 grants exclusively because they were located in states that voted for Kamala Harris, but not 340 other grants in states that voted for Donald Trump, "based solely on the political identity of the grant recipient's state…" and, further, that "the differential treatment . . . was not based on a rational connection between the recipient's location and/or place

---

[1] As noted in the Joint Status Report filed herewith (ECF No. 209), Plaintiffs Neeta Thakur, Ken Alex, and Nell Green Nylen have reached an agreement in principle with Defendant Environmental Protection Agency to resolve claims against the EPA on a class-wide basis. The Parties are working to finalize the settlement agreement documentation and, upon completion, will submit it to the Court for approval pursuant to Federal Rule of Civil Procedure 23(e).

46686\21195329

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

of performance and DOE's past or current agency priorities." *Id*. ¶ 9, Ex. F(1) at 5. Finally, DOD, DOT, NEH, NIH-HHS, and NSF have all admitted that the terminated grants at issue were made using funds that Congress "appropriated for the purpose of grant-making" and that the Agencies had "not re-allocated the terminated funds to other grant-making programs." *See id*. ¶¶ 4-9, Exs. A(1)-F(1) at ¶ II Stipulation, Nos. 10 and 11.

The Court should apply the law to these admissions and hold that the Defendant Agencies have violated the Constitution. Indeed, this Court has already held (and the Ninth Circuit has already affirmed) that executive agencies run afoul of the First Amendment by targeting grant projects for termination based upon viewpoint, and yet the Defendant Agencies admit that they have done exactly that. Similarly, as to DOE, this Court has held that the Equal Protection clause is violated where similarly situated classes are treated differently without a rational connection to a legitimate government purpose; again, DOE has admitted that it did so here. Further, the law is clear that when Congress appropriates funds for grantmaking, the executive branch cannot withhold those funds to advance its own policy goals. That is exactly what the Defendant Agencies have done across the spectrum of grants that were funded pursuant to congressional directives and terminated without redistribution, in contravention of separation of powers principles.

The stakes of this case—which involve roughly two billion dollars of previously awarded grant funding—are huge. If Defendants are allowed to terminate this funding, the researchers, graduate students, and program staff that relied on the grants to pursue their lives' work will all suffer significant damage to their reputations and careers. The public will lose out on public-private partnerships pursuing innovative research that would unquestionably improve the lives of every taxpayer. These terminations threaten America's competitive footing in the global pursuit of knowledge. And, of course, Defendants' conduct violates researchers' constitutional rights to equal protection of the laws, to free speech, to avoid targeting for expressing viewpoints that the President disdains, or for merely residing in a state that did not vote for him.

The Plaintiff Class Representatives have come forward to fight for these rights, on behalf of themselves and other University of California researchers whose grants have been caught up in

the Executive Branch's campaign to muzzle free expression and punish political enemies. The Constitution still stands guard to protect these interests. It demands that Defendants' actions be declared unlawful and enjoined.

## FACTUAL BACKGROUND

**I.    At the Executive's Behest, Defendant Agencies Terminate Grants Based on Viewpoint and Subject Matter.[2]**

Plaintiffs' grant terminations resulted from a coordinated sequence of at least eight Executive Orders the President issued in January and February 2025: Executive Order Nos. 14173, 14151, 14168, 14154, 14217, 14238, 14158, and 14222. The first three orders targeted disfavored ideas directly. Executive Order Nos. 14173 and 14151 seek to eliminate diversity, equity, and inclusion ("DEI"), diversity, equity, inclusion, and accessibility ("DEIA"), and "environmental justice" policies and initiatives from all aspects of the federal government. *Thakur v. Trump*, 176 F.4th 1187, 1194 (9th Cir. 2026).

Executive Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, states that "critical and influential institutions of American society," including the federal government and institutions of higher education, "have adopted and actively use dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called [DEI] or [DEIA] that can violate the civil-rights laws of this Nation." 90 Fed. Reg. 8633, 8633 (Jan. 21, 2025) (internal citations omitted). The Executive Order directs the Office of Management and Budget ("OMB") to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear," including grants. *Id.* at 8634.

---

[2]  This Motion references the Court's three prior Preliminary Injunction Orders with the shorthand as follows: Order Granting Mot. for Prelim. Inj. & and Provisional Class Certification (June 23, 2025), ECF No. 54 (hereafter "1st PI Order") (*published at Thakur v. Trump*, 787 F. Supp. 3d 955 (N.D. Cal. 2025*), aff'd in part, rev'd in part & remanded*, 176 F.4th 1187 (9th Cir. 2026)); Order Granting Mots. for Prelim. Inj. & Provisional Class Certification as to Additional Agency Defs., as Modified (Sept. 22, 2025), ECF No. 133 (hereafter "2nd PI Order") (*published at Thakur v. Trump*, 800 F. Supp. 3d 1044 (N.D. Cal. 2025)); Order Granting Mot. for Leave to File Third Am. Compl. and Denying Mot. for Prelim. Inj. & and Provisional Class Cert. (Jan. 30, 2026), ECF No. 182 (hereafter "3rd PI Order") (*published at Thakur v. Trump*, 823 F. Supp. 3d 974 (N.D. Cal. 2026).

46686\21195329

Executive Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, then translated that objective into a grant-specific directive: it instructs "[e]ach agency, department, or commission head" to provide the director of OMB with a list of all "[f]ederal grantees who received [f]ederal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities since January 20, 2021." 90 Fed. Reg. 8339, 8339-40 (Jan. 20, 2025). The Executive Order directs agency heads to "assess the operational impact" and cost of those grants and "recommend actions." *Id.* at 8340. Similarly, Executive Order No. 14168, titled *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, directs that "[f]ederal funds shall not be used to promote gender ideology." 90 Fed. Reg. 8615, 8616 (Jan. 20, 2025).

"The remaining Executive Orders reflect the various ways in which the government seeks to refocus or reduce government spending, including by establishing the Department of Government Efficiency (DOGE)." *Thakur*, 176 F.4th at 1194. Executive Order Nos. 14217, 14158, and 14222 instruct OMB and federal agencies to work with DOGE to review existing grants and terminate those considered unnecessary, in an effort to reduce federal spending. 90 Fed. Reg. 10577, 10577 (Feb. 19, 2025); 90 Fed. Reg. 8441, 8441 (Jan. 20, 2025); 90 Fed. Reg. 11095, 11095-96 (Feb. 26, 2025).

Defendant Agencies then translated these directives into a uniform termination process. Stipulations executed by NSF, NEH, DOD, DOT, and NIH-HHS make clear that the process each Defendant undertook in executing the Executive's agenda was unlawful. First, each agency, "act[ing] pursuant to Executive Orders or executive directives," identified and reviewed grants for termination expeditiously and "in a uniform manner." McLorg Decl. ¶¶ 4-8, Exs. A(1)-E(1) at ¶ II Stipulation, Nos. 1-2. As part of that process, Defendant Agencies used "search terms, keywords, or phrases"—and in some cases "artificial intelligence tools or software"—"to identify grants for termination review." *Id.* at ¶ II Stipulation, No. 3. Then, of the grants associated with the designated search terms, the agency selected for termination "those that expressed, or were presumed to express, viewpoints disfavored by the Administration, as set forth in Executive Orders or [the agency's] executive directives, because [the agency] no longer wished to subsidize

46686\21195329

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

those grants' viewpoints, or presumed viewpoints, such as the subject and/or topic of the grant." *Id.* at ¶ II Stipulation, No. 5.

The point of that process is plain. Indeed, each agency stipulated that "the search terms, keywords, or other criteria used to determine which grants to terminate were designed to identify grants that expressed, or were presumed to express, viewpoints the Administration no longer wished to subsidize[.]" *Id.* at ¶ II Stipulation, No. 6. Defendant Agencies further agreed that those criteria "were used to identify subjects and/or topics of the grant encompassing, or presuming to encompass, the relevant viewpoints." *Id.*

The termination mechanics were uniform across agencies and grants. *Id.* at ¶ II Stipulation, Nos. 1-2). For example, each agency "used standardized or form termination letters to notify grantees of the termination of the grants, rather than letters tailored to the specific circumstances of each grant"; "did not consider the reliance interests of individual researchers prior to termination of grants"; and "identified grants for termination using general criteria, rather than a grant-specific assessment of each award's compliance, or performance." *Id.* at ¶ II Stipulation, Nos. 7-9.

The form letters sent to Plaintiffs reflected the same pattern: they uniformly stated only that the grants "no longer effectuate the program goals or agency priorities," without providing any grant-specific reasons. *Thakur v. Trump*, 163 F.4th 1198, 1202 (9th Cir. 2025); *see also* 2nd PI Order at 5-6. Nor were the terminations "tied to any particular government program advancing a government message." 1st PI Order at 19 & n.20 (finding that many of the mass terminations "appear[ed] to undercut the programmatic message that Congress directed the agency to advance"). The scale of terminations matched their uniformity: each agency agrees that "the number of terminated grants renders joinder of all class members impracticable." McLorg Decl. ¶¶ 4-8, Ex. A(1)-E(1) at ¶ II Stipulation, No. 14.

Defendant Agencies further admit that the grants "were funded through funds appropriated for the purpose of grant-making," that Defendant Agencies "had not re-allocated the terminated funds to other grant-making programs," and that "none of the grantees failed to comply with the terms of the grant." *Id.* ¶ II Stipulation, Nos. 10-13.

After that common process was in place, each Defendant Agency applied it to the kinds of

46686\21195329

viewpoints against which it wished to discriminate. For DOT, that meant identifying grants for termination because they addressed enhanced "transportation equity," prioritized "disadvantaged communities," or focused on "diversifying the transportation workforce" and "Equity." McLorg Decl. ¶ 5, Ex. B(1) at ¶ II Stipulation, Nos. 3-4 Resp. For NEH, the same approach appeared in a policy that "focused first on identifying open grants that focused on or promoted (in whole or in part) 'environmental justice,' 'diversity, equity, and inclusion,' or 'diversity, equity, inclusion and accessibility,' and 'gender ideology.' " 1st PI Order at 10 (citing Decl. of Michael McDonald ¶ 9 (June 19, 2025), ECF No. 46); *see also* McLorg Decl. ¶ 6, Ex. C(2) (NEH Grants Spreadsheet). NEH singled out "Biden Grants" in its own spreadsheet and flagged certain awards as "Craziest Grants" and "Other Bad Grants." *Id*.

For NSF, the agency used DEIA-related keywords using the "NSF Search Tool," which "developed dynamic, semantic terms related to DEIA and generated a list of terms" for flagging grants. McLorg Decl. ¶ 8, Ex. E(1) at ¶ II Stipulation, Nos. 3 & 4 Resp. A review of terminated grants showed concentrations of titles containing "equity" (238 titles), "diversity" or "diverse" (103 titles), "community" (111 titles), "gender" (58 titles), "underrepresented" (50 titles), "inclusion" (45 titles), and "justice" (46 titles). 1st PI Order at 11, 15; *see also* McLorg Decl. ¶ 8, Ex. E(2) (NSF Grants Spreadsheet).

For NIH-HHS, the target list expanded over time. NIH-HHS implemented the Executive Orders through a series of internal directives requiring termination of grants in disfavored categories, beginning with "DEI-related" projects and expanding to include "gender," "transgender issues," "vaccine hesitancy," and "COVID-19." McLorg Decl. ¶ 7, Ex. D(1) at ¶ II Stipulation, Nos. 1-5, 3-4 Resp. NIH-HHS identified grants using a combination of grantee-specific terms and subject-matter keywords, including "work force diversity," "structural racism," "sexual orientation," "health equity," "diversity effects," and "promote diversity, health equity." McLorg Decl. ¶ 7, Ex. D(1) at ¶ II Stipulation, Nos. 3 & 4 Resp.; *see also id*. Ex. D(2) (NIH-HHS Grants Spreadsheet). NIH-HHS further acknowledged that, in some instances, grants were identified on lists compiled by DOGE and provided to NIH-HHS, and that "[i]t is possible that DOGE used AI in compiling the grant lists it provided." McLorg Decl. ¶ 7, Ex. D(1) at ¶ II

7

46686\21195329

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

Stipulation, No. 3 Resp.

## II.    Plaintiffs and Their Research Teams Suffer Harm as a Result of Defendants' Viewpoint-Based Grant Terminations.

Seven UC researchers whose federally funded grants were terminated because Defendant Agencies disfavored their research's presumed viewpoint serve as the representatives for the Viewpoint Discrimination Class: Susan Handy, Jedda Foreman, Christine Philliou, Robert Hirst, Eli Berman, Stuart Gansky, and Matthew Spinelli.

Dr. Susan L. Handy is a Distinguished Professor in the Department of Environmental Science and Policy at the University of California, Davis, who has served as Center Director of the National Center for Sustainable Transportation ("NCST") since its founding in 2013, and whose research examines the relationship between transportation and land use, including strategies for reducing automobile dependence. Third Am. Compl. ¶¶ 464-67 (Feb. 3, 2026), ECF No. 184 ("TAC"). DOT terminated the NCST's Grant Award Nos. 69A3552344814 and 69A3552348319, as well as Dr. Handy's Pacific Southwest Region (PSR) UTC Subaward No. SCON-00005220, on the ground that the awards were "inconsistent" with DOT's new priority "to cease promoting DEI initiatives," specifically flagging the NCST's and PSR UTC's research on equitable decarbonization, electric vehicles, and "environmental justice themes" as impermissible "green new deal" viewpoints. *Id.* ¶¶ 479-486. The terminations defunded the NCST and PSR UTC in their entirety, forcing 77 researchers to abandon 79 in-progress projects, lay off or find replacement funding for more than 40 graduate and undergraduate research assistants, and eliminate the equivalent of nearly five full-time staff positions at UC Davis alone; Dr. Handy personally lost nearly ten percent of her annual compensation as a result. *Id.* ¶¶ 487-493.

Jedda Foreman is the Director of the Center for Environmental Learning at the Lawrence Hall of Science, UC Berkeley's public science center. TAC ¶ 345. NSF terminated three of Foreman's grants—Award Nos. 2314075, 2315277, and 2241805, together worth more than $5.5 million—each of which funded research and museum programming designed to broaden participation in STEM among underrepresented and Indigenous communities. *Id.* ¶¶ 346-358. The termination notices stated only that the awards were "not in alignment with current NSF

8                                                          46686\21195329

priorities," and NSF's contemporaneous priorities statement and FAQs confirmed that the agency was targeting awards addressing "diversity, equity, and inclusion." *Id.* ¶¶ 335-338, 359-360. At the time of termination, more than $5.7 million across the three awards remained unpaid; the agency also cancelled supplemental funding for a Lawrence Hall event celebrating the NSF's own 75th anniversary. *Id.* ¶¶ 361-364. The Lawrence Hall, which depends on federal grants for 20-25% of its budget, will likely need to lay off academic personnel and staff as a result. *Id.* ¶¶ 359, 365.

Dr. Christine Philliou is a Professor of History at UC Berkeley and the founder of the Istan-Polis collaborative research project, which reconstructs the history of Istanbul's Orthodox Christian communities in the final Ottoman century. TAC ¶¶ 301-303. NEH terminated Dr. Philliou's grant (Award No. RZ-292650-23) on April 2, 2025, through a form email sent from a non-governmental domain, stating that the award "no longer effectuates the agency's needs and priorities" now that NEH was "repurposing its funding allocations in a new direction in furtherance of the President's agenda." *Id.* ¶¶ 310-311. The termination disrupted an in-progress public-facing website documenting Istanbul's religious minorities, forced cancellation of a planned Istanbul seminar, left staff facing loss of livelihood, and left the project team with $46,750 in unreimbursed expenses already incurred. *Id.* ¶ 312.

Robert Hirst has served since 1980 as curator of the Mark Twain Papers and general editor of the Mark Twain Project at the Bancroft Library, UC Berkeley. TAC ¶ 278. NEH terminated Dr. Hirst's grant (Award No. RQ-300297), which funded roughly half the salaries of three editors and a digital publications manager for the Mark Twain Project Online, through the same form termination email sent April 2, 2025, citing the need to "repurpos[e]" NEH's funding "in furtherance of the President's agenda." *Id.* ¶¶ 285-292. When Dr. Hirst searched for his grant on NEH's grant management system, he discovered that all record of it, including his years of correspondence with the agency, had been deleted. *Id.* ¶ 293. The termination has forced Dr. Hirst to divert his editorial time to fundraising to replace the lost $450,000 in funding, threatens his ability to retain the world's leading experts on the Mark Twain collection, and jeopardizes the ongoing migration of the Mark Twain Project Online to a modern platform. *Id.* ¶¶ 296-298.

