Erwin Chemerinsky (admitted *pro hac vice*)
echemerinsky@law.berkeley.edu
Claudia Polsky (State Bar No. 185505)
cpolsky@law.berkeley.edu
U.C. BERKELEY SCHOOL OF LAW
Law Building
Berkeley, CA 94720-7200
Telephone: (510) 642-6483

Elizabeth J. Cabraser (State Bar No.  83151)
ecabraser@lchb.com
Richard M. Heimann (State Bar No. 63607)
rheimann@lchb.com
Kevin R. Budner (State Bar No. 287271)
kbudner@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone: (415) 956-1000

Anthony P. Schoenberg (State Bar No. 203714)
tschoenberg@fbm.com
Linda S. Gilleran (State Bar No. 307107)
lgilleran@fbm.com
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, California 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEETA THAKUR, et al., | Case No. 3:25-cv-04737-RL |
| Plaintiffs, | **DECLARATION OF STUART GANSKY IN SUPPORT OF PLAINTIFFS' COMBINED MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION** |
| vs. | |
| DONALD J. TRUMP, et al., | |
| Defendants. | |
| | Judge:          The Honorable Rita F. Lin |
| | Hearing Date:   October 20, 2026 |
| | Hearing Time:   10:00 AM |
| | Courtroom:      4 – 17th Floor |

46686\21179422.5

GANSKY DECL. ISO MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION -
Case No. 3:25-cv-04737-RL

## DECLARATION OF STUART GANSKY

I, Stuart Gansky, declare as follows:

1.      I have personal knowledge of the facts contained in this declaration and, if called as a witness, could and would testify competently to those facts.

2.      I am Professor and Lee Hysan Chair of Oral Epidemiology at the University of California San Francisco ("UCSF") School of Dentistry and Director of the UCSF Center to Address Disparities in Children's Oral Health. I am a Co-Director of the Research Coordinating Center to Reduce Disparities in Multiple Chronic Diseases, and a Co-Director of the Clinical and Translational Research Innovation in Dental Schools Program.

3.      I earned my Bachelor of Science in Public Health from the University of North Carolina, School of Public Health, Chapel Hill in 1988 in Biostatistics, my Master of Science from the University of North Carolina, School of Public Health, Chapel Hill in 1992 in Biostatistics with a supporting program of Epidemiology, and my Doctor of Public Health degree from the University of North Carolina, School of Public Health, Chapel Hill in 1996 in Biostatistics with a supporting program of Epidemiology. From 1996 to present, I have held the titles of Assistant Adjunct Professor, Assistant Professor, Associate Professor, Professor, John C. Green Endowed Chair of Primary Care Dentistry, and Lee Hysan Chair of Oral Epidemiology, at the UCSF Department of Preventive and Restorative Dental Sciences, Division of Oral Epidemiology and Dental Public Health.

4.      My research concentrates on oral health research, health disparities research, especially regarding socioeconomic status and access to care, applied statistical analyses and related methodological issues. Methodological examination helps ground health research and build convincing arguments, while collaborative health research generates opportunities for innovative statistical practice and provides challenges for developing ways to solve real world problems.

5.      I have played a key role in the National Institutes of Health ("NIH") funded UCSF Center to Address Disparities in Children's Oral Health ("CAN-DO") since its inception. I was Principal Investigator ("PI") on an individual R01-type project to study early childhood

GANSKY DECL. ISO MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION -
Case No. 3:25-cv-04737-RL

caries risk prediction methods using knowledge discovery and data mining techniques, and PI on a pilot project studying the effects of translation on the readability of informed consent documents. Moreover, I was Director of the Measurement and Evaluation Core and oversaw a group of statisticians and programmers. CAN-DO continued with National Institute of Dental and Craniofacial Research ("NIDCR") funding for a U01 Coordinating Center and 2 UH2 projects—one of which continued as a UH3 project—as part of the Oral Health Disparities in Children Consortium; several subcontracts to the Coordinating Center facilitated colleagues completing their research projects studying ways to reduce oral health disparities in children.

6.    Articles illustrative of my research include:

(a)    2024 Lin TK, Zarate DEA, Iribarren N, Lindau H, Ramos-Gomez F, Gansky SA. *Quality-Adjusted Life Year Proxies for Caries in Primary Dentition: A Discrete Choice Experiment*. JDR Clin Trans Res. 9(1):85-94. doi: 10.1177/23800844221149337);

(b)    2007 Fisher-Owens S, Gansky SA, Platt LJ, Weintraub JA, Soobader M, Bramlett MD, Newacheck P. *Influences on children's oral health: A conceptual model*. Pediatrics.120(3): e510-20;

(c)    2020 White JS, Ramos-Gomez F, Liu JX, Jue B, Finlayson TL, Garza JR, Crawford AH, Helman S, Santo W, Cheng J, Kahn JG, Gansky SA. *Monetary incentives for improving smartphone-measured oral hygiene behaviors in young children: A randomized pilot trial*. PLoS One.15(7):e0236692. PMC7392266; and

(d)    2006 Weintraub JA, Ramos-Gomez F, Jue B, Shain S, Hoover CI, Featherstone JDB, Gansky SA. *Fluoride varnish efficacy in preventing early childhood caries*. J Dent Res 85:172-176.

