BRETT A. SHUMATE
Assistant Attorney General
Civil Division
ERIC J. HAMILTON
Deputy Assistant Attorney General
JOSEPH E. BORSON
Assistant Branch Director
KATHRYN BARRAGAN (D.C. Bar No. 90026294)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 598-7696
Email: kathryn.e.barragan@usdoj.gov

*Attorneys for United States*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| NEETA THAKUR, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 25-cv-4737-RFL<br><br>DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES<br><br>Hearing Date: October 20, 2026<br>Time: 10:00 AM<br>Judge: Hon. Rita F. Lin<br>Place: San Francisco Courthouse<br>Courtroom 4 – 17th Floor |

# TABLE OF CONTENTS


NOTICE OF MOTION ..... 1
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT ..... 2
STATEMENT OF THE ISSUES TO BE DECIDED ..... 4
BACKGROUND ..... 5
I. Regulatory Background ..... 5
II. Procedural Background ..... 5
  A. First Preliminary Injunction ..... 5
  B. Second Preliminary Injunction ..... 6
III. Appellate Proceedings ..... 7
IV. Department of Energy Grant Terminations ..... 7
  A. Plaintiffs' Motion for a Third Preliminary Injunction ..... 9
  B. Plaintiffs' Operative Complaint ..... 10
V. The Parties' Stipulations ..... 10
VI. Plaintiffs' Motion for Summary Judgment ..... 11
ARGUMENT ..... 12
I. Plaintiffs Cannot Seek Summary Judgment on Untimely, Unpleaded Claims and New Parties ..... 12
  A. Plaintiffs' Attempt to Add New Parties and Theories Fails Under Rule 16 ..... 14
  B. The Rule 15 Factors Are Not Met ..... 17
II. Threshold Issues Require Granting Summary Judgment for Defendants ..... 18
  A. Standard of Review ..... 18
  B. Plaintiffs Lack Standing ..... 19
    1. Plaintiffs Lack Standing Because They Are Not Parties to the Grants ..... 19
    2. Proposed Class Members Not Named as Principal Investigators or Project Leads Lack Standing ..... 21
    3. Plaintiffs Lack Standing to Challenge Possible Future Terminations of Possible Future Grants ..... 23
  C. The Tucker Act Precludes an APA Suit Asserting Grant-Termination Claims ..... 24
III. Plaintiffs' Motion for Summary Judgment Should Be Denied, and Defendants' Motion Should Be Granted ..... 26
  A. Summary Judgment Should Be Granted on Plaintiffs' APA Claims ..... 26
    1. Plaintiffs' Challenge to Future Grant Terminations Is Not a Final Agency Action ..... 27

2. Grant Termination Decisions Are Committed to Agency Discretion by Law ....28

3. Summary Judgment Should be Granted on Plaintiffs' Contrary to Law Claims ....30

B. Plaintiffs' Ultra Vires Claims Are Not Cognizable ....31

C. Plaintiffs' Separation of Powers Claims Fail ....33

D. Plaintiffs' First Amendment Viewpoint Discrimination Claims Fail ....41

E. Plaintiffs' First Amendment Retaliation Claims Fail ....44

F. Plaintiffs' First Amendment Association Claims Fail ....46

G. Plaintiffs' Fifth Amendment Equal Protection Claims Fail ....47

H. Plaintiffs' Fifth Amendment Due Process Claims Fail ....51

IV. Class Certification Should Be Denied ....54

A. Standard of Review for Class Certification ....54

B. Plaintiffs' Class Action Fails to Serve the Purposes of the Class Action ....55

C. The Department of Energy Class Should Not Be Certified ....56

D. There Is No Class Representative as to the NIH Grants ....57

E. The Separation of Powers Class Fails Commonality and Typicality Because Individual Questions Predominate. ....57

V. The Relief Requested in Plaintiffs' Complaint Is Overbroad ....59

A. An Injunction Should Not Run as to 9 of the 16 Defendant Agencies in This Case ....59

B. Plaintiffs Should Not Receive Forward-Looking Relief ....59

CONCLUSION ....60

## TABLE OF AUTHORITIES

**Cases**

*American Council of Learned Societies v. National Endowment for the Humanities* ,
No. 25-cv-3657(CM), 2026 WL 1256545 (S.D.N.Y. May 7, 2026) .................................................. 47

*Klamath Water Users Protective Ass'n v. Patterson*,
203 F.3d 1175 (9th Cir. 2000) .................................................................................................. 20

*Dalton v. Specter*,
511 U.S. 462 (1994)................................................................................................... 2, 34, 35

*NEA v. Finley*,
524 U.S. 569 (1998)...................................................................................................... *passim*

*Cnty. of Santa Clara v. Astra USA, Inc.*,
563 U.S. 110 (2011)......................................................................................................... 20

*City and Country of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) .................................................................................................. 34

*Global Health Council v. Trump*,
No. 25-5097, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025)................................................... 31

*Abdullah v. U.S. Sec. Assocs.*,
731 F.3d 952 (9th Cir. 2013) .................................................................................................... 58

*Acri v. Int'l Ass'n of Machinists & Aerospace Workers*,
781 F.2d 1393 (9th Cir. 1986) .................................................................................................. 15

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013)......................................................................................................... 42, 43

*Allen v. Wright*,
468 U.S. 737 (1984)......................................................................................................... 22, 23

*Am. Bus Ass'n v. Rogoff*,
649 F.3d 734 (D.C. Cir. 2011)................................................................................................ 50

*Am. Libr. Ass'n v. Sonderling*,
No. 25-1050 (RJL), 2025 WL 1615771 (D.D.C. June 6, 2025) ........................................... 26

*Am. Sch. of Magnetic Healing v. McAnnulty*,
187 U.S. 94 (1902)........................................................................................................... 33

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
824 F.3d 858 (9th Cir. 2016) .......... 44

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) .......... 33

*ASARCO Inc. v. Kadish*,
490 U.S. 605 (1989) .......... 24

*Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
502 U.S. 32 (1991) .......... 33

*Bd. of Regents v. Roth*,
408 U.S. 564 (1972) .......... 52

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 27

*Betts v. Reliable Collection Agency, Ltd.*,
659 F.2d 1000 (9th Cir. 1981) .......... 55

*Biden v. Texas*,
597 U.S. 785 (2022) .......... 48

*Brass v. County of Los Angeles*,
328 F.3d 1192 (9th Cir. 2003) .......... 14

*Califano v. Aznavorian*,
439 U.S. 170 (1978) .......... 49

*California v. Texas*,
593 U.S. 659 (2021) .......... 22, 23

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 19

*Ciampi v. City of Palo Alto*,
No. 09-cv-2655-LHK, 2010 WL 5174013 (N.D. Cal. Dec. 15, 2010) .......... 17

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) .......... 47

*City of New Haven v. United States*,
809 F.2d 900 (D.C. Cir. 1987) .......... 31, 36

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... *passim*

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) .......... 52

*Cnty. of Santa Clara v. Astra USA, Inc.*,
588 F.3d 1237 (9th Cir. 2009) .......... 20

*Cobell v. Kempthorne*,
455 F.3d 301 (D.C. Cir. 2006) .......... 28

*Comm'n v. Texas*,
605 U.S. 665 (2025) .......... 32, 34

*Consol. Edison Co. of N.Y, Inc. v. U.S. Dep't of Energy*,
247 F.3d 1378 (Fed. Cir. 2001) .......... 26

*Crawford v. Gould,*
56 F.3d 1162 (9th Cir. 1995) .......... 15

*Gupta v. Int'l Bus. Machines Corp.*,
No. 5:14-CV-01358-EJD, 2015 WL 9204348 (N.D. Cal. Dec. 17, 2015) .......... 17

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022) .......... 24, 25

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .......... 23

*Day v. GEICO Cas. Co.*,
No. 21-CV-02103-BLF, 2022 WL 16556802 (N.D. Cal. Oct. 31, 2022) .......... 56

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .......... 5

*Dep't of Educ. v. California*,
604 U.S. 650 (2025) .......... 25

*Desert Rain v. City of Los Angeles*,
754 F.3d 1147 (9th Cir. 2014) .......... 14

*Domestic & Foreign Com. Corp.*,
337 U.S. 682 (1949) .......... 32, 33

*Domino's Pizza, Inc. v. McDonald*,
546 U.S. 470 (2006) .......... 20

*E.V. v. Robinson*,
906 F.3d 1082 (9th Cir. 2018) .......... 32, 33

*Edwards v. Aurora Loan Servs., LLC,*
791 F. Supp. 2d 144 (D.D.C. 2011) ... 20

*Elgin* v. *Department of the Treasury*,
567 U.S. 1 (2012) ... 24, 27

*EPA v. Brown*,
431 U.S. 99 (1977) ... 28

*Experexchange, Inc. v. Doculex, Inc.,*
No. C–08–3875 JCS, 2009 WL 3837275 (N.D. Cal. Nov. 16, 2009) ... 17

*FCC* v. *Beach Commc'ns, Inc.*,
508 U.S. 307 (1993) ... 47

*FCC* v. *Fox TV Stations, Inc.*,
567 U.S. 239 (2012) ... 53

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ... 19

*Fleming v. Lind–Waldock & Co.*,
922 F.2d 20 (1st Cir.1990) ... 13, 18

*Foman v. Davis*,
371 U.S. 178 (1962) ... 17

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ... 59

*G.L. Christian & Assocs. v. United States*,
160 Ct. Cl. 1 (1963) ... 52

*Gen. Land Off. of Tx. v. Biden*,
722 F. Supp. 3d 710 (S.D. Tex. 2024) ... 30

*Gilmour v. Gates, McDonald & Co.*,
382 F.3d 1312 (11th Cir. 2004) ... 15

*Gizzo v. Ben-Habib*,
44 F. Supp. 3d 374 (S.D.N.Y. 2014) ... 52

*Global Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ... 31, 34

*Goldberg v. Kelly,*
397 U.S. 254 (1970) ... 51

*Gray v. First Winthrop Corp.*,
989 F.2d 1564 (9th Cir. 1993) ..... 49

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ..... 53

*Griffith v. FLRA*,
842 F.2d 487 (D.C. Cir. 1988) ..... 32

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ..... 58

*Heckler v. Chaney*,
470 U.S. 821 (1985) ..... 28

*Herklotz v. Parkinson*,
848 F.3d 894 (9th Cir. 2017) ..... 18

*Hewitt v. Helms*,
459 U.S. 460 (1983) ..... 52

*Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat'l Ass'n*,
747 F.3d 44 (2d Cir. 2014) ..... 20

*Houston Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022) ..... 45, 46

*In re W. States Wholesale Nat. Gas Antitrust Litig.*,
715 F.3d 716 (9th Cir. 2013) ..... 14

*J.L. v. Cissna*,
No. 18-CV-04914-NC, 2019 WL 415579 (N.D. Cal. Feb. 1, 2019) ..... 56

*Johnson v. Mammoth Recreations, Inc.*,
975 F.2d 604 (9th Cir. 1992) ..... 15

*Klamath Water Users Protective Ass'n v. Patterson*,
204 F.3d 1206 (9th Cir. 1999) ..... 20

*Kowalski v. Tesmer*,
543 U.S. 125 (2004) ..... 21

*Leathers v. Medlock*,
499 U.S. 439 (1991) ..... 43

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ..... *passim*

*Louisiana v. Biden*,
64 F.4th 674 (5th Cir. 2023) .......... 27, 60

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 19, 21, 23

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .......... 28

*Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers*,
485 U.S. 360 (1988) .......... 50

*Maher v. United States*,
314 F.3d 600 (Fed. Cir. 2002) .......... 20

*McDonald v. Bd. of Election Comm'rs of Chicago*,
394 U.S. 802 (1969) .......... 49

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) .......... 25

*Milk Train, Inc. v. Veneman*,
310 F.3d 747 (D.C. Cir. 2002) .......... 29

*Morrisey v. Brewer*,
408 U.S. 471 (1972) .......... 52

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983) .......... 48

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 19

*National Institutes of Health v. American Public Health Association*,
145 S. Ct. 2658 (2025) .......... 7, 23, 25

*Nat'l Urb. League v. Trump*,
783 F. Supp. 3d 61 (D.D.C. 2025) .......... 52

*New Vision Photography Program, Inc. v. District of Columbia*,
54 F. Supp. 3d 12 (D.D.C. 2014) .......... 52

*Nieves v. Bartlett*,
587 U.S. 391 (2019) .......... 45

*Northrop Grumman Corp. v. United States*,
46 Fed. Cl. 622 (2000) .......... 52

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ... 27

*O'Connor v. Boeing N. Am., Inc.*,
184 F.R.D. 311 (C.D. Cal. 1998) ... 56

*Oliver v. Ralphs Grocery Co.*,
654 F.3d 903 (9th Cir. 2011) ... 13

*Olson v. California*,
No. CV1910956DMGRAOX, 2020 WL 6439166 (C.D. Cal. Sept. 18, 2020) ... 49

Oneok, Inc. v. Learjet, Inc.,
575 U.S. 373 (2015) ... 14

*Orr v. Bank of Am., NT & SA*,
285 F.3d 764 (9th Cir. 2002) ... 22

*Perry v. Sindermann,*
408 U.S. 593 (1972) ... 51

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty.*,
391 U.S. 563 (1968) ... 46

*Pickern v. Pier 1 Imports (U.S.), Inc.*,
457 F.3d 963 (9th Cir. 2006) ... 13

*Probe v. State Teachers' Ret. Sys.*,
780 F.2d 776 (9th Cir. 1986) ... 56

*Pub. Citizen v. Stockman*,
528 F. Supp. 824 (D.D.C. 1981) ... 30

*Rannis v. Recchia*,
380 F. App'x. 646 (9th Cir. 2010) ... 57

*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*,
421 F.3d 1 (1st Cir. 2005) ... 52

*Reed v. Town of Gilbert*, *Ariz.*,
576 U.S. 155 (2015) ... 47

*Refuerzo v. Sw. Airlines Co.*,
No. 22-cv-00868-JSC, 2024 WL 4177936 (N.D. Cal. Sept. 12, 2024) ... 57

*Ries v. Ariz. Beverages USA LLC*,
287 F.R.D. 523 (N.D. Cal. 2012) ... 57

*Rosenberger v. Rector & Visitors of University of Virginia*,
515 U.S. 819 (1995) ... 43

*Rosenwald v. Kimberly-Clark Corp.*,
152 F.4th 1167 (9th Cir. 2025) ... 19

*Rust v. Sullivan*,
500 U.S. 173 (1991) ... *passim*

*Rutan v. Republican Party*,
497 U.S. 62 (1990) ... 46, 60

*Rutledge v. Elec. Hose & Rubber Co.*,
511 F.2d 668 (9th Cir. 1975) ... 55

*Ry. Exp. Agency v. People of State of N.Y.*,
336 U.S. 106 (1949) ... 49

*Sako v. Wells Fargo Bank, Nat'l Ass'n*,
No. 14CV1034-GPC JMA, 2015 WL 5022326 (S.D. Cal. Aug. 24, 2015) ... 17

*Sali v. Corona Reg Med. Ctr.*,
909 F.3d 996 (9th Cir. 2018) ... 56

*Sanchez v. Off. of State Supt. of Educ.*,
45 F.4th 388 (D.C. Cir. 2022) ... 47

*Sardarian v. Fed. Emergency Mgmt. Agency*,
No. 3:19-cv-00910 (OAW), 2022 WL 4080325 (D. Conn. Apr. 1, 2022) ... 20

*Schwerdt v. Int'l Fidelity Ins. Co.*,
28 F. App'x 715 (9th Cir. 2002) ... 17

*Scott v. Harris*,
550 U.S. 372 (2007) ... 19

*Sessions v. Dimaya*,
584 U.S. 148 (2018) ... 53

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010) ... 55

*Skinner v. First Am. Bank of Va.*,
64 F.3d 659 (4th Cir. 1995) ... 18

*Small v. Allianz Life Ins. Co. of N. Am.*,
122 F.4th 1182 (9th Cir. 2024) ... 55

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ... 19

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*,
480 F.3d 1116 (Fed. Cir. 2007) ... 25

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ... 24, 28

*Taylor v. Sturgell*,
553 U.S. 880 (2008) ... 55

*Thakur v. Trump*,
148 F.4th 1096 (9th Cir. 2025) ... 7

*Thakur v. Trump*,
163 F.4th 1198 (9th Cir. 2025) ... 7

*Thakur v. Trump*,
176 F.4th 1187 (9th Cir. 2026) ... *passim*

*Thakur v. Trump*,
823 F. Supp. 3d 974 (N.D. Cal. 2026) ... 9, 48

*Town of Castle Rock v. Gonzalez*,
545 U.S. 748 (2005) ... 51

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ... 21, 57

*Trump v. Hawaii*,
585 U.S. 667 (2018) ... 48

*Trump v. Sierra Club*,
588 U.S. 930 (2019) ... 31, 36

*Tucker v. Union of Needletrades, Indus. & Textile Emps.*,
407 F.3d 784 (6th Cir. 2005) ... 14

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,
136 F.3d 641 (9th Cir. 1998) ... 26

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016) ... 21

*Bd. of Cnty. Comm'r v. Umbehr*,
518 U.S. 668 (1996) ... 46

*United States v. Am. Libr. Ass'n*,
539 U.S. 194 (2003) .......... 43, 49

*United States* v. *Fausto*,
484 U.S. 439 (1988) .......... 24, 27

*United States v. Hansen*,
599 U.S. 762 (2023) .......... 21

*United States v. Mitchell*,
463 U.S. 206 (1983) .......... 25

*United States v. Wilson*,
503 U.S. 329 (1992) .......... 30

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... 58

*Wasco Prods., Inc. v. Southwall Techs., Inc.*,
435 F.3d 989 (9th Cir. 2006) .......... 13, 18

*Watson v. Chessman,*
362 F. Supp. 2d 1190 (S.D. Cal. 2005) .......... 59

*Whitmore v. Arkansas*,
495 U.S. 149 (1990) .......... 23

*Williamson v. Lee Optical of Okla., Inc.*,
348 U.S. 483 (1955) .......... 49

*XP Vehicles, Inc. v. Dep't of Energy*,
118 F. Supp. 3d 38 (D.D.C. 2015) .......... 50

