Erwin Chemerinsky (admitted *pro hac vice*)
echemerinsky@law.berkeley.edu
Claudia Polsky (State Bar No. 185505)
cpolsky@law.berkeley.edu
U.C. BERKELEY SCHOOL OF LAW
Law Building
Berkeley, CA 94720-7200
Telephone: (510) 642-6483

Elizabeth J. Cabraser (State Bar No. 83151)
ecabraser@lchb.com
Richard M. Heimann (State Bar No. 63607)
rheimann@lchb.com
Kevin R. Budner (State Bar No. 287271)
kbudner@lchb.com
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000

Anthony P. Schoenberg (State Bar No. 203714)
tschoenberg@fbm.com
Linda S. Gilleran (State Bar No. 307107)
lgilleran@fbm.com
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, California 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NEETA THAKUR, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>DONALD J. TRUMP, et al.,<br><br>Defendants. | Case No. 3:25-cv-04737-RL<br><br>**PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION; OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: The Honorable Rita F. Lin<br><br>Hearing Date: October 20, 2026<br>Hearing Time: 2:30 PM<br>Courtroom: 4 – 17th Floor |

46686\21349724.1

# TABLE OF CONTENTS

INTRODUCTION ........ 1

ARGUMENT ........ 3

I. The Department of Energy's Blue State Grant Terminations Violate the Equal Protection Clause. ........ 3

II. Plaintiffs Have Standing ........ 9

III. The Department of Energy Class Should Be Certified. ........ 11

A. The Department of Energy Class Serves the Purposes of a Class Action. ........ 11

B. The Department of Energy Class Meets Rule 23 Requirements and Should Be Certified. ........ 13

1. The Department of Energy Class is objectively defined, which is all that is required for a Rule 23(b)(2) class. ........ 13

2. Numerosity is met. ........ 15

IV. The Addition of Dr. Boettcher as a DOE Class Representative Is Proper. ........ 17

CONCLUSION ........ 20

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*A. B. v. Hawaii State Dep't of Educ.*,
30 F.4th 828 (9th Cir. 2022)....16

*Am. Bus Ass'n v. Rogoff*,
649 F.3d 734 (D.C. Cir. 2011)....7

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014)....4

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017)....13

*California v. Wright*,
No. 26-CV-01417-RFL, 2026 WL 1915590 (N.D. Cal. July 2, 2026)....3

*Chinitz v. Intero Real Est. Servs.*,
No. 18-cv-05623-BLF, 2020 WL 7391299 (N.D. Cal. July 22, 2020)....16

*City of St. Paul, Minnesota v. Wright*,
816 F. Supp. 3d 65 (D.D.C. 2026)....5, 7

*Cole v. City of Memphis*,
839 F.3d 530 (6th Cir. 2016)....13, 14

*Day v. GEICO Cas. Co.*,
No. 21-cv-02103-BLF, 2022 WL 16556802 (N.D. Cal. Oct. 31, 2022)....13

*De Malherbe v. Int'l Union of Elevator Constructors*,
438 F. Supp. 1121 (N.D. Cal. 1977)....17

*Diamond Alt. Energy, LLC v. EPA*,
606 U.S. 100 (2025)....10

*Doe #1 v. Trump*,
335 F.R.D. 416 (D. Or. 2020)....16

*Furno Materials, Inc. v. Wright*,
No. 1:26-cv-14131-NMG (D. Mass. Sept. 9, 2026)....2

*Gray v. First Winthrop Corp.*,
989 F.2d 1564 (9th Cir. 1993)....5

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*,
No. 19-md-02918, 2021 WL 5848055 (N.D. Cal. Dec. 9, 2021)....17, 19

*J.L. v. Cissna*,
No. 5:18-cv-04914, 2019 WL 415579 (N.D. Cal. Feb. 1, 2019). ....................13

*Jackson v. Danbury*,
240 F.R.D. 145 (D. Del. 2007)....................16

*In re: Lithium Ion Batteries Antitrust Litig.*,
No. 13-md-2420-YGR, 2016 WL 948874 (N.D. Cal. Mar. 14, 2016)....................17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ....................4

*Nightingale v. U.S. Citizenship & Immigr. Servs.*,
333 F.R.D. 449 (N.D. Cal. 2019) ....................16

*O'Connor v. Boeing N. Am., Inc.*,
184 F.R.D. 311 (C.D. Cal. 1998) ....................13, 14

*Olson v. California*,
No. CV1910956DMGRAOX, 2020 WL 6439166 (C.D. Cal. Sept. 18, 2020)....................6

*Patton v. Experian Data Corp.*,
No. SACV 17-01559-JVS(DFMx), 2019 WL 13034866 (C.D. Cal. Jan. 22, 2019)....................19

*Probe v. State Tchr.s' Ret. Sys.*,
780 F.2d 776 (9th Cir. 1986)....................13, 14

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013)....................19

*Romer v. Evans*,
517 U.S. 620 (1996) ....................9

*Shelton v. Bledsoe*,
775 F.3d 554 (3d Cir. 2015)....................13, 15

*Shook v. El Paso Cnty.*,
386 F.3d 963 (10th Cir. 2004)....................14

*Sueoka v. United States*,
101 F. App'x 649 (9th Cir. 2004)....................16

*Taylor v. Sturgell*,
553 U.S. 880 (2008) ....................12

*Thakur v. Trump*,
148 F.4th 1096 (9th Cir. 2025)....................9

*U.S. Dep't of Agric. v. Moreno*,
413 U.S. 528 (1973) ....................9

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ....................15

*XP Vehicles, Inc. v. Dep't of Energy*,
118 F. Supp. 3d 38 (D.D.C. 2015) ....................7

**FEDERAL RULES AND REGULATIONS**

2 C.F.R. § 200.340(a)(4) ....................4

Federal Rules of Civil Procedure,
Rule 15 ....................17
Rule 15(a) ....................17
Rule 15(a)(2) ....................17
Rule 16 ....................17
Rule 21 ....................17
Rule 23 ....................11, 13
Rule 23(b)(1) ....................13
Rule 23(b)(2) ....................13, 14, 15, 16
Rule 23(b)(3) ....................13, 15

**OTHER AUTHORITIES**

1 Newberg and Rubenstein on Class Actions § 1:9 (6th ed. 2025)....................12

1 Newberg and Rubenstein on Class Actions § 2:8 (6th ed. 2025)....................17

6 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure Civil
§ 1479 (3d ed.) ....................17

ENR Committee Democrat Press Releases, *Heinrick, Murray Lead 37 Colleagues in Demanding Trump Administration Restore Funding for Energy Projects That Were Illegally Cancelled and Politically Targeted* (July 30, 2026),
https://www.energy.senate.gov/press/dem/heinrich-murray-lead-37-colleagues-in-demanding-trump-administration-restore-funding-for-energy-projects-that-were-illegally-canceled-and-politically-targeted/ ....................2

