Erwin Chemerinsky (admitted *pro hac vice*)
echemerinsky@law.berkeley.edu
Claudia Polsky (State Bar No. 185505)
cpolsky@law.berkeley.edu
U.C. BERKELEY SCHOOL OF LAW
Law Building
Berkeley, CA 94720-7200
Telephone: (510) 642-6483

Elizabeth J. Cabraser (State Bar No. 83151)
ecabraser@lchb.com
Richard M. Heimann (State Bar No. 63607)
rheimann@lchb.com
Kevin R. Budner (State Bar No. 287271)
kbudner@lchb.com
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000

Anthony P. Schoenberg (State Bar No. 203714)
tschoenberg@fbm.com
Linda S. Gilleran (State Bar No. 307107)
lgilleran@fbm.com
Kyle A. McLorg (State Bar No. 332136)
kmclorg@fbm.com
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, California 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

NEETA THAKUR, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, et al.,

Defendants.

Case No. 3:25-cv-04737-RL

**PLAINTIFFS' SUPPLEMENTAL BRIEFING IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Judge: The Honorable Rita F. Lin

Hearing Date: November 17, 2026
Hearing Time: 1:30 PM
Courtroom: 4 – 17th Floor

46686\21429964.1

# TABLE OF CONTENTS


INTRODUCTION....1

ARGUMENT....2

I. IN TERMINATING GRANTS FOR PARTISAN POLITICAL REASONS, DOE FLOUTED CONGRESS'S INTENT THAT THE GRANT MONIES AT ISSUE BE DISBURSED FOR SPECIFIED PURPOSES....2

II. TERMINATING GRANTS TO OBTAIN LEVERAGE OVER AN OPPOSING POLITICAL PARTY IS AN ILLEGITIMATE USE OF DOE'S POWER....5

III. THE GROUP OF "BLUE STATE" GRANTS AND THE GROUP OF "NON-BLUE STATE" GRANTS THAT DOE INITIALLY PROPOSED FOR TERMINATION WERE INDISTINGUISHABLE. FURTHER, DOE DID NOT "FIRST" TERMINATE BLUE STATE GRANTS; IT TERMINATED *ONLY* BLUE STATE GRANTS. IT HAS ALSO CONFIRMED UNDER OATH THAT NO MORE TERMINATIONS ARE COMING....8

CONCLUSION....10

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Agua Caliente Tribe of Cupeno Indians of Pala Rsrv. v. Sweeney*, 932 F.3d 1207 (9th Cir. 2019) ..... 6

*Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337 (9th Cir. 1995) ..... 5

*City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290 (2013) ..... 2

*D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231 (D.C. Cir. 1971) ..... 6

*Earth Island Inst. v. Hogarth*, 494 F.3d 757 (9th Cir. 2007) ..... 7

*Estrella v. Brandt*, 682 F.2d 814 (9th Cir. 1982) ..... 4

*Foster v. City of Indio*, 908 F.3d 1204 (9th Cir. 2018) ..... 4

*Gray v. First Winthrop Corp.*, 989 F.2d 1564 (9th Cir. 1993) ..... 9

*Hampton v. Mow Sun Wong*, 426 U.S. 88 (1976) ..... 5, 6

*Mass. v. EPA*, 549 U.S. 497 (2007) ..... 6, 7

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)) ..... 5

*Ursack Inc. v. Sierra Interagency Black Bear Grp.* 639 F.3d 949 (9th Cir. 2011) ..... 6, 7

*Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483 (1955) ..... 10

## EXECUTIVE ORDERS

Executive Order 14154, *Unleashing American Energ*y (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/unleashing-american-energy/ ..... 3

## OTHER AUTHORITIES

Maeve Allsup, *Scoop: DOE sends a list of 'retained' projects to Congress*, Latitude Media (Apr. 15, 2026), https://www.latitudemedia.com/news/scoop-doe-sends-a-list-of-retained-projects-to-congress/ .......... 9

## INTRODUCTION

The Court is tasked with applying the rational basis standard to assess the legality of the Department of Energy's ("DOE") mass termination of only "Blue State" grants in October 2025. As the Court notes, the Stipulations attest to "a highly unusual situation" in which DOE frankly acknowledges that it terminated billions of dollars in federal research awards "based solely" on certain researchers' performance of grant work in states that voted for the President's opponent in the 2024 election. Order Requesting Suppl. Briefing at 2 (Oct. 13, 2026), ECF No. 246 ("Order").

