BRETT A. SHUMATE
Assistant Attorney General
Civil Division
JOSEPH E. BORSON
Assistant Branch Director
KATHRYN BARRAGAN (D.C. Bar No. 90026294)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 598-7696
Email: kathryn.e.barragan@usdoj.gov

*Attorneys for United States*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| NEETA THAKUR, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 25-cv-4737-RFL<br><br>**DEFENDANTS' OPENING SUPPLEMENTAL BRIEF**<br><br>Hearing Date: November 17, 2026<br>Time: 1:30 PM<br>Judge: Hon. Rita F. Lin<br>Place: San Francisco Courthouse<br>Courtroom 4 – 17th Floor |

## INTRODUCTION

The Court's October 13, 2026 Order requesting supplemental briefing states that "[the Department of Energy ("DOE")] admits that it developed a list of 624 grants deemed appropriate for termination pursuant to its agency priorities, and then selected 284 grants from that list to terminate solely based on whether the grant recipient's location or place of performance was in a 'Blue State.'" This is mistaken.

With the change of Administration in January 2025, current DOE leadership inherited a legacy of "green energy" loans and financial assistance awards that had yielded a series of Office of Inspector General ("OIG") and Government Accountability Office ("GAO") reports between 2012 to 2022,[1] as well as an active portfolio consisting of nearly $100 billion in "green energy" loans and awards that were doled out between Election Day and Inauguration in an operating environment that DOE's Inspector General had repeatedly determined to lack adequate compliance controls.[2]

Accordingly, DOE created a Portfolio Review Process ("PRP") that tasked program offices with reviewing their portfolios against specified criteria, including 2 C.F.R. § 200.340(a)(4). Between May and September 2025, DOE's program offices reviewed more than 2,300 financial assistance awards, rendering decisions to terminate 624 awards, modify 24 awards, and retain 1,685 awards.  None of these assessments or decisions were based on an award recipient's location or place of performance.

DOE conducted individualized reviews of each award and determined that every one of the 624 grants was no longer consistent with the Administration's goals, policies, and priorities or otherwise failed to advance current Departmental priorities. *See* Decl. of Kyle McLorg ("McLorg Decl."), ¶ 9, Ex. F at 5, Stip. Nos 1–3, 11. DOE's Portfolio Review Process ("PRP") tasked program offices with reviewing their portfolios against specified criteria, including 2 C.F.R. § 200.340(a)(4). Between May and September 2025, DOE's program offices reviewed more than 2,300 financial assistance awards, rendering decisions to terminate 624 awards, modify 24 awards, and retain 1,685 awards. None of these assessments or decisions were based on an award recipient's location or place of performance. Consistent with its

---

1 *See, e.g.,* Special Report on Prospective Consideration for Clean Energy Demonstration Projects (DOE-OIG-22-39 August 2022).

2 *See, e.g.,* Special Report on Prospective Consideration for Clean Energy Demonstration Projects (DOE-OIG-22-39 August 2022).

obligation to clear its funding decisions with the Office of Management and Budget ("OMB"), DOE provided OMB with a spreadsheet listing these decisions on September 26, 2025. In October 2025, OMB identified 284 specific grants on the aforementioned lists for inclusion in a tranche of termination notices. McLorg Decl., ¶ 9, Ex. F at 5, Stip No. 4. DOE proceeded to notify the grantees identified by OMB that their award had been terminated.

Thus, DOE did not "select" these 284 grants for termination based solely on whether the grant recipient's location or place of performance was in a "Blue State." Nor were any of the more than 2,300 PRP assessments or 284 termination decisions based on political geography. These distinctions are critical to the central issue the Court has been asked to decide, namely whether the Executive Branch is constitutionally or statutorily prohibited from taking initial action on a subset of broader apolitical decisions as part of a politically calculated effort to resolve an ongoing dispute with the Legislative Branch regarding its refusal to fund the continued operation of federal agencies.

## DISCUSSION

### 1. What did Congress authorize DOE to consider in dispersing these specific funds? How is political leveraging with the goal of ending a government shutdown within the scope of the statutory goals that Congress mandated for DOE?

The Department of Energy ("DOE")'s organic statute expressly contemplates that DOE would serve as a centralized executive branch agency responsible for "effective management of energy functions of the Federal Government[.]" 42 U.S.C. § 7112(2). Consistent with that role, Congress expansively authorized DOE to "carry out the planning, coordination, support, and management of a balanced and comprehensive energy research and development program" including by "assessing the requirements for energy research and development" and "developing priorities necessary to meet those requirements." *Id.* § 7112(5).