Dr. Eli Berman is a Professor of Economics at UC San Diego and Research Director for

46686\21195329

International Securities Studies at the UC Institute on Global Conflict and Cooperation, whose research applies rational choice analysis to conflict, deterrence, and the behavior of radical groups. TAC ¶¶ 395-398. DOD's Air Force Office of Scientific Research terminated Dr. Berman's Minerva Research Initiative grant (No. FA 9550-23-1-0437) for his project "Integrated Deterrence: Episodic Analysis," informing him "[i]n line with recent Presidential executive orders" that his award "no longer effectuates Minerva program goals or DOD priorities," and eliminating the $248,991 remaining in the grant's third year. *Id.* ¶¶ 412-415. As a result, Dr. Berman and his co-Principal Investigator have been forced to divert their time from research to grant-writing, have been unable to employ a postdoctoral fellow, have released their research assistants, and Dr. Berman lost 22% of his annual compensation this year alone. *Id.* ¶¶ 417-421.

Dr. Stuart Gansky is a Professor and the Associate Dean for Research at the UCSF School of Dentistry, where he holds the Lee Hysan Chair of Oral Epidemiology. Decl. of Stuart Gansky in Supp. of this Mot. ("Gansky Decl.") ¶¶ 2-6 & 9, Ex. B at 1 (Biosketch). NIH terminated Dr. Gansky's grant (No. 5U24MD017250-04), which funds a Research Coordinating Center supporting eleven regional centers researching the prevention and treatment of comorbid chronic diseases, stating that the award's "amorphous equity objectives" were "antithetical to the scientific inquiry" and that "so-called diversity, equity, and inclusion ('DEI') studies" were being deprioritized as agency policy—even though the Research Coordinating Center does not itself recruit human subjects and cannot produce data capable of discriminating against any group. *Id.* ¶¶ 19-21, Ex. F. The termination forced Dr. Gansky to lay off or reduce the hours of eight of the 38 faculty, trainees, and staff funded by the grant, and although the grant was reinstated on July 3, 2025 after a federal court found the termination unlawful, Dr. Gansky remains at risk that NIH will re-terminate the award before the project concludes in June 2027. *Id.* ¶¶ 26, 29-31.

Dr. Matthew Spinelli is an Associate Professor of Medicine at UCSF and an infectious disease physician who serves as PrEP Medical Lead for the Ward 86 Clinic at San Francisco General Hospital. Decl. of Matthew Spinelli in Supp. of this Mot. ¶¶ 2-4, Ex. A at 1 (CV). NIH terminated Dr. Spinelli's grant (No. R01AI186641), a $4,026,066 study establishing adherence benchmarks for doxycycline post-exposure prophylaxis against sexually transmitted infections, on

10

46686\21195329

the ground that "[r]esearch programs based on gender identity are often unscientific" and "ignore . . . biological realities"—notwithstanding that the study measures drug adherence among both men and women and does not concern gender identity. *Id.* ¶¶ 9-12, Ex. D. At the time of termination, six participants were actively receiving study medication with no funding to monitor their safety, prompting the study's Data Safety and Monitoring Board to raise urgent concerns; Dr. Spinelli had to use discretionary departmental funds to protect participants until the grant was reinstated on July 9, 2025. *Id.* ¶¶ 17-19, Ex. E.

The impact of these grant terminations on Plaintiffs is extensive, and, absent an injunction, will be irreparable. The deprivation of Plaintiffs' First Amendment rights, "for even minimal periods of time, unquestionably constitutes irreparable injury." 1st PI Order at 47 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Plaintiffs also experienced "layoffs of team members, interruption of graduate programs, and the potential complete loss of projects, all of which [have] harm[ed] Plaintiffs' professional reputations." *Id.* at 47-48; *see also* 2nd PI Order at 26-27. Further, abruptly terminating research grants risked the loss of both years of progress on unrecoverable research and the employment of entire teams of carefully selected researchers. *See generally* 2nd PI Order at 26-27; Decl. of Plamen Atanassov in Supp. of this Mot. ("Atanassov Decl.") ¶¶ 3-4, 16-17; Decl. of Louise Bedsworth in Supp. of this Mot. ("Bedsworth Decl.") ¶ 9; Decl. of Shannon Boettcher in Supp. of this Mot. ("Boettcher Decl.") ¶¶ 22-36; Gansky Decl. ¶¶ 29-36; Spinelli Decl. ¶¶ 17-20. These effects are of the kind that would dissuade researchers from pursuing such grants in the future. Accordingly, this Court recognized that the harm to Plaintiffs is nothing short of "catastrophic." 1st PI Order at 48 (quoting *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018)).

## III.    Department of Energy Terminated 283 Grants "Based Solely on the Political Identity of the Grant Recipient's State".

The Court is familiar with the factual contours of Plaintiffs' claims against DOE. On October 2, 2025, DOE announced the termination of hundreds of grants awarded to researchers in states that voted for Kamala Harris or Democratic-caucusing senators, while leaving untouched all remaining grants in states that voted otherwise (hereinafter, "Blue State Grants" and "Non-Blue

46686\21195329

State Grants"). *See generally*, Pls.' Mot. for Prelim. Inj. & Provisional Class Certification (Nov. 24, 2025), ECF No. 156 ("Pls.' 3rd PI Mot."); 3rd PI Order. Neither President Trump nor Office of Management and Budget ("OMB") Director Russell Vought were subtle about the reason for these selective terminations, which came on the first day of the government shutdown and which Vought called out in an X post as only applying to grants in Blue States. *See* Decl. of Kyle McLorg in Supp. of Pls.' 3rd PI Mot. ("McLorg PI Decl.") ¶ 9, Ex. E (Nov. 24, 2025), ECF No. 159 (Vought announcing that "[n]early $8 billion" in grant funding "is being cancelled," and making clear that "[t]he projects are in the following states: CA, CO, CT, DE, HI, IL, MD, MA, MN, NH, NJ, NM, NY, OR, VT, WA"); *see also id*. Ex. C (Trump: "We can do things during the shutdown that are irreversible, that are bad for them and irreversible by them, like cutting vast numbers of people out, cutting things that they like, cutting programs that they like").

On November 24, 2025, Plaintiffs moved to amend their Complaint and sought a preliminary injunction against DOE to void these terminations, arguing that they violated UC Researchers' rights to Equal Protection under the Fifth Amendment. *See* ECF Nos. 154-160, 166-167. The Court initially denied Plaintiffs' request for a Preliminary Injunction because it found the record at that early stage did not rule out DOE's claim that it treated the Blue State and Non-Blue State Grants differently for reasons related to its purportedly shifting agency priorities. 3rd PI Order at 10-11. DOE has since submitted stipulations contradicting that explanation, frankly admitting that the voting pattern of grantees' states was the ***sole*** basis for its distinction between the terminated and unterminated grants, and that the classification had no rational relationship to any actual agency priorities. *See* McLorg Decl. ¶ 9, Exs. F(1)-F(3).

The stipulations tell the story of DOE's actions in the agency's own words. In May 2025, DOE Secretary Chris Wright executed a policy memorandum entitled "Ensuring Responsibility for Financial Assistance." *Id*. Ex. F(1) at ¶ II Stipulation, No. 1. Among other things, this memorandum established a "Portfolio Review Process" ("PRP"), which tasked DOE's program offices with reviewing grants against a number of criteria, developing proposals to either retain, modify, or terminate the grants; presenting those proposals to a PRP committee for feedback and recommendations; and implementing the ultimate decisions made in the review process. *Id*.

46686\21195329

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

In September 2025, DOE submitted to OMB a list of 2,265 grants that it had reviewed and proposed to either retain, modify or terminate. *Id*. at ¶ II Stipulation, No. 2. Within this list, 624 grants were designated at either "termination" or "cancel." *Id*. ¶ II Stipulation, No. 3; *see also id*. Ex. F(2) (DOE's proposed termination list (Sept. 2025)). This list of 624 grants for termination or cancellation included both Blue State and Non-Blue State Grants. *Id*. Ex. F(1) ¶ II Stipulation, No. 3.

Then, in October 2025, OMB identified 284 specific grants for termination from this broader list of 624, and DOE subsequently announced that it had terminated those 284 grants. *Id*. ¶ II Stipulation, Nos. 4-5; *id*. Ex. F(2) (DOE's termination list (Oct. 2025)). Of those 284 terminated grants, one was to a recipient located in Canada; the other 283 terminated grants were Blue State Grants, and included grants to Plaintiffs Dr. Plamen Atanassov, Dr. Louise Bedsworth, and Dr. Shannon Boettcher (*id*. Ex. F(1) ¶ II Stipulation, No. 6), as well as grants to other UC researchers, who worked or were hired to work on a research grant or sub-award that named a UC researcher as a principal researcher, investigator, or project leader on the grant application or sub-award. *See* Decl. of Claudia Polsky in Supp. of this Mot. ("Polsky Decl.") ¶¶ 2-3 & 9, Ex. D. Meanwhile, the remaining 340 grants from the original list of 624 were not terminated in October 2025 and have not since been terminated. *Id*. McLorg Decl. ¶ 9, Ex. F(1) at ¶ II Stipulation, No. 7. All of those unterminated grants were Non-Blue State Grants—*i.e.*, grants to recipients located in or performing in a state that awarded its electoral votes to Donald Trump or has at least one Republican-caucusing Senator. *Id*.

DOE stipulates that its decision to include the 283 Blue State Grants in its October 2025 terminations "was [not] based on any programmatic, statutory, cost-reduction, or performance-based factor." *Id*. at ¶ II Stipulation, No. 8. Rather, its decision to terminate those 283 Blue State Grants "was based solely on the political identity of the grant recipient's state, i.e., whether the recipient's location and/or place of performance was in a Blue State or a non-Blue State." *Id*. at ¶ II Stipulation, No. 9. DOE also stipulates that "the differential treatment resulting in the October 2025 termination of Blue State Grants and the non-termination of non-Blue State Grants was not based on a rational connection between the recipient's location and/or place of performance and DOE's past or current agency priorities." *Id*. at ¶ II Stipulation, No. 10.

46686\21195329

Finally, DOE admits that its differential treatment of the Blue State and Non-Blue State Grants "was not part of" the process the agency had itself devised to guide the Trump Administration's grant review, known as the "PRP Charter." *Id*. at ¶ II Stipulation, No. 11. In particular, DOE admits that "the political identity of the grant recipient's state was not a factor that DOE's program offices considered in evaluating whether to retain, modify, or terminate the grants, and [] DOE's program offices had proposed to terminate similarly situated Blue State and non-Blue State grants"—but, ultimately, DOE terminated only those grants in Blue States. *Id*.

As noted above, research projects run by Plaintiffs Drs. Atanassov, Bedsworth, Boettcher, and three other UC faculty, were among those swept into DOE's Blue State Terminations. Their experience and the projects that DOE terminated are briefly summarized below.

Dr. Atanassov is a highly accomplished Professor of Chemical and Biomolecular Engineering at UC Irvine whose career has focused on engineered materials, fuel-cell electrocatalysts, and technologies for power production, energy conversion, and storage. Decl. of Plamen Atanassov in Supp. of Pls.' 3rd PI Mot. ("Atanassov PI Decl.") ¶¶ 2-6 (Nov. 24, 2025), ECF No. 158. DOE terminated three awards supporting Dr. Atanassov's work: the Advanced Low-PGM Cathode Catalysts project; the Novel Carbon Supports for Metal Catalysts for Fuel Cells project; and the ARCHES Hydrogen Hub project. *Id*. ¶¶ 9-40, Exs. E, H & M. Each project advanced the very energy objectives DOE invokes here: lowering the cost and expanding deployment of hydrogen fuel-cell technology, increasing U.S. market share and domestic manufacturing capacity, and developing clean hydrogen infrastructure at scale. *Id*. ¶¶ 10, 17, 24, 28-29. Those terminations caused immediate and concrete harm to Dr. Atanassov, his students, and the research enterprise built around these awards. *See id*. ¶¶ 14-15, 22-23, 24, 27, 36-38.

Dr. Louise Bedsworth is a climate scientist who serves in several roles, including as the Executive Director of the Center for Law, Energy & the Environment ("CLEE") at UC Berkeley School of Law; Director of CLEE's Land Use Program; and Senior Advisor to the California-China Climate Institute. Decl. of Louise Bedsworth in Supp. of Pls.' 3rd PI Mot. ("Bedsworth PI Decl.") ¶ 2 (Nov. 24, 2025), ECF No. 157. As part of its October 2, 2025 Blue State Grant terminations, DOE terminated funding for a grant that it had previously awarded to her as

46686\21195329

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

Principal Investigator for the groundbreaking "Feasibility Study to Co-Create a Community Alliance for Direct Air Capture" project (the "CALDAC Project"), which was designed to assess the technical, social, and governance feasibility of establishing a California Community Alliance for Direct Air Capture, with affected communities placed at the center of Direct Air Capture hub development. *Id*. ¶¶ 8-9 & 16-17, Exs. D & E. Termination of the CALDAC Project injured Dr. Bedsworth, her team, and the public interest. It reduced CLEE funds available for researcher and staff salaries, eliminated or reduced funding needed to sustain the project team, and caused the loss of a $300,000 California Energy Commission grant and significant cost-share contributions from project partners. *Id.* ¶ 18.

Dr. Boettcher, whom Plaintiffs propose to be added as an additional class representative herein (*see* Argument Section III(E), *infra*), is a tenured chemistry professor holding the Theodore Vermeulen Chair at UC Berkeley, whose research focus is to advance electrochemical science, engineering, and technology. Boettcher Decl. ¶¶ 2-3. His DOE grant project (the "Electrolyzer grant") sought to make electrolyzation (the process for converting water into hydrogen and oxygen gases, essential for applications in chemical production, manufacturing, and transportation energy) more durable, efficient, and cost-effective. *Id.* ¶ 9. Like the other Plaintiffs, Dr. Boettcher suffered immediate harm from the termination of his grant. *Id.* ¶¶ 28-36.

## IV.    The Executive Branch Terminated Grants that Congress Had Specifically Authorized.

Congress specifically authorized multiple grants that the Executive Branch then terminated. Specifically, the termination of Dr. Atanassov's ARCHES grant, Dr. Bedsworth's CALDAC grant, Dr. Boettcher's Electrolyzer grant, Dr. Handy's National University Transportation Center grant, and Dr. Gansky's Research Coordinating Center grant halted work that Congress specifically directed agencies to fund.

As to ARCHES, Congress *required* the Secretary of Energy to establish a program to support the development of "regional clean hydrogen hubs": "a network of clean hydrogen producers, potential clean hydrogen consumers, and connective infrastructure located in close proximity." 42 U.S.C. § 16161a(a) & (b). Congress also imposed strict timelines on DOE, requiring the Secretary to solicit proposals for regional clean hydrogen hubs no later than 180 days

15

after November 15, 2021, and to select at least four regional clean hydrogen hubs no later than one year after the deadline for submission of proposals. *Id.* § 16161a(c)(1) & (2). Congress further mandated geographic diversity, requiring that each regional clean hydrogen hub be located in a different region of the United States and use energy resources that are abundant in that region. *Id.* § 16161a(c)(3)(C). Congress additionally mandated that at least one such hub generate hydrogen exclusively from renewable energy—*i.e.*, that there be a so-called "green" hub. *Id.* at § 16161a(c)(3). Congress authorized an appropriation of $8 billion to the Secretary to carry out the regional clean hydrogen hubs program for the period of fiscal years 2022 through 2026. *Id.* at § 16161a(d).

Similarly, the CALDAC Project was authorized via 42 U.S.C. § 16298d ("Carbon Removal"), which establishes a comprehensive statutory framework for regional DAC hubs. It mandates that the Secretary of Energy "shall establish a program under which the Secretary shall provide funding for eligible projects that contribute to the development of 4 regional [DAC] hubs." 42 U.S.C. at § 16298d(j)(2)(A). Congress prescribed detailed requirements for these hubs, mandating specific selection criteria: requiring DOE to consider the carbon intensity of the local industry; geographic diversity; carbon potential; hubs in fossil-producing regions that are economically distressed; scalability; creation of employment opportunities; and other factors. *Id.* at § 16298d(j)(2)(B), (3)(C). Congress appropriated $3.5 billion specifically for this program for fiscal years 2022 through 2026, "to remain available until expended." *Id.* at § 16298d(j)(4).