7.    My research, which has involved collaboration with other universities and community-based organizations, has been supported by over 80 research awards, including state grants, federal grants from the NIH including the NIDCR, University of California Office of the President grants, and other industry awards in the form of grants and contracts.

8.    A true and correct copy of my CV is attached as **Exhibit A.**

**Grant Application and Award**

9.    In June 2021, I, along with UCSF colleagues Edwin D. Charlebois and Kim R. Rhoads, submitted a grant application to the NIH, titled "Research Coordinating Center to Reduce Disparities in Multiple Chronic Diseases (RCC RD-MCD)" (hereafter, the "Grant

3

Application"). The purpose of the Grant Application was to "develop and deliver new understandings and intervention approaches for chronic disease prevention, testing, diagnosis, and linkage to care, and treatment for affected communities." A true and correct copy of the Grant Application is attached as **Exhibit B.**

10. The specific aims of the project were to: 1) develop the National Institute on Minority Health and Health Disparities ("NIMHD") RD-MCD Research Consortium and its oversight mechanisms, 2) implement RD-MCD consortium-wide common data element development, collection, integration, curation, analysis, and sharing, and 3) establish a multiple chronic diseases disparities research educational development network, and facilitate and monitor vibrant community-engaged research under the Research Consortium members and community partners. **Ex. B** at 6 (Grant Application).

11. The premise of our grant research was that "[s]ignificant disparities in prevention, treatment, and management of multiple chronic diseases exist along intersecting racial, cultural, socio-economic, and vulnerable population contextual lines; community engagement and culturally informed multilevel approaches are required to effectively reduce these disparities." **Ex. B** at 6 (Grant Application).

12. The Grant Application requested federal funding commensurate with our cumulative five-year budget of $22,499,999.00. **Ex. B** at Electronic Cover Sheet (Grant Application).

13. On September 24, 2021, NIMHD awarded our grant application under Federal Award Identification Number U24MD017250. A true and correct copy of the Revised Notice of Award is attached as **Exhibit C**. Our team was authorized to proceed for a Project Period of September 24, 2021 to June 30, 2026. The total grant sum to be awarded was $22,499,999.00, including an initial grant amount of $4,499,999 for year one (2021). **Ex. C** at 6.

14. On June 23, 2022, NIH revised the Notice of Award to remove a restrictive term that was on the previous Notice of Award letter regarding other support, reflecting NIMHD's receipt and acceptance of the information provided. **Ex. C** at 5.

15. The grant was funded pursuant to Public Law 116-260, the Consolidated

4

Appropriations Act of 2021, which directed NIMHD to award funds to 11 research institutions and one research coordinating center to establish and support regional comprehensive research centers on the prevention, treatment, and management of comorbid chronic diseases that disproportionately affect populations with health disparities.

16.     As of July 2023, I became the Contact PI of the project as part of the co-directors' original Multiple Principal Investigator leadership plan to share duties and responsibilities.

17.     On September 23, 2023, NIMHD awarded us a supplement under award number 3U24MD017250-03S1 for $235,000. This supplement provided funding through June 30, 2024. A true and correct copy of the Notice of Award is attached as **Exhibit D**.

18.     On September 10, 2024, NIMHD awarded us a supplement under award number 3U24MD017250-04S1 for $235,000. This supplement provided funding through June 30, 2025. A true and correct copy of the Notice of Award is attached as **Exhibit E**.

<u>**Grant Termination on March 21, 2025**</u>

19.     On March 21, 2025, the NIH sent an electronic correspondence titled, "Grant Termination Notification" ("Termination Notification") to Annie Gregory, a Contracts and Grants Officer with The Regents of the University of California, San Francisco. A true and correct copy of NIH Appeal Letter, which includes the Termination Notice, is attached as **Exhibit F**. The e-mail terminated funding for year 4 of the project, stating:

> Effective with the date of this letter, funding for Project Number 5U24MD017250-04 is hereby terminated pursuant to the Fiscal Year 2024 National Institutes of Health ("NIH") Grants Policy Statement, and 2 C.F.R. § 200.340(a)(2). This letter constitutes a notice of termination.

**Ex. F** at Attach. 1.

20.     The Termination Notification provided as the basis for termination:

> This award no longer effectuates agency priorities. Research programs based primarily on artificial and non-scientific categories, including amorphous equity objectives, are antithetical to the scientific inquiry, do nothing to expand our knowledge of living systems, provide low returns on investment, and ultimately do not enhance health, lengthen life, or reduce illness. Worse, so-called diversity, equity, and inclusion ("DEI")

GANSKY DECL. ISO MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION -
Case No. 3:25-cv-04737-RL

studies are often used to support unlawful discrimination on the basis of race and other protected characteristics, which harms the health of Americans. Therefore, it is the policy of NIH not to prioritize such research programs.