*Ysursa v. Pocatello Educ. Ass'n*,
555 U.S. 353 (2009) .......... 43

**Statutes**

2 U.S.C. § 683 .......... 30

2 U.S.C. § 688 .......... 30

5 U.S.C. § 701(a)(2) .......... 28

5 U.S.C. § 702 .......... 24, 26

5 U.S.C. § 704 .......... 24, 27

10 U.S.C. § 4001(b)(1) .......... 29, 35

20 U.S.C. § 954(d)(1) .... 53, 54
20 U.S.C. § 956(c)(4) .... 35
28 U.S.C. § 1346(a)(2) .... 25
28 U.S.C. § 1491(a)(1) .... 25
31 U.S.C. § 503 .... 5
31 U.S.C. § 6301 .... 29
31 U.S.C. § 6305 .... 36
31 U.S.C. § 6307 .... 5
42 U.S.C. § 241 .... 34
42 U.S.C. § 1870(c) .... 29
42 U.S.C. § 1873(e) .... 29
42 U.S.C. § 16161a .... 34
42 U.S.C. § 16161a(c) .... 40
42 U.S.C. § 16161a(c)(3) .... 41
42 U.S.C. § 16161d .... 41
42 U.S.C. § 16161d(f)(1) .... 41
42 U.S.C. § 16298d(j)(2) .... 39
49 U.S.C. § 101(b)(4) .... 36
49 U.S.C. § 330(e)(1) .... 29, 35
49 U.S.C. § 5505(c)(2)(A) .... 37
49 U.S.C. § 5505(c)(3) .... 38
49 U.S.C. § 6503(c)(1) .... 38
PL 116-260 .... 39
42 U.S.C. § 241(a) .... 36

**Rules**

Fed. R. Civ. P. 8 .......... 13

Fed. R. Civ. P. 12(h)(3) .......... 18

Fed. R. Civ. P. 15(a) .......... 15

Fed. R. Civ. P. 23 .......... 55, 56

Fed. R. Civ. P. 23(a) .......... *passim*

Fed. R. Civ. P. 23(b)(2) .......... 37, 58

Fed. R. Civ. P. 56 .......... 1

Fed. R. Civ. P. 56(a) .......... 19

Fed R. Civ. P. 56(c)(4) .......... 22

**Regulations**

2 C.F.R. pt. 200 .......... 5

2 C.F.R. § 200.309 .......... 5

2 C.F.R.§ 200.339(c) .......... 5

2 C.F.R. § 200.340 .......... *passim*

2 C.F.R. § 200.340(a)(4) .......... *passim*

2 C.F.R. § 200.343 .......... 5

42 C.F.R. § 52.1 .......... 36

42 C.F.R. § 66.101 .......... 36

**Other Authorities**

Andrew H. Sidman, Pork Barrel Politics: How Government Spending Determines Elections in a Polarized Era (2019) .......... 50

Diana Evans, *Greasing the Wheels: Using Pork Barrel Projects to Build Majority Coalitions in Congress* (2004) .......... 50

Federal Register, Transportation Research & Development Strategic Plan; Request for Information, Docket No. DOT-OST-2025-2085 (Jan. 13, 2026), https://www.federalregister.gov/

documents/2026/01/13/2026-00455/transportation-research-and-development-strategic-plan-request-for-information

Heartland Hydrogen Hub, *Xcel Energy*, https://www.heartlandh2hub.com/projects/xcel-energy-clean-energy-h2-project/ ........ 40

H.R. Rep. No. 93-658 (1971) (reprinted in 1974 U.S.C.C.A.N. 3462) ........ 31, 36

Jonathan Allen, *The Case for Earmarks*, Vox (June 30, 2015), https://www.vox.com/2015/6/30/8864869/earmarks-pork-congress ........ 50

Tyler Cowen, *Congress Needs to Bring Back Earmarks*, Bloomberg (Jan. 9, 2018), https://www.bloomberg.com/view/articles/2018-01-09/congress-needs-to-bring-back-earmarks ....... 50

USASpending.gov, https://www.usaspending.gov/award/ ........ 39, 41

U.S. Dep't Energy, Award Announcement for Regional Direct Air Capture (DAC) Hubs Program – South Texas DAC Hub, https://www.energy.gov/cmei/oced/articles/award-wednesdays-september-12-2024 ........ 39

U.S. Dep't Energy, *DOE Project Selections for Funding Opportunity Announcement 2735: Regional Direct Air Capture Hubs*, https://www.energy.gov/hgeo/project-selections-foa-2735-regional-direct-air-capture-hubs-topic-area-1-feasibility-and ........ 39

U.S. Dep't of Energy, *Energy Announces Termination of 223 Projects Saving Over 75 Billion*, https://www.energy.gov/articles/energy-department-announces-termination-223-projects-saving-over-75-billion (last visited Aug. 21, 2026) ........ 8

U.S. Dep't Energy, *Hydrogen Program Libraries*, https://www.hydrogen.energy.gov/docs/hydrogenprogramlibraries/pdfs/review24/oced006_colella_2024_o.pdf (last visited Aug. 21, 2026) ........ 40

U.S. Dep't Energy, O*CED Issues $50M to Direct Air Capture Hub Project Cypress*, https://www.energy.gov/cmei/oced/articles/oced-issues-50m-direct-air-capture-hub-project-cypress 39

*See* U.S. Dep't Energy, *OCED Gulf Coast Hydrogen Hub Community Briefing*, https://www.energy.gov/sites/default/files/2024-12/Gulf%20Coast%20Phase%201%20Award%20Briefing_FINAL.pdf (last visited Aug. 21, 2026) 40

U.S. Dep't Energy, *Regional Clean Hydrogen Hubs Program – Appalachian Hydrgoen Hub (ARCH2)*, energy.gov/sites/default/files/2024-07/H2Hubs Appalachian FactsheetBooklet_update.pdf ........ 40

U.S. Dep't of Energy, *Secretary Wright Announces New Policy for Increasing Accountability, Identifying Wasteful Spending of Taxpayer Dollars* (May 15, 2025), https://www.energy.gov/articles/secretary-wright-announces-new-policy-increasing-accountability-identifying-wasteful ........ 8

U.S. Dep't of Transp., IIJA Centers & Grantees, https://www.transportation.gov/utc/iija-centers-and-grantees#National ........ 37

University Transportation Centers Program, FY 2025 Notice of Funding Opportunity, https://www.transportation.gov/sites/dot.gov/files/2025-12/2025%20UTC%20NOFO.pdf........ 38

**NOTICE OF MOTION**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on October 20, 2026, at 10 a.m., in the Courtroom of the Honorable Rita F. Lin, Courtroom 4, United States District Court, Northern District of California, 450 Golden Gate Avenue, 17th Floor, San Francisco, California, Defendants will move, and hereby do move, this Court for an Order granting Defendants' Motion for Summary Judgment. This Motion is brought pursuant to Federal Rules of Civil Procedure 56.

This Motion is based upon: (1) the Notice of Motion and Memorandum of Points and Authorities in Support; (2) Plaintiffs' Notice of Motion, Memorandum, declarations, and exhibits thereto; (3) any opposition and reply briefs; (4) all other filings and records in this proceeding; (5) any arguments and other evidence as may be presented to the Court prior to or at the hearing of this Motion; (6) all other matters of which the Court may take judicial notice; and (7) any further briefing, argument, and such other and further matters the Court may properly consider before ruling.

As set forth below, Defendants respectfully request that the Court deny Plaintiffs' motion for summary judgment, and the Court grant Defendants' cross-motion for summary judgment. Specifically, Defendants request the Court:

(1) dismiss the Form Termination Class's Arbitrary and Capricious Claim (Count VI) under the Administrative Procedure Act for lack of jurisdiction;

(2) decline to consider and enter judgment against Plaintiffs' unpleaded First Amendment retaliation and association theories;

(3) enter judgment for Defendants on Counts I–V of Plaintiffs' Complaint, which consist of Plaintiffs' claims alleging the violation of separation of powers, First Amendment content and viewpoint discrimination claims, Fifth Amendment Equal Protection claims, Fifth Amendment Due Process Void for Vagueness claims, and Contrary to Law claims under the Administrative Procedure Act;

(4) deny certification of Plaintiffs' proposed classes; and

(5) deny joinder of the three newly raised named Plaintiffs absent from the Complaint.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

Plaintiffs' Motion for Summary Judgment and Motion for Class Certification ("Pls.' Mot.") fails as both a matter of substance and procedure. ECF No. 210. At the outset, the Motion is procedurally improper because it seeks final judgment on claims and parties that are absent from the operative Third Amended Complaint in this case, *see* ECF No. 184 ("Compl."). Defendants received no notice of these new theories or proposed parties, and Plaintiffs do not explain why they waited to raise them despite having full knowledge of the facts before the February 6, 2026 scheduling order deadline to file an amended complaint. *See* January 30, 2026 Scheduling and Stay Order, ECF No. 183. The Court should decline to consider these unpled and undisclosed claims.

Turning to the merits, the Court should deny summary judgment for Plaintiffs and grant summary judgment for Defendants on all counts. First, as a housekeeping matter, Plaintiffs' arbitrary and capricious claims, *see* Compl. Count VI, must be dismissed. The Ninth Circuit has already held that the Tucker Act precludes district court jurisdiction over the Form Termination Class's Administrative Procedure Act ("APA") claim. *See Thakur v. Trump*, 176 F.4th 1187, 1197–99 (9th Cir. 2026).

Second, Plaintiffs' separation of powers claims fail. *See* Compl. Count I. Plaintiffs' purported constitutional claims simply allege the agencies violated various enabling statutes or grantmaking directives. This restyling of their contrary-to-law claims is foreclosed by *Dalton v. Specter*, where the Supreme Court held that an official acting in excess of her statutory authority is not *ipso facto* a Constitutional violation. 511 U.S. 462, 472 (1994). Moreover, Plaintiffs' claims fail on the merits, as an appropriation for general grantmaking does not require an agency to continue to fund any particular award made from that appropriation. *See Lincoln v. Vigil*, 508 U.S. 182 (1993). The relevant statutes direct the agencies to operate programs or award competitive grants; none mention Plaintiffs' particular awards.

The Court should not rule on Plaintiffs' viewpoint discrimination claims under the First Amendment, *see* Compl. Count II. The government has sought certiorari to review that ruling, *see Trump v. Thakur*, No. 26-210 (S. Ct. filed Aug. 18, 2026), and Defendants intend to file a motion to stay briefing in this case pending resolution of the government's petition for a writ of certiorari and any further proceedings in the Supreme Court. Defendants preserve their position that Plaintiffs' argument contradicts

longstanding precedent holding that viewpoint discrimination is permissible in the competitive grantmaking context. Government spending is not subject to traditional First Amendment scrutiny. "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). That is not impermissible viewpoint discrimination.

Summary judgment should be granted for Defendants on Plaintiffs' equal protection claims as to the Department of Energy ("DOE"). Following a monthslong, individualized review of over 2,000 grants, DOE identified 624 grants for termination based on their failure to align with the executive's policy priorities. In October 2025, DOE terminated 284 grants on the 624-grant list for rational political reasons. DOE's action passes the limited bar required of rational basis review.

Moreover, the two First Amendment retaliation and political association theories, Pls.' Mot. at 29–30, absent from Plaintiffs' Complaint and raised for the first time here, are untimely. Even if properly brought, both restate Plaintiffs' other legal theories, and fail on their merits.

Finally, Plaintiffs do not move for summary judgment on their APA contrary to law claim, *see* Compl. Count V, or on their void for vagueness claim, *see* Compl. Count IV. Summary judgment should be granted for Defendants on these claims. For the reasons discussed in the separation of powers section, which copies Plaintiffs' APA contrary to law claims, Defendants' termination of discretionary grants does not violate statutes authorizing grant programs. Plaintiffs' void for vagueness claim also fails because the termination decisions do not prohibit any conduct or impose any civil or criminal sanctions, and Plaintiffs have no property entitlement to a federal grant where they are not the recipients.

Plaintiffs' motion for class certification should be denied. Of the four proposed classes, only the Form Termination Class appears in the Complaint—and that class rests on an APA theory the Court lacks jurisdiction to hear. *See* Compl. Prayer for Relief. The remaining proposed classes are not viable because the named Plaintiffs are not parties to the challenged contracts or grant agreements, creating an unavoidable risk of inconsistent judgments. Separately, the proposed Department of Energy Class is impermissibly broad, unascertainable, and is unsupported by evidence of standing, numerosity, commonality, or typicality. The Separation of Powers Class should not be certified because each alleged

failure to spend appropriated funds for grantmaking involves analyzing different grantmaking statutes and cannot be resolved through a single class-wide answer. Additionally, Plaintiffs lack any adequate representatives for the National Institute of Health (a subagency within the Department of Health and Human Services) ("NIH") terminations, so the classes should not be certified as to researchers named on terminated NIH grants. Finally, Plaintiffs' requested injunctive relief is overbroad and should be denied.

## STATEMENT OF THE ISSUES TO BE DECIDED

1. Can Plaintiffs obtain summary judgment on newly raised First Amendment retaliation and political association theories, and add three new named Plaintiffs after discovery has been foreclosed, when none are pleaded in the Complaint and Defendants had no prior notice, even though Plaintiffs could have included them before the scheduling order deadline for filing an amended complaint?
2. Is this case, which seeks to compel the continued payment of funds pursuant to the terms of contracts with the United States, properly brought in this court?
3. Do Plaintiffs have standing to enforce contracts between the United States and nonparty educational institutions when Plaintiffs have no rights under those contracts?
4. Is the First Amendment implicated where the government chooses to no longer subsidize certain viewpoints through grantmaking?
5. Should Plaintiffs obtain summary judgment on their equal protection claims because DOE terminated grants based on location for political reasons, where those grants had previously been identified for termination because they did not align with the agency's policy priorities?
6. Should the Court certify a Separation of Powers Class where each terminated grant associated with a class member has a different authorizing statute and Plaintiffs identify no common legal questions as to the Class?
7. Should the Court certify a Department of Energy Class that includes individuals not named as principal investigators, principal researchers, or project leaders on grant materials?

//

//

## BACKGROUND

### I. Regulatory Background

Federal agencies are broadly empowered, through the terms and conditions of federal grants and associated regulations and guidance, to reorient grant portfolios in response to changing priorities. As a default matter, Office of Management and Budget ("OMB") regulations generally govern a variety of terms for federal grants and contracts. *See generally* 2 C.F.R. Part 200 (titled "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards"). For example, the regulations reference and generally provide terms for the suspension or termination of awarded federal grants. *See, e.g.*, *id.* § 200.309 ("If termination occurs, the period of performance will be amended to end upon the effective date of termination."); *id.* § 200.339(c) (noting suspension or termination is a remedy for noncompliance); *id.* § 200.343 (discussing the effects of suspension or termination).

Section 200.340 preserves agencies' ability to, "pursuant to the terms and conditions of the Federal award," terminate existing grants "including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *Id.* § 200.340(a)(4). This authority has been promulgated consistent with Congressional directives delegating to OMB the power to manage various aspects of federal grants and contracts. *See* 31 U.S.C. §§ 503, § 6307. Awardees are accordingly informed in their terms and conditions that funding may be cut off based on changes in agency priorities.

When President Trump assumed the office of President of the United States, the Executive Branch agencies adopted new policy priorities in conformity with the President's objectives, as is true whenever a new President is inaugurated. *Cf. Dep't of Com. v. New York*, 588 U.S. 752, 755 (2019) ("It is hardly improper for an agency head to come into office with policy preferences and ideas, discuss them with affected parties, sound out other agencies for support, and work with staff attorneys to substantiate the legal basis for a preferred policy."). Federal agencies exercised their significant legal discretion to review existing spending programs to ensure they effectuated this Administration's changed policy priorities.

### II. Procedural Background

#### A. First Preliminary Injunction

Plaintiffs are University of California ("UC") researchers who lead research projects on grants

awarded to UC institutions. They filed suit on June 5, 2025, naming sixteen federal grantmaking agencies, and originally sought a TRO and class certification. *See* ECF Nos. 1, 7-1, 18. Plaintiffs alleged that Defendants have violated the Take Care Clause and Appropriations Clause, the First Amendment's bar on viewpoint discrimination, and the Fifth Amendment's Due Process Clause. ECF No. 1 at ¶¶ 433–452. Plaintiffs also sought APA review for alleged violations of the Impoundment Control Act, agencies' governing statutes, unspecified regulations, and the bar on arbitrary and capricious final agency action. *Id.* ¶¶ 453–465.

In their emergency motion, Plaintiffs sought the restoration of terminated grant funding, a bar on future terminations, and an order reinstating pre-January 20, 2025 grant termination procedures. ECF No. 7 at 2. The Court granted relief but limited the scope and reach of Plaintiffs' request. The First Preliminary Injunction Order was limited to only those agencies where named plaintiffs were listed "as principal researchers, investigators, or project leaders on the grant applications for previously awarded research grants," namely the Environmental Protection Agency ("EPA"), National Science Foundation ("NSF"), and National Endowment for the Humanities ("NEH"). See First Prelim. Inj., ECF No. 55, at ¶¶ 1, 3.

As to those three agencies, the Court certified two classes. The Equity Termination Class, based on Plaintiffs' First Amendment claim and part of their APA contrary to law claim, covers "grants terminated by Agency Defendants pursuant to Executive Orders 14151 or 14173." *Id.* ¶ 4a. The Form Termination Class, based on Plaintiffs' arbitrary and capricious claim under the APA, covered "grant terminations . . . communicated by means of a form termination notice that does not provide a grant-specific explanation for the termination that states the reason for the change to the original award decision and considers the reliance interests at stake." *Id.* ¶ 2a. The Court also explained the basis for its injunction and provisional class certification. Order Granting Motion for Preliminary Injunction and Class Certification, ECF No. 54 ("1st Mem. Op.").

**B. Second Preliminary Injunction**

Following the first preliminary injunction, Plaintiffs sought to amend their complaint to encompass grant terminations as to additional agencies. On August 26, 2025, the Court granted their motion for leave to amend their complaint a second time, also entered a second preliminary injunction. *See* August 26,

2025 Order, ECF No. 107; *see also* Second Order Granting Mot. for Prelim. Inj. & Class Certification ("2nd Mem. Op."), ECF No. 133; Second Prelim. Inj., ECF No. 134. The Court's Second Preliminary Injunction was limited to the Department of Defense ("DOD") the Department of Transportation ("DOT"), and NIH. *See* Second Prelim. Inj. As to those three agencies, the Court certified two additional classes: a Second Form Termination Class, and a Second Equity Termination Class, both with the same scope and reach as the First Form Termination Class and the Second Form Termination Class. *See id.*

**III. Appellate Proceedings**

The government moved to stay the first preliminary injunction pending appeal. The Ninth Circuit initially denied the stay. *See Thakur v. Trump*, 148 F.4th 1096 (9th Cir. 2025). Later, however, the Ninth Circuit issued an amended order granting a partial stay as to the APA arbitrary and capricious claim. *Thakur v. Trump*, 163 F.4th 1198 (9th Cir. 2025). In doing so, the Ninth Circuit relied on *National Institutes of Health v. American Public Health Ass'n*, 145 S. Ct. 2658 (2025), which held that the APA's waiver of sovereign immunity does not permit district-court adjudication of claims challenging grant terminations. The Ninth Circuit concluded *NIH* controlled because Plaintiffs' arbitrary and capricious claim challenged the termination of discretionary grants. *Id.*

In May 2026, the Ninth Circuit issued its merits decision, reversing the portion of the First Preliminary Injunction concerning the APA arbitrary and capricious claim and the Form Termination Class, because the Tucker Act likely required those claims to be brought in the Court of Federal Claims. *Thakur*, 163 F.4th at 1204. The Ninth Circuit affirmed the injunction only as to the claims underlying the Equity Termination Class, holding that the grant terminations likely violated the First Amendment's prohibition on viewpoint discrimination. *See id.* at 1204–05.