Evan Halper, *DOE Says Agency Didn't Punish Blue States. His Lawyers Admit It Did*, Washington Post (June 12, 2026),
https://www.washingtonpost.com/business/2026/06/12/energy-dept-head-says-agency-didnt-punish-blue-states-his-lawyers-admit-it-did/ ....................1

John Dean, *Mem. re Dealing with our Political Enemies* (Aug. 16, 1971),
https://exhibits.lib.unc.edu/items/show/7896 ....................1

Manual for Complex Litigation § 30.14 (3rd ed.)....................13

Tony Romm and Brad Plumer, *Trump Administration Admits Cancelling Grants to States that Did Not Vote For Him, New York Times* (July 24, 2024), https://www.nytimes.com/2026/07/24/business/trump-state-grants-canceled.html ..... 1

Hayley Smith, *Trump Administration Targeted California and Other Blue States for Clean Energy Cuts*, L.A. Times (July 28, 2026), https://www.latimes.com/environment/story/2026-07-28/trump-administration-targeted-california-other-blue-states-for-clean-energy-cuts ..... 1

U.S. Congress H.R., *Lofgren and Amo Letter to Acting AG Blanch* (Aug. 4, 2026), https://democrats-science.house.gov/imo/media/doc/SST%20RM%20Lofgren%20and%20Amo%20-%20Letter%20to%20Acting%20AG%20Blanche%20-%20DOE%20Secretary%20Chris%20Wright%20-%208.4.26.pdf ..... 2

Wirtz & Clement, *Both sides of the pork trough*, Fed. Reserve Bank of Minneapolis (Mar. 1, 2008), https://perma.cc/8N9T-AWP6 ..... 7

## INTRODUCTION

In August 1971, a confidential internal memo in the Executive Office of the President announced a bold new political strategy:

> This memorandum addresses the matter of . . . how we can **use the available federal machinery to screw our political enemies**. [. . .]
>
> I have concluded that we do not need an elaborate mechanism or game plan, rather we need a good project coordinator and full support for the project. [. . .] The project coordinator should . . . determine what sorts of dealings these individuals have with the federal government and how we can best screw them (e.g., **grant availability,** federal contracts, litigation, prosecution, etc.).[1]

In October 2025, a public boast from the Executive Office of the President announced a bold, recycled strategy:

> **Nearly $8 billion in Green New Scam funding to fuel the Left's climate agenda is being cancelled**. More info to come from @ENERGY. **The projects are in the following states: CA, CO, CT, DE, HI, IL, MD, MA, MN, NH, NJ, NM, NY, OR, VT, WA**.[2]

The 1971 White House Counsel strategy was typed; the 2025 OMB Director strategy was posted on social media. History does not repeat, but it rhymes.

***

In July 2026, to avoid the political embarrassment of deposition discovery, the Department of Energy ("DOE") stipulated in this proceeding that it had terminated grants only to those in states that did not vote for Donald Trump in 2024. This extraordinarily frank admission received sustained national media attention.[3] It prompted immediate issuance of a letter from Senators of

---

[1] John Dean, *Mem. re Dealing with our Political Enemies*, at p.1 (Aug. 16, 1971), https://exhibits.lib.unc.edu/items/show/7896 (emphasis added).

[2] Decl. of Kyle McLorg in Supp. of Pls.' 3rd PI Mot. ("McLorg PI Decl.") ¶ 9, Ex. E (Nov. 24, 2025), ECF No. 159.

[3] *See, e.g.*, Tony Romm and Brad Plumer, *Trump Administration Admits Cancelling Grants to States that Did Not Vote For Him*, *New York Times* (July 24, 2024), https://www.nytimes.com/2026/07/24/business/trump-state-grants-canceled.html; Hayley Smith, *Trump Administration Targeted California and Other Blue States for Clean Energy Cuts*, L.A. Times (July 28, 2026), https://www.latimes.com/environment/story/2026-07-28/trump-administration-targeted-california-other-blue-states-for-clean-energy-cuts; Evan Halper, *DOE*

every Blue State[4] harmed by DOE's actions demanding the reinstatement of all unlawfully terminated grants to their respective states.[5] And it prompted an August 2026 letter from the House Committee on Science, Space, and Technology to then-Acting Attorney General Todd Blanche demanding a criminal investigation into—and potential prosecution of—Energy Secretary Christopher Wright for seeming misrepresentations to Congress about the motivations for his agency's October 2025 grant terminations.[6]

Most recently, DOE's stipulations in this court prompted filing of a near-replicate class action in the U.S. District Court for the District of Massachusetts on behalf all *non-UC* researchers harmed by illegal DOE grant terminations nationwide.[7]

This Court need not engage—much less, resolve—every political controversy raised by DOE's stipulations. These admissions eliminate, rather than raise, material questions of fact. This court need only resolve the legal question of whether Plaintiffs and the proposed class are entitled to restoration of their unlawfully terminated grants. The Constitution compels the conclusion that they are. Plaintiffs accordingly request that the Court grant Summary judgment on their claim that DOE violated the Equal Protection Clause, and certify the Department of Energy Class.

---

*Says Agency Didn't Punish Blue States. His Lawyers Admit It Did*, Washington Post (June 12, 2026), https://www.washingtonpost.com/business/2026/06/12/energy-dept-head-says-agency-didnt-punish-blue-states-his-lawyers-admit-it-did/.

4 As defined in DOE's own Stipulation, a Blue State is "a state that awarded its electoral votes to Kamala Harris in the 2024 election and has two Democratic-caucusing Senators." Decl. of Kyle McLorg in Supp. of Mot. for Summ. J. and Class Certification ¶ 9, Ex. F(1) at Stipulation, No. 6 (July 15, 2026), ECF No. 211 ("McLorg Decl.").

5 ENR Committee Democrat Press Releases, *Heinrick, Murray Lead 37 Colleagues in Demanding Trump Administration Restore Funding for Energy Projects That Were Illegally Cancelled and Politically Targeted* (July 30, 2026), https://www.energy.senate.gov/press/dem/heinrich-murray-lead-37-colleagues-in-demanding-trump-administration-restore-funding-for-energy-projects-that-were-illegally-canceled-and-politically-targeted/.

6 U.S. Congress H.R., *Lofgren and Amo Letter to Acting AG Blanch* (Aug. 4, 2026), https://democrats-science.house.gov/imo/media/doc/SST%20RM%20Lofgren%20and%20Amo%20-%20Letter%20to%20Acting%20AG%20Blanche%20-%20DOE%20Secretary%20Chris%20Wright%20-%208.4.26.pdf

7 *Furno Materials, Inc. v. Wright*, No. 1:26-cv-14131-NMG (D. Mass. Sept. 9, 2026).