In advance of the November 17, 2026 hearing on UC researchers' Equal Protection Claim, the Court posed three supplemental questions for the parties. *Id.* at 2-3. Plaintiffs respond to those questions here. In response to the Court's first question, Congress authorized DOE to consider program-specific factors and goals in making spending decisions, none of which included political leveraging in congressional budget negotiations. As to the second question, an executive agency violates the Equal Protection Clause by acting with an express purpose that is outside the goals that Congress mandated. And with regard to the third, while it is true that the broader group of 624 grants were identically situated, the Court can now definitively conclude that DOE was not "choosing which [] grants to terminate first" by axing only those in Blue States, because the Energy Secretary himself testified under oath in April 2026 that DOE has completed its Portfolio Review Process ("PRP"), and ***will not be terminating any more grants*** flagged for potential termination in the PRP.

As a threshold matter, however, the Court need not even reach these questions because they reflect a premise for which DOE has offered no supporting evidence. Specifically: DOE offers ***no evidence*** that it was actually considering the government shutdown when it terminated the Blue State Grants, and offers ***no evidence*** that it ever planned to terminate the 340 "similarly situated" non-Blue State Grants on the list of 624 grants after its October 2025 "differential treatment" of their Blue State counterparts. Decl. of Kyle McLorg in Supp. of Mot. for Summ. J. ¶ 9, Ex. F at ¶¶ 10, 11 (July 15, 2026), ECF No. 211-6 ("McLorg Decl."). To the contrary: the only evidence before the Court shows that DOE considered only "the political identity of the grant recipient's state" (*id.* ¶ 7), and never terminated the non-Blue State Grants (*id.* ¶ 9). On this

evidentiary record, the Court should reach the only tenable conclusion: that DOE's October 2025 Blue State Grant terminations, "based solely" on the political identity of recipient states, violate Plaintiffs' right to equal protection under the law, and must be overturned.

## ARGUMENT

### I. IN TERMINATING GRANTS FOR PARTISAN POLITICAL REASONS, DOE FLOUTED CONGRESS'S INTENT THAT THE GRANT MONIES AT ISSUE BE DISBURSED FOR SPECIFIED PURPOSES.

The Court's first supplemental question asks what Congress authorized DOE to consider in disbursing specific funds, and how political leveraging with the goal of ending a government shutdown could be within the scope of the statutory goals Congress established. Order at 2. As set forth below, the answer is that Congress set forth project-specific criteria for DOE to consider and did not allow DOE to consider "political leveraging" as a basis for grant termination.

Like all executive agencies, DOE acts pursuant to authority that Congress assigns to it via statute. Where Congress delegates such authority, the agency may act only pursuant to such contours as Congress has specified. *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 297-98 (2013) (executive agency authority is circumscribed by statute because the "power to act … [is] authoritatively prescribed by Congress"). In disbursing the grant funds here at issue, Congress spoke with varying degrees of specificity about the purposes to which monies must be put. For example, as to Dr. Atanassov's grants, Congress made plain that DOE must fund seven hydrogen hubs, and that two must derive hydrogen solely from renewable sources. *See* Mot. for Summ. J. at 15:24-16:9 (July 15, 2026), ECF No. 210. As to Dr. Bedsworth's grant, Congress likewise made plain that DOE must fund Direct Air Capture projects for carbon dioxide removal from the atmosphere. *See id.* at 16:10-19.