Congress further vested broad administrative authority in the Secretary of Energy, whom it designated as the head of DOE. *See id.* §§ 7131, 7254. The Secretary is authorized "to prescribe such procedural and administrative rules and regulations as he may deem necessary or appropriate to administer and manage the functions now or hereafter vested in him." *Id.* § 7254. Congress likewise empowered the Secretary to enter into contracts "as he may deem to be necessary or appropriate to carry out [the] functions

now or hereafter vested in the Secretary." *Id.* § 7256(a). Together, these provisions reflect Congress's intent to afford DOE substantial discretion to determine how best to administer its programs and carry out its statutory mission of supporting energy research and development.

The statutes authorizing the grant programs at issue here similarly confer broad discretion on DOE in administering those programs. The statutes make clear that DOE is not required to fund all eligible projects or treat every project identically. For example, the statute authorizing the research grant affiliated with named Plaintiff Bedsworth delineates criteria for DOE to consider in carrying out its grant program, but notes that DOE "may take into consideration other criteria that, in the judgment of the Secretary, are necessary or appropriate to carry out this subsection." *Id.* § 16298d(j)(3)(C)(vii); *see also* Decl. of Louise Bedsworth in Supp. of Pls.' Mot., ¶ 2–3, ECF No. 214. The statue authorizing the California Hydrogen Hub grant is similarly permissive: it states DOE "may" award grants that "accelerate commercialization of, and demonstrate the production, processing, delivery, storage, and end-use of, clean hydrogen." 42 U.S.C. § 16161a(c)(4). Neither statute mandates the funding of particular projects, nor does either constrain DOE's ability to reassess whether previously awarded grants continue to advance agency objectives.

DOE's discretionary authority to make termination decisions is reinforced by governing grant regulations and principles of sound management. Federal regulations expressly permit agencies to terminate awards where the award "no longer effectuates the program goals or agency priorities," provided the termination is consistent with the terms and conditions of the award. *See* 2 C.F.R. § 200.340(a)(4). Thus, DOE's reassessment of whether particular grants further current agency objectives falls within its discretion.

These authorities accord with the Supreme Court's decision in *Lincoln v. Vigil*, which confirms the breadth of an agency's discretion to administer competitive grant programs. 508 U.S. 182, 185 (1993). In *Lincoln*, the Supreme Court held an agency's termination of a grant program serving Native American children in the Southwestern United States and reallocation of funds to a new nationwide program was committed to agency discretion by law under 5 U.S.C. § 701(a)(2), and therefore not subject to judicial review. *Id.* at 184. The Court recognized the agency's funding decision was consistent with the governing

statutory objectives, even though it altered the geographic distribution of benefits and discontinued support for a subset of existing recipients. *Id.* at 192–193. The same principle applies here. DOE's decision to terminate certain grants because they no longer aligned with agency priorities does not conflict with any statutory directive, nor does the termination of a subset of awards conflict with any objective Congress identified for DOE's administration of its grant programs. In short, Congress gave DOE the power to determine what does—and does not—support energy research and development, and DOE's views that certain projects no longer accomplish that goal are in the heartland of its statutory authority.

Nor was DOE prohibited from considering broader executive branch priorities in exercising its discretion. Although Congress identified several purposes and objectives for DOE, the relevant statutes do not establish an exhaustive list of considerations that may inform the Department's administration of its programs. *See* 42 U.S.C. § 7112. To the contrary, Congress has repeatedly authorized DOE and the Secretary to take actions deemed "necessary or appropriate" to carry out the Department's functions. *See*, *e.g.*, *id.* §§ 7254, 16161a, 16298d. That language reflects Congress's expectation that DOE would exercise policy judgment in administering programs and balancing competing governmental interests.

Accordingly, DOE was not limited to considering only the specific programmatic factors expressly enumerated in individual grant statutes. So long as the Department's actions remain consistent with its statutory mission, it can properly account for other and broader governmental objectives. That is certainly true generally—it has long been true that agencies may also factor in political considerations, so long as they otherwise consider relevant factors. *See* Cross Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J. and for Class Certification at 48, ECF No. 226 ("Defs.' Mot.") (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 59 (1983) ("A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations.") (Rehnquist, J., concurring in part and dissenting in part) (cited favorably in *Biden v. Texas*, 597 U.S. 785, 812 (2022))).

Political considerations, such as leveraging agency resources to support efforts aimed at avoiding or ending a government shutdown, do not conflict with DOE's statutory purposes. It is akin to political horse-trading, where agencies factor in political considerations in support of broader programmatic goals.