With respect to Dr. Boettcher's Electrolyzer grant, Congress likewise established and funded the very program under which it was awarded. Through Section 40314 of the Bipartisan Infrastructure Law, Congress amended the Energy Policy Act of 2005 to create the Clean Hydrogen Electrolysis Program, 42 U.S.C. § 16161d, and Clean Hydrogen Manufacturing and Recycling Program, 42 U.S.C. § 16161c. *See* Notice of Intent Regarding Bipartisan Infrastructure Law (BIL) Support for Clean Hydrogen Electrolysis, Manufacturing, and Recycling, 87 Fed. Reg. 78667 (Dec. 22, 2022). Congress created the programs to accelerate the widespread, large-scale commercial production of affordable clean hydrogen using electrolyzers, and thereby to strengthen domestic manufacturing, enhance United States energy competitiveness, and advance the Nation's

transition to a clean energy economy.

As to the electrolysis program (Section 16161d), Congress mandated that, "[n]ot later than 90 days after November 15, 2021," the Secretary of Energy "shall establish a research, development, demonstration, commercialization, and deployment program for purposes of commercialization to improve the efficiency, increase the durability, and reduce the cost of producing clean hydrogen using electrolyzers." 42 U.S.C. § 16161d(b). Congress set a specific statutory goal of "reduc[ing] the cost of hydrogen produced using electrolyzers to less than $2 per kilogram of hydrogen by 2026," *id.* § 16161d(c), and directed that the program "focus on" precisely the technologies Dr. Boettcher's grant advanced—including low-temperature "membrane-based electrolyzers," "new highly active, selective, and durable electrolyzer catalysts" that "greatly reduce or eliminate the need for platinum group metals," and "low-cost membranes or electrolytes and separation materials that are durable in the presence of impurities." *Id.* § 16161d(e). Congress further directed that the Secretary "shall award grants, on a competitive basis, to eligible entities" to carry out the program, *id.* § 16161d(f)(1), and authorized $1 billion "to carry out the program . . . for the period of fiscal years 2022 through 2026, to remain available until expended." *Id.* § 16161d(g).

Congress separately established the Clean Hydrogen Manufacturing and Recycling program (Section 16161c), directing that the Secretary "shall award multiyear grants" for projects to advance new clean hydrogen production, processing, delivery, storage, and use equipment manufacturing technologies, and to increase the reuse and recycling of clean hydrogen technologies (*id.* § 16161c(a), (b)(1)), and authorized $500 million to carry out that program for the same period (2022-2026) (*id.* § 16161c(c)). In terminating Dr. Boettcher's Electrolyzer grant, DOE contravened Congress's instructions to fund precisely the type of research he was conducting pursuant to Sections 16161c and 16161d. Boettcher Decl. ¶ 10.

As to DOT, Congress specifically directed the agency to: (i) fund five national transportation centers (49 U.S.C. § 5505(c)(2)(A)); (ii) fund regional university transportation centers in ten specified regions (*id.* § 5505(c)(3)); and (iii) award grants for research priorities like environmental preservation (*id.* § 6503(c)(1)). By terminating Dr. Handy's grant, which Congress

17

46686\21195329

authorized to fund a National University Transportation Center focused on environmental preservation, DOT violated these express Congressional directives.

Finally, with respect to NIH-HHS, Dr. Gansky's Research Coordinating Center grant was likewise funded pursuant to an express Congressional directive. Public Law 116-260, the Consolidated Appropriations Act of 2021, directed the National Institute on Minority Health and Health Disparities ("NIMHD") to award funds to eleven research institutions and one research coordinating center to establish and support regional comprehensive research centers on the prevention, treatment, and management of comorbid chronic diseases that disproportionately affect populations with health disparities. Gansky Decl. ¶ 15. Congress appropriated over $22 million for Dr. Gansky's Research Coordinating Center, which was designed to develop new understanding of and intervention approaches for chronic disease prevention, testing, diagnosis, and treatment for affected communities. *Id.* ¶¶ 9, 12-13. NIH's termination of this grant contravened Congress's express mandate to fund a research coordinating center.

**ARGUMENT**

**I.    Plaintiffs Have Standing.**

To establish standing under the Constitution's Article III "actual case or controversy" requirement, a plaintiff "must demonstrate (1) an injury-in-fact, (2) causation, and (3) a likelihood that the injury will be redressed by a decision in the plaintiff's favor." *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1000 (9th Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Standing "is a jurisdictional element that must be satisfied prior to class certification." *LaDuke v. Nelson*, 762 F.2d 1318, 1325 (9th Cir. 1985). "[J]urisdiction is to be assessed under the facts existing when the complaint is filed." *Lujan*, 504 U.S. at 569 n.4.

As the Court has noted, "[t]he point of Article III's standing requirements is to ensure that Plaintiffs have a personal stake in the litigation, so that they 'do not sue the wrong parties and courts do not issue advisory opinions.'" 1st PI Order at 47 (quoting *Diamond Alt. Energy LLC v. EPA*, 606 U.S. 100, 120 (2025)). The Court found it "hard to imagine who could have a more personal stake in this case than the researchers whose research was allegedly defunded as either

46686\21195329

dangerous or insufficiently important."[3] 1st PI Order at 47. As the Court explained, all Plaintiffs "have had lengthy research careers of federal grant-supported research" and have "current research projects [that] were funded after an exhaustive process." *Id.* at 42.

Plaintiffs representing all four classes easily satisfy the injury, causation, and redressability requirements. As to injury, the researchers suffered harm to their careers and livelihoods, "traditionally cognizable interests sufficient to confer standing." *Id.* The Ninth Circuit agreed that Plaintiffs have "shown at least a 'substantial risk' that they will suffer economic harm" and other cognizable injuries including "reputational harm" and the expenditure of "time and resources seeking alternative sources of funding." *Thakur*, 176 F.4th at 1196.

Next, Defendants' decision to terminate these grants *en masse*, in violation of the Constitution, caused injury. *See* 1st PI Order at 42. Causation is satisfied because Defendants' termination decisions are the direct source of the alleged injury. "Defendants' actions here are likely to cause a predictable disruption to Plaintiffs' research," which is "sufficient for causation." *Id.* at 46.

Finally, Plaintiffs' "concrete and actual" harms, caused by Defendants' actions, "can be redressed by a reversal of the . . . illegal grant terminations." *Id.* at 42. Indeed, the Ninth Circuit declared in this case: "We conclude that Plaintiffs have adequately alleged injury flowing from the government's grant terminations." *Thakur*, 176 F.4th at 1196.

## II.    Plaintiffs' Motion for Summary Judgment Should Be Granted.

### A.    Legal Standard

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate

---

[3] The Court found that the Plaintiffs representing the Equity Termination Class (which Plaintiffs propose renaming as the "Viewpoint Discrimination" Class to reflect case discoveries) and Form Termination Class have standing. Although the Court did not assess standing for the newly added NIH Class Representatives Stuart Gansky and Matthew Spinelli, they have standing for the same reasons as the other Viewpoint Discrimination Plaintiffs: both were harmed by NIH-HHS's termination of their grants, which impaired ongoing research projects, harmed their careers and reputations, and suppressed their protected speech. Gansky Decl. ¶¶ 21, 29-36; Spinelli Decl. ¶¶ 11-12, 17-20. These harms will be redressed by a favorable ruling. The Court has also not yet conducted a standing analysis for the Plaintiffs' Separation of Powers and Equal Protection claims, but the outcome of that analysis is the same for all claims.

that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "[t]he moving party is 'entitled to a judgment as a matter of law.'" *Celotex*, 477 U.S. at 323 (citation omitted).

**B.    The Grant Terminations Violated the First Amendment.**

This claim presents a question this Court and the Ninth Circuit have already answered on a preliminary record, and that the stipulations now resolve definitively for purposes of summary judgment: whether the federal government terminated previously awarded research grants because it disapproved of the viewpoints those grants expressed or were presumed to express, in violation of the First Amendment. At the preliminary injunction stage, the answer was "likely" yes. *See* 1st PI Order; 2nd PI Order; 3rd PI Order; *Thakur*, 176 F.4th at 1203 ("Because the agencies' termination of grants is aimed at the suppression of viewpoints with which the government disagrees, it likely violates the First Amendment.") (citing *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 586-87 (1998); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995)).

Now, this constitutional violation is beyond dispute. The uncontroverted evidence—including Defendant Agencies' own stipulations—confirms that Defendants selected for

46686\21195329

termination those grants expressing, or presumed to express, disfavored viewpoints, which violates the First Amendment.

The controlling First Amendment rule is the one that both this Court and the Ninth Circuit applied, and it is straightforward: the government may not use its power to "punish or suppress disfavored expression." *Thakur*, 176 F.4th at 1199 (quoting *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024)). Specifically, the government cannot "restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). When the government targets "particular views taken by speakers on a subject," or "regulat[es] speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction," the violation is "all the more blatant." *Rosenberger*, 515 U.S. at 829, 833. "Discrimination against speech because of its message is presumed to be unconstitutional." *Id.* at 829. Such discrimination is "uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am.*, 602 U.S. at 187. These principles apply with special force here because the Ninth Circuit has already held that DEI, DEIA, and environmental justice are "inherently directional" viewpoints, not neutral topics. *Thakur*, 176 F.4th at 1201.

Those principles apply in the funding context: the government may not accomplish indirectly, "through the allocation or withdrawal of benefits - what it is forbidden to do directly." *Am. Council of Learned Soc'ys v. Nat' Endowment for the Humanities*, No. 25-cv-3657(CM), 2026 WL 1256545, at *41 (S.D.N.Y. May 7, 2026). "[E]ven though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Specifically, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests, especially, his interest in freedom of speech." *Id.*

This principle is often described as the doctrine of unconstitutional conditions, and it applies when the government conditions funding decisions on the expression or suppression of ideas. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 212, 214 (2013). Thus,

46686\21195329

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

while the government may lawfully define a funding program prospectively to foster certain viewpoints, it may not comb through existing awards to cancel privately authored work because it is perceived to embody disfavored ideas. *Id.* at 214-15. A categorical, viewpoint-based termination of already-awarded grants, untethered to any germane program condition, does not define program scope; it penalizes disfavored viewpoints. That is unconstitutional.

Nor can Defendants recast the terminated research and scholarship as government speech. The government does possess "some latitude in administering programs that involve the distribution of public funds" when the government itself is speaking or is using private actors to convey its own message. *Am. Council of Learned Soc'ys*, 2026 WL 1256545, at \*42. And the government may "selectively fund a program to encourage certain activities it believes to be in the public interest." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). However, that discretion does not apply when the government "creates and funds a program that is expressly designed to facilitate private expression." *Am. Council of Learned Soc'ys*, 2026 WL 1256545, at \*42.

Therefore, while the government is "entitled to say what it wishes" when the government speaks for itself, it may not use subsidies to "aim[] at the suppression of dangerous ideas," or to impose a disproportionate burden calculated to drive disfavored viewpoints from the marketplace. *Rosenberger*, 515 U.S. at 834; *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998). *Finley* cautioned that funding decisions would raise serious constitutional concerns if applied in a manner that penalizes or excludes speech based on viewpoint. *Finley*, 524 U.S. at 587-88. Thus, while a neutral, hortatory criterion, like NEA's "general standards of decency and respect," may survive First Amendment scrutiny, denying or terminating grants *because* particular projects express disfavored viewpoints does not. *Id.* at 580, 587.

1.    Defendants Illegally Terminated Grants Based on Viewpoint.

The undisputed record shows that the government has not merely exercised its power to choose the programs it funds but has instead terminated individual grants in existing programs based on the "viewpoint that the funded project promotes." 1st PI Order at 970. Such conduct violates the First Amendment because the grants at issue funded private expression; the government targeted the grants based on viewpoint, not neutral subjects; the government

22

terminated them because of those same viewpoints; and funding discretion does not save Defendants' post-award viewpoint-based cancellations.

>              i.    *The grants funded private expression, not government speech.*

The threshold question in a First Amendment analysis is to determine whether the funded expression is private speech or government speech, because "[t]he Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). To distinguish the two, courts examine "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022). Those considerations confirm that the terminated grants funded privately conducted research that yielded privately authored scholarship and private, nongovernmental speech (such as at professional conferences). Plainly, UC grant recipients were not promoting the government's own messages.

Defendants do not (and cannot) meaningfully contest this element. Indeed, in the appeal from the preliminary injunction, the Ninth Circuit already observed that the government "has not argued that the grant programs at issue use 'private speakers to transmit specific information pertaining to its own program,' nor that the grant programs enable the government 'to promote its own policies or to advance a particular idea[.]'" *Thakur*, 176 F.4th at 1201 n.5 (citation modified). And "[w]here private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548-49 (2001). Defendants therefore cannot avoid First Amendment scrutiny by recasting privately authored research and scholarship as government speech.

>              ii.    *The targeted concepts are viewpoints, not simply subjects.*

On a significantly less developed record, the Ninth Circuit has already concluded that Defendant Agencies terminated grants based on "viewpoint" where they used search words and phrases that are well understood as normative rather than merely descriptive. Noting that "the government does not dispute that the agencies terminated the grants at issue because of the recipients' perceived expression of DEI, DEIA, or environmental justice viewpoint[s]," the panel

23

explained that "the terms DEI, DEIA, and environmental justice *are inherently directional*; they reflect 'perspective[s],' rather than neutral topics," and "convey the viewpoint that the exclusion of historically disadvantaged groups is undesirable." *Thakur*, 176 F.4th at 1201, 1206 (emphasis added). *See also Am. Council of Learned Soc'ys*, 2026 WL 1256545, at *44 (finding that DEI is a "viewpoint").

The Ninth Circuit further noted that this Court "expressly found that the purpose of the grant terminations was to suppress the particular point of view the grant recipients promoted," a finding the panel found to be "well supported by the record." *Thakur*, 176 F.4th at 1201. Defendants' stipulations, in confirming that grants were terminated specifically because they expressed viewpoints disfavored by the government, now place that finding beyond dispute.

The stipulations also confirm that Defendant Agencies terminated grants in ways not previously contemplated or certified by this Court at the preliminary injunction stage. At that stage, the record supported a finding that Defendants discriminated on the basis of a few specific viewpoints: DEI, DEIA, and environmental justice. *See generally* 1st PI Order; 2nd PI Order; 3rd PI Order. We now know—as confirmed by the stipulations—that the government's discrimination was much broader, and encompassed every single one of the grants in the NIH, NSF, NEH, DOT, and DOD spreadsheets. Each of these Agency Defendants conceded that the listed grants were terminated based on the viewpoint they expressed or were presumed to express. *See generally* McLorg Decl. ¶¶ 4-8, Exs. A(2)-E(2) (DOD, DOT, NEH, NIH-HHS, and NSF Grant Spreadsheets).

           iii.    *The agencies admitted that they acted because of those viewpoints.*

The stipulations show that Defendants identified the viewpoints they wanted to suppress, searched the grants they funded for those that expressed those viewpoints, and terminated those grants on that basis.

First and foremost, Defendants admit that "[w]hen identifying grants for termination, [the agency] selected those that expressed, or were presumed to express, viewpoints disfavored by the Administration, as set forth in Executive Orders or [the agency's] executive directives, because [the agency] no longer wished to subsidize those grants' viewpoints, or presumed viewpoints, such

as the subject and/or topic of the grant." McLorg Decl. ¶¶ 4-8, Exs. A(1)-E(1) at ¶ II Stipulation, No. 5. This alone establishes a First Amendment violation.

Even without these direct admissions of viewpoint discrimination, however, the processes Defendant Agencies used to guide grant termination further confirm they identified and targeted grants based on impermissible viewpoint discrimination. "[T]o identify grants for termination review" each agency used "search terms, keywords, or phrases." *Id.* at ¶ II Stipulation, No. 3. The precise screening mechanism varied by agency, but the goal was uniform: to identify grants that expressed or were perceived to express disfavored viewpoints. *Id.* at ¶ II Stipulation, Nos. 3-4. Further, each agency "accept[ed] that the search terms, keywords, or other criteria used to determine which grants to terminate were designed to identify grants that expressed, or were presumed to express, viewpoints the Administration no longer wished to subsidize," and that those criteria "were used to identify subjects and/or topics of the grant encompassing, or presuming to encompass, the relevant viewpoints." *Id.* at ¶ II Stipulation, No. 6.