Although "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action before NIH makes a termination decision," no corrective action is possible here. The premise of this award is incompatible with agency priorities, and no modification of the project could align the project with agency priorities.

Costs resulting from financial obligations incurred after termination are not allowable. Nothing in this notice excuses either NIH or you from complying with the closeout obligations imposed by 2 C.F.R. §§ 75.381-75.390. NIH will provide any information required by the Federal Funding Accountability and Transparency Act or the Office of Management and Budget's regulations to *USAspending.gov*.

**Ex. F** at Attach. 1, pp. 1-2.

21. The Termination Notice provided no explanation of how our grant constitutes a "DEI" study, let alone how it would "support unlawful discrimination on the basis of race and other protected characteristics." To be clear, the research coordinating center, which this grant funds, is not a research program that performs research through recruiting individual participants. As such, the center cannot produce data that could be used to discriminate against any group of Americans.

22. Supplement 3U24MD017250-04S1 was terminated concurrently with the primary grant.

## **Appeal of Grant Termination**

23. The Termination Notification provided that UCSF could "object and provide information and documentation challenging this termination" by submitting a request for review to Dr. Matt Memoli, Acting Director of the NIH, within 30 days from the date NIH transmitted the termination notice. **Ex. F** at Attach. 1, p. 2.

24. On April 18, 2025, UCSF provided such an appeal letter to Dr. Matthew Memoli. **Ex. F**.

25. As of the date of this declaration, we have not received a response to the appeal

6

letter.

## Grant Reinstatement

26.     On July 3, 2025, I was forwarded a Notice of Award from the NIMHD dated July 1, 2025, which reinstated grants 5U24MD017250-04 and 3U24MD017250-04S1 for year 4. The Notice of Award Reinstatement for 5U24MD017250-04 is attached as **Exhibit G**, and the Notice of Award Reinstatement for 3U24MD017250-04S1 Revised is attached as **Exhibit H**.

27.     The project received a No Cost Extension through June 30, 2027. The April 2, 2026 email notice is attached as **Exhibit I**.

28.     Following the grant's reinstatement, in order to obtain funding for year 5, my team and I needed to prepare and submit our Research Proposal Progress Report ("RPPR"), which would have been prepared during the ordinary course of year 4 in a 60-day period before May 1, 2025. But because the grant had been terminated from March 21 to July 1, and year 4 had ended on June 30, we had to drop everything to quickly prepare the RPPR to obtain funding for year 5. This caused significant stress on me and my colleagues since the project was otherwise unfunded. Further complicating this timing, we could not submit through the eRA Commons electronic system as a result of the past due date (May 1, 2025) and had to learn to complete the report manually.

## Harm from NIH Grant Termination

29.     When the termination occurred, we had 38 paid faculty, trainees, and staff funded by the grant.

30.     Following the grant termination and the loss of funding, I was required to lay off or cut down the working hours of eight employees in my department. While I was able to rehire some of them after the grant was reinstated, I could not bring everyone back. The process of laying off and rehiring also took away time that could have otherwise been spent advancing our research.

31.     If NIMHD re-terminates the grant before the project is complete in June 2027, I would once again be required to lay off staff or downsize their commitments. I would also need

7

to spend more of my own time finding new sources of funding to fill the gap in finances.

32.    Additionally, re-termination would cause chaos among the numerous vendors and outside parties, who have been hired to support this research with goods and services and are located throughout the country.

33.    Re-termination would also result in waste for the American taxpayers, who have already invested significant public funds in this research, only to see those investments lost if the research is cancelled.

34.    Our goal in this research is to find effective ways to prevent, manage, or treat multiple chronic diseases and reduce health disparities. This research is in the best interest of our nation and, indeed, is consistent with the Administration's current priorities to address chronic disease through improved diet, increased physical activity, and reduced harmful exposures.

35.    Specifically, conducting studies in the populations most affected by diseases produces generalizable data more efficiently than studies conducted in the general populations because studies on smaller cohorts with higher prevalence/incidence require fewer resources. Further, discovering innovations that improve control of chronic conditions through prevention and risk reduction reduces the need for expensive hospital-based care, which is a major driver of excess healthcare costs. Thus, successfully executing the grant's aims can provide significant healthcare savings and thus provide return on investment.

36.    However, if the grant is re-terminated, the public would not benefit from the peer-reviewed published results or the data that would have been entered into a NIH data repository.

### Role of Class Representative

37.    I am ready to assume the responsibilities of serving as a class representative. I understand that I must stay informed regarding developments in the lawsuit, communicate regularly with my attorneys, and act in the best interests of the class. I have no conflicts that would prevent me from assuming this responsibility.

38.    I have been in communication with other UC researchers, who would be

8

members of the class, who have suffered the same general type of harm as I describe above, from the abrupt termination of their previously approved research grants. This harm is widespread, and I believe it will only increase in scope and impact if classwide relief is not granted.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed on this 7/19/2026th day of July, 2026, at San Francisco, California.

DocuSigned by:

Stuart Gansky

4853F89C9CA5435...

Stuart Gansky

GANSKY DECL. ISO MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION - Case No. 3:25-cv-04737-RL