**IV. Department of Energy Grant Terminations**

The Department of Energy ("DOE") grant terminations followed a different timeline than the other agency terminations that Plaintiffs challenge. In May 2025, DOE began a comprehensive Portfolio Review Process ("PRP") of over 2,000 of its existing awards to ensure that each was "financially sound and economically viable, aligned with national and economic security interests, and consistent with Federal law and this Administration's policies and priorities and program goals . . . (Standards)." U.S. Dep't of

Energy, *Secretary Wright Announces New Policy for Increasing Accountability, Identifying Wasteful Spending of Taxpayer Dollars* (May 15, 2025) ("PRP Policy").[1] The PRP tasked DOE program offices with reviewing awards on a case-by-case basis against a number of criteria; developing proposals to retain, modify, or terminate grants; presenting these proposals for recommendations to a PRP committee; and making the ultimate decision whether to retain, modify, or terminate grants." *See* Declaration of Kyle McLorg, ECF No. 211 ("McLorg Decl."), at ¶ 9, Ex. F(1) ("DOE Stipulations"), at 4 (Stip. No. 1). The evaluation did not consider the political identity of the grant recipient's state. *Id.* at 6 (Stip. No. 11).

DOE evaluated over two thousand awards individually to determine whether the awards no longer effectuated the purpose of the program or the Department's priorities under 2 C.F.R. § 200.340(a)(4). *See* DOE Stipulations at 4 (Stip. No. 2). Consistent with its Executive Branch obligation to clear its funding decisions with the Office of Management and Budget ("OMB"), DOE submitted to OMB in September 2025 two lists of grants that were reviewed: a list of 77 Office of Clean Energy Demonstrations ("OCED") projects that OCED had reviewed and proposed to retain, modify, or terminate, and a list of 2,265 financial assistance awards that other program offices had reviewed and proposed to retain, modify, or terminate. *Id*. DOE selected the 624 grants across the country for potential termination because each failed one or more of those criteria. DOE Stipulations at 4–6 (Stip. Nos. 1–3, 11); *see also* Ex. F(3).

Beginning on October 1, 2025, government appropriations lapsed due to a failure of Congress to pass a spending bill for fiscal year 2026. On October 1 and 2, 2025, at the beginning of the lapse in appropriations, DOE announced the termination of 284 specific grants on the 624-grant list. *See* DOE Stipulations at 4 (Stip. No. 5).[2] With one exception, the 284 terminated grants had a recipient location or at least one place of performance in a state that awarded its electoral votes to Kamala Harris in the 2024 election and has two Democratic-caucusing Senators (so-called "Blue State" grants). *Id.* at 5 (Stip. No. 6). The remaining approximately 340 grants proposed for termination following the PRP process were not

---

[1] https://www.energy.gov/articles/secretary-wright-announces-new-policy-increasing-accountability-identifying-wasteful (last visited Aug. 21, 2026).

[2] U.S. Dep't Energy, *Energy Announces Termination of 223 Projects Saving Over 75 Billion*, https://www.energy.gov/articles/energy-department-announces-termination-223-projects-saving-over-75-billion (last visited Aug. 21, 2026).

terminated in October 2025, and they have not since been terminated. *Id.* (Stip. No. 7). These 340 remaining grants had a recipient location or at least one place of performance in a state that awarded its electoral votes to President Trump in the 2024 election or has at least one Republican-caucusing Senator. *Id.* The initial identification of 624 DOE grants for termination was due to a finding that the grants were not consistent with federal law or the Administration's policies, priorities, and goals, and the decision to terminate a subset of these grants in October 2025 was based solely on the political identity of the grant recipient's state, i.e., whether the recipient's location or place of performance was in a Blue State or a non-Blue State. *Id.* at 5 (Stip. No. 9).

DOE sent letters terminating grant projects, including letters to grantees pertaining to the grants at issue here. The letters each included language stating the projects were not consistent with DOE's or the Administration's goals, policies, and priorities. *See Thakur v. Trump*, 823 F. Supp. 3d 974, 981 (N.D. Cal. 2026) (citing ECF Nos. 158-5, 158-8, 158-13, 157-5, 157-4).

### A. Plaintiffs' Motion for a Third Preliminary Injunction

In November 2025, Plaintiffs moved to file a third amended complaint and for an additional preliminary injunction and additional provisional class certifications as to DOE. *See* Pls.' Mot. for Leave, ECF No. 154; Mot. for Preliminary Injunction & Provisional Class Certification as to Additional Agency Defendants ("Pls.' 3rd PI Mot."), ECF No. 156. Plaintiffs sought to certify two additional classes as to DOE: a Third Form Termination Class, which seeks to include UC researchers listed as Principal Investigators ("PIs"), Co-PIs, or lead researchers on DOE grants terminated via a "form termination" since January 2025, and an Equal Protection Class, which seeks to include UC researchers listed as PIs, Co-PIs, or lead researchers on DOE grants terminated in October 2025. *See id.* at 9–11.

The Court granted Plaintiffs' motion for leave to file a third amended complaint and, in a scheduling order, directed that it be filed by February 6, 2026. *See* Scheduling and Stay Order, ECF No. 183. The Court denied Plaintiffs' Motion for a Third Preliminary Injunction and provisional class certification. *See* Order Granting Mot. for Leave to File Third Am. Compl. and Denying Mot. for Prelim. Inj. & and Provisional Class Cert. ("3rd Mem. Op."), ECF No. 182. The court applied rational basis review and concluded that Plaintiffs had not met their burden to show an equal protection violation. *See id.* at 10–

13. The Court also noted that "Plaintiffs are not asserting a First Amendment challenge based on the October 2025 DOE terminations." *Id.* at 9 n.10. Plaintiffs did not thereafter seek to amend the complaint to add such a challenge.

**B. Plaintiffs' Operative Complaint**

On February 3, 2026, Plaintiffs filed the operative Third Amended Complaint. *See* ECF No. 184. Count I asserts nonstatutory separation of powers claims based on the theory that Defendants cancelled grants and withheld funds appropriated by Congress. Compl. ¶¶ 717–723. Count II is captioned "Violation of First Amendment (Content and Viewpoint Discrimination)" and alleges Defendants terminated grants because the grants' subject matter reflected viewpoints disfavored by the Administration. *Id.* ¶¶ 724–729. Count III asserts Fifth Amendment Equal Protection claims arising from DOE's October 2025 terminations. *Id.* ¶¶ 730–737. Count IV alleges procedural due process and vagueness claims. *Id.* ¶¶ 738–744. Counts V and VI assert APA arbitrary and capricious and contrary to law claims. *Id.* ¶¶ 745–757.

Plaintiffs' claims are identical to those asserted in their first complaint except with respect to the equal protection claim. *Compare* June 4, 2025 Complaint, ECF No. 1, *with* Compl. The operative Complaint does not assert a First Amendment retaliation count or an association count. Plaintiffs never sought to file an amended Complaint adding these theories. The Complaint also limits itself to a class action, stating that "[b]ecause the claims of the Plaintiff Class members share common issues of law and fact, they will not require individualized determinations of the circumstances of any plaintiff, and satisfy Rule 23(a)(2) for purposes of the requested declaratory and injunctive relief." Compl. ¶ 81. Finally, the Complaint's proposed classes limit the type of UC researchers who would be class members. The as-pleaded DOE Equal Protection class includes UC researchers "named as principal researchers, investigators, or project leaders on the grant applications" on grants alleged to have been terminated. *Id.* ¶ 78. The previously pleaded Equity Termination Classes likewise are limited to named lead researchers. *Id.* ¶¶ 75–77. No pleaded class includes every UC employee who worked or expected to work on an award.

**V. The Parties' Stipulations**

The parties entered into agency-specific stipulations and limited productions and agreed to foreclose discovery. *See* ECF No. 211. DOD, DOT, NEH, NIH, and NSF accepted for purposes of this

litigation that search terms or other criteria were used to identify grants expressing, or presumed to express, viewpoints the Administration no longer wished to subsidize; that the agencies used form termination letters; that the agencies did not consider individual researchers' reliance interests; and that the grants were funded through appropriations for grantmaking generally and their enabling statutes contemplated grantmaking generally. *See* McLorg Decl., Exs. A(1)–E(1). The stipulations do not state that Congress requires continuation of any particular award. *See id.*

The stipulations of DOD, DOT, NEH, NIH, and NSF state the agencies have not reallocated the terminated funds to other grantmaking programs because the grants at issue are subject to preliminary injunctions in this case requiring reinstatement of the grants. *Id.* DOE entered into a separate stipulation concerning the October 2025 grant terminations. *See* DOE Stipulations. DOE also produced a grants chart, limited to any DOE grants terminations outside the PRP in October 2025. *See id.*, Ex. F(2) at 13.

## VI. Plaintiffs' Motion for Summary Judgment

Plaintiffs move for summary judgment on three constitutional theories—separation of powers, First Amendment, and Equal Protection—and seek final certification of four proposed classes. *See* Pls.' Mot. at 1, 19–56. The proposed Viewpoint Discrimination Class includes researchers listed as PIs, Co-PIs, or project leads on grant applications for NSF, NEH, DOD, DOT, and NIH grants terminated because the grants expressed or were presumed to express disfavored viewpoints. *Id.* at 43. The proposed Separation of Powers Class would include researchers listed as PIs, Co-PIs, or project leads on grant applications for the same five agencies' terminated grants, and alleges the Constitution was violated because funds were not reallocated to other grants. *Id.* at 44. The proposed Department of Energy Class is broader than the other classes because it seeks to include all UC affiliated researchers who "worked or were hired to work" on any grant located in a "Blue State" and terminated by Department of Energy in October 2025. *Id.* The Form Termination Class seeks to include researchers named on grant applications for previously awarded grants "that are terminated by means of a form termination notice" that lacks a grant-specific explanation or considers reliance interests, and is predicated on arbitrary and capricious claims the Ninth Circuit has held must be dismissed. *Id.* at 44–45.

Plaintiffs also ask the Court to replace the current NIH Class Representatives—Horwitz, van der Bliek, and Viskuhl—with new, unpleaded named Plaintiffs Gansky and Spinelli. Pls.' Mot. at 49. Plaintiffs contend this substitution request is warranted because discovery in this case allegedly revealed "for the first time," that the previous three representatives' claims—Horwitz, Voskuhl, and Van der Bliek—were not "typical of the Viewpoint Discrimination (former Equity Termination) Class" because they were researchers on UCLA grants that were terminated following findings of antisemitic bias at UCLA. *Id.* at 59. But Plaintiffs have known that the NIH class representatives fell outside the Equity Termination Class since September 2025, when the Court's Second Preliminary Injunction Order expressly found, "the record suggests that Horwitz, Voskuhl, and van der Bliek's grant funding was frozen not because of the subject matter of their research, but because NIH targeted UCLA, due to certain preferences it believed UCLA to be engaged in." *See* 2nd Mem. Op. at 25; *see also* Second Prelim. Inj.

Additionally, Plaintiffs for the first time seek to add Shannon Boettcher as an additional representative of the proposed Department of Energy Class, Pls.' Mot. at 47, even though two other proposed DOE class representatives, Atanassov and Bedsworth, are in the Complaint. Plaintiffs do not explain why they seek to add Boettcher as a third proposed class representative, but they do seek summary judgment on an individual basis as to an alleged statutory violation caused by termination of a grant project he led, which is absent from the Complaint. *Id.* at 38–39.

## ARGUMENT

### I. Plaintiffs Cannot Seek Summary Judgment on Untimely, Unpleaded Claims and New Parties

Plaintiffs ask the Court to award summary judgment on two new First Amendment theories that do not appear in the operative Complaint. *Id.* at 29–31. They also seek to add three new named Plaintiffs as class representatives and to obtain summary judgment on those individuals' claims (*Id.* at 58–60; see also ECF Nos. 215–217). These arguments and parties are raised for the first time at summary judgment. That is procedurally improper, and the Court should decline to consider them.

Throughout this case, the Court has made clear that any claim raised in a motion must match the claims pleaded in the operative complaint. When Plaintiffs moved for a second preliminary injunction, they asked the Court to certify a subclass of UC researchers whose grants were allegedly terminated based

on viewpoints expressed on their campuses. 2nd Mem. Op. at 32. The Court rejected that request, finding that Plaintiffs were attempting to advance "a new legal theory for a First Amendment violation that has not been pled in their complaint." *Id.*; *see also id.* at 25 (declining to find a likelihood of success where the asserted First Amendment theory "was not the First Amendment claim pled in the operative complaint" and explaining that Plaintiffs' First Amendment theory in the complaint is limited to the allegation that "Defendants terminated [] grants based on the recipients' (presumed) viewpoint as reflected in the subject matter of their research"). When Plaintiffs later sought a preliminary injunction regarding DOE's October 2025 terminations, the Court again noted that "Plaintiffs are not asserting a First Amendment challenge based on the October 2025 DOE terminations." 3rd Mem. Op. at 9 n.10.

The Court's repeated emphasis that relief sought in motions must reflect the operative complaint is for good reason: Rule 8 of the Federal Rules of Civil Procedure requires Plaintiffs to give Defendants fair notice of the claims and the grounds on which those claims rest. Fed. R. Civ. P. 8; *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006). The Ninth Circuit emphasized that summary judgment is not "a procedural second chance to flesh out inadequate pleadings." *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) (citing *Fleming v. Lind–Waldock & Co.*, 922 F.2d 20, 24 (1st Cir.1990)). New allegations first introduced in summary judgment briefing should be disregarded because they provide no notice to defendants. *See Pickern*, 457 F.3d at 969; *see also Oliver v. Ralphs Grocery Co*., 654 F.3d 903, 908–09 (9th Cir. 2011) ("The issue underlying *Pickern* . . . is whether the defendant had fair notice as required by Rule 8.").

Defendants had no prior notice of the two First Amendment theories Plaintiffs assert for the first time at summary judgment. The Complaint does not plead these claims, and Plaintiffs have not previously asserted them in any of the three preliminary injunction motions Plaintiffs have brought, or any other filings. Nor can the Plaintiffs contend that their First Amendment Viewpoint Discrimination claims cover alternative First Amendment theories—the Court previously rejected that argument. *See* 2nd Mem. Op. at 25 ("Although Plaintiffs contend that the freezing of those funds violated the First Amendment for other reasons, that is not the First Amendment claim pled in the operative complaint."). The Court also noted in its Third Preliminary Injunction Order that Plaintiffs did not bring a First Amendment claim as to DOE,

*see* 3rd Mem. Op. at 9 n.10, underscoring that neither the Court nor Defendants were on notice of an alleged DOE First Amendment theory.

The Court also granted Plaintiffs' request to amend their complaint, and set a scheduling order deadline—February 6, 2026—for Plaintiffs to file an amended complaint. Scheduling and Stay Order, ECF No. 183. But Plaintiffs—after noting that order—did not seek leave to further amend their complaint to add such a claim. Plaintiffs never told Defendants that they planned to add three new named Plaintiffs as class representatives or that they intended to rely on any factual allegations about the grants those individuals were involved in, nor did it arise in the discovery period. Plaintiffs instead waited to raise new theories and parties after the Parties negotiated stipulations concerning the claims actually pleaded in Plaintiffs' operative Complaint and raised at preliminary injunction hearings, on the basis that those stipulations foreclosed discovery. McLorg Decl., Exs. A–F.

Because Plaintiffs seek summary judgment on unpled claims that Defendants had no notice of and without seeking, much less receiving, leave of court to plead such claims, the Court should reject those claims outright. *Brass v. County of Los Angeles*, 328 F.3d 1192, 1197–98 (9th Cir. 2003) (upholding district court's finding that plaintiff waived new § 1983 arguments raised for the first time in his motion for summary judgment where nothing in his existing pleading suggested he was raising those arguments and he offered no excuse or justification for his failure to raise them earlier). Doing so would be consistent with the Court's reasoning throughout this litigation.

**Plaintiffs' Attempt to Add New Parties and Theories Fails Under Rule 16.** The Ninth Circuit has held that a Court may treat new arguments at summary judgment as a request to amend—but only when the opposing party "had ample notice" of the new claims before summary judgment. *Desert Rain v. City of Los Angeles*, 754 F.3d 1147, 1154–55 (9th Cir. 2014). Defendants had no such notice here, so the Court should not construe Plaintiffs' new theories or new parties as a request to amend.

Even if the Court construed Plaintiffs' new arguments in this way, Plaintiffs cannot satisfy Rule 16(b)'s "good cause" requirement. Because the scheduling order's deadline to file an Amended Complaint was on February 6, 2026, Rule 16—not Rule 15—governs. *see* Scheduling Order, ECF No. 184; *cf.* ECF No. 182 at 6 n.8; *see also In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 737 (9th Cir.

2013), *aff'd sub nom. Oneok, Inc. V. Learjet, Inc.,* 575 U.S. 373 (2015); *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (While "leave to amend the complaint 'shall be freely given,"' Fed. R. Civ. P. 15(a), "[o]nce a case has progressed to the summary judgment stage . . . 'the liberal pleading standards . . . are inapplicable.") (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)).

Rule 16's good cause standard "primarily considers the diligence of the party seeking the amendment." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). If the moving party "was not diligent, the inquiry should end." *Id.* Moreover, while motions to add new parties (*see* Pls.' Mot. at 58–59) are generally construed under Rule 15(b), where a Plaintiff seeks to amend the pleadings after the time to do so in a scheduling order has passed, a Rule 21 motion is likewise governed by Rule 16(b)'s good cause standard. *See Johnson*, 975 F.2d at 608. This good cause standard is especially apt because the Parties previously represented to the Court they anticipated summary judgment briefing would fully resolve the claims in this case. *See* ECF No. 58; *see also Crawford v. Gould,* 56 F.3d 1162, 1168–69 (9th Cir. 1995) ("The present case did not go to trial; it was decided on motions for summary judgment. Therefore, the situation which Rule 15(b) addresses simply did not arise in the present case.").

Plaintiffs were plainly not diligent in raising their new First Amendment theories. To start, the First Amendment retaliation claim is a repackaged version of Plaintiffs' long-pled First Amendment viewpoint claim. *See* Pls.' Mot. at 29. Plaintiffs could have added it at any point since the case began. *See Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1398–99 (9th Cir. 1986) ("[L]ate amendments to assert new theories are not reviewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action.") (internal citations omitted). And Plaintiffs could have added a First Amendment association claim as to DOE when they sought leave to file the operative complaint, or shortly after the Court flagged the absence of a First Amendment claim as to DOE, before the parties stipulated away discovery. *See* 3rd Mem. Op.