## ARGUMENT

### I. The Department of Energy's Blue State Grant Terminations Violate the Equal Protection Clause.

DOE admits that on October 2, 2025, it terminated 283 congressionally appropriated research grants "based solely" on the fact that the grantees reside in states that cast electoral votes against Donald Trump in the 2024 election. *See* McLorg Decl. ¶ 9, Ex. F(1) at Stipulation, Nos. 7 & 9. No matter how normalized displays of political animus have become in contemporary American politics, it remains constitutionally impermissible for agency actions to be predicated on partisan hatred. Simply put: the Equal Protection Clause protects United States citizens from being punished by the President when the state where they reside does not vote for him. The Court should accordingly grant summary judgment for Plaintiffs on their Equal Protection claim.[8]

DOE's stipulations establish conclusively that state political identity, and only state political identity, motivated its October 2025 grant termination decisions. DOE ***admits*** that its disparate treatment of the Blue State and Non-Blue State Grants "was based solely on the political identity of the grant recipient's state"; "was [not] based on any programmatic, statutory, cost reduction, or performance-based factor"; and "was not based on a rational connection between the recipient's location and/or place of performance and DOE's past or current agency priorities." Opp. at 9:4-8; McLorg Decl. ¶ 9, Ex. F(1) at Stipulation, Nos. 8-10. It also ***admits*** that the disparate treatment of the Blue State Grants "was not part of DOE's PRP Charter," specifically because "DOE's program offices had proposed to terminate similarly situated Blue State and non-Blue State grants." McLorg Decl. ¶ 9, Ex. F(1) at Stipulation, No. 11. These stipulations are unambiguous, as are their implications: DOE violated Plaintiffs' right to equal protection under the law.

---

[8] To the extent the Government is arguing that Plaintiffs' Equal Protection claim is an *ultra vires* claim that does not belong in federal district court (*see* Cross Mot. for Summ. J. & Opp'n at 32-33 (Aug. 21, 2026), ECF No. 226 ("Opp.")), this Court already rejected that argument in *California v. Wright*, No. 26-CV-01417-RFL, 2026 WL 1915590, at *7-11 (N.D. Cal. July 2, 2026), and should reject it here.

DOE's claims to the contrary are weak and, in some cases, contradicted by their stipulations. Indeed, the agency's main argument—directed not at the act of selective grant termination, but the conduct preceding it—is a red herring. DOE emphasizes that the 283 Blue State Grants were among the 624 grants previously identified for potential termination through its Portfolio Review Process ("PRP"). Opp. at 48:26-27. But this argument misunderstands the challenged action entirely. An Equal Protection claim turns on whether "a class that is [(1)] similarly situated [(2)] has been treated disparately." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1063-64 (9th Cir. 2014) (citation omitted). DOE's decision to include the Blue State Grants in the initial 624-grant list actually helps *Plaintiffs* by proving the first element: because those Blue State Grants were bundled with Non-Blue State Grants, all 624 grants were "similarly situated" for Equal Protection purposes, as DOE's stipulations separately admit. *See* McLorg Decl. ¶ 9, Ex. F(1) at Stipulation, Nos. 11 & 3.

For this same reason, the government's stale claims that the Blue State Grants failed to "effectuate[] the program goals or agency authorities," were "inconsistent with federal law or program priorities,"[9] or were purportedly terminable under 2 C.F.R. Section 200.340(a)(4) (*see* Opp. at 48:8-17) are also irrelevant. If any or all those things are true of the 283 Blue State Grants, they are also true of the similarly situated Non-Blue State Grants that DOE did not terminate.

It is what happened *after* the creation of the original 624-grant list that runs afoul of the Fifth Amendment's protections. It is undisputed that DOE's October 2, 2025 termination of the 283 Blue State Grants, but not the 340 Non-Blue State Grants, was "based solely" on whether their states voted for Kamala Harris or Donald Trump. *See* McLorg Decl. ¶ 9, Ex. F(1) at

[9] Justice Rehnquist's concurrence in *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29, 59 (1983), which DOE cites for the proposition that "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations" (Opp. at 48:11-14), is wholly inapposite. *State Farm* involved a post-election reversal of a federal regulation through regular notice and comment rulemaking under the Administrative Procedure Act. There was no evidence of animus, only evidence of a legitimate (and indeed, democratically responsive) change in agency priorities. Whether taken in or out of its case context, it is absurd to view Justice Rehnquist's statement as countenancing an agency's actions expressly designed to punish Americans who reside in states that cast electoral votes for the President's opponent.

Stipulation, Nos. 7, 9. This is "disparate treatment" of "similarly situated" grantees forbidden under the Equal Protection Clause. Because those Blue State and Non-Blue State Grants were both in the 624-grant list, the fact that "each [Blue State] grant had already been identified for termination based on individualized, policy-based reasons" in the original PRP (Opp. at 48:23-24) proves Plaintiffs' case, not DOE's, because DOE chose ***not*** to terminate the Non-Blue State Grants "based solely" on the fact that they were being performed in states that voted for Donald Trump. Opp. at 48:26-27; *compare with* McLorg Decl. ¶ 9, Ex. F(1) at Stipulation, Nos. 7 & 9.

Nor do DOE's purported justifications suffice to establish a rational relationship between its politically motivated grant terminations and any agency or executive priority. Judge Mehta concluded as much in *City of St. Paul, Minnesota v. Wright*, even without the benefit of the more extreme and dispositive facts to which DOE stipulated here. 816 F. Supp. 3d 65, 72-73 (D.D.C. 2026). In *St. Paul*, as here, DOE argued that its antecedent review process justified the selective termination of Blue State Grants. But the Court flatly rejected that argument, finding that "Defendants offer no explanation for how their purposeful segregation of grantees based on their electoral support for President Trump rationally advances their stated government interest." *Id.* at 72-73. The Court also held:

> [T]here is no reason to believe that terminating an award to a recipient located in a state whose citizens tend to vote for Democratic candidates—and, particularly, voted against President Trump—furthers the agency's energy priorities any more than terminating a similar grant of a recipient in a state whose citizens tend to vote for Republican candidates or voted for President Trump.

*Id.* DOE provides no reason for the Court to reach a different conclusion here.

DOE next suggests that its termination of Blue State Grants does not violate the Equal Protection Clause because "[a]gencies may implement 'reform … one step at a time, addressing itself to the phase of the problem which seems the most acute[.]'" Opp. at 49:8-11 (quoting *Gray v. First Winthrop Corp.*, 989 F.2d 1564, 1573 (9th Cir. 1993)). DOE also made this argument in *St. Paul*, but the court rejected it, noting "[t]here is no evidence that Plaintiffs, for example, receive more funding than other grantees or use the funding for projects the agency views as uniquely fruitless." 816 F. Supp. 3d at 72. DOE provides no such evidence here, either. To the

contrary: DOE has now admitted that these terminations had nothing to do with the PRP or any actual agency priority. McLorg Decl. ¶ 9, Ex. F(1) at Stipulation, Nos. 4-11. And crucially, the Non-Blue State Grants still have not been terminated, almost a year after DOE terminated their Blue State counterparts "based solely" on political animus (*id.*), giving lie to any notion that DOE was proceeding with these terminations in increments.