In other instances, Congress gave DOE more latitude to fund or decline to fund specific types of projects within delineated areas. But crucially: in no instance did Congress give DOE free rein to make or terminate grants in ways inconsistent with statutory mandates, and inconsistent with the agency's stated priorities. These include, *e.g.*, implementation of the "energy dominance"

agenda directed by Executive Order 14154.[1] Indeed, any (purely hypothetical) carte blanche Congress granted to DOE would appear to run afoul of the nondelegation doctrine (among other legal infirmities).

DOE recently provided Plaintiffs with a spreadsheet containing the statutory authority cited in the funding opportunity announcements for thirteen grants "at issue in this case," for the parties' mutual use in this round of briefing. Suppl. Decl. of Kyle A. McLorg ("Suppl. McLorg Decl.") ¶ 2, Ex. A. The spreadsheet lists ten different statutes. ***Not a single one of these statutes authorizes DOE to employ political leveraging—whether to end a government shutdown, or for other reasons.***

The table attached as Exhibit B to the Supplemental McLorg Declaration demonstrates that the funding for each grant was authorized pursuant to statutory criteria relevant to ***energy-related*** goals: renewable energy development, hydrogen production, removal of carbon dioxide from the atmosphere, and the like. No statute that DOE invokes to justify its grant-termination actions identifies "political leveraging with the goal of ending a government shutdown" as remotely encompassed by the statutory goals Congress tasked DOE to promote. *See id*.

Members of the House Committee on Energy and Commerce who have watched the agency's post-Inauguration conduct with alarm have recently called out the agency on this very basis. In an October 26, 2026 letter to DOE, members of the House minority emphasized that DOE ***has no statutory authority to terminate grants for political reasons***. Representative Frank Pallone, joined by two other ranking members, wrote to Energy Secretary Chris Wright:

> As Democratic leaders of the Committee with legislative and oversight jurisdiction over national energy policy and general management of DOE, ***we have not—and would not—authorize the Secretary of Energy or others at DOE to terminate properly awarded grants for partisan reasons, such as whether a state voted for a particular president or was represented by Senators of a certain party***. And the existence of a partial government shutdown did not somehow provide you with new powers to abuse the grantmaking process for partisan ends.

*See id.* ¶ 4, Ex. C at 2 (emphasis added) (footnote omitted).[2]

---

[1] Executive Order 14154, *Unleashing American Energ*y (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/unleashing-american-energy/.

[2] Available at https://democrats-energycommerce.house.gov/sites/evo-subsites/democrats-energycommerce.house.gov/files/evo-media-document/2026.10.26.doe_.follow-up-letter-to-sec-

Additionally and most importantly, there is no evidence to support the premise that DOE terminated the 283 Blue State grants to "create[e] leverage to end a government shutdown," as argued by DOE and suggested in the Court's supplemental questions. Order at 1 (citing Opp'n to Mot. for Summ. J. at 66 (Aug. 21, 2026), ECF No. 226 ("Opp'n")). Rather, the facts underlying the parties' instant Motions are those memorialized in their Stipulations, which do ***not*** state that DOE terminated Blue State grants to gain leverage during the initial days of the fall 2025 government shutdown. Instead, DOE's signatory counsel stated that the "sole" basis for the agency's grant terminations was "the political identity of the grant recipient's state." McLorg Decl. ¶ 9, Ex. F. This precludes DOE from arguing that any other basis motivated its decisions.

Even accepting *arguendo* that the Stipulations' unstated meaning was that shutdown leverage is downstream of a state's "political identity," at summary judgment, DOE needs to support that theory with actual evidence. "Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid summary judgment." *Estrella v. Brandt*, 682 F.2d 814, 819-20 (9th Cir. 1982). *See also Foster v. City of Indio*, 908 F.3d 1204, 1217-18 (9th Cir. 2018) ("bare *allegation* alone, without any *evidence* in the record," is insufficient) (emphasis in original). Indeed, Plaintiffs' reply surfaced this problem with DOE's argument, noting that "DOE's belated claim that it terminated those grants 'as leverage to end a government shutdown' [was] neither supported by the evidence nor in accord with common sense." Reply in Supp. of Mot. for Summ. J. at 8:13-15 (Sept. 18, 2026), ECF No. 233 at 8 (quoting Opp'n at 49:13-16).