*See*, *e.g.*, *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 12 (1982) (holding that the use of political party to determine appointments did not violate equal protection); *cf. Rucho v. Common Cause*, 588 U.S. 684, 701 (2019) (explaining that political partisanship can be taken into account when drawing congressional districts without violating the Equal Protection Clause). Moreover, the Ninth Circuit has upheld classifications adopted where they were deemed "necessary to remedy the severe financial problems" facing a governmental program. *Ernzen v. United States*, 875 F.2d 228, 231 (9th Cir. 1989). If anything, preventing a shutdown advances DOE's purposes by ensuring the continuity of DOE operations and reducing the risk of disruptions to the programs and activities Congress directed DOE to administer.

**2. Does an agency's action serve a "legitimate government purpose" when the stated purpose is outside of the agency's statutory goals as mandated by Congress? Put another way, how is an agency's classification rationally related to a legitimate government interest if the agency's classification is not based in any way on the considerations that the agency is permitted to use in its decisionmaking? *See Ursack Inc. v. Sierra Interagency Black Bear Grp.*, 639 F.3d 949, 955–56 (9th Cir. 2011) (describing the equal protection analysis as examining whether an agency's treatment of the plaintiff "was rational (i.e., not arbitrary and capricious)[,]" which in turn required examining whether "the agency relied on improper factors," among other things (citation omitted)); *see also Agua Caliente Tribe of Cupeño Indians of Pala Rsrv. v. Sweeney*, 932 F.3d 1207, 1219 n.10 (9th Cir. 2019) (noting that a rational basis review of agency action is "similar" to an arbitrary and capricious review).**

As an initial matter, the standard for Plaintiffs' equal protection claims is not interchangeable with an Administrative Procedure Act ("APA") arbitrary and capricious standard. Although the Ninth Circuit has observed similarities between rational basis review and arbitrary and capricious review of agency action, the Ninth Circuit nevertheless analyzed both claims separately, and first concluded that the challenged agency action survived arbitrary and capricious review before determining that it also satisfied the less demanding rational basis review. *See Ursack*, *Inc.*, 639 F.3d at 958 (upholding agency action under the APA and then concluding that the same action survived rational basis review); *see also Sweeney*, 932 F.3d at 1219 n.10 (noting that plaintiff had framed the claim as an equal protection challenge in the district court but presented it on appeal as an APA claim, while upholding the action under either approach).

Rational basis review is a less demanding standard of review. Rational basis review asks only whether a governmental classification is rationally related to *any* rational government objective. *See*

*Trump v. Hawaii*, 585 U.S. 667, 705 (2018). Moreover, "[r]ational-basis review affords the policy choices of the political branches 'a strong presumption of validity.'" *Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 395 (D.C. Cir. 2022) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993)).

By contrast, under the arbitrary and capricious standard, a court may set aside agency action where the agency relied on factors which Congress had not intended it to consider. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Insurance Co.*, 463 U.S. 29 (1983). Moreover, under rational basis review, courts may uphold governmental action based on justifications never articulated by the decisionmaker itself. *See Olson v. California*, 104 F.4th 66, 78 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 382 (2024). By contrast, under arbitrary and capricious review, agencies must provide reasoned explanations, and courts may not supply or imagine justifications on the agency's behalf. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). This stands in sharp contrast to rational basis review, where courts must uphold government action based on "some conceivable legitimate purpose," reflecting a far more deferential treatment. *Olson*, 104 F.4th at 78 .

The Supreme Court rejected the contention that these standards are equivalent. In *State Farm*, the government argued that the arbitrary and capricious review required no more than minimum rationality necessary to satisfy constitutional review. The Court disagreed, stating "[w]e do not view as equivalent the presumption of constitutionality afforded legislation drafted by Congress and the presumption of regularity afforded an agency in fulfilling its statutory mandate." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 n.9; *see also* David M. Driesen, *Judicial Review of Executive Orders' Rationality*, Boston Univ. L. Rev. (2018) (noting that "[t]he courts, however, have made the arbitrary and capricious standard much more demanding than the rational basis test").