This Court already found that grants were flagged because of "disfavored words in the project titles," such as "equity," "diversity," "community," "gender," "underrepresented," "inclusion," and "justice"—words appearing in hundreds of terminated grant titles. 1st PI Order at 15, 54-55. The stipulations confirm that the terminations turned on viewpoint, and they confirm the exact content-targeting mechanisms each agency employed: DOT flagged grants addressing "transportation equity," "disadvantaged communities," and "diversifying the transportation workforce." McLorg Decl. ¶ 5, Ex. B(1) at ¶ II Stipulation, Nos. 3 & 4 Resp. NSF drew its search terms from a congressional report targeting specific research topics and used an internal computational model to identify DEIA-related grants. McLorg Decl. ¶ 8, Ex. E(1) at ¶ II Stipulation, Nos. 3 & 4 Resp. And NIH-HHS targeted grants mentioning "structural racism," "sexual orientation," "health equity," and "work force diversity." McLorg Decl. ¶ 7, Ex. D(1) at ¶ II Stipulation, Nos. 3 & 4 Resp. NIH-HHS also implemented the Executive Orders through a series of internal directives requiring termination of grants in disfavored categories, beginning with "DEI-related" projects and expanding to include "gender," "transgender issues," "vaccine hesitancy," and "COVID-19." *Id.* at ¶ II Stipulation, Nos. 1-5, 3 & 4 Resp.

46686\21195329

Given all of this, there can be no genuine dispute that the rationale for the terminations was "the specific motivating ideology or the opinion or perspective of the speaker[,]" —or more precisely, what it was *perceived* to be because of the use of particular words—in flagrant violation of the First Amendment. *Rosenberger*, 515 U.S. at 829. The goal of these actions was clearly "to drive certain ideas or viewpoints from the marketplace." *Rhode Island Latino Arts v. Nat. Endowment for the Arts*, 777 F. Supp. 3d 87, 107 (D.R.I. 2025) (quoting *Finley*, 524 U.S. at 587). Unlike cases in which plaintiffs and courts must infer motive from circumstantial evidence, here, the stipulations directly identify the viewpoint-based criteria Defendants used to select grants for termination.

iv.    *An agency's ex ante discretion in grant funding is materially different from its engagement in post award, viewpoint-based grant cancellation.*

One of the few defenses Defendants mustered at the preliminary injunction stage was that the government is entitled to cease funding programs it no longer believes are in the public interest. At that stage, the Ninth Circuit found that this argument overlooks the "critical distinction between creating or ceasing a particular program (or subsidy, or forum), on the one hand, and discriminating against disfavored speaker viewpoints within a program (or subsidy, or forum) on the other." *Thakur*, 176 F.4th at 1202. The government may impose restrictions on subsidies "to define the limits and purposes of that program, but it cannot leverage its power to award subsidies into a penalty on disfavored viewpoints." *Id.* (citation modified) (citing *Velazquez*, 531 U.S. at 542; *Rust*, 500 U.S. at 193-95; *Finley*, 524 U.S. at 587). That distinction forecloses Defendants from arguing that the Executive Branch has unlimited discretion to cut off grants after they have been awarded.

As the Ninth Circuit explained, the critical distinction is between a facial challenge to a program "that by its design excludes categories of activities or speakers" and an as-applied challenge to "the government's decision to discriminate on the basis of viewpoint in a particular funding decision." *Thakur*, 176 F.4th at 1203. That is the distinction *Finley* drew when it upheld the NEA's decency-and-respect criterion against a facial challenge while expressly reserving "an

46686\21195329

as-applied challenge . . . where the denial of a grant may be shown to be the product of invidious viewpoint discrimination." *Finley*, 524 U.S. at 586-87.

At the preliminary injunction stage, "Plaintiffs specifically allege[d] discrimination in a[] particular funding decision," "contend[ing] that the agencies terminated their existing grants based solely on their perceived viewpoints regarding DEI, DEIA, and environmental justice, and d[id] not challenge the scope of the grant program, its requirements, or any conditions the agencies placed on the award of their grants." *Thakur*, 176 F.4th at 1202-03 (citation modified). This case is therefore the "different case" foretold in *Finley* that violates the First Amendment. As the Ninth Circuit declared: "The government's arguments to the contrary are unavailing."[4] *Id.* at 1203.

On a far less complete record, this Court similarly found that "Defendants terminated pre-existing grants *en masse* across the federal government for touching on prohibited topics. Those terminations, which occurred across different agencies, do not appear tied to any particular government program advancing a government message." 1st PI Order at 19; *see also id.* at 18 (noting that the terminations fell on "preexisting and ongoing federal research," "deliberately penalizing certain 'dangerous ideas,'" rather than defining the limits of any program).

The stipulations confirm the same. The agencies stipulated that they "did not terminate any grants based on alleged noncompliance with the terms of the grant" and used "general criteria, rather than grant-specific assessment of each award's compliance, or performance." McLorg Decl.

---

[4] First, the Ninth Circuit was not persuaded by the argument that the constitutional requirement of viewpoint neutrality does not apply to selective funding decisions in the competitive grant processes. *Id.* at 1203 ("Contrary to the government's suggestion, the important distinction between *Finley* and *Rosenberger* is not between competitive grants and generally available subsidies. Rather, the critical difference is between a facial challenge to a program that by its design excludes categories of activities or speakers (*e.g.*, those that tend to violate general standards of decency and respect), and an as-applied challenge to the government's decision to discriminate on the basis of viewpoint in a particular funding decision (e.g., as Plaintiffs allege here).""). Nor was it persuaded by the government's argument that its funding decisions are subject to a constitutional constraint only when the government "seek[s] to leverage funding to regulate speech outside of the contours of the program itself." *Id.* at 1204 ("To be sure, the government may violate unconstitutional-conditions principles when it imposes restrictions on speech outside the contours of a program, but the government offers no support for the assertion that this is the only constraint on the government's funding decisions.") (citing *Agency for Int'l Dev.*, 570 U.S. at 214-15).

46686\21195329

¶¶ 4-8, Exs. A(1)-E(1) at ¶ II Stipulation, Nos. 9, 13. This, coupled with admissions that the selection criteria "[were] designed to identify grants that expressed . . . viewpoints the Administration no longer wished to subsidize," puts to rest any question as to whether the terminations were tied to any particular government program advancing a government message. *Id*. at ¶ II Stipulation, Nos. 6, 9, 13. The spreadsheets accompanying the stipulations further confirm the point. *Id*. at Exs. A(2)-E(2) (Grant Spreadsheets).

Every aspect of the grant termination process reflects a single, unconstitutional directive by the government to terminate grants based on the viewpoints they were perceived to express, untethered to any particular government program advancing a government message. *See Nat'l Pub. Radio, Inc. v. Trump*, No. 2025-cv-01674, 2026 WL 877434, at *22, *26 (D.D.C. Mar. 31, 2026) (emphasizing that excluding a person or entity from eligibility for federal grants "based on that person or entity's disfavored speech, can certainly constitute a constitutionally impermissible penalty," and such action is unconstitutional where the directive is "untethered to the needs or confines of any particular federal program"). *See also Am. Council of Learned Soc'ys*, 2026 WL 1256545, at *51 (finding that DOGE's post-award cancellation of NEH grants, on virtually identical facts, "used funding leverage to penalize private speakers for failing to conform to the Government's preferred ideological position" in violation of the First Amendment). Because the government has leveraged its subsidy power to impose a penalty on disfavored viewpoints, the terminations are unconstitutional even accepting the government's broad view of its funding discretion.[5] *Finley*, 524 U.S. at 587.

---

[5] Nor can Defendants avoid judgment by invoking neutral labels, generalized agency priorities, or mixed motives. To the extent any mixed-motive question survives, once viewpoint is shown to be a motivating factor, the burden shifts to the government to prove it would have terminated the same grants for permissible reasons—a showing the admissions foreclose. *See Mt. Healthy City Sch. Dist. Bd. v. Doyle*, 429 U.S. 274, 287 (1977). This Court already found that Defendants "have not provided any evidence of why the named Plaintiffs' funding was terminated and therefore do not rebut this reasonable presumption" of viewpoint discrimination. 1st PI Order at 978. That remains true.

46686\21195329

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

2.    Defendants' Terminations also Constitute Unconstitutional First Amendment Retaliation.

The grant terminations independently violate the First Amendment because they retaliate against grant recipients for protected expression. The First Amendment "prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022). To establish retaliation, a plaintiff must show "(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016); *see Nat'l Pub. Radio, Inc.*, 2026 WL 877434, at *21.

Each element is satisfied on the undisputed record. First, the grant recipients engaged in protected expression through research and scholarship reflecting perspectives the Administration disfavored, including but not limited to DEI, DEIA, environmental justice, gender, structural racism, sexual orientation, vaccine hesitancy, COVID-19, and other topics identified by agency search criteria. McLorg Decl. ¶¶ 4-8, Exs. A(2)-E(2) (DOD, DOT, NEH, NIH-HHS, and NSF Grant Spreadsheets). Second, termination or suspension of mid-stream, competitively awarded grants is an adverse action that would deter a person of ordinary firmness from pursuing or continuing similar research. *See Thakur*, 176 F.4th at 1205 (summarizing Plaintiffs' harms, including "layoffs of team members, interruption of graduate programs, and the potential complete loss of projects, all of which will harm Plaintiffs' professional reputations."). Third, causation is established by the agencies' own admissions that they selected grants because they expressed, or were presumed to express, viewpoints the Administration no longer wished to subsidize. McLorg Decl. ¶¶ 4-8, Ex. A(1)-E(1) at ¶ II Stipulation, No. 5.

That the affected researchers may continue speaking in other ways does not cure the retaliation. The adverse action is the government's withdrawal of already-awarded support because of protected expression, and the First Amendment injury lies in the government's use of funding leverage to punish, suppress, and chill disfavored inquiry. The resulting harm is not

46686\21195329

merely monetary: it distorts the marketplace of ideas by signaling that researchers who pursue disfavored topics risk losing existing grants and future support. Nor does the timing of the terminations defeat the claim. "The temporal dimension of a retaliation claim is not whether the adverse action is discrete . . . or prospective . . . , but whether the adverse action followed and was caused by protected activity." *Nat'l Pub. Radio*, 2026 WL 877434, at *26 n.6. Here, the terminations followed from and were caused by Defendant Agencies' perception of the content and viewpoint of the funded research. The retaliation claim therefore supplies an independent basis for judgment.

> 3.   DOE Separately Violated the First Amendment by Targeting Grants Based on Political Association.

DOE likewise violated the First Amendment when it terminated grants based on the recipient's association with a political party. *Buckley v. Valeo*, 424 U.S. 1, 15 (1976) ("[The First Amendment] protects political association as well as political expression."). The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests[.]" *Perry*, 408 U.S. at 597. Accordingly, the government may not condition the receipt or retention of a federal grant on political affiliation, non-affiliation, or perceived political alignment. As another court held on virtually identical facts, the government "violated the First Amendment when it terminated grants based on their perceived association with the [prior] Administration," because the First Amendment does not permit penalizing disfavored political associations through the power of the purse. *Am. Council of Learned Soc'ys*, 2026 WL 1256545, at *52-53. Such terminations trigger strict scrutiny. *See, e.g., Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010); *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163-64 (2015).

DOE conceded that "the inclusion of grants in the October notice tranche was based solely on the political identity of the grant recipient's state" and that "neither the inclusion of the ARCHES grant nor any other grants in the October notice tranche was based on any programmatic, statutory, cost-reduction, or performance-based factor." McLorg Decl. ¶ 9, Ex. F(1) at ¶ II Stipulation, Nos. 8-9. Specifically, in October of 2025, DOE terminated 284 grants, and with one exception, the terminated grants "had a recipient location and/or at least one place of

30

46686\21195329

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

performance in a state that awarded its electoral votes to Kamala Harris in the 2024 election and has two Democratic-caucusing Senators" ("Blue State" grants). *Id.* at ¶ II Stipulation, Nos. 4-6.

The remaining approximately 340 grants proposed for termination, which had recipient locations in states that voted for President Trump or had at least one Republican-caucusing Senator, "were not terminated in October 2025, and they have not since been terminated." *Id.* at ¶ II Stipulation, No. 7. DOE further stipulated that "the differential treatment resulting in the October 2025 termination of Blue State Grants and the non-termination of Non-Blue State Grants was not based on a rational connection between the recipient's location and/or place of performance and DOE's past or current agency priorities," and that the political identity of the grant recipient's state "was not a factor that DOE's program offices considered in evaluating whether to retain, modify, or terminate grants." *Id.* at ¶ II Stipulation, Nos. 10-11. DOE's "selections among recipients of public subsidies that favor and strengthen those friendly to the government's message while placing at a disadvantage and thus weakening the opponents and skeptics" are exactly the kind of behavior that violates the First Amendment. *All. for Open Soc'y Int'l, Inc. v. USAID*, 430 F. Supp. 2d 222, 258 (S.D.N.Y. 2006).

### C. DOE Violated the Equal Protection Clause by Terminating 283 Blue State Grants "Based Solely on the Political Identity of the Grant Recipient's State."

The Court denied Plaintiffs' Motion for Preliminary Injunction as to DOE's October 2025 grant terminations because the record at that point did not provide "enough information to determine that Defendants' classification was likely based *solely* on a distinction between Red States versus Blue States." 3rd PI Order at 11 (emphasis in original). The record now directly addresses the Court's concern: DOE admits that it terminated 283 grants awarded to grantees in Blue States "**based <u>solely</u> on the political identity of the grant recipient's state**." McLorg Decl. ¶ 9, Ex. F(1) at ¶ II Stipulation, No. 9 (emphasis added). It also concedes that there was no other basis for the terminations whatsoever: it simply treated the Blue State Grants differently from the similarly situated Non-Blue State Grants that were not, and still have not been, terminated. *Id.* ¶ II Stipulation, Nos. 7-11. And it concedes that there is no rational connection between its politically motivated terminations and DOE's "past or current agency priorities." *Id.* ¶ II Stipulation, No. 10.

31

46686\21195329

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

Accordingly, there is no longer any genuine dispute on the stipulated facts: DOE's October 2025 terminations violate Plaintiffs' right to equal protection under the laws.

The Court set forth the applicable standard for a violation of the Equal Protection Clause in its Third Preliminary Injunction Order. *See* 3rd PI Order at 9-10. To prevail on an Equal Protection claim, Plaintiffs must show "that a class that is similarly situated has been treated disparately." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1063-64 (9th Cir. 2014) (citation omitted). The comparator group "need not be similar in all respects, but they must be similar in those respects relevant to the Defendants' policy." *Id*. at 1064 (citing *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). And because rational basis review applies to an equal protection claim, the question is whether "any reasonably conceivable state of facts [] could provide a rational basis for the classification." *Heller v. Doe*, 509 U.S. 312, 320 (1993) (citation omitted).

First, as to the requirement that the grantees be "similarly situated" and "treated disparately," the Court's Preliminary Injunction Order had expressed some concern that the Non-Blue State Grants might not have been "materially similarly situated to the terminated projects" in Blue States. 3rd PI Order at 11. Now, DOE admits that the Blue State and Non-Blue State Grants were "similarly situated." McLorg Decl. ¶ 9, Ex. F(1) at ¶ II Stipulation, No. 11. That admission is confirmed by DOE's own conduct: DOE placed all 624 grants on a single list for unified review, subjected them to identical criteria, and proposed them for the same treatment: termination. *Id*. ¶ II Stipulation, Nos. 2-7. That all grants received identical process until the moment OMB selected only the Blue State grants for actual termination confirms they were not merely "similar" but *identically* situated prior to the disparate treatment. *Id*. *See Ariz. Dream Act Coal.*, 757 F.3d at 1064. Yet, despite being identically situated, the grants were "treated disparately": DOE admits that only the 283 Blue State Grants were terminated on October 1, 2025, while "[t]he remaining approximately 340 [Non-Blue State Grants] were not terminated in October 2025, and they have not since been terminated." McLorg Decl. ¶ 9, Ex. F(1) at ¶ II Stipulation, Nos. 5-7. The first element of an Equal Protection violation is satisfied.