Nor were Plaintiffs diligent in seeking to add three new named Plaintiffs. Plaintiffs seek to add Spinelli and Gansky as NIH representatives for the Viewpoint Discrimination Class. *See* Pls.' Mot. at 58–59. Plaintiffs contend this late addition is warranted because discovery in this case allegedly revealed "for

the first time," that the previous three representatives' claims—Horwitz, Voskuhl, and Van der Bliek—were not "typical of the Viewpoint Discrimination (former Equity Termination) Class" because they were researchers on grants that were terminated following findings of antisemitic bias at UCLA. *Id*. But Plaintiffs have known the NIH class representatives fell outside the Equity Termination Class since September 2025, because the Court's Second Preliminary Injunction Order expressly found "the record suggests that Horwitz, Voskuhl, and van der Bliek's grant funding was frozen not because of the subject matter of their research, but because NIH targeted UCLA, due to certain preferences it believed UCLA to be engaged in." *See* 2nd Mem. Op. at 25; *see also* Second Prelim. Inj. (excluding NIH from the Equity Termination Class). The Court also found Plaintiffs' First Amendment allegations made in its motion for emergency relief with respect to the NIH grant terminations were "not the First Amendment claim pled in the operative complaint." 2nd Mem. Op. at 25. In other words, Plaintiffs have known of this deficiency since at least September 2025—approximately ten months before summary judgment briefing began—but Plaintiffs never sought to add new class representatives as to NIH until just before briefing on final judgment and after discovery was foreclosed.

The same is true for DOE. Plaintiffs now seek to add Boettcher as a DOE class representative even though two DOE representatives already appear in the operative complaint. Plaintiffs offer no explanation for why Boettcher is needed as a class representative and appear to seek her addition solely to pursue a new, individual claim unrelated to class certification. *See* Pls.' Mot. at 39–40. That is not a proper basis for amendment at the summary judgment stage.

Plaintiffs contend the production of DOE's spreadsheet "provided Plaintiffs with the information necessary to connect with . . . Dr. Boettcher, for the first time." Pls.' Mot. at 59. That does not hold water. DOE's spreadsheet does not include Boettcher's associated grant, *see* DOE Stipulations, Ex. F(2), because the Parties expressly stipulated that the spreadsheet would exclude DOE "grants terminated or indefinitely suspended through the PRP process" in October 2025. DOE Stipulations, at 2. Nor, in any event, was Boettcher raised to Plaintiffs at all, let alone "for the first time," in discovery or with production of DOE's spreadsheet. Rather, Boettcher and his associated grant was raised last year, in Defendants' opposition to Plaintiffs' third motion for summary judgment. *See* ECF No. 165-1 at 5; ECF No. 165 at 15–18.

Courts routinely find that delays far shorter than Plaintiffs' seven-month delay defeat Rule 16's good-cause requirement. "Courts have held that waiting two months after discovering new facts to bring a motion to amend does not constitute diligence under Rule 16." *Sako v. Wells Fargo Bank, Nat'l Ass'n*, No. 14CV1034-GPC JMA, 2015 WL 5022326, at *2 (S.D. Cal. Aug. 24, 2015) (citing *Schwerdt v. Int'l Fidelity Ins. Co.,* 28 F. App'x 715, 719 (9th Cir. 2002) (delay of one month after learning of facts from a witness' deposition does not constitute diligence under Rule 16 in raising claim); *Experexchange, Inc. v. Doculex, Inc.,* No. C–08–3875 JCS, 2009 WL 3837275, at *29 (N.D. Cal. Nov. 16, 2009) (delay of two months after discovering new facts to file motion to amend and after fully briefed summary judgment motion did not meet the good cause standard under Rule 16)). Plaintiffs' delay is inexcusable, and they fail to satisfy Rule 16's good cause requirement.

**The Rule 15 Factors Are Not Met.** "If, and only if, the requisite good cause [Under Rule 16] is shown, the court then turns to an examination of the relevant factors under Rule 15." *Gupta v. Int'l Bus. Machines Corp. (IBM)*, No. 5:14-CV-01358-EJD, 2015 WL 9204348, at *1 (N.D. Cal. Dec. 17, 2015) (citing *Johnson*, 975 F.2d at 609 ("If th[e] party was not diligent, the inquiry should end.")). The relevant factors include: "(1) bad faith on the part of the movant; (2) undue delay; (3) prejudice to the opposing party; and (4) futility of the proposed amendment." *Ciampi v. City of Palo Alto*, No. 09-cv-2655-LHK, 2010 WL 5174013, at *2 (N.D. Cal. Dec. 15, 2010) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Because Plaintiffs cannot satisfy Rule 16, the Court need not reach Rule 15. But the Rule 15 factors further underscore that amendment is improper. First, for the reasons stated above, Plaintiffs have unduly delayed in adding new claims and parties. Plaintiffs could have added the new First Amendment retaliation claim since the beginning of this lawsuit; they could have added the First Amendment association claim with their request for leave to file the third amended complaint; they could have added the new NIH plaintiffs after the second preliminary injunction order was entered in this case; they could have added Boettcher before the scheduling order deadline. All told, Plaintiffs could have sought to add all of the new theories and plaintiffs before the deadline to file an amended complaint passed.

Allowing Plaintiffs to seek summary judgment on new claims and parties would significantly prejudice the Government. The parties' stipulations underscore this prejudice. The stipulations for the

non-DOE Defendants focus exclusively on the viewpoint-discrimination theory—stipulating, for purposes of summary judgment, that agencies selected grants expressing viewpoints they no longer wished to subsidize. *See* McLorg Decl., Exs. A–E. Likewise, the DOE stipulations focus on the equal-protection claim pleaded against DOE. *See* DOE Stipulations. These stipulations reflect the Parties' shared understanding of the claims in the case and were negotiated in reliance on the operative Complaint.

Introducing new First Amendment theories and three new named Plaintiffs at summary judgment, after discovery is foreclosed, would upend that reliance. Defendants had no opportunity to explore these claims or parties through discovery or to negotiate stipulations with these claims in mind. Plaintiffs' maneuver forces Defendants to confront final judgment on new merits arguments without the opportunity to build any record to rebut them.

***

In sum, the Court should disregard the new First Amendment theories and claims with respect to the three new named Plaintiffs, which Plaintiffs raise for the first time without prior notice, because "[a] Rule 56 motion is not 'a procedural second chance to flesh out inadequate pleadings.'" *Wasco Prods., Inc.*, 435 F.3d at 992 (citing *Fleming*, 922 F.2d at 24). Allowing Plaintiffs to amend their complaint long after the scheduling order deadline has passed, at the summary judgment stage, on claims that defendants were not provided advanced notice of and are precluded from seeking discovery on, would significantly prejudice Defendants. It would also reward strategic pleading. *See Skinner v. First Am. Bank of Va.*, 64 F.3d 659 n.2 (4th Cir. 1995) (table).

## II. Threshold Issues Require Granting Summary Judgment for Defendants

### A. Standard of Review

"If the court determines at any time that it lacks subject-matter jurisdiction," including at the summary judgment stage, "the court must dismiss the action." Fed. R. Civ. P. 12(h)(3); *see Herklotz v. Parkinson*, 848 F.3d 894, 899 (9th Cir. 2017) (challenges to subject matter jurisdiction may be raised at any point). "[T]he party seeking to invoke" jurisdiction bears the burden of proof in establishing it. *Rosenwald v. Kimberly-Clark Corp.*, 152 F.4th 1167, 1175 (9th Cir. 2025).

Summary judgment is appropriate only when the movant shows there is no genuine dispute of material fact and it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). In deciding whether to grant summary judgment, the Court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The moving party bears the burden of informing the Court of the basis for its motion and submitting evidence that demonstrates the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

**B. Plaintiffs Lack Standing**

**1. Plaintiffs Lack Standing Because They Are Not Parties to the Grants**

To establish Article III standing, a plaintiff must show: (i) an "injury in fact," that is, a violation of a legally protected interest that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (ii) a causal connection between the injury and the defendant's conduct such that the injury is "fairly . . . trace[able] to the challenged action"; and (iii) that it is "likely, as opposed to merely speculative that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). Each plaintiff "bears the burden of establishing these elements," and therefore "must clearly . . . allege facts demonstrating each." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted). The alleged injury in fact cannot be "speculative—meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). If the injury has not materialized, it must be "*certainly impending,*" and "[a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Critically, "standing is not dispensed in gross," and "'plaintiffs must demonstrate standing for each claim they press' against each defendant, 'and for each form of relief.'" *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (citation omitted). That bears particular emphasis in this context—for every claim, and every form of relief, against every defendant, Plaintiffs must demonstrate standing.

Plaintiffs lack standing to enforce the rights of nonparties to recover funding on grants and contracts. "[T]o establish standing to enforce" payment of a government contract, or any other terms, a plaintiff must show that they are party to the contract or an intended third-party beneficiary. *Edwards v.*

*Aurora Loan Servs., LLC,* 791 F. Supp. 2d 144, 150 (D.D.C. 2011); *see also Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat'l Ass'n*, 747 F.3d 44, 49 (2d Cir. 2014) (holding that plaintiff lacked prudential standing because it could not "enforce the terms of" an agreement "as to which it is neither a party nor a third-party beneficiary"); *Maher v. United States*, 314 F.3d 600, 605 (Fed. Cir. 2002) ("The remaining shareholders [who were nonparties to the contract] did not have standing to sue and were not intended third-party beneficiaries."); *cf. Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479–480 (2006) ("[W]e hold that a plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'").

Plaintiffs are not in privity with the government and lack rights under these contracts—they are neither parties nor intended third-party beneficiaries. They are instead researchers with faculty positions or academic appointments at UC-affiliated institutions. "Before a third party can recover under a contract, it must show that the contract was made for its direct benefit—that it is an intended beneficiary of the contract." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999) (discussing the federal common law of contract that governs when the United States is a party), *opinion amended on denial of reh'g*, 203 F.3d 1175 (9th Cir. 2000). Plaintiffs do not argue they are intended beneficiaries, nor could they. "[T]he third party must show that the contract reflects the express or implied intention of the parties to the contract to benefit the third party." *Id.* at 1211. Courts apply a "'clear intent' hurdle [which] is not satisfied by a contract's recitation of interested constituencies, vague, hortatory pronouncements, statements of purpose, explicit reference to a third party, or even a showing that the contract operates to the third parties' benefit and was entered into with them in mind." *Cnty. of Santa Clara v. Astra USA, Inc.*, 588 F.3d 1237, 1244 (9th Cir. 2009) (cleaned up), *rev'd on other grounds*, 563 U.S. 110 (2011). None of that is sufficient to make Plaintiffs intended third-party beneficiaries. *Id.*

In sum, Plaintiffs do not have "a legally protected interest" as project managers or principal investigators working for a nonparty who has received a federal award. *See Sardarian v. Fed. Emergency Mgmt. Agency*, No. 3:19-cv-00910 (OAW), 2022 WL 4080325, at *1–2 (D. Conn. Apr. 1, 2022). Lacking rights for themselves, Plaintiffs must show that they have third-party standing to enforce the rights of others—the recipients. But "litigants typically lack standing to assert the constitutional rights of third

parties," *United States v. Hansen*, 599 U.S. 762, 769 (2023). The exception permitting third party suits applies only when a plaintiff shows that: (1) it has "a 'close' relationship with the person who possesses the right" and (2) there is "a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (citation omitted). Plaintiffs do not attempt to make this showing.

Finally, to the extent that Plaintiffs attempt to allege that they will suffer harm in the future due to federal funding cuts, those allegations are too speculative to satisfy Article III standing. *See Clapper*, 568 U.S. at 409 (2013) (explaining that any allegation of "threatened injury must be *certainly impending*" (citation omitted)). The mere fact that Plaintiffs' employing institutions receive federal funding is not nearly "concrete and particularized" enough to challenge *specific* future funding decisions, nor the announcement of specific funding priorities. *See Lujan*, 504 U.S. at 560–561.

#### 2. Proposed Class Members Not Named as Principal Investigators or Project Leads Lack Standing

"Every class member must have Article III standing in order to recover individual damages," and "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C. J., concurring)). As the party invoking federal jurisdiction, Plaintiffs bear the burden of demonstrating they have standing. *See Lujan*, 504 U.S. at 561.

Plaintiffs have not met that burden for the proposed Department of Energy class. Unlike the three other proposed classes, that proposed class seeks to include "[a]ll University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system, who worked or were hired to work on a research grant or sub-award[.]" Pls.' Mot. at 44. Not all members of such a broad proposed class can demonstrate standing.

Such an expansive class undermines the Court's previous findings that Plaintiffs had standing in this case, which was predicated on a finding that Plaintiffs had a "personal stake" in the dispute because they had "lengthy research careers," were required "to prepare detailed grant applications laying out their planned multi-year research proposals," and that such research "represents their livelihood and their professional reputation." 1st Mem. Op. at 42.

Plaintiffs contend they have standing because they have "shown at least a 'substantial risk' that they will suffer economic harm" and other cognizable injuries including "reputational harm" and the expenditure of "time and resources seeking alternative sources of funding." *See* Pls.' Mot. at 19. But those allegations plainly do not apply to each class member of the Department of Energy class.

As an initial matter, Plaintiffs rely on an attorney's declaration that compiled interviews and emails from nonparties to define the DOE class and demonstrate standing. *See* Declaration of Claudia Polsky, ECF No. 212 ("Polsky Decl."), Exs. A–D. At summary judgment, a declaration must be based on personal knowledge. *See* Fed R. Civ. P. 56(c)(4). Declarations with impermissible hearsay are not admissible at summary judgment. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764 (9th Cir. 2002). Counsel's understanding of what nonparty researchers told them about others is not personal knowledge of who worked on a grant or how they were harmed, and the emails are inadmissible and should not be considered.

Putting those evidentiary issues aside, the underlying record shows that most proposed class members lack an actual injury with respect to the terminated grants. For instance, one email mentions a PhD student who got a job in industry after the termination of a DOE grant that he was merely *considering* being involved in after completing his PhD. *See* ECF No. 212-1 at 4. But it's unclear how this former student was harmed by the termination. *Id.* Rather, following the termination, the researcher chose to "focus hi [sic] studies more on other areas" and "his intention was always to pursue a job in industry upon completing his PhD." *Id.* Another listed researcher had already left the grant to become a professor before the grant's termination, *see id.*, and three others had not begun working on the terminated research grant at all, but were only "intended" to be added, *id.* at 4–5.

Even assuming an injury has been shown with respect to PhD students, post-doctoral students, or other employees not leading research projects, their injuries will not be redressed by a favorable decision. "To determine whether an injury is redressable, a court will consider the relationship between the judicial relief requested and the injury suffered." *California v. Texas*, 593 U.S. 659, 671 (2021) (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984)). No relationship exists here: many proposed class members are no longer at a UC school, having obtained jobs "in industry" or professorships at other academic institutions. *See* ECF No. 212-1–212-3. Others found alternative research projects. *See id.* Even with a

favorable ruling ordering reinstatement of the grants at issue, these individuals will not return to these projects, and the "judicial relief requested" by Plaintiffs would not provide a remedy. *California*, 593 U.S. at 671 (quoting *Allen*, 468 U.S. at 753 n.19).

### 3. Plaintiffs Lack Standing to Challenge Possible Future Terminations of Possible Future Grants

Plaintiffs seek relief from future grant terminations and seek to certify classes with respect to possible future terminations of possible future grants. *See* Compl. Prayer for Relief ¶ C (requesting an injunction to enjoin Defendants from "undertaking any similar violative action to terminate additional duly awarded agency grants"); Pls.' Mot. at 44–45. Beyond the fact that the phrase "any similar violative action" is vague and overbroad, Plaintiffs lack standing to challenge possible future injuries.

For Article III standing, "an injury must be concrete, particularized, and actual or imminent." *Clapper*, 568 U.S. at 409 (citation omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Id.* (quoting *Lujan*, 504 U.S. at 565 n.2). To that end, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Plaintiffs' forward-looking relief fails this test. While operating within the wide boundaries set by 2 C.F.R. § 200.340—and by dozens of potentially relevant agency regulations and appropriations statutes that may affect individual grant-termination decisions at individual agencies—government officials will be making "policy judgment[s] committed to the[ir] broad and legitimate discretion." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345 (2006) (citation omitted). "[C]ourts cannot presume either to control or to predict" the future exercise of that discretion. *Id.*; *see also, e.g.*, *NIH*, 145 S. Ct. at 2665–66 (Kavanaugh, J., concurring) (agreeing with the government that grant terminations are "highly discretionary decisions over how to allocate limited agency resources"). When it comes to making grant-termination decisions on an agency-by-agency, grant-by-grant basis, "[t]hese policy decisions might be made in different ways by the governing officials, depending on their perceptions of wise . . . policy and myriad other circumstances." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 614–615 (1989).

Perhaps agencies will award, and then terminate, the future grants that Plaintiffs are concerned about—though at least in the absence of another change in administration, it is hardly obvious why an agency would take that inefficient approach. Alternatively, the grants that Plaintiffs have in mind may not be awarded at all. Or perhaps those grants will be awarded but then retained. Or perhaps future grant terminations *will* be justified on the ground that a particular grant "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). But perhaps not. Either way, the Supreme Court has been "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment," *Clapper*, 568 U.S. at 413, but Plaintiffs would have this Court do exactly that.

Ultimately, if and when Plaintiffs face actual or imminent harm from the actual termination of an actual grant—rather than the hypothetical future termination of a hypothetical future grant—they can attempt to challenge the termination of that grant, in an appropriate forum. But in general, they do not "have standing to challenge [these] regulations in the absence of a live dispute over a concrete application of those regulations." *Summers v. Earth Island Inst.*, 555 U.S. 488, 490 (2009).

### C. The Tucker Act Precludes an APA Suit Asserting Grant-Termination Claims

This lawsuit contests grant terminations and seeks to reinstate those grant agreements (and thus pay the money allegedly owed to them). But the Tucker Act requires such claims to be brought in the Court of Federal Claims ("CFC"), not federal district court. *See United States* v. *Fausto*, 484 U.S. 439, 447 (1988); *see also Elgin* v. *Department of the Treasury*, 567 U.S. 1, 12 (2012).