It is equally disingenuous for DOE to suggest its politically motivated terminations resulted from inevitably "imperfect lines" lacking "mathematical nicety." Opp. at 49:1-12 (citing *Olson v. California*, No. CV1910956DMGRAOX, 2020 WL 6439166, at *7 (C.D. Cal. Sept. 18, 2020)). There was nothing "imperfect" about DOE's line here: it was clear, precise, and drawn with mathematical precision to inflict maximal inequality between those residing in states that did and did not support the President in the 2024 election.

None of DOE's cases, including *Olson v. California*, authorize that kind of intentional and animus-based disparate treatment. In *Olson*, the plaintiff argued that a law creating a standard for determining employee classification violated the Equal Protection Clause because it included an allegedly arbitrary list of exempted industries. No. CV 19-10956-DMG (RAOx), 2020 WL 6439166, at *7 (C.D. Cal. Sept. 18, 2020). The Court held that its rational basis review may need to account for "some arbitrary line-drawing" because "the drawing of lines that create distinctions ***is peculiarly a legislative task***" and "a legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked" in a statute. *Id.* (citation omitted) (emphasis added). In this case, however, DOE's intentional distinction between grantees in states that voted for either Kamala Harris or Donald Trump is not a "legislative task" akin to drafting a statute that might apply across dozens of disparate industries. The law does not permit—much less require— the Court to defer to the agency's preference for deliberately discriminating against grantees in Blue States.

DOE next attempts to analogize its punishment of Blue States grantees to political-dealmaking spending in the form of budget earmarks and pork barrel projects, arguing that "[p]olitical factors are a longstanding and valid consideration in the realm of the allocation of discretionary funds." Opp. at 49:16-17. The analogy is specious. Earmarks and pork-barrel

spending refer to "a government appropriation for a project or program that will ***benefit*** a legislator's constituents." Wirtz & Clement, *Both sides of the pork trough*, Fed. Reserve Bank of Minneapolis (Mar. 1, 2008), https://perma.cc/8N9T-AWP6 (emphasis added). As Judge Mehta explained in *St. Paul*, "[m]embers of Congress securing more money for their districts [] is wholly different from taking away congressionally appropriated and already awarded funds." 816 F. Supp. 3d at 73 (citation omitted). DOE's terminating grants in states that did not vote for the President only ***harms*** constituents in those states and otherwise benefits no other constituents. Routine forms of coalition building and legislative self-interest bear no resemblance to the government singling out 283 already-awarded grants for disfavored treatment because of the political views of the citizens of the States where the grantees are located.

This distinction renders DOE's cases inapposite. In *American Bus Association v. Rogoff*, 649 F.3d 734 (D.C. Cir. 2011), for example, the plaintiffs challenged a congressional effort to provide constituents access to baseball games via charter bus service that the court held was "rationally related to the legitimate governmental goals of accommodating handicapped fans, restoring more affordable service, and reducing traffic congestion on game days." *Id.* at 742. This fact pattern has nothing to do with executive retribution against states that voted against the President. Indeed, Judge Mehta actually found that *Rogoff* supported a finding that DOE violated the Equal Protection Clause in *St. Paul* because DOE had "not offered any similar rational relationship between [its] segregation of Blue State and Red State grantees and a legitimate government interest." 816 F. Supp. 3d at 73-74. Similarly, in *XP Vehicles, Inc. v. Department of Energy*, 118 F. Supp. 3d 38 (D.D.C. 2015), the court dismissed the plaintiffs' Equal Protection claim where there was no plausible reason to believe DOE's decision to provide loans to certain clean-energy vehicle manufacturers over others resulted in differential treatment of similarly situated parties. *Id.* at 77-78. Neither of those cases are analogous to what happened here, where the government expressly intended to harm (not benefit) certain constituents, and where the sole basis for differential treatment of similarly situated parties was the political identity of the grant recipients' state. And this is certainly not a case of an implausible allegation, like *XP Vehicles*, given DOE's explicit admission that state support for Kamala Harris was the "sole" reason for the termination decisions.

In a last-ditch effort, DOE raises a few half-hearted arguments that are inconsistent with, and clearly foreclosed by, its own stipulations. The first is DOE's claim that its "ultimate decision to terminate these grants was not based exclusively on geographic considerations." Opp. at 48:22-23. To the extent this assertion refers to the PRP process, it is irrelevant, as noted above. And if it is directed at the decision to terminate the Blue State grants, it is contrary to DOE's admission that the terminations were "based solely on the political identity of the grant recipient's state" and not on any other factor. McLorg Decl. ¶ 9, Ex. F(1) at Stipulation, Nos. 9 & 7-11. Plaintiffs agreed to forgo discovery on DOE's grant terminations—including, the PRP process—specifically because DOE offered to concede to the facts in the Stipulations in Exhibit F(1) to the McLorg Declaration. *See* Ex. F(1) at 2 ("In exchange for obviating already-served discovery and discovery that could otherwise be sought and served, DoE agrees [] to the stipulations set forth below"). DOE cannot credibly posit facts directly contradicted by its own admissions.

The same point applies to DOE's belated claim that it terminated those grants "as leverage to end a government shutdown" (Opp. at 49:13-16), which is neither supported by the evidence nor in accord with common sense. DOE has made clear that the "sole basis" for the terminations was the voting pattern of the states, not to gain leverage in budget negotiations; that is mere attorney argument. But even if that were the case, it would not be an effective negotiation strategy, given that DOE terminated the grants on the first day of the shutdown. This is akin to killing hostages before negotiators even arrive. The Court should reject DOE's framing of the facts as contrary to the agency's stipulations. But if DOE is now truly disputing facts to which it has stipulated unambiguously, Plaintiffs should be entitled to seek full discovery regarding the PRP, the October 2, 2025 terminations, and what happened in between that led to the agency's decision to terminate only Blue State Grants.

In sum, terminating grants based on political animus is not ordinary spending that "benefits entities residing in one geographical location over another" (Opp. at 50:6-9), and finding an Equal Protection violation based on these facts would have no impact on the permissible "spending considerations" at play in earmarks and pork barrel spending. Political retribution is not a "legitimate government purpose" ***under any level of scrutiny***, "[f]or if the constitutional

conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare [governmental] desire to harm a politically unpopular group cannot constitute a legitimate government interest." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *see also Romer v. Evans*, 517 U.S. 620, 632 (1996) ("[A] bare … desire to harm a politically unpopular group" is not a legitimate state interest) (citation omitted). The Court should find that DOE's Blue State Grant terminations violate Plaintiffs' and the class's Fifth Amendment right to equal protection of the laws, and vacate those terminations in full.