DOE could have responded to that point with citation to ***evidence***; it did not. *See* Reply at 12 (Oct. 9, 2026), ECF No. 245 ("Reply").[3] Without such support, the Court should not accept

---

wright-re-false-testimony-and-court-order.pdf.

[3] Rather than identify actual evidence to support its unsubstantiated claim, DOE points to allegations in Plaintiffs' Complaint, claiming they show that Plaintiffs concede the leverage theory. *See* Reply at 12:3-6 (discussing Pls.' Third Am. Compl. at ¶¶ 612-613 (Nov. 20, 2025), ECF No. 154 ("Third Am. Compl.")). Plaintiffs did no such thing. Rather, they noted that President Trump "threatened to ***retaliate*** against congressional Democrats and their voters" in the event of a government shutdown, which is exactly what the President, the Office of Management and Budget, and DOE did in October 2025. Third Am. Compl. at ¶¶ 612-615. Plaintiffs have been consistent that the terminations were motivated solely by political animus. *See* Mot. for Prelim.

DOE's *post hoc* claim. *See* Pls.' Reply in Supp. of Mot. for Summ. J. at 8:13-23 (Sept. 18, 2026), ECF No. 233; *see also Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 345 (9th Cir. 1995) (at summary judgment, the Court need not draw an unreasonable inference or accept conclusory allegations). Accordingly, irrespective of whether DOE's "shutdown leverage" narrative is true, (1) the agency's shutdown ***conduct*** was unlawful because it deviated from the goals Congress authorized DOE to consider, and (2) the agency's ***legal claim*** must fail, because DOE has not supported it with record evidence.

## II. TERMINATING GRANTS TO OBTAIN LEVERAGE OVER AN OPPOSING POLITICAL PARTY IS AN ILLEGITIMATE USE OF DOE'S POWER.

The Court's second question asks whether an agency's action serves a "legitimate government purpose" when that stated purpose is outside of Congress's goals as expressed in statutes. Order at 2. The answer to this question is, ***No***: canceling already awarded funding to Blue State grantees on a partisan political basis, whether to end a government shutdown or otherwise, is well outside the statutory goals that Congress mandated for DOE, and thus cannot constitute a legitimate government interest.

An unbroken line of cases from the Supreme Court, this Circuit, and beyond makes clear that agencies act beyond the discretion conferred on them by statute where they consider factors uncontemplated by Congress that bear no logical relation to statutory goals. As explained in *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Company*:

> an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

463 U.S. 29, 43 (1983); *see also Hampton v. Mow Sun Wong*, 426 U.S. 88, 116 (1976) (holding

---

Inj. at 2:9-10 (Nov. 24, 2025), ECF No. 156 (DOE's conduct is "the weaponization of executive power for partisan retaliation"); Reply in Supp. of Mot. for Prelim. Inj. at 1:7-9 (Dec. 12, 2025), ECF No. 167 ("The purpose of these terminations . . . was to punish their political opposition in Blue States . . . .").

that even where national interests may be involved, "those interests cannot provide an acceptable rationalization" for an administrative agency where they are too far removed from the agency's stated objectives); *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1247-48 (D.C. Cir. 1971) (holding that if the Secretary of Transportation "took into account 'considerations that Congress could not have intended to make relevant,' his action proceeded from an erroneous premise and his decision cannot stand." (citation omitted)).

Simply put: because Congress is the lawmaking branch, and executive-agency power derives only from the laws Congress enacts and the powers these delegate, there can be no rational relationship between an agency action and a legitimate government interest if the agency invokes a criterion or invents a classification unrelated to congressionally enumerated decision criteria. This principle applies *a fortiori* when that criterion is unconstitutional.