The Supreme Court has also found that an agency action may fail APA review while nonetheless passing constitutional scrutiny. In *Department of Homeland Security v. Regents of the University of California*, the Court held the rescission of Deferred Action for Childhood Arrivals ("DACA") was arbitrary and capricious for a failure to consider certain statutory factors, while rejecting an equal protection challenge to the same action. 591 U.S. 1 (2020). Similarly, in *Department of Commerce v. New*

*York*, 588 U.S. 752 (2019), the Court sustained an APA challenge based on pretextual agency reasoning while leaving undisturbed the dismissal of the plaintiffs' equal protection claim. The Ninth Circuit likewise has recognized that the existence of a rational basis for government action does not foreclose a finding that agency decisionmaking was arbitrary and capricious. *See Rangel-Zuazo v. Holder*, 678 F.3d 967, 969 (9th Cir. 2012) (rejecting equal-protection challenge while setting aside another aspect of the agency action under the APA).

An agency's action may serve a "legitimate government purpose" under rational basis review even where that purpose is not enumerated in an agency's specific statutory goals. Rather, the relevant inquiry is whether the action could be supported by *any* legitimate government purpose. Indeed, if legitimate government purposes were limited to an agency's statutory goals, many routine actions by federal and state governments would be vulnerable to constitutional challenge. Courts routinely sustain agency actions advancing broader governmental goals, even where those goals are distinct from the specific statutory purpose of the program at issue. For instance, California courts have rejected an Equal Protection challenge to a statute suspending driver's licenses for individuals who failed to pay child support, notwithstanding that the statute's goal was not related to the traditional rationale for driver's license regulations, namely safe operation of motor vehicles. *Tolces v. Trask*, 76 Cal. App. 4th 285, 289 (1999). Likewise, in *Lyng v. International Union, United Automobile, Aerospace & Agricultural Implement Workers of America*, *UAW*, the Supreme Court rejected an equal protection challenge to the exclusion of certain striking workers from food stamp eligibility even though Congress's objective in creating that exclusion was unrelated to the purposes of the food stamp program itself. 485 U.S. 360, 370–371 (1988). Thus, rational basis review does not ask whether the government acted solely to advance the immediate objectives of a particular statutory program; it asks only whether the challenged action is rationally related to a legitimate governmental goal.

Collapsing the two standards would effectively transform a challenge to DOE's administration and termination of federal awards under the APA into a constitutional challenge. The Ninth Circuit recently reiterated that APA claims whose substance turns on whether the government properly terminated a contract for failure to consider factors relevant to the contract and the statutes authorizing the contract

belong in the Court of Federal Claims. *See Thakur v. Trump*, 176 F.4th 1187, 1197-98 (9th Cir. 2026); *Petition for Certiorari Filed* (No. 26-210), *Petition for Certiorari Docketed by* U.S. Aug. 19, 2026, (No. 26-210); *see also Megapulse*, *Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).

Here, there was a rational basis for termination: DOE determined based on a review of more than 2300 grants, that certain grants did not effectuate the policy goals of the Department, *consistent* with the Congressional statutes identified above, and should be terminated. *See* McLorg Decl., ¶ 9, Ex. F at 5, Stip. Nos 1–3, 11. There was also a rational basis for OMB's identification of a subset of those grants, and DOE's transmission of an initial tranche of termination notices in October 2025: political leveraging to prevent or end a government shutdown. *See, e.g.*, *Am. Bus Ass'n v. Rogoff*, 649 F.3d 734, 741–42 (D.C. Cir. 2011).

**3. Were all 624 grants identically situated for the purposes of DOE's legitimate agency priorities, and if so, does that mean that DOE needed no additional reason for choosing which of those grants to terminate first?**

For purposes of this litigation, all 624 grants identified through DOE's review process were similarly situated with respect to the Department's policy objectives. DOE conducted individualized reviews of each award and determined that every one of the 624 grants was no longer consistent with the Administration's goals, policies, and priorities or otherwise failed to advance current Departmental priorities. *See* McLorg Decl. ¶ 9, Ex. F at 5, Stip Nos. 1–3, 11. In other words, DOE concluded that each of the 624 awards was eligible for termination on the same rational basis.

That rational basis alone is sufficient to support the government action here. Rational basis review requires only a rational reason for the challenged action, and DOE indisputably had one for the terminated grants: after individualized review, it determined that each terminated award no longer advanced agency priorities. The Constitution does not require DOE to identify an additional reason for terminating some grants before others, any more than it requires the government to address every instance of a perceived problem simultaneously.