Second, there is no other "reasonably conceivable state of facts" that "could provide a rational basis" for DOE's disparate treatment of the Blue State Grants. *Heller*, 509 U.S. at 320. In

32

46686\21195329

evaluating an Equal Protection claim, courts "may consider purposes advanced by counsel for the [government]" as long as they "are careful not to attribute to the [government] purposes which it cannot reasonably be understood to have entertained." *Christian Science Reading Room Jointly Maintained v. City & Cnty. of S.F.*, 792 F.2d 124, 124 (9th Cir. 1986) (citation omitted) (amending *Christian Science Reading Room Jointly Maintained v. City & Cnty. of S.F.*, 784 F.2d 1010, 1013 (9th Cir. 1986) and holding that the purpose of government's policy excluding religious organizations from airport was to correct violations of the Establishment Clause, not maximization of airport revenue or to serve public desire, based on "dispositive" letters and meeting discussions).

The Court originally considered the possible alternative explanations for the Blue State/Non-Blue State classifications, as suggested in Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction: the Trump Administration's "shifted [] priorities," or DOE's desire not to "prioritize[] green hydrogen hubs." *See* 3rd PI Order at 10 (discussing Opp'n at 32-33, ECF No. 165). But those alternative, speculative possibilities are now foreclosed by DOE's concession that its decision to terminate the 283 Blue State Grants, but not the 340 Non-Blue State Grants, "was based solely on the political identity of the grant recipient's state, i.e., whether the recipient's location and/or place of performance was in a Blue State or a non-Blue State." McLorg Decl. ¶ 9, Ex. F(1) at ¶ II Stipulation, No. 9.

The Court should also take DOE at its word when DOE admits that its differential treatment of the Blue State Grants "was **not** based on a rational connection between the recipient's location and/or place of performance and DOE's past or current agency priorities." *Id.* at ¶ II Stipulation, No. 10 (emphasis added). "Solely" means "solely." DOE considered nothing more than the Democrat-favoring voting record of the grant recipient's state when deciding whether it should end funding for those 283 programs or retain the funding for those 340 programs located in swing or Republican-favoring voting states.

Finally, Defendants' termination of grants based on a state-political-identity classification is not "rationally related to a legitimate government purpose." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). As Judge Mehta held in *City of St. Paul, Minnesota v. Wright*, DOE can proffer no

46686\21195329

"legitimate government purpose" bearing any connection to the blatantly suspect classification at issue. 816 F. Supp. 3d 65, 72-75 (D.D.C. 2026). In *St. Paul*, DOE argued that Blue State/Non-Blue State distinction was necessary to vindicate its purported interests in re-orienting agency priorities under President Trump's administration. *Id.* at 72. But the court rejected that explanation because:

> Without more, there is no reason to believe that terminating an award to a recipient located in a state whose citizens tend to vote for Democratic candidates—and, particularly, voted against President Trump—furthers the agency's energy priorities any more than terminating a similar grant of a recipient in a state whose citizens tend to vote for Republican candidates or voted for President Trump.

*Id.*

DOE cannot even make the same argument here, because it *concedes* there is no connection between the classification and DOE's priorities. As noted above, DOE stipulates that "the differential treatment resulting in the October 2025 termination of Blue State Grants and the non-termination of non-Blue State Grants was not based on a rational connection between the recipient's location and/or place of performance and DOE's past or current agency priorities." McLorg Decl. ¶ 9, Ex. F(1) at ¶ II Stipulation, No. 10. Nor could it be based on any other interest, because DOE *also* admitted that those terminations were "based solely on the political identity of the grant recipient's state" (*id.* ¶ II Stipulation, No. 9), and not "on any programmatic, statutory, cost-reduction, or performance-based factor." (*id.* ¶ II Stipulation, No. 8). DOE's stipulations leave no doubt that the sole basis for its October 2, 2025 terminations was to cut off grant funding to projects being undertaken in Blue States.

DOE vindicated only one interest with these political classifications: President Trump's desire to punish his perceived enemies. But political retribution is not a "legitimate government purpose," and it cannot bear any rational relationship to funding decisions for research projects undertaken by researchers caught in the fallout zone. *Clark*, 486 U.S. at 461. Because DOE has stipulated that its sole basis for terminating the 283 Blue State Grants was "the political identity of the grant recipient's state"—a classification bearing no rational connection to any legitimate government purpose—DOE has violated the Equal Protection Clause. Indeed, the equal protection concerns are especially powerful when the discrimination is among states, as the Supreme Court

46686\21195329

has found that the Constitution recognizes a "fundamental principle of *equal* sovereignty" among the States. *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 544 (2013) (emphasis in original). Plaintiffs are entitled to summary judgment on this claim, and DOE's terminations must be reversed.

### D.    Defendants' Grant Terminations Violated the Separation of Powers.

In addition to violating the First Amendment and Equal Protection Clause, all Agency Defendants (except DOE) violated the separation of powers by unilaterally cancelling duly awarded grants and withholding funding that Congress appropriated to fund those grants. Separately, DOE, DOT, and NIH violated the separation of powers by cancelling certain specific grants that were mandated by specific and express acts of Congress.[6]

The Constitution empowers Congress to make laws (U.S. Const. art. 1, § 1) and requires the President to faithfully execute those laws (*id*. art. II, § 3). Congress's powers to set the policies of the nation are at their apex when it comes to spending money, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of S.F.*, 897 F.3d at 1231, 1238. Accordingly, the President and executive branch agencies have no constitutional power to cancel appropriations passed by Congress. *Id.* at 1235 ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.").

Nor does the Executive have the power to exercise Congress's Article I powers by attempting to unilaterally enact, amend, or repeal duly enacted statutes, or to direct federal agencies to refuse to spend funds that Congress earmarked for a specific purpose. *Clinton v. City of New York*, 524 U.S. 417, 438-39 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."); *City & Cnty. of S.F.*, 897 F.3d at 1231 ("[U]nder the principle of Separation of Powers…the Executive Branch may not refuse to disperse the federal grants in question without congressional authorization."); *In re Aiken Cnty.*,

---

[6] As described further below, the UC researchers associated with the first group of grants—all grants terminated by DOD, NEH, NIH-HHS, NSF, and DOT—are encompassed by the proposed separation of powers class. For the second group, no class is necessary because a named Plaintiff is associated with, and has standing to seek reinstatement of, each relevant grant individually.

35    46686\21195329

725 F.3d 255, 259 (D.C. Cir. 2013) ("[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objections . . . Those basic constitutional principles apply to the President and subordinate executive agencies"). The President may veto a bill passed by Congress. But once a law has been duly enacted, the President does not have a second opportunity to veto it by nullifying it.

Because "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . pose[s] an inherent 'threat to liberty[,]'" each branch of the federal government must stay within its proper domain. *Patchak v. Zinke*, 583 U.S. 244, 250 (2018) (plurality opinion) (citation omitted); *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923). When one of the three branches exceeds the scope of its constitutional authority, it falls to the federal courts to reestablish the proper division of federal power. *See Cnty. of Santa Clara v. Noem*, 815 F. Supp. 3d 979, 1024 (N.D. Cal. 2025) (affirming justiciability of separation of powers claim challenging Department of Homeland Security grant conditions); *Hous. Auth. of City & Cnty. of S.F. v. Turner*, No. 25-CV-08859-JST, 2025 WL 3187761, at *10 (N.D. Cal. Nov. 14, 2025) (affirming justiciability of separation of powers claim challenging federal grant conditions imposed on city and county public housing agencies).

*City and County of San Francisco v. Trump*, 897 F.3d 1225, 1233 (9th Cir. 2018), is instructive. There, the Ninth Circuit held that the Executive Branch violated the separation of powers when it refused to disperse federal grant funding to sanctuary cities. *Id.* at 1231. As the court explained, "Congress's power to spend is directly linked to its power to legislate," and "[a]side from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress." *Id.* at 1231-1232. "Simply put, the President does not have unilateral authority to refuse to spend the funds. And, the President may not decline to follow a statutory mandate or prohibition simply because of policy objections." *Id.* at 1232 (citation modified) (citing *In re Aiken Cnty.*, 725 F.3d at 261 n.1). Accordingly, because the "President's duty to enforce the laws necessarily extends to appropriations" (*id*. at 1233-34), the Executive has no power to "redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *Id*. at 1235.

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

As in *City and County of San Francisco*, the Administration in this case defied clear congressional mandates to appropriate funds for grantmaking, and terminated hundreds of grants in an attempt to substitute its own policy preferences for the will of Congress. *See id.* at 1235; *see* McLorg Decl. ¶¶ 4-8, Exs. A(1)-E(1) at ¶ II Stipulation, Nos. 10-12 (Admitting that (i) "the grants at issue were funded through funds appropriated for the purpose of grant-making"; (ii) the agencies "ha[ve] not re-allocated the terminated funds to other grant-making programs"; and (iii) the agencies' "enabling statute or other legislation includes grant-making as a directive from Congress."); *id.* at ¶ 5 (Executive agencies were directed to terminate grants that "expressed, or were presumed to express, viewpoints disfavored by the Administration."). Accordingly, with respect to all agency terminations at issue in this case,[7] the Executive Branch violated the separation of powers.

        1.      DOD, NEH, NIH-HHS, NSF, and DOT terminated all relevant grants in defiance of congressional mandates and illegally withheld congressionally authorized funds.

**DOD, NEH, NIH-HHS, NSF, and DOT Terminations.** The Executive Branch violated the separation of powers by cancelling DOD, NEH, NIH-HHS, NSF, and DOT grants that were awarded pursuant to the express mandates of Congress. Indeed, as the Government has stipulated, each Defendant Agency's enabling statute or other applicable legislation included a directive from Congress to engage in grant-making. *See* McLorg Decl. ¶¶ 4-8, Exs. A(1)-E(1) at ¶ II Stipulation, No. 12. These directives include the exact kinds of grants that the Executive terminated in this case.

To take a few examples, Congress directed **NEH** to fund grants specifically to "initiate and support programs and research . . . that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community." 20 U.S.C. § 956(c)(4). **HHS** was specifically instructed to "encourage . . . and render assistance to . . . scientific institutions, and scientists in the conduct of . . . research, investigations, experiments, demonstrations, and studies relating to the causes, diagnosis, treatment, control, and prevention of

---

[7] This excludes grants from DOE, which did not stipulate to withholding the terminating funds. DOE did, however, violate the separation of powers with respect to specific projects specifically authorized by Congress, as set forth below.

physical and mental diseases and impairments of man." 42 U.S.C. §§ 241(a), 286(b)(7), 288; *see also* 31 U.S.C. § 6305; 42 C.F.R. §§ 52, 66. And **DOT** was required to award grants to nonprofit institutions of higher education to establish and operate university transportation centers that advance transportation expertise and technology through education, research, and technology-transfer activities. 49 U.S.C. § 5505(a)(1), (a)(2)(A); *see also* 49 U.S.C. § 101(b) ("A Department of Transportation is necessary in the public interest and to [. . .] stimulate technological advances in transportation, through research and development or otherwise.").

The terminated grants were issued for the purpose of effectuating these congressional mandates (McLorg Decl. ¶¶ 4-9, Exs. A(2)-F(2) (Grant Spreadsheets)), and Defendants have stipulated that the specific "grants at issue were funded through funds appropriated for the purpose of grant-making." *Id.* ¶¶ 4-8, Exs. A(1)-E(1) at ¶ II Stipulation, No. 10. Defendants further stipulated that the properly appropriated grant funds were not reallocated to other grant-making programs after Plaintiffs' grants were terminated. *Id.* at ¶ II Stipulation, No. 11. Accordingly, by refusing to follow Congressional directives regarding grant-making, and by refusing to spend properly appropriated funds for grant-making purposes as required by Congress, the Executive Branch violated the separation of powers, and its actions should be enjoined. *See City & Cnty. of S.F.*, 897 F.3d at 1235.

> 2.     DOE, DOT, and NIH terminated specific grants expressly appropriated by Congress.

**DOE Terminations.** The Executive Branch violated the separation of powers by refusing to fund regional DAC hubs, at least one green hydrogen hub, and electrolyzer research, as expressly required by Congress.

Under 42 U.S.C. Section 16298d, Congress established a comprehensive statutory framework for regional DAC hubs and commanded that the Secretary of Energy "*shall* establish a program under which the Secretary *shall* provide funding for eligible projects that contribute to the development of 4 regional [DAC] hubs." 42 U.S.C. § 16298d(j)(2)(A) (emphasis added). Congress appropriated $3.5 billion specifically for this program for fiscal years 2022 through 2026, "to remain available until expended." *Id*. at § 16298d(k). Dr. Bedsworth's CALDAC Project was one

38

of the grants authorized under this statute. *See* Bedsworth PI Decl. ¶ 13. The Executive's unilateral decision to defund DAC hubs in Blue States based on their location in Blue States (*see* McLorg Decl. ¶ 9, Ex. F(1) at ¶ II Stipulation, Nos. 1, 8-9) cannot override Congress's explicit mandate to fund DAC projects, nor wipe away Congress's appropriation of $3.5 billion for this purpose. *See City & Cnty. of S.F.*, 897 F.3d at 1234-35 (the Executive Branch cannot withhold appropriated funds to effectuate its own policy goals); *In re Aiken Cnty.*, 725 F.3d at 261 n.1 (same).

DOE also violated the separation of powers by terminating funding for the only two green hydrogen hubs in America: the ARCHES Hydrogen Hub and the Pacific Northwest Hub. Decl. of Claudia Polsky in Supp. of Pls.' 3rd PI Mot. ("Polsky PI Decl.") ¶ 4 (Nov. 24, 2025), ECF No. 160 (both associated with Plaintiff Atanassov). Under 42 U.S.C. § 16161a(c)(2), Congress required the Secretary of Energy to fund at least four "regional clean hydrogen hubs" that would consist of "a network of clean hydrogen producers, potential clean hydrogen consumers, and connective infrastructure located in close proximity." *Id.* § 16161a(a). Among these hubs, there was an additional requirement to fund at least one hub using "clean hydrogen from renewable energy," also known as a green hub. *Id.* at § 16161a(c)(3). To that end, Congress authorized an appropriation of $8 billion to the Secretary to carry out the regional clean hydrogen hubs program for the period of fiscal years 2022 through 2026. *Id.* at § 16161a(d). Yet despite these clear statutory mandates, the Executive unilaterally terminated funding for the only two green hubs, because it no longer wanted to support hubs in Blue States. *See* Atanassov PI Decl. ¶ 31 (Dr. Atanassov's ARCHES grant was summarily terminated). By terminating funding for the ARCHES Hydrogen Hub and the Pacific Northwest Hub, the Executive defied the congressional requirement to fund at least one green hydrogen hub.

DOE similarly disregarded Congress's command to fund electrolyzer research when it terminated Dr. Boettcher's Electrolyzer grant. In 42 U.S.C. Section 16161d, Congress directed that the Secretary of Energy "*shall* establish" a "research, development, demonstration, commercialization, and deployment program" to "reduce the cost of producing clean hydrogen using electrolyzers" (*id.* § 16161d(b) (emphasis added)), and that, in carrying out that program, the Secretary "*shall* award grants, on a competitive basis, to eligible entities" for qualifying projects,

39

(*id.* § 16161d(f)(1) (emphasis added)). Congress appropriated $1 billion to carry out that program for fiscal years 2022 through 2026, "to remain available until expended" (*id.* § 16161d(g)), in addition to $500 million for the related Clean Hydrogen Manufacturing and Recycling program (*id.* § 16161c(c)). Dr. Boettcher's Electrolyzer grant was awarded and funded pursuant to these directives: DOE issued the funding opportunity under which it was awarded expressly to implement Sections 16161c and 16161d (Boettcher Decl. ¶ 10, Ex. D), and the grant advanced exactly the technologies Congress directed the program to fund—low-temperature, membrane-based electrolyzers using "new highly active, selective, and durable electrolyzer catalysts" designed to "greatly reduce or eliminate the need for platinum group metals." *Id.* § 16161d(e); Boettcher Decl. ¶ 10, Ex. D at 2 ("The primary goal of this project is to develop and co-design advanced catalyst, ionomer, and interface for electrolyte-free operation of durable and high-performance alkaline exchange membrane water electrolyzers (AEMWEs). . . . while using cost-effective, non-platinum group metal (non-PGM) materials."). Again, the Executive's unilateral decision to terminate that grant based on the political identity of the recipient's state (*see* McLorg Decl. ¶ 9, Ex. F(1) at ¶ II Stipulation, Nos. 1, 8-9) cannot override Congress's express mandate to fund electrolyzer research, nor wipe away the appropriation Congress dedicated to that purpose.