Two statutes waiving sovereign immunity are at issue here: the APA and the Tucker Act. Under 5 U.S.C. § 702, the APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking non-monetary relief. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). That waiver only applies when "there is no other adequate remedy in a court." 5 U.S.C. § 704. Moreover, "[t]he APA's waiver of sovereign immunity does not apply," so long as "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) ("*California*") (per curiam) (quoting 5 U.S.C. § 702). The Tucker Act contains its own waiver of sovereign immunity. Congress consented to suit and granted "the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United

States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)); *see United States v. Mitchell*, 463 U.S. 206, 215 (1983) (recognizing the waiver of sovereign immunity). And Congress has expressly forbidden federal district courts from hearing contract claims against the United States exceeding $10,000 in value. *See* 28 U.S.C. § 1346(a)(2). Thus, the "Tucker Act both waives sovereign immunity for, and grants the Court of Federal Claims exclusive jurisdiction over, [certain] actions for money damages of more than $10,000." *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1121 (Fed. Cir. 2007). "With these limitations, the APA and the Tucker Act were understood to cover quite different challenges to Government action." *Id.* at 1122.

In determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act, courts consider "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought[.]" *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); s*ee, e.g., Crowley,* 38 F.4th at 1102 ("[T]he question is whether Crowley's suit against the GSA . . . is 'at its essence' contractual.") (quoting *Megapulse*, 672 F.2d at 968). Recent Supreme Court rulings confirm that Plaintiffs' claims contesting the grant terminations are, in essence, contract actions. *See California*, 604 U.S. at 651; *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025).

The Ninth Circuit held that Plaintiffs' arbitrary and capricious claim (Compl. Count VI), is "at its essence a contract action" and that the Tucker Act therefore precludes an APA suit. *Thakur*, 176 F.4th at 1197–99. The Ninth Circuit rejected Plaintiffs' argument that a different rule applies where, as here, the plaintiffs are not parties to the grant agreement and therefore lack standing in the Court of Federal Claims. *Id.* at 1199. Plaintiffs acknowledge that holding and do not try to distinguish it. *See* Pls.' Mot. at 42, 44–45. Instead, they seek only to preserve the issue and the Form Termination Class in case they later obtain relief from the Supreme Court.

The same logic compels the conclusion that Plaintiffs' purported constitutional claims and Plaintiffs' remaining APA claims likewise can be maintained, if at all, only in the Court of Federal Claims (Compl. Counts I–VI). These claims are equally premised on the notion that the Government is bound by a contractual obligation to provide funding—i.e., it is only through a government contract that a party claims entitlement to funds, and there is no statutory or constitutional entitlement to such monies. Because

the obligation for payment "is in the first instance dependent on the contract, these claims are contractually based" and thus may be heard, if at all, only in the CFC. *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 647 (9th Cir. 1998) (concluding district court lacked jurisdiction under the Tucker Act over constitutional due process claim because it was contractually based); *see also, e.g., Consol. Edison Co. of N.Y, Inc. v. U.S. Dep't of Energy*, 247 F.3d 1378, 1385–86 (Fed. Cir. 2001) (directing district court to transfer case sounding in contract but asserting constitutional claims to the COFC because the COFC "can supply an 'adequate remedy' to prevent the constitutional wrongs alleged by [plaintiff]").

The Tucker Act precludes an APA suit where the claim is, in essence, a contract claim, even when plaintiffs invoke another area of law to claim that a contract was terminated unlawfully. Claims brought under constitutional provisions can be, in essence, contract claims. *See Am. Libr. Ass'n v. Sonderling*, Civ. Case No. 25-1050 (RJL), 2025 WL 1615771, at *7 (D.D.C. June 6, 2025) ("The heart of these allegations is that defendants have failed to comply with Congress's statutory mandates for IMLS. However, the main mechanism through which defendants allegedly violated those mandates is by suspending and terminating grants . . . . [P]laintiffs' framing of their claims for relief under the APA and the Constitution do not necessarily take this case out of the ambit of the Tucker Act."). Were the rule otherwise, a plaintiff could evade the Tucker Act through artful pleading. Under the Supreme Court's recent precedents, as explained above, Plaintiffs bring contract claims, notwithstanding their invocation of constitutional provisions.

Of course, as noted above, Plaintiffs are not the contractual counterparties and thus likely cannot obtain relief in the CFC. *See Thakur*, 176 F.4th at 1199. But that simply means that the Tucker Act has *entirely* precluded relief for Plaintiffs' claims—and APA suits are barred where another statute "forbids the relief which is sought," 5 U.S.C. §702. Although that preclusion of relief makes this a merits defense rather than a jurisdictional one, *see Fausto*, 484 U.S. at 447; *compare Elgin*, 567 U.S. at 12, it is still no less mandatory and requires dismissal of Plaintiffs' claims here.

## III. Plaintiffs' Motion for Summary Judgment Should Be Denied, and Defendants' Motion Should Be Granted

### A. Summary Judgment Should Be Granted on Plaintiffs' APA Claims

To the extent that Plaintiffs' APA contrary to law claims are not precluded by the Tucker Act, they nonetheless fail at the threshold. First, Plaintiffs do not challenge a discrete final agency action. Second,

the allocation of appropriations is committed to agency discretion by law. Third, the agencies' actions were consistent with all applicable law.

### 1. Plaintiffs' Challenge to Future Grant Terminations Is Not a Final Agency Action

"[F]inal agency action" is a requirement for APA review. 5 U.S.C. § 704. Agency action requires a specific "rule, order, license, sanction, relief, or the equivalent." *Id.* § 551(13). It must be a "discrete" act, and a plaintiff may not bring a "broad programmatic attack." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). the Supreme Court has laid out a two-part test for finality, including that (1) "the action must mark the 'consummation' of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature[;]" and (2) "the action must be one by which 'rights or obligations have been determined,'" or from which "legal consequences will flow[.]" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).

Plaintiffs bring a broader challenge, seeking to enjoin Defendants under the APA "from cutting off agency and grantee access to congressionally appropriated funding" and from "undertaking any similar violative action to terminate additional duly awarded grants." *See* Compl. Prayer for Relief, at ¶ C. Broad relief into amorphous and speculative future grant terminations is definitionally a programmatic attack not based on the consummation of an agency's decisionmaking process. While each termination may eventually represent a final agency action, a plaintiff may not "in a single swipe at the duly elected executive" seek judicial superintendence over the entire grantmaking structure of the Executive Branch. *See Louisiana v. Biden*, 64 F.4th 674, 684 (5th Cir. 2023). Indeed, by Congressional ordering, the APA does not permit Plaintiffs to "seek *wholesale* improvement" of agency management "by court decree"—even in the face of allegations of "rampant" violations of law. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). "Because 'an on-going program or policy is not, in itself, a "final agency action" under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted). "Consequently, as each case only presents the court with a narrow question to resolve, [the court] can have no occasion to order wholesale reform." *Id.*

Accordingly, the Court should reject Plaintiffs' expansive APA challenge as being beyond the bounds Congress has set out for such review. Even if it does not wholly toss the claims, it should at least apply the APA only to finally terminated grants. And it should not exercise authority over speculative future terminations, as "[f]or [courts] to review [agency actions] not yet promulgated, the final form of which has only been hinted at, would be wholly novel." *EPA v. Brown*, 431 U.S. 99, 104 (1977).

Plaintiffs put forth no information to show that the possibility of future grant terminations is certainly impeding, or that they are injured with respect to future terminations. Plaintiffs do not "have standing to challenge [these] regulations in the absence of a live dispute over a concrete application of those regulations." *Summers*, 555 U.S. at 490.

**2. Grant Termination Decisions Are Committed to Agency Discretion by Law**

The APA's waiver of sovereign immunity does not apply where the relevant statute authorizing the grant programs at issue is "drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

The Supreme Court made clear in *Lincoln v. Vigil* that a decision to discontinue a previously funded program is committed to agency discretion by law under 5 U.S.C. § 701(a)(2), and is not reviewable under the APA. 508 U.S. 182, 193 (1993). The Court explained that there is no waiver of sovereign immunity where agency action requires "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including whether "resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all." *Id.* (citation omitted). An "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* Moreover, although *Lincoln* addressed lump-sum appropriations, courts have made clear that its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002).

The statutes at issue here underscore that administration of their grants is committed to the agency's discretion. For instance, Congress authorizes NSF to issue grants it "deems necessary to carry

out" its mission. 42 U.S.C. § 1870(c). To that end, NSF is given "discretion" to "utilize appropriations" however will "best realize" four congressional objectives. *Id.* § 1873(e). And it would be hard to find a statute that better encompasses committed to agency discretion by law than DOD's statute. The statute simply and clearly authorizes funding discretion: "Authorized means.—The Secretary of Defense or the Secretary of a military department *may* perform research and development projects—(1) by contract, cooperative agreement, or grant, in accordance with chapter 63 of title 31." 10 U.S.C. § 4001(b)(1) (emphasis added); *see also* 31 U.S.C. § 6301 *et seq.* (providing guidelines for how to manage funding). The use of the word "may" provides discretion as to whether funding for research and development projects shall be undertaken at all. *See Milk Train*, 310 F.3d at 751 ("Insofar as Congress has left to the Secretary's sole judgment the determination of the manner for providing assistance to dairy farmers, we hold that the district court lacked jurisdiction to review Milk Train's challenge.").

DOT has been granted similar discretion. "The Secretary *may*—(1) enter into grants and cooperative agreements with Federal agencies, State and local government agencies, other public entities, private organizations, and other persons to conduct research into transportation service and infrastructure assurance and to carry out other research activities of the Department of Transportation." 49 U.S.C. § 330(e)(1) (emphasis added). Congress provided broad discretionary funding authority.

The fact that a regulation provides for termination in accordance with agency priorities does not limit this discretion. Most directly, the agencies incorporate these regulations into "terms and conditions," 2 C.F.R. § 200.340, and the regulations are only effectuated once incorporated as terms in individual contracts—emphasizing the requirement for Court of Federal Claims, rather that district court, review. The mere creation of contractual funding cannot suddenly provide "law to apply" for purposes of defeating this exception. To the extent any such law is generated, it is contractual, an area of law entirely placed within the sphere of the Court of Federal Claims and outside this Court's review.

Putting that to the side, "the proper ordering of [agency] priorities" is precisely what the Supreme Court in *Lincoln* emphasized as being squarely committed to agency discretion by law in the funding context. 508 U.S. at 193 (citation omitted). The text of Section 200.340(a)(4) contemplates this discretion. Section 200.340 is stated in the present tense—allowing for termination "if an award *no longer* effectuates

the program goals or agency priorities" in the present. 2 C.F.R. § 200.340(a)(4) (emphasis added). As such, it expressly contemplates the possibility of significant changes to "agency priorities" over time—including, but not limited to, a change in Presidential administration. *Id.* Just as "Congress' use of a verb tense is significant in construing statutes," *United States v. Wilson*, 503 U.S. 329, 333 (1992), OMB's use of the present tense in (a)(4) is significant. By expressly contemplating shifting agency priorities, the regulation does not provide a standard for a reviewing Court to consider.

**3. Summary Judgment Should be Granted on Plaintiffs' Contrary to Law Claims**

Summary judgment should be granted to Defendants with respect to Plaintiffs' contrary to law claims. *See* Compl. Count V. Plaintiffs do not move for summary judgment with respect to these claims. *See* Pls.' Mot. at 1. Instead, Plaintiffs attempt to elevate their APA contrary to law claims as Constitutional "separation of powers" claims. *Id.* at 35–38. But Defendants have not violated any statutes by terminating the grants at issue here, let alone raised Constitutional concerns. *See infra* Part III.C.

Moreover, the allegations in the Complaint fail. The Complaint alleges a violation of the Impoundment Control Act ("ICA") because the agencies "refus[ed] to spend money that Congress appropriated." Compl. ¶ 747. But Plaintiffs lack a clause of action under the ICA, which is generally not enforceable through an APA suit. *See Gen. Land Off. of Tx. v. Biden*, 722 F. Supp. 3d 710, 734–735 (S.D. Tex. 2024); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981). Rather, that statute generally directs the President to notify Congress when he believes that appropriated funds should be rescinded, establishes procedures to ensure Congress may timely consider a bill to rescind such funds, and provides that funds contained in a notification "shall be made available for obligation" only once Congress fails to act on a rescission bill within 45 days after notification. *See generally* 2 U.S.C. §§ 683, 688. As the D.C. Circuit recently explained, that inter-branch framework provides no room for third parties like plaintiffs to seek judicial enforcement of the Executive Branch's asserted obligations. *See Global Health Council v. Trump*, 153 F.4th 1, 17–20 (D.C. Cir. 2025) ("[I]t does not make sense that the Congress would craft a complex scheme of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits to enforce the [ICA] at any time and without notice to the Congress of the alleged violation."), *denying reh'g en banc*, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025).

Even if the ICA is reviewable, the termination of grants is not an impoundment. Moreover, to the extent that Plaintiffs argue that the illegal impoundment comes from a failure to re-allocate funds elsewhere, that argument fails, because as explained below, Defendants have been subject to injunctions in this case requiring reinstatement of the grants and thereby preventing them from re-allocating funds. Moreover, the D.C. Circuit has explained that withholding funds within the bounds of a statutory or regulatory program does not qualify as an impoundment or a failure to make funds "available for obligation" under the statute. *Cf. Trump v. Sierra Club*, 588 U.S. 930 (2019) (granting stay of injunction pending appeal, including because "the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with" a statute governing the transfer of funds among appropriation accounts). Deferring expenditure of funds that are earmarked for certain grant programs, including because the agency needs time to locate a meritorious grantee, is permissible. *See City of New Haven v. United States*, 809 F.2d 900, 907 (D.C. Cir. 1987) (explaining how Congress has previously acknowledged that "the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year" and such delays may result from the "normal and orderly operation of the government" (quoting H.R. Rep. No. 93-658, at 41 (1971) *reprinted in* 1974 U.S.C.C.A.N. 3462, 3487)). Indeed, the alternative would be startling. If any termination of a contract violated the ICA, the Federal Government would be entirely disabled from ever reordering its funding affairs, or even cutting off funding to entities committing fraud, that have gone bankrupt, or any of the myriad instances where agencies must redirect funding. That is not what the ICA requires, and accordingly, Defendants have not violated it.

Plaintiffs also allege that "Defendants are violating the agencies' enabling statutes and other laws passed by Congress that include grant-making as a directive to the agencies." Compl. ¶ 750. But that fails to consider the relevant grantmaking statutes. The various statutory grantmaking schemes set forth considerations for agencies to utilize when making awards—but do not foreclose the use of policy priorities to terminate such awards, as Plaintiffs appear to suggest. As explained below, Defendants' terminations do not violate any of the statutes that Plaintiffs raise.

//

**B. Plaintiffs' Ultra Vires Claims Are Not Cognizable**

Beyond the APA, Plaintiffs assert a generalized "ultra vires" right to review Defendants' actions. *See* Compl. Counts I–IV. "Suits against the government are barred for lack of subject matter jurisdiction unless the government expressly and unequivocally waives its sovereign immunity." *E. V. v. Robinson*, 906 F.3d 1082, 1090 (9th Cir. 2018) (citation omitted).

The Supreme Court has "strictly limited" the scope of ultra vires review, reasoning that "ultra vires review could become an easy end-run around the limitations of . . . judicial-review statutes" like the APA. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025); *Id.* at 681–682 (noting than an ultra vires claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds" (citation omitted)). Ultra vires review outside the APA is only available when the invocation of authority not granted is "so extreme that one may view it as jurisdictional or nearly so." *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988). It is thus an equitable cause of action, fashioned by courts in the most limited of circumstances, to review whether an executive official is entirely outside the bounds of her authority.

In the Ninth Circuit, such an ultra vires claim is only cognizable when the defendant officials act so far outside the bounds of authority that the suit is effectively "not [a] suit[] against the sovereign." *E. V.*, 906 F.3d at 1090 (quoting *v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 688–689 (1949)). For non-constitutional claims, this occurs when the official acts wholly outside the bounds of authority, rather than merely being subject to "[a] claim of error in the exercise of [assigned] power." *Id.* at 1091 (cleaned up). For constitutional claims, the claims must assert that the officers acted pursuant to unconstitutional authority, or in an unconstitutional manner, such that "the conduct against which specific relief is sought is beyond the officer's powers and is, therefore, not the conduct of the sovereign." *See id.* (cleaned up).

Various issues bar Plaintiffs' ultra vires claims. First and foremost, such claims can only be brought against individual officers, not agencies, so no ultra vires claims can succeed against the latter. *Id.* (describing ultra vires as applying to "officers" sued in their official capacity). Second, the Ninth Circuit has specifically recognized that in the context of "breach of contract" ultra vires cannot succeed because "the relief sought in a suit nominally addressed to the officer is relief against the sovereign." *Id.* (quoting *Larson*, 337 U.S. at 684–687. And because the claims are effectively for breach of contract, that

bar applies here. *Larson*, 337 U.S. at 688 (dismissing due to sovereign immunity because the suit was "in substance, a suit against the Government over which the court, in the absence of consent, has no jurisdiction"). That, again, is the relief sought here—the continuation of government contracts requiring the payment of public funds, a classic remedy at law. Third, ultra vires relief developed as an equitable remedy to prevent the government from unlawfully acting upon a person—i.e., to prevent a certain restriction or enforcement action. *See, e.g.*, *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110–11 (1902). While it can be used by a plaintiff facing direct and immediate action by a government actor, this careful equitable tool is not designed for third parties to an allegedly unlawful action to intervene. Finally, it is subject to "implied statutory limitations," such as the Tucker Act. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–327 (2015). Because the Tucker Act shows "meaningful and adequate opportunity for judicial review," or "clear and convincing evidence that Congress intended to deny . . . District Court jurisdiction," ultra vires review is foreclosed. *See Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43–44 (1991).

Finally, ultra vires relief cannot be sought as to actions that have not occurred. *See Larson*, 337 U.S. at 702. The use of ultra vires review for relief regarding speculative future actions should be rejected.

**C. Plaintiffs' Separation of Powers Claims Fail**

Plaintiffs seek summary judgment on their separation of powers claims. *See* Compl. ¶¶ 717–723. Plaintiffs put forth two alternative theories of separation of powers violations. *See* Pls.' Mot. at 35–42. First, Plaintiffs claim (at 35) that all Defendants, except DOE, violated the separation of powers by terminating grants that were funded through Congressional appropriations for grantmaking generally. *Id.* at 35. In support of this supposed Constitutional issue, Plaintiffs list (at 37–38) several statutes authorizing DOT, NEH, and NIH to use funds for grantmaking. Then, perhaps realizing there is no across-the-board statutory violation where each terminated grant involves different authorizing statutes, Plaintiffs' next theory (at 38–42) of a violation of the separation of powers is limited to individual grant terminations. Plaintiffs fail to meet their burden to show a separation of powers violation.

As an initial matter, Plaintiffs' supposed constitutional claims are simply APA claims that an agency action was contrary to law or in excess of statutory authority. *See Dalton*, 511 U.S. at 472.