**II. Plaintiffs Have Standing.**

DOE's threshold jurisdictional challenge must fail, as all members of the Department of Energy Class have standing. The class includes UC researchers named as principal investigators ("PIs"), researchers, and investigators, as well as additional researchers who worked or were hired to work on terminated grants even if they were not named on the original applications. Contrary to DOE's arguments, this class definition is not "impermissibly broad," and all Class members have Article III standing. Opp. at 20-21.

This is unequivocally true for the PIs, researchers, and investigators named in the grant materials, as this Court already concluded for UC researchers with grants terminated by the other Agency Defendants. In its first Preliminary Injunction Order, the Court explained that Plaintiffs' standing is "easy to see" because, among other reasons, they "have had lengthy research careers of federal grant-supported research"; were "required [] to prepare detailed grant applications laying out their planned multi-year research proposals"; and their research "represents their livelihood and their professional reputation." Order Granting Mot. for Prelim. Inj. & Class Certification at 41-42 (June 23, 2025), ECF No. 54 ("PI Order"). The Court therefore found that Plaintiffs "suffered direct, classic injury-in-fact from likely illegal grant terminations that upended their research and threatened the funds from which they are paid." *Id.* at 35. The Ninth Circuit affirmed this analysis on appeal. *See Thakur v. Trump*, 148 F.4th 1096, 1104-05 (9th Cir. 2025). This reasoning applies equally to the named PIs, researchers, and investigators in the Department of Energy Class. Nothing in DOE's cross-motion undermines that conclusion—including the thrice-rejected argument that researchers lack standing because they are not parties to the grant

agreements. *See, e.g.*, PI Order at 43 ("The traditional Article III standing rules do not change simply because the alleged harm occurred through the termination of a contract with a third party."); *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 113-14 (2025).

The remaining Class members—those who worked on or were hired to work on terminated grants but were not specifically named on the initial grant applications—have standing too. As in the case of ARCHES, DOE grants often support enormous, complex research projects that contemplate large teams working across multiple years. DOE grants in the million-plus dollar category are routine. Why, then, are the names of key grant-supported researchers not included in grant applications or award letters? The answer is remarkably simple: *because they can be hired only once it is certain that grant funding is forthcoming. See* Decl. of Shannon Boettcher in Supp. of Mot. for Summ. J. ¶ 25 (July 15, 2026), ECF No. 217 ("Boettcher Decl."). Accordingly, those researchers are frequently identified in post-award documents, such as periodic progress reports. *Id.* ¶ 26. The absence of a researcher's name from a PI's initial submission to DOE (*i.e.*, the grant application) thus reflects the structure of federally funded research, not the lack of essential connection between non-PI researchers and research projects funded by DOE.

The record confirms that PhD candidates, postdoctoral researchers, and other research team members are significant scientific contributors whose roles were contemplated in grants' design and budgets, and whose work is directly impacted when funding is terminated. *See* Boettcher Decl. ¶¶ 6-7, 22-27; Decl. of Claudia Polsky in Supp. of Mot. for Summ. J. ¶¶ 3-4 (July 15, 2026), ECF No. 212 ("Polsky Decl."); *see also* Decl. of Jeffrey Long in Supp. of Mot. for Summ. J. ("Long Decl.") ¶¶ 4-5; Decl. of Vinod Narayanan in Supp. of Mot. for Summ. J. ("Narayanan Decl.") ¶¶ 4-5; Decl. of Iryna Zenyuk in Supp. of Mot. for Summ. J. ("Zenyuk Decl.") ¶¶ 4-8.[10] These are the people performing the research, building publication records, and developing careers through the projects that DOE has terminated. As with the other class

[10] DOE's argument that the information contained in the Polsky Declaration (ECF No. 212) is inadmissible hearsay (*see* Opp. at 22) is mooted and irrelevant. Drs. Long, Narayanan and Zenyuk have submitted sworn declarations, filed with this Reply, attesting directly to that same information originally provided in the Polsky Declaration. The Court should have no concerns about admissibility or its ability to consider their testimony in concluding that class members have standing.

members, "their livelihood and their professional reputation" depended on the grants, and they suffered a cognizable harm—loss of financial support, disruption of ongoing research, impairment of publication opportunities, and career damage—when those grants were terminated. *See e.g.*, Long Decl. ¶ 5 (detailing harms suffered by four researchers on terminated grant project); Narayanan Decl. ¶ 5 (same as to four researchers); Zenyuk Decl. ¶¶ 5-8 (same as to ten researchers across four terminated grant projects). *See also* PI Order at 41-42; Boettcher Decl. ¶¶ 28-36. All proposed Class Members have a "personal stake" in their research and in their claims, whether or not they were named in initial application materials submitted to DOE.

The Department of Energy Class does not confer standing on abstract or attenuated claimants; it captures researchers who actually worked or were hired to work on now-terminated grants. Each one has suffered concrete, actual injuries directly traceable to DOE's unlawful grant-termination actions, and these injuries would be redressed through grant reinstatement. The factual record—and the Court's prior analysis—thus defeats DOE's effort to limit standing to named PIs or project leaders.[11]

**III. The Department of Energy Class Should Be Certified.**

The proposed Department of Energy Class meets the requirements of Rule 23, and its certification would allow for efficient adjudication of claims. DOE errs in asserting that (1) this case fails "to serve the purposes of a class action," and (2) the Department of Energy Class is unascertainable and insufficiently numerous.

**A. The Department of Energy Class Serves the Purposes of a Class Action.**

This Court has repeatedly concluded that the Rule 23 factors—which incorporate fairness and efficiency concerns—are met in this case. *See, e.g.*, PI Order at 50, 54-58; Order Granting Mot. for Prelim. Inj. at 28-32 (Sept. 22, 2025), ECF 133. The same logic applies to the

[11] It is Plaintiffs' understanding that the argument that Plaintiffs lack standing to challenge "possible future terminations of possible future grants" (*see* Opp. at 23-24), is not aimed at the Department of Energy Class. Nevertheless, while this action is limited to the 283 terminated Blue State Grants described in the Stipulations, any conclusion by this Court that terminations "based solely on" a state's voting pattern violate the Equal Protection Clause would obviously prohibit DOE from taking similar action in the future.

Department of Energy Class. Many researchers were harmed by DOE's uniform conduct; combining their claims in a single case serves judicial economy and the interests of justice by, respectively, avoiding a multiplicity of actions and preventing inconsistent adjudications. *See* 1 Newberg and Rubenstein on Class Actions § 1:9 (6th ed. 2025) (describing how class actions promote efficiency).