The Ninth Circuit has spoken directly to this issue both generically and in the Equal Protection context specifically. In *Agua Caliente Tribe of Cupeno Indians of Pala Reservation v. Sweeney*, the Indigenous plaintiffs challenged the Department of the Interior's denial of their request to be listed as a federally recognized tribe. 932 F.3d 1207, 1212-13 (9th Cir. 2019). In analyzing the plaintiffs' Administrative Procedure Act and Equal Protection claims related to this denial, the court noted that Equal Protection review of an agency action under the rational basis standard is "similar" to arbitrary-and-capricious review of agency action under the Administrative Procedure Act. *Id.* at 1219 & n.10 (treating the APA and Equal Protection claims "as one claim"). Thus, rational basis review does ***not*** grant federal agencies carte blanche to consider any factors they wish outside of those enumerated by Congress.

Likewise, in *Ursack Inc. v. Sierra Interagency Black Bear Group*, the Ninth Circuit examined whether the National Park Service's withdrawal of conditional approval for plaintiff-manufacturer's bear-resistant containers "was rational (i.e., not arbitrary and capricious)." 639 F.3d 949, 955-56 (9th Cir. 2011). The court treated plaintiff's APA and Equal Protection claims as "folded into" one another. *Id.*; *see also Mass. v. EPA*, 549 U.S. 497, 532-34 (2007) (EPA's refusal to make an endangerment finding regarding greenhouse gas emissions was arbitrary and capricious because it relied on policy judgments (including the agency's concern over scientific

uncertainty), rather than exclusively on the question "whether greenhouse gas emissions contribute to climate change," which was the only statutorily authorized factor).

The Ninth Circuit has also explained that an executive agency acts arbitrarily and capriciously where its decision-making process is influenced by political considerations that contravene a congressional mandate. In *Earth Island Institute v. Hogarth*, environmental groups challenged a finding by the Secretary of Commerce that there was insufficient evidence to show that tuna purse-seine fishing harmed depleted dolphin stocks in the Pacific; had the Secretary found otherwise, this would have triggered changes in the dolphin-safe label standards for tuna. 494 F.3d 757, 760-61 (9th Cir. 2007). The Secretary's finding regarding harm to dolphins for purse-seine tuna fishing was required by statute to be based on specific "scientific studies," but the district court found that it was instead "improperly influenced by political concerns." *Id*. at 760, 768-69. The court explained that "political concerns [are] 'within Congress's bailiwick.'" *Id.* at 768 (citation omitted). It thus held that "if the agency's decision was in any material way influenced by political concerns it should not be upheld" because "Congress's clear intent was to have the findings be based on science alone." *Id*.

The holding in *Earth Island* is directly applicable here. As set forth above, Congress's intent (as expressed in the statutes provided by DOE itself) was for the terminated funding to be allocated based on program-specific, energy-relevant criteria; nowhere in evidence is a legislative intention for the funds to be wielded for political leveraging in shutdown fights. Thus, DOE acted in an arbitrary and capricious manner in October 2025 by bringing ***any*** unauthorized "political concerns" into its funding determinations (including but not limited to purported "shutdown leverage"), just as the Secretary in *Earth Island* did in his finding regarding tuna fishing. And because "the only question is whether [DOE's] treatment of [Plaintiffs' grants] was rational (*i.e.*, not arbitrary and capricious)," that arbitrary and capricious analysis "can be folded into" the Equal Protection analysis here, enabling the Court to conclude that DOE's agency action was not rationally related to any legitimate government interest. *Ursack Inc.*, 639 F.3d at 955.

### III. THE GROUP OF "BLUE STATE" GRANTS AND THE GROUP OF "NON-BLUE STATE" GRANTS THAT DOE INITIALLY PROPOSED FOR TERMINATION WERE INDISTINGUISHABLE. FURTHER, DOE DID NOT "FIRST" TERMINATE BLUE STATE GRANTS; IT TERMINATED *ONLY* BLUE STATE GRANTS. IT HAS ALSO CONFIRMED UNDER OATH THAT NO MORE TERMINATIONS ARE COMING.