Even if DOE's rational basis would have supported the termination of all 624 grants, it does not follow that DOE was constitutionally required to terminate all 624 at once. It is a settled principal of rational basis review that the government need not tailor its actions perfectly to the problem and "may

select one phase of one field and apply a remedy there, neglecting the others." *Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483 489 (1955) (citations omitted). The Ninth Circuit has similarly recognized the government may proceed "one step, or one profession, at a time" without violating equal protection. *Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1053 (9th Cir. 2000) (citation omitted). The principle that piecemeal approach is constitutionally permissible is true "regardless of the probability that the government will ever address the rest of the problem." *Brazil-Breashears v. Bilandic*, 53 F.3d 789, 793 (7th Cir. 1995). A classification therefore does not fail rational-basis review because it "is not made with mathematical nicety or because in practice it results in some inequality." *Heller v. Doe by Doe*, 509 U.S. 312, 321 (1993) (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)).

Then-Judge Kentanji Brown-Jackson's decision in *XP Vehicles*, *Incorporated v. Department of Energy* reinforces this point. 118 F. Supp. 3d 38, 50–53, 76 (D.D.C. 2015). That case involved DOE's decision to award a loan to some applicants while denying plaintiffs' applications. *Id.* The Court assumed for purposes of the motion to dismiss that the granted and denied applications were "equally as meritorious"—i.e., "similarly situated." *Id.* at 76–78. The Court concluded that the agency's actions survived rational basis review "even if Plaintiffs are correct that the real impetus behind the DOE's decision to reject [Plaintiff's] application" involved political considerations. *Id.* at 78. Thus, *XP Vehicles* makes clear that equal protection does not require the government to treat all similarly qualified applicants for funding identically, nor does it require an additional, separate justification for every distinction made among members of a similarly situated class. *Id.* at 76. Accordingly, once DOE had a rational basis for determining that each of the 624 grants no longer advanced agency priorities, DOE was not required to identify a further justification for terminating a subset of those grants.

In any event, even if some additional basis were required for selecting which of the 624 grants to terminate first, political considerations would satisfy that requirement. Rational basis permits reliance on political considerations. *See*, *e.g.*, *Rogoff*, 649 F.3d at 741–42. Moreover, the allocation federal funds based on political or geographical conditions has been a feature of governmental decisionmaking for decades, as longstanding debates over "earmarks" and "pork barrel" spending make clear. *See*, *e.g.*,

Andrew H. Sidman, Pork Barrel Politics: How Government Spending Determines Elections in a Polarized Era (2019); Tyler Cowen, *Congress Needs to Bring Back Earmarks*, Bloomberg (Jan. 9, 2018);[3] Jonathan Allen, *The Case for Earmarks*, Vox (June 30, 2015);[4] Diana Evans, Greasing the Wheels: Using Pork Barrel Projects to Build Majority Coalitions in Congress (2004).

Avoiding or mitigating a fiscal emergency constitutes a legitimate governmental interest. In *Council 31 of the American Federation of State, County & Municipal Employees v. Quinn,* for example, the Seventh Circuit found that "[i]instituting cost-saving measures" during a budgetary crisis was "unquestionably a legitimate governmental interest[.]" 680 F.3d 875, 887 (7th Cir. 2012). Likewise, the Ninth Circuit upheld classifications adopted because they were deemed "necessary to remedy the severe financial problems" facing a governmental program. *Ernzen v. United States*, 875 F.2d 228, 231 (9th Cir. 1989). Thus, efforts to avoid or shorten the effects of a government shutdown fall within the category of legitimate governmental objectives.

Rational basis review does not require anything more. The challenged action need not "actually advance its stated purposes"; it is enough that "the government could have had a legitimate reason for acting as it did." *Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1141 (9th Cir. 2011) (citation omitted); *see also Olson*, 104 F.4th at 78 (The government is not required to "proffer its actual rationale motivating the legislation—or any rationale, for that matter." (citation omitted)). Nor must the government support its decision "by 'evidence or empirical data.'" *Olson*, 104 F.4th at 78 (quoting *Beach Commc'ns*, *Inc.*, 508 U.S. at 315); *see also XP Vehicles*, 118 F. Supp. 3d at 77 ("In traditional equal protection contexts, the subjective motivations of the government actor are not considered."). Because DOE had a conceivable rational basis for terminating the challenged grants, summary judgment should be granted to Defendants on Plaintiffs' equal protection claims.

DATED: October 27, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

[3] https://www.bloomberg.com/view/articles/2018-01-09/congress-needs-to-bring-back-earmarks.

[4] https://www.vox.com/2015/6/30/8864869/earmarks-pork-congress.

Civil Division

JOSEPH E. BORSON
Assistant Branch Director

/s/ Kathryn Barragan

KATHRYN BARRAGAN (D.C. Bar No. 90026294)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 598-7696
Email: kathryn.e.barragan@usdoj.gov

*Attorneys for the United States*