As admitted by DOE, its termination of the DAC, ARCHES, Electrolyzer, and other grants was not based on any "programmatic, statutory, cost-reduction, or performance-based factor," but on the political identity of the grant recipient's state. *Id.* at ¶ II Stipulation, Nos. 8-9. In substituting its own policy preferences for Congress's specific mandates, DOE violated the separation of powers. *See City & Cnty. of S.F.*, 897 F.3d at 1231.

**DOT Terminations.** DOT also violated separation of powers by disregarding express congressional mandates to: (i) fund five national transportation centers; (ii) fund regional university transportation centers in ten specified regions; and (iii) award grants for research priorities like environmental preservation. *See* 49 U.S.C. § 5505(c)(2)(A) (funding for five national transportation centers); § 5505(c)(3) (funding for regional centers in ten specified regions); § 6503(c)(1) (funding for environment research priority).

In the 2021 Infrastructure Investment and Jobs Act (IIJA), Congress specifically directed

40

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS
CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

DOT to award grants for five *national* transportation centers. *See* 49 U.S.C. § 5505(c)(2)(A) (requiring the DOT Secretary to provide "grants to 5 consortia"). On June 1, 2023, pursuant to 49 U.S.C. Section 5505, Dr. Handy was awarded a grant to conduct a multi-disciplinary program of transportation research, education, and technology transfer through a National University Transportation Center (UTC) that focused on preserving the environment. Decl. of Susan Handy in Supp. of Am. Class Action Compl. ("Handy Decl.") ¶ 21, Ex. D (July 18, 2025), ECF No. 70. On May 2, 2025, DOT terminated Dr. Handy's grant (*see* Handy Decl. ¶ 24), and has not allocated the appropriated grant funds to other grant-making programs since then (McLorg Decl. ¶ 6, Ex. B(1) at ¶ II Stipulation, No. 11). By terminating Dr. Handy's grant and refusing to fund another national transportation center, DOT violated Congress's express directive to fund five national transportation centers. *See In re Aiken Cnty.*, 725 F.3d at 259 ("But absent a lack of funds . . . the Executive must abide by statutory mandates and prohibitions. Those basic constitutional principles apply to the President and subordinate executive agencies.").

Similarly, 49 U.S.C. Section 5505(c)(3) sets forth specific requirements for funding *regional* university transportation centers. Pursuant to this statutory mandate, DOT was required to fund a regional university transportation center in each of the "10 Federal regions" established by the OMB. *Id*. § 5505(c)(3)(A). Dr. Handy was a sub-awardee for a regional university transportation center at the University of Southern California ("USC"). *See* Handy Decl. ¶ 28-33. By terminating the USC grant, DOT left Region 9 without the required University Transportation Center (and Dr. Handy without a sub-award). Further, DOT has not allocated appropriated grant funds to other grant-making programs since then. McLorg Decl. ¶ 6, Ex. B(1) at ¶ II Stipulation, No. 11. In so doing, DOT again contravened Congress's express command, in violation of the separation of powers.

Finally, in addition to the particular grant-making ordered by Congress in the 2021 IIJA, DOT's grant terminations violated a separate congressional mandate to fund grants that addressed the research priority of "Preserving the Environment." 49 U.S.C. § 6503(c)(1). Dr. Handy's NCST grant proposal targeted this research priority. *See* Handy Decl. ¶ 19 ("In 2022, my colleagues and I at the NCST submitted a grant proposal to the DOT to fund the NCST's research activities in the

DOT Priority Area Preserving the Environment."). By terminating that grant, DOT disregarded congressional directives to prioritize research addressing environmental preservation, substituted its own policy preferences over congressional mandate, and violated the separation of powers. *See City & Cnty. of S.F.*, 897 F.3d at 1234-35.

**NIH Termination**. Finally, NIH violated the separation of powers by terminating Dr. Gansky's grant. In the Consolidated Appropriations Act of 2021, Congress directed NIMHD to award funds to eleven research institutions and *one research coordinating center* to establish and support regional comprehensive research centers on the prevention, treatment, and management of comorbid chronic diseases that disproportionately affect populations with health disparities. Pub. L. No. 116-260; Gansky Decl. ¶¶ 15 & 19, Ex. F at 1-2 (Disputed Element No. 1). Pursuant to this congressional directive, on September 24, 2021, NIMHD awarded Dr. Gansky's team a grant to establish the Research Coordinating Center to Reduce Disparities in Multiple Chronic Diseases, appropriating over $22 million for a project period running through June 30, 2026. Gansky Decl. ¶¶ 9, 12-13. On March 21, 2025, NIH terminated Dr. Gansky's grant on the ground that it "no longer effectuates agency priorities." *Id.* ¶¶ 19-20. By terminating a grant that Congress specifically directed NIMHD to fund, and substituting its own policy preferences for Congress's express mandate, the Executive Branch contravened Congress's command, in violation of the separation of powers. *See City & Cnty. of S.F.*, 897 F.3d at 1234-35.

### E.     Plaintiffs Reserve Their Right to Seek Leave to File a Supplemental Motion for Summary Judgment on Their APA Arbitrary and Capricious Claim.

On September 22, 2025, this Court held that its review of Plaintiffs' APA claims was not barred by the Tucker Act under *NIH v. American Public Health Association*, 145 S. Ct. 2658 (2025). 2nd PI Order at 13-18. On May 26, 2026, the Ninth Circuit reversed that Order in part and held that the Tucker Act precluded District Court review of Plaintiffs' APA arbitrary and capricious claim. *Thakur*, 176 F.4th at 1199 (while not addressing whether the Tucker Act precluded District Court review of Plaintiffs' APA contrary to law claim). Should Plaintiffs petition the Supreme Court for review of the Ninth Circuit's decision and obtain a favorable ruling from the Supreme Court, they respectfully reserve their right to seek leave to file a supplemental

motion for summary judgment on the APA arbitrary and capricious claim at issue in this case.

## III.    The Classes Should Be Certified.

The case for class certification has only become stronger since the Court provisionally certified the Form and Equity Termination Classes. *See* 1st PI Order at 49-60; 2nd PI Order at 28-32. With modest exceptions for DOE, all accounted for in the class definitions, all Agency Defendants agreed to identical stipulations, making clear that all grants were terminated in the same manner for the same reasons. Moreover, courts around the country have continued to certify Rule 23(b)(2) classes to address similar uniform executive action. *See infra*, n.17. Plaintiffs have refined or introduced class definitions that reflect information learned during the discovery process; in other words, these classes bring claims that Defendants' stipulations have revealed to be meritorious. Given the strong legal and factual support, for the reasons discussed below, the Court should certify the following four classes.

### A.    Proposed Class Definitions

Plaintiffs propose four classes (membership may overlap):

#### 1.    The Viewpoint Discrimination Class (NSF, NEH, DOD, DOT, and NIH)

The Viewpoint Discrimination Class builds on the Court's Equity Termination Class (*see* 1st PI Order), updated to reflect information learned during the discovery process.[8] It consists of:

> All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system who are named as principal researchers, investigators, or project leaders on the grant applications or subawards for previously awarded research grants by the NSF, NEH, DOD, DOT, and NIH (or their sub-agencies) that were terminated because they "expressed, or were presumed to express, viewpoints disfavored by the [Trump] Administration, as set forth in Executive Orders or [each Agency's] executive directives," as listed in the attached stipulations and spreadsheets[9] (including those grants terminated

---

[8]  As Defendants concede in the attached stipulations, Defendants terminated grants that were presumed to express a number of disfavored viewpoints *generally*, including, but *not limited to*, grants expressing "DEI" viewpoints. *See* Fed. R. Civ. P. 23(c) (providing for amendment of class definitions and other aspects of class certification before entry of final judgment).

[9]  McLorg Decl. ¶¶ 4-8, Exs. A(1)-E(1) & A(2)-E(2). For sake of clarity, the Viewpoint Discrimination Class does *not* include grants that were terminated as part of Defendants' mass action against UCLA in July 2025. The spreadsheets produced by Defendants indicate which grants (if any) were terminated based solely on UCLA affiliation. Such grants are encompassed in the Form Termination Class.

pursuant to Executive Orders 14151 or 14173), from and after January 20, 2025.

Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.

2.      Separation of Powers Class (NSF, NEH, DOD, DOT, and NIH)

The Separation of Powers Class consists of:

All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system who are named as principal researchers, investigators, or project leaders on the grant applications or subawards for previously awarded research grants by the NSF, NEH, DOD, DOT, and NIH (or their sub-agencies), "funded through funds appropriated" by Congress "for the purpose of grant-making,," the NSF, NEH, DOD, DOT, and NIH (or their sub-agencies) from and after January 20, 2025, and whose terminated funds were not "re-allocated . . . to other grant-making programs." This includes all the grants listed in the attached stipulations and spreadsheets for NSF, NEH, DOD, DOT, and NIH (or their sub-agencies).

Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.[10]

3.      The Department of Energy (Equal Protection and First Amendment)

The Department of Energy Class consists of:

All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system, who worked or were hired to work on a research grant or sub-award that (a) named a UC researcher as a principal researcher, investigator, or project leader on the grant application or sub-award and (b) was included in the 284 grants that DOE terminated "based solely on the political identity of the grant recipient's state," on or around October 2, 2025.

Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.

4.      The Form Termination Class

Plaintiffs understand that the Ninth Circuit concluded that this Court lacks jurisdiction over the Administrative Procedure Act claim relevant to the previously certified Form Termination Class. *See Thakur*, 176 F. 4th at 1187. Nevertheless, Plaintiffs include the Class in this motion

---

[10]  As discussed above, each of the DOE, DOT, and NIH grants terminated in contravention of a specific congressional mandate is associated with a named Plaintiff with standing to seek the grant's reinstatement. There is, therefore, no need for a separate class or subclass for this group.

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

solely for the purpose of preserving the claim through further appeals. As defined by the Court, *see* 1st PI Order at 51-52 and 2nd PI Order at 28-29, the Form Termination Class consists of:

> All University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system who are named as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants by the NSF, NEH, DOD, DOT, and NIH (or their sub-agencies) that are terminated by means of a form termination notice that does not provide a grant-specific explanation for the termination that states the reason for the change to the original award decision and considers the reliance interests at stake, from and after January 20, 2025.

> Excluded from the class are Defendants, the judicial officer(s) assigned to this case, and their respective employees, staffs, and family members.

Plaintiffs incorporate and rely on the analysis advanced by the Court in certifying the Class in earlier proceedings, and do not here make further arguments regarding this Class. *See* 1st PI Order at 58 (EPA, NSF, NEH); 2nd PI Order at 29 (DOD, DOT, NIH).

### B.    Legal Standard for Certification

Under Federal Rule of Civil Procedure 23(a), a class action is proper if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a); 1st PI Order at 50. Once a proposed class satisfies the Rule 23(a) factors, the court must determine whether a class can be certified under Rule 23(b). *See id*. Certification under Rule 23(b)(2) is proper when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *See* Fed. R. Civ. P. 23(b)(2). Thus, under Rule 23(b)(2), "a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011).

**C.      Plaintiffs Satisfy All Rule 23(a) Factors.**

1.      Rule 23(a)(1): The Proposed Classes Are Sufficiently Numerous.

Plaintiffs have put forth sufficient evidence to conclude the proposed classes meet Rule 23(a)'s numerosity requirement. Rule 23(a)(1) is "an impracticability-of-joinder rule, not a strict numerosity rule." Introduction to Rule 23(a)(1)—Impracticability of joinder, 1 Newberg and Rubenstein on Class Actions § 3:11 (6th ed. 2025). And while courts often use a rule-of-thumb threshold—typically between 20 and 40 class members—there is no "clear formula" or "magic number" to establish impracticability. *Id.*[11] In injunctive and declaratory relief cases, "the practical value of joining each of the [] class members as a formal party is slim to non-existent and is plainly outweighed by the substantial logistical burdens that would entail." *A. B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 837 (9th Cir. 2022). Thus, for Rule 23(b)(2) classes, "the numerosity requirement is relaxed." *Chinitz v. Intero Real Est. Servs.*, No. 2018-cv-05623, 2020 WL 7391299, at *8 (N.D. Cal. July 22, 2020) (citing *Civil Rights Educ. & Enf't Ctr. v. Hosp. Properties Tr.*, 317 F.R.D. 91, 100 (N.D. Cal. 2016), *aff'd*, 867 F.3d 1093 (9th Cir. 2017)); *Jackson v. Danbury*, 240 F.R.D. 145, 147-48 (D. Del. 2007) (numerosity met by class of 16 members in injunctive relief action).[12] Plaintiffs "'need not state the exact number of potential members nor identify all the members of the class so long as the putative class is not amorphous.'" *Foon v. Centene Mgmt. Co.*, No. 2:19-cv-01420, 2023 WL 1447922, at *4 (E.D. Cal. Feb. 1, 2023) (quoting *Arnold v. United Artists Theatre Cir., Inc.*, 158 F.R.D. 439, 449 (N.D. Cal. 1994)).

---

[11] *See, e.g.*, Defs.' Combined Opp'n to Pls.' Mot. for Leave to File Third Am. Compl. & Mot. for Third Prelim. Inj. at 14 (Dec. 8, 2025), ECF No.165 (Defendants acknowledging that Rule 23(b) classes may be certified with as few as twenty-one class members) (citing, e.g., *Refuerzo v. Sw. Airlines Co.*, No. 22-cv-00868-JSC, 2024 WL 4177936, at *4 (N.D. Cal. Sep. 12, 2024)).

[12] *See also, e.g.*, *Doe #1 v. Trump*, 335 F.R.D. 416, 431 (D. Or. 2020) (citing *Sueoka v. United States*, 101 F. App'x 649, 653 (9th Cir. 2004)) ("[W]hen plaintiffs seek injunctive or declaratory relief, 'the numerosity requirement is relaxed and plaintiffs may rely on the reasonable inference arising from plaintiffs' other evidence that the number of unknown and future members [of the proposed class] is sufficient to make joinder impracticable'"); *Nightingale v. U.S. Citizenship & Immigration Servs.*, 333 F.R.D. 449, 457 (N.D. Cal. 2019) (similar).