Tellingly, the statutes Plaintiffs contend are violated are the same statutes Plaintiffs previously raised in their contrary to law claims brought in preliminary injunction motions. *Compare* Pls.' Mot. at 37 *with* Mot. for Preliminary Injunction & Provisional Class Certification as to Additional Agency Defendants ("Pls.' 2nd PI Mot."), ECF No. 76, at 17 (both alleging a violation of 42 U.S.C. § 241); Pls.' Mot at 38–40 *with* Pls.' 3rd PI Mot., at 16–17 (both alleging violations of 42 U.S.C. § 16161a).

Plaintiffs attempt to "basically dress up a typical statutory-authority argument as an ultra vires claim," *Nuclear Regul. Comm'n*, 605 U.S. at 682, which the Supreme Court has foreclosed. In *Dalton v. Specter*, plaintiffs argued an executive action exceeded statutory authority and violated the separation of powers. 511 U.S. at 472. The Supreme Court held that claims alleging executive officials violated a statute are statutory claims, not constitutional claims, because not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* "[P]laintiffs would otherwise be able to avoid statutory limits on review by reframing any alleged statutory violation by the President as a constitutional one." *Glob. Health Council*, 153 F.4th at 14.

Plaintiffs' reliance (at 36) on *City and Country of San Francisco v. Trump* is unavailing. 897 F.3d 1225 (9th Cir. 2018). That case concerned an executive order purporting to impose sweeping funding conditions on all grants to sanctuary cities except those necessary for law enforcement. *Id.* It bears no relation here, where agencies selected individual awards for termination following a grant-by-grant review. Whether a particular grantmaking directive is violated is a question properly classified "a statutory one," *Dalton*, 511 U.S. at 474, to be brought under an APA contrary to law or excess of statutory authority claim, not a freestanding constitutional claim.

At any rate, Plaintiffs' theory fails. Its flawed conclusion rests on three propositions: first, that the grants were funded through appropriations for grantmaking; second, that the agencies' organic statutes included or contemplated grantmaking; and third, that the terminated funds had not been reallocated to other grantmaking programs. Pls.' Mot. at 37–38. But the mere fact that a statute allows an agency to make grants does not mean an agency acts contrary to law when it chooses to fund one grant over another or terminate a discretionary grant—much less contrary to the Constitution.

As to Plaintiffs' first proposition, Plaintiffs identify no Congressional directive to fund the particular grants with which they were involved. Rather, the grants at issue are funded through lump-sum appropriations for grantmaking. In those circumstances, the Supreme Court has held that the allocation of funds—and the termination of a discretionary grant—is permissible. *See Lincoln*, 508 U.S. at 192–93.

Plaintiffs' second proposition ignores the grantmaking statutes' broad language. The agencies exercise significant discretion in administering their grant programs and awarding grants. For instance, the authorizing statute for DOD grantmaking states "[t]he Secretary of Defense or the Secretary of a military department *may* perform research and development projects." 10 U.S.C. § 4001(b)(1) (emphasis added). And the authorizing statute for DOT similarly states that "The Secretary *may* . . . enter into grants and cooperative agreements . . . to conduct research into transportation service and infrastructure assurance." 49 U.S.C. § 330(e)(1) (emphasis added). Once again, Congress has provided broad, discretionary, funding authority. *See Lincoln*, 508 U.S. at 192–193. An agency's discretionary role in executing such statutory programs is a feature of the separation of powers, not a bug.

Plaintiffs' scattershot statutory and regulatory objections (at 37) cannot support a contrary to law claim, much less a Constitutional one. Plaintiffs contend NEH violated a statute that "authorize[s]" NEH to fund research that reflects ten broad standards, including the "diversity and richness of our American cultural heritage." 20 U.S.C. § 956(c)(4). The statutory text is permissive, not obligatory, and Plaintiffs do not identify any specific grant terminations that violate it. Plaintiffs next contend that NIH violated a statute directing it to "promote" research on several topics, including "prevention of physical and mental diseases and the impairments of man." 42 U.S.C. § 241(a). But Plaintiffs do not explain how any grant termination violated the statute's broad ideas. Plaintiffs' objections regarding DOT (at 38) also miss the mark. They cite to a statute outlining DOT's statutory purpose, citing to language stating that DOT is established to "stimulate technological advances in transportation." 49 U.S.C. §101(b)(4). But that broad statement does not require DOT to fund every transportation research grant.

Plaintiffs (at 38) also cite several other statutes and regulations, with no explanation as to how they are violated. This includes 31 U.S.C. § 6305, which lays out when an agency should use a cooperative agreement rather than a procurement contract as a legal instrument, and two regulations stating that NIH

agency regulations apply to research grants (42 C.F.R. §§ 52.1, 66.101). Plaintiffs do not show how these provisions are relevant, let alone violated.

Finally, Plaintiffs' third proposition in support of their claim is misleading. NSF, NEH, DOD, DOT, and NIH have not reallocated the funds for the terminated grants because these Defendants have been subject to preliminary injunctions in this case *requiring reinstatement and thereby preventing them from re-allocating the funds*. Using this fact to find a Constitutional violation, as Plaintiffs attempt to do (at 37–38) would punish the agencies for complying with the Court's orders. And even if the agencies could reallocate the funds at issue here to other grants they deem meritorious, reallocating funds from those grants to a new grantee within the bounds of a statutory or regulatory program does not qualify as an impoundment or a failure to make funds "available for obligation" under the statute. *Cf. Trump v. Sierra Club*, 588 U.S. 930 (2019) (granting stay of injunction pending appeal, including because "the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with" a statute governing the transfer of funds among appropriation accounts). Deferring expenditure of funds that are earmarked for certain grant programs, including because the agency needs time to locate a meritorious grantee, is permissible. *See City of New Haven*, 809 F.2d at 907 (explaining how Congress has previously acknowledged that "the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year" and such delays may result from the "normal and orderly operation of the government" (quoting H.R. Rep. No. 93-658, at 41). Plaintiffs' general separation of powers claims fail.

**Individualized Challenges.** Separately, Plaintiffs (at 38) raise separation of powers claims as to certain individual grants. Defendants received no prior notice that Plaintiffs would be seeking individual judgment on particular grants in this case, as Plaintiffs' Complaint disclaims any request for non-class relief. *See* Compl. ¶ 74 (stating that named Plaintiffs "bring this action as a class action for declaratory and injunctive relief pursuant to Federal Rule of Civil Procedure 23(a)(1)-(4) and 23(b)(2)") & ¶ 81 ("Because the claims of the Plaintiff Class members share common issues of law and fact, they will not require individualized determinations of the circumstances of any plaintiff, and satisfy Rule 23(a)(2) for purposes of the requested declaratory and injunctive relief.").

Plaintiffs' individualized theories (at 38) recycle the same contrary to law statutory authority violations Plaintiffs previously brought. Specifically, Plaintiffs claim that DOE, DOT, and NIH violated the separation of powers by terminating competitive grants, in violation of various statutes.

**DOT.** Plaintiffs contend (at 40–41) that DOT violated three statutes by terminating a National University Transportation Center ("UTC") grant at UC Davis, and a Regional UTC grant at University of Southern California ("USC"). They first claim DOT violated 49 U.S.C. § 5505(c)(2)(A) because the UC Davis UTC grant—one of five national transportation center grants—was terminated and its funds were not reallocated, thereby, according to Plaintiffs, violating "the express directive to fund five national transportation centers." That is misleading. DOT did not terminate funding to the four other national transportation centers.[3] And DOT has not re-allocated funding to a different, fifth national transportation center *because it is subject to an injunction in this case requiring reinstatement of funding to the UC Davis UTC*. *See* Second Prelim. Inj.; *see also* McLorg Decl., ¶ 5, Ex. B(1). Because DOT is precluded from re-allocating its funding, it cannot select a new center, and accepting Plaintiffs' contention would punish DOT for following the law. Moreover, if Plaintiffs' argument is that DOT must *always* fund five UTCs at any given time, DOT would never be able to reallocate funding or select new UTCs (since that would result in, at a particular time, four or six funded UTCs, depending on how the grants were structured). Congress imposed no such restriction, and this Court ought not create one from whole cloth.

Plaintiffs' contention (at 41) that the USC UTC grant termination violates 49 U.S.C. § 5505(c)(3) misses the mark. That statute directs DOT to fund ten regional transportation centers, and DOT did not terminate funding to eight of those centers.[4] As stated above, DOT is subject to the injunction in this case which required reinstatement of the USC UTC grant and prevented DOT from re-allocating funding.[5] To be sure, in May 2025, DOT also terminated a regional transportation center located in "Region 2," which

---

[3] U.S. Dep't of Transp., IIJA Centers & Grantees, https://www.transportation.gov/utc/iija-centers-and-grantees#National (last visited Aug. 21, 2026).

[4] U.S. Dep't of Transp., IIJA Centers & Grantees, https://www.transportation.gov/utc/iija-centers-and-grantees#Regional (last visited Aug. 21, 2026).

[5] *Id.*

does not include California.[6] But in December 2025, DOT issued a Notice of Funding Opportunity ("NOFO") soliciting applications to fund a new center in that region, showing DOT's intent to continue to fund ten centers.[7]

Finally, Plaintiffs allege (at 41–42) that terminating the UC Davis UTC violated 49 U.S.C. § 6503(c)(1). But that statute does not authorize a grantmaking program; rather, it directs the Secretary of Transportation to develop a 5-year plan to fund federal transportation research, and specifies the plan should further several different purposes, including "preserving the environment." Nothing in the statute says that DOT must select *every* grant that may involve *any* purpose articulated in the plan. And to the extent that Plaintiffs contend that the Secretary failed to develop such a plan, that contention fails. DOT recently issued a request for information with respect to its next five-year strategic plan.[8]

**NIH.** For the first time, as to new named plaintiff Gansky, Plaintiffs contend a 2021 Appropriations Act violation. *See* Pls.' Mot. at 42. According to Plaintiffs, this Act requires the National Institute on Minority Health and Health Disparities ("NIMHD") within NIH "to award funds to 11 research institutions and one research coordinating center." ECF No. 210 at 42. But the Appropriations Act does not say this at all. Rather, it generally provides $390 million to NIMH "[f]or carrying out section 301 and title IV of the PHS Act with respect to minority health and health disparities research." *See* PL 116-260, December 27, 2020, 134 Stat 1182. Plaintiffs fail to show a statutory or a Constitutional violation.

**DOE.** Plaintiffs (at 38–40) allege three statutory violations as to DOE. Plaintiffs first claim that DOE violated 42 U.S.C. § 16298d(j)(2)(A), which directs DOE to "establish a program under which the Secretary shall provide funding for eligible projects that contribute to the development of 4 regional [Direct Air Capture ("DAC")] hubs." Plaintiffs claim that the decision to terminate the "Community

---

[6] *Id.*

[7] University Transportation Centers Program, *FY 2025 Notice of Funding Opportunity*, https://www.transportation.gov/sites/dot.gov/files/2025-12/2025%20UTC%20NOFO.pdf (last visited Aug. 21, 2026).

[8] Federal Register, Transportation Research & Development Strategic Plan; Request for Information, Docket No. DOT-OST-2025-2085 (Jan. 13, 2026), https://www.federalregister.gov/documents/2026/01/13/2026-00455/transportation-research-and-development-strategic-plan-request-for-information (last visited Aug. 21, 2026).

Alliance for Direct Air Capture" ("CALDAC") project Bedsworth was involved in violates this statutory directive. That is wrong. The CALDAC project, which is not mentioned in the statute, explored whether a "community-led" DAC hub could be built in California. 1st Decl. of Louise Bedsworth, ECF No. 157, at ¶¶ 8–12. It was one of many projects funded under the program, and sixteen other projects supporting the development of DAC hubs were also awarded by the Office of Fossil Energy and Carbon Management under the grant program.[9] Four of these awards were not subject to a termination notice, and three awards that received a termination notice are subject to ongoing internal dispute resolution or administrative appeal processes.[10] Moreover, two additional DAC hubs awarded by OCED under this program have not been terminated.[11] DOE has not acted contrary to law—much less violated the Constitution—by terminating one project under the grant program.

Plaintiffs next allege (at 39) that DOE violated 42 U.S.C. § 16161a(c)(2–3), which directs the Secretary to fund four "regional clean hydrogen hubs," including one hub demonstrating production of "clean hydrogen from renewable energy." Plaintiffs contend the terminations of the ARCHES hydrogen hub and the Pacific Northwest Hydrogen Hub violate these statutes. *Id.*

To the extent Plaintiffs purport to challenge the termination, or seek reinstatement, of the Pacific Northwest Hydrogen Hub grant, they lack standing to do so because they do not show that Atanassov or any named plaintiff is involved with the grant. *See* Pls.' Br. at 39; *see also* 1st Decl. of Plamen Atanassov, ECF No. 160; 2nd Decl. of Plamen Atanassov, ECF No. 213.

---

[9] *See* U.S. Dep't Energy, *DOE Project Selections for Funding Opportunity Announcement 2735: Regional Direct Air Capture Hubs*, https://www.energy.gov/hgeo/project-selections-foa-2735-regional-direct-air-capture-hubs-topic-area-1-feasibility-and (last visited Aug. 21, 2026).

[10] *See* USASpending.gov, https://www.usaspending.gov/award/ASST_NON_DEFE0032387_089; and three other awards available at USASpending.gov with award numbers DEFE0032385; DEFE0032391; DEFE0032392.

[11] *See* U.S. Dep't Energy, Award Announcement for Regional Direct Air Capture (DAC) Hubs Program – South Texas DAC Hub, https://www.energy.gov/cmei/oced/articles/award-wednesdays-september-12-2024; U.S. Dep't Energy, OCED Issues $50M to Direct Air Capture Hub Project Cypress, https://www.energy.gov/cmei/oced/articles/oced-issues-50m-direct-air-capture-hub-project-cypress. The active budget periods for these awards expired at the end of May and June 2026, and awardees are awaiting no-cost time extension approvals. *See* USASpending.gov, https://www.usaspending.gov/award/ASST_NON_DECD0000020_089; *see also* USASpending.gov https://www.usaspending.gov/award/ASST_NON_DECD0000021_089 (all last visited Aug. 21, 2026).

Regardless, DOE has not violated 42 U.S.C. § 16161a(c)(2–3) because it selected, and continues to fund, five regional clean hydrogen hubs, nearly all of which proposed to demonstrate production of clean hydrogen from renewable energy. First, and as selected by DOE, the Heartland Hydrogen Hub included a project by Xcel Energy that would "utilize renewable-powered electrolysis to produce hydrogen."[12] Likewise, the Appalachian Hydrogen Hub included a project by Fidelis New Energy to "produce clean hydrogen via autothermal reforming of natural gas and biomass with carbon capture" to power a data center, and a project by Empire Diversified Energy to "produce hydrogen from anaerobically digested food waste . . . to convert biomass into clean hydrogen for transportation and industrial uses."[13] Similarly, the Mid-Atlantic Hydrogen Hub included plans for clean hydrogen production "using electrolysis powered by renewable [and] nuclear energy."[14] The Gulf Coast Hydrogen Hub also proposed electrolysis projects to produce clean hydrogen from renewable energy sources.[15] These hydrogen hubs are major infrastructure projects requiring multiple years of planning and development, and DOE and awardees continue to discuss the planned components of each hub.

DOE has satisfied any obligation to select at least one hub that "demonstrate[s] the production of clean hydrogen from renewable energy[.]" 42 U.S.C. § 16161a(c)(3)(A). Moreover, there is no statutory requirement that ARCHES or the Pacific Northwest Hub be specifically funded—indeed, these projects are not mentioned in the statute—nor is there a requirement that DOE must fund a hub that runs entirely on renewable energy.

---

[12] *See* Heartland Hydrogen Hub, *Xcel Energy*, https://www.heartlandh2hub.com/projects/xcel-energy-clean-energy-h2-project/ (last visited Aug. 21, 2026).

[13] *See* U.S. Dep't Energy, *Regional Clean Hydrogen Hubs Program – Appalachian Hydrogen Hub (ARCH2)*, https://www.energy.gov/sites/default/files/2024-07/H2Hubs%20Appalachian%20Factsheet%20Booklet_update.pdf (last visited Aug. 21, 2026).

[14] *See* U.S. Dep't Energy, *Hydrogen Program Libraries*, https://www.hydrogen.energy.gov/docs/hydrogenprogramlibraries/pdfs/review24/oced006_colella_2024_o.pdf (last visited Aug. 21, 2026).

[15] *See* U.S. Dep't Energy, *OCED Gulf Coast Hydrogen Hub Community Briefing*, https://www.energy.gov/sites/default/files/2024-12/Gulf%20Coast%20Phase%201%20Award%20Briefing_FINAL.pdf (last visited Aug. 21, 2026).

Finally, Plaintiffs claim—for the first time—that DOE violated 42 U.S.C. § 16161d, which directs DOE to establish a program to "reduce the cost of producing clean hydrogen using electrolyzers" and to award competitive grants to eligible entities, by terminating the grant that the new proposed Plaintiff, Boettcher, worked on. This claim fails for the same reasons as the other alleged statutory violations. The statute does not require DOE to fund Boettcher's project or mention the project. Moreover, sixteen other grant projects remain were never terminated and remain funded under the grant program.[16] Therefore, the Secretary continues to fund competitive projects which "the Secretary determines would provide the greatest progress toward achieving the goal of the program." 42 U.S.C. § 16161d(f)(1).

All told, there is no overarching separation of powers violation where agencies terminated discretionary grants funded by appropriations to support general grantmaking, nor are there any individual statutory violations. Plaintiffs' claim fails.

### D. Plaintiffs' First Amendment Viewpoint Discrimination Claims Fail

Defendants acknowledge that the Ninth Circuit, at the preliminary injunction stage, concluded the government was unlikely to succeed in arguing that it may terminate grants simply because it disagrees with the viewpoints those grants express. *See Thakur*, 176 F.4th at 1199–1200. The government has sought certiorari to review that ruling, *see Trump v. Thakur*, No. 26-210 (S. Ct. filed Aug. 18, 2026), and Defendants intend to file a motion to stay briefing in this case pending resolution of the government's petition for a writ of certiorari and any further proceedings in the Supreme Court. Defendants respectfully raise and preserve their argument that the First Amendment does not apply in the competitive grantmaking context, which pertains to government's sponsorship of speech—not regulation of it.

"The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest . . . [i]n so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the

---

[16] *See, e.g.,* USASpending.gov, https://www.usaspending.gov/award/ASST_NON_DEEE0011302_089, and fifteen other awards available at USAspending.gov with award numbers DEEE0011305; DEEE0011314; DEEE0011316; DEEE0011318; DEEE0011320; DEEE0011321; DEEE0011323; DEEE0011325; DEEE0011329; DEEE0011331; DEEE0011333; DEEE0011334; DEEE0011335; DEEE0011336; DEEE0011339.

other." *Rust*, 500 U.S. at 193. Thus, *Rust* held that when awarding competitive grants for family-planning programs, the government could decline to fund programs that encouraged abortion as a method of family planning while funding those that encouraged carrying a pregnancy to term. *See id.* at 192–200. And *NEA v. Finley* held that, when awarding competitive grants to artists, the government could consider "general standards of decency and respect." 524 U.S. 569, 576 (1998); *see id.* at 580–588. By the same token, the First Amendment does not prohibit the government from declining to award competitive grants that fund research projects promoting DEI.