DOE's argument to the contrary is based on the fact that Plaintiffs "are not parties to the challenged contract and grant agreements," and, as a result, the class definition does not "sweep in all the relevant parties." Opp. at 55:14-25. In DOE's mind, this creates a risk of inconsistent adjudications because the class members and contracting institution—the UC—could receive different judgments related to the same contract. *Id.*[12] This Court already rejected this argument: "The grantees under the relevant contracts [the UCs] remain free to assert their breach of contract claims in another action, should they choose to do so. Therefore, Defendants do not identify any risk of 'inconsistent adjudications.'" PI Order at 53. This remains true.

DOE's next argument is even weaker. It cites *Taylor v. Sturgell*, 553 U.S. 880, 884 (2008), for the proposition that nonparties may be bound by class action judgments, but does not explain why that means this class action "fails to serve the purposes of a class action." Opp. at 55:7. If anything, *Taylor* supports the opposite conclusion. In *Taylor*, the Court explained that nonparties can be bound by a class action judgment where a suit was litigated by "someone with the same interests" as the nonparty. 553 U.S. at 894. As this Court has explained, Defendants have identified no reason Plaintiffs' interests would be adverse to the UC's. *See* PI Order at 54 ("Defendants identify no reason to doubt that Plaintiffs would be adequate representatives of grantees' interests as to the claims in this action."). The UC is well aware of this litigation, and has had more than a year to intervene if it identified a conflict. Plaintiffs have adequately represented the interests of entities affected by the grant terminations. As the course of this litigation has demonstrated, the class action mechanism has provided an appropriate vehicle to test the claims of many in one adjudication.

[12] DOE also states that the specter of the UC "renders Plaintiffs unable to satisfy commonality and typicality" (Opp. at 55:24), but offers no explanation as to why that would be true.

### B. The Department of Energy Class Meets Rule 23 Requirements and Should Be Certified.

DOE errs in asserting that the Department of Energy Class does not fulfill the requirements of (1) ascertainability and definiteness, and (2) numerosity.

#### 1. The Department of Energy Class is objectively defined, which is all that is required for a Rule 23(b)(2) class.

DOE argues that the Department of Energy Class is not ascertainable or definite. It is unclear to what extent DOE is making separate arguments or using those terms interchangeably. Regardless, all that is required for certification is that the class definition be "sufficiently definite to conform to Rule 23." *Probe v. State Tchr.s' Ret. Sys.*, 780 F.2d 776, 780 (9th Cir. 1986). There is no separate ascertainability requirement in the Ninth Circuit for *any* classes, let alone for a Rule 23(b)(2) class. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123-25, 1127 n.7 (9th Cir. 2017).[13]

The case law DOE cites supports this understanding. The court in *O'Connor v. Boeing North American, Inc.* explains that "due to notice requirements, class definitions of actions maintained under Rule 23(b)(3) command greater precision than those brought under Rule 23(b)(1) or (b)(2)," and emphasizes that ascertainability requirements are minimal even for Rule 23(b)(3) classes. 184 F.R.D. 311, 319 (C.D. Cal. 1998) (citing Manual for Complex Litigation § 30.14, at 217 (3rd ed.)). Likewise, *J.L. v. Cissna* holds that although a "proposed class must be sufficiently defined and not vague, 'ascertainability' is not a threshold requirement for class certification." No. 5:18-cv-04914, 2019 WL 415579, at *7 (N.D. Cal. Feb. 1, 2019). Several circuits are yet more explicit in rejecting an ascertainability requirement for a Rule 23(b)(2) class seeking declaratory and injunctive relief.[14]

---

[13] DOE cites *Day v. GEICO Casualty Company* to argue an ascertainability requirement exists. No. 21-cv-02103-BLF, 2022 WL 16556802, at *8 (N.D. Cal. Oct. 31, 2022). That case concerns a Rule 23(b)(3) class, so it is inapplicable here. Regardless, it holds that a class is ascertainable where "the class definition relies on objective criteria." *Id.*

[14] *See, e.g.*, *Shelton v. Bledsoe*, 775 F.3d 554, 561-63 (3d Cir. 2015) (rejecting ascertainability requirement in (b)(2) classes; surveying other circuit courts concluding same); *Cole v. City of*

All that is required of the Department of Energy Class is that it be objective and definite. ***It is***. The class is limited to UC researchers (a) "who worked or were hired to work on a research grant or sub-award" that (b) named a UC researcher on the grant application or sub-award, and (c) was included in the list of 283 terminated grants. *See* Mot. for Summ. J. at 44 (July 15, 2026), ECF No. 210 ("MSJ"). The Parties have identified thirteen such grants, meaning that the class is drawn from a narrow, identifiable universe. *Id.* at 47. This alone renders the class far more definite than other certified classes. *See, e.g.*, *Probe*, 780 F.3d at 780 (upholding a class definition that the defendant argued "seems to include every male person in the world").

The only possible question, then, is whether "worked" is an objective term. DOE cannot seriously argue that it is not—in fact, one of the cases it cites found sufficiently definite a class definition that include "persons who have lived, *worked*, and/or owned real property" in a specific geographic area. *O'Connor*, 184 F.R.D. at 319 (emphasis added). While there was debate over whether the geographic area was sufficiently defined, *see id.* at 319-29, there was no debate over whether the word "worked" was sufficiently definite. As Plaintiffs' efforts to identify class members demonstrates, it is not difficult to determine whether someone worked on one of the thirteen grants at issue, including by asking researchers to self-identify, and reviewing researcher names and time reporting data in the progress reports submitted to the Department of Energy. *See* MSJ at 47-48.

DOE also makes vague protestations about needing a "standard regarding the requisite level of involvement for inclusion" in the class (Opp. at 56:21-22), but that argument is more properly about standing, as discussed above. As the titles of the seventy-six class members identified by Plaintiffs show, Plaintiffs are  not straining the definition by listing *anyone* associated with the terminated grants; rather, the class is limited to *researchers* (e.g., scientists, postdoctoral researchers, and PhD students) who had project-relevant training and objectively "worked" on the terminated projects. Polsky Decl. ¶ 9, Ex. D.

---

*Memphis*, 839 F.3d 530, 542 (6th Cir. 2016) ("The decisions of other federal courts and the purpose of Rule 23(b)(2) persuade us that ascertainability is not an additional requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief."); *Shook v. El Paso Cnty.*, 386 F.3d 963, 972 (10th Cir. 2004) ("[M]any courts have found Rule 23(b)(2) well suited for cases where the composition of a class is not readily ascertainable.").

The instant situation demonstrates *why* ascertainability is not a requirement in the Rule 23(b)(2) context: it is unnecessary to identify every researcher who worked on one of the thirteen grants where the remedy is simply an injunction reinstating the grants. "Because the focus in a (b)(2) class is more heavily placed on the nature of the remedy sought, and because a remedy obtained by one member will naturally affect the others, the identities of individual class members are less critical in a (b)(2) action than in a (b)(3) action." *See Shelton*, 775 F.3d at 561 (noting there is no opt-out right in a (b)(2) class). No action from the researchers is needed; the remedy applies automatically as to "all of the class members or as to none of them." *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011).