The Court's third and final question asks if "all 624 grants [were] identically situated for the purposes of DOE's legitimate agency priorities, and if so, does that mean that DOE needed no additional reason for choosing which of those grants to terminate first." Order at 3.

As to the first half of the question, the answer is: ***Yes***, all 624 grants were in relevant respects alike. This fact is undisputed, insofar as DOE has already stipulated that "[t]erminating Blue State grants in October 2025 while not terminating ***similarly situated*** non-Blue State Grants was not part of DOE's PRP Charter," because, among other reasons, "DOE's program offices had proposed to terminate ***similarly situated*** Blue State and non-Blue State grants." McLorg Decl. ¶ 9, Ex. F at ¶ 11 (emphasis added).

And DOE has already stipulated that "the differential treatment resulting in the October 2025 termination of Blue State grants and the non-termination of non-Blue State grants ***was not based on*** a rational connection between the recipient's location and/or place of performance and ***DOE's past or current agency priorities***." *Id*. ¶ 10 (emphasis added). Thus, DOE admits that the 624 grants were functionally equivalent, and that it terminated 283 of them based solely on the political identity of the state where grant-funded work was performed.

The second subpart of the Court's question—whether DOE need not consider any "additional reason for choosing which of those grants to terminate first"—rests upon DOE's disingenuous implication that this was simply a matter of ordering, with more terminations from the 624-grant list to follow the Blue State terminations. *See* Opp'n at 64-66. Once again, there is no evidence in the record supporting the notion that the remaining 340 non-Blue State Grants will be terminated, and the Court can now definitively conclude that they will ***not*** be.

As explained in the Stipulations, and as DOE has relied on in briefing this point: both Blue State and non-Blue State Grants on the original list of 624 grants were placed there through the Portfolio Review Process (which was in turn undertaken pursuant to the DOE Secretary's policy

memorandum, "Ensuring Responsibility for Financial Assistance"). McLorg Decl. ¶ 9, Ex. F at ¶¶ 1-2. On April 15, 2026, Secretary Wright testified to Congress under oath that the PRP Committee's review of these grants had "finally come to a completion," and that the Committee has "finished that effort." *See* Suppl. McLorg Decl. ¶ 5, Ex. D at 12 (transcript of testimony).[4] Simultaneously, DOE sent to Congress a list of nearly 2,000 awards that it planned ***to retain or to modify*** (not: ***to terminate***) as a result of the PRP that Secretary Wright announced had "come to a completion." *Id.* ¶ 6, Ex. E.[5] In letters dated one day prior to Secretary Wright's testimony (*i.e.*, April 14, 2026), DOE informed those award grantees that it had "implemented a Portfolio Review Process" and "determined to retain [their] award." *See, e.g.*, Suppl. McLorg Decl. ¶ 7, Ex. F (exemplar letter).[6]

Thus, this is not a situation where the Blue State Grants were simply those that DOE decided "to terminate first" (Order at 3) in order to—as DOE now claims—"[undertake] reform . . . one step at a time" (Reply at 1:21-24 (quoting *Gray v. First Winthrop Corp.*, 989 F.2d 1564, 1573 (9th Cir. 1993))). Instead: There was never,[7] and now will never be, a second set of terminations, as confirmed in the Energy Secretary's sworn testimony that the PRP has "come to a completion." Suppl. McLorg Decl. ¶ 5, Ex. D. Nor has DOE ever actually argued (let alone, provided evidence) that it will be terminating non-Blue State counterpart awards in the future. Instead: DOE's briefing has merely cited case law for the abstract proposition that "one step at a time" implementation ***might be permissible***. *See* Opp'n at 48-49 (legal arguments only); Reply at 1, 9-10. In fact, the agency appears to concede in its reply brief that it did not intend to terminate

---

[4] Video of Secretary Wright's testimony is also available online at https://democrats-appropriations.house.gov/events/hearings/budget-hearing-department-energy.

[5] *See also* Maeve Allsup, *Scoop: DOE sends a list of 'retained' projects to Congress*, Latitude Media (Apr. 15, 2026), https://www.latitudemedia.com/news/scoop-doe-sends-a-list-of-retained-projects-to-congress/ (linking to list that DOE sent to Congress).