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

i.    *The Viewpoint Discrimination Class & Separation of Powers Classes*

There is no dispute as to numerosity for the Viewpoint Discrimination Class or the Separation of Powers Class. DOD, DOT, NIH, NEH, and NSF have all agreed that "the number of terminated grants renders joinder of all class members impracticable." McLorg Decl. ¶¶ 4-8, Exs. A(1)-E(1) at ¶ II Stipulation, No. 14. Plaintiffs have demonstrated that hundreds of grants with UC researchers named as principal researchers, investigators, or project leaders on the grant applications across the agencies were terminated because of the viewpoints the grants were presumed to express. *See id*. at ¶ II Stipulation, Nos. 5-6; Exs. A(2)-E(2) (Grant Spreadsheets). *See also* 1st PI Order at 54 (concluding Plaintiffs sufficiently alleged numerosity for equity-related grants). Numerosity is satisfied.

ii.    *The Department of Energy Class*

The Department of Energy Class is also sufficiently numerous to render joinder impracticable. Among the 284 grants terminated "based solely on the political identity of the grant recipient's state, i.e., . . . Blue State or a non-Blue State," there are thirteen grants or sub-awards associated with the University of California. McLorg Decl. ¶ 9, Ex. F(1) at ¶ II Stipulation, No. 9; Ex. F(3) at Ex. B. The class consists of the UC researchers who worked on those grants, which, at latest count, is at least seventy-six class members.[13] That includes: at least twenty-nine who worked on ARCHES (Polsky PI Decl. ¶¶ 3-6); five who worked on grant EE0011347 (novel carbon supports), led by Plaintiff Plamen Atanassov (Atanassov Decl. ¶ 3-4); three who worked on grant EE0010751 (cathode catalysts), also led by Dr. Atanassov (*id.*); eleven who worked on grant FE0032383 (carbon capture), led by Plaintiff Louise Bedsworth (Bedsworth Decl. ¶ 6-8); nine who worked on grant EE0011322 (electrolyzers), led by Dr. Shannon Boettcher of UC Berkeley (Boettcher Decl. ¶ 22-24); eight who worked on grant EE0010499 (porous aromatic), led

---

[13] As detailed in the Polsky, Atanassov, Bedsworth, and Boettcher declarations, working on the DOE grants were many UC researchers—including PhD candidates and postdoctoral researchers—who, despite not being named as principal researchers, were nevertheless key scientific contributors to their projects. Their roles were typically contemplated in the grant application budgets, and, like those who were listed by name, they were harmed financially, professionally, or both, by the termination of their research teams' grants. 1st PI Order at 47 (acknowledging harm to graduate programs, among other things).

by Dr. Jeffrey Long of UC Berkeley (Polsky Decl. ¶ 6, Ex. A); five who worked on grant EE0011345 (IONOMR innovations), three who worked on grant EE0011326 (proton energy systems), two who worked on grant EE0011315 (ACS industries), and four who worked on grant EE0011353 (AvCarb LLC), (Polsky Decl. ¶ 7, Ex. B); four who worked on grant EE0010190 (micro-pin array), led by Dr. Vinod Narayanan of UC Davis (Polsky Decl. ¶ 8, Ex. C); and at least two who worked on grants EE0010992 (wastewater treatment) and EE0009779 (sunpower) (Decl. of Janella Davis in Supp. of Fed. Defs.' Opp'n to Pls.' Mot. to Am. at ¶ 134 (Dec. 8, 2025), ECF No.165-1).[14]

As noted, a class with at least forty members presumptively satisfies the numerosity requirement. But even if there were slightly fewer members, for this injunctive relief case, "the practical value of joining each of the [] class members . . . is plainly outweighed by the substantial logistical burdens that would entail," *Hawaii State Dep't of Educ.*, 30 F.4th at 837; *see also Jackson*, 240 F.R.D. at 147-48; 1 Newberg on Class Actions § 3:12. Numerosity is satisfied for the Department of Energy Class.

> 2.    Rule 23(a)(2): The Proposed Classes Are Bound by Common Questions of Law and Fact.

"To satisfy commonality, the 'plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation.'" 1st PI Order at 54 (quoting *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012)). Commonality is generally satisfied where "[t]he factual and legal questions that [plaintiffs] present can be answered 'yes' or 'no' in one stroke as to the entire class." *Parsons v. Ryan*, 754 F.3d 657, 684 (9th Cir. 2014). As long as the case presents a legal theory with a uniform answer, certification is appropriate even when there are factual differences among class members. *See id.* (certification appropriate where "dissimilarities among class members do not impede the generation of common answers to th[e] questions"); *Xiufang Situ v. Leavitt*, 240 F.R.D. 551, 560 (N.D. Cal. 2007) ("[I]t is sufficient for class members to have shared

---

[14] Class members who worked on multiple terminated grants—notably, Drs. Atanassov and Zenyuk—are counted only once in the tally of seventy-six DOE class members.

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

legal issues but divergent facts[.]"). In general, commonality is satisfied when the plaintiffs are "challeng[ing] a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *overruled on other grounds*, *Johnson v. Cal.*, 543 U.S. 499 (2005); *accord* 1st PI Order at 54.

Here, Plaintiffs' claims focus *entirely* on Defendants' course of conduct that caused the common, class-wide injuries. Because this "class-wide proceeding [will] generate common answers" to the core questions set forth below, which are "apt to drive the resolution of the litigation," class certification is appropriate. *Dukes*, 564 U.S. at 350 (citation modified).

i.      *The Viewpoint Discrimination Class*

Plaintiffs have demonstrated commonality for the Viewpoint Discrimination Class. Plaintiffs and all class members were impacted by Defendants' common conduct of terminating grants, which each Agency Defendant admits occurred in a "uniform manner." McLorg Decl. ¶¶ 4-8, Exs. A(1)-E(1) at ¶ II Stipulation, No. 2. Each Agency Defendant acted in the same manner towards class members. Each Agency Defendant admits it "acted pursuant to Executive Orders or executive directives . . . when reviewing grants for termination." *Id*. at ¶ II Stipulation, No. 1. Each Agency Defendant had the same goal: "When identifying grants for termination, [each Agency] selected those that expressed, or were presumed to express, viewpoints disfavored by the Administration." *Id*. at ¶ II Stipulation, No. 5. To accomplish this goal, each Agency "used search terms, keywords, or phrases to identify and terminate grants presumed to express viewpoints . . . [the Agency] no longer wished to subsidize." *Id*. at ¶ II Stipulation, No. 3a; *see* 1st PI Order at 54 (concluding commonality was met: "Plaintiffs have shown that each of the Agency Defendants . . . used similar, keyword-based procedures to terminate grants pursuant to the Equity Termination Orders"). This uniform process gives rise to common questions that can be answered as to the whole class. *See Mazza*, 666 F.3d at 588.

This case hinges on the answer to a single overarching question: whether the agencies' termination of grants pursuant to executive direction, designed to terminate only grants presumed to express viewpoints with which the Administration disagrees, constitutes impermissible viewpoint discrimination under the First Amendment. The answer to this question is not affected

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

by the fact that the search terms varied across agency (although there were common themes), and that class members' grants may have been terminated because they flagged different disfavored words. *See Parsons*, 754 F.3d at 684; 1st PI Order at 54-55 ("Grant-by-grant review is unnecessary in order to determine whether terminations pursuant to the Equity Termination Orders constitute unconstitutional viewpoint discrimination."); 2nd PI Order at 30 (even if the termination process differed between agencies, "common questions remain regarding whether [agency] intentionally targeted viewpoints to drive them from the market, regardless of [the agency's] grant identification strategy"). Defendants acted in a uniform manner, and the factual differences among the class members are immaterial to the central common question before the Court.

### ii.    *The Separation of Powers Class*

A similar analysis applies to the Separation of Powers Class. As confirmed by the stipulations, all of the Agency Defendants' "enabling statute or other legislation includes grant-making as a directive from Congress to [the Agency Defendant]" (McLorg Decl. ¶¶ 4-8, Exs. A(1)-E(1) at ¶ II Stipulation, No. 12); all of "[t]he grants at issue were funded through funds appropriated for the purpose of grant-making" (*id.* at ¶ II Stipulation, No. 10); and none of the "terminated funds" were "re-allocated . . . to other grant-making programs" (*id.* at ¶ II Stipulation, No. 11). Whether these facts rendered the terminations unconstitutional is a common question that will be answered in the same way for the entire class.

### iii.    *The Department of Energy Class*

The Department of Energy Class likewise satisfies commonality. The common questions of law or fact that are "apt to drive the resolution of the [Equal Protection] litigation," *see Mazza*, 666 F.3d at 588, are whether DOE: (1) targeted the Plaintiffs' grants for termination based on their location in Blue States, (2) treated Plaintiffs in Blue States differently from those similarly situated researchers in non-Blue States, and (3) violated the Plaintiffs' rights under the Fifth and First Amendments by targeting their grants for termination based on their location in Blue States and political affiliation, respectively. All are factual and legal questions that "can be answered 'yes' or 'no' in one stroke as to the entire class." *Parsons*, 754 F.3d at 684.

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

Indeed, DOE has already answered the first and second questions in a single stroke, by conceding that:

- "[T]he inclusion of grants in the October notice tranche was based solely on the political identity of the grant recipient's state, i.e., whether the recipient's location and/or place of performance was in a Blue state or a non-Blue state"; and

- "[T]he differential treatment resulting in the October 2025 termination of Blue State grants and the non-termination of non-Blue State grants was not based on a rational connection between the recipient's location and/or place of performance and DOE's past or current agency priorities."

McLorg Decl. ¶ 9, Ex F(1) at ¶ II Stipulation, Nos. 9-10. The remaining question, which is whether the facts "support a determination that [all of] the terminations likely lacked any conceivable legitimate purpose and were based *solely* on political animus," 3rd PI Order at 2, can similarly be answered based on facts the stipulations have shown to be common. The class should be certified on this basis.

3.    Rule 23(a)(3): Plaintiffs' Claims Are Typical of Those of the Classes.

Plaintiffs satisfy the Rule 23(a) typicality requirement for largely the same reasons they satisfy the commonality requirement. *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982) ("The commonality and typicality requirements of Rule 23(a) tend to merge."). "The test of typicality is whether other class members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." 1st PI Order at 56 (quoting *Hanlon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Typicality ensures "the interest[s] of the named representative align [] with the interests of the class." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016) (citation omitted). A claim or defense is not required to be identical, but rather "reasonably co-extensive" with those of absent class members. *Hanlon v. Chrysler Corp.*, 150 F.3d. 1011, 1020 (9th Cir. 1998). Here, named Plaintiffs have suffered the same injury as other class members because of Defendants' conduct.

i.    *The Viewpoint Discrimination Class*

Like all other class members, each proposed class representative had their grant terminated because it expressed or was presumed to express a disfavored viewpoint, rendering the class representatives' claims co-extensive with those of the class. As this Court concluded when assessing typicality at the provisional class certification stage: "The record supports a reasonable and unrebutted inference that the grants funding these Plaintiffs' research were flagged by a keyword search and terminated pursuant to the Equity Termination Orders. This is precisely the type of conduct other [class] members will have been subject to and same injury other members will have suffered." 1st PI Order at 56. This conclusion has only become clearer, as Defendants have now stipulated that Agency Defendants terminated all of the grants at issue because they "expressed, or were presumed to express, viewpoints disfavored by the Administration." McLorg Decl. ¶¶ 4-8, Exs. A(1)-E(1) at ¶ II Stipulation, No. 5. That should end the analysis. To the extent there were any doubts, however, the terminated grants held by the class representatives typify viewpoint suppression.

**DOT (Plaintiff Susan Handy):** DOT admits that it terminated grants that expressed or were presumed to expressed viewpoints with which the Administration disagreed. *See id.* ¶ 5, Ex. B(1) at ¶ II Stipulation, Nos. 5 & 6. DOT used search terms to identify these disfavored grants. *Id.* at ¶ II Stipulation, No. 3a. DOT admits that Dr. Handy's grant was terminated because it implicated several phrases (*e.g.*, "accelerating reductions in greenhouse gas emissions while simultaneously enhancing transportation equity;" "to prioritize disadvantaged communities," "reduce impacts associated with infrastructure . . . for disadvantaged populations"), all of which were on the list of phrases DOT used to identify grants for termination. *See* McLorg Decl. ¶ 5, Ex. B(1) at ¶ II Stipulation, No. 3a & Ex. B(2) at column P, row 3 (DOT spreadsheet). Dr. Handy's viewpoint-based termination claim is thus typical of all other class members' viewpoint-targeting claims.

**NSF (Plaintiff Jedda Foreman):** NSF also stipulated that it used "search terms, keywords, or phrases to identify and terminate grants presumed to express viewpoints" with which the Administration disagreed. *See* McLorg Decl. ¶ 8, Ex. E(1) at ¶ II Stipulation, Nos. 3a, 5, 6. These included "DEIA-related keywords." *See id.* ¶ II Stipulation, Nos. 3a. Foreman's grant

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

termination fit this pattern; indeed, NSF gave the same answer when asked to describe what keywords led to termination for *all* terminated grants: "NSF utilized word(s)/phrase(s) from NSF's search lists for terminations."[15] *See, e.g., id.* ¶ 8, Ex. E(2) at column R, row 73; column R, row 75 (Foreman's grants on NSF spreadsheet). Foreman's claim is thus typical of other class members' claims.

**NEH (Plaintiffs Christine Philliou; Robert Hirst):** NEH also admits that *all* grants it terminated were targeted because of the viewpoints they were presumed to express. *See* McLorg Decl. ¶ 6, Ex. C(1) at ¶ II Stipulation, Nos. 5 & 6. Like the other agencies, NEH admitted that it used search terms "to identify and terminate grants presumed to express [disfavored] viewpoints." *Id.* at ¶ II Stipulation, No. 3a. In the spreadsheet column identifying what keywords were used, NEH either lists specific terms or admits that the terminated grant was on a list provided by DOGE. *See* NEH spreadsheet column P. Plaintiff Philliou's and Plaintiff Hirst's grants were both terminated because they appeared on the DOGE spreadsheet. *See id.* Ex. C(2) at column P, row 9 (Philliou); column P, row (4) (Hirst's Mark Twain project) (NEH spreadsheet). This does not render them atypical of the class (*id.* Ex. C(2)): NEH admits its "understanding that DOGE may have relied on similar terms" to those used by NEH to identify disfavored grants. *Id.* Ex. C(1) at ¶ II Stipulation, No, 3b.[16] *See also* 1st PI Order at 56 (concluding Plaintiff Philliou's claim was typical of the Equity Termination Class's because her "grant proposal aimed to 'shed light on the possibilities of inclusion and belonging of non-Muslims in a Muslim state.'"). Because all NEH grants were terminated because of their presumed viewpoints, the Plaintiffs' claims are co-extensive with those of other class members.

---

[15] NSF did not provide keywords for the grants terminated as part of the Administration's July 2025 attack on UCLA.

[16] That DOGE's process was also viewpoint-based is confirmed by the court's findings in *Am. Council of Learned Soc'ys*, 2026 WL 1256545. There, the court found that DOGE asked ChatGPT to come up with DEI-related rationales for terminating grants even when human reviewers found no link. *See id.* at *11. This process folded in grants with project descriptions that "contained general references to 'history,' 'culture,' or 'identity.'" *Id.*

**DOD (Plaintiff Eli Berman):** DOD indicates that Dr. Berman's grant was terminated because the phrase "social science" was identified in connection with his grant. *See* McLorg Decl. ¶ 4, Ex. A(2) at column R, row 5 (DOD spreadsheet). DOD admits that it "used search terms, keywords, or phrases to identify and terminate grants presumed to express viewpoints . . . that DoD no longer wished to subsidize." *Id*. Ex. A(1) at ¶ II Stipulation, No. 3a. DOD then lists the terms it used to search for these viewpoints, and the list includes "social science." *Id.* Dr. Berman's grant was thus clearly terminated because of the viewpoint it was presumed to express. Dr. Berman's viewpoint-based termination is thus co-extensive with other class members' claims.

**NIH (Stuart Gansky and Matthew Spinelli):** NIH also admits it terminated grants "that expressed, or were presumed to express, viewpoints disfavored by the Administration." McLorg Decl. ¶ 6, Ex. D(1) at ¶ II Stipulation, No. 5; *accord id.* ¶ II Stipulation, No. 6. NIH terminated 355 UC-affiliated grants it identified using "[s]ubject matter-specific search terms" that were designed to "express viewpoints . . . that NIH-HHS no longer wished to subsidize." *Id*. ¶ II Stipulation, No. 3a; *id*. Ex. D(2) (NIH-HHS spreadsheet). Dr. Gansky's and Dr. Spinelli's grants were included among those flagged for viewpoint-based termination by keyword search. *See id.* Ex. D(2) at column P, row 296 (Gansky; keyword "DEI"), column P, row 177 (Spinelli; keyword "gender") (NIH spreadsheet). Because Spinelli's and Gansky's grants were terminated because of their presumed viewpoints, the Plaintiffs' claims are typical of those of other class members.

In sum, for all Agency Defendants, the "record supports a reasonable and unrebutted inference that the grants funding these Plaintiffs' research were flagged by a keyword search and terminated pursuant to" executive direction. *See* 1st PI Order at 56. "This is precisely the type of conduct other [Viewpoint Discrimination] Class members will have been subject to and [the] same injury other members will have suffered." *Id.* Plaintiffs have satisfied the typicality requirement.

ii.    *The Separation of Powers Class*

For NSF, NEH, DOD, DOT, and NIH, each proposed class representative had a grant that was funded with monies appropriated by Congress for grantmaking and terminated by an Agency Defendant, and for each of their grants, the terminated funds were not re-allocated to other grant-making programs. McLorg Decl. ¶¶ 4-8, A(1)-E(1) at ¶ II Stipulation, Nos. 10-12. These facts

54                                    46686\21195329

form the basis for the Separation of Powers claim, and they are identical for the class representatives and each class member. The representatives' claims are typical.