To be sure, while the government may "specify the activities [it] wants to subsidize[,]"it cannot "leverage funding to regulate speech *outside* the contours of the programs itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* ("*AID*"), 570 U.S. 205, 214-215 (2013) (emphasis added). For example, limitations on the use of federal funds for a specific purpose—such as "promot[ing] or advocat[ing] [for] the legalization or practice of prostitution or sex trafficking"—is constitutionally permissible, *id.* at 217-18 (citation omitted), but outright conditioning federal funds on a pledge to a policy "explicitly opposing prostitution and sex trafficking" is not, *id.* at 221 (citation omitted). The latter amounts to an unconstitutional condition because it regulates speech even on the recipients' "own time and dime." *Id.* at 218–219. This critical distinction decides the present case.

Plaintiffs do not base their First Amendment claims on speech outside of the federally funded activities on their own time and dime. Rather, their First Amendment argument is tied to the topics of the grants—alleging that the grants themselves cover certain viewpoints and content that the agencies have decided that they no longer wish to promote. *See* Pls.' Mot. at 20. As Plaintiffs allege, "Defendants terminated many grants based on the recipients' (presumed) viewpoint *as reflected in the subject matter of their research*." Compl. ¶ 728 (emphasis added). Nowhere have Plaintiffs alleged (much less shown) that their grants were terminated because of their speech outside the funded program.

In short, what Plaintiffs allege does not impose an unconstitutional condition on Plaintiffs' speech or amount to viewpoint discrimination; rather, as permitted under *Rust* and *Finley*, the terminations align the government's sponsorship of activities with its policy priorities. In so doing, the terminations do not seek to regulate a grantee's speech "outside the contours of" any such policy initiatives—i.e., they do not

prohibit entities from engaging in protected speech on their "own time and dime." *AID*, 570 U.S. at 218. The Supreme Court has repeatedly held that the government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it. *See, e.g.*, *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that government "is not required to assist others in funding the expression of particular ideas[]"); *United States v. Am. Libr. Ass'n*, 539 U.S. 194, 212 (2003) (plurality op.) (holding that a "decision not to subsidize the exercise of a fundamental right does not infringe the right" (quoting *Rust*, 500 U.S. at 193)); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) ("[The Government] is not required to subsidize First Amendment rights[.]"). Simply put, the government is permitted to have policy priorities, and it does not violate the First Amendment by not funding awards that are out of alignment with those policies.

In support of their challenge, Plaintiffs (at 20–22) primarily invoke *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 828–829 (1995). But *Rosenberger* is inapposite; there, the Supreme Court applied a "framework" developed to address situations where the government creates a "limited public forum" for speech, in which the government may impose reasonable content-based restrictions but "must respect the lawful boundaries it has itself set" and may not "discriminate against speech on the basis of its viewpoint." *Id.* at 829. The Court viewed a student activities fund as a "metaphysical" forum for speech because the university "expend[ed] funds to encourage a diversity of views from private speakers" and to provide "'a wide range of opportunities' for its students" in order to "'enhance the University environment.'" *Id.* at 824, 830, 834. That framework is inapplicable to the highly selective grant program at issue here, which does not seek to encourage a diversity of views. Unlike with subsidies generally available to all comers, when the government decides to "selectively fund a program," it may choose programs that advance its policy goals and reject programs that do not. *Finley*, 524 U.S. at 588 (quoting *Rust*, 500 U.S. at 193).

The Ninth Circuit's reliance on *Rosenberger* was especially misplaced in light of the Supreme Court's subsequent decision in *Finley*, which expressly held that the Ninth Circuit there had erred in applying the public-forum analysis in *Rosenberger* to the competitive-grant context at issue there (and here). *See* 524 U.S. at 586 (reliance on *Rosenberger* is "misplaced" in cases involving "competitive

process" for grants); *id.* at 599 (Scalia, J., concurring in the judgment) (the "granting of highly selective (if not highly discriminating) awards bears no resemblance" to the "limited public forum" in *Rosenberger*). In relying on *Rosenberger*, the Ninth Circuit at the PI stage thus repeated the same error it made in *Finley* itself.

In sum, the Federal Government may choose how it wishes to promote certain policy priorities within the bounds of the First Amendment. As *Rust, Finley*, and other related cases establish, considering the content of a grant is well within the bounds of the Government's discretion.

**E. Plaintiffs' First Amendment Retaliation Claims Fail**

As stated above, Plaintiffs did not plead a First Amendment retaliation claim and should not be allowed to raise this for the first time on summary judgment. *See Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 870 (9th Cir. 2016) (retaliation is asserted *where the complaint* "alleges plausible circumstances connecting the defendant's retaliatory intent to the suppressive conduct.").

Moreover, their retaliation claim fails because Plaintiffs, as nongrantees, lack standing to bring it. Plaintiffs seemingly seek to vindicate a claim on behalf of the grantees (i.e. the UC and its institutions) rather than themselves as researchers, framing the retaliation as an action taken against the universities as the grantees.

Even if they had standing, Plaintiffs' retaliation claims fail on the merits. A plaintiff bringing a retaliation claim must establish that she engaged in protected activity, suffered an adverse action that would chill a person of "ordinary firmness," and the protected activity was a substantial or motivating factor in the adverse action. *See Ariz. Students' Ass'n*, 824 F.3d at 867–868. As to the third prong, the Supreme Court has emphasized that "a plaintiff pursuing a First Amendment retaliation claim must show, among other things, that the government took an 'adverse action' in response to his speech that 'would not have been taken absent the retaliatory motive.'" *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019)). In other words, the government's retaliatory motive must be a "but-for cause," "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves*, 587 U.S. at 399.

Plaintiffs' retaliation claims fail on all three prongs. To start, an entitlement to federally funded research is not protected speech under the First Amendment. As the Court explained in *Finley*, no First Amendment concern exists even though, "as a practical matter, [government-funding recipients] may conform their speech to what they believe to be the decisionmaking criteria in order to acquire funding." *Finley*, 524 U.S. at 589. When the government acts "as patron," it does not infringe on constitutionally protected speech even when it articulates funding standards with "imprecision." *Id.*; *see also id.* at 599 (Scalia, J., concurring) ("Insofar as it bears upon First Amendment concerns, the vagueness doctrine addresses the problems that arise from government *regulation* of expressive conduct . . . not government grant programs." (citation omitted)).

As to the second prong, Plaintiffs do not meet their evidentiary burden at the summary judgment stage to show that the grant recipients (i.e., the universities) were chilled as a result of the cuts to funding. *See* Compl. Indeed, Plaintiffs do not show how their own speech was chilled; rather, they offer only a legal conclusion as to chilling, without any concrete facts. *See* Pls.' Mot. at 29–30.

Plaintiffs also fail to meet their burden to identify facts showing that the government acted with a retaliatory motive—i.e., that the grant terminations "would not have been taken absent the retaliatory motive." *Houston Cmty. Coll. Sys.*, 595 U.S. at 477 (citing *Nieves*, 587 U.S. at 399). Indeed, accepting the third prong as true would contradict Plaintiffs' arguments with respect to their viewpoint discrimination theory. Plaintiffs' own framing defeats their theory: Plaintiffs repeatedly argue the government ended these grants because it no longer wished to subsidize the viewpoints expressed in the research, not that it retaliated against those viewpoints. By contrast, a retaliation claim requires showing the government acted to punish speakers for their protected expression and would not have terminated grants "absent a retaliatory motive." *Houston*, 595 U.S. at 477. But here, the government's keyword review process shows they terminated grants based on the viewpoints expressed, regardless of the speakers. Plaintiffs improperly conflate terminating based on viewpoint with retaliation.

Moreover, claims alleging retaliation against a government contractor for protected speech are governed by the balancing test announced in *Pickering v. Board*, which weighs the "interests of the [contractor], as a citizen, in commenting upon matters of public concern and the interest of the State, as

[a contracting entity], in promoting the efficiency of the public services it performs through its [contractors]." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563, 568 (1968). And "absent contractual, statutory, or constitutional restriction, the government is entitled to terminate [a contractor] for no reason at all." *Bd. of Cnty. Comm'r v. Umbehr*, 518 U.S. at 668, 674 (1996). The government's interests here outweigh any interests Plaintiffs may have.

**F. Plaintiffs' First Amendment Association Claims Fail**

For the first time, Plaintiffs allege that DOE targeted grantees based on their political association by terminating grants in October 2025. *See* 3rd Mem. Op. at 9 n.10. Plaintiffs' contention repackages their equal protection claims with respect to DOE and is unsupported by evidence.

A political-association claim ordinarily requires showing an action was taken because of the claimant's actual political affiliation or activity. *See Rutan v. Republican Party*, 497 U.S. 62 (1990). Yet Plaintiffs put forward no facts to show the grantees' political party affiliations were considered, and none of the cases they rely on equate location with protected political association.

DOE stipulated that the inclusion of grants in an October 2025 tranche of termination notices was based "solely" on "the recipient location," namely, the state electoral outcome in that location and the political affiliation of the U.S. Senators representing that location. DOE Stipulations, at 5 (Stip No. 9). It further agreed that its differential treatment in the October 2025 terminations did not consider a grant's alignment with "DOE's past or current agency priorities." *Id.* (Stip No. 10). There is no stipulation or evidence that the termination decisions were based on a grantee's political affiliation or even perceived affiliation; it was based on location. Thus, grantees who may have been affiliated with the Democratic party but were located in so-called "Red States" did not have their grants terminated, and vice versa. Plaintiffs have not put forward facts to show that grantee affiliation was considered; in fact, the stipulated facts in this case contradict this. *See id.* (Stip No. 9).

Plaintiffs' reference (at 30) to *American Council of Learned Societies v. National Endowment for the Humanities ("ACLS"),* Nos. 25-cv-3657(CM) & 25-cv-3923(CM), 2026 WL 1256545 (S.D.N.Y. May 7, 2026),[17] is unavailing. That case involves challenges to the NEH grant terminations at issue here, where

[17] *Appeals filed sub nom., The Authors Guild v. National Endowment for the Humanities* (2d Cir.

the grants' viewpoints did not align with agency priorities; *ACLS* did not involve termination of grants based on geography. But Plaintiffs do not allege a First Amendment association claim as to NEH. By contrast, here, the parties agreed that DOE's differential treatment in October 2025 was not based on whether a grant's expressed viewpoint aligned with DOE agency priorities. *See* Pls.' Mot. at 30.

Nor does strict scrutiny apply here, as Plaintiffs contend. Government funding decisions do not trigger strict scrutiny absent compelled or prohibited private expression. *See Finley*, 524 U.S. at 589. As stated above, government funding decisions do not implicate the First Amendment. *See id.* And the cases Plaintiffs rely on for the proposition that strict scrutiny applies are inapposite because they both involved government actions prohibiting expression. *See* Pls.' Mot. at 30 (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) & *Reed v. Town of Gilbert*, *Ariz*., 576 U.S. 155, 163–164 (2015)).

### G. Plaintiffs' Fifth Amendment Equal Protection Claims Fail

Summary judgment should be entered for Defendants on Plaintiffs' equal protection claims. As Plaintiffs acknowledge, challenges to federal grant terminations are subject only to rational basis review. *See* Pls.' Mot. at 32. Under that standard, the "policy choices of the political branches" carry "'a strong presumption of validity.'" *Sanchez v. Off. of State Supt. of Educ.*, 45 F.4th 388, 395 (D.C. Cir. 2022) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–315 (1993)). Plaintiffs must show that "no conceivable set of facts could support the challenged policy." *Id.* at 395–396. The government's action is constitutional so long as it is "plausibly related to the Government's stated objective[.]" *Trump v. Hawaii*, 585 U.S. 667, 704–705 (2018).

DOE's termination of 284 grants located in so-called "Blue States" readily survives rational basis review. These grants were terminated only after DOE conducted individualized reviews and determined that each award was inconsistent with federal law or with the Administration's policies, priorities, or program goals. *See* DOE Stipulations at 4 (Stip. Nos. 1–3).

.

---

July 8, 2026); *American Council of Learned Societies v. McDonald* (2d Cir. July 8, 2026) and *American Council of Learned Societies v. McDonald* (2d Cir. July 22, 2026).

In May 2025, DOE began a comprehensive review of over 2,000 existing awards to ensure that each was "financially sound and economically viable, aligned with national and economic security interests, and consistent with Federal law and this Administration's policies and priorities and program goals[.]" *Id.*; *see also* PRP Policy. The evaluation did not consider the political identity of the grant recipient's state. *See* DOE Stipulations at 6 (Stip. No. 11). The evaluation did not consider the political identity of the grant recipient's state. *Id.* Through this review, DOE selected 624 grants across the country for potential termination because each failed one or more of those criteria. *See id.* at 4 (Stip. No. 3).

On October 1 and 2, 2025, DOE terminated 284 grants from that 624-grant list. Terminating a subset of grants already identified as inconsistent with federal law or program priorities reflects a legitimate governmental interest in administering federal programs in accordance with priorities set by a democratically elected administration. As the Supreme Court has recognized, "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting in part), *cited favorably in Biden v. Texas*, 597 U.S. 785, 812 (2022). DOE also acted pursuant to its contractual authority under 2 C.F.R. § 200.340(a)(4) to terminate awards that "no longer effectuate[] the program goals or agency priorities."

DOE explained the basis for each termination. *See, e.g.*, *Thakur v. Trump*, 823 F. Supp. 3d 974, 981 (N.D. Cal. 2026) (citing First Atanassov Decl., Ex. E, ECF No. 158-5) (terminating award because it "does not effectuate the Department of Energy's priorities of ensuring affordable, reliable, and abundant energy to meet growing demand and/or addresses the national emergency declared pursuant to Executive Order 14156"). These are rational reasons to terminate grant funding, and the ultimate decision to terminate these grants was not based exclusively on geographic considerations. Rather, each grant had already been identified for termination based on individualized, policy-based reasons. *See* DOE Stipulations at 4 (Stip. Nos. 1–3); *see also* PRP Policy.

DOE's decision in October 2025 to terminate only 284 grants, rather than all 624, solely based on the location of the grant project, survives rational-basis scrutiny. DOE was not constitutionally required

to terminate all grants that it identified as inconsistent with policy. Agencies may draw imperfect lines: "[i]t is no requirement of equal protection that all evils of the same genus be eradicated or none at all." *Ry. Exp. Agency v. People of State of N.Y.*, 336 U.S. 106, 110 (1949) (internal citation omitted). "[S]ome admittedly arbitrary line-drawing . . . is acceptable." *Olson v. California*, No. CV1910956DMGRAOX, 2020 WL 6439166, at *7 (C.D. Cal. Sept. 18, 2020) (citing *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 809 (1969)). Nor does a decision "offend the Constitution simply because it is not made with mathematical nicety or because in practice it results in some inequality." *Id.* (quoting *Califano v. Aznavorian*, 439 U.S. 170, 175 (1978) (citation modified)). Agencies may implement "reform . . . one step at a time, addressing itself to the phase of the problem which seems the most acute[.]" *Gray v. First Winthrop Corp.*, 989 F.2d 1564, 1573 (9th Cir. 1993) (quoting *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955)). DOE did not violate equal protection by terminating only the subset of grants located in Blue States that had already been flagged as unlawful or inconsistent with policy.

Even setting aside that these 284 grants were deemed appropriate for termination based on individualized merits grounds, the consideration of political factors, including terminating grants as leverage to end a government shutdown, would itself be a rational basis for terminating only awards located in Blue States. Political factors are a longstanding and valid consideration in the realm of the allocation of discretionary funds. *See, e.g.*, *Am. Libr. Ass'n*, 539 U.S. at 212 (rejecting constitutional challenge to condition on federal funding of libraries requiring installation of software blocking obscene images, and explaining that "[a] refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity" (citation omitted)). Political actors have funneled federal funds based on political or geographical conditions for decades, as longstanding debates over "earmarks" and "pork barrel" spending make clear. *See, e.g.*, Andrew H. Sidman, Pork Barrel Politics: How Government Spending Determines Elections in a Polarized Era (2019); Tyler Cowen, *Congress Needs to Bring Back Earmarks*, Bloomberg (Jan. 9, 2018);[18] Jonathan Allen, *The Case for Earmarks*, Vox (June

---

[18] Bloomberg, *Congress Needs to Bring Back Earmarks*, https://www.bloomberg.com/view/articles/2018-01-09/congress-needs-to-bring-back-earmarks (last visited Aug. 21, 2026).

30, 2015);[19] Diana Evans, *Greasing the Wheels: Using Pork Barrel Projects to Build Majority Coalitions in Congress* (2004). Constitutionalizing such spending considerations would be a significant shift.

When the political branches exercise their authority under the Spending Clause to make discretionary funding decisions, they "make allocations from a finite pool of resources[,]" and judicial review of such decisions "must be deferential[.]" *Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers*, 485 U.S. 360, 373 (1988). It has long been established practice that in making discretionary funding decisions, Congress and the executive branch may earmark certain funds or engage in "pork barrel" spending that benefits entities residing in one geographical location over another, and that such decisions may take political interests into account. If Plaintiffs' equal protection challenge had merit, then every entity that lost out on such an appropriation or an earmark when arguably similar groups received funds would have an equal protection claim. But that is not the law. *See, e.g.*, *Am. Bus Ass'n v. Rogoff*, 649 F.3d 734, 741–742 (D.C. Cir. 2011).

*American Bus Association* is instructive. There, Congress shielded one location—Seattle, Washington—from a federal law that prohibited funding to public transportation systems outside the urban area they regularly service, for the purpose of allowing special local bus service to Seattle Mariners baseball games. *Id.* at 735–736. Applying rational basis review, the D.C. Circuit rejected an equal protection challenge to this congressional appropriation allowing subsidization of one bus company but not others. *Id.* at 741–743. The D.C. Circuit upheld this politically targeted allocation under rational-basis review. *Id.*; *see also XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 75–78 (D.D.C. 2015) (dismissing equal protection claim because even if clean-energy vehicle manufacturers had been denied DOE loan due to the agency's desire to preserve funds for "government-favored companies[,]" that would not overcome the rationality of the government's explanation).

Similarly, DOE's discretionary spending decisions are subject only to rational basis review. Even if DOE's decisions resulted in geographically disparate outcomes, DOE's actions remain constitutional because they were rationally related to legitimate government objectives even if—as Plaintiffs allege—

---

[19] Vox, *The Case for Earmarks*, https://www.vox.com/2015/6/30/8864869/earmarks-pork-congress (last visited Aug. 21, 2026).

the effect of a swath of those decisions results in some entities receiving funding while other arguably similarly situated entities do not. Thus, DOE's termination decisions did not violate the Constitution.