The class definition Plaintiffs propose is sufficiently objective to identify the thirteen relevant grants, and the term "worked" is sufficiently definite for DOE-grant-terminee researchers to identify themselves. (Indeed, most or all of them have already been identified.). That is all that Rule 23(b)(2) requires.

2. Numerosity is met.

DOE does not contest numerosity of the class *as actually defined*. Using the sufficiently definite and objective definition, Plaintiffs have identified more than <u>seventy-six</u> class members. *See* MSJ at 47-48; Long Decl.; Narayanan Decl.; Zenyuk Decl.[15] This plainly satisfies the numerosity requirement.

Thus, instead of engaging with the Department of Energy Class definition, DOE makes arguments about why numerosity would not be met *if* the Department of Energy Class had the same definition as the *other* classes in this case, which focus on named principal investigators or lead researchers. *See* Opp. at 56-57. But those classes relate to different claims and different fact patterns; the DOE situation is unique because of the structure of the grants at issue, and the class definition is drafted accordingly. Because all proposed Class Members have standing, the numerosity analysis can and should end here.

---

[15] As discussed above, the Long, Narayanan, and Zenyuk Declarations simply formalize evidence already submitted via the Polsky Declaration, in light of DOE's evidentiary argument related thereto. Their testimony can be considered in the Court's numerosity analysis.

Nevertheless, even accepting DOE's argument that the class should be limited to researchers who are *named* on initial grant applications, Plaintiffs satisfy the numerosity requirement. DOE concedes there are "fourteen putative class members" (Opp. to Mot. for Leave to File Third Am. Compl. at 14 (Dec. 8, 2025), ECF No. 165 ("Opp. to Mot. for Leave")) who are "named as PIs, co-PIs, or lead researchers" on the terminated grants (*see* Opp. at 57). It then acknowledges that there are actually at least 16 total class members, once grants reinstated pursuant to a different court order are counted. Opp. to Mot. for Leave at 16 n.16. Moreover, DOE concedes that the grants often name other researchers, even if they are not PIs. *See Id.* at 16-17 (acknowledging that one of Dr. Atanassov's applications lists "three additional UC researchers"). Plaintiffs have further demonstrated that DOE grant documents explicitly mention researchers who will be hired later. *See, e.g.*, Polsky Decl. ¶ 8 & Ex. A (under "Personnel," identifying positions of "Post Doctoral Researcher" and "Graduate Student Researcher"); Boettcher Decl. ¶ 25.

This is enough under the "relaxed" numerosity requirements in Rule 23(b)(2) and judicial precedent in cases for equitable relief. *See Chinitz v. Intero Real Est. Servs.*, No. 18-cv-05623-BLF, 2020 WL 7391299, at *8 (N.D. Cal. July 22, 2020) (citations omitted); *Jackson v. Danbury*, 240 F.R.D. 145, 147-48 (D. Del. 2007) (numerosity met by class of 16 members in injunctive relief action); *Doe #1 v. Trump*, 335 F.R.D. 416, 431 (D. Or. 2020) (citing *Sueoka v. United States*, 101 F. App'x 649, 653 (9th Cir. 2004)) ("[W]hen plaintiffs seek injunctive or declaratory relief, 'the numerosity requirement is relaxed and plaintiffs may rely on the reasonable inference arising from plaintiffs' other evidence that the number of unknown and future members [of the proposed class] is sufficient to make joinder impracticable"); *Nightingale v. U.S. Citizenship & Immigr. Servs.*, 333 F.R.D. 449, 457 (N.D. Cal. 2019) (similar). Even if the class only contained 16 members—which it does not—"the practical value of joining each of the [] class members as a formal party is slim to non-existent and is plainly outweighed by the substantial logistical burdens that would entail." *A. B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 837 (9th Cir. 2022). The Department of Energy Class should be certified.

**IV. The Addition of Dr. Boettcher as a DOE Class Representative Is Proper.**

Plaintiffs' request to add Dr. Shannon Boettcher as a class representative for the Department of Energy Class, which is a routine class-plaintiff addition involving no new claims, satisfies Rule 21 and the liberal Rule 15(a) standard. *See*, *e.g.*, 1 Newberg and Rubenstein on Class Actions § 2:8 (6th ed. 2025) ("Substitution among class representatives is [] allowed so long as there are several and at least one has standing throughout the case."). Plaintiffs acted diligently once DOE produced the terminated-grants spreadsheet and associated data. Dr. Boettcher's claims are typical of Department of Energy Class members. His claims are not futile. And DOE suffers no prejudice from the addition.

Rule 21 allows the court to "at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21. Although DOE urges that Rule 16 controls the analysis, courts considering whether to add or drop a party under Rule 21 typically do so instead under Rule 15(a). *See* 6 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure Civil § 1479 (3d ed.); *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, No. 19-md-02918, 2021 WL 5848055, at *1 n.2 (N.D. Cal. Dec. 9, 2021). Under that standard, courts freely grant leave to amend. *See In re Hard Disk Drive*, 2021 WL 5848055, at *1 (citing Fed. R. Civ. P. 15(a)(2)); *De Malherbe v. Int'l Union of Elevator Constructors*, 438 F. Supp. 1121, 1128 (N.D. Cal. 1977) ("[T]he liberal standard of Rule 15 also applies to Rule 21 motions."); *see also In re: Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420-YGR, 2016 WL 948874, at *2 (N.D. Cal. Mar. 14, 2016) (applying Rule 15's liberal standard to allow substitution of class representatives contemporaneously with motion for class certification).

Here, Plaintiffs do not seek to amend the complaint to add new causes of action; they seek only to supplement the roster of proposed class representatives for a previously-proposed class whose claims have already been pled. As Plaintiffs explained in their combined Motion for Summary Judgment and Class Certification, such a request is made in good faith and without delay. MSJ at 59-60.

DOE's reliance on Rule 16 is further misplaced because, contrary to DOE's argument, the Davis Declaration did not provide notice sufficient to treat Plaintiffs' later addition of Dr.

Boettcher as untimely. The grant and grantee status information in the Davis Declaration was both incomplete and provisional. As DOE acknowledged in Defendants' preliminary injunction briefing, the number of DOE plaintiffs "may increase," because as the agency's declarant noted:

> DOE is still working diligently to review the six awards listed in Exhibit A that did not include Federal Award Identifiers, and it is possible that additional putative class members will be identified based on that review. [. . . ] Additionally, DOE confirmed that DE-EE0010724 has been terminated, and is working diligently to pull information related to that award.

Opp. to Mot. for Leave at 17 n.19 (citing Davis Decl. and Polsky Decl.).