[6] Recipient information is redacted from this letter to protect the grantees' identity.

[7] Once again, it is undisputed that DOE ***never*** terminated non-Blue State Grants on that list, nor manifested an intention to do so. *See* McLorg Decl. ¶ 9, Ex. F at ¶¶ 4-10 ("[t]he remaining approximately 340 grants proposed for termination were not terminated in October 2025, and they have not since been terminated.").

the non-Blue State Grants, in pressing the argument that it may "select one phase" and "neglect[] the others." *Id.* at 10:2-5 (quoting *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955)).[8]

Accordingly, the second subpart of the Court's question can only be answered as follows: DOE must provide ***some additional*** basis for terminating the 283 Blue State Grants, and this must be grounded in congressionally permitted criteria; fidelity to funding already-conferred grant awards cannot be "based solely on the political identity of the grant recipient's state." McLorg Decl. ¶ 9, Ex. F at ¶ 9. More generally and more crucially: It cannot be the law that, as long as an agency at one point "proposed to terminate" a set of grants, a subset of those can then be terminated "based solely" on political animus, where the grantor openly admits that its grant terminations "[were] not based on a rational connection" to "past or current agency priorities." *Id.* ¶ 10.

## CONCLUSION

Answers to the Court's three questions about application of the rational basis standard to case facts point to a single conclusion: DOE's October 2025 Blue State Grant terminations were unconstitutional. They were done without regard to DOE's congressionally delegated authority. They were done without a rational connection to any actual agency priority. And they were done without any intention of terminating the remaining non-Blue State Grants because, of course, the decision to terminate the Blue State Grants was *ab initio* "based solely" on their political identity. Plaintiffs thus respectfully request that the Court grant summary judgment in their favor on their Equal Protection Claim.

[8] The decision in *Williamson* centered around a law that subjected opticians to a regulatory system while exempting sellers of ready-to-wear glasses. 348 U.S. at 488. The doctrine relied on by DOE here, that the government may "select one phase" while "neglecting the others," is about giving legislatures leeway to pass laws addressing some problems without needing to address every conceivable problem lest they face an Equal Protection challenge. *Id.* at 489. When the Supreme Court referred to "[e]vils in the same field," it was referring to this concern, not to Democratic and Republican voters, and DOE's admitted discrimination against the former in terminating these grants is "the invidious discrimination" that the *Williamson* court held the Equal Protection Clause is intended to prevent. *Id.*

Dated: October 27, 2026

By: ______________________________

Anthony P. Schoenberg (CA Bar No. 203714)
tschoenberg@fbm.com
Linda S. Gilleran (CA Bar No. 307107)
lgilleran@fbm.com
Dylan M. Silva (CA Bar No. 306363)
dsilva@fbm.com
Kyle A. McLorg (CA Bar No. 332136)
kmclorg@kbm.com
Katherine T. Balkoski (CA Bar No. 353366)
kbalkoski@fbm.com
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, CA 94104
Telephone: 415. 954.4400

By: ______________________________

Claudia Polsky (CA Bar No. 185505)
cpolsky@law.berkeley.edu
Erwin Chemerinsky (*pro hac vice*)
echemerinsky@law.berkeley.edu
U.C. BERKELEY SCHOOL OF LAW
Law Building
Berkeley, CA 94720-7200
Telephone: 510.642.6483

By: /s/ Elizabeth J. Cabraser

Elizabeth J. Cabraser (CA Bar No. 83151)
ecabraser@lchb.com
Richard M. Heimann (CA Bar No. 63607)
rheimann@lchb.com
Kevin R. Budner (CA Bar No. 287271)
kbudner@lchb.com
Annie M. Wanless (CA Bar No. 339635)
awanless@lchb.com
Clare D. Perez (CA Bar No. 363027)
cdperez@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000

*Attorneys for Plaintiffs and the Proposed Class*