### iii.    *The Department of Energy Class*

The claims of the proposed Department of Energy Class representatives are typical of the entire class's claims because their grants, like those of all others in the class, were terminated based on the grantee's Blue State location, in violation of the Equal Protection Clause and the First Amendment. McLorg Decl. ¶ 9, Ex. F(1) at ¶ II Stipulation, No. 9; McLorg PI Decl. ¶¶ 2-6; Atanassov PI Decl. ¶¶ 12-13, 19, 31, Exs. E, H, M; Bedsworth PI Decl. ¶¶ 16-17, Exs. D-E; Boettcher Decl. ¶¶ 9-36, Exs. B-D, G-H. Like the rest of the class, termination of the class representatives' grants was based solely upon the political identity of their states. McLorg Decl. ¶ 9, Ex. F(1) at ¶ II Stipulation, Nos. 9-10. Typicality is met here.

### 4.    Rule 23(a)(4): Plaintiffs and Class Counsel Will Adequately Represent the Classes.

Plaintiffs and class counsel will adequately represent the proposed classes. Courts engage in two inquiries when evaluating whether the adequacy requirement of Rule 23(a)(4) is satisfied: (1) whether the named plaintiffs "'fairly and adequately protect the interests of the class' without a conflict of interest with the absent class members," *Yates v. NewRez LLC*, 686 F. Supp. 3d 397, 405 (D. Md. 2023), and (2) whether class counsel is "qualified, experienced, and capable." Newberg on Class Actions § 3:12; *accord* 1st PI Order at 56-57. As the Supreme Court has explained, "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625 (1997).

Here, all Classes' representative plaintiffs and counsel will adequately represent the interests of the classes. The representative plaintiffs have no conflicts with the classes' interests. To the contrary, by virtue of having had their grants terminated in the same manner as the remaining members of the class, their interests are aligned with those of absent class members. *See Yates*, 686 F. Supp. 3d at 405; 1st PI Order at 58-59 ("The proposed class representatives are adequate because their interests are aligned with those of absent class members, having had their

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

funding terminated in the same way."). Moreover, as this Court previously determined, class counsel is adequate because they have "sufficient experience, knowledge, resources, and ha[ve] already invested significant time preparing to bring this case." *Id.* at 60. The vigorous and ongoing pursuit of grant restorations, from the inception and throughout this action, demonstrates Plaintiffs' and their counsel's satisfaction of Rule 23(a)(4). In this case, adequacy of representation has been litigation-tested, and demonstrated by the commitment and actions of the Plaintiffs and their counsel; Rule 23(a)(4) is satisfied.

### D.    Plaintiffs Satisfy Rule 23(b)(2).

Under Rule 23(b)(2), class certification is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The fundamental focus of such a class is "the indivisible nature of the injunctive or declaratory remedy warranted." *Dukes*, 564 U.S. at 360 (citation omitted). The inquiry "does not require an examination of the viability or bases of the class members' claims for relief," nor "a finding that all members of the class have suffered identical injuries"; it asks only whether the defendant "has acted or refused to act on grounds that apply generally to the class." *Parsons*, 754 F.3d at 688; Fed. R. Civ. P. 23(b)(2).

For that reason, actions "alleging systemic administrative failures of government entities," as here, "are frequently granted class action status under Rule 23(b)(2)." *Shakhnes ex rel. Shakhnes v. Eggleston*, 740 F. Supp. 2d 602, 628 (S.D.N.Y. 2010) (collecting cases), *aff'd in part, vacated in part on other grounds sub nom. Shakhnes v. Berlin*, 689 F.3d 244 (2d Cir. 2012); *see also Goodlaxson v. Mayor & City Council of Baltimore*, 776 F. Supp. 3d 311, 332 (D. Md. 2025); *D.V.D. v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 355, 386 (D. Mass. 2025); *Scholl v. Mnuchin*, 489 F. Supp. 3d 1008, 1046 (N.D. Cal. 2020).[17]

---

[17] Within the past two years, courts around the country have repeatedly certified Rule 23(b)(2) classes in which the plaintiffs challenge the implementation of an Executive branch direction—whether made through Executive Order or agency directive. *See, e.g., "Barbara" v. Trump*, 790 F. Supp. 3d 80 (D.N.H. 2025) *aff'd sub nom*, *Trump v. Barbara*, 609 U.S. ---, 2026 WL 1870543 (June 30, 2026) (affirming district court order preliminarily enjoining Executive Order No. 14260 and provisionally certifying a nationwide class of children who would be denied citizenship under

Here, Defendants' uniform misconduct injured the classes as a whole, and Plaintiffs' requested remedies are wholly injunctive, aimed at stopping and reversing Defendants' unconstitutional actions. Declaring those actions invalid and enjoining their implementation will "'provide the same relief to all class members.'" *Planned Parenthood of Md., Inc. v. Azar*, No. CCV-20-00361, 2020 WL 3893241, at \*7 (D. Md. July 10, 2020) (quoting *Healthy Futures of Tex. v. Dep't of Health & Human Servs.*, 326 F.R.D. 1, 8 (D.D.C. 2018)); *see also Lyon v. U.S. Immigr. & Customs Enf't*, 308 F.R.D. 203, 214 (N.D. Cal. 2015) (certifying a Rule 23(b)(2) class where plaintiffs sought "systemic changes consistent with a single overarching constitutional standard that will be applicable to all class members"); *Coreas v. Bounds*, No. 20-cv-00780, 2020 WL 5593338, at \*15 (D. Md. Sept. 18, 2020). The Court should certify the three Rule 23(b)(2) classes.

### 1. The Viewpoint Discrimination Class

All agencies followed the same basic process with the goal of terminating grants to silence viewpoints with which they disagreed. *See* McLorg Decl. ¶¶ 4-8, Exs. A(1)-E(1) at ¶ II Stipulation, Nos. 1-9. Rule 23(b)(2) is thus satisfied for the same reasons commonality is satisfied. *See supra* Argument Section III(C)(2), and 1st PI Order at 56 (discussing Equity Termination class: "The requirements of Rule 23(b)(2) are met for the same reasons [as commonality]."). Plaintiffs have sufficiently shown that the Agency Defendants have "acted or refused to act" on grounds that apply to the Viewpoint Discrimination class "as a whole." Specifically: Agency Defendants mass-

it); *D.B.U. v. Trump*, 349 F.R.D. 228, 240-42 (D. Colo. 2025) (certifying class of all noncitizens subject to Presidential Proclamation); *M.A.P.S. v. Garite*, 349 F.R.D. 631, 639-40 (W.D. Tex. 2025) (same); *Arevalo Millan v. Trump*, 785 F. Supp. 3d 644, 671 (C.D. Cal. 2025) (same); *Refugee & Immigrant Center for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19 (D.D.C. 2025) (certifying class of individuals subject to Executive Proclamation 10888); *Guerrero Orellana v. Moniz*, 808 F. Supp. 3d 167, 187-88 (D. Mass. 2025) (certifying class based on DHS policy mandating treatment of noncitizens as "applicants for admission" automatically denied bond hearings); *Ramirez Ovando v. Noem*, 810 F. Supp. 3d 1209, 1240 (D. Colo. 2025) (certifying class alleging ICE practice of conducting warrantless arrests violated the law); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 808 F. Supp. 3d 167, 187 (D.D.C. 2025) (similar); *Orr v. Trump*, 786 F. Supp. 3d 397, 411-12 (D. Mass. 2025) (certifying class challenging State Department rules requiring passports to reflect sex at birth); *Pablo Sequen v. Albarran*, No. 25-cv-06487-PCP, 2026 WL 1805114, at \*20 (N.D. Cal. June 23, 2026) (certifying two classes related to ICE detention policies and practices).

46686\21195329

terminated grants pursuant to executive direction to cease funding the disfavored viewpoints these grants were presumed to express. *See* 1st PI Order at 56 (quoting Fed. R. Civ. P. 23(b)(2)).

### 2.    The Separation of Powers Class

For NSF, NEH, DOD, DOT, and NIH, all Agency Defendants terminated grants that were funded by monies appropriated by Congress, and all Agency Defendants failed to re-allocate those funds even though all Agency Defendants' enabling statues include grant-making as a directive from Congress. *See* McLorg Decl. ¶¶ 4-8, Exs. A(1)-E(1) at ¶ II Stipulation, Nos. 10-12. Thus, Rule 23(b)(2) is again satisfied for the same reasons commonality is satisfied. *See supra* Argument Section III(C)(2); 1st PI Order at 56 (discussing Equity Termination class: "The requirements of Rule 23(b)(2) are met for the same reasons [as commonality].").

### 3.    The Department of Energy Class

The Department of Energy Class meets the standard for Rule 23(b)(2) certification for similar reasons. DOE "has acted . . . on grounds that apply generally to the class." Fed. R. Civ. P. (23)(b)(2). For every member of the class, DOE identified grants based on the grantee's Blue State location, and ordered the grantees to cease doing grant-funded work. McLorg Decl. ¶ 9, Ex. F(1) at ¶ II Stipulation, No. 9; McLorg PI Decl. ¶¶ 2-6; Atanassov PI Decl. ¶¶ 12-13, 19, 31, Exs. E, H, M; Bedsworth PI Decl. ¶¶ 16-17, Exs. D-E; Boettcher Decl. ¶¶ 9-21, Exs. C-H. "For the same reasons" the Department of Energy Class satisfies commonality and typicality, "the requirements of Rule 23(b)(2) are met" here. 1st PI Order at 58.

### E.    Request to Add Class Representatives Stuart Gansky, Matthew Spinelli, and Shannon Boettcher

Plaintiffs seek to add class members Stuart Gansky and Matthew Spinelli as class representatives for the Viewpoint Discrimination and Separation of Powers Classes, and class member Shannon Boettcher as a class representative for the Department of Energy, pursuant to Federal Rule of Civil Procedure 21. Gansky, Spinelli, and Boettcher are willing to serve as class representatives and are appropriate representatives for the reasons described above and in their attached declarations. *See* Gansky Decl. ¶ 37-38; Spinelli Decl. ¶ 21-22; Boettcher Decl. ¶ 37-38.

46686\21195329

Under Rule 21, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21. Courts considering whether to add or drop a party under Rule 21 typically do so using the Rule 15(a) framework, *see* 6 Fed. Prac. & Proc. Civ. § 1479 (3d ed.); *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, No. 19-cv-2918, 2021 WL 5848055, at *1 n.2 (N.D. Cal. Dec. 9, 2021), under which leave to amend should be freely given. *See In re Hard Disk Drive*, 2021 WL 5848055, at *1 (citing Fed. R. Civ. P. 15(a)(2)); *De Malherbe v. Int'l Union of Elevator Constructors*, 438 F. Supp. 1121, 1128 (N.D. Cal. 1977) ("[T]he liberal standard of Rule 15 also applies to Rule 21 motions."). Courts consider the presence or absence of undue delay, bad faith, undue prejudice, and the futility of the proposed amendment. *See In re: Lithium Ion Batteries Antitrust Litig.*, No. 13-cv-2420, 2016 WL 948874, at *2 (N.D. Cal. Mar. 14, 2016) (citing *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 538 (9th Cir. 1989)).

This Court should exercise its discretion and allow Dr. Gansky and Dr. Spinelli to serve as class representatives for the Viewpoint Discrimination and Separation of Powers Classes, and Dr. Boettcher to serve as a class representative for the Department of Energy Class. The request is made in good faith and without delay: Plaintiffs seek to substitute Drs. Gansky and Spinelli as representatives for the Viewpoint Discrimination class because the spreadsheet produced by Defendants on June 11, 2026 revealed that the prior NIH-HHS class representatives' grants were terminated as part of the mass UCLA-specific termination event, not necessarily because of their expressed viewpoint. This discovery revealed—for the first time—that these Plaintiffs' claims were not typical of the Viewpoint Discrimination (formerly Equity Termination) Class. Plaintiffs wasted no time in securing substitute class representatives by the date of this Motion. *See In re: Lithium Ion Batteries*, 2016 WL 948874, at *3 (allowing plaintiffs to substitute class representatives contemporaneously with motion for class certification "several months" after discovery revealed the prior representatives' claims were deficient); *In re Hard Disk Drive*, 2021 WL 5848055, at *2 (delay alone is insufficient to deny request to substitute). DOE's grant termination spreadsheet similarly provided Plaintiffs with the information necessary to connect with other Department of Energy Class members, including Dr. Boettcher, for the first time, as detailed in the Polsky Declaration. *See* Polsky Decl. ¶¶ 2-3.

46686\21195329

Moreover, Plaintiffs' request to substitute class representatives (as to NIH) and supplement class representatives (as to DOE) will not prejudice Defendants. The addition of plaintiffs does not prejudice Defendants with respect to discovery, as the parties in this case agreed to proceed via exchange of information without formal written discovery or depositions. Drs. Ganksy, Spinelli, and Boettcher, like the other Class Representatives, have provided attestations through declarations.[18] Their addition thus does not delay or complicate the proceedings. *See In re Hard Disk Drive*, 2021 WL 5848055, at *2 ("[D]efendants have not shown the proposed substitution is likely to require changes to the existing schedule or adversely affect defendants' ability to obtain or produce discovery."). Further, prejudice is unlikely to be shown when "Plaintiffs seek only to substitute a class representative, and do not seek to add, change or alter any causes of action or theories in the [complaint]." *Patton v. Experian Data Corp.*, No. 15-cv-01871, 2019 WL 13034866, at *6 (C.D. Cal. Jan. 22, 2019).

Finally, Plaintiffs' request to substitute class representatives is not futile: their claims have the same basis as those of the other class representatives. The Court should exercise its discretion and allow Drs. Gansky and Spinelli to serve as class representatives for the Viewpoint Discrimination and Separation of Powers Classes, and Dr. Boettcher to serve as a class representative for the Department of Energy Class.

### F.    Class Counsel Should Be Appointed Under Rule 23(g).

Class counsel requests that the Court re-affirm their appointment for the reasons described in the Court's First PI Order. 1st PI Order at 60. Class counsel will continue to devote their time, energy, and resources to the vigorous advancement of the claims of Plaintiffs and the Classes.

### CONCLUSION

For the foregoing reasons, and based upon the record in this case, Plaintiffs respectfully request that the Court grant summary judgment and certify the proposed classes.

---

[18] These newly proposed class representatives have submitted accompanying declarations attesting to their membership in the class they propose to represent, the class injuries they suffered, and the typicality of their claims. Should the Court require, Plaintiffs will amend the complaint to name them as additional plaintiffs.

Dated: July 15, 2026    By:    */s/ Claudia Polsky*

Claudia Polsky (CA Bar No. 185505)
cpolsky@law.berkeley.edu
U.C. BERKELEY SCHOOL OF LAW
Law Building
Berkeley, CA 94720-7200
Telephone: 510.642.6483

Dated: July 15, 2026    By:    */s/  Ewrin Chemerinsky*

Erwin Chemerinsky (*pro hac vice*)
echemerinsky@law.berkeley.edu
U.C. BERKELEY SCHOOL OF LAW
Law Building
Berkeley, CA 94720-7200
Telephone: 510.642.6483

Dated: July 15, 2026    By:    */s/ Elizabeth J. Cabraser*

Elizabeth J. Cabraser (CA Bar No. 83151)
ecabraser@lchb.com
Richard M. Heimann (CA Bar No. 63607)
rheimann@lchb.com
Kevin R. Budner (CA Bar No. 287271)
kbudner@lchb.com
Annie M. Wanless
awanless@lchb.com (CA Bar No. 339635)
Clare D. Perez
cdperez@lchb.com (CA Bar No. 363027)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000

46686\21195329

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS
CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

Dated: July 15, 2026                    By:     /s/ Linda S. Gilleran

Anthony P. Schoenberg (CA Bar No. 203714)
tschoenberg@fbm.com
Linda S. Gilleran (CA Bar No. 307107)
lgilleran@fbm.com
Dylan M. Silva (CA Bar No. 306363)
dsilva@fbm.com
Kyle A. McLorg (CA Bar No. 332136)
kmclorg@fbm.com
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 954-4400

*Attorneys for Plaintiffs and the Proposed Class*

46686\21195329

PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on July 15, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to registered parties.

Executed July 15, 2026, at San Francisco, California.


/s/ Clare D. Perez
Clare D. Perez

46686\21195329
PLAINTIFFS' NOTICE OF MOTION AND COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS
CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT - Case No. 3:25-cv-4737