### H. Plaintiffs' Fifth Amendment Due Process Claims Fail

Plaintiffs do not move for summary judgment on their due process claims or seek to certify a class with respect to these claims. *See* Pls.' Mot.; Compl. ¶¶ 738–744. Summary judgment should be granted to Defendants on these claims.

The Complaint raises procedural due process and void-for-vagueness challenges under the Fifth Amendment's Due Process Clause. *See* Compl. ¶¶ 738–744. Plaintiffs argue the terminations did not comply with the strictures of procedural due process and failed to give fair notice to Plaintiffs about what conduct was prohibited. *See id.* at ¶¶ 742–743. These challenges fail at the threshold and on the merits.

**Procedural Due Process.** In order to assert a due process claim, Plaintiffs must identify a liberty or property interest that is protected by the Fifth Amendment in the first place. "The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire'" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005) (citation omitted). Plaintiffs cite "a constitutionally protected property interest in grant [and contract] funding that supports their salaries and stipends, as well as their ongoing research." Compl. ¶ 740. But that is insufficient.

It is well established that future grant funding is not a protected property interest even for grant recipients (which Plaintiffs are not). The Supreme Court has identified only a narrow set of government benefits—so-called "new property"—that are protected under the Due Process Clause. *See Perry v. Sindermann,* 408 U.S. 593 (1972) (tenured teaching position); *Goldberg v. Kelly,* 397 U.S. 254 (1970) (welfare benefits); *see also Bd. of Regents v. Roth*, 408 U.S. 564 (1972) (collecting cases). But the protections afforded to this narrow set have not been extended to "'ordinary' or 'routine' government contracts." *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014); *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 97, 105 (D.D.C. 2025) (denying injunction in a similar funding case); *see also Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 10 (1st Cir. 2005) ("We have held with

a regularity bordering on the echolalic that a simple breach of contract does not amount to an unconstitutional deprivation of property."); *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) ("The Supreme Court has never held that government contracts for goods and services create property interests protected by due process . . . it is unimaginable that all government agencies would be required to provide a hearing before they take any action that is arguably inconsistent with a contract." (citation omitted)).

Here, Plaintiffs have not shown that they have any constitutionally protected entitlement-like grants that will be subject to termination. Government contracts and grants generally allow for termination at the agency's direction. *See* 2 C.F.R. § 200.340(a)(4) ("program goals or agency priorities"). Courts have upheld the government's right to terminate a contract for convenience even absent a termination clause. *See G.L. Christian & Assocs. v. United States*, 160 Ct. Cl. 1 (1963) (reading a termination for convenience clause into the contract by operation of law); *see also Northrop Grumman Corp. v. United States*, 46 Fed. Cl. 622, 626 (2000) ("The Government's right to terminate a contract for convenience is broad."). That is the antithesis of a constitutionally protected entitlement.

Finally, even if there were a protected interest, and Plaintiffs could somehow invoke it, "the question remains what process is due." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). The Tucker Act provides a judicial mechanism sufficient to satisfy due process. And the terminations themselves provided notice, some with the opportunity for appeal. Due process standards are "flexible" and "call[] for such procedural protections as the particular situation demands." *Morrisey v. Brewer*, 408 U.S. 471, 481 (1972). The Due Process Clause does not invariably require an opportunity to be heard in advance of a decision. *See Hewitt v. Helms*, 459 U.S. 460, 476 & n.8 (1983). Here, the post-termination procedures are robust and well satisfy due process.

**Void for Vagueness.** Plaintiffs also allege the standard for terminations was so vague that it violates due process under the "void for vagueness" doctrine. Compl. ¶ 743. But the void-for-vagueness doctrine under the Fifth Amendment is inapplicable. The vagueness doctrine traditionally "guarantees that ordinary people have 'fair notice' of the conduct *a statute* proscribes." *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (plurality op.) (emphasis added). While courts have applied the doctrine outside of the statutory

context, they have done so with respect to direct regulation of primary conduct. *See, e.g.*, *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." (citation omitted)). There is good reason for the doctrine's limited reach. The Due Process Clause prohibits uneven enforcement of coercive sanctions; not the discretion to affirmatively fund the work of private institutions. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). No vagueness concerns arise in this context.

Even setting aside that Plaintiffs are not the subject of the governmental action, the kind of vagueness challenge Plaintiffs bring has been rejected by the Supreme Court previously. In *National Endowment for the Arts v. Finley*, the Supreme Court rejected application of demanding vagueness standards to government funding decisions. *See* 524 U.S. at 572. There, plaintiffs brought vagueness challenges under the First and Fifth Amendments to a funding provision that required the National Endowment for the Arts to "take[] into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id.* (quoting 20 U.S.C. § 954(d)(1)). Those terms are little different from the kinds of "agency priority" provisions in the relevant regulations, termination letters, and grant conditions. Nonetheless, that "[t]he terms of the provision are undeniably opaque," was of no constitutional concern, even though "if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns[,]" for "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Id.* at 588–589; *see also id.* at 589 (cautioning that "[t]o accept [plaintiffs'] vagueness argument would be to call into question the constitutionality of . . . valuable Government programs and countless others like them" that "award[] scholarships and grants on the basis of subjective criteria such as 'excellence'"). This Court should similarly reject Plaintiffs' invitation to impose a demanding vagueness standard on the government when it "is acting as patron rather than as sovereign[.]" *Id.*

//

//

## IV. Class Certification Should Be Denied

Plaintiffs seek final certification of four proposed classes. *See* Pls.' Mot. at 1, 19–56. The Viewpoint Discrimination Class includes researchers listed as PIs, Co-PIs, or project leads on grant applications for NSF, NEH, DOD, DOT, and NIH grants terminated because the grants expressed or were presumed to express disfavored viewpoints. *Id.* at 43. The Separation of Powers Class includes researchers listed as PIs, Co-PIs, or project leads on applications for the same five agencies' terminated grants on grant applications, and alleges the Constitution was violated because funds were not reallocated to other grants. *Id.* at 44. The Department of Energy Class is broader than the other classes because it includes all UC affiliated researchers who "worked or were hired to work" on any grant located in a "Blue State" and terminated by Department of Energy in October 2025. *Id.* Finally, the Form Termination Class includes researchers named on grant applications for previously awarded grants "terminated by means of a form termination notice" that lacks a grant-specific explanation or considers reliance interests, and is predicated on an arbitrary and capricious claim the Ninth Circuit has held must be dismissed. *Id.* at 44–45.

Only one of the proposed classes—the Form Termination Class—is actually pleaded in the Complaint. Moreover, that class improperly seeks to litigate a claim outside the Court's jurisdiction, because the Ninth Circuit's decision squarely forecloses the Form Termination Class's APA theory. *Thakur*, 176 F.4th at 1197–99. Plaintiffs' stated desire to preserve appellate review fails Rule 23 and Article III. Certification as to the Form Termination Class should be denied and the claims dismissed.

The remaining three classes fail for other reasons. All three fail to serve the purposes of a class action because the Plaintiffs are not parties to the challenged grant agreements. The Department of Energy Class is impermissibly broad, in an attempt to circumvent numerosity requirements. The Separation of Powers Class fails to establish commonality and typicality, because the alleged Constitutional violation terminating grants funded by Congressional appropriates turns on any requirements outlined in the relevant grant program's authorizing statutes.

### A. Standard of Review for Class Certification

Critically, "plaintiffs must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23 by a preponderance of the evidence." *Small v. Allianz Life Ins. Co. of N. Am.*,

122 F.4th 1182, 1197 (9th Cir. 2024), *cert. denied,* No. 24-1225, 145 S. Ct. 285 (U.S. June 30, 2025). This is "a rigorous analysis." *Id.* (citation omitted). The failure to meet "any one of Rule 23's requirements destroys the alleged class action." *Rutledge v. Elec. Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir. 1975). Similarly, "each subclass must independently meet the requirements of Rule 23 for the maintenance of a class action." *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981).

### B. Plaintiffs' Class Action Fails to Serve the Purposes of the Class Action

Plaintiffs' motion for class certification fails to serve the purposes of a class action, i.e., efficient and preclusive resolution of disputes. "In a class action . . . a person not named as a party may be bound by a judgment on the merits of the action, if she was adequately represented by a party who actively participated in the litigation." *Taylor v. Sturgell*, 553 U.S. 880, 884 (2008). Accordingly, Rule 23 is "designed to further procedural fairness and efficiency," *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 402 (2010), including "by preventing inconsistent adjudications," 1 Newberg and Rubenstein on Class Actions § 1:9 (6th ed. 2025). This suit does not serve those interests.

Plaintiffs are not parties to the challenged contract and grant agreements. As a result, this proposed class action does not further the goals of Rule 23. Because the proposed class does not exclusively cover all parties with legal interests in the challenged contracts (indeed, it does not cover *any* parties with legal interests in the challenged agreements), this class action cannot prevent inconsistent adjudications. Even assuming that Plaintiffs can challenge specific grant or contract agreements in this court (and they cannot), the proposed class would not include the institutions that hold the contracts. The risk of inconsistent adjudication is obvious: the purported class members could receive a judgment related to a contract and the actual contracting institution could receive a judgment related to the same contract—and those judgments could be completely opposed. That does not serve the interests of justice. This fact dooms Plaintiffs' class definition, because it does not sweep in all the relevant parties and thus cannot prevent inconsistent adjudication. It also renders Plaintiffs unable to satisfy commonality and typicality. And it illustrates Plaintiffs' lack of standing here. For this reason alone, class certification is inappropriate.

//

//

### C. The Department of Energy Class Should Not Be Certified

Plaintiffs' proposed Department of Energy Class includes "[a]ll University of California researchers, including faculty, staff, academic appointees, and employees across the University of California system, who worked or were hired to work on a research grant or sub-award . . ." Pls.' Mot. at 44. As stated above, Plaintiffs' exhibits in support of numerosity raise evidentiary concerns. Although the Court may consider a broader range of evidence at the class certification stage, *see Sali v. Corona Reg Med. Ctr.*, 909 F.3d 996, 1004–06 (9th Cir. 2018), the weight of the evidence remains relevant.

As a rule, a class must be "sufficiently definite to conform to Rule 23." *Probe v. State Teachers' Ret. Sys.*, 780 F.2d 776, 780 (9th Cir. 1986). This requires that "the class is defined with objective criteria and . . . is administratively feasible to determine whether a particular individual is a member of the class." *Day v. GEICO Cas. Co.*, No. 21-CV-02103-BLF, 2022 WL 16556802, at *8 (N.D. Cal. Oct. 31, 2022). A class definition should be "precise, objective, and presently ascertainable." *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998) (citation omitted). In sum, "a proposed class must be ascertainable in the sense that the proposed class must be sufficiently defined and not vague." *J.L. v. Cissna*, No. 18-CV-04914-NC, 2019 WL 415579, at *7 (N.D. Cal. Feb. 1, 2019).

As defined, Plaintiffs' proposed class fails the ascertainability requirement, leaving neither party nor the Court able to determine when a UC employee becomes part of the class. Plaintiffs' own submissions—spanning public records request responses, emails of interview summaries, and declarations—demonstrate the absence of any uniform standard. For instance, an exhibit relied upon by Plaintiffs shows that UC personnel devoted only a fraction of their time to the challenged grants. *See* Pls.' Mot. at 47 (citing Polsky Decl., at ¶¶ 1–3). Plaintiffs provide no standard regarding the requisite level of involvement for inclusion in the proposed Department of Energy class. Consequently, Plaintiffs fail to establish that each proposed member sustained a concrete injury that is traceable to the Department of Energy and redressable by the requested injunction. *See TransUnion*, 594 U.S. at 430.

Numerosity is not met as to the class members that are ascertainable. By rule, Plaintiffs must show that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). As the Court noted in its opinion, "courts find the numerosity requirement satisfied when a class includes at

least 40 members." *Rannis v. Recchia*, 380 F. App'x. 646, 651 (9th Cir. 2010) (unpublished); ECF No. 54 at 54 (quoting and citing the same). After all, 40 members would generally make joinder an impracticable mechanism for continuing litigation. On the other hand, even in the (b)(2) context, "[w]hile there is no fixed number that satisfies the numerosity requirement, as a general matter, . . . one less than twenty-one does not." *Refuerzo v. Sw. Airlines Co.*, No. 22-cv-00868-JSC, 2024 WL 4177936, at *4 (N.D. Cal. Sept. 12, 2024) (quoting *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 536 (N.D. Cal. 2012)). Defendants incorporate their arguments opposition to Plaintiffs' third motion for a preliminary injunction, see ECF No. 165 at 14–19, as well as Defendants' statements at third preliminary injunction hearing, where Defendants explained that there are fewer than 21 class members who are named as PIs, co-PIs, or lead researchers on terminated DOE awards, and these individuals are all identified.

**D. There Is No Class Representative as to the NIH Grants**

Plaintiffs have withdrawn the previous NIH named Plaintiffs as class representatives because their grants were terminated as part of the UCLA antisemitism task force. *See* Pls.' Mot. at 43 n.9. Plaintiffs concede that the UCLA grant terminations from July 2025 were "not necessarily because of their expressed viewpoint," and appear to no longer challenge those terminations. *Id.* at 43 n.9, 59. For the reasons explained above, the Court should not allow Plaintiffs to add new class representatives absent from the Complaint at summary judgment. Plaintiffs lack an NIH class representative who can adequately represent grantees whose grants were terminated by NIH, and neither the proposed Viewpoint Discrimination Class nor the Separation of Powers Class should include researchers named on terminated NIH grants in its scope. This aligns with the Court's previous determination that NIH terminations fell outside the Equity Termination Class. *See* 2nd Mem. Op. & 2nd Prelim. Inj.

**E. The Separation of Powers Class Fails Commonality and Typicality Because Individual Questions Predominate.**

Plaintiffs have failed to demonstrate that "a single significant question of law or fact," *Abdullah v. U.S. Sec. Assocs.*, 731 F.3d 952, 957 (9th Cir. 2013) (citation omitted), common to the class suffices to render class action treatment appropriate. "What matters to class certification is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350

(2011) (cleaned up). "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* (citation omitted).

The commonality requirement is especially rigorous where, as here, Plaintiffs seek class certification under Rule 23(b)(2), which requires that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). For Rule 23(b)(2) certification, plaintiffs must show the challenged conduct is "such that it can be enjoined or declared unlawful only as to all of the class members or as to none." *Dukes*, 564 U.S. at 360 (citation omitted).

The commonality and typicality requirements of Rule 23(a) are interrelated and, in some instances, merge. *Id.* at 349 n.5. Commonality requires that "claims must depend upon a common contention . . . of such a nature that it is capable of classwide resolution[.]" *Dukes*, 564 U.S. at 349. Typicality focuses on how the named plaintiffs' claims relate to those of the potential class members. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). In sum, "[b]oth [requirements] serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Dukes*, 564 U.S. at 349 n.5.

The separation of powers class should not be certified because each terminated grant has a separate authorizing statute requiring independent analysis into whether the statute was violated. Class certification is therefore improper because the challenged conduct cannot be "enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360 (citation omitted). For the same reason, the named Plaintiffs' claims are not typical of the class, as their claims turn on whether their grants' specific statutes were violated, which would not determine the lawfulness of the terminations with respect to the other class members. Plaintiffs (at 35 n.6) recognize this flaw: they separately seek summary judgment on individual named Plaintiffs' claims and analyze the specific reasons the relevant grants' authorizing statutes were violated. Thus, the alleged harm is individualized and tied to specific grants and specific plaintiffs, defeating the commonality and typicality requirements to certify a class. The separation of powers class should fail.

//

## V. The Relief Requested in Plaintiffs' Complaint Is Overbroad

### A. An Injunction Should Not Run as to 9 of the 16 Defendant Agencies in This Case

The operative Complaint names 16 defendant agencies and related officials in this case, but Plaintiffs' Motion seeks summary judgment only as to NSF, NEH, DOD, DOT, NIH, and DOE.[20] Plaintiffs fail to identify any named Plaintiff or specific facts tied to the other defendants' alleged grant terminations, nor do they seek to certify any classes with respect to the remaining defendants.

The Court previously determined that Plaintiffs "failed to establish the factual predicate, by a preponderance of the evidence, to support the application of the juridical link doctrine" because Plaintiffs failed to proffer evidence with respect to the agency Defendants without associated named Plaintiffs. *See* 1st Mem. Op. at 59. Plaintiffs failed to amend their pleadings or put forth evidence showing they should prevail on their claims with respect to these defendants. Summary judgment therefore should be granted to Defendants on any claims pertaining to agencies without named Plaintiffs associated with their grants.

Moreover, no injunction should run against the President. The President is not an agency under the APA, *see Franklin v. Massachusetts*, 505 U.S. 788, 800–801 (1992), and an injunction against his performance of discretionary official duties is extraordinary and generally unavailable*, id.* at 802–803.

### B. Plaintiffs Should Not Receive Forward-Looking Relief

To the extent Plaintiffs seek summary judgment on prospective relief from future terminations *see* Compl. Prayer for Relief, such future actions are not reviewable under the APA. Under the APA, plaintiffs must identify the specific "final agency action" that has already occurred. *See, e.g., Watson v. Chessman,* 362 F. Supp. 2d 1190, 1196 (S.D. Cal. 2005) ("[T]he alleged 'agency action' has not yet happened. As such, the APA has no relation to this case." (cleaned up)). While a future termination may eventually represent a final agency action, a plaintiff may not "in a single swipe at the duly elected executive" seek judicial superintendence over the entire, future grantmaking process of the Executive Branch. *See Louisiana v. Biden*, 64 F.4th 674, 684 (5th Cir. 2023). The APA does not allow a plaintiff to seek

---

[20] As previously noticed to the Court, *see* ECF Nos. 209 & 221, Plaintiffs have reached an agreement in principle with Defendant the Environmental Protection Agency ("EPA") to resolve claims against EPA on a class-wide basis.

prospective, "*wholesale* improvement of [government] program[s] by court decree," but limits a plaintiff to challenging "some particular 'agency action' that causes it harm." *Lujan*, 497 U.S. at 89.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for summary judgment, and the Court should grant Defendants' cross-motion for summary judgment by (1) dismissing the Form Termination Class's APA claim (Count VI) for lack of jurisdiction; (2) declining to consider and entering judgment against the unpleaded First Amendment retaliation and association theories; (3) entering judgment for Defendants on Counts I–V of Plaintiffs' Complaint; (4) denying certification of the proposed classes; and (5) denying joinder of the new three named Plaintiffs.

DATED: August 21, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

JOSEPH E. BORSON
Assistant Branch Director

*<u>/s/ Kathryn Barragan</u>*

KATHRYN BARRAGAN (D.C. Bar No. 90026294)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 598-7696
Email: kathryn.e.barragan@usdoj.gov

*Attorneys for the United States*