Plaintiffs reasonably awaited DOE production of additional information about terminated grants based on the promised further "review," but in the months following the hearing, none came. Instead, DOE waited until its execution of stipulations many months later, and—still later—provision to Plaintiffs of the grant-specific data they specified. It was DOE's ultimate provision of this comprehensive data on terminated UC grants that enabled Plaintiffs to revisit the (incomplete) data in the Davis Declaration; investigate why Dr. Boettcher's grant was missing from the newly provided spreadsheet; reach out to Dr. Boettcher to learn details of his terminated grant; and determine his willingness to serve as a class representative.

Plaintiffs acted diligently to home in on Dr. Boettcher once DOE produced the terminated-grants spreadsheet and associated data, which supplied the factual foundation necessary to identify and evaluate potential DOE class representatives who would be adequate, typical, and participation-amenable. *See* Polsky Decl. ¶¶ 2-3 (describing analysis of the DOE spreadsheet "and other data" that Plaintiffs' counsel used to guide interviews with multiple PIs on terminated DOE grants or sub-awards to UC, including Dr. Boettcher). Plaintiffs filed their motion on July 15, 2026, just over one month after receiving the spreadsheet, and in accord with the Court ordered briefing schedule. This reflects diligence, not delay.

Even if the Davis Declaration's one-line reference to Dr. Boettcher were treated as constructive notice, however, the record still shows diligence rather than delay because Plaintiffs could not assess or develop him as a class representative without the broader factual foundation obtained in June 2026. *See* Polsky Decl. ¶¶ 2-3. Identifying a researcher by name is not the same

as being in a position to assess typicality, confirm class membership, interview the researcher, and secure a declaration—all of which counsel did within mere weeks of receiving the spreadsheet. Plaintiffs acted with diligence once they had the tools to do so, which is precisely the standard this Court applied when it granted Plaintiffs leave to file the Third Amended Complaint. *See* Order Granting Leave to File Third Am. Compl. (Jan. 30, 2026), ECF No. 182 (finding no "undue delay" where "Plaintiffs' delay of less than two months to file this motion does not constitute undue delay, in light of Plaintiffs' counsel's diligent efforts to identify potential named plaintiffs, and to gather the necessary information to support their complaint").

As important, DOE has suffered no prejudice, because adding Dr. Boettcher changes neither this case's claims nor the case schedule. This Court has already found that Plaintiffs' amendment of their complaint to add DOE claims did not "unfairly prejudice Defendants," noting that the parties had stipulated to an amended case schedule. *Id.* at 7 (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

The same reasoning applies here, and with greater force. The parties agreed to proceed via exchange of information without formal written discovery or depositions. Dr. Boettcher, like the other DOE class representatives, has submitted a detailed declaration attesting to his membership in the class, the injuries he suffered, and the typicality of his claims. *See* Boettcher Decl. ¶¶ 1-38. His addition changes nothing material to the litigation or management of this case. *See In re Hard Disk Drive*, 2021 WL 5848055, at *2 ("[D]efendants have not shown the proposed substitution is likely to require changes to the existing schedule or adversely affect defendants' ability to obtain or produce discovery."); *Patton v. Experian Data Corp.*, No. SACV 17-01559-JVS(DFMx), 2019 WL 13034866, at *6 (C.D. Cal. Jan. 22, 2019) (prejudice unlikely when plaintiffs "seek only to substitute a class representative, and do not seek to add, change or alter any causes of action or theories").

Neither is Dr. Boettcher's addition as plaintiff futile. His claims are typical of the Department of Energy Class and arise from the same conduct challenged by the existing proposed representatives. His DOE grant (Award EE0011322), a $4.67 million award for alkaline-exchange-membrane electrolyzer research, was terminated in October 2025 as part of DOE's mass

Blue State terminations. This is the conduct underlying Plaintiffs' DOE Equal Protection and First Amendment claims. *See* Boettcher Decl. ¶¶ 9-20; McLorg Decl. ¶ 9, Ex. F(1) at Stipulation, No. 9.

DOE terminated Dr. Boettcher's grant despite his team having completed all Budget Period 1 milestones, meeting the Go/No-Go criterion, and publishing in the top-tier journal Science. Boettcher Decl. ¶¶ 12-14, 28. DOE provided no project-specific explanation for the termination, and did not identify any performance deficiency. *Id.* ¶¶ 18-19, 34. Dr. Boettcher has *nine* research team members who were directly harmed by the termination. *Id.* ¶¶ 22-27. He is willing to serve as a class representative and has no conflicts that prevent him from doing so. *Id.* ¶¶ 37-38. Accordingly, the Court should exercise its discretion and allow Dr. Boettcher to serve as a class representative for the Department of Energy Class.

Should the Court have any concerns with Dr. Boettcher's participation as named plaintiff, however, this does not materially affect Plaintiffs' case: Drs. Atanassov and Bedsworth are typical of and adequate to represent the Department of Energy Class, and Dr. Boettcher's declaration remains valid evidence even if he participates only as an absent class member.

## CONCLUSION

For the reasons stated above, remedying the injustice that DOE has inflicted upon Plaintiffs and the Department of Energy Class requires the grant of summary judgment, and issuance of classwide relief.



Dated: September 18, 2026 By: ______________________________

Claudia Polsky (State Bar No. 185505)
cpolsky@law.berkeley.edu
U.C. BERKELEY SCHOOL OF LAW
Law Building
Berkeley, CA 94720-7200
Telephone: 510.642.6483

Dated: September 18, 2026

By: */s/ Erwin Chemerinsky*

Erwin Chemerinsky (*pro hac vice*)
echemerinsky@law.berkeley.edu
U.C. BERKELEY SCHOOL OF LAW
Law Building
Berkeley, CA 94720-7200
Telephone: 510.642.6483

Dated: September 18, 2026

By: */s/ Elizabeth J. Cabraser*

Elizabeth J. Cabraser (CA Bar No. 83151)
ecabraser@lchb.com
Richard M. Heimann (CA Bar No. 63607)
rheimann@lchb.com
Kevin R. Budner (CA Bar No. 287271)
kbudner@lchb.com
Annie M. Wanless
awanless@lchb.com (CA Bar No. 339635)
Clare D. Perez
cdperez@lchb.com (CA Bar No. 363027)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000

Dated: September 18, 2026

By: */s/ Anthony P. Schoenberg*

Anthony P. Schoenberg (CA Bar No. 203714)
tschoenberg@fbm.com
Linda S. Gilleran (CA Bar No. 307107)
lgilleran@fbm.com
Dylan M. Silva (CA Bar No. 306363)
dsilva@fbm.com
Kyle A. McLorg (CA Bar No. 332136)
kmclorg@fbm.com
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, CA 94104
Telephone: 415.954.4400

*Attorneys for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on September 18, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to registered parties.

Executed September 18, 2026, at San Francisco, California.

*/s/ Anthony P. Schoenberg*

Anthony P. Schoenberg